# EXHIBIT 1

1

2

3

4

5                PBS FRONTLINE:   "THE GODS OF GAMBLING"

6                        April 25, 2014

7

      Transcribed from the following link:

8

      http://fora.tv/2014/04/25/sneak_preview_panel_

9

      pbs_frontlines_the_gods_of_gambling

10

11

      LOWELL BERGMAN, U.C. Berkeley, Moderator

12

13

      PANEL:

14

      DAVID BARBOZA, The New York Times

15

      JAMES CHANOS, Kynikos Associates LP

16

      RAYMOND "Shrimp Boy" CHOW

17

      STEVE VICKERS, Vickers & Associates

18

19

20

21

22

23

24

25

PBS Frontline:  The Gods of Gambling

1        MR. BERGMAN:  So we're going to give

2    you a couple of clips tonight of a

3    Frontline documentary that will probably

4    not air towards the end of September, but

5    has been the subject of almost four years

6    of work by the Investigative Reporting

7    Program here at Berkeley.  And so the

8    caution is is that what you're going to

9    see is still in the edit room, literally,

10   and so some of it may change.

11       The panelists are currently sitting

12   so they can watch what's going to happen.

13   And one of the panelists who we had

14   scheduled, who's in your program, Raymond

15   "Shrimp Boy" Chow, unfortunately, the

16   federal government decided to take him

17   off the street a number of weeks ago, but

18   we had already interviewed him for the

19   film.  So you'll also see a clip from our

20   interview with him as well as a clip that

21   introduces one of the other panelists.

22       Those of you who have been to prior

23   symposiums understand that we've done

24   this before when people were unable to

25   appear in person.

PBS Frontline:  The Gods of Gambling

1        Okay.  I just want, as a caution, to
2    say that not only will the track of the
3    clips that you're going to see change,
4    but it, obviously, doesn't represent all
5    of what we're going to show in a ninety-
6    minute film now scheduled, as I said,
7    for, I think, the third week of
8    September.
9        So, Janice, are we ready to show a
10   clip?  Okay.  So we're going to lower the
11   lights and you'll see what may, in fact,
12   be the introduction to a Frontline
13   documentary called "The Gods of
14   Gambling."
15   (Break)
16       MR. BERGMAN:  This is the first of
17   two clips you're going to see.  Our
18   panelists are David Barboza from The New
19   York Times whose been reporting for a
20   long time on corruption in China, Jim
21   Chanos whose hedge fund I can never
22   pronounce the name of because it's in
23   Greek.  And Steve Vickers, and Raymond
24   Chow, who couldn't be with us this
25   evening, but we'll show you a little clip

PBS Frontline:  The Gods of Gambling

1      in a little bit about Raymond and also

2      Steve Vickers.  But I wanted to ask

3      David --

4          MR. BARBOZA:  Um-hum.

5          MR. BERGMAN:  -- you're saying all

6      kinds of underground activities, how is

7      business done in China?

8          MR. BARBOZA:  Well, you know,

9      China's the, obviously, the fastest

10     growing economy in the world and as a I

11     said in the piece, the rule of law is not

12     in place in China yet, and so there's

13     lots of money coming in and lots of shell

14     companies trying to capture some of that

15     money.  So it's sort of partly in the

16     21st, 22nd Century and partly it's the

17     robber baron's era that you're finding in

18     China.

19         I think one of the interesting

20     things for journalism is that journalists

21     now have the tools, even in China, to

22     start to uncover some of this illicit

23     cash and it's probably going to get a lot

24     worse as far as the -- or a lot better,

25     in some ways, as far as the reporting,

PBS Frontline:  The Gods of Gambling

1    because although China is not a very

2    transparent country, there is a great

3    deal of transparency in certain areas of

4    that economy.  And journalists -- Chinese

5    journalists and western journalists are

6    going to start teasing that out.

7        MR. BERGMAN:  And, I think, in the

8    film itself, you'll see some of the

9    Chinese journalists who have actually

10    delved into what's going on and the

11    movement of money.

12        But, Mr. Chanos, you're famous,

13    obviously, for shorting Enron, why are

14    you shorting Macau in China?

15        MR. CHANOS:  Well, first of all, I

16    want to thank you for inviting me and I

17    also want to thank David for the fact

18    that I have to change my Gmail address

19    and password every few weeks for being

20    one of your sources.

21        MR. BERGMAN:  You too?

22        MR. CHANOS:  Yeah.  Amazing.

23        Anyway, the -- we were actually long

24    Macau for a while.  And when we first put

25    our short bet on in China in late '09,

PBS Frontline:   The Gods of Gambling

1   2010 that David wrote about, we were

2   actually long Macau casinos on the

3   thought that I wanted to be long

4   corruption and short property.  And that

5   actually worked out pretty well, but even

6   I got a little nervous the deeper we dug

7   into Macau and the more I got concerned

8   that although I was long, the U.S. casino

9   operators, like Mr. Adelson and Mr. Wynn,

10  I began to really get concerned about the

11  risk I was taking with clients' money

12  under Foreign Corrupt Practices Act and a

13  variety of other, you know, aspects of

14  exactly how business is done there.  And,

15  although, they hide behind the facade of

16  the junket companies, increasingly, from

17  a -- if not across the legal line, to use

18  my friend Bethany McLean's term, it was

19  "legal fraud."

20       While they might be adhering to

21  every aspect of legal requirements in

22  what they were doing, there was still an

23  attempt to mislead and an attempt to

24  obfuscate and I just couldn't get

25  comfortable with that.

PBS Frontline:  The Gods of Gambling

1       So we got out of our Macau casinos
2       and now, I think, more importantly, I
3       think, we're looking at the Macau
4       situation as a conduit for, in effect,
5       wholesale capital flight on China which
6       has implications for the banking system
7       and the credit system there.
8           MR. BERGMAN:  Wholesale capital
9       flight, would you explain that in -- what
10      that means?
11          MR. CHANOS:  Well, I mean, we talked
12      a little bit before this event.  I mean,
13      one of the interesting things, and I
14      think you put it well, was that in a way,
15      as money was flowing -- hot money was
16      flowing into China from investors and
17      speculators, and that was based on,
18      basically, a double-barreled-can't-miss
19      proposition for investors.  You could
20      borrow money in Hong Kong or in Sydney or
21      in Tokyo, wherever the case might be, in
22      dollars or in a dollar-linked currency,
23      buy property, or just simply buy the
24      currency in China, but most like buy
25      something that was appreciating, on the

PBS Frontline:  The Gods of Gambling

1    double-barreled certainty that property

2    prices only go up and the RMB was on a

3    glide path up because the government told

4    you that.

5          MR. BERGMAN:  Um-hum.

6          MR. CHANOS:  And that double-

7    barreled belief, on a leverage basis,

8    brought a lot of hot money, often from

9    Chinese nationals living offshore, back

10   into the country.

11         So while that was happening over the

12   past four or five years, it didn't matter

13   so much that the elites were getting

14   their money out, state-owned enterprise

15   execs, party cadres, whatever.  But

16   there's been a little wrinkle in the

17   ointment, as you know, lately.  Lately,

18   the property market has stopped going up

19   and, God forbid, the RMB, the yuan, has

20   begun to go down.

21         And now, if the capital flight

22   stops -- if the capital flows --

23   speculative flows stop going in, and we

24   still have this money being laundered

25   out, the Chinese currency's going to have

PBS Frontline:  The Gods of Gambling

1    a big, big problem.

2       MR. BERGMAN:  Okay.  So the next

3    question is, which you heard in the clip,

4    is that this all has something to do with

5    Chinese organized crime.  And there's a

6    clip, actually, I can't play, of Mr.

7    Vickers at the moment, which is about

8    organized crime gets involved where

9    there's a vacuum in terms of what the

10   government can and doesn't regulate.  I

11   want to play a little clip that will

12   introduce Mr. Vickers as well as our

13   missing panelist.  So let me run the next

14   clip.

15   (Break)

16      MR. BERGMAN:  Briefly, Steve, what

17   is the Triad role in Macau and China in

18   this movement of money and in the gaming

19   industry?

20      MR. VICKERS:  It's actually quite

21   complex.  Ask yourself -- organized crime

22   anywhere in the world operates in a

23   vacuum created by governments.  So, for

24   example, it's illegal, completely illegal

25   to gamble in China.  There are casino

PBS Frontline:  The Gods of Gambling

1      gambling.  It is totally legal in Macau

2      but it's illegal to move the money from A

3      to B.

4          So once you create an anomaly like

5      that, organized crime in any country in

6      the world will step in and do that.  So

7      one of the Triad's functions is to

8      facilitate the movement of money from the

9      mainland to Macau where it can be gamed

10     and then moved on elsewhere, what kind of

11     people can enforce debts?  The people who

12     can enforce debts, because Macau,

13     remember, is a tiny place, you know,

14     800,000 people, perhaps living there

15     permanently, squillions moving across the

16     border backwards and forwards but --

17         MR. BERGMAN:  Twenty-eight million

18     people visiting every year; 650,000

19     population.

20         MR. VICKERS:  Yeah; it's huge.  But

21     who can reach out and enforce the debts?

22     So, again, you need people who can move

23     the money, enforce the debts, and the

24     rest.  Now, the casinos themselves don't

25     need that.

PBS Frontline:  The Gods of Gambling

1      Once the money reaches the casino

2      legitimately, the casinos can operate

3      legally, but it's the -- it's this gap,

4      this sort of ballistic gap between the

5      two -- the two systems in which the

6      Triads can function.  But it's a lot more

7      complicated than gangsters with knives

8      and stuff.  It's moved onto a combination

9      of politics, national politics,

10     economics, and the rest all at once.  And

11     Macau is the place where the rubber meets

12     the road.

13         The official gaming revenues of

14     Macau are a little south of fifty billion

15     U.S. compared to Vegas which is just over

16     six.

17         The actual revenues are at least six

18     times that because of side-betting that

19     occurs in the casinos.  That might

20     represent six percent of China's GDP, top

21     line revenue going through Macau.  So

22     that's a pretty interesting number.  That

23     excludes completely the soccer betting

24     and the rest that goes on.

25         So the scale of this, in my career,

PBS Frontline:  The Gods of Gambling

1       I've never -- I've never seen before.  I

2       wasn't ever in the Hong Kong Police, by

3       the way; I only worked in the Royal Hong

4       Kong Police.

5              MR. BERGMAN:  Oh, the Royal; sorry.

6              MR. VICKERS:  And there's a big

7       difference.  Okay.  And I would be

8       grateful --

9              MR. BERGMAN:  They're American --

10             MR. VICKERS:  -- if everyone could

11      remember this when the movie comes out,

12      he's going to promise to fix that by the

13      time it comes out.  Okay.

14             MR. BERGMAN:  We'll fix that.

15             MR. VICKERS:  But, I think, at the

16      moment, there's massive changes, the

17      central Chinese government, obviously,

18      have acquiesced to the movement of this

19      much money.  They've not necessarily

20      agreed it, but there's clearly been an

21      acquiescence when it -- it's hard not to

22      notice that much money moving from the

23      mainland through Macau and elsewhere.

24      But I do believe there are changes as it

25      relates to the junkets and our belief,

PBS Frontline:  The Gods of Gambling

1    and its intelligence not evidence, is

2    there's been some form of beauty contest

3    quite recently as to which junkets are

4    approved and which junkets, perhaps,

5    don't have the papal blessing.  And the

6    ones that don't are probably the ones

7    that belong to the past.

8         Just eight to ten years ago, Macau's

9    turnover, you know, was ten percent of

10   what it is now.  Now, this is huge

11   business.  There's no room for broken

12   tooth, ugly -- ugly gangsters; we're now

13   into a -- it's now a completely different

14   situation.

15        And also, China's economic situation

16   has radically changed.  Instead of being

17   frightened of inflation, they're now in a

18   completely different situation.  So the

19   absolute economic rationale for

20   hemorrhaging money on that scale may not

21   exist.  So changes, I think, changes are

22   coming and we're seeing them now.

23        MR. BERGMAN:  Well, I think, we'll

24   come back to some of these things --

25        MR. VICKERS:  Right.

PBS Frontline:  The Gods of Gambling

1          MR. BERGMAN:  -- about junkets and

2     what we have to deal with right now is

3     the limitations of the Santa Rita County

4     Jail where Raymond Chow is on hold.  So

5     can you hear me now?  Okay.

6          So, Raymond, how do the Triads

7     traditionally use casinos and what's the

8     relationship of the Triads in the gaming

9     industry, particularly in Macau?

10         MR. CHOW:  Hello.  Can you hear me?

11         MR. BERGMAN:  Yeah.  We can hear

12     you.

13         MR. CHOW:  Oh.  Can you repeat that

14     question?  I'm having difficulty, you

15     know, in holding the phone hearing the

16     conversation.

17         MR. BERGMAN:  Okay.

18         MR. CHOW:  And can you repeat that

19     question for me, Mr. Lowell --

20         MR. BERGMAN:  Yeah.

21         MR. CHOW:  -- Professor Lowell?

22         MR. BERGMAN:  What's the Triad's

23     traditional relationship to casinos and

24     gambling, particularly in places like

25     Macau?

PBS Frontline:  The Gods of Gambling

1      MR. CHOW:  The traditional

2      relationship to the -- to the casino, you

3      know, just the Triad themselves, you

4      know, back in '80, '90, the year 2000

5      have strong influence to the -- to the

6      casino world.  And any, like, doing with

7      the gambling or entertainment business,

8      and also have the tie to it.  And to the

9      time, you know, and in my time back in

10     '90, the relationship with the casino is

11     pretty tight and in the United States,

12     pretty much, you know, and they supply a

13     lot of -- a lot of cash flow, you know,

14     to, a lot of, you know, people on the

15     street working for me.

16         MR. BERGMAN:  In collecting debts?

17         MR. CHOW:  And that is -- that is in

18     my time.

19         MR. BERGMAN:  Collecting debts?

20     Gambling debts?

21         MR. CHOW:  What's that?

22         MR. BERGMAN:  Collecting gambling

23     debts?

24         MR. CHOW:  Yeah.  I mean, you talk

25     about the gambling debts?

PBS Frontline:  The Gods of Gambling

1          MR. BERGMAN:  Um-hum.  Yeah.

2          MR. CHOW:  Hello?

3          MR. BERGMAN:  Yeah.  Gambling debts.

4          MR. CHOW:  The casino, like, we do a

5      lot of loan sharking and we, I mean,

6      like, we can do a lot of money on that.

7      And also, like, we using a lot of money,

8      like, generating, like, buying, like, a

9      lot of stolen property, everything.  All

10     that is a part of the generating in the

11     casino, the business, and also, a lot of

12     entertainment will be involved with it,

13     you know.  We take the show to the Reno,

14     we take the show to the Vegas; we

15     entertain a lot of our guests back in the

16     day, you know, using the casino and to

17     generating our money.  That is back in

18     the time in the '90s -- no,'80s when

19     time -- '80, '90 at that time.  But now

20     the -- now, the city changed, you know.

21     It's different.

22          It's the casino between the -- in

23     the United States and Hong Kong in the

24     Macau, it's starting, kind of, like,

25     changing the shape to the money pool;

                    PBS Frontline:  The Gods of Gambling

1        everybody get into it.  It's about the

2        money have that traction.  It's not just

3        only the Triad, the business anymore.

4            MR. BERGMAN:  Let me ask you just a

5        historical question and then I'm going to

6        come back to the panel, the Triads were

7        pushed out of China in 1949 when there

8        was a communist revolution.  Why have

9        they been invited back into China?

10           MR. CHOW:  Wait a minute.  Can you

11       repeat that?  I cannot hear you.

12           MR. BERGMAN:  The Triads were pushed

13       out of China by the communists in 1949,

14       but now, we see that they've been invited

15       back into China.  Why did that happen?

16           MR. CHOW:  Well, it's -- we talk

17       about money laundering.  The money

18       actually run the -- I mean, run the games

19       themselves; they're generating on their

20       own.  Whatever money -- whatever people

21       who can throw the money into the pit, the

22       money pit, and who going to call the

23       shots.  And now, in Macau it starting,

24       like, booming and all that, you know,

25       every -- even in Vegas they finance, they

                    PBS Frontline:  The Gods of Gambling

1        want to build their spot over in Macau

2        and it's traction.  And now, it's, a,

3        money laundering.  It's not just only,

4        like, Triad member of the business; it's

5        banker, politician.  Everybody involved

6        with this now.  It's not just -- take

7        two-handed (indiscernible), you know, and

8        money just -- money flow and people --

9        just everybody want to be part of it.

10            MR. BERGMAN:  Steve, you're shaking

11       your head.

12            MR. CHOW:  I guess, no money

13       themselves; they have their own traction.

14            MR. BERGMAN:  Steve?

15            MR. VICKERS:  No, I agree.  I think

16       it's -- things have -- the scale of this

17       money is beyond all belief.  I think the

18       scale of it has shocked everybody.

19            The official revenue, let's say it's

20       fifty billion topline, fifty billion

21       United States dollars, topline, is

22       actually because of the side bettings and

23       the VIP room, at least six times more

24       than that, that has never happened

25       before.  The scale of this is huge.  And

PBS Frontline:  The Gods of Gambling

1      when that much money is involved, then

2      it's not just a business operation or a

3      junket operation that you're involved in,

4      it involves the renminbi.  It involves --

5          MR. BERGMAN:  The Chinese currency.

6          MR. VICKERS:  -- there's a lot of

7      complexities.  So, yeah, once it gets to

8      this scale then you're in a different --

9      you know, you're in a whole different

10     situation.

11         MR. BERGMAN:  The scale has changed?

12         MR. CHANOS:  Much bigger.

13     Imagine -- the analogy I would use is the

14     Vegas of Martin Scorsese's "Casino"

15     versus the Vegas of today that it was --

16     back then, the Chicago and the Cleveland

17     and Milwaukee mob, the Kansas City mob

18     really controlled the skim, the

19     Teamster's Pension Fund financed

20     everything, and it was still controlled

21     by the mob.  And by the 1980's, the scale

22     of Vegas and the growth and the ability

23     of Wall Street to begin to finance the

24     casinos and the corporations to move in

25     changed the scale dramatically where it

PBS Frontline:  The Gods of Gambling

1    just couldn't do it anymore.  And I would

2    say that the analogy might -- it's a

3    little bit of a stretch but, I mean, it's

4    the construct to think about it that way

5    that the size of the money going through

6    this place now is a state -- really,

7    is -- controls the currency of the state.

8       MR. BERGMAN:  Maybe one thing that I

9    would like, Steve, for you to help us

10   with a little bit, because we can't show

11   you the whole documentary, but there was

12   this reference you were making to

13   junkets.

14      MR. VICKERS:  Hum.

15      MR. BERGMAN:  And you may not

16   know -- understand what he's talking

17   about but it's the peculiar part of the

18   Macau business model and what's going on

19   here.  Why -- what would be the role of a

20   Triad-like Shrimp Boy and why are they

21   important in terms of what goes on?

22      MR. VICKERS:  Is he still online?

23      MR. BERGMAN:  Yeah, yeah.  He's --

24      MR. VICKERS:  Okay.  Well, hi.

25      Well, look, I mean, I think it's

                    PBS Frontline:   The Gods of Gambling

1          evolved.   The bottom line remains that

2          because Macau is such a tiny place,

3          there's a vast amount of money in China;

4          somebody needs to, a) move the money, b)

5          find the gamblers, c) extend them credit,

6          d) organize their fun and games when

7          they're in Macau.   So, one, two, three --

8               MR. BERGMAN:   And collect their

9          debts.

10              MR. VICKERS:   -- four; four

11         different things.   And the scale of it, I

12         mean, you've got to also look, I mean, a

13         lot of the analysts pump out really

14         rather interesting statistics.   I've read

15         them all.   I see them quite regularly,

16         and people will say it's yabba dabba do,

17         it will never stop, there's no such thing

18         as gravity, you know, there's only

19         upwards and what could possibly go wrong

20         and other things.   What could possibly go

21         wrong is very simple, is a strategic

22         decision from the central government of

23         China, they've had enough to hemorrhaging

24         and there's much -- they've decided they

25         don't want to hemorrhage that much money

PBS Frontline:  The Gods of Gambling

1      or they've decided that they'd like to

2      exercise control over various junkets.

3      And I'm picking up indications now by

4      various actions that rather than bringing

5      it to an end, because they're goal isn't

6      to kill Macau, but their goal may well be

7      to corral or to channel the junket

8      activities into more controllable -- into

9      more controllable areas.

10          So I think the days of the violent

11      gangsters and the -- have moved on.  This

12      is a political issue involving finance,

13      money, the value of renminbi, corruption

14      crackdowns.  This is where politics,

15      business, and organized crime, the rubber

16      meets the road in Macau.

17          MR. BERGMAN:  And then, David, when

18      we were talking, you were saying there's

19      a business model in Mainland China, it

20      must extend to Macau ---

21          MR. BARBOZA:  Yeah.

22          MR. BERGMAN:  -- or there's some

23      version of it.  What were you talking

24      about?

25          MR. BARBOZA:  Well, Macau is now

PBS Frontline:  The Gods of Gambling

1     part of China, effectively, and so

2     nothing that happens in China happens

3     without the government's approval.  And

4     if a lot of money is coming into any

5     business, the government is going to take

6     a share of that.  You know, the state is

7     still -- it's still a form of state

8     capitalism where the government-owned

9     companies are bigger but even the private

10    entrepreneurs are linked to the

11    government in ways so that they can send

12    some of that money over to, either the

13    officials or their relatives of even the

14    top ranking officials which is why you're

15    seeing this, maybe, massive anti-

16    corruption campaign going on with Xi

17    Jinping now.

18         I think part of it is corruption has

19    gotten so out of control that the party

20    worries that it could cripple the party

21    in the eyes of the public.  And so he's

22    both trying to, you know, wipe out some

23    of his political enemies but also to push

24    down corruption enough so that the

25    economy can function effectively.  And

PBS Frontline:  The Gods of Gambling

1    we'll see whether he's effective at doing

2    that.

3         Usually, the new leaders that come

4    in go after their enemies with anti-

5    corruption campaigns.  We don't yet know

6    is this one different.  And we may not

7    know that for a few years.

8         MR. BERGMAN:  One of the things that

9    struck me in the course of the last

10   number of years of trying to work on this

11   was the reluctance of people, whether

12   it's the media in Hong Kong with some few

13   exceptions, whether it's the financial

14   community or the press --

15        MR. BARBOZA:  Um-hum.

16        MR. BERGMAN:  -- to talk about the

17   realities of doing business in Macau

18   and/or China in general.  Why is that?

19        MR. BARBOZA:  Because everyone's

20   afraid to speak out about China.

21   Everyone has interests in China.

22   Everyone wants to visit China, to do

23   business in China.  And so, you know, I

24   think about when I moved to China nine

25   years ago, I had dealt -- I had worked

PBS Frontline:  The Gods of Gambling

1      for a while covering Wall Street, and the

2      analysts on Wall Street were generally a

3      little reluctant to talk about the

4      companies they covered, you know, with

5      their named used if they had anything

6      negative to say.  Well, that's nothing

7      compared to what happens in China with

8      the same analyst that know -- they can't

9      even say that the economy is weakening

10     without fearing that there may be someone

11     in the government who may come after them

12     or deny them something.  So China's been

13     pretty effective at scaring everyone that

14     if you say anything, if you do anything

15     that you're going to be punished, that

16     you hurt the feelings of the Chinese

17     people.  And so I think it's natural that

18     you'll have difficulty getting people to

19     be interviewed about China and having to

20     deal with these issues about corruption.

21         MR. BERGMAN:  And, Jim Chanos,

22     you -- I mean I know you shorted Enron

23     and that's your -- your claim to fame is

24     to be a contrarian, but was the stark

25     reality of Macau or of China what changed

                    PBS Frontline:  The Gods of Gambling

1          your mind?  You could be making a lot

2          more money if you'd gone the other way.

3               MR. CHANOS:  Well, actually, China's

4          been a pretty good place to be short for

5          the last four years.  It's the only

6          market that's been down.

7               And you have to understand from a

8          financial perspective, if you're being

9          coldly analytical about it, the Chinese

10         stock market is not a market; it's a

11         scheme.  And I was talking a little bit

12         earlier to someone in the row here, I

13         mean, all you need to do is look at the

14         Sina Weibo transaction which occurred a

15         few weeks ago, the Twitter of China.  And

16         in-between the filing of the initial

17         public offering preliminary prospectus

18         under one of the worst pieces of

19         financial legislation I've ever seen, the

20         JOBS Act, to the filing of the final

21         prospectus, in-between that, the senior

22         management of Sina Weibo decided to sell

23         forty-seven percent of their holdings

24         back to the company at a discount to the

25         IPO price and nobody picked up on it.

PBS Frontline:   The Gods of Gambling

1      One outlet in China picked up on it.

2           And so that's why when you look at

3      China from a financial analyst

4      perspective, you just see that much of

5      these companies and the way they've been

6      structured with what we call the -- I

7      don't want to get in the weeds here --

8      but you don't own the assets, you

9      don't -- you have a piece of paper,

10     variable interest entity, where you have

11     an agreement with the company in China

12     that owns the assets that, maybe, they'll

13     make good on the agreement.  And as one

14     businessman said to me, the easiest

15     contract you'll ever sign in your life is

16     with a Chinese company.  You know,

17     they'll sign anything.

18          And so from my perspective, you

19     know, the Chinese market from a Hong Kong

20     and U.S. and Singaporean perspective is

21     almost designed for short sellers because

22     the money that gets raised only goes one

23     way; it only goes into China, it never

24     comes out.

25          And you look at these entities, you

PBS Frontline:  The Gods of Gambling

1    know, it's a marvel; one is worse than

2    the other.  They don't enter their

3    profits in cash, you don't see the money,

4    there's all kind of affiliated

5    transactions, and you have no recourse in

6    terms of corporate governance if anything

7    wrong happens.

8        So, I mean, why wouldn't I be there,

9    I guess, is the answer.

10       MR. BERGMAN:  Well, Steve, how does

11   that -- how is that reflected in what

12   we've seen in Macau and what's going on

13   in Macau?

14       MR. VICKERS:  Well, obviously, Jim's

15   a professional in that area and I would

16   defer to this -- I think, Macau, it just

17   got bigger faster than anybody -- the

18   Chinese government, the Macau government,

19   the Guangdong, it just got bigger then

20   Ben-Hur so quick, so fast, that I think

21   it got completely out of control.  And I

22   think the acquiescence to the currency

23   transfers was also wasn't really planned.

24   There were excuses for it to happen,

25   perhaps, again -- Jim's the economist not

PBS Frontline:  The Gods of Gambling

1    me -- but if you're in an inflationary

2    environment, perhaps blowing off large

3    amounts of steam in terms of capital out

4    of your market might be justifiable.  But

5    right now, China's clearly not in that,

6    sort of, environment.  So justifying 50

7    billion officially and 300 billion or

8    whatever it really is, is clearly not --

9    not sustainable.

10    So we're seeing this huge change

11    happening now in Macau, I firmly believe,

12    and I think you're going to see the

13    Chinese government get a grip over

14    junkets now soon.

15    MR. BERGMAN:  You think they're

16    cracking down now?

17    MR. VICKERS:  They may not be

18    cracking down for U.S. or U.K.-type

19    headsets, it'll be cracking down from

20    a -- a controlling the -- controlling the

21    outflow of money.  It's not morality or

22    which Triad is doing what.

23    MR. CHANOS:  They'll be cracking

24    down after September.

25    MR. VICKERS:  Yeah.

PBS Frontline:  The Gods of Gambling

1           MR. BERGMAN:  After September.

2           MR. CHANOS:  Yeah.  They tend to be

3       a little bit embarrassed when things like

4       David Barboza's pieces run in The New

5       York Times or Frontline shows up.  I

6       mean, these things are important there.

7       They're really are.

8           MR. BERGMAN:  Because of a loss of

9       face or --

10          MR. CHANOS:  Yeah.

11          MR. VICKERS:  But I think

12      financially, it's not -- it would not be

13      sustainable to be hemorrhaging money at

14      the scale at which they're hemorrhaging.

15      I mean, I think it doesn't make economic

16      sense, though, because it doesn't make

17      economic sense.  They will do -- they'll

18      crack down.  But instead of prosecuting

19      people, I think they'll be corralling

20      people into -- so you'll see acquisitions

21      and mergers of the major junkets and I'm

22      not sure that the U.S. gaming guys who

23      have done such a lot for Macau will be in

24      such an advantageous position a few years

25      from now.  I think they'll probably want

PBS Frontline:  The Gods of Gambling

1      their own people or people from Asia in

2      those -- moving in or taking a position

3      in some of those situations.

4          MR. BERGMAN:  They're in a temporary

5      position?

6          MR. VICKERS:  It's been yabba dabba

7      do for a long, long time.

8          MR. BERGMAN:  Did you say yabba

9      dabba do?

10         MR. VICKERS:  Yabba dabba do.  I'm

11     in America; I got to -- the other -- I

12     mean, but I think the other thing is the

13     dependence on the VIP revenue as opposed

14     to the volume revenues, it will change;

15     it has to change.  And I think -- we're

16     in a period of change; change of junkets,

17     change of the government policy,

18     crackdowns on corruption.  So -- and

19     crackdowns on the more monstrous Triad

20     people all at once.

21         MR. BERGMAN:  Do we have any

22     questions in the audience about any of

23     this?  Hum?

24         UNIDENTIFIED SPEAKER:  (Inaudible).

25         MR. BERGMAN:  Oh, explain the

PBS Frontline:  The Gods of Gambling

1    junkets.  Okay.  Steve, you want to

2    explain the junkets?

3         MR. VICKERS:  Oh, dear me.  Well,

4    where do we start?

5         Essentially, Macau is a tiny place,

6    you know, I don't know what -- it has a

7    few hundred thousand people.

8         MR. BERGMAN:  Six hundred thousand.

9         MR. VICKERS:  Six hundred thousand.

10   China has 1.4 billion.  You want to get

11   people to come to you.  It's illegal to

12   move so much money across the border so

13   somebody needs to find the punters, move

14   the money, afford them credit, enforce on

15   the debt, if necessary.  So, you know,

16   that's what you need a junket for.  It's

17   not necessarily a bad thing; it's just a

18   model that in China has worked.

19        Unfortunately, back-to-back with

20   that comes -- comes activity in the VIP

21   rooms where the big rollers roll their

22   money which -- a lot of which is off-

23   ticket.  So the official gaming revenues

24   in Macau are fifty billion.  I firmly

25   believe it's many more times than that,

PBS Frontline:  The Gods of Gambling

```
1     simply because of what's being played in
2     the rooms.  It's (indiscernible).
3         MR. CHANOS:  The way it works --
4     just so you can figure it out -- I'm a
5     Chinese businessman, we'll say for
6     purposes, this is all in U.S. Dollars,
7     but -- so, I want to go to Macau.  I put
8     up 100,000 dollars in Chinese currency of
9     the junket company or I will owe that to
10    them, either way.  I'm now in debt to
11    them or pay them 100,000 dollars.  In
12    exchange, I'll get a round-trip ticket
13    from Beijing to -- this is hypothetical
14    but it's representative -- I'll get a
15    round-trip ticket to Macau, I'll get two
16    or three nights in a VIP suite in one of
17    the casinos, I'll get RFB, which is room,
18    food, and beverage, comped, and I will
19    get a credit line depending on the deal I
20    struck -- strike, between 60- and 65- or
21    70,000 U.S.  So if I'm the junket
22    company, I get a 100-, I'm laying out 70-
23    in creditor cash at the other end, and I
24    have a cost of doing business of probably
25    5- or 10,000, you know, the cost of doing
```

PBS Frontline:  The Gods of Gambling

1    all this stuff.

2         If I'm the businessman, I, in

3    effect, have turned 100,000 dollars'

4    worth of RMB into 7- -- 60,000 or 70,000

5    dollars' worth of western currency.  Now,

6    my obligation, typically, with the junket

7    company casino is to play through it at

8    least once or twice and risk it, okay.

9    And that's the deal.  And there are side

10   bets.  Forgetting all that stuff.

11        At the end of the day, that's what

12   it is.  It's a money laundering scheme by

13   which you take Chinese currency, go

14   there, pay your debts in the Chinese

15   currency, and what happens with what you

16   have left over, nobody asks any

17   questions.

18        MR. BERGMAN:  There's a law in China

19   that you can only take out 50,000

20   dollars -- the equivalent of 50,000 U.S.

21   a year.

22        MR. CHANOS:  A year.

23        MR. BERGMAN:  Right.  So in order to

24   justify -- figure out how to get more

25   than that to Macau, you got to do it

PBS Frontline:   The Gods of Gambling

1    through other means.   It's only 3,000 a

2    trip or 5,000 a trip.

3         MR. VICKERS:   It's 5,000.

4         MR. BERGMAN:   A little bit over --

5    3,200 U.S. in a day --

6         MR. CHANOS:   A fraction of that.

7         MR. BERGMAN:   -- is the most you can

8    take.   When you see the film, you'll see

9    how there are various ways to move the

10   money.   But one is a credit system for

11   high rollers who use VIP rooms.

12        Imagine, forty-five billion, what

13   that represents is the official winnings,

14   of, let's say, two percent of the handle,

15   basically.   So you're talking over a

16   trillion dollars has moved in.

17        MR. CHANOS:   But, Lowell, you're

18   forgetting an important thing; who owns

19   the junket companies?

20        MR. BERGMAN:   Ah.   Well, that's

21   where Raymond's friends come in and

22   various other people.   The junket

23   companies get forty percent of the

24   profit; casinos only get twenty.   So you

25   can imagine how much money's involved and

PBS Frontline:  The Gods of Gambling

1    who that's going to, that's one of the

2    questions.

3          And then, recently, David, there's

4    been this whole revelation about the

5    movement of money by the political

6    leadership through these companies,

7    through these junket companies.

8          MR. BARBOZA:  Right.

9          MR. BERGMAN:  Maybe you can address

10    that.

11          MR. BARBOZA:  And I think the other

12    point is you can -- just when you think

13    about those numbers, you can, you know,

14    think about -- for all the western

15    companies, the Wynn's and the Sands and

16    also the other companies that are

17    Mainland China, when you have that much

18    growth coming out of China, even though

19    you know the risks involved, and there

20    are lots of risks in China -- there's

21    political risks, the Foreign Corrupt

22    Practices Act -- how do you say no to

23    that kind of growth when the U.S. and

24    Europe are, basically, flat?  And so I

25    think that's the situation you're seeing

PBS Frontline:  The Gods of Gambling

1      in your film.

2          But, also, for any major company

3      going into China right now, they're

4      looking for that great upside and,

5      although the Chinese stock market is not

6      doing well, the companies, the American

7      companies and European companies that are

8      selling increasingly more into China,

9      they're doing extremely well.

10         Apple will probably sell forty

11     billion dollars' worth of iPhones and

12     iPads this year in China.

13         When I got to China nine years ago,

14     a lot of money for foreign -- for

15     multinational to sell to consumers in

16     China was about one billion dollars.  So

17     they're a forty billion dollar company in

18     China.

19         MR. VICKERS:  But do you not think,

20     fundamentally, there's another issue I

21     take away.  If there's going to be people

22     betting money far above the forty-five,

23     fifty billion official revenue, that

24     money should go -- should be taxed by the

25     government and go to taxpayers, right?

PBS Frontline:  The Gods of Gambling

1    The scary bit, if the multiple is five or

2    six times the actual turnover, is that

3    money is not going anywhere near the

4    government, is going nowhere near the

5    taxpayer, and that money is going

6    straight to organized crime.  That's why

7    the side betting is critically important

8    from an observation point of view as

9    opposed to -- the side betting is what

10   goes on in VIP rooms where this can be a

11   1,000 dollar chip but actually we've all

12   agreed before we got there that it's

13   10,000 or 100,000.  That is the bet --

14   that's the off-balance sheet bet.  That's

15   the off-book bet that's scary.

16       MR. CHANOS:  Yeah, but they're --

17   you guys are skirting around another

18   issue and so I'll say it, that the junket

19   companies are also controlled by the

20   People's Liberation Army.  That's an

21   important part that you need to know.

22       And so when you do this dance

23   between the government, and I would also

24   point out that most recently a very

25   interesting development's happened in

                    PBS Frontline:  The Gods of Gambling

1        China where senior leadership of the

2        People's Liberation Army was forced to

3        sign -- or swear personal loyalty to Xi

4        Jinping; first time it's happened in a

5        long time.

6            And so my own view on this is that

7        this is the sinecure that, basically, is

8        the little two-step between the military

9        and the political leadership.  You know,

10       we have troops in the barracks, we have

11       tanks, we have airplanes, we will do your

12       bidding, we will not ever rise up against

13       you, but we have an awful cushy deal here

14       in Macau and we don't want to lose it.

15           MR. VICKERS:  I think that's

16       interesting.  I think it's -- I'm not

17       defending anybody.  I think I'd be a

18       little cautious before I said all junket

19       companies could own -- because some of

20       them are publicly listed companies,

21       right.  But it wouldn't be without the

22       bounds of possibility that different

23       elements had control (indiscernible).

24       That's why I think it's really important

25       that the off-balance sheet stuff, the

PBS Frontline:  The Gods of Gambling

1    off-ticket money is tracked and

2    identified because then you can, maybe,

3    do something about it.

4        I have no religious or emotional

5    objection to gambling.  I just would

6    rather it wasn't given -- a lot of it

7    wasn't given to organized crime which is

8    my -- you know, my contention.

9        MR. BERGMAN:  Is Raymond still on?

10   Okay, Raymond, we're going to be -- we're

11   going to take one more question.  So

12   thank you for calling in.  You there?

13       MR. CHOW:  Thank you, Professor, you

14   have me in the program and I really do

15   appreciate it.  And I'm good.  I'm good.

16       MR. BERGMAN:  Okay.  Have a good

17   evening.

18       MR. CHOW:  Okay.  Thank you.

19       MR. BERGMAN:  And one question over

20   there.  Yeah.

21       I have this blinding light in my

22   eye.  It's a pain.

23       UNIDENTIFIED SPEAKER IN AUDIENCE:

24   You mentioned the FCPA but all of these

25   companies, the casinos, are American

PBS Frontline:  The Gods of Gambling

1    companies.  So, you know, there are --

2    there's the Nevada Gaming Commission,

3    there other state and federal authorities

4    that are supposed to, you know, hold sway

5    over them by having the power to revoke

6    their casino licenses.  That's why they

7    all have former FBI agents running

8    security for them.  But, you know, are

9    they completely ineffectual in this whole

10   thing or what are their American

11   authorities and regulatory officials

12   doing about any of this stuff if, you

13   know --

14       MR. CHANOS:  I mean, the fact of the

15   matter is in the Foreign Corrupt

16   Practices Act, almost any major company

17   doing business in China knows something

18   about the law; it's a pretty broad law.

19   Almost any company doing meaningful

20   amounts of business in China probably

21   could be found in violation of FCPA.  So

22   the question is what is the political

23   will to enforce this or go after it, and

24   my view is having had a, you know, a

25   front row seat in the global financial

                   PBS Frontline:  The Gods of Gambling

1       crisis, if we didn't go after some of the

2       bankers and shenanigans there, I'm

3       doubtful we're going to go after this.

4       So I could be wrong.

5            MR. BARBOZA:  Also, you have think

6       that, you know, how much access does the

7       U.S. officials have to Chinese documents

8       and the ability to come here and get

9       those -- get that information.

10           Now, when some of it leaks out, they

11      can announce an investigation but it's

12      not so easy for the U.S. government to

13      come in and investigate these matters

14      inside China.

15           MR. CHANOS:  It's a little bit like

16      that scene in Casablanca; I'm shocked,

17      shocked this is going on.

18           MR. BERGMAN:  Gambling going on.

19           MR. CHANOS:  Funny line.

20           MR. BARBOZA:  Also, most of the

21      casinos are not American-operated

22      casinos.

23           MR. CHANOS:  Right.  That's right.

24           MR. BARBOZA:  Those are mostly

25      Chinese-operated, but there are two major

PBS Frontline:  The Gods of Gambling

1    ones are American.

2        MR. BERGMAN:  And I should point out

3    that the U.S. government officially

4    has -- next to Nigeria, China is the

5    largest generator of Foreign Corrupt

6    Practice Act cases that are pending from

7    the U.S. government.  There are two going

8    on in Macau.  But the U.S. government

9    tends to fine the companies.  There

10   aren't any, really, criminal -- specific

11   criminal penalties.

12       MR. CHANOS:  Just like the banking

13   industry.

14       MR. BARBOZA:  It's also -- yeah, you

15   also have to look at what kind of cases

16   those are.  Those are often cases where

17   U.S. companies take Chinese officials to

18   visit the U.S. and they stop in Las Vegas

19   and gamble and they fine them in

20   violation for that kind of thing.

21       MR. BERGMAN:  Right.

22       MR. BARBOZA:  It's not that they're

23   getting things inside of China.

24       MR. BERGMAN:  So last question, Dave

25   Marash.

PBS Frontline:  The Gods of Gambling

1          MR. MARASH:  Two questions actually.

2          At the input end, this 300 billion

3     or trillion dollars that's coming in,

4     what's the source of that?  Is it almost

5     exclusively China's one percent?

6          MR. BERGMAN:  There's a microphone;

7     one of your favorite instruments.

8          MR. MARASH:  So on the input end,

9     the trillion dollars that's flowing into

10    Macau, what's the source of it?  Is it

11    simply China's one percent?  And on the

12    output end, Jim, you sort of gave us the

13    roach motel construct of money goes into

14    China, it grows explosively inside China,

15    but doesn't tend to come out.  What are

16    the implications of that model for Steve

17    Wynn and Mr. Adelson?

18         MR. VICKERS:  Can I -- I'll let Jim

19    do the economic model.

20         MR. CHANOS:  I'll let you do the

21    whole thing.  Go ahead.

22         MR. VICKERS:  No, no, no.  No, no,

23    no.

24         MR. BARBOZA:  I can answer, at

25    least, the first part of that.

PBS Frontline:  The Gods of Gambling

1        MR. VICKERS:  I think it's a

2    bandwidth issue.  I'm not going to talk

3    about any individual.  But those -- no,

4    no, Wynn and Adelson, I know that they're

5    big names, they're not -- the bigger --

6    there are other bigger Chinese long

7    established players.  They just happen to

8    have the razzmatazz and the noise, right.

9        The guys with the bandwidth who can

10   move from reliance on one percent of the

11   punters to produce eighty percent of the

12   profit, the people who can move from that

13   model to the model that they can deal

14   with the volume visit, they will survive

15   longer term.

16       The ones who cannot deal with the

17   situation other than that, will not

18   survive longer term.  That's my

19   assessment based not just on business but

20   just on how policy is evolving.

21       MR. BARBOZA:  I think his other

22   question, though, was where does this

23   money come from?  And it's not just -- I

24   mean there are lots of wealthy people now

25   in China and there's hundreds of

PBS Frontline:  The Gods of Gambling

1    billionaires, but it's also believed to

2    be a lot of state-owned companies that,

3    you know, people get a hold of state

4    assets and they're gambling away their

5    assets or they're laundering some of it

6    out of the country.  And I think there's

7    still a lot of -- it's still pretty murky

8    where that money is exactly coming from.

9    It's not just from the wealthy

10   individuals who've made the money

11   legally; it may be that they

12   intentionally gamble away state assets.

13   And so you've had lots of suicides in

14   Macau and lots of controversy over how

15   did they get that money.

16        MR. VICKERS:  But we haven't

17   discussed shadow banking and shadow

18   banking's relationship with junket

19   operators.

20        MR. BERGMAN:  Well, they're going to

21   have to watch the film.

22        MR. VICKERS:  Yeah, well, that's

23   right.

24        MR. BERGMAN:  Most of the --

25        MR. VICKERS:  That's actually quite

PBS Frontline:  The Gods of Gambling

1      critical because that's a deep economic

2      factor.  Again, which Jim's better

3      qualified to talk about than me.

4          MR. BERGMAN:  Most of the film is

5      about the economic model of -- and shadow

6      banking and how business is actually done

7      in China which to somebody like myself

8      who was not used to it, when you see it,

9      you'll be a little surprised at actually

10     what's going on and how business is done

11     there.

12          But in addition, I think that we

13     should keep in mind that there is a

14     direct benefit to all of us here, that

15     is, if you own property in the Bay Area.

16     It's one reason why the United States

17     government is reluctant to talk about

18     this phenomenon because it means a huge

19     influx of money into the United States as

20     it does in Australia, as it does in

21     Canada, and as it does in the United

22     Kingdom.  And real estate prices, to a

23     great extent, in this area, in Los

24     Angeles, and a number of other

25     communities are being propped up by the

PBS Frontline:  The Gods of Gambling

1    flow of capital out of China, including

2    out of Macau.

3        The last State Department estimate

4    that they cited was 200 billion dollars a

5    year leaves Macau outside of reported

6    banking controls.  So --

7        MR. VICKERS:  What could possibly go

8    wrong?

9        MR. BERGMAN:  I don't know.

10       Thank you, guys.  Thank you.

11   (End of audio)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                   C E R T I F I C A T I O N

3

4          I, Ellen S. Kolman, hereby certify that

5      the foregoing is a true and correct

6      transcription, to the best of my ability, of

7      the sound recorded proceedings submitted for

8      transcription.

9

10         I further certify that I am not employed

11     by nor related to any party to this action.

12

13         In witness whereof, I hereby sign this

14     date:

15     October 7, 2014.

16

17

18     _Ellen S. Kolman_

19

_____

20

ELLEN S. KOLMAN

21

AAERT (CET**D-568)

22

23

24

25

# EXHIBIT 2

issues that my friend from Texas finds it difficult to follow in an annual report. I think all Americans would find difficult to follow. We will hear from Dr. Bala Dharan who is a professor in the Graduate School of Management at Rice University in Texas. We'll also then move to Mr. Baruch Lev who is the Philips Bardes Professor of Accounting and Finance at the Department of Accounting Taxation and Business Law at the Stern School of Business in New York. I'm told that Mr. Lev is an extraordinarily gifted individual in this area and who can teach us about accounting policy and possible remedies and we look forward to your recommendations, Mr. Lev. We'll move then to governance of accounting. Many suggestions as to how we might oversee the accounting industry, who audits the auditors has been the question raised and we're going to get some recommendations from another witness recommended by the minority, Mr. Bevis Longstreth of New York, who also has some expertise in this area and I would be deeply interested in your suggestions and observations, Mr. Longstreth. Finally, I want to thank David Sokol, Chairman and CEO of MidAmerican Energy Holdings Company for coming to give us a perspective on the energy markets and the energy business and how it reacted to the collapse of Enron and whether or not it worked well as Mr. Largent has indicated in working around the financial collapse and still delivered electricity and gas to customers across the country served by the seventh largest corporation in America as it collapsed. So we get a sense of the effect of the Enron collapse on the energy markets. Indeed, a distinguished panel. We turn to you and we welcome Mr. James Chanos, for your testimony, sir.

## STATEMENTS OF JAMES S. CHANOS, KYNIKOS ASSOCIATES, LTD.; ROGER W. RABER, NATIONAL ASSOCIATION OF CORPORATE DIRECTORS; ROMAN L. WEIL, UNIVERSITY OF CHICAGO; BALA G. DHARAN, RICE UNIVERSITY; BARUCH LEV, NEW YORK UNIVERSITY; BEVIS LONGSTRETH, DEBEVOISE & PLIMPTON; AND DAVID L. SOKOL, MIDAMERICAN ENERGY HOLDINGS COMPANY

Mr. CHANOS. Good afternoon, my name is James Chanos. I would like to take this opportunity to thank the House Committee on Energy and Commerce for allowing me to offer my perspective on this tragic Enron story. I'm the president of Kynikos Associates, a New York private investment management company that I founded in 1985. Kynikos Associates specializes in short selling, an investment technique that profits in finding fundamentally overvalued securities that are poised to fall in price. Kynikos Associates employs seven investment professionals and is considered the largest organization of its type in the world, managing over $1 billion for its clients.

Prior to founding Kynikos Associates, I was a securities analyst at Deutsche Bank Capital and Gilford Securities. My first job on Wall Street was as an analyst at the investment banking firm of Blyth Eastman Paine Webber, a position I took in 1980 upon graduating from Yale University with a B.A. in Economics and Political Science. Neither I nor any of our professionals is an attorney or a certified public accountant, and none of us has had any direct dealings with Enron, its employees or accountants.

72

On behalf of our clients, Kynikos Associates manages a portfolio of securities we consider to be overvalued. The portfolio is designed to profit if the securities it holds fall in value. Kynikos Associates selects portfolio securities by conducting a rigorous financial analysis and focusing on securities issued by companies that appear to have (1) materially overstated its earnings; (2) been victims of a flawed business plan; or (3) that engaged in outright fraud. In choosing securities for its portfolios, Kynikos Associates also relies on the many years of experience that I and my team have accumulated in the equity markets.

My involvement with Enron began normally enough. In October of 2000, a friend asked me if I had seen an interesting article in The Texas Wall Street Journal, which is a regional edition, about accounting practices at large energy trading firms. The article, written by Jonathan Weil, pointed out that many of these firms, including Enron, employed the so-called "gain-on-sale" accounting method for their long-term energy trades. Basically, "gain-on-sale" accounting allows a company to estimate the future profitability of a trade made today and book a profit today based on the present value of those estimated future profits.

Our interest in Enron and other energy trading companies was picked because our experience with companies that have used this accounting method has been that management's temptation to be overly aggressive in making assumptions about the future was too great for them to ignore. In effect, "earnings" could be created out of thin air if management was willing to push the envelope by using highly favorable assumptions. However, if these future assumptions did not come to pass, previously booked "earnings" would have to be adjusted downward. If this happened, as if often did, companies addicted to the crack cocaine of "gain-on-sale" accounting would simply do new and bigger deals—with a larger immediate "earnings" impact—to offset those downward revisions. Once a company got on such an accounting treadmill, it was hard for it to get off.

The first Enron document my firm analyzed was its 1999 Form 10-K filing, which it had filed with the U.S. SEC. What immediately struck us was that despite using the "gain-on-sale" model, Enron's return on capital, a widely used measure of profitability, was a paltry 7 percent before taxes. That is, for every dollar in outside capital that Enron employed, it earned about seven cents. This is important for two reasons; first, we viewed Enron as a trading company that was akin to an "energy hedge fund." For this type of firm, a 7 percent return on capital seemed abysmally low, particularly given its market dominance and accounting methods. Second, it was our view that Enron's cost of capital was likely in excess of 7 percent and probably closer to 9 percent, which meant from an economic point of view, that Enron wasn't really earning any money at all, despite reporting "profits" to its shareholders. This mismatch of Enron's cost of capital and its return on investment became the cornerstone for our bearish view on Enron and we began shorting Enron common stock in November of 2000 for our clients.

We were also troubled by Enron's cryptic disclosure regarding various "related party transactions" described in its 1999 Form 10-

73

K as well as the quarterly Form 10-Qs it filed with the SEC in
2000 for its March, June and September quarters. We read the
footnotes in Enron's financial statements about these transactions
over and over again, and like Representative Barton, we could not
decipher what impact they had on Enron's overall financial condi-
tion. It did seem strange to us, however, that Enron had organized
these entities for the apparent purpose of trading with their parent
company, and that they were run by an Enron executive. Another
disturbing factor in our review of Enron's situation was what we
perceived to be the large amount of insider selling of Enron stock
by Enron's senior executives. While not damning by itself, such
selling in conjunction with our other financial concerns added to
our conviction.

Finally, we were puzzled by Enron's and its supporters' boasts in
late 2000 regarding the company's initiative in the telecommuni-
cations field, particularly in the trading of broadband capacity.
Enron waxed eloquent about a huge, untapped market in such ca-
pacity and told analysts that the present value of Enron's oppor-
tunity in that market could be $20 to $30 per share of Enron stock.
These statements are troubling to us because our portfolio already
contained a number of short ideas in the telecommunications and
broadband area based on the snowballing glut of capacity that was
developing in that industry. By late 2000, the stocks of companies
in this industry had fallen precipitously, yet Enron and its execu-
tives seemed oblivious to this. Despite the obvious bear market in
telecommunications capacity, Enron still saw a bull market in
terms of its own valuation of the same business, an ominous por-
tent.

In January 2001, we began contacting a number of analysts at
various Wall Street firms with whom we did business and invited
them to our offices to discuss Enron. Over the next few months a
number of them accepted our invitation and met with us to discuss
Enron and its valuation. We were struck by how many of them con-
ceded that there was no way to analyze Enron, but that investing
in Enron was instead a "trust me" story. One analyst, while admit-
ting that Enron was a "black box" regarding profits, said that, as
long as Enron delivered, who was he to argue. It was clear to us
that most of these analysts were hopelessly conflicted over the in-
vestment banking and advisory fees that Enron was paying to their
firms. We took their "buy" recommendations, both current and fu-
ture, with a very large gain of salt.

Something else that caught our attention was a story that ran
in The New York Times about Enron in early February of 2001. In
light of the California energy crisis, Enron was invoking a little-no-
ticed clause in its contract with its California retail customers. This
clause allowed Enron to directly match its retail buyers of power
in California with the power providers with whom Enron had con-
tracted on its customers' behalf. Most of these power providers
were in bankruptcy now. In effect, Enron was telling a number of
very prominent California companies and institutions "This is now
your problem, not ours." This was done despite the fact that Enron
was paid by its customers a middleman fee precisely so that Enron
would accept what is called counter-party risk, something Enron
now backed out of doing. As a result, Enron's credibility in the en-

74

tire energy retail business began to crumble simply because the company refused to recognize sure losses in California. One of my analysts said at the time, "Gee, it's as if Enron can never admit to a losing trade." Future revelations would prove that remark prophetic.

It was also in February 2001 that I presented Enron as an investment idea at our firm's annual "Bears in Hibernation" conference. As I recounted Enron's story to the conference participants, most of them agreed that the fact pattern and numbers presented were very troubling. Most also agreed that Enron's stock price left no room for error. Following our conference, the short position in Enron reported monthly began to move higher.

In the spring of 2001, we heard reports, confirmed by Enron, that a number of senior executives were departing from the company. Further, the insider selling of Enron stock continued unabated. Finally, our analysis of Enron's 2000 Form 10-K and March 2001 Form 10-Q filings continued to show low returns on capital as well as a number of one-time gains that boosted Enron's earnings. These filings also reflected Enron's continuing participation in various "related party transactions" that we found difficult to understand despite the more detailed disclosure Enron had provided. These observations strengthened our conviction that the market was still is over-pricing Enron's stock.

In the summer of 2001, energy and power prices, specifically natural gas and electricity, began to drop. Rumors surfaced routinely on Wall Street that Enron had been caught "long" in the power market and that it was moving aggressively to reverse its exposure. It is an axiom in securities trading that no matter how well "hedged" a firm claims to be, trading operations always seem to do better in bull markets and to struggle in bear markets. We believe that the power market had entered a bear phase at just the wrong moment for Enron.

Also in the summer of 2001, stories began circulating in the marketplace about Enron's affiliated partnerships and how Enron's stock price itself was important to Enron's financial well-being. In effect, traders were saying that Enron's dropping stock price could create a cash-flow squeeze at the company because of certain provisions and agreements that it had entered into with affiliated partnerships. These stories gained some credibility as Enron disclosed more information about these partnerships in its June 2001 Form 10-Q which it filed in August of 2001.

To us, however, the most important story in August of 2001 was the abrupt resignation of Enron's CEO, Jeff Skilling, for "personal reasons." In our experience, there is no louder alarm bell in a controversial company than the unexplained, sudden departure of a chief executive officer no matter what "official" reason is given. Because we viewed Skilling as the architect of the present Enron, his abrupt departure was the most ominous development yet. Kynikos Associates increased its portfolio's short position in Enron shares following this disclosure.

The events affecting Enron that occurred in the fall of 2001, particularly after October 16, have been recounted seemingly everywhere in the financial press. Kynikos Associates cannot add much to that discussion, but I have tried to provide an overview of what

75

our firm thought were significant developments and revelations during the preceding 12 months.

And while this testimony is mainly about our firm's assessment of Enron and the basis for that assessment, we would be remiss if we did not share a few observations about what happened.

First and foremost, no one should depend on Wall Street to identify and extricate investors from disastrous financial situations. There are too many conflicts of interest, all of them usually disclosed, but pervasive and important nevertheless. In addition, outside auditors are archaeologists, not detectives. I can't think of one major financial fraud in the United States in the last 10 years that was uncovered by a major brokerage house analyst or an outside accounting firm. Almost every such fraud ultimately was unmasked by short sellers and/or financial journalists.

In addition, a company's adherence to GAAP, generally accepted accounting principles, does not mean that the company's earnings and financial position are not overstated. GAAP allows too much leeway in the use of estimates, forecasts and other inherently unknowable things to portray current results. In the hands of dishonest management, a rapidly growing subset in my opinion, GAAP can mislead far more than they inform. Further, I believe that certain aspects of GAAP, particularly accounting for stock options in the United States, are basically a fraud themselves. Such obvious accounting scams should be ended immediately without any interference by third parties.

While no fan of the plaintiffs bar, I must also point out that the so called "Safe Harbor" Act of 1995 has probably harmed more investors than any other piece of recent legislation. The statute, in my opinion, has emboldened dishonest managements to lie with impunity, by relieving them of concern that those to whom they lie will have legal recourse. The statute also seems to have shielded underwriters and accountants from the consequences of lax performance of their "watchdog" duties. Surely, some tightening of this legislation must be possible, while retaining the worthy objective of preventing obviously frivolous lawsuits.

Our current system of self-monitored disclosure is first-rate in my opinion, with one important exception. In this day and age of EDGAR, the internet and real-time disclosure, our system for disclosing insider stock purchases and sales remains antiquated. Insiders buying or selling shares should disclose such transactions immediately. And esoteric collars, loan/stock repurchase deals and other derivatives that are in the "gray area" of insider disclosure should be treated for what they are, another way to either buy or sell shares. The structure of an inside transaction should never hinder its immediate disclosure.

Finally, I want to remind you that despite 200 years of "bad press" on Wall Street, it was those "unAmerican, unpatriotic" short sellers that did so much to uncover the disaster at Enron and at other infamous financial disasters during the past decade. While short sellers probably will never be popular on Wall Street, they often are the ones wearing the white hats when it comes to looking for and identifying the bad guys.

Thank you very much for this opportunity to tell our story.

[The prepared statement of James S. Chanos follows:]

76

PREPARED STATEMENT OF JAMES S. CHANOS, KYNIKOS ASSOCIATES, LTD.

Good afternoon. My name is James Chanos. I would like to take this opportunity to thank the House Committee on Energy and Commerce for allowing me to offer my perspective on the tragic Enron story.

I am the President of Kynikos Associates, a New York private investment management company that I founded in 1985. Kynikos Associates specializes in short-selling, an investment technique that profits in finding fundamentally overvalued securities that are poised to fall in price. Kynikos Associates employs seven investment professionals and is considered the largest organization of its type in the world, managing over $1 billion for its clients.

Prior to founding Kynikos Associates, I was a securities analyst at Deutsche Bank Capital and Gilford Securities. My first job on Wall Street was as an analyst at the investment banking firm of Blyth Eastman Paine Webber, a position I took in 1980 upon graduating from Yale University with a B.A. in Economics and Political Science. Neither I nor any of our professionals is an attorney or a certified public accountant, and none of us has had any direct dealings with Enron, its employees or accountants.

On behalf of our clients, Kynikos Associates manages a portfolio of securities we consider to be overvalued. The portfolio is designed to profit if the securities it holds fall in value. Kynikos Associates selects portfolio securities by conducting a rigorous financial analysis and focusing on securities issued by companies that appear to have (1) materially overstated earnings (Enron), (2) been victims of a flawed business plan (most internet companies), or (3) been engaged in outright fraud. In choosing securities for its portfolios, Kynikos Associates also relies on the many years of experience that I and my team have accumulated in the equity markets.

My involvement with Enron began normally enough. In October of 2000, a friend asked me if I had seen an interesting article in *The Texas Wall Street Journal* (a regional edition) about accounting practices at large energy trading firms. The article, written by Jonathan Weil, pointed out that many of these firms, including Enron, employed the so-called "gain-on-sale" accounting method for their long-term energy trades. Basically, "gain-on-sale" accounting allows a company to estimate the future profitability of a trade made today, and book a profit today based on the present value of those estimated future profits.

Our interest in Enron and the other energy trading companies was piqued because our experience with companies that have used this accounting method has been that management's temptation to be overly aggressive in making assumptions about the future was too great for them to ignore. In effect, "earnings" could be created out of thin air if management was willing to "push the envelope" by using highly favorable assumptions. However, if these future assumptions did not come to pass, previously booked "earnings" would have to be adjusted downward. If this happened, as it often did, companies addicted to the crack cocaine of "gain-on-sale" accounting would simply do new and bigger deals with a larger immediate "earnings" impact) to offset those downward revisions. Once a company got on such an accounting treadmill, it was hard for it to get off.

The first Enron document my firm analyzed was its 1999 Form 10-K filing, which it had filed with the U.S. Securities and Exchange Commission. What immediately struck us was that despite using the "gain-on-sale" model, Enron's return on capital, a widely used measure of profitability, was a paltry 7% before taxes. That is, for every dollar in outside capital that Enron employed, it earned about seven cents. This is important for two reasons; first, we viewed Enron as a trading company that was akin to an "energy hedge fund." For this type of firm a 7% return on capital seemed abysmally low, particularly given its market dominance and accounting methods. Second, it was our view that Enron's cost of capital was likely in excess of 7% and probably closer to 9%, which meant, from an economic cost point-of-view, that Enron wasn't really earning any money at all, despite reporting "profits" to its shareholders. This mismatch of Enron's cost of capital and its return on investment became the cornerstone for our bearish view on Enron and we began shorting Enron common stock in November of 2000.

We were also troubled by Enron's cryptic disclosure regarding various "related party transactions" described in its 1999 Form 10-K as well as the quarterly Form 10-Qs it filed with the SEC in 2000 for its March, June and September quarters. We read the footnotes in Enron's financial statements about these transactions over and over again but could not decipher what impact they had on Enron's overall financial condition. It did seem strange to us, however, that Enron had organized these entities for the apparent purpose of trading with their parent company, and that they were run by an Enron executive. Another disturbing factor in our review of Enron's situation was what we perceived to be the large amount of insider selling

77

of Enron stock by Enron's senior executives. While not damning by itself, such selling in conjunction with our other financial concerns added to our conviction.

Finally, we were puzzled by Enron's and its supporters boasts in late 2000 regarding the company's initiatives in the telecommunications field, particularly in the trading of broadband capacity. Enron waxed eloquent about a huge, untapped market in such capacity and told analysts that the present value of Enron's opportunity in that market could be $20 to $30 per share of Enron stock. These statements were troubling to us because our portfolio already contained a number of short ideas in the telecommunications and broadband area based on the snowballing glut of capacity that was developing in that industry. By late 2000, the stocks of companies in this industry had fallen precipitously, yet Enron and its executives seemed oblivious to this! Despite the obvious bear market in telecommunications capacity, Enron still saw a bull market in terms of its own valuation of the same business—an ominous portent.

In January 2001, we began contacting a number of analysts at various Wall Street firms with whom we did business and invited them to our offices to discuss Enron. Over the next few months a number of them accepted our invitation and met with us to discuss Enron and its valuation. We were struck by how many of them conceded that there was no way to analyze Enron, but that investing in Enron was instead a "trust me" story. One analyst, while admitting that Enron was a "black box" regarding profits, said that, as long as Enron delivered, who was he to argue! It was clear to us that most of these analysts were hopelessly conflicted over the investment banking and advisory fees that Enron was paying to their firms. We took their "buy" recommendations, both current and future, with a very large grain of salt!

Something else that caught our attention was a story that ran in The New York Times about Enron in early February of 2001. In light of the California energy crisis, Enron was invoking a little-noticed clause in its contract with its California retail customers. This clause allowed Enron to directly match its retail buyers of power in California with the power providers with whom Enron had contracted on its customers' behalf. Most of these power providers were in bankruptcy. In effect, Enron was telling a number of very prominent California companies and institutions "This is now your problem, not ours." This was done despite the fact that Enron was paid by its customers a middleman fee precisely so that Enron would accept what is called counter-party risk—something Enron now backed out of doing. As a result, Enron's credibility in the entire energy retail business began to crumble simply because the company refused to recognize sure losses in California. One of my analysts said at the time, "Gee, it's as if Enron can never admit to a losing trade!" Future revelations would prove that remark prophetic.

It was also in February 2001 that I presented Enron as an investment idea at our firm's annual "Bears In Hibernation" conference. As I recounted Enron's story to the conference participants, most of them agreed that the fact pattern and numbers presented were very troubling. Most also agreed that Enron's stock price left no room for error. Following our conference, the short position in Enron (reported monthly) began to move higher.

In the spring of 2001, we heard reports, confirmed by Enron, that a number of senior executives were departing from the company. Further, the insider selling of Enron stock continued unabated. Finally, our analysis of Enron's 2000 Form 10-K and March 2001 Form 10-Q filings continued to show low returns on capital as well as a number of one-time gains that boosted Enron's earnings. These filings also reflected Enron's continuing participation in various "related party transactions" that we found difficult to understand despite the more detailed disclosure Enron had provided. These observations strengthened our conviction that the market was mispricing Enron's stock.

In the summer of 2001, energy and power prices, specifically natural gas and electricity, began to drop. Rumors surfaced routinely that Enron had been caught "long" the power market and that it was moving aggressively to reverse its exposure. It is an axiom in securities trading that, no matter how well "hedged" a firm claims to be, trading operations always seem to do better in bull markets and to struggle in bear markets. We believed that the power market had entered a bear phase at just the wrong moment for Enron.

Also in the summer of 2001, stories circulated in the marketplace about Enron's affiliated partnerships and how Enron's stock price itself was important to Enron's financial well-being. In effect, traders were saying that Enron's dropping stock price could create a cash-flow squeeze at the company because of certain provisions in agreements that it had entered into with its affiliated partnerships. These stories gained some credibility as Enron disclosed more information about these partnerships in its June 2001 Form 10-Q, which it filed in August of 2001.

78

To us, however, the most important story in August 2001 was the abrupt resignation of Enron's CEO, Jeff Skilling, for "personal reasons." In our experience, there is no louder alarm bell in a controversial company than the unexplained, sudden departure of a chief executive officer no matter what "official" reason is given. Because we viewed Skilling as the architect of the present Enron, his abrupt departure was the most ominous development yet. Kynikos Associates increased its portfolio's short position in Enron shares following this disclosure.

The events affecting Enron that occurred in the fall of 2001, particularly after October 16th, have been recounted seemingly everywhere in the financial press. Kynikos Associates cannot add much to that discussion, but I have tried to provide an overview of what our firm thought were significant developments and revelations during the preceding twelve months.

SOME OBSERVATIONS POST-ENRON

While this testimony is mainly about our firm's assessment of Enron and the basis for that assessment, we would be remiss if we did not share a few observations about what happened.

First and foremost, no one should depend on Wall Street to identify and extricate investors from disastrous financial situations. There are too many conflicts of interest, all of them usually disclosed, but pervasive and important nevertheless. In addition, outside auditors are archeologists, not detectives. I can't think of one major financial fraud in the United States in the last ten years that was uncovered by a major brokerage house analyst or an outside accounting firm. Almost every such fraud ultimately was unmasked by short sellers and/or financial journalists.

In addition, a company's adherence to GAAP (generally accepted accounting principles), does not mean that the company's earnings and financial position are not overstated. GAAP allows too much leeway in the use of estimates, forecasts and other inherently unknowable things to portray current results. In the hands of dishonest management (a rapidly growing subset in my opinion), GAAP can mislead far more than they inform! Further, I believe that certain aspects of GAAP, particularly accounting for stock options in the United States, are basically a fraud themselves. Such obvious accounting scams should be ended immediately without any interference by third parties.

While no fan of the plaintiffs bar, I also must point out that the so called "Safe Harbor" Act of 1995 has probably harmed more investors than any other piece of recent legislation. That statute, in my opinion, has emboldened dishonest managements to lie with impunity, by relieving them of concern that those to whom they lie will have legal recourse. The statute also seems to have shielded underwriters and accountants from the consequences of lax performance of their "watchdog" duties. Surely, some tightening of this legislation must be possible, while retaining the worthy objective of preventing obviously frivolous lawsuits.

Our current system of self-monitored disclosure is first-rate, in my opinion, with one important exception. In this day and age of EDGAR, the internet and real-time disclosure, our system for disclosing insider stock purchases and sales remains antiquated. Insiders buying or selling shares should disclose such transactions immediately. And esoteric collars, loan/stock repurchase deals, etc., that are in the "gray area" of insider disclosure should be treated for what they are—another way to either buy or sell shares. The structure of an insider transaction should never hinder its immediate disclosure!

Finally, I want to remind you that, despite two hundred years of "bad press" on Wall Street, it was those "unAmerican, unpatriotic" short sellers that did so much to uncover the disaster at Enron and at other infamous financial disasters during the past decade (Sunbeam, Boston Chicken, etc.). While short sellers probably will never be popular on Wall Street, they often are the ones wearing the white hats when it comes to looking for and identifying the bad guys!

Thank you very much for this opportunity to tell our story.

Chairman TAUZIN. Thanks for your patience, Mr. Chanos, it's interesting testimony. We normally limit our witnesses to 5 minutes. You can see I'm being rather generous after you've waited so long, but I would encourage to try to keep it at least within a 10 minute frame if you can.

We'll now turn to Mr. Roger Raber who is the President of the trade association of Boards of Directors, correct, Mr. Raber?

# EXHIBIT 3



1 of 1 DOCUMENT

Copyright 2002 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



(Copyright (c) 2002, Dow Jones & Company, Inc.)

**BARRON'S**

Barron's

January 28, 2002 Monday

**SECTION:** Pg. 18

**LENGTH:** 2923 words

**HEADLINE:** The Bear That Roared: How short-seller Jim Chanos helped expose Enron

**BYLINE:** By Jonathan R. Laing

**BODY:**

Over the past 20 years, short-seller Jim Chanos has had a volatile career of exhilarating highs and gut-wrenching lows. As a callow 24-year-old analyst in 1982, he made the call that's still the stuff of Wall Street legend. In August of that year -- "the day before the great post-1982 bull market began its epic ascent," he laughs -- Chanos put out a sell recommendation on Baldwin-United, then a highflying annuity company. He declared the firm a "house of cards" doomed to collapse from over-leverage, kinky accounting and negative cash flow.

The young analyst stuck to his guns over the succeeding months in the face of withering criticism by fellow Wall Street analysts, virtually all of whom were wildly bullish on Baldwin, and threats of lawsuits from the company. He was vindicated, however, when 13 months later Baldwin filed for Chapter 11, vaporizing some $6 billion in stock value and leaving the holders of billions of dollars in annuities in the lurch.

Chanos received deserved star treatment in the financial news media, as a result. A front-page story in The Wall Street Journal in the fall of 1983 hailed him as a David who'd slain Goliath by "defying the experts."

His hot streak in selling short continued into the early-'Nineties despite the severe head winds of a bull market. He exploited the serial collapse in the late 'Eighties of commercial real estate in Texas, Arizona, California, New England and finally Canada, making millions off short positions in the stocks of various regional banks, savings and loans and real-estate development companies. Moreover, he presciently saw Mike Milken's junk-bond kingdom for what it was, a

The Bear That Roared: How short-seller Jim Chanos helped expose Enron Barron's January 28, 2002 Monday

daisy chain of Drexel Burnham-financed holding companies that were able to loot heavily-regulated insurance companies and S&L subsidiaries of funds by buying each other's junkbonds. He rode the stocks of such Milken-financed companies as Integrated Resources, Southland Financial, Columbia S&L and First Executive all the way to their oblivion. His Ursus Partners hedge fund -- ursus being Latin for bear -- more than quadrupled in value between its formation in October 1985 through the end of December 1990. That was twice the rise in the Standard & Poor's Index over the same time span.

But as so often happens, early success seemed to breed subsequent failure. For Chanos was brutalized by the torrid bull climb in stock prices in early 1991 that kicked in following the onset of the Allied invasion of Kuwait, and continued with only a few interruptions through the end of 1999. The net asset value of Ursus Partners dropped nearly 75% over that period, virtually wiping out all the gains the fund had achieved over the previous five and a half years. At various times during the 'Nineties, the fund was down nearly 85% from its high-water mark achieved in late-1990. Over the same 15-year period, the S&P rocketed up a cumulative 12-fold.

Sitting recently in his cramped office on the 44th floor of the Citigroup Center in midtown Manhattan, the tall and lanky Chanos clinically analyzed his problems during the 'Nineties. He had missed the sea change that had occurred in the financial markets after Federal Reserve Chairman Alan Greenspan had begun to flood the economy with liquidity to bail out Citicorp and other then-shaky major banks in the early 'Nineties. Salubrious stock and bond markets during the decade had allowed even companies with overstretched balance sheets and dubious business plans to heal themselves and finance their dreams.

He admitted to making a number of analytic errors that cost Ursus dearly. A large short position in McDonnell-Douglas blew up in his face after a series of large contract awards by the Pentagon after the Gulf War bailed out the troubled company. America Online was another disaster. He thought that the way it accounted for marketing costs by putting them on the balance sheet rather than running them through the income statement was suspect. What he missed, he now admits, was the dimension of the Internet boom that ensued, turning AOL into an impregnable brand name.

And his short positions in mutual fund company Franklin Resources and brokerage firm Charles Schwab in 1995 and 1996 went south because the stock market mania wasn't ending as he thought. It was just going into overdrive. "We were making a market-timing call which is not something our investors pay us to do," he concedes with obvious chagrin.

And just perhaps, Chanos was laid low by an element of hubris. At least that's what a hedge-fund competitor and admirer claims. He elaborates: "Jim is a spectacular analyst, a straight-up guy loaded with integrity and ability. He deals in facts rather than innuendo, unlike so many shorts. But he was typical of the ball player who bats .400 in his first season in the majors and assumed that it would be easy to repeat it every year. Success may have gone to his head. He allowed Mr. Market to take away way too much of his money by staying with losing positions too long and ignoring the market forces arrayed against him."

The bull market ultimately brought a certain pragmatism to Chanos' business strategy, however. In late 1996, he reduced the leverage on Ursus Partners. And his firm, Kynikos Associates, opened the Beta Hedge fund, which was designed to take the risk of raging-bull markets by offsetting every dollar of short exposure with a dollar of long exposure. The fund's long positions are selected quantitatively by another manager solely to mimic the volatility of the fund's short selections. Beta Hedge has delivered a compound annual growth rate of over 13%. Today, it comprises about half of Chanos' more than $1 billion under management.

The flagship Ursus fund is now leading the revival of Chanos's fortunes. Ursus posted a gain of 47.4%, before fees, in 2000 and 18.2% in 2001. The big money came from anticipating the collapse of Internet stocks -- Chanos thought their business plans were screwy -- and telecom stocks, which he reasoned would be felled by overcapacity. Among his winning shorts were Amazon.com, Priceline, Williams Communications, along with McLeod USA. Finally, Chanos

The Bear That Roared: How short-seller Jim Chanos helped expose Enron Barron's January 28, 2002 Monday

seems to have his groove back.

The bursting of the tech bubble also put Chanos back in the media limelight after a decade or more in the shadows. The searing bear market of the last two years has helped raise his profile. And perhaps most important, he's now widely credited with being the first on Wall Street to blow the whistle on the biggest bankruptcy in U.S. history, Enron. It was surely the market call of the decade, if not the past 50 years. And made by the very same analyst who had wowed the investment world with Baldwin-United some 20 years ago. Not bad coups in anyone's career.

In a wide-ranging interview with Barron's, Chanos chronicled the tale of what led him to first short Enron in late 2000, when the company was trading near its all-time high of 90 and enjoying near universal acclaim on Wall Street. He continued to short the shares in early 2001, when soaring electricity prices in California seemed to only strengthen the likelihood of profit growth for wholesale energy marketers like Enron.

He concedes that, initially, he thought the energy-trading concern was viable, but that its stock was wildly overpriced. But further research convinced him that Enron had been engaging in fraudulent accounting and that the company's condition was likely terminal. The resignation of Enron Chief Executive Jeffrey Skilling in August for half-baked reasons only solidified that conclusion in Chanos's mind. Skilling sensed big trouble ahead. (Friday, J. Clifford Baxter, a former Enron vice chairman, was found shot in the head in a car. Initial reports described his death as a suicide.)

Chanos' interest in Enron was first piqued in October 2000 when he chanced upon an article that had appeared the previous month in the Texas regional section of The Wall Street Journal, penned by the paper's current accounting writer, Jonathan Weil. (Barron's and The Wall Street Journal are published by Dow Jones.) The writer asserted that Enron and other leading marketers of electricity and natural gas were artificially boosting their profits by reporting unrealized, non-cash gains on long-term energy deals that wouldn't be actually booked for years to come. Some of these contracts extended out more than 20 years. And whether these profits would ever be realized depended on seeming unknowable, difficult-to-hedge assumptions such as the future course of natural gas and electricity prices stretching out over decades, interest-rate trends and importantly, it turned out, Enron's maintenance of its non-junk credit rating.

The article resonated with Chanos. Abuses of so-called "gain-on-sale" accounting over the years had led to some of his biggest investment coups. Baldwin-United, for example, had gunned its reported earnings by making all sorts of fraudulent assumptions on the present value of its future profits on its annuity sales. Chanos had also made a bundle on such avid gain-on-sale exponents as the mobile home-financier Conseco, the sub-prime auto-finance company Mercury Finance and the sub-prime mortgage company First Plus. All used faulty assumptions in their securitizations to gin up fancy profit growth.

"It has been our experience that gain-on-sale accounting creates an irresistible temptation on the part of managements heavily incentivized with options and heavy stock ownership to create earnings out of thin air," he says.

At the same time, Chanos and an associate began to pore over Enron's financials. Selling at the time for some 60 times earnings, the stock seemed "priced for perfection." Yet another picture emerged in the company's 1999 10-K and 10-Q filings with the SEC for the nine months ended September 30, 2000.

Instead, the company seemed to be "a hedge fund in disguise," relying on energy trading for more than 80% of its current earnings. And not a very good hedge fund. By Chanos' calculations, Enron was only able to churn out a paltry 7% return on its capital, while its cost of capital was over 10%. In other words, Enron would require more and more capital just to eke out continuing modest returns, let alone enjoy any profit growth. At the time, neither Chanos nor any outsiders suspected that two-thirds of Enron's debt resided off the balance sheet in the now- infamous partnerships and other special-purpose entities.

Chanos concluded that investors were crazy to pay six times book value to own the stock when other far-better-performing hedge-fund portfolios could be purchased for their net asset value.

The Bear That Roared: How short-seller Jim Chanos helped expose Enron Barron's January 28, 2002 Monday

The 10-K and 10-Q also revealed other tantalizing clues. He remembers being "baffled" by a flurry of "related party" transactions detailed in various footnotes. Mentioned were two outside partnerships, headed by an unnamed senior officer of Enron, that seemed to be engaged in a flurry of transactions that took assets off Enron's books and yielded lush pre-tax gains and revenues to the parent.

The revelation in October 2001 that the manager of these partnerships was Enron's chief financial officer, Andrew Fastow, and that he made more than $30 million on the side running the entities, created the crisis in confidence that ultimately drove Enron into bankruptcy proceedings. But Chanos had no way of knowing this in late 2000, or fully grasping the import of the convoluted disclosures in the SEC documents. His original copies of these filings bear his notations made at the time, a series of exclamation points and question marks in the margins. "We're pretty good at deciphering footnotes and other disclosures, but these reports left us scratching our heads," he recalls. "We did decide, however, that it's rarely good news when a company is engaged in deals with an outside entity run by one of its senior officers. How could it be an arm's-length transaction?"

Chanos continued to add to his short position in early 2001, but as a precaution he talked to a number of sell-side analysts on Wall Street, almost all wildly bullish on Enron's prospects, to get the bull's argument for the stock. He was heartened to find that many were pinning their hopes on Enron's entry into trading in excess fiberoptic bandwidth capacity. No less than Jeff Skilling had asserted to analysts in January 2001 that bandwidth trading would likely add as much as $35 to the stock, which was then trading in the low 80s.

Chanos knew differently. From his reading of the opaque footnotes, he realized that Enron was dumping its unused fiber and other physical broadband assets on the partnerships. Moreover, he had shorted a number of fiberoptic-network companies, correctly judging that the industry was going into free fall as a result of gross overcapacity and a collapse in pricing. "Didn't the energy analysts touting Enron ever bother to talk to any of the telecom analysts?" he still wonders.

Chanos and his associates also talked to several energy traders at leading financial institutions. They expressed incredulity at the trading profits Enron was reporting. They described the business as a fairly blue-collar, low-margin affair of matching buyers with sellers. He deduced from this that Enron must be making a lot of directional, unhedged bets, and with the bull market in natural-gas prices and electricity rates starting to turn, Enron might suffer severe losses.

At this point, Chanos began to publicize his views on Enron. In February 2001, at the "Bears in Hibernation" meeting he hosts annually in Miami, he made Enron one of his two short picks. He counted on the fact that many of the attendees, including other well-known bears and hedge-fund managers, would be intrigued by his Enron story and assist him in much of the heavy lifting in researching such a complicated situation.

A reporter from Fortune magazine called him later that month to query him about his latest investment ideas. He methodically took her through the Enron story. Though the resulting story in March was somewhat pallid, it did raise questions about Enron's valuation, promotional style and opaque financials for the first time since the Weil effort the previous fall.

As the year wore on, Chanos dug more deeply into accounting issues at Enron. By then, he and other hedge-fund managers were scouring documents, often from anonymous sources, relating to various secret Enron off-balance-sheet partnerships with names like Osprey, Marlin Water and Yosemite Securities.

There was a certain invariable pattern to the flurry of transactions between the partnerships and Enron. Millions of dollars in Enron assets and attendant debt would dance off Enron's books, and the parent would reap lush benefits from sale revenues, trading profits and merchant banking gains. What Chanos didn't know was that Enron had created literally thousands of partnerships and other special-purpose entities to shield losses from investors' view.

But the odor of the deals was unmistakable. For one thing, some of the assets being transferred, such as parts of Enron's broadband system, water-company holdings and various stock investment holdings, were plummeting in value.

The Bear That Roared: How short-seller Jim Chanos helped expose Enron Barron's January 28, 2002 Monday

And Chanos realized after a close reading of the partnership documents that, though the partnerships were technically independent entities, Enron was still on the hook for any losses in value the partnerships suffered. These "make good" arrangements required Enron to contribute additional Enron shares to the partnerships to make them whole in the event of losses.

Likewise, the partnership debt was not non-recourse to Enron. In the event of a downgrade in Enron's credit rating, to below investment grade, the company would be on the hook for much of this supposedly off-balance-sheet debt.

With the stock steadily falling, from over 70 to the mid-40s during the summer, the potential for a China Syndrome meltdown in Enron's balance sheet loomed. "We could see the partnerships becoming insolvent and this in turn causing a financial death spiral for the parent," Chanos recalls. "We knew we were right when Skilling quit the company in August. In our opinion, he saw that Enron's declining stock price meant the game was over for Enron."

The rapidity of Enron's collapse left Chanos agog nonetheless. And he is stunned by the scabrous tales of document-shredding at Enron's accounting firm and company headquarters.

It will take months of forensic accounting effort to fully plumb the depths of the apparent fraud at Enron. But he suspects that far more will be discovered than just Enron's apparent attempt to use the now infamous partnerships to hide debt. He contends that Enron also used the partnerships to boost Enron profits by acting as a dumping ground for losing trades, bad long-term investments and busted Enron investment-banking deals. Moreover, he thinks that millions of dollars in past- reported Enron profits will melt away once its long-term energy trades are properly marked-to-the-market. "That's the next big shoe to drop," he predicts.

But for a bear like Chanos, Enron's travails are hardly unwelcome. Especially because, suddenly, Wall Street is zealously burrowing into the financials of other companies with opaque financial statements. Trust-me managements are coming under scrutiny as never before. And the stock market appears to be treading water.

In short, it's the best of all possible worlds for a confirmed cynic and accounting-whiz like Jim Chanos. The stock market is now in his dojo.

(See related letters: "Barron's Mailbag: Checking In on Chanos" -- Barron's Feb. 11, 2002)

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 5, 2004

# EXHIBIT 4

**COVER STORY**

# CLOUT

## WHO'S GOT JUICE IN LAS VEGAS? IDEAS VARY, BUT HERE ARE OURS

By HOWARD STUTZ

Coming up with a list of people who are considered the most influential in business and civic affairs in Las Vegas is subjective.

Ask 20 people to name the person who carries the most clout and the response could yield at least that many different suggestions.

That's because Las Vegas is still an evolving community — and one unlike any other city.

"Because Las Vegas is so young, family prestige may be less common here," said Shannon Monnat, an assistant professor in the Department of Sociology at the University of Nevada, Las Vegas. "In cities like Boston and New York, several generations have built power and prestige over time. Las Vegas seems to be on that path, and in that respect, we are not all that unique."

We asked Monnat to give us a definition of clout.

In Las Vegas, clout or influence is oftentimes referred to as juice.

"From a sociological perspective, having influence or power means having the ability to get what you want despite opposition from a large group of people," Monnat said. "Influence is not attached only to individuals in Las Vegas, but also to major corporations."

Historically, casino owners, gaming companies and their executives have seemingly run the town.

When big gaming wants a change in the law or a person elected, the industry usually wins.

In the recent legislative session, gaming used its influence to help tavern owners push through several changes in the 2006 voter-enacted ban on smoking in bars, restaurants and taverns.

In 1998, political pundit Jon Ralston coined the phrase, "politics of anointment" to describe what happened when the gaming industry and the business community banded together to ensure the election of Gov. Kenny Guinn.

"Las Vegas is a typical American city," Monnat said. "Local business owners and land developers (and the gaming industry) have a great deal of political influence."

But have the politicians eclipsed gaming?

For example, Senate Majority Leader Harry Reid is the key if Nevada's gaming industry hopes to see the legalization of Internet poker approved in Washington, D.C. Closer to home, Gov. Brian Sandoval was universally praised for his active efforts in crafting a budget deal in the fractured state Legislature.

We've taken a stab at coming up with a list of the individuals who seemingly have the most influence on the business community. Our criteria are fairly simple: Who can pick up a telephone and make things move with a call that cannot be refused? Staff members of the Las Vegas Business Press and the Las Vegas Review-Journal nominated dozens of powerful people, with 20 names getting the most nods, and five garnering enough attention to make an honorable mention.

Many of the top vote-getters are politicians — Reid, Sandoval, and the Mayors Goodman, former Las Vegas Mayor Oscar Goodman and his wife, current Mayor Carolyn Goodman.

Gaming's big names were somewhat predictable -- Las Vegas Sands Corp. Chairman and Chief Executive Officer Sheldon Adelson, for example. But Culinary Local 226, which represents some 60,000 hotel and restaurant workers on the Strip and downtown, in the form of its Secretary-Treasurer D. Taylor, also made the list.

Monnat wasn't surprised.

"Las Vegas can be considered unlike other major cities in that educational attainment carries very little influence here," Monnat said. "Educated individuals may have less clout in Las Vegas than in any other city in the country. Las Vegas also has a strong Culinary union that carries a great deal of influence, and this is not the case in most major cities."

At the top of this story, we said the list was subjective.

You might think we missed a few names. You might think some individuals are ranked too high, or too low, or shouldn't even be on the list at all.

That's what makes this list subjective.

Often, Monnat will ask her students — especially those who are native to Las Vegas — to name some of the city's most powerful leaders. Former Mayor Goodman, Adelson and Wynn Resorts Ltd. Chairman Steve Wynn are often mentioned. Names associated with the past — ex-UNLV basketball coach Jerry Tarkanian, downtown casino pioneer Benny Binion and the late mobster-turned community philanthropist Moe Dalitz are also mentioned.

"They suggested that there is an irreverence here, more so than other places, where individuals and groups that most cities might shun are awarded prestige," Monnat said. "How many cities have a mob lawyer who goes on to be mayor?"

Copyright of Las Vegas Business Press (10712186) is the property of Las Vegas Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.



**Harry Reid**

71, Senate majority leader, D-Nev.



**Brian Sandoval**

48, governor of Nevada




**Mayors Goodman**

Carolyn Goodman, 72; Oscar Goodman, 72



**Billy Vassiliadis**

55, CEO, R&R Partners



**Christopher Kaempfer**

62, senior partner, Kaempfer Crowell



**Randall Walker**

58, director, Clark County Department of Aviation

# TOP 20 LOCALS WITH INFLUENCE

In the early 1980s, Harry Reid never would have been on this list, much less at the top.

Elected Nevada's youngest-ever lieutenant governor in 1970 at age 30, Reid had seemingly come to the end of his political career by 1980, losing races for the U.S. Senate and Las Vegas mayor.

Today, Reid is the Senate majority leader, an influential post he has held for the last three sessions of Congress. Reid was first elected to the U.S. Senate in 1986 after serving two terms in the U.S. House of Representatives.

Reid is considered by some to be the most powerful politician Nevada has ever had in Washington, D.C.

In his most recent re-election campaign in 2010, Reid took credit for saving the massive $8.5 billion CityCenter project. Reid called banking executives and asked them to consider backing the funds needed to complete the financially troubled Strip development.

Reid's backing of the DesertXpress, the $4 billion high-speed train project between Las Vegas and Victorville, Calif., has made it the leading candidate for the much-discussed rail system.

As a member of the Senate Transportation Committee, Reid brought long-haul airline flights to Las Vegas. He assisted some 15 Las Vegans with getting loan modification funds through the Home Affordable Modification Program, simply by calling Bank of America. Reid also is helping a Chinese company set up a solar plant in Laughlin.

Reid had a successful law practice when he decided to try politics one more time, running and winning a House seat in 1982. He won re-election to the Senate in 1992, 1998, 2004 and 2010.

— Howard Stutz

First-term Republican Gov. Brian Sandoval had to go back on his "no new taxes" pledge late in the 2011 Legislative session when a Supreme Court decision left the state with a $657 million budget hole.

Yet, Sandoval came out of the session, "smelling like a rose," as one lobbyist told the Las Vegas Review-Journal.

Sandoval was credited with putting together the final budget deal and praised by lawmakers from both political parties and lobbyists for becoming personally invested in reaching a budget compromise and by "showing true leadership."

Sandoval has had a varied public career. He served two terms in the Legislature, was chairman of the Nevada Gaming Commission and served as attorney general. He became a federal judge in 2005, but gave up the lifetime appointment to run for governor.

With the Legislature behind him, Sandoval has said time to concentrate on other areas.

His goal is to bring business to Nevada. The primary goal of his administration is to improve economic development and education.

He traveled to Iraq and Kuwait with governors of three other states to visit with troops deployed in the region. Sandoval has participated in summits concerning Lake Tahoe and clean energy.

Some political pundits have placed Sandoval on a list of potential Republicans who could be chosen as the vice presidential running mate for the Republican presidential nominee. Sandoval has brushed aside those suggestions.

— Howard Stutz

When it came time to vote on Oscar Goodman's contract as a roving ambassador for the Las Vegas Convention and Visitors Authority in August, board member Carolyn Goodman received a reminder that she needed to abstain.

As if on script, she shot back, "I've been abstaining my whole life."

With Oscar not opting for a quiet retirement, Carolyn may still find herself in a withholding pattern. Already, Oscar has licensed his name to the Plaza for a restaurant, in addition to this part-time job with the authority, and more ventures may be coming. While he got a lot of mileage in national and even international media as the gin-swilling mayor joined at the hip with showgirls and always at the ready with a Mafia story, it remains to be seen if he can maintain the outsized persona as Oscar without an official title.

Carolyn is still something of a blank slate. After nearly three decades as president of the Meadows School, she is well known as an educator but not as a politician. She has said she will continue Oscar's boosterism for downtown redevelopment, but style differences have started to emerge. Where Oscar often talked about "I" when moving things forward, Carolyn has shown an inclination toward "we." She prefers trying to include people on the front end instead of battling them on the back end.

— Tim O'Reiley

Nevadans profiled on the cover of The New York Times? It's a pretty short list.

But that list includes Billy Vassiliadis, the man whose advertising agency created perhaps the best-known national marketing campaign of the 2000s. Every time you hear a sitcom writer or magazine reporter riff on "What happens here, stays here," give Vassiliadis credit.

Vassiliadis is renowned for his resort-sector marketing, but as a lobbyist and adman, he's represented other major interests such as homebuilders, utilities and mining companies. He's advised some of the state's — and the nation's — most prominent pols, serving as a close adviser to former Nevada Gov. Bob Miller and consulting with presidents George H.W. Bush, Bill Clinton and Barack Obama.

Vassiliadis was born in Greece and grew up in Chicago. He moved to Southern Nevada at age 18 to attend UNLV. A fellow clout holder, Sig Rogich, hired Vassiliadis in 1982 to work at R&R Partners. As Rogich delved into national politics, Vassiliadis transformed R&R into Nevada's most powerful ad agency. He bought the firm from Rogich in 1994.

Since then, Vassiliadis has made himself into a "huckster, deal maker and fixer extraordinaire," as well as "the most powerful unelected person in Nevada," the Times wrote in 2004. Or, as Vassiliadis' bio puts it: "Billy is, simply, the man to see."

Vassiliadis is a fixture at the Legislature, where he represents the Nevada Resort Association. He argued most recently for protecting education funding by keeping 2009 tax increases in place.

— Jennifer Robison

From casino expansions to master-planned communities, Las Vegas attorney Christopher Kaempfer knows how to get projects approved by city and county officials.

He's one of Nevada's top lawyers when it comes to appearing before boards and commissions on planning, zoning, waivers, variances, licensing and other development matters.

Kaempfer handled the legal work for Rhodes Ranch, Southern Highlands, Mountain's Edge and Providence. He's represented Marnell Corrao Associates since 1977.

Kaempfer comes from a legal background — his father was a court reporter for U.S. District Court Judge Roger Foley. Kaempfer attended the University of Nevada, Las Vegas, and got his law degree at the University of the Pacific's McGeorge School of Law in 1975. He then clerked for Foley.

Kaempfer's expertise in real estate development is a function of doing it for 35 years. He's said he turns down 25 percent to 50 percent of the work he's offered because the projects don't make sense.

"I don't take projects that have no reasonable or rational basis for them," he said.

Kaempfer, who was formerly with Kummer Kaempfer Bonner & Renshaw, joined longtime friend Pete Bernhard to form Kaempfer Crowell in 2009.

Kaempfer's firm was recognized by Best Lawyers in America as Nevada's top law firm for land use and zoning laws in 2007, 2008 and 2009.

A baseball fan, Kaempfer serves as general counsel for the Las Vegas 51s minor-league baseball team and coaches girls' softball at Meadows School.

— Hubble Smith

Behind the bureaucratic-sounding title, Randall Walker is Las Vegas' chief gatekeeper as the boss of McCarran International Airport.

More than 40 percent of the area's total visitors fly into town and the resorts have long realized that those fliers spend more and stay longer than people who drive. Visitors' first and departing impressions fall under his purview, whether those visitors arrive on a discount airline or a private jet.

Because he answers to the seven elected county commissioners in public meetings, the limits of his clout sometimes rise to the surface. When developer Bill Walters proposed changing the lease terms covering Bali Hai golf course, Walker's objections were overridden. When union leaders wanted to take operation and maintenance of the passenger shuttle between concourses, Walker's preference for an outside contractor lost.

However, his support for building Terminal 3 helped carry the day when airlines started to raise objections. His staff plays an influential role in picking the winners of potentially lucrative concessions.

Sometimes, patience counts. The commissioners decided a few years ago, against his recommendation, to go from allowing five limo and shuttle van companies to serve the airport to allowing six. But this year quietly went along with his plan to cut the number to four.

Walker, an accountant by training who has spent a career in city or county government and has been McCarran's chief since 1997, has developed a political touch. He meets often with commissioners. And people with airport business, win or lose, always seek him out for a handshake and pleasantries.

— Tim O'Reiley

P8 **BUSINESS PRESS** | SEPTEMBER 19, 2011

      

### D. Taylor
54, secretary-treasurer, Culinary Local 226

### Sheldon Adelson
77, chairman and chief executive officer, Las Vegas Sands Corp.

### Sig Rogich
67, president, Rogich Communications Group

### Jan Jones
62, vice president of communications and government affairs, Caesars Entertainment Corp.

### Steve Wynn
69, founder and chief executive officer, Wynn Resorts Ltd.

### Elaine Wynn
68, director, Wynn Resorts Ltd.

### Andre Agassi
41, retired tennis professional and businessman

---

D. Taylor is probably the only one of our clout honorees who's been arrested.

OK, so the cops called Taylor for failure to clear the streets, a mere misdemeanor during a Culinary Local 226 protest outside Palace Station in February. But Taylor's encounter with handcuffs shows how committed he is to organizing Southern Nevada's hotel-casinos.

Taylor has been with the Culinary for 25 years. Today, he oversees one of the biggest organized-labor groups in the city, with 60,000 members.

Thanks to Taylor's, and the Culinary's, organizing and bargaining influence, the city's dishwashers, food servers and hotel housekeepers have perhaps the best standard of living of service workers anywhere. That includes higher salaries than their counterparts in other cities.

Taylor, a Georgetown University grad who's worked strike detail in cities from Washington, D.C., to San Francisco, joined the union movement after watching his single mom struggle to provide for her family. He's waged high-pitched, high-profile battles with gaming titans, including ordering local Democrats in 2008 not to take campaign money from Las Vegas Sands Corp. owner and union opponent Sheldon Adelson

These days, Taylor has his eyes on another big prize, organizing the 13,000 workers at Station Casinos' 18 local properties. He's also spearheading efforts to shift the burden of proof in discrimination cases from the employee to the employer, which would make for a new standard in labor law

— Jennifer Robison

---

At one time, Sheldon Adelson was the third-richest person in the United States, according to Forbes magazine. He told Bloomberg News his desire was to be No. 1.

But the economy tanked and Las Vegas Sands came close to bankruptcy.

Adelson then invested $1 billion in his own company, reduced his ownership stake to 53 percent and changed management teams.

Today, Las Vegas Sands is on track for $9 billion in annual revenues, operating The Venetian and Palazzo hotel-casinos on the Strip and the Sands Expo and Convention Center. The company is the leading American casino operator in Asia, with three resorts in Macau and a hotel-casino in Singapore.

After its economic setback, Las Vegas Sands restarted development of additional hotel-casinos on Macau's Cotai Strip and is expected to begin opening an additional 5,800 hotel rooms next year.

Adelson was the owner of the large Comdex trade show, which he brought annually to Las Vegas. In 1989, he acquired the Sands Hotel & Casino, eventually closing and demolishing the Rat Pack-era property to build The Venetian.

Adelson is active in Republican politics both nationally and locally. He is expected to play a role in next year's presidential campaign on behalf of the Republican nominee.

With his company's prospects stabilized, Adelson is back on top.

He is said to be the No. 5 wealthiest American and 16th wealthiest person in the world, with a net worth of $23.3 billion.

— Howard Stutz

---

U.S. history might look a little different without Sig Rogich.

Rogich advised the campaigns of two U.S. presidents — Ronald Reagan and George H. W. Bush — and helped Senate Majority Leader Harry Reid, D-Nev., fend off a re-election challenge in 2010.

Along the way, Rogich also started the state's most influential advertising and lobbying firm in R&R Partners, served as ambassador to his native Iceland and assembled a cadre of connections and clients including Wayne Newton, John McCain, Mike Tyson, Donald Trump and Frank Sinatra. And when Reid's campaign needed a boost last fall, Rogich pulled out his Rolodex and assembled Republicans for Reid.

When he's not putting his weight behind political campaigns, Rogich works behind the scenes to make business deals — especially his own — happen. Reid supported a proposed high-speed train to Disneyland, but changed his tune in 2009 and put his money and clout behind DesertXpress Enterprises, a planned $4 billion high-speed train from Las Vegas to Victorville, Calif. Not surprisingly, Reid is also a project booster.

In May, DesertXpress made headlines when its preferred station site near Mandalay Bay ended up in the cross hairs of developers looking to build a $2 billion stadium complex. Handling the stadium developers' publicity? Rogich, through his Rogich Communications Group.

The stadium deal is dead for now, forced for tax reasons to find another site. But for Rogich, it doesn't matter: Thanks to his ability to represent both sides, he comes out a winner either way.

— Jennifer Robison

---

Jan Jones is just as comfortable walking the halls at City Hall as at a Caesars Entertainment Corp. property or in Congress.

Jones refined her political skills as Sin City's first female mayor. She served through the 1990s, as Las Vegas became known as America's quintessential boomtown.

When her second term ended in 1998, Jones looked for another challenge. She found it a year later as vice president of communications and government affairs with Caesars Entertainment, formerly Harrah's Entertainment.

In her position with Caesars, Jones lobbies for gaming's and Nevada's interests before the Legislature in Carson City and before Congress.

Jones has been influential in lobbying lawmakers in Washington to oppose a state-by-state legalization of online gaming, especially poker. Jones believes the Internet is the future of gaming but has argued that it's an interstate activity that must be legalized federally.

She has also been proactive in supporting women in the gaming industry and is on the steering committee for the American Gaming Association's recently formed Global Gaming Women initiative. As a key figure in the industry, Jones will receive the association's 2011 lifetime achievement award for gaming contributions on Oct. 5.

She also serves as a director of the U.S. Chamber of Commerce and the Women's Campaign Fund in Washington D.C. She is also a member of the Women's Leadership Board at the John F. Kennedy School of Government at Harvard University.

— Chris Sieroty

---

Steve Wynn made headlines recently by describing President Barack Obama as "the greatest wet blanket to business, progress and job creation in my lifetime." He's even threatened to move his gaming company, Wynn Resorts Ltd., to Macau.

But to dismiss Wynn, who identifies himself as a "Democratic businessman," for his rants during quarterly conference calls with Wall Street analysts would be a mistake.

The 69-year-old businessman cares deeply about politics, art and his family, but his true passion is designing, building and operating luxury resorts. He played a pivotal role in the 1990s resurgence and expansion of the Strip.

His companies refurbished or built what are now widely recognized resorts, including the Golden Nugget, The Mirage, Treasure Island, Bellagio, Wynn Las Vegas and Encore.

BusinessWeek magazine described Wynn in an April 2005 article as a man who has "put everything into showing he's the guy who makes the best resorts in the world."

These risks have made Wynn wealthy. As of 2011, Forbes magazine ranked Wynn as the 512th richest man in the world, with a net worth of $2.3 billion. He made his debut in the Forbes 400 in September 2003, coming in at No. 377 with a net worth of $650 million.

Wynn was born Stephen Alan Weinberg in New Haven, Conn. Wynn's father ran a string of bingo parlors in Maryland.

In 1963, his father, Michael, died from complications from heart surgery, leaving $350,000 of gaming debts. Wynn took over the family business, doing well enough to buy a stake in the Frontier in Las Vegas just four years later.

The rest is Las Vegas history.

— Chris Sieroty

---

Elaine Wynn has a successful career outside of her former marriages to casino developer Steve Wynn.

She's served on several corporate and philanthropic boards and was co-chairwoman of the Greater Las Vegas After-School All-Stars since 1995. Wynn is also the founding chairwoman of Communities in Schools of Nevada and in 2009 was appointed national chairwoman.

She even has a Las Vegas elementary school named for her.

But her divorce from the chairman of Wynn Resorts Ltd. was very profitable for her, putting her at No. 382 on the Forbes 400 list of wealthiest Americans with a net worth of $1.05 billion.

Wynn told the Las Vegas Review-Journal that being "recognized as having wealth doesn't mean anything, what is meaningful is that if you are successful, what is it that you intend to do with it."

Elaine Farrell Pasca married Steve Wynn in 1963. They divorced in 1986, remarried in 1991, and filed for divorce again in 2009. She remains a director of the casino company's board of directors.

Steve Wynn once said he bought the Desert Inn casino, the site of Wynn Las Vegas, as a birthday present for Elaine.

— Chris Sieroty

---

Las Vegas golden boy Andre Agassi is perhaps one of the most famous human beings to come out of Sin City.

At 16, Agassi, then sporting his famous long hair, earned himself an international fan base as a tennis professional. Throughout his 20-year career he won 60 men's singles titles, including eight Grand Slam singles championships. Agassi is the only male player to win all four Grand Slam titles and an Olympic gold medal.

If that weren't enough achievements for one lifetime, Agassi created The Andre Agassi Charitable Foundation at age 24. Since its inception in 1994, the foundation has built a children's shelter, the Andre Agassi Boys & Girls Club and formed Team Agassi, a program that nurtures professional tennis players. In 2001, the Andre Agassi College Preparatory Academy opened in West Las Vegas and graduated its first senior class in June 2009.

Since retiring from professional tennis in 2006, do-gooder Agassi built a lifestyle business through endorsement relationships, joint venture investments and real estate development. Through Agassi Graf Holdings, Agassi and his wife, tennis star Stefanie Graf, operate their business interests, which include partnerships with Adidas, Head and Kreiss.

— Laura Emerson

















### Peter Bernhard

**62, of counsel, Kaempfer Crowell; chairman, Nevada Gaming Commission**

Peter Bernhard is the longest-serving chairman of the part-time Nevada Gaming Commission, which has the final say in gaming license matters and regulations.

He was first appointed to the commission in 2001 and Gov. Brian Sandoval reappointed him to a new four-year term in April.

Bernhard served as the chairman of the Nevada Commission on Ethics before joining the gaming commission.

In his legal career, Bernhard has represented prominent Nevada individuals, organizations and businesses since 1976.

Before joining the gaming commission, Bernhard handled real estate transactions, including gaming and nongaming properties. He has also been involved with commercial litigation and alternative dispute resolution.

Bernhard, who grew up in Las Vegas, led the commission as the gaming industry dealt with the aftermath of the Sept. 11, 2001, terrorist attacks, the economic upswing in the middle of the decade and the recent recession.

He will now lead the commission as it deals with the debate over creating regulations governing Internet poker.

— Howard Stutz

### Pat Mulroy

**58, general manager, Southern Nevada Water Authority and Las Vegas Valley Water District**

If you need water in Southern Nevada, you'll have to go through Pat Mulroy.

Mulroy oversees the valley's most precious resource as head of the Southern Nevada Water Authority and Las Vegas Valley Water District. She built the agencies from the ground up — water policy in Southern Nevada has Mulroy's fingerprints all over it.

Under her supervision, the agencies implemented progressive water conservation programs, among them paying homeowners to replace their lawns with desert landscaping, during the city's population boom and concurrent drought.

Mulroy navigates the strict appropriations of the 1922 Colorado Compact to obtain water for Nevada, often negotiating with the compact's member states for their unused shares of the Colorado River.

Mulroy's job — to ensure that Southern Nevadans have water — is a powerful one, and not without controversy. She is advocating for water from rural basins in Northern Nevada to be piped down south, which has inspired fierce protests from residents and farmers up north.

— Caitlin McGarry

### Fertitta Bros.

**Frank Fertitta III, 49, chairman, CEO; Lorenzo Fertitta, 42, vice chairman, Station Casinos LLC**

The Hanson brothers from the movie "Slap Shot" are just one example of famous brothers.

Sin City has the Fertittas. They don't wear black glasses or skate like the Hansons, but they do own the professional mixed martial arts company Ultimate Fighting Championship.

The brothers bought the UFC in 2001 for $2 million, and spent $44 million to improve its operations and image. But when they tried to sell, no one would offer more than $4 million.

That was then. In 2004, they debuted the reality show "The Ultimate Fighter." Today, the UFC employs 275 fighters and is worth more than $1 billion.

Both learned about business from their father, Frank Jr., who got his start as a dealer at the Stardust, before creating locals gaming giant Station Casinos.

The empire began in 1976, when Fertitta opened The Casino. The name was changed to Bingo Palace and ultimately to Palace Station in 1983. Station Casinos Inc. went public in 1993. Frank, Lorenzo and Thomas Barrack of Colony Capital LLC took it private for $9 billion in cash and assumed debt in 2008.

Frank Fertitta Jr. died in 2009 — the same year that a combination of debt and the recession put Station and its 18 properties in bankruptcy. Two years later, the company emerged with 17 properties and a more manageable debt level of $2 billion.

In July, Frank Fertitta III said, "Lorenzo and I believe in the future of Las Vegas, which is why we remain committed to the company and the community."

The Fertitta family now owns 45 percent of the restructured company, having invested $200 million to raise its stake from 25 percent before the bankruptcy.

— Chris Sieroty

### Irwin Molasky

**84, managing partner, Molasky Cos.**

Real estate developer Irwin Molasky came to Las Vegas in 1951 with a couple of thousand dollars and now lives in a penthouse suite at Park Towers, the $100 million luxury condominium towers he built at Hughes Center.

Although his most recent developments include Molasky Corporate Center and the Internal Revenue Service building in downtown Las Vegas, Molasky is best known for turning Maryland Parkway into a major commercial corridor, bringing Sunrise Hospital, Nevada Southern University (now UNLV) and the Boulevard Mall to the area.

He also developed the downtown Bank of America plaza and Best of the West shopping center at Lake Mead and Rainbow boulevards.

Molasky, a close friend of casino developer Steve Wynn, said he's never had a desire to go into the gaming business.

"I respect it, but I'm a builder," he said.

Molasky built apartments in California in the late 1940s and started out doing room additions and garage conversions in Las Vegas. He developed seven golf course communities, including what is now called Las Vegas National Golf Club and La Costa Resort and Spa in Southern California.

Molasky, the son of an Ohio businessman, attended military school in Georgia and studied at Ohio State University and UCLA. He loves horse racing and has owned several thoroughbreds over the years, including Breeder's Cup champion Kona Gold.

He's got a middle school and a park in Las Vegas named after him.

— Hubble Smith

### Jim Murren

**50, chairman and chief executive officer, MGM Resorts International**

Jim Murren spent 14 years on Wall Street, but nothing there prepared him for the challenges of the last 34 months.

Murren became chairman and chief executive officer of what was then MGM Mirage when the late Terry Lanni retired in November 2008. He was already the company's chief operating officer and seemingly heir apparent to the CEO role.

Shortly after taking over, MGM faced economic near-catastrophe. Its $8.5 billion CityCenter development was nearly bankrupt and would have taken the company down with it. However, with the help of an executive team and a collection of financial institutions around the world, Murren helped craft a short-term solution that saved the project and the company.

Murren, who held various executive-level positions with MGM Resorts over a 10-year period, including president and chief financial officer, was considered the visionary behind CityCenter. The project opened in December 2009.

Earlier this year, Murren helped engineer a public offering on the Hong Kong Stock Exchange that raised more than $3.4 billion and gave MGM Resorts 51 percent ownership in the MGM Grand Macau.

Murren and his wife, Heather, developed and opened the Nevada Cancer Institute.

— Howard Stutz

### Rossi Ralenkotter

**64, president and chief executive officer, Las Vegas Convention and Visitors Authority**

What happens here often begins with Rossi Ralenkotter.

Although the valley's hotel-casinos all have their own lavish marketing budgets, Ralenkotter has about $180 million a year in room-tax money with which to set the message for the entire city. When people think of "What happens here stays here," and see the message driven home by Hollywood, it comes back to Ralenkotter and the authority.

With a board of directors that can go for months on end without registering a no vote on anything Ralenkotter puts in front of them, many of his ideas turn out to be the finished versions.

His marketing acumen will be tested again in the next few years, as the authority puts a lot more effort into bringing in international visitors and lessening dependence on a slower-growing domestic market.

The operation of the Las Vegas Convention Center also comes under his purview. Although meeting and convention attendees account for less than 20 percent of the city's total visitors, the resorts know that conventioneers' expense accounts mean they spend considerably more on average than the typical T-shirt-wearing tourist can.

Las Vegas Events, another part of the authority that helps stage extravaganzas, will work to fend off Jerry Jones, who hopes to fill the calendar of his Arlington, Texas-based Cowboys Stadium with more than just NFL games, including events that have called Las Vegas home.

— Tim O'Reiley

### Larry Ruvo

**65, founder, Cleveland Clinic Lou Ruvo Center for Brain Health**

Larry Ruvo's influence on Las Vegas can be felt while sampling vintages at the annual UNLVino wine-tasting event and when driving past the Frank Gehry-designed mass of metal known as the Cleveland Clinic Lou Ruvo Center for Brain Health.

Ruvo is the son of Lou and Angelina Ruvo, proprietors of The Venetian Restaurant, a well-known (though now closed) Italian restaurant on West Sahara Avenue. Larry Ruvo's formative years were spent in the hospitality industry, which inspired him to work at a string of casino properties on the Strip.

Ruvo went on to found a liquor distribution company with Steve Wynn in 1970, which has since grown into Southern Wine and Spirits of Nevada. The UNLVino charity event is Ruvo's way of giving back to the University of Nevada, Las Vegas' hotel college.

Ruvo's most important contribution to Las Vegas may be his philanthropic work. Ruvo's father died from Alzheimer's in 1994, after which Ruvo founded the Keep Memory Alive foundation to find a cure for the disease. He raised millions of dollars and decided to open a world-class health care facility for the treatment of cognitive diseases.

If Las Vegas becomes a health care destination, the city will have Larry Ruvo to thank.

— Caitlin McGarry

Copyright of Las Vegas Business Press (10712186) is the property of Las Vegas Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# EXHIBIT 5

10-K 1 d644551d10k.htm 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

---

# FORM 10-K

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the fiscal year ended December 31, 2013**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   For the transition period_____to_____

Commission File No. 000-50028

# WYNN RESORTS, LIMITED
### (Exact name of registrant as specified in its charter)

| NEVADA | 46-0484987 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**3131 Las Vegas Boulevard South—Las Vegas, Nevada 89109**
(Address of principal executive offices) (Zip Code)

**(702) 770-7555**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $.01 par value | Nasdaq Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the registrant's voting and non-voting common stock held by non-affiliates based on the closing price as reported on the NASDAQ Global Select Market on June 30, 2013 was approximately $10.3 billion.

As of February 14, 2014, 101,212,217 shares of the registrant's Common Stock, $.01 par value, were outstanding.

Portions of the registrant's Proxy Statement for its 2014 Annual Meeting of Stockholders to be filed not later than 120 days after the end of the fiscal year covered by this report are incorporated by reference into Part III of this Form 10-K.

Table of Contents

## TABLE OF CONTENTS

**PART I**

| | | |
|---|---|---:|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 18 |
| Item 1B | Unresolved Staff Comments | 34 |
| Item 2. | Properties | 34 |
| Item 3. | Legal Proceedings | 35 |
| Item 4. | Mine Safety Disclosures | 41 |

**PART II**

| | | |
|---|---|---:|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 42 |
| Item 6. | Selected Financial Data | 42 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 44 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 70 |
| Item 8. | Financial Statements and Supplementary Data | 73 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 127 |
| Item 9A. | Controls and Procedures | 127 |
| Item 9B. | Other Information | 127 |

**PART III**

| | | |
|---|---|---:|
| Item 10. | Directors, Executive Officers and Corporate Governance | 128 |
| Item 11. | Executive Compensation | 128 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 128 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 129 |
| Item 14. | Principal Accountant Fees and Services | 129 |

**PART IV**

| | | |
|---|---|---:|
| Item 15. | Exhibits and Financial Statement Schedules | 130 |
| Signatures | | 145 |

Table of Contents

PART I

ITEM 1.        BUSINESS

Overview

Wynn Resorts, Limited, a Nevada corporation, was formed in June 2002, is led by Chairman and Chief Executive Officer, Stephen A. Wynn, and is a leading developer, owner and operator of destination casino resorts. Wynn Resorts, Limited currently owns 72.3% of Wynn Macau, Limited which operates a casino hotel resort property in the Macau Special Administrative Region of the People's Republic of China ("Macau"). In Las Vegas, Nevada, we own and operate Wynn Las Vegas, which includes Encore at Wynn Las Vegas. We present our results based on the following two segments: Macau Operations and Las Vegas Operations. For more information on the financial results for our segments, see Item 8—"Financial Statements and Supplementary Data", Note 17 "Segment Information."

Unless the context otherwise requires, all references herein to "Wynn Resorts," the "Company," "we," "us" or "our," or similar terms, refer to Wynn Resorts, Limited and its consolidated subsidiaries.

Wynn Resorts files annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments of such reports with the Securities and Exchange Commission ("SEC"). Any document Wynn Resorts files may be inspected, without charge, at the SEC's public reference room at 100 F Street, N.E. Washington, D.C. 20549 or at the SEC's internet site address at http://www.sec.gov. Information related to the operation of the SEC's public reference room may be obtained by calling the SEC at 1-800-SEC-0330. In addition, through our own internet address at www.wynnresorts.com, Wynn Resorts provides a hyperlink to a third-party SEC filing website which posts these filings as soon as reasonably practicable, where they can be reviewed without charge. The information found on our website is not a part of this Annual Report on Form 10-K or any other report we file or furnish to the SEC.

Our Resorts

Macau Operations

Wynn Macau opened on September 6, 2006. On April 21, 2010, we opened Encore at Wynn Macau, an expansion of Wynn Macau. We refer to the fully integrated Wynn Macau and Encore at Wynn Macau resort as "Wynn Macau | Encore" or as our "Macau Operations." We believe that this resort offers exceptional accommodations, amenities and service.

Our Macau Operations feature 1,008 spacious guest rooms and suites, 493 table games, 866 slot machines and a poker pit in approximately 280,000 square feet of casino gaming space (including sky casinos and private gaming salons), casual and fine dining in eight restaurants, two spas and a salon, lounges, meeting facilities and approximately 57,000 square feet of retail space featuring boutiques from Bvlgari, Cartier, Chanel, Dior, Dunhill, Ermenegildo Zegna, Ferrari, Giorgio Armani, Graff, Gucci, Hermes, Hugo Boss, Jaeger-LeCoultre, Loro Piana, Louis Vuitton, Miu Miu, Piaget, Prada, Roger Dubuis, Rolex, Tiffany, Tudor, Vacheron Constantin, Van Cleef & Arpels, Versace, Vertu, and others. Our Macau Operations include a show in the rotunda featuring a Chinese zodiac-inspired ceiling along with gold "prosperity tree" and "dragon of fortune" attractions.

Las Vegas Operations

Wynn Las Vegas opened on April 28, 2005. On December 22, 2008, we opened Encore at Wynn Las Vegas, an expansion of Wynn Las Vegas. We refer to the fully integrated Wynn Las Vegas and Encore at Wynn Las Vegas resort as "Wynn Las Vegas | Encore" or as our "Las Vegas Operations." We believe that this resort offers exceptional accommodations, amenities and service.

3

Table of Contents

Our Las Vegas Operations feature 4,748 hotel rooms and suites, 230 table games, 1,854 slot machines, a race and sports book and a poker room in approximately 186,000 square feet of casino gaming space (including a sky casino and private gaming salons), casual and fine dining in 34 food and beverage outlets, two spas and salons, lounges, and approximately 96,000 square feet of retail space featuring boutiques from Alexander McQueen, Brioni, Cartier, Chanel, Chloé, Chopard, Dior, Graff, Hermes, IWC Schaffhausen, Jaeger-LeCoultre, Loro Piana, Louis Vuitton, Manolo Blahnik, Nicholas Kirkwood, Oscar de la Renta, Piaget, Rolex, Vertu and others. Our Las Vegas Operations also offer three nightclubs, a beach club, a Ferrari and Maserati automobile dealership, wedding chapels, an 18-hole golf course, approximately 284,000 square feet of meeting space, a specially designed theater presenting "Le Rêve-The Dream," a water-based theatrical production, and the Encore Theater presenting various headliner entertainment acts throughout the year.

See Item 7—"Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations" for more information.

**Construction and Development Opportunities**

In the ordinary course of our business, and as a market leader and innovator, we have made and continue to make certain enhancements and refinements to our resort complexes.

In September 2011, Palo Real Estate Company Limited ("Palo") and Wynn Resorts (Macau), S.A. ("Wynn Macau"), each an indirect subsidiary of Wynn Macau, Limited, formally accepted the terms and conditions of a draft land concession contract from the Macau government for approximately 51 acres of land in the Cotai area of Macau. On May 2, 2012, the land concession contract was gazetted by the government of Macau evidencing the final step in the granting of the land concession.

The initial term of the land concession contract is 25 years from May 2, 2012, and it may be renewed with government approval for successive periods. The total land premium payable, including interest as required by the land concession contract, is $193.4 million. An initial payment of $62.5 million was paid in December 2011, with eight additional semi-annual payments of approximately $16.4 million each (including interest at 5%) which began in November 2012. As of December 31, 2013, the Company has recorded this obligation and related asset with $29.3 million included as a current liability and $46.8 million included as a long-term liability. The Company will also be required to make annual lease payments of $0.8 million during the resort construction period and annual lease payments of approximately $1.1 million once the development is completed.

On the land subject to the land concession discussed above, we are currently constructing Wynn Palace, a full-scale integrated resort containing a 1,700-room hotel, performance lake, meeting space, casino, spa, retail offerings and food and beverage outlets. The total project budget, including construction costs, capitalized interest, pre-opening expenses, land costs and financing fees, is $4 billion. As of December 31, 2013, we have invested $703.7 million in the project. We continue to remain on schedule for an opening in the first half of 2016.

On July 29, 2013, Wynn Macau and Palo executed a guaranteed maximum price construction ("GMP") contract with Leighton Contractors (Asia) Limited, acting as the general contractor. Under the GMP contract, the general contractor is responsible for both the construction and design of the project. The general contractor is obligated to substantially complete the project in the first half of 2016 for a guaranteed maximum price of HK$20 billion (approximately $2.57 billion). An early completion bonus for achievement of substantial completion on or before January 25, 2016, will be paid to the general contractor if certain conditions are satisfied under the GMP contract. Both the contract time and guaranteed maximum price are subject to further adjustment under certain specified conditions. The performance of the general contractor is backed by a full completion guarantee given by Leighton Holdings Limited, the parent company of the general contractor, as well as a performance bond for 5% of the guaranteed maximum price.

4

Table of Contents

**Our Strategy**

We believe that Steve Wynn is the preeminent designer, developer and operator of destination casino resorts and has developed brand name status. Mr. Wynn's involvement with our casino resorts provides a distinct advantage over other gaming enterprises. We integrate luxurious surroundings, distinctive entertainment and superior amenities, including convention facilities, entertainment, fine dining and premium retail offerings, to create resorts that appeal to our international customer base.

Our resorts are designed, built and operated to provide a premium experience for our guests. Our business is dependent upon repeat visitation from our guests and we believe superior customer experience and service is the best marketing strategy to attract and retain our customers. Our company heavily emphasizes human resources and staff training to ensure our employees are prepared to provide the luxury service that our guests expect. We market our resorts directly to gaming customers using database marketing techniques, as well as traditional incentives, including reduced room rates and complimentary meals and suites. Our rewards system offers discounted and complimentary meals, lodging and entertainment for our guests. We also create general market awareness for our resorts through various media channels, including social media, television, radio, newspapers, magazines, the internet, direct mail and billboards.

Mr. Wynn and his team bring significant experience in designing, developing and operating casino resorts. The senior executive team has an average of over 25 years of experience in the hotel and gaming industries. We also have an approximately 125-person design, development and construction subsidiary, the senior management of which has significant experience in all major construction disciplines.

For the sixth consecutive year, Wynn Macau and The Spa at Wynn Macau received the Forbes five-star distinction, while Encore at Wynn Macau and the Spa at Encore at Wynn Macau received the Forbes five-star distinction for the second consecutive year. For the eighth consecutive year, The Tower Suites at Wynn Las Vegas has received the Forbes five-star distinction. The Spa at Wynn Las Vegas earned five-star recognition from Forbes for the sixth year in a row. The Tower Suites at Encore and the Spa at Encore are also recipients of the Forbes five-star distinction. In addition, a number of restaurants in our resorts have earned star-distinction from Forbes, with 38 stars in total for the current year.

We continually seek out new opportunities for additional gaming or related businesses, in the United States, and worldwide. On November 11, 2013, we announced that our Board had elected to withdraw the previously filed application for a gaming license in Pennsylvania. We have made an application for a gaming license in Massachusetts. The process is competitive and we do not expect to know the outcome until the end of the first half of 2014. Proceeding with this project will require significant expenditure of Company funds. In addition, we are exploring expansion opportunities in other international jurisdictions.

**Market and Competition**

The casino resort industry is highly competitive. Both our Macau Operations and our Las Vegas Operations compete with other high-quality casino resorts. Resorts located on or near our properties compete on the basis of overall atmosphere, range of amenities, level of service, price, location, entertainment, themes and size, among other factors. We seek to differentiate our Macau and Las Vegas resorts from other major resorts by concentrating on our fundamental elements of superior design, atmosphere, personal service and luxury.

**Macau**

Macau is governed as a special administrative region of China and is located approximately 37 miles southwest of, and approximately one hour away via ferry from, Hong Kong. Macau, which has been a casino destination for more than 50 years, consists principally of a peninsula on mainland China, with two neighboring islands, Taipa and Coloane, between which the Cotai area is located. In 2002, the government of Macau ended a

5

Table of Contents

40 year monopoly of the conduct of gaming operations by conducting a competitive process resulting in the issuance of concessions to conduct gaming operations to three concessionaires (including Wynn Macau), who in turn were permitted, subject to the approval of the government of Macau, to each grant one subconcession, resulting in a total of six gaming concessionaires. In addition to Wynn Macau, each of Sociedade de Jogos de Macau ("SJM") and Galaxy Entertainment Group Limited are primary concessionaires and Sands China Ltd., Melco Crown and MGM China Holdings Limited operate under subconcessions. There is no limit to the number of casinos each concessionaire is permitted to operate, but each facility is subject to government approval. Currently, there are 35 operating casinos in Macau.

We believe that Macau is located in one of the world's largest concentrations of potential gaming customers. According to Macau Statistical Information, casinos in Macau, the largest gaming market in the world, generated approximately $45.2 billion in gaming revenue in 2013, an 18.6% increase over the approximately $38.1 billion generated in 2012, and a significant increase over the approximately $2.9 billion generated in 2002.

Macau's gaming market is primarily dependent on tourists. Tourist arrivals in 2013 were 29.3 million, compared to 28.1 million in 2012. The Macau market has also experienced tremendous growth in capacity in the last several years. As of December 31, 2013, there were 27,764 hotel rooms, 5,750 table games and 13,106 slot machines in Macau, compared to 12,978 hotel rooms, 2,762 table games and 6,546 slot machines as of December 31, 2006.

Gaming customers traveling to Macau have typically come from nearby destinations in Asia including Hong Kong, mainland China, Taiwan, South Korea and Malaysia. According to the Macau Statistics and Census Service Monthly Bulletin of Statistics, approximately 90% of the tourists who visited Macau in 2013 came from Hong Kong, mainland China and Taiwan. Travel to Macau by citizens of mainland China requires a visa. Chinese government officials have, on occasion, exercised their authority to adjust the visa policy and may do so in the future.

Wynn Macau faces competition from casinos located throughout Asia, as well as other major gaming centers located around the world, including Singapore, Australia, Las Vegas and cruise ships in Asia that offer gaming.

**Las Vegas**

Las Vegas is the largest gaming market in the United States. During 2013, the economic environment in the gaming and hotel markets in Las Vegas continued to improve with increased levels of gaming revenue and hotel room demand. While these gaming and hotel statistics have increased from prior year levels, uncertainty still exists in the Las Vegas market. During 2013, the average daily room rate increased 2.4%, visitation remained relatively flat at 39.7 million visitors, and Las Vegas Strip gaming revenues increased 4.8%, all as compared to the year ended December 31, 2012. During 2012, the average daily room rate increased 2.8%, visitation increased 2.1% to 39.7 million visitors, and Las Vegas Strip gaming revenues increased 2.3%, all as compared to the year ended December 31, 2011.

Our Las Vegas Operations are located on the Las Vegas Strip and compete with other high-quality resorts and hotel casinos in Las Vegas. Our Las Vegas Operations also compete, to some extent, with other casino resorts in Nevada and throughout the United States, and elsewhere in the world. The legalization of casino gaming in or near metropolitan areas from which we attract customers could have a negative effect on our business. New or renovated casinos in Asia, including Singapore, the Philippines, South Korea and Macau, could draw gaming customers away from Las Vegas.

6

Table of Contents

**Geographic Data**

Geographic data are reported in Item 8—"Financial Statements and Supplementary Data", Note 17 "Segment Information." Additional financial data about our geographic operations is provided in Item 7—"Management's Discussion and Analysis of Financial Condition and Results of Operations".

**Regulation and Licensing**

**Macau**

*General.* As a casino concessionaire, Wynn Macau, an indirect 72.3% owned subsidiary of the Company, is subject to the regulatory control of the Government of Macau. The government has adopted Laws and Administrative Regulations governing the operation of casinos in Macau. Only concessionaires or subconcessionaires are permitted to operate casinos. Subconcessions may be awarded subject to the approval of the Macau government and each concessionaire has issued one subconcession. Each concessionaire was required to enter into a concession agreement with the Macau government which, together with the Law and Administrative Regulations, form the framework for the regulation of the activities of the concessionaire.

Under the Law and Administrative Regulations, concessionaires are subject to suitability requirements relating to background, associations and reputation, as are stockholders of 5% or more of a concessionaire's equity securities, officers, directors and key employees. The same requirements apply to any entity engaged by a concessionaire to manage casino operations. Concessionaires are required to satisfy minimum capitalization requirements, demonstrate and maintain adequate financial capacity to operate the concession and submit to continuous monitoring of their casino operations by the Macau government. Concessionaires also are subject to periodic financial reporting requirements and reporting obligations with respect to, among other things, certain contracts, financing activities and transactions with directors, financiers and key employees. Transfers or the encumbering of interests in concessionaires must be reported to the Macau government and are ineffective without government approval.

Each concessionaire is required to engage an executive director who must be a permanent resident of Macau and the holder of at least 10% of the capital stock of the concessionaire. The appointment of the executive director and of any successor is ineffective without the approval of the Macau government. All contracts placing the management of a concessionaire's casino operations with a third party also are ineffective without the approval of the Macau government.

Concessionaires are subject to a special gaming tax of 35% of gross gaming revenue, and must also make an annual contribution of up to 4% of gross gaming revenue for the promotion of public interests, social security, infrastructure and tourism. Concessionaires are obligated to withhold applicable taxes, according to the rate in effect as set by the government, from any commissions paid to games promoters. The withholding rate may be adjusted from time to time.

A games promoter, also known as a junket representative, is a person who, for the purpose of promoting casino gaming activity, arranges customer transportation and accommodations, and provides credit in their sole discretion, food and beverage services and entertainment in exchange for commissions or other compensation from a concessionaire. Macau law provides that games promoters must be licensed by the Macau government in order to do business with and receive compensation from concessionaires. For a license to be obtained, direct and indirect owners of 5% or more of a games promoter (regardless of its corporate form or sole proprietor status), its directors and its key employees must be found suitable. Applicants are required to pay the cost of license investigations, and are required to maintain suitability standards during the period of licensure. The term of a games promoters' license is one calendar year, and licenses can be renewed for additional periods upon the submission of renewal applications. Natural person junket representative licensees are subject to a suitability verification process every three years and business entity licensees are subject to the same requirement every six years. The Gaming Inspection and Coordination Bureau ("DICJ") implemented certain instructions in 2009,

7

Table of Contents

which have the force of law, relating to commissions paid to, and by, games promoters. Such instructions also impose certain financial reporting and audit requirements on games promoters.

Under Macau law, licensed games promoters must identify outside contractors who assist them in their promotion activities. These contractors are subject to approval of the Macau government. Changes in the management structure of business entity games promoters licensees must be reported to the Macau government and any transfer or the encumbering of interests in such licensees is ineffective without prior government approval. To conduct gaming promotion activities licensees must be registered with one or more concessionaires and must have written contracts with such concessionaires, copies of which must be submitted to the Macau government.

Macau law further provides that concessionaires are jointly responsible with their games promoters for the activities of such representatives and their directors and contractors in the concessionaires' casinos, and for their compliance with applicable laws and regulations. Concessionaires must submit annual lists of their games promoters, and must update such lists on a quarterly basis. The Macau government may designate a maximum number of games promoters and specify the number of games promoters a concessionaire is permitted to engage. Concessionaires are subject to periodic reporting requirements with respect to commissions paid to their games promoters representatives and are required to oversee their activities and report instances of unlawful activity.

The government of Macau may assume temporary custody and control over the operation of a concession in certain circumstances. During any such period, the costs of operations must be borne by the concessionaire. The government of Macau also may redeem a concession starting at an established date after the entering into effect of a concession. The government of Macau may also terminate a concession for cause, including, without limitation, failure of the concessionaire to fulfill its obligations under law or the concession contract.

*Concession Agreement.* The concession agreement between Wynn Macau and the Macau government required Wynn Macau to construct and operate one or more casino gaming properties in Macau, including, at a minimum, one full-service casino resort by the end of December 2006, and to invest not less than a total of 4 billion Macau patacas (approximately $500 million) in Macau-related projects by June 2009. These obligations were satisfied upon the opening of Wynn Macau in 2006.

Wynn Macau was also obligated to obtain, and did obtain, a 700 million Macau pataca (approximately $87 million) bank guarantee from Banco National Ultramarino, S.A. ("BNU") that was effective until March 31, 2007. The amount of this guarantee was reduced to 300 million Macau patacas (approximately $37 million) for the period from April 1, 2007 until 180 days after the end of the term of the concession agreement. This guarantee, which is for the benefit of the Macau government, assures Wynn Macau's performance under the casino concession agreement, including the payment of premiums, fines and indemnity for any material failure to perform the concession agreement. Wynn Macau is obligated, upon demand by BNU, to promptly repay any claim made on the guarantee by the Macau government. BNU is currently paid an annual fee by Wynn Macau for the guarantee of approximately 5.2 million patacas (approximately $0.7 million).

The government of Macau may redeem the concession beginning on June 24, 2017, and in such event Wynn Macau will be entitled to fair compensation or indemnity. The amount of such compensation or indemnity will be determined based on the amount of revenue generated during the tax year prior to the redemption multiplied for the remaining years under the concession.

The government of Macau may unilaterally rescind the concession if Wynn Macau fails to fulfill its fundamental obligations under the concession agreement. The concession agreement expressly provides that the government of Macau may unilaterally rescind the concession agreement if Wynn Macau:

- conducts unauthorized games or activities that are excluded from its corporate purpose;

- abandons or suspends gaming operations in Macau for more than seven consecutive days (or more than 14 days in a civil year) without justification;

8

Table of Contents

- defaults in payment of taxes, premiums, contributions or other required amounts;
- does not comply with government inspections or supervision;
- systematically fails to observe its obligations under the concession system;
- fails to maintain bank guarantees or bonds satisfactory to the government;
- is the subject of bankruptcy proceedings or becomes insolvent;
- engages in serious fraudulent activity, damaging to the public interest; or,
- repeatedly and seriously violates applicable gaming laws.

If the government of Macau unilaterally rescinds the concession agreement for one of the reasons stated above, Wynn Macau will be required to compensate the government in accordance with applicable law, and the areas defined as casino under Macau law and all of the gaming equipment pertaining to the gaming operations of Wynn Macau will be transferred to the government without compensation. In addition, the government of Macau may, in the public interest, unilaterally terminate the concession at any time, in which case Wynn Macau would be entitled to reasonable compensation.

### Nevada

*Introduction.* The ownership and operation of casino gaming facilities in the State of Nevada are subject to the Nevada Gaming Control Act and the regulations made under the Act, as well as to various local ordinances. Our Las Vegas Operations are subject to the licensing and regulatory control of the Nevada Gaming Commission, the Nevada State Gaming Control Board and the Clark County Liquor and Gaming Licensing Board, which we refer to herein collectively as the "Nevada Gaming Authorities."

*Policy Concerns of Gaming Laws.* The laws, regulations and supervisory procedures of the Nevada Gaming Authorities are based upon declarations of public policy. Such public policy concerns include, among other things:

- preventing unsavory or unsuitable persons from being directly or indirectly involved with gaming at any time or in any capacity;
- establishing and maintaining responsible accounting practices and procedures;
- maintaining effective controls over the financial practices of licensees, including establishing minimum procedures for internal fiscal affairs and safeguarding assets and revenue, providing reliable recordkeeping and requiring the filing of periodic reports with the Nevada Gaming Authorities;
- preventing cheating and fraudulent practices; and
- providing a source of state and local revenue through taxation and licensing fees.

Changes in applicable laws, regulations and procedures could have significant negative effects on our Las Vegas gaming operations and our financial condition and results of operations.

*Owner and Operator Licensing Requirements.* Our subsidiary, Wynn Las Vegas, LLC, the owner and operator of our Las Vegas Operations, has been approved by the Nevada Gaming Authorities as a limited liability company licensee, referred to as a company licensee, which includes approval to conduct casino gaming operations, including a race book and sports pool and pari-mutuel wagering. These gaming licenses are not transferable.

*Company Registration Requirements.* Wynn Resorts was found suitable by the Nevada Gaming Commission to own the equity interests of Wynn Resorts Holdings, LLC ("Wynn Resorts Holdings"), a wholly owned subsidiary of Wynn Resorts, and to be registered by the Nevada Gaming Commission as a publicly traded corporation, referred to as a registered company, for the purposes of the Nevada Gaming Control Act. Wynn Resorts Holdings was found suitable by the Nevada Gaming Commission to own the equity interests of Wynn

9

Table of Contents

Las Vegas, LLC and to be registered by the Nevada Gaming Commission as an intermediary company. In addition to being licensed, Wynn Las Vegas, LLC, as an issuer of debt securities registered with the SEC, also qualified as a registered company. Wynn Las Vegas Capital Corp., a co-issuer of the debt securities, was not required to be registered or licensed, but may be required to be found suitable as a lender or financing source.

Periodically, we are required to submit detailed financial and operating reports to the Nevada Gaming Commission and provide any other information that the Nevada Gaming Commission may require. Substantially all of our material loans, leases, sales of securities and similar financing transactions must be reported to, and/or approved by, the Nevada Gaming Commission.

*Individual Licensing Requirements.* No person may become a more than 5% stockholder or member of, or receive any percentage of the profits of, an intermediary company or company licensee without first obtaining licenses and approvals from the Nevada Gaming Authorities. The Nevada Gaming Authorities may investigate any individual who has a material relationship to or material involvement with us to determine whether the individual is suitable or should be licensed as a business associate of a gaming licensee. Certain of our officers, directors and key employees have been or may be required to file applications with the Nevada Gaming Authorities and are or may be required to be licensed or found suitable by the Nevada Gaming Authorities. All applications required as of the date of this report have been filed. However, the Nevada Gaming Authorities may require additional applications and may also deny an application for licensing for any reason which they deem appropriate. A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation. An applicant for licensing or an applicant for a finding of suitability must pay or must cause to be paid all the costs of the investigation. Changes in licensed positions must be reported to the Nevada Gaming Authorities and, in addition to their authority to deny an application for a finding of suitability or licensing, the Nevada Gaming Authorities have the jurisdiction to disapprove a change in a corporate position.

If the Nevada Gaming Authorities were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the Nevada Gaming Commission may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review in Nevada.

*Redemption of Securities Owned By an Unsuitable Person.* The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the Board of Directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts. The redemption price will be the amount, if any, required by the gaming authority or, if the gaming authority does not determine the price, the sum deemed by the Board of Directors to be the fair value of the securities to be redeemed. If Wynn Resorts determines the redemption price, the redemption price will be capped at the closing price of the shares on the principal national securities exchange on which the shares are listed on the trading day before the redemption notice is given. If the shares are not listed on a national securities exchange, the redemption price will be capped at the closing sale price of the shares as quoted on The NASDAQ Global Select Market or if the closing price is not reported, the mean between the bid and ask prices, as quoted by any other generally recognized reporting system. Wynn Resorts' right of redemption is not exclusive of any other rights that it may have or later acquire under any agreement, its bylaws or otherwise. The redemption price may be paid in cash, by promissory note, or both, as required, and pursuant to the terms established by, the applicable Gaming Authority and if, not, as the Board of Directors of Wynn Resorts elects, and as set forth in the Company's articles of incorporation.

On February 18, 2012, Wynn Resorts' Gaming Compliance Committee concluded an investigation after receiving an independent report by Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing a pattern of

10

Table of Contents

misconduct by Aruze USA, Inc. (at the time a stockholder of Wynn Resorts), Universal Entertainment Corporation, Aruze USA, Inc.'s parent company, and Kazuo Okada, (the majority shareholder of Universal Entertainment Corporation and a former member of the Board of Directors of Wynn Resorts and Wynn Macau, Limited) (collectively, the "Okada Parties").

Based on the Freeh Report, the Board of Directors of Wynn Resorts determined that the Okada Parties are "unsuitable persons" under Article VII of the Company's articles of incorporation. The Board of Directors was unanimous (other than Mr. Okada) in its determination. After authorizing the redemption of the Aruze shares, the Board of Directors took certain actions to protect the Company and its operations from any influence of an unsuitable person, including placing limitations on the provision of certain operating information to unsuitable persons and formation of an Executive Committee of the Board to manage the business and affairs of the Company during the period between each annual meeting. The Charter of the Executive Committee provides that "Unsuitable Persons" are not permitted to serve on the Committee. All members of the Board, other than Mr. Okada, were appointed to the Executive Committee on February 18, 2012. The Board of Directors also requested that Mr. Okada resign as a director of Wynn Resorts (under Nevada corporation law, a board of directors does not have the power to remove a director) and recommended that Mr. Okada be removed as a member of the Board of Directors of Wynn Macau, Limited. In addition, on February 18, 2012, Mr. Okada was removed from the Board of Directors of Wynn Las Vegas Capital Corp., an indirect wholly owned subsidiary of Wynn Resorts. On February 24, 2012, Mr. Okada was removed from the Board of Directors of Wynn Macau, Limited and on February 22, 2013, he was removed from the Board of Directors of Wynn Resorts by a stockholder vote in which 99.6% of the over 86 million shares voted were cast in favor of removal. Additionally, Mr. Okada resigned from the Board of Directors of Wynn Resorts on February 21, 2013. Although the Company has retained the structure of the Executive Committee, the Board has resumed its past role in managing the business and affairs of the Company.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares held by Aruze USA, Inc. under the terms of the Stockholders Agreement (as defined below). Pursuant to its articles of incorporation, Wynn Resorts issued the Redemption Price Promissory Note (the "Redemption Note") to Aruze USA, Inc. in redemption of the shares. The Redemption Note has a principal amount of $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Note. The Company may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts or any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

The Okada Parties have challenged the redemption of Aruze USA, Inc.'s shares and the Company is currently involved in litigation with those parties as well as related shareholder derivative litigation. See Item 1A—"Risk Factors", Item 3—"Legal Proceedings" and Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies". The outcome of these various proceedings cannot be predicted. The Company's claims and the Okada Parties' counterclaims are in a preliminary stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any. An adverse judgment or settlement involving payment of a material amount could cause a material adverse effect on our financial condition.

11

Table of Contents

*Consequences of Violating Gaming Laws.* If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

*Requirements for Voting or Nonvoting Securities Holders.* Regardless of the number of shares held, any beneficial owner of Wynn Resorts' voting or nonvoting securities may be required to file an application, be investigated and have that person's suitability as a beneficial owner of voting securities determined if the Nevada Gaming Commission has reason to believe that the ownership would be inconsistent with the declared policies of the State of Nevada. If the beneficial owner of the voting or nonvoting securities of Wynn Resorts who must be found suitable is a corporation, partnership, limited partnership, limited liability company or trust, it must submit detailed business and financial information including a list of its beneficial owners. The applicant must pay all costs of the investigation incurred by the Nevada Gaming Authorities in conducting any investigation.

The Nevada Gaming Control Act requires any person who acquires more than 5% of the voting securities of a registered company to report the acquisition to the Nevada Gaming Commission. The Nevada Gaming Control Act requires beneficial owners of more than 10% of a registered company's voting securities to apply to the Nevada Gaming Commission for a finding of suitability within 30 days after the Chairman of the Nevada State Gaming Control Board mails the written notice requiring such filing. However, an "institutional investor," as defined in the Nevada Gaming Control Act, which beneficially owns more than 10% but not more than 11% of a registered company's voting securities as a result of a stock repurchase by the registered company may not be required to file such an application. Further, an institutional investor which acquires more than 10%, but not more than 25%, of a registered company's voting securities may apply to the Nevada Gaming Commission for a waiver of a finding of suitability if the institutional investor holds the voting securities for investment purposes only. An institutional investor that has obtained a waiver may hold more than 25% but not more than 29% of a registered company's voting securities and maintain its waiver where the additional ownership results from a stock repurchase by the registered company. An institutional investor will not be deemed to hold voting securities for investment purposes unless the voting securities were acquired and are held in the ordinary course of business as an institutional investor and not for the purpose of causing, directly or indirectly, the election of a majority of the members of the Board of Directors of the registered company, a change in the corporate charter, bylaws, management, policies or operations of the registered company, or any of its gaming affiliates, or any other action which the Nevada Gaming Commission finds to be inconsistent with holding the registered company's voting securities for investment purposes only. Activities which are not deemed to be inconsistent with holding voting securities for investment purposes only include:

- voting on all matters voted on by stockholders or interest holders;

- making financial and other inquiries of management of the type normally made by securities analysts for informational purposes and not to cause a change in management, policies or operations; and,

- other activities that the Nevada Gaming Commission may determine to be consistent with such investment intent.

The articles of incorporation of Wynn Resorts include provisions intended to assist its implementation of the above restrictions.

Wynn Resorts is required to maintain a current stock ledger in Nevada which may be examined by the Nevada Gaming Authorities at any time. If any securities are held in trust by an agent or by a nominee, the record

12

Table of Contents

holder may be required to disclose the identity of the beneficial owner to the Nevada Gaming Authorities. A failure to make the disclosure may be grounds for finding the record holder unsuitable. We are required to provide maximum assistance in determining the identity of the beneficial owner of any of Wynn Resorts' voting securities. The Nevada Gaming Commission has the power to require the stock certificates of any registered company to bear a legend indicating that the securities are subject to the Nevada Gaming Control Act. The certificates representing shares of Wynn Resorts' common stock note that the shares are subject to a right of redemption and other restrictions set forth in Wynn Resorts' articles of incorporation and bylaws and that the shares are, or may become, subject to restrictions imposed by applicable gaming laws.

*Consequences of Being Found Unsuitable.* Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the Nevada Gaming Commission or by the Chairman of the Nevada State Gaming Control Board, or who refuses or fails to pay the investigative costs incurred by the Nevada Gaming Authorities in connection with the investigation of its application, may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any person found unsuitable and who holds, directly or indirectly, any beneficial ownership of any voting security or debt security of a registered company beyond the period of time as may be prescribed by the Nevada Gaming Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to hold an equity interest or to have any other relationship with us, we:

- pay that person any dividend or interest upon any voting securities;

- allow that person to exercise, directly or indirectly, any voting right held by that person relating to Wynn Resorts;

- pay remuneration in any form to that person for services rendered or otherwise; or,

- fail to pursue all lawful efforts to require the unsuitable person to relinquish such person's voting securities including, if necessary, the immediate purchase of the voting securities for cash at fair market value.

*Gaming Laws Relating to Debt Securities Ownership.* The Nevada Gaming Commission may, in its discretion, require the owner of any debt or similar securities of a registered company, to file applications, be investigated and be found suitable to own the debt or other security of the registered company if the Nevada Gaming Commission has reason to believe that such ownership would otherwise be inconsistent with the declared policies of the State of Nevada. If the Nevada Gaming Commission decides that a person is unsuitable to own the security, then under the Nevada Gaming Control Act, the registered company can be sanctioned, including the loss of its approvals if, without the prior approval of the Nevada Gaming Commission, it:

- pays to the unsuitable person any dividend, interest or any distribution whatsoever;

- recognizes any voting right by the unsuitable person in connection with the securities;

- pays the unsuitable person remuneration in any form; or,

- makes any payment to the unsuitable person by way of principal, redemption, conversion, exchange, liquidation or similar transaction.

*Approval of Public Offerings.* We may not make a public offering without the prior approval of the Nevada Gaming Commission if the proceeds from the offering are intended to be used to construct, acquire or finance gaming facilities in Nevada, or to retire or extend obligations incurred for those purposes or for similar transactions. On March 21, 2013, the Nevada Gaming Commission granted us and Wynn Las Vegas, LLC prior approval, subject to certain conditions, to make public offerings for a period of three years (the "Shelf Approval"). The Shelf Approval also applies to any affiliated company wholly owned by us which is a publicly traded corporation or would thereby become a publicly traded corporation pursuant to a public offering. The Shelf Approval may be rescinded for good cause without prior notice upon the issuance of an interlocutory stop

13

Table of Contents

order by the Chairman of the Nevada State Gaming Control Board. The Shelf Approval does not constitute a finding, recommendation or approval by any of the Nevada Gaming Authorities as to the accuracy or adequacy of the offering memorandum or the investment merits of the securities. Any representation to the contrary is unlawful.

*Approval of Changes in Control.* A registered company must obtain the prior approval of the Nevada Gaming Commission with respect to a change in control through merger; consolidation; stock or asset acquisitions; management or consulting agreements; or any act or conduct by a person by which the person obtains control of the registered company.

Entities seeking to acquire control of a registered company must satisfy the Nevada State Gaming Control Board and Nevada Gaming Commission with respect to a variety of stringent standards before assuming control of the registered company. The Nevada Gaming Commission may also require controlling stockholders, officers, directors and other persons having a material relationship or involvement with the entity proposing to acquire control to be investigated and licensed as part of the approval process relating to the transaction.

*Approval of Defensive Tactics.* The Nevada legislature has declared that some corporate acquisitions opposed by management, repurchases of voting securities and corporate defense tactics affecting Nevada corporate gaming licensees or affecting registered companies that are affiliated with the operations of Nevada gaming licensees may be harmful to stable and productive corporate gaming. The Nevada Gaming Commission has established a regulatory scheme to reduce the potential adverse effects of these business practices upon Nevada's gaming industry and to further Nevada's policy in order to:

• assure the financial stability of corporate gaming licensees and their affiliated companies;

• preserve the beneficial aspects of conducting business in the corporate form; and,

• promote a neutral environment for the orderly governance of corporate affairs.

Approvals may be required from the Nevada Gaming Commission before a registered company can make exceptional repurchases of voting securities above its current market price and before a corporate acquisition opposed by management can be consummated. The Nevada Gaming Control Act also requires prior approval of a plan of recapitalization proposed by a registered company's Board of Directors in response to a tender offer made directly to its stockholders for the purpose of acquiring control.

*Fees and Taxes.* License fees and taxes, computed in various ways depending on the type of gaming or activity involved, are payable to the State of Nevada and to the counties and cities in which the licensed subsidiaries' respective operations are conducted. Depending upon the particular fee or tax involved, these fees and taxes are payable monthly, quarterly or annually and are based upon:

• a percentage of the gross revenue received;

• the number of gaming devices operated; or,

• the number of table games operated.

A live entertainment tax also is imposed on admission charges and sales of food, beverages and merchandise where live entertainment is furnished.

*Foreign Gaming Investigations.* Any person who is licensed, required to be licensed, registered, required to be registered in Nevada, or is under common control with such persons (collectively, "licensees"), and who proposes to become involved in a gaming venture outside of Nevada, is required to deposit with the Nevada State Gaming Control Board, and thereafter maintain, a revolving fund in the amount of $10,000 to pay the expenses of investigation of the Nevada State Gaming Control Board of the licensee's or registrant's participation in such foreign gaming. The revolving fund is subject to increase or decrease at the discretion of the Nevada Gaming

14

Table of Contents

Commission. Licensees and registrants are required to comply with the foreign gaming reporting requirements imposed by the Nevada Gaming Control Act. A licensee or registrant is also subject to disciplinary action by the Nevada Gaming Commission if it:

- knowingly violates any laws of the foreign jurisdiction pertaining to the foreign gaming operation;

- fails to conduct the foreign gaming operation in accordance with the standards of honesty and integrity required of Nevada gaming operations;

- engages in any activity or enters into any association that is unsuitable because it poses an unreasonable threat to the control of gaming in Nevada, reflects or tends to reflect, discredit or disrepute upon the State of Nevada or gaming in Nevada, or is contrary to the gaming policies of Nevada;

- engages in activities or enters into associations that are harmful to the State of Nevada or its ability to collect gaming taxes and fees; or,

- employs, contracts with or associates with a person in the foreign operation who has been denied a license or finding of suitability in Nevada on the ground of unsuitability.

*Licenses for Conduct of Gaming and Sale of Alcoholic Beverages.* The conduct of gaming activities and the service and sale of alcoholic beverages at Wynn Las Vegas are subject to licensing, control and regulation by the Clark County Liquor and Gaming Licensing Board, which has granted Wynn Las Vegas, LLC licenses for such purposes. In addition to approving Wynn Las Vegas, LLC, the Clark County Liquor and Gaming Licensing Board has the authority to approve all persons owning or controlling the stock of any corporation controlling a gaming license. Clark County gaming and liquor licenses are not transferable. The County has full power to limit, condition, suspend or revoke any license. Any disciplinary action could, and revocation would, have a substantial negative impact upon our operations.

## Other Regulations

In addition to gaming regulations, we are subject to extensive local, state, federal and foreign laws and regulations in the jurisdictions in which we operate. These include, but are not limited to, laws and regulations relating to alcoholic beverages, environmental matters, employment and immigration, currency and other transactions, taxation, zoning and building codes, marketing and advertising, lending, debt collection, privacy, telemarketing, money laundering, laws and regulations administered by the Office of Foreign Assets Control, and anti-bribery laws, including the Foreign Corrupt Practices Act. Such laws and regulations could change or could be interpreted differently in the future, or new laws and regulations could be enacted. Any material changes, new laws or regulations, or material differences in interpretations by courts or governmental authorities could adversely affect our business and operating results.

## Seasonality

We may experience fluctuations in revenues and cash flows from month to month, however, we do not believe that our business is materially impacted by seasonality.

## Employees

As of December 31, 2013, we had a total of approximately 16,500 full-time equivalent employees (including approximately 7,000 in Macau and 9,500 in Las Vegas).

We entered into a ten year collective bargaining agreement with the Culinary and Bartenders Union local covering approximately 5,575 employees at our Las Vegas Operations that will expire in 2015. We also entered into a ten year collective bargaining agreement with the Transportation Workers Union in November 2010, which covers the table games dealers at Wynn Las Vegas. Certain other unions may seek to organize the workers of our Las Vegas Operations.

15

Table of Contents

**Intellectual Property**

Among our most important marks are our trademarks and service marks that use the name "WYNN." Wynn Resorts has registered with the U.S. Patent and Trademark Office ("PTO") a variety of the WYNN-related trademarks and service marks in connection with a variety of goods and services. These marks include "WYNN RESORTS," "WYNN DESIGN AND DEVELOPMENT," "WYNN LAS VEGAS," "ENCORE" and "WYNN MACAU." Some of the applications are based upon ongoing use and others are based upon a bona fide intent to use the marks.

A common element of most of these marks is the use of the surname "WYNN." As a general rule, a surname (or the portion of a mark primarily constituting a surname) is not eligible for registration unless the surname has acquired "secondary meaning." Wynn Resorts has been successful in demonstrating to the PTO such secondary meaning for the Wynn name based upon factors including Mr. Wynn's prominence as a resort developer.

Federal registrations are not completely dispositive of the right to such marks. Third parties who claim prior rights with respect to similar marks may nonetheless challenge our right to obtain registrations or our use of the marks and seek to overcome the presumptions afforded by such registrations.

We have also filed applications with various foreign patent and trademark registries, including in Macau, China, Singapore, Hong Kong, Taiwan, Japan, certain European countries and various other jurisdictions throughout the world, to register a variety of WYNN-related trademarks and service marks in connection with a variety of goods and services. These marks include many of the same marks filed with the United States PTO and include "WYNN MACAU," "WYNN LAS VEGAS," "WYNN PALACE" and "ENCORE." Some of the applications are based upon ongoing use and others are based upon a bona fide intent to use the marks.

We recognize that our intellectual property assets, including the word and logo version of "WYNN," are among our most valuable assets. As a result, and in connection with expansion of our resorts and gaming activities outside the United States, we have undertaken a program to register our trademarks and other intellectual property rights in relevant jurisdictions. We have retained counsel and intend to take all steps necessary to protect our intellectual property rights against unauthorized use throughout the world.

On August 6, 2004, we entered into agreements with Mr. Wynn that confirm and clarify our rights to use the "Wynn" name and Mr. Wynn's persona in connection with our casino resorts. Under a Surname Rights Agreement, Mr. Wynn has acknowledged our exclusive, fully paid-up, perpetual, worldwide right to use, and to own and register trademarks and service marks incorporating, the "Wynn" name for casino resorts and related businesses, together with the right to sublicense the name and marks to our affiliates. Under a Rights of Publicity License, Mr. Wynn has granted us the exclusive, royalty-free, worldwide right to use his full name, persona and related rights of publicity for casino resorts and related businesses, together with the ability to sublicense the persona and publicity rights to our affiliates, until October 24, 2017.

We have also registered various domain names including, but not limited to, www.wynnlasvegas.com, www.wynnmacau.com, www.wynnmacaulimited.com, www.encorelasvegas.com and www.wynnresorts.com, with various domain registrars around the world. Our domain registrations extend to various foreign countries such as ".com.cn" and ".com.hk." We pursue domain related infringement on a case by case basis depending on the infringing domain in question. The information found on these websites is not a part of this Annual Report on Form 10-K or any other report we file or furnish to the SEC.

**Forward-Looking Statements**

We make forward-looking statements in this Annual Report on Form 10-K based upon the beliefs and assumptions of our management and on information currently available to us. Forward-looking statements

16

Table of Contents

include, but are not limited to, information about our business strategy, development activities, competition and possible or assumed future results of operations, throughout this report and are often preceded by, followed by or include the words "may," "will," "should," "would," "could," "believe," "expect," "anticipate," "estimate," "intend," "plan," "continue" or the negative of these terms or similar expressions.

Forward-looking statements are subject to a number of risks and uncertainties that could cause actual results to differ materially from those we express in these forward-looking statements, including the risks and uncertainties in Item 1A—"Risk Factors" and other factors we describe from time to time in our periodic filings with the SEC, such as:

- our dependence on Stephen A. Wynn and existing management;
- regulatory or enforcement actions and probity investigations;
- potential violations of law by Mr. Kazuo Okada, a former shareholder of ours;
- changes in the valuation of the promissory note we issued in connection with the redemption of Mr. Okada's shares;
- any violations by us of the Foreign Corrupt Practices Act or federal anti-money laundering laws;
- pending or future legal proceedings;
- decreases in levels of travel, leisure and consumer spending;
- fluctuations in occupancy rates and average daily room rates;
- competition in the casino/hotel and resort industries and actions taken by our competitors;
- uncertainties over the development and success of new gaming and resort properties;
- new development and construction activities of competitors;
- our dependence on a limited number of resorts and locations for all of our cash flow;
- adverse tourism and trends reflecting current domestic and international economic conditions;
- general global macroeconomic conditions;
- doing business in foreign locations such as Macau;
- changes in gaming laws or regulations (including the legalization of gaming in certain jurisdictions);
- the effect of environmental regulation on management and construction of projects;
- our current and future insurance coverage levels;
- our subsidiaries' ability to pay us dividends and distributions;
- our ability to protect our intellectual property rights;
- our relationships with Macau games promoters;
- our ability to maintain our customer relationships and collect and enforce gaming debts;
- the maintenance of our concession from the Macau government;
- changes in exchange rates;
- cybersecurity risk including misappropriation of customer information or other breaches of information security;
- changes in U.S. laws regarding healthcare;
- changes in federal, foreign, or state tax laws or the administration of such laws;

17

Table of Contents

- approvals under applicable jurisdictional laws and regulations (including gaming laws and regulations);

- volatility and weakness in world-wide credit and financial markets and from governmental intervention in the financial markets;

- conditions precedent to funding under our credit facilities;

- continued compliance with all provisions in our credit agreements;

- leverage and debt service (including sensitivity to fluctuations in interest rates);

- restrictions or conditions on visitation by citizens of mainland China to Macau;

- the impact that an outbreak of an infectious disease or the impact of extreme weather patterns or a natural disaster may have on the travel and leisure industry; and

- the consequences of military conflicts and any future security alerts and/or terrorist attacks.

Further information on potential factors that could affect our financial condition, results of operations and business are included in this report and our other filings with the SEC. You should not place undue reliance on any forward-looking statements, which are based only on information available to us at the time this statement is made. We undertake no obligation to update or revise any forward-looking statement, whether as a result of new information, future developments or otherwise.

## ITEM 1A.    RISK FACTORS

You should carefully consider the risk factors set forth below, as well as the other information contained in this Annual Report on Form 10-K, regarding matters which could have an adverse effect, including a material one, on our business, financial condition, results of operations and cash flows. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial may also have a material adverse effect on our business, financial condition, results of operations and cash flows.

### Risks Related to our Business

*The loss of Stephen A. Wynn could significantly harm our business.*

Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts. Mr. Wynn's employment agreement expires in October 2020. However, we cannot assure you that Mr. Wynn will remain with Wynn Resorts, Limited. If we lose the services of Mr. Wynn, or if he is unable to devote sufficient attention to our operations for any other reason, our business may be significantly impaired.

*Visitation to Macau may decline due to economic disruptions in mainland China as well as increased restrictions on visitations to Macau from citizens of mainland China.*

A significant number of our gaming customers at Wynn Macau come from mainland China. Any economic disruption or contraction in China could disrupt the number of patrons visiting our property or the amount they may be willing to spend. In addition, any travel restrictions imposed by China on its citizens could disrupt the number of visitors from mainland China to our property. It is not known when, or if, policies similar to those implemented in 2009 restricting visitation by mainland Chinese citizens to Macau and Hong Kong, will be put in place and travel policies may be adjusted, without notice, in the future. The resulting decreased visitation would negatively affect our revenues and results of operations.

18

Table of Contents

*Potential violations of law by Mr. Okada (former director and formerly the largest beneficial owner of our shares) and his affiliates could have adverse consequences to the Company.*

On February 18, 2012, the Board of Directors of Wynn Resorts received a report from Freeh, Sporkin & Sullivan, LLP detailing numerous instances of conduct constituting prima facie violations of the Foreign Corrupt Practices Act (the "FCPA") by Kazuo Okada (formerly the largest beneficial owner of our shares) and certain of his affiliates. See Item 3—"Legal Proceedings" and Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies." The Company has provided the Freeh Report to applicable regulators and has been cooperating with related investigations of such regulators. The conduct of Mr. Okada and his affiliates and the outcome of any resulting regulatory findings could have adverse consequences to the Company. A finding by regulatory authorities that Mr. Okada violated the FCPA on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, regulators have and may pursue separate investigations into the Company's compliance with applicable laws in connection with the Okada matter, as discussed in Item 3—"Legal Proceedings". While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company, which could negatively affect the Company's financial condition or results of operations.

*Mr. Okada and his affiliates have challenged the redemption of Aruze USA, Inc.'s Shares. An adverse judgment or settlement resulting from the related litigation could reduce our profits or limit our ability to operate our business.*

On February 18, 2012, after receiving the Freeh Report, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Kazuo Okada (collectively, the "Okada Parties") were "unsuitable" within the meaning of Article VII of Wynn Resorts' articles of incorporation and redeemed all of Aruze USA, Inc.'s shares of Wynn Resorts' common stock. See Item 3—"Legal Proceedings" and Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies". On February 19, 2012, Wynn Resorts filed a complaint in the Eighth Judicial District Court, Clark County, Nevada against the Okada Parties (as amended, the "Complaint"), alleging breaches of fiduciary duty and related claims (the "Redemption Action") arising from the activities addressed in the Freeh Report. The Company is seeking compensatory and special damages as well as a declaration that it acted lawfully and in full compliance with its articles of incorporation, bylaws and other governing documents in redeeming and cancelling the shares of Aruze, USA, Inc. On March 12, 2012, the Okada Parties filed an answer denying the claims and a counterclaim (as amended, the "Counterclaim") against the Company, each of the members of the Company's Board of Directors (other than Mr. Okada) and Wynn Resorts' General Counsel (collectively, the "Wynn Parties"), seeking, among other things a declaration that the redemption of Aruze USA, Inc.'s shares was void, an injunction restoring Aruze USA, Inc.'s share ownership, damages in an unspecified amount and rescission of the Amended and Restated Stockholders Agreement, dated as of January 6, 2010, by and among Aruze USA, Inc., Stephen A. Wynn, and Elaine Wynn (the "Stockholders Agreement"). In connection with the Redemption Action and Counterclaim (1) various Okada Parties filed a complaint in the Tokyo District Court against the Company, all members of the Board (other than Mr. Okada) and the Company's General Counsel alleging that the press release issued by the Company in connection with the Redemption Action has damaged their social evaluation and credibility and seeking damages and legal fees, (2) four federal derivative actions were commenced against the Company and all members of its Board of Directors, (3) two state derivative actions were commenced against the Company and all members of its Board of Directors and (4) regulatory inquiries and investigations were initiated against the Company. See Item 3—"Legal Proceedings", for a full description of these matters and status as of the date of this report. The Company is vigorously pursuing its claims against the Okada Parties, and together with the other counter-defendants, vigorously defending against the Counterclaims and other actions asserted against them. However, as with all litigation, the outcome of these proceedings cannot be predicted. Any adverse judgments or settlements involving payment of a material sum of money could cause a material adverse effect on our financial condition and results of operations and could expose us to additional claims by third parties, including current or former investors or regulators. Any adverse judgments or settlements would reduce our profits and could limit our ability to operate our business.

19

Table of Contents

*Change in valuation of our Redemption Price Promissory Note could have a negative impact on our results of operations.*

In connection with the redemption of the shares previously held by Aruze USA, Inc., we recorded the fair value of the Redemption Note of approximately $1.94 billion in accordance with applicable accounting guidance. We utilized an independent third party valuation to assist in the determination of this fair value. In determining this fair value, we estimated the Redemption Note's present value using discounted cash flows with a probability weighted expected return for redemption assumptions and a discount rate which included time value and non-performance risk adjustments commensurate with risk of the Redemption Note.

Considerations for the redemption assumptions included the stated maturity of the Redemption Note, uncertainty of the related cash flows as well as potential effects of the following: uncertainties surrounding the potential outcome and timing of pending litigation with the Okada Parties (see Item 8—"Financial Statements and Supplementary Data", Note 16—"Commitments and Contingencies"); the outcome of on-going investigations of Aruze USA, Inc. by the United States Attorney's Office, the U.S. Department of Justice and by the Nevada Gaming Control Board; and other potential legal and regulatory actions. In addition, in the furtherance of various future business objectives, we considered our ability, at our sole option, to prepay the Redemption Note at any time in accordance with its terms without penalty. Accordingly, we reasonably determined that the estimated life of the Redemption Note could be less than the contractual life of the Redemption Note.

In determination of the appropriate discount rate to be used in the estimated present value, the Redemption Note's subordinated position relative to all other debt in our capital structure and credit ratings associated our traded debt were considered. Observable inputs for the risk free rate based on Federal Reserve rates for U.S. Treasury securities and credit risk spread based on a yield curve index of similarly rated debt was used. As a result of this analysis, we concluded the Redemption Notes' stated rate of 2% approximated a market rate.

A change in any of the assumptions discussed above could result in a change in the fair value of this Redemption Note and significantly impact our results of operations.

*Ongoing litigation and other disputes with Mr. Okada and certain of his affiliates could distract management and result in negative publicity and additional scrutiny of regulators.*

There has been widespread publicity of the findings in the Freeh Report of prima facie violations of law by Mr. Okada and his affiliates, the Board's unsuitability finding, the redemption of shares and related litigation. The actions, litigation, and publicity could reduce demand for shares of Wynn Resorts and Wynn Macau, Limited and thereby have a negative impact on the trading prices of their respective shares. The disputes may also lead to additional scrutiny from regulators, which could lead to investigations relating to, and possibly a negative impact on, the Company's gaming licenses, and possibly have a negative impact on the Company's ability to bid successfully for new gaming market opportunities.

*Any violation of the Foreign Corrupt Practices Act or applicable Anti-Money Laundering laws or regulations could have a negative impact on us.*

A significant portion of our revenue is derived from operations outside the United States, which exposes the Company to complex foreign and U.S. regulations inherent in doing business cross-border and in each of the countries in which it transacts business. We also deal with significant amounts of cash in our operations and are subject to various reporting and anti-money laundering regulations. Any violation of anti-money laundering laws or regulations by any of our resorts could have a negative effect on our results of operations. Compliance with international and U.S. laws and regulations that apply to our international operations also increases our cost of doing business in foreign jurisdictions.

20

Table of Contents

We are subject to regulations imposed by the FCPA and other anti-corruption laws that generally prohibit U.S. companies and their intermediaries from offering, promising, authorizing or making improper payments to foreign government officials for the purpose of obtaining or retaining business. Violations of the FCPA and other anti-corruption laws may result in severe criminal and civil sanctions as well as other penalties and the SEC and U.S. Department of Justice have increased their enforcement activities with respect to the FCPA.

Internal control policies and procedures and employee training and compliance programs that we have implemented to deter prohibited practices may not be effective in prohibiting our directors, employees, contractors or agents from violating or circumventing our policies and the law. If our directors, employees or agents fail to comply with applicable laws or Company policies governing our international operations, the Company may face investigations, prosecutions and other legal proceedings and actions which could result in civil penalties, administrative remedies and criminal sanctions. Any future government investigations, prosecutions or other legal proceedings or actions, however, could have a negative impact on us.

Kazuo Okada, one of our former directors, failed to comply with internal training in these matters and failed to return to the Company an executed Acknowledgment agreeing to comply with the Company's Code of Business Conduct and Ethics. For additional information on the Freeh Report, which detailed numerous instances of conduct constituting prima facie violations of the FCPA by Mr. Okada and certain of his affiliates, and the redemption of Aruze USA, Inc.'s shares, see Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies." On February 19, 2012, the Company filed a complaint in Nevada state court against Mr. Okada and other entities alleging, among other things, breach of fiduciary duty in connection with alleged violations of the FCPA. For a detailed description of the legal proceedings between the Company and Mr. Okada and his affiliates, see Item 3—"Legal Proceedings."

*Our business is particularly sensitive to reductions in discretionary consumer and corporate spending as a result of downturns in the economy.*

Consumer demand for hotel/casino resorts, trade shows and conventions and for the type of luxury amenities that we offer is particularly sensitive to downturns in the economy which adversely impact discretionary spending on leisure activities. Changes in discretionary consumer spending or consumer preferences brought about by factors such as perceived or actual general economic conditions, high unemployment, the housing foreclosure crisis, perceived or actual changes in disposable consumer income and wealth, an economic recession and changes in consumer confidence in the economy, or fears of war and future acts of terrorism could reduce customer demand for the luxury amenities and leisure activities we offer, and may have a significant negative impact on our operating results.

*Our casino, hotel, convention and other facilities face intense competition, which may increase in the future.*

The casino/hotel industry is highly competitive. Resorts located on or near the Las Vegas Strip compete with other Las Vegas Strip hotels and with other hotel casinos in Las Vegas on the basis of overall atmosphere, range of amenities, level of service, price, location, entertainment, theme and size, among other factors.

Wynn Las Vegas also competes with other hotel/casino facilities in other cities. The proliferation of gaming activities in other areas could significantly harm our business as well. In particular, the legalization or expansion of casino gaming in or near metropolitan areas from which we attract customers could have a negative effect on our business. In addition, new or renovated casinos in Macau or elsewhere in Asia could draw Asian gaming customers away from our Las Vegas Operations.

Our Macau operations also face intense competition. Currently there are 35 operating casinos in Macau. We hold a concession under one of only three gaming concessions and three subconcessions authorized by the Macau government to operate casinos in Macau. The Macau government has had the ability to grant additional gaming

21

Table of Contents

concessions since April 2009. If the Macau government were to allow additional competitors to operate in Macau through the grant of additional concessions or subconcessions, we would face additional competition, which could have a material adverse effect on our business, financial condition, results of operations and cash flows. Current concessionaries and subconcessionaires can open additional facilities.

Our Macau resort complex also faces competition from casinos located in other areas of Asia, including the Marina Bay Sands and Resorts World Sentosa resorts operating in Singapore, Genting Highlands Resort, a major gaming and resort destination located outside of Kuala Lumpur, Malaysia, and casinos in the Philippines. We also encounter competition from other major gaming centers located around the world, including Australia and Las Vegas, cruise ships in Asia that offer gaming, and other casinos throughout Asia. Further, if current efforts to legalize gaming in other Asian countries are successful, our Wynn Macau resort will face additional regional competition.

*We are entirely dependent on a limited number of resorts for all of our cash flow, which subjects us to greater risks than a gaming company with more operating properties.*

We are entirely dependent upon our Macau Operations and Las Vegas Operations for all of our operating cash flow. As a result, we are subject to a greater degree of risk than a gaming company with more operating properties or greater geographic diversification. The risks to which we have a greater degree of exposure include the following:

- local economic and competitive conditions;
- changes in local and state governmental laws and regulations, including gaming laws and regulations;
- natural and other disasters;
- a decline in the number of visitors to Las Vegas or Macau;
- a decrease in gaming and non-casino activities at our resorts; and
- the outbreak of infectious diseases.

Any of the factors outlined above could negatively affect our ability to generate sufficient cash flow to make payments or maintain our covenants with respect to our debt.

*Development costs of Wynn Palace may be higher than expected.*

The total project budget, including construction costs, capitalized interest, pre-opening expenses, land costs and financing costs, is $4 billion.

These projected development costs reflect our best estimates and the actual development costs may be higher than expected. Owners' contingencies that have been set aside to cover cost overruns may be insufficient to cover the full amount of such overruns. If these contingencies are not sufficient to cover these costs, we may not have the funds required to pay the excess costs and Wynn Palace may not be completed. Failure to complete Wynn Palace would negatively affect our financial condition, our results of operations and our ability to pay our debt.

*There are significant risks associated with the construction of Wynn Palace, which could have an adverse effect on our financial condition, results of operations or cash flows from this planned facility.*

Major construction projects of the scope and scale of Wynn Palace entail significant risks, including:

- shortages of materials or skilled labor;
- unforeseen engineering, environmental and/or geological problems;

22

Table of Contents

- work stoppages;

- delays or interference from severe weather or natural disasters;

- unanticipated cost increases; and

- unavailability of construction equipment.

Construction, equipment or staffing problems or difficulties in obtaining any of the requisite licenses, permits and authorizations from regulatory authorities could increase the total cost, delay or prevent the construction or opening or otherwise affect the design and features of Wynn Palace.

We anticipate that only some of the subcontractors engaged for these projects will post bonds guaranteeing timely completion of the subcontractor's work and payment for all of that subcontractor's labor and materials. These bonds may not be adequate to ensure completion of the work.

Our Wynn Palace facility may not commence operations on schedule and construction costs for this project may exceed budgeted amounts. Failure to complete this project on schedule or within budget may have a significant negative effect on us and on our ability to make payments on our debt.

***Our business relies on high-end, international customers. We often extend credit, and we may not be able to collect gaming receivables from our credit players or credit play may decrease.***

*General.* A significant portion of our table games revenue at our resorts is attributable to the play of a limited number of international customers. The loss or a reduction in the play of the most significant of these customers could have a material adverse effect on our business, financial condition, results of operations and cashflows. A downturn in economic conditions in the countries in which these customers reside could cause a further reduction in the frequency of visits by and revenue generated from these customers.

We conduct our gaming activities on a credit as well as a cash basis. This credit is unsecured. We will extend credit to those customers whose level of play and financial resources, in the opinion of management, warrant such an extension. The collectability of receivables from international customers could be negatively affected by future business or economic trends or by significant events in the countries in which these customers reside.

In addition, premium gaming is more volatile than other forms of gaming, and variances in win-loss results attributable to high-end gaming may have a positive or negative impact on cash flow and earnings in a particular quarter.

*Wynn Las Vegas.* While gaming debts evidenced by a credit instrument, including what is commonly referred to as a "marker," are enforceable under the current laws of Nevada, and judgments on gaming debts are enforceable in all states of the United States under the Full Faith and Credit Clause of the United States Constitution, other jurisdictions may determine that direct or indirect enforcement of gaming debts is against public policy. Although courts of some foreign nations will enforce gaming debts directly and the assets in the United States of foreign debtors may be used to satisfy a judgment, judgments on gaming debts from U.S. courts are not binding on the courts of many foreign nations. We cannot assure you that we will be able to collect the full amount of gaming debts owed to us, even in jurisdictions that enforce them. Recent changes in economic conditions may make it more difficult to assess creditworthiness and more difficult to collect the full amount of any gaming debt owed to us. Our inability to collect gaming debts could have a significant negative impact on our operating results.

*Wynn Macau.* Although the law in Macau permits casino operators to extend credit to gaming customers, Wynn Macau may not be able to collect all of its gaming receivables from its credit players. We expect that Wynn Macau will be able to enforce these obligations only in a limited number of jurisdictions, including

23

Case 3:14-cv-04329-WHO    Document 14-1    Filed 10/20/14    Page 97 of 218

Table of Contents

Macau. To the extent our gaming customers are visitors from other jurisdictions, we may not have access to a forum in which we will be able to collect all of our gaming receivables because, among other reasons, courts of many jurisdictions do not enforce gaming debts and we may encounter forums that will refuse to enforce such debts. Our inability to collect gaming debts could have a significant negative impact on our operating results.

Currently, the gaming tax in Macau is calculated as a percentage of gross gaming revenue. However, unlike Nevada, the gross gaming revenue calculation in Macau does not include deductions for uncollectible gaming debts. As a result, if we extend credit to our customers in Macau and are unable to collect on the related receivables from them, we remain obligated to pay taxes on our winnings from these customers.

> *We are subject to extensive state and local regulation and licensing and gaming authorities have significant control over our operations. The cost of compliance or failure to comply with such regulations and authorities could have a negative effect on our business.*

The operations of our resorts are contingent upon our obtaining and maintaining all necessary licenses, permits, approvals, registrations, findings of suitability, orders and authorizations in the jurisdictions in which our resorts are located. The laws, regulations and ordinances requiring these licenses, permits and other approvals generally relate to the responsibility, financial stability and character of the owners and managers of gaming operations, as well as persons financially interested or involved in gaming operations. The Nevada Gaming Commission may require the holder of any debt or securities we or Wynn Las Vegas issue to file applications, be investigated and be found suitable to own Wynn Resorts' securities if it has reason to believe that the security ownership would be inconsistent with the declared policies of the State of Nevada.

The Company's articles of incorporation also provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the Board of Directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts. The redemption price may be paid in cash, by promissory note, or both, as required, and pursuant to the terms established by, the applicable gaming authority and, if not, as Wynn Resorts elects.

On February 18, 2012, the Board of Directors of Wynn Resorts received the Freeh Report. See Item 3—"Legal Proceedings", and Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies." After receiving the Freeh Report, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada were "unsuitable" within the meaning of Article VII of Wynn Resorts' articles of incorporation and redeemed all of Aruze USA, Inc.'s shares of Wynn Resorts' common stock. See Item 3—"Legal Proceedings" and Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies".

Nevada regulatory authorities also have broad powers to request detailed financial and other information, to limit, condition, suspend or revoke a registration, gaming license or related approvals, approve changes in our operations and levy fines or require forfeiture of assets for violations of gaming laws or regulations. Complying with gaming laws, regulations and license requirements is costly. Any change in the Nevada laws, regulations or licenses applicable to our business or a violation of any current or future laws or regulations applicable to our business or gaming licenses could require us to make substantial expenditures and forfeit assets, and would negatively affect our gaming operations.

Wynn Macau's operations are subject to unique risks. Failure to adhere to the regulatory and gaming environment in Macau could result in the revocation of Wynn Macau's concession or otherwise negatively affect its operations in Macau. Moreover, we are subject to the risk that U.S. regulators could determine that Macau's gaming regulatory framework has not developed in a way that would permit us to conduct operations in Macau in a manner consistent with the way in which we intend, or the Nevada gaming authorities require us, to conduct our operations in the United States.

24

Table of Contents

***Our information technology and other systems are subject to cyber security risk including misappropriation of customer information or other breaches of information security.***

We rely on information technology and other systems to maintain and transmit customer financial information, credit card settlements, credit card funds transmissions, mailing lists and reservations information. The systems and processes we have implemented to protect customers, employees and company information are subject to the ever-changing risk of compromised security. These risks include cyber and physical security breaches, system failure, computer viruses, and negligent or intentional misuse by customers, company employees, or employees of third party vendors. The steps we take to deter and mitigate these risks may not be successful and our insurance coverage for protecting against cybersecurity risks may not be sufficient. Any disruption, compromise or loss of data or systems that results from a cybersecurity attack or breach could materially adversely impact, operations or regulatory compliance and could result in remedial expenses, fines, litigation, and loss of reputation, potentially impacting our financial results.

***Our insurance coverage may not be adequate to cover all possible losses that we could suffer, including losses resulting from terrorism, and our insurance costs may increase.***

We have comprehensive property and liability insurance policies for our properties with coverage features and insured limits that we believe are customary in their breadth and scope. However, in the event of a substantial loss, the insurance coverage we carry may not be sufficient to pay the full market value or replacement cost of our lost investment or could result in certain losses being totally uninsured. As a result, we could lose some or all of the capital we have invested in a property, as well as the anticipated future revenue from the property, and we could remain obligated for debt or other financial obligations related to the property.

Market forces beyond our control may limit the scope of the insurance coverage we can obtain in the future or our ability to obtain coverage at reasonable rates. Certain catastrophic losses may be uninsurable or too expensive to justify obtaining insurance. As a result, if we suffer such a catastrophic loss, we may not be successful in obtaining future insurance without increases in cost or decreases in coverage levels. Furthermore, our debt instruments and other material agreements require us to maintain a certain minimum level of insurance. Failure to satisfy these requirements could result in an event of default under these debt instruments or material agreements, which would negatively affect our business and financial condition.

***Our business is particularly sensitive to the willingness of our customers to travel. Acts of terrorism, regional political events and developments in the conflicts in certain countries could cause severe disruptions in air travel that reduce the number of visitors to our facilities, resulting in a material adverse effect on our business and financial condition, results of operations or cash flows.***

We are dependent on the willingness of our customers to travel. Only a small amount of our business is and will be generated by local residents. Most of our customers travel to reach our Las Vegas and Macau properties. Acts of terrorism may severely disrupt domestic and international travel, which would result in a decrease in customer visits to Las Vegas and Macau, including our properties. Regional conflicts could have a similar effect on domestic and international travel. Disruptions in air or other forms of travel as a result of any further terrorist act, outbreak of hostilities or escalation of war would have an adverse effect on our business and financial condition, results of operations or cash flows.

***We are a parent company and our primary source of cash is and will be distributions from our subsidiaries.***

We are a parent company with limited business operations of our own. Our main asset is the capital stock of our subsidiaries. We conduct most of our business operations through our direct and indirect subsidiaries. Accordingly, our primary sources of cash are dividends and distributions with respect to our ownership interests in our subsidiaries that are derived from the earnings and cash flow generated by our operating properties. Our subsidiaries might not generate sufficient earnings and cash flow to pay dividends or distributions in the future.

25

Table of Contents

Our subsidiaries' payments to us will be contingent upon their earnings and upon other business considerations. In addition, our subsidiaries' debt instruments and other agreements limit or prohibit certain payments of dividends or other distributions to us. We expect that future debt instruments for the financing of our other developments will contain similar restrictions. An inability of our subsidiaries to pay us dividends and distributions would have a significant negative effect on our liquidity.

### *If a third party successfully challenges our ownership of, or right to use, the Wynn-related trademarks and/or service marks, our business or results of operations could be harmed.*

Our intellectual property assets, especially the logo version of "Wynn," are among our most valuable assets. We have filed applications with the PTO and with various foreign patent and trademark registries including registries in Macau, China, Hong Kong, Singapore, Taiwan, Japan, certain European countries and various other jurisdictions throughout the world, to register a variety of WYNN-related trademarks and service marks in connection with a variety of goods and services. These marks include "WYNN RESORTS," "WYNN DESIGN AND DEVELOPMENT," "WYNN LAS VEGAS," "WYNN MACAU," "WYNN PALACE" and "ENCORE." Some of the applications are based upon ongoing use and others are based upon a bona fide intent to use the marks in the future.

A common element of most of these marks is the use of the surname "WYNN." As a general rule, a surname (or the portion of a mark primarily constituting a surname) is not eligible for registration unless the surname has acquired "secondary meaning." To date, we have been successful in demonstrating to the PTO such secondary meaning for the Wynn name, in certain of the applications, based upon factors including Mr. Wynn's prominence as a resort developer, but we cannot assure you that we will be successful with the other pending applications.

Federal registrations are not completely dispositive of the right to such marks. Third parties who claim prior rights with respect to similar marks may nonetheless challenge our right to obtain registrations or our use of the marks and seek to overcome the presumptions afforded by such registrations.

Furthermore, due to the increased use of technology in computerized gaming machines and in business operations generally, other forms of intellectual property rights (such as patents and copyrights) are becoming of increased relevance. It is possible that, in the future, third parties might assert superior intellectual property rights or allege that their intellectual property rights cover some aspect of our operations. The defense of such allegations may result in substantial expenses, and, if such claims are successfully prosecuted, may have a material impact on our business. Efforts we take to acquire and protect our intellectual property rights against unauthorized use throughout the world, which may include retaining counsel and commencing litigation in various jurisdictions, may be costly and may not be successful in protecting and preserving the status and value of our intellectual property assets.

### *We are subject to taxation by various governments and agencies. The rate of taxation could change.*

We are subject to tax by various governments and agencies, both in the U.S. and in Macau. Changes in the rates of taxation, the amount of taxes we owe and the time when income is subject to taxation, our ability to claim U.S. foreign tax credits, failure to renew our Macau dividend agreement and Macau income tax exemption after 2015 and the imposition of foreign withholding taxes could increase our overall rate of taxation.

### *Because we own real property, we are subject to extensive environmental regulation, which creates uncertainty regarding future environmental expenditures and liabilities.*

We have incurred costs to comply with environmental requirements, such as those relating to discharges into the air, water and land, the handling and disposal of solid and hazardous waste and the cleanup of properties affected by hazardous substances. Under these and other environmental requirements we may be required to

26

Table of Contents

investigate and clean up hazardous or toxic substances or chemical releases at our property. As an owner or operator, we could also be held responsible to a governmental entity or third parties for property damage, personal injury and investigation and cleanup costs incurred by them in connection with any contamination.

These laws typically impose cleanup responsibility and liability without regard to whether the owner or operator knew of or caused the presence of the contaminants. The liability under those laws has been interpreted to be joint and several unless the harm is divisible and there is a reasonable basis for allocation of the responsibility. The costs of investigation, remediation or removal of those substances may be substantial, and the presence of those substances, or the failure to remediate a property properly, may impair our ability to use our property.

**Risks Associated with our Macau Operations**

*We depend upon games promoters for a significant portion of our gaming revenue. If we are unable to maintain, or develop additional, successful relationships with reputable games promoters, our ability to maintain or grow our gaming revenues could be adversely affected.*

We may lose the clientele of our games promoters, who generate a significant portion of our gaming revenue. There is intense competition among casino operators in Macau for services provided by games promoters, which we expect to intensify as additional casinos open in Macau. If we are unable to maintain, or develop additional, successful relationships with reputable games promoters, or lose a significant number of games promoters to our competitors, our ability to maintain or grow our gaming revenues will be adversely affected and we will have to seek alternative ways of developing relationships with VIP customers. In addition, if our games promoters are unable to develop or maintain relationships with our VIP customers, our ability to maintain or grow our gaming revenues will be hampered.

*Increased competition for the services of games promoters may require us to pay increased commission rates to games promoters.*

Certain games promoters have significant leverage and bargaining strength in negotiating operational agreements with casino operators. This leverage could result in games promoters negotiating changes to our operational agreements, including higher commissions, or the loss of business to a competitor or the loss of certain relationships with games promoters. If we need to increase our commission rates or otherwise change our practices with respect to games promoters due to competitive forces, our results of operations could be adversely affected.

*Failure by the games promoters with whom we work to comply with Macau gaming laws and high standards of probity and integrity might affect our reputation and ability to comply with the requirements of our concession, Macau gaming laws and other gaming licenses.*

The reputations and probity of the games promoters with whom we work are important to our own reputation and to our ability to operate in compliance with our concession, Macau gaming laws and other gaming licenses. We are not able to control our games promoters' compliance with these high standards of probity and integrity, and our games promoters may violate provisions in their contracts with us designed to ensure such compliance. In addition, if we enter into a new business relationship with a games promoter whose probity is in doubt, this may be considered by regulators or investors to reflect negatively on our own probity. If our games promoters are unable to maintain required standards of probity and integrity, we may face consequences from gaming regulators with authority over our operations. Furthermore, if any of our games promoters violate the Macau gaming laws while on our premises, the Macau government may, in its discretion, take enforcement action against us, the games promoter, or each concurrently, and we may be sanctioned and our reputation could be harmed.

27

Table of Contents

***The financial resources of our games promoters may be insufficient to allow them to continue doing business at our resort.***

Our games promoters may encounter decreased liquidity, limiting their ability to grant credit to their patrons, resulting in decreased gaming volume at Wynn Macau. Furthermore, credit already extended by our games promoters to their patrons may become increasingly difficult for them to collect. This inability to grant credit and collect amounts due can negatively affect our games promoters' operations, and as a result, our results of operations could be adversely impacted.

***Revenues from our Macau gaming operations will end if we cannot secure an extension of our concession in 2022 or if the Macau government exercises its redemption right in 2017.***

Our concession agreement with the Macau government expires in June 2022. Unless our concession is extended, in June 2022, all of our gaming operations and related equipment in Macau will be automatically transferred to the Macau government without compensation to us and we will cease to generate any revenues from these operations. Beginning in June 2017, the Macau government may redeem the concession agreement by providing us at least one year's prior notice. In the event the Macau government exercises this redemption right, we are entitled to fair compensation or indemnity. The amount of such compensation or indemnity will be determined based on the amount of revenue generated during the tax year prior to the redemption multiplied for the remaining years under the concession. We may not be able to renew or extend our concession agreement on terms favorable to us or at all and, if our concession is redeemed, the compensation paid to us may not be adequate to compensate us for the loss of future revenues. The redemption of or failure to extend our concession would have a material adverse effect on our results of operations.

***If Wynn Macau fails to comply with the concession agreement, the Macau government can terminate our concession without compensation to us, which would have a material adverse effect on our business and financial condition.***

The Macau government has the right to unilaterally terminate our concession in the event of our material non-compliance with the basic obligations under the concession and applicable Macau laws. The concession agreement expressly provides that the government of Macau may unilaterally rescind the concession agreement if Wynn Macau:

- conducts unauthorized games or activities that are excluded from its corporate purpose;

- suspends gaming operations in Macau for more than seven consecutive days (or more than 14 days in a civil year) without justification;

- defaults in payment of taxes, premiums, contributions or other required amounts;

- does not comply with government inspections or supervision;

- systematically fails to observe its obligations under the concession system;

- fails to maintain bank guarantees or bonds satisfactory to the government;

- is the subject of bankruptcy proceedings or becomes insolvent;

- engages in serious fraudulent activity, damaging to the public interest; or

- repeatedly violates applicable gaming laws.

If the government of Macau unilaterally rescinds the concession agreement, Wynn Macau will be required to compensate the government in accordance with applicable law, and the areas defined as casino space under Macau law and all of the gaming equipment pertaining to our gaming operations will be transferred to the government without compensation. The loss of our concession would prohibit us from conducting gaming operations in Macau, which would have a material adverse effect on our business and financial condition.

28

Table of Contents

*Our Macau subsidiaries' indebtedness is secured by a substantial portion of their assets.*

Subject to applicable laws, including gaming laws, and certain agreed upon exceptions, our Macau subsidiaries' debt is secured by liens on substantially all of their assets. In the event of a default by such subsidiaries under their financing documents, or if such subsidiaries experience insolvency, liquidation, dissolution or reorganization, the holders of such secured debt would first be entitled to payment from their collateral security, and only then would holders of our Macau subsidiaries' unsecured debt be entitled to payment from their remaining assets.

*We compete for limited labor resources in Macau and Macau government policies may also affect our ability to employ imported labor.*

The success of our operations in Macau will be affected by our success in hiring and retaining employees. We compete with a large number of casino resorts in Macau for a limited number of qualified employees. We have to seek employees from other countries to adequately staff our resort and certain Macau government policies affect our ability to import labor in certain job classifications. Despite our coordination with the Macau labor and immigration authorities to assure that our labor needs are satisfied, we may not be able to recruit and retain a sufficient number of qualified employees for our operations or obtain required work permits for those employees.

*Wynn Macau may be affected by adverse political and economic conditions.*

A significant portion of our revenue is derived from our Macau operations. Our Macau operations are subject to significant political, economic and social risks inherent in doing business in an emerging market. Macau's legislative, regulatory, legal, economic and cultural institutions are in a period of transition. The continued success of Wynn Macau will depend on political and economic conditions in Macau and mainland China. For example, fiscal decline and civil, domestic or international unrest in Macau, China or the surrounding region could significantly harm our business, not only by reducing customer demand for casino resorts, but also by increasing the risk of imposition of taxes and exchange controls or other governmental restrictions, laws or regulations that might impede Wynn Macau's operations or ability to repatriate funds.

*Macau may not have an adequate transportation infrastructure to accommodate the demand from future development.*

Because of additional casino projects which are under construction and to be developed in the future, the ferry and helicopter services which provide transportation between Macau and Hong Kong may need to be expanded to accommodate the increased visitation of Macau. If transportation facilities to and from Macau are inadequate to meet the demands of an increased volume of gaming customers visiting Macau, the desirability of Macau as a gaming destination, as well as the results of operations of Wynn Macau, could be negatively impacted.

*Extreme weather conditions may have an adverse impact on Wynn Macau.*

Macau's subtropical climate and location on the South China Sea are subject to extreme weather conditions including typhoons and heavy rainstorms. Unfavorable weather conditions could negatively affect the profitability of our resort complex and prevent or discourage guests from traveling to Macau.

*Conflicts of interest may arise because certain of our directors and officers are also directors of Wynn Macau, Limited.*

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary of Wynn Resorts and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock

29

10K

Table of Contents

Exchange of Hong Kong Limited. Wynn Macau, Limited sold through an initial public offering, 1,437,500,000 shares (27.7%) of this subsidiary's common stock. As a result of Wynn Macau, Limited having stockholders who are not affiliated with us, and certain of our officers and directors who also serve as officers and/or directors of Wynn Macau, Limited may have conflicting fiduciary obligations to our stockholders and to the minority stockholders of Wynn Macau, Limited. Decisions that could have different implications for Wynn Resorts and Wynn Macau, Limited, including contractual arrangements that we have entered into or may in the future enter into with Wynn Macau, Limited, may give rise to the appearance of a potential conflict of interest.

### *Certain Nevada gaming laws apply to Wynn Macau's gaming activities and associations.*

Certain Nevada gaming laws also apply to gaming activities and associations in jurisdictions outside the State of Nevada. With respect to our Wynn Macau operations, we and our subsidiaries that must be licensed to conduct gaming operations in Nevada are required to comply with certain reporting requirements concerning gaming activities and associations in Macau conducted by our Macau-related subsidiaries. We and our licensed Nevada subsidiaries also will be subject to disciplinary action by the Nevada Gaming Commission if our Macau-related subsidiaries:

- knowingly violate any Macau laws relating to their Macau gaming operations;

- fail to conduct Wynn Macau's operations in accordance with the standards of honesty and integrity required of Nevada gaming operations;

- engage in any activity or enter into any association that is unsuitable for us because it poses an unreasonable threat to the control of gaming in Nevada, reflects or tends to reflect discredit or disrepute upon the State of Nevada or gaming in Nevada, or is contrary to Nevada gaming policies;

- engage in any activity or enter into any association that interferes with the ability of the State of Nevada to collect gaming taxes and fees; or

- employ, contract with or associate with any person in the foreign gaming operation who has been denied a license or a finding of suitability in Nevada on the ground of unsuitability, or who has been found guilty of cheating at gambling.

Such disciplinary action could include suspension, conditioning, limitation or revocation of the registration, licenses or approvals held by us and our licensed Nevada subsidiaries, including Wynn Las Vegas, LLC, and the imposition of substantial fines.

In addition, if the Nevada State Gaming Control Board determines that any actual or intended activities or associations of our Macau-related subsidiaries may be prohibited pursuant to one or more of the standards described above, the Nevada State Gaming Control Board can require us and our licensed Nevada subsidiaries to file an application with the Nevada Gaming Commission for a finding of suitability of the activity or association. If the Nevada Gaming Commission finds that the activity or association in Macau is unsuitable or prohibited, our Macau-related subsidiaries will either be required to terminate the activity or association, or will be prohibited from undertaking the activity or association. Consequently, should the Nevada Gaming Commission find that our Macau-related subsidiary's gaming activities or associations in Macau are unsuitable, those subsidiaries may be prohibited from undertaking their planned gaming activities or associations in Macau, or be required to divest their investment in Macau, possibly on unfavorable terms.

### *Unfavorable changes in currency exchange rates may increase Wynn Macau's obligations under the concession agreement and cause fluctuations in the value of our investment in Macau.*

The currency delineated in Wynn Macau's concession agreement with the government of Macau is the Macau pataca. The Macau pataca, which is not a freely convertible currency, is linked to the Hong Kong dollar, and the two are often used interchangeably in Macau. The Hong Kong dollar is linked to the U.S. dollar and the

30

Case 3:14-cv-04329-WHO   Document 14-1   Filed 10/20/14   Page 104 of 218

Table of Contents

exchange rate between these two currencies has remained relatively stable over the past several years. However, the exchange linkages of the Hong Kong dollar and the Macau pataca, and the Hong Kong dollar and the U.S. dollar, are subject to potential changes due to changes in Chinese governmental policies and international economic and political developments.

If the Hong Kong dollar and the Macau pataca are no longer linked to the U.S. dollar, the exchange rate for these currencies may severely fluctuate. The current rate of exchange fixed by the applicable monetary authorities for these currencies may also change.

Because many of Wynn Macau's payment and expenditure obligations are in Macau patacas, in the event of unfavorable Macau pataca or Hong Kong dollar rate changes, Wynn Macau's obligations, as denominated in U.S. dollars, would increase. In addition, because we expect that most of the revenues for any casino that we operate in Macau will be in Hong Kong dollars, we are subject to foreign exchange risk with respect to the exchange rate between the Hong Kong dollar and the U.S. dollar. Also, if any of our Macau-related entities incur U.S. dollar-denominated debt, fluctuations in the exchange rates of the Macau pataca or the Hong Kong dollar, in relation to the U.S. dollar, could have adverse effects on our results of operations, financial condition and ability to service its debt.

*Currency exchange controls and currency export restrictions could negatively impact Wynn Macau.*

Currency exchange controls and restrictions on the export of currency by certain countries may negatively impact the success of Wynn Macau. For example, there are currently existing currency exchange controls and restrictions on the export of the renminbi, the currency of China. Restrictions on the export of the renminbi may impede the flow of gaming customers from China to Macau, inhibit the growth of gaming in Macau and negatively impact Wynn Macau's gaming operations.

## Risks Related to Share Ownership and Stockholder Matters

*Our largest stockholders are able to exert significant influence over our operations and future direction.*

As of December 31, 2013, Mr. Wynn and Elaine P. Wynn own 10,026,708 shares and 9,659,355 shares, respectively, or in the aggregate approximately 19.5%, of our outstanding common stock. As a result, Mr. Wynn and Elaine P. Wynn, to the extent they vote their shares in a similar manner, may be able to exert significant influence over all matters requiring our stockholders' approval, including the approval of significant corporate transactions. In addition, until February 2012, Aruze USA, Inc. owned 24,549,222 shares of our outstanding common stock. On February 18, 2012, the Company redeemed all of the shares of the Company's common stock held by Aruze USA, Inc. For additional information on the redemption, see Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies".

Under the Amended and Restated Stockholders Agreement, dated as of January 6, 2010, by and among Stephen A. Wynn, Elaine P. Wynn and Aruze USA, Inc. (the "Amended and Restated Stockholders Agreement"), Mr. Wynn and Elaine P. Wynn have agreed to vote the shares of the Company's common stock held by them subject to the terms of the Amended and Restated Stockholders Agreement in a manner so as to elect to our Board of Directors each of the nominees contained on each and every slate of directors endorsed by Mr. Wynn, which slate will include, subject to certain exceptions, Elaine P. Wynn. As a result of this voting arrangement, Mr. Wynn, as a practical matter, exercises significant influence over the slate of directors to be elected to our Board of Directors. In addition, with stated exceptions, the Amended and Restated Stockholders Agreement requires the written consent of the other party prior to any party selling any shares of the Company's common stock that it owns.

In June 2012, in connection with the pending litigation between the Company and Aruze USA, Inc., Elaine P. Wynn submitted a cross claim against Mr. Wynn and Kazuo Okada seeking to void the Amended and

31

Table of Contents

Restated Stockholders Agreement. Certain Wynn Las Vegas indentures provide that if Mr. Wynn, together with certain related parties, in the aggregate beneficially owns a lesser percentage of the outstanding common stock of the Company than is beneficially owned by any other person, a change of control will have occurred. If Elaine Wynn prevails in her cross claim, Stephen A. Wynn would not beneficially own or control Elaine Wynn's shares and a change in control may result under the Wynn Las Vegas debt documents. For additional information on the cross claim, see Item 8—"Financial Statements and Supplementary Data", Note 8 "Long-Term Debt" and Note 16 "Commitments and Contingencies".

In November 2006, the Board of Directors of Wynn Resorts approved an amendment of its bylaws that exempts future acquisitions of shares of Wynn Resorts' common stock by either Mr. Wynn or Aruze USA, Inc. from Nevada's acquisition of controlling interest statutes. In light of the determination by the Board of Directors on February 18, 2012 that each of Aruze USA, Inc., Universal Entertainment Corporation and Mr. Kazuo Okada is an "Unsuitable Person" under the Company's articles of incorporation and the redemption and cancellation of Aruze USA Inc.'s shares of Company common stock, our Fifth Amended and Restated Bylaws amended these provisions to delete the reference to Aruze USA, Inc. and its affiliates. The Nevada acquisition of controlling interest statutes require stockholder approval in order to exercise voting rights in connection with any acquisition of a controlling interest in certain Nevada corporations unless the articles of incorporation or bylaws of the corporation in effect on the 10th day following the acquisition of a controlling interest by certain acquiring persons provide that these statutes do not apply to the corporation or to the acquisition specifically by types of existing or future stockholders. These statutes define a "controlling interest" as (i) one-fifth or more but less than one third, (ii) one-third or more but less than a majority, or (iii) a majority or more, of the voting power in the election of directors. As a result of these bylaws provisions, Mr. Wynn or his affiliates may acquire ownership of outstanding voting shares of Wynn Resorts permitting him or them to exercise more than one-third but less than a majority, or a majority or more, of all of the voting power of the Company in the election of directors, without requiring a resolution of the Company's stockholders granting voting rights in the control shares acquired.

*Our stock price may be volatile.*

The trading price of our common stock may be subject to wide fluctuations. Our stock price may fluctuate in response to a number of events and factors, such as general United States, China, and world economic and financial conditions, our own quarterly variations in operating results, increased competition, changes in financial estimates and recommendations by securities analysts, changes in applicable laws or regulations, changes affecting the travel industry. The stock market in general, and prices for companies in our industry in particular, has experienced extreme volatility that may be unrelated to the operating performance of a particular company. These broad market and industry fluctuations may adversely affect the price of our common stock, regardless of our operating performance.

Risks Related to our Substantial Indebtedness

*We are highly leveraged and future cash flow may not be sufficient for us to meet our obligations, and we might have difficulty obtaining more financing.*

We have a substantial amount of consolidated debt in relation to our equity. As of December 31, 2013, we had total outstanding debt of approximately $6.6 billion, which includes a portion of the funds we expect to need to construct Wynn Palace. We may, however, incur additional indebtedness in connection with the construction of Wynn Palace. See Item—1 "Business", "Construction and Development Opportunities". In addition, we are permitted to incur additional indebtedness if certain conditions are met, including conditions under our Wynn Macau credit facilities and our Wynn Las Vegas indentures in connection with other future potential development plans. On February 18, 2012, we issued a subordinated promissory note with a principal amount of approximately $1.94 billion in redemption of all of the shares of Wynn Resorts common stock held by Aruze USA, Inc. (the "Redemption Note"). For additional information on the redemption and the Redemption Note, see Item 3—"Legal Proceedings" and Item 8—"Financial Statements and Supplementary Data", Note 16—"Commitments and Contingencies".

32

Table of Contents

Our substantial indebtedness could have important consequences. For example:

- failure to meet our payment obligations could result in acceleration of our indebtedness, foreclosure upon our assets that serve as collateral or bankruptcy;

- servicing our indebtedness requires a substantial portion of our cash flow from the operations of Wynn Las Vegas and Wynn Macau and reduces the amount of available cash, if any, to fund working capital and other cash requirements;

- Aruze USA, Inc., Universal Entertainment Corporation and Kazuo Okada have challenged the redemption of Aruze USA, Inc.'s shares and we are currently involved in litigation with those parties as well as related shareholder derivative litigation. The outcome of these various proceedings cannot be predicted. Any adverse judgments or settlements involving payment of a material sum of money could cause a material adverse effect on our financial condition and results of operations and could expose us to additional claims by third parties including current or former investors or regulators. Any adverse judgments or settlements would reduce our profits and could limit our ability to operate our business. See Item 3—"Legal Proceedings" and Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies";

- we may experience decreased revenues from our operations due to decreased consumer spending levels and high unemployment, and could fail to generate sufficient cash to fund our liquidity needs and/or fail to satisfy the financial and other restrictive covenants to which we are subject under our existing indebtedness. Our business may not generate sufficient cash flow from operations to pay our indebtedness or to fund our other liquidity needs;

- we may not be able to obtain additional financing, if needed, to satisfy working capital requirements or pay for other capital expenditures, debt service or other obligations; and

- rates with respect to a portion of the interest we pay will fluctuate with market rates and, accordingly, our interest expense will increase if market interest rates increase.

Under the terms of the documents governing our debt facilities, subject to certain limitations, we are permitted to incur indebtedness. If we incur additional indebtedness, the risks described above will be exacerbated.

***The agreements governing our debt facilities contain certain covenants that restrict our ability to engage in certain transactions and may impair our ability to respond to changing business and economic conditions.***

Some of our debt facilities require us to satisfy various financial covenants, which include requirements for minimum interest coverage ratios and leverage ratios pertaining to total debt to earnings before interest, tax, depreciation and amortization (both currently required for our Wynn Macau credit facilities). Future indebtedness or other contracts could contain covenants more restrictive than those contained in our existing debt facilities.

The agreements governing our debt facilities also contain restrictions on our ability to engage in certain transactions and may limit our ability to respond to changing business and economic conditions. These restrictions include, among other things, limitations on our ability and the ability of our restricted subsidiaries to:

- pay dividends or distributions or repurchase equity;

- incur additional debt;

- make investments;

- create liens on assets to secure debt;

- enter into transactions with affiliates;

- issue stock of, or member's interests in, subsidiaries;

Table of Contents

- enter into sale-leaseback transactions;

- engage in other businesses;

- merge or consolidate with another company;

- transfer, sell or otherwise dispose of assets;

- issue disqualified stock;

- create dividend and other payment restrictions affecting subsidiaries; and

- designate restricted and unrestricted subsidiaries.

Our ability to comply with the terms of our outstanding facilities may be affected by general economic conditions, industry conditions and other events outside of our control. As a result, we may not be able to maintain compliance with these covenants. If our or Wynn Macau's operations fail to generate adequate cash flow, we may violate those covenants, causing a default under our agreements, which would materially and adversely affect our operating results and our financial condition or result in our lenders or holders of our debt taking action to enforce their security interests in our various assets or cause all outstanding amounts to be due and payable immediately.

**ITEM 1B.       UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2.        PROPERTIES**

**Macau Land Concessions**

The government of Macau owns most of the land in Macau. In most cases, private interests in real property located in Macau are obtained through long-term leases known as concessions and other grants of rights to use land from the government. In July 2004, our subsidiary, Wynn Macau, entered into a land concession contract under which Wynn Macau leases from the Macau government an approximately 16-acre parcel of land in downtown Macau's inner harbor area where Wynn Macau is located. The term of the land concession contract is 25 years from August 2004, and it may be renewed with government approval for successive periods. Wynn Macau paid a land concession premium of approximately 319.4 million Macau patacas (approximately US $40 million) for this land concession. In 2009, the Company and the Macau government agreed to modify this land concession as a result of the expansion of Wynn Macau with Encore at Wynn Macau and the additional square footage that was added as a result of such expansion. In November 2009, the Company made an additional one-time land premium payment of approximately 113.4 million Macau patacas (approximately US $14.2 million). Annual rent of approximately 4.2 million Macau patacas (approximately US $525,000) is being paid in accordance with the land concession contract.

In September 2011, Palo Real Estate Company Limited and Wynn Macau, each an indirect subsidiary of Wynn Macau Limited, formally accepted the terms and conditions of a draft land concession contract from the Macau government for approximately 51 acres of land in the Cotai area of Macau. On May 2, 2012, the land concession contract was gazetted by the government of Macau evidencing the final step in the granting of the land concession. We are currently constructing Wynn Palace in the Cotai area of Macau, a full-scale integrated resort containing a 1,700-room hotel, performance lake, meeting space, casino, spa, retail offerings and food and beverage outlets. The total project budget, including construction costs, capitalized interest, pre-opening expenses, land costs and financing fees, is $4 billion. As of December 31, 2013, we have invested $703.7 million in the project. We continue to remain on schedule for an opening in the first half of 2016.

34

Table of Contents

**Las Vegas Land**

We currently own approximately 238 acres of land on or near the Las Vegas Strip consisting of approximately 75 acres at the northeast corner of the intersection of Las Vegas Boulevard and Sands Avenue, on which Wynn Las Vegas is located, the approximately 140-acre golf course behind Wynn Las Vegas, approximately 5 acres adjacent to the golf course on which an office building is located, and approximately 18 acres located across from the Wynn Las Vegas site at Koval Lane and Sands Avenue, a portion of which is improved with an employee parking garage and an office building.

**Las Vegas Water Rights**

We own approximately 834 acre-feet of permitted and certificated water rights, which we currently use to irrigate the golf course. We also own approximately 151.5 acre-feet of permitted and certificated water rights for commercial use. There are significant cost savings and conservation benefits associated with using water supplied pursuant to our water rights. We anticipate using our water rights to support future development of the golf course land.

**ITEM 3.   LEGAL PROCEEDINGS**

We are occasionally party to lawsuits. As with all litigation, no assurance can be provided as to the outcome of such matters and we note that litigation inherently involves significant costs. For more information regarding the Company's legal matters see Item 1A—"Risk Factors" and Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies," in this Annual Report on Form 10-K.

*Atlantic-Pacific Capital*

On May 3, 2010, Atlantic-Pacific Capital, Inc. ("APC") filed an arbitration demand with JAMS, a private alternative dispute resolution provider, regarding an agreement with the Company. The action concerns a claim for compensation of approximately $32 million pursuant to an agreement entered into between APC and the Company on or about March 30, 2008, whereby APC was engaged to raise private equity capital for a specific investment vehicle sponsored by the Company. APC is seeking compensation unrelated to the investment vehicle. The Company has denied APC's claims for compensation. The Company filed a Complaint for Damages and Declaratory Relief against APC in the Eighth Judicial District Court, Clark County, Nevada, on May 10, 2010, which APC removed to the United States District Court, District of Nevada. In March 2011, the District Court denied APC's motion to compel arbitration, and dismissed the action. APC appealed, and on November 13, 2012, the United States Court of Appeals for the Ninth Circuit reversed the District Court and compelled arbitration. The arbitration is set for April 2014. An arbitrator has been selected, and the parties have been engaging in discovery. Management believes that APC's claims against the Company are without merit, and the Company intends to continue to defend this matter vigorously.

*Determination of Unsuitability and Redemption of Aruze USA, Inc. and Affiliates*

On February 18, 2012, Wynn Resorts' Gaming Compliance Committee concluded an investigation after receiving an independent report by Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing a pattern of misconduct by Aruze USA, Inc. (at the time a stockholder of Wynn Resorts), Universal Entertainment Corporation, Aruze USA, Inc.'s parent company, and Kazuo Okada, (the majority shareholder of Universal Entertainment Corporation and a former member of the Board of Directors of Wynn Resorts and Wynn Macau, Limited) (collectively, the "Okada Parties"). The factual record presented in the Freeh Report included evidence that the Okada Parties had provided valuable items to certain foreign gaming officials who were responsible for regulating gaming in a jurisdiction in which entities controlled by Mr. Okada were developing a gaming resort. Mr. Okada denied the impropriety of such conduct to members of the Board of Directors of Wynn Resorts and while serving as one of the Company's directors Mr. Okada refused to acknowledge or abide by Wynn Resorts' anti-bribery policies and refused to participate in the training all other directors have received concerning these policies.

Table of Contents

Based on the Freeh Report, the Board of Directors of Wynn Resorts determined that the Okada Parties are "unsuitable persons" under Article VII of the Company's articles of incorporation. The Board of Directors was unanimous (other than Mr. Okada) in its determination. After authorizing the redemption of the Aruze shares, as discussed below, the Board of Directors took certain actions to protect the Company and its operations from any influence of an unsuitable person, including placing limitations on the provision of certain operating information to unsuitable persons and formation of an Executive Committee of the Board to manage the business and affairs of the Company during the period between each annual meeting. The Charter of the Executive Committee provides that "Unsuitable Persons" are not permitted to serve on the Committee. All members of the Board, other than Mr. Okada, were appointed to the Executive Committee on February 18, 2012. The Board of Directors also requested that Mr. Okada resign as a director of Wynn Resorts (under Nevada corporation law, a board of directors does not have the power to remove a director) and recommended that Mr. Okada be removed as a member of the Board of Directors of Wynn Macau, Limited. In addition, on February 18, 2012, Mr. Okada was removed from the Board of Directors of Wynn Las Vegas Capital Corp., an indirect wholly owned subsidiary of Wynn Resorts. On February 24, 2012, Mr. Okada was removed from the Board of Directors of Wynn Macau, Limited and on February 22, 2013, he was removed from the Board of Directors of Wynn Resorts by a stockholder vote in which 99.6% of the over 86 million shares voted were cast in favor of removal. Additionally, Mr. Okada resigned from the Board of Directors of Wynn Resorts on February 21, 2013. Although the Company has retained the structure of the Executive Committee, the Board has resumed its past role in managing the business and affairs of the Company.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," Article VII of Wynn Resorts' articles of incorporation authorizes redemption at "fair value" of the shares held by unsuitable persons. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares held by Aruze USA, Inc. under the terms of the Stockholders Agreement (as defined below). Pursuant to its articles of incorporation, Wynn Resorts issued the Redemption Note to Aruze USA, Inc. in redemption of the shares. The Redemption Note has a principal amount of $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Note. The Company may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts or any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

The Company provided the Freeh Report to appropriate regulators and law enforcement agencies and has been cooperating with related investigations that such regulators and agencies have undertaken. The conduct of the Okada Parties and any resulting regulatory investigations could have adverse consequences to the Company and its subsidiaries. A finding by regulatory authorities that Mr. Okada violated anti-corruption statutes and/or other laws or regulations applicable to persons affiliated with a gaming licensee on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company and its subsidiaries.

*Redemption Action and Counterclaim*

On February 19, 2012, Wynn Resorts filed a complaint in the Eighth Judicial District Court, Clark County, Nevada against the Okada Parties (as amended, the "Complaint"), alleging breaches of fiduciary duty and related claims (the "Redemption Action") arising from the activities addressed in the Freeh Report. The Company is seeking compensatory and special damages as well as a declaration that it acted lawfully and in full compliance with its articles of incorporation, bylaws and other governing documents in redeeming and cancelling the shares of Aruze, USA, Inc.

36

Table of Contents

On March 12, 2012, the Okada Parties removed the action to the United States District Court for the District of Nevada (the action was subsequently remanded to Nevada state court). On that same date, the Okada Parties filed an answer denying the claims and a counterclaim (as amended, the "Counterclaim") that purports to assert claims against the Company, each of the members of the Company's Board of Directors (other than Mr. Okada) and Wynn Resorts' General Counsel (the "Wynn Parties"). The Counterclaim alleges, among other things: (1) that the shares of Wynn Resorts common stock owned by Aruze USA, Inc. were exempt from the redemption-for-unsuitability provisions in the Wynn Resorts articles of incorporation (the "Articles") pursuant to certain agreements executed in 2002; (2) that the Wynn Resorts directors who authorized the redemption of Aruze USA, Inc.'s shares acted at the direction of Stephen A. Wynn and did not independently and objectively evaluate the Okada Parties' suitability, and by so doing, breached their fiduciary duties; (3) that the Wynn Resorts directors violated the terms of the Wynn Resorts Articles by failing to pay Aruze USA, Inc. fair value for the redeemed shares; and (4) that the terms of the Redemption Note that Aruze USA, Inc. received in exchange for the redeemed shares, including the Redemption Note's principal amount, duration, interest rate, and subordinated status, were unconscionable. Among other relief, the Counterclaim seeks a declaration that the redemption of Aruze USA, Inc.'s shares was void, an injunction restoring Aruze USA, Inc.'s share ownership, damages in an unspecified amount and rescission of the Amended and Restated Stockholders Agreement, dated as of January 6, 2010, by and among Aruze USA, Inc., Stephen A. Wynn, and Elaine Wynn (the "Stockholders Agreement").

On June 19, 2012, Elaine Wynn responded to the Counterclaim and asserted a cross claim against Steve Wynn and Kazuo Okada seeking a declaration that (1) any and all of Elaine Wynn's duties under the Stockholders Agreement be discharged; (2) the Stockholders Agreement is subject to rescission and is rescinded; (3) the Stockholders Agreement is an unreasonable restraint on alienation in violation of public policy; and/or (4) the restrictions on sale of shares shall be construed as inapplicable to Elaine Wynn. Mr. Wynn filed his answer to Elaine Wynn's cross claim on September 24, 2012. The indentures for Wynn Las Vegas, LLC's 7 7/8% first mortgage notes due 2020, 7 3/4% first mortgage notes due 2020 (the "2020 Indentures") and the indenture for Wynn Las Vegas, LLC's 4 1/4% Senior Notes due 2023 (the "2023 Indenture," and, together with the 2020 Indentures, the "Indentures") provide that if Stephen A. Wynn, together with certain related parties, in the aggregate beneficially owns a lesser percentage of the outstanding common stock of the Company than are beneficially owned by any other person, a change of control will have occurred. If Elaine Wynn prevails in her cross claim, Stephen A. Wynn would not beneficially own or control Elaine Wynn's shares and a change in control may result under the Wynn Las Vegas debt documents. Under the 2020 Indentures, the occurrence of a change of control requires that the Company make an offer to each holder to repurchase all or any part of such holder's notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest on the notes purchased, if any, to the date of repurchase (unless the notes have been previously called for redemption). Under the 2023 Indenture, if a change of control occurs and within 60 days after that occurrence the 4 1/4% Senior Notes due 2023 are rated below investment grade by both rating agencies that rate such notes, the Company is required to make an offer to each holder to repurchase all or any part of such holder's notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest on the notes purchased, if any, to the date of repurchase (unless the notes have been previously called for redemption). Mr. Wynn is opposing Ms. Wynn's cross claim.

The Company's Complaint and the Okada Parties' Counterclaim have been, and continue to be, challenged through motion practice. At a hearing held on November 13, 2012, the Nevada state court granted the Wynn Parties' motion to dismiss the Counterclaim with respect to the Okada Parties' claim under the Nevada Racketeer Influenced and Corrupt Organizations Act with respect to certain Company executives but otherwise denied the motion. At a hearing held on January 15, 2013, the court denied the Okada Parties' motion to dismiss the Company's Complaint. On April 22, 2013, the Company filed a second amended complaint. On August 30, 2013, the Okada Parties filed their third amended Counterclaim. On September 18, 2013, the Company filed a Partial Motion to Dismiss related to a claim in the third amended Counterclaim alleging civil extortion by Mr. Wynn and the Company's General Counsel. On October 29, 2013, the court granted the motion and dismissed the claim. On November 26, 2013, the Okada Parties filed their fourth amended Counterclaim, and the Company

37

Table of Contents

filed an answer to that pleading on December 16, 2013. The parties had been engaged in discovery at the time the court entered the Stay (defined and discussed below). Therefore, although the court previously set a timetable for all discovery, pre-trial and trial deadlines, with a five-week jury trial scheduled to commence in April 2014, this schedule will necessarily change due to the Stay.

On February 13, 2013, the Okada Parties filed a motion in the Nevada state court asking the court to establish an escrow account (specifically, they asked the court to establish a "disputed ownership fund," as defined in a federal tax regulation ("DOF")) to hold the Redemption Note as well as the redeemed shares themselves (although those shares were previously cancelled in February 2012), until the resolution of the Redemption Action and Counterclaim. The Okada Parties subsequently filed reply papers in further support of their motion, in which they narrowed the relief they were seeking, specifically by withdrawing their request that the redeemed shares be placed into the escrow account. On April 17, 2013, the court entered an order granting the Okada Parties' motion in part as to the narrowed relief outlined in their reply papers. Among other things, the court's order directed the Okada Parties to establish an escrow account with a third party (without making any ruling as to whether such an account would satisfy the requirements of a DOF) to hold interest payments tendered by the Company on the Redemption Note. Per the court's order, the Company is to have no responsibility for fees or costs of the account, and will receive a full release and indemnity related to the account. On each of February 14, 2013 and February 13, 2014, the Company issued checks to Aruze USA, Inc. in the amount of $38.7 million, representing the interest payments due on the Redemption Note at those times. However, as of the date of this report, the checks remain uncashed. The parties engaged in discussions regarding the terms of the escrow agreement contemplated by the court's order. However, the Okada Parties recently advised of their intent to deposit any checks for interest and principal, past and future, due under the terms of the Redemption Note to the Clerk of the Court for deposit into the Clerk's Trust Account.

On April 8, 2013, the United States Attorney's Office and the U.S. Department of Justice filed a Motion to Intervene and for Temporary and Partial Stay of Discovery in the Redemption Action. The motion stated that the federal government has been conducting a criminal investigation of the Okada Parties involving the "same underlying allegations of misconduct—that is, potential violations of the Foreign Corrupt Practice Act and related fraudulent conduct—that form the basis of" the Company's complaint, as amended, in the Redemption Action. The motion sought to stay all discovery in the Redemption Action related to the Okada Parties' allegedly unlawful activities in connection with their casino project in the Philippines until the conclusion of the criminal investigation and any resulting criminal prosecution, with an interim status update to the court in six months. At a hearing on May 2, 2013, the court granted the motion and ordered that all discovery in the Redemption Action be stayed for a period of six months (the "Stay"). On May 30, 2013, Elaine Wynn filed a motion for partial relief from the Stay, to allow her to conduct limited discovery related to her cross and counterclaims. The Wynn Parties opposed the motion so as to not interfere with the United States government's investigation. At a hearing on August 1, 2013, the court denied the motion. On October 29, 2013, the United States Attorney's Office and the U.S. Department of Justice filed a Motion to Extend the Stay for a period of six months, expiring May 2, 2014. At a hearing on October 31, 2013, the court granted the requested extension based upon an affidavit provided under seal that outlined, among other things, concerns for witness safety. The court did, however, order the parties to exchange written discovery propounded prior to May 2, 2013, including discovery related to the Elaine Wynn cross and counterclaims referred to above.

Subject to the Stay, the Company will continue to vigorously pursue its claims against the Okada Parties, and the Company and the Wynn Parties will continue to vigorously defend against the counterclaims asserted against them. The Company's claims and the Okada Parties' counterclaims remain in an early stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any. An adverse judgment or settlement involving payment of a material amount could cause a material adverse effect on our financial condition. See Item 1A—"Risk Factors" and Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies".

38

Table of Contents

*Litigation Commenced by Kazuo Okada*

Japan Action:

On August 28, 2012, Mr. Okada, Universal Entertainment Corporation and Okada Holdings ("Okada Japan Parties") filed a complaint in Tokyo District Court against the Company, all members of the Board of Directors (other than Mr. Okada) and the Company's General Counsel (the "Wynn Parties"), alleging that the press release issued by the Company with respect to the redemption has damaged plaintiffs' social evaluation and credibility. The Okada Japan Parties seek damages and legal fees from the Wynn Parties. After asking the Okada Japan Parties to clarify the allegations in their complaint, the Wynn Parties objected to the jurisdiction of the Japanese court. On April 30, 2013, the Wynn Parties filed a memorandum in support of their jurisdictional position. On October 21, 2013, the court dismissed the action on jurisdictional grounds. On November 1, 2013, the Okada Japan Parties filed an appeal moving the matter to the Tokyo High Court. An informal hearing on the matter has been scheduled for February 27, 2014.

Indemnification Action:

On March 20, 2013, Mr. Okada filed a complaint against the Company in Nevada state court for indemnification under the Company's Articles, bylaws and agreements with its directors. The complaint seeks advancement of Mr. Okada's costs and expenses (including attorney's fees) incurred pursuant to the various legal proceedings and related regulatory investigations described above. The Company believes there is no basis for the relief requested in the complaint and intends to vigorously defend against this matter. The Company's answer and counterclaim was filed on April 15, 2013. The counterclaim names each of the Okada Parties as defendants and seeks indemnification under the Company's Articles for costs and expenses (including attorney's fees) incurred pursuant to the various legal proceedings and related regulatory investigations described above. On April 30, 2013, Mr. Okada filed his reply to the counterclaim.

On June 14, 2013, Mr. Okada filed a motion for partial summary judgment that he was entitled to advancement of his expenses incurred in the various proceedings and investigations. Mr. Okada also filed a special motion to dismiss, arguing that the Company's counterclaims seek to infringe upon Mr. Okada's right to petition the court, and constitute a strategic lawsuit against public policy. The Company's counterclaims seek only to enforce Wynn Resorts' contractual right to indemnity under Article VII, Section 4 of the Company's Articles. At a hearing on August 1, 2013, the court denied both motions and provided for limited discovery (*i.e.*, discovery that does not implicate any of the issues subject to the Stay entered in the Redemption Action). On August 2, 2013, the court stayed discovery in the indemnification action related to the government investigations (consistent with the Stay in the Redemption Action), and ordered that all other discovery be conducted within ninety (90) days.

On August 22, 2013, the Company noticed Mr. Okada's deposition for September 16, 2013. Mr. Okada filed a motion for protective order seeking to vacate his deposition, arguing that he did not have any information relevant to his claims for advancement of fees and/or indemnity that he asserted against the Company. On October 18, 2013, after a full briefing by the parties, the court denied Mr. Okada's motion and entered an order stating that Mr. Okada's deposition testimony is relevant to the claims he asserted against the Company, that Mr. Okada may not designate someone else to testify on his behalf, and that the Company may sequence discovery in the action as it chooses. On February 4, 2014, the court entered an order on the parties' stipulation that: (1) dismissed Okada's claims asserted against the Company in that action (i.e., all Okada's claims that relate to advancement); (2) reserved Okada's right to assert, in the future, any claims for indemnity following the resolution of the Redemption Action; and (3) stayed the claims asserted by the Company against Okada in that action pending the resolution of the Redemption Action.

39

Table of Contents

*Related Investigations and Derivative Litigation*

Investigations:

In the U.S. Department of Justice's Motion to Intervene and for Temporary and Partial Stay of Discovery in the Redemption Action, the Department of Justice states in a footnote that the government also has been conducting a criminal investigation into the Company's donation to the University of Macau discussed above. The Company has not received any target letter or subpoena in connection with such an investigation. The Company intends to cooperate fully with the government in response to any inquiry related to the donation to the University of Macau.

Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company.

Derivative Claims:

Six derivative actions were commenced against the Company and all members of its Board of Directors: four in the United States District Court, District of Nevada, and two in the Eighth Judicial District Court of Clark County, Nevada.

The four federal actions brought by the following plaintiffs have been consolidated: (1) The Louisiana Municipal Police Employees' Retirement System, (2) Maryanne Solak, (3) Excavators Union Local 731 Welfare Fund, and (4) Boilermakers Lodge No. 154 Retirement Fund (collectively, the "Federal Plaintiffs").

The Federal Plaintiffs filed a consolidated complaint on August 6, 2012, asserting claims for: (1) breach of fiduciary duty; (2) waste of corporate assets; (3) injunctive relief; and (4) unjust enrichment. The claims are against the Company and all Company directors, including Mr. Okada, however, the plaintiffs voluntarily dismissed Mr. Okada as a defendant in this consolidated action on September 27, 2012. The Federal Plaintiffs claim that the individual defendants breached their fiduciary duties and wasted assets by: (a) failing to ensure the Company's officers and directors complied with federal and state laws and the Company's Code of Conduct; (b) voting to allow the Company's subsidiary to make the donation to the University of Macau; and (c) redeeming Aruze USA, Inc.'s stock such that the Company incurs the debt associated with the redemption. The Federal Plaintiffs seek unspecified compensatory damages, restitution in the form of disgorgement, reformation of corporate governance procedures, an injunction against all future payments related to the donation/pledge, and all fees (attorneys, accountants, and experts) and costs. The directors responded to the consolidated complaint by filing a motion to dismiss on September 14, 2012. On February 1, 2013, the federal court dismissed the complaint for failure to plead adequately the futility of a pre-suit demand on the Board. The dismissal was without prejudice to the Federal Plaintiffs' ability to file a motion within 30 days seeking leave to file an amended complaint. On April 9, 2013, the Federal Plaintiffs filed their amended complaint. The Company and the directors filed their motion to dismiss the amended complaint on May 23, 2013. The Federal Plaintiffs filed their opposition on July 8, 2013, and the Company and directors filed their reply on August 8, 2013. The court has not yet ruled on this motion.

The two state court actions brought by the following plaintiffs have also been consolidated: (1) IBEW Local 98 Pension Fund and (2) Danny Hinson (collectively, the "State Plaintiffs"). Through a coordination of efforts by all parties, the directors and the Company (a nominal defendant) have been served in all of the actions. The State Plaintiffs filed a consolidated complaint on July 20, 2012 asserting claims for (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; and (4) unjust enrichment. The claims are against the Company and all Company directors, including Mr. Okada, as well as the Company's Chief Financial Officer, who signs financial disclosures filed with the SEC. The State Plaintiffs claim that the individual defendants failed to

40

Table of Contents

disclose to the Company's stockholders the investigation into, and the dispute with director Okada as well as the alleged potential violations of the FCPA related to, the University of Macau Development Foundation donation. The State Plaintiffs seek unspecified monetary damages (compensatory and punitive), disgorgement, reformation of corporate governance procedures, an order directing the Company to internally investigate the donation, as well as attorneys' fees and costs. On October 13, 2012, the court entered the parties' stipulation providing for a stay of the state derivative action for 90 days, subject to the parties' obligation to monitor the progress of the pending litigation, discussed above, between Wynn Resorts (among others) and Mr. Okada (among others). Per the stipulation, Wynn Resorts and the individual defendants were not required to respond to the consolidated complaint while the stay remained in effect. Following the expiration of the stay, the State Plaintiffs advised the Company and the individual defendants that they intended to resume the action by filing an amended complaint, which they did, on April 26, 2013. The Company and directors filed their motion to dismiss on June 10, 2013. However, on July 31, 2013, the parties agreed to a stipulation that was submitted to, and approved by the court. The stipulation contemplates a stay of the consolidated state court derivative action of equal duration as the Stay entered by the court in the Redemption Action. On February 5, 2014, the court entered a new stipulation between the parties that provides for a further stay of the state derivative action and directs the parties, within 30 days of the conclusion of the stay in the Redemption Action, to discuss how the state derivative action should proceed and to file a joint report with the court.

The individual defendants are vigorously defending against the claims pleaded against them in these derivative actions. We are unable to predict the outcome of these litigations at this time.

ITEM 4.        MINE SAFETY DISCLOSURES

Not Applicable.

41

Table of Contents

## PART II

**ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock trades on the NASDAQ Global Select Market under the symbol "WYNN." The following table sets forth the high and low sale prices for the indicated periods, as reported by the NASDAQ Global Select Market.

|  | High | Low |
|---|---|---|
| **Year Ended December 31, 2013** | | |
| First Quarter | $126.98 | $113.39 |
| Second Quarter | $144.99 | $114.41 |
| Third Quarter | $159.85 | $124.57 |
| Fourth Quarter | $194.53 | $155.77 |
| **Year Ended December 31, 2012** | | |
| First Quarter | $132.59 | $104.62 |
| Second Quarter | $138.28 | $ 95.82 |
| Third Quarter | $116.47 | $ 90.11 |
| Fourth Quarter | $123.64 | $103.34 |

**Holders**

There were approximately 195 holders of record of our common stock as of February 14, 2014.

**Dividends**

Wynn Resorts is a holding company and, as a result, our ability to pay dividends is dependent on our ability to obtain funds and our subsidiaries' ability to provide funds to us. Restrictions imposed by our subsidiaries' debt instruments significantly restrict certain key subsidiaries holding a majority of our assets, including Wynn Las Vegas, LLC and Wynn Macau, from making dividends or distributions to Wynn Resorts. Specifically, Wynn Las Vegas, LLC and certain of its subsidiaries are restricted under the indentures governing the first mortgage notes from making certain "restricted payments," as defined in the indentures. These restricted payments include the payment of dividends or distributions to any direct or indirect holders of equity interests of Wynn Las Vegas, LLC. Restricted payments cannot be made unless certain financial and non-financial criteria have been satisfied. In addition, the terms of the other loan agreements of Wynn Las Vegas, LLC and Wynn Macau contain similar restrictions. Our Company has paid the following dividends:

- In December 2013, we paid a cash dividend of $3.00 per share. In each of March 2013, June 2013, August 2013 and November 2013, we paid a cash dividend of $1.00 per share.

- In November 2012, we paid a cash dividend of $8.00 per share. In each of March 2012, June 2012 and August 2012, we paid a cash dividend of $0.50 per share.

The Company has increased its quarterly dividend to $1.25 per share in 2014. On January 30, 2014, we announced a cash dividend of $1.25 per share, payable on February 27, 2014 to Stockholders of record as of February 13, 2014. Our Board of Directors will continue to periodically assess the level and appropriateness of any cash dividends.

**ITEM 6.    SELECTED FINANCIAL DATA**

The following tables reflect selected consolidated financial data of Wynn Resorts and its subsidiaries. This data should be read together with our Consolidated Financial Statements and Notes thereto, Item 7—"Management's Discussion and Analysis of Financial Condition and Results of Operations" and the other

Table of Contents

information contained in this Annual Report on Form 10-K. Operating results for the periods presented are not indicative of the results that may be expected for future years. Significant events impacting our selected financial data include:

- On April 28, 2005, we opened our Wynn Las Vegas resort.

- On September 6, 2006, we opened our Wynn Macau resort.

- On December 24, 2007, we opened an expansion of our Wynn Macau resort.

- On December 22, 2008, we opened Encore at Wynn Las Vegas, an expansion of Wynn Las Vegas.

- On October 9, 2009, Wynn Macau, Limited listed its shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 27.7% of its common stock through an initial public offering.

- On April 21, 2010, we opened Encore at Wynn Macau, a further expansion of Wynn Macau.

- On February 18, 2012, we redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts common stock.

| | Years Ended December 31, | | | | |
| | 2013 | 2012 | 2011 | 2010 | 2009 |
| | (in thousands, except per share amounts) | | | | |
|---|---|---|---|---|---|
| **Consolidated Statements of Income Data:** | | | | | |
| Net revenues | $ 5,620,936 | $ 5,154,284 | $ 5,269,792 | $ 4,184,698 | $ 3,045,611 |
| Pre-opening costs | 3,169 | 466 | — | 9,496 | 1,817 |
| Operating income | 1,290,091 | 1,029,276 | 1,008,240 | 625,252 | 234,963 |
| Net income | 1,004,157 | 728,699 | 825,113 | 316,596 | 39,107 |
| Less: Net income attributable to noncontrolling interest[1] | (275,505) | (226,663) | (211,742) | (156,469) | (18,453) |
| Net income attributable to Wynn Resorts, Limited | 728,652 | 502,036 | 613,371 | 160,127 | 20,654 |
| Basic income per share | $ 7.25 | $ 4.87 | $ 4.94 | $ 1.30 | $ 0.17 |
| Diluted income per share | $ 7.17 | $ 4.82 | $ 4.88 | $ 1.29 | $ 0.17 |

| | As of December 31, | | | | |
| | 2013 | 2012 | 2011 | 2010 | 2009 |
| | (in thousands, except per share amounts) | | | | |
|---|---|---|---|---|---|
| **Consolidated Balance Sheets Data:** | | | | | |
| Cash and cash equivalents | $ 2,435,041 | $ 1,725,219 | $ 1,262,587 | $ 1,258,499 | $ 1,991,830 |
| Construction in progress | 558,624 | 110,490 | 28,477 | 22,901 | 457,594 |
| Total assets | 8,377,030 | 7,276,594 | 6,899,496 | 6,674,497 | 7,581,769 |
| Total long-term obligations[2] | 6,789,145 | 6,041,285 | 3,096,149 | 3,405,983 | 3,695,821 |
| Stockholders' equity[3] | 132,351 | 103,932 | 2,223,454 | 2,380,585 | 3,160,363 |
| Cash distributions declared per common share | $ 7.00 | $ 9.50 | $ 6.50 | $ 8.50 | $ 4.00 |

[1]  In October 2009, Wynn Macau, Limited, our indirect wholly owned subsidiary and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of its common stock through an initial public offering. Net income attributable to noncontrolling interest represents the noncontrolling interests' share of our net income of Wynn Macau, Limited.

[2]  Includes long-term debt, the required contract premium payments under our land concession contract at Wynn Macau, future charitable contributions and deferred income taxes.

43

Table of Contents

[3]   In February 2012, in connection with the redemption and cancellation of Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts common stock, stockholders' equity was reduced by $1.94 billion, the face amount of the Redemption Note. Aruze USA has challenged the redemption and cancellation of the 24,549,222 shares and legal proceedings are ongoing. Please see Item 3—"Legal Proceedings".

ITEM 7.        MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion should be read in conjunction with, and is qualified in its entirety by, the consolidated financial statements and the notes thereto included elsewhere in this Annual Report on Form 10-K.

**Overview**

We are a developer, owner and operator of destination casino resorts. In the Macau Special Administrative Region of the People's Republic of China ("Macau"), we operate and own 72.3% of Wynn Macau, which opened on September 6, 2006. On April 21, 2010, we opened Encore at Wynn Macau, a further expansion of Wynn Macau. We refer to the fully integrated Wynn Macau and Encore at Wynn Macau resort as Wynn Macau | Encore or as our Macau Operations. In Las Vegas, Nevada, we own and operate Wynn Las Vegas | Encore, which we refer to as our Las Vegas Operations. We are developing Wynn Palace, a full-scale casino resort in the Cotai area of Macau.

**Our Resorts**

The following table sets forth information about our resorts as of February 14, 2014:

| | Hotel Rooms & Suites | Approximate Casino Square Footage | Approximate Number of Table Games | Approximate Number of Slots |
|---|---|---|---|---|
| Macau Operations | 1,008 | 280,000 | 493 | 866 |
| Las Vegas Operations | 4,748 | 186,000 | 230 | 1,854 |

*Macau Operations*

We operate Wynn Macau | Encore under a 20-year casino concession agreement granted by the Macau government in June 2002.

Our Macau resort complex features:

- Approximately 280,000 square feet of casino space, offering 24-hour gaming and a full range of games, including private gaming salons, sky casinos and a poker pit;
- Two luxury hotel towers with a total of 1,008 spacious guest rooms and suites;
- Casual and fine dining in eight restaurants;
- Approximately 57,000 square feet of high-end, brand-name retail shopping, including stores and boutiques by Bvlgari, Cartier, Chanel, Dior, Dunhill, Ferrari, Giorgio Armani, Graff, Gucci, Hermes, Hugo Boss, Jaegar-LeCoultre, Loro Piana, Louis Vuitton, Miu Miu, Piaget, Prada, Roger Dubuis, Rolex, Tiffany, Tudor, Vacheron Constantin, Van Cleef & Arpels, Versace, Vertu, Ermenegildo Zegna and others;
- Recreation and leisure facilities, including two health clubs and spas, a salon, a pool; and
- Lounges and meeting facilities.

44

Table of Contents

During 2013, we made renovations to our spa, VIP gaming area and various other areas on our property. In response to our evaluation of our Macau Operations and the reactions of our guests, we have made and expect to continue to make enhancements and refinements to this resort complex.

*Las Vegas Operations*

Wynn Las Vegas | Encore is located at the intersection of the Las Vegas Strip and Sands Avenue, and occupies approximately 215 acres of land fronting the Las Vegas Strip. In addition, we own approximately 18 acres across Sands Avenue, a portion of which is utilized for employee parking and an office building, and approximately 5 acres adjacent to the golf course on which an office building is located.

Our Las Vegas resort complex features:

- Approximately 186,000 square feet of casino space, offering 24-hour gaming and a full range of games, including private gaming salons, a sky casino, a poker room, and a race and sports book;

- Two luxury hotel towers with a total of 4,748 spacious guest rooms, suites and villas;

- 34 food and beverage outlets featuring signature chefs;

- A Ferrari and Maserati automobile dealership;

- Approximately 96,000 square feet of high-end, brand-name retail shopping, including stores and boutiques by Alexander McQueen, Brioni, Cartier, Chanel, Chloé, Chopard, Dior, Graff, Hermes, IWC Schaffhausen, Jaeger-LeCoultre, Loro Piana, Louis Vuitton, Manolo Blahnik, Nicholas Kirkwood, Oscar de la Renta, Piaget, Rolex, Vertu and others;

- Recreation and leisure facilities, including an 18-hole golf course, swimming pools, private cabanas and two full service spas and salons;

- Two showrooms; and

- Three nightclubs and a beach club.

During 2013, we remodeled our villas and two of our restaurants. In response to our evaluation of our Las Vegas Operations and the reactions of our guests, we have and expect to continue to make enhancements and refinements to this resort complex.

*Future Development*

We are currently constructing Wynn Palace in the Cotai area of Macau, a full-scale integrated resort containing a 1,700-room hotel, performance lake, meeting space, casino, spa, retail offerings and food and beverage outlets. The total project budget, including construction costs, capitalized interest, pre-opening expenses, land costs and financing fees, is $4 billion. As of December 31, 2013, we have invested $703.7 million in the project. We continue to remain on schedule for an opening in the first half of 2016.

On July 29, 2013, Wynn Macau and Palo finalized and executed a GMP contract with Leighton Contractors (Asia) Limited, acting as the general contractor. Under the GMP contract, the general contractor is responsible for both the construction and design of the Wynn Palace project. The general contractor is obligated to substantially complete the project in the first half of 2016 for a guaranteed maximum price of HK$20 billion (approximately $2.57 billion). An early completion bonus for achievement of substantial completion on or before January 25, 2016 will be paid to the general contractor if certain conditions are satisfied under the GMP contract. Both the contract time and guaranteed maximum price are subject to further adjustment under certain specified conditions. The performance of the general contractor is backed by a full completion guarantee given by Leighton Holdings Limited, the parent company of the general contractor, as well as a performance bond for 5% of the guaranteed maximum price.

45

Table of Contents

We continually seek out new opportunities for additional gaming or related businesses, in the United States, and worldwide. On November 11, 2013, we announced that our Board had elected to withdraw the previously filed application for a gaming license in Pennsylvania. We have made an application for a gaming license in Massachusetts. The process is competitive and we expect to know the outcome by the end of the first half of 2014. Proceeding with this project will require significant expenditure of Company funds. In addition, we are exploring various international jurisdictions for expansion opportunities.

## Results of Operations

The table below presents our net revenues (amounts in thousands).

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| Net Revenues: | | | |
| Macau Operations | $  4,040,526 | $  3,667,454 | $  3,789,073 |
| Las Vegas Operations | 1,580,410 | 1,486,830 | 1,480,719 |
| | $  5,620,936 | $  5,154,284 | $  5,269,792 |

Reliance on only two resort complexes (in two geographic regions) for our operating cash flow exposes us to certain risks that competitors, whose operations are more geographically diversified, may be better able to control. In addition to the concentration of operations in two resort complexes, many of our customers are premium gaming customers who wager on credit, thus exposing us to increased credit risk. High-end gaming also increases the potential for variability in our results.

*Operating Measures*

Certain key operating statistics specific to the gaming industry are included in our discussion of our operational performance for the periods for which a Consolidated Statement of Income is presented. Below are definitions of these key operating statistics discussed:

- Table games win is the amount of drop or turnover that is retained and recorded as casino revenue.

- Drop is the amount of cash and net markers issued that are deposited in a gaming table's drop box.

- Turnover is the sum of all losing rolling chip wagers within our Wynn Macau Operations' VIP program.

- Rolling chips are identifiable chips that are used to track turnover for purposes of calculating incentives.

- Slot win is the amount of handle (representing the total amount wagered) that is retained by us and is recorded as casino revenue.

- Average Daily Rate ("ADR") is calculated by dividing total room revenue including the retail value of promotional allowances (less service charges, if any) by total rooms occupied including complimentary rooms.

- Revenue per Available Room ("REVPAR") is calculated by dividing total room revenue including the retail value of promotional allowances (less service charges, if any) by total rooms available.

- Occupancy is calculated by dividing total occupied rooms, including complimentary rooms, by the total rooms available.

Below is a discussion of the methodologies used to calculate win percentage at our resorts.

In our VIP casino in Macau, customers primarily purchase non-negotiable chips, commonly referred to as rolling chips, from the casino cage and there is no deposit into a gaming table drop box from chips purchased

46

Table of Contents

from the cage. Non-negotiable chips can only be used to make wagers. Winning wagers are paid in cash chips. The loss of the non-negotiable chips in the VIP casino is recorded as turnover and provides a base for calculating VIP casino win percentage. It is customary in Macau to measure VIP casino play using this rolling chip method. We expect our win as a percentage of turnover to be within the range of 2.7% to 3.0%.

The measurement base used in the general casino is not the same as what is used in the VIP casino. In our general casino in Macau, customers may purchase cash chips at either the gaming tables or at the casino cage. The cash used to purchase the cash chips at the gaming tables is deposited in the gaming table's drop box. This is the base of measurement that we use for calculating win percentage in our general casino. We do not report an expected range for the win percentage in our general casino as chips purchased at the casino cage are excluded from table games drop and distort our expected win percentage. With increased purchases at the casino cage, we believe the relevant indicator of volumes in the mass market segment should be table games win.

The measurements in our VIP casino and the general casino are not comparable as the general casino tracks the initial purchase of chips at the table while the measurement method in our VIP casino tracks the sum of all losing wagers. Accordingly, the base measurement in the VIP casino is much larger than the base measurement in the general casino. As a result, the expected win percentage with the same amount of gaming win is smaller in the VIP casino when compared to the general casino.

In Las Vegas, customers purchase chips at the gaming tables. The cash and net markers used to purchase chips are deposited in the gaming table's drop box. This is the base of measurement that we use for calculating win percentage in Las Vegas. Each type of table game has its own theoretical win percentage. Our expected table games win percentage in Las Vegas is 21% to 24%.

**_Financial results for the year ended December 31, 2013 compared to the year ended December 31, 2012._**

_Revenues_

Net revenues for the year ended December 31, 2013 are comprised of $4,490.6 million in casino revenues (79.9% of total net revenues) and $1,130.3 million of net non-casino revenues (20.1% of total net revenues). Net revenues for the year ended December 31, 2012 are comprised of $4,034.8 million in casino revenues (78.3% of total net revenues) and $1,119.5 million of net non-casino revenues (21.7% of total net revenues).

Casino revenues are primarily comprised of the net win from our table games and slot machine operations. Casino revenues for the year ended December 31, 2013 of $4,490.6 million represents a $455.9 million (11.3%) increase from casino revenues of $4,034.8 million for the year ended December 31, 2012. Our Macau Operations experienced a $365.4 million (10.6%) increase in casino revenues to $3,807.8 million for the year ended December 31, 2013, compared to the prior year casino revenues of $3,442.5 million due primarily to stronger table game volumes in our general casino and VIP casino. Our Las Vegas Operations experienced a $90.5 million (15.3%) increase in casino revenues to $682.8 million, compared to the prior year casino revenues of $592.3 million due to a significant increase in our table games win percentage (before discounts).

47

Table of Contents

The table below sets forth key gaming statistics related to our Macau and Las Vegas operations.

| | Years Ended December 31, | | | |
| | 2013 | 2012 | Increase/ (Decrease) | Percent Change |
| | | (amounts in thousands, except for win per day amounts) | | |
|---|---|---|---|---|
| **Macau Operations:** | | | | |
| **VIP Casino** | | | | |
| VIP turnover | $ 122,991,763 | $ 119,251,854 | $ 3,739,909 | 3.14% |
| VIP win as a % of turnover | 3.01% | 2.84% | 0.17 pts | — |
| **General Casino** | | | | |
| Drop(1) | $ 2,633,870 | $ 2,764,664 | $ (130,794) | (4.73)% |
| Table games win | $ 992,872 | $ 843,001 | $ 149,871 | 17.8% |
| Table games win %(1) | 37.7% | 30.5% | 7.2 pts | — |
| Table games win per unit per day | $ 13,098 | $ 11,549 | $ 1,549 | 13.4% |
| Slot machine handle | $ 4,846,938 | $ 4,697,463 | $ 149,475 | 3.2% |
| Slot machine win | $ 245,578 | $ 247,020 | $ (1,442) | (0.6)% |
| Slot machine win per unit per day | $ 777 | $ 718 | $ 59 | 8.2% |
| **Las Vegas Operations:** | | | | |
| Drop | $ 2,617,634 | $ 2,591,833 | $ 25,801 | 1.0% |
| Table games win | $ 657,927 | $ 567,014 | $ 90,913 | 16.0% |
| Table games win % | 25.1% | 21.9% | 3.2 pts | — |
| Table games win per unit per day | $ 7,729 | $ 7,031 | $ 698 | 9.9% |
| Slot machine handle | $ 2,874,646 | $ 2,908,678 | $ (34,032) | (1.2)% |
| Slot machine win | $ 177,452 | $ 177,420 | $ 32 | 0.0% |
| Slot machine win per unit per day | $ 239 | $ 206 | $ 33 | 16.0% |

(1)   Customers purchase general casino gaming chips at either the gaming tables or the casino cage. Chips purchased at the casino cage are excluded from table games drop and will increase the expected win percentage. With the increased purchases at the casino cage in our Macau general casino, we believe the relevant indicator of volumes in the general casino should be table games win.

   For the year ended December 31, 2013, room revenues were $492.2 million, an increase of $12.2 million (2.6%) compared to prior year room revenue of $480 million. Room revenue at our Macau Operations decreased $3 million (2.6%) to $114.6 million compared to the prior year period of $117.7 million. During 2013, we renovated approximately 600 guestrooms in the original Wynn Macau tower, contributing to an approximate 4.8% reduction in the number of available room-nights during the year. Room revenue at our Las Vegas Operations increased $15.3 million (4.2%) to $377.6 million compared to the prior year room revenue of $362.3 million. In Las Vegas, during 2013, we experienced an increase in occupancy and an increase in room rates compared to 2012.

48

Table of Contents

The table below sets forth key operating measures related to room revenue.

|  | Years Ended December 31, | |
|---|---|---|
|  | **2013** | **2012** |
| Average Daily Rate | | |
| Macau | $ 313 | $ 315 |
| Las Vegas | 258 | 252 |
| Occupancy | | |
| Macau | 95.5% | 93.0% |
| Las Vegas | 84.6% | 82.9% |
| REVPAR | | |
| Macau | $ 299 | $ 293 |
| Las Vegas | 218 | 209 |

Other non-casino revenues for the year ended December 31, 2013, included food and beverage revenues of $586.7 million, retail revenues of $278.9 million, entertainment revenues of $65.4 million, and other revenues from outlets such as the spa and salon, of $74.4 million. Other non-casino revenues for the year ended December 31, 2012, included food and beverage revenues of $588.4 million, retail revenues of $261.6 million, entertainment revenues of $81.8 million, and other revenues from outlets, including the spa and salon, of $73.8 million. Food and beverage revenues were relatively flat year-over-year at our Macau Operations and Las Vegas Operations. Retail revenues at our Macau Operations increased $10.5 million (5.9%) due to stronger business in our leased stores. Retail revenues at our Las Vegas Operations increased $6.7 million (8.0%) as we completed the reconfiguration to certain stores in our retail area during the first half of 2013. Entertainment revenues decreased $16.4 million (20%) due to a Las Vegas show that ended its run in November 2012.

*Departmental, Administrative and Other Expenses*

For the year ended December 31, 2013, departmental expenses included casino expenses of $2.8 billion, room expenses of $133.5 million, food and beverage expenses of $323.6 million, and entertainment, retail and other expenses of $175.3 million. Also included are general and administrative expenses of approximately $448.8 million and $11.9 million charged as a provision for doubtful accounts receivable. For the year ended December 31, 2012, departmental expenses included casino expenses of $2.6 billion, room expenses of $126.5 million, food and beverage expenses of $308.4 million, and entertainment, retail and other expenses of $189.8 million. Also included are general and administrative expenses of approximately $441.7 million and approximately $18.1 million charged as a provision for doubtful accounts receivable. Casino expenses have increased during the year ended December 31, 2013 due primarily to higher gaming taxes commensurate with the increase in casino revenue at our Las Vegas Operations and Macau Operations (where we incur a gaming tax and other levies at a rate totaling 39% in accordance with the concession agreement). Food and beverage expenses increased over the prior year period primarily due to additional nightclub promotional costs at our Las Vegas Operations. The decrease in entertainment, retail and other expenses was due primarily to a Las Vegas show that ended its run in November 2012. General and administrative expense increased primarily due to higher stock-based compensation expense related to the accelerated vesting of a restricted stock award that was previously granted to our former chief operating officer and increased development costs partially offset by higher expenses related to the share redemption and litigation with a former shareholder that were incurred during the prior year period. During the years ended 2013 and 2012, we recorded adjustments of $14.9 million and $30.9 million, respectively, to our reserve estimates for casino accounts receivable based on the results of historical collection patterns and current collection trends.

*Pre-opening costs*

During the year ended December 31, 2013, we incurred $3.2 million of pre-opening costs as compared to $0.5 million for the year ended December 31, 2012. We began to incur pre-opening costs during October 2012

Table of Contents

related to the design and planning for Wynn Palace. We expect our pre-opening costs to increase in the future as construction and development of Wynn Palace continues toward the expected completion in the first half of 2016.

*Depreciation and amortization*

Depreciation and amortization for the year ended December 31, 2013, was $371.1 million compared to $373.2 million for the year ended December 31, 2012.

During the construction of our resorts, costs incurred in the construction of the buildings, improvements to land and the purchases of assets for use in operations were capitalized. Once these resorts opened, their assets were placed into service and we began recognizing the associated depreciation expense. Depreciation expenses will continue throughout the estimated useful lives of these assets. In addition, we continually evaluate the useful life of our property and equipment, intangibles and other assets and adjust them when warranted.

The maximum useful life of assets at our Macau Operations is the remaining life of the gaming concession or land concession, which currently expire in June 2022 and August 2029, respectively. Consequently, depreciation related to our Macau Operations is charged on an accelerated basis when compared to our Las Vegas Operations.

*Property charges and other*

Property charges and other for the year ended December 31, 2013, was $17.1 million compared to $40 million for the year ended December 31, 2012. For the year ended December 31, 2013, property charges and other related primarily to miscellaneous renovations and abandonments at our resorts, a contract termination fee and entertainment development costs. For the year ended December 31, 2012, property charges and other related primarily to a remodel of a Las Vegas restaurant, charges related to the cancellation of a Las Vegas show which ended its run in November 2012, and miscellaneous renovations and abandonments.

In response to our evaluation of our resorts and the reactions of our guests, we continue to remodel and make enhancements at our resorts.

*Other non-operating costs and expenses*

Interest income was $15.7 million and $12.5 million for the years ended December 31, 2013 and 2012, respectively. This increase is mainly due to higher cash balances during 2013. During 2013 and 2012, our short-term investment strategy was to preserve capital while retaining sufficient liquidity. The majority of our short-term investments were primarily in money market accounts, time deposits and fixed deposits with a maturity of three months or less.

Interest expense was $299 million, net of capitalized interest of $10.5 million for the year ended December 31, 2013, compared to $288.8 million, net of capitalized interest of $2 million, for the year ended December 31, 2012. Our interest expense increased compared to the prior year period primarily due to the issuance of the Wynn Las Vegas $500 million 4 1/4% Senior Notes in May 2013 and a full period of expense for the $1.94 billion Redemption Note and the Wynn Las Vegas $900 million 5 3/8% first mortgage notes, which were issued in 2012. Capitalized interest increased due to the construction costs of Wynn Palace. Capitalized interest will continue to increase with the ongoing borrowings and construction costs of Wynn Palace.

We recorded a gain of $14.2 million and $1 million for the years ended December 31, 2013 and December 31, 2012, respectively, resulting from the changes in the fair value of our interest rate swaps during those years. For further information on our interest rate swaps, see Item 7A—"Quantitative and Qualitative Disclosures about Market Risk."

50

Table of Contents

During the year ended December 31, 2013, we recognized $40.4 million in loss from extinguishment of debt. On May 22, 2013, Wynn Las Vegas completed the purchase of $274.7 million of the 7 7/8% First Mortgage Notes due 2017 (the "2017 Notes") pursuant to a tender offer for any and all of the 2017 Notes. In connection with this tender offer, Wynn Las Vegas paid $19.6 million in consideration to holders who tendered their notes. Additionally, Wynn Las Vegas expensed $6.7 million of unamortized financing costs and original issue discount related to the 2017 Notes and incurred other fees of approximately $0.3 million related to the tender offer. On November 1, 2013, Wynn Las Vegas redeemed the untendered 2017 Notes plus accrued and unpaid interest. As a result of the redemption, we incurred redemption fees of $8.9 million and expensed $4.9 million of unamortized financing costs and original issue discount.

During the year ended December 31, 2012, we recognized $25.2 million in loss from extinguishment of debt primarily attributable to the amendment of our credit agreements. In March 2012, Wynn Las Vegas entered into an eighth amendment to its Amended and Restated Credit Agreement (the "Wynn Las Vegas Credit Agreement"). In connection with this amendment, Wynn Las Vegas prepaid all term loans under the Wynn Las Vegas Credit Agreement, terminated all of its revolving credit commitments that were due to expire in 2013, and terminated all but $100 million of its revolving credit commitments expiring in 2015. In connection with this transaction, we expensed deferred financing fees of $4.8 million. Additionally, as described in Item 8—"Financial Statements and Supplementary Data", Note 8 "Long-Term Debt" to our Consolidated Financial Statements, we amended our Wynn Macau credit facilities in July 2012. In connection with amending the Wynn Macau credit facilities, we expensed $17.7 million of deferred financing costs and third party fees.

*Income Taxes*

For the year ended December 31, 2013, we recorded a tax benefit of $17.6 million. Our income tax benefit is primarily related to a decrease in our deferred tax liabilities reduced by foreign taxes assessable on the dividends of Wynn Macau. Since June 30, 2010, we have no longer considered our portion of the tax earnings and profits of Wynn Macau, Limited to be permanently reinvested. No additional U.S. tax provision has been made with respect to amounts not considered permanently reinvested as we anticipate that U.S. foreign tax credits should be sufficient to eliminate any U.S. tax provision relating to such repatriation. We have not provided deferred U.S. income taxes or foreign withholding taxes on temporary differences which are considered indefinitely reinvested. On November 30, 2010, Wynn Macau received a second 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits, thereby exempting the casino gaming profits of Wynn Macau through December 31, 2015. Accordingly, we were exempted from the payment of approximately $107.3 million and $87.1 million in such taxes for the years ended December 31, 2013 and 2012, respectively. Our non-gaming profits remain subject to the Macau Complementary Tax and casino winnings remain subject to the Macau Special Gaming tax and other levies at a rate totaling 39% in accordance with our concession agreement.

In April 2012, the Company reached an agreement with the Appellate division of the Internal Revenue Service ("IRS") regarding issues raised during the examination of the 2006 through 2009 U.S. income tax returns. The settlement with the Appellate division did not impact the Company's unrecognized tax benefits. The settlement of the 2006 through 2009 examination issues resulted in a cash tax payment of $1.3 million and the utilization of $3.1 million and $0.9 million in foreign tax credit and general business credit carryforwards, respectively.

During December 2012, the IRS completed an examination of the Company's 2010 U.S. income tax return and had no changes. In May 2013, the Company received notification that the IRS completed its examination of the Company's 2011 U.S. income tax return and had no changes.

For tax year 2012, the Company is participating in the IRS Compliance Assurance Program ("CAP"), which accelerates IRS examination of key transactions with the goal of resolving any issues before the taxpayer files its return. The Company believes the IRS will complete their examination of the 2012 tax year in the next 12 months. In March 2013, the Company received notification that it had been selected for the Compliance

Table of Contents

Maintenance phase of CAP for the 2013 tax year. In the Compliance Maintenance phase, the IRS, at its discretion, may reduce the level of review of the taxpayer's tax positions based on the complexity and number of issues, and the taxpayer's history of compliance, cooperation and transparency in the CAP. The Company does not expect a change in its unrecognized tax benefits as a result of the completion of these examinations.

In July 2012, the Macau Financial Services Bureau commenced an examination of the 2008 Macau income tax return of Wynn Macau. In November 2012, the Company received the results of the examination. While no additional tax was due, adjustments were made to the Company's foreign net operating loss carryforwards.

In January 2013, the Macau Financial Services Bureau examined the 2009 and 2010 Macau income tax returns of Palo, which is a co-holder of the land concession for Wynn Palace. The exam resulted in no change to the tax returns.

In March 2013, the Macau Financial Services Bureau commenced an examination of the 2009, 2010, and 2011 Macau income tax returns of Wynn Macau. Since the examination is in its initial stages, the Company is unable to determine if it will conclude within the next 12 months. The Company believes that its liability for uncertain tax positions is adequate with respect to these years.

*Net income attributable to noncontrolling interests*

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of its common stock through an initial public offering. We recorded net income attributable to noncontrolling interests of $275.5 million for the year ended December 31, 2013, compared to $226.7 million for the year ended December 31, 2012. This represents the noncontrolling interests' share of net income from Wynn Macau, Limited for each year.

**Financial results for the year ended December 31, 2012 compared to the year ended December 31, 2011.**

*Revenues*

Net revenues for the year ended December 31, 2012 are comprised of $4,034.8 million in casino revenues (78.3% of total net revenues) and $1,119.5 million of net non-casino revenues (21.7% of total net revenues). Net revenues for the year ended December 31, 2011 are comprised of $4,190.5 million in casino revenues (79.5% of total net revenues) and $1,079.3 million of net non-casino revenues (20.5% of total net revenues).

Casino revenues are primarily comprised of the net win from our table games and slot machine operations. Casino revenues for the year ended December 31, 2012 of $4,034.8 million represents a $155.7 million (3.7%) decrease from casino revenues of $4,190.5 million for the year ended December 31, 2011. Our Las Vegas Operations experienced a $32.9 million (5.3%) decrease in casino revenues to $592.3 million, compared to the prior year casino revenues of $625.2 million due to a decrease in our table games win percentage (before discounts). Our Macau Operations experienced a $122.8 million (3.4%) decrease in casino revenues to $3,442.5 million for the year ended December 31, 2012, compared to the prior year due to lower turnover and hold percentage in our VIP casino.

52

Table of Contents

The table below sets forth key gaming statistics related to our Macau and Las Vegas operations.

| | Years Ended December 31, | | Increase/ (Decrease) | Percent Change |
|---|---|---|---|---|
| | 2012 | 2011 | (amounts in thousands, except for win per day amounts) | |
| **Macau Operations:** | | | | |
| **VIP Casino** | | | | |
| VIP turnover | $ 119,251,854 | $ 123,099,838 | $ (3,847,984) | (3.1)% |
| VIP win as a % of turnover | 2.84% | 2.93% | (0.09) pts | — |
| **General Casino** | | | | |
| Drop(1) | $ 2,764,664 | $ 2,769,284 | $ (4,620) | (0.2)% |
| Table games win | $ 843,001 | $ 787,678 | $ 55,323 | 7.0% |
| Table games win %(1) | 30.5% | 28.4% | 2.1 pts | — |
| Table games win per unit per day | $ 11,549 | $ 10,045 | $ 1,504 | 15.0% |
| Slot machine handle | $ 4,697,463 | $ 5,400,697 | $ (703,234) | (13.0)% |
| Slot machine win | $ 247,020 | $ 277,124 | $ (30,104) | (10.9)% |
| Slot machine win per unit per day | $ 718 | $ 760 | $ (42) | (5.5)% |
| | | | | |
| **Las Vegas Operations:** | | | | |
| Drop | $ 2,591,833 | $ 2,366,711 | $ 225,122 | 9.5% |
| Table games win | $ 567,014 | $ 589,093 | $ (22,079) | (3.7)% |
| Table games win % | 21.9% | 24.9% | (3.0) pts | — |
| Table games win per unit per day | $ 7,031 | $ 7,188 | $ (157) | (2.2)% |
| Slot machine handle | $ 2,908,678 | $ 2,738,261 | $ 170,417 | 6.2% |
| Slot machine win | $ 177,420 | $ 170,027 | $ 7,393 | 4.3% |
| Slot machine win per unit per day | $ 206 | $ 184 | $ 22 | 12.0% |

(1)    Customers purchase general casino gaming chips at either the gaming tables or the casino cage. Chips purchased at the casino cage are excluded from table games drop and will increase the expected win percentage. With the increased purchases at the casino cage in our Macau general casino, we believe the relevant indicator of volumes in the general casino should be table games win.

For the year ended December 31, 2012, room revenues were $480 million, an increase of $7.9 million (1.7%) compared to prior year room revenue of $472.1 million. Room revenue at our Las Vegas Operations increased $8.3 million (2.3%) to $362.3 million compared to the prior year room revenue of $354 million. In Las Vegas, we experienced an increase in room rates during the year ended December 31, 2012, however our occupancy rate decreased 3.2 percentage points, both compared to the prior year. We were able to achieve an increase in ADR as we adjusted rates to attract a higher quality customer who would take advantage of all aspects of our resort. Room revenue at our Macau Operations did not change significantly during the year ended December 31, 2012.

53

Table of Contents

The table below sets forth key operating measures related to room revenue.

| | Years Ended December 31, | |
| | 2012 | 2011 |
|---|---|---|
| Average Daily Rate | | |
| Macau | $ 315 | $ 315 |
| Las Vegas | 252 | 242 |
| Occupancy | | |
| Macau | 93.0% | 91.8% |
| Las Vegas | 82.9% | 86.1% |
| REVPAR | | |
| Macau | $ 293 | $ 289 |
| Las Vegas | 209 | 208 |

Other non-casino revenues for the year ended December 31, 2012, included food and beverage revenues of $588.4 million, retail revenues of $261.6 million, entertainment revenues of $81.8 million, and other revenues from outlets such as the spa and salon, of $73.8 million. Other non-casino revenues for the year ended December 31, 2011, included food and beverage revenues of $547.7 million, retail revenues of $260.8 million, entertainment revenues of $82.2 million, and other revenues from outlets, including the spa and salon, of $71.8 million. Food and beverage revenues at our Las Vegas Operations increased $36.3 million (8%), while our Macau Operations increased $4.4 million (4.8%), as compared to the prior year. The increase in Las Vegas is due primarily to strong business in our beach club and nightclubs. Retail revenues at our Macau Operations increased $2.6 million (1.5%), while retail at our Las Vegas Operations decreased by $1.8 million (2.1%). The increase at Wynn Macau is due primarily to strong same-store sales growth combined with new stores from the first half of 2012. Retail revenues at our Las Vegas Operations decreased as we reconfigured the Encore retail area and rebranded several retail outlets. Entertainment revenues decreased $0.4 million (0.5%) from the prior year primarily due to a Las Vegas show that ended its run in November 2012 and another Las Vegas show that ended in April 2011.

*Departmental, Administrative and Other Expenses*

For the year ended December 31, 2012, departmental expenses included casino expenses of $2,626.8 million, room expenses of $126.5 million, food and beverage expenses of $308.4 million, and entertainment, retail and other expenses of $189.8 million. Also included are general and administrative expenses of approximately $441.7 million and $18.1 million charged as a provision for doubtful accounts receivable. For the year ended December 31, 2011, departmental expenses included casino expenses of $2,686.4 million, room expenses of $125.3 million, food and beverage expenses of $283.9 million, and entertainment, retail and other expenses of $214.4 million. Also included are general and administrative expenses of approximately $389.1 million and approximately $33.8 million charged as a provision for doubtful accounts receivable. Casino expenses have decreased during the year ended December 31, 2012 due to lower volume which caused lower junket commission expense and lower gaming taxes at our Macau Operations (where we incur a gaming tax and other levies at a rate totaling 39% in accordance with the concession agreement). Although our room revenues increased $7.9 million (1.7%), room expenses increased only $1.2 million (1%) as the revenue increase was driven primarily by increased ADR. Food and beverage expenses increased over the prior year primarily due to additional nightclub promotional costs in Las Vegas. The decrease in entertainment, retail and other expenses was driven by the conversion of certain owned retail stores to leased outlets in Macau resulting in lower cost of sales. General and administrative expense increased primarily due to legal and other costs incurred related to the share redemption and litigation with a former stockholder, higher advertising costs, development and other activities. The provision for doubtful accounts decreased during the year ended December 31, 2012 as we recorded an adjustment of $30.9 million that benefitted our reserve estimates for casino accounts receivable based on the results of historical collection patterns and current collection trends.

54

Table of Contents

*Pre-opening costs*

We began to incur pre-opening costs during October 2012 related to the design and planning for our Wynn Palace Resort. We expect our pre-opening costs to increase in the future as construction and development of Wynn Palace continues toward the expected completion in the first half of 2016. There were no pre-opening expenses incurred during the year ended December 31, 2011.

*Depreciation and amortization*

Depreciation and amortization for the year ended December 31, 2012, was $373.2 million compared to $398 million for the year ended December 31, 2011. Depreciation expense decreased due to assets with a 5-year life being fully depreciated as of September 2011 at our Macau Operations and assets with a three and six year life becoming fully depreciated throughout 2011 at our Las Vegas Operations.

During the construction of our resorts, costs incurred in the construction of the buildings, improvements to land and the purchases of assets for use in operations were capitalized. Once these resorts opened, their assets were placed into service and we began recognizing the associated depreciation expense. Depreciation expenses will continue throughout the estimated useful lives of these assets. In addition, we continually evaluate the useful life of our property and equipment, intangibles and other assets and adjust them when warranted.

The maximum useful life of assets at our Macau Operations is the remaining life of the gaming concession or land concession, which currently expire in June 2022 and August 2029, respectively. Consequently, depreciation related to our Macau Operations is charged on an accelerated basis when compared to our Las Vegas Operations.

*Property charges and other*

Property charges and other for the year ended December 31, 2012, were $40 million compared to $130.6 million for the year ended December 31, 2011. Property charges and other for the year ended December 31, 2012 include the remodel of a Las Vegas restaurant, charges associated with the termination of a Las Vegas show that ended its run in November 2012, charges associated with the reconfiguration of Las Vegas retail areas and miscellaneous renovations and abandonments at our resorts.

Property charges and other for the year ended December 31, 2011 include a charge of $109.6 million reflecting the present value of a charitable contribution made by Wynn Macau to the University of Macau Development Foundation. This contribution consists of a $25 million payment made in May 2011, and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive, for a total of $135 million. The amount reflected in the accompanying Consolidated Statements of Income has been discounted using our then estimated borrowing rate over the time period of the remaining committed payments. Also included are the write off of certain off-site golf memberships by Wynn Las Vegas, miscellaneous renovations and abandonments at our resorts, including modifications of the Encore at Wynn Las Vegas and Wynn Macau retail esplanades, closure of the Blush nightclub and the write off of certain costs related to a show that ended its run in Las Vegas in April 2011.

*Other non-operating costs and expenses*

Interest income was $12.5 million and $7.7 million for the years ended December 31, 2012 and 2011, respectively. This increase in mainly due to higher cash balances during 2012. During 2012 and 2011, our short-term investment strategy was to preserve capital while retaining sufficient liquidity. Beginning in April 2011, we have invested in certain corporate bond securities and commercial paper, in addition to holding money-market accounts, U.S. Treasury Bills and bank time deposits with a maturity of three months or less, which has contributed to the increase in interest income.

55

Table of Contents

Interest expense was $288.8 million, net of capitalized interest of $2 million for the year ended December 31, 2012, compared to $229.9 million, net of capitalized interest of $0, for the year ended December 31, 2011. Our interest expense increased compared to the prior year primarily due to the issuance of the $1.94 billion Redemption Note by Wynn Resorts, the issuance of the Wynn Las Vegas $900 million 5 3/8% first mortgage notes in March 2012, and the increase in the Wynn Macau term loan offset by the reduction of $370.9 million in Wynn Las Vegas term loan borrowings, all as described in Item 8—"Financial Statements and Supplementary Data", Note 8—"Long-Term Debt".

Changes in the fair value of our interest rate swaps are recorded as an increase (decrease) in swap fair value in each period. We recorded a gain of $1 million for the year ended December 31, 2012, resulting from the changes in the fair value of our interest rate swaps during the year. For the year ended December 31, 2011, we recorded a gain of $14.2 million resulting from the increase in the fair value of interest rate swaps between December 31, 2010 and December 31, 2011. For further information on our interest rate swaps, see Item 7A—"Quantitative and Qualitative Disclosures about Market Risk."

*Income Taxes*

For the year ended December 31, 2012, we recorded a tax expense of $4.3 million. Our income tax expense is primarily related to the timing of the payment of dividends from Macau, stock option exercises and capital expenditures. Since June 30, 2010, we have no longer considered our portion of the tax earnings and profits of Wynn Macau, Limited to be permanently reinvested. No additional U.S. tax provision has been made with respect to amounts not considered permanently reinvested as we anticipate that U.S. foreign tax credits should be sufficient to eliminate any U.S. tax provision relating to such repatriation. We have not provided deferred U.S. income taxes or foreign withholding taxes on temporary differences which are considered indefinitely reinvested. On November 30, 2010, Wynn Macau received a second 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits, thereby exempting the casino gaming profits of Wynn Macau through December 31, 2015. Accordingly, we were exempted from the payment of approximately $87.1 million and $82.7 million in such taxes for the years ended December 31, 2012 and 2011, respectively. Our non-casino profits remain subject to the Macau Complementary Tax and casino winnings remain subject to the Macau Special Gaming tax and other levies at a rate totaling 39% in accordance with our concession agreement.

In April 2012, the Company reached an agreement with the Appellate division of the IRS regarding issues raised during the examination of the 2006 through 2009 U.S. income tax returns. The settlement with the Appellate division did not impact the Company's unrecognized tax benefits. The settlement of the 2006 through 2009 examination issues resulted in a cash tax payment of $1.3 million and the utilization of $3.1 million and $0.9 million in foreign tax credit and general business credit carryforwards, respectively.

*Net income attributable to noncontrolling interests*

We recorded net income attributable to noncontrolling interests of $226.7 million for the year ended December 31, 2012, compared to $211.7 million for the year ended December 31, 2011. The increase is attributable to the noncontrolling interests' share of net income from Wynn Macau, Limited for each year.

**Adjusted Property EBITDA**

We use adjusted property EBITDA to manage the operating results of our segments. Adjusted property EBITDA is earnings before interest, taxes, depreciation, amortization, pre-opening costs, property charges and other, corporate expenses, intercompany golf course and water rights leases, stock-based compensation, and other non-operating income and expenses, and includes equity in income from unconsolidated affiliates. Adjusted property EBITDA is presented exclusively as a supplemental disclosure because we believe that it is widely used to measure the performance, and as a basis for valuation, of gaming companies. We use adjusted property EBITDA as a measure of the operating performance of our segments and to compare the operating performance

56

Table of Contents

of our properties with those of our competitors. We also present adjusted property EBITDA because it is used by some investors as a way to measure a company's ability to incur and service debt, make capital expenditures and meet working capital requirements. Gaming companies have historically reported EBITDA as a supplement to financial measures in accordance with U.S. generally accepted accounting principles ("GAAP"). In order to view the operations of their casinos on a more stand-alone basis, gaming companies, including us, have historically excluded from their EBITDA calculations pre-opening expenses, property charges, corporate expenses and stock-based compensation that do not relate to the management of specific casino properties. However, adjusted property EBITDA should not be considered as an alternative to operating income as an indicator of our performance, as an alternative to cash flows from operating activities as a measure of liquidity, or as an alternative to any other measure determined in accordance with GAAP. Unlike net income, adjusted property EBITDA does not include depreciation or interest expense and therefore does not reflect current or future capital expenditures or the cost of capital. We have significant uses of cash flows, including capital expenditures, interest payments, debt principal repayments, taxes and other non-recurring charges, which are not reflected in adjusted property EBITDA. Also, our calculation of adjusted property EBITDA may be different from the calculation methods used by other companies and, therefore, comparability may be limited.

The following table (amounts in thousands) summarizes adjusted property EBITDA for our Macau and Las Vegas Operations as reviewed by management and summarized in Item 8—"Financial Statements and Supplementary Data," Note 17 "Segment Information." That footnote also presents a reconciliation of adjusted property EBITDA to net income.

|                                 | Years Ended December 31, | | |
|                                 | 2013 | 2012 | 2011 |
|---------------------------------|------|------|------|
| Macau Operations                | $ 1,324,119 | $ 1,167,340 | $ 1,196,232 |
| Las Vegas Operations            | 486,682 | 408,472 | 439,036 |
| Total Adjusted Property EBITDA  | $ 1,810,801 | $ 1,575,812 | $ 1,635,268 |

For the year ended December 31, 2013, the adjusted property EBITDA at both our Macau and Las Vegas Operations benefitted from stronger operating results primarily in the casino department due to an increase in table games volume and win percentage. Refer to the discussions above regarding the specific details of our results of operations.

**Liquidity and Capital Resources**

*Operating Activities*

Our operating cash flows primarily consist of our operating income generated by our Macau and Las Vegas operations (excluding depreciation and other non-cash charges), interest paid, and changes in working capital accounts such as receivables, inventories, prepaid expenses, and payables. Our table games play both in Macau and Las Vegas is a mix of cash play and credit play, while our slot machine play is conducted primarily on a cash basis. A significant portion of our table games revenue is attributable to the play of a limited number of premium international customers that gamble on credit. The ability to collect these gaming receivables may impact our operating cash flow for the period. Our rooms, food and beverage, and entertainment, retail, and other revenue is conducted primarily on a cash basis or as a trade receivable. Accordingly, operating cash flows will be impacted by changes in operating income and accounts receivables.

Net cash provided from operations for the year ended December 31, 2013 was $1.7 billion compared to $1.2 billion provided by operations for the year ended December 31, 2012. Cash flow from operations improved due to significant changes in ordinary working capital accounts such as accounts payables and accrued expenses. Also benefitting operating cash flow was increased operating income that was driven primarily by stronger operating results in the casino department.

57

Table of Contents

During the year ended December 31, 2012, our operating activities provided $1.2 billion compared to $1.5 billion during the year ended December 31, 2011. This decrease is primarily due to lower casino department profitability and changes in ordinary working capital accounts.

*Investing Activities*

Net cash used in investing activities for the year ended December 31, 2013 was $677.6 million compared to $344.9 million for the year ended December 31, 2012. Net cash used in investing activities was primarily driven by capital expenditures, net of construction payables and retention of $506.8 million and $241 million for the years ended December 31, 2013 and 2012, respectively. During the year ended December 31, 2013, capital expenditures included $381.1 million in site preparation costs and piling work for Wynn Palace, along with capital expenditures for various other renovations at our resorts. Capital expenditures during the year ended December 31, 2012 primarily related to various renovations at our resorts, a one-time payment of $50 million in consideration of an unrelated third party's relinquishment of certain rights in and to any future development on the Cotai land that we are using for constructing Wynn Palace, as well as site preparation costs for Wynn Palace.

During the year ended December 31, 2011, our net cash used in investing activities was $459.1 million. Our primary use of cash was for the investment of $215.5 million in corporate debt securities and commercial paper, net of maturities, and $184.1 million in capital expenditures primarily for room and suite remodel at Wynn Las Vegas and various other renovations at our resorts.

*Financing Activities*

Net cash flows used in financing activities were $291.1 million for the year ended December 31, 2013, which was primarily attributable to payment of dividends of $1,035 million and the redemption of first mortgage notes of $500 million, offset by proceeds from the issuance of senior notes of $1,100 million and the increase in our senior term loan facility of $200 million.

Net cash flows used in financing activities were $382.5 million for the year ended December 31, 2012, which was primarily attributable to principal payments of $1,022.8 million on term loan facilities and payment of dividends of $955.5 million, partially offset by proceeds of $1,648.6 million from the issuance of first mortgage notes of $900 million and proceeds of $748.6 million from the fully funded senior term loan facility.

During the year ended December 31, 2011, we used cash flows in financing activities of $1,057.6 million primarily attributable to payment of dividends.

*Macau Operations*

On October 16, 2013, Wynn Macau, Limited ("WML"), an indirect subsidiary of Wynn Resorts, Limited, entered into an Indenture, dated as of October 16, 2013 (the "WML Indenture"), between WML and Deutsche Bank Trust Company Americas, as trustee, pursuant to which WML issued $600 million aggregate principal amount of 5 1/4% Senior Notes due 2021 (the "2021 Notes"). WML received net proceeds of approximately $591.5 million from the offering of the 2021 Notes after deducting commissions and estimated expenses of the offering and will use the net proceeds for working capital requirements and general corporate purposes.

The WML Indenture contains covenants limiting WML's (and certain of its subsidiaries') ability to, among other things: merge or consolidate with another company; transfer or sell all or substantially all of its properties or assets; and lease all or substantially all of its properties or assets. The terms of the WML Indenture contain customary events of default, including, but not limited to: default for 30 days in the payment when due of interest on the 2021 Notes; default in the payment when due of the principal of, or premium, if any, on the 2021 Notes; failure to comply with any payment obligations relating to the repurchase by WML of the 2021 Notes upon a change of control; failure to comply with certain covenants in the WML Indenture; certain defaults on certain

58

Table of Contents

other indebtedness; failure to pay judgments against WML or certain subsidiaries that, in the aggregate, exceed $50 million; and certain events of bankruptcy or insolvency. In the case of an event of default arising from certain events of bankruptcy or insolvency, all 2021 Notes then outstanding will become due and payable immediately without further action or notice.

During the year ended December 31, 2012, Wynn Macau repaid $150.4 million of borrowings under the Wynn Macau Senior Revolving Credit Facility. On June 27, 2012, the Wynn Macau Senior Revolving Credit Facility matured with an outstanding balance of $0.

On July 31, 2012, Wynn Macau amended and restated its credit facilities, dated September 14, 2004 (as so amended and restated, the "Amended Wynn Macau Credit Facilities"), and appointed Bank of China Limited, Macau Branch as intercreditor agent, facilities agent and security agent. The Amended Wynn Macau Credit Facilities took effect on July 31, 2012 and expand availability under Wynn Macau's senior secured bank facility to $2.3 billion equivalent, consisting of a $750 million equivalent fully funded senior secured term loan facility and a $1.55 billion equivalent senior secured revolving credit facility. Borrowings under the Amended Wynn Macau Credit Facilities, which consist of both Hong Kong Dollar and United States Dollar tranches, were used to refinance Wynn Macau's existing indebtedness, and will be used to fund the design, development, construction and pre-opening expenses of Wynn Palace, and for general corporate purposes.

On July 30, 2013, Wynn Macau exercised its option to increase the senior term loan facility by $200 million equivalent pursuant to the terms and provisions of the Amended Wynn Macau Credit Facilities. The $200 million equivalent was fully funded as of July 31, 2013 and is required to be used for the payment of certain Wynn Palace related construction and development costs.

The term loan facility matures in July 2018, and the revolving credit facility matures in July 2017. The principal amount of the term loan is required to be repaid in two equal installments in July 2017 and July 2018. The senior secured facilities will bear interest for the first six months after closing at LIBOR or HIBOR plus a margin of 2.50% and thereafter will be subject to LIBOR or HIBOR plus a margin of between 1.75% to 2.50% based on Wynn Macau's leverage ratio.

Borrowings under the Amended Wynn Macau Credit Facilities are guaranteed by Palo Real Estate Company Limited ("Palo"), a subsidiary of Wynn Macau, and by certain subsidiaries of the Company that own equity interests in Wynn Macau, and are secured by substantially all of the assets of Wynn Macau, the equity interests in Wynn Macau and substantially all of the assets of Palo.

In connection with amending the Wynn Macau credit facilities, we expensed $17.7 million and capitalized $33.2 million of financing costs in the year ended December 31, 2012.

The Amended Wynn Macau Credit Facilities contain a requirement that the Company must make mandatory repayments of indebtedness from specified percentages of excess cash flow. If the Wynn Macau subsidiary has a Consolidated Leverage Ratio, as defined in the Amended Wynn Macau Credit Facilities, of greater than 4.0 to 1, such repayment is defined as 50% of Excess Cash Flow, as defined in the Amended Wynn Macau Credit Facilities. If the Consolidated Leverage Ratio is equal or less than 4.0 to 1, then no excess cash flow prepayment is required. Based on current estimates the Company does not believe that the Wynn Macau Consolidated Leverage Ratio during the year ending December 31, 2014 will exceed 4.0 to 1. Accordingly, the Company does not expect to make any mandatory repayments pursuant to this requirement during 2014.

The Amended Wynn Macau Credit Facilities contain customary covenants restricting certain activities including, but not limited to: the incurrence of additional indebtedness, the incurrence or creation of liens on any of its property, sales and leaseback transactions, the ability to dispose of assets, and make loans or other investments. In addition, Wynn Macau was required by the financial covenants to maintain a Leverage Ratio, as defined in the Amended Wynn Macau Credit Facilities, of not greater than 4.0 to 1 as of December 31, 2013, and

59

Table of Contents

an Interest Coverage Ratio, as defined, of not less than 2.00 to 1. Management believes that Wynn Macau was in compliance with all covenants at December 31, 2013.

*Las Vegas Operations*

On May 15, 2013, Wynn Las Vegas, LLC commenced the tender offer for any and all of the outstanding $500 million aggregate principal amount of the 2017 Notes of Wynn Las Vegas and Wynn Las Vegas Capital Corp., an indirect wholly owned subsidiary of Wynn Resorts, Limited (together with Wynn Las Vegas, the "Issuers"), and a solicitation of consents to certain proposed amendments to the indenture (the "2017 Indenture") governing the 2017 Notes.

The tender offer expired on May 21, 2013 and at the time of expiration, Wynn Las Vegas had received valid tenders with respect to approximately $274.7 million of the $500 million aggregate principal amount of the 2017 Notes outstanding. On May 22, 2013, note holders who validly tendered their 2017 Notes received the total consideration of $1,071.5 for each $1,000 principal amount of 2017 Notes, the premium portion of which totaled approximately $19.6 million. In accordance with accounting standards, the tender offer premium was expensed and is included in loss on extinguishment of debt in the accompanying Consolidated Statements of Income. In addition, upon the tender offer completion, the Issuers entered into a supplemental indenture, which eliminated substantially all of the restrictive covenants and certain events of default from the 2017 Indenture.

Also in connection with this transaction, unamortized financing costs and original issue discount related to the 2017 Notes totaling $6.7 million were expensed and are included in loss on extinguishment of debt in the accompanying Consolidated Statements of Income.

On November 1, 2013, the Company redeemed the untendered 2017 Notes principal amount of $225.3 million. The redemption price was equal to 103.938% of the aggregate principal amount of the 2017 Notes plus accrued and unpaid interest on November 1, 2013. The total redemption fees paid were $8.9 million and we expensed $4.9 million of unamortized financing costs and original issue discount.

Separately, on May 22, 2013, the Issuers completed the issuance of $500 million aggregate principal amount of 4 1/4% Senior Notes due 2023 (the "2023 Notes") pursuant to an indenture, dated as of May 22, 2013 (the "2023 Indenture"), among the Issuers, all of the Issuers' subsidiaries, other than Wynn Las Vegas Capital Corp. which was a co-issuer, and U.S. Bank National Association, as trustee. The 2023 Notes were issued at par. The Issuers used the net proceeds from the 2023 Notes to cover the cost of purchasing the 2017 Notes tendered in the tender offer. In addition, the Issuers satisfied and discharged the 2017 Indenture and, in November 2013, used the remaining net proceeds to redeem any and all of the 2017 Notes not previously tendered. In connection with the issuance of the 2023 Notes, the Company capitalized approximately $4.1 million of financing costs.

The 2023 Notes will mature on May 30, 2023 and bear interest at the rate of 5 1/4% per annum. The Issuers may redeem all or a portion of the 2023 Notes at any time, which redemption price includes a make-whole premium if redeemed before February 28, 2023. The 2023 Notes are also subject to mandatory redemption requirements imposed by gaming laws and regulations of gaming authorities in Nevada.

The 2023 Indenture contains covenants limiting the Issuers' and the Issuers' restricted subsidiaries' ability to: create liens on assets to secure debt; enter into sale-leaseback transactions; and merge or consolidate with another company. These covenants are subject to a number of important and significant limitations, qualifications and exceptions.

The 2023 Notes are the Issuers' senior unsecured obligations and rank pari passu in right of payment with the Issuers' outstanding 7 7/8% First Mortgage Notes due 2020 ("7 7/8% 2020 Notes"), 7 3/4% First Mortgage Notes due 2020 (the "7 3/4% 2020 Notes") and 5 3/8% First Mortgage Notes Due 2022 (the "2022 Notes" and, together with the 7 7/8% 2020 Notes and 7 3/4% Notes, the "Existing Notes"). The 2023 Notes are secured by a first priority pledge of the Company's equity interests, the effectiveness of which is subject to the prior approval of the Nevada gaming authorities. The equity interests of the Company also secure the Existing Notes. If Wynn Resorts, Limited receives an investment grade rating from one or more ratings agencies, the first priority pledge securing the 2023 Notes will be released.

60

Table of Contents

On March 12, 2012, the Issuers issued, in a private offering, $900 million aggregate principal amount of 2022 Notes pursuant to an Indenture, dated as of March 12, 2012 (the "2022 Indenture"). A portion of the proceeds were used to repay all amounts outstanding under the Wynn Las Vegas term loan facilities. In October 2012, the Issuers commenced an offer to exchange all of the 2022 Notes for notes registered under the Securities Act of 1933, as amended. The exchange offer closed on November 6, 2012.

The 2022 Notes will mature on March 15, 2022 and bear interest at the rate of 5 3/8% per annum. The Issuers may redeem all or a portion of the 2022 Notes at any time on or after March 15, 2017, at a premium decreasing ratably to zero, plus accrued and unpaid interest. In addition, prior to March 15, 2015, the Issuers may redeem up to 35% of the aggregate principal amount of the 2022 Notes with the net proceeds of one or more qualified equity contributions made to the Issuers by their parent, Wynn Resorts, Limited. The 2022 Notes are also subject to mandatory redemption requirements imposed by gaming laws and regulations of gaming authorities in Nevada.

The 2022 Indenture contains covenants limiting the Issuers' and the Issuers' restricted subsidiaries' ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; issue stock of, or member's interests in, subsidiaries; enter into sale-leaseback transactions; engage in other businesses; merge or consolidate with another company; transfer and sell assets; issue disqualified stock; create dividend and other payment restrictions affecting subsidiaries; and designate restricted and unrestricted subsidiaries. These covenants are subject to a number of important and significant limitations, qualifications and exceptions.

Concurrently with the issuance of the 2022 Notes, Wynn Las Vegas, LLC entered into an eighth amendment ("Amendment No. 8") to its Amended and Restated Credit Agreement (the "Wynn Las Vegas Credit Agreement"). Amendment No. 8 amended the Wynn Las Vegas Credit Agreement to, among other things, permit the issuance of the 2022 Notes. With the issuance of the 2022 Notes, Wynn Las Vegas prepaid all term loans under the Wynn Las Vegas Credit Agreement, terminated all of its revolving credit commitments that were due to expire in 2013, and terminated all but $100 million of its revolving credit commitments expiring in 2015. In connection with this transaction, Wynn Las Vegas expensed deferred financing costs of $4.8 million.

On September 17, 2012, Wynn Las Vegas terminated the Wynn Las Vegas Credit Agreement. No loans were outstanding under the Wynn Las Vegas Credit Agreement at the time of termination. Prior to such termination, certain letters of credit in which lenders had participated pursuant to the Wynn Las Vegas Credit Agreement were reallocated to a separate, unsecured letter of credit facility provided by Deutsche Bank, A.G. Wynn Las Vegas, LLC did not incur any early termination penalties in connection with the termination.

In connection with the termination, the Company expensed $2.6 million of previously deferred financing costs and third party fees related to the Wynn Las Vegas Credit Agreement.

For more information on our outstanding first mortgage notes, see Item 8—"Financial Statements and Supplementary Data", Note 8 "Long-Term Debt."

*Capital Resources*

At December 31, 2013, we had approximately $2,435 million of cash and cash equivalents and $254.4 million of available-for-sale investments in foreign and domestic debt securities with maturities of up to 2 years. Our cash is available for operations, debt service and retirement, development activities, general corporate purposes and enhancements to our resorts. In addition, we had $199.9 million of restricted cash for Wynn Palace related construction and development costs. Of these amounts, Wynn Macau, Limited and its subsidiaries held $1,822.3 million and $4.9 million in cash and available-for-sale investments, respectively, of which we own 72.3%. If our portion of this cash was repatriated to the U.S. on December 31, 2013, approximately two-thirds of this amount would be subject to U.S. tax in the year of repatriation. Wynn Resorts, Limited, which is not a

Table of Contents

guarantor of the debt of its subsidiaries, held $381.6 million (including cash of its subsidiaries other than those of Wynn Las Vegas and Wynn Macau) and $249.5 million of cash and available-for-sale investments, respectively. Wynn Las Vegas LLC held cash balances of $231.2 million.

On July 30, 2013, Wynn Macau exercised its option to increase the senior term loan facility by $200 million equivalent pursuant to the terms and provisions of the Amended Wynn Macau Credit Facilities. The $200 million equivalent was fully funded as of July 31, 2013 and is required to be used for the payment of certain Wynn Palace related construction and development costs.

We believe that cash flow from operations, availability under our Wynn Macau credit facility and our existing cash balances will be adequate to satisfy our anticipated uses of capital during 2014. If any additional financing becomes necessary, we cannot provide assurance that future borrowings will be available.

Cash and cash equivalents include cash in bank and fixed deposits, investments in money market funds, domestic and foreign bank time deposits and commercial paper, all with maturities of less than 90 days.

*Redemption Price Promissory Note*

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, we redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," our articles of incorporation authorize redemption at "fair value" of the shares held by unsuitable persons. We engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares which are subject to the terms of an existing stockholder agreement. Pursuant to our articles of incorporation, we issued the Redemption Price Promissory Note (the "Redemption Note") to Aruze USA, Inc., a former stockholder and related party, in redemption of the shares. The Redemption Note has a principal amount of approximately $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Note. We may, in our sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts and its affiliates in respect of indebtedness for borrowed money of any kind or nature. Aruze USA, Inc., Universal Entertainment Corporation and Kazuo Okada have challenged the redemption of Aruze USA, Inc.'s shares and we are currently involved in litigation with those parties as well as related shareholder derivative litigation. The outcome of these various proceedings cannot be predicted. If any of these proceedings were to be determined adversely to us or a settlement involving a payment of a material sum of money were to occur, there could be a material adverse effect on our financial condition and results of operations. See Item 1A—"Risk Factors", Item 3—"Legal Proceedings" and Item 8—"Financial Statements and Supplementary Data", Note 16 "Commitments and Contingencies".

*Wynn Resorts, Limited*

During the years ended December 31, 2013, 2012 and 2011, we paid cash dividends totaling $7.00 per share, $9.50 per share and $6.50 per share, respectively.

Our Board of Directors has authorized an equity repurchase program of up to $1.7 billion. The repurchase program may include repurchases from time to time through open market purchases, in privately negotiated transactions, and under plans complying with Rules 10b5-1 and 10b-18 under the Exchange Act. As of December 31, 2013, we had purchased a cumulative total of 12,978,085 shares of our common stock for a net cost of $1.1 billion under the program, with no purchases made under this program during the years ended December 31, 2013, 2012, and 2011.

62

Table of Contents

During 2013 and 2012, the Company repurchased a total of 114,355 (8,796 shares were purchased during the fourth quarter 2013) and 7,640 shares, respectively, in satisfaction of tax withholding obligations on vested restricted stock.

*Off Balance Sheet Arrangements*

We have not entered into any transactions with special purpose entities nor do we engage in any derivatives except for previously discussed interest rate swaps. We do not have any retained or contingent interest in assets transferred to an unconsolidated entity. At December 31, 2013, we had unsecured outstanding letters of credit totaling $16.7 million.

*Contractual Obligations and Commitments*

The following table summarizes our scheduled contractual commitments at December 31, 2013 (amounts in millions):

| | Payments Due By Period | | | | |
| --- | --- | --- | --- | --- | --- |
| | Less Than 1 Year | 1 to 3 Years | 4 to 5 Years | After 5 Years | Total |
| Long-term debt obligations | $ 1.1 | $ 2.8 | $ 981.5 | $ 5,608.5 | $ 6,593.9 |
| Fixed interest payments | 269.9 | 539.7 | 539.7 | 661.5 | 2,010.8 |
| Estimated variable interest payments[1] | 22.9 | 45.8 | 26.5 | — | 95.2 |
| Operating leases | 8.8 | 14.7 | 3.4 | 4.8 | 31.7 |
| Construction contracts and commitments | 970.0 | 1,327.8 | — | — | 2,297.8 |
| Leasehold interest in land | 29.3 | 46.8 | — | — | 76.1 |
| Employment agreements | 53.5 | 60.8 | 19.1 | 9.1 | 142.5 |
| Other[2] | 80.6 | 67.8 | 42.1 | 99.3 | 289.8 |
| Total commitments | $ 1,436.1 | $ 2,106.2 | $ 1,612.3 | $ 6,383.2 | $ 11,537.8 |

[1] Amounts for all periods represent our estimated future interest payments on our debt facilities based upon amounts outstanding and LIBOR or HIBOR rates at December 31, 2013. Such rates continue at historical lows as of December 31, 2013. Actual rates will vary.

[2] Other includes open purchase orders, future charitable contributions, fixed gaming tax payments in Macau and other contracts. As further discussed in Item 8—"Financial Statements and Supplementary Data", Note 15 "Income Taxes", of this report, we had $89.5 million of unrecognized tax benefits as of December 31, 2013. Due to the inherent uncertainty of the underlying tax positions, it is not practicable to assign this liability to any particular year and therefore it is not included in the table above as of December 31, 2013.

*Other Liquidity Matters*

Wynn Resorts is a holding company and, as a result, our ability to pay dividends is highly dependent on our ability to obtain funds and our subsidiaries' ability to provide funds to us. Restrictions imposed by our Wynn Macau and Wynn Las Vegas debt instruments significantly restrict our ability to pay dividends. Specifically, Wynn Las Vegas, LLC and certain of its subsidiaries are restricted under the indentures governing its notes from making certain "restricted payments" as defined in the indentures. These restricted payments include the payment of dividends or distributions to any direct or indirect holders of equity interests of Wynn Las Vegas, LLC. These restricted payments may not be made unless certain financial and non-financial criteria have been satisfied. While the Amended Wynn Macau Credit Facilities contain similar restrictions, Wynn Macau is currently in compliance with all requirements, namely satisfaction of its leverage ratio, which must be met in order to pay dividends and is presently able to pay dividends in accordance with the Amended Wynn Macau Credit Facilities.

Table of Contents

Wynn Las Vegas, LLC intends to fund its operations and capital requirements from cash on hand and operating cash flow. We cannot assure you however, that our Las Vegas Operations will generate sufficient cash flow from operations or the availability of additional indebtedness will be sufficient to enable us to service and repay Wynn Las Vegas, LLC's indebtedness and to fund its other liquidity needs. Similarly, we expect that our Macau Operations will fund Wynn Macau's debt service obligations with existing cash, operating cash flow and availability under the Amended Wynn Macau Credit Facilities. However, we cannot assure you that operating cash flows will be sufficient to do so. We may refinance all or a portion of our indebtedness on or before maturity. We cannot assure you that we will be able to refinance any of the indebtedness on acceptable terms or at all. Certain legal matters may also impact our liquidity. As described in our Notes to Consolidated Financial Statements, Note 16—"Commitments and Contingencies", Elaine Wynn has submitted a cross claim against Steve Wynn and Kazuo Okada. The Indentures for Wynn Las Vegas provide that if Stephen A. Wynn, together with certain related parties, in the aggregate beneficially owns a lesser percentage of the outstanding common stock of the Company than are beneficially owned by any other person, a change of control will have occurred. If Elaine Wynn prevails in her cross claim, Stephen A. Wynn would not beneficially own or control Elaine Wynn's shares and a change in control may result under the Wynn Las Vegas debt documents.

In the future, we may periodically consider repurchasing our outstanding notes for cash. The amount of any notes to be repurchased, as well as the timing of any repurchases, will be based on business, market and other conditions and factors, including price, contractual requirements or consents, and capital availability. Any repurchases might be made using a variety of methods, which may include open market purchases, privately negotiated transactions, or by any combination of those methods, in compliance with applicable securities laws and regulations.

New business developments or other unforeseen events may occur, resulting in the need to raise additional funds. We continue to explore opportunities to develop additional gaming or related businesses in domestic and international markets. There can be no assurances regarding the business prospects with respect to any other opportunity. Any new development would require us to obtain additional financing. We may decide to conduct any such development through Wynn Resorts or through subsidiaries separate from the Las Vegas or Macau-related entities.

The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the Board of Directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by the Company. The redemption price may be paid in cash, by promissory note or both, as required by the applicable gaming authority and, if not, as we elect. Any promissory note that we issue to an unsuitable person or its affiliate in exchange for its shares could increase our debt to equity ratio and would increase our leverage ratio.

On February 18, 2012, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Kazuo Okada are "unsuitable" under our articles of incorporation and redeemed and cancelled all of Aruze USA, Inc.'s, 24,549,222 shares of Wynn Resorts' common stock. Pursuant to our articles of incorporation, we issued the Redemption Note to Aruze USA, Inc. in redemption of the shares. For additional information on the redemption and the Redemption Note, see Notes to Consolidated Financial Statements, Note 16—"Commitments and Contingencies."

**Critical Accounting Policies and Estimates**

Management's discussion and analysis of our results of operations and liquidity and capital resources are based on our consolidated financial statements. Our consolidated financial statements were prepared in conformity with accounting principles generally accepted in the United States of America. A summary of our significant accounting policies are presented in Note 2 to the Consolidated Financial Statements. Certain of our

64

Table of Contents

accounting policies require management to apply significant judgment in defining the appropriate assumptions integral to financial estimates. On an ongoing basis, management evaluates those estimates, including those relating to the estimated lives of depreciable assets, asset impairment, allowances for doubtful accounts, accruals for customer loyalty rewards, contingencies, litigation and other items. Judgments are based on historical experience, terms of existing contracts, industry trends and information available from outside sources, as appropriate. However, by their nature, judgments are subject to an inherent degree of uncertainty, and therefore actual results could differ from our estimates.

*Development, Construction and Property and Equipment Estimates*

During the construction and development of a resort, pre-opening or start-up costs are expensed when incurred. In connection with the construction and development of our resorts, significant start-up costs are incurred and charged to pre-opening costs through their respective openings. Once our resorts open, expenses associated with the opening of the resorts are no longer charged as pre-opening costs.

During the construction and development stage, direct costs such as those incurred for the design and construction of our resorts, including applicable portions of interest, are capitalized. Accordingly, the recorded amounts of property and equipment increase significantly during construction periods. Depreciation expense related to capitalized construction costs is recognized when the related assets are placed in service. Upon the opening of our resorts, we began recognizing depreciation expense on the resort's fixed assets. The remaining estimated useful lives of assets are periodically reviewed.

Our leasehold interest in land in Macau under the land concession contracts entered into in August 2004 and May 2012 are being amortized over 25 years, to the initial term of the concession contract, which currently terminate in August 2029 and May 2037. Depreciation on a majority of the assets comprising Wynn Macau commenced in September of 2006, when Wynn Macau opened. The maximum useful life of assets at Wynn Macau is deemed to be the remaining life of the land concession which currently expires in August 2029, or the gaming concession which currently expires in June 2022. Consequently, depreciation related to Wynn Macau will generally be charged over shorter periods when compared to Wynn Las Vegas.

Costs of repairs and maintenance are charged to expense when incurred. The cost and accumulated depreciation of property and equipment retired or otherwise disposed of are eliminated from the respective accounts and any resulting gain or loss is included in operating income.

We also evaluate our property and equipment and other long-lived assets for impairment in accordance with applicable accounting standards. For assets to be disposed of, we recognize the asset at the lower of carrying value or fair market value less costs of disposal, as estimated based on comparable asset sales, solicited offers, or a discounted cash flow model. For assets to be held and used, we review for impairment whenever indicators of impairment exist. In reviewing for impairment, we compare the estimated future cash flows of the asset, on an undiscounted basis, to the carrying value of the asset. If the undiscounted cash flows exceed the carrying value, no impairment is indicated. If the undiscounted cash flows do not exceed the carrying value, an impairment is recorded based on the fair value of the asset, typically measured using a discounted cash flow model. If an asset is still under development, future cash flows include remaining construction costs. All recognized impairment losses, whether for assets to be disposed of or assets to be held and used, are recorded as operating expenses.

*Redemption Price Promissory Note*

In connection with the redemption of the shares previously held by Aruze USA, Inc., we recorded the fair value of the Redemption Note of approximately $1.94 billion in accordance with applicable accounting guidance. We utilized an independent third party valuation to assist in the determination of this fair value. In determining this fair value, we estimated the Redemption Note's present value using discounted cash flows with a probability weighted expected return for redemption assumptions and a discount rate which included time value and non-performance risk adjustments commensurate with risk of the Redemption Note.

Table of Contents

Considerations for the redemption assumptions included the stated maturity of the Redemption Note, uncertainty of the related cash flows as well as potential effects of the following: uncertainties surrounding the potential outcome and timing of pending litigation with the Aruze USA, Inc. (at the time a stockholder of Wynn Resorts), Universal Entertainment Corporation (Aruze USA, Inc.'s parent company), and Kazuo Okada (the majority shareholder of Universal Entertainment Corporation and former director of the Company and certain of its subsidiaries and affiliates) (collectively, the "Okada Parties") (see Note 16—"Commitments and Contingencies"); the outcome of on-going investigations of Aruze USA, Inc. by the United States Attorney's Office, the U.S. Department of Justice and the Nevada Gaming Control Board; and other potential legal and regulatory actions. In addition, in the furtherance of various future business objectives, we considered our ability, at our sole option, to prepay the Redemption Note at any time in accordance with its terms without penalty. Accordingly, we reasonably determined that the estimated life of the Redemption Note could be less than the contractual life of the Redemption Note.

In determination of the appropriate discount rate to be used in the estimated present value, the Redemption Note's subordinated position relative to all other debt in our capital structure and credit ratings associated our traded debt were considered. Observable inputs for the risk free rate based on Federal Reserve rates for U.S. Treasury securities and credit risk spread based on a yield curve index of similarly rated debt were used. As a result of this analysis, we concluded the Redemption Notes' stated rate of 2% approximated a market rate.

*Investments and Fair Value*

We have made investments in domestic and foreign corporate debt securities and commercial paper. Our investment policy requires investments to be investment grade and limits the amount of exposure to any one issuer with the objective of minimizing the potential risk of principal loss. We determine the appropriate classification (held-to-maturity/available-for-sale) of our investments at the time of purchase and reevaluate such designation as of each balance sheet date. Our investments are reported at fair value, with unrealized gains and losses, net of tax, reported in other comprehensive income (loss). Adjustments are made for amortization of premiums and accretion of discounts to maturity computed under the effective interest method. Such amortization is included in interest income together with realized gains and losses and the stated interest on such securities.

We measure certain of our financial assets and liabilities, such as cash equivalents, available-for-sale securities and interest rate swaps, at fair value on a recurring basis pursuant to accounting standards for fair value measurements. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. These accounting standards establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

We obtain pricing information in determining the fair value of our available-for-sale securities from independent pricing vendors. Based on our inquiries, the pricing vendors use various pricing models consistent with what other market participants would use. The assumptions and inputs used by the pricing vendors are derived from market observable sources including: reported trades, broker/dealer quotes, issuer spreads, benchmark curves, bids, offers and other market-related data. We have not made adjustments to such prices. Each quarter, we validate the fair value pricing methodology to determine the fair value consistent with applicable accounting guidance and to confirm that the securities are classified properly in the fair value hierarchy. We also compare the pricing received from our vendors to independent sources for the same or similar securities.

*Allowance for Estimated Doubtful Accounts Receivable*

A substantial portion of our outstanding receivables relates to casino credit play. Credit play, through the issuance of markers, represents a significant portion of the table games volume at our Las Vegas Operations. While offered, the issuance of credit at our Macau Operations is less significant when compared to Las Vegas.

66

Table of Contents

Our goal is to maintain strict controls over the issuance of credit and aggressively pursue collection from those customers who fail to pay their balances in a timely fashion. These collection efforts may include the mailing of statements and delinquency notices, personal contacts, the use of outside collection agencies, and litigation. Markers issued at our Las Vegas Operations are generally legally enforceable instruments in the United States, and United States assets of foreign customers may be used to satisfy judgments entered in the United States.

The enforceability of markers and other forms of credit related to gaming debt outside of the United States varies from country to country. Some foreign countries do not recognize the enforceability of gaming related debt, or make enforcement burdensome. We closely consider the likelihood and difficulty of enforceability, among other factors, when issuing credit to customers who are not residents of the United States. In addition to our internal credit and collection departments, located in both Las Vegas and Macau, we have a network of legal, accounting and collection professionals to assist us in our determinations regarding enforceability and our overall collection efforts.

As of December 31, 2013 and 2012, approximately 86% and 84% of our casino accounts receivable were owed by customers from foreign countries, primarily in Asia. In addition to enforceability issues, the collectability of markers given by foreign customers is affected by a number of factors including changes in currency exchange rates and economic conditions in the customers' home countries.

We regularly evaluate our reserve for bad debts based on a specific review of customer accounts as well as management's prior experience with collection trends in the casino industry and current economic and business conditions. In determining our allowance for estimated doubtful accounts receivable, we apply loss factors based on historical marker collection history to aged account balances and we specifically analyze the collectability of each account with a balance over a specified dollar amount, based upon the age, the customer's financial condition, collection history and any other known information.

The following table presents key statistics related to our casino accounts receivable (amounts in thousands):

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Casino accounts receivable | $ 252,998 | $ 275,302 |
| Allowance for doubtful casino accounts receivable | $ 73,561 | $ 101,548 |
| Allowance as a percentage of casino accounts receivable | 29.1% | 36.9% |
| Percentage of casino accounts receivable outstanding over 180 days | 30.3% | 34.3% |

Our reserve for doubtful casino accounts receivable is based on our estimates of amounts collectible and depends on the risk assessments and judgments by management regarding realizability, the state of the economy and our credit policy. In June 2013, the Company recorded an adjustment to its reserve estimates for casino accounts receivable based on the results of historical collection patterns and current collection trends. For the year ended December 31, 2013, this adjustment benefited operating income by $14.9 million and net income attributable to Wynn Resorts, Limited by $12 million (or $0.12 per share on a fully diluted basis). For the year ended December 31, 2012, this adjustment benefited operating income by $30.9 million and net income attributable to Wynn Resorts, Limited by $23.3 million (or $0.22 per share on a fully diluted basis). Our reserve methodology is applied similarly to credit extended at each of our resorts. As of December 31, 2013 and 2012, approximately 24.8% and 30.8%, respectively, of our outstanding casino account receivable balance originated at our Macau Operations.

At December 31, 2013, a 100 basis-point change in the allowance for doubtful accounts as a percentage of casino accounts receivable would change the provision for doubtful accounts by approximately $2.5 million.

Table of Contents

As our customer payment experience evolves, we will continue to refine our estimated reserve for bad debts. Accordingly, the associated provision for doubtful accounts expense may fluctuate. Because individual customer account balances can be significant, the reserve and the provision can change significantly between periods, as we become aware of additional information about a customer or changes occur in a region's economy or legal system.

*Derivative Financial Instruments*

We seek to manage our market risk, including interest rate risk associated with variable rate borrowings, through balancing fixed-rate and variable-rate borrowings and the use of derivative financial instruments. We account for derivative financial instruments in accordance with applicable accounting standards. Derivative financial instruments are recognized as assets or liabilities, with changes in fair value affecting net income. As of December 31, 2013, changes in our interest rate swap fair values are being recorded in our Consolidated Statements of Income, as the swaps do not qualify for hedge accounting.

We measure the fair value of our interest rate swaps on a recurring basis. We categorize our interest rate swap contracts as Level 2 in the hierarchy as described above. The fair value approximates the amount we would receive (pay) if these contracts were settled at the respective valuation dates. Fair value is estimated based upon current, and predictions of future, interest rate levels along a yield curve, the remaining duration of the instruments and other market conditions, and therefore is subject to significant estimation and a high degree of variability of fluctuation between periods. We adjust this amount by applying a non-performance valuation, considering our creditworthiness or the creditworthiness of our counterparties at each settlement date, as applicable.

*Stock-Based Compensation*

Accounting standards for stock-based payments establish standards for the accounting for transactions in which an entity exchanges its equity instruments for goods and services or incurs a liability in exchange for goods and services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. It requires an entity to measure the costs of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award and recognize that cost over the service period. We use the Black-Scholes valuation model to value the equity instruments we issue. The Black-Scholes valuation model uses assumptions of expected volatility, risk-free interest rates, the expected term of options granted, and expected rates of dividends. Management determines these assumptions by reviewing current market rates, making industry comparisons and reviewing conditions relevant to our Company.

The expected volatility and expected term assumptions can significantly impact the fair value of stock options. We believe that the valuation techniques and the approach utilized to develop our assumptions are reasonable in calculating the fair value of the options we grant. We estimate the expected stock price volatility using a combination of implied and historical factors related to our stock price in accordance with applicable accounting standards. As our stock price fluctuates, this estimate will change. For example, a 10% change in the volatility assumption for the 77,800 options granted in 2013 would have resulted in an approximate $0.01 million change in fair value. Expected term represents the estimated average time between the option's grant date and its exercise date. A 10% change in the expected term assumption for the 77,800 options granted in 2013 would have resulted in an approximate $0.3 million change in fair value. These assumed changes in fair value would have been recognized over the vesting schedule of such awards.

Accounting standards also require the classification of stock compensation expense in the same financial statement line items as cash compensation, and therefore impacts our departmental expenses (and related operating margins), pre-opening costs and construction in progress for our development projects, and our general and administrative expenses (including corporate expenses).

Table of Contents

*Income Taxes*

We are subject to income taxes in the United States and other foreign jurisdictions where we operate. Accounting standards require the recognition of deferred tax assets, net of applicable reserves, and liabilities for the estimated future tax consequences attributable to differences between financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. The effect of a change in tax rates on the income tax provision and deferred tax assets and liabilities is recognized in the results of operations in the period that includes the enactment date. Accounting standards require recognition of a future tax benefit to the extent that realization of such benefit is more likely than not. Otherwise, a valuation allowance is applied.

As of December 31, 2013, we have a foreign tax credit carryover of $2,615 million and we have recorded a valuation allowance of $2,543 million against this asset based on our estimate of future realization. The foreign tax credits are attributable to the Macau special gaming tax which is 35% of gross gaming revenue in Macau. The U.S. taxing regime only allows a credit for 35% of "net" foreign source income. Due to our current operating history of U.S. losses, we currently do not rely on forecasted taxable income in order to support the utilization of the foreign tax credits. As we become more profitable, each year we reevaluate our methodology in determining the need for valuation allowances. The estimated future foreign tax credit realization was based upon the estimated future taxable income from the reversal of "net" U.S. taxable temporary differences that we expect will reverse during the 10-year foreign tax credit carryover period. The amount of the valuation allowance is subject to change based upon the actual reversal of temporary differences and future taxable income exclusive of reversing temporary differences.

Our income tax returns are subject to examination by the IRS and other tax authorities in the locations where we operate. We assess potentially unfavorable outcomes of such examinations based on accounting standards for uncertain income taxes. The accounting standards prescribe a minimum recognition threshold a tax position is required to meet before being recognized in the financial statements.

Uncertain tax position accounting standards apply to all tax positions related to income taxes. These accounting standards utilize a two-step approach for evaluating tax positions. Recognition (Step I) occurs when the Company concludes that a tax position, based on its technical merits, is more likely than not to be sustained upon examination. Measurement (Step II) is only addressed if the position is deemed to be more likely than not to be sustained. Under Step II, the tax benefit is measured as the largest amount of benefit that is more likely than not to be realized upon settlement. Use of the term "more likely than not" is consistent with how that term is used in accounting for income taxes (i.e., likelihood of occurrence is greater than 50%).

Tax positions failing to qualify for initial recognition are recognized in the first subsequent interim period that they meet the "more likely than not" standard. If it is subsequently determined that a previously recognized tax position no longer meets the "more likely than not" standard, it is required that the tax position is derecognized. Accounting standards for uncertain tax positions specifically prohibit the use of a valuation allowance as a substitute for derecognition of tax positions. As applicable, we recognize accrued penalties and interest related to unrecognized tax benefits in the provision for income taxes.

**Recently Issued Accounting Standards**

In July 2013, the Financial Accounting Standards Board ("FASB") issued an accounting standards update that amends the presentation requirements of an unrecognized tax benefit when a loss or other carryforward exists. The update would require the netting of unrecognized tax benefits against a deferred tax asset for a loss or other carryforward that would apply in settlement of the uncertain tax positions. The effective date for this update is for the annual and interim periods beginning after December 15, 2013. The Company is currently evaluating the impact, if any, of adopting this statement on its consolidated financial statements.

Table of Contents

In February 2013, the FASB issued an accounting standards update that amends the presentation requirements for reclassifications out of accumulated other comprehensive income. The amendment would require an entity to present amounts reclassified out of accumulated other comprehensive income by component either on the face of the statement where net income is presented or in the notes. This update is effective prospectively for reporting periods beginning after December 15, 2012. The Company has adopted this update; Item 8—"Financial Statements and Supplementary Data", Note 3—"Accumulated Other Comprehensive Income."

In July 2012, the FASB issued an accounting standards update that is intended to simplify the guidance for testing the decline in the realizable value (impairment) of indefinite-lived intangible assets other than goodwill. The update allows for the consideration of qualitative factors in determining whether it is necessary to perform quantitative impairment tests. The effective date for this update is for the years and interim impairment tests performed for years beginning after September 15, 2012. The adoption of this guidance did not have a material effect on the Company's financial statements.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Market risk is the risk of loss arising from adverse changes in market rates and prices, such as interest rates, foreign currency exchange rates and commodity prices.

### Interest Rate Risks

One of our primary exposures to market risk is interest rate risk associated with our debt facilities that bear interest based on floating rates. See Item 7—"Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Financing Activities." We attempt to manage interest rate risk by managing the mix of long-term fixed rate borrowings and variable rate borrowings supplemented by hedging activities as believed by us to be appropriate. We cannot assure you that these risk management strategies have had the desired effect, and interest rate fluctuations could have a negative impact on our results of operations.

The following table provides estimated future cash flow information derived from our best estimates of repayments at December 31, 2013 of our expected long-term indebtedness and related weighted average interest rates by expected maturity dates. However, we cannot predict the LIBOR or HIBOR rates that will be in effect in the future. As of December 31, 2013, such rates remain at historic lows. Actual rates will vary. The one-month LIBOR and HIBOR rates at December 31, 2013 of 0.1677% and 0.2100%, respectively were used for all variable rate calculations in the table below.

The information is presented in U.S. dollar equivalents as applicable

| | Years Ending December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | Expected Maturity Date | | | | | | |
| | 2014 | 2015 | 2016 | 2017 | 2018 | Thereafter | Total |
| | (in millions) | | | | | | |
| **Long-term debt:** | | | | | | | |
| Fixed rate | $— | $— | $— | $— | $— | $ 5,608 | $5,608 |
| Average interest rate | — % | — % | — % | — % | — % | 4.8% | 4.8% |
| Variable rate | $ 1.1 | $ 1.4 | $ 1.4 | $405 | $576 | $   — | $ 985 |
| Average interest rate | 1.4% | 1.4% | 1.4% | 1.9% | 2.0% | — % | 1.9% |

70

Table of Contents

*Interest Rate Swap Information*

We have entered into floating-for-fixed interest rate swap arrangements relating to certain of our floating-rate debt facilities. We measure the fair value of our interest rate swaps on a recurring basis. Changes in the fair values of our interest rate swaps for each reporting period recorded are, and will continue to be, recognized as an increase (decrease) in swap fair value in our Consolidated Statements of Income, as the swaps do not qualify for hedge accounting.

*Macau Operations*

Effective, September 28, 2012, we entered into two interest rate swap agreements intended to hedge a portion of the underlying interest rate risk on borrowings under the Amended Wynn Macau Credit Facilities. Under the two swap agreements, the Company pays a fixed interest rate (excluding the applicable interest margin) of 0.73% on notional amounts corresponding to borrowings of HK$3.95 billion (approximately $509.4 million) incurred under the Amended Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable interest rate based on the applicable HIBOR at the time of payment. These interest rate swaps fix the all-in interest rate on such amounts at 2.48% to 3.23%. These interest rate swap agreements mature in July 2017.

Effective October 31, 2012, we entered into a third interest rate swap agreement intended to hedge a portion of the underlying interest rate risk on borrowings under the Amended Wynn Macau Credit Facilities. Under this swap agreement, the Company pays a fixed interest rate (excluding the applicable interest margin) of 0.6763% on notional amounts corresponding to borrowings of $243.8 million incurred under the Amended Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable rate based on the applicable LIBOR at the time of payment. This interest rate swap fixes the all-in interest rate on such amounts at 2.4263% to 3.1763%. This interest rate swap agreement matures in July 2017.

As of December 31, 2013, the interest rate swaps were recorded as an asset of $10.3 million and included in deposits and other assets. As of December 31, 2012, the interest rate swaps were recorded as a liability of $3.9 million and included in other long-term liabilities.

The fair value approximates the amount we would pay if these contracts were settled at the respective valuation dates. Fair value is estimated based upon current, and predictions of future, interest rate levels along a yield curve, the remaining duration of the instruments and other market conditions, and therefore, is subject to significant estimation and a high degree of variability of fluctuation between periods. We adjust this amount by applying a non-performance valuation, considering our creditworthiness or the creditworthiness of our counterparties at each settlement date, as applicable.

*Las Vegas Operations*

In June 2012, we terminated our only Wynn Las Vegas swap for a payment of $2.4 million.

*Other Interest Rate Swap Information*

The following table provides information about our interest rate swaps, by contractual maturity dates, as of December 31, 2013 and using estimated future LIBOR and HIBOR rates based upon implied forward rates in the yield curve. The information is presented in U.S. dollar equivalents, which is our reporting currency:

|  | 2014 | 2015 | 2016 | Years Ending December 31, Expected Maturity Date 2017 (in millions) | 2018 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Average notional amount | $— | $— | $— | $753.0 | $— | $  — | $753.0 |
| Average pay rate | —% | —% | —% | 0.71% | —% | —% | 0.71% |
| Average receive rate | —% | —% | —% | 0.60% | —% | —% | 0.60% |

10K

Page 72 of 145

Case 3:14-cv-04329-WHO   Document 14-1   Filed 10/20/14   Page 145 of 218

[Table of Contents](#)

We do not use derivative financial instruments, other financial instruments or derivative commodity instruments for trading or speculative purposes.

*Interest Rate Sensitivity*

As of December 31, 2013, approximately 96% all of our debt was based on fixed rates, including the notional amounts related to interest rate swaps. Based on our borrowings as of December 31, 2013, an assumed 1% change in the variable rates would cause our annual interest cost to change by $2.3 million.

**Foreign Currency Risks**

The currency delineated in Wynn Macau's concession agreement with the government of Macau is the Macau pataca. The Macau pataca, which is not a freely convertible currency, is linked to the Hong Kong dollar, and in many cases the two are used interchangeably in Macau. The Hong Kong dollar is linked to the U.S. dollar and the exchange rate between these two currencies has remained relatively stable over the past several years. However, the exchange linkages of the Hong Kong dollar and the Macau pataca, and the Hong Kong dollar and the U.S. dollar, are subject to potential changes due to, among other things, changes in Chinese governmental policies and international economic and political developments.

If the Hong Kong dollar and the Macau pataca are not linked to the U.S. dollar in the future, severe fluctuations in the exchange rate for these currencies may result. We also cannot assure you that the current rate of exchange fixed by the applicable monetary authorities for these currencies will remain at the same level.

Because many of Wynn Macau's payment and expenditure obligations are in Macau patacas, in the event of unfavorable Macau pataca or Hong Kong dollar rate changes, Wynn Macau's obligations, as denominated in U.S. dollars, would increase. In addition, because we expect that most of the revenues for any casino that Wynn Macau operates in Macau will be in Hong Kong dollars, we are subject to foreign exchange risk with respect to the exchange rate between the Hong Kong dollar and the U.S. dollar. Also, if any of our Macau-related entities incur U.S. dollar-denominated debt, fluctuations in the exchange rates of the Macau pataca or the Hong Kong dollar, in relation to the U.S. dollar, could have adverse effects on Wynn Macau's results of operations, financial condition, and ability to service its debt. To date, we have not engaged in hedging activities intended to protect against foreign currency risk. Approximately 53% of our cash balances are denominated in foreign currencies, primarily the Hong Kong Dollar. Based on our balances at December 31, 2013, an assumed 1% change in the US dollar/Hong Kong dollar exchange rate would cause a foreign currency transaction gain/loss of approximately $12.3 million.

72

https://www.sec.gov/Archives/edgar/data/1174922/000119312514077632/d644551d10k.htm                    10/14/2014

Table of Contents

**ITEM 8.**      **FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

*INDEX TO CONSOLIDATED FINANCIAL STATEMENTS*

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting | 74 |
| Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements | 75 |
| Consolidated Balance Sheets | 76 |
| Consolidated Statements of Income | 77 |
| Consolidated Statements of Comprehensive Income | 78 |
| Consolidated Statements of Stockholders' Equity | 79 |
| Consolidated Statements of Cash Flows | 80 |
| Notes to Consolidated Financial Statements | 81 |

73

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of Wynn Resorts, Limited and subsidiaries:

We have audited Wynn Resorts, Limited and subsidiaries' (the "Company") internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (1992 framework) (the "COSO criteria"). The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management Report on Internal Control Over Financial Reporting, included in Item 9A. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the 2013 consolidated financial statements of Wynn Resorts, Limited and subsidiaries and our report dated February 28, 2014 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Las Vegas, Nevada
February 28, 2014

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of Wynn Resorts, Limited and subsidiaries:

We have audited the accompanying consolidated balance sheets of Wynn Resorts, Limited and subsidiaries (the "Company") as of December 31, 2013 and 2012, and the related consolidated statements of income, comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2013. Our audits also included the financial statement schedules listed in the Index at item 15(a)2. These financial statements and schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Wynn Resorts, Limited and subsidiaries at December 31, 2013 and 2012, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2013, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedules referred to above, when considered in relation to the basic financial statements taken as a whole, present fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (1992 framework) and our report dated February 28, 2014 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Las Vegas, Nevada
February 28, 2014

75

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(amounts in thousands, except share data)**

| | December 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 2,435,041 | $ 1,725,219 |
| Investment securities | 174,399 | 138,887 |
| Receivables, net | 241,932 | 238,573 |
| Inventories | 74,739 | 63,799 |
| Prepaid expenses and other | 42,703 | 35,900 |
| Total current assets | 2,968,814 | 2,202,378 |
| Property and equipment, net | 4,934,449 | 4,727,899 |
| Restricted cash and investment securities | 279,925 | 140,334 |
| Intangibles, net | 30,767 | 31,297 |
| Deferred financing costs, net | 67,926 | 71,189 |
| Deposits and other assets | 91,001 | 99,227 |
| Investment in unconsolidated affiliates | 4,148 | 4,270 |
| Total assets | $ 8,377,030 | $ 7,276,594 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts and construction payables | $   272,861 | $   164,858 |
| Current portion of long-term debt | 1,050 | 1,050 |
| Current portion of land concession obligation | 29,341 | 27,937 |
| Customer deposits | 704,401 | 544,649 |
| Gaming taxes payable | 205,260 | 163,092 |
| Accrued compensation and benefits | 83,769 | 75,962 |
| Accrued interest | 101,442 | 100,562 |
| Other accrued liabilities | 47,739 | 44,244 |
| Construction retention | 3,578 | 3,826 |
| Deferred income taxes, net | 4,035 | 3,178 |
| Income taxes payable | 2,058 | 2,019 |
| Total current liabilities | 1,455,534 | 1,131,377 |
| Long-term debt | 6,586,518 | 5,781,770 |
| Land concession obligation | 46,819 | 76,186 |
| Other long-term liabilities | 141,465 | 137,830 |
| Deferred income taxes, net | 14,343 | 45,499 |
| Total liabilities | 8,244,679 | 7,172,662 |
| Commitments and contingencies (Note 16) | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.01; 40,000,000 shares authorized; zero shares issued and outstanding | — | — |
| Common stock, par value $0.01; 400,000,000 shares authorized; 114,170,493 and 113,730,442 shares issued; 101,192,408 and 100,866,712 shares outstanding | 1,142 | 1,137 |
| Treasury stock, at cost; 12,978,085 and 12,863,730 shares | (1,143,419) | (1,127,947) |
| Additional paid-in capital | 888,727 | 818,821 |
| Accumulated other comprehensive income | 2,913 | 4,177 |
| Retained earnings | 66,130 | 44,775 |
| Total Wynn Resorts, Limited stockholders' deficit | (184,507) | (259,037) |
| Noncontrolling interest | 316,858 | 362,969 |
| Total equity | 132,351 | 103,932 |
| Total liabilities and stockholders' equity | $ 8,377,030 | $ 7,276,594 |

The accompanying notes are an integral part of these consolidated financial statements.

76

Case 3:14-cv-04329-WHO   Document 14-1   Filed 10/20/14   Page 150 of 218

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**(amounts in thousands, except share data)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| Operating revenues: | | | |
| Casino | $ 4,490,637 | $ 4,034,759 | $ 4,190,507 |
| Rooms | 492,230 | 479,983 | 472,074 |
| Food and beverage | 586,672 | 588,437 | 547,735 |
| Entertainment, retail and other | 418,705 | 417,209 | 414,786 |
| Gross revenues | 5,988,244 | 5,520,388 | 5,625,102 |
| Less: promotional allowances | (367,308) | (366,104) | (355,310) |
| Net revenues | 5,620,936 | 5,154,284 | 5,269,792 |
| Operating costs and expenses: | | | |
| Casino | 2,846,489 | 2,626,822 | 2,686,372 |
| Rooms | 133,503 | 126,527 | 125,286 |
| Food and beverage | 323,573 | 308,394 | 283,940 |
| Entertainment, retail and other | 175,257 | 189,832 | 214,435 |
| General and administrative | 448,788 | 441,699 | 389,053 |
| Provision for doubtful accounts | 11,877 | 18,091 | 33,778 |
| Pre-opening costs | 3,169 | 466 | — |
| Depreciation and amortization | 371,051 | 373,199 | 398,039 |
| Property charges and other | 17,138 | 39,978 | 130,649 |
| Total operating costs and expenses | 4,330,845 | 4,125,008 | 4,261,552 |
| Operating income | 1,290,091 | 1,029,276 | 1,008,240 |
| Other income (expense): | | | |
| Interest income | 15,713 | 12,543 | 7,654 |
| Interest expense, net of amounts capitalized | (299,022) | (288,759) | (229,918) |
| Increase in swap fair value | 14,235 | 991 | 14,151 |
| Loss on extinguishment of debt | (40,435) | (25,151) | — |
| Equity in income from unconsolidated affiliates | 1,085 | 1,086 | 1,472 |
| Other | 4,856 | 3,012 | 3,968 |
| Other income (expense), net | (303,568) | (296,278) | (202,673) |
| Income before income taxes | 986,523 | 732,998 | 805,567 |
| Benefit (provision) for income taxes | 17,634 | (4,299) | 19,546 |
| Net income | 1,004,157 | 728,699 | 825,113 |
| Less: Net income attributable to noncontrolling interest | (275,505) | (226,663) | (211,742) |
| Net income attributable to Wynn Resorts, Limited | $ 728,652 | $ 502,036 | $ 613,371 |
| Basic and diluted income per common share: | | | |
| Net income attributable to Wynn Resorts, Limited: | | | |
| Basic | $ 7.25 | $ 4.87 | $ 4.94 |
| Diluted | $ 7.17 | $ 4.82 | $ 4.88 |
| Weighted average common shares outstanding: | | | |
| Basic | 100,540 | 103,092 | 124,039 |
| Diluted | 101,641 | 104,249 | 125,667 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

**(amounts in thousands)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| Net income | $1,004,157 | $ 728,699 | $ 825,113 |
| Other comprehensive income: | | | |
|     Foreign currency translation adjustments, net of tax | (2,106) | 2,749 | 2,102 |
|     Unrealized gain (loss) on available-for-sale securities, net of tax | 319 | 1,780 | (2,070) |
| Total comprehensive income | 1,002,370 | 733,228 | 825,145 |
|     Less: Comprehensive income attributable to noncontrolling interest | (274,982) | (227,855) | (211,823) |
| Comprehensive income attributable to Wynn Resorts, Limited | $ 727,388 | $ 505,373 | $ 613,322 |

The accompanying notes are an integral part of these consolidated financial statements.

78

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(amounts in thousands, except share data)**

| | Common stock | | Treasury stock | Additional paid-in capital | Accumulated other comprehensive income | Retained earnings | Total Wynn Resorts, Ltd stockholders' equity (deficit) | Noncontrolling interest | Total stockholders' equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares outstanding | Par value | | | | | | | |
| Balances, January 1, 2011 | 124,599,508 | $1,374 | $(1,119,407) | $3,346,050 | $889 | $9,042 | $2,237,948 | $142,637 | $2,380,585 |
| Net income | — | — | — | — | — | 613,371 | 613,371 | 211,742 | 825,113 |
| Currency translation adjustment | — | — | — | — | 1,520 | — | 1,520 | 582 | 2,102 |
| Net unrealized loss on investments | — | — | — | — | (1,569) | — | (1,569) | (501) | (2,070) |
| Exercise of stock options | 431,126 | 4 | — | 23,836 | — | — | 23,840 | 19 | 23,859 |
| Shares repurchased by the company and held as treasury shares | (51,136) | — | (7,629) | — | — | — | (7,629) | — | (7,629) |
| Issuance of restricted stock | 101,500 | 1 | — | (1) | — | — | — | — | — |
| Cash dividends declared | — | — | — | (226,755) | — | (586,045) | (812,800) | (221,649) | (1,034,449) |
| Excess tax benefits from stock-based compensation | — | — | — | 11,176 | — | — | 11,176 | — | 11,176 |
| Stock-based compensation | — | — | — | 23,165 | — | — | 23,165 | 1,602 | 24,767 |
| Balances, December 31, 2011 | 125,080,998 | 1,379 | (1,127,036) | 3,177,471 | 840 | 36,368 | 2,089,022 | 134,432 | 2,223,454 |
| Stock redemption | (24,549,222) | (245) | — | (1,936,198) | — | — | (1,936,443) | — | (1,936,443) |
| Net income | — | — | — | — | — | 502,036 | 502,036 | 226,663 | 728,699 |
| Currency translation adjustment | — | — | — | — | 1,987 | — | 1,987 | 762 | 2,749 |
| Net unrealized gain on investments | — | — | — | — | 1,350 | — | 1,350 | 430 | 1,780 |
| Exercise of stock options | 332,576 | 3 | — | 15,580 | — | — | 15,583 | — | 15,583 |
| Cancellation of restricted stock | (31,500) | — | — | 1 | — | — | — | — | — |
| Shares repurchased by the company and held as treasury shares | (7,640) | — | (911) | — | — | — | (911) | — | (911) |
| Issuance of restricted stock | 41,500 | — | — | — | — | — | — | — | — |
| Cash dividends declared | — | — | — | (462,730) | — | (493,629) | (956,359) | — | (956,359) |
| Excess tax benefits from stock-based compensation | — | — | — | 5,537 | — | — | 5,537 | — | 5,537 |
| Stock-based compensation | — | — | — | 19,161 | — | — | 19,161 | 682 | 19,843 |
| Balances, December 31, 2012 | 100,866,712 | 1,137 | (1,127,947) | 818,821 | 4,177 | 44,775 | (259,037) | 362,969 | 103,932 |
| Net income | — | — | — | — | — | 728,652 | 728,652 | 275,505 | 1,004,157 |
| Currency translation adjustment | — | — | — | — | (1,522) | — | (1,522) | (584) | (2,106) |
| Net unrealized gain on investments | — | — | — | — | 258 | — | 258 | 61 | 319 |
| Exercise of stock options | 383,151 | 5 | — | 20,431 | — | — | 20,436 | — | 20,436 |
| Cancellation of restricted stock | (78,500) | (1) | — | 1 | — | — | — | — | — |
| Shares repurchased by the company and held as treasury shares | (114,355) | — | (15,472) | — | — | — | (15,472) | — | (15,472) |
| Issuance of restricted stock | 135,400 | 1 | — | (1) | — | — | — | — | — |
| Cash dividends declared | — | — | — | 480 | — | (707,297) | (706,817) | (322,305) | (1,029,122) |
| Excess tax benefits from stock-based compensation | — | — | — | 10,474 | — | — | 10,474 | — | 10,474 |
| Stock-based compensation | — | — | — | 38,521 | — | — | 38,521 | 1,212 | 39,733 |
| Balances, December 31, 2013 | 101,192,408 | $1,142 | $(1,143,419) | $888,727 | $2,913 | $66,130 | $(184,507) | $316,858 | $132,351 |

The accompanying notes are an integral part of these consolidated financial statements.

79

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(amounts in thousands)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 | 2012 | 2011 |
| Cash flows from operating activities: | | | |
| Net income | $ 1,004,157 | $ 728,699 | $ 825,113 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 371,051 | 373,199 | 398,039 |
| Deferred income taxes | (19,826) | (3,655) | (10,822) |
| Stock-based compensation | 39,537 | 19,648 | 23,881 |
| Excess tax benefits from stock-based compensation | (12,332) | (5,253) | (11,052) |
| Amortization and write-offs of deferred financing costs and other | 21,453 | 23,965 | 19,683 |
| Loss on extinguishment of debt | 40,435 | 25,151 | — |
| Provision for doubtful accounts | 11,877 | 18,091 | 33,778 |
| Property charges and other | 6,950 | 36,714 | 104,223 |
| Equity in income (loss) of unconsolidated affiliates, net of distributions | 122 | 106 | (144) |
| Increase in swap fair value | (14,235) | (991) | (14,151) |
| Increase (decrease) in cash from changes in: | | | |
| Receivables, net | (14,875) | (21,019) | (84,653) |
| Inventories and prepaid expenses and other | (17,749) | 3,644 | 11,168 |
| Accounts payable and accrued expenses | 260,077 | (12,581) | 220,772 |
| Net cash provided by operating activities | 1,676,642 | 1,185,718 | 1,515,835 |
| Cash flows used in investing activities: | | | |
| Capital expenditures, net of construction payables and retention | (506,786) | (240,985) | (184,146) |
| Purchase of corporate debt securities | (222,856) | (183,445) | (316,533) |
| Proceeds from sale or maturity of corporate debt securities | 146,112 | 216,051 | 101,017 |
| Restricted cash | (100,709) | (99,163) | — |
| Deposits and purchase of other assets | (13,961) | (38,042) | (60,135) |
| Proceeds from sale of assets | 20,620 | 730 | 697 |
| Net cash used in investing activities | (677,580) | (344,854) | (459,100) |
| Cash flows from financing activities: | | | |
| Proceeds from exercise of stock options | 20,436 | 15,583 | 23,859 |
| Excess tax benefits from stock-based compensation | 12,332 | 5,253 | 11,052 |
| Dividends paid | (1,034,986) | (955,493) | (1,033,447) |
| Proceeds from issuance of long-term debt | 1,297,870 | 1,648,643 | 150,483 |
| Principal payments on long-term debt | (501,400) | (1,022,847) | (201,901) |
| Repurchase of common stock | (15,472) | (911) | (7,629) |
| Interest rate swap settlement | — | (2,368) | — |
| Payments on long-term land concession obligation | (27,917) | (13,449) | — |
| Payment of financing costs | (42,006) | (56,890) | (58) |
| Net cash used in financing activities | (291,143) | (382,479) | (1,057,641) |
| Effect of exchange rate on cash | 1,903 | 4,247 | 4,994 |
| Cash and cash equivalents: | | | |
| Increase in cash and cash equivalents | 709,822 | 462,632 | 4,088 |
| Balance, beginning of year | 1,725,219 | 1,262,587 | 1,258,499 |
| Balance, end of year | $ 2,435,041 | $ 1,725,219 | $ 1,262,587 |
| Supplemental cash flow disclosures: | | | |
| Increase in debt related to the redemption of stock | $ — | $ 1,936,443 | $ — |
| Cash paid for interest, net of amounts capitalized | 284,849 | 225,499 | 221,123 |
| Change in property and equipment included in accounts and construction payables | 67,650 | 6,557 | 13,794 |
| Cash paid for income taxes | 2,518 | 4,547 | 2,088 |
| Increase in liability for dividends declared on nonvested stock | 2,708 | 866 | 1,003 |

The accompanying notes are an integral part of these consolidated financial statements.

80

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Organization**

Wynn Resorts, Limited, a Nevada corporation (together with its subsidiaries, "Wynn Resorts" or the "Company") owns 72.3% of Wynn Macau, Limited which operates a casino hotel resort property in the Macau Special Administrative Region of the People's Republic of China. The Company also owns and operates a casino hotel resort property in Las Vegas, Nevada.

Our Macau resort is a resort destination casino with two luxury hotel towers (Wynn Macau and Encore) with a total of 1,008 spacious rooms and suites, approximately 280,000 square feet of casino space, casual and fine dining in eight restaurants, approximately 57,000 square feet of retail space, recreation and leisure facilities, including two health clubs and spas and a pool.

Our Las Vegas operations (Wynn Las Vegas and Encore) feature two luxury hotel towers with a total of 4,748 spacious hotel rooms, suites and villas, approximately 186,000 square feet of casino space, 34 food and beverage outlets featuring signature chefs, an on-site 18-hole golf course, meeting space, a Ferrari and Maserati dealership, approximately 96,000 square feet of retail space as well as two showrooms, three nightclubs and a beach club.

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary of the Company, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Through an initial public offering, including the over allotment, Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of this subsidiary's common stock.

**2. Summary of Significant Accounting Policies**

*Principles of Consolidation*

The accompanying consolidated financial statements include the accounts of the Company and its majority-owned subsidiaries. Investments in the 50%-owned joint ventures operating the Ferrari and Maserati automobile dealership and the Brioni mens' retail clothing store inside Wynn Las Vegas are accounted for under the equity method. All significant intercompany accounts and transactions have been eliminated. Certain amounts in the consolidated financial statements for the previous years have been reclassified to be consistent with the current year presentation. These reclassifications had no effect on the previously reported net income.

*Use of Estimates*

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Redemption Price Promissory Note*

The Company recorded the fair value of the Redemption Price Promissory Note (the "Redemption Note") of approximately $1.94 billion in accordance with applicable accounting guidance. The Company utilized an independent third party valuation to assist in the determination of this fair value. In determining this fair value, the Company estimated the Redemption Note's present value using discounted cash flows with a probability weighted expected return for redemption assumptions and a discount rate which included time value and non-performance risk adjustments commensurate with risk of the Redemption Note.

Considerations for the redemption assumptions included the stated maturity of the Redemption Note, uncertainty of the related cash flows as well as potential effects of the following: uncertainties surrounding the

81

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

potential outcome and timing of pending litigation with Aruze USA, Inc., Universal Entertainment Corporation and Mr. Kazuo Okada (collectively, the "Okada Parties") (see Note 16—"Commitments and Contingencies"); the outcome of on-going investigations of Aruze USA, Inc. by the United States Attorney's Office, the U.S. Department of Justice and the Nevada Gaming Control Board; and other potential legal and regulatory actions. In addition, in the furtherance of various future business objectives, the Company considered its ability, at its sole option, to prepay the Redemption Note at any time in accordance with its terms without penalty. Accordingly, the Company reasonably determined that the estimated life of the Redemption Note could be less than the contractual life of the Redemption Note.

In determination of the appropriate discount rate to be used in the estimated present value, the Redemption Note's subordinated position relative to all other debt in the Company's capital structure and credit ratings associated with the Company's traded debt were considered. Observable inputs for the risk free rate based on Federal Reserve rates for U.S. Treasury securities and credit risk spread based on a yield curve index of similarly rated debt were used. As a result of this analysis, the Company concluded the Redemption Notes' stated rate of 2% approximated a market rate.

*Cash and Cash Equivalents*

Cash and cash equivalents are comprised of highly liquid investments with original maturities of three months or less and include both U.S. dollar-denominated and foreign currency-denominated securities. Cash equivalents are carried at cost, which approximates fair value. Cash equivalents of $1,349.6 million and $969.2 million at December 31, 2013 and 2012, respectively, were invested in bank time deposits, money market accounts, U.S. treasuries and commercial paper. In addition, the Company held bank deposits and cash on hand of approximately $1,085.4 million and $756 million as of December 31, 2013 and 2012, respectively.

*Restricted Cash and Investment Securities*

Restricted cash consists primarily of certain proceeds of the Company's financing activities that are restricted by the agreements governing the Company's debt instruments for the payment of certain Wynn Palace related construction and development costs. The Company's long-term restricted cash balances consisted of approximately $199.9 million and $99.2 million at December 31, 2013 and 2012, respectively, substantially all of which were invested in time deposits. In November 2013, the Company used $243 million of current restricted cash for the purpose of redeeming the portion of the 7 7/8% First Mortgage Notes due 2017 of Wynn Las Vegas, LLC ("Wynn Las Vegas") an indirect wholly owned subsidiary of Wynn Resorts, Limited, that were not tendered in May 2013 in the cash tender offer (the "tender offer"). For more information on the Wynn Las Vegas tender offer, see Note 8—"Long-Term Debt."

Investment securities consist of short-term and long-term investments in domestic and foreign corporate debt securities and commercial paper. The Company's investment policy limits the amount of exposure to any one issuer with the objective of minimizing the potential risk of principal loss. Management determines the appropriate classification (held-to-maturity/available-for-sale) of its securities at the time of purchase and reevaluates such designation as of each balance sheet date. The Company's current investments are reported at fair value, with unrealized gains and losses, net of tax, reported in other comprehensive income. Adjustments are made for amortization of premiums and accretion of discounts to maturity computed under the effective interest method. Such amortization is included in interest income together with realized gains and losses and the stated interest on such securities.

82

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Accounts Receivable and Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of casino accounts receivable. The Company issues credit in the form of "markers" to approved casino customers following investigations of creditworthiness. At December 31, 2013 and 2012, approximately 86% and 84% of the Company's markers were due from customers residing outside the United States, primarily in Asia. Business or economic conditions or other significant events in these countries could affect the collectability of such receivables.

Accounts receivable, including casino and hotel receivables, are typically non-interest bearing and are initially recorded at cost. Accounts are written off when management deems them to be uncollectible. Recoveries of accounts previously written off are recorded when received. An estimated allowance for doubtful accounts is maintained to reduce the Company's receivables to their carrying amount, which approximates fair value. The allowance is estimated based on specific review of customer accounts as well as management's experience with collection trends in the casino industry and current economic and business conditions. In June 2013, the Company recorded an adjustment to its reserve estimates for casino accounts receivable based on the results of historical collection patterns and current collection trends. This adjustment benefitted operating income by $14.9 million and net income attributable to Wynn Resorts, Limited by $12 million (or $0.12 per share on a fully diluted basis for the year ended December 31, 2013). In June 2012, the Company recorded a similar adjustment to its reserve estimates for casino accounts receivable based on the results of historical collection patterns and current collection trends. For the year ended December 31, 2012, this adjustment benefitted operating income by $30.9 million and net income attributable to Wynn Resorts, Limited by $23.3 million (or $0.22 per share on a fully diluted basis).

*Inventories*

Inventories consist of retail merchandise, food and beverage items which are stated at the lower of cost or market value and certain operating supplies. Cost is determined by the first-in, first-out, average and specific identification methods.

*Property and Equipment*

Purchases of property and equipment are stated at cost. Depreciation is provided over the estimated useful lives of the assets using the straight-line method as follows:

| | |
|---|---|
| Buildings and improvements | 10 to 45 years |
| Land improvements | 10 to 45 years |
| Leasehold interest in land | 25 years |
| Airplanes | 18 to 20 years |
| Furniture, fixtures and equipment | 3 to 20 years |

Costs related to improvements are capitalized, while costs of repairs and maintenance are charged to expense as incurred. The cost and accumulated depreciation of property and equipment retired or otherwise disposed of are eliminated from the respective accounts and any resulting gain or loss is included in operations.

*Capitalized Interest*

The interest cost associated with major development and construction projects is capitalized and included in the cost of the project. Interest capitalization ceases once a project is substantially complete or no longer

83

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

undergoing construction activities to prepare it for its intended use. When no debt is specifically identified as being incurred in connection with a construction project, the Company capitalizes interest on amounts expended on the project at the Company's weighted average cost of borrowed money. Interest of $10.5 million and $2 million was capitalized for the years ended December 31, 2013 and 2012, respectively. No interest was capitalized for the year ended December 31, 2011.

*Intangibles*

The Company's indefinite-lived intangible assets consist primarily of water rights acquired as part of the original purchase price of the property on which Wynn Las Vegas is located, and trademarks. Indefinite-lived intangible assets are not amortized, but are reviewed for impairment annually. The Company's finite-lived intangible assets consist primarily of a Macau gaming concession. Finite-lived intangible assets are amortized over the shorter of their contractual terms or estimated useful lives.

*Long-Lived Assets*

Long-lived assets, which are to be held and used, including intangibles and property and equipment, are periodically reviewed by management for impairment whenever events or changes in circumstances indicate that the carrying value of the asset may not be recoverable. If an indicator of impairment exists, the Company compares the estimated future cash flows of the asset, on an undiscounted basis, to the carrying value of the asset. If the undiscounted cash flows exceed the carrying value, no impairment is indicated. If the undiscounted cash flows do not exceed the carrying value, then impairment is measured as the difference between fair value and carrying value, with fair value typically based on a discounted cash flow model. If an asset is still under development, future cash flows include remaining construction costs.

*Deferred Financing Costs*

Direct and incremental costs incurred in obtaining loans or in connection with the issuance of long-term debt are capitalized and amortized to interest expense over the terms of the related debt agreements. Approximately $11.2 million, $11 million and $11.6 million were amortized to interest expense during the years ended December 31, 2013, 2012 and 2011, respectively. Debt discounts incurred in connection with the issuance of debt have been capitalized and are being amortized to interest expense using the effective interest method.

*Derivative Financial Instruments*

The Company seeks to manage its market risk, including interest rate risk associated with variable rate borrowings, through balancing fixed-rate and variable-rate borrowings with the use of derivative financial instruments. The fair value of derivative financial instruments are recognized as assets or liabilities at each balance sheet date, with changes in fair value affecting net income as the Company's current interest rate swaps do not qualify for hedge accounting. Accordingly, changes in the fair value of the interest rate swaps are presented as an increase (decrease) in swap fair value in the accompanying Consolidated Statements of Income. The differentials paid or received on interest rate swap agreements are recognized as adjustments to interest expense.

*Revenue Recognition and Promotional Allowances*

The Company recognizes revenues at the time persuasive evidence of an arrangement exists, the service is provided or the retail goods are sold, prices are fixed or determinable and collection is reasonably assured.

84

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Casino revenues are measured by the aggregate net difference between gaming wins and losses, with liabilities recognized for funds deposited by customers before gaming play occurs and for chips in the customers' possession. Cash discounts, other cash incentives related to casino play and commissions rebated through junkets to customers are recorded as a reduction to casino revenue. Hotel, food and beverage, entertainment and other operating revenues are recognized when services are performed. Entertainment, retail and other revenue includes rental income which is recognized on a time proportion basis over the lease term. Contingent rental income is recognized when the right to receive such rental income is established according to the lease agreements. Advance deposits on rooms and advance ticket sales are recorded as customer deposits until services are provided to the customer.

Revenues are recognized net of certain sales incentives which are required to be recorded as a reduction of revenue; consequently, the Company's casino revenues are reduced by discounts, commissions and points earned in the player's club loyalty program.

The retail value of accommodations, food and beverage, and other services furnished to guests without charge is included in gross revenues. Such amounts are then deducted as promotional allowances. The estimated cost of providing such promotional allowances is primarily included in casino expenses as follows (amounts in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
| Rooms | $  52,585 | $  53,487 | $  52,019 |
| Food and beverage | 112,897 | 107,882 | 104,413 |
| Entertainment, retail and other | 14,659 | 17,522 | 17,017 |
|  | $ 180,141 | $ 178,891 | $ 173,449 |

*Customer Loyalty Program*

The Company offers a slot club program whereby customers may earn points based on their level of play that may be redeemed for free credit that must be replayed in the slot machine. The Company accrues a liability based on the points earned times the redemption value, less an estimate for breakage, and records a related reduction in casino revenue.

*Slot Machine Jackpots*

The Company does not accrue a liability for base jackpots because it has the ability to avoid such payment as slot machines can legally be removed from the gaming floor without payment of the base amount. When the Company is unable to avoid payment of the jackpot (i.e., the incremental amount on a progressive slot machine) due to legal requirements, the jackpot is accrued as the obligation becomes unavoidable. This liability is accrued over the time period in which the incremental progressive jackpot amount is generated with a related reduction in casino revenue.

*Gaming Taxes*

The Company is subject to taxes based on gross gaming revenue in the jurisdictions in which it operates, subject to applicable jurisdictional adjustments. These gaming taxes are an assessment on the Company's gaming revenue and are recorded as an expense within the "Casino" line item in the accompanying Consolidated Statements of Income. These taxes totaled $2 billion, $1.8 billion and $1.9 billion for the years ended December 31, 2013, 2012 and 2011, respectively.

85

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Advertising Costs*

The Company expenses advertising costs the first time the advertising takes place. Advertising costs incurred in development periods are included in pre-opening costs. Once a project is completed, advertising costs are primarily included in general and administrative expenses. Total advertising costs were $21.5 million, $23 million and $19.5 million for the years ended December 31, 2013, 2012 and 2011, respectively.

*Pre-Opening Costs*

Pre-opening costs consist primarily of direct salaries and wages, legal and consulting fees, insurance, utilities and advertising, and are expensed as incurred. During the years ended December 31, 2013 and 2012, the Company incurred pre-opening costs in connection with the design and construction of Wynn Palace in the Cotai area of Macau. There were no pre-opening costs during the year ended December 31, 2011.

*Income Taxes*

The Company is subject to income taxes in the United States and other foreign jurisdictions where it operates. Accounting standards require the recognition of deferred tax assets, net of applicable reserves, and liabilities for the estimated future tax consequences attributable to differences between financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. The effect of a change in tax rates on the income tax provision and deferred tax assets and liabilities is recognized in the results of operations in the period that includes the enactment date. Accounting standards also require recognition of a future tax benefit to the extent that realization of such benefit is more likely than not. Otherwise, a valuation allowance is applied.

The Company's income tax returns are subject to examination by the IRS and other tax authorities in the locations where it operates. The Company assesses potentially unfavorable outcomes of such examinations based on accounting standards for uncertain income taxes. The accounting standards prescribe a minimum recognition threshold a tax position is required to meet before being recognized in the financial statements.

Uncertain tax position accounting standards apply to all tax positions related to income taxes. These accounting standards utilize a two-step approach for evaluating tax positions. Recognition (Step I) occurs when the Company concludes that a tax position, based on its technical merits, is more likely than not to be sustained upon examination. Measurement (Step II) is only addressed if the position is deemed to be more likely than not to be sustained. Under Step II, the tax benefit is measured as the largest amount of benefit that is more likely than not to be realized upon settlement. Use of the term "more likely than not" is consistent with how that term is used in accounting for income taxes (i.e., likelihood of occurrence is greater than 50%).

Tax positions failing to qualify for initial recognition are recognized in the first subsequent interim period that they meet the "more likely than not" standard. If it is subsequently determined that a previously recognized tax position no longer meets the "more likely than not" standard, it is required that the tax position is derecognized. Accounting standards for uncertain tax positions specifically prohibit the use of a valuation allowance as a substitute for derecognition of tax positions. As applicable, the Company will recognize accrued penalties and interest related to unrecognized tax benefits in the provision for income taxes.

*Currency Translation*

Gains or losses from foreign currency remeasurements are included in other income (expense) in the accompanying Consolidated Statements of Income. The results of operations and the balance sheet of

86

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Wynn Macau, Limited and its subsidiaries are translated from Macau patacas to U.S. dollars. Balance sheet accounts are translated at the exchange rate in effect at each year-end. Income statement accounts are translated at the average rate of exchange prevailing during the year. Translation adjustments resulting from this process are charged or credited to other comprehensive income.

*Comprehensive Income*

Comprehensive income includes net income and all other non-stockholder changes in equity, or other comprehensive income. Components of the Company's comprehensive income are reported in the accompanying Consolidated Statements of Stockholders' Equity and Consolidated Statements of Comprehensive Income. The cumulative balance of other comprehensive income consists solely of currency translation adjustments and unrealized gain (loss) on available-for-sale securities.

*Fair Value Measurements*

The Company measures certain of its financial assets and liabilities, such as cash equivalents, available-for-sale securities and interest rate swaps, at fair value on a recurring basis pursuant to accounting standards for fair value measurements. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. These accounting standards establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

The following table presents assets and (liabilities) carried at fair value (amounts in thousands):

| | Total Carrying Value | Fair Value Measurements Using: | | |
| --- | --- | --- | --- | --- |
| | | Quoted Market Prices in Active Markets (Level 1) | Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
| **As of December 31, 2013** | | | | |
| Redemption Price Promissory Note | $ (1,936,443) | $ — | $ (1,936,443) | $ — |
| Cash equivalents | $ 1,349,647 | $ 220,923 | $ 1,128,724 | $ — |
| Interest rate swaps | $ 10,308 | $ — | $ 10,308 | $ — |
| Restricted cash and available-for-sale securities | $ 454,324 | $ — | $ 454,324 | $ — |
| **As of December 31, 2012** | | | | |
| Redemption Price Promissory Note | $ (1,936,443) | $ — | $ (1,936,443) | $ — |
| Cash equivalents | $ 969,166 | $ 80,434 | $ 888,732 | $ — |
| Interest rate swaps | $ (3,938) | $ — | $ (3,938) | $ — |
| Restricted cash and available-for-sale securities | $ 279,221 | $ — | $ 279,221 | $ — |

As of December 31, 2013 and 2012, approximately 91% and 77% of the Company's cash equivalents categorized as level 2 were deposits held in foreign currencies, respectively.

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Earnings Per Share*

Basic earnings per share ("EPS") is computed by dividing net income attributable to Wynn Resorts, Ltd. by the weighted average number of shares outstanding during the year. Diluted EPS reflects the addition of potentially dilutive securities which for the Company include stock options and nonvested stock.

The weighted average number of common and common equivalent shares used in the calculation of basic and diluted EPS for the years ended December 31, 2013, 2012 and 2011, consisted of the following (amounts in thousands):

|  | 2013 | 2012 | 2011 |
|---|---|---|---|
| Weighted average common shares outstanding (used in calculation of basic earnings per share) | 100,540 | 103,092 | 124,039 |
| Potential dilution from the assumed exercise of stock options and nonvested stock | 1,101 | 1,157 | 1,628 |
| Weighted average common and common equivalent shares outstanding (used in calculation of diluted earnings per share) | 101,641 | 104,249 | 125,667 |
| Anti-dilutive stock options excluded from the calculation of diluted earnings per share | 92 | 680 | 610 |
| Net income attributable to Wynn Resorts, Ltd. | $ 728,652 | $ 502,036 | $ 613,371 |
| Net income attributable to Wynn Resorts, Ltd. per common share, basic | $ 7.25 | $ 4.87 | $ 4.94 |
| Net income attributable to Wynn Resorts, Ltd. per common share, diluted | $ 7.17 | $ 4.82 | $ 4.88 |

*Stock-Based Compensation*

Accounting standards require the Company to measure the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award and recognize that cost over the service period. The Company uses the Black-Scholes valuation model to determine the estimated fair value for each option grant issued. The Black-Scholes determined fair value net of estimated forfeitures is amortized as compensation cost on a straight line basis over the service period.

Further information on the Company's stock-based compensation arrangements is included in Note 14—"Benefit Plans".

*Recently Issued Accounting Standards*

In July 2013, the Financial Accounting Standards Board ("FASB") issued an accounting standards update that amends the presentation requirements of an unrecognized tax benefit when a loss or other carryforward exists. The update would require the netting of unrecognized tax benefits against a deferred tax asset for a loss or other carryforward that would apply in settlement of the uncertain tax positions. The effective date for this update is for the annual and interim periods beginning after December 15, 2013. The Company is currently evaluating the impact, if any, of adopting this statement on its consolidated financial statements.

88

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

In February 2013, the FASB issued an accounting standards update that amends the presentation requirements for reclassifications out of accumulated other comprehensive income. The amendment would require an entity to present amounts reclassified out of accumulated other comprehensive income by component either on the face of the statement where net income is presented or in the notes. This update is effective prospectively for reporting periods beginning after December 15, 2012. The Company has adopted this update; see Note 3—"Accumulated Other Comprehensive Income."

In July 2012, the FASB issued an accounting standards update that is intended to simplify the guidance for testing the decline in the realizable value (impairment) of indefinite-lived intangible assets other than goodwill. The update allows for the consideration of qualitative factors in determining whether it is necessary to perform quantitative impairment tests. The effective date for this update is for the years and interim impairment tests performed for years beginning after September 15, 2012. The adoption of this guidance did not have a material effect on the Company's financial statements.

**3. Accumulated Other Comprehensive Income**

The following table presents the changes by component, net of tax and noncontrolling interest, in accumulated other comprehensive income of the Company (amounts in thousands):

|  | Foreign currency translation | Unrealized (loss) gain on securities | Accumulated other comprehensive income |
|---|---|---|---|
| December 31, 2012 | $ 4,396 | $ (219) | $ 4,177 |
| Current period other comprehensive (loss) gain | (332) | 266 | (66) |
| Amounts reclassified from accumulated other comprehensive income | (1,190) | (8) | (1,198) |
| Net current-period other comprehensive (loss) gain . | (1,522) | 258 | (1,264) |
| December 31, 2013 | $ 2,874 | $ 39 | $ 2,913 |

**4. Investment Securities**

Investment securities consisted of the following (amounts in thousands):

|  | | Available-for-sale securities | | |
|---|---|---|---|---|
|  | Amortized cost | Gross unrealized gains | Gross unrealized losses | Fair value (net carrying amount) |
| **December 31, 2013** | | | | |
| Domestic and foreign corporate bonds | $221,418 | $ 140 | $ (124) | $ 221,434 |
| Commercial paper | 32,941 | 16 | (3) | 32,954 |
|  | $254,359 | $ 156 | $ (127) | $ 254,388 |
| **December 31, 2012** | | | | |
| Domestic and foreign corporate bonds | $161,631 | $ 94 | $ (369) | $ 161,356 |
| Commercial paper | 18,704 | 4 | (5) | 18,703 |
|  | $180,335 | $ 98 | $ (374) | $ 180,059 |

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

For investments with unrealized losses as of December 31, 2013, the Company has determined that (i) it does not have the intent to sell any of these investments, and (ii) it is not likely that the Company will be required to sell these investments prior to the recovery of the amortized cost. Accordingly, the Company has determined that no other-than-temporary impairments exist at the reporting date.

The Company obtains pricing information in determining the fair value of its available-for-sale securities from independent pricing vendors. Based on management's inquiries, the pricing vendors use various pricing models consistent with what other market participants would use. The assumptions and inputs used by the pricing vendors are derived from market observable sources including: reported trades, broker/dealer quotes, issuer spreads, benchmark curves, bids, offers and other market-related data. The Company has not made adjustments to such prices. Each quarter, the Company validates the fair value pricing methodology to determine the fair value is consistent with applicable accounting guidance and to confirm that the securities are classified properly in the fair value hierarchy. The Company compares the pricing received from its vendors to independent sources for the same or similar securities.

The amortized cost and estimated fair value of these investment securities at December 31, 2013, by contractual maturity are shown below (amounts in thousands):

|  | Amortized Cost | Fair value |
|---|---|---|
| **Available-for-sale securities** | | |
| Due in one year or less | $ 174,439 | $ 174,399 |
| Due after one year through two years | 79,920 | 79,989 |
| | $ 254,359 | $ 254,388 |

**5. Receivables, net**

Receivables, net consisted of the following (amounts in thousands):

|  | As of December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| Casino | $ 252,998 | $ 275,302 |
| Hotel | 15,386 | 18,227 |
| Retail leases and other | 47,539 | 47,257 |
| | 315,923 | 340,786 |
| Less: allowance for doubtful accounts | (73,991) | (102,213) |
| | $ 241,932 | $ 238,573 |

90

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**6. Property and Equipment, net**

Property and equipment, net consisted of the following (amounts in thousands):

|  | As of December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| Land and improvements | $ 733,233 | $ 732,209 |
| Buildings and improvements | 3,883,442 | 3,837,215 |
| Airplanes | 135,040 | 135,392 |
| Furniture, fixtures and equipment | 1,686,522 | 1,646,506 |
| Leasehold interest in land | 316,550 | 316,658 |
| Construction in progress | 558,624 | 110,490 |
|  | 7,313,411 | 6,778,470 |
| Less: accumulated depreciation | (2,378,962) | (2,050,571) |
|  | $ 4,934,449 | $ 4,727,899 |

Depreciation expense for the years ended December 31, 2013, 2012 and 2011, was $367.4 million, $367.1 million and $389.8 million, respectively.

**7. Intangibles, net**

Intangibles, net consisted of the following (amounts in thousands):

|  | Macau Gaming Concession | Show Production Rights | Water Rights | Trademarks | Other | Total Intangibles, Net |
|---|---|---|---|---|---|---|
| **January 1, 2012** | $ 25,018 | $ 2,934 | $6,400 | $ 1,399 | $ — | $ 35,751 |
| Amortization | (2,383) | (2,071) | — | — | — | (4,454) |
| **December 31, 2012** | 22,635 | 863 | 6,400 | 1,399 | — | 31,297 |
| Additions | — | — | — | — | 2,716 | 2,716 |
| Amortization | (2,383) | (863) | — | — | — | (3,246) |
| **December 31, 2013** | $ 20,252 | $ — | $6,400 | $ 1,399 | $2,716 | $ 30,767 |

The Macau gaming concession intangible is being amortized over the 20-year life of the concession. The Company expects that amortization of the Macau gaming concession will be $2.4 million each year from 2014 through 2021, and $1.2 million in 2022.

The water rights and trademarks are indefinite-lived assets and, accordingly, not amortized. Water rights reflect the fair value allocation determined in the purchase of the property on which Wynn Las Vegas is located in April 2000. The value of the trademarks primarily represents the costs to acquire the "Le Rêve" name.

91

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**8. Long-Term Debt**

Long-term debt consisted of the following (amounts in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| Wynn Macau Senior Term Loan Facilities (as amended July 2012), due July 31, 2017 and July 31, 2018; interest at LIBOR or HIBOR plus 1.75%—2.50%, net of original issue discount of $4,900 at December 31, 2013 and $3,737 at December 31, 2012 | $ 948,028 | $ 749,433 |
| 5 1/4% Wynn Macau, Limited Senior Notes, due October 15, 2021 | 600,000 | — |
| 7 7/8% Wynn Las Vegas First Mortgage Notes, net of original issue discount of $7,384 at December 31, 2012 | — | 492,616 |
| 7 7/8% Wynn Las Vegas First Mortgage Notes, due May 1, 2020, net of original issue discount of $1,463 at December 31, 2013 and $1,632 at December 31, 2012 | 350,547 | 350,378 |
| 7 3/4% Wynn Las Vegas First Mortgage Notes, due August 15, 2020 | 1,320,000 | 1,320,000 |
| 5 3/8% Wynn Las Vegas First Mortgage Notes, due March 15, 2022 | 900,000 | 900,000 |
| 4 1/4% Wynn Las Vegas Senior Notes, due May 30, 2023 | 500,000 | — |
| Redemption Price Promissory Note with former stockholder and related party, due February 18, 2022; interest at 2% | 1,936,443 | 1,936,443 |
| $42 million Note Payable, due April 1, 2017; interest at LIBOR plus 1.25% | 32,550 | 33,950 |
| | 6,587,568 | 5,782,820 |
| Current portion of long-term debt | (1,050) | (1,050) |
| | $ 6,586,518 | $ 5,781,770 |

*Wynn Macau Credit Facilities*

On July 31, 2012, Wynn Resorts (Macau) S.A. ("Wynn Macau"), amended and restated its credit facilities, dated September 14, 2004 (as so amended and restated, the "Amended Wynn Macau Credit Facilities"), and appointed Bank of China Limited, Macau Branch as intercreditor agent, facilities agent and security agent. The Amended Wynn Macau Credit Facilities and related agreements took effect on July 31, 2012 and expand availability under Wynn Macau's senior secured bank facility to $2.3 billion equivalent, consisting of a $750 million equivalent fully funded senior secured term loan facility and a $1.55 billion equivalent senior secured revolving credit facility. Borrowings under the Amended Wynn Macau Credit Facilities, which consist of both Hong Kong Dollar and United States Dollar tranches, were used to refinance Wynn Macau's existing indebtedness, and will be used to fund the design, development, construction and pre-opening expenses of Wynn Palace and for general corporate purposes.

The term loan facility matures in July 2018, and the revolving credit facility matures in July 2017. The principal amount of the term loan is required to be repaid in two equal installments in July 2017 and July 2018. The senior secured facilities bear interest for the first six months after closing at LIBOR or HIBOR plus a margin of 2.50% and thereafter will be subject to LIBOR or HIBOR plus a margin of between 1.75% to 2.50% based on Wynn Macau's leverage ratio.

Borrowings under the Amended Wynn Macau Credit Facilities are guaranteed by Palo Real Estate Company Limited ("Palo"), a subsidiary of Wynn Macau, and by certain subsidiaries of the Company that own equity interests in Wynn Macau, and are secured by substantially all of the assets of Wynn Macau, the equity interests in Wynn Macau and substantially all of the assets of Palo.

92

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

In connection with amending the Wynn Macau credit facilities, the Company expensed $17.7 million and capitalized $33.2 million of financing costs in the year ended December 31, 2012.

The Amended Wynn Macau Credit Facilities contain a requirement that Wynn Macau must make mandatory repayments of indebtedness from specified percentages of excess cash flow. If Wynn Macau meets a Consolidated Leverage Ratio, as defined in the Amended Wynn Macau Credit Facilities, of greater than 4.0 to 1, such repayment is defined as 50% of Excess Cash Flow, as defined in the Amended Wynn Macau Credit Facilities. If the Consolidated Leverage Ratio is equal or less than 4.0 to 1, then no repayment is required. Based on current estimates the Company does not believe that the Wynn Macau Consolidated Leverage Ratio during the year ending December 31, 2014 will exceed 4.0 to 1. Accordingly, Wynn Macau does not expect to make any mandatory repayments pursuant to this requirement during 2014.

The Amended Wynn Macau Credit Facilities contain customary covenants restricting certain activities including, but not limited to: the incurrence of additional indebtedness, the incurrence or creation of liens on any of its property, sale and leaseback transactions, the ability to dispose of assets, and making loans or other investments. In addition, Wynn Macau was required by the financial covenants to maintain a Leverage Ratio, as defined in the Amended Wynn Macau Credit Facilities, of not greater than 4.0 to 1 as of December 31, 2013, and an Interest Coverage Ratio, as defined in the Amended Wynn Macau Credit Facilities, of not less than 2.00 to 1. Management believes that Wynn Macau was in compliance with all covenants at December 31, 2013.

In connection with the initial financing of Wynn Macau, Wynn Macau entered into a Bank Guarantee Reimbursement Agreement with Banco Nacional Ultramarino, S.A. ("BNU") for the benefit of the Macau government. This guarantee assures Wynn Macau's performance under the casino concession agreement, including the payment of premiums, fines and indemnity for any material failure to perform under the terms of the concession agreement. As of December 31, 2013, the guarantee was in the amount of 300 million Macau patacas (approximately $37 million) and will remain at such amount until 180 days after the end of the term of the concession agreement (2022). BNU, as issuer of the guarantee, is currently secured by a second priority security interest in the senior lender collateral package. From and after repayment of all indebtedness under the Amended Wynn Macau Credit Facilities, Wynn Macau is obligated to promptly, upon demand by BNU, repay any claim made on the guarantee by the Macau government. BNU is paid an annual fee for the guarantee of approximately 5.2 million Macau patacas (approximately $0.7 million).

On July 30, 2013, Wynn Macau exercised its option to increase the senior term loan facility by $200 million equivalent pursuant to the terms and provisions of the Amended Wynn Macau Credit Facilities. The $200 million equivalent was fully funded as of July 31, 2013 and is required to be used for the payment of certain Wynn Palace related construction and development costs. The additional $200 million equivalent will mature on July 31, 2018 and will bear interest at HIBOR plus a margin between 1.75% to 2.50% based on Wynn Macau's leverage ratio.

As of December 31, 2013, there were no amounts outstanding under the Wynn Macau senior secured revolving credit facility. Accordingly, the Company has availability of $1.55 billion under the Amended Wynn Macau Credit Facilities.

*5 1/4% Wynn Macau, Limited Senior Notes due 2021*

On October 16, 2013, Wynn Macau, Limited ("WML"), an indirect subsidiary of Wynn Resorts, Limited, entered into an Indenture, dated as of October 16, 2013 (the "WML Indenture"), between WML and Deutsche Bank Trust Company Americas, as trustee, pursuant to which WML issued $600 million aggregate principal

93

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

amount of 5 1/4% Senior Notes due 2021 (the "2021 Notes"). WML received net proceeds of approximately $591.5 million from the offering of the 2021 Notes after deducting commissions and estimated expenses of the offering and will use the net proceeds for working capital requirements and general corporate purposes.

The 2021 Notes will bear interest at the rate of 5 1/4% per annum and will mature on October 15, 2021. Interest on the 2021 Notes is payable semi-annually in arrears on April 15 and October 15 of each year, beginning on April 15, 2014. At any time on or before October 14, 2016, WML may redeem the 2021 Notes, in whole or in part, at a redemption price equal to the greater of (a) 100% of the aggregate principal amount of the 2021 Notes or (b) a "make-whole" amount as determined by an independent investment banker in accordance with the terms of the WML Indenture, in either case, plus accrued and unpaid interest. In addition, on or after October 15, 2016, WML may redeem the 2021 Notes, in whole or in part, at a premium decreasing annually from 103.938% of the principal amount to zero, plus accrued and unpaid interest. If WML undergoes a Change of Control (as defined in the WML Indenture), it must offer to repurchase the 2021 Notes at a price equal to 101% of the aggregate principal amount thereof, plus accrued and unpaid interest. In addition, the Company may redeem the 2021 Notes, in whole but not in part, at a redemption price equal to 100% of the principal amount, plus accrued and unpaid interest, in response to any change in or amendment to certain tax laws or tax positions. Further, if a holder or beneficial owner of the 2021 Notes fails to meet certain requirements imposed by any Gaming Authority (as defined in the WML Indenture), WML may require the holder or beneficial owner to dispose of or redeem its 2021 Notes.

The 2021 Notes are WML's general unsecured obligations and rank pari passu in right of payment with all of WML's existing and future senior unsecured indebtedness; will rank senior to all of WML's future subordinated indebtedness, if any; will be effectively subordinated to all of WML's future secured indebtedness to the extent of the value of the assets securing such debt; and will be structurally subordinated to all existing and future obligations of WML's subsidiaries, including Wynn Macau's existing credit facilities. The 2021 Notes are not registered under the Securities Act of 1933, as amended (the "Securities Act"), and the 2021 Notes are subject to restrictions on transferability and resale.

The WML Indenture contains covenants limiting WML's (and certain of its subsidiaries') ability to, among other things: merge or consolidate with another company; transfer or sell all or substantially all of its properties or assets; and lease all or substantially all of its properties or assets. The terms of the WML Indenture contain customary events of default, including, but not limited to: default for 30 days in the payment when due of interest on the 2021 Notes; default in the payment when due of the principal of, or premium, if any, on the 2021 Notes; failure to comply with any payment obligations relating to the repurchase by WML of the 2021 Notes upon a change of control; failure to comply with certain covenants in the WML Indenture; certain defaults on certain other indebtedness; failure to pay judgments against WML or certain subsidiaries that, in the aggregate, exceed $50 million; and certain events of bankruptcy or insolvency. In the case of an event of default arising from certain events of bankruptcy or insolvency, all 2021 Notes then outstanding will become due and payable immediately without further action or notice.

*7 7/8% Wynn Las Vegas First Mortgage Notes*

In October 2009, Wynn Las Vegas, LLC ("Wynn Las Vegas"), an indirect wholly owned subsidiary of Wynn Resorts, Limited, and Wynn Las Vegas Capital Corp., an indirect wholly owned subsidiary of Wynn Resorts, Limited (together, the "Issuers") issued, in a private offering, $500 million aggregate principal amount of 7 7/8% first mortgage notes due November 1, 2017 (the "2017 Notes") at a price of 97.823% of the principal amount. Interest is due on the 2017 Notes on May 1st and November 1st of each year. Commencing November 1, 2013, the 2017 Notes are redeemable at the Issuers' option at a price equal to 103.938% of the principal amount

94

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

redeemed and the premium over the principal amount declines ratably on November 1st of each year thereafter to zero on or after November 1, 2015. The 2017 Notes are senior obligations of the Issuers and are unsecured (except by the first priority pledge by Wynn Resorts Holdings, LLC of its equity interests in Wynn Las Vegas, LLC (the "Holdings pledge")). The Issuers' obligations under the 2017 Notes rank pari passu in right of payment with the 7 7/8% 2020 Notes (as defined below), the 7 3/4% 2020 Notes (as defined below) and the 2022 Notes (as defined below). The 2017 Notes are not guaranteed by any of the Company's subsidiaries. If the Issuers undergo a change of control, they must offer to repurchase the 2017 Notes at 101% of the principal amount, plus accrued and unpaid interest. The indenture governing the 2017 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restrictions affecting subsidiaries.

On May 15, 2013, Wynn Las Vegas commenced a cash tender offer (the "tender offer") for any and all of the outstanding $500 million aggregate principal amount of the 2017 Notes of the Issuers, and a solicitation of consents to certain proposed amendments to the indenture (the "2017 Indenture") governing the 2017 Notes.

The tender offer expired on May 21, 2013 and at the time of expiration, Wynn Las Vegas had received valid tenders with respect to approximately $274.7 million of the $500 million aggregate principal amount of the 2017 Notes outstanding. On May 22, 2013, note holders who validly tendered their 2017 Notes received the total consideration of $1,071.45 for each $1,000 principal amount of 2017 Notes, the premium portion of which totaled approximately $19.6 million. In accordance with accounting standards, the tender offer premium was expensed and is included in loss on extinguishment of debt in the accompanying Consolidated Statements of Income. In addition, upon the tender offer completion, the Issuers entered into a supplemental indenture, which eliminated substantially all of the restrictive covenants and certain events of default from the 2017 Indenture.

Also in connection with this transaction, the Company expensed $6.7 million of unamortized financing costs and original issue discount related to the 2017 Notes and incurred other fees of approximately $0.3 million that are included in loss on extinguishment of debt in the accompanying Consolidated Statements of Income.

On November 1, 2013, Wynn Las Vegas redeemed the untendered 2017 Notes principal amount of $225.3 million. The redemption price was equal to 103.938% of the aggregate principal amount of the 2017 Notes plus accrued and unpaid interest on November 1, 2013. The total redemption fees paid were $8.9 million and we expensed $4.9 million of unamortized financing costs and original issue discount.

*7 7/8% Wynn Las Vegas First Mortgage Notes due 2020*

In April 2010, the Issuers issued, in a private offering, $352 million aggregate principal amount of 7 7/8% first mortgage notes due May 1, 2020 (the "7 7/8% 2020 Notes"). The 7 7/8% 2020 Notes were issued pursuant to an exchange offer for previously issued notes that were to mature in December 2014. Interest is due on the 7 7/8% 2020 Notes on May 1st and November 1st of each year. Commencing May 1, 2015, the 7 7/8% 2020 Notes are redeemable at the Issuers' option at a price equal to 103.938% of the principal amount redeemed and the premium over the principal amount declines ratably on May 1st of each year thereafter to zero on or after May 1, 2018. The 7 7/8% 2020 Notes are senior obligations of the Issuers and are unsecured (except by the Holdings pledge). The Issuers' obligations under the 7 7/8% 2020 Notes rank pari passu in right of payment with the 7 3/4% 2020 Notes (as defined below), the 2022 Notes (as defined below) and the 2023 Notes (as defined below). The 7 7/8% 2020 Notes are not guaranteed by any of the Company's subsidiaries. If the Issuers undergo a change of control, they must offer to repurchase the 7 7/8% 2020 Notes at 101% of the principal amount, plus

95

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

accrued and unpaid interest. The indenture governing the 7 7/8% 2020 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restrictions affecting subsidiaries.

*7 3/4% Wynn Las Vegas First Mortgage Notes due 2020*

In August 2010, the Issuers issued $1.32 billion aggregate principal amount of 7 3/4% first mortgage notes due August 15, 2020 (the "7 3/4% 2020 Notes"). The 7 3/4% 2020 Notes were issued at par. The 7 3/4% 2020 Notes refinanced a previous notes issue that was to mature in December 2014. Interest is due on the 7 3/4% 2020 Notes on February 15th and August 15th of each year. Commencing August 15, 2015, the 7 3/4% 2020 Notes are redeemable at the Issuers' option at a price equal to 103.875% of the principal amount redeemed and the premium over the principal amount declines ratably on August 15th of each year thereafter to zero on or after August 15, 2018. The 7 3/4% 2020 Notes are senior obligations of the Issuers and are unsecured (except by the Holdings pledge). The Issuers' obligations under the 7 3/4% 2020 Notes rank pari passu in right of payment with the 7 7/8% 2020 Notes, the 2022 Notes (as defined below) and the 2023 Notes (as defined below). The 7 3/4% 2020 Notes are not guaranteed by any of the Company's subsidiaries. If the Issuers undergo a change of control, they must offer to repurchase the 7 3/4% 2020 Notes at 101% of the principal amount, plus accrued and unpaid interest. The indenture governing the 7 3/4% 2020 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restrictions affecting subsidiaries.

*5 3/8% Wynn Las Vegas First Mortgage Notes due 2022*

In March 2012, the Issuers issued, in a private offering, $900 million aggregate principal amount of 5 3/8% First Mortgage Notes due 2022 (the "2022 Notes"). A portion of the proceeds were used to repay all amounts outstanding under the Wynn Las Vegas term loan facilities. In October 2012, the Issuers commenced an offer to exchange all of the 2022 Notes for notes registered under the Securities Act of 1933, as amended. The exchange offer closed on November 6, 2012. Interest is due on the 2022 Notes on March 15th and September 15th of each year. Commencing March 15, 2017, the 2022 Notes are redeemable at the Issuers' option at a price equal to 102.688% of the principal amount redeemed and the premium over the principal amount declines ratably on March 15th of each year thereafter to zero on or after March 15, 2020. The 2022 Notes are senior obligations of the Issuers and are unsecured (except by the Holdings pledge). The Issuers' obligations under the 2022 Notes rank pari passu in right of payment with the 7 7/8% 2020 Notes, the 7 3/4% 2020 Notes and the 2023 Notes (as defined below). The 2022 Notes are not guaranteed by any of the Company's subsidiaries. If the Issuers undergo a change of control, they must offer to repurchase the 2022 Notes at 101% of the principal amount, plus accrued and unpaid interest. The indenture governing the 2022 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restrictions affecting subsidiaries.

96

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*4 1/4% Wynn Las Vegas Senior Notes due 2023*

In May 2013, the Issuers completed the issuance of $500 million aggregate principal amount of 4 1/4% Senior Notes due 2023 (the "2023 Notes") pursuant to an indenture, dated as of May 22, 2013 (the "2023 Indenture"), among the Issuers, the Guarantors (as defined below) and U.S. Bank National Association, as trustee. The 2023 Notes were issued at par. The Issuers used the net proceeds from the 2023 Notes to cover the cost of purchasing the 2017 Notes tendered in the tender offer. In addition, the Issuers satisfied and discharged the 2017 Indenture and, in November 2013, used the remaining net proceeds to redeem all of the 2017 Notes not previously tendered. In connection with the issuance of the 2023 Notes, the Company capitalized approximately $4.1 million of financing costs.

The 2023 Notes will mature on May 30, 2023 and bear interest at the rate of 4 1/4% per annum. The Issuers may, at their option, redeem the 2023 Notes, in whole or in part, at any time or from time to time prior to their stated maturity. The redemption price for 2023 Notes that are redeemed before February 28, 2023 will be equal to the greater of (a) 100% of the principal amount of the 2023 Notes to be redeemed or (b) a "make-whole" amount described in the 2023 Indenture, plus in either case accrued and unpaid interest to, but not including, the redemption date. The redemption price for the 2023 Notes that are redeemed on or after February 28, 2023 will be equal to 100% of the principal amount of the 2023 Notes to be redeemed, plus accrued and unpaid interest to, but not including, the redemption date. In the event of a change of control triggering event, the Issuers will be required to offer to repurchase the 2023 Notes at 101% of the principal amount, plus accrued and unpaid interest to but not including the repurchase date. The 2023 Notes are also subject to mandatory redemption requirements imposed by gaming laws and regulations of gaming authorities in Nevada.

The 2023 Notes are the Issuers' senior unsecured obligations and rank pari passu in right of payment with the Issuers' outstanding 7 7/8% 2020 Notes, 7 3/4% 2020 Notes and the 2022 Notes and, together with the 7 7/8% 2020 Notes and 7 3/4% 2020 Notes, the ("Existing Notes"). The 2023 Notes are secured by a first priority pledge of the Company's equity interests, the effectiveness of which is subject to the prior approval of the Nevada gaming authorities. The equity interests of the Company also secure the Existing Notes. If Wynn Resorts, Limited receives an investment grade rating from one or more ratings agencies, the first priority pledge securing the 2023 Notes will be released.

The 2023 Notes are jointly and severally guaranteed by all of the Issuers' subsidiaries, other than Wynn Las Vegas Capital Corp. which was a co-issuer (the "Guarantors"). The guarantees are senior unsecured obligations of the Guarantors and rank senior in right of payment to all of their existing and future subordinated debt. The guarantees rank equally in right of payment with all existing and future liabilities of the Guarantors that are not so subordinated and will be effectively subordinated in right of payment to all of such Guarantors' existing and future secured debt (to the extent of the collateral securing such debt).

The 2023 Indenture contains covenants limiting the Issuers' and the Guarantor's ability to create liens on assets to secure debt; enter into sale-leaseback transactions; and merge or consolidate with another company. These covenants are subject to a number of important and significant limitations, qualifications and exceptions.

Events of default under the 2023 Indenture include, among others, the following: default for 30 days in the payment when due of interest on the 2023 Notes; default in payment when due of the principal of, or premium, if any, on the 2023 Notes; failure to comply with certain covenants in the 2023 Indenture; and certain events of bankruptcy or insolvency. In the case of an event of default arising from certain events of bankruptcy or insolvency with respect to the Issuers or any Guarantor, all 2023 Notes then outstanding will become due and payable immediately without further action or notice.

Table of Contents

WYNN RESORTS, LIMITED AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)

The 2023 Notes were offered pursuant to an exemption under the Securities Act of 1933, as amended (the "Securities Act"). The 2023 Notes were offered only to qualified institutional buyers in reliance on Rule 144A under the Securities Act or outside the United States to certain persons in reliance on Regulation S under the Securities Act. The 2023 Notes have not been and will not be registered under the Securities Act of 1933 or under any state securities laws. Therefore, the 2023 Notes may not be offered or sold within the United States to, or for the account or benefit of, any United States person unless the offer or sale would qualify for a registration exemption from the Securities Act and applicable state securities laws.

*Wynn Las Vegas Credit Facilities*

In March 2012, Wynn Las Vegas entered into an eighth amendment ("Amendment No. 8") to its Amended and Restated Credit Agreement, dated as of August 15, 2006 (as amended, the "Wynn Las Vegas Credit Agreement"). Amendment No. 8 amended the Wynn Las Vegas Credit Agreement to, among other things, permit the issuance of the 2022 Notes. Concurrently with the issuance of the 2022 Notes, Wynn Las Vegas, LLC prepaid all term loans under the Wynn Las Vegas Credit Agreement, terminated all of its revolving credit commitments that were due to expire in 2013, and terminated all but $100 million of its revolving credit commitments expiring in 2015. In connection with this transaction, the Company expensed deferred financing fees of $4.8 million, all related to the Wynn Las Vegas term loan and revolving credit facilities.

In September 2012, Wynn Las Vegas terminated the Wynn Las Vegas Credit Agreement. No loans were outstanding under the Wynn Las Vegas Credit Agreement at the time of termination. Prior to such termination, certain letters of credit in which lenders had participated pursuant to the Wynn Las Vegas Credit Agreement were reallocated to a separate, unsecured letter of credit facility provided by Deutsche Bank, A.G. Wynn Las Vegas did not incur any early termination penalties related to the termination.

In connection with the termination, the Company expensed $2.6 million of previously deferred financing costs and third party fees related to the Wynn Las Vegas Credit Agreement.

*Redemption Price Promissory Note*

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, the Company redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," Wynn Resorts' articles of incorporation authorize redemption of the shares held by unsuitable persons at a "fair value" redemption price. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares which were subject to the terms of an existing stockholder agreement. Pursuant to its articles of incorporation, the Company issued the Redemption Note to Aruze USA, Inc., a former stockholder and related party, in redemption of the shares. The Redemption Note has a principal amount of $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum payable annually in arrears on each anniversary of the date of the Redemption Note. The Company may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of the Company or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts and any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

The Company recorded the fair value of the Redemption Note of approximately $1.94 billion in accordance with applicable accounting guidance. The Company utilized an independent third party valuation to assist in the

98

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

determination of this fair value. In determining this fair value, the Company estimated the Redemption Note's present value using discounted cash flows with a probability weighted expected return for redemption assumptions and a discount rate which included time value and non-performance risk adjustments commensurate with risk of the Redemption Note.

Considerations for the redemption assumptions included the stated maturity of the Redemption Note, uncertainty of the related cash flows as well as potential effects of the following: uncertainties surrounding the potential outcome and timing of pending litigation with the Okada Parties (see Note 16—"Commitments and Contingencies"); the outcome of on-going investigations of Aruze USA, Inc. by the United States Attorney's Office, the U.S. Department of Justice and the Nevada Gaming Control Board; and other potential legal and regulatory actions. In addition, in the furtherance of various future business objectives, the Company considered its ability, at its sole option, to prepay the Redemption Note at any time in accordance with its terms without penalty. Accordingly, the Company reasonably determined that the estimated life of the Redemption Note could be less than the contractual life of the Redemption Note.

In determination of the appropriate discount rate to be used in the estimated present value, the Redemption Note's subordinated position relative to all other debt in the Company's capital structure and credit ratings associated with the Company's traded debt were considered. Observable inputs for the risk free rate based on Federal Reserve rates for U.S. Treasury securities and credit risk spread based on a yield curve index of similarly rated debt was used. As a result of this analysis, the Company concluded the Redemption Notes's stated rate of 2% approximated a market rate.

The Okada Parties have challenged the redemption of Aruze USA, Inc.'s shares and the Company is currently involved in litigation with those parties as well as related shareholder derivative litigation. On February 13, 2013, the Okada Parties filed a motion in the Nevada state court asking the court to establish an escrow account (specifically, they asked the court to establish a "disputed ownership fund," as defined in a federal tax regulation ("DOF")) to hold the Redemption Note as well as the redeemed shares themselves (although those shares were previously cancelled in February 2012), until the resolution of the redemption action and counterclaim. The Okada Parties subsequently filed reply papers in further support of their motion, in which they narrowed the relief they were seeking, specifically by withdrawing their request that the redeemed shares be placed into the escrow account. On April 17, 2013, the court entered an order granting the Okada Parties' motion in part as to the narrowed relief outlined in their reply papers. Among other things, the court's order directed the Okada Parties to establish an escrow account with a third party (without making any ruling as to whether such an account would satisfy the requirements of a DOF) to hold interest payments tendered by the Company on the Redemption Note. The Company is to have no responsibility for fees or costs of the account, and will receive a full release and indemnity related to the account. On each of February 14, 2013 and February 13, 2014, the Company issued checks to Aruze USA, Inc. in the amount of $38.7 million, representing the interest payments due on the Redemption Note at those times. However, as of the date of this report, the checks remain uncashed. The parties engaged in discussions regarding the terms of the escrow agreement contemplated by the court's order. However, the Okada Parties recently advised of their intent to deposit any checks for interest and principal, past and future, due under the terms of the Redemption Note to the Clerk of the Court for deposit into the Clerk's Trust Account.

As further discussed in Note 16—"Commitments and Contingencies", on June 19, 2012, Elaine Wynn responded to the counterclaim and asserted a cross claim against Steve Wynn and Kazuo Okada. The indentures for the Issuers' 7 7/8% 2020 Notes, 7 3/4% 2020 Notes (the "2020 Indentures") and the indenture for the Issuers' 2023 Notes (the "2023 Indenture" and, together with the 2020 Indentures, the "Indentures") provide that if Stephen A. Wynn, together with certain related parties, in the aggregate beneficially owns a lesser percentage of the outstanding common stock of the Company than is beneficially owned by any other person, a change of

99

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

control will have occurred. If Elaine Wynn prevails in her cross claim, Stephen A. Wynn would not beneficially own or control Elaine Wynn's shares and a change in control may result under the Wynn Las Vegas debt documents. Under the 2020 Indentures, the occurrence of a change of control requires that the Company make an offer to each holder to repurchase all or any part of such holder's notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest on the notes purchased, if any, to the date of repurchase (unless the notes have been previously called for redemption). Under the 2023 Indenture, if a change of control occurs and within 60 days after that occurrence the 4 1/4% Senior Notes are rated below investment grade by both rating agencies that rate such notes, the Company is required to make an offer to each holder to repurchase all or any part of such holder's notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest on the notes purchased, if any, to the date of repurchase (unless the notes have been previously called for redemption). Mr. Wynn is opposing Ms. Wynn's cross claim.

The outcome of these various proceedings cannot be predicted. The Company's claims and the Okada Parties' counterclaims are in a preliminary stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any. An adverse judgment or settlement involving payment of a material amount could cause a material adverse effect on our financial condition.

*$42 Million Note Payable for Aircraft*

On March 30, 2007, World Travel, LLC, a subsidiary of Wynn Las Vegas, entered into a loan agreement with a principal balance of $42 million. The loan is guaranteed by Wynn Las Vegas, LLC and secured by a first priority security interest in one of the Company's aircraft. Principal payments of $350,000 plus interest are made quarterly with a balloon payment of $28 million due at maturity, April 1, 2017. Interest is calculated at 90-day LIBOR plus 125 basis points.

*Fair Value of Long-Term Debt*

The estimated fair value of the Company's long-term debt, excluding the Redemption Note, as of December 31, 2013 and 2012, was approximately $4.8 billion and $4.2 billion, respectively compared to its carrying value of $4.7 billion and $3.9 billion, respectively. The estimated fair value of the Company's long-term debt, excluding the Redemption Note, is based on recent trades, if available, and indicative pricing from market information (level 2 inputs). See Note 2—"Summary of Significant Accounting Policies" for discussion on the estimated fair value of the Redemption Note.

*Scheduled Maturities of Long-Term Debt*

Scheduled maturities of long-term debt, including the accretion of debt discounts of $6.4 million, are as follows (amounts in thousands):

| Years Ending December 31, | |
|---|---:|
| 2014 | $ 1,050 |
| 2015 | 1,400 |
| 2016 | 1,400 |
| 2017 | 405,196 |
| 2018 | 576,432 |
| Thereafter | 5,608,453 |
| | $ 6,593,931 |

100

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**9. Interest Rate Swaps**

The Company has entered into floating-for-fixed interest rate swap arrangements in order to manage interest rate risk relating to certain of its debt facilities. These interest rate swap agreements modify the Company's exposure to interest rate risk by converting a portion of the Company's floating-rate debt to a fixed rate. These interest rate swaps essentially fix the interest rate at the percentages noted below; however, changes in the fair value of the interest rate swaps for each reporting period have been recorded as an increase/decrease in swap fair value in the accompanying Consolidated Statements of Income, as the interest rate swaps do not qualify for hedge accounting.

The Company utilized Level 2 inputs as described in Note 2—"Summary of Significant Accounting Policies" to determine fair value. The fair value approximates the amount the Company would pay if these contracts were settled at the respective valuation dates. Fair value is estimated based upon current, and predictions of future, interest rate levels along a yield curve, the remaining duration of the instruments and other market conditions, and therefore, is subject to significant estimation and a high degree of variability and fluctuation between periods. The fair value is adjusted, to reflect the impact of credit ratings of the counterparties or the Company, as applicable. These adjustments resulted in a reduction in the fair values as compared to their settlement values. As of December 31, 2013, the interest rate swaps were recorded as an asset of $10.3 million and included in deposits and other assets. As of December 31, 2012, the interest rate swaps were recorded as a liability of $3.9 million and included in other long-term liabilities.

The Company currently has three interest rate swap agreements intended to hedge a portion of the underlying interest rate risk on borrowings under the Amended Wynn Macau Credit Facilities. Under two of the swap agreements, the Company pays a fixed interest rate (excluding the applicable interest margin) of 0.73% on notional amounts corresponding to borrowings of HK$3.95 billion (approximately $509.4 million) incurred under the Amended Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable interest rate based on the applicable HIBOR at the time of payment. These interest rate swaps fix the all-in interest rate on such amounts at 2.48% to 3.23%. These interest rate swap agreements mature in July 2017.

Under the third swap agreement, the Company pays a fixed interest rate (excluding the applicable interest margin) of 0.6763% on notional amounts corresponding to borrowings of $243.8 million incurred under the Amended Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable rate based on the applicable LIBOR at the time of payment. This interest rate swap fixes the all-in interest rate on such amounts at 2.4263% to 3.1763%. This interest rate swap agreement matures in July 2017.

**10. Related Party Transactions**

*Related Party Share Redemption*

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, the Company redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," Wynn Resorts' articles of incorporation authorize redemption of the shares held by unsuitable persons at a "fair value" redemption price. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares which were subject to the terms of an existing stockholder agreement. Pursuant to its articles of incorporation, the Company issued the Redemption Note to Aruze USA, Inc., a former stockholder and related party, in redemption of the shares. Aruze USA, Inc., Universal Entertainment Corporation and Kazuo Okada have challenged the redemption of Aruze USA, Inc.'s shares and we are currently involved in litigation with those parties as well as related shareholder derivative litigation. The

101

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

outcome of these various proceedings cannot be predicted. The Company's claims and the Okada Parties' counterclaims are in a preliminary stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any. An adverse judgment or settlement involving payment of a material amount could cause a material adverse effect on our financial condition.

*Amounts Due to Officers*

The Company periodically provides services to Stephen A. Wynn, Chairman of the Board of Directors and Chief Executive Officer ("Mr. Wynn"), and certain other officers and directors of the Company, including the personal use of employees, construction work and other personal services. Mr. Wynn and other officers and directors have deposits with the Company to prepay any such items, which are replenished on an ongoing basis as needed. As of December 31, 2013 and 2012, Mr. Wynn and the other officers and directors had a net deposit balance with the Company of $0.8 million and $1 million, respectively.

*Villa Lease*

On March 18, 2010, Mr. Wynn and Wynn Las Vegas entered into an Amended and Restated Agreement of Lease (the "Prior SW Lease") for a villa to serve as Mr. Wynn's personal residence. The Prior SW Lease amended and restated a previous lease. The Prior SW Lease was approved by the Audit Committee of the Board of Directors of the Company. The term of the Prior SW Lease commenced as of March 1, 2010 and ran concurrent with Mr. Wynn's employment agreement with the Company; provided that either party could terminate on 90 days notice. Pursuant to the Prior SW Lease, the rental value of the villa was treated as imputed income to Mr. Wynn, and was equal to the fair market value of the accommodations provided. Effective March 1, 2010, and for the first two years of the term of the Prior SW Lease, the rental value was $503,831 per year. Effective March 1, 2012, the rental value was $440,000 per year.

On May 7, 2013, Wynn Las Vegas entered into a 2013 Amended and Restated Agreement of Lease (the "Existing SW Lease"), effective December 29, 2012, to include an expansion of the villa and to adjust the rental value accordingly to $525,000 per year based on the current fair market value as established by the Audit Committee of the Company with the assistance of an independent third-party appraisal.

On November 7, 2013, Mr. Wynn and Wynn Las Vegas entered into a 2013 Second Amended and Restated Agreement of Lease (the "New SW Lease") amending and restating the Existing SW Lease, effective as of November 5, 2013. The New SW Lease was approved by the Audit Committee of the Board of Directors of Wynn Resorts. Pursuant to the New SW Lease, effective as of November 5, 2013 and ending on February 28, 2015, Mr. Wynn will pay Wynn Las Vegas annual rent for the villa of $525,000, which amount was determined to be the fair market value of the accommodations based on a third-party appraisal and which is consistent with the rental value under the Existing SW Lease. In addition, pursuant to the New SW Lease, the Company pays for all capital improvements to the villa and will reimburse Mr. Wynn for all amounts he previously paid the Company for capital improvements to the villa in 2012 and 2013. The rental value for the villa will be re-determined every two years during the term of the New SW Lease by the Audit Committee. Certain services for, and maintenance of, the villa are included in the rental.

*Home Purchase*

In May 2010, the Company entered into an employment agreement with Linda Chen, who is the Chief Operating Officer of Wynn Macau. The term of the employment agreement is through February 24, 2020. Under

102

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

the terms of the employment agreement, the Company purchased a home in Macau for use by Ms. Chen and has made renovations to the home with total costs of $9.4 million through December 31, 2013. Upon the occurrence of certain events set forth below, Ms. Chen has the option to purchase the home at the then fair market value of the home (as determined by an independent appraiser) less a discount equal to ten percentage points multiplied by each anniversary of the term of the agreement that has occurred (the "Discount Percentage"). The option is exercisable for (a) no consideration at the end of the term, (b) $1.00 in the event of termination of Ms. Chen's employment without "cause" or termination of Ms. Chen's employment for "good reason" following a "change of control" and (c) at a price based on the applicable Discount Percentage in the event Ms. Chen terminates the agreement due to material breach by the Company. Upon Ms. Chen's termination for "cause," Ms. Chen will be deemed to have elected to purchase the Macau home based on the applicable Discount Percentage unless the Company determines to not require Ms. Chen to purchase the home. If Ms. Chen's employment terminates for any other reason before the expiration of the term (e.g., because of her death or disability or due to revocation of gaming license), the option will terminate.

*Plane Option Agreement*

On January 3, 2013, the Company and Mr. Wynn entered into an agreement pursuant to which Mr. Wynn agreed to terminate a previously granted option to purchase an approximately two acre tract of land located on the Wynn Las Vegas golf course and, in return, the Company granted Mr. Wynn the right to purchase any or all of the aircraft owned by the Company or its direct wholly owned subsidiaries. The aircraft purchase option is exercisable upon 30 days written notice and at a price equal to the book value of such aircraft, and will terminate on the date of termination of the employment agreement between the Company and Mr. Wynn, which expires in October 2020.

*The "Wynn" Surname Rights Agreement*

On August 6, 2004, the Company entered into agreements with Mr. Wynn that confirm and clarify the Company's rights to use the "Wynn" name and Mr. Wynn's persona in connection with its casino resorts. Under the parties' Surname Rights Agreement, Mr. Wynn granted the Company an exclusive, fully paid-up, perpetual, worldwide license to use, and to own and register trademarks and service marks incorporating the "Wynn" name for casino resorts and related businesses, together with the right to sublicense the name and marks to its affiliates. Under the parties' Rights of Publicity License, Mr. Wynn granted the Company the exclusive, royalty-free, worldwide right to use his full name, persona and related rights of publicity for casino resorts and related businesses, together with the ability to sublicense the persona and publicity rights to its affiliates, until October 24, 2017.

**11. Property Charges and Other**

Property charges and other consisted of the following (amounts in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
| Net loss on assets abandoned/retired for remodel or sold | $ 7,358 | $29,524 | $ 19,708 |
| Donation to University of Macau Foundation | 3,780 | 4,083 | 109,563 |
| Loss on contract termination | 6,000 | 315 | — |
| Loss on show cancellation | — | 6,056 | 1,378 |
|  | $17,138 | $39,978 | $130,649 |

103

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Property charges and other generally include costs related to the retirement of assets for remodels and asset abandonments. Property charges and other for the year ended December 31, 2013 include fees paid in connection with the termination of a contract, miscellaneous renovations and abandonments at our resorts and entertainment development costs.

Property charges and other for the year ended December 31, 2012 include the remodel of a Las Vegas restaurant, charges associated with the termination of a Las Vegas show that ended its run in November 2012, and miscellaneous renovations and abandonments at our resorts.

Property charges and other for the year ended December 31, 2011 include the present value of a charitable contribution made by Wynn Macau to the University of Macau Development Foundation. This contribution consists of a $25 million payment made in May 2011, and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive, for a total of $135 million. The amount reflected in the accompanying Consolidated Statements of Income has been discounted using the Company's estimated borrowing rate over the time period of the remaining committed payments. In accordance with accounting standards for contributions, subsequent accretion of the discount is being recorded as additional donation expense and included in Property charges and other. Also included are the write off of certain off-site golf memberships by Wynn Las Vegas, miscellaneous renovations and abandonments at the Company's resorts, including modifications of the Encore at Wynn Las Vegas retail esplanade, closure of the Blush nightclub and the write off of certain costs related to a show that ended its run in Las Vegas in April 2011.

**12. Stockholders' Equity**

*Common Stock*

The Company is authorized to issue up to 400,000,000 shares of its common stock, $0.01 par value per share (the "Common Stock"). As of December 31, 2013 and 2012, 101,192,408 shares and 100,866,712 shares, respectively, of the Company's Common Stock were outstanding. Except as otherwise provided by the Company's articles of incorporation or Nevada law, each holder of the Common Stock is entitled to one vote for each share held of record on each matter submitted to a vote of stockholders. Holders of the Common Stock have no cumulative voting, conversion, redemption or preemptive rights or other rights to subscribe for additional shares. Subject to any preferences that may be granted to the holders of the Company's preferred stock, each holder of Common Stock is entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefore, as well as any distributions to the stockholders and, in the event of liquidation, dissolution or winding up of the Company, is entitled to share ratably in all assets of the Company remaining after payment of liabilities.

The Board of Directors of Wynn Resorts has authorized an equity repurchase program of up to $1.7 billion. The repurchase program may include repurchases from time to time through open market purchases or negotiated transactions, depending upon market conditions. As of December 31, 2013, the Company had repurchased a cumulative total of 12,978,085 shares of the Company's Common Stock for a net cost of $1.1 billion under the program. Under the repurchase program, there were no repurchases made during the years ended December 31, 2013, 2012 and 2011.

During 2013 and 2012, the Company repurchased a total of 114,355 shares and 7,640 shares, respectively, in satisfaction of tax withholding obligations on vested restricted stock.

In February 2013, May 2013, August 2013 and November 2013 the Company paid a dividend of $1.00 per common share as part of a cash dividend program. In December 2013, the Company paid a dividend of $3.00 per common share.

104

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Preferred Stock*

The Company is authorized to issue up to 40,000,000 shares of undesignated preferred stock, $0.01 par value per share (the "Preferred Stock"). As of December 31, 2013, the Company had not issued any Preferred Stock. The Board of Directors, without further action by the holders of Common Stock, may designate and issue shares of Preferred Stock in one or more series and may fix or alter the rights, preferences, privileges and restrictions, including the voting rights, redemption provisions (including sinking fund provisions), dividend rights, dividend rates, liquidation rates, liquidation preferences, conversion rights and the description and number of shares constituting any wholly unissued series of Preferred Stock. The issuance of such shares of Preferred Stock could adversely affect the rights of the holders of Common Stock. The issuance of shares of Preferred Stock under certain circumstances could also have the effect of delaying or preventing a change of control of the Company or other corporate action.

*Redemption of Securities*

Wynn Resorts' articles of incorporation provide that, to the extent a gaming authority makes a determination of unsuitability or to the extent the Board of Directors determines, in its sole discretion, that a person is likely to jeopardize the Company or any affiliates application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, Wynn Resorts may redeem shares of its capital stock that are owned or controlled by an unsuitable person or its affiliates. The redemption price will be the amount, if any, required by the gaming authority or, if the gaming authority does not determine the price, the sum deemed by the Board of Directors to be the fair value of the securities to be redeemed. If Wynn Resorts determines the redemption price, the redemption price will be capped at the closing price of the shares on the principal national securities exchange on which the shares are listed on the trading day before the redemption notice is given. If the shares are not listed on a national securities exchange, the redemption price will be capped at the closing sale price of the shares as quoted on The NASDAQ Global Select Market or if the closing price is not reported, the mean between the bid and ask prices, as quoted by any other generally recognized reporting system. Wynn Resorts' right of redemption is not exclusive of any other rights that it may have or later acquire under any agreement, its bylaws or otherwise. The redemption price may be paid in cash, by promissory note, or both, as required, and pursuant to the terms established by, the applicable Gaming Authority and, if not, as the Board of Directors of Wynn Resorts elects.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. For more information, refer to Note 16—"Commitments and Contingencies".

**13. Noncontrolling Interest**

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary of the Company and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Through an initial public offering, including the over allotment, Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of this subsidiary's common stock (the "Wynn Macau Limited IPO"). Proceeds to the Company as a result of this transaction were approximately $1.8 billion, net of transaction costs of approximately $84 million. The shares of Wynn Macau, Limited were not and will not be registered under the Securities Act and may not be offered or sold in the United States absent a registration under the Securities Act, or an applicable exception from such registration requirements. Net income attributable to noncontrolling interest was $275.5 million, $226.7 million and $211.7 million for the years ended December 31, 2013, 2012 and 2011, respectively.

105

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

On August 23, 2013, the Wynn Macau, Limited Board of Directors approved a HK$0.50 per share dividend. The total dividend amount was $334.5 million and the Company's share of this dividend was $241.8 million. A reduction of $92.7 million was made to noncontrolling interest in the accompanying Consolidated Balance Sheets to reflect the payment of this dividend.

On March 28, 2013, the Wynn Macau, Limited Board of Directors approved a HK$1.24 per share dividend. The total dividend amount was $828.6 million and the Company's share of this dividend was $599.1 million. A reduction of $229.6 million was made to noncontrolling interest in the accompanying Consolidated Balance Sheets to reflect the payment of this dividend.

On November 16, 2011, the Wynn Macau, Limited Board of Directors approved a HK$1.20 per share dividend. The total dividend amount was approximately $800 million and the Company's share of this dividend was $578.3 million. A reduction of $221.6 million was made to noncontrolling interest in the accompanying Consolidated Balance Sheets to reflect the payment of this dividend.

**14. Benefit Plans**

*Employee Savings Plan*

The Company established a retirement savings plan under Section 401(k) of the Internal Revenue Code covering its U.S. non-union employees in July 2000. The plan allows employees to defer, within prescribed limits, a percentage of their income on a pre-tax basis through contributions to this plan. On April 30, 2013, the Company announced a 401(k) plan match for the 2013 plan year. For the 2013 plan year, the Company matched 50% of employee contributions, up to 6% of employees' paychecks, with a one-time annual matching cap of $500 per employee. The company expensed $1.2 million related to this match as of December 31, 2013. The Company suspended matching contributions to this plan effective March 2009 and did not record any expense for matching contributions for the years ended December 31, 2012 and 2011, respectively.

Wynn Macau also operates a defined contribution retirement benefits plan (the "Wynn Macau Plan"). Eligible employees are allowed to contribute 5% of their salary to the Wynn Macau Plan and the Company matches any contributions. The assets of the Wynn Macau Plan are held separately from those of the Company in an independently administered fund. The Company's matching contributions vest to the employee at 10% per year with full vesting in ten years. Forfeitures of unvested contributions are used to reduce the Company's liability for its contributions payable. During the years ended December 31, 2013, 2012 and 2011, the Company recorded an expense for matching contributions of $7.5 million, $7.1 million and $6.6 million, respectively.

*Multi-employer pension plan*

Wynn Las Vegas contributes to a multi-employer defined benefit pension plan for certain of its union employees under the terms of the Southern Nevada Culinary and Bartenders Union collective-bargaining agreement. The collective-bargaining agreement that covers these union-represented employees expires in 2016. The legal name of the multi-employer pension plan is the Southern Nevada Culinary and Bartenders Pension Plan (the "Plan") (EIN: 88-6016617 Plan Number: 001). The Company recorded an expense of $9 million, $8.6 million and $7.6 million for contributions to the Plan for the years ended December 31, 2013, 2012 and 2011, respectively. For the 2012 plan year, the most recent for which plan data is available, the Company's contributions were identified by the Plan to exceed 5% of total contributions for that year. Based on information the Company received from the Plan, it was certified to be in neither endangered nor critical status for the 2012

106

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

plan year. Risks of participating in a multi-employer plan differs from single-employer plans for the following reasons: (1) assets contributed to a multi-employer plan by one employer may be used to provide benefits to employees of other participating employers; (2) if a participating employer stops contributing to the plan, the unfunded obligations of the plan may be borne by the remaining participating employers; and (3) if a participating employer stops participating, it may be required to pay those plans an amount based on the underfunded status of the plan, referred to as a withdrawal liability.

*Stock-Based Compensation*

The Company established the 2002 Stock Incentive Plan (the "WRL Stock Plan") to provide for the grant of (i) incentive stock options, (ii) compensatory (i.e., nonqualified) stock options, and (iii) nonvested shares of Common Stock of Wynn Resorts, Limited. Employees, directors (whether employee or nonemployee) and independent contractors or consultants of the Company are eligible to participate in the WRL Stock Plan. However, only employees of the Company are eligible to receive incentive stock options.

A maximum of 12,750,000 shares of Common Stock are reserved for issuance under the WRL Stock Plan. As of December 31, 2013, 4,438,524 shares remain available for the grant of stock options or nonvested shares of Common Stock.

Options are granted at the current market price at the date of grant. The WRL Stock Plan provides for a variety of vesting schedules all determined at the time of grant. All options expire ten years from the date of grant.

A summary of option activity under the WRL Stock Plan as of December 31, 2013, and the changes during the year then ended is presented below:

| | Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2013 | 2,397,820 | $ 66.89 | | |
| Granted | 77,800 | $139.54 | | |
| Exercised | (383,151) | $ 53.34 | | |
| Forfeited or expired | (486,160) | $ 59.50 | | |
| Outstanding at December 31, 2013 | 1,606,309 | $ 75.89 | 5.30 | $ 190,064,746 |
| Fully vested and expected to vest at December 31, 2013 | 1,546,461 | $ 75.63 | 5.31 | $ 183,393,072 |
| Exercisable at December 31, 2013 | 181,761 | $ 69.79 | 4.93 | $ 22,614,588 |

107

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The following information is provided for stock options of the WRL Stock Plan (amounts in thousands, except weighted average grant date fair value):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
| Weighted average grant date fair value | $ 39.93 | $ 33.03 | $ 48.31 |
| Intrinsic value of stock options exercised | $33,830 | $22,416 | $36,776 |
| Net cash proceeds from the exercise of stock options | $20,436 | $15,583 | $23,789 |
| Tax benefits realized from the exercise of stock options and vesting of restricted stock | $10,474 | $ 5,537 | $11,176 |

As of December 31, 2013, there was a total of $33.4 million of unamortized compensation related to stock options, which is expected to be recognized over the vesting period of the related grants through May 2019.

A summary of the status of the WRL Stock Plan's nonvested shares as of December 31, 2013 and changes during the year then ended is presented below:

|  | Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Nonvested at January 1, 2013 | 651,500 | $ 103.27 |
| Granted | 135,400 | 125.56 |
| Vested | (310,900) | 116.85 |
| Forfeited | (78,500) | 131.79 |
| Nonvested at December 31, 2013 | 397,500 | $ 113.13 |

The following information is provided for nonvested stock of the WRL Stock Plan (amounts in thousands, except weighted average grant date fair value):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
| Weighted average grant date fair value | $125.56 | $110.04 | $129.55 |
| Fair value of shares vested | $36,328 | $15,653 | $24,865 |

Approximately $26.3 million of unamortized compensation cost relating to nonvested shares of Common Stock at December 31, 2013 will be recognized as compensation over the vesting period of the related grants through October 2021.

*Wynn Macau, Limited Stock Incentive Plan*

The Company's majority-owned subsidiary Wynn Macau, Limited adopted a stock incentive plan effective September 16, 2009 (the "WML Stock Plan"). The purpose of the WML Stock Plan is to reward participants, which may include directors and employees of Wynn Macau, Limited who have contributed towards enhancing the value of Wynn Macau and its shares. A maximum of 518,750,000 shares have been reserved for issuance

108

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

under the WML Stock Plan. The Wynn Macau, Limited shares available for issuance under the WML Stock Plan are separate and distinct from the common stock of Wynn Resorts equity compensation plans and are not available for issuance for any awards under any of the Wynn Resorts equity compensation plans.

A summary of option activity under the WML Stock Plan as of December 31, 2013, and the changes during the year then ended is presented below:

|  | Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2013 | 2,110,000 | $ 2.15 | | |
| Granted | 800,000 | $ 3.21 | | |
| Exercised | — | — | | |
| Outstanding at December 31, 2013 | 2,910,000 | $ 2.44 | 7.8 | $6,082,136 |
| Fully vested and expected to vest at December 31, 2013 | 2,910,000 | $ 2.44 | 7.8 | $6,082,136 |
| Exercisable at December 31, 2013 | 862,000 | $ 1.95 | 6.8 | $2,224,036 |

The following information is provided for stock options of the WML Stock Plan (amounts in thousands, except weighted average grant date fair value):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
| Weighted average grant date fair value | $0.78 | $0.78 | $0.75 |
| Intrinsic value of stock options exercised | $ — | $ — | $99.2 |
| Net cash proceeds from exercise of stock options | $ — | $ — | $70.2 |

As of December 31, 2013, there was a total of $0.7 million of unamortized compensation related to stock options, which is expected to be recognized over the vesting period of the related grants through June 2017.

*Compensation Cost*

The Company uses the Black-Scholes valuation model to determine the estimated fair value for each option grant issued, with highly subjective assumptions, changes in which could materially affect the estimated fair value. Expected volatility is based on implied and historical factors related to the Company's Common Stock. Expected term represents the weighted average time between the option's grant date and its exercise date. The risk-free interest rate used for each period presented is based on the U.S. Treasury yield curve for WRL Stock Plan options or the Hong Kong Exchange Fund rates for the WML Stock Plan options at the time of grant for the period equal to the expected term.

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The fair value of stock options granted under the WRL Stock Plan was estimated on the date of grant using the following weighted-average assumptions:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2013 | 2012 | 2011 |
| Expected dividend yield | 3.0% | 4.0% | 4.0% |
| Expected stock price volatility | 39.4% | 48.8% | 49.7% |
| Risk-free interest rate | 1.1% | 1.2% | 2.4% |
| Expected average life of options (years) | 6.7 | 7.0 | 6.5 |

The fair value of stock options granted under the WML Stock Plan was estimated on the date of grant using the following assumptions:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2013 | 2012 | 2011 |
| Expected dividend yield | 5.0% | 4.0% | 4.0% |
| Expected stock price volatility | 43.3% | 49.0% | 37.8% |
| Risk-free interest rate | 0.6% | 0.7% | 2.1% |
| Expected average life of options (years) | 6.5 | 6.5 | 6.5 |

The total compensation cost for both the WRL Stock Plan and the WML Stock Plan is allocated as follows (amounts in thousands):

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2013 | 2012 | 2011 |
| Casino | $ 4,791 | $ 4,794 | $ 8,997 |
| Rooms | 853 | 313 | 383 |
| Food and beverage | 1,202 | 178 | 429 |
| Entertainment, retail and other | 477 | 43 | 24 |
| General and administrative | 32,214 | 14,320 | 14,048 |
| Total stock-based compensation expense | 39,537 | 19,648 | 23,881 |
| Total stock-based compensation capitalized | 196 | 195 | 886 |
| Total stock-based compensation costs | $39,733 | $19,843 | $24,767 |

For the year ended December 31, 2013, the Company recorded a charge in accordance with applicable accounting standards, of approximately $23 million due to the retirement of the Company's former chief operating officer and the related accelerated vesting of shares previously granted to him.

For the year ended December 31, 2012, the Company reversed stock-based compensation expense allocated to casino operations related to stock options and restricted stock granted in 2008 with an approximate 8 year cliff vest provision that were forfeited during the first quarter of 2012.

110

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**15. Income Taxes**

Consolidated income (loss) before taxes for domestic and foreign operations consisted of the following (amounts in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
| Domestic | $ (9,935) | $ (87,122) | $ 49,521 |
| Foreign | 996,458 | 820,120 | 756,046 |
| Total | $986,523 | $732,998 | $805,567 |

The Company's provision (benefit) for income taxes consisted of the following (amounts in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
| Current |  |  |  |
| Federal | $ 135 | $ 5,912 | $ — |
| Foreign | 2,057 | 2,042 | (3,386) |
|  | $ 2,192 | $ 7,954 | $ (3,386) |
| Deferred |  |  |  |
| Federal | $(19,826) | $(3,655) | $(10,809) |
| Foreign | — | — | (5,351) |
|  | (19,826) | (3,655) | (16,160) |
| Total | $(17,634) | $ 4,299 | $(19,546) |

The income tax provision (benefit) differs from that computed at the federal statutory corporate tax rate as follows:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
| Federal statutory rate | 35.0% | 35.0% | 35.0% |
| Foreign tax rate differential | (23.1%) | (25.6%) | (21.3%) |
| Non-taxable foreign income | (13.4%) | (15.4%) | (13.0%) |
| Foreign tax credits, net of valuation allowance | (89.3%) | 1.7% | (80.8%) |
| Repatriation of foreign earnings | 87.2% | 0.0% | 76.3% |
| Other, net | 1.9% | 3.6% | 0.4% |
| Valuation allowance, other | (0.1%) | 1.3% | 1.0% |
| Effective tax rate | (1.8%) | 0.6% | (2.4%) |

On November 30, 2010, Wynn Macau received a second 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits, thereby exempting the casino gaming profits of Wynn Macau through December 31, 2015. Accordingly for the years ended December 31, 2013, 2012, and 2011, the Company was exempted from the payment of $107.3 million, $87.1 million and $82.7 million in such taxes or $1.06, $0.84 and $0.66 per share, respectively. The Company's non-gaming profits remain subject to the Macau Complementary Tax and its casino winnings remain subject to the Macau Special Gaming tax and other levies in accordance with its concession agreement.

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

In July of 2011, Wynn Macau received a 5-year extension of its agreement with the Macau Special Administrative Region that provides for an annual payment of MOP $15.5 million (approximately $1.9 million U.S. dollars) as complementary tax otherwise due by shareholders of Wynn Macau on dividend distributions through 2015. As a result of the shareholder dividend tax agreements, income tax expense includes $1.9 million, $1.9 million and $1.9 million for the years ended December 31, 2013, 2012 and 2011, respectively.

The Macau special gaming tax is 35% of gross gaming revenue. U.S. tax laws only allow a foreign tax credit up to 35% of "net" foreign source income. In February 2010, the Company and the IRS entered into a Pre-Filing Agreement ("PFA") providing that the Macau Special Gaming Tax qualifies as a tax paid in lieu of an income tax and could be claimed as a U.S. foreign tax credit.

During the years ended December 31, 2013 and December 31, 2011, the Company recognized tax benefits of $879.7 million and $647.6 million, respectively (net of valuation allowance and uncertain tax positions), for foreign tax credits generated applicable to the earnings of Wynn Macau. During December 31, 2012, the Company did not repatriate any earnings of Wynn Macau and consequently did not generate foreign tax credits in that year.

Accounting standards require recognition of a future tax benefit to the extent that realization of such benefit is more likely than not. Otherwise, a valuation allowance is applied. During 2013 and 2012, the aggregate valuation allowance for deferred tax assets increased by $755.5 million and $19.1 million, respectively. The 2013 and 2012 increases are primarily related to foreign tax credit carryforwards and other foreign deferred tax assets that are not considered more likely than not realizable.

The Company recorded tax benefits resulting from the exercise of nonqualified stock options and the value of vested restricted stock and accrued dividends of $10.5 million, $5.5 million, and $11.2 million as of December 31, 2013, 2012 and 2011, respectively, in excess of the amounts reported for such items as compensation costs under accounting standards related to stock-based compensation. The Company uses a with-and-without approach to determine if the excess tax deductions associated with compensation costs have reduced income taxes payable.

112

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The tax effects of significant temporary differences representing net deferred tax assets and liabilities consisted of the following (amounts in thousands):

| | As of December 31, | |
|---|---|---|
| | 2013 | 2012 |
| Deferred tax assets—U.S.: | | |
| Current: | | |
| Receivables, inventories, accrued liabilities and other | $ 36,556 | $ 38,488 |
| Less: valuation allowance | (34,347) | (35,386) |
| | 2,209 | 3,102 |
| Long-term: | | |
| Foreign tax credit carryforwards | 2,614,665 | 1,843,757 |
| Intangibles and related other | 26,324 | 26,773 |
| Stock based compensation | 10,736 | 19,113 |
| Pre-opening costs | 12,884 | 14,584 |
| Other | 11,341 | 12,320 |
| | 2,675,950 | 1,916,547 |
| Less: valuation allowance | (2,514,258) | (1,762,090) |
| | 161,692 | 154,457 |
| Deferred tax liabilities—U.S.: | | |
| Current: | | |
| Prepaid insurance, maintenance and taxes | (6,243) | (6,280) |
| Long-term: | | |
| Property and equipment | (176,036) | (199,956) |
| Deferred tax assets—Foreign: | | |
| Current: | | |
| Accrued liabilities | 164 | 156 |
| Less: valuation allowance | (164) | (156) |
| | — | — |
| Long-term: | | |
| Net operating loss carryforwards | 13,701 | 17,157 |
| Property and equipment | 17,441 | 11,973 |
| Pre-opening costs | 3,040 | 854 |
| Other | 4,074 | 3,929 |
| Less: valuation allowance | (38,256) | (33,913) |
| | — | — |
| Net deferred tax liability | $ (18,378) | $ (48,677) |

As of December 31, 2013, the Company had foreign tax credit carryforwards (net of uncertain tax positions) of $2,615 million. Of this amount, $660.5 million will expire in 2018, $110.9 million will expire in 2019, $530.4 million in 2020, $540.3 million in 2021 and $772.6 million in 2023. The Company has no U.S. tax loss carryforwards. The Company incurred foreign tax losses of $42.4 million, $79.1 million and $70.9 million during the tax years ended December 31, 2013, 2012 and 2011, respectively. These foreign tax loss carryforwards expire

113

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

in 2016, 2015, and 2014, respectively. The Company incurred a U.S. capital loss of $3.6 million during the year ended December 31, 2011. The U.S. capital loss carryforward will expire in 2016.

In assessing the need for a valuation allowance, the Company does not currently consider forecasted future operating results when scheduling the realization of deferred tax assets and the required valuation allowance but instead relies solely on the reversal of net taxable temporary differences. The valuation allowance for foreign tax credits was determined by scheduling the existing U.S. taxable temporary differences that are expected to reverse and result in "net" foreign source income during the 10-year foreign tax credit carryover period.

As of December 31, 2013 and 2012, the Company had valuation allowances of $2,543 million and $1,786 million, respectively, provided on foreign tax credits expected to expire unutilized and valuation allowances of $5.8 million and $11.1 million provided on other U.S. deferred tax assets. The Company has recorded a valuation allowance against all of its foreign deferred tax assets.

Except for $434 million of accumulated earnings which the Company plans on repatriating, the Company has not provided deferred U.S. income taxes or foreign withholding taxes on temporary differences of $388.1 million and $333.6 million as of December 31, 2013 and 2012, respectively, which are indefinitely reinvested and will be used to fund future operations or expansion. The amount of the unrecognized deferred tax liability associated with these temporary differences is approximately $135.8 million and $116.8 million for the years ended December 31, 2013 and 2012. Deferred income taxes, net of foreign tax credits, are provided for foreign earnings planned for repatriation. For the years ended December 31, 2013 and 2012, the Company repatriated $840.9 million and $0 from Wynn Macau, Limited. The amounts repatriated were used to fund domestic operations, to provide additional U.S. liquidity, and to fund dividends to the Company's shareholders.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (amounts in thousands):

|  | As of December 31, | | |
|---|---|---|---|
|  | **2013** | **2012** | **2011** |
| Balance—beginning of year | $84,289 | $85,498 | $ 83,834 |
| Additions based on tax positions of the current year | 8,360 | 8,140 | 12,427 |
| Additions based on tax positions of prior years | — | — | — |
| Reductions for tax positions of prior years | — | — | — |
| Settlements | — | — | — |
| Lapses in statutes of limitations | (3,105) | (9,349) | (10,763) |
| Balance—end of year | $89,544 | $84,289 | $ 85,498 |

As of December 31, 2013, 2012, and 2011 unrecognized tax benefits of $60.3 million, $55.2 million, and $60.4 million, respectively, were recorded as reductions to the U.S. foreign tax credit deferred tax asset and the foreign net operating loss deferred tax asset. As of December 31, 2013, 2012, and 2011, unrecognized tax benefits of $29.2 million, $29.1 million and $25.1 million, respectively, were recorded in Other long-term liabilities.

As of December 31, 2013, 2012 and 2011, $20.7 million, $18.8 million and $24.2 million, respectively, of unrecognized tax benefits would, if recognized, impact the effective tax rate.

114

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The Company recognizes penalties and interest related to unrecognized tax benefits in the provision for income taxes. During the years ended December 31, 2013, 2012 and 2011, the Company recognized interest and penalties of $0, $0.3 million and $0.04 million, respectively.

The Company anticipates that the 2009 statute of limitations will expire in the next 12 months for certain foreign tax jurisdictions. Also, the Company's unrecognized tax benefits include certain income tax accounting methods. These accounting methods govern the timing and deductibility of income tax deductions. As a result, the Company's unrecognized tax benefits could increase by a range of $0 to $0.5 million over the next 12 months.

The Company files income tax returns in the U.S. federal jurisdiction, various states and foreign jurisdictions. The Company's income tax returns are subject to examination by the IRS and other tax authorities in the locations where it operates. The Company's 2002 to 2009 domestic income tax returns remain subject to examination by the IRS to the extent of tax attributes carryforwards to future years. The Company's 2010 to 2012 domestic income tax returns also remain subject to examination by the IRS. The Company's 2009 to 2012 Macau income tax returns remain subject to examination by the Macau Financial Services Bureau.

In April 2012, the Company reached an agreement with the Appellate division of the IRS regarding issues raised during the examination of the 2006 through 2009 U.S. income tax returns. The settlement with the Appellate division did not impact the Company's unrecognized tax benefits. The settlement of the 2006 through 2009 examination issues resulted in a cash tax payment of $1.3 million and the utilization of $3.1 million and $0.9 million in foreign tax credit and general business credit carryforwards, respectively.

During December 2012, the IRS completed an examination of the Company's 2010 U.S. income tax return and had no changes. In May 2013, the Company received notification that the IRS completed its examination of the Company's 2011 U.S. income tax return and had no changes.

For tax year 2012, the Company is participating in the IRS Compliance Assurance Program ("CAP") which accelerates IRS examination of key transactions with the goal of resolving any issues before the taxpayer files its return. The Company believes the IRS will complete their examination of the 2012 tax year in the next 12 months. In March 2013, the Company received notification that it had been selected for the Compliance Maintenance phase of CAP for the 2013 tax year. In the Compliance Maintenance phase, the IRS, at its discretion, may reduce the level of review of the taxpayer's tax positions based on the complexity and number of issues, and the taxpayer's history of compliance, cooperation and transparency in the CAP. The Company does not expect a change in its unrecognized tax benefits as a result of the completion of these examinations.

During August 2011, Wynn Macau settled an appeal related to the Macau Financial Services Bureau's examination of its 2006 and 2007 Macau Complementary Tax returns. As part of the settlement, the Company paid $1.1 million in Macau Complementary tax. As the result of the exam settlement and the expiration of the statute of limitations for the 2006 Macau Complementary tax return, the total amount of unrecognized tax benefits decreased by $10.8 million.

In July 2012, the Macau Financial Services Bureau commenced an examination of the 2008 Macau income tax return of Wynn Macau. In November 2012, the Company received the results of the examination. While no additional tax was due, adjustments were made to the Company's foreign net operating loss carryforwards.

On December 31, 2013, the statute of limitations for the 2008 Macau Complementary tax return expired. As a result, the Company's unrecognized tax benefits decreased by $3.1 million.

115

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

In January 2013, the Macau Financial Services Bureau examined the 2009 and 2010 Macau income tax returns of Palo, which is a co-holder of the land concession for Wynn Palace. The exam resulted in no change to the tax returns.

In March 2013, the Macau Financial Services Bureau commenced an examination of the 2009, 2010, and 2011 Macau income tax returns of Wynn Macau. Since the examination is in its initial stages, the Company is unable to determine if it will conclude within the next 12 months. The Company believes that its liability for uncertain tax positions is adequate with respect to these years.

**16. Commitments and Contingencies**

*Cotai Development and Land Concession Contract*

In September 2011, Palo Real Estate Company Limited ("Palo") and Wynn Macau, each an indirect subsidiary of Wynn Macau Limited, formally accepted the terms and conditions of a draft land concession contract from the Macau government for approximately 51 acres of land in the Cotai area of Macau. On May 2, 2012, the land concession contract was gazetted by the government of Macau evidencing the final step in the granting of the land concession. The initial term of the land concession contract is 25 years from May 2, 2012, and it may be renewed with government approval for successive periods. The total land premium payable, including interest as required by the land concession contract, is $193.4 million. An initial payment of $62.5 million was paid in December 2011, with eight additional semi-annual payments of approximately $16.4 million each (which includes interest at 5%) due beginning November 2012. As of December 31, 2013 and 2012, the Company has recorded this obligation and related asset with $29.3 million and $27.9 million included as a current liability, respectively and $46.8 million and $76.2 million, respectively, included as a long-term liability. The Company is also required to make annual lease payments of $0.8 million during the resort construction period and annual payments of approximately $1.1 million once the development is completed.

The Company is currently constructing Wynn Palace, a full-scale integrated resort containing a 1,700-room hotel, performance lake, meeting space, casino, spa, retail offerings and food and beverage outlets. The total project budget, including construction costs, capitalized interest, pre-opening expenses, land costs and financing fees, is $4 billion. The Company continues to remain on schedule for an opening in the first half of 2016.

On July 29, 2013, Wynn Macau and Palo finalized and executed a guaranteed maximum price construction ("GMP") contract with Leighton Contractors (Asia) Limited, acting as the general contractor. Under the GMP contract, the general contractor is responsible for both the construction and design of the Wynn Palace project. The general contractor is obligated to substantially complete the project in the first half of 2016 for a guaranteed maximum price of HK$20 billion (approximately $2.57 billion). An early completion bonus for achievement of substantial completion on or before January 25, 2016 will be paid to the general contractor if certain conditions are satisfied under the GMP contract. Both the contract time and guaranteed maximum price are subject to further adjustment under certain specified conditions. The performance of the general contractor is backed by a full completion guarantee given by Leighton Holdings Limited, the parent company of the general contractor, as well as a performance bond for 5% of the guaranteed maximum price.

*Leases and other arrangements*

The Company is the lessor under several retail leases and has entered into license and distribution agreements for several additional retail outlets. The Company also is a party to joint venture agreements for the operation of one retail outlet and the Ferrari and Maserati automobile dealership at Wynn Las Vegas. The lease agreements include minimum base rents with contingent rental clauses.

116

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The following table presents the future minimum rentals to be received under the operating leases (amounts in thousands):

| Years Ending December 31, | |
|---|---:|
| 2014 | $ 39,735 |
| 2015 | 40,805 |
| 2016 | 38,276 |
| 2017 | 28,713 |
| 2018 | 5,929 |
| Thereafter | 17,220 |
| | $ 170,678 |

The total future minimum rentals do not include contingent rental. Contingent rentals were $101 million, $94 million and $73.2 million for the years ended December 31, 2013, 2012, and 2012, respectively.

In addition, the Company is the lessee under leases for office space in Las Vegas, Macau and certain other locations, warehouse facilities, the land underlying the Company's aircraft hangar and certain office equipment.

At December 31, 2013, the Company was obligated under non-cancelable operating leases to make future minimum lease payments as follows (amounts in thousands):

| Years Ending December 31, | |
|---|---:|
| 2014 | $ 8,835 |
| 2015 | 8,556 |
| 2016 | 6,091 |
| 2017 | 1,997 |
| 2018 | 1,393 |
| Thereafter | 4,799 |
| | $31,671 |

Rent expense for the years ended December 31, 2013, 2012 and 2011, was $21.9 million, $21.5 million and $20.2 million, respectively.

*Employment Agreements*

The Company has entered into employment agreements with several executive officers, other members of management and certain key employees. These agreements generally have three- to five-year terms and typically indicate a base salary and often contain provisions for discretionary bonuses. Certain of the executives are also entitled to a separation payment if terminated without "cause" or upon voluntary termination of employment for "good reason" following a "change of control" (as these terms are defined in the employment contracts).

*Letters of Credit*

As of December 31, 2013, the Company had unsecured outstanding letters of credit of $16.7 million.

*Litigation*

In addition to the actions noted below, the Company's affiliates are involved in litigation arising in the normal course of business. In the opinion of management, such litigation will not have a material effect on the Company's financial condition, results of operations or cash flows.

117

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Atlantic-Pacific Capital*

On May 3, 2010, Atlantic-Pacific Capital, Inc. ("APC") filed an arbitration demand with JAMS, a private alternative dispute resolution provider, regarding an agreement with the Company. The action concerns a claim for compensation of approximately $32 million pursuant to an agreement entered into between APC and the Company on or about March 30, 2008, whereby APC was engaged to raise private equity capital for a specific investment vehicle sponsored by the Company. APC is seeking compensation unrelated to the investment vehicle. The Company has denied APC's claims for compensation. The Company filed a Complaint for Damages and Declaratory Relief against APC in the Eighth Judicial District Court, Clark County, Nevada, on May 10, 2010, which APC removed to the United States District Court, District of Nevada. In March 2011, the District Court denied APC's motion to compel arbitration, and dismissed the action. APC appealed, and on November 13, 2012, the United States Court of Appeals for the Ninth Circuit reversed the District Court and compelled .arbitration. The arbitration is set for April 2014. An arbitrator has been selected, and the parties have been engaging in discovery. Management believes that APC's claims against the Company are without merit, and the Company intends to continue to defend this matter vigorously.

*Determination of Unsuitability and Redemption of Aruze USA, Inc. and Affiliates*

On February 18, 2012, Wynn Resorts' Gaming Compliance Committee concluded an investigation after receiving an independent report by Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing a pattern of misconduct by Aruze USA, Inc. (at the time a stockholder of Wynn Resorts), Universal Entertainment Corporation, Aruze USA, Inc.'s parent company, and Kazuo Okada, (the majority shareholder of Universal Entertainment Corporation and a former member of the Board of Directors of Wynn Resorts and Wynn Macau, Limited) (collectively, the "Okada Parties"). The factual record presented in the Freeh Report included evidence that the Okada Parties had provided valuable items to certain foreign gaming officials who were responsible for regulating gaming in a jurisdiction in which entities controlled by Mr. Okada were developing a gaming resort. Mr. Okada denied the impropriety of such conduct to members of the Board of Directors of Wynn Resorts and while serving as one of the Company's directors Mr. Okada refused to acknowledge or abide by Wynn Resorts' anti-bribery policies and refused to participate in the training all other directors have received concerning these policies.

Based on the Freeh Report, the Board of Directors of Wynn Resorts determined that the Okada Parties are "unsuitable persons" under Article VII of the Company's articles of incorporation. The Board of Directors was unanimous (other than Mr. Okada) in its determination. After authorizing the redemption of the Aruze shares, as discussed below, the Board of Directors took certain actions to protect the Company and its operations from any influence of an unsuitable person, including placing limitations on the provision of certain operating information to unsuitable persons and formation of an Executive Committee of the Board to manage the business and affairs of the Company during the period between each annual meeting. The Charter of the Executive Committee provides that "Unsuitable Persons" are not permitted to serve on the Committee. All members of the Board, other than Mr. Okada, were appointed to the Executive Committee on February 18, 2012. The Board of Directors also requested that Mr. Okada resign as a director of Wynn Resorts (under Nevada corporation law, a board of directors does not have the power to remove a director) and recommended that Mr. Okada be removed as a member of the Board of Directors of Wynn Macau, Limited. In addition, on February 18, 2012, Mr. Okada was removed from the Board of Directors of Wynn Las Vegas Capital Corp., an indirect wholly owned subsidiary of Wynn Resorts. On February 24, 2012, Mr. Okada was removed from the Board of Directors of Wynn Macau, Limited and on February 22, 2013, he was removed from the Board of Directors of Wynn Resorts by a stockholder vote in which 99.6% of the over 86 million shares voted were cast in favor of removal. Additionally, Mr. Okada resigned from the Board of Directors of Wynn Resorts on February 21, 2013. Although the Company has retained the structure of the Executive Committee, the Board has resumed its past role in managing the business and affairs of the Company.

118

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," Article VII of Wynn Resorts' articles of incorporation authorizes redemption at "fair value" of the shares held by unsuitable persons. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares held by Aruze USA, Inc. under the terms of the Stockholders Agreement (as defined below). Pursuant to its articles of incorporation, Wynn Resorts issued the Redemption Note to Aruze USA, Inc. in redemption of the shares. The Redemption Note has a principal amount of $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Note. The Company may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts or any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

The Company provided the Freeh Report to appropriate regulators and law enforcement agencies and has been cooperating with related investigations that such regulators and agencies have undertaken. The conduct of the Okada Parties and any resulting regulatory investigations could have adverse consequences to the Company and its subsidiaries. A finding by regulatory authorities that Mr. Okada violated anti-corruption statutes and/or other laws or regulations applicable to persons affiliated with a gaming licensee on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company and its subsidiaries.

*Redemption Action and Counterclaim*

On February 19, 2012, Wynn Resorts filed a complaint in the Eighth Judicial District Court, Clark County, Nevada against the Okada Parties (as amended, the "Complaint"), alleging breaches of fiduciary duty and related claims (the "Redemption Action") arising from the activities addressed in the Freeh Report. The Company is seeking compensatory and special damages as well as a declaration that it acted lawfully and in full compliance with its articles of incorporation, bylaws and other governing documents in redeeming and cancelling the shares of Aruze, USA, Inc.

On March 12, 2012, the Okada Parties removed the action to the United States District Court for the District of Nevada (the action was subsequently remanded to Nevada state court). On that same date, the Okada Parties filed an answer denying the claims and a counterclaim (as amended, the "Counterclaim") that purports to assert claims against the Company, each of the members of the Company's Board of Directors (other than Mr. Okada) and Wynn Resorts' General Counsel (the "Wynn Parties"). The Counterclaim alleges, among other things: (1) that the shares of Wynn Resorts common stock owned by Aruze USA, Inc. were exempt from the redemption-for-unsuitability provisions in the Wynn Resorts articles of incorporation (the "Articles") pursuant to certain agreements executed in 2002; (2) that the Wynn Resorts directors who authorized the redemption of Aruze USA, Inc.'s shares acted at the direction of Stephen A. Wynn and did not independently and objectively evaluate the Okada Parties' suitability, and by so doing, breached their fiduciary duties; (3) that the Wynn Resorts directors violated the terms of the Wynn Resorts Articles by failing to pay Aruze USA, Inc. fair value for the redeemed shares; and (4) that the terms of the Redemption Note that Aruze USA, Inc. received in exchange for the redeemed shares, including the Redemption Note's principal amount, duration, interest rate, and

119

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

subordinated status, were unconscionable. Among other relief, the Counterclaim seeks a declaration that the redemption of Aruze USA, Inc.'s shares was void, an injunction restoring Aruze USA, Inc.'s share ownership, damages in an unspecified amount and rescission of the Amended and Restated Stockholders Agreement, dated as of January 6, 2010, by and among Aruze USA, Inc., Stephen A. Wynn, and Elaine Wynn (the "Stockholders Agreement").

On June 19, 2012, Elaine Wynn responded to the Counterclaim and asserted a cross claim against Steve Wynn and Kazuo Okada seeking a declaration that (1) any and all of Elaine Wynn's duties under the Stockholders Agreement be discharged; (2) the Stockholders Agreement is subject to rescission and is rescinded; (3) the Stockholders Agreement is an unreasonable restraint on alienation in violation of public policy; and/or (4) the restrictions on sale of shares shall be construed as inapplicable to Elaine Wynn. Mr. Wynn filed his answer to Elaine Wynn's cross claim on September 24, 2012. The Indentures for the Issuers provide that if Stephen A. Wynn, together with certain related parties, in the aggregate beneficially owns a lesser percentage of the outstanding common stock of the Company than are beneficially owned by any other person, a change of control will have occurred. If Elaine Wynn prevails in her cross claim, Stephen A. Wynn would not beneficially own or control Elaine Wynn's shares and a change in control may result under the Wynn Las Vegas debt documents. Under the 2020 Indentures, the occurrence of a change of control requires that the Company make an offer to each holder to repurchase all or any part of such holder's notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest on the notes purchased, if any, to the date of repurchase (unless the notes have been previously called for redemption). Under the 2023 Indenture, if a change of control occurs and within 60 days after that occurrence the 4 1/4% Senior Notes due 2023 are rated below investment grade by both rating agencies that rate such notes, the Company is required to make an offer to each holder to repurchase all or any part of such holder's notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest on the notes purchased, if any, to the date of repurchase (unless the notes have been previously called for redemption). Mr. Wynn is opposing Ms. Wynn's cross claim.

The Company's Complaint and the Okada Parties' Counterclaim have been, and continue to be, challenged through motion practice. At a hearing held on November 13, 2012, the Nevada state court granted the Wynn Parties' motion to dismiss the Counterclaim with respect to the Okada Parties' claim under the Nevada Racketeer Influenced and Corrupt Organizations Act with respect to certain Company executives but otherwise denied the motion. At a hearing held on January 15, 2013, the court denied the Okada Parties' motion to dismiss the Company's Complaint. On April 22, 2013, the Company filed a second amended complaint. On August 30, 2013, together the Okada Parties filed their third amended Counterclaim. On September 18, 2013, the Company filed a Partial Motion to Dismiss related to a claim in the third amended Counterclaim alleging civil extortion by Mr. Wynn and the Company's General Counsel. On October 29, 2013, the court granted the motion and dismissed the claim. On November 26, 2013, the Okada Parties filed their fourth amended Counterclaim, and the Company filed an answer to that pleading on December 16, 2013. The parties had been engaged in discovery at the time the court entered the Stay (defined and discussed below). Therefore, although the court previously set a timetable for all discovery, pre-trial and trial deadlines, with a five-week jury trial scheduled to commence in April 2014, this schedule will necessarily change due to the Stay.

On February 13, 2013, the Okada Parties filed a motion in the Nevada state court asking the court to establish an escrow account (specifically, they asked the court to establish a "disputed ownership fund," as defined in a federal tax regulation ("DOF") to hold the Redemption Note as well as the redeemed shares themselves (although those shares were previously cancelled in February 2012), until the resolution of the Redemption Action and Counterclaim. The Okada Parties subsequently filed reply papers in further support of their motion, in which they narrowed the relief they were seeking, specifically by withdrawing their request that

120

Table of Contents

the redeemed shares are placed into the escrow account. On April 17, 2013, the court entered an order granting the Okada Parties' motion in part as to the narrowed relief outlined in their reply papers. Among other things, the court's order directed the Okada Parties to establish an escrow account with a third party (without making any ruling as to whether such an account would satisfy the requirements of a DOF) to hold interest payments tendered by the Company on the Redemption Note. Per the court's order, the Company is to have no responsibility for fees or costs of the account, and will receive a full release and indemnity related to the account. On February 14, 2013 and February 13, 2014, the Company issued checks to Aruze USA, Inc. in the amounts of $38.7 million, representing the interest payments due on the Redemption Note at those times. However, as of the date of this report, the checks remain uncashed. The parties engaged in discussions regarding the terms of the escrow agreement contemplated by the court's order. However, the Okada Parties recently advised of their intent to deposit any checks for interest and principal, past and future, due under the terms of the Redemption Note to the Clerk of the Court for deposit into the Clerk's Trust Account.

On April 8, 2013, the United States Attorney's Office and the U.S. Department of Justice filed a Motion to Intervene and for Temporary and Partial Stay of Discovery in the Redemption Action. The motion stated that the federal government has been conducting a criminal investigation of the Okada Parties involving the "same underlying allegations of misconduct—that is, potential violations of the Foreign Corrupt Practice Act and related fraudulent conduct—that form the basis of" the Company's complaint, as amended, in the Redemption Action. The motion sought to stay all discovery in the Redemption Action related to the Okada Parties' allegedly unlawful activities in connection with their casino project in the Philippines until the conclusion of the criminal investigation and any resulting criminal prosecution, with an interim status update to the court in six months. At a hearing on May 2, 2013, the court granted the motion and ordered that all discovery in the Redemption Action be stayed for a period of six months (the "Stay"). On May 30, 2013, Elaine Wynn filed a motion for partial relief from the Stay, to allow her to conduct limited discovery related to her cross and counterclaims. The Wynn Parties opposed the motion so as to not interfere with the United States government's investigation. At a hearing on August 1, 2013, the court denied the motion. On October 29, 2013, the United States Attorney's Office and the U.S. Department of Justice filed a Motion to Extend the Stay for a period of six months, expiring May 2, 2014. At a hearing on October 31, 2013, the court granted the requested extension based upon an affidavit provided under seal that outlined, among other things, concerns for witness safety. The court did, however, order the parties to exchange written discovery propounded prior to May 2, 2013, including discovery related to the Elaine Wynn cross and counterclaims referred to above.

Subject to the Stay, the Company will continue to vigorously pursue its claims against the Okada Parties, and the Company and the Wynn Parties will continue to vigorously defend against the counterclaims asserted against them. The Company's claims and the Okada Parties' counterclaims remain in an early stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any. An adverse judgment or settlement involving payment of a material amount could cause a material adverse effect on our financial condition.

*Litigation Commenced by Kazuo Okada*

Japan Action:

On August 28, 2012, Mr. Okada, Universal Entertainment Corporation and Okada Holdings ("Okada Japan Parties") filed a complaint in Tokyo District Court against the Company, all members of the Board of Directors (other than Mr. Okada) and the Company's General Counsel (the "Wynn Parties"), alleging that the press release issued by the Company with respect to the redemption has damaged plaintiffs' social evaluation and credibility. The Okada Japan Parties seek damages and legal fees from the Wynn Parties. After asking the Okada Japan Parties to clarify the allegations in their complaint, the Wynn Parties objected to the jurisdiction of the Japanese

121

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

court. On April 30, 2013, the Wynn Parties filed a memorandum in support of their jurisdictional position. On October 21, 2013, the court dismissed the action on jurisdictional grounds. On November 1, 2013, the Okada Japan Parties filed an appeal moving the matter to the Tokyo High Court. An informal hearing on the matter has been scheduled for February 27, 2014.

Indemnification Action:

On March 20, 2013, Mr. Okada filed a complaint against the Company in Nevada state court for indemnification under the Company's Articles, bylaws and agreements with its directors. The complaint seeks advancement of Mr. Okada's costs and expenses (including attorney's fees) incurred pursuant to the various legal proceedings and related regulatory investigations described above. The Company believes there is no basis for the relief requested in the complaint and intends to vigorously defend against this matter. The Company's answer and counterclaim was filed on April 15, 2013. The counterclaim names each of the Okada Parties as defendants and seeks indemnification under the Company's Articles for costs and expenses (including attorney's fees) incurred pursuant to the various legal proceedings and related regulatory investigations described above. On April 30, 2013, Mr. Okada filed his reply to the counterclaim.

On June 14, 2013, Mr. Okada filed a motion for partial summary judgment that he was entitled to advancement of his expenses incurred in the various proceedings and investigations. Mr. Okada also filed a special motion to dismiss, arguing that the Company's counterclaims seek to infringe upon Mr. Okada's right to petition the court, and constitute a strategic lawsuit against public policy. The Company's counterclaims seek only to enforce Wynn Resorts' contractual right to indemnity under Article VII, Section 4 of the Company's Articles. At a hearing on August 1, 2013, the court denied both motions and provided for limited discovery (i.e., discovery that does not implicate any of the issues subject to the Stay entered in the Redemption Action). On August 2, 2013, the court stayed discovery in the indemnification action related to the government investigations (consistent with the Stay in the Redemption Action), and ordered that all other discovery be conducted within ninety (90) days.

On August 22, 2013, the Company noticed Mr. Okada's deposition for September 16, 2013. Mr. Okada filed a motion for protective order seeking to vacate his deposition, arguing that he did not have any information relevant to his claims for advancement of fees and/or indemnity that he asserted against the Company. On October 18, 2013, after a full briefing by the parties, the court denied Mr. Okada's motion and entered an order stating that Mr. Okada's deposition testimony is relevant to the claims he asserted against the Company, that Mr. Okada may not designate someone else to testify on his behalf, and that the Company may sequence discovery in the action as it chooses. On February 4, 2014, the court entered an order on the parties' stipulation that: (1) dismissed Okada's claims asserted against the Company in that action (i.e., all Okada's claims that relate to advancement); (2) reserved Okada's right to assert, in the future, any claims for indemnity following the resolution of the Redemption Action; and (3) stayed the claims asserted by the Company against Okada in that action pending the resolution of the Redemption Action.

Management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of these actions or the range of reasonably possible loss, if any.

*Related Investigations and Derivative Litigation*

Investigations:

In the U.S. Department of Justice's Motion to Intervene and for Temporary and Partial Stay of Discovery in the Redemption Action, the Department of Justice states in a footnote that the government also has been

122

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

conducting a criminal investigation into the Company's donation to the University of Macau discussed above. The Company has not received any target letter or subpoena in connection with such an investigation. The Company intends to cooperate fully with the government in response to any inquiry related to the donation to the University of Macau.

Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company.

Derivative Claims:

Six derivative actions were commenced against the Company and all members of its Board of Directors: four in the United States District Court, District of Nevada, and two in the Eighth Judicial District Court of Clark County, Nevada.

The four federal actions brought by the following plaintiffs have been consolidated: (1) The Louisiana Municipal Police Employees' Retirement System, (2) Maryanne Solak, (3) Excavators Union Local 731 Welfare Fund, and (4) Boilermakers Lodge No. 154 Retirement Fund (collectively, the "Federal Plaintiffs").

The Federal Plaintiffs filed a consolidated complaint on August 6, 2012, asserting claims for: (1) breach of fiduciary duty; (2) waste of corporate assets; (3) injunctive relief; and (4) unjust enrichment. The claims are against the Company and all Company directors, including Mr. Okada, however, the plaintiffs voluntarily dismissed Mr. Okada as a defendant in this consolidated action on September 27, 2012. The Federal Plaintiffs claim that the individual defendants breached their fiduciary duties and wasted assets by: (a) failing to ensure the Company's officers and directors complied with federal and state laws and the Company's Code of Conduct; (b) voting to allow the Company's subsidiary to make the donation to the University of Macau; and (c) redeeming Aruze USA, Inc.'s stock such that the Company incurs the debt associated with the redemption. The Federal Plaintiffs seek unspecified compensatory damages, restitution in the form of disgorgement, reformation of corporate governance procedures, an injunction against all future payments related to the donation/pledge, and all fees (attorneys, accountants, and experts) and costs. The directors responded to the consolidated complaint by filing a motion to dismiss on September 14, 2012. On February 1, 2013, the federal court dismissed the complaint for failure to plead adequately the futility of a pre-suit demand on the Board. The dismissal was without prejudice to the Federal Plaintiffs' ability to file a motion within 30 days seeking leave to file an amended complaint. On April 9, 2013, the Federal Plaintiffs filed their amended complaint. The Company and the directors filed their motion to dismiss the amended complaint on May 23, 2013. The Federal Plaintiffs filed their opposition on July 8, 2013, and the Company and directors filed their reply on August 8, 2013. The court has not yet ruled on this motion.

The two state court actions brought by the following plaintiffs have also been consolidated: (1) IBEW Local 98 Pension Fund and (2) Danny Hinson (collectively, the "State Plaintiffs"). Through a coordination of efforts by all parties, the directors and the Company (a nominal defendant) have been served in all of the actions. The State Plaintiffs filed a consolidated complaint on July 20, 2012 asserting claims for (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; and (4) unjust enrichment. The claims are against the Company and all Company directors, including Mr. Okada, as well as the Company's Chief Financial Officer, who signs financial disclosures filed with the SEC. The State Plaintiffs claim that the individual defendants failed to disclose to the Company's stockholders the investigation into, and the dispute with director Okada as well as the

123

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

alleged potential violations of the FCPA related to, the University of Macau Development Foundation donation. The State Plaintiffs seek unspecified monetary damages (compensatory and punitive), disgorgement, reformation of corporate governance procedures, an order directing the Company to internally investigate the donation, as well as attorneys' fees and costs. On October 13, 2012, the court entered the parties' stipulation providing for a stay of the state derivative action for 90 days, subject to the parties' obligation to monitor the progress of the pending litigation, discussed above, between Wynn Resorts (among others) and Mr. Okada (among others). Per the stipulation, Wynn Resorts and the individual defendants were not required to respond to the consolidated complaint while the stay remained in effect. Following the expiration of the stay, the State Plaintiffs advised the Company and the individual defendants that they intended to resume the action by filing an amended complaint, which they did, on April 26, 2013. The Company and directors filed their motion to dismiss on June 10, 2013. However, on July 31, 2013, the parties agreed to a stipulation that was submitted to, and approved by the court. The stipulation contemplates a stay of the consolidated state court derivative action of equal duration as the Stay entered by the court in the Redemption Action. On February 5, 2014, the court entered a new stipulation between the parties that provides for a further stay of the state derivative action and directs the parties, within 30 days of the conclusion of the stay in the Redemption Action, to discuss how the state derivative action should proceed and to file a joint report with the court.

The individual defendants are vigorously defending against the claims pleaded against them in these derivative actions. We are unable to predict the outcome of these litigations at this time. Management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of these actions or the range of reasonably possible loss, if any.

**17. Segment Information**

The Company monitors its operations and evaluates earnings by reviewing the assets and operations of its Las Vegas Operations and its Macau Operations. The Company's total assets and capital expenditures by segment consisted of the following (amounts in thousands):

|  | As of December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| **Assets** | | |
| Macau Operations | $ 3,918,163 | $ 3,004,658 |
| Las Vegas Operations | 3,576,649 | 3,669,881 |
| Corporate and other | 882,218 | 602,055 |
|  | $ 8,377,030 | $ 7,276,594 |

|  | Years ended December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| **Capital expenditures** | | |
| Macau Operations | $ 442,274 | $ 189,384 |
| Las Vegas Operations | 63,872 | 41,552 |
| Corporate and other | 640 | 10,049 |
|  | $ 506,786 | $ 240,985 |

124

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The Company's results of operations by segment for the years ended December 31, 2013, 2012 and 2011 consisted of the following (amounts in thousands):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 | 2012 | 2011 |
| **Net revenues** | | | |
| Macau Operations | $ 4,040,526 | $ 3,667,454 | $ 3,789,073 |
| Las Vegas Operations | 1,580,410 | 1,486,830 | 1,480,719 |
| Total | $ 5,620,936 | $ 5,154,284 | $ 5,269,792 |
| **Adjusted Property EBITDA**(1) | | | |
| Macau Operations | $ 1,324,119 | $ 1,167,340 | $ 1,196,232 |
| Las Vegas Operations | 486,682 | 408,472 | 439,036 |
| Total | 1,810,801 | 1,575,812 | 1,635,268 |
| **Other operating costs and expenses** | | | |
| Pre-opening costs | 3,169 | 466 | — |
| Depreciation and amortization | 371,051 | 373,199 | 398,039 |
| Property charges and other | 17,138 | 39,978 | 130,649 |
| Corporate expenses and other | 128,267 | 131,807 | 96,868 |
| Equity in income from unconsolidated affiliates | 1,085 | 1,086 | 1,472 |
| Total other operating costs and expenses | 520,710 | 546,536 | 627,028 |
| Operating income | 1,290,091 | 1,029,276 | 1,008,240 |
| **Other non-operating costs and expenses** | | | |
| Interest income | 15,713 | 12,543 | 7,654 |
| Interest expense, net of amounts capitalized | (299,022) | (288,759) | (229,918) |
| Increase in swap fair value | 14,235 | 991 | 14,151 |
| Loss from extinguishment of debt | (40,435) | (25,151) | — |
| Equity in income from unconsolidated affiliates | 1,085 | 1,086 | 1,472 |
| Other | 4,856 | 3,012 | 3,968 |
| Total other non-operating costs and expenses | (303,568) | (296,278) | (202,673) |
| Income before income taxes | 986,523 | 732,998 | 805,567 |
| Benefit (provision) for income taxes | 17,634 | (4,299) | 19,546 |
| Net income | $ 1,004,157 | $ 728,699 | $ 825,113 |

(1)    "Adjusted Property EBITDA" is earnings before interest, taxes, depreciation, amortization, pre-opening costs, property charges and other, corporate expenses, intercompany golf course and water rights leases, stock-based compensation, and other non-operating income and expenses and includes equity in income from unconsolidated affiliates. Adjusted Property EBITDA is presented exclusively as a supplemental disclosure because management believes that it is widely used to measure the performance, and as a basis for valuation, of gaming companies. Management uses Adjusted Property EBITDA as a measure of the operating performance of its segments and to compare the operating performance of its properties with those of its competitors. The Company also presents Adjusted Property EBITDA because it is used by some

125

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

investors as a way to measure a company's ability to incur and service debt, make capital expenditures and meet working capital requirements. Gaming companies have historically reported EBITDA as a supplement to financial measures in accordance with U.S. generally accepted accounting principles ("GAAP"). In order to view the operations of their casinos on a more stand-alone basis, gaming companies, including Wynn Resorts, Limited, have historically excluded from their EBITDA calculations pre-opening expenses, property charges, corporate expenses and stock-based compensation, which do not relate to the management of specific casino properties. However, Adjusted Property EBITDA should not be considered as an alternative to operating income as an indicator of the Company's performance, as an alternative to cash flows from operating activities as a measure of liquidity, or as an alternative to any other measure determined in accordance with GAAP. Unlike net income, Adjusted Property EBITDA does not include depreciation or interest expense and therefore does not reflect current or future capital expenditures or the cost of capital. The Company has significant uses of cash flows, including capital expenditures, interest payments, debt principal repayments, taxes and other non-recurring charges, which are not reflected in Adjusted Property EBITDA. Also, Wynn Resorts' calculation of Adjusted Property EBITDA may be different from the calculation methods used by other companies and, therefore, comparability may be limited.

**18. Quarterly Financial Information (Unaudited)**

The following tables (amounts in thousands, except per share data) present selected quarterly financial information for 2013 and 2012, as previously reported. Because income per share amounts are calculated using the weighted average number of common and dilutive common equivalent shares outstanding during each quarter, the sum of the per share amounts for the four quarters may not equal the total income per share amounts for the year.

| | Year Ended December 31, 2013 | | | | |
| | First | Second | Third | Fourth | Year |
|---|---|---|---|---|---|
| Net revenues | $ 1,378,654 | $ 1,332,273 | $ 1,390,112 | $ 1,519,897 | $ 5,620,936 |
| Operating income | 333,648 | 274,024 | 313,978 | 368,441 | 1,290,091 |
| Net income | 272,144 | 192,716 | 248,811 | 290,486 | 1,004,157 |
| Net income attributable to Wynn Resorts, Limited | 202,963 | 129,785 | 182,020 | 213,884 | 728,652 |
| Basic income per share | $ 2.02 | $ 1.29 | $ 1.81 | $ 2.12 | $ 7.25 |
| Diluted income per share | $ 2.00 | $ 1.28 | $ 1.79 | $ 2.10 | $ 7.17 |

| | Year Ended December 31, 2012 | | | | |
| | First | Second | Third | Fourth | Year |
|---|---|---|---|---|---|
| Net revenues | $ 1,313,498 | $ 1,253,207 | $ 1,298,495 | $ 1,289,084 | $ 5,154,284 |
| Operating income | 260,099 | 264,123 | 247,092 | 257,962 | 1,029,276 |
| Net income | 198,409 | 199,293 | 165,171 | 165,826 | 728,699 |
| Net income attributable to Wynn Resorts, Limited | 140,564 | 138,064 | 112,035 | 111,373 | 502,036 |
| Basic income per share | $ 1.25 | $ 1.38 | $ 1.12 | $ 1.11 | $ 4.87 |
| Diluted income per share | $ 1.23 | $ 1.37 | $ 1.11 | $ 1.10 | $ 4.82 |

**19. Subsequent Event**

On January 30, 2014, the Company announced a cash dividend of $1.25 per share, payable on February 27, 2014 to stockholders of record as of February 13, 2014.

126

Table of Contents

**ITEM 9.        CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A.        CONTROLS AND PROCEDURES**

(a)        *Disclosure Controls and Procedures.* The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can only provide reasonable assurance of achieving the desired control objectives and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2013, the Company's disclosure controls and procedures are effective, at the reasonable assurance level, in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act and in ensuring that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely discussions regarding required disclosure.

(b)        *Management Report on Internal Control Over Financial Reporting.* Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2013. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (1992 framework) ("COSO") in *Internal Control-Integrated Framework*.

Based on our assessment, management believes that, as of December 31, 2013, the Company's internal control over financial reporting was effective.

The Company's independent registered public accounting firm has issued an audit report on our internal control over financial reporting. This report appears under "Report of Independent Registered Public Accounting Firm on Internal Controls Over Financial Reporting" on page 74.

(c)        *Changes in Internal Control Over Financial Reporting.* There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our fourth fiscal quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**ITEM 9B.        OTHER INFORMATION**

None

127

Table of Contents

## PART III

**ITEM 10.      DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by this item will be contained in the Registrant's definitive Proxy Statement for its 2013 Annual Stockholder Meeting to be filed with the Securities and Exchange Commission within 120 days after December 31, 2013 (the "2014 Proxy Statement") under the captions "Election of Directors", "Named Executive Officers", "Corporate Governance" and "Section 16(a) Beneficial Ownership Reporting Compliance," and is incorporated herein by reference.

As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website at *http://www.wynnresorts.com* under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

**ITEM 11.      EXECUTIVE COMPENSATION**

The information required by this item will be contained in the 2014 Proxy Statement under the captions "Director Compensation", "Compensation Discussion and Analysis" and "Executive Compensation Tables," and is incorporated herein by reference.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table summarizes compensation plans under which our equity securities are authorized for issuance, aggregated as to: (i) all compensation plans previously approved by stockholders, and (ii) all compensation plans not previously approved by stockholders. These plans are described in Item 8—"Financial Statements and Supplementary Data" of Part II (see Notes to Consolidated Financial Statements).

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 1,606,309 | $    75.89 | 4,438,524 |
| Equity compensation plans not approved by security holders | — | — | — |
| **Total** | 1,606,309 | $    75.89 | 4,438,524 |

Certain information required by this item will be contained in the 2014 Proxy Statement under the caption "Security Ownership of Certain Beneficial Owners and Management," and is incorporated herein by reference.

128

Table of Contents

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by this item will be contained in the 2014 Proxy Statement under the caption "Certain Relationships and Related Transactions, and "Corporate Governance," and is incorporated herein by reference.

**ITEM 14.        PRINCIPAL ACCOUNTANT FEES AND SERVICES**

The information required by this item will be contained in the 2014 Proxy Statement under the caption "Ratification of Appointment of Independent Public Accountants," and is incorporated herein by reference.

129

Table of Contents

PART IV

ITEM 15.        EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a)1. The following consolidated financial statements of the Company are filed as part of this report under Item 8—"Financial Statements and Supplementary Data."

- Reports of Independent Registered Public Accounting Firm
- Consolidated Balance Sheets as of December 31, 2013 and 2012
- Consolidated Statements of Income for the years ended December 31, 2013, 2012 and 2011
- Consolidated Statements of Comprehensive Income for the years ended December 31, 2013, 2012, and 2011
- Consolidated Statements of Stockholders' Equity for the years ended December 31, 2013, 2012 and 2011
- Consolidated Statements of Cash Flows for the years ended December 31, 2013, 2012 and 2011
- Notes to Consolidated Financial Statements

(a)2. Financial Statement Schedules filed in Part IV of this report are listed below:

- Schedule I—Condensed financial information of the registrant
- Schedule II—Valuation and Qualifying Accounts

We have omitted all other financial statement schedules because they are not required or are not applicable, or the required information is shown in the financial statements or notes to the financial statements.

130

Table of Contents

SCHEDULE 1—CONDENSED FINANCIAL INFORMATION OF THE REGISTRANT

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**
**CONDENSED BALANCE SHEETS**
**(amounts in thousands, except share data)**

|  | December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 299,716 | $ 179,939 |
| Investment securities | 169,496 | 89,155 |
| Receivables | 1,804 | 1,328 |
| Prepaid expenses | 3,165 | 2,698 |
| Total current assets | 474,181 | 273,120 |
| Property and equipment, net | 11,314 | 11,737 |
| Investment securities | 79,989 | 36,484 |
| Other assets | 33,787 | 33,682 |
| Due from subsidiaries | 298,410 | 232,400 |
| Investment in subsidiaries | 1,269,696 | 1,586,186 |
| Total assets | $ 2,167,377 | $ 2,173,609 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 334 | $ 171 |
| Accrued compensation and benefits | 1,326 | 1,796 |
| Interest payable | 33,636 | 33,650 |
| Other accrued liabilities | 4,865 | 3,750 |
| Deferred income taxes, net | 4,034 | 3,178 |
| Total current liabilities | 44,195 | 42,545 |
| Long-term debt | 1,936,443 | 1,936,443 |
| Other long-term liabilities | 10,770 | 16,051 |
| Uncertain tax position liability | 29,275 | 29,139 |
| Deferred income taxes, net | 14,343 | 45,499 |
| Total liabilities | 2,035,026 | 2,069,677 |
| Commitments and contingencies (Note 2) | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.01; 40,000,000 shares authorized; zero shares issued and outstanding | — | — |
| Common stock, par value $0.01; 400,000,000 shares authorized; 114,170,493 and 113,730,442 shares issued; and, 101,192,408 and 100,866,712 shares outstanding | 1,142 | 1,137 |
| Treasury stock, at cost; 12,978,085 and 12,863,730 shares | (1,143,419) | (1,127,947) |
| Additional paid-in capital | 888,727 | 818,821 |
| Accumulated other comprehensive income | 2,913 | 4,177 |
| Retained earnings | 66,130 | 44,775 |
| Total Wynn Resorts, Limited stockholders' deficit | (184,507) | (259,037) |
| Noncontrolling interest | 316,858 | 362,969 |
| Total equity | 132,351 | 103,932 |
| Total liabilities and stockholders' equity | $ 2,167,377 | $ 2,173,609 |

The accompanying notes are an integral part of these condensed financial statements.

131

Table of Contents

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**
**CONDENSED STATEMENTS OF INCOME**
**(amounts in thousands, except per share data)**

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
| Operating revenues: | | | |
| Wynn Las Vegas management fees | $ 23,721 | $ 22,318 | $ 22,229 |
| Wynn Macau royalty fees | 160,923 | 147,101 | 152,463 |
| Net revenues | 184,644 | 169,419 | 174,692 |
| Operating costs and expenses: | | | |
| General and administrative | 45,285 | 70,602 | 30,421 |
| Depreciation and amortization | 423 | 421 | 421 |
| Property charges and other | — | 33 | — |
| Total operating costs and expenses | 45,708 | 71,056 | 30,842 |
| Operating income | 138,936 | 98,363 | 143,850 |
| Other income (expense): | | | |
| Interest and other income | 1,486 | 1,116 | 865 |
| Interest expense | (38,715) | (33,650) | — |
| Equity in income of subsidiaries | 882,760 | 665,127 | 669,589 |
| Other income (expense), net | 845,531 | 632,593 | 670,454 |
| Income before income taxes | 984,467 | 730,956 | 814,304 |
| Benefit (provision) for income taxes | 19,690 | (2,257) | 10,809 |
| Net income | 1,004,157 | 728,699 | 825,113 |
| Less: Net income attributable to noncontrolling interests. | (275,505) | (226,663) | (211,742) |
| Net income attributable to Wynn Resorts, Limited | $ 728,652 | $ 502,036 | $ 613,371 |
| Basic and diluted earnings per common share: | | | |
| Net income: | | | |
| Basic | $ 7.25 | $ 4.87 | $ 4.94 |
| Diluted | $ 7.17 | $ 4.82 | $ 4.88 |
| Weighted average common shares outstanding: | | | |
| Basic | 100,540 | 103,092 | 124,039 |
| Diluted | 101,641 | 104,249 | 125,667 |

The accompanying notes are an integral part of these condensed financial statements.

132

Table of Contents

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**
**CONDENSED STATEMENTS OF CASH FLOWS**
**(amounts in thousands)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| Cash flows from operating activities: | | | |
| Net income | $1,004,157 | $ 728,699 | $ 825,113 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 423 | 421 | 421 |
| Deferred income taxes | (19,826) | (3,655) | (10,809) |
| Stock-based compensation | 26,964 | 11,894 | 10,663 |
| Amortization of discount on investment securities and other | 3,338 | 3,762 | — |
| Dividends received from subsidiary | 840,914 | 700,025 | 578,240 |
| Equity in income of subsidiaries | (882,760) | (665,127) | (669,589) |
| Increase (decrease) in cash from changes in: | | | |
| Receivables | (476) | 823 | (1,610) |
| Prepaid expenses | (467) | (1,695) | (9) |
| Accounts payable, accrued expenses and other | 1,515 | 38,337 | 5,168 |
| Due from affiliates | (23,721) | (22,318) | (22,065) |
| Net cash provided by operating activities | 950,061 | 791,166 | 715,523 |
| Cash flows from investing activities: | | | |
| Purchase of investment securities | (222,856) | (183,484) | (249,374) |
| Proceeds from sales or maturities of investment securities | 95,771 | 202,406 | 101,017 |
| Purchase of other assets | (105) | (33,682) | — |
| Due to (from) subsidiaries | 4,623 | (34,132) | (55,673) |
| Net cash used in investing activities | (122,567) | (48,892) | (204,030) |
| Cash flows from financing activities: | | | |
| Cash distributions | (712,681) | (955,493) | (811,798) |
| Exercise of stock options | 20,436 | 15,583 | 23,859 |
| Repurchase of common stock | (15,472) | (911) | (7,629) |
| Net cash used in financing activities | (707,717) | (940,821) | (795,568) |
| Cash and cash equivalents: | | | |
| Increase (decrease) in cash and cash equivalents | 119,777 | (198,547) | (284,075) |
| Balance, beginning of year | 179,939 | 378,486 | 662,561 |
| Balance, end of year | $ 299,716 | $ 179,939 | $ 378,486 |

The accompanying notes are an integral part of these condensed financial statements.

133

Table of Contents

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

**1. Basis of Presentation**

The accompanying condensed financial statements include only the accounts of Wynn Resorts, Limited (the "Company"). Investments in the Company's subsidiaries are accounted for under the equity method.

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary of the Company and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold through an initial public offering, including the over allotment, 1,437,500,000 (27.7%) shares of this subsidiary's common stock.

Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted since this information is included in the Company's consolidated financial statements included elsewhere in this Form 10-K.

**2. Commitments and Contingencies**

The Company is a holding company and, as a result, its ability to pay dividends is dependent on its subsidiaries' ability to provide funds to it. Restrictions imposed by Wynn Las Vegas, LLC (a wholly owned indirect subsidiary of the Company) and Wynn Macau debt instruments significantly restrict certain of the Company's key subsidiaries holding a majority of the consolidated group's total assets, including Wynn Las Vegas, LLC, from making dividends or distributions to the Company, subject to certain exceptions for affiliated overhead expenses as defined in the agreements governing Wynn Las Vegas, LLC's debt instruments, unless certain financial and non-financial criteria have been satisfied. In addition, the terms of the loan agreement of Wynn Resorts (Macau) S.A. contain similar restrictions. The Company received cash dividends of $840.9 million, $700 million and $578.3 million from its subsidiaries during the years ended December 31, 2013, 2012 and 2011, respectively.

134

Table of Contents

**SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS**
**(In thousands)**

| Description | Balance at Beginning of Year | Provisions for Doubtful Accounts | Write-offs, Net of Recoveries | Balance at End of Year |
|---|---|---|---|---|
| Allowance for doubtful accounts: | | | | |
| 2013 | $ 102,213 | 11,877 | (40,099) | $ 73,991 |
| 2012 | $ 91,854 | 18,091 | (7,732) | $ 102,213 |
| 2011 | $ 77,452 | 33,778 | (19,376) | $ 91,854 |

| Description | Balance at Beginning of Year | Additions | Deductions | Balance at End of Year |
|---|---|---|---|---|
| Deferred income tax asset valuation allowance: | | | | |
| 2013 | $ 1,831,545 | 773,509 | (18,029) | $ 2,587,025 |
| 2012 | $ 1,812,482 | 29,132 | (10,069) | $ 1,831,545 |
| 2011 | $ 1,285,916 | 533,474 | (6,908) | $ 1,812,482 |

135

Table of Contents

**(a)3. Exhibits**

Exhibits that are not filed herewith have been previously filed with the SEC and are incorporated herein by reference.

| Exhibit No. | Description |
|---|---|
| 3.1 | Second Amended and Restated Articles of Incorporation of the Registrant.(1) |
| 3.2 | Sixth Amended and Restated Bylaws of the Registrant, as amended.(41) |
| 4.1 | Specimen certificate for shares of Common Stock, $0.01 par value per share of the Registrant.(1) |
| 4.2 | Indenture, dated as of October 19, 2009, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors set forth therein and U.S. Bank National Association, as trustee.(20) |
| 4.3 | Indenture, dated as of April 28, 2010, by and among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors set forth therein and U.S. Bank National Association, as trustee.(24) |
| 4.4 | Indenture, dated as of August 4, 2010, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors named therein and U.S. Bank National Association, as trustee.(26) |
| 4.5 | Indenture, dated as of March 12, 2012, by and among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors set forth therein and U.S. Bank National Association, as trustee.(35) |
| 4.6 | Third Supplemental Indenture, dated August 4, 2010, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors name therein and U.S. Bank National Association, as trustee.(26) |
| 4.7 | Indenture, dated May 22, 2013, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors named therein and the U.S. Bank National Association.(44) |
| 4.8 | Supplemental Indenture, dated May 22, 2013, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors named therein and the U.S. Bank National Association.(44) |
| *10.1.1.0 | Employment Agreement, dated as of October 4, 2002, by and between Wynn Resorts, Limited and Stephen A. Wynn.(1) |
| *10.1.1.1 | First Amendment to Employment Agreement, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts, Limited.(4) |
| *10.1.1.2 | Second Amendment to employment agreement between Wynn Resorts, Limited and Stephen A. Wynn dated January 31, 2007.(14) |
| *10.1.1.3 | Third Amendment to Employment Agreement, dated as of September 11, 2008, between Wynn Resorts, Limited and Stephen A. Wynn.(15) |
| *10.1.1.4 | Fourth Amendment to Employment Agreement dated as of December 31, 2008, between Wynn Resorts, Limited and Stephen A. Wynn.(17) |
| *10.1.1.5 | Amendment to Employment Agreement, dated as of February 16, 2009, by and between Wynn Resorts, Limited and Stephen A. Wynn.(18) |
| *10.1.1.6 | Sixth Amendment to Employment Agreement dated as of February 24, 2011, between Wynn Resorts, Limited and Stephen A. Wynn.(30) |
| *10.1.2.0 | Employment Agreement, dated as of March 4, 2008, by and between Wynn Resorts, Limited and Marc D. Schorr.(9) |
| *10.1.2.1 | First Amendment to Employment Agreement dated as of December 31, 2008, between Wynn Resorts, Limited and Marc D. Schorr.(17) |

Table of Contents

| | |
|---|---|
| *10.1.2.2 | Amendment to Employment Agreement, dated as of February 12, 2009, by and between Wynn Resorts, Limited and Marc D. Schorr.(18) |
| *10.1.2.3 | Second Amendment to Employment Agreement dated as of February 27, 2013, between Wynn Resorts, Limited and Marc D. Schorr.(42) |
| *10.1.2.4 | Resignation and Release Agreement, dated March 27, 2013 between Wynn Resorts, Limited, as the Company and Marc D. Schorr, as Employee.(43) |
| *10.1.3.0 | Employment Agreement, dated as of October 1, 2005, by and between Wynn Las Vegas, LLC and Matt Maddox.(17) |
| *10.1.3.1 | First Amendment to Employment Agreement, dated as of May 5, 2008, by and between Wynn Resorts, Limited and Matt Maddox.(16) |
| *10.1.3.2 | Second Amendment to Employment Agreement dated as of December 31, 2008, between Wynn Resorts, Limited and Matt Maddox.(17) |
| *10.1.3.3 | Amendment to Employment Agreement, dated as of February 13, 2009, by and between Wynn Resorts, Limited and Matt Maddox.(18) |
| *10.1.3.4 | Fourth Amendment to Employment Agreement, dated as of March 5, 2009, by and between Wynn Resorts, Limited and Matt Maddox.(19) |
| *10.1.3.5 | Fifth Amendment to Employment Agreement, dated as of February 2, 2010, by and between Wynn Resorts, Limited and Matt Maddox.(22) |
| *10.1.3.6 | Employment Agreement, dated November 18, 2013, by and between Wynn Resorts Limited and Matt Maddox.(46) |
| *10.1.4.0 | Employment agreement, dated May 12, 2010, by and between Worldwide Wynn, LLC and Linda C. Chen.(25) |
| *10.1.4.1 | Retention agreement, dated July 27, 2011, by and between Worldwide Wynn, LLC and Linda Chen.(31) |
| *10.1.4.2 | First Amendment to Employment Agreement, dated as of November 2, 2012, by and between Worldwide Wynn, LLC and Linda Chen.(40) |
| *10.1.5.0 | Employment Agreement, dated as of April 24, 2007, by and between Wynn Resorts, Limited and Kim Sinatra.(29) |
| *10.1.5.1 | First Amendment to Employment Agreement, dated as of December 31, 2008 by and between Wynn Resorts, Limited and Kim Sinatra.(29) |
| *10.1.5.2 | Amendment to Employment Agreement, dated as of February 12, 2009 by and between Wynn Resorts, Limited and Kim Sinatra.(29) |
| *10.1.5.3 | Second Amendment to Employment Agreement, dated as of November 30, 2009, by and between Wynn Resorts, Limited and Kim Sinatra.(29) |
| *10.1.6.0 | John Strzemp Employment Agreement, dated August 31, 2005 by and between Wynn Resorts, Limited and John Strzemp.(46) |
| *10.1.6.1 | First Amendment to Employment Agreement, dated as of March 26, 2008 by and between Wynn Resorts, Limited and John Strzemp.(46) |
| *10.1.6.2 | Second Amendment to Employment Agreement, dated as of December 31, 2008 by and between Wynn Resorts, Limited and John Strzemp.(46) |
| *10.1.6.3 | Amendment to Employment Agreement, dated as of February 12, 2009 by and between Wynn Resorts, Limited and John Strzemp.(46) |

137

Table of Contents

| | |
|---|---|
| *10.1.6.4 | Fourth Amendment to Employment Agreement, dated as of March 23, 2009 by and between Wynn Resorts, Limited and John Strzemp.(46) |
| *10.1.6.5 | Fifth Amendment to Employment Agreement, dated as of February 25, 2013 by and between Wynn Resorts, Limited and John Strzemp.(46) |
| *10.1.6.6 | Sixth Amendment to Employment Agreement, dated as of September 10, 2013 by and between Wynn Resorts, Limited and John Strzemp.(46) |
| *10.2.1 | 2002 Stock Incentive Plan as Amended and Restated effective May 12, 2010.(32) |
| *10.2.2 | 2002 Stock Incentive Plan as Amended and Restated effective May 17, 2011.(39) |
| *10.2.3 | Form of Stock Option Agreement pursuant to 2002 Stock Incentive Plan.(39) |
| *10.2.4 | Form of Stock Option Grant Notice.(39) |
| *10.2.5 | Form of Restricted Stock Agreement pursuant to 2002 Stock Incentive Plan.(39) |
| 10.3.1.0 | Amended and Restated Stockholder Agreement, dated January 6, 2010, by and among Stephen A. Wynn, Elaine P. Wynn and Aruze USA, Inc.(21) |
| 10.3.1.1 | Waiver and Consent, dated November 24, 2010, by and among Aruze USA, Inc., Stephen A. Wynn and Elaine P. Wynn.(27) |
| 10.3.1.2 | Waiver and Consent, dated December 15, 2010, by and among Aruze USA, Inc., Stephen A. Wynn and Elaine P. Wynn.(28) |
| 10.3.2 | Amended and Restated Shareholders Agreement, dated as of September 16, 2004 by and among Wynn Resorts (Macau), Ltd., Wong Chi Seng and Wynn Resorts (Macau), S.A.(4) |
| 10.4.1.1 | Concession Contract for the Operation of Games of Chance or Other Games in Casinos in the Macau Special Administrative Region, dated June 24, 2002, between the Macau Special Administrative Region and Wynn Resorts (Macau), S.A. (English translation of Portuguese version of Concession Agreement).(2) |
| 10.4.1.2 | Concession Contract for Operating Casino Gaming or Other Forms of Gaming in the Macao Special Administrative Region, dated June 24, 2002, between the Macau Special Administrative Region and Wynn Resorts (Macau) S.A. (English translation of Chinese version of Concession Agreement).(5) |
| 10.4.1.3 | Unofficial English translation of Land Concession Contract between the Macau Special Administrative Region and Wynn Resorts (Macau) S.A.(3) |
| 10.4.1.4 | Land Concession Contract, published on May 2, 2012, by and among Palo Real Estate Company Limited, Wynn Resorts (Macau) S.A. and the Macau Special Administration of the People's Republic of China (translated to English from traditional Chinese and Portuguese).(37) |
| 10.5.1.1 | Surname Rights Agreement, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts Holdings, LLC.(4) |
| 10.5.1.2 | Rights of Publicity License, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts Holdings, LLC.(4) |
| 10.5.1.3 | Termination Agreement, dated as of August 6, 2004, by and between Stephen A. Wynn and Valvino Lamore, LLC.(4) |
| 10.5.1.4 | Trademark Assignment, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts Holdings, LLC.(4) |
| 10.5.2 | Intellectual Property License Agreement dated as of December 14, 2004, by and among Wynn Resorts Holdings, Wynn Resorts, Limited and Wynn Las Vegas, LLC.(7) |

138

[Table of Contents](#)

10.6.1.0   Common Terms Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., certain financial institutions as Hotel Facility Lenders, Project Facility Lenders and Revolving Credit Facility Lenders, Deutsche Bank AG, Hong Kong Branch and Societe Generale Asia Limited as Global Coordinating Lead Arrangers and Societe Generale Asia Limited as Hotel Facility Agent, Project Facility Agent, Intercreditor Agent and Security Agent.(4)

10.6.1.1   Common Terms Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as the Company, Certain Financial Institutions as Hotel Facility Lenders, Project Facility Lenders, Revolving Credit Facility Lenders and Hedging Counterparties, Bank of America Securities Asia Limited, Deutsche Bank AG, Hong Kong Branch and Societe Generale Asia Limited as Global Coordinating Lead Arrangers, Societe Generale Asia Limited as Hotel Facility Agent and Project Facility Agent, Societe Generale Asia Limited as Intercreditor Agent, and Societe Generale, Hong Kong Branch as Security Agent.(8)

10.6.1.2   Second Amendment Agreement to the Common Terms Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A., certain financial institutions as Hotel Facility Lenders, Project Facility Lenders, and Revolving Credit Facility Lenders, Banc of America Securities Asia Limited, Deutsche Bank A.G. Hong Kong Branch, and Societe Generale Asia Limited as Global Lead Arrangers and Societe Generale Asia Limited as Hotel Facility Agent and Project Facility Agent and Societe Generale Hong Kong Branch as Intercreditor Agent.(10)

10.6.1.3   Common Terms Agreement Third Amendment Agreement dated September 8, 2009 between, among others, Wynn Resorts (Macau), S.A. as the company and Société Générale, Hong King Branch as security agent.(29)

10.6.1.4   Common Terms Agreement Fourth Amendment Agreement, dated as of July 31, 2012 between, among others, Wynn Resorts (Macau), S.A. as the company and Bank of China Limited Macau Branch as security agent.(38)

10.6.2.0   Hotel Facility Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Hotel Facility Agent and the several Hotel Facility Lenders named therein.(4)

10.6.2.1   Hotel Facility Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company, Societe Generale Asia Limited, as Hotel Facility Agent and Certain Financial Institutions as Hotel Facility Lenders.(8)

10.6.2.2   Second Amendment Agreement to the Hotel Facility Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Hotel Facility Agent, and certain financial institutions as Hotel Facility Lenders.(10)

10.6.2.3   Third Amendment Agreement to the Hotel Facility Agreement dated July 31, 2012 among Wynn Resorts, (Macau), S.A., Bank of China Limited Macau Branch, and certain financial institutions as Hotel Facility Lenders.(38)

10.6.3.0   Project Facility Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Project Facility Agent and the several Project Facility Lenders named therein.(4)

10.6.3.1   Project Facility Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company, Societe Generale Asia Limited, as Project Facility Agent and Certain Financial Institutions as Project Facility Lenders.(8)

10.6.3.2   Second Amendment Agreement to the Project Facility Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Project Facility Agent, and certain financial institutions as Project Facility Lenders.(10)

139

Table of Contents

| | |
|---|---|
| 10.6.4.0 | Revolving Credit Facility Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A. and the several Revolving Credit Facility Lenders named therein.(4) |
| 10.6.4.1 | Revolving Credit Facility Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company and Certain Financial Institutions as Revolving Credit Facility Lenders.(8) |
| 10.6.4.2 | Revolving Credit Facility Second Amendment Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as Revolving Credit Facility Agent and certain financial institutions as revolving credit facility lenders.(10) |
| 10.6.4.3 | Revolving Credit Facility Agreement dated July 31, 2012 among Wynn Resorts (Macau), S.A., Bank of China, Limited Macau Branch, and certain financial institutions as Project Facility Lenders.(38) |
| 10.6.5.0 | Deed of Appointment and Priority, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., certain financial institutions as Original First Ranking Lenders, Banco Nacional Ultramarino, S.A. as Second Ranking Finance Party, Wynn Group Asia, Inc. as Third Ranking Finance Party, Societe Generale -Hong Kong Branch as Security Agent, Societe Generale Asia Limited as Intercreditor Agent and Hotel Facility Agent and Project Facility Agent and others.(4) |
| 10.6.5.1 | Deed of Appointment and Priority Deed of Amendment, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company, Certain Financial Institutions as Original First Ranking Lenders, Certain Financial Institutions as Original Hedging Counterparties, Banco Nacional Ultramarino, S.A. as Second Ranking Finance Party, Wynn Group Asia, Inc. as Third Ranking Finance Party, Societe Generale Asia Limited as Security Agent, Societe Generale Asia Limited as Intercreditor Agent , Societe Generale Asia Limited as Hotel Facility Agent and Project Facility Agent, and Others.(8) |
| 10.6.6 | Floating Charge (unofficial English Translation), dated September 14, 2004 between Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as the Security Agent.(4) |
| 10.6.7 | Debenture, dated September 14, 2004 between Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as the Security Agent.(4) |
| 10.6.8.0 | Wynn Resorts Support Agreement, dated September 14, 2004 between Wynn Resorts, Limited, Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as the Security Agent.(4) |
| 10.6.8.1 | Wynn Resorts Support Agreement Deed of Amendment, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as Security Agent.(8) |
| 10.6.9 | Wynn Pledgors' Guarantee, dated September 14, 2004 between Wynn Group Asia, Inc., Wynn Resorts International, Ltd., Wynn Resorts (Macau) Holdings, Ltd. and Wynn Resorts (Macau), Ltd. as Guarantors; and Societe Generale, Hong Kong Branch as the Security Agent.(4) |
| 10.6.10 | Bank Guarantee Reimbursement Agreement, dated September 14, 2004, between Wynn Resorts (Macau), S.A. and Banco Nacional Ultramarino.(4) |
| 10.6.11 | Sponsors' Subordination Deed, dated September 14, 2004 between Wynn Resorts (Macau), S.A., Wynn Group Asia, Inc., Wynn Resorts International, Ltd., Wynn Resorts (Macau) Holdings, Ltd. and Wynn Resorts (Macau), Ltd. as the Wynn Companies and Societe Generale, Hong Kong Branch as the Security Agent.(4) |
| 10.7.0 | Amended and Restated Master Disbursement Agreement, dated as of October 25, 2007, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the initial Bank Agent, and Deutsche Bank Trust Company America, as the initial Disbursement Agent.(13) |

140

**Table of Contents**

| | |
|---|---|
| 10.7.1 | First Amendment to Amended and Restated Master Disbursement Agreement, dated as of October 31, 2007, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the initial Bank Agent, and Deutsche Bank Trust Company America, as the initial Disbursement Agent.(11) |
| 10.7.2 | Second Amendment to Amended and Restated Master Disbursement Agreement, dated as of November 6, 2007, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent.(12) |
| 10.7.3 | Third Amendment to Amended and Restated Master Disbursement Agreement, dated October 19, 2009, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent.(20) |
| 10.7.4 | Fourth Amendment to Amended and Restated Master Disbursement Agreement, dated April 28, 2010, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent.(24) |
| 10.7.5 | Fifth Amendment to the Amended and Restated Master Disbursement Agreement, dated August 4, 2012, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent.(40) |
| 10.7.6 | Sixth Amendment to Amended and Restated Master Disbursement Agreement, dated March 12, 2012, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent.(35) |
| 10.8.1 | Amended and Restated Agreement of Lease made as of March 18, 2010, by and between Wynn Las Vegas an Stephen A. Wynn.(23) |
| 10.8.1.1 | First Amendment to Amended and Restated Agreement of Lease, dated as of April 9, 2012, by and between Wynn Las Vegas, LLC and Stephen A. Wynn. (36) |
| 10.8.1.2 | 2013 Amended and Restated Agreement of Lease, dated as of May 7, 2013, by and between Wynn Las Vegas, LLC and Stephen A. Wynn.(43) |
| 10.8.1.3 | 2013 Second Amended and Restated Agreement of Lease, dated as of November 7, 2013, by and between Wynn Las Vegas, LLC and Stephen A. Wynn.(45) |
| 10.8.2.1 | Fifth Amended and Restated Art Rental and Licensing Agreement, dated as of July 1, 2007, between Stephen A. Wynn, as lessor, Wynn Gallery, LLC, as lessee.(33) |
| 10.8.2.2 | Sixth Amended and Restated Art Rental and Licensing Agreement, dated as of July 1, 2012 between Stephen A. Wynn, as lessor, Wynn Las Vegas, LLC, as lessee.(38) |
| 10.9.1.1 | Acknowledgement and Agreement, dated as of September 1, 2004, among Wynn Las Vegas, LLC, Wells Fargo Bank, National Association and the lenders named therein.(6) |
| 10.9.2.0 | Aircraft Time Sharing Agreement dated as of November 25, 2002, by and between Las Vegas Jet, LLC and Stephen A. Wynn.(29) |
| 10.9.2.1 | Amendment No. 1 to Aircraft Time Sharing Agreement, entered into as of January 1, 2004, by and between Las Vegas Jet, LLC and Stephen A. Wynn.(29) |
| 10.9.2.2 | Amendment No. 2 to Aircraft Time Sharing Agreement, entered into as of October 31, 2009, by and between Las Vegas Jet, LLC and Stephen A. Wynn.(29) |
| 10.9.3.0 | Aircraft Time Sharing Agreement dated as of November 26, 2002, by and between Las Vegas Jet, LLC and Marc Schorr.(29) |
| 10.9.3.1 | Amendment No. 1 to Aircraft Time Sharing Agreement, entered into as of January 1, 2004, by and between Las Vegas Jet, LLC and Marc Schorr.(29) |

141

Table of Contents

| | |
|---|---|
| 10.9.3.2 | Amendment No. 2 to Aircraft Time Sharing Agreement, entered into as of October 31, 2009, by and between Las Vegas Jet, LLC and Marc Schorr.(29) |
| 10.9.4 | Aircraft Purchase Option Agreement, dated January 3, 2013, between Wynn Resorts, Limited and Stephen A. Wynn.(40) |
| 10.10.1 | Agreement, dated as of June 13, 2002, by and between Stephen A. Wynn and Wynn Resorts, Limited.(2) |
| 10.10.2 | Tax Indemnification Agreement, effective as of September 24, 2002, by and among Stephen A. Wynn, Aruze USA, Inc., Baron Asset Fund on behalf of the Baron Asset Fund Series, Baron Asset Fund on behalf of the Baron Growth Fund Series, Kenneth R. Wynn Family Trust dated February 20, 1985, Valvino Lamore, LLC and Wynn Resorts, Limited.(1) |
| 10.10.3 | Form of Indemnity Agreement.(5) |
| 10.10.4 | Management Agreement, made as of December 14, 2004, by and among Wynn Las Vegas, LLC, Wynn Show Performers, LLC, Wynn Las Vegas Capital Corp., Wynn Golf, LLC, World Travel, LLC, Las Vegas Jet, LLC, Wynn Sunrise, LLC, and Wynn Resorts, Limited.(7) |
| 10.10.5 | Management Fees Subordination Agreement, dated as of December 14, 2004, by Wynn Resorts, Limited, Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., and those subsidiaries of Wynn Las Vegas, LLC listed on Exhibit A hereto in favor of Deutsche Bank Trust Company Americas, as administrative agent, and U.S. Bank National Association, as trustee.(7) |
| 10.10.6 | Redemption Price Promissory Note, dated February 18, 2012, made by Wynn Resorts, Limited to Aruze USA, Inc.(34) |
| 10.10.7 | Registration Rights Agreement, dated as of March 12, 2012, by and among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp, Wynn Show Performers, LLC, Wynn Golf, LLC, Las Vegas Jet, LLC, World Travel, LLC, Wynn Sunrise, LLC, Kevyn, LLC, Deutsche Bank Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities LLC.(35) |
| 21.1 | Subsidiaries of the Registrant.(46) |
| 23.1 | Consent of Ernst & Young LLP.(46) |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.(46) |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.(46) |
| 32.1 | Certification of CEO and CFO pursuant to 18 U.S.C. Section 1350.(46) |
| 101 | The following financial information from the Company's Annual Report on Form 10-K for the year ended December 31, 2013, filed with the SEC on February 28, 2014 formatted in Extensible Business Reporting Language (XBRL): (i) the Consolidated Statements of Income for the years ended December 31, 2013, 2012 and 2011, (ii) the Consolidated Balance Sheets at December 31, 2013 and December 31 2012, (iii) the Consolidated Statements of Cash Flows for the years ended December 31, 2013, 2012 and 2011, (iv) the Consolidated Statements of Stockholders' Equity at December 31, 2013, 2012 and 2011, (v) the Consolidated Statements of Comprehensive Income and (vi) Notes to Consolidated Financial Statements.(46) |

* Denotes management contract or compensatory plan or arrangement.
(1) Incorporated by reference from Amendment No. 4 to the Form S-1 filed by the Registrant on October 7, 2002 (File No. 333-90600).
(2) Incorporated by reference from Amendment No. 1 to the Form S-1 filed by the Registrant on August 20, 2002 (File No. 333-90600).

142

**Table of Contents**

(3)   Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on August 3, 2004.

(4)   Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on November 4, 2004.

(5)   Incorporated by reference from Amendment No. 3 to the Form S-1 filed by the Registrant on September 18, 2002 (File No. 333-90600).

(6)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 8, 2004.

(7)   Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 15, 2005.

(8)   Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on November 8, 2005.

(9)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 4, 2008.

(10)  Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on August 9, 2007.

(11)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 1, 2007.

(12)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 13, 2007.

(13)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on October 31, 2007.

(14)  Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 1, 2007.

(15)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 15, 2008.

(16)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on May 7, 2008.

(17)  Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 2, 2009.

(18)  Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on May 11, 2009.

(19)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 9, 2009.

(20)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on October 20, 2009.

(21)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on January 6, 2010.

(22)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on February 5, 2010.

(23)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 19, 2010.

(24)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on April 28, 2010.

(25)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on May 18, 2010.

(26)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on August 5, 2010.

(27)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 26, 2010.

(28)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on December 15, 2010.

(29)  Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 1, 2010.

(30)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on February 28, 2011.

(31)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on August 18, 2011.

(32)  Incorporated by reference from the Form S-8 Registration Statement filed by the Registrant on July 27, 2010.

(33)  Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 1, 2011.

(34)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on February 21, 2012.

(35)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 13, 2012.

(36)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on April 12, 2012.

(37)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on May 2, 2012.

(38)  Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on November 9, 2012.

143

Table of Contents

(39)   Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on February 29, 2012.
(40)   Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 1, 2013.
(41)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 12, 2013.
(42)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 5, 2013.
(43)   Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on May 10, 2013.
(44)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on May 22, 2013.
(45)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 14, 2013.
(46)   Filed herewith

144

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**WYNN RESORTS, LIMITED**

Dated: February 28, 2014

By    /s/ Stephen A. Wynn
Stephen A. Wynn
Chairman of the Board and Chief Executive Officer (Principal Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Stephen A. Wynn<br>Stephen A. Wynn | Chairman of the Board and Chief Executive Officer (Principal Executive Officer) | February 28, 2014 |
| /s/ John Hagenbuch<br>John Hagenbuch | Director | February 28, 2014 |
| /s/ Ray R. Irani<br>Dr. Ray R. Irani | Director | February 28, 2014 |
| /s/ Robert J. Miller<br>Robert J. Miller | Director | February 28, 2014 |
| /s/ Alvin Shoemaker<br>Alvin V. Shoemaker | Director | February 28, 2014 |
| /s/ Edward J Virtue<br>Edward J Virtue | Director | February 28, 2014 |
| /s/ D. Boone Wayson<br>D. Boone Wayson | Director | February 28, 2014 |
| /s/ Elaine P. Wynn<br>Elaine P. Wynn | Director | February 28, 2014 |
| /s/ Matt Maddox<br>Matt Maddox | President and Chief Financial Officer (Principal Financial and Accounting Officer) | February 28, 2014 |

145