# EXHIBIT 6

*Hong Kong Exchanges and Clearing Limited and The Stock Exchange of Hong Kong Limited take no responsibility for the contents of this announcement, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*

**MACAU**

**Wynn Macau, Limited**
**永利澳門有限公司***

*(incorporated in the Cayman Islands with limited liability)*
**(Stock Code: 1128)**

# INSIDE INFORMATION

# UNAUDITED IFRS RESULTS
# FOR THE FIRST QUARTER ENDED 31 MARCH 2014
# OF WYNN MACAU, LIMITED
# AND
# UNAUDITED RESULTS FOR THE FIRST QUARTER
# ENDED 31 MARCH 2014
# OF OUR CONTROLLING SHAREHOLDER,
# WYNN RESORTS, LIMITED

This announcement is issued pursuant to Rule 13.09 of the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited and under Part XIVA of the Securities and Futures Ordinance (Cap. 571).

The Board of Directors of Wynn Macau, Limited is pleased to announce the unaudited consolidated results of the Company and its subsidiaries prepared in accordance with IFRS for the first quarter ended 31 March 2014.

Our controlling shareholder, Wynn Resorts, Limited has, on or about 1 May 2014 (1:18 p.m., Las Vegas time), released its unaudited results for the first quarter ended 31 March 2014.

This announcement is issued by Wynn Macau, Limited ("**we**" or our "**Company**") pursuant to Rule 13.09 of the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited and under Part XIVA of the Securities and Futures Ordinance (Cap. 571).

**Consolidated Financial Results for Wynn Macau, Limited**

The Board of Directors of Wynn Macau, Limited is pleased to announce the unaudited consolidated results of the Company and its subsidiaries (the "**Group**") prepared in accordance with International Financial Reporting Standards ("**IFRS**") for the first quarter ended 31 March 2014 (the "**WML Results**").

# WYNN MACAU, LIMITED
## CONDENSED CONSOLIDATED INCOME STATEMENT
(amounts in US$ thousands)
(unaudited)

| | For the Three Months Ended 31 March | |
|---|---|---|
| | **2014** | **2013** |
| **Operating revenues** | | |
| Casino | $ 1,070,854 | $ 930,251 |
| Rooms | 4,140 | 4,906 |
| Food and beverage | 6,834 | 6,232 |
| Retail leases and other | 50,870 | 50,676 |
| **Total operating revenues** | 1,132,698 | 992,065 |
| **Operating costs and expenses** | | |
| Gaming taxes and premiums | 543,802 | 473,325 |
| Staff costs | 91,802 | 74,659 |
| Other operating expenses | 171,114 | 160,665 |
| Depreciation and amortization | 30,856 | 28,994 |
| Property charges and other | 9,269 | 1,629 |
| | 846,843 | 739,272 |
| **Operating profit** | 285,855 | 252,793 |
| Finance revenues | 4,362 | 3,994 |
| Finance costs | (15,677) | (11,086) |
| Net foreign currency differences | (423) | 653 |
| Changes in fair value of interest rate swaps | 842 | 3,144 |
| | (10,896) | (3,295) |
| **Profit before tax** | 274,959 | 249,498 |
| **Income tax expense** | (485) | (485) |
| **Net profit attributable to owners of the Company** | $ 274,474 | $ 249,013 |

**Earnings Release for Wynn Resorts, Limited**

Our Company's controlling shareholder, Wynn Resorts, Limited, is a company listed on the National Association of Securities Dealers Automated Quotations ("**NASDAQ**") in the United States. As at the date of this announcement, Wynn Resorts, Limited beneficially owns approximately 72.3% of the issued share capital of our Company.

Wynn Resorts, Limited has, on or about 1 May 2014 (1:18 p.m., Las Vegas time), released its unaudited results for the first quarter ended 31 March 2014 ("**Earnings Release**"). If you wish to review the Earnings Release prepared by Wynn Resorts, Limited and as filed with the U.S. Securities and Exchange Commission, please visit *http://www.sec.gov/Archives/edgar/data/1174922/000117492214000007/0001174922-14-000007-index.htm*. The Earnings Release contains segmented financial information about the Macau operations of Wynn Resorts, Limited, which Macau operations are owned by our Company. The Earnings Release is also available in the public domain.

The financial results of Wynn Resorts, Limited, including those contained in the Earnings Release, have been prepared in accordance with Generally Accepted Accounting Principles of the United States ("**US GAAP**"), which are different from IFRS. We use IFRS to prepare and present our financial information. As such, the financial information in the Earnings Release is not directly comparable to the financial results our Company discloses as a company listed on the Main Board of The Stock Exchange of Hong Kong Limited. In particular, Average Daily Rate ("**ADR**") and Revenue Per Available Room ("**REVPAR**") as presented in the Earnings Release is based on room revenues as reported under US GAAP, which include associated promotional allowances within room revenues. Under US GAAP, promotional allowances are deducted from gross revenues in presenting net revenue. Under IFRS, room revenues exclude such promotional allowances.

Our shareholders and potential investors are advised that the financial results in the Earnings Release are unaudited and have not been prepared or presented by our Company and there is no indication or assurance from our Company that the financial results of our Group for the three months ended 31 March 2014 will be the same as that presented in the Earnings Release.

To ensure that all our shareholders and potential investors have equal and timely access to the information pertaining to our Company, set forth below are the key highlights of financial information published by Wynn Resorts, Limited in the Earnings Release that relate to our Company and our operations in Macau (unless otherwise provided, all dollar amounts in the Earnings Release are denominated in United States dollars):

# "WYNN RESORTS, LIMITED REPORTS FIRST QUARTER 2014 RESULTS

*Net revenues for the first quarter of 2014 were $1,513.6 million, compared to $1,378.7 million in the first quarter of 2013. The growth was driven by a 14.2% revenue increase from our Macau operations, modestly offset by a 1.5% decline in net revenues from our Las Vegas operations. Adjusted property EBITDA (1) was $494.6 million for the first quarter of 2014, a 9.7% increase from $451.1 million in the first quarter of 2013.*

*On a US GAAP basis, net income attributable to Wynn Resorts for the first quarter of 2014 was $226.9 million, or $2.22 per diluted share, compared to net income attributable to Wynn Resorts of $203.0 million, or $2.00 per diluted share, in the first quarter of 2013.*

### *Macau Operations*

*In the first quarter of 2014, net revenues were $1,132.7 million, a 14.2% increase from the $992.1 million generated in the first quarter of 2013. Adjusted property EBITDA in the first quarter of 2014 reached a record $384.3 million, up 16.2% from $330.7 million in the first quarter of 2013.*

*Table games results in Macau are segregated into two distinct reporting categories, the VIP segment and the mass market segment.*

*Table games turnover in the VIP segment was $36.0 billion for the first quarter of 2014, a 26.7% increase from $28.4 billion in the first quarter of 2013. VIP table games win as a percentage of turnover (calculated before commissions) for the quarter was 2.79%, within the expected range of 2.7% to 3.0% and significantly below the 3.14% experienced in the first quarter of 2013.*

*Table games win in the mass market segment increased by 23.7% to $300.7 million in the first quarter of 2014. Mass market table games win per unit per day increased by 19.1% to $15,695 from $13,180 in the first quarter of 2013. Drop in the mass market segment was $692.5 million in the first quarter of 2014, up 1.1% from the 2013 first quarter, while the segment's win percentage of 43.4% compares to 35.5% in last year's first quarter and sequentially to 42.3% in the fourth quarter of 2013. Note that customers purchase mass market gaming chips at either the gaming tables or the casino cage. Chips purchased at the casino cage are excluded from table games drop and will increase the expected win percentage. With the increased purchases at the casino cage, we believe the relevant indicator of volumes in the mass market segment should be table games win.*

*Slot machine handle of $1.4 billion for the first quarter of 2014 was 25.3% above the prior-year quarter, and slot win increased 13.1% compared to the prior-year period. Win per unit per day was 13.3% higher at $917, compared to $809 in the first quarter of 2013.*

*For the first quarter of 2014, we achieved an average daily rate (ADR) of $338, 7.3% above the $315 reported in the 2013 first quarter. Occupancy at Wynn Macau of 98.1% compares to 93.8% in the prior-year period, and revenue per available room (REVPAR) rose 11.8% to $331 in the 2014 quarter from $296 in last year's first quarter. Gross non-casino revenues increased 7.3% during the quarter to $113.0 million.*

### Wynn Palace Project in Macau

*The Company is currently constructing Wynn Palace, a fully integrated resort containing a 1,700-room hotel, performance lake, meeting space, casino, spa, retail offerings, and food and beverage outlets on Cotai in Macau. In July 2013, we signed a $2.6 billion guaranteed maximum price (GMP) contract for the project's construction. The total project budget, including construction costs, capitalized interest, pre-opening expenses, land costs and financing fees, is $4.0 billion. We expect to open our resort on Cotai in the first half of 2016.*

*During the first quarter of 2014, we invested approximately $163.1 million in our Cotai project, taking the total investment to date to $866.7 million.*

### Balance Sheet and Other

*Our total cash and investments balance at March 31, 2014 was $3.5 billion. Total debt outstanding at the end of the quarter was $7.3 billion, including $3.1 billion of Wynn Las Vegas debt, $2.3 billion of Wynn Macau debt and $1.9 billion at the parent company. Note that, during the 2014 first quarter, Wynn Macau, Limited issued $750.0 million of new 5.25% senior notes due in 2021.*

*Non-GAAP Financial Measures*

*(1) "Adjusted property EBITDA" is earnings before interest, taxes, depreciation, amortization, pre-opening costs, property charges and other, corporate expenses, intercompany golf course and water rights leases, stock-based compensation, and other non-operating income and expenses, and includes equity in income from unconsolidated affiliates. Adjusted property EBITDA is presented exclusively as a supplemental disclosure because management believes that it is widely used to measure the performance, and as a basis for valuation, of gaming companies. Management uses adjusted property EBITDA as a measure of the operating performance of its segments and to compare the operating performance of its properties with those of its competitors. The Company also presents adjusted property EBITDA because it is used by some investors as a way to measure a company's ability to incur and service debt, make capital expenditures and meet working capital requirements. Gaming companies have historically reported EBITDA as a supplement to financial measures in accordance with U.S. generally accepted accounting principles ("GAAP"). In order to view the operations of their casinos on a more stand-alone basis, gaming companies, including Wynn Resorts, Limited, have historically excluded from their EBITDA calculations pre-opening expenses, property charges, corporate expenses and stock-based compensation, that do not relate to the management of specific casino properties. However, adjusted property EBITDA should not be considered as an alternative to operating income as an indicator of the Company's performance, as an alternative to cash flows from operating activities as a measure of liquidity, or as an alternative to any other measure determined in accordance with GAAP. Unlike net income, adjusted property EBITDA does not include depreciation or interest expense and therefore does not reflect current or future capital expenditures or the cost of capital. The Company has significant uses of cash flows, including capital expenditures, interest payments, debt principal repayments, taxes and other non-recurring charges, which are not reflected in adjusted property EBITDA. Also, Wynn Resorts' calculation of adjusted property EBITDA may be different from the calculation methods used by other companies and, therefore, comparability may be limited.*

*The Company has included schedules in the tables that accompany this release that reconcile (i) net income attributable to Wynn Resorts, Limited to adjusted net income attributable to Wynn Resorts, Limited, and (ii) operating income to adjusted property EBITDA and adjusted property EBITDA to net income attributable to Wynn Resorts, Limited.*

# WYNN RESORTS, LIMITED AND SUBSIDIARIES
## RECONCILIATION OF OPERATING INCOME TO ADJUSTED PROPERTY EBITDA
## AND ADJUSTED PROPERTY EBITDA TO NET INCOME ATTRIBUTABLE TO WYNN RESORTS, LIMITED

*(in thousands)*
*(unaudited)*

|  | Three Months Ended March 31, 2014 |
|  | Macau Operations |
|---|---|
| **Operating income** | $284,930 |
| Pre-opening costs | 3,073 |
| Depreciation and amortization | 31,159 |
| Property charges and other | 10,180 |
| Management and royalty fees | 44,755 |
| Corporate expenses and other | 8,921 |
| Stock-based compensation | 1,310 |
| Equity in income from unconsolidated affiliates | — |
| **Adjusted Property EBITDA**[1] | $384,328 |

|  | Three Months Ended March 31, 2013 |
|  | Macau Operations |
|---|---|
| **Operating income** | $251,526 |
| Pre-opening costs | 452 |
| Depreciation and amortization | 29,297 |
| Property charges and other | 2,619 |
| Management and royalty fees | 39,196 |
| Corporate expenses and other | 6,618 |
| Stock-based compensation | 1,003 |
| Equity in (loss) income from unconsolidated affiliates | — |
| **Adjusted Property EBITDA**[1] | $330,711 |

# WYNN RESORTS, LIMITED AND SUBSIDIARIES
## SUPPLEMENTAL DATA SCHEDULE

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | *2014* | *2013* |
| **Room Statistics for Macau operations:** | | |
| Occupancy % | 98.1% | 93.8% |
| Average Daily Rate (ADR)[a] | $338 | $315 |
| Revenue per available room (REVPAR)[b] | $331 | $296 |
| **Other information for Macau operations:** | | |
| Table games win per unit per day[c] | $29,457 | $25,550 |
| Slot machine win per unit per day[d] | $917 | $809 |
| Average number of table games | 492 | 494 |
| Average number of slot machines | 842 | 843 |

(a)   ADR is Average Daily Rate and is calculated by dividing total room revenue including the retail value of promotional allowances (less service charges, if any) by total rooms occupied including complimentary rooms.

(b)   REVPAR is Revenue per Available Room and is calculated by dividing total room revenue including the retail value of promotional allowances (less service charges, if any) by total rooms available.

(c)   Table games win per unit per day is shown before discounts and commissions, as applicable.

(d)   Slot machine win per unit per day is calculated as gross slot win minus progressive accruals and free play."

This announcement contains forward-looking statements. Such forward-looking information involves important risks and uncertainties that could significantly affect anticipated results in the future and, accordingly, such results may differ from those expressed in any forward-looking statements made by us. The risks and uncertainties include, but are not limited to, competition in the casino/hotel and resorts industries, our Company's dependence on existing management, levels of travel, leisure and casino spending, general economic conditions, and changes in gaming laws or regulations. Additional information concerning potential factors that could affect our Company's financial results are included in our published interim and annual reports. We are under no obligation to (and expressly disclaim any such obligation to) update the forward-looking statements as a result of new information, future events or otherwise.

Our shareholders and potential investors are advised not to place undue reliance on either the WML Results or Earnings Release and are reminded that the financial results presented herein have not been audited. Our shareholders and potential investors are advised to exercise caution in dealing in securities in our Company.

<div align="right">

By order of the Board
**Wynn Macau, Limited**
**Stephen A. Wynn**
*Chairman*

</div>

Hong Kong, 2 May 2014

*As at the date of this announcement, the board of directors comprises Stephen A. Wynn, Gamal Aziz, Ian Michael Coughlan and Linda Chen (as executive directors); Matthew O. Maddox (as non-executive director); and Allan Zeman, Nicholas Sallnow-Smith, Bruce Rockowitz and Jeffrey Kin-fung Lam (as independent non-executive directors).*

\*   *For identification purposes only.*

# EXHIBIT 7

**WSJ**

| News, Quotes, Companies, Videos | SEARCH |

LOG IN    SUBSCRIBE

☰   **MANAGEMENT**

TOP STORIES IN MANAGEMENT    1 of 12

 **Zuckerberg Champions Global Internet**

2 of 12

 **Icahn Pushes Apple on Buybacks**

3 of 12

 **Lego to End Contract With Shell**

 **PepsiCo Rai; Its Profit Outlo for t...**

BOSS TALK

STEVE WYNN

# Wynn Resorts CEO Doubles Down on China Casino Business

Email    Print    4 Comments


🔑 ARTICLE FREE PASS
Enjoy your free sample of exclusive subscriber content.    **$12 *for* 12 Weeks**    SUBSCRIBE NOW

BY DUNCAN MAVIN And KATE O'KEEFFE
Updated May 23, 2011 12:01 a.m. ET

Steve Wynn, who made his name reinventing the Las Vegas Strip with large, luxurious casino resorts such as the Mirage, the Bellagio and Wynn Las Vegas, has a new canvas: China.



Wynn Resorts CEO Steve Wynn visits the Chinese territory of Macau at least every six weeks. The company plans to open a second casino there.
*Bloomberg*

The casino mogul says so much of his business is in the Chinese territory of Macau these days that he thinks of Wynn Resorts Ltd. ( WYNN +0.01% ) as a Chinese company.

Gambling revenue in Macau is expected to be five times that of the Las Vegas Strip in 2011, even though it is just nine years since Beijing opened up the territory to Western casinos. At Hong Kong-listed subsidiary Wynn Macau Ltd. ( 1128.HK +0.19% ) , net profit more than doubled in 2010 to $4.42 billion Hong Kong dollars (US$568.7 million) from HK$2.07 billion.

Mr. Wynn, who is the chairman and chief executive of both Wynn Resorts and Wynn Macau, says he flies into the Chinese gambling enclave at least every six weeks. He has plans to open a second casino resort there by 2015.

But running a gambling business in China isn't without its challenges. There is fierce competition among the casino operators, not only with fellow U.S. companies Las Vegas Sands Corp. ( LVS +0.20% ) and MGM Resorts International, ( MGM +0.05% ) but also with local operators including Macau tycoon Stanley Ho's SJM Holdings Ltd. ( 0880.HK -1.83% )

There is also the question of government relations—Macau's local government tightly controls the pace of development through access to land and labor.

Mr. Wynn, 69 years old, spoke to The Wall Street Journal about plans for his second Macau casino and doing business in China. Excerpts:

**WSJ:** Is it more difficult managing in a high-growth market like Macau compared to a more mature market like Las Vegas?

**Mr. Wynn:** [In Macau] there are more transactions at the high end, [there are] more complicated issues. It's more orderly in Las Vegas but it's more exciting [in Macau].

### Popular Now     What's This?

**ARTICLES**

1   **Opinion: The Global Warming Statistical Meltdown** 

2   **Children's Rights Activists Get Peace Prize** 

3   **Colleges' Wider**

RECOMMENDED STORIES

practices?

**Mr. Wynn:** Profoundly real. You come to China with your hat in your hand. They hire outside help when they need it in this country. In my case, they wanted to broaden Macau. Well lucky you if you happen to have what they're looking for, and they invite you and allow you to participate. I was fortunate enough to be identified as a person who could be useful.

**WSJ:** Do you have anyone in mind to become the next CEO of Wynn?

**Mr. Wynn:** Not in the sense you're asking. I'm too young. I'm 69 and I got married [a few] weeks ago. I'm healthy and I'm going out with my boots on. But there are a score of young people who are very smart and very healthy, in Nevada and Macau. Incidentally, Linda Chen [chief operating officer of Wynn Macau] is on the board of the parent company. So if you ask me who could do it? A Chinese woman.

**WSJ:** What are the key qualities you look for in [your] staff?

**Mr. Wynn:** Our organizational structure is a la carte. At any given moment in any enterprise, there's a collection of human beings with a set of skills. I prefer to see who I've got and then create an organization that fits the personalities. I am a designer and a marketing and [human resources] kind of person. But I'm not technically a quant. So I tend to rely on extremely strong financial types.

**WSJ:** Are you concerned that the U.S. federal probe into allegations [of possible lack of compliance into the Foreign Corrupt Practices Act] against Sheldon Adelson and Las Vegas Sands' operations in Macau could result in regulators turning their eyes on Wynn too?

**Mr. Wynn:** Anybody can turn all their eyes on us. My pleasure. Naturally, I don't want anything that impugns the integrity of the industry. We've got the Justice Department, the SEC and the Hong Kong regulator, not to mention the Singapore regulators, the Nevada regulators and the Macau regulators all looking at this. There's no way the truth will not be told.

**WSJ:** Why has it taken so long to get the go-ahead to build in Cotai, [home to Macau's largest casino resorts]?

**Mr. Wynn:** This current government is very meticulous. We've noticed a very definite tightening of attention to detail. Things happened faster when they were starting up. Now [the government is] managing a rather big industry.

**WSJ:** The casino developers in Macau have had problems securing enough labor, and local labor groups have resisted the influx of foreign workers. Is this a problem for your planned future development?

**Mr. Wynn:** As much as a Western or capitalistic sense has drifted in [to China], there's still a strong sense of what's good for the people. Going on past performance, we never had any trouble getting enough imported labor here while other places seemed to be having problems. But other places were building bigger. Now, there's a lot of demand for construction here in the region. That's apt to be more important than government policy in my view.

**WSJ:** It seems like in Macau you just have to build a casino and wait for the money to come in. Is managing [the Wynn Macau] here as straightforward as that?

**Mr. Wynn:** Not quite. As a designer and a builder of [resorts and casinos], the job I have isn't about marble or onyx or hand-woven fabrics or crystal chandeliers. They're nice, but do they create an environment that makes people want to linger? Or will the people that work for me be fighting the building because the elevator is in the wrong place, the kitchens aren't adequate, the storerooms are wrong, the break areas not big enough, the front door is in the wrong place and all they are getting is complaints from the public? Goodbye happy staff.

Write to Duncan Mavin at duncan.mavin@wsj.com and Kate O'Keeffe at



**4** **White House Considers Closing Guantanamo**



**5** **Cuba at Forefront of Ebola Battle in Africa**



**VIDEO**

**1** **Tesla Motors Unveils New Automated Driving System**



**2** **Inside a Russian Billionaire's $300 Million Yacht**



**3** **Why Top Students Are Being Rejected by In-State Schools**



**4** **Are Chimps People Too? A Potential Legal Evolution**



**5** **Opinion: Ukraine Energy Czar on Gas Supplies and Negotiating Putin**



RECOMMENDED STORIES

| | Revenue, in billions | | Profit, in millions | | Employees | |
|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2009 | 2010 | End 2009 | End 2010 |
| | $3.1 | $4.2 | $21 | $160 | 18,900 | 16,405 |
| | | | Wynn Resorts Ltd. | | | |

Email     Print     4 Comments     Order Reprints

**WSJ In-Depth**



**Google's Tax Setup Faces French Challenge**

**Wellness Programs Get a Health Check**

**What's Next for Hong Kong**

**California Drought Produces Tastier Wine Grapes**

**GOP Senate Races Get Cash Infusion**

**Why the NFL Commissioner Has Survived**

SPONSORED RESULTS

- High Yield Savings Account
- Best Stocks To Invest
- Best Stocks To Buy
- Top 5 Stocks To Buy
- Best Investments For 2014

- Hot Penny Stocks To Buy
- Dividend Stocks To Buy
- Best Stocks To Buy Now
- Best Investment Funds
- 2014 Luxury Sedans



$12 for 12 Weeks

SUBSCRIBE NOW

DIGITAL + PRINT

RECOMMENDED STORIES

**Join the Discussion**                          LOG IN TO COMMENT

**There are 4 comments.**                          1 person watching.

Newest

ARCHIVED COMMENTS                          Newest | Oldest

  Jiadong Yang

Readers might be interested in Advanced Market Timing Experts Workshop 2011 (**http://www.advancedmarkettiming.com**), to be held in Singapore (June 20-21) and Hong Kong (June 23-24). The tutor for this workshop is Trevor Neil, Managing Director, BETA Group, who also works with traders at a large UK hedge fund offering a timing overlay. This workshop is designed for finance professionals involved in front office trading, Forex, futures, equities, derivatives, fixed income, commodities, energy and power; in summary, anyone for whom precision market timing is important. It is suited for those who have knowledge of technical analysis theory but need a bridge between the books they have read and courses they have attended and their job. What techniques are right for your job? How to protect positions with a low risk of being 'whippedâ out of a position? This is a how to do it course for professionals interested in exploring the frontiers of technical analysis.

*May 24, 2011*

  Alex Temenid

He's right to set his focus outside of the US. However, if his company is still based in the US, he needs to find a way to turn it into the subsidiary of a foreign owned company, or spin off the non-US possessions in a listing outside of the US. Otherwise, he is destroying value by exposing the company to needless political risk and tax burdens.

*May 23, 2011*

Subscribe / Login                          Back to Top

**Customer Service**

Customer Center

New! Live Help

Contact Us

WSJ Weekend

Contact Directory

Corrections

**Policy**

Privacy Policy

Cookie Policy

Data Policy

Copyright Policy

Subscriber Agreement & Terms of Use

Your Ad Choices

**Ads**

Advertise

Place a Classified Ad

Sell Your Home

Sell Your Business

Commercial Real Estate Ads

Recruitment & Career Ads

Franchising

Advertise Locally

**Tools & Features**

Apps

Emails & Alerts

Graphics & Photos

Columns

Topics

Guides

Portfolio

Old Portfolio

**More**

Register for Free

Reprints

Content Partnerships

Conferences

SafeHouse

Mobile Site

News Archive

**Jobs at WSJ**                          Copyright ©2014 Dow Jones & Company, Inc. All Rights Reserved.

**RECOMMENDED** STORIES

# EXHIBIT 8

# Forbes

http://onforb.es/zrLX5O



**Nathaniel Parish Flannery** Contributor

*I write about Latin American companies and political risk.*

Opinions expressed by Forbes Contributors are their own.

**LEADERSHIP**    3/12/2012 @ 3:20PM   4,131 views

# Wynn-sanity: A Power Struggle at Macau Gambling Giant Wynn Resorts Puts Shareholder Value at Risk

**Comment Now**



An internecine board struggle at casino giant Wynn Resorts between the company's 70 year old founder and his Japanese business partner could damage the company's reputation and erase shareholder value.

Wynn Resorts has governance profile that is characterized by a number of weaknesses.  A gambling man, the company's Chairman and CEO, Steve Wynn, leaves nothing to chance when it comes to protecting his own interests.  He has a deal with Wynn Resorts that entitles him to a severance package worth FOUR times his current annual rate of compensation.  By contrast, according to GMI Ratings, the New York City based corporate governance research company, less than one third of the U.S.'s largest 1,775 companies have agreed to pay their CEOs severance packages worth more than three times their base level of pay.  The company is also involved in a number of related party transactions with Mr. Wynn and his family.

Naveen Reddy, a research analyst at GMI Ratings explained that "Wynn Resorts has a long history of governance issues.  We give them a "D" Rating when it comes to corporate governance."

Recently these governance problems have become an increasing concern for investors.  On February 24, 2012, infighting among Wynn Resorts' board culminated when the board of Wynn Macau, Limited, one of the company's Asian subsidiaries, voted to remove Kazuo Okada, one of Japan's wealthiest businessmen, from the board of Wynn Macau.  The struggle is not over.  Mr. Okada, a man Forbes estimates is worth $1.8 billion, continues to serve as the vice-chairman of Wynn Resorts.

Over the previous few weeks, the battle between Mr. Wynn and Mr. Okada had become increasingly public, and the company even announced that it would submit evidence to U.S. authorities that Mr. Okada, the company's Vice Chairman and largest investor, bribed foreign regulators and may have violated the U.S. Foreign Corrupt Practices Act (FCPA).  The company accused Mr. Okada of "comping" elected officials in the Philippines for thousands of dollars of casino services.  Mr. Okada has responded by raising questions about a $135 million dollar donation Wynn Resorts made to a university in Macau.

Although the company has a history of problems, the escalating struggle between Mr. Wynn and Mr. Okada poses a new threat to shareholder value.

Regardless of who gets the upper hand in the casino company's board-room battle, shareholders may end up losing the most.  Allegations of corruption are particularly damaging in the highly regulated casino industry, and the company may particularly vulnerable since the accusations are being made at a time when U.S. regulators are pursuing a record-breaking number of anti-corruption investigations.  In recent months, John Deere, Total, and Diageo, have all been targeted for investigations into possible violations of the FCPA.  Billionaire Rupert Murdoch's News Corp, the company owns Fox News, has also been targeted by an investigation into overseas bribery.  (See my article "How the Battle Against Corporate Bribery Represents a New Risk for Investors for more information.)

As the accusations of illegal and unethical behavior fly, shareholder value is being placed at risk.

The Wall Street Journal reported that "On Sept. 30, two attorneys from Wynn Resorts presented Mr. Okada's attorney with the board's corruption concerns from its investigation and said that because Mr. Okada's casino in the Philippines may compete with Wynn's businesses, he was violating his fiduciary duties as a board member."

Then, in late October, 2011 Wynn Resorts hired Louis Freeh, a former director of the U.S. Federal Bureau of Investigation (FBI), to investigate a casino project that Mr. Okada had launched in the Philippines, a country which is considered to be a "frontier market" in the gambling industry.

From a governance perspective, the ongoing feud between Mr. Okada and Mr. Wynn is only a symptom of the company's larger governance problems.

According to Wynn Resorts' 2011 proxy statement, filed with the U.S. Securities and Exchange Commission, "Wynn Las Vegas is responsible for all expenses incurred in exhibiting and safeguarding those works [of art] that it [leases from Mr. Wynn and] exhibits under the lease, including the cost of

insurance (including terrorism insurance) and taxes." Mr. Wynn and his ex-wife also lease apartments at company owned properties in Las Vegas. His private use of company aircraft cost shareholders $314,000 in 2010.

According to a recent report from GMI Ratings, "the company also employs Elaine Wynn's brother and his wife as hosts at one of the company's Las Vegas hotels.  Previously, the company also employed another one of Ms. Wynn's relatives.  In 2010, salary payments and severance agreements paid to Ms. Wynn's relatives totaled $2.4 million."  The company has nominated an executive from Wynn Macau to serve on its board.  Wynn Resorts paid $5.4 million to buy Linda Chen, the COO of Wynn Macau a house in Macau, and also employs her husband, paying him a salary of $572,000 in 2010.

For a long time, Mr. Wynn and his family have benefited from a long list of related party transactions with the company, at the expense of common shareholders.  Now, the company's governance problems are becoming a real risk.  Investigations spurred because of the recent allegations of "comped" hotel rooms and donations to universities, two relatively innocuous activities, could uncover bigger problems, and lead to criminal charges against executives and sizable civil charges, a cost that would be borne by shareholders.

Wynn Resorts shares have lost 24% of their value since October, 2011.

Investors should hope that their losses at the casino don't continue to pile up.

Photo courtesy of freedigitalphotos.net.

This article is available online at: http://onforb.es/zrLX5O        2014 Forbes.com LLC™   All Rights Reserved

# EXHIBIT 9

Case 3:14-cv-04329-WHO   Document 14-2   Filed 10/20/14   Page 21 of 214

10-K 1 d459372d10k.htm FORM 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
     **For the fiscal year ended December 31, 2012**

### OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
     **For the transition period _____ to _____**

### Commission File No. 000-50028

# WYNN RESORTS, LIMITED
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **NEVADA** | **46-0484987** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**3131 Las Vegas Boulevard South—Las Vegas, Nevada 89109**
(Address of principal executive offices) (Zip Code)

**(702) 770-7555**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $.01 par value | Nasdaq Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the registrant's voting and non-voting common stock held by non-affiliates based on the closing price as reported on the NASDAQ Global Select Market on June 30, 2012 was approximately $8 billion.

As of February 15, 2013, 100,982,712 shares of the registrant's Common Stock, $.01 par value, were outstanding.

Portions of the registrant's Proxy Statement for its 2013 Annual Meeting of Stockholders to be filed not later than 120 days after the end of the fiscal year covered by this report are incorporated by reference into Part III of this Form 10-K.

Table of Contents

**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 18 |
| Item 1B | Unresolved Staff Comments | 35 |
| Item 2. | Properties | 35 |
| Item 3. | Legal Proceedings | 36 |
| Item 4. | Mine Safety Disclosures | 42 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 43 |
| Item 6. | Selected Financial Data | 43 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 45 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 67 |
| Item 8. | Financial Statements and Supplementary Data | 71 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 122 |
| Item 9A. | Controls and Procedures | 122 |
| Item 9B. | Other Information | 122 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 123 |
| Item 11. | Executive Compensation | 123 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 123 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 124 |
| Item 14. | Principal Accountant Fees and Services | 124 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 125 |
| Signatures | | 148 |

2

Table of Contents

PART I

### ITEM 1.       BUSINESS

#### Overview

Wynn Resorts, Limited, a Nevada corporation, was formed in June 2002, is led by Chairman and Chief Executive Officer, Stephen A. Wynn, and is a leading developer, owner and operator of destination casino resorts. We currently own and operate two destination casino resorts. In Las Vegas, Nevada, we own and operate Wynn Las Vegas, which includes Encore at Wynn Las Vegas. In the Macau Special Administrative Region of the People's Republic of China ("Macau") we own and operate Wynn Macau which includes Encore at Wynn Macau. We present our results based on the following two segments: Las Vegas Operations and Macau Operations. For more information on the financial results for our segments, see Item 8—"Financial Statements", Note 17 "Segment Information."

Unless the context otherwise requires, all references herein to "Wynn Resorts," the "Company," "we," "us" or "our," or similar terms, refer to Wynn Resorts, Limited and its consolidated subsidiaries.

Wynn Resorts files annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments of such reports with the Securities and Exchange Commission ("SEC"). Any document Wynn Resorts files may be inspected, without charge, at the SEC's public reference room at 100 F Street, N.E. Washington, D.C. 20549 or at the SEC's internet site address at http://www.sec.gov. Information related to the operation of the SEC's public reference room may be obtained by calling the SEC at 1-800-SEC-0330. In addition, through our own internet address at www.wynnresorts.com, Wynn Resorts provides a hyperlink to a third-party SEC filing website which posts these filings as soon as reasonably practicable, where they can be reviewed without charge. The information found on our website is not a part of this Annual Report on Form 10-K or any other report we file or furnish to the SEC.

#### Our Resorts

*Las Vegas Operations*

Wynn Las Vegas opened on April 28, 2005. On December 22, 2008, we opened Encore at Wynn Las Vegas, an expansion of Wynn Las Vegas. We refer to the fully integrated Wynn Las Vegas and Encore at Wynn Las Vegas resort as "Wynn Las Vegas | Encore" or as our "Las Vegas Operations." We believe that this resort offers exceptional accommodations, amenities and service. For the seventh consecutive year, The Tower Suites at Wynn Las Vegas has received the Forbes five-star distinction. The Spa at Wynn Las Vegas earned five-star recognition from Forbes for the fifth year in a row. The Tower Suites at Encore and the Spa at Encore are also recipients of the Forbes five-star distinction.

Our Las Vegas Operations feature approximately 4,750 hotel rooms and suites, 240 table games, 2,195 slot machines, a race and sports book and a poker room in approximately 186,000 square feet of casino gaming space, (including a sky casino and private gaming salons), casual and fine dining in 35 food and beverage outlets, two spas and salons, lounges, and approximately 95,000 square feet of retail space featuring boutiques from Alexander McQueen, Brioni, Cartier, Chanel, Chloé, Chopard, Dior, Graff, Hermes, IWC Schaffhausen, Jaeger-Lecoultre, Loro Piana, Louis Vuitton, Manolo Blahnik, Oscar de la Renta, Piaget, Vertu and others. Our Las Vegas Operations also offer three nightclubs, a beach club, a Ferrari and Maserati automobile dealership, wedding chapels, an 18-hole golf course, approximately 283,000 square feet of meeting space, a specially designed theater presenting "Le Rêve-The Dream," a water-based theatrical production, and an Encore Theater presenting various headliner entertainment acts throughout the year. We believe that the unique experience of our Las Vegas Operations drives the significant visitation experienced since opening.

*Macau Operations*

Wynn Macau opened on September 6, 2006. On April 21, 2010, we opened Encore at Wynn Macau, an expansion of Wynn Macau. We refer to the fully integrated Wynn Macau and Encore at Wynn Macau resort as

3

Table of Contents

"Wynn Macau | Encore" or as our "Macau Operations." We believe that this resort offers exceptional accommodations, amenities and service. For the fifth consecutive year, Wynn Macau and The Spa at Wynn Macau received the Forbes five-star distinction. In 2013, Encore at Wynn Macau and the Spa at Encore at Wynn Macau also received the Forbes five-star distinction.

Our Macau Operations feature approximately 1,008 hotel rooms and suites, 495 table games, 835 slot machines and a poker pit in approximately 275,000 square feet of casino gaming space, (including sky casinos and private gaming salons), casual and fine dining in eight restaurants, two spas and a salon, lounges, meeting facilities and approximately 55,000 square feet of retail space featuring boutiques from Bvlgari, Cartier, Chanel, Dior, Dunhill, Ermenegildo Zegna, Ferrari, Giorgio Armani, Graff, Gucci, Hermes, Hugo Boss, Jaeger-LeCoultre, Louis Vuitton, Miu Miu, Piaget, Prada, Roger Dubuis, Rolex, Tiffany, Tudor, Vacheron Constantin, Van Cleef & Arpels, Versace, Vertu, and others. Our Macau Operations include a show in the rotunda featuring a Chinese zodiac-inspired ceiling and interchangeable gold "prosperity tree" and "dragon of fortune" attractions.

See Item 7 of Part II, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations" for more information.

**Construction and Development Opportunities**

In the ordinary course of our business, in response to market developments and customer preferences, we have made and continue to make certain enhancements and refinements to our resort complexes.

In September 2011, Palo Real Estate Company Limited and Wynn Resorts (Macau) S.A., each an indirect subsidiary of Wynn Macau, Limited, formally accepted the terms and conditions of a draft land concession contract from the Macau government for approximately 51 acres of land in the Cotai area of Macau. On May 2, 2012, the land concession contract was gazetted by the government of Macau evidencing the final step in the granting of the land concession. The Company is constructing a full scale integrated resort containing a casino, luxury hotel, convention, retail, entertainment and food and beverage offerings on this land. The Company estimates the project budget to be in the range of $3.5 billion to $4.0 billion. The Company expects to enter into a guaranteed maximum price contract for the project construction costs in the first half of 2013. We expect to open our resort in Cotai during the first half of 2016.

The initial term of the land concession contract is 25 years from May 2, 2012, and it may be renewed with government approval for successive periods. The total land premium payable, including interest as required by the land concession contract, is $193.4 million. An initial payment of $62.5 million was paid in December 2011, with eight additional semi-annual payments of approximately $16.4 million each (including interest at 5%) which began in November 2012. As of December 31, 2012, the Company has recorded this obligation and related asset with $27.9 million included as a current liability and $76.2 million included as a long-term liability. The Company will also be required to make annual lease payments of $0.8 million during the resort construction period and annual lease payments of approximately $1.1 million once the development is completed.

**Our Strategy**

We believe that Steve Wynn is the preeminent designer, developer and operator of destination casino resorts and has developed brand name status. Mr. Wynn's involvement with our casino resorts provides a distinct advantage over other gaming enterprises. We integrate luxurious surroundings, distinctive entertainment and superior amenities, including convention facilities, entertainment, fine dining and premium retail offerings, to create resorts that appeal to the global customer base.

Our resorts are designed and built to provide a premium experience for our guests. Our business is dependent on repeat visitation from our guests and we believe superior customer experience and service is the best marketing strategy to attract and retain our customers. Our company heavily emphasizes human resources and staff

4

Table of Contents

training to ensure our employees are prepared to provide the luxury service that our guests expect. In addition, we market these resorts directly to gaming customers using database marketing techniques, as well as traditional incentives, including reduced room rates and complimentary meals and suites. Our rewards system offers discounted and complimentary meals, lodging and entertainment for our guests. We also create general market awareness for our resorts through various media channels, including social media, television, radio, newspapers, magazines, the internet, direct mail and billboards.

Mr. Wynn and his team bring significant experience in designing, developing and operating casino resorts. The senior executive team has an average of over 25 years of experience in the hotel and gaming industries. We also have an approximately 90-person design, development and construction subsidiary, the senior management of which has significant experience in all major construction disciplines.

We continually seek out new opportunities for additional gaming or related businesses, in the United States, and worldwide. We recently filed gaming applications and plan to participate in the competitive bidding process for a gaming license in both Massachusetts and Pennsylvania as part of our strategy to expand in select markets. We are also exploring various international jurisdictions for expansion opportunities.

## Market and Competition

### Las Vegas

Las Vegas is the largest gaming market in the United States. The casino/hotel industry in Las Vegas is highly competitive. Over the last several years, Las Vegas has been impacted by economic disruptions. In 2012, Las Vegas visitation and gaming statistics stabilized, but uncertainty remains regarding the future gaming, tourism and convention environment. Our Las Vegas Operations are located on the Las Vegas Strip and compete with other high-quality resorts and hotel casinos in Las Vegas. Many competing properties draw a significant number of visitors and directly compete with our operations. Resorts located on or near the Las Vegas Strip compete with other Las Vegas Strip hotels and with other hotel casinos in Las Vegas on the basis of overall atmosphere, range of amenities, level of service, price, location, entertainment, themes and size, among other factors. We seek to differentiate our Las Vegas Operations from other major Las Vegas resorts by concentrating on our fundamental elements of design, atmosphere, personal service and luxury.

Our Las Vegas Operations also compete, to some extent, with other hotel/casino facilities in Nevada and throughout the United States, casino resorts throughout Asia, and elsewhere in the world. In addition, the legalization of casino gaming in or near metropolitan areas from which we attract customers could have a negative effect on our business. New or renovated casinos in Asia, including two resorts in Singapore, resorts in the Philippines, and our resort in Macau, could draw gaming customers away from Las Vegas.

During 2012, the economic environment in the gaming and hotel markets in Las Vegas continued to improve with increased levels of gaming revenue, visitation and hotel room demand. While these gaming and hotel statistics have increased from prior year levels, uncertainty still exists in the Las Vegas market. During 2012, the average daily room rate increased 2.8%, visitation increased 2.1% to 39.7 million visitors, and Las Vegas Strip gaming revenues increased 2.3%, all as compared to the year ended December 31, 2011. During 2011, the average daily room rate increased 10.7%, visitation increased 4.3% to 38.9 million visitors, and Las Vegas Strip gaming revenues increased 5.1%, all as compared to the year ended December 31, 2010.

### Macau

Macau, which was a Portuguese colony for approximately 450 years, was transferred from Portuguese to Chinese political control in December 1999. Macau is governed as a special administrative region of China and is located approximately 37 miles southwest of, and approximately one hour away via ferry from, Hong Kong. Macau, which has been a casino destination for more than 40 years, consists principally of a peninsula on mainland China, and two neighboring islands, Taipa and Coloane. We believe that Macau is located in one of the

5

Table of Contents

world's largest concentrations of potential gaming customers. According to Macau Statistical Information, casinos in Macau, the largest gaming market in the world, generated approximately $38.1 billion in gaming revenue in 2012, a 13.5% increase over the approximately $33.5 billion generated in 2011.

Macau's gaming market is primarily dependent on tourists. Tourist arrivals in 2012 were 28.1 million, compared to 28 million in 2011. The Macau market has also experienced tremendous growth in capacity in the last several years. As of December 31, 2012, there were 26,069 hotel rooms and 5,485 table games in Macau, compared to 12,978 hotel rooms and 2,762 table games as of December 31, 2006.

Gaming customers traveling to Macau have typically come from nearby destinations in Asia including Hong Kong, mainland China, Taiwan, South Korea and Japan. According to the Macau Statistics and Census Service Monthly Bulletin of Statistics, approximately 89% of the tourists who visited Macau in 2012 came from mainland China, Hong Kong and Taiwan. Macau completed construction of an international airport in 1995, which accommodates large commercial aircraft and provides direct air service to major cities in Asia, including Beijing, Shanghai, Jakarta, Taipei, Manila, Singapore and Bangkok. Travel to Macau by citizens of mainland China requires a visa. Chinese government officials have, on occasion, exercised their authority to adjust the visa policy and may do so in the future.

Prior to 2002, gaming in Macau was permitted as a government-sanctioned monopoly concession awarded to a single concessionaire. However, the government of Macau liberalized the gaming industry in 2002 by granting concessions to operate casinos to three concessionaires (including Wynn Macau), who in turn were permitted, subject to the approval of the government of Macau, to each grant one sub-concession. There is no limit to the number of casinos each concessionaire is permitted to operate, but each facility is subject to government approval. Currently, there are 35 operating casinos in Macau.

In 2002, the other two concessions were granted to Sociedade de Jogos de Macau ("SJM") and Galaxy Entertainment Group Limited ("Galaxy"). SJM, which is controlled by the family of Stanley Ho, operates 20 of the 35 existing casinos, including the Hotel Lisboa and The Grand Lisboa. In addition, an affiliate of SJM owns several of the water ferry services and the only helicopter shuttle service that links Macau to Hong Kong. SJM is a Hong Kong Stock Exchange listed company.

Galaxy owns the Waldo Hotel/Casino located on the Macau peninsula, Galaxy Star World hotel casino located immediately adjacent to Wynn Macau, the Grand Waldo Cotai and Galaxy Cotai. Galaxy is a Hong Kong Stock Exchange listed company.

Las Vegas Sands Corp., the owner and operator of The Venetian and The Palazzo resorts in Las Vegas and a former partner of Galaxy, entered into a sub-concession agreement with Galaxy in 2002 which allows it to independently develop and operate casinos in Macau. An affiliate of Las Vegas Sands Corp. owns and operates the Sands Macao, The Venetian Macao Resort Hotel, the largest casino resort in Macau, and the Four Seasons Hotel Macau, located adjacent to the Venetian Macao. In addition, an affiliate of Las Vegas Sands Corp. opened Sands Cotai Central in 2012, which includes additional hotel properties as well as gaming and retail space. In late 2009, Las Vegas Sands Corp. completed the initial public offering of Sands China, Ltd. on the Hong Kong Stock Exchange.

A joint venture consisting of Melco, a Hong Kong Stock Exchange listed company, and Crown, Ltd., an Australian company, is currently operating the Altira hotel in Taipa and the City of Dreams, a large resort in Cotai. This joint venture operates its properties under a subconcession purchased from Wynn Macau in 2006. In December 2011, Melco Crown, a NASDAQ listed company, completed its dual listing and started trading on the Hong Kong Stock Exchange.

In December 2007, a joint venture of MGM Resorts International and Pansy Ho Chiu-king opened the MGM Grand Macau, a resort on the Macau peninsula adjacent to Wynn Macau. The MGM Grand Macau is

6

Table of Contents

operated pursuant to a subconcession granted to the joint venture by SJM. In June 2011, MGM Resorts International and Pansy Ho Chiu-king completed the initial public offering of MGM China Holdings Limited on the Hong Kong Stock Exchange.

Our casino concession agreement currently allows the government to grant additional concessions for the operation of casinos. If the government of Macau awards additional concessions or permits additional sub-concessionaires, Wynn Macau will face increased competition from casino operators in Macau. Resorts located on or near Macau compete with other hotels and with other hotel casinos in Macau on the basis of overall atmosphere, range of amenities, level of service, price, location, entertainment and size, among other factors. In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of its common stock through an initial public offering.

Wynn Macau faces competition from casinos located in other areas of Asia, including the Marina Bay Sands and Resorts World Sentosa resorts operating in Singapore, Genting Highlands Resort, a major gaming and resort destination located outside of Kuala Lumpur, Malaysia, and casinos in the Philippines. Wynn Macau also encounters competition from other major gaming centers located around the world, including Australia and Las Vegas, cruise ships in Asia that offer gaming, and other casinos throughout Asia.

### Geographic Data

Geographic data are reported in the Notes to Consolidated Financial Statements, Note 17 "Segment Information." Additional financial data about our geographic operations is provided in Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### Regulation and Licensing

The gaming industry is highly regulated. Gaming registrations, licenses and approvals, once obtained, can be suspended or revoked for a variety of reasons. We cannot assure you that we will obtain all required registrations, licenses and approvals on a timely basis or at all, or that, once obtained, the registrations, findings of suitability, licenses and approvals will not be suspended, conditioned, limited or revoked. If we are ever prohibited from operating one of our gaming facilities, we would, to the extent permitted by law, seek to recover our investment by selling the property affected, but we cannot assure you that we could recover full value.

#### Nevada

*Introduction.* The ownership and operation of casino gaming facilities in the State of Nevada are subject to the Nevada Gaming Control Act and the regulations made under the Act, as well as to various local ordinances. Our Las Vegas Operations are subject to the licensing and regulatory control of the Nevada Gaming Commission, the Nevada State Gaming Control Board and the Clark County Liquor and Gaming Licensing Board, which we refer to herein collectively as the "Nevada Gaming Authorities."

*Policy Concerns of Gaming Laws.* The laws, regulations and supervisory procedures of the Nevada Gaming Authorities are based upon declarations of public policy. Such public policy concerns include, among other things:

- preventing unsavory or unsuitable persons from being directly or indirectly involved with gaming at any time or in any capacity;

- establishing and maintaining responsible accounting practices and procedures;

- maintaining effective controls over the financial practices of licensees, including establishing minimum procedures for internal fiscal affairs and safeguarding assets and revenue, providing reliable recordkeeping and requiring the filing of periodic reports with the Nevada Gaming Authorities;

7

Table of Contents

- preventing cheating and fraudulent practices; and
- providing a source of state and local revenue through taxation and licensing fees.

Changes in applicable laws, regulations and procedures could have significant negative effects on our Las Vegas gaming operations and our financial condition and results of operations.

**Owner and Operator Licensing Requirements.** Our subsidiary, Wynn Las Vegas, LLC, the owner and operator of our Las Vegas Operations, has been approved by the Nevada Gaming Authorities as a limited liability company licensee, referred to as a company licensee, which includes approval to conduct casino gaming operations, including a race book and sports pool and pari-mutuel wagering. These gaming licenses are not transferable.

**Company Registration Requirements.** Wynn Resorts was found suitable by the Nevada Gaming Commission to own the equity interests of Wynn Resorts Holdings, LLC ("Wynn Resorts Holdings"), a wholly owned subsidiary of Wynn Resorts, and to be registered by the Nevada Gaming Commission as a publicly traded corporation, referred to as a registered company, for the purposes of the Nevada Gaming Control Act. Wynn Resorts Holdings was found suitable by the Nevada Gaming Commission to own the equity interests of Wynn Las Vegas, LLC and to be registered by the Nevada Gaming Commission as an intermediary company. In addition to being licensed, Wynn Las Vegas, LLC, as an issuer of first mortgage notes registered with the SEC, also qualified as a registered company. Wynn Las Vegas Capital Corp., a co-issuer of the first mortgage notes, was not required to be registered or licensed, but may be required to be found suitable as a lender or financing source.

Periodically, we are required to submit detailed financial and operating reports to the Nevada Gaming Commission and provide any other information that the Nevada Gaming Commission may require. Substantially all of our material loans, leases, sales of securities and similar financing transactions must be reported to, and/or approved by, the Nevada Gaming Commission.

**Individual Licensing Requirements.** No person may become a more than 5% stockholder or member of, or receive any percentage of the profits of, an intermediary company or company licensee without first obtaining licenses and approvals from the Nevada Gaming Authorities. The Nevada Gaming Authorities may investigate any individual who has a material relationship to or material involvement with us to determine whether the individual is suitable or should be licensed as a business associate of a gaming licensee. Certain of our officers, directors and key employees have been or may be required to file applications with the Nevada Gaming Authorities and are or may be required to be licensed or found suitable by the Nevada Gaming Authorities. All applications required as of the date of this report have been filed. However, the Nevada Gaming Authorities may require additional applications and may also deny an application for licensing for any reason which they deem appropriate. A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation. An applicant for licensing or an applicant for a finding of suitability must pay or must cause to be paid all the costs of the investigation. Changes in licensed positions must be reported to the Nevada Gaming Authorities and, in addition to their authority to deny an application for a finding of suitability or licensing, the Nevada Gaming Authorities have the jurisdiction to disapprove a change in a corporate position.

If the Nevada Gaming Authorities were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the Nevada Gaming Commission may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review in Nevada.

**Redemption of Securities Owned By an Unsuitable Person.** The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the Board of Directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any

8

Table of Contents

gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts. The redemption price will be the amount, if any, required by the gaming authority or, if the gaming authority does not determine the price, the sum deemed by the Board of Directors to be the fair value of the securities to be redeemed. If Wynn Resorts determines the redemption price, the redemption price will be capped at the closing price of the shares on the principal national securities exchange on which the shares are listed on the trading day before the redemption notice is given. If the shares are not listed on a national securities exchange, the redemption price will be capped at the closing sale price of the shares as quoted on The NASDAQ Global Select Market or if the closing price is not reported, the mean between the bid and ask prices, as quoted by any other generally recognized reporting system. Wynn Resorts' right of redemption is not exclusive of any other rights that it may have or later acquire under any agreement, its bylaws or otherwise. The redemption price may be paid in cash, by promissory note, or both, as required, and pursuant to the terms established by, the applicable Gaming Authority and, if not, as the Board of Directors of Wynn Resorts elects, as set forth in the Company's articles of incorporation.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares held by Aruze USA, Inc. under the terms of the Stockholders Agreement (as defined below). Pursuant to the articles of incorporation, Wynn Resorts issued the Redemption Price Promissory Note (the "Redemption Note") to Aruze USA, Inc. in redemption of the shares. The Redemption Note has a principal amount of $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Note. The Company may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts or any of its affiliates in respect of indebtedness for borrowed money of any kind or nature. After authorizing the redemption of the Aruze shares, the Board of Directors took certain actions to protect the Company and its operations from any influence of an unsuitable person, including placing limitations on the provision of certain operating information to unsuitable persons, evaluating whether to seek the removal of Mr. Okada from the Company's Board of Directors, and formation of an Executive Committee of the Board to manage the business and affairs of the Company during the period between each annual meeting. The Charter of the Executive Committee provides that "Unsuitable Persons" are not permitted to serve on the Committee. All members of the Board, other than Mr. Okada, were appointed to the Executive Committee on February 18, 2012. On January 3, 2013, the Company filed a definitive proxy statement on Schedule 14A ("Proxy Statement") for a special meeting of the stockholders to consider and vote upon a proposal to remove Mr. Okada as a director of the Company ("Removal Proposal"). On January 24, 2013, Mr. Okada filed a complaint in the United States District Court, District of Nevada against the Company, alleging that the Proxy Statement was materially false and misleading in contravention of Section 14(a) of the Securities Exchange Act of 1934, as amended, and Securities and Exchange Commission Rule 14a-9 promulgated thereunder. Mr. Okada also filed a motion for a preliminary injunction on January 28, 2013, in which he sought an order preliminarily enjoining the special meeting of stockholders until such time as the Company corrected certain alleged misstatements and omissions in its Proxy Statement. At the conclusion of a hearing held on February 15, 2013, the federal court denied Mr. Okada's motion.

On the afternoon of February 21, 2013, Mr. Okada resigned as a director of the Company. On February 22, 2013, the special meeting of stockholders was held and the stockholders approved the Removal Proposal with an affirmative vote of 85.7% of the shares entitled to vote at the special meeting (99.6% of the shares that were voted at the special meeting of stockholders were voted in favor of the Removal Proposal).

Table of Contents

*Consequences of Violating Gaming Laws.* If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

*Requirements for Voting or Nonvoting Securities Holders.* Regardless of the number of shares held, any beneficial owner of Wynn Resorts' voting or nonvoting securities may be required to file an application, be investigated and have that person's suitability as a beneficial owner of voting securities determined if the Nevada Gaming Commission has reason to believe that the ownership would be inconsistent with the declared policies of the State of Nevada. If the beneficial owner of the voting or nonvoting securities of Wynn Resorts who must be found suitable is a corporation, partnership, limited partnership, limited liability company or trust, it must submit detailed business and financial information including a list of its beneficial owners. The applicant must pay all costs of the investigation incurred by the Nevada Gaming Authorities in conducting any investigation.

The Nevada Gaming Control Act requires any person who acquires more than 5% of the voting securities of a registered company to report the acquisition to the Nevada Gaming Commission. The Nevada Gaming Control Act requires beneficial owners of more than 10% of a registered company's voting securities to apply to the Nevada Gaming Commission for a finding of suitability within 30 days after the Chairman of the Nevada State Gaming Control Board mails the written notice requiring such filing. However, an "institutional investor," as defined in the Nevada Gaming Control Act, which beneficially owns more than 10% but not more than 11% of a registered company's voting securities as a result of a stock repurchase by the registered company may not be required to file such an application. Further, an institutional investor which acquires more than 10%, but not more than 25%, of a registered company's voting securities may apply to the Nevada Gaming Commission for a waiver of a finding of suitability if the institutional investor holds the voting securities for investment purposes only. An institutional investor that has obtained a waiver may hold more than 25% but not more than 29% of a registered company's voting securities and maintain its waiver where the additional ownership results from a stock repurchase by the registered company. An institutional investor will not be deemed to hold voting securities for investment purposes unless the voting securities were acquired and are held in the ordinary course of business as an institutional investor and not for the purpose of causing, directly or indirectly, the election of a majority of the members of the board of directors of the registered company, a change in the corporate charter, bylaws, management, policies or operations of the registered company, or any of its gaming affiliates, or any other action which the Nevada Gaming Commission finds to be inconsistent with holding the registered company's voting securities for investment purposes only. Activities which are not deemed to be inconsistent with holding voting securities for investment purposes only include:

- voting on all matters voted on by stockholders or interest holders;

- making financial and other inquiries of management of the type normally made by securities analysts for informational purposes and not to cause a change in management, policies or operations; and,

- other activities that the Nevada Gaming Commission may determine to be consistent with such investment intent.

The articles of incorporation of Wynn Resorts include provisions intended to assist its implementation of the above restrictions.

Wynn Resorts is required to maintain a current stock ledger in Nevada which may be examined by the Nevada Gaming Authorities at any time. If any securities are held in trust by an agent or by a nominee, the record

10

Table of Contents

holder may be required to disclose the identity of the beneficial owner to the Nevada Gaming Authorities. A failure to make the disclosure may be grounds for finding the record holder unsuitable. We are required to provide maximum assistance in determining the identity of the beneficial owner of any of Wynn Resorts' voting securities. The Nevada Gaming Commission has the power to require the stock certificates of any registered company to bear a legend indicating that the securities are subject to the Nevada Gaming Control Act. The certificates representing shares of Wynn Resorts' common stock note that the shares are subject to a right of redemption and other restrictions set forth in Wynn Resorts' articles of incorporation and bylaws and that the shares are, or may become, subject to restrictions imposed by applicable gaming laws.

*Consequences of Being Found Unsuitable.* Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the Nevada Gaming Commission or by the Chairman of the Nevada State Gaming Control Board, or who refuses or fails to pay the investigative costs incurred by the Nevada Gaming Authorities in connection with the investigation of its application, may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any person found unsuitable and who holds, directly or indirectly, any beneficial ownership of any voting security or debt security of a registered company beyond the period of time as may be prescribed by the Nevada Gaming Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to hold an equity interest or to have any other relationship with us, we:

- pay that person any dividend or interest upon any voting securities;

- allow that person to exercise, directly or indirectly, any voting right held by that person relating to Wynn Resorts;

- pay remuneration in any form to that person for services rendered or otherwise; or,

- fail to pursue all lawful efforts to require the unsuitable person to relinquish such person's voting securities including, if necessary, the immediate purchase of the voting securities for cash at fair market value.

*Gaming Laws Relating to Debt Securities Ownership.* The Nevada Gaming Commission may, in its discretion, require the owner of any debt or similar securities of a registered company, to file applications, be investigated and be found suitable to own the debt or other security of the registered company if the Nevada Gaming Commission has reason to believe that such ownership would otherwise be inconsistent with the declared policies of the State of Nevada. If the Nevada Gaming Commission decides that a person is unsuitable to own the security, then under the Nevada Gaming Control Act, the registered company can be sanctioned, including the loss of its approvals if, without the prior approval of the Nevada Gaming Commission, it:

- pays to the unsuitable person any dividend, interest or any distribution whatsoever;

- recognizes any voting right by the unsuitable person in connection with the securities;

- pays the unsuitable person remuneration in any form; or,

- makes any payment to the unsuitable person by way of principal, redemption, conversion, exchange, liquidation or similar transaction.

*Approval of Public Offerings.* We may not make a public offering without the prior approval of the Nevada Gaming Commission if the proceeds from the offering are intended to be used to construct, acquire or finance gaming facilities in Nevada, or to retire or extend obligations incurred for those purposes or for similar transactions. On March 24, 2011, the Nevada Gaming Commission granted us and Wynn Las Vegas, LLC prior approval, subject to certain conditions, to make public offerings for a period of two years (the "Shelf Approval"). The Shelf Approval also applies to any affiliated company wholly owned by us which is a publicly traded corporation or would thereby become a publicly traded corporation pursuant to a public offering. The Shelf Approval may be rescinded for good cause without prior notice upon the issuance of an interlocutory stop order

11

Table of Contents

by the Chairman of the Nevada State Gaming Control Board. The Shelf Approval does not constitute a finding, recommendation or approval by any of the Nevada Gaming Authorities as to the accuracy or adequacy of the offering memorandum or the investment merits of the securities. Any representation to the contrary is unlawful.

*Approval of Changes in Control.* A registered company must obtain the prior approval of the Nevada Gaming Commission with respect to a change in control through merger; consolidation; stock or asset acquisitions; management or consulting agreements; or any act or conduct by a person by which the person obtains control of the registered company.

Entities seeking to acquire control of a registered company must satisfy the Nevada State Gaming Control Board and Nevada Gaming Commission with respect to a variety of stringent standards before assuming control of the registered company. The Nevada Gaming Commission may also require controlling stockholders, officers, directors and other persons having a material relationship or involvement with the entity proposing to acquire control to be investigated and licensed as part of the approval process relating to the transaction.

*Approval of Defensive Tactics.* The Nevada legislature has declared that some corporate acquisitions opposed by management, repurchases of voting securities and corporate defense tactics affecting Nevada corporate gaming licensees or affecting registered companies that are affiliated with the operations of Nevada gaming licensees may be harmful to stable and productive corporate gaming. The Nevada Gaming Commission has established a regulatory scheme to reduce the potential adverse effects of these business practices upon Nevada's gaming industry and to further Nevada's policy in order to:

- assure the financial stability of corporate gaming licensees and their affiliated companies;

- preserve the beneficial aspects of conducting business in the corporate form; and,

- promote a neutral environment for the orderly governance of corporate affairs.

Approvals may be required from the Nevada Gaming Commission before a registered company can make exceptional repurchases of voting securities above its current market price and before a corporate acquisition opposed by management can be consummated. The Nevada Gaming Control Act also requires prior approval of a plan of recapitalization proposed by a registered company's board of directors in response to a tender offer made directly to its stockholders for the purpose of acquiring control.

*Fees and Taxes.* License fees and taxes, computed in various ways depending on the type of gaming or activity involved, are payable to the State of Nevada and to the counties and cities in which the licensed subsidiaries' respective operations are conducted. Depending upon the particular fee or tax involved, these fees and taxes are payable monthly, quarterly or annually and are based upon:

- a percentage of the gross revenue received;

- the number of gaming devices operated; or,

- the number of table games operated.

A live entertainment tax also is imposed on admission charges and sales of food, beverages and merchandise where live entertainment is furnished.

*Foreign Gaming Investigations.* Any person who is licensed, required to be licensed, registered, required to be registered in Nevada, or is under common control with such persons (collectively, "licensees"), and who proposes to become involved in a gaming venture outside of Nevada, is required to deposit with the Nevada State Gaming Control Board, and thereafter maintain, a revolving fund in the amount of $10,000 to pay the expenses of investigation of the Nevada State Gaming Control Board of the licensee's or registrant's participation in such foreign gaming. The revolving fund is subject to increase or decrease at the discretion of the Nevada Gaming Commission. Licensees and registrants are required to comply with the foreign gaming reporting requirements

12

Table of Contents

imposed by the Nevada Gaming Control Act. A licensee or registrant is also subject to disciplinary action by the Nevada Gaming Commission if it:

- knowingly violates any laws of the foreign jurisdiction pertaining to the foreign gaming operation;

- fails to conduct the foreign gaming operation in accordance with the standards of honesty and integrity required of Nevada gaming operations;

- engages in any activity or enters into any association that is unsuitable because it poses an unreasonable threat to the control of gaming in Nevada, reflects or tends to reflect, discredit or disrepute upon the State of Nevada or gaming in Nevada, or is contrary to the gaming policies of Nevada;

- engages in activities or enters into associations that are harmful to the State of Nevada or its ability to collect gaming taxes and fees; or,

- employs, contracts with or associates with a person in the foreign operation who has been denied a license or finding of suitability in Nevada on the ground of unsuitability.

*Licenses for Conduct of Gaming and Sale of Alcoholic Beverages.* The conduct of gaming activities and the service and sale of alcoholic beverages at Wynn Las Vegas are subject to licensing, control and regulation by the Clark County Liquor and Gaming Licensing Board, which has granted Wynn Las Vegas, LLC licenses for such purposes. In addition to approving Wynn Las Vegas, LLC the Clark County Liquor and Gaming Licensing Board has the authority to approve all persons owning or controlling the stock of any corporation controlling a gaming license. Clark County gaming and liquor licenses are not transferable. The County has full power to limit, condition, suspend or revoke any license. Any disciplinary action could, and revocation would, have a substantial negative impact upon our operations.

**Macau**

*General.* As a casino concessionaire, Wynn Macau, S.A., an indirect subsidiary of the Company, is subject to the regulatory control of the Government of Macau. The government has adopted Laws and Administrative Regulations governing the operation of casinos in Macau. Only concessionaires or subconcessionaires are permitted to operate casinos. Subconcessions may be awarded subject to the approval of the Macau government and each concessionaire has issued one subconcession. Each concessionaire was required to enter into a concession agreement with the Macau government which, together with the Law and Administrative Regulations, forms the framework for the regulation of the activities of the concessionaire.

Under the Law and Administrative Regulations, concessionaires are subject to suitability requirements relating to background, associations and reputation, as are stockholders of 5% or more of a concessionaire's equity securities, officers, directors and key employees. The same requirements apply to any entity engaged by a concessionaire to manage casino operations. Concessionaires are required to satisfy minimum capitalization requirements, demonstrate and maintain adequate financial capacity to operate the concession and submit to continuous monitoring of their casino operations by the Macau government. Concessionaires also are subject to periodic financial reporting requirements and reporting obligations with respect to, among other things, certain contracts, financing activities and transactions with directors, financiers and key employees. Transfers or the encumbering of interests in concessionaires must be reported to the Macau government and are ineffective without government approval.

Each concessionaire is required to engage an executive director who must be a permanent resident of Macau and the holder of at least 10% of the capital stock of the concessionaire. The appointment of the executive director and of any successor is ineffective without the approval of the Macau government. All contracts placing the management of a concessionaire's casino operations with a third party also are ineffective without the approval of the Macau government.

13

Table of Contents

Concessionaires are subject to a special gaming tax of 35% of gross gaming revenue, and must also make an annual contribution of up to 4% of gross gaming revenue for the promotion of public interests, social security, infrastructure and tourism. Concessionaires are obligated to withhold, according to the rate in effect as set by the government, from any commissions paid to games promoters. Such withholding rate may be adjusted from time to time.

A games promoter, also known as a junket representative, is a person who, for the purpose of promoting casino gaming activity, arranges customer transportation and accommodations, and provides credit in their sole discretion, food and beverage services and entertainment in exchange for commissions or other compensation from a concessionaire. Macau law provides that games promoters must be licensed by the Macau government in order to do business with and receive compensation from concessionaires. For a license to be obtained, direct and indirect owners of 5% or more of a games promoter (regardless of its corporate form or sole proprietor status), its directors and its key employees must be found suitable. Applicants are required to pay the cost of license investigations, and are required to maintain suitability standards during the period of licensure. The term of a games promoters' license is one calendar year, and licenses can be renewed for additional periods upon the submission of renewal applications. Natural person junket representative licensees are subject to a suitability verification process every three years and business entity licensees are subject to the same requirement every six years. The DICJ implemented certain instructions in 2009, which have the force of law, relating to commissions paid to and by games promoters. Such instructions also impose certain financial reporting and audit requirements on games promoters.

Under Macau law, licensed games promoters must identify outside contractors who assist them in their promotion activities. These contractors are subject to approval of the Macau government. Changes in the management structure of business entity games promoters licensees must be reported to the Macau government and any transfer or the encumbering of interests in such licensees is ineffective without prior government approval. To conduct gaming promotion activities licensees must be registered with one or more concessionaires and must have written contracts with such concessionaires, copies of which must be submitted to the Macau government.

Macau law further provides that concessionaires are jointly responsible with their games promoters for the activities of such representatives and their directors and contractors in the concessionaires' casinos, and for their compliance with applicable laws and regulations. Concessionaires must submit annual lists of their games promoters, and must update such lists on a quarterly basis. The Macau government may designate a maximum number of games promoters and specify the number of games promoters a concessionaire is permitted to engage. Concessionaires are subject to periodic reporting requirements with respect to commissions paid to their games promoters representatives and are required to oversee their activities and report instances of unlawful activity.

The government of Macau may assume temporary custody and control over the operation of a concession in certain circumstances. During any such period, the costs of operations must be borne by the concessionaire. The government of Macau also may redeem a concession starting at an established date after the entering into effect of a concession. The government of Macau also may terminate a concession for cause, including, without limitation, failure of the concessionaire to fulfill its obligations under law or the concession contract.

***Concession Agreement.*** The concession agreement between Wynn Macau S.A. and the Macau government required Wynn Macau, S.A. to construct and operate one or more casino gaming properties in Macau, including, at a minimum, one full-service casino resort by the end of December 2006, and to invest not less than a total of 4 billion patacas (approximately US$500 million) in Macau-related projects by June 2009. These obligations were satisfied upon the opening of Wynn Macau in 2006.

Wynn Macau, S.A. was also obligated to obtain, and did obtain, a 700 million pataca (approximately US$87 million) bank guarantee from Banco National Ultramarino, S.A. ("BNU") that was effective until March 31, 2007. The amount of this guarantee was reduced to 300 million patacas (approximately US$37 million) for the period from April 1, 2007 until 180 days after the end of the term of the concession agreement. This guarantee,

14

Table of Contents

which is for the benefit of the Macau government, assures Wynn Macau, S.A.'s performance under the casino concession agreement, including the payment of premiums, fines and indemnity for any material failure to perform the concession agreement. Wynn Macau, S.A. is obligated, upon demand by BNU, to promptly repay any claim made on the guarantee by the Macau government. BNU is currently paid an annual fee by Wynn Macau, S.A. for the guarantee of approximately 5.2 million patacas (approximately US$0.7 million).

The government of Macau may redeem the concession beginning on June 24, 2017, and in such event Wynn Macau, S.A. will be entitled to fair compensation or indemnity. The amount of such compensation or indemnity will be determined based on the amount of revenue generated during the tax year prior to the redemption multiplied for the remaining years under the concession.

The government of Macau may unilaterally rescind the concession if Wynn Macau, S.A. fails to fulfill its fundamental obligations under the concession agreement. The concession agreement expressly provides that the government of Macau may unilaterally rescind the concession agreement if Wynn Macau, S.A.:

- conducts unauthorized games or activities that are excluded from its corporate purpose;

- abandons or suspends gaming operations in Macau for more than seven consecutive days (or more than 14 days in a civil year) without justification;

- defaults in payment of taxes, premiums, contributions or other required amounts;

- does not comply with government inspections or supervision;

- systematically fails to observe its obligations under the concession system;

- fails to maintain bank guarantees or bonds satisfactory to the government;

- is the subject of bankruptcy proceedings or becomes insolvent;

- engages in serious fraudulent activity, damaging to the public interest; or,

- repeatedly and seriously violates applicable gaming laws.

If the government of Macau unilaterally rescinds the concession agreement for one of the reasons stated above, Wynn Macau, S.A. will be required to compensate the government in accordance with applicable law, and the areas defined as casino under Macau law and all of the gaming equipment pertaining to the gaming operations of Wynn Macau will be transferred to the government without compensation. In addition, the government of Macau may, in the public interest, unilaterally terminate the concession at any time, in which case Wynn Macau, S.A. would be entitled to reasonable compensation.

**Other Regulations**

In addition to gaming regulations, we are subject to extensive local, state, federal and foreign laws and regulations in the jurisdictions in which we operate. These include, but are not limited to, laws and regulations relating to alcoholic beverages, environmental matters, employment and immigration, currency and other transactions, taxation, zoning and building codes, marketing and advertising, lending, debt collection, privacy, telemarketing, money laundering, laws and regulations administered by the Office of Foreign Assets Control, and anti-bribery laws, including the Foreign Corrupt Practices Act. Such laws and regulations could change or could be interpreted differently in the future, or new laws and regulations could be enacted. Any material changes, new laws or regulations, or material differences in interpretations by courts or governmental authorities could adversely affect our business and operating results.

**Seasonality**

We may experience fluctuations in revenues and cash flows from month to month, however, we do not believe that our business is materially impacted by seasonality.

15

Table of Contents

**Employees**

As of December 31, 2012, we had a total of approximately 16,000 full-time equivalent employees (including approximately 9,000 in Las Vegas and approximately 7,000 in Macau).

During 2006, we entered into a ten year collective bargaining agreement with the Culinary and Bartenders Union local that covers approximately 5,500 employees at our Las Vegas Operations. We also entered into a ten year collective bargaining agreement with the Transportation Workers Union in November 2010, which covers the table games dealers at our Las Vegas Operations. Certain other unions may seek to organize the workers of our Las Vegas Operations. Unionization, pressure to unionize or other forms of collective bargaining could increase our labor costs.

The success of our operations in Macau will be affected by our success in retaining our employees. Wynn Macau competes with the large number of casino resort developments in Macau for limited qualified employees. We seek employees from other countries to adequately staff our Macau resorts, and policies announced publicly by the Macau government have affected our ability to import labor in certain job classifications. We are coordinating with the Macau labor and immigration authorities to ensure that our labor demand is satisfied, but cannot be certain that we will be able to recruit and retain a sufficient number of qualified employees for our Macau operations or that we will be able to obtain required work permits for those employees.

**Intellectual Property**

Among our most important marks are our trademarks and service marks that use the name "WYNN." Wynn Resorts has registered with the U.S. Patent and Trademark Office ("PTO") a variety of the WYNN-related trademarks and service marks in connection with a variety of goods and services. These marks include "WYNN RESORTS," "WYNN DESIGN AND DEVELOPMENT," "WYNN LAS VEGAS," "ENCORE" and "WYNN MACAU." Some of the applications are based upon ongoing use and others are based upon a bona fide intent to use the marks.

A common element of most of these marks is the use of the surname "WYNN." As a general rule, a surname (or the portion of a mark primarily constituting a surname) is not eligible for registration unless the surname has acquired "secondary meaning." To date, Wynn Resorts has been successful in demonstrating to the PTO such secondary meaning for the Wynn name based upon factors including Mr. Wynn's prominence as a resort developer.

Federal registrations are not completely dispositive of the right to such marks. Third parties who claim prior rights with respect to similar marks may nonetheless challenge our right to obtain registrations or our use of the marks and seek to overcome the presumptions afforded by such registrations.

We have also filed applications with various foreign patent and trademark registries, including in Macau, China, Singapore, Hong Kong, Taiwan, Japan, certain European countries and various other jurisdictions throughout the world, to register a variety of WYNN-related trademarks and service marks in connection with a variety of goods and services. These marks include many of the same marks filed with the United States PTO and include "WYNN MACAU," "WYNN LAS VEGAS" and "ENCORE." Some of the applications are based upon ongoing use and others are based upon a bona fide intent to use the marks.

We recognize that our intellectual property assets, including the word and logo version of "WYNN," are among our most valuable assets. As a result, and in connection with expansion of our resorts and gaming activities outside the United States, we have undertaken a program to register our trademarks and other intellectual property rights in relevant jurisdictions. We have retained counsel and intend to take all steps necessary to protect our intellectual property rights against unauthorized use throughout the world.

On August 6, 2004, we entered into agreements with Mr. Wynn that confirm and clarify our rights to use the "Wynn" name and Mr. Wynn's persona in connection with our casino resorts. Under a Surname Rights

16

Table of Contents

Agreement, Mr. Wynn has acknowledged our exclusive, fully paid-up, perpetual, worldwide right to use, and to own and register trademarks and service marks incorporating, the "Wynn" name for casino resorts and related businesses, together with the right to sublicense the name and marks to our affiliates. Under a Rights of Publicity License, Mr. Wynn has granted us the exclusive, royalty-free, worldwide right to use his full name, persona and related rights of publicity for casino resorts and related businesses, together with the ability to sublicense the persona and publicity rights to our affiliates, until October 24, 2017.

We have also registered various domain names including, but not limited to, www.wynnlasvegas.com, www.wynnmacau.com, www.wynnmacaulimited.com, www.encorelasvegas.com and www.wynnresorts.com, with various domain registrars around the world. Our domain registrations extend to various foreign countries such as ".com.cn" and ".com.hk." We pursue domain related infringement on a case by case basis depending on the infringing domain in question. The information found on these websites is not a part of this Annual Report on Form 10-K or any other report we file or furnish to the SEC.

**Forward-Looking Statements**

We make forward-looking statements in this Annual Report on Form 10-K based upon the beliefs and assumptions of our management and on information currently available to us. Forward-looking statements include, but are not limited to, information about our business strategy, development activities, competition and possible or assumed future results of operations, throughout this report and are often preceded by, followed by or include the words "may," "will," "should," "would," "could," "believe," "expect," "anticipate," "estimate," "intend," "plan," "continue" or the negative of these terms or similar expressions.

Forward-looking statements are subject to a number of risks and uncertainties that could cause actual results to differ materially from those we express in these forward-looking statements, including the risks and uncertainties in Item 1A—Risk Factors, other factors we describe from time to time in our periodic filings with the SEC as well as the following:

- our dependence on Stephen A. Wynn and existing management;

- regulatory or enforcement actions and probity investigations;

- pending or future legal proceedings;

- decreases in levels of travel, leisure and consumer spending;

- continued high unemployment;

- fluctuations in occupancy rates and average daily room rates;

- competition in the casino/hotel and resort industries and actions taken by our competitors;

- uncertainties over the development and success of new gaming and resort properties;

- new development and construction activities of competitors;

- our dependence on a limited number of resorts and locations for all of our cash flow;

- adverse tourism and trends reflecting current domestic and international economic conditions;

- general global macroeconomic conditions;

- doing business in foreign locations such as Macau (including the risks associated with developing gaming regulatory frameworks);

- changes in gaming laws or regulations (including the legalization of gaming in certain jurisdictions);

- cyber security risk including misappropriation of customer information or other breaches of information security;

- changes in U.S. laws regarding healthcare;

17

Table of Contents

- changes in federal, foreign, or state tax laws or the administration of such laws;

- approvals under applicable jurisdictional laws and regulations (including gaming laws and regulations);

- volatility and weakness in world-wide credit and financial markets and from governmental intervention in the financial markets;

- conditions precedent to funding under our credit facilities;

- continued compliance with all provisions in our credit agreements;

- leverage and debt service (including sensitivity to fluctuations in interest rates);

- restrictions or conditions on visitation by citizens of mainland China to Macau;

- the impact that an outbreak of an infectious disease or the impact of a natural disaster may have on the travel and leisure industry; and

- the consequences of military conflicts in the Middle East and any future security alerts and/or terrorist attacks.

Further information on potential factors that could affect our financial condition, results of operations and business are included in this report and our other filings with the SEC. You should not place undue reliance on any forward-looking statements, which are based only on information available to us at the time this statement is made. We undertake no obligation to update or revise any forward-looking statement, whether as a result of new information, future developments or otherwise.

**ITEM 1A.      RISK FACTORS**

You should carefully consider the risk factors set forth below, as well as the other information contained in this Annual Report on Form 10-K, regarding matters which could have an adverse effect, including a material one, on our business, financial condition, results of operations and cash flows. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial may also have a material adverse effect on our business, financial condition, results of operations and cash flows.

**Risks Related to our Business**

*The loss of Stephen A. Wynn could significantly harm our business.*

Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts. Mr. Wynn's employment agreement expires in October 2020. However, we cannot assure you that Mr. Wynn will remain with Wynn Resorts, Limited. If we lose the services of Mr. Wynn, or if he is unable to devote sufficient attention to our operations for any other reason, our business may be significantly impaired.

*Potential violations of law by Mr. Okada (formerly the largest beneficial owner of our shares) and his affiliates could have adverse consequences to the Company.*

On February 18, 2012, the Board of Directors of Wynn Resorts received a report from Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing numerous instances of conduct constituting prima facie violations of the FCPA by Kazuo Okada (formerly the largest beneficial owner of our shares) and certain of his affiliates. See Item 3—"Legal Proceedings" and Item 8—"Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies." The Company has provided the Freeh Report to applicable regulators and has been cooperating with related investigations of such regulators. The conduct of Mr. Okada and his affiliates and the outcome of any resulting regulatory findings could have adverse consequences to the Company. A

18

Table of Contents

finding by regulatory authorities that Mr. Okada violated the FCPA on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, regulators could pursue separate investigations into the Company's compliance with applicable laws, including in response to litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau and a related informal inquiry by the SEC into this donation. While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company.

### *Mr. Okada and his affiliates have challenged the redemption of Aruze USA, Inc.'s Shares. An adverse judgment or settlement resulting from the related litigation could reduce our profits or limit our ability to operate our business.*

On February 18, 2012, after receiving the Freeh Report, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada were "unsuitable" within the meaning of Article VII of Wynn Resorts' articles of incorporation and redeemed all of Aruze USA, Inc.'s shares of Wynn Resorts' common stock. See Item 3—"Legal Proceedings" and Item 8—"Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies." On February 19, 2012, the Company filed a complaint in Nevada state court against Mr. Okada and certain of his affiliates (the "Okada Parties") alleging, among other things, breach of fiduciary duty in connection with alleged violations of the FCPA and seeking a declaration that the redemption was proper (collectively, the "Redemption Action"). On March 12, 2012, the Okada Parties filed an answer and cross claim against the Company, each of the members of the Company's Board of Directors (other than Mr. Okada) and Wynn Resorts' General Counsel seeking, among other things, a declaration that the redemption of Aruze USA , Inc.'s shares was void, an injunction restoring Aruze USA, Inc.'s share ownership, damages in an unspecified amount and rescission of the Amended and Restated Stockholders Agreement, dated as of January 6, 2010, by and among Aruze USA, Inc., Steve Wynn and Elaine Wynn as amended from time to time. In connection with the Redemption Action and Okada Parties cross claim, (1) various Okada Parties filed a complaint in the Tokyo District Court against the Company, all members of the Board (other than Mr. Okada) and the Company's General Counsel alleging that the press release issued by the Company in connection with the Redemption Action has damaged their social evaluation and credibility and seeking damages and legal fees, (2) four federal derivative actions were commenced against the Company and all members of its Board of Directors and (3) two state derivative actions were commenced against the Company and all members of its Board of Directors. See Item 3—"Legal Proceedings, for a full description of these proceedings and status as of the date of this report. The Company is vigorously pursuing its claims against the Okada Parties, and together with the other counter-defendants vigorously defending against the counterclaims and other actions asserted against them. However, as with all litigation, the outcome of these proceedings cannot be predicted. Any adverse judgments or settlements involving payment of a material sum of money could cause a material adverse effect on our financial condition and results of operations and could expose us to additional claims by third parties, including current or former investors or regulators. Any adverse judgments or settlements would reduce our profits and could limit our ability to operate our business.

### *Change in valuation of our Redemption Price Promissory Note could have a negative impact on our results of operations*

In connection with the redemption of the shares previously held by Aruze USA, Inc., we recorded the fair value of the Redemption Note at its estimated present value of approximately $1.94 billion in accordance with applicable accounting guidance. In determining this fair value, we considered the stated maturity of the Redemption Note, its stated interest rate, and the uncertainty of the related cash flows of the Redemption Note as well as the potential effects of the following: uncertainties surrounding the potential outcome and timing of pending litigation with Aruze USA, Inc. (see Item 8—"Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies."); the outcome of on-going investigations by the Nevada Gaming Control Board; and other potential legal and regulatory actions. In addition, in the furtherance of various future business objectives, we considered our ability, at our sole option, to prepay the Redemption Note at any time in

19

Table of Contents

accordance with its terms without penalty. Accordingly, we reasonably determined that the estimated life of the Redemption Note could be less than the contractual life of the Redemption Note. When considering the appropriate rate of interest to be used to determine fair value for accounting purposes and in light of the uncertainty in the timing of the cash flows, we used observable inputs from a range of trading values of financial instruments with terms and lives similar to the estimated life and terms of the Redemption Note. As a result of this analysis, we concluded the Redemption Note's stated rate of 2% approximated a market rate. A change in any of the assumptions discussed above could result in a change in the fair value of this Redemption Note and significantly impact our results of operations.

> ### *Ongoing litigation and other disputes with Mr. Okada and certain of his affiliates could distract management and result in negative publicity and additional scrutiny of regulators.*

There has been widespread publicity of the findings in the Freeh Report of prima facie violations of law by Mr. Okada and his affiliates, the Board's unsuitability finding, the redemption of shares and related litigation. The actions, litigation, and publicity could reduce demand for shares of Wynn Resorts and Wynn Macau, Limited and thereby have a negative impact on the trading prices of their respective shares. The disputes may also lead to additional scrutiny from gaming regulators, which could lead to investigations relating to, and possibly a negative impact on, the Company's gaming licenses, and possibly have a negative impact on the Company's ability to bid successfully for new gaming market opportunities.

> ### *Any violation of the Foreign Corrupt Practices Act or applicable Anti-Money Laundering laws or regulations could have a negative impact on us.*

A significant portion of our revenue is derived from operations outside the United States, which exposes the Company to complex foreign and U.S. regulations inherent in doing business cross-border and in each of the countries in which it transacts business. We are subject to regulations imposed by the Foreign Corrupt Practices Act (the "FCPA") and other anti-corruption laws that generally prohibit U.S. companies and their intermediaries from offering, promising, authorizing or making improper payments to foreign government officials for the purpose of obtaining or retaining business. Violations of the FCPA and other anti-corruption laws may result in severe criminal and civil sanctions as well as other penalties and the SEC and U.S. Department of Justice have increased their enforcement activities with respect to the FCPA. Internal control policies and procedures and employee training and compliance programs that we have implemented to deter prohibited practices may not be effective in prohibiting our directors, employees, contractors or agents from violating or circumventing our policies and the law. If our directors, employees or agents fail to comply with applicable laws or Company policies governing our international operations, the Company may face investigations, prosecutions and other legal proceedings and actions which could result in civil penalties, administrative remedies and criminal sanctions. Kazuo Okada, one of our directors, has failed to comply with internal training in these matters and has failed to return to the Company an executed Acknowledgment that he agrees to comply with the Company's Code of Business Conduct and Ethics. For additional information on the Freeh Report, which detailed numerous instances of conduct constituting prima facie violations of the FCPA by Mr. Okada and certain of his affiliates, and the redemption of Aruze USA, Inc.'s shares, see Item 8— "Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies."

On February 8, 2012, the Company received a letter from the Salt Lake Regional Office of the U.S. Securities and Exchange Commission ("SEC") requesting that, in connection with an informal inquiry by the SEC, the Company preserve information relating to a donation made by the Company to the University of Macau, any donations by the Company to any other educational charitable institutions, including the University of Macau Development Foundation, and the Company's casino or concession gaming licenses or renewals in Macau. As previously disclosed, in May 2011, Wynn Macau, a majority owned subsidiary of the Company, made a commitment to the University of Macau Development Foundation in support of the new Asia-Pacific Academy of Economics and Management. This contribution consists of a $25 million payment made in May 2011 and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022

<div align="center">20</div>

Table of Contents

inclusive. The pledge was consistent with the Company's long-standing practice of providing philanthropic support for deserving institutions in the markets in which it operates. The pledge was made following an extensive analysis which concluded that the gift was made in accordance with all applicable laws. The pledge was considered by the Boards of Directors of both the Company and Wynn Macau and approved by 15 of the 16 directors who served on those boards. The sole dissenting vote was Mr. Kazuo Okada whose stated objection was to the length of time over which the donation would occur, not its propriety. The SEC letter was received after Mr. Okada commenced litigation in Nevada on January 11, 2012 against the Company seeking to compel the Company to produce information relating to the donation to the University of Macau, among other things. On February 19, 2012, the Company filed a complaint in Nevada state court against Mr. Okada and other entities alleging, among other things, breach of fiduciary duty in connection with alleged violations of the FCPA. For a detailed description of the legal proceedings between the Company and Mr. Okada and his affiliates, see Item 3—"Legal Proceedings."

The Company has been fully cooperating with the Salt Lake Regional Office of the SEC. However, any determination that we have violated the FCPA could have a material adverse effect on our business and financial condition.

We also deal with significant amounts of cash in our operations and are subject to various reporting and anti-money laundering regulations. Any violation of anti-money laundering laws or regulations by any of our resorts could have a negative effect on our results of operations.

Compliance with international and U.S. laws and regulations that apply to our international operations also increases our cost of doing business in foreign jurisdictions.

***Our business is particularly sensitive to reductions in discretionary consumer and corporate spending as a result of downturns in the economy.***

Consumer demand for hotel/casino resorts, trade shows and conventions and for the type of luxury amenities that we offer is particularly sensitive to downturns in the economy which adversely impact discretionary spending on leisure activities. Changes in discretionary consumer spending or consumer preferences brought about by factors such as perceived or actual general economic conditions, high unemployment, the housing foreclosure crisis, perceived or actual changes in disposable consumer income and wealth, an economic recession and changes in consumer confidence in the economy, or fears of war and future acts of terrorism could reduce customer demand for the luxury amenities and leisure activities we offer, and may have a significant negative impact on our operating results.

***Our casino, hotel, convention and other facilities face intense competition.***

_Competition for our Las Vegas Operations._ The casino/hotel industry is highly competitive. Resorts located on or near the Las Vegas Strip compete with other Las Vegas Strip hotels and with other hotel casinos in Las Vegas on the basis of overall atmosphere, range of amenities, level of service, price, location, entertainment, theme and size, among other factors.

Wynn Las Vegas also competes with other hotel/casino facilities in other cities. The proliferation of gaming activities in other areas could significantly harm our business as well. In particular, the legalization or expansion of casino gaming in or near metropolitan areas from which we attract customers could have a negative effect on our business. In addition, new or renovated casinos in Macau or elsewhere in Asia could draw Asian gaming customers away from our Las Vegas Operations.

_Competition for Macau Operations._ Currently there are 35 operating casinos in Macau. We hold a concession under one of only three gaming concessions and three sub-concessions authorized by the Macau government to operate casinos in Macau. The Macau government has had the ability to grant additional gaming

21

Table of Contents

concessions since April 2009. If the Macau government were to allow additional competitors to operate in Macau through the grant of additional concessions or subconcessions, we would face additional competition, which could have a material adverse effect on our business, financial condition, results of operations and cashflows. Current concessionaries and subconcessionaires can open additional facilities.

Our Macau resort complex also faces competition from casinos located in other areas of Asia, including the Marina Bay Sands and Resorts World Sentosa resorts operating in Singapore, Genting Highlands Resort, a major gaming and resort destination located outside of Kuala Lumpur, Malaysia, and casinos in the Philippines. We also encounter competition from other major gaming centers located around the world, including Australia and Las Vegas, cruise ships in Asia that offer gaming, and other casinos throughout Asia. Further, if current efforts to legalize gaming in other Asian countries are successful, our Wynn Macau resort will face additional regional competition.

*We are entirely dependent on a limited number of resorts for all of our cash flow, which subjects us to greater risks than a gaming company with more operating properties.*

We are entirely dependent upon our Las Vegas Operations and our Macau Operations for all of our operating cash flow. As a result, we are subject to a greater degree of risk than a gaming company with more operating properties. The risks to which we have a greater degree of exposure include the following:

- local economic and competitive conditions;

- changes in local and state governmental laws and regulations, including gaming laws and regulations;

- natural and other disasters;

- a decline in the number of visitors to Las Vegas or Macau;

- a decrease in gaming and non-gaming activities at our resorts ; and

- the outbreak of infectious diseases.

Any of the factors outlined above could negatively affect our ability to generate sufficient cash flow to make payments or maintain our covenants with respect to our debt.

Our efforts to develop gaming and resort properties in other locations may be costly and may not be successful.

*Our business relies on high-end, international customers. We often extend credit, and we may not be able to collect gaming receivables from our credit players or credit play may decrease.*

General. A significant portion of our table games revenue at our resorts is attributable to the play of a limited number of international customers. The loss or a reduction in the play of the most significant of these customers could have a material adverse effect on our business, financial condition, results of operations and cashflows. A downturn in economic conditions in the countries in which these customers reside could cause a further reduction in the frequency of visits by and revenue generated from these customers.

We conduct our gaming activities on a credit as well as a cash basis. This credit is unsecured. Table games players typically are extended more credit than slot players, and high-stakes players typically are extended more credit than patrons who tend to wager lower amounts. The collectabilty of receivables from international customers could be negatively affected by future business or economic trends or by significant events in the countries in which these customers reside. We will extend credit to those customers whose level of play and financial resources, in the opinion of management, warrant such an extension.

In addition, premium gaming is more volatile than other forms of gaming, and variances in win-loss results attributable to high-end gaming may have a positive or negative impact on cash flow and earnings in a particular quarter.

22

Table of Contents

*Wynn Las Vegas.* While gaming debts evidenced by a credit instrument, including what is commonly referred to as a "marker," are enforceable under the current laws of Nevada, and judgments on gaming debts are enforceable in all states of the United States under the Full Faith and Credit Clause of the United States Constitution, other jurisdictions may determine that direct or indirect enforcement of gaming debts is against public policy. Although courts of some foreign nations will enforce gaming debts directly and the assets in the United States of foreign debtors may be used to satisfy a judgment, judgments on gaming debts from U.S. courts are not binding on the courts of many foreign nations. We cannot assure you that we will be able to collect the full amount of gaming debts owed to us, even in jurisdictions that enforce them. Recent dramatic changes in economic conditions may make it more difficult to assess creditworthiness and more difficult to collect the full amount of any gaming debt owed to us. Our inability to collect gaming debts could have a significant negative impact on our operating results.

*Wynn Macau.* Although the law in Macau permits casino operators to extend credit to gaming customers, Wynn Macau may not be able to collect all of its gaming receivables from its credit players. We expect that Wynn Macau will be able to enforce these obligations only in a limited number of jurisdictions, including Macau. To the extent our gaming customers are visitors from other jurisdictions, we may not have access to a forum in which it will be able to collect all of its gaming receivables because, among other reasons, courts of many jurisdictions do not enforce gaming debts and we may encounter forums that will refuse to enforce such debts. Our inability to collect gaming debts could have a significant negative impact on our operating results.

Currently, the gaming tax in Macau is calculated as a percentage of gross gaming revenue. However, unlike Nevada, the gross gaming revenue calculation in Macau does not include deductions for uncollectible gaming debts. As a result, if we extend credit to our customers in Macau and are unable to collect on the related receivables from them, we remain obligated to pay taxes on our winnings from these customers.

***We are subject to extensive state and local regulation and licensing and gaming authorities have significant control over our operations. The cost of compliance or failure to comply with such regulations and authorities, could have a negative effect on our business.***

*General.* The operations of our resorts are contingent upon our obtaining and maintaining all necessary licenses, permits, approvals, registrations, findings of suitability, orders and authorizations. The laws, regulations and ordinances requiring these licenses, permits and other approvals generally relate to the responsibility, financial stability and character of the owners and managers of gaming operations, as well as persons financially interested or involved in gaming operations. The scope of the approvals required to open and operate a facility is extensive. We received all approvals for the opening of Wynn Las Vegas on April 28, 2005, and Encore at Wynn Las Vegas on December 22, 2008. We are subject to ongoing regulation to maintain their operations. We opened Wynn Macau on September 6, 2006 and Encore at Wynn Macau on April 21, 2010, and are subject to ongoing regulation to maintain their operations.

*Wynn Las Vegas.* The Nevada Gaming Commission may, in its discretion, require the holder of any debt or securities we issue to file applications, be investigated and be found suitable to own Wynn Resorts' securities if it has reason to believe that the security ownership would be inconsistent with the declared policies of the State of Nevada.

Nevada regulatory authorities have broad powers to request detailed financial and other information, to limit, condition, suspend or revoke a registration, gaming license or related approval and to approve changes in our operations. Substantial fines or forfeiture of assets for violations of gaming laws or regulations may be levied. The suspension or revocation of any license which may be granted to us or the levy of substantial fines or forfeiture of assets could significantly harm our business, financial condition and results of operations. Furthermore, compliance costs associated with gaming laws, regulations and licenses are significant. Any change in the laws, regulations or licenses applicable to our business or a violation of any current or future laws or

23

Table of Contents

regulations applicable to our business or gaming licenses could require us to make substantial expenditures or could otherwise negatively affect our gaming operations.

The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the Board of Directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts. The redemption price may be paid in cash, by promissory note, or both, as required, and pursuant to the terms established by, the applicable gaming authority and, if not, as Wynn Resorts elects.

On February 18, 2012, the Board of Directors of Wynn Resorts received a report from Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing numerous instances of conduct constituting prima facie violations of the FCPA by Kazuo Okada (formerly the largest beneficial owner of our shares) and certain of his affiliates. See Item 3—"Legal Proceedings", and Item 8—"Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies." After receiving the Freeh Report, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada were "unsuitable" within the meaning of Article VII of Wynn Resorts' articles of incorporation and redeemed all of Aruze USA, Inc.'s shares of Wynn Resorts' common stock. See Item 3—"Legal Proceedings" and Item 8—"Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies".

*Wynn Macau.* Wynn Macau's operations are subject to unique risks, including risks related to Macau's regulatory framework. Failure to adhere to the regulatory and gaming environment in Macau could result in the revocation of Wynn Macau, S.A.'s concession or otherwise negatively affect its operations in Macau. Moreover, we would be subject to the risk that U.S. regulators could determine that Macau's gaming regulatory framework has not developed in a way that would permit us to conduct operations in Macau in a manner consistent with the way in which we intend, or the Nevada gaming authorities require us, to conduct our operations in the United States.

### *Our information technology and other systems are subject to cyber security risk including misappropriation of customer information or other breaches of information security.*

We rely on information technology and other systems to maintain and transmit customer financial information, credit card settlements, credit card funds transmissions, mailing lists and reservations information. In addition, our financial and recordkeeping processes are run from one central location at a secured off site Network Operations Center. We have implemented systems that are designed to meet all requirements of the Payment Card Industry standards for data protection. However, our information and processes are subject to the ever-changing threat of compromised security, in the form of a risk of potential breach, system failure, computer virus, or unauthorized or fraudulent use by customers, company employees, or employees of third party vendors. The steps we take to deter and mitigate these risks may not be successful, and any resulting compromise or loss of data or systems could adversely impact, operations or regulatory compliance and could result in remedial expenses, fines, litigation, and loss of reputation, potentially impacting our financial results.

### *Because we own real property, we are subject to extensive environmental regulation, which creates uncertainty regarding future environmental expenditures and liabilities.*

We have incurred costs to comply with environmental requirements, such as those relating to discharges into the air, water and land, the handling and disposal of solid and hazardous waste and the cleanup of properties affected by hazardous substances. Under these and other environmental requirements we may be required to investigate and clean up hazardous or toxic substances or chemical releases at our property. As an owner or operator, we could also be held responsible to a governmental entity or third parties for property damage, personal injury and investigation and cleanup costs incurred by them in connection with any contamination.

24

Table of Contents

These laws typically impose cleanup responsibility and liability without regard to whether the owner or operator knew of or caused the presence of the contaminants. The liability under those laws has been interpreted to be joint and several unless the harm is divisible and there is a reasonable basis for allocation of the responsibility. The costs of investigation, remediation or removal of those substances may be substantial, and the presence of those substances, or the failure to remediate a property properly, may impair our ability to use our property.

***Our insurance coverage may not be adequate to cover all possible losses that we could suffer, including terrorism, and our insurance costs may increase.***

We have comprehensive property and liability insurance policies for our properties in operation as well as those in the course of construction with coverage features and insured limits that we believe are customary in their breadth and scope. Market forces beyond our control may nonetheless limit the scope of the insurance coverage we can obtain or our ability to obtain coverage at reasonable rates. Certain types of losses, generally of a catastrophic nature, such as earthquakes, hurricanes and floods, or terrorist acts, or certain liabilities may be uninsurable or too expensive to justify obtaining insurance. As a result, we may not be successful in obtaining insurance without increases in cost or decreases in coverage levels. In addition, in the event of a substantial loss, the insurance coverage we carry may not be sufficient to pay the full market value or replacement cost of our lost investment or in some cases could result in certain losses being totally uninsured. As a result, we could lose some or all of the capital we have invested in a property, as well as the anticipated future revenue from the property, and we could remain obligated for debt or other financial obligations related to the property.

Our debt instruments and other material agreements require us to maintain a certain minimum level of insurance. Failure to satisfy these requirements could result in an event of default under these debt instruments or material agreements.

***Our business is particularly sensitive to the willingness of our customers to travel. Acts of terrorism, regional political events and developments in the conflicts in certain countries could cause severe disruptions in air travel that reduce the number of visitors to our facilities, resulting in a material adverse effect on our business and financial condition, results of operations or cash flows.***

We are dependent on the willingness of our customers to travel. Only a small amount of our business is and will be generated by local residents. Most of our customers travel to reach our Las Vegas and Macau properties. Acts of terrorism may severely disrupt domestic and international travel, which would result in a decrease in customer visits to Las Vegas and Macau, including our properties. Regional conflicts could have a similar effect on domestic and international travel. Management cannot predict the extent to which disruptions in air or other forms of travel as a result of any further terrorist act, outbreak of hostilities or escalation of war would have an adverse effect on our business and financial condition, results of operations or cash flows.

***We are a parent company and our primary source of cash is and will be distributions from our subsidiaries.***

We are a parent company with limited business operations of our own. Our main asset is the capital stock of our subsidiaries. We conduct most of our business operations through our direct and indirect subsidiaries. Accordingly, our primary sources of cash are dividends and distributions with respect to our ownership interests in our subsidiaries that are derived from the earnings and cash flow generated by our operating properties. Our subsidiaries might not generate sufficient earnings and cash flow to pay dividends or distributions in the future. Our subsidiaries' payments to us will be contingent upon their earnings and upon other business considerations. In addition, our subsidiaries' debt instruments and other agreements limit or prohibit certain payments of dividends or other distributions to us. We expect that future debt instruments for the financing of our other developments will contain similar restrictions.

25

Table of Contents

*If a third party successfully challenges our ownership of, or right to use, the Wynn-related trademarks and/or service marks, our business or results of operations could be harmed.*

We have filed applications with the PTO and with various foreign patent and trademark registries including registries in Macau, China, Hong Kong, Singapore, Taiwan, Japan, certain European countries and various other jurisdictions throughout the world, to register a variety of WYNN-related trademarks and service marks in connection with a variety of goods and services. These marks include "WYNN RESORTS," "WYNN DESIGN AND DEVELOPMENT," "WYNN LAS VEGAS," "ENCORE" and "WYNN MACAU." Some of the applications are based upon ongoing use and others are based upon a bona fide intent to use the marks in the future.

A common element of most of these marks is the use of the surname "WYNN." As a general rule, a surname (or the portion of a mark primarily constituting a surname) is not eligible for registration unless the surname has acquired "secondary meaning." To date, we have been successful in demonstrating to the PTO such secondary meaning for the Wynn name, in certain of the applications, based upon factors including Mr. Wynn's prominence as a resort developer, but we cannot assure you that we will be successful with the other pending applications.

Federal registrations are not completely dispositive of the right to such marks. Third parties who claim prior rights with respect to similar marks may nonetheless challenge our right to obtain registrations or our use of the marks and seek to overcome the presumptions afforded by such registrations.

Our intellectual property assets, especially the logo version of "Wynn," are among our most valuable assets. Efforts we take to acquire and protect our intellectual property rights against unauthorized use throughout the world, which may include retaining counsel and commencing litigation in various jurisdictions, may be costly and may not be successful in protecting and preserving the status and value of our intellectual property assets.

*If a third party asserts other forms of intellectual property claims against us, our business or results of operations could be adversely affected.*

Historically, trademarks and service marks have been the principal form of intellectual property right of relevance to the gaming industry. However, due to the increased use of technology in computerized gaming machines and in business operations generally, other forms of intellectual property rights (such as patents and copyrights) are becoming of increased relevance. It is possible that, in the future, third parties might assert superior intellectual property rights or allege that their intellectual property rights cover some aspect of our operations. The defense of such allegations may result in substantial expenses, and, if such claims are successfully prosecuted, may have a material impact on our business.

*We are subject to taxation by various governments and agencies. The rate of taxation could change.*

We are subject to tax by various governments and agencies, both in the U.S. and in Macau. Changes in the rates of taxation, the amount and the time when income is subject to taxation, the ability to claim U.S. foreign tax credits, failure to renew our Macau dividend agreement and Macau income tax exemption after 2015 and the imposition of foreign withholding taxes could increase our overall rate of taxation.

## Risks Associated with our Macau Operations

*We depend upon games promoters for a significant portion of our gaming revenue. If we are unable to maintain, or develop additional, successful relationships with reputable games promoters, our ability to maintain or grow our gaming revenues could be adversely affected. Increased competition may result in increased pressure on commission rates.*

A significant portion of our gaming revenue is generated by clientele of our games promoters. There is intense competition among casino operators in Macau for services provided by games promoters. We anticipate

26

Table of Contents

that this competition will further intensify as additional casinos open in Macau. Other operators in the market have increased commissions and advances to games promoters, in some cases dramatically, in an effort to increase market share. These types of actions by other casino operators have further intensified competition for the services of games promoters. While we believe that we currently maintain good relations with our existing games promoters, there can be no assurance that we will be able to continue to maintain these relationships. If we are unable to maintain, or develop additional, successful relationships with reputable games promoters, or lose a significant number of our games promoters to our competitors, our ability to maintain or grow our gaming revenues will be adversely affected and we will have to seek alternative ways of developing relationships with VIP customers. In addition, if our games promoters are unable to develop or maintain relationships with our VIP customers, our ability to maintain or grow our gaming revenues will be hampered.

Certain games promoters have significant leverage and bargaining strength in negotiating operational agreements with casino operators. This leverage could result in games promoters negotiating changes to our operational agreements, including higher commissions, or the loss of business to a competitor or the loss of certain relationships with games promoters. If we need to increase our commission rates or otherwise change our practices with respect to games promoters due to competitive forces, our results of operations could be adversely affected.

The reputations and probity of the games promoters we deal with are important to our own reputation and to our ability to operate in compliance with our concession, Macau gaming laws and other gaming licenses. While we endeavor, through contractual protections and otherwise, to ensure that our games promoters comply with high standards of probity and integrity, we cannot assure you that our games promoters will always comply with these standards. In addition, if we enter into a business relationship with a games promoter whose probity is in doubt, this may be considered by regulators or investors to reflect negatively on our own probity. If any of our games promoters violate the Macau gaming laws while on our premises, the Macau government may, in its discretion, take enforcement action against us, the games promoter, or each concurrently, and we may be sanctioned and our reputation could be harmed. If our games promoters are unable to maintain required standards of probity and integrity, we may face consequences from gaming regulators with authority over our operations.

### *The financial resources of our games promoters may be insufficient to allow them to continue doing business at our resort.*

Our games promoters may encounter decreased liquidity, for a variety of reasons, limiting their ability to grant credit to their patrons and thereby decreasing gaming volume at Wynn Macau. Furthermore, credit already extended by our games promoters to their patrons may become increasingly difficult for them to collect. This inability to grant credit and collect amounts due can negatively affect our games promoters' operations, and as a result, our results of operations could be adversely impacted.

### *Revenues from our Macau gaming operations will end if we cannot secure an extension of our concession in 2022 or if the Macau government exercises its redemption right in 2017.*

Our concession agreement expires in June 2022. Unless our concession is extended, in June 2022, all of our gaming operations and related equipment in Macau will be automatically transferred to the Macau government without compensation to us and we will cease to generate any revenues from these operations. Beginning in June 2017, the Macau government may redeem the concession agreement by providing us at least one year's prior notice. In the event the Macau government exercises this redemption right, we are entitled to fair compensation or indemnity. The amount of such compensation or indemnity will be determined based on the amount of revenue generated during the tax year prior to the redemption multiplied for the remaining years under the concession. We cannot assure you that we will be able to renew or extend our concession agreement on terms favorable to us or at all. We also cannot assure you that if our concession is redeemed, the compensation paid will be adequate to compensate us for the loss of future revenues.

27

Table of Contents

***The development costs of Cotai are estimates only, and actual development costs may be higher than expected.***

We expect the total development costs of our Cotai project to be in the range of $3.5 billion to $4.0 billion, including the budgeted design and construction costs, cost of the land payments (through opening), capitalized interest, pre-opening expenses and all financing fees. The required cash interest payments and commitment fees on our Wynn Macau credit facilities which will become due through the estimated commencement date of operations of Wynn Macau have been included in our estimate of the total development costs.

While we believe that the overall budget for the development costs of Cotai are reasonable, these development costs are estimates and the actual development costs may be higher than expected. Although we have certain owners' contingencies set aside to cover cost overruns, these contingencies may not be sufficient to cover the full amount of such overruns. If these contingencies are not sufficient to cover these costs, we may not have the funds required to pay the excess costs.

***There are significant risks associated with the construction of Cotai, which could have an adverse effect on our financial condition, results of operations or cash flows from this planned facility.***

Major construction projects of the scope and scale of our Cotai project entail significant risks, including:

- shortages of materials or skilled labor;
- unforeseen engineering, environmental and/or geological problems;
- work stoppages;
- weather interference;
- unanticipated cost increases; and
- unavailability of construction equipment.

Construction, equipment or staffing problems or difficulties in obtaining any of the requisite licenses, permits and authorizations from regulatory authorities could increase the total cost, delay or prevent the construction or opening or otherwise affect the design and features of our Cotai project.

We anticipate that only some of the subcontractors engaged for these projects will post bonds guaranteeing timely completion of a subcontractor's work and payment for all of that subcontractor's labor and materials. These bonds may not be adequate to ensure completion of the work.

We have not yet entered into a final agreement with a general contractor or any trade contractors with respect to the construction of Cotai. We may not agree with general or trade contractors on financial and other terms that will meet our forecasted cost budget and schedule.

Our Cotai facility may not commence operations on schedule and construction costs for this project may exceed budgeted amounts. Failure to complete this project on schedule or within budget may have a significant negative effect on us and on our ability to make payments on our debt.

***Our Macau subsidiaries' indebtedness is secured by a substantial portion of their assets.***

Subject to applicable laws, including gaming laws, and certain agreed upon exceptions, our Macau subsidiaries' debt is secured by liens on substantially all of their assets. In the event of a default by such subsidiaries under their financing documents, or if such subsidiaries experience insolvency, liquidation, dissolution or reorganization, the holders of such secured debt would first be entitled to payment from their

28

Table of Contents

collateral security, and only then would holders of our Macau subsidiaries' unsecured debt be entitled to payment from their remaining assets.

### *Visitation to Macau may decline due to economic disruptions in mainland China as well as increased restrictions on visitations to Macau from citizens of mainland China.*

A significant number of our gaming customers at Wynn Macau come from mainland China. Any economic disruption or contraction in China could disrupt the number of patrons visiting our property or the amount they may be willing to spend. In addition, any travel restrictions imposed by China on its citizens could disrupt the number of visitors from mainland China to our property. It is not known when, or if, policies similar to those implemented in 2009 restricting visitation by mainland Chinese citizens to Macau and Hong Kong, will be put in place and travel policies may be adjusted, without notice, in the future.

### *We compete for limited labor resources in Macau and Macau government policies may also affect our ability to employ imported labor.*

The success of our operations in Macau will be affected by our success in retaining our employees. We compete with a large number of casino resorts in Macau for a limited number of qualified employees. We have to seek employees from other countries to adequately staff our resort and certain Macau government policies affect our ability to import labor in certain job classifications. We coordinate with the Macau labor and immigration authorities to ensure our labor needs are satisfied, but cannot be certain that we will be able to recruit and retain a sufficient number of qualified employees for our operations or that we will be able to obtain required work permits for those employees.

### *Wynn Macau may be affected by adverse political and economic conditions.*

The success of Wynn Macau will depend on political and economic conditions in Macau and mainland China. In December 1999, after approximately 450 years of Portuguese control, Portugal returned Macau to Chinese administration. The People's Republic of China established Macau as a special administrative region. As a result of this change in control, Macau's legislative, regulatory, legal, economic and cultural institutions are in a period of transition. We cannot predict how these systems and cultural institutions will develop, or how developments will affect the business of Wynn Macau.

Our operations are subject to significant political, economic and social risks inherent in doing business in an emerging market. For example, fiscal decline and civil, domestic or international unrest in Macau, China or the surrounding region could significantly harm our business, not only by reducing customer demand for casino resorts, but also by increasing the risk of imposition of taxes and exchange controls or other governmental restrictions that might impede its ability to repatriate funds.

### *Macau may not have an adequate transportation infrastructure to accommodate the demand from future development.*

Because of additional casino projects which are under construction and to be developed in the future, the ferry and helicopter services which provide transportation between Macau and Hong Kong may need to be expanded to accommodate the increased visitation of Macau. If transportation facilities to and from Macau are inadequate to meet the demands of an increased volume of gaming customers visiting Macau, the desirability of Macau as a gaming destination, as well as the results of operations of Wynn Macau, could be negatively impacted.

### *Extreme weather conditions may have an adverse impact on Wynn Macau.*

Macau's subtropical climate and location on the South China Sea are subject to extreme weather conditions including typhoons and heavy rainstorms. Unfavorable weather conditions could negatively affect the profitability of our resort complex and prevent or discourage guests from traveling to Macau.

<div align="center">29</div>

Table of Contents

***The Macau government can terminate our concession under certain circumstances without compensation to us, which would have a material adverse effect on our business and financial condition.***

The Macau government has the right to unilaterally terminate our concession in the event of our material non-compliance with the basic obligations under the concession and applicable Macau laws. The concession agreement expressly provides that the government of Macau may unilaterally rescind the concession agreement if Wynn Macau, S.A.:

- conducts unauthorized games or activities that are excluded from its corporate purpose;

- suspends gaming operations in Macau for more than seven consecutive days (or more than 14 days in a civil year) without justification;

- defaults in payment of taxes, premiums, contributions or other required amounts;

- does not comply with government inspections or supervision;

- systematically fails to observe its obligations under the concession system;

- fails to maintain bank guarantees or bonds satisfactory to the government;

- is the subject of bankruptcy proceedings or becomes insolvent;

- engages in serious fraudulent activity, damaging to the public interest; or

- repeatedly violates applicable gaming laws.

If the government of Macau unilaterally rescinds the concession agreement, Wynn Macau, S.A. will be required to compensate the government in accordance with applicable law, and the areas defined as casino space under Macau law and all of the gaming equipment pertaining to our gaming operations will be transferred to the government without compensation. The loss of our concession would prohibit us from conducting gaming operations in Macau, which would have a material adverse effect on our business and financial condition.

***Conflicts of interest may arise because certain of our directors and officers are also directors of Wynn Macau, Limited.***

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary of Wynn Resorts and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold through an initial public offering, 1,437,500,000 shares (27.7%) of this subsidiary's common stock. As a result of Wynn Macau, Limited having stockholders who are not affiliated with us, and certain of our officers and directors who also serve as officers and/or directors of Wynn Macau, Limited may have conflicting fiduciary obligations to our stockholders and to the minority stockholders of Wynn Macau, Limited. Decisions that could have different implications for Wynn Resorts and Wynn Macau, Limited, including contractual arrangements that we have entered into or may in the future enter into with Wynn Macau, Limited, may give rise to the appearance of a potential conflict of interest.

***Certain Nevada gaming laws apply to Wynn Macau's gaming activities and associations.***

Certain Nevada gaming laws also apply to gaming activities and associations in jurisdictions outside the State of Nevada. With respect to our Wynn Macau operations, we and our subsidiaries that must be licensed to conduct gaming operations in Nevada are required to comply with certain reporting requirements concerning gaming activities and associations in Macau conducted by our Macau-related subsidiaries. We and our licensed Nevada subsidiaries also will be subject to disciplinary action by the Nevada Gaming Commission if our Macau-related subsidiaries:

- knowingly violate any Macau laws relating to their Macau gaming operations;

- fail to conduct Wynn Macau's operations in accordance with the standards of honesty and integrity required of Nevada gaming operations;

30

Table of Contents

•   engage in any activity or enter into any association that is unsuitable for us because it poses an unreasonable threat to the control of gaming in Nevada, reflects or tends to reflect discredit or disrepute upon the State of Nevada or gaming in Nevada, or is contrary to Nevada gaming policies;

•   engage in any activity or enter into any association that interferes with the ability of the State of Nevada to collect gaming taxes and fees; or

•   employ, contract with or associate with any person in the foreign gaming operation who has been denied a license or a finding of suitability in Nevada on the ground of unsuitability, or who has been found guilty of cheating at gambling.

Such disciplinary action could include suspension, conditioning, limitation or revocation of the registration, licenses or approvals held by us and our licensed Nevada subsidiaries, including Wynn Las Vegas, LLC, and the imposition of substantial fines.

In addition, if the Nevada State Gaming Control Board determines that any actual or intended activities or associations of our Macau-related subsidiaries may be prohibited pursuant to one or more of the standards described above, the Nevada State Gaming Control Board can require us and our licensed Nevada subsidiaries to file an application with the Nevada Gaming Commission for a finding of suitability of the activity or association. If the Nevada Gaming Commission finds that the activity or association in Macau is unsuitable or prohibited, our Macau-related subsidiaries will either be required to terminate the activity or association, or will be prohibited from undertaking the activity or association. Consequently, should the Nevada Gaming Commission find that our Macau-related subsidiary's gaming activities or associations in Macau are unsuitable, those subsidiaries may be prohibited from undertaking their planned gaming activities or associations in Macau, or be required to divest their investment in Macau, possibly on unfavorable terms.

*Unfavorable changes in currency exchange rates may increase Wynn Macau's obligations under the concession agreement and cause fluctuations in the value of our investment in Macau.*

The currency delineated in Wynn Macau's concession agreement with the government of Macau is the Macau Pataca. The Macau Pataca, which is not a freely convertible currency, is linked to the Hong Kong dollar, and in many cases the two are used interchangeably in Macau. The Hong Kong dollar is linked to the U.S. dollar and the exchange rate between these two currencies has remained relatively stable over the past several years. However, the exchange linkages of the Hong Kong dollar and the Macau Pataca, and the Hong Kong dollar and the U.S. dollar, are subject to potential changes due to, among other things, changes in Chinese governmental policies and international economic and political developments.

We cannot assure you that the Hong Kong dollar and the Macau Pataca will continue to be linked to the U.S. dollar, which may result in severe fluctuations in the exchange rate for these currencies. We also cannot assure you that the current rate of exchange fixed by the applicable monetary authorities for these currencies will remain at the same level.

Because many of Wynn Macau's payment and expenditure obligations are in Macau Patacas, in the event of unfavorable Macau Pataca or Hong Kong dollar rate changes, Wynn Macau's obligations, as denominated in U.S. dollars, would increase. In addition, because we expect that most of the revenues for any casino that we operate in Macau will be in Hong Kong dollars, we are subject to foreign exchange risk with respect to the exchange rate between the Hong Kong dollar and the U.S. dollar. Also, if any of our Macau-related entities incur U.S. dollar-denominated debt, fluctuations in the exchange rates of the Macau Pataca or the Hong Kong dollar, in relation to the U.S. dollar, could have adverse effects on our results of operations, financial condition and ability to service its debt.

*Currency exchange controls and currency export restrictions could negatively impact Wynn Macau.*

Currency exchange controls and restrictions on the export of currency by certain countries may negatively impact the success of Wynn Macau. For example, there are currently existing currency exchange controls and

31

Table of Contents

restrictions on the export of the renminbi, the currency of China. Restrictions on the export of the renminbi may impede the flow of gaming customers from China to Macau, inhibit the growth of gaming in Macau and negatively impact Wynn Macau's gaming operations.

### Risks Related to Share Ownership and Stockholder Matters

*Our largest stockholders are able to exert significant influence over our operations and future direction.*

As of December 31, 2012, Mr. Wynn and Elaine P. Wynn own 10,026,708 shares and 9,742,150 shares, respectively, or in the aggregate approximately 19.6%, of our outstanding common stock. As a result, Mr. Wynn and Elaine P. Wynn, to the extent they vote their shares in a similar manner, may be able to exert significant influence over all matters requiring our stockholders' approval, including the approval of significant corporate transactions. In addition, until February 2012, Aruze USA, Inc. owned 24,549,222 shares of our outstanding common stock. On February 18, 2012, the Company redeemed all of the shares of the Company's common stock held by Aruze USA, Inc. For additional information on the redemption, see Item 8—"Notes to the Consolidated Financial Statements", Note 16 "Commitments and Contingencies".

Under the Amended and Restated Stockholders Agreement, dated as of January 6, 2010, by and among Stephen A. Wynn, Elaine P. Wynn and Aruze USA, Inc. (the "Amended and Restated Stockholders Agreement"), Mr. Wynn and Elaine P. Wynn have agreed to vote the shares of the Company's common stock held by them subject to the terms of the Amended and Restated Stockholders Agreement in a manner so as to elect to our Board of Directors each of the nominees contained on each and every slate of directors endorsed by Mr. Wynn, which slate will include, subject to certain exceptions, Elaine P. Wynn. As a result of this voting arrangement, Mr. Wynn, as a practical matter, exercises significant influence over the slate of directors to be elected to our Board of Directors. In addition, with stated exceptions, the Amended and Restated Stockholders Agreement requires the written consent of the other party prior to any party selling any shares of the Company's common stock that it owns.

In June 2012, in connection with the pending litigation between the Company and Aruze USA, Inc., Elaine P. Wynn submitted a cross claim against Mr. Wynn and Kazuo Okada seeking to void the Amended and Restated Stockholders Agreement. The Wynn Las Vegas indentures provide that if Mr. Wynn, together with certain related parties, in the aggregate beneficially owns a lesser percentage of the outstanding common stock of the Company than is beneficially owned by any other person, a change of control will have occurred. If Elaine Wynn prevails in her cross claim, Mr. Wynn would not beneficially own or control Elaine Wynn's shares and a change in control may result under the Indentures. For additional information on the cross claim, see Item 8—"Notes to the Consolidated Financial Statements", Note 8 "Long-Term Debt" and Note 16 "Commitments and Contingencies".

In November 2006, the Board of Directors of Wynn Resorts approved an amendment of its bylaws that exempts future acquisitions of shares of Wynn Resorts' common stock by either Mr. Wynn or Aruze USA, Inc. from Nevada's acquisition of controlling interest statutes. In light of the determination by the Board of Directors on February 18, 2012 that each of Aruze USA, Inc., Universal Entertainment Corporation and Mr. Kazuo Okada is an "Unsuitable Person" under the Company's articles of incorporation and the redemption and cancellation of Aruze USA Inc.'s shares of Company common stock, our Fifth Amended and Restated Bylaws amended these provisions to delete the reference to Aruze USA, Inc. and its affiliates. The Nevada acquisition of controlling interest statutes require stockholder approval in order to exercise voting rights in connection with any acquisition of a controlling interest in certain Nevada corporations unless the articles of incorporation or bylaws of the corporation in effect on the 10th day following the acquisition of a controlling interest by certain acquiring persons provide that these statutes do not apply to the corporation or to the acquisition specifically by types of existing or future stockholders. These statutes define a "controlling interest" as (i) one-fifth or more but less than one third, (ii) one-third or more but less than a majority, or (iii) a majority or more, of the voting power in the election of directors. As a result of these bylaws provisions, Mr. Wynn or his affiliates may acquire ownership of

Table of Contents

outstanding voting shares of Wynn Resorts permitting him or them to exercise more than one-third but less than a majority, or a majority or more, of all of the voting power of the Company in the election of directors, without requiring a resolution of the Company's stockholders granting voting rights in the control shares acquired.

### Risks Related to our Substantial Indebtedness

*We are highly leveraged and future cash flow may not be sufficient for us to meet our obligations, and we might have difficulty obtaining more financing.*

We have a substantial amount of consolidated debt in relation to our equity. As of December 31, 2012, we had total outstanding debt of approximately $5.8 billion. This amount reflects a portion of the funds we need to construct our Cotai project. However, as our project budget is an estimate only as of the date of this report, we may require additional financing to complete construction of our Cotai project. The estimated project budget for our Cotai project is in the range of $3.5 billion to $4.0 billion and we expect to enter into a guaranteed maximum price contract for the project construction costs in the first half of 2013. See Item—1 "Business", "Construction and Development Opportunities". In addition, we may incur additional indebtedness if certain conditions are met, including conditions under our Wynn Macau credit facilities and our Wynn Las Vegas indentures, as applicable, including but not limited to in connection with other potential development plans in the future. Furthermore, on February 18, 2012, we issued a subordinated promissory note with a principal amount of approximately $1.9 billion in redemption of all of the shares of Wynn Resorts common stock held by Aruze USA, Inc. (the "Redemption Note"). For additional information on the redemption and the Redemption Note, see Item 3—"Legal Proceedings" and Item 8—"Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies". Our substantial indebtedness could have important consequences. For example:

- if we fail to meet our payment obligations or otherwise default under the agreements governing our indebtedness, the lenders under those agreements will have the right to accelerate the indebtedness and exercise other rights and remedies against us. These rights and remedies include rights to:

    - repossess and foreclose upon any assets that serve as collateral;

    - in the case of secured debt, initiate judicial foreclosure against us;

    - petition a court to appoint a receiver for us or for substantially all of our assets;

- we are required to use a substantial portion of our cash flow from the operations of Wynn Las Vegas and Wynn Macau to service and amortize, as applicable, our indebtedness at Wynn Las Vegas and Wynn Macau, respectively, which will reduce the amount of available cash, if any, to fund working capital, other capital expenditures and other general corporate purposes at Wynn Las Vegas and Wynn Macau, respectively, and may give us greater exposure to adverse economic and industry conditions;

- Aruze USA, Inc., Universal Entertainment Corporation and Kazuo Okada have challenged the redemption of Aruze USA, Inc.'s shares and we are currently involved in litigation with those parties as well as related shareholder derivative litigation. The outcome of these various proceedings cannot be predicted. Any adverse judgments or settlements involving payment of a material sum of money could cause a material adverse effect on our financial condition and results of operations and could expose us to additional claims by third parties including current or former investors or regulators. Any adverse judgments or settlements would reduce our profits and could limit our ability to operate our business. See Item 3—"Legal Proceedings" and Item 8—"Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies".

- we may experience decreased revenues from our operations attributable to decreases in consumer spending levels and high unemployment due to adverse economic and industry conditions, and could fail to generate sufficient cash to fund our liquidity needs and/or fail to satisfy the financial and other restrictive covenants to which we are subject under our existing indebtedness. We cannot provide assurance that our business will generate sufficient cash flow from operations or that future borrowings will be available to us in an amount sufficient to enable us to pay our indebtedness or to fund our other liquidity needs;

- we may have a limited ability to respond to changing business and economic conditions and to withstand competitive pressures, which may affect our financial condition;

Table of Contents

- we may not be able to obtain additional financing, if needed, to satisfy working capital requirements or pay for other capital expenditures, debt service or other obligations;

- while we do hedge a certain amount of our debt under our credit facilities, rates with respect to a portion of the interest we pay will fluctuate with market rates and, accordingly, our interest expense will increase if market interest rates increase; and

- if we fail to pay our debts generally as they become due, unsecured creditors that we fail to pay may initiate involuntary bankruptcy proceedings against us, and such bankruptcy proceedings will delay or impair the repayment of our debt.

Under the terms of the documents governing our debt facilities, subject to certain limitations, we are permitted to incur additional indebtedness, including secured and unsecured senior and subordinated indebtedness. If we incur additional indebtedness, the risks described above will be exacerbated.

Following the Company's press release on February 19, 2012 relating to the redemption of Aruze USA, Inc.'s shares of Wynn Resorts' common stock and the issuance of the Redemption Price Promissory Note, Standard & Poor's Ratings Services and Fitch Ratings revised their ratings outlooks on Wynn Resorts to stable from positive, although they did not change their ratings of Wynn Resorts. (Moody's did not revise the ratings or outlook for Wynn Resorts as a result of the announcement.) Such ratings agency actions could make it more difficult for us to obtain additional financing on acceptable terms.

***The agreements governing our debt facilities contain certain financial covenants and other covenants that restrict our ability to engage in certain transactions and may impair our ability to respond to changing business and economic conditions.***

Some of our debt facilities require us to satisfy various financial covenants, which include requirements for minimum interest coverage ratios and leverage ratios pertaining to total debt to earnings before interest, tax, depreciation and amortization (both currently required for our Wynn Macau credit facilities). If our operations fail to generate adequate cash flow, we may violate those covenants causing a default in our agreements. Future indebtedness or other contracts could contain covenants more restrictive than those contained in our existing debt facilities.

Our ability to comply with the terms of our outstanding facilities may be affected by general economic conditions, industry conditions and other events, some of which may be beyond our control. As a result, we may not be able to maintain compliance with these covenants. Our failure to comply with the terms of our debt facilities, including failure as a result of events beyond our control, could result in an event of default, which would materially and adversely affect our operating results and our financial condition or result in our lenders taking action to enforce their security interests in our various assets.

The agreements governing our debt facilities also contain restrictions on our ability to engage in certain transactions and may limit our ability to respond to changing business and economic conditions. These restrictions include, among other things, limitations on our ability and the ability of our restricted subsidiaries to:

- pay dividends or distributions or repurchase equity;

- incur additional debt;

- make investments;

- create liens on assets to secure debt;

- enter into transactions with affiliates;

- issue stock of, or member's interests in, subsidiaries;

- enter into sale-leaseback transactions;

34

Table of Contents

- engage in other businesses;
- merge or consolidate with another company;
- transfer, sell or otherwise dispose of assets;
- issue disqualified stock;
- create dividend and other payment restrictions affecting subsidiaries; and
- designate restricted and unrestricted subsidiaries.

If there were an event of default under one of our debt instruments, the holders of the defaulted debt could cause all amounts outstanding with respect to that debt to be due and payable immediately and such event also could result in an event of default under other debt. We cannot assure you that our assets or cash flow would be sufficient to fully repay borrowings under our outstanding debt if accelerated upon an event of default, or that we would be able to repay, refinance or restructure the payments on such debt.

If Wynn Macau were to cease to produce cash flow sufficient to service its indebtedness or otherwise become unable to make certain payments or dividends to us which we in turn could use to service our indebtedness, our ability to service the indebtedness at Wynn Macau or Wynn Las Vegas could be negatively impacted.

## ITEM 1B.    UNRESOLVED STAFF COMMENTS

None.

## ITEM 2.    PROPERTIES

**Las Vegas Land**

We currently own approximately 238 acres of land on or near the Las Vegas Strip consisting of approximately 75 acres at the northeast corner of the intersection of Las Vegas Boulevard and Sands Avenue on which Wynn Las Vegas is located, the approximately 140-acre golf course behind Wynn Las Vegas, approximately 5 acres adjacent to the golf course on which an office building is located, and approximately 18 acres located across from the Wynn Las Vegas site at Koval Lane and Sands Avenue, a portion of which is improved with an employee parking garage and an office building.

**Las Vegas Water Rights**

We own approximately 834 acre-feet of permitted and certificated water rights, which we currently use to irrigate the golf course. We also own approximately 151.5 acre-feet of permitted and certificated water rights for commercial use. There are significant cost savings and conservation benefits associated with using water supplied pursuant to our water rights. We anticipate using our water rights to support future development of the golf course land.

**Macau Land Concessions**

The government of Macau owns most of the land in Macau. In most cases, private interests in real property located in Macau are obtained through long-term leases and other grants of rights to use land from the government. In July 2004, our subsidiary, Wynn Macau, S.A., entered into a land concession contract under which Wynn Macau, S.A. leases from the Macau government an approximately 16-acre parcel of land in downtown Macau's inner harbor area where Wynn Macau is located. The term of the land concession contract is 25 years from August 2004, and it may be renewed with government approval for successive periods. Wynn Macau, S.A. paid a land concession premium of approximately 319.4 million patacas (approximately US

35

Table of Contents

$40 million) for this land concession. In 2009, the Company and the Macau government agreed to modify this land concession as a result of the expansion of Wynn Macau with Encore at Wynn Macau and the additional square footage that was added as a result of such expansion. In November 2009, the Company made an additional one-time land premium payment of approximately 113.4 million patacas (approximately US $14.2 million). Annual rent of approximately 4.2 million patacas (approximately US $525,000) is being paid in accordance with the land concession contract.

In September 2011, Palo Real Estate Company Limited ("Palo") and Wynn Resorts (Macau) S.A., each an indirect subsidiary of Wynn Macau Limited, formally accepted the terms and conditions of a draft land concession contract from the Macau government for approximately 51 acres of land in the Cotai area of Macau. On May 2, 2012, the land concession contract was gazetted by the government of Macau evidencing the final step in the granting of the land concession. The Company is constructing a full scale integrated resort containing a casino, luxury hotel, convention, retail, entertainment and food and beverage offerings on this land. The Company estimates the project budget to be in the range of $3.5 billion to $4.0 billion. The Company expects to enter into a guaranteed maximum price contract for the project construction costs in the first half of 2013. We expect to open our resort in Cotai during the first half of 2016.

The initial term of the Cotai land concession contract is 25 years from May 2, 2012, and it may be renewed with government approval for successive periods. Palo made an initial payment of 500 million patacas (approximately US$62.5 million) in December 2011. Additionally, Palo is obligated to pay, in eight additional semi-annual installments, a total of 938.8 million patacas (approximately US $117.6 million) plus interest at 5%, beginning November 2012. The Company will also be required to make annual lease payments of 6.2 million patacas (approximately US $0.8 million) during the resort construction period and annual payments of 8.6 million patacas (approximately US $1.1 million) once the development is completed.

## ITEM 3.    LEGAL PROCEEDINGS

We are occasionally party to lawsuits. As with all litigation, no assurance can be provided as to the outcome of such matters and we note that litigation inherently involves significant costs. For more information regarding the Company's legal matters see Item 1A—"Risk Factors" and Item 8—Notes to Consolidated Financial Statements, Note 16 "Commitments and Contingencies," in this Annual Report on Form 10-K.

*Atlantic-Pacific Capital*

On May 3, 2010, Atlantic-Pacific Capital, Inc. ("APC") filed an arbitration demand with JAMS, a private alternative dispute resolution provider, regarding an agreement with the Company. The action concerns a claim for compensation of approximately $32 million pursuant to an agreement entered into between APC and the Company on or about March 30, 2008 whereby APC was engaged to raise equity capital for an investment vehicle sponsored by the Company. APC is seeking compensation unrelated to the investment vehicle. The Company has denied APC's claims for compensation. The Company filed a Complaint for Damages and Declaratory Relief against APC in the Eighth Judicial District Court, Clark County, Nevada, on May 10, 2010, which APC removed to the United States District Court, District of Nevada. In March 2011, the District Court denied APC's motion to compel arbitration, and dismissed the action. APC appealed, and on November 13, 2012, the United States Court of Appeals for the Ninth Circuit reversed the District Court and compelled arbitration. The matter is proceeding in arbitration, and an arbitrator recently has been selected. Management believes that APC's claims against the Company are without merit, and the Company continues to defend this matter vigorously.

*Determination of Unsuitability and Redemption of Aruze USA, Inc. and Affiliates*

On February 18, 2012, Wynn Resorts' Gaming Compliance Committee concluded an investigation after receiving an independent report by Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing a pattern of

36

Table of Contents

misconduct by Aruze USA, Inc., at the time a stockholder of Wynn Resorts, Universal Entertainment Corporation, Aruze USA, Inc.'s parent company, and Kazuo Okada, the majority shareholder of Universal Entertainment Corporation, who, until February 21, 2013, was also a member of Wynn Resorts' Board of Directors and was at the time a director of Wynn Macau, Limited. The factual record presented in the Freeh Report included evidence that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada had provided valuable items to certain foreign gaming officials who were responsible for regulating gaming in a jurisdiction in which entities controlled by Mr. Okada were developing a gaming resort. Mr. Okada has denied the impropriety of such conduct to members of the Board of Directors of Wynn Resorts and Mr. Okada has refused to acknowledge or abide by Wynn Resorts' anti-bribery policies and has refused to participate in the training all other directors have received concerning these policies.

Based on the Freeh Report, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada are "unsuitable persons" under Article VII of the Company's articles of incorporation. The Board of Directors was unanimous (other than Mr. Okada) in its determination. The Board of Directors also requested that Mr. Okada resign as a director of Wynn Resorts (under Nevada corporation law, a board of directors does not have the power to remove a director) and recommended that Mr. Okada be removed as a member of the Board of Directors of Wynn Macau, Limited. In addition, on February 18, 2012, Mr. Okada was removed from the Board of Directors of Wynn Las Vegas Capital Corp., an indirect wholly owned subsidiary of Wynn Resorts. On February 24, 2012, Mr. Okada was removed from the Board of Directors of Wynn Macau, Limited and on February 22, 2013, he was removed from the Board of Directors of Wynn Resorts by a stockholder vote in which 99.6% of the over 86 million shares voted were cast in favor of removal. Additionally, Mr. Okada resigned from the Board of Directors of Wynn Resorts on February 21, 2013.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," Article VII of Wynn Resorts' articles of incorporation authorizes redemption at "fair value" of the shares held by unsuitable persons. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares held by Aruze USA, Inc. under the terms of the Stockholders Agreement (as defined below). Pursuant to the articles of incorporation, Wynn Resorts issued the Redemption Note to Aruze USA, Inc. in redemption of the shares. The Redemption Note has a principal amount of $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Note. The Company may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts or any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

After authorizing the redemption of the Aruze USA, Inc. shares, the Board of Directors took certain actions to protect the Company and its operations from any influence of an unsuitable person, including placing limitations on the provision of certain operating information to unsuitable persons, evaluating whether to seek the removal of Mr. Okada from the Company's Board of Directors, and the formation of an Executive Committee of the Board to manage the business and affairs of the Company during the period between each annual meeting. The Charter of the Executive Committee provides that "Unsuitable Persons" are not permitted to serve on the Committee. All members of the Board, other than Mr. Okada, were appointed to the Executive Committee on February 18, 2012. On February 24, 2012, the Board of Directors of Wynn Macau, Limited removed Mr. Kazuo Okada from the board. On January 3, 2013, the Company filed a definitive proxy statement on Schedule 14A ("Proxy Statement") for a special meeting of the stockholders to consider and vote upon a proposal to remove

Table of Contents

Mr. Okada as a director of the Company ("Removal Proposal"). On January 24, 2013, Mr. Okada filed a complaint in the United States District Court, District of Nevada against the Company, alleging that Proxy Statement was materially false and misleading in contravention of Section 14(a) of the Securities Exchange Act of 1934, as amended, and Securities and Exchange Commission Rule 14a-9 promulgated thereunder. Mr. Okada also filed a motion for a preliminary injunction on January 28, 2013, in which he sought an order preliminarily enjoining the special meeting of stockholders until such time as the Company corrected certain alleged misstatements and omissions in its Proxy Statement. At the conclusion of a hearing held on February 15, 2013, the federal court denied Mr. Okada's motion.

On the afternoon of February 21, 2013, Mr. Okada resigned as a director of the Company. On February 22, 2013, the special meeting of stockholders was held and the stockholders approved the Removal Proposal with an affirmative vote of 85.7% of the shares entitled to vote at the special meeting (99.6% of the shares that were voted at the special meeting of stockholders were voted in favor of the Removal Proposal).

*Redemption Action and Counterclaim*

On February 19, 2012, Wynn Resorts filed a complaint in the Eighth Judicial District Court, Clark County, Nevada against Mr. Okada, Aruze USA, Inc. and Universal Entertainment Corporation (companies controlled by Mr. Okada) (the "Okada Parties"), alleging breaches of fiduciary duty and related claims. The Company is seeking compensatory and special damages as well as a declaration that it acted lawfully and in full compliance with its articles of incorporation, bylaws and other governing documents in redeeming and cancelling the shares of Aruze, USA, Inc.

On March 12, 2012, the Okada Parties removed the action to the United States District Court for the District of Nevada (the action was subsequently remanded to Nevada state court). On that same date, the Okada Parties filed an answer denying the claims and a counterclaim that purports to assert claims against the Company, each of the members of the Company's Board of Directors (other than Mr. Okada) and Wynn Resorts' General Counsel (the "Wynn Parties"). As amended, the Okada Parties' counterclaim alleges, among other things: (1) that the shares of Wynn Resorts common stock owned by Aruze USA, Inc. were exempt from the redemption-for-unsuitability provisions in the Wynn Resorts articles of incorporation pursuant to certain agreements executed in 2002; (2) that the Wynn Resorts directors who authorized the redemption of Aruze USA, Inc.'s shares acted at the direction of Stephen A. Wynn and did not independently and objectively evaluate Mr. Okada's, Universal Entertainment Corporation's, and Aruze USA, Inc.'s suitability, and by so doing, breached their fiduciary duties; (3) that the Wynn Resorts directors violated the terms of the Wynn Resorts articles of incorporation by failing to pay Aruze USA, Inc. fair value for the redeemed shares; and (4) that the terms of the Redemption Note that Aruze USA, Inc. received in exchange for the redeemed shares, including the Redemption Note's principal amount, duration, interest rate, and subordinated status, were unconscionable. Among other relief, the amended counterclaim seeks a declaration that the redemption of Aruze USA, Inc.'s shares was void, an injunction restoring Aruze USA, Inc.'s share ownership, damages in an unspecified amount and rescission of the Amended and Restated Stockholders Agreement. On August 31, 2012, Aruze USA, Inc. filed a motion for preliminary injunction with the Nevada state court. The motion sought an order that would prohibit Wynn Resorts from barring or preventing Aruze USA, Inc. from exercising rights as a stockholder at the November 2, 2012 annual meeting of Wynn Resorts' stockholders. On October 2, 2012, the Nevada state court denied Aruze USA, Inc.'s motion for preliminary injunction. On October 19, 2012, Aruze USA, Inc. filed a notice of appeal with the Nevada Supreme Court. The appeal was assigned to the Nevada Supreme Court's mediation program, has not progressed, and is pending. Wynn Resorts intends to vigorously defend against the appeal and to argue that the Nevada Supreme Court should affirm the state court's decision denying Aruze USA, Inc.'s motion for a preliminary injunction.

The Company's complaint, as amended, and the Okada Parties' counterclaim, as amended, were challenged at the pleading stage through motion practice. At a hearing held on November 13, 2012, the Nevada state court denied the Wynn Parties' motion to dismiss the Okada Parties' amended counterclaim, but dismissed the Okada

38

Table of Contents

Parties' claims under the Nevada Racketeer Influenced and Corrupt Organizations Act. At a hearing held on January 15, 2013, the court denied the Okada Parties' motion to dismiss the Company's amended complaint.

On February 13, 2013, the Okada Parties filed a motion in the Nevada state court in which they asked the court to establish a "disputed ownership fund" as defined in a federal tax regulation. Specifically, the motion sought an order establishing an escrow account to hold the Redemption Note issued to Aruze USA, Inc. as compensation for the shares of Wynn Resorts common stock redeemed by the board of directors in February 2012 in light of the board's determination of unsuitability, as well as the redeemed shares themselves (although those shares were previously cancelled in February 2012), pending a resolution of the state court action. The order sought by the Okada Parties would also require the Company to, among other things, make any payments on the Redemption Note into the escrow account. A hearing on the motion has been set for March 22, 2013. The Company believes there is no basis for the relief requested in the motion and intends to oppose the motion vigorously.

The Company is vigorously pursuing its claims against the Okada Parties, and the Company and the other counter-defendants are vigorously defending against the counterclaims asserted against them. The Company's claims and the Okada Parties' counterclaims are in a preliminary stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any. Any adverse judgments or settlements involving payment of a material sum of money could cause a material adverse effect on our financial condition and results of operations and could expose us to additional claims by third parties, including current or former investors or regulators. Any adverse judgments or settlements would reduce our profits and could limit our ability to operate our business. See Item 1A—"Risk Factors" and Item 8—"Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies".

*Related Matters*

The Company provided the Freeh Report to appropriate regulators and law enforcement agencies and is cooperating with related investigations that such regulators and agencies have undertaken. The conduct of the Okada Parties and any resulting regulatory investigations could have adverse consequences to the Company and its subsidiaries. A finding by regulatory authorities that Mr. Okada violated anti-corruption statutes and/or other laws or regulations applicable to persons affiliated with a gaming licensee on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, as described below, the Salt Lake Regional Office of the U.S. Securities and Exchange Commission ("SEC") has commenced an informal inquiry into, and other regulators could pursue separate investigations into, the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company. In February 2013, the Nevada Gaming Control Board informed the Company that it has completed its investigation of allegations made by Mr. Okada against the Company regarding the activities of Mr. Wynn and related entities in Macau and found no violations of the Gaming Control Act or the Nevada Gaming Commission Regulations.

On June 19, 2012, Elaine Wynn responded to the Okada Parties' counterclaim and asserted a cross claim against Steve Wynn and Kazuo Okada seeking a declaration that (1) any and all of Elaine Wynn's duties under the January 2010 Stockholders Agreement (the "Stockholders Agreement") by and among Aruze USA, Inc., Steve Wynn, and Elaine Wynn be discharged; (2) the Stockholders Agreement is subject to rescission and is rescinded; (3) the Stockholders Agreement is an unreasonable restraint on alienation in violation of public policy; and/or (4) the restrictions on sale of shares shall be construed as inapplicable to Elaine Wynn. Mr. Wynn filed his answer to Elaine Wynn's cross claim on September 24, 2012. The indentures for the Wynn Las Vegas, LLC 2022 Notes and Existing Notes (the "Indentures") provide that if Steve Wynn, together with certain related parties, in

39

Table of Contents

the aggregate beneficially owns a lesser percentage of the outstanding common stock of the Company than are beneficially owned by any other person, a change of control will have occurred. If Elaine Wynn prevails in her cross claim, Steve Wynn would not beneficially own or control Elaine Wynn's shares and a change in control may result under the Company's debt documents. Under the Indentures, the occurrence of a change of control requires that the Company make an offer (unless the notes have been previously called for redemption) to each holder to repurchase all or any part of such holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest on the Notes purchased, if any, to the date of repurchase.

*Litigation Commenced by Kazuo Okada and Related Matters*

Books and Records Action:

On January 11, 2012, Mr. Okada, in his role as a Wynn Resorts' director, commenced a writ proceeding in the Eighth Judicial District Court, Clark County, Nevada, seeking to compel the Company to produce certain books and records relating to a donation to the University of Macau, among other things.

In May 2011, Wynn Macau, a majority owned subsidiary of the Company, made a commitment to the University of Macau Development Foundation in support of the new Asia-Pacific Academy of Economics and Management. This contribution consists of a $25 million payment made in May 2011 and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive. The pledge was consistent with the Company's long-standing practice of providing philanthropic support for deserving institutions in the markets in which it operates. The pledge was made following an extensive analysis which concluded that the gift was made in accordance with all applicable laws. The pledge was considered by the boards of directors of both the Company and Wynn Macau, Limited and approved by 15 of the 16 directors who served on those boards. The sole dissenting vote was cast by Mr. Okada whose stated objection was to the length of time over which the donation would occur, not its propriety.

At a hearing on February 9, 2012, the Nevada state court held that, as a director of the Company, Mr. Okada had the right to make a reasonable inspection of the Company's corporate books and records. Following the hearing, the Company released certain documents to Mr. Okada for his inspection. At a subsequent hearing on March 8, 2012, the court considered Mr. Okada's request that the Company's Board of Directors make additional documents available to him, and ruled that Mr. Okada was entitled to inspect two additional pages of documents. The Company promptly complied with the court's ruling.

On May 25, 2012, Mr. Okada amended his petition to request inspection of additional records. Following a hearing held on October 2, 2012, the court ruled that Mr. Okada is entitled to review certain additional Company documents from the 2000 to 2002 time period. The Company promptly complied with the court's ruling. On November 2, 2012, Mr. Okada filed a motion to compel the production of additional documents and to depose a witness designated by the Company. At the conclusion of a hearing held on November 8, 2012, the court denied Mr. Okada's motion. The Company has not received any further requests for information by Mr. Okada in relation to this matter as of the date of this report.

SEC Inquiry:

On February 8, 2012, following Mr. Okada's lawsuit, the Company received a letter from the Salt Lake Regional Office of the SEC requesting that, in connection with an informal inquiry by the SEC, the Company preserve information relating to the donation to the University of Macau, any donations by the Company to any other educational charitable institutions, including the University of Macau Development Foundation, and the Company's casino or concession gaming licenses or renewals in Macau. The Company is fully cooperating with the Salt Lake Regional Office staff.

40

Table of Contents

Japan Action:

On August 28, 2012, Mr. Okada, Universal Entertainment Corporation and Okada Holdings filed a complaint in Tokyo District Court against the Company, all members of the Board of Directors (other than Mr. Okada) and the Company's General Counsel, alleging that the press release issued by the Company with respect to the redemption has damaged plaintiffs' social evaluation and credibility. The plaintiffs seek damages and legal fees from the defendants. The Company and the other counter-defendants are vigorously defending against the claims asserted against them in this matter.

Federal Securities Action:

On January 3, 2013, the Company filed a definitive proxy statement on Schedule 14A ("Proxy Statement") for a special meeting of the stockholders to consider and vote upon a proposal to remove Mr. Okada as a director of the Company ("Removal Proposal"). On January 24, 2013, Mr. Okada filed a complaint in the United States District Court, District of Nevada against the Company, alleging that the Proxy Statement was materially false and misleading in contravention of Section 14(a) of the Securities Exchange Act of 1934, as amended, and Securities and Exchange Commission Rule 14a-9 promulgated thereunder. Mr. Okada also filed a motion for a preliminary injunction on January 28, 2013, in which he sought an order preliminarily enjoining the special meeting of stockholders until such time as the Company corrected certain alleged misstatements and omissions in its Proxy Statement. At the conclusion of a hearing held on February 15, 2013, the federal court denied Mr. Okada's motion.

On the afternoon of February 21, 2013, Mr. Okada resigned as a director of the Company. On February 22, 2013, the special meeting of stockholders was held and the stockholders approved the Removal Proposal with an affirmative vote of 85.7% of the shares entitled to vote at the special meeting (99.6% of the shares that were voted at the special meeting of stockholders were voted in favor of the Removal Proposal).

*Related Derivative Litigation*

Six derivative actions were commenced against the Company and all members of its Board of Directors: four in the United States District Court, District of Nevada, and two in the Eighth Judicial District Court of Clark County, Nevada.

The four federal actions brought by the following plaintiffs have been consolidated: (1) The Louisiana Municipal Police Employees' Retirement System, (2) Maryanne Solak, (3) Excavators Union Local 731 Welfare Fund, and (4) Boilermakers Lodge No. 154 Retirement Fund (collectively, the "Federal Plaintiffs").

The Federal Plaintiffs filed a consolidated complaint on August 6, 2012, asserting claims for: (1) breach of fiduciary duty; (2) waste of corporate assets; (3) injunctive relief; and (4) unjust enrichment. The claims are against the Company all Company directors, including Mr. Okada, however, the plaintiffs voluntarily dismissed Mr. Okada as a defendant in this consolidated action on September 27, 2012. The Federal Plaintiffs claim that the individual defendants breached their fiduciary duties and wasted assets by: (a) failing to ensure the Company's officers and directors complied with federal and state laws and the Company's Code of Conduct; (b) voting to allow the Company's subsidiary to make the donation to the University of Macau; and (c) redeeming Aruze USA, Inc.'s stock such that the Company incurs the debt associated with the redemption. The Federal Plaintiffs seek unspecified compensatory damages, restitution in the form of disgorgement, reformation of corporate governance procedures, an injunction against all future payments related to the donation/pledge, and all fees (attorneys, accountants, and experts) and costs. The directors responded to the consolidated complaint by filing a motion to dismiss on September 14, 2012. On February 1, 2013, the federal court dismissed the complaint for failure to plead adequately the futility of a pre-suit demand on the Board of Directors. The dismissal was without prejudice to the Federal Plaintiffs' ability to file a motion within 30 days seeking leave to file an amended complaint.

41

Table of Contents

The two state court actions brought by the following plaintiffs have also been consolidated: (1) IBEW Local 98 Pension Fund and (2) Danny Hinson (collectively, the "State Plaintiffs"). Through a coordination of efforts by all parties, the directors and the Company (a nominal defendant) have been served in all of the actions.

The State Plaintiffs filed a consolidated complaint on July 20, 2012 asserting claims for (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; and (4) unjust enrichment. The claims are against the Company and all Company directors, including Mr. Okada, as well as the Company's Chief Financial Officer, who signs financial disclosures filed with the SEC. The State Plaintiffs claim that the individual defendants failed to disclose to the Company's stockholders the investigation into, and the dispute with director Okada as well as the alleged potential violations of the FCPA related to, the University of Macau Development Foundation donation. The State Plaintiffs seek unspecified monetary damages (compensatory and punitive), disgorgement, reformation of corporate governance procedures, an order directing the Company to internally investigate the donation, as well as attorneys' fees and costs. On October 13, 2012, the court entered the parties' stipulation providing for a stay of the state derivative action for 90 days, subject to the parties' obligation to monitor the progress of the pending litigation, discussed above, between Wynn Resorts (among others) and Mr. Okada (among others). Per the stipulation, Wynn Resorts and the individual defendants were not required to respond to the consolidated complaint while the stay remained in effect. Although the stay has now expired, the State Plaintiffs have agreed to further extend the defendants' time to respond to the consolidated complaint to allow the State Plaintiffs additional time to consider their plans for the action going forward, including a possible extension by agreement of the stay in the state derivative action.

The individual defendants are vigorously defending against the claims pleaded against them in these derivative actions. We are unable to predict the outcome of these litigations at this time.

**ITEM 4.**      **MINE SAFETY DISCLOSURES**

Not Applicable.

42

Table of Contents

**PART II**

**ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock trades on the NASDAQ Global Select Market under the symbol "WYNN." The following table sets forth the high and low sale prices for the indicated periods, as reported by the NASDAQ Global Select Market.

|  | High | Low |
|---|---|---|
| **Year Ended December 31, 2012** | | |
| First Quarter | $132.59 | $104.62 |
| Second Quarter | $138.28 | $ 95.82 |
| Third Quarter | $116.47 | $ 90.11 |
| Fourth Quarter | $123.64 | $103.34 |
| **Year Ended December 31, 2011** | | |
| First Quarter | $132.25 | $106.08 |
| Second Quarter | $151.73 | $128.15 |
| Third Quarter | $172.58 | $111.71 |
| Fourth Quarter | $142.20 | $101.02 |

**Holders**

There were approximately 199 record holders of our common stock as of February 14, 2013.

**Dividends**

Wynn Resorts is a holding company and, as a result, our ability to pay dividends is dependent on our ability to obtain funds and our subsidiaries' ability to provide funds to us. Restrictions imposed by our subsidiaries' debt instruments significantly restrict certain key subsidiaries holding a majority of our assets, including Wynn Las Vegas, LLC and Wynn Macau, S.A., from making dividends or distributions to Wynn Resorts. Specifically, Wynn Las Vegas, LLC and certain of its subsidiaries are restricted under the indentures governing the first mortgage notes from making certain "restricted payments," as defined in the indentures. These restricted payments include the payment of dividends or distributions to any direct or indirect holders of equity interests of Wynn Las Vegas, LLC. Restricted payments cannot be made unless certain financial and non-financial criteria have been satisfied. In addition, the terms of the other loan agreements of Wynn Las Vegas, LLC and Wynn Macau, S.A. contain similar restrictions. Our Company has paid the following dividends:

- In November 2012, we paid a cash dividend of $8 per share. In each of March 2012, June 2012 and August 2012, we paid a cash dividend of $0.50 per share.

- In December 2011, we paid a cash dividend of $5 per share. In each of May 2011, August 2011 and November 2011, we paid a cash dividend of $0.50 per share.

The Company has increased its quarterly dividend to $1.00 per share in 2013. On January 31, 2013, we announced a cash dividend of $1.00 per share, that was paid on February 28, 2013 to stockholders of record as of February 14, 2013. Our Board of Directors will continue to periodically assess the level and appropriateness of any cash dividends.

**ITEM 6.    SELECTED FINANCIAL DATA**

The following tables reflect selected consolidated financial data of Wynn Resorts and its subsidiaries. This data should be read together with our Consolidated Financial Statements and Notes thereto, "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and the other

43

Table of Contents

information contained in this Annual Report on Form 10-K. Operating results for the periods presented are not indicative of the results that may be expected for future years. Significant events impacting our selected financial data include:

- On April 28, 2005, we opened our Wynn Las Vegas resort.
- On September 6, 2006, we opened our Wynn Macau resort.
- On December 24, 2007, we opened an expansion of our Wynn Macau resort.
- On December 22, 2008, we opened Encore at Wynn Las Vegas, an expansion of Wynn Las Vegas.
- On October 9, 2009, Wynn Macau, Limited listed its shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 27.7% of its common stock through an initial public offering.
- On April 21, 2010, we opened Encore at Wynn Macau, an expansion of Wynn Macau.
- On February 18, 2012, we redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts common stock.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2012 | 2011 | 2010 | 2009 | 2008 |
| | (in thousands, except per share amounts) | | | | |
| **Consolidated Statements of Income Data:** | | | | | |
| Net revenues | $ 5,154,284 | $ 5,269,792 | $ 4,184,698 | $ 3,045,611 | $ 2,987,324 |
| Pre-opening costs | 466 | — | 9,496 | 1,817 | 72,375 |
| Operating income | 1,029,276 | 1,008,240 | 625,252 | 234,963 | 312,136 |
| Net income | 728,699 | 825,113 | 316,596 | 39,107 | 210,479 |
| Less: Net income attributable to noncontrolling interest[1] | (226,663) | (211,742) | (156,469) | (18,453) | — |
| Net income attributable to Wynn Resorts | 502,036 | 613,371 | 160,127 | 20,654 | 210,479 |
| Basic income per share | $ 4.87 | $ 4.94 | $ 1.30 | $ 0.17 | $ 1.94 |
| Diluted income per share | $ 4.82 | $ 4.88 | $ 1.29 | $ 0.17 | $ 1.92 |

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2012 | 2011 | 2010 | 2009 | 2008 |
| | (in thousands, except per share amounts) | | | | |
| **Consolidated Balance Sheets Data:** | | | | | |
| Cash and cash equivalents | $ 1,725,219 | $ 1,262,587 | $ 1,258,499 | $ 1,991,830 | $ 1,133,904 |
| Construction in progress | 110,490 | 28,477 | 22,901 | 457,594 | 221,696 |
| Total assets | 7,276,594 | 6,899,496 | 6,674,497 | 7,581,769 | 6,755,788 |
| Total long-term obligations[2] | 6,041,285 | 3,096,149 | 3,405,983 | 3,695,821 | 4,430,436 |
| Stockholders' equity[3] | 103,932 | 2,223,454 | 2,380,585 | 3,160,363 | 1,601,595 |
| Cash distributions declared per common share | $ 9.50 | $ 6.50 | $ 8.50 | $ 4.00 | $ — |

[1] In October 2009, Wynn Macau, Limited, our indirect wholly owned subsidiary and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of its common stock through an initial public offering. Net income attributable to noncontrolling interest represents the noncontrolling interests' share of our net income of Wynn Macau, Limited.

[2] Includes long-term debt, the required contract premium payments under our land concession contract at Wynn Macau, future charitable contributions and deferred income taxes.

[3] In February 2012, in connection with the redemption and cancellation of Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts common stock, stockholders' equity was reduced by $1.94 billion, the

Table of Contents

face amount of the Redemption Note. Aruze USA has challenged the redemption and cancellation of the 24,549,222 shares and legal proceedings are ongoing. Please see Item 3—"Legal Proceedings".

**ITEM 7.**      **MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion should be read in conjunction with, and is qualified in its entirety by, the consolidated financial statements and the notes thereto included elsewhere in this Annual Report on Form 10-K.

**Overview**

We are a developer, owner and operator of destination casino resorts. We currently own and operate two casino resort complexes. In Las Vegas, Nevada, we own and operate Wynn Las Vegas I Encore, which we refer to as our Las Vegas Operations. In the Macau Special Administrative Region of the People's Republic of China ("Macau"), we own and operate Wynn Macau, which opened on September 6, 2006. On April 21, 2010 we opened Encore at Wynn Macau, a further expansion of Wynn Macau. We refer to the fully integrated Wynn Macau and Encore at Wynn Macau resort as Wynn Macau I Encore or as our Macau Operations.

**Our Resorts**

The following table sets forth information about our resorts as of February 2013:

| | Hotel Rooms & Suites | Approximate Casino Square Footage | Approximate Number of Table Games | Approximate Number of Slots |
|---|---|---|---|---|
| Las Vegas Operations | 4,750 | 186,000 | 240 | 2,195 |
| Macau Operations | 1,008 | 275,000 | 495 | 835 |

*Las Vegas Operations*

Wynn Las Vegas I Encore is located at the intersection of the Las Vegas Strip and Sands Avenue, and occupies approximately 215 acres of land fronting the Las Vegas Strip. In addition, we own approximately 18 acres across Sands Avenue, a portion of which is utilized for employee parking and an office building, and approximately 5 acres adjacent to the golf course on which an office building is located.

Our Las Vegas resort complex features:

- Approximately 186,000 square feet of casino space, offering 24-hour gaming and a full range of games, including private gaming salons, a sky casino, a poker room, and a race and sports book;

- Two luxury hotel towers with a total of 4,750 spacious hotel rooms, suites and villas;

- 35 food and beverage outlets featuring signature chefs;

- A Ferrari and Maserati automobile dealership;

- Approximately 95,000 square feet of high-end, brand-name retail shopping, including stores and boutiques by Alexander McQueen, Brioni, Cartier, Chanel, Chloé, Chopard, Dior, Graff, Hermes, IWC Schaffhausen, Jaeger-Lecoultre, Loro Piana, Louis Vuitton, Manolo Blahnik, Oscar de la Renta, Piaget, Vertu and others;

- Recreation and leisure facilities, including an 18-hole golf course, swimming pools, private cabanas and two full service spas and salons;

- Two showrooms; and

- Three nightclubs and a beach club.

In response to our evaluation of our Las Vegas Operations and the reactions of our guests, we have and expect to continue to make enhancements and refinements to this resort complex. During 2012, we remodeled two of our restaurants, and rebranded several retail outlets.

45

Table of Contents

*Macau Operations*

We operate Wynn Macau | Encore under a 20-year casino concession agreement granted by the Macau government in June 2002.

Our Macau resort complex features:

- Approximately 275,000 square feet of casino space, offering 24-hour gaming and a full range of games, including private gaming salons, sky casinos and a poker pit;

- Two luxury hotel towers with a total of 1,008 spacious rooms and suites;

- Casual and fine dining in eight restaurants;

- Approximately 55,000 square feet of high-end, brand-name retail shopping, including stores and boutiques by Bvlgari, Cartier, Chanel, Dior, Dunhill, Ferrari, Giorgio Armani, Graff, Gucci, Hermes, Hugo Boss, Jaegar-LeCoultre, Louis Vuitton, Miu Miu, Piaget, Prada, Roger Dubuis, Rolex, Tiffany, Tudor, Vacheron Constantin, Van Cleef & Arpels, Versace, Vertu, Ermenegildo Zegna and others;

- Recreation and leisure facilities, including two health clubs and spas, a salon, a pool; and

- Lounges and meeting facilities.

In response to our evaluation of our Macau Operations and the reactions of our guests, we have made and expect to continue to make enhancements and refinements to this resort complex. During 2012, we converted certain storage and office areas to two new retail outlets, enhanced our fountain show in the front of the hotel, and converted some of our employee training rooms to gaming space.

*Future Development*

On May 2, 2012, the land concession contract for approximately 51 acres of land in the Cotai area of Macau was gazetted, evidencing the final step in the granting of the land concession. We are constructing a full scale integrated resort containing a casino, luxury hotel, convention, retail, entertainment and food and beverage offerings on this land. We estimate the project budget to be in the range of $3.5 billion to $4.0 billion. We expect to enter into a guaranteed maximum price contract for the construction costs in the first half of 2013. We expect to open our resort in Cotai during the first half of 2016.

We continually seek out new opportunities for additional gaming or related businesses, in the United States, and worldwide. We recently filed gaming applications and plan to participate in the competitive bidding process for a gaming license in both Massachusetts and Pennsylvania as part of our strategy to expand in select markets. In addition, we are exploring various international jurisdictions for expansion opportunities.

**Results of Operations**

The table below presents our net revenues (amounts in thousands). Our results for the years presented are not comparable as the years ended December 31, 2012 and 2011 includes full year of operations for Encore at Wynn Macau which opened on April 21, 2010.

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| Net Revenues: | | | |
| Las Vegas Operations | $ 1,486,830 | $ 1,480,719 | $ 1,296,064 |
| Macau Operations | 3,667,454 | 3,789,073 | 2,888,634 |
| | $ 5,154,284 | $ 5,269,792 | $ 4,184,698 |

Reliance on only two resort complexes (in two geographic regions) for our operating cash flow exposes us to certain risks that competitors, whose operations are more geographically diversified, may be better able to

46

Table of Contents

control. In addition to the concentration of operations in two resort complexes, many of our customers are premium gaming customers who wager on credit, thus exposing us to increased credit risk. High-end gaming also increases the potential for variability in our results.

*Operating Measures*

Certain key operating statistics specific to the gaming industry are included in our discussion of our operational performance for the periods for which a Consolidated Statement of Income is presented. There are two methods used to calculate win percentage in the casino industry. In Las Vegas and in the general casino in Macau, customers usually purchase cash chips at the gaming tables. The cash and net markers used to purchase the cash chips are deposited in the gaming table's drop box. This is the base of measurement that we use in the casino at our Las Vegas Operations and in the general casino at our Macau Operations for calculating win percentage.

In our VIP casino in Macau, customers primarily purchase non-negotiable chips, commonly referred to as rolling chips, from the casino cage and there is no deposit into a gaming table drop box from chips purchased from the cage. Non-negotiable chips can only be used to make wagers. Winning wagers are paid in cash chips. The loss of the non-negotiable chips in the VIP casino is recorded as turnover and provides a base for calculating VIP casino win percentage. Because of this difference in chip purchase activity, the measurement base used in the general casino is not the same that is used in the VIP casino. It is customary in Macau to measure VIP casino play using this rolling chip method. For 2012, our expected win as a percentage of turnover was 2.7% to 3.0%.

The measurement method in Las Vegas and in the general casino in Macau tracks the initial purchase of chips at the table while the measurement method in our VIP casino in Macau tracks the sum of all losing wagers. Accordingly, the base measurement in the VIP casino is much larger than Las Vegas and the general casino in Macau. As a result, the expected win percentage with the same amount of gaming win is smaller in the VIP casino in Macau when compared to Las Vegas and the general casino in Macau.

Even though both use the same measurement method, we experience different table games win percentages in Las Vegas and the general casino in Macau. This difference is primarily due to the difference in the mix of table games and customer playing habits between the two casinos. Each type of table game has its own theoretical win percentage. For 2012, our expected table games win percentage in Las Vegas was 21% to 24%. Our expected table games win percentage in the general casino at Wynn Macau, which we have periodically revised based on our experience since the opening of the Encore at Wynn Macau expansion, was 28% to 30%.

Below are definitions of the statistics discussed:

- Table games win is the amount of drop or turnover that is retained and recorded as casino revenue.

- Drop is the amount of cash and net markers issued that are deposited in a gaming table's drop box.

- Turnover is the sum of all losing rolling chip wagers within our Macau VIP program.

- Rolling chips are identifiable chips that are used to track VIP wagering volume (turnover) for purposes of calculating incentives.

- Slot win is the amount of handle (representing the total amount wagered) that is retained by us and is recorded as casino revenue.

- Average Daily Rate ("ADR") is calculated by dividing total room revenue including the retail value of promotional allowances (less service charges, if any) by total rooms occupied, including complimentary rooms.

- Revenue per Available Room ("REVPAR") is calculated by dividing total room revenue including the retail value of promotional allowances (less service charges, if any) by total rooms available.

- Occupancy is calculated by dividing total occupied rooms, including complimentary rooms, by the total rooms available.

47

Table of Contents

*Financial results for the year ended December 31, 2012 compared to the year ended December 31, 2011.*

*Revenues*

Net revenues for the year ended December 31, 2012 are comprised of $4,034.8 million in casino revenues (78.3% of total net revenues) and $1,119.5 million of net non-casino revenues (21.7% of total net revenues). Net revenues for the year ended December 31, 2011 are comprised of $4,190.5 million in casino revenues (79.5% of total net revenues) and $1,079.3 million of net non-casino revenues (20.5% of total net revenues).

Casino revenues are primarily comprised of the net win from our table games and slot machine operations. Casino revenues for the year ended December 31, 2012 of $4,034.8 million represents a $155.7 million (3.7%) decrease from casino revenues of $4,190.5 million for the year ended December 31, 2011. Our Las Vegas Operations experienced a $32.9 million (5.3%) decrease in casino revenues to $592.3 million, compared to the prior year casino revenues of $625.2 million due to a decrease in our table games win percentage (before discounts). Our Macau Operations experienced a $122.8 million (3.4%) decrease in casino revenues to $3,442.5 million for the year ended December 31, 2012, compared to the prior year due to lower turnover and hold percentage in our VIP casino.

The table below sets forth key gaming statistics related to our Las Vegas and Macau operations.

| | Years Ended December 31, | | | |
| | 2012 | 2011 | Increase/ (Decrease) | Percent Change |
|---|---|---|---|---|
| | | | (amounts in thousands) | |
| **Las Vegas Operations:** | | | | |
| Drop | $ 2,591,833 | $ 2,366,711 | $ 225,122 | 9.5% |
| Table games win % | 21.9% | 24.9% | (3.0) pts | — |
| Slot machine handle | $ 2,908,678 | $ 2,738,261 | $ 170,417 | 6.2% |
| Slot machine win | $ 177,420 | $ 170,027 | $ 7,393 | 4.3% |
| **Macau Operations:** | | | | |
| **VIP Casino** | | | | |
| VIP turnover | $ 119,251,854 | $ 123,099,838 | $ (3,847,984) | (3.1)% |
| VIP win as a % of turnover | 2.84% | 2.93% | (0.09) pts | — |
| **General Casino** | | | | |
| Drop | $ 2,764,664 | $ 2,769,284 | $ (4,620) | (0.2)% |
| Table games win % | 30.5% | 28.4% | 2.1 pts | — |
| Slot machine handle | $ 4,697,463 | $ 5,400,697 | $ (703,234) | (13.0)% |
| Slot machine win | $ 247,020 | $ 277,124 | $ (30,104) | (10.9)% |

For the year ended December 31, 2012, room revenues were $480 million, an increase of $7.9 million (1.7%) compared to prior year room revenue of $472.1 million. Room revenue at our Las Vegas Operations increased $8.3 million (2.3%) to $362.3 million compared to the prior year room revenue of $354 million. In Las Vegas, we experienced an increase in room rates during the year ended December 31, 2012, however our occupancy rate decreased 3.2 percentage points, both compared to the prior year. We were able to achieve an increase in ADR as we adjusted rates to attract a higher quality customer who would take advantage of all aspects of our resort. Room revenue at our Macau Operations did not change significantly during the year ended December 31, 2012.

48

Table of Contents

The table below sets forth key operating measures related to room revenue.

| | Years Ended December 31, | |
|---|---|---|
| | **2012** | **2011** |
| Average Daily Rate | | |
| Las Vegas | $ 252 | $ 242 |
| Macau | 315 | 315 |
| Occupancy | | |
| Las Vegas | 82.9% | 86.1% |
| Macau | 93.0% | 91.8% |
| REVPAR | | |
| Las Vegas | $ 209 | $ 208 |
| Macau | 293 | 289 |

Other non-casino revenues for the year ended December 31, 2012, included food and beverage revenues of $588.4 million, retail revenues of $261.6 million, entertainment revenues of $81.8 million, and other revenues from outlets such as the spa and salon, of $73.8 million. Other non-gaming revenues for the year ended December 31, 2011, included food and beverage revenues of $547.7 million, retail revenues of $260.8 million, entertainment revenues of $82.2 million, and other revenues from outlets, including the spa and salon, of $71.8 million. Food and beverage revenues at our Las Vegas Operations increased $36.3 million (8%), while our Macau Operations increased $4.4 million (4.8%), as compared to the prior year. The increase in Las Vegas is due primarily to strong business in our beach club and nightclubs. Retail revenues at our Macau Operations increased $2.6 million (1.5%), while retail at our Las Vegas Operations decreased by $1.8 million (2.1%). The increase at Wynn Macau is due primarily to strong same-store sales growth combined with new stores from the first half of 2012. Retail revenues at our Las Vegas Operations decreased as we reconfigured the Encore retail area and rebranded several retail outlets. Entertainment revenues decreased $0.4 million (0.5%) from the prior year primarily due to a Las Vegas show that ended its run in November 2012 and another Las Vegas show that ended in April 2011.

*Departmental, Administrative and Other Expenses*

For the year ended December 31, 2012, departmental expenses included casino expenses of $2,626.8 million, room expenses of $126.5 million, food and beverage expenses of $308.4 million, and entertainment, retail and other expenses of $189.8 million. Also included are general and administrative expenses of approximately $441.7 million and $18.1 million charged as a provision for doubtful accounts receivable. For the year ended December 31, 2011, departmental expenses included casino expenses of $2,686.4 million, room expenses of $125.3 million, food and beverage expenses of $283.9 million, and entertainment, retail and other expenses of $214.4 million. Also included are general and administrative expenses of approximately $389.1 million and approximately $33.8 million charged as a provision for doubtful accounts receivable. Casino expenses have decreased during the year ended December 31, 2012 due to lower volume which caused lower junket commission expense and lower gaming taxes at our Macau Operations (where we incur a gaming tax and other levies at a rate totaling 39% in accordance with the concession agreement). Although our room revenues increased $7.9 million (1.7%), room expenses increased only $1.2 million (1%) as the revenue increase was driven primarily by increased ADR. Food and beverage expenses increased over the prior year primarily due to additional nightclub promotional costs in Las Vegas. The decrease in entertainment, retail and other expenses was driven by the conversion of certain owned retail stores to leased outlets in Macau resulting in lower cost of sales. General and administrative expense increased primarily due to legal and other costs incurred related to the share redemption and litigation with a former stockholder, higher advertising costs, development and other activities. The provision for doubtful accounts decreased during the year ended December 31, 2012 as we recorded an adjustment of $30.9 million that benefitted our reserve estimates for casino accounts receivable based on the results of historical collection patterns and current collection trends.

49

Table of Contents

*Pre-opening costs*

We began to incur pre-opening costs during October 2012 related to the design and planning for our resort in the Cotai area of Macau. We expect our pre-opening costs to increase in the future as construction and development of our resort in Cotai continues toward the expected completion in the first half of 2016. There were no pre-opening expenses incurred during the year ended December 31, 2011.

*Depreciation and amortization*

Depreciation and amortization for the year ended December 31, 2012, was $373.2 million compared to $398 million for the year ended December 31, 2011. Depreciation expense decreased due to assets with a 5-year life being fully depreciated as of September 2011 at our Macau Operations and assets with a three and six year life becoming fully depreciated throughout 2011 at our Las Vegas Operations.

During the construction of our resorts, costs incurred in the construction of the buildings, improvements to land and the purchases of assets for use in operations were capitalized. Once these resorts opened, their assets were placed into service and we began recognizing the associated depreciation expense. Depreciation expenses will continue throughout the estimated useful lives of these assets. In addition, we continually evaluate the useful life of our property and equipment, intangibles and other assets and adjust them when warranted.

The maximum useful life of assets at our Macau Operations is the remaining life of the gaming concession or land concession, which currently expire in June 2022 and August 2029, respectively. Consequently, depreciation related to our Macau Operations is charged on an accelerated basis when compared to our Las Vegas Operations.

*Property charges and other*

Property charges and other for the year ended December 31, 2012, were $40 million compared to $130.6 million for the year ended December 31, 2011. Property charges and other for the year ended December 31, 2012 include a remodel of two Las Vegas restaurants, charges associated with the termination of a Las Vegas show that ended its run in November 2012, charges associated with the reconfiguration of Las Vegas retail areas and miscellaneous renovations and abandonments at our resorts.

Property charges and other for the year ended December 31, 2011 include a charge of $109.6 million reflecting the present value of a charitable contribution made by Wynn Macau to the University of Macau Development Foundation. This contribution consists of a $25 million payment made in May 2011, and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive, for a total of $135 million. The amount reflected in the accompanying Consolidated Statements of Income has been discounted using our then estimated borrowing rate over the time period of the remaining committed payments. Also included are the write off of certain off-site golf memberships by Wynn Las Vegas, miscellaneous renovations and abandonments at our resorts, including modifications of the Encore at Wynn Las Vegas and Wynn Macau retail esplanades, closure of the Blush nightclub and the write off of certain costs related to a show that ended its run in Las Vegas in April 2011.

*Other non-operating costs and expenses*

Interest income was $12.5 million and $7.7 million for the years ended December 31, 2012 and 2011, respectively. This increase in mainly due to higher cash balances during 2012. During 2012 and 2011, our short-term investment strategy has been to preserve capital while retaining sufficient liquidity. Beginning in April 2011, we have invested in certain corporate bond securities and commercial paper, in addition to holding money-market accounts, U.S. Treasury Bills and bank time deposits with a maturity of three months or less, which has contributed to the increase in interest income.

Interest expense was $288.8 million, net of capitalized interest of $2 million for the year ended December 31, 2012, compared to $229.9 million, net of capitalized interest of $0, for the year ended

50

Table of Contents

December 31, 2011. Our interest expense increased compared to the prior year primarily due to the issuance of the $1.94 billion Redemption Note by Wynn Resorts, the issuance of the Wynn Las Vegas $900 million 5 ³/₈% first mortgage notes in March 2012, and the increase in the Wynn Macau term loan offset by the reduction of $370.9 million in Wynn Las Vegas term loan borrowings, all as described in Notes to Consolidated Financial Statements, Note 8—"Long-Term Debt".

Changes in the fair value of our interest rate swaps are recorded as an increase (decrease) in swap fair value in each period. We recorded a gain of $1 million for the year ended December 31, 2012, resulting from the changes in the fair value of our interest rate swaps during the year. For the year ended December 31, 2011, we recorded a gain of $14.2 million resulting from the increase in the fair value of interest rate swaps between December 31, 2010 and December 31, 2011. For further information on our interest rate swaps, see Item 7A—"Quantitative and Qualitative Disclosures about Market Risk."

*Income Taxes*

For the year ended December 31, 2012, we recorded a tax expense of $4.3 million. Our income tax expense is primarily related to the timing of the payment of dividends from Macau, stock option exercises and capital expenditures. Since June 30, 2010, we have no longer considered our portion of the tax earnings and profits of Wynn Macau, Limited to be permanently reinvested. No additional U.S. tax provision has been made with respect to amounts not considered permanently reinvested as we anticipate that U.S. foreign tax credits should be sufficient to eliminate any U.S. tax provision relating to such repatriation. We have not provided deferred U.S. income taxes or foreign withholding taxes on temporary differences which are considered indefinitely reinvested. On November 30, 2010, Wynn Macau, S.A. received a second 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits, thereby exempting the casino gaming profits of Wynn Macau, S.A. through December 31, 2015. Accordingly, we were exempted from the payment of approximately $87.1 million and $82.7 million in such taxes for the years ended December 31, 2012 and 2011, respectively. Our non-gaming profits remain subject to the Macau Complementary Tax and casino winnings remain subject to the Macau Special Gaming tax and other levies at a rate totaling 39% in accordance with our concession agreement.

In April 2012, the Company reached an agreement with the Appellate division of the Internal Revenue Service ("IRS") regarding issues raised during the examination of the 2006 through 2009 U.S. income tax returns. The settlement with the Appellate division did not impact the Company's unrecognized tax benefits. The settlement of the 2006 through 2009 examination issues resulted in a cash tax payment of $1.3 million and the utilization of $3.1 million and $0.9 million in foreign tax credit and general business credit carryforwards, respectively.

During December 2012, the IRS completed an examination of the Company's 2010 U.S. income tax return and had no changes. For tax years 2011 and 2012, the Company is participating in the IRS Compliance Assurance Program ("CAP"). Under the CAP program, the IRS and the taxpayer work together in a pre-filing environment to examine transactions and issues and thus complete the tax examination before the tax return is filed. In February 2013, the Company received notification that it had been accepted into the IRS CAP for the 2013 tax year. The Company believes the IRS will complete their examination of the 2011 tax year in the next 12 months. The Company does not expect a change in its unrecognized tax benefits as a result of the completion of the examination.

In July 2012, the Macau Finance Bureau commenced an examination of the 2008 Macau income tax return of Wynn Macau, S.A. In November 2012, the Company received the results of the examination. While no additional tax was due, adjustments were made to the Company's foreign net operating loss carryforwards.

In January 2013, the Macau Finance Bureau examined the 2009 and 2010 Macau income tax returns of Palo Real Estate Company Limited, which is a co-holder of the land concession for the resort in Cotai. The exam resulted in no change to the tax returns.

51

Table of Contents

*Net income attributable to noncontrolling interests*

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of its common stock through an initial public offering. We recorded net income attributable to noncontrolling interests of $226.7 million for the year ended December 31, 2012, compared to $211.7 million for the year ended December 31, 2011. This represents the noncontrolling interests' share of net income from Wynn Macau, Limited for each year.

**Financial results for the year ended December 31, 2011 compared to the year ended December 31, 2010.**

*Revenues*

Net revenues for the year ended December 31, 2011 are comprised of $4,190.5 million in casino revenues (79.5% of total net revenues) and $1,079.3 million of net non-casino revenues (20.5% of total net revenues). Net revenues for the year ended December 31, 2010 are comprised of $3,245.1 million in casino revenues (77.5% of total net revenues) and $939.6 million of net non-casino revenues (22.5% of total net revenues).

Casino revenues are primarily comprised of the net win from our table games and slot machine operations. Casino revenues for the year ended December 31, 2011 of $4,190.5 million represents a $945.4 million (29.1%) increase from casino revenues of $3,245.1 million for the year ended December 31, 2010. Our Las Vegas Operations experienced a $90.9 million (17%) increase in casino revenues to $625.2 million, compared to the prior year casino revenues of $534.3 million due to a 9.9% increase in drop and an increase in our average table games win percentage. Our Macau Operations experienced a $854.5 million (31.5%) increase in casino revenues to $3,565.3 million for the year ended December 31, 2011, compared to the prior year casino revenue of $2,710.8 million due to a 34.9% increase in turnover in our VIP casino offset by a lower win percentage.

The table below sets forth key gaming statistics related to our Las Vegas and Macau operations.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2011** | **2010** | **Increase/ (Decrease)** | **Percent Change** |
| | | | (amounts in thousands) | |
| **Las Vegas Operations:** | | | | |
| Drop | $ 2,366,711 | $ 2,152,846 | $ 213,865 | 9.9% |
| Table games win % | 24.9% | 22.2% | 2.7 pts | — |
| Slot machine handle | $ 2,738,261 | $ 2,734,912 | $ 3,349 | 0.1% |
| Slot machine win | $ 170,027 | $ 158,912 | $ 11,115 | 7.0% |
| **Macau Operations:** | | | | |
| **VIP Casino** | | | | |
| VIP turnover | $ 123,099,838 | $ 91,283,674 | $ 31,816,164 | 34.9% |
| VIP win as a % of turnover | 2.93% | 3.0% | (0.07) pts | — |
| **General Casino** | | | | |
| Drop | $ 2,769,284 | $ 2,344,706 | $ 424,578 | 18.1% |
| Table games win % | 28.4% | 23.6% | 4.8% | — |
| Slot machine handle | $ 5,400,697 | $ 4,206,886 | $ 1,193,811 | 28.4% |
| Slot machine win | $ 277,124 | $ 218,486 | $ 58,638 | 26.8% |

For the year ended December 31, 2011, room revenues were $472.1 million, an increase of $71.8 million (17.9%) compared to prior year room revenue of $400.3 million. Room revenue at our Las Vegas Operations increased $45.6 million (14.8%) compared to the prior year. In Las Vegas, we experienced an increase in room rates during the year ended December 31, 2011, compared to the prior year, with a 1.9 percentage point decrease in occupancy rate. We were able to achieve an increase in ADR as we adjusted rates to attract a higher quality customer who would take advantage of all aspects of our resort. Room revenue at our Macau Operations

52

Table of Contents

increased $26.2 million (28.5%) due to increases in both occupancy rate and room rates compared to the prior year, as well as the inclusion of a full year of the 414 additional suites added with the opening of Encore at Wynn Macau in April 2010.

The table below sets forth key operating measures related to room revenue.

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | 2011 | 2010 |
| Average Daily Rate |  |  |
| Las Vegas | $ 242 | $ 210 |
| Macau | 315 | 291 |
| Occupancy |  |  |
| Las Vegas | 86.1% | 88.0% |
| Macau | 91.8% | 87.8% |
| REVPAR |  |  |
| Las Vegas | $ 208 | $ 185 |
| Macau | 289 | 256 |

Other non-casino revenues for the year ended December 31, 2011, included food and beverage revenues of $547.7 million, retail revenues of $260.8 million, entertainment revenues of $82.2 million, and other revenues from outlets such as the spa and salon, of $71.8 million. Other non-gaming revenues for the year ended December 31, 2010, included food and beverage revenues of $488.1 million, retail revenues of $214.6 million, entertainment revenues of $72 million, and other revenues from outlets, including the spa and salon, of $67.7 million. Food and beverage revenues at our Las Vegas Operations increased $37.5 million (9.0%), while our Macau Operations increased $22.1 million (31.3%), as compared to the prior year. The increase in Las Vegas is due primarily to business in our nightclubs including the full year of operations for the Encore Beach Club and Surrender Nightclub (which opened in May 2010) and increases in our catering and restaurant business. The increase in Macau is due to increased visitation to our resort and a full year of operations from Encore at Wynn Macau which opened in April 2010. Retail revenues at our Macau Operations increased $42.6 million (32.3%), while retail at our Las Vegas Operations increased by $3.6 million (4.3%). The increase at Wynn Macau is due primarily to strong same-store sales growth and the addition of three new boutiques at Encore at Wynn Macau. Entertainment revenues increased $10.2 million (14.1%) over the prior year primarily due to increased revenue from Garth Brooks, who performs in the Encore Theater, and the Sinatra "Dance with Me" show, both in Las Vegas. The Sinatra "Dance with Me" show ended its run on April 23, 2011.

### Departmental, Administrative and Other Expenses

For the year ended December 31, 2011, departmental expenses included casino expenses of $2,686.4 million, room expenses of $125.3 million, food and beverage expenses of $283.9 million, and entertainment, retail and other expenses of $214.4 million. Also included are general and administrative expenses of approximately $389.1 million and $33.8 million charged as a provision for doubtful accounts receivable. For the year ended December 31, 2010, departmental expenses included casino expenses of $2,100.1 million, room expenses of $122.3 million, food and beverage expenses of $272.7 million, and entertainment, retail and other expenses of $204.6 million. Also included are general and administrative expenses of approximately $391.3 million and approximately $28.3 million charged as a provision for doubtful accounts receivable. Casino expenses have increased during the year ended December 31, 2011 due to an increase in casino revenues at both of our Las Vegas Operations and at our Macau Operations (where we incur a gaming tax and other levies at a rate totaling 39% in accordance with the concession agreement). Although our room revenues increased 17.9%, room expenses increased only 2.5% as the revenue increase was driven primarily by increased ADR. Food and beverage and entertainment, retail and other expenses increased commensurate with the increase in revenues. The increase in the provision for doubtful accounts relates primarily to Wynn Las Vegas and is a result of the higher casino revenue base experienced during the year ended December 31, 2011, compared to the prior year.

53

Table of Contents

*Pre-opening costs*

We incurred no pre-opening costs during the year ended December 31, 2011. For the year ended December 31, 2010, we incurred $9.5 million of pre-opening costs primarily related to Encore at Wynn Macau which opened on April 21, 2010 and the Encore Beach Club and Surrender Nightclub which opened in Las Vegas on May 28, 2010.

*Depreciation and amortization*

Depreciation and amortization for the year ended December 31, 2011, was $398 million compared to $405.6 million for the year ended December 31, 2010. While there was little change between periods, depreciation expense decreased due to assets with a 5-year life being fully depreciated as of September 2011 at Wynn Macau and assets with a 5-year life being fully depreciated as of April 2010 at Wynn Las Vegas. These decreases were offset by additional depreciation for the assets of Encore at Wynn Macau which were placed into service in April 2010 and the assets of the Encore Beach Club and Surrender Nightclub in Las Vegas which were placed into service in May 2010.

During the construction of our resorts, costs incurred in the construction of the buildings, improvements to land and the purchases of assets for use in operations were capitalized. Once these resorts opened, their assets were placed into service and we began recognizing the associated depreciation expense. Depreciation expenses will continue throughout the estimated useful lives of these assets. In addition, we continually evaluate the useful life of our property and equipment, intangibles and other assets and adjust them when warranted.

The maximum useful life of assets at our Macau Operations is the remaining life of the gaming concession or land concession, which currently expire in June 2022 and August 2029, respectively. Consequently, depreciation related to our Macau Operations is charged on an accelerated basis when compared to our Las Vegas Operations.

*Property charges and other*

Property charges and other for the year ended December 31, 2011, were $130.6 million compared to $25.2 million for the year ended December 31, 2010. Property charges and other for the year ended December 31, 2011 include a charge of $109.6 million reflecting the present value of a charitable contribution made by Wynn Macau to the University of Macau Development Foundation. This contribution consists of a $25 million payment made in May 2011, and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive, for a total of $135 million. The amount reflected in the accompanying Consolidated Statements of Income has been discounted using our then estimated borrowing rate over the time period of the remaining committed payments. Also included are the write off of certain off-site golf memberships by Wynn Las Vegas, miscellaneous renovations and abandonments at our resorts, including modifications of the Encore at Wynn Las Vegas and Wynn Macau retail esplanades, closure of the Blush nightclub and the write off of certain costs related to a show that ended its run in Las Vegas in April 2011.

Property charges and other for the year ended December 31, 2010, include a contract termination payment of $14.9 million related to a management contract for certain of the nightclubs at Wynn Las Vegas and miscellaneous renovations, abandonments and gain/loss on sale of equipment at our resorts.

*Other non-operating costs and expenses*

Interest income was $7.7 million and $2.5 million for the years ended December 31, 2011 and 2010, respectively. During 2011 and 2010, our short-term investment strategy has been to preserve capital while retaining sufficient liquidity. While the majority of our short-term investments were primarily in money market accounts, U.S. Treasury Bills and time deposits with a maturity of three months or less, beginning in April 2011

54

Table of Contents

we have invested in certain corporate bond securities and commercial paper which contributed to the increase in interest income.

Interest expense was $229.9 million, net of capitalized interest of $0, for the year ended December 31, 2011, compared to $222.9 million, net of capitalized interest of $7.2 million, for the year ended December 31, 2010. Our interest expense increased compared to the prior year primarily due to a decrease in interest capitalized and an increase in interest rates on our first mortgage notes, offset by a decrease in amounts outstanding under our Wynn Las Vegas and Wynn Macau bank credit revolving facilities compared to the prior year.

Changes in the fair value of our interest rate swaps are recorded as an increase (decrease) in swap fair value in each period. We recorded a gain of $14.2 million for the year ended December 31, 2011, resulting from the increase in the fair value of our interest rate swaps from December 31, 2010 to December 31, 2011. For the year ended December 31, 2010, we recorded an expense of $0.9 million resulting from the decrease in the fair value of interest rate swaps between December 31, 2009 and December 31, 2010. For further information on our interest rate swaps, see Item 7A—"Quantitative and Qualitative Disclosures about Market Risk."

In April 2010, we completed an exchange offer for a portion of our outstanding 6 5/8% First Mortgage Notes (the "2014 Notes"). In connection with that exchange offer, the direct costs incurred with third parties of $4.4 million were expensed. In August 2010, we completed a tender offer for the then outstanding 2014 Notes and subsequent call of all the remaining amounts once the tender was completed. In connection with this transaction, we recorded a loss on extinguishment of debt of $63 million. This included the tender offer consideration, the call premium and the related write off of the unamortized debt issue costs and original issue discount.

*Income Taxes*

For the year ended December 31, 2011, we recorded a tax benefit of $19.5 million. Our income tax benefit was primarily related to tax benefits resulting from an increase in our deferred tax assets, a decrease in our liability for uncertain tax positions as the result of the statute of limitations lapse reduced by foreign taxes assessable on the dividends of Wynn Macau, S.A. and foreign tax provisions related to our international marketing offices. Since June 30, 2010, we have no longer considered our portion of the tax earnings and profits of Wynn Macau, Limited to be permanently reinvested. No additional U.S. tax provision was made with respect to amounts not considered permanently reinvested as we anticipated that U.S. foreign tax credits would be sufficient to eliminate any U.S. tax provision relating to such repatriation. To the extent that book earnings exceed the tax earnings and profits of Wynn Macau, Limited, such excess was considered permanently reinvested.

Effective September 6, 2006, Wynn Macau, S.A. received a 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits. On November 30, 2010, Wynn Macau, S.A. received an additional 5-year exemption through December 31, 2015. Accordingly, we were exempted from the payment of approximately $82.7 million and $64.4 million in such taxes for the years ended December 31, 2011 and 2010, respectively. Our non-gaming profits remain subject to the Macau Complementary Tax and casino winnings remain subject to the Macau Special Gaming tax and other levies at a rate totaling 39% in accordance with our concession agreement.

During the year ended December 31, 2011, Wynn Macau, S.A. received the results of the Macau Finance Bureau's examination of its 2006 and 2007 Macau Complementary Tax returns and filed an appeal related to the examination's disallowance of certain deductions claimed in its 2006 Macau Complementary Tax Return. In August 2011, the 2006 Macau tax issues under appeal were resolved. As part of the settlement, the Company paid $1.1 million in Macau Complementary tax substantially all of which was provided for in prior years. As the result of the resolution of these Macau tax issues and expiration of the statute of limitations for 2006 Macau

55

Table of Contents

Complementary tax assessments on December 31, 2011, the total amount of unrecognized tax benefits decreased $10.8 million.

*Net income attributable to noncontrolling interests*

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of its common stock through an initial public offering. We recorded net income attributable to noncontrolling interests of $211.7 million for the year ended December 31, 2011, compared to $156.5 million for the year ended December 31, 2010. This represents the noncontrolling interests' share of net income from Wynn Macau, Limited for each year.

## Adjusted Property EBITDA

We use adjusted property EBITDA to manage the operating results of our segments. Adjusted property EBITDA is earnings before interest, taxes, depreciation, amortization, pre-opening costs, property charges and other, corporate expenses, intercompany golf course and water rights leases, stock-based compensation, and other non-operating income and expenses, and includes equity in income from unconsolidated affiliates. Adjusted property EBITDA is presented exclusively as a supplemental disclosure because we believe that it is widely used to measure the performance, and as a basis for valuation, of gaming companies. We use adjusted property EBITDA as a measure of the operating performance of our segments and to compare the operating performance of our properties with those of our competitors. We also present adjusted property EBITDA because it is used by some investors as a way to measure a company's ability to incur and service debt, make capital expenditures and meet working capital requirements. Gaming companies have historically reported EBITDA as a supplement to financial measures in accordance with U.S. generally accepted accounting principles ("GAAP"). In order to view the operations of their casinos on a more stand-alone basis, gaming companies, including us, have historically excluded from their EBITDA calculations pre-opening expenses, property charges, corporate expenses and stock-based compensation that do not relate to the management of specific casino properties. However, adjusted property EBITDA should not be considered as an alternative to operating income as an indicator of our performance, as an alternative to cash flows from operating activities as a measure of liquidity, or as an alternative to any other measure determined in accordance with GAAP. Unlike net income, adjusted property EBITDA does not include depreciation or interest expense and therefore does not reflect current or future capital expenditures or the cost of capital. We have significant uses of cash flows, including capital expenditures, interest payments, debt principal repayments, taxes and other non-recurring charges, which are not reflected in adjusted property EBITDA. Also, our calculation of adjusted property EBITDA may be different from the calculation methods used by other companies and, therefore, comparability may be limited.

The following table (amounts in thousands) summarizes adjusted property EBITDA for our Las Vegas and Macau Operations as reviewed by management and summarized in Item 8—"Notes to Consolidated Financial Statements "– Note 17" Segment Information." That footnote also presents a reconciliation of adjusted property EBITDA to net income.

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
| Las Vegas | $ 408,472 | $ 439,036 | $ 270,299 |
| Macau | 1,167,340 | 1,196,232 | 892,686 |
| Total Adjusted Property EBITDA | $ 1,575,812 | $ 1,635,268 | $ 1,162,985 |

During 2012, our Macau Operations were negatively impacted by lower turnover and hold percentage in the VIP casino. Our Las Vegas Operations were negatively impacted by lower table games win percentage (before discounts) when compared to 2011. Results for both Las Vegas and Macau were positively impacted by a credit

56

Table of Contents

taken to the provision for doubtful accounts as we recorded an adjustment to our reserve estimates based on the results of historical collection patterns and current collection trends. Refer to the discussions above regarding the specific details of our results of operations.

**Liquidity and Capital Resources**

*Cash Flow from Operations*

Our operating cash flows primarily consist of our operating income generated by our Las Vegas and Macau operations (excluding depreciation and other non-cash charges), interest paid, and changes in working capital accounts such as receivables, inventories, prepaid expenses, and payables. Our table games play both in Macau and Las Vegas is a mix of cash play and credit play, while our slot machine play is conducted primarily on a cash basis. A portion of our table games revenue is attributable to the play of a limited number of premium international customers that gamble on credit. The ability to collect these gaming receivables may impact our operating cash flow for the period. Our rooms, food and beverage, and entertainment, retail, and other revenue is conducted primarily on a cash basis or as a trade receivable. Accordingly, operating cash flows will be impacted by changes in operating income and accounts receivables.

Net cash provided from operations for the year ended December 31, 2012 was $1.2 billion compared to $1.5 billion provided by operations for the year ended December 31, 2011. This decrease is primarily due to lower casino department profitability and changes in ordinary working capital accounts such as accounts payable and accrued expenses.

*Investing Activities*

Capital expenditures were approximately $241 million, $184.1 million and $283.8 million for the years ended December 31, 2012, 2011 and 2010, respectively. During 2012, our capital expenditures included a one-time payment of $50 million in consideration of an unrelated third party's relinquishment of certain rights in and to any future development on the Cotai land as well as approximately $70 million of site preparation costs for our Cotai land and various renovations at our resorts including the remodel of two Las Vegas restaurants and the conversion of certain storage and office areas in Macau to two new retail outlets. During 2011, our capital expenditures primarily related to the room and suite remodel at Wynn Las Vegas, a high limit slot salon, new Las Vegas Tower Suites lobby and lounge and other property remodels. In addition, 2011 includes a $62.5 million initial payment pursuant to the terms of a land concession in Macau. For the year ended December 31, 2010 our capital expenditures related primarily to the construction cost associated with Encore at Wynn Macau, which opened in April 2010, and the Encore Beach Club and Surrender Nightclub, which opened in May 2010.

During the years ended December 31, 2012 and 2011, we invested $183.5 million and $316.5 million in corporate debt securities and commercial paper, respectively.

*Financing Activities*

*Las Vegas Operations*

On March 12, 2012, Wynn Las Vegas, LLC and Wynn Las Vegas Capital Corp. (together the "Issuers") issued, in a private offering, $900 million aggregate principal amount of 5 ³/₈% first mortgage notes due 2022 (the "2022 Notes") pursuant to an Indenture, dated as of March 12, 2012 (the "2022 Indenture"). A portion of the proceeds were used to repay all amounts outstanding under the Wynn Las Vegas term loan facilities. In October 2012, the Issuers commenced an offer to exchange all of the 2012 notes for notes registered under the Securities Act of 1933, as amended. The exchange offer closed on November 6, 2012.

The 2022 Notes will mature on March 15, 2022 and bear interest at the rate of 5 ³/₈% per annum. The Issuers may redeem all or a portion of the 2022 Notes at any time on or after March 15, 2017, at a premium decreasing ratably to zero, plus accrued and unpaid interest. In addition, prior to March 15, 2015, the Issuers may

57

Table of Contents

redeem up to 35% of the aggregate principal amount of the 2022 Notes with the net proceeds of one or more qualified equity contributions made to the Issuers by their parent, Wynn Resorts, Limited. The 2022 Notes are also subject to mandatory redemption requirements imposed by gaming laws and regulations of gaming authorities in Nevada.

The 2022 Indenture contains covenants limiting the Issuers' and the Issuers' restricted subsidiaries' ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; issue stock of, or member's interests in, subsidiaries; enter into sale-leaseback transactions; engage in other businesses; merge or consolidate with another company; transfer and sell assets; issue disqualified stock; create dividend and other payment restrictions affecting subsidiaries; and designate restricted and unrestricted subsidiaries. These covenants are subject to a number of important and significant limitations, qualifications and exceptions.

The 2022 Notes rank pari passu in right of payment with the Issuers' outstanding 7 7/8% first mortgage notes due 2017 (the "2017 Notes"), the 7 7/8% first mortgage notes due 2020 ("7 7/8% 2020 Notes") and the 7 3/4% first mortgage notes due 2020 (the "7 3/4% 2020 Notes" and, together with the 2017 Notes and the 7 7/8% 2020 Notes, the "Existing Notes").

On March 12, 2012, Wynn Las Vegas, LLC entered into an eighth amendment ("Amendment No. 8") to its Amended and Restated Credit Agreement (the "Wynn Las Vegas Credit Agreement"). Amendment No. 8 amends the Wynn Las Vegas Credit Agreement to, among other things, permit the issuance of the 2022 Notes. Concurrently with the issuance of the 2022 Notes, Wynn Las Vegas prepaid all term loans under the Wynn Las Vegas Credit Agreement, terminated all of its revolving credit commitments that were due to expire in 2013, and terminated all but $100 million of its revolving credit commitments expiring in 2015. In connection with this transaction, Wynn Las Vegas expensed deferred financing costs of $4.8 million.

On September 17, 2012, Wynn Las Vegas terminated the Wynn Las Vegas Credit Agreement and, in accordance with the respective Indentures, the liens (other than the Holdings pledge) on the assets of Wynn Las Vegas, LLC and its subsidiaries securing, and the subsidiary guarantees of, the 2017 Notes, the 7 7/8% 2020 Notes, the 7 3/4% 2020 Notes and the 2022 Notes were released. No loans were outstanding under the Wynn Las Vegas Credit Agreement at the time of termination. Prior to such termination, certain letters of credit in which lenders had participated pursuant to the Wynn Las Vegas Credit Agreement were reallocated to a separate, unsecured letter of credit facility provided by Deutsche Bank, A.G. Wynn Las Vegas, LLC did not incur any early termination penalties in connection with the termination.

In connection with the termination, the Company expensed $2.6 million of previously deferred financing costs and third party fees related to the Wynn Las Vegas Credit Agreement.

For more information on our outstanding first mortgage notes, see Item 8—"Notes to Consolidated Financial Statements", Note 8 "Long Term Debt."

*Macau Operations*

During the year ended December 31, 2012, Wynn Macau, S.A. repaid $150.4 million of borrowings under the Wynn Macau Senior Revolving Credit Facility. On June 27, 2012, the Wynn Macau Senior Revolving Credit Facility matured with an outstanding balance of $0.

On July 31, 2012, Wynn Macau, amended and restated its credit facilities, dated September 14, 2004 (as so amended and restated, the "Amended Wynn Macau Credit Facilities"), and appointed Bank of China Limited, Macau Branch as intercreditor agent, facilities agent and security agent. The Amended Wynn Macau Credit Facilities took effect on July 31, 2012 and expand availability under Wynn Macau's senior secured bank facility to US$2.3 billion equivalent, consisting of a US$750 million equivalent fully funded senior secured term loan facility and a US$1.55 billion equivalent senior secured revolving credit facility. Wynn Macau also has the

58

Table of Contents

ability to upsize the total senior secured facilities by an additional US$200 million pursuant to the terms and provisions of the Amended Wynn Macau Credit Facilities. Borrowings under the Amended Wynn Macau Credit Facilities, which consist of both Hong Kong Dollar and United States Dollar tranches, were used to refinance Wynn Macau's existing indebtedness, and will be used to fund the design, development, construction and pre-opening expenses of Wynn Cotai, and for general corporate purposes.

The term loan facility matures in July 2018, and the revolving credit facility matures in July 2017. The principal amount of the term loan is required to be repaid in two equal installments in July 2017 and July 2018. The senior secured facilities will bear interest for the first six months after closing at LIBOR or HIBOR plus a margin of 2.50% and thereafter will be subject to LIBOR or HIBOR plus a margin of between 1.75% to 2.50% based on Wynn Macau's leverage ratio.

Borrowings under the Amended Wynn Macau Credit Facilities are guaranteed by Palo Real Estate Company Limited ("Palo"), a subsidiary of Wynn Macau, S.A., and by certain subsidiaries of the Company that own equity interests in Wynn Macau, S.A., and are secured by substantially all of the assets of Wynn Macau, S.A., the equity interests in Wynn Macau, S.A. and substantially all of the assets of Palo.

In connection with amending the Wynn Macau credit facilities, we expensed $17.7 million and capitalized $33.2 million of financing costs.

The Amended Wynn Macau Credit Facilities contain a requirement that the Company must make mandatory repayments of indebtedness from specified percentages of excess cash flow. If the Wynn Macau subsidiary has a Consolidated Leverage Ratio, as defined in the Amended Wynn Macau Credit Facilities, of greater than 4.0 to 1, such repayment is defined as 50% of Excess Cash Flow, as defined in the Amended Wynn Macau Credit Facilities. If the Consolidated Leverage Ratio is equal or less than 4.0 to 1, then no excess cash flow prepayment is required. Based on current estimates the Company does not believe that the Wynn Macau Consolidated Leverage Ratio during the year ending December 31, 2013 will exceed 4.0 to 1. Accordingly, the Company does not expect to make any mandatory repayments pursuant to this requirement during 2013.

The Amended Wynn Macau Credit Facilities contain customary covenants restricting certain activities including, but not limited to: the incurrence of additional indebtedness, the incurrence or creation of liens on any of its property, sales and leaseback transactions, the ability to dispose of assets, and make loans or other investments. In addition, Wynn Macau was required by the financial covenants to maintain a Leverage Ratio, as defined in the Amended Wynn Macau Credit Facilities, of not greater than 3.75 to 1 as of December 31, 2012, and an Interest Coverage Ratio, as defined, of not less than 2.00 to 1. Management believes that Wynn Macau was in compliance with all covenants at December 31, 2012.

*Capital Resources*

At December 31, 2012, we had approximately $1.7 billion of cash and cash equivalents and $180.1 million of available-for-sale investments in foreign and domestic debt securities with maturities of up to 2 years. Our cash is available for operations, debt service and retirement, development activities, general corporate purposes and enhancements to our resorts. In addition, we had $99.2 million of restricted cash for Cotai related construction and development costs. Of these amounts, Wynn Macau, Limited and its subsidiaries held $1,351.4 million and $54.5 million in cash and available-for-sale investments, respectively, of which we own 72.3%. If our portion of this cash was repatriated to the U.S. on December 31, 2012, approximately one-third of this amount would be subject to U.S. tax in the year of repatriation. Wynn Resorts, Limited, which is not a guarantor of the debt of its subsidiaries, held $225.4 million (including cash of its subsidiaries other than those of Wynn Las Vegas and Wynn Macau) and $125.6 million of cash and available-for-sale investments, respectively. Wynn Las Vegas LLC held cash balances of $148.4 million.

On September 17, 2012, Wynn Las Vegas terminated its Amended and Restated Credit Agreement. No loans were outstanding at the time of termination. On September 18, 2012, Wynn Las Vegas distributed to Wynn Resorts, Limited, the Wynn Las Vegas golf course land, the related water rights, and $700 million in cash.

59

Table of Contents

On July 31, 2012, Wynn Macau expanded its availability under the senior secured bank facility to US$2.3 billion equivalent, consisting of a US$750 million equivalent fully funded senior secured term loan facility and a US$1.55 billion equivalent senior secured revolving credit facility. Wynn Macau also has the ability to upsize the total senior secured facilities by an additional US$200 million pursuant to the terms and provisions of the Amended Wynn Macau Credit Facilities. These borrowings were used to refinance Wynn Macau's existing indebtedness, and will be used to fund the design, development, construction and pre-opening expenses of Wynn Cotai, and for general corporate purposes.

We believe that cash flow from operations, availability under our Wynn Macau credit facility and our existing cash balances will be adequate to satisfy our anticipated uses of capital during 2013. If any additional financing became necessary, we cannot provide assurance that future borrowings will be available.

Cash and cash equivalents include cash in bank and fixed deposits, investments in money market funds, domestic and foreign bank time deposits and commercial paper, all with maturities of less than 90 days.

*Redemption Price Promissory Note*

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, we redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," our articles of incorporation authorize redemption at "fair value" of the shares held by unsuitable persons. We engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares which are subject to the terms of an existing stockholder agreement. Pursuant to the articles of incorporation, we issued the Redemption Price Promissory Note (the "Redemption Note") to Aruze USA, Inc., a former stockholder and related party, in redemption of the shares. The Redemption Note has a principal amount of approximately $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Note. We may, in our sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts and any of its affiliates in respect of indebtedness for borrowed money of any kind or nature. Aruze USA, Inc., Universal Entertainment Corporation and Kazuo Okada have challenged the redemption of Aruze USA, Inc.'s shares and we are currently involved in litigation with those parties as well as related shareholder derivative litigation. The outcome of these various proceedings cannot be predicted. Any adverse judgments or settlements involving payment of a material sum of money could cause a material adverse effect on our financial condition and results of operations and could expose us to additional claims by third parties, including current or former investors or regulators. Any adverse judgments or settlements would reduce our profits and could limit our ability to operate our business. See Item 1A—"Risk Factors", Item 3—"Legal Proceedings" and Item 8—"Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies".

*Wynn Resorts, Limited*

During the years ended December 31, 2012, 2011 and 2010, we paid cash dividends totaling $9.50 per share, $6.50 per share and $8.50 per share, respectively.

Our Board of Directors has authorized an equity repurchase program of up to $1.7 billion. The repurchase program may include repurchases from time to time through open market purchases, in privately negotiated transactions, and under plans complying with Rules 10b5-1 and 10b-18 under the Exchange Act. As of December 31, 2012, we had repurchased a cumulative total of 12,863,730 shares of our common stock for a net cost of $1.1 billion under the program, with no repurchases made during the years ended December 31, 2012, 2011, and 2010.

Table of Contents

During 2012 and 2011, the Company repurchased a total of 7,640 (no shares were purchased during the fourth quarter 2012) and 51,136 shares, respectively, in satisfaction of tax withholding obligations on vested restricted stock.

*Off Balance Sheet Arrangements*

We have not entered into any transactions with special purpose entities nor do we engage in any derivatives except for previously discussed interest rate swaps. We do not have any retained or contingent interest in assets transferred to an unconsolidated entity. At December 31, 2012, we had unsecured outstanding letters of credit totaling $15.8 million.

*Contractual Obligations and Commitments*

The following table summarizes our scheduled contractual commitments at December 31, 2012 (amounts in millions):

| | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| | Less Than 1 Year | 1 to 3 Years | 4 to 5 Years | After 5 Years | Total |
| Long-term debt obligations | $  1.1 | $  2.8 | $  906.7 | $4,885.0 | $5,795.6 |
| Fixed interest payments | 256.5 | 513.0 | 506.4 | 696.8 | 1,972.7 |
| Estimated variable interest payments[1] | 24.7 | 49.3 | 44.0 | 7.1 | 125.1 |
| Operating leases | 5.8 | 8.7 | 4.1 | 3.9 | 22.5 |
| Construction contracts and commitments | 60.7 | 27.0 | 3.0 | — | 90.7 |
| Leasehold interest in land | 27.9 | 60.2 | 16.0 | — | 104.1 |
| Employment agreements | 44.8 | 53.9 | 17.5 | 15.2 | 131.4 |
| Other[2] | 64.1 | 69.1 | 47.7 | 119.9 | 300.8 |
| Total commitments | $485.6 | $784.0 | $1,545.4 | $5,727.9 | $8,542.9 |

[1]   Amounts for all periods represent our estimated future interest payments on our debt facilities based upon amounts outstanding and LIBOR or HIBOR rates at December 31, 2012. Such rates are at historical lows as of December 31, 2012. Actual rates will vary.

[2]   Other includes open purchase orders, future charitable contributions, land rent payments, fixed gaming tax payments in Macau and other contracts. As further discussed in Item 8—"Financial Statements", Note 15 "Income Taxes", of this report, we had $84.3 million of unrecognized tax benefits as of December 31, 2012. Due to the inherent uncertainty of the underlying tax positions, it is not practicable to assign this liability to any particular year and therefore it is not included in the table above as of December 31, 2012.

*Other Liquidity Matters*

Wynn Resorts is a holding company and, as a result, our ability to pay dividends is highly dependent on our ability to obtain funds and our subsidiaries' ability to provide funds to us. Restrictions imposed by our Wynn Las Vegas and Wynn Macau debt instruments significantly restrict our ability to pay dividends. Specifically, Wynn Las Vegas, LLC and certain of its subsidiaries are restricted under the indentures governing the 2017 Notes, the 2020 Notes, the New 2020 Notes and the 2022 Notes from making certain "restricted payments" as defined in the indentures. These restricted payments include the payment of dividends or distributions to any direct or indirect holders of equity interests of Wynn Las Vegas, LLC. These restricted payments may not be made unless certain financial and non-financial criteria have been satisfied. While the Amended Wynn Macau Credit Facilities contains similar restrictions, Wynn Macau is currently in compliance with all requirements, namely satisfaction of its leverage ratio, which must be met in order to pay dividends and is presently able to pay dividends in accordance with the Amended Wynn Macau Credit Facilities.

Table of Contents

Wynn Las Vegas, LLC intends to fund its operations and capital requirements from operating cash flow. We cannot assure you; however, that our Las Vegas Operations will generate sufficient cash flow from operations to be sufficient to enable us to service and repay Wynn Las Vegas, LLC's indebtedness and to fund its other liquidity needs. Similarly, we expect that Wynn Macau will fund Wynn Macau, S.A.'s debt service obligations with existing cash, operating cash flow and availability under the Wynn Macau Revolver. However, we cannot assure you that operating cash flows will be sufficient to do so. We may refinance all or a portion of our indebtedness on or before maturity. We cannot assure you that we will be able to refinance any of the indebtedness on acceptable terms or at all.

New business developments or other unforeseen events may occur, resulting in the need to raise additional funds. We continue to explore opportunities to develop additional gaming or related businesses in domestic and international markets. There can be no assurances regarding the business prospects with respect to any other opportunity. Any new development would require us to obtain additional financing. We may decide to conduct any such development through Wynn Resorts or through subsidiaries separate from the Las Vegas or Macau-related entities.

The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the Board of Directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts. The redemption price may be paid in cash, by promissory note or both, as required by the applicable gaming authority and, if not, as we elect. Any promissory note that we issue to an unsuitable person or its affiliate in exchange for its shares could increase our debt to equity ratio and would increase our leverage ratio.

On February 18, 2012, we issued a subordinated promissory note with a principal amount of approximately $1.9 billion in redemption of all of the shares of Wynn Resorts common stock held by Aruze USA, Inc. (the "Redemption Price Promissory Note"). For additional information on the redemption and the Redemption Price Promissory Note, see Item 8—"Notes to Consolidated Financial Statements", Note 8 "Long Term Debt."

**Critical Accounting Policies and Estimates**

Management's discussion and analysis of our results of operations and liquidity and capital resources are based on our consolidated financial statements. Our consolidated financial statements were prepared in conformity with accounting principles generally accepted in the United States of America. A summary of our significant accounting policies are presented in Note 2 to the Consolidated Financial Statements. Certain of our accounting policies require management to apply significant judgment in defining the appropriate assumptions integral to financial estimates. On an ongoing basis, management evaluates those estimates, including those relating to the estimated lives of depreciable assets, asset impairment, allowances for doubtful accounts, accruals for customer loyalty rewards, self-insurance, contingencies, litigation and other items. Judgments are based on historical experience, terms of existing contracts, industry trends and information available from outside sources, as appropriate. However, by their nature, judgments are subject to an inherent degree of uncertainty, and therefore actual results could differ from our estimates.

*Development, Construction and Property and Equipment Estimates*

During the construction and development of a resort, pre-opening or start-up costs are expensed when incurred. In connection with the construction and development of our resorts, significant start-up costs are incurred and charged to pre-opening costs through their respective openings. Once our resorts open, expenses associated with the opening of the resorts are no longer charged as pre-opening costs.

During the construction and development stage, direct costs such as those incurred for the design and construction of our resorts, including applicable portions of interest, are capitalized. Accordingly, the recorded

62

Table of Contents

amounts of property and equipment increase significantly during construction periods. Depreciation expense related to capitalized construction costs is recognized when the related assets are placed in service. Upon the opening of our resorts, we began recognizing depreciation expense on the resort's fixed assets. The remaining estimated useful lives of assets are periodically reviewed.

Our leasehold interest in land in Macau under the land concession contract entered into in June 2004 is being amortized over 25 years, to the initial term of the concession contract, which currently terminates in August 2029. Depreciation on a majority of the assets comprising Wynn Macau commenced in September of 2006, when Wynn Macau opened. The maximum useful life of assets at Wynn Macau is deemed to be the remaining life of the land concession which currently expires in August 2029, or the gaming concession which currently expires in June 2022. Consequently, depreciation related to Wynn Macau will generally be charged over shorter periods when compared to Wynn Las Vegas.

Costs of repairs and maintenance are charged to expense when incurred. The cost and accumulated depreciation of property and equipment retired or otherwise disposed of are eliminated from the respective accounts and any resulting gain or loss is included in operating income.

We also evaluate our property and equipment and other long-lived assets for impairment in accordance with applicable accounting standards. For assets to be disposed of, we recognize the asset at the lower of carrying value or fair market value less costs of disposal, as estimated based on comparable asset sales, solicited offers, or a discounted cash flow model. For assets to be held and used, we review for impairment whenever indicators of impairment exist. In reviewing for impairment, we compare the estimated future cash flows of the asset, on an undiscounted basis, to the carrying value of the asset. If the undiscounted cash flows exceed the carrying value, no impairment is indicated. If the undiscounted cash flows do not exceed the carrying value, an impairment is recorded based on the fair value of the asset, typically measured using a discounted cash flow model. If an asset is still under development, future cash flows include remaining construction costs. All recognized impairment losses, whether for assets to be disposed of or assets to be held and used, are recorded as operating expenses.

*Redemption Price Promissory Note*

We recorded the fair value of the Redemption Note at its estimated present value of approximately $1.94 billion in accordance with applicable accounting guidance. In determining this fair value, we considered the stated maturity of the Redemption Note, its stated interest rate, and the uncertainty of the related cash flows of the Redemption Note as well as the potential effects of the following: uncertainties surrounding the potential outcome and timing of pending litigation with Aruze USA, Inc. (see Item 8—"Notes to Consolidated Financial Statements", Note 16 "Commitments and Contingencies."); the outcome of on-going investigations by the Nevada Gaming Control Board; and other potential legal and regulatory actions. In addition, in the furtherance of various future business objectives, we considered our ability, at our sole option, to prepay the Redemption Note at any time in accordance with its terms without penalty. Accordingly, we reasonably determined that the estimated life of the Redemption Note could be less than the contractual life of the Redemption Note. When considering the appropriate rate of interest to be used to determine fair value for accounting purposes and in light of the uncertainty in the timing of the cash flows, we used observable inputs from a range of trading values of financial instruments with terms and lives similar to the estimated life and terms of the Redemption Note. As a result of this analysis, we concluded the Redemption Note's stated rate of 2% approximated a market rate. A change in any of the assumptions discussed above could result in a change in the fair value of this Redemption Note and significantly impact our results of operations.

*Investments and Fair Value*

We have made investments in domestic and foreign corporate debt securities and commercial paper. Our investment policy requires investments to be investment grade and limits the amount of exposure to any one issuer with the objective of minimizing the potential risk of principal loss. We determine the appropriate classification (held-to-maturity/available-for-sale) of our investments at the time of purchase and reevaluate such designation as of each balance sheet date. Our investments are reported at fair value, with unrealized gains and losses, net of tax,

63

Table of Contents

reported in other comprehensive income (loss). Adjustments are made for amortization of premiums and accretion of discounts to maturity computed under the effective interest method. Such amortization is included in interest income together with realized gains and losses and the stated interest on such securities.

We measure certain of our financial assets and liabilities, such as cash equivalents, available-for-sale securities and interest rate swaps, at fair value on a recurring basis pursuant to accounting standards for fair value measurements. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. These accounting standards establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

We obtain pricing information in determining the fair value of our available-for-sale securities from independent pricing vendors. Based on our inquiries, the pricing vendors use various pricing models consistent with what other market participants would use. The assumptions and inputs used by the pricing vendors are derived from market observable sources including: reported trades, broker/dealer quotes, issuer spreads, benchmark curves, bids, offers and other market-related data. We have not made adjustments to such prices. Each quarter, we validate the fair value pricing methodology to determine the fair value consistent with applicable accounting guidance and to confirm that the securities are classified properly in the fair value hierarchy. We also compare the pricing received from our vendors to independent sources for the same or similar securities.

*Allowance for Estimated Doubtful Accounts Receivable*

A substantial portion of our outstanding receivables relates to casino credit play. Credit play, through the issuance of markers, represents a significant portion of the table games volume at our Las Vegas Operations. While offered, the issuance of credit at our Macau Operations is less significant when compared to Las Vegas. Our goal is to maintain strict controls over the issuance of credit and aggressively pursue collection from those customers who fail to pay their balances in a timely fashion. These collection efforts may include the mailing of statements and delinquency notices, personal contacts, the use of outside collection agencies, and litigation. Markers issued at our Las Vegas Operations are generally legally enforceable instruments in the United States, and United States assets of foreign customers may be used to satisfy judgments entered in the United States.

The enforceability of markers and other forms of credit related to gaming debt outside of the United States varies from country to country. Some foreign countries do not recognize the enforceability of gaming related debt, or make enforcement burdensome. We closely consider the likelihood and difficulty of enforceability, among other factors, when issuing credit to customers who are not residents of the United States. In addition to our internal credit and collection departments, located in both Las Vegas and Macau, we have a network of legal, accounting and collection professionals to assist us in our determinations regarding enforceability and our overall collection efforts.

As of December 31, 2012 and 2011, approximately 84% of our casino accounts receivable were owed by customers from foreign countries, primarily in Asia. In addition to enforceability issues, the collectability of markers given by foreign customers is affected by a number of factors including changes in currency exchange rates and economic conditions in the customers' home countries.

We regularly evaluate our reserve for bad debts based on a specific review of customer accounts as well as management's prior experience with collection trends in the casino industry and current economic and business conditions. In determining our allowance for estimated doubtful accounts receivable, we apply loss factors based on historical marker collection history to aged account balances and we specifically analyze the collectability of

64

Table of Contents

each account with a balance over a specified dollar amount, based upon the age, the customer's financial condition, collection history and any other known information.

The following table presents key statistics related to our casino accounts receivable (amounts in thousands):

|  | December 31, 2012 | December 31, 2011 |
|---|---|---|
| Casino accounts receivable | $ 275,302 | $ 264,034 |
| Allowance for doubtful casino accounts receivable | $ 101,548 | $ 91,251 |
| Allowance as a percentage of casino account balances | 36.9% | 34.6% |
| Percentage of casino accounts receivable outstanding over 180 days | 37.5% | 19.8% |

Our reserve for doubtful casino accounts receivable is based on our estimates of amounts collectible and depends on the risk assessments and judgments by management regarding realizability, the state of the economy and our credit policy. In June 2012, the Company recorded an adjustment to its reserve estimates for casino accounts receivable based on the results of historical collection patterns and current collection trends. For the year ended December 31, 2012, this adjustment benefited operating income by $30.9 million and net income attributable to Wynn Resorts, Limited by $23.3 million (or $0.22 per share on a fully diluted basis). Our reserve methodology is applied similarly to credit extended at each of our resorts. As of December 31, 2012 and 2011, approximately 30.8% and 40.7%, respectively, of our outstanding casino account receivable balance originated at our Macau Operations.

At December 31, 2012, a 100 basis-point change in the allowance for doubtful accounts as a percentage of casino accounts receivable would change the provision for doubtful accounts by approximately $2.8 million.

As our customer payment experience evolves, we will continue to refine our estimated reserve for bad debts. Accordingly, the associated provision for doubtful accounts expense may fluctuate. Because individual customer account balances can be significant, the reserve and the provision can change significantly between periods, as we become aware of additional information about a customer or changes occur in a region's economy or legal system.

*Derivative Financial Instruments*

We seek to manage our market risk, including interest rate risk associated with variable rate borrowings, through balancing fixed-rate and variable-rate borrowings and the use of derivative financial instruments. We account for derivative financial instruments in accordance with applicable accounting standards. Derivative financial instruments are recognized as assets or liabilities, with changes in fair value affecting net income. As of December 31, 2012, changes in our interest rate swap fair values are being recorded in our Consolidated Statements of Income, as the swaps do not qualify for hedge accounting.

We measure the fair value of our interest rate swaps on a recurring basis. We categorize our interest rate swap contracts as Level 2 in the hierarchy as described above. The fair value approximates the amount we would receive (pay) if these contracts were settled at the respective valuation dates. Fair value is estimated based upon current, and predictions of future, interest rate levels along a yield curve, the remaining duration of the instruments and other market conditions, and therefore is subject to significant estimation and a high degree of variability of fluctuation between periods. We adjust this amount by applying a non-performance valuation, considering our creditworthiness or the creditworthiness of our counterparties at each settlement date, as applicable.

*Stock-Based Compensation*

Accounting standards for stock-based payments establish standards for the accounting for transactions in which an entity exchanges its equity instruments for goods and services or incurs a liability in exchange for

65

Table of Contents

goods and services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. It requires an entity to measure the costs of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award and recognize that cost over the service period. We use the Black-Scholes valuation model to value the equity instruments we issue. The Black-Scholes valuation model uses assumptions of expected volatility, risk-free interest rates, the expected term of options granted, and expected rates of dividends. Management determines these assumptions by reviewing current market rates, making industry comparisons and reviewing conditions relevant to our Company.

The expected volatility and expected term assumptions can significantly impact the fair value of stock options. We believe that the valuation techniques and the approach utilized to develop our assumptions are reasonable in calculating the fair value of the options we grant. We estimate the expected stock price volatility using a combination of implied and historical factors related to our stock price in accordance with applicable accounting standards. As our stock price fluctuates, this estimate will change. For example, a 10% change in the volatility assumption for the 173,830 options granted in 2012 would have resulted in an approximate $598,000 change in fair value. Expected term represents the estimated average time between the option's grant date and its exercise date. A 10% change in the expected term assumption for the 173,830 options granted in 2012 would have resulted in an approximate $65,000 change in fair value. These assumed changes in fair value would have been recognized over the vesting schedule of such awards.

Accounting standards also require the classification of stock compensation expense in the same financial statement line items as cash compensation, and therefore impacts our departmental expenses (and related operating margins), pre-opening costs and construction in progress for our development projects, and our general and administrative expenses (including corporate expenses).

*Income Taxes*

We are subject to income taxes in the United States and other foreign jurisdictions where we operate. Accounting standards require the recognition of deferred tax assets, net of applicable reserves, and liabilities for the estimated future tax consequences attributable to differences between financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. The effect of a change in tax rates on the income tax provision and deferred tax assets and liabilities is recognized in the results of operations in the period that includes the enactment date. Accounting standards require recognition of a future tax benefit to the extent that realization of such benefit is more likely than not. Otherwise, a valuation allowance is applied.

As of December 31, 2012, we have a foreign tax credit carryover of $1,844 million and we have recorded a valuation allowance of $1,786 million against this asset based on our estimate of future realization. The foreign tax credits are attributable to the Macau special gaming tax which is 35% of gross gaming revenue in Macau. The U.S. taxing regime only allows a credit for 35% of "net" foreign source income. Due to our current operating history of U.S. losses, we currently do not rely on forecasted taxable income in order to support the utilization of the foreign tax credits. The estimated future foreign tax credit realization was based upon the estimated future taxable income from the reversal of "net" U.S. taxable temporary differences that we expect will reverse during the 10-year foreign tax credit carryover period. The amount of the valuation allowance is subject to change based upon the actual reversal of temporary differences and future taxable income exclusive of reversing temporary differences.

Our income tax returns are subject to examination by the IRS and other tax authorities in the locations where we operate. We assess potentially unfavorable outcomes of such examinations based on accounting standards for uncertain income taxes. The accounting standards prescribe a minimum recognition threshold a tax position is required to meet before being recognized in the financial statements.

66

Table of Contents

Uncertain tax position accounting standards apply to all tax positions related to income taxes. These accounting standards utilize a two-step approach for evaluating tax positions. Recognition (Step I) occurs when the Company concludes that a tax position, based on its technical merits, is more likely than not to be sustained upon examination. Measurement (Step II) is only addressed if the position is deemed to be more likely than not to be sustained. Under Step II, the tax benefit is measured as the largest amount of benefit that is more likely than not to be realized upon settlement. Use of the term "more likely than not" is consistent with how that term is used in accounting for income taxes (i.e., likelihood of occurrence is greater than 50%).

Tax positions failing to qualify for initial recognition are recognized in the first subsequent interim period that they meet the "more likely than not" standard. If it is subsequently determined that a previously recognized tax position no longer meets the "more likely than not" standard, it is required that the tax position is derecognized. Accounting standards for uncertain tax positions specifically prohibit the use of a valuation allowance as a substitute for derecognition of tax positions. As applicable, we recognize accrued penalties and interest related to unrecognized tax benefits in the provision for income taxes.

**Recently Issued Accounting Standards**

In July 2012, the Financial Accounting Standards Board ("FASB") issued an accounting standards update that is intended to simplify the guidance for testing the decline in the realizable value (impairment) of indefinite-lived intangible assets other than goodwill. The update allows for the consideration of qualitative factors in determining whether it is necessary to perform quantitative impairment tests. The effective date for this update is for the years and interim impairment tests performed for years beginning after September 15, 2012. This update is not expected to have a material impact on the Company's financial statements.

In May 2011, the FASB issued an accounting standards update that is intended to align the principles for fair value measurements and the related disclosure requirements under GAAP and IFRS. From a GAAP perspective, the updates are largely clarifications and certain additional disclosures. The effective date for this update was for years, and the interim periods within those years, beginning after December 15, 2011. The adoption of this guidance did not have a material effect on the Company's financial statements.

In June 2011, the FASB issued an accounting standards update that requires items of net income, items of other comprehensive income ("OCI") and total comprehensive income to be presented in one continuous statement or two separate but consecutive statements. This updated presentation makes the items within OCI more prominent. Companies are no longer allowed to present OCI in the statement of stockholders' equity. The effective date for this update was for the years, and the interim periods within those years, beginning after December 15, 2011. The Company has adopted this guidance and Consolidated Statements of Comprehensive Income are included in the Company's financial statements.

**ITEM 7A.       QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Market risk is the risk of loss arising from adverse changes in market rates and prices, such as interest rates, foreign currency exchange rates and commodity prices.

*Interest Rate Risks*

One of our primary exposures to market risk is interest rate risk associated with our debt facilities that bear interest based on floating rates. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources—Financing Activities." We attempt to manage interest rate risk by managing the mix of long-term fixed rate borrowings and variable rate borrowings supplemented by hedging activities as believed by us to be appropriate. We cannot assure you that these risk management strategies have had the desired effect, and interest rate fluctuations could have a negative impact on our results of operations.

67

Table of Contents

The following table provides estimated future cash flow information derived from our best estimates of repayments at December 31, 2012 of our expected long-term indebtedness and related weighted average interest rates by expected maturity dates. However, we cannot predict the LIBOR or HIBOR rates that will be in effect in the future. As of December 31, 2012, such rates remain at historic lows. Actual rates will vary. The one-month LIBOR and HIBOR rates at December 31, 2012 of 0.2087% and 0.2775%, respectively were used for all variable rate calculations in the table below.

The information is presented in U.S. dollar equivalents as applicable.

|  | Years Ending December 31, Expected Maturity Date | | | | | | |
|  | 2013 | 2014 | 2015 | 2016 | 2017 | Thereafter | Total |
|  | | | (in millions) | | | | |
| **Long-term debt:** | | | | | | | |
| Fixed rate | $ — | $ — | $ — | $ — | $500.0 | $4,508.5 | $5,008.5 |
| Average interest rate | — | — | — | — | 7.875% | 4.82% | 5.12% |
| Variable rate | $ 1.1 | $ 1.4 | $ 1.4 | $ 1.4 | $405.3 | $ 376.5 | $ 787.1 |
| Average interest rate | 1.46% | 1.46% | 1.46% | 1.46% | 2.66% | 2.76% | 2.70% |

### Interest Rate Swap Information

We have entered into floating-for-fixed interest rate swap arrangements relating to certain of our floating-rate debt facilities. We measure the fair value of our interest rate swaps on a recurring basis. Changes in the fair values of our interest rate swaps for each reporting period recorded are, and will continue to be, recognized as an increase (decrease) in swap fair value in our Consolidated Statements of Income, as the swaps do not qualify for hedge accounting.

### Las Vegas Operations

In June 2012, we terminated our only Wynn Las Vegas swap for a payment of $2.4 million.

### Macau Operations

In June 2012, the Wynn Macau swap matured. As of December 31, 2011, the liability fair value of this interest rate swap was approximately $2.7 million.

Effective, September 28, 2012, we entered into two interest rate swap agreements intended to hedge a portion of the underlying interest rate risk on borrowings under the Amended Wynn Macau Credit Facilities. Under the two swap agreements, the Company pays a fixed interest rate (excluding the applicable interest margin) of 0.73% on notional amounts corresponding to borrowings of HK$3.95 billion (approximately US$509.4 million) incurred under the Amended Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable interest rate based on the applicable HIBOR at the time of payment. These interest rate swaps fix the all-in interest rate on such amounts at 2.48% to 3.23%. These interest rate swap agreements mature in July 2017.

Effective October 31, 2012, we entered into a third interest rate swap agreement intended to hedge a portion of the underlying interest rate risk on borrowings under the Amended Wynn Macau Credit Facilities. Under this swap agreement, the Company pays a fixed interest rate (excluding the applicable interest margin) of 0.6763% on notional amounts corresponding to borrowings of US$243.75 million incurred under the Amended Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable rate based on the applicable LIBOR at the time of payment. This interest rate swap fixes the all-in interest rate on such amounts at 2.4263% to 3.1763%. This interest rate swap agreement matures in July 2017.

Table of Contents

*Summary of Historical Fair Values*

The following table presents the historical liability fair values as of December 31, 2012 and 2011, of our interest rate swap arrangements (amounts in thousands):

|  | Las Vegas Operations | Macau Operations | Total Interest Rate Swaps |
|---|---|---|---|
| Liability fair value at: |  |  |  |
| December 31, 2012 | $ — | $ 3,938 | $3,938 |
| December 31, 2011 | $ 4,628 | $ 2,670 | $7,298 |

The fair value approximates the amount we would pay if these contracts were settled at the respective valuation dates. Fair value is estimated based upon current, and predictions of future, interest rate levels along a yield curve, the remaining duration of the instruments and other market conditions, and therefore, is subject to significant estimation and a high degree of variability of fluctuation between periods. We adjust this amount by applying a non-performance valuation, considering our creditworthiness or the creditworthiness of our counterparties at each settlement date, as applicable.

*Other Interest Rate Swap Information*

The following table provides information about our interest rate swaps, by contractual maturity dates, as of December 31, 2012 and using estimated future LIBOR and HIBOR rates based upon implied forward rates in the yield curve. The information is presented in U.S. dollar equivalents, which is our reporting currency:

|  | Years Ending December 31, Expected Maturity Date (in millions) |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
|  | 2013 | 2014 | 2015 | 2016 | 2017 | Thereafter | Total |
| Average notional amount | $— | $— | $— | $— | $753.2 | $  — | $753.2 |
| Average pay rate | —% | —% | —% | —% | 0.71% | —% | 0.71% |
| Average receive rate | —% | —% | —% | —% | 0.60% | —% | 0.60% |

We do not use derivative financial instruments, other financial instruments or derivative commodity instruments for trading or speculative purposes.

*Interest Rate Sensitivity*

As of December 31, 2012, essentially all of our debt was based on fixed rates, including the notional amounts related to interest rate swaps.

**Foreign Currency Risks**

The currency delineated in Wynn Macau's concession agreement with the government of Macau is the Macau pataca. The Macau pataca, which is not a freely convertible currency, is linked to the Hong Kong dollar, and in many cases the two are used interchangeably in Macau. The Hong Kong dollar is linked to the U.S. dollar and the exchange rate between these two currencies has remained relatively stable over the past several years. However, the exchange linkages of the Hong Kong dollar and the Macau pataca, and the Hong Kong dollar and the U.S. dollar, are subject to potential changes due to, among other things, changes in Chinese governmental policies and international economic and political developments.

If the Hong Kong dollar and the Macau pataca are not linked to the U.S. dollar in the future, severe fluctuations in the exchange rate for these currencies may result. We also cannot assure you that the current rate of exchange fixed by the applicable monetary authorities for these currencies will remain at the same level.

Table of Contents

Because many of Wynn Macau's payment and expenditure obligations are in Macau patacas, in the event of unfavorable Macau pataca or Hong Kong dollar rate changes, Wynn Macau's obligations, as denominated in U.S. dollars, would increase. In addition, because we expect that most of the revenues for any casino that Wynn Macau operates in Macau will be in Hong Kong dollars, we are subject to foreign exchange risk with respect to the exchange rate between the Hong Kong dollar and the U.S. dollar. Also, if any of our Macau-related entities incur U.S. dollar-denominated debt, fluctuations in the exchange rates of the Macau pataca or the Hong Kong dollar, in relation to the U.S. dollar, could have adverse effects on Wynn Macau's results of operations, financial condition, and ability to service its debt. To date, we have not engaged in hedging activities intended to protect against foreign currency risk. Approximately 70% of our cash balances are denominated in foreign currencies, primarily the Hong Kong Dollar. Based on our balances at December 31, 2012, an assumed 1% change in the US dollar/Hong Kong dollar exchange rate would cause a foreign currency transaction gain/loss of approximately $9.7 million.

As of December 31, 2012, in addition to Hong Kong dollars, Wynn Macau also holds other foreign currencies, primarily CNH (offshore renminbi).

70

Table of Contents

ITEM 8.        FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

*INDEX TO CONSOLIDATED FINANCIAL STATEMENTS*

| | **Page** |
|---|---|
| Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting | 72 |
| Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements | 73 |
| Consolidated Balance Sheets | 74 |
| Consolidated Statements of Income | 75 |
| Consolidated Statements of Comprehensive Income | 76 |
| Consolidated Statements of Stockholders' Equity | 77 |
| Consolidated Statements of Cash Flows | 78 |
| Notes to Consolidated Financial Statements | 79 |

71

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of Wynn Resorts, Limited and subsidiaries:

We have audited Wynn Resorts, Limited and subsidiaries' (the "Company") internal control over financial reporting as of December 31, 2012, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management Report on Internal Control Over Financial Reporting, included in Item 9A. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the 2012 consolidated financial statements of Wynn Resorts, Limited and subsidiaries and our report dated March 1, 2013 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Las Vegas, Nevada
March 1, 2013

72

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of Wynn Resorts, Limited and subsidiaries:

We have audited the accompanying consolidated balance sheets of Wynn Resorts, Limited and subsidiaries (the "Company") as of December 31, 2012 and 2011, and the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2012. Our audits also included the financial statement schedules listed in the index at item 15(a)2. These financial statements and schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Wynn Resorts, Limited and subsidiaries at December 31, 2012 and 2011, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2012, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedules referred to above, when considered in relation to the basic financial statements taken as a whole, present fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2012, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 1, 2013 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
Las Vegas, Nevada
March 1, 2013

73

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(amounts in thousands, except share data)**

| | December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| **ASSETS** | | |
| Current assets: | | |
|     Cash and cash equivalents | $ 1,725,219 | $ 1,262,587 |
|     Investment securities | 138,887 | 122,066 |
|     Receivables, net | 238,573 | 238,490 |
|     Inventories | 63,799 | 72,061 |
|     Prepaid expenses and other | 35,900 | 31,248 |
|         Total current assets | 2,202,378 | 1,726,452 |
| Property and equipment, net | 4,727,899 | 4,865,332 |
| Restricted cash and investment securities | 140,334 | 91,501 |
| Intangibles, net | 31,297 | 35,751 |
| Deferred financing costs, net | 71,189 | 50,372 |
| Deposits and other assets | 99,227 | 125,712 |
| Investment in unconsolidated affiliates | 4,270 | 4,376 |
|     Total assets | $ 7,276,594 | $ 6,899,496 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
|     Accounts and construction payables | $    164,858 | $    171,608 |
|     Current portion of long-term debt | 1,050 | 407,934 |
|     Current portion of land concession obligation | 27,937 | 13,425 |
|     Customer deposits | 544,649 | 576,011 |
|     Gaming taxes payable | 163,092 | 177,504 |
|     Accrued compensation and benefits | 75,962 | 78,717 |
|     Accrued interest | 100,562 | 49,989 |
|     Other accrued liabilities | 44,244 | 94,642 |
|     Construction retention | 3,826 | 4,471 |
|     Deferred income taxes, net | 3,178 | 3,575 |
|     Income taxes payable | 2,019 | 2,017 |
|         Total current liabilities | 1,131,377 | 1,579,893 |
| Long-term debt | 5,781,770 | 2,809,785 |
| Land concession obligation | 76,186 | 103,854 |
| Other long-term liabilities | 137,830 | 128,216 |
| Deferred income taxes, net | 45,499 | 54,294 |
|     Total liabilities | 7,172,662 | 4,676,042 |
| Commitments and contingencies (Note 16) | | |
| Stockholders' equity: | | |
|     Preferred stock, par value $0.01; 40,000,000 shares authorized; zero shares issued and outstanding | — | — |
|     Common stock, par value $0.01; 400,000,000 shares authorized; 113,730,442 and 137,937,088 shares issued; 100,866,712 and 125,080,998 shares outstanding | 1,137 | 1,379 |
|     Treasury stock, at cost; 12,863,730 and 12,856,090 shares | (1,127,947) | (1,127,036) |
|     Additional paid-in capital | 818,821 | 3,177,471 |
|     Accumulated other comprehensive income | 4,177 | 840 |
|     Retained earnings | 44,775 | 36,368 |
|         Total Wynn Resorts, Limited stockholders' equity (deficit) | (259,037) | 2,089,022 |
| Noncontrolling interest | 362,969 | 134,432 |
|     Total equity | 103,932 | 2,223,454 |
|     Total liabilities and stockholders' equity | $ 7,276,594 | $ 6,899,496 |

The accompanying notes are an integral part of these consolidated financial statements.

74

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**(amounts in thousands, except share data)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Operating revenues: | | | |
| Casino | $ 4,034,759 | $ 4,190,507 | $ 3,245,104 |
| Rooms | 479,983 | 472,074 | 400,291 |
| Food and beverage | 588,437 | 547,735 | 488,108 |
| Entertainment, retail and other | 417,209 | 414,786 | 354,332 |
| Gross revenues | 5,520,388 | 5,625,102 | 4,487,835 |
| Less: promotional allowances | (366,104) | (355,310) | (303,137) |
| Net revenues | 5,154,284 | 5,269,792 | 4,184,698 |
| Operating costs and expenses: | | | |
| Casino | 2,626,822 | 2,686,372 | 2,100,050 |
| Rooms | 126,527 | 125,286 | 122,260 |
| Food and beverage | 308,394 | 283,940 | 272,747 |
| Entertainment, retail and other | 189,832 | 214,435 | 204,558 |
| General and administrative | 441,699 | 389,053 | 391,254 |
| Provision for doubtful accounts | 18,091 | 33,778 | 28,304 |
| Pre-opening costs | 466 | — | 9,496 |
| Depreciation and amortization | 373,199 | 398,039 | 405,558 |
| Property charges and other | 39,978 | 130,649 | 25,219 |
| Total operating costs and expenses | 4,125,008 | 4,261,552 | 3,559,446 |
| Operating income | 1,029,276 | 1,008,240 | 625,252 |
| Other income (expense): | | | |
| Interest income | 12,543 | 7,654 | 2,498 |
| Interest expense, net of amounts capitalized | (288,759) | (229,918) | (222,863) |
| Increase (decrease) in swap fair value | 991 | 14,151 | (880) |
| Loss on extinguishment of debt/exchange offer | (25,151) | — | (67,990) |
| Equity in income from unconsolidated affiliates | 1,086 | 1,472 | 801 |
| Other | 3,012 | 3,968 | 225 |
| Other income (expense), net | (296,278) | (202,673) | (288,209) |
| Income before income taxes | 732,998 | 805,567 | 337,043 |
| (Provision) benefit for income taxes | (4,299) | 19,546 | (20,447) |
| Net income | 728,699 | 825,113 | 316,596 |
| Less: Net income attributable to noncontrolling interest | (226,663) | (211,742) | (156,469) |
| Net income attributable to Wynn Resorts, Limited | $ 502,036 | $ 613,371 | $ 160,127 |
| Basic and diluted income per common share: | | | |
| Net income attributable to Wynn Resorts, Limited: | | | |
| Basic | $ 4.87 | $ 4.94 | $ 1.30 |
| Diluted | $ 4.82 | $ 4.88 | $ 1.29 |
| Weighted average common shares outstanding: | | | |
| Basic | 103,092 | 124,039 | 122,787 |
| Diluted | 104,249 | 125,667 | 123,939 |
| Dividends declared per common share: | $ 9.50 | $ 6.50 | $ 8.50 |

The accompanying notes are an integral part of these consolidated financial statements.

75

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

**(amounts in thousands)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Net income | $ 728,699 | $ 825,113 | $ 316,596 |
| Other comprehensive income (loss): | | | |
| Foreign currency translation adjustments, net of tax | 2,749 | 2,102 | (2,154) |
| Unrealized gain (loss) on available-for-sale securities, net of tax | 1,780 | (2,070) | — |
| Total comprehensive income | 733,228 | 825,145 | 314,442 |
| Less: Comprehensive income attributable to noncontrolling interest | (227,855) | (211,823) | (155,872) |
| Comprehensive income attributable to Wynn Resorts, Limited | $ 505,373 | $ 613,322 | $ 158,570 |

The accompanying notes are an integral part of these consolidated financial statements.

76

[Table of Contents](#)

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

**(amounts in thousands, except share data)**

| | Common stock | | Treasury stock | Additional paid-in capital | Accumulated other comprehensive income | Retained earnings (deficit) | Total Wynn Resorts, Ltd stockholders' equity (deficit) | Noncontrolling interest | Total stockholders' equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares outstanding | Par value | | | | | | | |
| Balances, January 1, 2010 | 123,293,456 | $1,361 | $(1,119,407) | $ 4,239,497 | $ 2,446 | $ (89,559) | $ 3,034,338 | $ 126,025 | $ 3,160,363 |
| Net income | — | — | — | — | — | 160,127 | 160,127 | 156,469 | 316,596 |
| Currency translation adjustment | — | — | — | — | (1,557) | — | (1,557) | (597) | (2,154) |
| Exercise of stock options | 1,308,052 | 13 | — | 66,173 | — | — | 66,186 | — | 66,186 |
| Issuance of restricted stock | 50,000 | 1 | — | — | — | — | 1 | — | 1 |
| Cancellation of restricted stock | (52,000) | (1) | — | — | — | — | (1) | — | (1) |
| Forfeited cash dividends upon cancellation of nonvested stock | — | — | — | — | — | 252 | 252 | — | 252 |
| Cash dividends | — | — | — | (996,473) | — | (61,778) | (1,058,251) | (140,672) | (1,198,923) |
| Excess tax benefits from stock-based compensation | — | — | — | 10,480 | — | — | 10,480 | — | 10,480 |
| Stock-based compensation | — | — | — | 26,373 | — | — | 26,373 | 1,412 | 27,785 |
| Balances, December 31, 2010 | 124,599,508 | 1,374 | (1,119,407) | 3,346,050 | 889 | 9,042 | 2,237,948 | 142,637 | 2,380,585 |
| Net income | — | — | — | — | — | 613,371 | 613,371 | 211,742 | 825,113 |
| Currency translation adjustment | — | — | — | — | 1,520 | — | 1,520 | 582 | 2,102 |
| Net unrealized loss on investments | — | — | — | — | (1,569) | — | (1,569) | (501) | (2,070) |
| Exercise of stock options | 431,126 | 4 | — | 23,836 | — | — | 23,840 | 19 | 23,859 |
| Purchase of Treasury stock | (51,136) | — | (7,629) | — | — | — | (7,629) | — | (7,629) |
| Issuance of restricted stock | 101,500 | 1 | — | (1) | — | — | — | — | — |
| Cash dividends | — | — | — | (226,755) | — | (586,045) | (812,800) | (221,649) | (1,034,449) |
| Excess tax benefits from stock-based compensation | — | — | — | 11,176 | — | — | 11,176 | — | 11,176 |
| Stock-based compensation | — | — | — | 23,165 | — | — | 23,165 | 1,602 | 24,767 |
| Balances, December 31, 2011 | 125,080,998 | 1,379 | (1,127,036) | 3,177,471 | 840 | 36,368 | 2,089,022 | 134,432 | 2,223,454 |
| Stock redemption | (24,549,222) | (245) | — | (1,936,198) | — | — | (1,936,443) | — | (1,936,443) |
| Net income | — | — | — | — | — | 502,036 | 502,036 | 226,663 | 728,699 |
| Currency translation adjustment | — | — | — | — | 1,987 | — | 1,987 | 762 | 2,749 |
| Net unrealized gain on investments | — | — | — | — | 1,350 | — | 1,350 | 430 | 1,780 |
| Exercise of stock options | 332,576 | 3 | — | 15,580 | — | — | 15,583 | — | 15,583 |
| Cancellation of restricted stock | (7,640) | — | (911) | — | — | — | (911) | — | (911) |
| Purchase of Treasury stock | (31,500) | — | — | — | — | — | — | — | — |
| Issuance of restricted stock | 41,500 | — | — | — | — | — | — | — | — |
| Cash dividends | — | — | — | (462,730) | — | (493,629) | (956,359) | — | (956,359) |
| Excess tax benefits from stock-based compensation | — | — | — | 5,537 | — | — | 5,537 | — | 5,537 |
| Stock-based compensation | — | — | — | 19,161 | — | — | 19,161 | 682 | 19,843 |
| Balances, December 31, 2012 | 100,866,712 | $1,137 | $(1,127,947) | $ 818,821 | $ 4,177 | $ 44,775 | $ (259,037) | $ 362,969 | $ 103,932 |

The accompanying notes are an integral part of these consolidated financial statements.

77

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(amounts in thousands)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Cash flows from operating activities: | | | |
| Net income | $  728,699 | $  825,113 | $  316,596 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 373,199 | 398,039 | 405,558 |
| Deferred income taxes | (3,655) | (10,822) | 18,875 |
| Stock-based compensation | 19,648 | 23,881 | 27,168 |
| Excess tax benefits from stock-based compensation | (5,253) | (11,052) | (9,833) |
| Amortization and write-offs of deferred financing costs and other | 23,965 | 19,683 | 24,342 |
| Loss on extinguishment of debt/exchange offer | 25,151 | — | 62,608 |
| Provision for doubtful accounts | 18,091 | 33,778 | 28,304 |
| Property charges and other | 36,714 | 104,223 | 10,270 |
| Equity in income of unconsolidated affiliates, net of distributions | 106 | (144) | (130) |
| (Increase) decrease in swap fair value | (991) | (14,151) | 880 |
| Increase (decrease) in cash from changes in: | | | |
| Receivables, net | (21,019) | (84,653) | (63,073) |
| Inventories and prepaid expenses and other | 3,644 | 11,168 | 22,169 |
| Accounts payable and accrued expenses | (12,581) | 220,772 | 213,578 |
| Net cash provided by operating activities | 1,185,718 | 1,515,835 | 1,057,312 |
| Cash flows used in investing activities: | | | |
| Capital expenditures, net of construction payables and retention | (240,985) | (184,146) | (283,828) |
| Restricted cash and purchase of corporate debt securities | (282,608) | (316,533) | — |
| Proceeds from sale or maturity of corporate debt securities | 216,051 | 101,017 | — |
| Deposits and purchase of other assets | (38,042) | (60,135) | (13,034) |
| Proceeds from sale of equipment | 730 | 697 | 739 |
| Net cash used in investing activities | (344,854) | (459,100) | (296,123) |
| Cash flows from financing activities: | | | |
| Proceeds from exercise of stock options | 15,583 | 23,859 | 66,186 |
| Excess tax benefits from stock-based compensation | 5,253 | 11,052 | 9,833 |
| Dividends paid | (955,493) | (1,033,447) | (1,192,138) |
| Proceeds from issuance of long-term debt | 1,648,643 | 150,483 | 2,246,361 |
| Principal payments on long-term debt | (1,022,847) | (201,901) | (2,551,561) |
| Purchase of treasury stock | (911) | (7,629) | — |
| Interest rate swap settlement | (2,368) | — | — |
| Payments on long-term land concession obligation | (13,449) | — | — |
| Payment of financing costs | (56,890) | (58) | (71,317) |
| Net cash used in financing activities | (382,479) | (1,057,641) | (1,492,636) |
| Effect of exchange rate on cash | 4,247 | 4,994 | (1,884) |
| Cash and cash equivalents: | | | |
| Increase (decrease) in cash and cash equivalents | 462,632 | 4,088 | (733,331) |
| Balance, beginning of year | 1,262,587 | 1,258,499 | 1,991,830 |
| Balance, end of year | $ 1,725,219 | $ 1,262,587 | $ 1,258,499 |
| Supplemental cash flow disclosures: | | | |
| Increase in debt related to the redemption of stock | $ 1,936,443 | $ — | $ — |
| Cash paid for interest, net of amounts capitalized | 225,499 | 221,123 | 171,663 |
| Change in property and equipment included in accounts and construction payables | 6,557 | 13,794 | (27,670) |
| Cash paid for income taxes | 4,547 | 2,088 | 1,019 |
| Increase in liability for dividends declared on nonvested stock | 866 | 1,003 | 6,703 |

The accompanying notes are an integral part of these consolidated financial statements.

78

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Organization**

Wynn Resorts, Limited, a Nevada corporation (together with its subsidiaries, "Wynn Resorts" or the "Company") currently owns and operates casino hotel resort properties in Las Vegas, Nevada and Macau.

Our Las Vegas operations feature two luxury hotel towers with a total of 4,750 spacious hotel rooms, suites and villas, approximately 186,000 square feet of casino space, 35 food and beverage outlets featuring signature chefs, an on-site 18-hole golf course, meeting space, a Ferrari and Maserati dealership, approximately 95,000 square feet of retail space as well as two showrooms; three nightclubs and a beach club.

Our Macau resort is a resort destination casino located in the Macau Special Administrative Region of the People's Republic of China with two luxury hotel towers with a total of 1,008 spacious rooms and suites, approximately 275,000 square feet of casino space, casual and fine dining in eight restaurants, approximately 55,000 square feet of retail space, recreation and leisure facilities, including two health clubs and spas and a pool.

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary of the Company, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Through an initial public offering, including the over allotment, Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of this subsidiary's common stock.

**2. Summary of Significant Accounting Policies**

*Principles of Consolidation*

The accompanying consolidated financial statements include the accounts of the Company and its majority owned subsidiaries. Investments in the 50%-owned joint ventures operating the Ferrari and Maserati automobile dealership and the Brioni mens' retail clothing store inside Wynn Las Vegas are accounted for under the equity method. All significant intercompany accounts and transactions have been eliminated. Certain amounts in the consolidated financial statements for the previous years have been reclassified to be consistent with the current year presentation. These reclassifications had no effect on the previously reported net income.

*Use of Estimates*

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Redemption Price Promissory Note*

The Company recorded the fair value of the Redemption Price Promissory Note (the "Redemption Note") at its estimated present value of approximately $1.94 billion in accordance with applicable accounting guidance. In determining this fair value, the Company considered the stated maturity of the Redemption Note, its stated interest rate, and the uncertainty of the related cash flows of the Redemption Note as well as the potential effects of the following: uncertainties surrounding the potential outcome and timing of pending litigation with Aruze USA, Inc. (see Note 16—"Commitments and Contingencies"); the outcome of on-going investigations by the Nevada Gaming Control Board; and other potential legal and regulatory actions. In addition, in the furtherance of various future business objectives, the Company considered its ability, at its sole option, to prepay the Redemption Note at any time in accordance with its terms without penalty. Accordingly, the Company reasonably determined that the estimated life of the Redemption Note could be less than the contractual life of

79

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

the Redemption Note. When considering the appropriate rate of interest to be used to determine fair value for accounting purposes and in light of the uncertainty in the timing of the cash flows, the Company used observable inputs from a range of trading values of financial instruments with terms and lives similar to the estimated life and terms of the Redemption Note. As a result of this analysis, the Company concluded the Redemption Note's stated rate of 2% approximated a market rate.

*Cash and Cash Equivalents*

Cash and cash equivalents are comprised of highly liquid investments with original maturities of three months or less and include both U.S. dollar-denominated and foreign currency-denominated securities. Cash equivalents are carried at cost, which approximates fair value. Cash equivalents of $969.2 million and $545 million at December 31, 2012 and 2011, respectively, were invested in bank time deposits, money market accounts, U.S. treasuries and commercial paper. In addition, the Company held bank deposits and cash on hand of approximately $756 million and $717.5 million as of December 31, 2012 and 2011, respectively.

*Restricted Cash and Investment Securities*

Restricted cash consists primarily of certain proceeds of the Company's financing activities that are restricted by the agreements governing the Company's debt instruments for the payment of certain Cotai related construction and development costs. Restricted cash balances totaled approximately $99.2 million at December 31, 2012, substantially all of which were invested in time deposits. There was no restricted cash at December 31, 2011.

Investment securities consist of short-term and long-term investments in domestic and foreign corporate debt securities and commercial paper. The Company's investment policy limits the amount of exposure to any one issuer with the objective of minimizing the potential risk of principal loss. Management determines the appropriate classification (held-to-maturity/available-for-sale) of its securities at the time of purchase and reevaluates such designation as of each balance sheet date. The Company's current investments are reported at fair value, with unrealized gains and losses, net of tax, reported in other comprehensive income. Adjustments are made for amortization of premiums and accretion of discounts to maturity computed under the effective interest method. Such amortization is included in interest income together with realized gains and losses and the stated interest on such securities.

*Accounts Receivable and Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of casino accounts receivable. The Company issues credit in the form of "markers" to approved casino customers following investigations of creditworthiness. At December 31, 2012 and 2011, approximately 84% of the Company's markers were due from customers residing outside the United States, primarily in Asia. Business or economic conditions or other significant events in these countries could affect the collectability of such receivables.

Accounts receivable, including casino and hotel receivables, are typically non-interest bearing and are initially recorded at cost. Accounts are written off when management deems them to be uncollectible. Recoveries of accounts previously written off are recorded when received. An estimated allowance for doubtful accounts is maintained to reduce the Company's receivables to their carrying amount, which approximates fair value. The allowance is estimated based on specific review of customer accounts as well as management's experience with

80

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

collection trends in the casino industry and current economic and business conditions. In June 2012, the Company recorded an adjustment to its reserve estimates for casino accounts receivable based on the results of historical collection patterns and current collection trends. For the year ended December 31, 2012, this adjustment benefitted operating income by $30.9 million and net income attributable to Wynn Resorts, Limited by $23.3 million (or $0.22 per share on a fully diluted basis).

*Inventories*

Inventories consist of retail merchandise, food and beverage items which are stated at the lower of cost or market value and certain operating supplies. Cost is determined by the first-in, first-out, average and specific identification methods.

*Property and Equipment*

Purchases of property and equipment are stated at cost. Depreciation is provided over the estimated useful lives of the assets using the straight-line method as follows:

| | |
|---|---|
| Buildings and improvements | 10 to 45 years |
| Land improvements | 10 to 45 years |
| Leasehold interest in land | 25 years |
| Airplanes | 18 to 20 years |
| Furniture, fixtures and equipment | 3 to 20 years |

Costs related to improvements are capitalized, while costs of repairs and maintenance are charged to expense as incurred. The cost and accumulated depreciation of property and equipment retired or otherwise disposed of are eliminated from the respective accounts and any resulting gain or loss is included in operations.

*Capitalized Interest*

The interest cost associated with major development and construction projects is capitalized and included in the cost of the project. Interest capitalization ceases once a project is substantially complete or no longer undergoing construction activities to prepare it for its intended use. When no debt is specifically identified as being incurred in connection with a construction project, the Company capitalizes interest on amounts expended on the project at the Company's weighted average cost of borrowed money. Interest of $2 million, $0 and $7.2 million was capitalized for the years ended December 31, 2012, 2011 and 2010, respectively.

*Intangibles*

The Company's indefinite-lived intangible assets consist primarily of water rights acquired as part of the original purchase price of the property on which Wynn Las Vegas is located, and trademarks. Indefinite-lived intangible assets are not amortized, but are reviewed for impairment annually. The Company's finite-lived intangible assets consist of a Macau gaming concession and show production rights. Finite-lived intangible assets are amortized over the shorter of their contractual terms or estimated useful lives.

*Long-Lived Assets*

Long-lived assets, which are to be held and used, including intangibles and property and equipment, are periodically reviewed by management for impairment whenever events or changes in circumstances indicate that

81

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

the carrying value of the asset may not be recoverable. If an indicator of impairment exists, the Company compares the estimated future cash flows of the asset, on an undiscounted basis, to the carrying value of the asset. If the undiscounted cash flows exceed the carrying value, no impairment is indicated. If the undiscounted cash flows do not exceed the carrying value, then impairment is measured as the difference between fair value and carrying value, with fair value typically based on a discounted cash flow model. If an asset is still under development, future cash flows include remaining construction costs.

*Deferred Financing Costs*

Direct and incremental costs incurred in obtaining loans or in connection with the issuance of long-term debt are capitalized and amortized to interest expense over the terms of the related debt agreements. Approximately $11 million, $11.6 million and $13.2 million were amortized to interest expense during the years ended December 31, 2012, 2011 and 2010, respectively. Debt discounts incurred in connection with the issuance of debt have been capitalized and are being amortized to interest expense using the effective interest method.

*Derivative Financial Instruments*

The Company seeks to manage its market risk, including interest rate risk associated with variable rate borrowings, through balancing fixed-rate and variable-rate borrowings with the use of derivative financial instruments. The fair value of derivative financial instruments are recognized as assets or liabilities at each balance sheet date, with changes in fair value affecting net income as the Company's current interest rate swaps do not qualify for hedge accounting. Accordingly, changes in the fair value of the interest rate swaps are presented as an increase (decrease) in swap fair value in the accompanying Consolidated Statements of Income. The differentials paid or received on interest rate swap agreements are recognized as adjustments to interest expense.

*Revenue Recognition and Promotional Allowances*

The Company recognizes revenues at the time persuasive evidence of an arrangement exists, the service is provided or the retail goods are sold, prices are fixed or determinable and collection is reasonably assured.

Casino revenues are measured by the aggregate net difference between gaming wins and losses, with liabilities recognized for funds deposited by customers before gaming play occurs and for chips in the customers' possession. Cash discounts, other cash incentives related to casino play and commissions rebated through junkets to customers are recorded as a reduction to casino revenue. Hotel, food and beverage, entertainment and other operating revenues are recognized when services are performed. Entertainment, retail and other revenue includes rental income which is recognized on a time proportion basis over the lease term. Contingent rental income is recognized when the right to receive such rental income is established according to the lease agreements. Advance deposits on rooms and advance ticket sales are recorded as customer deposits until services are provided to the customer.

Revenues are recognized net of certain sales incentives which are required to be recorded as a reduction of revenue; consequently, the Company's casino revenues are reduced by discounts, commissions and points earned in the player's club loyalty program.

The retail value of accommodations, food and beverage, and other services furnished to guests without charge is included in gross revenues. Such amounts are then deducted as promotional allowances. The estimated

82

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

cost of providing such promotional allowances is primarily included in casino expenses as follows (amounts in thousands):

|  | Years Ended December 31, | | |
|  | 2012 | 2011 | 2010 |
| --- | --- | --- | --- |
| Rooms | $ 53,487 | $ 52,019 | $ 52,017 |
| Food and beverage | 107,882 | 104,413 | 94,220 |
| Entertainment, retail and other | 17,522 | 17,017 | 21,091 |
|  | $ 178,891 | $ 173,449 | $ 167,328 |

*Customer Loyalty Program*

The Company offers a slot club program whereby customers may earn points based on their level of play that may be redeemed for free credit that must be replayed in the slot machine. The Company accrues a liability based on the points earned times the redemption value, less an estimate for breakage, and records a related reduction in casino revenue.

*Slot Machine Jackpots*

The Company does not accrue a liability for base jackpots because it has the ability to avoid such payment as slot machines can legally be removed from the gaming floor without payment of the base amount. When the Company is unable to avoid payment of the jackpot (i.e., the incremental amount on a progressive slot machine) due to legal requirements, the jackpot is accrued as the obligation becomes unavoidable. This liability is accrued over the time period in which the incremental progressive jackpot amount is generated with a related reduction in casino revenue.

*Gaming Taxes*

The Company is subject to taxes based on gross gaming revenue in the jurisdictions in which it operates, subject to applicable jurisdictional adjustments. These gaming taxes are an assessment on the Company's gaming revenue and are recorded as an expense within the "Casino" line item in the accompanying Consolidated Statements of Income. These taxes totaled $1.8 billion, $1.9 billion and $1.4 billion for the years ended December 31, 2012, 2011 and 2010, respectively.

*Advertising Costs*

The Company expenses advertising costs the first time the advertising takes place. Advertising costs incurred in development periods are included in pre-opening costs. Once a project is completed, advertising costs are primarily included in general and administrative expenses. Total advertising costs were $23 million, $19.5 million and $19 million for the years ended December 31, 2012, 2011 and 2010, respectively.

*Pre-Opening Costs*

Pre-opening costs consist primarily of direct salaries and wages, legal and consulting fees, insurance, utilities and advertising, and are expensed as incurred. During the year ended December 31, 2012, the Company incurred pre-opening costs in connection with the design and construction of the Company's planned resort in the Cotai area of Macau. There were no pre-opening costs during the year ended December 31, 2011. During the year ended

83

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

December 31, 2010, the Company incurred pre-opening costs in connection with the Encore Beach Club and Surrender Nightclub which opened in May 2010, and Encore at Wynn Macau prior to its opening in April 2010.

*Income Taxes*

The Company is subject to income taxes in the United States and other foreign jurisdictions where it operates. Accounting standards require the recognition of deferred tax assets, net of applicable reserves, and liabilities for the estimated future tax consequences attributable to differences between financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. The effect of a change in tax rates on the income tax provision and deferred tax assets and liabilities is recognized in the results of operations in the period that includes the enactment date. Accounting standards also require recognition of a future tax benefit to the extent that realization of such benefit is more likely than not. Otherwise, a valuation allowance is applied.

The Company's income tax returns are subject to examination by the IRS and other tax authorities in the locations where it operates. The Company assesses potentially unfavorable outcomes of such examinations based on accounting standards for uncertain income taxes. The accounting standards prescribe a minimum recognition threshold a tax position is required to meet before being recognized in the financial statements.

Uncertain tax position accounting standards apply to all tax positions related to income taxes. These accounting standards utilize a two-step approach for evaluating tax positions. Recognition (Step I) occurs when the Company concludes that a tax position, based on its technical merits, is more likely than not to be sustained upon examination. Measurement (Step II) is only addressed if the position is deemed to be more likely than not to be sustained. Under Step II, the tax benefit is measured as the largest amount of benefit that is more likely than not to be realized upon settlement. Use of the term "more likely than not" is consistent with how that term is used in accounting for income taxes (i.e., likelihood of occurrence is greater than 50%).

Tax positions failing to qualify for initial recognition are recognized in the first subsequent interim period that they meet the "more likely than not" standard. If it is subsequently determined that a previously recognized tax position no longer meets the "more likely than not" standard, it is required that the tax position is derecognized. Accounting standards for uncertain tax positions specifically prohibit the use of a valuation allowance as a substitute for derecognition of tax positions. As applicable, the Company will recognize accrued penalties and interest related to unrecognized tax benefits in the provision for income taxes.

*Currency Translation*

Gains or losses from foreign currency remeasurements are included in other income/expense in the accompanying Consolidated Statements of Income. The results of operations and the balance sheet of Wynn Macau, Limited and its subsidiaries are translated from Macau Patacas to U.S. dollars. Balance sheet accounts are translated at the exchange rate in effect at each year-end. Income statement accounts are translated at the average rate of exchange prevailing during the year. Translation adjustments resulting from this process are charged or credited to other comprehensive income.

*Comprehensive Income*

Comprehensive income includes net income and all other non-stockholder changes in equity, or other comprehensive income. Components of the Company's comprehensive income are reported in the accompanying

84

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Consolidated Statements of Stockholders' Equity and Consolidated Statements of Comprehensive Income. The cumulative balance of other comprehensive income consists solely of currency translation adjustments and unrealized gain (loss) on available-for-sale securities.

*Fair Value Measurements*

The Company measures certain of its financial assets and liabilities, such as cash equivalents, available-for-sale securities and interest rate swaps, at fair value on a recurring basis pursuant to accounting standards for fair value measurements. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. These accounting standards establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

The following table presents assets and liabilities carried at fair value (amounts in thousands):

| | | Fair Value Measurements Using: | | |
| --- | --- | --- | --- | --- |
| | Total Carrying Value | Quoted Market Prices in Active Markets (Level 1) | Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
| **As of December 31, 2012** | | | | |
| Redemption Price Promissory Note | $ 1,936,443 | $ — | $ 1,936,443 | $ — |
| Cash equivalents | $ 969,166 | $ 80,434 | $ 888,732 | $ — |
| Interest rate swaps | $ 3,938 | $ — | $ 3,938 | $ — |
| Restricted cash and available-for-sale securities | $ 279,221 | $ — | $ 279,221 | $ — |
| **As of December 31, 2011** | | | | |
| Cash equivalents | $ 545,045 | $ 363,104 | $ 181,941 | $ — |
| Interest rate swaps | $ 7,298 | $ — | $ 7,298 | $ — |
| Available-for-sale securities | $ 213,567 | $ — | $ 213,567 | $ — |

As of December 31, 2012 and 2011, approximately 77% and 100% of the Company's cash equivalents categorized as level 2 were deposits held in foreign currencies, respectively.

*Earnings Per Share*

Basic earnings per share ("EPS') is computed by dividing net income attributable to Wynn Resorts by the weighted average number of shares outstanding during the year. Diluted EPS reflects the addition of potentially dilutive securities which for the Company include stock options and nonvested stock.

85

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The weighted average number of common and common equivalent shares used in the calculation of basic and diluted EPS for the years ended December 31, 2012, 2011 and 2010, consisted of the following (amounts in thousands):

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Weighted average common shares outstanding (used in calculation of basic earnings per share) | 103,092 | 124,039 | 122,787 |
| Potential dilution from the assumed exercise of stock options and nonvested stock | 1,157 | 1,628 | 1,152 |
| Weighted average common and common equivalent shares outstanding (used in calculation of diluted earnings per share) | 104,249 | 125,667 | 123,939 |
| Anti-dilutive stock options excluded from the calculation of diluted earnings per share | 680 | 610 | 1,078 |

*Stock-Based Compensation*

Accounting standards require the Company to measure the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award and recognize that cost over the service period. The Company uses the Black-Scholes valuation model to determine the estimated fair value for each option grant issued. The Black-Scholes determined fair value net of estimated forfeitures is amortized as compensation cost on a straight line basis over the service period.

Further information on the Company's stock-based compensation arrangements is included in Note 14 "Benefit Plans".

*Recently Issued Accounting Standards*

In July 2012, the Financial Accounting Standards Board ("FASB") issued an accounting standards update that is intended to simplify the guidance for testing the decline in the realizable value (impairment) of indefinite-lived intangible assets other than goodwill. The update allows for the consideration of qualitative factors in determining whether it is necessary to perform quantitative impairment tests. The effective date for this update is for the years and interim impairment tests performed for years beginning after September 15, 2012. This update is not expected to have a material impact on the Company's financial statements.

In May 2011, the FASB issued an accounting standards update that is intended to align the principles for fair value measurements and the related disclosure requirements under GAAP and IFRS. From a GAAP perspective, the updates are largely clarifications and certain additional disclosures. The effective date for this update is for years, and the interim periods within those years, beginning after December 15, 2011. The adoption of this guidance did not have a material effect on the Company's financial statements.

In June 2011, the FASB issued an accounting standards update that requires items of net income, items of other comprehensive income ("OCI") and total comprehensive income to be presented in one continuous statement or two separate but consecutive statements. This updated presentation makes the items within OCI more prominent. Companies are no longer allowed to present OCI in the statement of stockholders' equity. The effective date for this update was for the years, and the interim periods within those years, beginning after December 15, 2011. The Company has adopted this guidance and Consolidated Statements of Comprehensive Income are included in the Company's financial statements.

86

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**3. Comprehensive Income**

The following table presents the changes by component in Accumulated Other Comprehensive Income of the Company (amounts in thousands):

|  | Foreign currency translation | Unrealized gain/loss on securities | Accumulated other comprehensive income |
|---|---|---|---|
| December 31, 2011 | $ 2,409 | $ (1,569) | $ 840 |
| Current period other comprehensive income | 1,987 | 1,350 | 3,337 |
| December 31, 2012 | $ 4,396 | $ (219) | $ 4,177 |

**4. Investment Securities**

Investment securities consisted of the following (amounts in thousands):

|  | Amortized Cost | Available-for-sale securities | | Fair value (net carrying amount) |
|---|---|---|---|---|
|  |  | Gross unrealized gains | Gross unrealized losses |  |
| **December 31, 2012** |  |  |  |  |
| Domestic and foreign corporate bonds | $161,631 | $ 94 | $ (369) | $ 161,356 |
| Commercial paper | 18,704 | 4 | (5) | 18,703 |
|  | $180,335 | $ 98 | $ (374) | $ 180,059 |
| **December 31, 2011** |  |  |  |  |
| Domestic and foreign corporate bonds | $196,986 | $ 20 | $ (2,070) | $ 194,936 |
| Commercial paper | 18,651 | 1 | (21) | 18,631 |
|  | $215,637 | $ 21 | $ (2,091) | $ 213,567 |

For investments with unrealized losses as of December 31, 2012, the Company has determined that (i) it does not have the intent to sell any of these investments, and (ii) it is not likely that the Company will be required to sell these investments prior to the recovery of the amortized cost. Accordingly, the Company has determined that no other-than-temporary impairments exist at the reporting date.

The Company obtains pricing information in determining the fair value of its available-for-sale securities from independent pricing vendors. Based on management's inquiries, the pricing vendors use various pricing models consistent with what other market participants would use. The assumptions and inputs used by the pricing vendors are derived from market observable sources including: reported trades, broker/dealer quotes, issuer spreads, benchmark curves, bids, offers and other market-related data. The Company has not made adjustments to such prices. Each quarter, the Company validates the fair value pricing methodology to determine the fair value consistent with applicable accounting guidance and to confirm that the securities are classified properly in the fair value hierarchy. The Company compares the pricing received from its vendors to independent sources for the same or similar securities.

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The amortized cost and estimated fair value of these investment securities at December 31, 2012, by contractual maturity are shown below (amounts in thousands):

|  | Amortized Cost | Fair Value |
|---|---|---|
| **Available-for-sale securities** |  |  |
| Due in one year or less | $138,992 | $138,887 |
| Due after one year through two years | 41,343 | 41,172 |
|  | $180,335 | $180,059 |

**5. Receivables, net**

Receivables, net consisted of the following (amounts in thousands):

|  | As of December 31, | |
|---|---|---|
|  | 2012 | 2011 |
| Casino | $275,302 | $264,034 |
| Hotel | 18,227 | 20,790 |
| Retail leases and other | 47,257 | 45,520 |
|  | 340,786 | 330,344 |
| Less: allowance for doubtful accounts | (102,213) | (91,854) |
|  | $238,573 | $238,490 |

**6. Property and Equipment, net**

Property and equipment, net consisted of the following (amounts in thousands):

|  | As of December 31, | |
|---|---|---|
|  | 2012 | 2011 |
| Land and improvements | $732,209 | $730,335 |
| Buildings and improvements | 3,837,215 | 3,777,612 |
| Airplanes | 135,392 | 77,436 |
| Furniture, fixtures and equipment | 1,646,506 | 1,655,655 |
| Leasehold interest in land | 316,658 | 316,437 |
| Construction in progress | 110,490 | 28,477 |
|  | 6,778,470 | 6,585,952 |
| Less: accumulated depreciation | (2,050,571) | (1,720,620) |
|  | $4,727,899 | $4,865,332 |

Depreciation expense for the years ended December 31, 2012, 2011 and 2010, was $367.1 million, $389.8 million and $394.9 million, respectively.

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**7. Intangibles, net**

Intangibles, net consisted of the following (amounts in thousands):

|  | Macau Gaming Concession | Show Production Rights | Water Rights | Trademarks | Total Intangibles, Net |
|---|---|---|---|---|---|
| **January 1, 2011** | $ 27,401 | $ 5,005 | $6,400 | $ 1,399 | $ 40,205 |
| Amortization | (2,383) | (2,071) | — | — | (4,454) |
| **December 31, 2011** | 25,018 | 2,934 | 6,400 | 1,399 | 35,751 |
| Amortization | (2,383) | (2,071) | — | — | (4,454) |
| **December 31, 2012** | $ 22,635 | $ 863 | $6,400 | $ 1,399 | $ 31,297 |

The Macau gaming concession intangible is being amortized over the 20-year life of the concession. The Company expects that amortization of the Macau gaming concession will be $2.4 million each year from 2013 through 2021, and $1.2 million in 2022.

Show production rights represent amounts paid to purchase the rights to the "Le Rêve" production show, which is performed at Wynn Las Vegas. The Company expects show production rights amortization of $0.9 million in 2013, which is the final year of amortization.

Water rights reflect the fair value allocation determined in the purchase of the property on which Wynn Las Vegas is located in April 2000. The value of the trademarks primarily represents the costs to acquire the "Le Rêve" name. The water rights and trademarks are indefinite-lived assets and, accordingly, not amortized.

89

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**8. Long-Term Debt**

Long-term debt consisted of the following (amounts in thousands):

| | As of December 31, | |
| --- | ---: | ---: |
| | 2012 | 2011 |
| 7 7/8% Wynn Las Vegas First Mortgage Notes, due November 1, 2017, net of original issue discount of $7,384 at December 31, 2012 and $8,578 at December 31, 2011 | $ 492,616 | $ 491,422 |
| 7 7/8% Wynn Las Vegas First Mortgage Notes, due May 1, 2020,net of original issue discount of $1,632 at December 31, 2012 and $1,789 at December 31, 2011 | 350,378 | 350,221 |
| 7 3/4% Wynn Las Vegas First Mortgage Notes, due August 15, 2020 | 1,320,000 | 1,320,000 |
| 5 3/8% Wynn Las Vegas First Mortgage Notes, due March 15, 2022 | 900,000 | — |
| Wynn Las Vegas Term Loan Facility, due August 15, 2013; interest at LIBOR plus 1.875% | — | 40,262 |
| Wynn Las Vegas Term Loan Facility, due August 17, 2015; interest at LIBOR plus 3% | — | 330,605 |
| Wynn Macau Senior Term Loan Facilities (as amended July 2012), due July 31, 2017 and July 31, 2018; interest at LIBOR or HIBOR plus 1.75%—2.50%, net of original issue discount of $3,737 at December 31, 2012 | 749,433 | — |
| Wynn Macau Senior Term Loan Facilities (as amended June 2007), due June 27, 2014; interest at LIBOR or HIBOR plus 1.25%—1.75% at December 31, 2011 | — | 477,251 |
| Wynn Macau Senior Revolving Credit Facilities, (as amended July 2012) due July 31, 2017; interest at LIBOR or HIBOR plus 1.75%—2.50% | — | — |
| Wynn Macau Senior Revolving Credit Facility, due June 27, 2012; interest at LIBOR or HIBOR plus 1.25% at December 31, 2011…… | — | 150,400 |
| Redemption Price Promissory Note with former stockholder and related party, due February 18, 2022; interest at 2% | 1,936,443 | — |
| $42 million Note Payable, due April 1, 2017; interest at LIBOR plus 1.25% | 33,950 | 35,350 |
| $32.5 million Note Payable, due August 10, 2012; interest at LIBOR plus 1.15% | — | 22,208 |
| | 5,782,820 | 3,217,719 |
| Current portion of long-term debt | (1,050) | (407,934) |
| | $ 5,781,770 | $ 2,809,785 |

*7 7/8% Wynn Las Vegas First Mortgage Notes due 2017*

In October 2009, Wynn Las Vegas, LLC and Wynn Las Vegas Capital Corp. (together, the "Issuers") issued, in a private offering, $500 million aggregate principal amount of 7 7/8% first mortgage notes due November 1, 2017 (the "2017 Notes") at a price of 97.823% of the principal amount. Interest is due on the 2017 Notes on May 1st and November 1st of each year. Commencing November 1, 2013, the 2017 Notes are redeemable at the Issuers' option at a price equal to 103.938% of the principal amount redeemed and the premium over the principal amount declines ratably on November 1st of each year thereafter to zero on or after November 1, 2015. The 2017 Notes are senior obligations of the Issuers and are unsecured (except by the first priority pledge by Wynn Resorts Holdings, LLC of its equity interests in Wynn Las Vegas, LLC (the "Holdings pledge")). The Issuers' obligations under the 2017 Notes rank pari passu in right of payment with the 7 7/8% 2020 Notes (as defined below), the 7 3/4% 2020 Notes (as defined below) and the 2022 Notes (as defined below). The 2017 Notes are not guaranteed by any of the Company's subsidiaries. If the Issuers undergo a change of control, they must offer to repurchase the 2017 Notes at 101% of the principal amount, plus accrued

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

and unpaid interest. The indenture governing the 2017 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restrictions affecting subsidiaries.

*7 7/8% Wynn Las Vegas First Mortgage Notes due 2020*

In April 2010, the Issuers issued, in a private offering, $352 million aggregate principal amount of 7 7/8% first mortgage notes due May 1, 2020 (the "7 7/8% 2020 Notes"). The 7 7/8% 2020 Notes were issued pursuant to an exchange offer for previously issued notes that were to mature in December 2014. Interest is due on the 7 7/8% 2020 Notes on May 1st and November 1st of each year. Commencing May 1, 2015, the 7 7/8% 2020 Notes are redeemable at the Issuers' option at a price equal to 103.938% of the principal amount redeemed and the premium over the principal amount declines ratably on May 1st of each year thereafter to zero on or after May 1, 2018. The 7 7/8% 2020 Notes are senior obligations of the Issuers and are unsecured (except by the Holdings pledge). The Issuers' obligations under the 7 7/8% 2020 Notes rank pari passu in right of payment with the 2017 Notes, the 7 3/4% 2020 Notes (as defined below) and the 2022 Notes (as defined below). The 7 7/8% 2020 Notes are not guaranteed by any of the Company's subsidiaries. If the Issuers undergo a change of control, they must offer to repurchase the 7 7/8% 2020 Notes at 101% of the principal amount, plus accrued and unpaid interest. The indenture governing the 7 7/8% 2020 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restrictions affecting subsidiaries.

*7 3/4% Wynn Las Vegas First Mortgage Notes due 2020*

In August 2010, the Issuers issued $1.32 billion aggregate principal amount of 7 3/4% first mortgage notes due August 15, 2020 (the "7 3/4% 2020 Notes"). The 7 3/4% 2020 Notes were issued at par. The 7 3/4% 2020 Notes refinanced a previous notes issue that was to mature in December 2014. Interest is due on the 7 3/4% 2020 Notes on February 15th and August 15th of each year. Commencing August 15, 2015, the 7 3/4% 2020 Notes are redeemable at the Issuers' option at a price equal to 103.875% of the principal amount redeemed and the premium over the principal amount declines ratably on August 15th of each year thereafter to zero on or after August 15, 2018. The 7 3/4% 2020 Notes are senior obligations of the Issuers and are unsecured (except by the Holdings pledge). The Issuers' obligations under the 7 3/4% 2020 Notes rank pari passu in right of payment with the 2017 Notes, the 7 7/8% 2020 Notes and the 2022 Notes (as defined below). The 7 3/4% 2020 Notes are not guaranteed by any of the Company's subsidiaries. If the Issuers undergo a change of control, they must offer to repurchase the 7 3/4% 2020 Notes at 101% of the principal amount, plus accrued and unpaid interest. The indenture governing the 7 3/4% 2020 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restrictions affecting subsidiaries.

*5 3/8% Wynn Las Vegas First Mortgage Notes due 2022*

In March 2012, the Issuers issued, in a private offering, $900 million aggregate principal amount of 5 3/8% first mortgage notes due 2022 (the "2022 Notes"). A portion of the proceeds were used to repay all amounts

91

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

outstanding under the Wynn Las Vegas term loan facilities. In October 2012, the Issuers commenced an offer to exchange all of the 2022 Notes for notes registered under the Securities Act of 1933, as amended. The exchange offer closed on November 6, 2012. Interest is due on the 2022 Notes on March 15th and September 15th of each year. Commencing March 15, 2017, the 2022 Notes are redeemable at the Issuers' option at a price equal to 102.688% of the principal amount redeemed and the premium over the principal amount declines ratably on March 15th of each year thereafter to zero on or after March 15, 2020. The 2022 Notes are senior obligations of the Issuers and are unsecured (except by the Holdings pledge). The Issuers' obligations under the 2022 Notes rank pari passu in right of payment with the 2017 Notes, the 7 7/8% 2020 Notes and the 7 3/4% 2020 Notes. The 2022 Notes are not guaranteed by any of the Company's subsidiaries. If the Issuers undergo a change of control, they must offer to repurchase the 2022 Notes at 101% of the principal amount, plus accrued and unpaid interest. The indenture governing the 2022 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restrictions affecting subsidiaries.

As described in Note 16 of the Consolidated Financial Statements, Elaine Wynn has submitted a cross claim against Steve Wynn and Kazuo Okada. The indentures for the 2017 Notes, the 7 7/8% 2020 Notes, the 7 3/4% 2020 Notes and the 2022 Notes (collectively, the "Indentures") provide that if Steve Wynn, together with certain related parties, in the aggregate beneficially owns a lesser percentage of the outstanding common stock of the Company than are beneficially owned by any other person, a change of control will have occurred. If Elaine Wynn prevails in her cross claim, Steve Wynn would not beneficially own or control Elaine Wynn's shares and a change in control may result under the Indentures and the Company's other debt documents.

In September 2012, as discussed below, the Wynn Las Vegas Credit Agreement (as defined below) was terminated, and in accordance with the respective Indentures, the liens (other than the Holdings pledge) on the assets of Wynn Las Vegas, LLC and its subsidiaries securing, and the subsidiary guarantees of, the 2017 Notes, the 7 7/8% 2020 Notes, the 7 3/4% 2020 Notes and the 2022 Notes were released.

*Wynn Las Vegas Credit Facilities*

In March 2012, Wynn Las Vegas entered into an eighth amendment ("Amendment No. 8") to its Amended and Restated Credit Agreement, dated as of August 15, 2006 (as amended, the "Wynn Las Vegas Credit Agreement"). Amendment No. 8 amended the Wynn Las Vegas Credit Agreement to, among other things, permit the issuance of the 2022 Notes. Concurrently with the issuance of the 2022 Notes, Wynn Las Vegas, LLC prepaid all term loans under the Wynn Las Vegas Credit Agreement, terminated all of its revolving credit commitments that were due to expire in 2013, and terminated all but $100 million of its revolving credit commitments expiring in 2015. In connection with this transaction, the Company expensed deferred financing fees of $4.8 million, all related to the Wynn Las Vegas term loan and revolving credit facilities.

In September 2012, Wynn Las Vegas terminated the Wynn Las Vegas Credit Agreement. No loans were outstanding under the Wynn Las Vegas Credit Agreement at the time of termination. Prior to such termination, certain letters of credit in which lenders had participated pursuant to the Wynn Las Vegas Credit Agreement were reallocated to a separate, unsecured letter of credit facility provided by Deutsche Bank, A.G. Wynn Las Vegas did not incur any early termination penalties related to the termination.

In connection with the termination, the Company expensed $2.6 million of previously deferred financing costs and third party fees related to the Wynn Las Vegas Credit Agreement.

92

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Wynn Macau Credit Facilities*

During the year ended December 31, 2012, Wynn Macau, S.A. repaid $150.4 million of borrowings under the Wynn Macau Senior Revolving Credit Facility. On June 27, 2012, the Wynn Macau Senior Revolving Credit Facility matured with an outstanding balance of $0.

On July 31, 2012, Wynn Macau, S.A., amended and restated its credit facilities, dated September 14, 2004 (as so amended and restated, the "Amended Wynn Macau Credit Facilities"), and appointed Bank of China Limited, Macau Branch as intercreditor agent, facilities agent and security agent. The Amended Wynn Macau Credit Facilities and related agreements took effect on July 31, 2012 and expand availability under Wynn Macau S.A.'s senior secured bank facility to US$2.3 billion equivalent, consisting of a US$750 million equivalent fully funded senior secured term loan facility and a US$1.55 billion equivalent senior secured revolving credit facility. Wynn Macau, S.A. also has the ability to upsize the total senior secured facilities by an additional US$200 million pursuant to the terms and provisions of the Amended Wynn Macau Credit Facilities. Borrowings under the Amended Wynn Macau Credit Facilities, which consist of both Hong Kong Dollar and United States Dollar tranches, were used to refinance Wynn Macau S.A.'s existing indebtedness, and will be used to fund the design, development, construction and pre-opening expenses of Wynn Cotai and for general corporate purposes.

The term loan facility matures in July 2018, and the revolving credit facility matures in July 2017. The principal amount of the term loan is required to be repaid in two equal installments in July 2017 and July 2018. The senior secured facilities bear interest for the first six months after closing at LIBOR or HIBOR plus a margin of 2.50% and thereafter will be subject to LIBOR or HIBOR plus a margin of between 1.75% to 2.50% based on Wynn Macau, S.A.'s leverage ratio.

Borrowings under the Amended Wynn Macau Credit Facilities are guaranteed by Palo Real Estate Company Limited ("Palo"), a subsidiary of Wynn Macau, S.A., and by certain subsidiaries of the Company that own equity interests in Wynn Macau, S.A., and are secured by substantially all of the assets of Wynn Macau, S.A., the equity interests in Wynn Macau, S.A. and substantially all of the assets of Palo.

In connection with amending the Wynn Macau credit facilities, the Company expensed $17.7 million and capitalized $33.2 million of financing costs.

The Amended Wynn Macau Credit Facilities contain a requirement that Wynn Macau, S.A. must make mandatory repayments of indebtedness from specified percentages of excess cash flow. If Wynn Macau, S.A. meets a Consolidated Leverage Ratio, as defined in the Amended Wynn Macau Credit Facilities, of greater than 4.0 to 1, such repayment is defined as 50% of Excess Cash Flow, as defined in the Amended Wynn Macau Credit Facilities. If the Consolidated Leverage Ratio is equal or less than 4.0 to 1, then no repayment is required. Based on current estimates the Company does not believe that the Wynn Macau Consolidated Leverage Ratio during the year ending December 31, 2013 will exceed 4.0 to 1. Accordingly, Wynn Macau, S.A. does not expect to make any mandatory repayments pursuant to this requirement during 2013.

The Amended Wynn Macau Credit Facilities contain customary covenants restricting certain activities including, but not limited to: the incurrence of additional indebtedness, the incurrence or creation of liens on any of its property, sale and leaseback transactions, the ability to dispose of assets, and making loans or other investments. In addition, Wynn Macau was required by the financial covenants to maintain a Leverage Ratio, as defined in the Amended Wynn Macau Credit Facilities, of not greater than 3.75 to 1 as of December 31, 2012, and an Interest Coverage Ratio, as defined in the Amended Wynn Macau Credit Facilities, of not less than 2.00 to 1. Management believes that Wynn Macau was in compliance with all covenants at December 31, 2012.

93

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

In connection with the initial financing of Wynn Macau, Wynn Macau, S.A. entered into a Bank Guarantee Reimbursement Agreement with Banco Nacional Ultramarino, S.A. ("BNU") for the benefit of the Macau government. This guarantee assures Wynn Macau, S.A.'s performance under the casino concession agreement, including the payment of premiums, fines and indemnity for any material failure to perform under the terms of the concession agreement. As of December 31, 2012, the guarantee was in the amount of 300 million Macau Patacas (approximately US$37 million) and will remain at such amount until 180 days after the end of the term of the concession agreement (2022). BNU, as issuer of the guarantee, is currently secured by a second priority security interest in the senior lender collateral package. From and after repayment of all indebtedness under the Amended Wynn Macau Credit Facilities, Wynn Macau, S.A. is obligated to promptly, upon demand by BNU, repay any claim made on the guarantee by the Macau government. BNU is paid an annual fee for the guarantee of approximately 5.2 million Macau Patacas (approximately US$0.7 million).

*Redemption Price Promissory Note*

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, the Company redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," Wynn Resorts' articles of incorporation authorize redemption of the shares held by unsuitable persons at a "fair value" redemption price. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares which are subject to the terms of an existing stockholder agreement. Pursuant to the articles of incorporation, the Company issued the Redemption Note to Aruze USA, Inc., a former stockholder and related party, in redemption of the shares. The Redemption Note has a principal amount of $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum payable annually in arrears on each anniversary of the date of the Redemption Note. The Company may, in its sole and absolute discretion, at any time from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of the Company or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts and any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

The Company has recorded the fair value of the Redemption Note at its estimated present value of approximately $1.94 billion in accordance with applicable accounting guidance. In determining this fair value, the Company considered the stated maturity of the Redemption Note, its stated interest rate, and the uncertainty of the related cash flows of the Redemption Note as well as the potential effects of the following: uncertainties surrounding the potential outcome and timing of pending litigation with Aruze USA, Inc. (see Note 16); the outcome of on-going investigations by the Nevada Gaming Control Board; and other potential legal and regulatory actions. In addition, in the furtherance of various future business objectives, the Company considered its ability, at its sole option, to prepay the Redemption Note at any time in accordance with its terms without penalty. Accordingly, the Company reasonably determined that the estimated life of the Redemption Note could be less than the contractual life of the Redemption Note. When considering the appropriate rate of interest to be used to determine fair value for accounting purposes and in light of the uncertainty in the timing of the cash flows, the Company used observable inputs from a range of trading values of financial instruments with terms and lives similar to the estimated life and terms of the Redemption Note. As a result of this analysis, the Company concluded the Redemption Note's stated rate of 2% approximated a market rate. Aruze USA, Inc., Universal Entertainment Corporation and Kazuo Okada have challenged the redemption of Aruze USA, Inc.'s shares and we are currently involved in litigation with those parties as well as related shareholder derivative

94

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

litigation. The outcome of these various proceedings cannot be predicted. Any adverse judgments or settlements involving payment of a material sum of money could cause a material adverse effect on our financial condition and results of operations and could expose the Company to additional claims by third parties, including current or former investors or regulators. Any adverse judgments or settlements would reduce the Company's profits and could limit the Company's ability to operate its business.

*$42 Million Note Payable for Aircraft*

On March 30, 2007, World Travel, LLC, a subsidiary of Wynn Las Vegas, entered into a loan agreement with a principal balance of $42 million. The loan is guaranteed by Wynn Las Vegas, LLC and secured by a first priority security interest in one of the Company's aircraft. Principal payments of $350,000 plus interest are made quarterly with a balloon payment of $28 million due at maturity, April 1, 2017. Interest is calculated at 90-day LIBOR plus 125 basis points.

*$32.5 Million Note Payable for Aircraft*

On May 10, 2007, World Travel G-IV, LLC, a subsidiary of Wynn Resorts, entered into a $32.5 million term loan credit facility to finance the purchase of an aircraft. Principal payments of $542,000 plus interest were made quarterly with a balloon payment of $21.1 million made on August 10, 2012. Interest was calculated at LIBOR plus 115 basis points. There were no amounts outstanding on this note as of December 31, 2012.

*Fair Value of Long-Term Debt*

The net book value of the Company's outstanding first mortgage notes was $3.1 billion and $2.2 billion at December 31, 2012 and 2011, respectively. The estimated fair value of the Company's outstanding first mortgage notes, based on recent trades (using level 2 inputs), was approximately $3.4 billion and $2.4 billion as of December 31, 2012 and 2011, respectively. The net book value of the Company's other debt instruments, excluding the Redemption Note, was approximately $783.4 million and $1.1 billion as of December 31, 2012 and 2011, respectively. The estimated fair value of the Company's other debt instruments was approximately $760.8 million and $1 billion as of December 31, 2012 and 2011, respectively. The estimated fair value of the Redemption Note (using level 2 inputs) was approximately $1.94 billion at December 31, 2012.

*Scheduled Maturities of Long-Term Debt*

Scheduled maturities of long-term debt, including the accretion of debt discounts of $12.8 million, are as follows (amounts in thousands):

| Years Ending December 31, | |
|---|---|
| 2013 | $ 1,050 |
| 2014 | 1,400 |
| 2015 | 1,400 |
| 2016 | 1,400 |
| 2017 | 905,285 |
| Thereafter | 4,885,038 |
| | $ 5,795,573 |

**9. Interest Rate Swaps**

The Company has entered into floating-for-fixed interest rate swap arrangements in order to manage interest rate risk relating to certain of its debt facilities. These interest rate swap agreements modify the Company's

95

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

exposure to interest rate risk by converting a portion of the Company's floating-rate debt to a fixed rate. These interest rate swaps essentially fix the interest rate at the percentages noted below; however, changes in the fair value of the interest rate swaps for each reporting period have been recorded in the increase/decrease in swap fair value in the accompanying Consolidated Statements of Income, as the interest rate swaps do not qualify for hedge accounting.

The following table presents the historical fair value of the interest rate swaps recorded in the accompanying Consolidated Balance Sheets as of December 31, 2012 and 2011. The Company utilized Level 2 inputs as described in Note 2 to determine fair value. The fair value approximates the amount the Company would pay if these contracts were settled at the respective valuation dates. Fair value is estimated based upon current, and predictions of future, interest rate levels along a yield curve, the remaining duration of the instruments and other market conditions, and therefore, is subject to significant estimation and a high degree of variability and fluctuation between periods. The fair value is adjusted, to reflect the impact of credit ratings of the counterparties or the Company, as applicable. These adjustments resulted in a reduction in the fair values as compared to their settlement values. As of December 31, 2012, the interest rate swaps are included in other long term liabilities. As of December 31, 2011, the interest rate swap liabilities were included in other current accrued liabilities.

| Liability fair value:<br>(amounts in thousands) | Wynn Las Vegas | | Wynn Macau | | Total Interest<br>Rate Swaps | |
|---|---|---|---|---|---|---|
| December 31, 2012 | $ | — | $ | 3,938 | $ | 3,938 |
| December 31, 2011 | $ | 4,628 | $ | 2,670 | $ | 7,298 |

*Wynn Las Vegas Swap*

In June 2012, the Company terminated its Wynn Las Vegas swap for a payment of $2.4 million. As of December 31, 2011, the liability fair value of this interest rate swap was approximately $4.6 million.

*Wynn Macau Swaps*

In June 2012, the Wynn Macau swap matured. As of December 31, 2011, the liability fair value of this interest rate swap was approximately $2.7 million.

Effective September 28, 2012, the Company entered into two interest rate swap agreements intended to hedge a portion of the underlying interest rate risk on borrowings under the Amended Wynn Macau Credit Facilities. Under the two swap agreements, the Company pays a fixed interest rate (excluding the applicable interest margin) of 0.73% on notional amounts corresponding to borrowings of HK$3.95 billion (approximately US$509.4 million) incurred under the Amended Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable interest rate based on the applicable HIBOR at the time of payment. These interest rate swaps fix the all-in interest rate on such amounts at 2.48% to 3.23%. These interest rate swap agreements mature in July 2017.

Effective October 31, 2012, the Company entered into a third interest rate swap agreement intended to hedge a portion of the underlying interest rate risk on borrowings under the Amended Wynn Macau Credit Facilities. Under this swap agreement, the Company pays a fixed interest rate (excluding the applicable interest margin) of 0.6763% on notional amounts corresponding to borrowings of US$243.75 million incurred under the Amended Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable rate based on the applicable LIBOR at the time of payment. This interest rate swap fixes the all-in interest rate on such amounts at 2.4263% to 3.1763%. This interest rate swap agreement matures in July 2017.

96

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**10. Related Party Transactions**

*Related Party Share Redemption*

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, the Company redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," Wynn Resorts' articles of incorporation authorizes redemption of the shares held by unsuitable persons at a "fair value" redemption price. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares which are subject to the terms of an existing stockholder agreement. Pursuant to the articles of incorporation, the Company issued the Redemption Price Promissory Note to Aruze USA, Inc., a former stockholder and related party, in redemption of the shares. Aruze USA, Inc., Universal Entertainment Corporation and Kazuo Okada have challenged the redemption of Aruze USA, Inc.'s shares and we are currently involved in litigation with those parties as well as related shareholder derivative litigation. The outcome of these various proceedings cannot be predicted. Any adverse judgments or settlements involving payment of a material sum of money could cause a material adverse effect on our financial condition and results of operations and could expose the Company to additional claims by third parties, including current or former investors or regulators. Any adverse judgments or settlements would reduce the Company's profits and could limit the Company's ability to operate its business.

*Amounts Due to Officers*

The Company periodically provides services to Stephen A. Wynn, Chairman of the Board of Directors and Chief Executive Officer ("Mr. Wynn"), and certain other officers and directors of the Company, including the personal use of employees, construction work and other personal services. Mr. Wynn and other officers and directors have deposits with the Company to prepay any such items, which are replenished on an ongoing basis as needed. As of December 31, 2012 and 2011, Mr. Wynn and the other officers and directors had a net deposit balance with the Company of $1.0 million and $0.4 million, respectively.

*Villa Suite Lease*

On March 18, 2010, Mr. Wynn and Wynn Las Vegas entered into an Amended and Restated Agreement of Lease (the "SW Lease") for a villa suite to serve as Mr. Wynn's personal residence. The SW Lease amends and restates a prior lease. The SW Lease was approved by the Audit Committee of the Board of Directors of the Company. The term of the SW Lease commenced as of March 1, 2010 and runs concurrent with Mr. Wynn's employment agreement with the Company; provided that either party may terminate on 90 days notice. Pursuant to the SW Lease, the rental value of the villa suite will be treated as imputed income to Mr. Wynn, and will be equal to the fair market value of the accommodations provided. Effective March 1, 2010, and for the first two years of the term of the SW Lease, the rental value was $503,831 per year. Effective March 1, 2012, the rental value is $440,000 per year based on the current fair market value as established by the Audit Committee of the Company with the assistance of an independent third-party appraisal. The rental value for the villa suite will be re-determined every two years during the term of the lease by the Audit Committee, with the assistance of an independent third-party appraisal. Certain services for, and maintenance of, the villa suite are included in the rental.

*Home Purchase*

In May 2010, the Company entered into an employment agreement with Linda Chen, who is the Chief Operating Officer of Wynn Macau. The term of the employment agreement is through February 24, 2020. Under the terms of the employment agreement, the Company purchased a home in Macau for use by Ms. Chen and has made renovations to the home with total costs of $9.3 million through December 31, 2012. The employment agreement also provides Ms. Chen the use of an automobile in Macau. Upon the occurrence of certain events set

97

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

forth below, Ms. Chen has the option to purchase the home at the then fair market value of the home (as determined by an independent appraiser) less a discount equal to ten percentage points multiplied by each anniversary of the term of the agreement that has occurred (the "Discount Percentage"). The option is exercisable for (a) no consideration at the end of the term, (b) $1.00 in the event of termination of Ms. Chen's employment without "cause" or termination of Ms. Chen's employment for "good reason" following a "change of control" and (c) at a price based on the applicable Discount Percentage in the event Ms. Chen terminates the agreement due to material breach by the Company. Upon Ms. Chen's termination for "cause," Ms. Chen will be deemed to have elected to purchase the Macau home based on the applicable Discount Percentage unless the Company determines to not require Ms. Chen to purchase the home. If Ms. Chen's employment terminates for any other reason before the expiration of the term (e.g., because of her death or disability or due to revocation of gaming license), the option will terminate.

*Plane Option Agreement*

On January 3, 2013, the Company and Mr. Wynn entered into an agreement pursuant to which Mr. Wynn agreed to the termination of a previously granted option to purchase an approximately two acre tract of land located on the Wynn Las Vegas golf course and in consideration the Company granted Mr. Wynn the right to purchase any or all of the aircraft owned by the Company or its direct wholly owned subsidiaries. The aircraft purchase option is exercisable upon 30 days written notice and at a price equal to the book value of such aircraft, and will terminate on the date of termination of the employment agreement between the Company and Mr. Wynn, which expires in October 2020.

*The "Wynn" Surname Rights Agreement*

On August 6, 2004, the Company entered into agreements with Mr. Wynn that confirm and clarify the Company's rights to use the "Wynn" name and Mr. Wynn's persona in connection with its casino resorts. Under the parties' Surname Rights Agreement, Mr. Wynn granted the Company an exclusive, fully paid-up, perpetual, worldwide license to use, and to own and register trademarks and service marks incorporating the "Wynn" name for casino resorts and related businesses, together with the right to sublicense the name and marks to its affiliates. Under the parties' Rights of Publicity License, Mr. Wynn granted the Company the exclusive, royalty-free, worldwide right to use his full name, persona and related rights of publicity for casino resorts and related businesses, together with the ability to sublicense the persona and publicity rights to its affiliates, until October 24, 2017.

**11. Property Charges and Other**

Property charges and other consisted of the following (amounts in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Net loss on assets abandoned/retired for remodel or sold | $29,524 | $ 19,708 | $10,270 |
| Donation to University of Macau Foundation | 4,083 | 109,563 | — |
| Loss on contract termination | 315 | — | 14,949 |
| Loss on show cancellation | 6,056 | 1,378 | — |
| | $39,978 | $130,649 | $25,219 |

Property charges and other generally include costs related to the retirement of assets for remodels and asset abandonments. Property charges and other for the year ended December 31, 2012 include a remodel of two Las

98

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Vegas restaurants, charges associated with the termination of a Las Vegas show that ended its run in November 2012, and miscellaneous renovations and abandonments at our resorts.

Property charges and other for the year ended December 31, 2011 include the present value of a charitable contribution made by Wynn Macau to the University of Macau Development Foundation. This contribution consists of a $25 million payment made in May 2011, and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive, for a total of $135 million. The amount reflected in the accompanying Consolidated Statements of Income has been discounted using the Company's estimated borrowing rate over the time period of the remaining committed payments. In accordance with accounting standards for contributions, subsequent accretion of the discount is being recorded as additional donation expense and included in Property charges and other. Also included are the write off of certain off-site golf memberships by Wynn Las Vegas, miscellaneous renovations and abandonments at the Company's resorts, including modifications of the Encore at Wynn Las Vegas retail esplanade, closure of the Blush nightclub and the write off of certain costs related to a show that ended its run in Las Vegas in April 2011.

Property charges and other for the year ended December 31, 2010 include a contract termination payment of $14.9 million related to a management contract for certain of the nightclubs at Wynn Las Vegas as well as miscellaneous renovations, abandonments and gain/loss on sale of equipment at Wynn Las Vegas and Wynn Macau.

**12. Stockholders' Equity**

*Common Stock*

The Company is authorized to issue up to 400,000,000 shares of its common stock, $0.01 par value per share (the "Common Stock"). As of December 31, 2012 and 2011, 100,866,712 shares and 125,080,998 shares, respectively, of the Company's Common Stock were outstanding. Except as otherwise provided by the Company's articles of incorporation or Nevada law, each holder of the Common Stock is entitled to one vote for each share held of record on each matter submitted to a vote of stockholders. Holders of the Common Stock have no cumulative voting, conversion, redemption or preemptive rights or other rights to subscribe for additional shares. Subject to any preferences that may be granted to the holders of the Company's preferred stock, each holder of Common Stock is entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefore, as well as any distributions to the stockholders and, in the event of liquidation, dissolution or winding up of the Company, is entitled to share ratably in all assets of the Company remaining after payment of liabilities.

The Board of Directors of Wynn Resorts has authorized an equity repurchase program of up to $1.7 billion. The repurchase program may include repurchases from time to time through open market purchases or negotiated transactions, depending upon market conditions. As of December 31, 2012, the Company had repurchased a cumulative total of 12,863,730 shares of the Company's Common Stock for a net cost of $1.1 billion under the program. Under the repurchase program, there were no repurchases made during the years ended December 31, 2012, 2011 and 2010.

During 2012 and 2011, the Company repurchased a total of 7,640 and 51,136 shares, respectively, in satisfaction of tax withholding obligations on vested restricted stock.

*Preferred Stock*

The Company is authorized to issue up to 40,000,000 shares of undesignated preferred stock, $0.01 par value per share (the "Preferred Stock"). As of December 31, 2012, the Company had not issued any Preferred Stock. The

99

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Board of Directors, without further action by the holders of Common Stock, may designate and issue shares of Preferred Stock in one or more series and may fix or alter the rights, preferences, privileges and restrictions, including the voting rights, redemption provisions (including sinking fund provisions), dividend rights, dividend rates, liquidation rates, liquidation preferences, conversion rights and the description and number of shares constituting any wholly unissued series of Preferred Stock. The issuance of such shares of Preferred Stock could adversely affect the rights of the holders of Common Stock. The issuance of shares of Preferred Stock under certain circumstances could also have the effect of delaying or preventing a change of control of the Company or other corporate action.

*Redemption of Securities*

Wynn Resorts' articles of incorporation provide that, to the extent a gaming authority makes a determination of unsuitability or to the extent the Board of Directors determines, in its sole discretion, that a person is likely to jeopardize the Company or any affiliates application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, Wynn Resorts may redeem shares of its capital stock that are owned or controlled by an unsuitable person or its affiliates. The redemption price will be the amount, if any, required by the gaming authority or, if the gaming authority does not determine the price, the sum deemed by the Board of Directors to be the fair value of the securities to be redeemed. If Wynn Resorts determines the redemption price, the redemption price will be capped at the closing price of the shares on the principal national securities exchange on which the shares are listed on the trading day before the redemption notice is given. If the shares are not listed on a national securities exchange, the redemption price will be capped at the closing sale price of the shares as quoted on The NASDAQ Global Select Market or if the closing price is not reported, the mean between the bid and ask prices, as quoted by any other generally recognized reporting system. Wynn Resorts' right of redemption is not exclusive of any other rights that it may have or later acquire under any agreement, its bylaws or otherwise. The redemption price may be paid in cash, by promissory note, or both, as required, and pursuant to the terms established by, the applicable Gaming Authority and, if not, as the Board of Directors of Wynn Resorts elects.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. For more information, refer to Note 16—"Commitments and Contingencies".

**13. Noncontrolling Interest**

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary of the Company and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Through an initial public offering, including the over allotment, Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of this subsidiary's common stock (the "Wynn Macau Limited IPO"). Proceeds to the Company as a result of this transaction were approximately $1.8 billion, net of transaction costs of approximately $84 million. The shares of Wynn Macau, Limited were not and will not be registered under the Securities Act and may not be offered or sold in the United States absent a registration under the Securities Act, or an applicable exception from such registration requirements. Net income attributable to noncontrolling interest was $226.7 million, $211.7 million and $156.5 million for the years ended December 31, 2012, 2011 and 2010, respectively.

On November 16, 2011, the Wynn Macau, Limited Board of Directors approved a HK$1.20 per share dividend. The total dividend amount was approximately $800 million and the Company's share of this dividend was $578.3 million. A reduction of $221.6 million was made to noncontrolling interest in the accompanying Consolidated Balance Sheets to reflect the payment of this dividend.

100

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

On November 2, 2010, the Wynn Macau, Limited Board of Directors approved a HK$0.76 per share dividend. The total dividend amount was approximately $508 million and the Company's share of this dividend was $367 million. A reduction of $140.7 million was made to noncontrolling interest in the accompanying Consolidated Balance Sheets to reflect the payment of this dividend.

## 14. Benefit Plans

*Employee Savings Plan*

The Company established a retirement savings plan under Section 401(k) of the Internal Revenue Code covering its U.S. non-union employees in July 2000. The plan allows employees to defer, within prescribed limits, a percentage of their income on a pre-tax basis through contributions to this plan. The Company suspended matching contributions to this plan effective March 2009 and did not record any expense for matching contributions for the years ended December 31, 2012, 2011 and 2010, respectively.

Wynn Macau also operates a defined contribution retirement benefits plan (the "Wynn Macau Plan"). Eligible employees are allowed to contribute 5% of their salary to the Wynn Macau Plan and the Company matches any contributions. The assets of the Wynn Macau Plan are held separately from those of the Company in an independently administered fund. The Company's matching contributions vest to the employee at 10% per year with full vesting in ten years. Forfeitures of unvested contributions are used to reduce the Company's liability for its contributions payable. For the period from March 1, 2009 through April 30, 2010, the Company suspended its matching contributions. The contributions were reinstated effective May 1, 2010. During the years ended December 31, 2012, 2011 and 2010, the Company recorded an expense for matching contributions of $7.1 million, $6.6 million and $3.3 million, respectively.

*Multi-employer pension plan*

Wynn Las Vegas contributes to a multi-employer defined benefit pension plan for certain of its union employees under the terms of the Southern Nevada Culinary and Bartenders Union collective-bargaining agreement. The collective-bargaining agreement that covers these union-represented employees expires in 2016. The legal name of the multi-employer pension plan is the Southern Nevada Culinary and Bartenders Pension Plan (the "Plan") (EIN: 88-6016617 Plan Number: 001). The Company recorded an expense of $8.6 million, $7.6 million and $6.8 million for contributions to the Plan for the years ended December 31, 2012, 2011 and 2010, respectively. For the 2011 plan year, the most recent for which plan data is available, the Company's contributions were identified by the Plan to exceed 5% of total contributions for that year. Based on information the Company received from the Plan, it was certified to be in neither endangered nor critical status for the 2011 plan year. Risks of participating in a multi-employer plan differs from single-employer plans for the following reasons: (1) assets contributed to a multi-employer plan by one employer may be used to provide benefits to employees of other participating employers; (2) if a participating employer stops contributing to the plan, the unfunded obligations of the plan may be borne by the remaining participating employers; and (3) if a participating employer stops participating, it may be required to pay those plans an amount based on the underfunded status of the plan, referred to as a withdrawal liability.

*Stock-Based Compensation*

The Company established the 2002 Stock Incentive Plan (the "WRL Stock Plan") to provide for the grant of (i) incentive stock options, (ii) compensatory (i.e., nonqualified) stock options, and (iii) nonvested shares of Common Stock of Wynn Resorts, Limited. Employees, directors (whether employee or nonemployee) and

101

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

independent contractors or consultants of the Company are eligible to participate in the WRL Stock Plan. However, only employees of the Company are eligible to receive incentive stock options.

A maximum of 12,750,000 shares of Common Stock are reserved for issuance under the WRL Stock Plan. As of December 31, 2012, 4,087,064 shares remain available for the grant of stock options or nonvested shares of Common Stock.

Options are granted at the current market price at the date of grant. The WRL Stock Plan provides for a variety of vesting schedules all determined at the time of grant. All options expire ten years from the date of grant.

A summary of option activity under the WRL Stock Plan as of December 31, 2012, and the changes during the year then ended is presented below:

|  | Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2012 | 2,729,124 | $ 63.49 |  |  |
| Granted | 173,830 | $101.60 |  |  |
| Exercised | (332,576) | $ 46.86 |  |  |
| Canceled/Expired | (172,558) | $ 86.65 |  |  |
| Outstanding at December 31, 2012 | 2,397,820 | $ 66.89 | 6.08 | $ 110,155,465 |
| Fully vested and expected to vest at December 31, 2012 | 2,285,904 | $ 66.60 | 6.07 | $ 105,717,827 |
| Exercisable at December 31, 2012 | 311,290 | $ 63.00 | 3.96 | $ 15,907,396 |

The following information is provided for stock options of the WRL Stock Plan (amounts in thousands, except weighted average grant date fair value):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
| Weighted average grant date fair value | $ 33.03 | $ 48.31 | $ 40.32 |
| Intrinsic value of stock options exercised | $22,416 | $36,776 | $63,095 |
| Net cash proceeds from the exercise of stock options | $15,583 | $23,789 | $66,186 |
| Tax benefits realized from the exercise of stock options and vesting of restricted stock | $ 5,537 | $11,176 | $10,480 |

As of December 31, 2012, there was a total of $53.4 million of unamortized compensation related to stock options, which is expected to be recognized over the vesting period of the related grants through May 2019.

102

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

A summary of the status of the WRL Stock Plan's nonvested shares as of December 31, 2012 and changes during the year then ended is presented below:

| | Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Nonvested at January 1, 2012 | 794,500 | $ 98.08 |
| Granted | 41,500 | 110.04 |
| Vested | (153,000) | 76.93 |
| Canceled | (31,500) | 109.34 |
| Nonvested at December 31, 2012 | 651,500 | $ 103.27 |

The following information is provided for nonvested stock of the WRL Stock Plan (amounts in thousands, except weighted average grant date fair value):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| Weighted average grant date fair value | $110.04 | $129.55 | $107.03 |
| Fair value of shares vested | $15,653 | $24,865 | $ 2,833 |

Approximately $42.5 million of unamortized compensation cost relating to nonvested shares of Common Stock at December 31, 2012 will be recognized as compensation over the vesting period of the related grants through October 2021.

*Wynn Macau, Limited Stock Incentive Plan*

The Company's majority owned subsidiary Wynn Macau, Limited adopted a stock incentive plan effective September 16, 2009 (the "WML Stock Plan"). The purpose of the WML Stock Plan is to reward participants, which may include directors and employees of Wynn Macau, Limited who have contributed towards enhancing the value of Wynn Macau and its shares. A maximum of 518,750,000 shares have been reserved for issuance under the WML Stock Plan. As of December 31, 2012, 2.2 million options have been granted.

A summary of option activity under the WML Stock Plan as of December 31, 2012, and the changes during the year then ended is presented below:

| | Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2012 | 1,350,000 | $ 1.98 | | |
| Granted | 760,000 | 2.46 | | |
| Exercised | — | — | | |
| Outstanding at December 31, 2012 | 2,110,000 | 2.15 | 8.3 | $1,416,513 |
| Fully vested and expected to vest at December 31, 2012 | 2,110,000 | 2.15 | 8.3 | $1,416,513 |
| Exercisable at December 31, 2012 | 430,000 | 1.77 | 7.5 | $ 452,880 |

103

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The following information is provided for stock options of the WML Stock Plan (amounts in thousands, except weighted average grant date fair value):

|  | Years Ended December 31, | |
|---|---|---|
|  | **2012** | **2011** |
| Weighted average grant date fair value | $ 0.78 | $ 0.75 |
| Intrinsic value of stock options exercised | $ — | $ 99.2 |
| Net cash proceeds from the exercise of stock options | $ — | $ 70.2 |

As of December 31, 2012, there was a total of $1.0 million of unamortized compensation related to stock options, which is expected to be recognized over the vesting period of the related grants through June 2017.

*Compensation Cost*

The Company uses the Black-Scholes valuation model to determine the estimated fair value for each option grant issued, with highly subjective assumptions, changes in which could materially affect the estimated fair value. Expected volatility is based on implied and historical factors related to the Company's Common Stock. Expected term represents the weighted average time between the option's grant date and its exercise date. The risk-free interest rate used for each period presented is based on the U.S. Treasury yield curve for WRL Stock Plan options or the Hong Kong Exchange Fund rates for the WML Stock Plan options at the time of grant for the period equal to the expected term.

The fair value of stock options granted under the WRL Stock Plan was estimated on the date of grant using the following weighted-average assumptions:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2012** | **2011** | **2010** |
| Expected dividend yield | 4.0% | 4.0% | 1.23% |
| Expected stock price volatility | 48.8% | 49.7% | 60.9% |
| Risk-free interest rate | 1.18% | 2.4% | 3.1% |
| Expected average life of options (years) | 7.0 | 6.5 | 6.9 |

The fair value of stock options granted under the WML Stock Plan was estimated on the date of grant using the following assumptions:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2012** | **2011** | **2010** |
| Expected dividend yield | 4.0% | 4.0% | —% |
| Expected stock price volatility | 49.0% | 37.8% | 40.8% |
| Risk-free interest rate | 0.67% | 2.1% | 2.4% |
| Expected average life of options (years) | 6.5 | 6.5 | 6.5 |

104

Case 3:14-cv-04329-WHO   Document 14-2   Filed 10/20/14   Page 125 of 214

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The total compensation cost for both the WRL Stock Plan and the WML Stock Plan is allocated as follows (amounts in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
| Casino | $ 4,794 | $ 8,997 | $10,497 |
| Rooms | 313 | 383 | 455 |
| Food and beverage | 178 | 429 | 301 |
| Entertainment, retail and other | 43 | 24 | 87 |
| General and administrative | 14,320 | 14,048 | 15,828 |
| Total stock-based compensation expense | 19,648 | 23,881 | 27,168 |
| Total stock-based compensation capitalized | 195 | 886 | 617 |
| Total stock-based compensation costs | $19,843 | $24,767 | $27,785 |

**15. Income Taxes**

Consolidated income (loss) before taxes for domestic and foreign operations consisted of the following (amounts in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
| Domestic | $ (87,122) | $ 49,521 | $ (239,125) |
| Foreign | 820,120 | 756,046 | 576,168 |
| Total | $732,998 | $805,567 | $ 337,043 |

The Company's provision (benefit) for income taxes consisted of the following (amounts in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
| Current |  |  |  |
| Federal | $ 5,912 | $ — | $ — |
| Foreign | 2,042 | (3,386) | 1,560 |
|  | $ 7,954 | $ (3,386) | $ 1,560 |
| Deferred |  |  |  |
| Federal | $(3,655) | $(10,809) | $ 9,640 |
| Foreign | — | (5,351) | 9,247 |
|  | (3,655) | (16,160) | 18,887 |
| Total | $ 4,299 | $(19,546) | $20,447 |

https://www.sec.gov/Archives/edgar/data/1174922/000119312513087674/d459372d10k.htm

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The income tax provision (benefit) differs from that computed at the federal statutory corporate tax rate as follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Federal statutory rate | 35.0% | 35.0% | 35.0% |
| Foreign tax rate differential | (25.6%) | (21.3%) | (38.8%) |
| Non-taxable foreign income | (15.4%) | (13.0%) | (24.8%) |
| Foreign tax credits, net of valuation allowance | 1.7% | (80.8%) | (104.9%) |
| Repatriation of foreign earnings | 0.0% | 76.3% | 134.9% |
| Other, net | 3.6% | 0.4% | 1.7% |
| Valuation allowance, other | 1.3% | 1.0% | 3.0% |
| Effective tax rate | 0.6% | (2.4%) | 6.1% |

On November 30, 2010, Wynn Macau, S.A. received a second 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits, thereby exempting the casino gaming profits of Wynn Macau, S.A. through December 31, 2015. Accordingly for the years ended December 31, 2012, 2011, and 2010, the Company was exempted from the payment of $87.1 million, $82.7 million, and $64.4 million in such taxes or $0.84, $0.66 and $0.51 per share, respectively. The Company's non-gaming profits remain subject to the Macau Complementary Tax and its casino winnings remain subject to the Macau Special Gaming tax and other levies in accordance with its concession agreement.

In July of 2011, Wynn Macau, S.A. received a 5-year extension of its agreement with the Macau Special Administrative Region that provides for an annual payment of MOP $15.5 million (approximately $1.9 million U.S. dollars) as complementary tax otherwise due by shareholders of Wynn Macau, S.A. on dividend distributions through 2015. As a result of the shareholder dividend tax agreements, income tax expense includes $1.9 million and $1.9 million for the years ended December 31, 2012 and 2011.

The Macau special gaming tax is 35% of gross gaming revenue. U.S. tax laws only allow a foreign tax credit up to 35% of "net" foreign source income. In February 2010, the Company and the IRS entered into a Pre-Filing Agreement ("PFA") providing that the Macau Special Gaming Tax qualifies as a tax paid in lieu of an income tax and could be claimed as a U.S. foreign tax credit.

During December 31, 2012, the Company did not repatriate any earnings of Wynn Macau, S.A. and consequently did not generate foreign tax credits in the current year. During the years ended December 31, 2011 and 2010, the Company recognized tax benefits of $647.6 million and $955.2 million, respectively (net of valuation allowance and uncertain tax positions) for foreign tax credits generated applicable to the earnings of Wynn Macau, S.A.

Accounting standards require recognition of a future tax benefit to the extent that realization of such benefit is more likely than not. Otherwise, a valuation allowance is applied. During 2012 and 2011, the aggregate valuation allowance for deferred tax assets increased by $19.1 million and $526.6 million, respectively. The 2012 and 2011 increases are primarily related to foreign tax credit carryforwards and other foreign deferred tax assets that are not considered more likely than not realizable.

The Company recorded tax benefits resulting from the exercise of nonqualified stock options and the value of vested restricted stock and accrued dividends of $5.5 million, $11.2 million, and $10.5 million as of December 31, 2012, 2011, and 2010, respectively, in excess of the amounts reported for such items as

106

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

compensation costs under accounting standards related to stock-based compensation. The Company uses a with-and-without approach to determine if the excess tax deductions associated with compensation costs have reduced income taxes payable.

The tax effects of significant temporary differences representing net deferred tax assets and liabilities consisted of the following (amounts in thousands):

|  | As of December 31, | |
|---|---|---|
|  | 2012 | 2011 |
| Deferred tax assets—U.S.: | | |
| Current: | | |
| Receivables, inventories, accrued liabilities and other | $ 38,488 | $ 36,753 |
| Less: valuation allowance | (35,386) | (33,525) |
|  | 3,102 | 3,228 |
| Long-term: | | |
| Foreign tax credit carryforwards | 1,843,757 | 1,848,185 |
| Intangibles and related other | 26,773 | 31,215 |
| Stock based compensation | 19,113 | 17,001 |
| Pre-opening costs | 14,584 | 16,671 |
| Other | 12,320 | 9,473 |
|  | 1,916,547 | 1,922,545 |
| Less: valuation allowance | (1,762,090) | (1,753,667) |
|  | 154,457 | 168,878 |
| Deferred tax liabilities—U.S.: | | |
| Current: | | |
| Prepaid insurance, maintenance and taxes | (6,280) | (6,803) |
|  | (6,280) | (6,803) |
| Long-term: | | |
| Property and equipment | (199,956) | (223,172) |
|  | (199,956) | (223,172) |
| Deferred tax assets – Foreign: | | |
| Current: | | |
| Accrued liabilities… | 156 | — |
| Less: valuation allowance | (156) | — |
|  | — | — |
| Long-term: | | |
| Net operating loss carryforwards | 17,157 | 17,593 |
| Property and equipment | 11,973 | 5,345 |
| Other | 4,783 | 2,352 |
| Less: valuation allowance | (33,913) | (25,290) |
|  | — | — |
| Net deferred tax liability | $ (48,677) | $ (57,869) |

107

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

As of December 31, 2012, the Company had foreign tax credit carryforwards (net of uncertain tax positions) of $1,844 million. Of this amount, $662.2 million will expire in 2018, $110.9 million will expire in 2019, $530.4 million in 2020, and $540.3 million in 2021. The Company has no U.S. tax loss carryforwards. The Company incurred foreign tax losses of $85.4 million, $70.9 million, and $89.4 million during the tax years ended December 31, 2012, 2011 and 2010, respectively. These foreign tax loss carryforwards expire in 2015, 2014, and 2013, respectively. The Company incurred a U.S. capital loss of $3.6 million during the year ended December 31, 2011. The U.S. capital loss carryforward will expire in 2016.

In assessing the need for a valuation allowance, the Company does not consider forecasted future operating results when scheduling the realization of deferred tax assets and the required valuation allowance but instead relies solely on the reversal of net taxable temporary differences. The valuation allowance for foreign tax credits was determined by scheduling the existing U.S. taxable temporary differences that are expected to reverse and result in "net" foreign source income during the 10-year foreign tax credit carryover period.

As of December 31, 2012 and 2011, the Company had valuation allowances of $1,786 million and $1,777 million, respectively, provided on foreign tax credits expected to expire unutilized and valuation allowances of $11.1 million and $9.7 million provided on other U.S. deferred tax assets. The Company has recorded a valuation allowance against all of its foreign deferred tax assets.

Except for $604.6 million of accumulated earnings which the Company plans on repatriating, the Company has not provided deferred U.S. income taxes or foreign withholding taxes on temporary differences of $333.6 million and $300.6 million as of December 31, 2012 and 2011, respectively, which are indefinitely reinvested and will be used to fund future operations or expansion. The amount of the unrecognized deferred tax liability associated with these temporary differences is approximately $116.8 million and $105.2 million for the years ended December 31, 2012 and 2011. Deferred income taxes, net of foreign tax credits, are provided for foreign earnings planned for repatriation. For the years ended December 31, 2012 and 2011, the Company repatriated $0 and $578.2 million from Wynn Macau, Limited. The amounts repatriated were used to fund domestic operations, to provide additional U.S. liquidity, and to fund dividends to the Company's shareholders.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (amounts in thousands):

| | As of December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Balance—beginning of year | $85,498 | $ 83,834 | $148,365 |
| Additions based on tax positions of the current year | 8,140 | 12,427 | 13,164 |
| Additions based on tax positions of prior years | — | — | 694 |
| Reductions for tax positions of prior years | — | — | — |
| Settlements | — | — | (78,389) |
| Lapses in statutes of limitations | (9,349) | (10,763) | — |
| Balance—end of year | $84,289 | $ 85,498 | $ 83,834 |

As of December 31, 2012, 2011, and 2010 unrecognized tax benefits of $55.2 million, $60.4 million, and $48.0 million respectively, were recorded as reductions to the U.S. foreign tax credit deferred tax asset and the foreign net operating loss deferred tax asset. As of December 31, 2012, 2011, and 2010, unrecognized tax benefits of $29.1 million, $25.1 million, and $35.9 million, respectively, were recorded in Other Long Term Liabilities.

108

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

As of December 31, 2012, 2011 and 2010, $18.8 million, $24.2 million, and $17.9 million, respectively, of unrecognized tax benefit would, if recognized, impact the effective tax rate.

The Company recognizes penalties and interest related to unrecognized tax benefits in the provision for income taxes. During the years ended December 31, 2012 and 2011, the Company recognized interest and penalties of $0.3 million and $0.04 million, respectively. The Company recognized no interest or penalties during the year ended December 31, 2010.

The Company anticipates that the 2008 statute of limitations will expire in the next 12 months for certain foreign tax jurisdictions. Also, the Company's unrecognized tax benefits include certain income tax accounting methods. These accounting methods govern the timing and deductibility of income tax deductions. As a result, the Company's unrecognized tax benefits could increase by a range of $0 to $4.0 million over the next 12 months.

The Company files income tax returns in the U.S. federal jurisdiction, various states and foreign jurisdictions. The Company's income tax returns are subject to examination by the IRS and other tax authorities in the locations where it operates. The Company's 2002 to 2008 domestic income tax returns remain subject to examination by the IRS to the extent of tax attributes carryforwards to future years. The Company's 2009 to 2011 domestic income tax returns also remain subject to examination by the IRS. The Company's 2008 to 2011 Macau income tax returns remain subject to examination by the Macau Finance Bureau.

In April 2012, the Company reached an agreement with the Appellate division of the IRS regarding issues raised during the examination of the 2006 through 2009 U.S. income tax returns. The settlement with the Appellate division did not impact the Company's unrecognized tax benefits. The settlement of the 2006 through 2009 examination issues resulted in a cash tax payment of $1.3 million and the utilization of $3.1 million and $0.9 million in foreign tax credit and general business credit carryforwards, respectively.

During December 2012, the IRS completed an examination of the Company's 2010 U.S. income tax return and had no changes. For tax years 2011 and 2012, the Company is participating in the IRS Compliance Assurance Program ("CAP"). Under the CAP program, the IRS and the taxpayer work together in a pre-filing environment to examine transactions and issues and thus complete the tax examination before the tax return is filed. In February 2013, the Company received notification that it had been accepted into the IRS CAP for the 2013 tax year. The Company believes the IRS will complete their examination of the 2011 tax year in the next 12 months. The Company does not expect a change in its unrecognized tax benefits as a result of the completion of the examination.

During August 2011, Wynn Macau, S.A. settled an appeal related to the Macau Finance Bureau's examination of its 2006 and 2007 Macau Complementary Tax returns. As part of the settlement, the Company paid $1.1 million in Macau Complementary tax. As the result of the exam settlement and the expiration of the statute of limitations for the 2006 Macau Complementary tax return, the total amount of unrecognized tax benefits decreased by $10.8 million.

On December 31, 2012, the statute of limitations for the 2007 Macau Complementary tax return expired. As a result, the Company's unrecognized tax benefits decreased by $9.3 million.

In July 2012, the Macau Finance Bureau commenced an examination of the 2008 Macau income tax return of Wynn Macau, S.A. In November 2012, the Company received the results of the examination. While no additional tax was due, adjustments were made to the Company's foreign net operating loss carryforwards.

109

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

In January 2013, the Macau Finance Bureau examined the 2009 and 2010 Macau income tax returns of Palo, which is a co-holder of the land concession for the resort in Cotai. The exam resulted in no change to the tax returns.

**16. Commitments and Contingencies**

*Wynn Macau*

    *Land Concession Contract.* Wynn Macau, S.A. has entered into a land concession contract for the land on which Wynn Macau is located. Under the land concession contract, Wynn Macau, S.A. leases a parcel of approximately 16 acres from the government for an initial term of 25 years, with a right to renew for additional periods with government approval. Wynn Macau, S.A. has made payments to the Macau government under the land concession contract totaling $56.9 million, including interest. During the term of the land concession contract, Wynn Macau, S.A. is required to make annual lease payments of up to $525,000.

    *Cotai Development and Land Concession Contract.* In September 2011, Palo and Wynn Resorts (Macau) S.A., each an indirect subsidiary of Wynn Macau Limited, formally accepted the terms and conditions of a draft land concession contract from the Macau government for approximately 51 acres of land in the Cotai area of Macau. On May 2, 2012, the land concession contract was gazetted by the government of Macau evidencing the final step in the granting of the land concession. The Company is constructing a full scale integrated resort containing a casino, luxury hotel, convention, retail, entertainment and food and beverage offerings on this land. The Company estimates the project budget to be in the range of $3.5 billion to $4.0 billion. The Company expects to enter into a guaranteed maximum price contract for the project construction costs in the first half of 2013. We expect to open our resort in Cotai during the first half of 2016.

    The initial term of the land concession contract is 25 years from May 2, 2012, and it may be renewed with government approval for successive periods. The total land premium payable, including interest as required by the land concession contract, is $193.4 million. An initial payment of $62.5 million was paid in December 2011, with eight additional semi-annual payments of approximately $16.4 million each (which includes interest at 5%) due beginning November 2012. As of December 31, 2012, the Company has recorded this obligation and related asset with $27.9 million included as a current liability and $76.2 million included as a long-term liability. The Company will also be required to make annual lease payments of $0.8 million during the resort construction period and annual payments of approximately $1.1 million once the development is completed.

    *Cotai Land Agreement.* On May 10, 2012, the Company made a $50 million payment to an unrelated third party in consideration of that party's relinquishment of certain rights in and to any future development on the Cotai land noted above.

*Leases and other arrangements*

    The Company is the lessor under several retail leases and has entered into license and distribution agreements for several additional retail outlets. The Company also is a party to joint venture agreements for the operation of one retail outlet and the Ferrari and Maserati automobile dealership at Wynn Las Vegas. The lease agreements include minimum base rents with contingent rental clauses.

110

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The following table presents the future minimum rentals to be received under the operating leases (amounts in thousands):

| Years Ending December 31, | |
|---|---|
| 2013 | $ 34,728 |
| 2014 | 35,151 |
| 2015 | 34,435 |
| 2016 | 31,771 |
| 2017 | 22,379 |
| Thereafter | 1,982 |
| | $ 160,446 |

The total future minimum rentals do not include contingent rental. Contingent rentals were $94 million, $73.2 million and $42.5 million for the years ended December 31, 2012, 2011 and 2010, respectively.

In addition, the Company is the lessee under leases for office space in Las Vegas, Macau and certain other locations, warehouse facilities, the land underlying the Company's aircraft hangar and certain office equipment.

At December 31, 2012, the Company was obligated under non-cancelable operating leases to make future minimum lease payments as follows (amounts in thousands):

| Years Ending December 31, | |
|---|---|
| 2013 | $ 5,775 |
| 2014 | 4,846 |
| 2015 | 3,882 |
| 2016 | 2,962 |
| 2017 | 1,106 |
| Thereafter | 3,944 |
| | $22,515 |

Rent expense for the years ended December 31, 2012, 2011 and 2010, was $21.5 million, $20.2 million, $21.6 million, respectively.

*Employment Agreements*

The Company has entered into employment agreements with several executive officers, other members of management and certain key employees. These agreements generally have three- to five-year terms and typically indicate a base salary and often contain provisions for discretionary bonuses. Certain of the executives are also entitled to a separation payment if terminated without "cause" or upon voluntary termination of employment for "good reason" following a "change of control" (as these terms are defined in the employment contracts).

*Litigation*

In addition to the actions noted below, the Company's affiliates are involved in litigation arising in the normal course of business. In the opinion of management, such litigation will not have a material effect on the Company's financial condition, results of operations or cash flows.

111

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Atlantic-Pacific Capital*

On May 3, 2010, Atlantic-Pacific Capital, Inc. ("APC") filed an arbitration demand with JAMS, a private alternative dispute resolution provider, regarding an agreement with the Company. The action concerns a claim for compensation of approximately $32 million pursuant to an agreement entered into between APC and the Company on or about March 30, 2008 whereby APC was engaged to raise equity capital for an investment vehicle sponsored by the Company. APC is seeking compensation unrelated to the investment vehicle. The Company has denied APC's claims for compensation. The Company filed a Complaint for Damages and Declaratory Relief against APC in the Eighth Judicial District Court, Clark County, Nevada, on May 10, 2010, which APC removed to the United States District Court, District of Nevada. In March 2011, the District Court denied APC's motion to compel arbitration, and dismissed the action. APC appealed, and on November 13, 2012, the United States Court of Appeals for the Ninth Circuit reversed the District Court and compelled arbitration. The matter is proceeding in arbitration, and an arbitrator recently has been selected. Management believes that APC's claims against the Company are without merit, and the Company continues to defend this matter vigorously.

*Determination of Unsuitability and Redemption of Aruze USA, Inc. and Affiliates*

On February 18, 2012, Wynn Resorts' Gaming Compliance Committee concluded an investigation after receiving an independent report by Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing a pattern of misconduct by Aruze USA, Inc., at the time a stockholder of Wynn Resorts, Universal Entertainment Corporation, Aruze USA, Inc.'s parent company, and Kazuo Okada, the majority shareholder of Universal Entertainment Corporation, who, until February 21, 2013, was also a member of Wynn Resorts' Board of Directors and was at the time a director of Wynn Macau, Limited. The factual record presented in the Freeh Report included evidence that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada had provided valuable items to certain foreign gaming officials who were responsible for regulating gaming in a jurisdiction in which entities controlled by Mr. Okada were developing a gaming resort. Mr. Okada has denied the impropriety of such conduct to members of the Board of Directors of Wynn Resorts and Mr. Okada has refused to acknowledge or abide by Wynn Resorts' anti-bribery policies and has refused to participate in the training all other directors have received concerning these policies.

Based on the Freeh Report, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada are "unsuitable persons" under Article VII of the Company's articles of incorporation. The Board of Directors was unanimous (other than Mr. Okada) in its determination. The Board of Directors also requested that Mr. Okada resign as a director of Wynn Resorts (under Nevada corporation law, a board of directors does not have the power to remove a director) and recommended that Mr. Okada be removed as a member of the Board of Directors of Wynn Macau, Limited. In addition, on February 18, 2012, Mr. Okada was removed from the Board of Directors of Wynn Las Vegas Capital Corp., an indirect wholly owned subsidiary of Wynn Resorts. On February 24, 2012, Mr. Okada was removed from the Board of Directors of Wynn Macau, Limited and on February 22, 2013, he was removed from the Board of Directors of Wynn Resorts by a stockholder vote in which 99.6% of the over 86 million shares voted were cast in favor of removal. Additionally, Mr. Okada resigned from the Board of Directors of Wynn Resorts on February 21, 2013.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," Article VII of Wynn Resorts' articles of incorporation authorizes redemption at "fair value" of the shares held by unsuitable persons. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares held by Aruze USA, Inc. under the terms of the

112

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Stockholders Agreement (as defined below). Pursuant to the articles of incorporation, Wynn Resorts issued the Redemption Note to Aruze USA, Inc. in redemption of the shares. The Redemption Note has a principal amount of $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Note. The Company may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts or any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

After authorizing the redemption of the Aruze USA, Inc. shares, the Board of Directors took certain actions to protect the Company and its operations from any influence of an unsuitable person, including placing limitations on the provision of certain operating information to unsuitable persons, evaluating whether to seek the removal of Mr. Okada from the Company's Board of Directors, and the formation of an Executive Committee of the Board to manage the business and affairs of the Company during the period between each annual meeting. The Charter of the Executive Committee provides that "Unsuitable Persons" are not permitted to serve on the Committee. All members of the Board, other than Mr. Okada, were appointed to the Executive Committee on February 18, 2012. On February 24, 2012, the Board of Directors of Wynn Macau, Limited removed Mr. Kazuo Okada from the board. On January 3, 2013, the Company filed a definitive proxy statement on Schedule 14A ("Proxy Statement") for a special meeting of the stockholders to consider and vote upon a proposal to remove Mr. Okada as a director of the Company ("Removal Proposal"). On January 24, 2013, Mr. Okada filed a complaint in the United States District Court, District of Nevada against the Company, alleging that the Proxy Statement was materially false and misleading in contravention of Section 14(a) of the Securities Exchange Act of 1934, as amended, and Securities and Exchange Commission Rule 14a-9 promulgated thereunder. Mr. Okada also filed a motion for a preliminary injunction on January 28, 2013, in which he sought an order preliminarily enjoining the special meeting of stockholders until such time as the Company corrected certain alleged misstatements and omissions in its Proxy Statement. At the conclusion of a hearing held on February 15, 2013, the federal court denied Mr. Okada's motion.

On the afternoon of February 21, 2013, Mr. Okada resigned as a director of the Company. On February 22, 2013, the special meeting of stockholders was held and the stockholders approved the Removal Proposal with an affirmative vote of 85.7% of the shares entitled to vote at the special meeting (99.6% of the shares that were voted at the special meeting of stockholders were voted in favor of the Removal Proposal).

*Redemption Action and Counterclaim*

On February 19, 2012, Wynn Resorts filed a complaint in the Eighth Judicial District Court, Clark County, Nevada against Mr. Okada, Aruze USA, Inc. and Universal Entertainment Corporation (companies controlled by Mr. Okada) (the "Okada Parties"), alleging breaches of fiduciary duty and related claims. The Company is seeking compensatory and special damages as well as a declaration that it acted lawfully and in full compliance with its articles of incorporation, bylaws and other governing documents in redeeming and cancelling the shares of Aruze, USA, Inc.

On March 12, 2012, the Okada Parties removed the action to the United States District Court for the District of Nevada (the action was subsequently remanded to Nevada state court). On that same date, the Okada Parties filed an answer denying the claims and a counterclaim that purports to assert claims against the Company, each of the

113

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

members of the Company's Board of Directors (other than Mr. Okada) and Wynn Resorts' General Counsel (the "Wynn Parties"). As amended, the Okada Parties' counterclaim alleges, among other things: (1) that the shares of Wynn Resorts common stock owned by Aruze USA, Inc. were exempt from the redemption-for-unsuitability provisions in the Wynn Resorts articles of incorporation pursuant to certain agreements executed in 2002; (2) that the Wynn Resorts directors who authorized the redemption of Aruze USA, Inc.'s shares acted at the direction of Stephen A. Wynn and did not independently and objectively evaluate Mr. Okada's, Universal Entertainment Corporation's, and Aruze USA, Inc.'s suitability, and by so doing, breached their fiduciary duties; (3) that the Wynn Resorts directors violated the terms of the Wynn Resorts articles of incorporation by failing to pay Aruze USA, Inc. fair value for the redeemed shares; and (4) that the terms of the Redemption Note that Aruze USA, Inc. received in exchange for the redeemed shares, including the Redemption Note's principal amount, duration, interest rate, and subordinated status, were unconscionable. Among other relief, the amended counterclaim seeks a declaration that the redemption of Aruze USA, Inc.'s shares was void, an injunction restoring Aruze USA, Inc.'s share ownership, damages in an unspecified amount and rescission of the Amended and Restated Stockholders Agreement. On August 31, 2012, Aruze USA, Inc. filed a motion for preliminary injunction with the Nevada state court. The motion sought an order that would prohibit Wynn Resorts from barring or preventing Aruze USA, Inc. from exercising rights as a stockholder at the November 2, 2012 annual meeting of Wynn Resorts' stockholders. On October 2, 2012, the Nevada state court denied Aruze USA, Inc.'s motion for preliminary injunction. On October 19, 2012, Aruze USA, Inc. filed a notice of appeal with the Nevada Supreme Court. The appeal was assigned to the Nevada Supreme Court's mediation program, has not progressed, and is pending. Wynn Resorts intends to vigorously defend against the appeal and to argue that the Nevada Supreme Court should affirm the state court's decision denying Aruze USA, Inc.'s motion for a preliminary injunction.

The Company's complaint, as amended, and the Okada Parties' counterclaim, as amended, were challenged at the pleading stage through motion practice. At a hearing held on November 13, 2012, the Nevada State court denied the Wynn Parties' motion to dismiss the Okada Parties' amended counterclaim, but dismissed the Okada Parties' claims under the Nevada Racketeer Influenced and Corrupt Organizations Act. At a hearing held on January 15, 2013, the court denied the Okada Parties' motion to dismiss the Company's amended complaint.

On February 13, 2013, the Okada Parties filed a motion in the Nevada state court in which they asked the court to establish a "disputed ownership fund" as defined in a federal tax regulation. Specifically, the motion sought an order establishing an escrow account to hold the Redemption Note issued to Aruze USA, Inc. as compensation for the shares of Wynn Resorts common stock redeemed by the board of directors in February 2012 in light of the board's determination of unsuitability, as well as the redeemed shares themselves (although those shares were previously cancelled in February 2012), pending a resolution of the state court action. The order sought by the Okada Parties would also require the Company to, among other things, make any payments on the Redemption Note into the escrow account. A hearing on the motion has been set for March 22, 2013. The Company believes there is no basis for the relief requested in the motion and intends to oppose the motion vigorously.

The Company is vigorously pursuing its claims against the Okada Parties, and the Company and the other counter-defendants are vigorously defending against the counterclaims asserted against them. The Company's claims and the Okada Parties' counterclaims are in a preliminary stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any. Any adverse judgments or settlements involving payment of a material sum of money could cause a material adverse effect on our financial condition and results of operations and could expose the Company to additional claims by third parties, including current or former investors or regulators. Any adverse judgments or settlements would reduce the Company's profits and could limit the Company's ability to operate its business.

114

[Table of Contents](#)

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Related Matters*

    The Company provided the Freeh Report to appropriate regulators and law enforcement agencies and is cooperating with related investigations that such regulators and agencies have undertaken. The conduct of the Okada Parties and any resulting regulatory investigations could have adverse consequences to the Company and its subsidiaries. A finding by regulatory authorities that Mr. Okada violated anti-corruption statutes and/or other laws or regulations applicable to persons affiliated with a gaming licensee on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, as described below, the Salt Lake Regional Office of the U.S. Securities and Exchange Commission ("SEC") has commenced an informal inquiry into, and other regulators could pursue separate investigations into, the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company. In February 2013, the Nevada Gaming Control Board informed the Company that it has completed its investigation of allegations made by Mr. Okada against the Company regarding the activities of Mr. Wynn and related entities in Macau and found no violations of the Gaming Control Act or the Nevada Gaming Commission Regulations.

    On June 19, 2012, Elaine Wynn responded to the Okada Parties' counterclaim and asserted a cross claim against Steve Wynn and Kazuo Okada seeking a declaration that (1) any and all of Elaine Wynn's duties under the January 2010 Stockholders Agreement (the "Stockholders Agreement") by and among Aruze USA, Inc., Steve Wynn, and Elaine Wynn be discharged; (2) the Stockholders Agreement is subject to rescission and is rescinded; (3) the Stockholders Agreement is an unreasonable restraint on alienation in violation of public policy; and/or (4) the restrictions on sale of shares shall be construed as inapplicable to Elaine Wynn. Mr. Wynn filed his answer to Elaine Wynn's cross claim on September 24, 2012. The indentures for the Wynn Las Vegas, LLC 2022 Notes and Existing Notes (the "Indentures") provide that if Steve Wynn, together with certain related parties, in the aggregate beneficially owns a lesser percentage of the outstanding common stock of the Company than are beneficially owned by any other person, a change of control will have occurred. If Elaine Wynn prevails in her cross claim, Steve Wynn would not beneficially own or control Elaine Wynn's shares and a change in control may result under the Company's debt documents. Under the Indentures, the occurrence of a change of control requires that the Company make an offer (unless the notes have been previously called for redemption) to each holder to repurchase all or any part of such holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest on the Notes purchased, if any, to the date of repurchase.

*Litigation Commenced by Kazuo Okada and Related Matters*

    <u>Books and Records Action</u>:

    On January 11, 2012, Mr. Okada, in his role as a Wynn Resorts' director, commenced a writ proceeding in the Eighth Judicial District Court, Clark County, Nevada, seeking to compel the Company to produce certain books and records relating to a donation to the University of Macau, among other things.

    In May 2011, Wynn Macau, a majority owned subsidiary of the Company, made a commitment to the University of Macau Development Foundation in support of the new Asia-Pacific Academy of Economics and Management. This contribution consists of a $25 million payment made in May 2011 and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive. The pledge was consistent with the Company's long-standing practice of providing philanthropic support for deserving

115

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

institutions in the markets in which it operates. The pledge was made following an extensive analysis which concluded that the gift was made in accordance with all applicable laws. The pledge was considered by the boards of directors of both the Company and Wynn Macau, Limited and approved by 15 of the 16 directors who served on those boards. The sole dissenting vote was cast by Mr. Okada whose stated objection was to the length of time over which the donation would occur, not its propriety.

At a hearing on February 9, 2012, the Nevada state court held that, as a director of the Company, Mr. Okada had the right to make a reasonable inspection of the Company's corporate books and records. Following the hearing, the Company released certain documents to Mr. Okada for his inspection. At a subsequent hearing on March 8, 2012, the court considered Mr. Okada's request that the Company's Board of Directors make additional documents available to him, and ruled that Mr. Okada was entitled to inspect two additional pages of documents. The Company promptly complied with the court's ruling.

On May 25, 2012, Mr. Okada amended his petition to request inspection of additional records. Following a hearing held on October 2, 2012, the court ruled that Mr. Okada is entitled to review certain additional Company documents from the 2000 to 2002 time period. The Company promptly complied with the court's ruling. On November 2, 2012, Mr. Okada filed a motion to compel the production of additional documents and to depose a witness designated by the Company. At the conclusion of a hearing held on November 8, 2012, the court denied Mr. Okada's motion. The Company has not received any further requests for information by Mr. Okada in relation to this matter as of the date of this report.

SEC Inquiry:

On February 8, 2012, following Mr. Okada's lawsuit, the Company received a letter from the Salt Lake Regional Office of the SEC requesting that, in connection with an informal inquiry by the SEC, the Company preserve information relating to the donation to the University of Macau, any donations by the Company to any other educational charitable institutions, including the University of Macau Development Foundation, and the Company's casino or concession gaming licenses or renewals in Macau. The Company is fully cooperating with the Salt Lake Regional Office staff.

Japan Action:

On August 28, 2012, Mr. Okada, Universal Entertainment Corporation and Okada Holdings filed a complaint in Tokyo District Court against the Company, all members of the Board of Directors (other than Mr. Okada) and the Company's General Counsel, alleging that the press release issued by the Company with respect to the redemption has damaged plaintiffs' social evaluation and credibility. The plaintiffs seek damages and legal fees from the defendants. The Company and the other counter-defendants are vigorously defending against the claims asserted against them in this matter.

Federal Securities Action:

On January 3, 2013, the Company filed a definitive proxy statement on Schedule 14A ("Proxy Statement") for a special meeting of the stockholders to consider and vote upon a proposal to remove Mr. Okada as a director of the Company ("Removal Proposal"). On January 24, 2013, Mr. Okada filed a complaint in the United States District Court, District of Nevada against the Company, alleging that the Proxy Statement was materially false and misleading in contravention of Section 14(a) of the Securities Exchange Act of 1934, as amended, and Securities and Exchange Commission Rule 14a-9 promulgated thereunder. Mr. Okada also filed a motion for a preliminary injunction on January 28, 2013, in which he sought an order preliminarily enjoining the special meeting of stockholders until such time as the Company corrected certain alleged misstatements and omissions in its Proxy

116

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Statement. At the conclusion of a hearing held on February 15, 2013, the federal court denied Mr. Okada's motion.

On the afternoon of February 21, 2013, Mr. Okada resigned as a director of the Company. On February 22, 2013, the special meeting of stockholders was held and the stockholders approved the Removal Proposal with an affirmative vote of 85.7% of the shares entitled to vote at the special meeting (99.6% of the shares that were voted at the special meeting of stockholders were voted in favor of the Removal Proposal).

*Related Derivative Litigation*

Six derivative actions were commenced against the Company and all members of its Board of Directors: four in the United States District Court, District of Nevada, and two in the Eighth Judicial District Court of Clark County, Nevada.

The four federal actions brought by the following plaintiffs have been consolidated: (1) The Louisiana Municipal Police Employees' Retirement System, (2) Maryanne Solak, (3) Excavators Union Local 731 Welfare Fund, and (4) Boilermakers Lodge No. 154 Retirement Fund (collectively, the "Federal Plaintiffs").

The Federal Plaintiffs filed a consolidated complaint on August 6, 2012, asserting claims for: (1) breach of fiduciary duty; (2) waste of corporate assets; (3) injunctive relief; and (4) unjust enrichment. The claims are against the Company all Company directors, including Mr. Okada, however, the plaintiffs voluntarily dismissed Mr. Okada as a defendant in this consolidated action on September 27, 2012. The Federal Plaintiffs claim that the individual defendants breached their fiduciary duties and wasted assets by: (a) failing to ensure the Company's officers and directors complied with federal and state laws and the Company's Code of Conduct; (b) voting to allow the Company's subsidiary to make the donation to the University of Macau; and (c) redeeming Aruze USA, Inc.'s stock such that the Company incurs the debt associated with the redemption. The Federal Plaintiffs seek unspecified compensatory damages, restitution in the form of disgorgement, reformation of corporate governance procedures, an injunction against all future payments related to the donation/pledge, and all fees (attorneys, accountants, and experts) and costs. The directors responded to the consolidated complaint by filing a motion to dismiss on September 14, 2012. On February 1, 2013, the federal court dismissed the complaint for failure to plead adequately the futility of a pre-suit demand on the Board. The dismissal was without prejudice to the Federal Plaintiffs' ability to file a motion within 30 days seeking leave to file an amended complaint.

The two state court actions brought by the following plaintiffs have also been consolidated: (1) IBEW Local 98 Pension Fund and (2) Danny Hinson (collectively, the "State Plaintiffs"). Through a coordination of efforts by all parties, the directors and the Company (a nominal defendant) have been served in all of the actions.

The State Plaintiffs filed a consolidated complaint on July 20, 2012 asserting claims for (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; and (4) unjust enrichment. The claims are against the Company and all Company directors, including Mr. Okada, as well as the Company's Chief Financial Officer, who signs financial disclosures filed with the SEC. The State Plaintiffs claim that the individual defendants failed to disclose to the Company's stockholders the investigation into, and the dispute with director Okada as well as the alleged potential violations of the FCPA related to, the University of Macau Development Foundation donation. The State Plaintiffs seek unspecified monetary damages (compensatory and punitive), disgorgement, reformation of corporate governance procedures, an order directing the Company to internally investigate the donation, as well as attorneys' fees and costs. On October 13, 2012, the court entered the parties' stipulation providing for a stay of the state derivative action for 90 days, subject to the parties' obligation to monitor the progress of the pending litigation, discussed above, between Wynn Resorts (among others) and Mr. Okada (among others). Per the stipulation, Wynn Resorts and the individual defendants were not required to

117

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

respond to the consolidated complaint while the stay remained in effect. Although the stay has now expired, the State Plaintiffs have agreed to further extend the defendants' time to respond to the consolidated complaint to allow the State Plaintiffs additional time to consider their plans for the action going forward, including a possible extension by agreement of the stay in the state derivative action.

The individual defendants are vigorously defending against the claims pleaded against them in these derivative actions. We are unable to predict the outcome of these litigations at this time.

**17. Segment Information**

The Company monitors its operations and evaluates earnings by reviewing the assets and operations of its Las Vegas Operations and its Macau Operations. The Company's total assets and capital expenditures by segment consisted of the following (amounts in thousands):

|  | As of December 31, | |
|---|---|---|
|  | 2012 | 2011 |
| **Assets** | | |
| Las Vegas Operations | $ 3,669,881 | $ 4,035,398 |
| Macau Operations | 3,004,658 | 2,202,683 |
| Corporate and other | 602,055 | 661,415 |
|  | $ 7,276,594 | $ 6,899,496 |

|  | Years ended December 31, | |
|---|---|---|
|  | 2012 | 2011 |
| **Capital expenditures** | | |
| Las Vegas Operations | $ 41,552 | $ 65,207 |
| Macau Operations | 189,384 | 115,702 |
| Corporate and other | 10,049 | 3,237 |
|  | $ 240,985 | $ 184,146 |

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The Company's results of operations by segment for the years ended December 31, 2012, 2011 and 2010 consisted of the following (amounts in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| **Net revenues** | | | |
| Las Vegas Operations | $ 1,486,830 | $ 1,480,719 | $ 1,296,064 |
| Macau Operations | 3,667,454 | 3,789,073 | 2,888,634 |
| Total | $ 5,154,284 | $ 5,269,792 | $ 4,184,698 |
| **Adjusted Property EBITDA**(1) | | | |
| Las Vegas Operations | $    408,472 | $    439,036 | $    270,299 |
| Macau Operations | 1,167,340 | 1,196,232 | 892,686 |
| Total | 1,575,812 | 1,635,268 | 1,162,985 |
| **Other operating costs and expenses** | | | |
| Pre-opening costs | 466 | — | 9,496 |
| Depreciation and amortization | 373,199 | 398,039 | 405,558 |
| Property charges and other | 39,978 | 130,649 | 25,219 |
| Corporate expenses and other | 131,807 | 96,868 | 96,659 |
| Equity in income from unconsolidated affiliates | 1,086 | 1,472 | 801 |
| Total other operating costs and expenses | 546,536 | 627,028 | 537,733 |
| Operating income | 1,029,276 | 1,008,240 | 625,252 |
| **Other non-operating costs and expenses** | | | |
| Interest income | 12,543 | 7,654 | 2,498 |
| Interest expense, net of amounts capitalized | (288,759) | (229,918) | (222,863) |
| Increase (decrease) in swap fair value | 991 | 14,151 | (880) |
| Loss from extinguishment of debt/exchange offer | (25,151) | — | (67,990) |
| Equity in income from unconsolidated affiliates | 1,086 | 1,472 | 801 |
| Other | 3,012 | 3,968 | 225 |
| Total other non-operating costs and expenses | (296,278) | (202,673) | (288,209) |
| Income before income taxes | 732,998 | 805,567 | 337,043 |
| (Provision) benefit for income taxes | (4,299) | 19,546 | (20,447) |
| Net income | $    728,699 | $    825,113 | $    316,596 |

(1)    "Adjusted Property EBITDA" is earnings before interest, taxes, depreciation, amortization, pre-opening costs, property charges and other, corporate expenses, intercompany golf course and water rights leases, stock-based compensation, and other non-operating income and expenses and includes equity in income from unconsolidated affiliates. Adjusted Property EBITDA is presented exclusively as a supplemental disclosure because management believes that it is widely used to measure the performance, and as a basis for valuation, of gaming companies. Management uses Adjusted Property EBITDA as a measure of the

119

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

operating performance of its segments and to compare the operating performance of its properties with those of its competitors. The Company also presents Adjusted Property EBITDA because it is used by some investors as a way to measure a company's ability to incur and service debt, make capital expenditures and meet working capital requirements. Gaming companies have historically reported EBITDA as a supplement to financial measures in accordance with U.S. generally accepted accounting principles ("GAAP"). In order to view the operations of their casinos on a more stand-alone basis, gaming companies, including Wynn Resorts, Limited, have historically excluded from their EBITDA calculations pre-opening expenses, property charges, corporate expenses and stock-based compensation, which do not relate to the management of specific casino properties. However, Adjusted Property EBITDA should not be considered as an alternative to operating income as an indicator of the Company's performance, as an alternative to cash flows from operating activities as a measure of liquidity, or as an alternative to any other measure determined in accordance with GAAP. Unlike net income, Adjusted Property EBITDA does not include depreciation or interest expense and therefore does not reflect current or future capital expenditures or the cost of capital. The Company has significant uses of cash flows, including capital expenditures, interest payments, debt principal repayments, taxes and other non-recurring charges, which are not reflected in Adjusted Property EBITDA. Also, Wynn Resorts' calculation of Adjusted Property EBITDA may be different from the calculation methods used by other companies and therefore, comparability may be limited.

**18. Quarterly Financial Information (Unaudited)**

The following tables (amounts in thousands, except per share data) present selected quarterly financial information for 2012 and 2011, as previously reported. Because income per share amounts are calculated using the weighted average number of common and dilutive common equivalent shares outstanding during each quarter, the sum of the per share amounts for the four quarters may not equal the total income per share amounts for the year.

| | Year Ended December 31, 2012 | | | | |
| | First | Second | Third | Fourth | Year |
|---|---|---|---|---|---|
| Net revenues | $ 1,313,498 | $ 1,253,207 | $ 1,298,495 | $ 1,289,084 | $ 5,154,284 |
| Operating income | 260,099 | 264,123 | 247,092 | 257,962 | 1,029,276 |
| Net income | 198,409 | 199,293 | 165,171 | 165,826 | 728,699 |
| Net income attributable to Wynn Resorts | 140,564 | 138,064 | 112,035 | 111,373 | 502,036 |
| Basic income per share | $ 1.25 | $ 1.38 | $ 1.12 | $ 1.11 | $ 4.87 |
| Diluted income per share | $ 1.23 | $ 1.37 | $ 1.11 | $ 1.10 | $ 4.82 |

| | Year Ended December 31, 2011 | | | | |
| | First | Second | Third | Fourth | Year |
|---|---|---|---|---|---|
| Net revenues | $ 1,260,272 | $ 1,367,353 | $ 1,298,304 | $ 1,343,863 | $ 5,269,792 |
| Operating income | 280,556 | 213,033 | 239,845 | 274,806 | 1,008,240 |
| Net income | 226,335 | 155,331 | 185,185 | 258,262 | 825,113 |
| Net income attributable to Wynn Resorts | 173,804 | 122,031 | 127,063 | 190,473 | 613,371 |
| Basic income per share | $ 1.40 | $ 0.98 | $ 1.02 | $ 1.53 | $ 4.94 |
| Diluted income per share | $ 1.39 | $ 0.97 | $ 1.01 | $ 1.52 | $ 4.88 |

**19. Subsequent Events (Unaudited)**

On January 31, 2013, the Company announced a cash dividend of $1.00 per share, that was paid on February 28, 2013 to stockholders of record as of February 14, 2013.

120

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

On January 3, 2013, the Company filed a definitive proxy statement on Schedule 14A ("Proxy Statement") for a special meeting of the stockholders to consider and vote upon a proposal to remove Mr. Okada as a director of the Company ("Removal Proposal"). On January 24, 2013, Mr. Okada filed a complaint in the United States District Court, District of Nevada against the Company, alleging that the Proxy Statement was materially false and misleading in contravention of Section 14(a) of the Securities Exchange Act of 1934, as amended, and Securities and Exchange Commission Rule 14a-9 promulgated thereunder. Mr. Okada also filed a motion for a preliminary injunction on January 28, 2013, in which he sought an order preliminarily enjoining the special meeting of stockholders until such time as the Company corrected certain alleged misstatements and omissions in its Proxy Statement. At the conclusion of a hearing held on February 15, 2013, the federal court denied Mr. Okada's motion.

On the afternoon of February 21, 2013, Mr. Okada resigned as a director of the Company. On February 22, 2013, the special meeting of stockholders was held and the stockholders approved the Removal Proposal with an affirmative vote of 85.7% of the shares entitled to vote at the special meeting (99.6% of the shares that were voted at the special meeting of stockholders were voted in favor of the Removal Proposal).

121

Table of Contents

**ITEM 9.      CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A.      CONTROLS AND PROCEDURES**

(a)      *Disclosure Controls and Procedures.* The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can only provide reasonable assurance of achieving the desired control objectives and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2012, the Company's disclosure controls and procedures are effective, at the reasonable assurance level, in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act and in ensuring that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely discussions regarding required disclosure.

(b)      *Management Report on Internal Control Over Financial Reporting.* Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2012. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control-Integrated Framework*.

Based on our assessment, management believes that, as of December 31, 2012, the Company's internal control over financial reporting was effective.

The Company's independent registered public accounting firm has issued an audit report on our internal control over financial reporting. This report appears under "Report of Independent Registered Public Accounting Firm on Internal Controls Over Financial Reporting" on page 72.

(c)      *Changes in Internal Control Over Financial Reporting.* There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our fourth fiscal quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**ITEM 9B.      OTHER INFORMATION**

None.

Table of Contents

## PART III

**ITEM 10.        DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by this item will be contained in the Registrant's definitive Proxy Statement for its 2013 Annual Stockholder Meeting to be filed with the Securities and Exchange Commission within 120 days after December 31, 2012 (the "2013 Proxy Statement") under the captions "Directors and Executive Officers, "Further Information Concerning the Board of Directors-Corporate Governance," and "Section 16(a) Beneficial Ownership Reporting Compliance," and is incorporated herein by reference.

As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website at *http://www.wynnresorts.com* under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

**ITEM 11.        EXECUTIVE COMPENSATION**

The information required by this item will be contained in the 2013 Proxy Statement under the caption "Directors and Executive Officer Compensation and Other Matters," and is incorporated herein by reference.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table summarizes compensation plans under which our equity securities are authorized for issuance, aggregated as to: (i) all compensation plans previously approved by stockholders, and (ii) all compensation plans not previously approved by stockholders. These plans are described in "Item 8. Financial Statements and Supplementary Data" of Part II (see Notes to Consolidated Financial Statements).

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 2,397,820 | $    66.89 | 4,087,064 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 2,397,820 | $    66.89 | 4,087,064 |

Certain information required by this item will be contained in the 2013 Proxy Statement under the caption "Security Ownership of Certain Beneficial Owners and Management," and is incorporated herein by reference.

123

Table of Contents

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by this item will be contained in the 2013 Proxy Statement under the caption "Certain Relationships and Related Transactions, and "Further Information Concerning the Board of Directors-Corporate Governance," and is incorporated herein by reference.

**ITEM 14.        PRINCIPAL ACCOUNTANT FEES AND SERVICES**

The information required by this item will be contained in the 2013 Proxy Statement under the caption "Ratification of Appointment of Independent Public Accountants," and is incorporated herein by reference.

Table of Contents

**PART IV**

**ITEM 15.       EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a)1. The following consolidated financial statements of the Company are filed as part of this report under "Item. 8—Financial Statements and Supplementary Data."

- Reports of Independent Registered Public Accounting Firm
- Consolidated Balance Sheets as of December 31, 2012 and 2011
- Consolidated Statements of Income for the years ended December 31, 2012, 2011 and 2010
- Consolidated Statements of Comprehensive Income for the years ended December 31, 2012, 2011, and 2010
- Consolidated Statements of Stockholders' Equity for the years ended December 31, 2012, 2012 and 2010
- Consolidated Statements of Cash Flows for the years ended December 31, 2012, 2011 and 2010
- Notes to Consolidated Financial Statements

(a)2. Financial Statement Schedules filed in Part IV of this report are listed below:

- Schedule I—Condensed financial information of the registrant
- Schedule II—Valuation and Qualifying Accounts

We have omitted all other financial statement schedules because they are not required or are not applicable, or the required information is shown in the financial statements or notes to the financial statements.

125

Table of Contents

SCHEDULE 1—CONDENSED FINANCIAL INFORMATION OF THE REGISTRANT

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**
**CONDENSED BALANCE SHEETS**
**(amounts in thousands, except share data)**

| | December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 179,939 | $ 378,486 |
| Investment securities | 89,155 | 108,676 |
| Receivables | 1,328 | 2,151 |
| Prepaid expenses | 2,698 | 1,003 |
| Total current assets | 273,120 | 490,316 |
| Property and equipment, net | 11,737 | 12,161 |
| Investment securities | 36,484 | 39,419 |
| Other assets | 33,682 | — |
| Due from subsidiaries | 232,400 | 173,583 |
| Investment in subsidiaries | 1,586,186 | 1,611,198 |
| Total assets | $ 2,173,609 | $ 2,326,677 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 171 | $ 1,274 |
| Accrued compensation and benefits | 1,796 | 5,811 |
| Interest payable | 33,650 | — |
| Other accrued liabilities | 3,750 | 1,768 |
| Deferred income taxes, net | 3,178 | 3,575 |
| Total current liabilities | 42,545 | 12,428 |
| Long-term debt | 1,936,443 | — |
| Other long term liabilities | 16,051 | 11,388 |
| Uncertain tax position liability | 29,139 | 25,112 |
| Deferred income taxes, net | 45,499 | 54,295 |
| Total liabilities | 2,069,677 | 103,223 |
| Commitments and contingencies (Note 2) | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.01; 40,000,000 shares authorized; zero shares issued and outstanding | — | — |
| Common stock, par value $0.01; 400,000,000 shares authorized; 113,730,442 and 137,937,088 shares issued; and, 100,866,712 and 125,080,998 shares outstanding | 1,137 | 1,379 |
| Treasury stock, at cost; 12,863,730 and 12,856,090 shares | (1,127,947) | (1,127,036) |
| Additional paid-in capital | 818,821 | 3,177,471 |
| Accumulated other comprehensive income | 4,177 | 840 |
| Retained earnings | 44,775 | 36,368 |
| Total Wynn Resorts, Limited stockholders' equity (deficit) | (259,037) | 2,089,022 |
| Noncontrolling interest | 362,969 | 134,432 |
| Total equity | 103,932 | 2,223,454 |
| Total liabilities and stockholders' equity | $ 2,173,609 | $ 2,326,677 |

The accompanying notes are an integral part of these condensed financial statements.

126

Table of Contents

**WYNN RESORTS, LIMITED**
(Parent Company Only)

**CONDENSED STATEMENTS OF INCOME**
(amounts in thousands, except per share data)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| Operating revenues: | | | |
| Wynn Las Vegas management fees | $ 22,318 | $ 22,229 | $ 19,459 |
| Wynn Macau royalty fees | 147,101 | 152,463 | 114,904 |
| Net revenues | 169,419 | 174,692 | 134,363 |
| Operating costs and expenses: | | | |
| General and administrative | 70,602 | 30,421 | 31,468 |
| Provision for doubtful accounts | — | — | (68) |
| Depreciation and amortization | 421 | 421 | 483 |
| Property charges and other | 33 | — | 163 |
| Total operating costs and expenses | 71,056 | 30,842 | 32,046 |
| Operating income | 98,363 | 143,850 | 102,317 |
| Other income (expense): | | | |
| Interest and other income | 1,116 | 865 | 1,750 |
| Interest expense | (33,650) | — | — |
| Equity in income of subsidiaries | 665,127 | 669,589 | 263,684 |
| Other income (expense), net | 632,593 | 670,454 | 265,434 |
| Income before income taxes | 730,956 | 814,304 | 367,751 |
| (Provision) benefit for income taxes | (2,257) | 10,809 | (51,155) |
| Net income | 728,699 | 825,113 | 316,596 |
| Less: Net income attributable to noncontrolling interests. | (226,663) | (211,742) | (156,469) |
| Net income attributable to Wynn Resorts, Limited | $ 502,036 | $ 613,371 | $ 160,127 |
| Basic and diluted earnings per common share: | | | |
| Net income: | | | |
| Basic | $ 4.87 | $ 4.94 | $ 1.30 |
| Diluted | $ 4.82 | $ 4.88 | $ 1.29 |
| Weighted average common shares outstanding: | | | |
| Basic | 103,092 | 124,039 | 122,787 |
| Diluted | 104,249 | 125,667 | 123,939 |

The accompanying notes are an integral part of these condensed financial statements.

127

Table of Contents

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**
**CONDENSED STATEMENTS OF CASH FLOWS**
**(amounts in thousands)**

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2012** | **2011** | **2010** |
| Cash flows from operating activities: | | | |
| Net income | $ 728,699 | $ 825,113 | $ 316,596 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 421 | 421 | 483 |
| Deferred income taxes | (3,655) | (10,809) | 51,155 |
| Stock-based compensation | 11,894 | 10,663 | 10,792 |
| Amortization of discount on investment securities and other | 3,762 | — | 163 |
| Dividends received from subsidiary | 700,025 | 578,240 | 1,509,584 |
| Equity in income of subsidiaries | (665,127) | (669,589) | (263,684) |
| Increase (decrease) in cash from changes in: | | | |
| Receivables | 823 | (1,610) | (178) |
| Prepaid expenses | (1,695) | (9) | 4 |
| Accounts payable, accrued expenses and other | 38,337 | 5,168 | (8,305) |
| Due from affiliates | (22,318) | (22,065) | (9,040) |
| Net cash provided by operating activities | 791,166 | 715,523 | 1,607,570 |
| Cash flows from investing activities: | | | |
| Redemption of Wynn Las Vegas First Mortgage Notes | — | — | 30,000 |
| Purchase of investment securities | (183,484) | (249,374) | — |
| Proceeds from sales or maturities of investment securities | 202,406 | 101,017 | — |
| Purchase of other assets | (33,682) | — | — |
| Due from subsidiaries | (34,132) | (55,673) | (25,300) |
| Net cash (used in) provided by investing activities | (48,892) | (204,030) | 4,700 |
| Cash flows from financing activities: | | | |
| Capital contribution to Wynn Las Vegas LLC | — | — | (50,000) |
| Dividends paid | (955,493) | (811,798) | (1,051,543) |
| Exercise of stock options | 15,583 | 23,859 | 66,186 |
| Purchase of treasury stock | (911) | (7,629) | — |
| Net cash used in financing activities | (940,821) | (795,568) | (1,035,357) |
| Cash and cash equivalents: | | | |
| Increase (decrease) in cash and cash equivalents | (198,547) | (284,075) | 576,913 |
| Balance, beginning of year | 378,486 | 662,561 | 85,648 |
| Balance, end of year | $ 179,939 | $ 378,486 | $ 662,561 |

The accompanying notes are an integral part of these condensed financial statements.

128

Table of Contents

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

**1. Basis of Presentation**

The accompanying condensed financial statements include only the accounts of Wynn Resorts, Limited (the "Company"). Investments in the Company's subsidiaries are accounted for under the equity method.

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary of the Company and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold through an initial public offering, including the over allotment, 1,437,500,000 (27.7%) shares of this subsidiary's common stock.

Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted since this information is included in the Company's consolidated financial statements included elsewhere in this Form 10-K.

**2. Commitments and Contingencies**

The Company is a holding company and, as a result, its ability to pay dividends is dependent on its subsidiaries' ability to provide funds to it. Restrictions imposed by Wynn Las Vegas, LLC (a wholly owned indirect subsidiary of the Company) and Wynn Macau debt instruments significantly restrict certain of the Company's key subsidiaries holding a majority of the consolidated group's total assets, including Wynn Las Vegas, LLC, from making dividends or distributions to the Company, subject to certain exceptions for affiliated overhead expenses as defined in the agreements governing Wynn Las Vegas, LLC's debt instruments, unless certain financial and non-financial criteria have been satisfied. In addition, the terms of the loan agreement of Wynn Resorts (Macau), S.A. contain similar restrictions. The Company received cash dividends of $700 million, $578.3 million and $1.51 billion from its subsidiaries during the years ended December 31, 2012, 2011 and 2010, respectively.

**3. Equity Repurchase Program**

The Board of Directors of Wynn Resorts has authorized an equity repurchase program of up to $1.7 billion. The repurchase program may include repurchases from time to time through open market purchases or negotiated transactions, depending upon market conditions. As of December 31, 2012, the Company had repurchased a cumulative total of 12,863,730 shares of the Company's Common Stock for a net cost of $1.1 billion under the program. Under the repurchase program, there were no repurchases made during the years ended December 31, 2012, 2011 and 2010.

During 2012 and 2011, the Company repurchased a total of 7,640 and 51,136 shares, respectively, in satisfaction of tax withholding obligations on vested restricted stock.

**4. Long-Term Debt**

*Redemption Price Promissory Note*

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, the Company redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," Wynn Resorts' articles of incorporation authorize redemption at "fair value" of the shares held by unsuitable persons. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things,

129

Table of Contents

restrictions on most of the shares which are subject to the terms of an existing stockholder agreement. Pursuant to the articles of incorporation, the Company issued the Redemption Price Promissory Note (the "Redemption Note") to Aruze USA, Inc., a former stockholder and related party, in redemption of the shares. The Redemption Note has a principal amount of approximately $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Note. The Company may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts and any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

The Company recorded the fair value of the Redemption Note at its estimated present value of approximately $1.94 billion in accordance with applicable accounting guidance. In determining this fair value, the Company considered the stated maturity of the Redemption Note, its stated interest rate, and the uncertainty of the related cash flows of the Redemption Note as well as the potential effects of the following: uncertainties surrounding the potential outcome and timing of pending litigation with Aruze USA, Inc. (see Note 6); the outcome of on-going investigations by the Nevada Gaming Control Board; and other potential legal and regulatory actions. In addition, in the furtherance of various future business objectives, the Company considered its ability, at its sole option, to prepay the Redemption Note at any time in accordance with its terms without penalty. Accordingly, the Company reasonably determined that the estimated life of the Redemption Note could be less than the contractual life of the Redemption Note. When considering the appropriate rate of interest to be used to determine fair value for accounting purposes and in light of the uncertainty in the timing of the cash flows, the Company used observable inputs from a range of trading values of financial instruments with terms and lives similar to the estimated life and terms of the Redemption Note. As a result of this analysis, the Company concluded the Redemption Note's stated rate of 2% approximated a market rate.

**5. Noncontrolling Interest**

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary of the Company and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Through an initial public offering, including the over allotment, Wynn Macau, Limited sold 1,437,500,000 (27.7%) shares of this subsidiary's common stock. Net proceeds to the Company as a result of this transaction were approximately $1.8 billion. The shares of Wynn Macau, Limited were not and will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be offered or sold in the United States absent a registration under the Securities Act, or an applicable exception from such registration requirements. Net income attributable to noncontrolling interest was $226.7 million, $211.7 million and $156.5 million for the years ended December 31, 2012, 2011 and 2010, respectively.

On November 16, 2011, the Wynn Macau, Limited Board of Directors approved a HK$1.20 per share dividend. The total dividend amount was $800 million and the Company's share of this dividend was $578.3 million. A reduction of $221.6 million was made to noncontrolling interest in the accompanying Condensed Balance Sheets to reflect this dividend.

On November 2, 2010, the Wynn Macau, Limited Board of Directors approved a HK$0.76 per share dividend. The total dividend amount was $508 million and the Company's share of this dividend was $367 million. A reduction of $140.7 million was made to noncontrolling interest in the accompanying Condensed Balance Sheets to reflect this dividend.

130

Table of Contents

**6. Litigation**

In addition to the actions noted below, the Company's affiliates are involved in litigation arising in the normal course of business. In the opinion of management, such litigation will not have a material effect on the Company's financial condition, results of operations or cash flows.

*Atlantic-Pacific Capital*

On May 3, 2010, Atlantic-Pacific Capital, Inc. ("APC") filed an arbitration demand with JAMS, a private alternative dispute resolution provider, regarding an agreement with the Company. The action concerns a claim for compensation of approximately $32 million pursuant to an agreement entered into between APC and the Company on or about March 30, 2008 whereby APC was engaged to raise capital for an investment vehicle sponsored by the Company. APC is seeking compensation unrelated to the investment vehicle. The Company has denied APC's claims for compensation. The Company filed a Complaint for Damages and Declaratory Relief against APC in the Eighth Judicial District Court, Clark County, Nevada, on May 10, 2010, which APC removed to the United States District Court, District of Nevada. In March 2011, the District Court denied APC's motion to compel arbitration, and dismissed the action. APC appealed, and on November 13, 2012, the United States Court of Appeals for the Ninth Circuit reversed the District Court and compelled arbitration. The matter is proceeding in arbitration, and an arbitrator recently has been selected. Management believes that APC's claims against the Company are without merit, and the Company continues to defend this matter vigorously.

*Determination of Unsuitability and Redemption of Aruze USA, Inc. and Affiliates*

On February 18, 2012, Wynn Resorts' Gaming Compliance Committee concluded an investigation after receiving an independent report by Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing a pattern of misconduct by Aruze USA, Inc., at the time a stockholder of Wynn Resorts, Universal Entertainment Corporation, Aruze USA, Inc.'s parent company, and Kazuo Okada, the majority shareholder of Universal Entertainment Corporation, who, until February 21, 2013, was also a member of Wynn Resorts' Board of Directors and was at the time a director of Wynn Macau, Limited. The factual record presented in the Freeh Report included evidence that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada had provided valuable items to certain foreign gaming officials who were responsible for regulating gaming in a jurisdiction in which entities controlled by Mr. Okada were developing a gaming resort. Mr. Okada has denied the impropriety of such conduct to members of the Board of Directors of Wynn Resorts and Mr. Okada has refused to acknowledge or abide by Wynn Resorts' anti-bribery policies and has refused to participate in the training all other directors have received concerning these policies.

Based on the Freeh Report, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada are "unsuitable persons" under Article VII of the Company's articles of incorporation. The Board of Directors was unanimous (other than Mr. Okada) in its determination. The Board of Directors also requested that Mr. Okada resign as a director of Wynn Resorts (under Nevada corporation law, a Board of Directors does not have the power to remove a director) and recommended that Mr. Okada be removed as a member of the Board of Directors of Wynn Macau, Limited. In addition, on February 18, 2012, Mr. Okada was removed from the Board of Directors of Wynn Las Vegas Capital Corp., an indirect wholly owned subsidiary of Wynn Resorts. On February 24, 2012, Mr. Okada was removed from the Board of Directors of Wynn Macau, Limited and on February 22, 2013, he was removed from the Board of Directors of Wynn Resorts by a stockholder vote in which 99.6% of the over 86 million shares voted were cast in favor of removal. Additionally, Mr. Okada resigned from the Board of Directors of Wynn Resorts on February 21, 2013.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and cancelled Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Following a finding of "unsuitability," Article VII of Wynn Resorts' articles of incorporation authorizes redemption at "fair value" of

131

[Table of Contents](#)

the shares held by unsuitable persons. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the then current trading price was appropriate because of, among other things, restrictions on most of the shares held by Aruze USA, Inc. under the terms of the Stockholders Agreement (as defined below). Pursuant to the articles of incorporation, Wynn Resorts issued the Redemption Note to Aruze USA, Inc. in redemption of the shares. The Redemption Note has a principal amount of $1.94 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Note. The Company may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Note. In no instance shall any payment obligation under the Redemption Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Note, to the prior payment in full of all existing and future obligations of Wynn Resorts or any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

After authorizing the redemption of the Aruze USA, Inc. shares, the Board of Directors took certain actions to protect the Company and its operations from any influence of an unsuitable person, including placing limitations on the provision of certain operating information to unsuitable persons, evaluating whether to seek the removal of Mr. Okada from the Company's Board of Directors, and the formation of an Executive Committee of the Board to manage the business and affairs of the Company during the period between each annual meeting. The Charter of the Executive Committee provides that "Unsuitable Persons" are not permitted to serve on the Committee. All members of the Board, other than Mr. Okada, were appointed to the Executive Committee on February 18, 2012. On February 24, 2012, the Board of Directors of Wynn Macau, Limited removed Mr. Kazuo Okada from the board. On January 3, 2013, the Company filed a definitive proxy statement on Schedule 14A ("Proxy Statement") for a special meeting of the stockholders to consider and vote upon a proposal to remove Mr. Okada as a director of the Company ("Removal Proposal"). On January 24, 2013, Mr. Okada filed a complaint in the United States District Court, District of Nevada against the Company, alleging that the Proxy Statement was materially false and misleading in contravention of Section 14(a) of the Securities Exchange Act of 1934, as amended, and Securities and Exchange Commission Rule 14a-9 promulgated thereunder. Mr. Okada also filed a motion for a preliminary injunction on January 28, 2013, in which he sought an order preliminarily enjoining the special meeting of stockholders until such time as the Company corrected certain alleged misstatements and omissions in its Proxy Statement. At the conclusion of a hearing held on February 15, 2013, the federal court denied Mr. Okada's motion.

On the afternoon of February 21, 2013, Mr. Okada resigned as a director of the Company. On February 22, 2013, the special meeting of stockholders was held and the stockholders approved the Removal Proposal with an affirmative vote of 85.7% of the shares entitled to vote at the special meeting (99.6% of the shares that were voted at the special meeting of stockholders were voted in favor of the Removal Proposal).

*Redemption Action and Counterclaim*

On February 19, 2012, Wynn Resorts filed a complaint in the Eighth Judicial District Court, Clark County, Nevada against Mr. Okada, Aruze USA, Inc. and Universal Entertainment Corporation (companies controlled by Mr. Okada) (the "Okada Parties"), alleging breaches of fiduciary duty and related claims. The Company is seeking compensatory and special damages as well as a declaration that it acted lawfully and in full compliance with its articles of incorporation, bylaws and other governing documents.

On March 12, 2012, the Okada Parties removed the action to the United States District Court for the District of Nevada (the action was subsequently remanded to Nevada state court). On that same date, the Okada Parties filed an answer denying the claims and a counterclaim that purports to assert claims against the Company, each of the members of the Company's Board of Directors (other than Mr. Okada) and Wynn Resorts' General Counsel (the "Wynn Parties"). As amended, the Okada Parties' counterclaim alleges, among other things: (1) that

132

Table of Contents

the shares of Wynn Resorts common stock owned by Aruze USA, Inc. were exempt from the redemption-for-unsuitability provisions in the Wynn Resorts articles of incorporation pursuant to certain agreements executed in 2002; (2) that the Wynn Resorts directors who authorized the redemption of Aruze USA, Inc.'s shares acted at the direction of Stephen A. Wynn and did not independently and objectively evaluate Mr. Okada's, Universal Entertainment Corporation's, and Aruze USA, Inc.'s suitability, and by so doing, breached their fiduciary duties; (3) that the Wynn Resorts directors violated the terms of the Wynn Resorts articles of incorporation by failing to pay Aruze USA, Inc. fair value for the redeemed shares; and (4) that the terms of the Redemption Note that Aruze USA, Inc. received in exchange for the redeemed shares, including the Redemption Note's principal amount, duration, interest rate, and subordinated status, were unconscionable. Among other relief, the amended counterclaim seeks a declaration that the redemption of Aruze USA, Inc.'s shares was void, an injunction restoring Aruze USA, Inc.'s share ownership, damages in an unspecified amount and rescission of the Amended and Restated Stockholders Agreement. On August 31, 2012, Aruze USA, Inc. filed a motion for preliminary injunction with the Nevada state court. The motion sought an order that would prohibit Wynn Resorts from barring or preventing Aruze USA, Inc. from exercising rights as a stockholder at the November 2, 2012 annual meeting of Wynn Resorts' stockholders. On October 2, 2012, the Nevada state court denied Aruze USA, Inc.'s motion for preliminary injunction. On October 19, 2012, Aruze USA, Inc. filed a notice of appeal with the Nevada Supreme Court. The appeal was assigned to the Nevada Supreme Court's mediation program, has not progressed, and is pending. Wynn Resorts intends to vigorously defend against the appeal and to argue that the Nevada Supreme Court should affirm the state court's decision denying Aruze USA, Inc.'s motion for a preliminary injunction.

The Company's complaint, as amended, and the Okada Parties' counterclaim, as amended, were challenged at the pleading stage through motion practice. At a hearing held on November 13, 2012, the Nevada state court denied the Wynn Parties' motion to dismiss the Okada Parties' amended counterclaim, but dismissed the Okada Parties' claims under the Nevada Racketeer Influenced and Corrupt Organizations Act. At a hearing held on January 15, 2013, the court denied the Okada Parties' motion to dismiss the Company's amended complaint.

On February 13, 2013, the Okada Parties filed a motion in the Nevada state court in which they asked the court to establish a "disputed ownership fund" as defined in a federal tax regulation. Specifically, the motion sought an order establishing an escrow account to hold the Redemption Note issued to Aruze USA, Inc. as compensation for the shares of Wynn Resorts common stock redeemed by the board of directors in February 2012 in light of the board's determination of unsuitability, as well as the redeemed shares themselves (although those shares were previously cancelled in February 2012), pending a resolution of the state court action. The order sought by the Okada Parties would also require the Company to, among other things, make any payments on the Redemption Note into the escrow account. A hearing on the motion has been set for March 22, 2013. The Company believes there is no basis for the relief requested in the motion and intends to oppose the motion vigorously.

The Company is vigorously pursuing its claims against the Okada Parties, and the Company and the other counter-defendants are vigorously defending against the counterclaims asserted against them. The Company's claims and the Okada Parties' counterclaims are in a preliminary stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any. Any adverse judgments or settlements involving payment of a material sum of money could cause a material adverse effect on our financial condition and results of operations and could expose the Company to additional claims by third parties, including current or former investors or regulators. Any adverse judgments or settlements would reduce the Company's profits and could limit the Company's ability to operate its business.

*Related Matters*

The Company provided the Freeh Report to appropriate regulators and law enforcement agencies and is cooperating with related investigations that such regulators and agencies have undertaken. The conduct of the

133

Table of Contents

Okada Parties and any resulting regulatory investigations could have adverse consequences to the Company and its subsidiaries. A finding by regulatory authorities that Mr. Okada violated anti-corruption statutes and/or other laws or regulations applicable to persons affiliated with a gaming licensee on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, as described below, the Salt Lake Regional Office of the U.S. Securities and Exchange Commission ("SEC") has commenced an informal inquiry into, and other regulators could pursue separate investigations into, the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company. In February 2013, the Nevada Gaming Control Board informed the Company that it has completed its investigation of allegations made by Mr. Okada against the Company regarding the activities of Mr. Wynn and related entities in Macau and found no violations of the Gaming Control Act or the Nevada Gaming Commission Regulations.

On June 19, 2012, Elaine Wynn responded to the Okada Parties' counterclaim and asserted a cross claim against Steve Wynn and Kazuo Okada seeking a declaration that (1) any and all of Elaine Wynn's duties under the January 2010 Stockholders Agreement (the "Stockholders Agreement") by and among Aruze USA, Inc., Steve Wynn, and Elaine Wynn be discharged; (2) the Stockholders Agreement is subject to rescission and is rescinded; (3) the Stockholders Agreement is an unreasonable restraint on alienation in violation of public policy; and/or (4) the restrictions on sale of shares shall be construed as inapplicable to Elaine Wynn. Mr. Wynn filed his answer to Elaine Wynn's cross claim on September 24, 2012. The indentures for the Wynn Las Vegas, LLC 2022 Notes and Existing Notes (the "Indentures") provide that if Steve Wynn, together with certain related parties, in the aggregate beneficially owns a lesser percentage of the outstanding common stock of the Company than are beneficially owned by any other person, a change of control will have occurred. If Elaine Wynn prevails in her cross claim, Steve Wynn would not beneficially own or control Elaine Wynn's shares and a change in control may result under the Company's debt documents. Under the Indentures, the occurrence of a change of control requires that the Company make an offer (unless the notes have been previously called for redemption) to each holder to repurchase all or any part of such holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest on the Notes purchased, if any, to the date of repurchase.

*Litigation Commenced by Kazuo Okada and Related Matters*

<u>Books and Records Action:</u>

On January 11, 2012, Mr. Okada, in his role as a Wynn Resorts' director, commenced a writ proceeding in the Eighth Judicial District Court, Clark County, Nevada, seeking to compel the Company to produce certain books and records relating to a donation to the University of Macau, among other things.

In May 2011, Wynn Macau, a majority owned subsidiary of the Company, made a commitment to the University of Macau Development Foundation in support of the new Asia-Pacific Academy of Economics and Management. This contribution consists of a $25 million payment made in May 2011 and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive. The pledge was consistent with the Company's long-standing practice of providing philanthropic support for deserving institutions in the markets in which it operates. The pledge was made following an extensive analysis which concluded that the gift was made in accordance with all applicable laws. The pledge was considered by the boards of directors of both the Company and Wynn Macau, Limited and approved by 15 of the 16 directors who serve on those boards. The sole dissenting vote was cast by Mr. Okada whose stated objection was to the length of time over which the donation would occur, not its propriety.

At a hearing on February 9, 2012, the Nevada state court held that, as a director of the Company, Mr. Okada had the right to make a reasonable inspection of the Company's corporate books and records. Following the

134

Table of Contents

hearing, the Company released certain documents to Mr. Okada for his inspection. At a subsequent hearing on March 8, 2012, the court considered Mr. Okada's request that the Company's Board of Directors make additional documents available to him, and ruled that Mr. Okada was entitled to inspect two additional pages of documents. The Company promptly complied with the court's ruling.

On May 25, 2012, Mr. Okada amended his petition to request inspection of additional records. Following a hearing held on October 2, 2012, the court ruled that Mr. Okada is entitled to review certain additional Company documents from the 2000 to 2002 time period. The Company promptly complied with the court's ruling. On November 2, 2012, Mr. Okada filed a motion to compel the production of additional documents and to depose a witness designated by the Company. At the conclusion of a hearing held on November 8, 2012, the court denied Mr. Okada's motion. The Company has not received any further requests for information by Mr. Okada in relation to this matter as of the date of this report.

SEC Inquiry:

On February 8, 2012, following Mr. Okada's lawsuit, the Company received a letter from the Salt Lake Regional Office of the SEC requesting that, in connection with an informal inquiry by the SEC, the Company preserve information relating to the donation to the University of Macau, any donations by the Company to any other educational charitable institutions, including the University of Macau Development Foundation, and the Company's casino or concession gaming licenses or renewals in Macau. The Company is fully cooperating with the Salt Lake Regional Office staff.

Japan Action:

On August 28, 2012, Mr. Okada, Universal Entertainment Corporation and Okada Holdings filed a complaint in Tokyo District Court against the Company, all members of the Board of Directors (other than Mr. Okada) and the Company's General Counsel, alleging that the press release issued by the Company with respect to the redemption has damaged plaintiffs' social evaluation and credibility. The plaintiffs seek damages and legal fees from the defendants. The Company and the other counter-defendants are vigorously defending against the claims asserted against them in this matter.

Federal Securities Action:

On January 3, 2013, the Company filed a definitive proxy statement on Schedule 14A ("Proxy Statement") for a special meeting of the stockholders to consider and vote upon a proposal to remove Mr. Okada as a director of the Company ("Removal Proposal"). On January 24, 2013, Mr. Okada filed a complaint in the United States District Court, District of Nevada against the Company, alleging that the Proxy Statement was materially false and misleading in contravention of Section 14(a) of the Securities Exchange Act of 1934, as amended, and Securities and Exchange Commission Rule 14a-9 promulgated thereunder. Mr. Okada also filed a motion for a preliminary injunction on January 28, 2013, in which he sought an order preliminarily enjoining the special meeting of stockholders until such time as the Company corrected certain alleged misstatements and omissions in its Proxy Statement. At the conclusion of a hearing held on February 15, 2013, the federal court denied Mr. Okada's motion.

On the afternoon of February 21, 2013, Mr. Okada resigned as a director of the Company. On February 22, 2013, the special meeting of stockholders was held and the stockholders approved the Removal Proposal with an affirmative vote of 85.7% of the shares entitled to vote at the special meeting (99.6% of the shares that were voted at the special meeting of stockholders were voted in favor of the Removal Proposal).

*Related Derivative Litigation*

Six derivative actions were commenced against the Company and all members of its Board of Directors: four in the United States District Court, District of Nevada, and two in the Eighth Judicial District Court of Clark County, Nevada.

135

Table of Contents

The four federal actions brought by the following plaintiffs have been consolidated: (1) The Louisiana Municipal Police Employees' Retirement System, (2) Maryanne Solak, (3) Excavators Union Local 731 Welfare Fund, and (4) Boilermakers Lodge No. 154 Retirement Fund (collectively, the Federal Plaintiffs").

The Federal Plaintiffs filed a consolidated complaint on August 6, 2012, asserting claims for: (1) breach of fiduciary duty; (2) waste of corporate assets; (3) injunctive relief; and (4) unjust enrichment. The claims are against the Company all Company directors, including Mr. Okada, however, the plaintiffs voluntarily dismissed Mr. Okada as a defendant in this consolidated action on September 27, 2012. The Federal Plaintiffs claim that the individual defendants breached their fiduciary duties and wasted assets by: (a) failing to ensure the Company's officers and directors complied with federal and state laws and the Company's Code of Conduct; (b) voting to allow the Company's subsidiary to make the donation to the University of Macau; and (c) redeeming Aruze USA, Inc.'s stock such that the Company incurs the debt associated with the redemption. The Federal Plaintiffs seek unspecified compensatory damages, restitution in the form of disgorgement, reformation of corporate governance procedures, an injunction against all future payments related to the donation/pledge, and all fees (attorneys, accountants, and experts) and costs. The directors responded to the consolidated complaint by filing a motion to dismiss on September 14, 2012. On February 1, 2013, the federal court dismissed the complaint for failure to plead adequately the futility of a pre-suit demand on the Board. The dismissal was without prejudice to the Federal Plaintiffs' ability to file a motion within 30 days seeking leave to file an amended complaint.

The two state court actions brought by the following plaintiffs have also been consolidated: (1) IBEW Local 98 Pension Fund and (2) Danny Hinson (collectively, the "State Plaintiffs"). Through a coordination of efforts by all parties, the directors and the Company (a nominal defendant) have been served in all of the actions.

The State Plaintiffs filed a consolidated complaint on July 20, 2012 asserting claims for (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; and (4) unjust enrichment. The claims are against the Company and all Company directors, including Mr. Okada, as well as the Company's Chief Financial Officer, who signs financial disclosures filed with the SEC. The State Plaintiffs claim that the individual defendants failed to disclose to the Company's stockholders the investigation into, and the dispute with director Okada as well as the alleged potential violations of the FCPA related to, the University of Macau Development Foundation donation. The State Plaintiffs seek unspecified monetary damages (compensatory and punitive), disgorgement, reformation of corporate governance procedures, an order directing the Company to internally investigate the donation, as well as attorneys' fees and costs. On October 13, 2012, the court entered the parties' stipulation providing for a stay of the state derivative action for 90 days, subject to the parties' obligation to monitor the progress of the pending litigation, discussed above, between Wynn Resorts (among others) and Mr. Okada (among others). Per the stipulation, Wynn Resorts and the individual defendants were not required to respond to the consolidated complaint while the stay remained in effect. Although the stay has now expired, the State Plaintiffs have agreed to further extend the defendants' time to respond to the consolidated complaint to allow the State Plaintiffs additional time to consider their plans for the action going forward, including a possible extension by agreement of the stay in the state derivative action.

The individual defendants are vigorously defending against the claims pleaded against them in these derivative actions. We are unable to predict the outcome of these litigations at this time.

## Note 7. Subsequent Events

On January 3, 2013, the Company filed a definitive proxy statement on Schedule 14A ("Proxy Statement") for a special meeting of the stockholders to consider and vote upon a proposal to remove Mr. Okada as a director of the Company ("Removal Proposal"). On January 24, 2013, Mr. Okada filed a complaint in the United State District Court, District of Nevada against the Company, alleging that the Proxy Statement was materially false and misleading in contravention of Section 14(a) of the Securities Exchange Act of 1934, as amended, and Securities and Exchange Commission Rule 14a-9 promulgated thereunder. Mr. Okada also filed a motion for a preliminary injunction on January 28, 2013, in which he sought an order preliminarily enjoining the special meeting of

136

Table of Contents

stockholders until such time as the Company corrected certain alleged misstatements and omissions in its Proxy Statement. At the conclusion of a hearing held on February 15, 2013, the federal court denied Mr. Okada's motion.

On the afternoon of February 21, 2013, Mr. Okada resigned as a director of the Company. On February 22, 2013, the special meeting of stockholders was held and the stockholders approved the Removal Proposal with an affirmative vote of 85.7% of the shares entitled to vote at the special meeting (99.6% of the shares that were voted at the special meeting of stockholders were voted in favor of the Removal Proposal).

137

Table of Contents

**SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS**
**(In Thousands)**

| Description | Balance at Beginning of Year | Provisions for Doubtful Accounts | Write-offs, Net of Recoveries | Balance at End of Year |
|---|---|---|---|---|
| Allowance for doubtful accounts: | | | | |
| 2012 | $ 91,854 | 18,091 | (7,732) | $ 102,213 |
| 2011 | $ 77,452 | 33,778 | (19,376) | $ 91,854 |
| 2010 | $ 82,129 | 28,304 | (32,981) | $ 77,452 |

| Description | Balance at Beginning of Year | Additions | Deductions | Balance at End of Year |
|---|---|---|---|---|
| Deferred income tax asset valuation allowance: | | | | |
| 2012 | $ 1,812,482 | 29,132 | (10,069) | $ 1,831,545 |
| 2011 | $ 1,285,916 | 533,474 | (6,908) | $ 1,812,482 |
| 2010 | $ 711,719 | 574,197 | — | $ 1,285,916 |

138

Table of Contents

**(a)3. Exhibits**

Exhibits that are not filed herewith have been previously filed with the SEC and are incorporated herein by reference.

| Exhibit No. | Description |
|---|---|
| 3.1 | Second Amended and Restated Articles of Incorporation of the Registrant.(1) |
| 3.2 | Fifth Amended and Restated Bylaws of the Registrant, as amended.(45) |
| 4.1 | Specimen certificate for shares of Common Stock, $0.01 par value per share of the Registrant.(1) |
| 4.2 | Indenture, dated as of October 19, 2009, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors set forth therein and U.S. Bank National Association, as trustee.(24) |
| 4.3 | Indenture, dated as of April 28, 2010, by and among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors set forth therein and U.S. Bank National Association, as trustee.(28) |
| 4.4 | Indenture, dated as of August 4, 2010, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors named therein and U.S. Bank National Association, as trustee.(30) |
| 4.5 | Indenture, dated as of March 12, 2012, by and among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors set forth therein and U.S. Bank National Association, as trustee.(39) |
| 4.6 | Third Supplemental Indenture, dated August 4, 2010, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors name therein and U.S. Bank National Association, as trustee.(30) |
| *10.1.1.0 | Employment Agreement, dated as of October 4, 2002, by and between Wynn Resorts, Limited and Stephen A. Wynn.(1) |
| *10.1.1.1 | First Amendment to Employment Agreement, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts, Limited.(4) |
| *10.1.1.2 | Second Amendment to employment agreement between Wynn Resorts, Limited and Stephen A. Wynn dated January 31, 2007.(15) |
| *10.1.1.3 | Third Amendment to Employment Agreement, dated as of September 11, 2008, between Wynn Resorts, Limited and Stephen A. Wynn.(16) |
| *10.1.1.4 | Fourth Amendment to Employment Agreement dated as of December 31, 2008, between Wynn Resorts, Limited and Stephen A. Wynn.(19) |
| *10.1.1.5 | Amendment to Employment Agreement, dated as of February 16, 2009, by and between Wynn Resorts, Limited and Stephen A. Wynn.(20) |
| *10.1.1.6 | Sixth Amendment to Employment Agreement dated as of February 24, 2011, between Wynn Resorts, Limited and Stephen A. Wynn.(34) |
| *10.1.2.0 | Employment Agreement, dated as of March 4, 2008, by and between Wynn Resorts, Limited and Marc D. Schorr.(9) |
| *10.1.2.1 | First Amendment to Employment Agreement dated as of December 31, 2008, between Wynn Resorts, Limited and Marc D. Schorr.(19) |
| *10.1.2.2 | Amendment to Employment Agreement, dated as of February 12, 2009, by and between Wynn Resorts, Limited and Marc D. Schorr.(20) |
| 10.1.3.0 | Employment Agreement, dated as of October 1, 2005, by and between Wynn Las Vegas, LLC and Matt Maddox.(19) |

Table of Contents

| | |
|---|---|
| *10.1.3.1 | First Amendment to Employment Agreement, dated as of May 5, 2008, by and between Wynn Resorts, Limited and Matt Maddox.(18) |
| *10.1.3.2 | Second Amendment to Employment Agreement dated as of December 31, 2008, between Wynn Resorts, Limited and Matt Maddox.(19) |
| *10.1.3.3 | Amendment to Employment Agreement, dated as of February 13, 2009, by and between Wynn Resorts, Limited and Matt Maddox.(20) |
| *10.1.3.4 | Fourth Amendment to Employment Agreement, dated as of March 5, 2009, by and between Wynn Resorts, Limited and Matt Maddox.(21) |
| *10.1.3.5 | Fifth Amendment to Employment Agreement, dated as of February 2, 2010, by and between Wynn Resorts, Limited and Matt Maddox.(26) |
| *10.1.4.0 | Employment agreement, dated May 12, 2010, by and between Worldwide Wynn, LLC and Linda C. Chen.(29) |
| *10.1.4.1 | Retention agreement, dated July 27, 2011, by and between Worldwide Wynn, LLC and Linda Chen.(35) |
| *10.1.4.2 | First Amendment to Employment Agreement, dated as of November 2, 2012, by and between Worldwide Wynn, LLC and Linda Chen.(46) |
| *10.1.5.0 | Employment Agreement, dated as of April 24, 2007, by and between Wynn Resorts, Limited and Kim Sinatra.(33) |
| *10.1.5.1 | First Amendment to Employment Agreement, dated as of December 31, 2008 by and between Wynn Resorts, Limited and Kim Sinatra.(33) |
| *10.1.5.2 | Amendment to Employment Agreement, dated as of February 12, 2009, by and between Wynn Resorts, Limited and Kim Sinatra.(33) |
| *10.1.5.3 | Second Amendment to Employment Agreement, dated as of November 30, 2009, by and between Wynn Resorts, Limited and Kim Sinatra.(33) |
| *10.2.1 | 2002 Stock Incentive Plan as Amended and Restated effective May 12, 2010.(36) |
| *10.2.2 | 2002 Stock Incentive Plan as Amended and Restated effective May 17, 2011.(44) |
| *10.2.3 | Form of Stock Option Agreement pursuant to 2002 Stock Incentive Plan.(44) |
| *10.2.4 | Form of Stock Option Grant Notice.(44) |
| *10.2.5 | Form of Restricted Stock Agreement pursuant to 2002 Stock Incentive Plan.(44) |
| 10.3.1.0 | Amended and Restated Stockholder Agreement, dated January 6, 2010, by and among Stephen A. Wynn, Elaine P. Wynn and Aruze USA, Inc.(25) |
| 10.3.1.1 | Waiver and Consent, dated November 24, 2010, by and among Aruze USA, Inc., Stephen A. Wynn and Elaine P. Wynn.(31) |
| 10.3.1.2 | Waiver and Consent, dated December 15, 2010, by and among Aruze USA, Inc., Stephen A. Wynn and Elaine P. Wynn.(32) |
| 10.3.2 | Amended and Restated Shareholders Agreement, dated as of September 16, 2004 by and among Wynn Resorts (Macau), Ltd., Wong Chi Seng and Wynn Resorts (Macau), S.A.(4) |
| 10.4.1.1 | Concession Contract for the Operation of Games of Chance or Other Games in Casinos in the Macau Special Administrative Region, dated June 24, 2002, between the Macau Special Administrative Region and Wynn Resorts (Macau), S.A. (English translation of Portuguese version of Concession Agreement).(2) |

140

[Table of Contents](#)

| | |
|---|---|
| 10.4.1.2 | Concession Contract for Operating Casino Gaming or Other Forms of Gaming in the Macao Special Administrative Region, dated June 24, 2002, between the Macau Special Administrative Region and Wynn Resorts (Macau) S.A. (English translation of Chinese version of Concession Agreement).(5) |
| 10.4.1.3 | Unofficial English translation of Land Concession Contract between the Macau Special Administrative Region and Wynn Resorts (Macau) S.A.(3) |
| 10.4.1.4 | Land Concession Contract, published on May 2, 2012, by and among Palo Real Estate Company Limited, Wynn Resorts (Macau) S.A. and the Macau Special Administration of the People's Republic of China (translated to English from traditional Chinese and Portuguese.(41) |
| 10.5.1.1 | Surname Rights Agreement, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts Holdings, LLC.(4) |
| 10.5.1.2 | Rights of Publicity License, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts Holdings, LLC.(4) |
| 10.5.1.3 | Termination Agreement, dated as of August 6, 2004, by and between Stephen A. Wynn and Valvino Lamore, LLC.(4) |
| 10.5.1.4 | Trademark Assignment, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts Holdings, LLC.(4) |
| 10.5.2 | Intellectual Property License Agreement dated as of December 14, 2004, by and among Wynn Resorts Holdings, Wynn Resorts, Limited and Wynn Las Vegas, LLC.(7) |
| 10.6.1.0 | Common Terms Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., certain financial institutions as Hotel Facility Lenders, Project Facility Lenders and Revolving Credit Facility Lenders, Deutsche Bank AG, Hong Kong Branch and Societe Generale Asia Limited as Global Coordinating Lead Arrangers and Societe Generale Asia Limited as Hotel Facility Agent, Project Facility Agent, Intercreditor Agent and Security Agent.(4) |
| 10.6.1.1 | Common Terms Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as the Company, Certain Financial Institutions as Hotel Facility Lenders, Project Facility Lenders, Revolving Credit Facility Lenders and Hedging Counterparties, Bank of America Securities Asia Limited, Deutsche Bank AG, Hong Kong Branch and Societe Generale Asia Limited as Global Coordinating Lead Arrangers, Societe Generale Asia Limited as Hotel Facility Agent and Project Facility Agent, Societe Generale Asia Limited as Intercreditor Agent, and Societe Generale, Hong Kong Branch as Security Agent.(8) |
| 10.6.1.2 | Second Amendment Agreement to the Common Terms Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A., certain financial institutions as Hotel Facility Lenders, Project Facility Lenders, and Revolving Credit Facility Lenders, Banc of America Securities Asia Limited, Deutsche Bank A.G. Hong Kong Branch, and Societe Generale Asia Limited as Global Lead Arrangers and Societe Generale Asia Limited as Hotel Facility Agent and Project Facility Agent and Societe Generale Hong Kong Branch as Intercreditor Agent.(11) |
| 10.6.1.3 | Common Terms Agreement Third Amendment Agreement dated September 8, 2009 between, among others, Wynn Resorts (Macau) S.A. as the company and Société Générale, Hong King Branch as security agent.(33) |
| 10.6.1.4 | Common Terms Agreement Fourth Amendment Agreement, dated as of July 31, 2012 between, among others, Wynn Resorts (Macau) S.A. as the company and Bank of China Limited Macau Branch as security agent.(42) |
| 10.6.2.0 | Hotel Facility Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Hotel Facility Agent and the several Hotel Facility Lenders named therein.(4) |

141

Table of Contents

| 10.6.2.1 | Hotel Facility Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company, Societe Generale Asia Limited, as Hotel Facility Agent and Certain Financial Institutions as Hotel Facility Lenders.(8) |
| --- | --- |
| 10.6.2.2 | Second Amendment Agreement to the Hotel Facility Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Hotel Facility Agent, and certain financial institutions as Hotel Facility Lenders (11) |
| 10.6.2.3 | Third Amendment Agreement to the Hotel Facility Agreement dated July 31, 2012 among Wynn Resorts, (Macau), S.A., Bank of China Limited Macau Branch, and certain financial institutions as Hotel Facility Lenders.(42) |
| 10.6.3.0 | Project Facility Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Project Facility Agent and the several Project Facility Lenders named therein.(4) |
| 10.6.3.1 | Project Facility Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company, Societe Generale Asia Limited, as Project Facility Agent and Certain Financial Institutions as Project Facility Lenders.(8) |
| 10.6.3.2 | Second Amendment Agreement to the Project Facility Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Project Facility Agent, and certain financial institutions as Project Facility Lenders.(11) |
| 10.6.4.0 | Revolving Credit Facility Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A. and the several Revolving Credit Facility Lenders named therein.(4) |
| 10.6.4.1 | Revolving Credit Facility Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company and Certain Financial Institutions as Revolving Credit Facility Lenders.(8) |
| 10.6.4.2 | Revolving Credit Facility Second Amendment Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as Revolving Credit Facility Agent and certain financial institutions as revolving credit facility lenders.(11) |
| 10.6.4.3 | Revolving Credit Facility Agreement dated July 31, 2012 among Wynn Resorts (Macau), S.A., Bank of China, Limited Macau Branch, and certain financial institutions as Project Facility Lenders.(42) |
| 10.6.5.0 | Deed of Appointment and Priority, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., certain financial institutions as Original First Ranking Lenders, Banco Nacional Ultramarino, S.A. as Second Ranking Finance Party, Wynn Group Asia, Inc. as Third Ranking Finance Party, Societe Generale -Hong Kong Branch as Security Agent, Societe Generale Asia Limited as Intercreditor Agent and Hotel Facility Agent and Project Facility Agent and others.(4) |
| 10.6.5.1 | Deed of Appointment and Priority Deed of Amendment, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company, Certain Financial Institutions as Original First Ranking Lenders, Certain Financial Institutions as Original Hedging Counterparties, Banco Nacional Ultramarino, S.A. as Second Ranking Finance Party, Wynn Group Asia, Inc. as Third Ranking Finance Party, Societe Generale Asia Limited as Security Agent, Societe Generale Asia Limited as Intercreditor Agent , Societe Generale Asia Limited as Hotel Facility Agent and Project Facility Agent, and Others.(8) |
| 10.6.6 | Floating Charge (unofficial English Translation), dated September 14, 2004 between Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as the Security Agent.(4) |

142

Table of Contents

| | |
|---|---|
| 10.6.7 | Debenture, dated September 14, 2004 between Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as the Security Agent.(4) |
| 10.6.8.0 | Wynn Resorts Support Agreement, dated September 14, 2004 between Wynn Resorts, Limited, Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as the Security Agent.(4) |
| 10.6.8.1 | Wynn Resorts Support Agreement Deed of Amendment, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as Security Agent.(8) |
| 10.6.9 | Wynn Pledgors' Guarantee, dated September 14, 2004 between Wynn Group Asia, Inc., Wynn Resorts International, Ltd., Wynn Resorts (Macau) Holdings, Ltd. and Wynn Resorts (Macau), Ltd. as Guarantors; and Societe Generale, Hong Kong Branch as the Security Agent.(4) |
| 10.6.10 | Bank Guarantee Reimbursement Agreement, dated September 14, 2004, between Wynn Resorts (Macau), S.A. and Banco Nacional Ultramarino.(4) |
| 10.6.11 | Sponsors' Subordination Deed, dated September 14, 2004 between Wynn Resorts (Macau), S.A., Wynn Group Asia, Inc., Wynn Resorts International, Ltd., Wynn Resorts (Macau) Holdings, Ltd. and Wynn Resorts (Macau), Ltd. as the Wynn Companies and Societe Generale, Hong Kong Branch as the Security Agent.(4) |
| 10.7.0 | Amended and Restated Master Disbursement Agreement, dated as of October 25, 2007, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the initial Bank Agent, and Deutsche Bank Trust Company America, as the initial Disbursement Agent.(14) |
| 10.7.1 | First Amendment to Amended and Restated Master Disbursement Agreement, dated as of October 31, 2007, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the initial Bank Agent, and Deutsche Bank Trust Company America, as the initial Disbursement Agent.(12) |
| 10.7.2 | Second Amendment to Amended and Restated Master Disbursement Agreement, dated as of November 6, 2007, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent.(13) |
| 10.7.3 | Third Amendment to Amended and Restated Master Disbursement Agreement, dated October 19, 2009, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent.(24) |
| 10.7.4 | Fourth Amendment to Amended and Restated Master Disbursement Agreement, dated April 28, 2010, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent.(28) |
| 10.7.5 | Fifth Amendment to the Amended and Restated Master Disbursement Agreement, dated August 4, 2012, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent.(46) |
| 10.7.6 | Sixth Amendment to Amended and Restated Master Disbursement Agreement, dated March 12, 2012, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent.(39) |
| 10.8.1 | Amended and Restated Agreement of Lease made as of March 18, 2010, by and between Wynn Las Vegas an Stephen A. Wynn.(27) |
| 10.8.1.1 | First Amendment to Amended and Restated Agreement of Lease, dated as of April 9, 2012, by and between Wynn Las Vegas, LLC and Stephen A. Wynn.(40) |
| 10.8.2.1 | Fifth Amended and Restated Art Rental and Licensing Agreement, dated as of July 1, 2007, between Stephen A. Wynn, as lessor, Wynn Gallery, LLC, as lessee.(37) |
| 10.8.2.2 | Sixth Amended and Restated Art Rental and Licensing Agreement, dated as of July 1, 2012 between Stephen A. Wynn, as lessor, Wynn Las Vegas, LLC, as lessee.(42) |

143

**Table of Contents**

10.9.1.1    Acknowledgement and Agreement, dated as of September 1, 2004, among Wynn Las Vegas, LLC, Wells Fargo Bank, National Association and the lenders named therein.(6)

10.9.2.0    Aircraft Time Sharing Agreement dated as of November 25, 2002, by and between Las Vegas Jet, LLC and Stephen A. Wynn.(33)

10.9.2.1    Amendment No. 1 to Aircraft Time Sharing Agreement, entered into as of January 1, 2004, by and between Las Vegas Jet, LLC and Stephen A. Wynn.(33)

10.9.2.2    Amendment No. 2 to Aircraft Time Sharing Agreement, entered into as of October 31, 2009, by and between Las Vegas Jet, LLC and Stephen A. Wynn.(33)

10.9.3.0    Aircraft Time Sharing Agreement dated as of November 26, 2002, by and between Las Vegas Jet, LLC and Marc Schorr.(33)

10.9.3.1    Amendment No. 1 to Aircraft Time Sharing Agreement, entered into as of January 1, 2004, by and between Las Vegas Jet, LLC and Marc Schorr.(33)

10.9.3.2    Amendment No. 2 to Aircraft Time Sharing Agreement, entered into as of October 31, 2009, by and between Las Vegas Jet, LLC and Marc Schorr.(33)

10.9.4     Aircraft Purchase Option Agreement, dated January 3, 2013, between Wynn Resorts, Limited and Stephen A. Wynn.(46)

10.10.1.0   Amended and Restated Credit Agreement, dated as of August 15, 2006 among Wynn Las Vegas, LLC, as the Borrower, several lenders and agents, and Deutsche Bank Trust Company Americas, as Administrative Agent.(10)

10.10.1.1   First Amendment to Amended and Restated Credit Agreement dated April 9, 2007 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006.(11)

10.10.1.2   Second Amendment to Amended and Restated Credit Agreement dated October 31, 2007 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantors, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006.(12)

10.10.1.3   Third Amendment to Amended and Restated Credit Agreement dated as of September 17, 2008 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantor, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas, LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006. (17)

10.10.1.4   Fourth Amendment to Amended and Restated Credit Agreement, dated as of April 17, 2009, among Wynn Las Vegas, LLC and Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantors, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006.(22)

144

Table of Contents

| | |
|---|---|
| 10.10.1.5 | Fifth Amendment to Amended and Restated Credit Agreement, dated as of September 10, 2009, among Wynn Las Vegas, LLC and Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantors, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006. (23) |
| 10.10.1.6 | Sixth Amendment to Amended and Restated Credit Agreement dated as of April 28, 2010 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantor, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent.(28) |
| 10.10.1.7 | Seventh Amendment to Amended and Restated Credit Agreement dated as of August 4, 2010 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantor, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas, LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006.(30) |
| 10.10.1.8 | Eighth Amendment to Amended and Restated Credit Agreement dated as of March 12, 2012 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantor, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas, LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006.(39) |
| 10.11.1 | Agreement, dated as of June 13, 2002, by and between Stephen A. Wynn and Wynn Resorts, Limited.(2) |
| 10.11.2 | Tax Indemnification Agreement, effective as of September 24, 2002, by and among Stephen A. Wynn, Aruze USA, Inc., Baron Asset Fund on behalf of the Baron Asset Fund Series, Baron Asset Fund on behalf of the Baron Growth Fund Series, Kenneth R. Wynn Family Trust dated February 20, 1985, Valvino Lamore, LLC and Wynn Resorts, Limited.(1) |
| 10.11.3 | Form of Indemnity Agreement.(5) |
| 10.11.4 | Management Agreement, made as of December 14, 2004, by and among Wynn Las Vegas, LLC, Wynn Show Performers, LLC, Wynn Las Vegas Capital Corp., Wynn Golf, LLC, World Travel, LLC, Las Vegas Jet, LLC, Wynn Sunrise, LLC, and Wynn Resorts, Limited.(7) |
| 10.11.5 | Management Fees Subordination Agreement, dated as of December 14, 2004, by Wynn Resorts, Limited, Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., and those subsidiaries of Wynn Las Vegas, LLC listed on Exhibit A hereto in favor of Deutsche Bank Trust Company Americas, as administrative agent, and U.S. Bank National Association, as trustee.(7) |
| 10.11.6 | Redemption Price Promissory Note, dated February 18, 2012, made by Wynn Resorts, Limited to Aruze USA, Inc.(38) |
| 10.11.7 | Registration Rights Agreement, dated as of March 12, 2012, by and among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp, Wynn Show Performers, LLC, Wynn Golf, LLC, Las Vegas Jet, LLC, World Travel, LLC, Wynn Sunrise, LLC, Kevyn, LLC, Deutsche Bank Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities LLC.(39) |
| 21.1 | Subsidiaries of the Registrant.(46) |

145

Table of Contents

| | |
|---|---|
| 23.1 | Consent of Ernst & Young LLP.(46) |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.(46) |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.(46) |
| 32.1 | Certification of CEO and CFO pursuant to 18 U.S.C. Section 1350.(46) |
| 101 | The following financial information from the Company's Annual Report on Form 10-K for the year ended December 31, 2012, filed with the SEC on March 1, 2013 formatted in Extensible Business Reporting Language (XBRL): (i) the Consolidated Statements of Income for the years ended December 31, 2012, 2011 and 2010, (ii) the Consolidated Balance Sheets at December 31, 2012 and December 31 2011, (iii) the Consolidated Statements of Cash Flows for the years ended December 31, 2012, 2011 and 2010, (iv) the Consolidated Statements of Stockholders' Equity at December 31, 2012, 2011 and 2010, (v) the Consolidated Statements of Comprehensive Income for the years ended December 31, 2012, 2011 and 2010 and (vi) Notes to Consolidated Financial Statements.(46) |

---

* Denotes management contract or compensatory plan or arrangement.
(1) Incorporated by reference from Amendment No. 4 to the Form S-1 filed by the Registrant on October 7, 2002 (File No. 333-90600).
(2) Incorporated by reference from Amendment No. 1 to the Form S-1 filed by the Registrant on August 20, 2002 (File No. 333-90600).
(3) Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on August 3, 2004.
(4) Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on November 4, 2004.
(5) Incorporated by reference from Amendment No. 3 to the Form S-1 filed by the Registrant on September 18, 2002 (File No. 333-90600).
(6) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 8, 2004.
(7) Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 15, 2005.
(8) Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on November 8, 2005.
(9) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 4, 2008.
(10) Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on November 9, 2006.
(11) Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on August 9, 2007.
(12) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 1, 2007.
(13) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 13, 2007.
(14) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on October 31, 2007.
(15) Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 1, 2007.
(16) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 15, 2008.
(17) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 19, 2008.
(18) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on May 7, 2008.
(19) Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 2, 2009.
(20) Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on May 11, 2009.
(21) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 9, 2009.
(22) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on April 21, 2009.
(23) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 14, 2009.
(24) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on October 20, 2009.
(25) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on January 6, 2010.
(26) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on February 5, 2010.
(27) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 19, 2010.
(28) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on April 28, 2010.
(29) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on May 18, 2010.
(30) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on August 5, 2010.
(31) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 26, 2010.
(32) Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on December 15, 2010.

146

Table of Contents

(33)    Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 1, 2010.
(34)    Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on February 28, 2011.
(35)    Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on August 18, 2011.
(36)    Incorporated by reference from the Form S-8 Registration Statement filed by the Registrant on July 27, 2010.
(37)    Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 1, 2011.
(38)    Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on February 21, 2012.
(39)    Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 13, 2012.
(40)    Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on April 12, 2012.
(41)    Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on May 2, 2012.
(42)    Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on November 9, 2012.
(43)    Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 12, 2011.
(44)    Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on February 29, 2012.
(45)    Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on December 14, 2012.
(46)    Filed herewith.

147

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**WYNN RESORTS, LIMITED**

Dated: March 1, 2013                        By    /s/ Stephen A. Wynn
                                                  Stephen A. Wynn
                                                  Chairman of the Board and Chief Executive
                                                  Officer (Principal Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Stephen A. Wynn<br>Stephen A. Wynn | Chairman of the Board and Chief Executive Officer (Principal Executive Officer) | March 1, 2013 |
| /s/ John Hagenbuch<br>John Hagenbuch | Director | March 1, 2013 |
| /s/ Ray R. Irani<br>Dr. Ray R. Irani | Director | March 1, 2013 |
| /s/ Robert J. Miller<br>Robert J. Miller | Director | March 1, 2013 |
| /s/ Alvin Shoemaker<br>Alvin V. Shoemaker | Director | March 1, 2013 |
| /s/ Edward J Virtue<br>Edward J Virtue | Director | March 1, 2013 |
| /s/ D. Boone Wayson<br>D. Boone Wayson | Director | March 1, 2013 |
| /s/ Elaine P. Wynn<br>Elaine P. Wynn | Director | March 1, 2013 |
| /s/ Matt Maddox<br>Matt Maddox | Chief Financial Officer and Treasurer (Principal Financial and Accounting Officer) | March 1, 2013 |

148

# EXHIBIT 10

# The New York Times

# War at Wynn Opens a Legal Can of Worms

**By Peter J. Henning**

February 27, 2012 3:35 pm

What the Deal Professor described as an "all-out war" between Wynn Resorts and Kazuo Okada, the Japanese pachinko machine magnate who has been ousted as a director and shareholder, is not just a boardroom battle over control of the company.

Wynn's accusations that Mr. Okada may have violated the Foreign Corrupt Practices Act means the Justice Department and the Securities and Exchange Commission will be scouring the company's books for possible violations, a front that neither side can control.

By invoking the specter of overseas bribery, Wynn has effectively opened itself up to a wide-ranging federal investigation of its dealings in Macao and elsewhere. Combined with the lawsuit it filed against Mr. Okada, the company most likely will face soaring legal costs over the next year or two as it deals with the fallout from the dispute.

**White Collar Watch**

**View all posts**

Mr. Okada owned 19.66 percent of Wynn until the company forcibly moved to redeem his shares at a 30 percent discount earlier this month because of its determination that he did not meet the "suitability" requirement for an investor in a Nevada casino. Wynn released a report prepared by Louis J. Freeh, a former F.B.I. director, and his law firm asserting there was evidence Mr. Okada engaged in "prima facie violations" of the Foreign Corrupt Practices Act, a conclusion he strongly disagrees with. The report describes $110,000 in benefits purportedly

provided by Mr. Okada to Philippine casino regulators and potential benefits of about $5,000 to South Korean officials.

Mr. Okada has been seeking to build a $2 billion casino complex in the Philippines, but had been rebuffed in his attempt to get Wynn to participate in the project. The growing dispute between Mr. Okada and Wynn marked the end of the once-close relationship he had with Stephen A. Wynn, the billionaire who controls the company.

The first salvo in the battle between Mr. Okada and Wynn was fired in January, when he sued the company to gain access to records relating to its $135 million donation to the University of Macao, where the company has a large casino. Wynn disclosed that the S.E.C. had asked the company to preserve its records related to the donation as part of an informal inquiry.

An initial issue that investigators will have to determine is whether these transactions violated the Foreign Corrupt Practices Act. While it is described as a bribery statute, the act also covers gifts given for the purpose of influencing in any way the acts or decisions of a foreign official, so a charitable donation could result in a violation.

Wynn's donation does not fit the usual pattern for a violation of the Foreign Corrupt Practices Act, however, because it was a highly public gift, including a ceremony attended by, among others, Mr. Okada. Investigators will look at the reasons for the donation, and whether it was made as a result of any pressure from public officials in Macao. It is not a defense to a charge that the payment was made in response to requests by a local government.

The information about the benefits that Mr. Okada is accused of providing raise a different question regarding the applicability of the Foreign Corrupt Practices Act. Under the law, a company that issues securities in the United States, or any citizen or resident of this country, comes within the prohibition on overseas bribery. A third category in the statute reaches payments made by any person "while in the territory of the United States," so that transactions that involve an American subsidiary or transfers through a United States financial institution could be covered by the law.

Mr. Freeh's report describes benefits provided to Philippine casino regulators for "high-roller" rooms at Wynn Resorts Macao and other expenses that were paid through a "ledger account" that Mr. Okada maintained with the company, paid for by him and created "for billing conveniences related to charges incurred at various Wynn Resorts locales."

Whether there is any direct tie between benefits that Mr. Okada provided abroad and conduct in the United States is unclear. He has a Nevada-based company through which he owned his Wynn shares before their redemption, and it also has an equity interest in the Philippine gambling operation. None of the benefits were provided at Wynn's Nevada properties.

The only apparent connection to the United States is Mr. Okada's use of his Wynn "ledger account" to pay for the rooms and expenses, which resulted in entries on the company's records in the United States. But this does not appear to have involved any misuse of corporate assets, only funds provided by Mr. Okada that were maintained with the company, almost like a personal account in which Wynn acted as the bookkeeper.

Even if these transactions did not violate the Foreign Corrupt Practices Act, federal investigators are unlikely to limit themselves to just the University of Macao donation and Mr. Okada's dealings with Philippine casino regulators. For example, the Las Vegas Sands Corporation has disclosed that the S.E.C. and Justice Department are investigating whether it violated the act related to its Macao casino, and there is a possibility that Wynn's operation there will be subjected to similar scrutiny.

Once an investigation is opened, it takes on a life of its own and can go in any direction, so Wynn should be prepared to deal with the S.E.C. and Justice Department for quite a while. Legal fees for the company and its directors in this type of investigation can grow quickly, as Avon has learned as it disclosed spending $95 million in 2010 dealing with a Foreign Corrupt Practices Act investigation that has been going on since 2008.

Wynn will also see burgeoning legal costs from its lawsuit against Mr. Okada, filed in Nevada state court, alleging breach of fiduciary duty and other violations.

He is sure to litigate his removal from the company's board and the redemption of his shares at a substantial discount to the current market price.

Not only does Wynn have to pay its own lawyers, but it may have to pay for Mr. Okada's legal counsel in defending against the company's lawsuit. Wynn's articles of incorporation are typical of publicly traded companies by providing for indemnification of legal fees resulting from litigation related to a director's conduct. By accusing him of breaching his fiduciary duty as a director, the company may be on the hook for any costs in defending against its lawsuit.

In addition, the indemnification provision covers government investigations, so to the extent the S.E.C. and Justice Department scrutinize Mr. Okada for his actions as a director of Wynn, the company may be responsible for paying those legal fees as well.

The indemnification provision has an interesting limitation that does not require the company to pay legal fees for any actions related to a person's "capacity as a stockholder, including, but not limited to, in connection with such person being deemed an unsuitable person."

Wynn could try to avoid paying Mr. Okada's lawyers by claiming that the cases relate to his suitability as an investor in a Nevada casino. Whether that argument can succeed remains to be seen, and asserting this ground would generate additional litigation over the availability of indemnification – for which the company might also have to pay for his lawyers, too.

For Wynn, this is only the beginning of its battles as it faces a potentially lengthy investigation by the S.E.C. and Justice Department along with protracted litigation with Mr. Okada. The company may well see its legal costs take a sizable bite out of profits over the next few quarters.

Peter J. Henning, a professor at Wayne State University Law School, is a co-author of "Securities Crimes (2d edition)." Twitter: @peterjhenning

© 2014 The New York Times Company

# EXHIBIT 11

WSJ
<h4>WSJ on Facebook</h4><div style="border: none; padding: 2px 3px;" class="fb-like" data-href="http://www.facebook.com/wsj" data-send="false" data-layout="button_count" data-width="250" data-show-faces="false" data-action="recommend"></div>
<h4>WSJ on Twitter</h4><a href="https://twitter.com/wsj" class="twitter-follow-button" data-show-count="true">Follow @wsj</a>
WSJ LIVE
WSJ Live on Facebook
WSJ Live on Twitter
MARKETWATCH
MarketWatch on Facebook
MarketWatch on Twitter
BARRON'S
Barron's on Facebook
Barron's on Twitter
Membership
Member on Facebook
Member on Twitter
DJX
Product X on Facebook
Product X on Twitter
RT
F
R&C
PE&VC
WSJ
B
MORE
WSJ Portfolio
WSJ Secure
BigCharts
Financial News
Professor Journal
Student Journal
Virtual Stock Exchange
WSJ Classifieds
WSJ Classrooms
WSJ Radio
WSJ Wine



News, Quotes, Companies, Videos    SEARCH

**BUSINESS**                    Michael's Journal    Live Help

TOP STORIES IN BUSINESS    1 of 12

Secret of New Veggie Burgers: Plant Blo...

2 of 12

Apple Surprised by Partner's Bankruptcy

3 of 12
Wellness Programs Get a Health Check

4 of 12
New Car Fuel Economy Hits Record



Business
In Wynn's Macau Deal, a Web of Political Ties

Email    Print    7Comments

By KATE O'KEEFFE

July 1, 2012 2:58 p.m. ET



The Macau government's decision in May to grant Wynn Resorts Ltd. WYNN +1.38% land rights for a $4 billion casino-resort has paved the way for what Chairman Steve Wynn has called "the single most important project" in the company's history.

The decision also has triggered a $50 million payment by Wynn Resorts to a little-known Macau company as part of a complex deal whose seven-year history has involved the Chinese territory's former top official, his close associate and a businessman from a prominent Beijing family, according to public records, Wynn executives and company documents reviewed by The Wall Street Journal.

The deal's history and the connections among the companies and people involved open a window on business dealings in the booming Chinese gambling enclave of Macau, which generates more than five times as much gambling revenue as the Las Vegas strip.

To expand in Macau, U.S. casino operators have had to grapple with a complicated and opaque government approval process. On occasion, those efforts have drawn U.S. government scrutiny. Wynn said in February that the Securities and Exchange Commission was investigating a pledge it made last year to donate $135 million to the University of Macau. The company said the donation was made in accordance with all applicable laws and was consistent



Steve Wynn  UPI Photo/Alexis C. Glenn

with the company's tradition of philanthropy. The university's top academic official said Wynn's gift will support activities at the school's Asia-Pacific Academy of Economics and Management.

Meanwhile, Wynn rival Las Vegas Sands LVS +1.13% has said it is under investigation by both the SEC and the Justice Department for possible violations of the Foreign Corrupt Practices Act, which bans bribery by U.S. companies abroad. Las Vegas Sands says it is cooperating with investigators.

Macau land deals also are facing scrutiny at home. In late May, the Chinese territory's top court found a former top government official guilty of helping a Hong Kong property mogul win land rights in return for a $2.5 million bribe in 2005.

In a lengthy lunch interview at Wynn Macau's Cafe Esplanada last month, Mr. Wynn, flanked by two senior lawyers, two Wynn Macau Ltd. board members, two bodyguards and his wife, said that it was Edmund Ho, Macau's former top official, who sparked the

Popular Now                    What's This?

ARTICLES

land-deal discussions. Edmund Ho was the first chief executive of Macau after Portugal handed it over to China in 1999, and he held the post for a decade.



High Rollers

Last year's Macau's casinos raked in $33.5 billion in gaming revenue, or more than five times that of the Las Vegas Strip.

Enlarge Image

Mr. Wynn said he had been "bugging" the city's leader about getting land in the space-starved territory for another casino project. Edmund Ho told him about a plot that had been earmarked for a person named Ho Ho, Mr. Wynn said, and provided Ho Ho's phone number to a Wynn staff member, who set up a meeting in Wynn's Macau offices. A Wynn lawyer said the company doesn't believe the Messrs. Ho are related.

According to a document dated Aug. 25, 2005, and signed by Stephen A. Wynn and Ho Ho, Wynn Resorts agreed to jointly pursue rights to the site in Macau's Cotai area with a company controlled by Ho Ho. The company, called Cia. de Entretenimento e Investimento Chinese Limitada, is 90% owned by Ho Ho, with prominent Macau businessman Cliff Cheong owning the rest, according to Macau public records. Both men list Mr. Cheong's office as their residential address in Macau.

While Ho Ho is little-known in Macau, Mr. Cheong has close connections to one of the city's most powerful people, Edmund Ho. A representative for Mr. Cheong, who is involved in the junket business, said he wasn't available to comment. Junkets are middlemen who bring Chinese gamblers to Macau and account for three-quarters of the city's gambling revenue.

Mr. Cheong's relationship with Edmund Ho was outlined in a lawsuit that he and two associates filed against Las Vegas Sands. The suit alleged that Mr. Cheong and his associates were owed money for helping Las Vegas Sands win a casino license in Macau. The casino company paid the three men $42.5 million to settle the suit in June 2009, according to its 2009 annual report.

In the suit in Clark County District Court in Nevada, Mr. Cheong testified that he served as a key liaison between Macau's chief executive and Las Vegas Sands during the final hours of the casino-license bidding in 2002.

One of Mr. Cheong's associates in the suit, Dax Turok, told the court that Mr. Cheong "had his finger on the pulse all the time" on Macau policy because of his close relationship with Edmund Ho. Mr. Cheong was also a member of the advisory committee on the handover of Macau to China, Mr. Turok said.



Enlarge Image

Wynn resorts in Macau. The Macau government decided in May to grant Wynn Resorts Ltd. land rights for a $4 billion casino-resort. *Associated Press*

Mr. Wynn told the Journal that he has never heard of Mr. Cheong. He also said his company vetted Ho Ho and his associates thoroughly because he and other executives were very aware of the Foreign Corrupt Practices Act.

"This whole business of the Foreign Corrupt Practices Act—we were schooled in this," Mr. Wynn said. "Right away we started checking everybody with Mr. Ho Ho, and everybody came up dandy." He also said that he is confident none of the deal were government officials. "Edmund told me they are upstanding people from Beijing families," Mr. Wynn said, declining to elaborate further. The company hasn't been accused of wrongdoing in the Macau deal.

The Journal was unable to locate records showing the land was ever owned by Ho Ho. Wynn Resorts' contract for the land shows Wynn as the first official owner of the plot. Ho Ho, whose given name means river in Chinese, couldn't be located.

A representative for Edmund Ho, who is now vice chairman of the Chinese People's Political Consultative Conference, China's top political advisory body, declined to comment.

In May 2006, Wynn and its partners established a joint venture called Cotai Land Development Co., according to Macau public records. Mr. Wynn, Marc Schorr, the casino company's chief operating officer, and Ho Ho were the company's three directors. Under the arrangements, according to a company document reviewed by the Journal, Wynn Resorts would pay another company controlled by Ho Ho $35 million as a "one-time finder's fee" when the venture secured land rights for the casino from the government.

Two years later, as the global economic crisis brewed and China cut back visas allowing its citizens to visit Macau, Wynn Resorts sought to dissolve the agreement, Mr. Wynn said. As an inducement for its partners, Wynn agreed to pay an additional $15 million to Ho Ho and his associates to walk away once Wynn got the land rights, according to Mr. Wynn and a company document reviewed by the Journal.

Wynn disclosed the deal in a September 2009 statement to the SEC in which the company said it had agreed to pay $50 million to its partner for the "relinquishment of certain rights with respect to its business interests."



1   **Secret of New Veggie Burgers: Plant Blood**

2   **WSJ+** Win an unforgettable trip for two to Nashville. Where: Nationwide   When: Enter before midnight on October 31, 2014   Learn more ▶   *Nashville MUSIC CITY*

3

4   **Dallas Ebola Patient Dies** 

5   **'Maximizer' or 'Satisficer'—Which Are You?** 

**VIDEO**

1   **NASA Is Considering Deep Sleep for Human Mars Mission** 

2   **Inside a Russian Billionaire's $300 Million Yacht** 

3   **Lunar Eclipse Turns Moon Blood Red** 

4   **Paper Airplane to Drone in 60 Seconds** 

5   **Turkey Idle as Strikes Hit Islamic State in Kobani** 



**Customer Service**

Customer Center

New! Live Help

Contact Us

WSJ Weekend

**Policy**

Privacy Policy

Cookie Policy

Data Policy

Copyright Policy

Back to Top

The SEC filing identified a Macau company called Tien Chiao Entertainment Ltd. as Wynn's partner. Though neither Ho Ho's nor Cliff Cheong's name is mentioned in the public records for the company, Wynn lawyers and corporate documents indicate that Ho Ho controls Tien Chiao, whose shareholders are listed as Ho Ho's brother and a man with a business registered at Mr. Cheong's office.

In later disclosures, Wynn said the $50 million payment would go to a third party unrelated to Wynn.

Macau's Department of Public Works, which granted the land to Wynn, declined to comment.

Mr. Wynn said he also got Macau to agree to give him a contiguous plot of land instead of the plot initially under discussion, which was divided by a road. Mr. Wynn said he had earlier been troubled by this layout: "How are we gonna do something sexy with a street going through the middle?" he remarked.

—Alexandra Berzon contributed to this article.

Email    Print    7 Comments    Order Reprints

## WSJ In-Depth

Contact Directory

Corrections



Ads

Advertise
Place an
Sell Your
Sell You
Commerc
Recruit
Franchis

Advertise Locally

More

Reprints

Content Partnerships

Conferences

SafeHouse

Mobile Site

Price & Volume

Keyword & Symbol

News Archive

Subscriber Agreement
& Terms of Use

Old Portfolio

Jobs at WSJ



**Wellness Programs Get a Health Check**



**What's Next for Hong Kong**



**California Drought Produces Tastier Wine Grapes**





**GOP Senate Races Get Cash Infusion**



**Why the NFL Commissioner Has Survived**



**Startups Spend With Abandon**



SPONSORED RESULTS

- High-Yield CD Rates
- Best Stocks To Buy
- Dividend Stocks To Buy
- Best Stocks To Invest
- 10 Best Dividend Stocks

- 10 Stocks To Own
- High Yield Savings Account
- High Yield Bond Funds
- Top Stocks To Buy Now
- 2014 Luxury Sedans

**Upgrade your browser to join the discussion**

7 comments

Copyright ©2014 Dow Jones & Company, Inc. All Rights Reserved.

# EXHIBIT 12

Electronically Filed
04/08/2013 03:20:04 PM

**CLERK OF THE COURT**

1  DANIEL G. BOGDEN
   United States Attorney
2
3  RUSSELL E. MARSH (Bar No. 11198)
   ROGER WENTHE (Bar No. 8920)
4  Assistant United States Attorneys
   333 Las Vegas Blvd., South, Ste. 5000
5  Las Vegas, NV 89101
   (702) 388-6336
6
7  JEFFREY H. KNOX
   Chief, Fraud Section, Criminal Division
8  U.S. Department of Justice
9  JOEY LIPTON
   Trial Attorney
10 1400 New York Ave., NW
   Washington, DC 20005
11 (202) 514-0839
12
   Attorneys for Proposed Intervenor
13 United States of America

14                    DISTRICT COURT

15                 CLARK COUNTY, NEVADA

16 WYNN RESORTS, LIMITED, a Nevada        Case No.:   A-12-656710-B
   Corporation,
17                                         Dept. No.:   XI
                        Plaintiff,
18 vs.                                     **UNITED STATES OF AMERICA'S
                                           MOTION TO INTERVENE AND FOR
19 KAZUO OKADA, an individual, ARUZE       TEMPORARY AND PARTIAL STAY OF
   USA, INC., a Nevada corporation, and    DISCOVERY AND FOR ORDER
20 UNIVERSAL ENTERTAINMENT CORP.,          SHORTENING TIME**
   a Japanese corporation,
21                                         Date of Hearing:
                        Defendants,
22                                         Time of Hearing:
   and
23
   UNITED STATES OF AMERICA,
24
                        Proposed Intervenor.
25
26 AND ALL RELATED CLAIMS
27
28

                              2

Proposed intervenor, the United States of America (the "government"), by and through its undersigned attorneys, hereby moves the Court, pursuant to Rules 24 and 26 of the Nevada Rules of Civil Procedure, Rule 12.130 of the Nevada Revised Statutes, and Rule 2.26 of the Rules of Practice for the Eighth Judicial District Court, for permission to intervene, for a temporary and partial stay of discovery, and for an order shortening time, in the above-captioned civil action.

The basis for this motion is that the government is conducting a criminal investigation into the same matters that form the basis of this civil action. Due to the substantial overlap between the facts at issue in the civil litigation and the ongoing criminal investigation, permitting civil discovery to proceed, without limitation, risks interfering with and potentially compromising the criminal investigation. To further the public interest and the interests of justice in ensuring the integrity and effectiveness of the criminal investigation, the government requests that the Court enter a temporary and partial stay of discovery in this action until the completion of the criminal investigation and any resulting prosecution. To ensure that the government makes every effort to investigate the matter in a diligent and expeditious manner, and so as not to delay civil discovery any longer than is necessary for the legitimate needs of the criminal investigation and any resulting prosecution, the government requests that the Court set a control date of approximately six months, in order for the government to advise the Court of the progress and status of the investigation, and explain whether the stay should remain in force or expire, and the reasons why. Given the government and public's significant interest in ensuring that the integrity of the criminal investigation remains uncompromised, and the fact that the requested relief implicates the interests of the parties and the Court, there is good cause to justify an order shortening time to hear the government's motion.

The government has contacted counsel for the parties to advise them of the motion and confer with them regarding the requested relief. The plaintiff has advised that it consents to the government's motion to intervene and for a temporary and partial stay of discovery. The defendants have advised that they are likely to oppose the motion in whole or in part.

This motion is supported by the attached Memorandum of Points and Authorities, an *ex parte* Declaration submitted *in camera* and under seal, the papers and pleadings on file herein, and any oral argument the Court may choose to hear.

DATED this 5th day of April, 2013.

Respectfully submitted,

DANIEL G. BOGDEN
United States Attorney

/s/ Russell E. Marsh
RUSSELL E. MARSH
ROGER WENTHE
Assistant United States Attorneys

JEFFREY H. KNOX
Chief, Fraud Section
Criminal Division, U.S. Department of Justice

/s/ Joey Lipton
JOEY LIPTON
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice

Attorneys for Proposed Intervenor
United States of America

## ORDER SHORTENING TIME

TO:     ALL INTERESTED PARTIES; and

TO:     THEIR RESPECTIVE ATTORNEYS OF RECORD:

FOR GOOD CAUSE SHOWN PLEASE TAKE NOTICE that the above-referenced United States of America's Motion to Intervene and for Temporary and Partial Stay of Discovery will come on for hearing in Dept. XI of the above-entitled Court on the 16th day of April, 2013, at 8:30 a.m.

Dated this 5th day of April, 2013.

_____
DISTRICT COURT JUDGE, DEPT. XI
**ELIZABETH GONZALEZ**

4

1

<u>**DECLARATION OF JOEY LIPTON**</u>

2

JOEY LIPTON, being first duly sworn, states as follows:

3   1.   I am a Trial Attorney for the Fraud Section of the Criminal Division of the United

4 States Department of Justice in Washington, DC.  I have been assigned to represent the United

5 States in this matter.

6   2.   This Declaration is submitted in support of the United States of America's Motion

7 for Order Shortening Time to hear the United States of America's Motion to Intervene and For

8 Temporary and Partial Stay of Discovery, and the United States of America's Motion to File

9 Under Seal *Ex Parte* Declaration in Support of Motion to Intervene and For Temporary and Partial

10 Stay of Discovery.

11   3.   The government is seeking to intervene in this civil action to seek a temporary and

12 partial stay of discovery in order to prevent interference with an ongoing federal criminal

13 investigation into the same matters that form the basis of this civil action.  That motion is

14 supported by an *ex parte* declaration that the government seeks to file under seal.  As set forth in

15 the government's motion, the government and the public have a significant interest in ensuring that

16 the integrity of the criminal investigation remains uncompromised.  Those interests must be

17 considered in conjunction with the interests of the parties and the Court.  Shortening time to hear

18 the government's motions will give appropriate effect to those interests.

19   4.   Under the circumstances, there is good cause to justify an order shortening time to

20 hear the government's motion.

21   I declare under penalty of perjury under the law of the State of Nevada that the

22 foregoing is true and correct.

23

Dated:   April 5, 2013                          _____

24                                                  Joey Lipton

25

26

27

28

5

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION**

The United States of America (the "government") requests permission to intervene in this civil action for the limited purpose of requesting that the Court impose a temporary and partial stay of discovery in order to protect the substantial public interests at stake in the criminal investigation being conducted by the government arising out of the same facts and circumstances that form the basis of the civil action.  It is alleged in this civil action that Kazuo Okada, his companies, and their associates were engaged in unethical, unlawful, and potentially criminal activities in connection with a casino resort being developed by Okada, his companies, and their associates in the Republic of the Philippines (the "Philippine Casino Project").  The government is currently conducting a criminal investigation into the same allegations involving the Philippine Casino Project.

**II.     BACKGROUND**

**A.      Civil Action**

On February 19, 2012, plaintiff Wynn Resorts, Limited ("Wynn Resorts") filed a complaint against defendants Kazuo Okada, Aruze USA, Inc. ("Aruze USA"), and Universal Entertainment Corp. ("Universal"), alleging violations arising out of potentially unlawful payments made by Okada to gaming regulators in the Philippines, where Okada and his companies are developing a casino resort.  (*See* Compl. at 2.)  As alleged in the complaint, Wynn Resorts, on behalf of its Compliance Committee, retained the former Director of the Federal Bureau of Investigation, Louis J. Freeh, to conduct an independent investigation into Okada's activities.  (*See id.*)  Freeh's report (the "Freeh Report"), which is attached as an exhibit to, and incorporated by reference in, the complaint, identifies a number of payments for lodging, dinners, shopping, and spending money to members of the Philippine Amusement and Gaming Corporation ("PAGCOR"), the entity that regulates gaming in the Philippines.  (*See id.* ¶ 44(a).)  The report also indicates that "Okada's conduct in connection with [the Philippine Casino Project] constitutes *prima facie* evidence of violations of the Foreign Corrupt Practices Act" – the federal law that prohibits, *inter alia*, certain

1   persons and entities from making corrupt payments to foreign officials to obtain or retain business.

2   (*Id.* ¶ 44(a)); *see* 15 U.S.C. § 78dd-1 *et seq.*

3         On October 29, 2012, Wynn Resorts filed an amended complaint containing additional

4   allegations relating to the payments identified in the Freeh Report in connection with the

5   Philippine Casino Project.  The amended complaint alleges that "[s]ince 2008, Okada and his

6   associates have made multiple payments to and on behalf of the Philippines' chief gaming

7   regulators at PAGCOR, the government officials who directly oversee and regulate Okada's

8   licensing agreement to operate in the Philippines." (Am. Compl. ¶ 52(a).)  The amended

9   complaint also alleges that "Okada stated that Universal paid expenses related to then-PAGCOR

10  Chairman [Efraim] Genuino's trip to Beijing during the 2008 Olympics." (*Id.* ¶ 52(d).)  The

11  amended complaint further alleges that "Okada and his associates and companies have also

12  procured land in the Philippines [for the Philippine Casino Project] in a manner that appears to

13  have enabled the evasion of Philippine constitutional and statutory requirements." (*Id.* ¶ 52(j).)

14        On February 27, 2013, Wynn Resorts filed a motion for leave to file its second amended

15  complaint.  The Court has yet to rule on the motion.  The proposed second amended complaint

16  adds further allegations of Okada's purported wrongdoing in connection with the Philippine

17  Casino Project.  In addition to the payments identified in the Freeh Report, the proposed second

18  amended complaint makes the following allegations:

19       In July 2010, reports surfaced in the Philippine press that at the behest of the new
20  [PAGCOR] President, Mr. Naguiat was investigating certain "midnight deals" that
     had been approved by his predecessor.  Specifically, in his final weeks as
21  Chairman, Mr. Genuino, with the support of then-President Arroyo, had caused
     PAGCOR to award several gaming licenses and related concessions on an
22  abnormally expedited basis.  Among the beneficiaries of these deals was Mr.
     Okada, who received a special exemption allowing an Okada-controlled company
23  to take title to the land on which his casino resort was to be built.  Without the
     exemption, Mr. Okada's company would have been subject to Philippine law
24  prohibiting foreign investors from owning land.  A decision by Mr. Naguiat to
     revoke the exemption, therefore, would have significantly impaired Mr. Okada's
25  project in the Philippines.

26  (Proposed 2nd Am. Compl. ¶ 27.)

27               .   .   .   .

28

It has been widely reported in the press that Mr. Okada and his companies are the subject of multiple pending investigations relating to the [Philippine Casino Project]. The FBI, the Nevada Gaming Control Board, and the Philippine Department of Justice, among many other organizations, are reportedly gathering additional evidence that Mr. Okada's companies paid bribes to Philippine gaming regulators at PAGCOR and their associates to facilitate the development of Mr. Okada's [Philippine Casino Project].

At the center of the new evidence that has reportedly come to light is Rodolfo Soriano, a former consultant to PAGCOR and a close business associate of former PAGCOR Chairman Genuino. Mr. Freeh's report to the Wynn Resorts Board in February 2012 described Mr. Soriano as a "bag man" for Mr. Genuino. Mr. Soriano is often referred to by his nickname, "Boysie."

The evidence reportedly uncovered in the ongoing investigations shows that, in or about 2009, Mr. Okada and his companies made a strategic "shift to Boysie" to jumpstart the lagging progress at their Philippine development site. This shift in strategy, it has been reported, involved Okada-controlled companies paying up to $40 million in bribes to companies controlled by Mr. Soriano in order to secure benefits from PAGCOR and the Arroyo administration that were essential to the viability and profitability of Mr. Okada's [Philippine Casino Project]. Of course, the factual circumstances of these transactions were never disclosed to the Wynn Resorts Board despite their unquestionable material effect on the Company's rights and interests.

News reports indicate that on January 14, 2010, Mr. Okada's company transferred $10 million to Subic Leisure and Management ("Subic Leisure"), a Soriano-controlled company registered in the British Virgin Islands. Mr. Okada's company transferred an additional $15 million to Subic Leisure on March 3, 2010, and a further $10 million to Subic Leisure in or about early May 2010. And, it has been reported that Mr. Okada's company transferred $5 million to a Hong Kong shell company named People's Technology Holding Ltd., of which Mr. Soriano was the sole shareholder.

The *Asahi Shimbun*, one of the largest national newspapers in Japan, has reported that these money transfers were reported to senior management at Universal and were approved by its board of directors. According to these *Asahi Shimbun* reports, the money transfers were discussed at a Universal board meeting and expressly approved in a board resolution that Mr. Okada himself signed as the Chairman of Universal. Again, the factual circumstances of these transactions were never disclosed to the Wynn Resorts Board despite their unquestionable material effect on the Company's rights and interests.

Other news reports indicate that in exchange for these illicit payments, between late 2009 and early 2010, Mr. Okada's companies won concessions on three critical issues related to the [Philippine Casino Project]. In November 2009, PAGCOR, through its then-Chairman Genuino, brokered a land swap that Mr. Okada's company needed to move ahead with construction of its casino resort. Then, in or

1    about February 2010, then-Philippine President Arroyo signed a presidential order
2    that permitted foreign investors such as Mr. Okada to have 100-percent ownership
     of casinos.  Finally, around the same time, the Philippine government approved an
3    application for corporate tax relief by Mr. Okada's company.

4    This additional evidence that has reportedly come to light in the ongoing
     government investigations is entirely consistent with and supplements the findings
5    contained in Mr. Freeh's report to the Wynn Resorts Board, as detailed above.  This
     additional evidence is consistent with Mr. Okada's statements to the Wynn Resorts
6    Board in February 2011, discussed above, regarding Mr. Okada's perspective on
     anti-corruption laws and regulations and his willingness to pay bribes through
7    intermediaries while doing business in certain Asian countries. . . .

8    (*Id.* ¶¶ 55-61.[1])

9    **B.    Criminal Investigation**

10            As explained more fully in the *ex parte* declaration submitted *in camera* and under seal in

11   support of this motion, the government has been conducting a criminal investigation into, among

12   other things, the same underlying allegations of misconduct – that is, potential violations of the

13   Foreign Corrupt Practices Act and related fraudulent conduct – that form the basis of this civil

14   action.[2]  Given the nature of the criminal investigation, as well as the secrecy requirements

15   _____

16           [1]      In addition to those allegations, Okada, Aruze USA, and Universal filed a
     counterclaim, which has been amended on two occasions, against Wynn Resorts, each of the
17   members of Wynn Resorts' Board of Directors (other than Okada), and Wynn Resorts' General
     Counsel, which includes allegations of improprieties concerning a donation made by Wynn
18   Macau, a majority owned subsidiary of Wynn Resorts, to the University of Macau Development
     Foundation, consisting of a $25 million payment made in May 2011, and a commitment for
19   additional donations of $10 million each year for 10 years.  (This donation is the subject of a
     separate civil action pending before this Court brought by Okada against Wynn Resorts to compel
20   the production of certain books and records relating to the University of Macau donation, among
     other things.  (*See* Case No. A-12-654522-B).)  As set forth in the *ex parte* declaration, the
21   government also has been conducting a criminal investigation into that conduct.
22
             [2]      It is "widely employed in judicial practice" in Nevada state court for "litigants to
23   deliver materials of possible evidentiary significance to a reviewing court for private or '*in
     camera*' inspection, as a prudential first step in deciding whether to allow opposing litigants access
24   to any part of such materials."  *Whitehead v. Nevada Comm'n On Judicial Discipline*, 110 Nev.
     128, 132, 906 P.2d 230, 233 (1994).  Likewise, in the federal system, it is well established that trial
25   courts have "an inherent power to receive in camera evidence and place such evidence under seal."
     *United States v. $9,041,598.68*, 163 F.3d 238, 251 (5th Cir. 1998) (affirming stay of civil
26   discovery pending criminal trial); *see, e.g., Bureerong v. Uvawas*, 167 F.R.D. 83, 85 (C.D. Cal.
     1996) (granting stay of civil discovery on basis of *ex parte* affidavit filed *in camera* and under
27   seal); *United States v. Downe*, 1993 WL 22126, at *11 n.7 (S.D.N.Y. 1993) (granting stay of civil
28

1   governing disclosure of material obtained during such investigations, *see* Rule 6(e) of the Federal

2   Rules of Criminal Procedure, the government is unable to provide greater detail in this motion.

3       **C.**    **Civil Discovery**

4       The government understands that discovery in this civil action has begun, and that the

5   parties have made disclosures of witnesses and documents, pursuant to Rule 16.1 of the Nevada

6   Rules of Civil Procedure ("NRCP").  The government further understands that in January 2013,

7   both parties made their first requests to the other side for the production of documents, pursuant to

8   NRCP 34, and that a number of the requests focus on the defendants' allegedly unlawful activities

9   in connection with the Philippine Casino Project.  The government understands that the parties

10  have produced a number of documents in response to those requests and they anticipate producing

11  additional documents in the future.

12      The government further understands that in March 2013, the defendants issued subpoenas

13  *duces tecum*, pursuant to NRCP 45, for the depositions of a custodian of records or other qualified

14  person from (a) The Freeh Group International Solutions, LLC ("The Freeh Group"), the

15  consulting firm headed by Freeh at the time he issued his report, (b) Pepper Hamilton, LLP

16  ("Pepper Hamilton"), the law firm that acquired The Freeh Group, and with which Freeh's law

17  firm, Freeh Sporkin & Sullivan, LLP, merged in September 2012, and (c) Moelis Company

18  Holdings, LLC ("Moelis"), the company involved in the valuation of Aruze USA's redeemed

19  shares of Wynn Resorts stock.  The government understands that a number of the document

20  requests to The Freeh Group and Pepper Hamilton focus on the defendants' allegedly unlawful

21  activities in connection with the Philippine Casino Project.

22      The government understands that certain areas of discovery in the civil action do not focus

23  on the defendants' allegedly unlawful activities in connection with the Philippine Casino Project,

24  and therefore would not be implicated by the temporary and partial stay requested by the

25  government.  For instance, it appears that the valuation by Moelis of Aruze USA's redeemed

26  

27  discovery and finding, in response to objection to *ex parte* affidavit filed under seal, that "it is
    well-established that the district court may read *in camera* submissions from the Government

28  where an interest in grand jury secrecy is at issue").

1    shares of Wynn Resorts stock does not involve the allegations concerning the defendants'

2    allegedly unlawful activities in connection with the Philippine Casino Project, and thus discovery

3    into that matter would not impact the government's criminal investigation.  The government is

4    willing to work with the parties and the Court to identify any other areas of discovery in the civil

5    action that do not focus on the defendants' allegedly unlawful activities in connection with the

6    Philippine Casino Project so that any stay is narrowly tailored to the legitimate needs of the

7    criminal investigation.

8        **D.**    **Stay Request**

9          In this case, the government has a compelling interest in ensuring that its criminal

10   investigation proceeds uncompromised in its integrity and remains unimpaired in its execution.

11   This interest encompasses and reflects the public's more general interest in the maintenance of

12   justice and the preservation of the rule of law.  The civil action pending before this Court involves

13   the same subject matter being investigated by the government.  Permitting discovery to proceed in

14   this civil action, without limitation, risks disclosure of the government's proof to an extent not

15   sanctioned by the rules governing criminal proceedings.  Besides the inherent risks presented by

16   this situation, there is also the potential benefit that a stay may offer in terms of reducing

17   redundancy, streamlining discovery, and narrowing legal issues, without unduly burdening the

18   civil parties.

19         Accordingly, the government seeks permission to intervene in this civil action for the

20   limited purpose of temporarily and partially staying discovery until the completion of the criminal

21   investigation and any resulting prosecution.  In this regard, the government is making every effort

22   to investigate the matter in a diligent and expeditious manner.  In light of the instant request, the

23   government requests that the Court set a control date of approximately six months, at which time

24   the government will explain to the Court, in an *ex parte* submission if necessary, whether the stay

25   should remain in force or expire, and the reasons why.  Should the government's investigation

26

27

28

1    terminate prior to any such control date, the government would immediately advise the Court

2    accordingly.[3]

3    **III.    ARGUMENT**

4        **A.    Intervention Is Appropriate Pursuant to the Nevada Rules of Civil Procedure**

5            Rule 24 of the Nevada Rules of Civil Procedure provides that an applicant may intervene in

6    a civil action either as a matter of right or on a permissive basis.[4]  Rule 24(a)(2) provides for

7    intervention as of right "when the applicant claims an interest relating to the property or

8    transaction which is the subject of the action and the applicant is so situated that the disposition of

9    the action may as a practical matter impair or impede the applicant's ability to protect that interest,

10   unless the applicant's interest is adequately represented by the existing parties."  NRCP 24(a)(2).

11   Rule 24(b)(2) provides for permissive intervention "when an applicant's claim or defense and the

12   main action have a question of law or fact in common."  NRCP 24(b)(2).  Here, the government's

13   application satisfies both provisions for intervention.

14           In the federal system, courts routinely permit the United States to intervene in a civil case

15   in order to seek a stay of civil proceedings pending completion of a related criminal matter.  *See*

16   *SEC v. Nicholas*, 569 F. Supp. 2d 1065, 1068 (C.D. Cal. 2008) (collecting cases demonstrating that

17   "numerous courts have allowed the United States Government to intervene in a civil case for the

18   purpose of moving to stay discovery and other proceedings until the resolution of a related

19   criminal case"); *SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1998) (*per curiam*).  This is especially

20   true when there is a parallel criminal proceeding involving a common question of law or fact.  *See*

21

22   _____

23           [3]      The government recognizes that the requested stay of discovery may realistically
     prevent the civil action from being pursued to conclusion in the near term.  The government's
24   request, however, does not seek to stay any other aspects of the civil action, and, to the extent
     possible, will not prevent the parties from engaging in motion practice, mediation, settlement, or
25   any other form of litigation that does not impact the criminal investigation.

26           [4]      Rule 12.130(1)(a) of the Nevada Revised Statutes ("NRS") provides: "Before trial,
     any person may intervene in an action or proceeding, who has an interest in the matter in litigation,
27   in the success of either of the parties, or an interest against both."  Rule 12.130(1)(c) provides:
28   "Intervention is made as provided by the Nevada Rules of Civil Procedure."

1   *In re Flash Memory Antitrust Litig.*, 2007 WL 3119612, at *1 (N.D. Cal. 2007); *Downe*, 1993 WL

2   22126, at *11 (citing *Chestman*, 861 F.2d at 50).

3          While applications in Nevada state court for intervention by the state or federal government

4   appear to be limited, the Nevada Supreme Court has indicated that Nevada state courts may look to

5   the interpretation by federal courts of similar federal rules for guidance in interpreting Nevada's

6   Rules of Civil Procedure.  *See American Home Assur. Co. v. Eighth Jud. Dist. Ct. ex rel. County of*

7   *Clark*, 122 Nev. 1229, 1238 n.28, 147 P.3d 1120, 1126 n.28 (2006) (citing *Lawler v. Ginochio*, 94

8   Nev. 623, 626, 584 P.2d 667, 668-69 (1978)); *Executive Mgmt. v. Ticor Title Ins. Co.*, 118 Nev.

9   46, 53, 38 P.3d 872, 876 (2002) (recognizing that federal decisions involving the federal civil

10  procedure rules are persuasive authority when this court examines its equivalent rules).  Applying

11  that to NRCP 24, the Nevada Supreme Court has looked to the federal courts' interpretation of

12  Rule 24 of the Federal Rules of Civil Procedure – "the equivalent federal rule" – for guidance.

13  *American Home*, 122 Nev. at 1238, 147 P.3d at 1126.[5]

14                **1.      Intervention Is Appropriate As of Right**

15         To intervene as of right under NRCP 24(a)(2), "an applicant must meet four requirements:

16  (1) that it has a sufficient interest in the litigation's subject matter, (2) that it could suffer an

17  impairment of its ability to protect that interest if it does not intervene, (3) that its interest is not

18  adequately represented by existing parties, and (4) that its application is timely.  Determining

19  whether an applicant has met these four requirements is within the district court's discretion."  *Id.*;

20  *see also United States v. Stringfellow*, 783 F.2d 821, 826 (9th Cir. 1986) ("We have adopted a

21  four-part test [virtually identical to the requirements for NRCP 24(a)(2)] to determine whether

22  applications for intervention as of right pursuant to [Fed. R. Civ. P.] 24(a)(2) should be granted.").

23

24  _____

25         [5]      Almost identical to NRCP 24(a)(2), Rule 24(a)(2) of the Federal Rules of Civil
    Procedure permits anyone to intervene as of right "who . . . claims an interest relating to the
26  property or transaction that is the subject of the action and is so situated that disposing of the
    action may as a practical matter impair or impede the movant's ability to protect its interest, unless
27  existing parties adequately represent that interest."  Likewise, NRCP 24(b)(2)'s federal analogue,
    Rule 24(b)(2) of the Federal Rules of Civil Procedure, permits "anyone to intervene who . . . has a
28  claim or defense that shares with the main action a common question of law or fact."

1  In exercising that discretion, courts have indicated that Rule 24 should be construed broadly in

2  favor of intervention. *See State Indus. Ins. Sys. v. Eighth Jud. Dist. Ct. In and For County of*

3  *Clark*, 111 Nev. 28, 32, 888 P.2d 911, 913 (1995) (citing *Scotts Valley Band of Pomo Indians v.*

4  *United States*, 921 F.2d 924, 926 (9th Cir. 1990)); *Washington State Bldg. & Construction Trades*

5  *Council v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982); 7A C. Wright & A. Miller, *Federal*

6  *Practice and Procedure* § 1904.

7      In this case, the government satisfies each of the four requirements.  First, the government

8  has a sufficient interest in the subject matter of the civil action because, as set forth more fully in

9  the *ex parte* declaration, it is virtually identical to the ongoing investigation into possible criminal

10  violations of federal law concerning the defendants' activities in connection with the Philippine

11  Casino Project.  Indeed, the government has a strong and compelling interest in the subject matter

12  given that certain aspects of the pending criminal investigation concern the same alleged facts and

13  circumstances, conduct, and transactions that form the basis of the civil action.

14      Second, "[g]enerally, after finding that a proposed intervenor has a significant protectable

15  interest, courts have 'little difficulty concluding' that the disposition of the case may affect it."

16  *Tucson Women's Ctr. v. Arizona Med. Bd.*, 2009 WL 4438933, at *4 (D. Ariz. 2009) (quoting

17  *California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006)).  "The United

18  States, in its role as criminal prosecutor, 'is so situated that disposing of the [civil] action,'

19  particularly permitting the broad-ranging discovery planned by the civil parties, 'may as a practical

20  matter impair or impede the [government's] ability to protect its interest,' Fed. R. Civ. P. 24(a)(2),

21  specifically, its unique investigative and prosecutorial interests." *Southeast Recovery Group, LLC*

22  *v. BP Am., Inc.*, 278 F.R.D. 162, 167 (E.D. La. 2012).  Courts have explained that the government

23  has a distinct and "discernible interest in intervening in order to prevent discovery in [a] civil case

24  from being used to circumvent the more limited scope of discovery in the criminal matter."

25  *Chestman*, 861 F.2d at 50.  "The government also has an interest in protecting the integrity of its

26  criminal investigation, as well as an interest in protecting the secrecy that accompanies grand jury

27  proceedings." *In re Urethane Antitrust Litig.*, 2010 WL 4226214, at *6 (D. Kan. 2010).  In light of

28

the foregoing, there is little doubt that the government could suffer an impairment of its ability to protect its interest in the criminal investigation if it does not intervene in the civil action.

Third, the compelling interest of the government in enforcing the criminal laws potentially implicated in this civil action is not adequately represented by any of the existing parties in the civil action.  Understandably, neither the interests of the plaintiff nor those of the defendants are concerned primarily with the proper enforcement of the federal criminal statutes at issue in the government's criminal investigation.  *See Aspen Fin. Servs. v. District Ct.*, 289 P.3d 201, 208, 128 Nev. Adv. Op. 57 (2012) ("it must be remembered that private entities and the government have differing interests.") (citing *Sterling Nat. Bank v. A-1 Hotels Int'l, Inc.*, 175 F. Supp. 2d 573, 579 (S.D.N.Y. 2001)).  Whatever alignment of interests may exist, for instance between the government and the plaintiff, is coincidental and so insufficiently correlated to provide any meaningful reassurance.  *See Bureerong*, 167 F.R.D. at 86 (finding that "[c]learly, the Government's intervention is warranted" where, among other factors, "the Government's prosecutorial and investigative interest is not adequately protected by any of the civil parties" that "[c]learly" do not "have this identical interest").  Moreover, even where one party to a civil action has an interest in proving that the other engaged in bribery, fraud, or some other misconduct, the civil burden of proof is far less than the burden the government must sustain in the criminal matter, such that "no existing party adequately represents the prosecutorial or investigative interests of the United States." *Southeast Recovery Group*, 278 F.R.D. at 167.

Finally, the government's application to intervene is timely.  While NRS 12.130(1) provides that an applicant may intervene anytime "[b]efore the trial," the Nevada Supreme Court has provided that "even when made before trial, an application must be 'timely' in the sense afforded the term under NRCP 24." *American Home*, 122 Nev. at 1244, 147 P.3d at 1130.  In *American Home*, the Court explained:

> Determining whether an application is timely under NRCP 24 involves examining "'the extent of prejudice to the rights of existing parties resulting from the delay'" and then weighing that prejudice against any prejudice resulting to the applicant if intervention is denied.  Further, the timeliness of an application may depend on when the applicant learned of its need to intervene to protect its interests.  Thus, in

1    deciding whether an application is timely, the district court must consider the length
     of delay and the reasons therefore . . . .

2    *Id.* (footnotes omitted).[6]  More recently, the Nevada Supreme Court noted that "[o]ur cases

3    generally reflect that intervention is timely [under NRCP 24] if the procedural posture of the action

4    allows the intervenor to protect its interest."  *Estate of Lomastro ex rel. Lomastro v. American*

5    *Family Ins. Group*, 124 Nev. 1060, 1071 n.29, 195 P.3d 339, 347 n.29 (2008).

6        While the civil action here has been pending for approximately 13 months, discovery has

7    only recently commenced and the currently scheduled trial date is over a year away.[7]  As set forth

8    more fully in the *ex parte* declaration, the government did not delay in taking steps to protect its

9    interests.  Rather, it acted promptly in seeking to intervene as soon as it became apparent that civil

10   discovery likely to interfere with the criminal investigation was about to begin.  *See, e.g., Home*

11   *Savings of Am. v. Pioneer Bank & Trust Co.*, 169 F.R.D. 332, 334 (N.D. Ill. 1996) (measuring

12   timeliness of intervention based upon time at which intervener's rights are threatened).  As

13   explained in the *ex parte* declaration, there is good reason why moving to intervene sooner, either

14   when the complaint was filed or at some point shortly thereafter, was not warranted under the

15   circumstances.  Nevertheless, the current "procedural posture of the civil action allows" the

16   government "to protect its interest[s]" in the criminal investigation.  *Lomastro*, 124 Nev. at 1071

17   n.29, 195 P.3d at 347 n.29.

18       More importantly, the parties to the civil action cannot identify any undue prejudice caused

19   by any purported delay.  "The most important question to be resolved in the determination of the

20   timeliness of an application for intervention is not the length of the delay by the intervenor but the

21   extent of prejudice to the rights of existing parties resulting from the delay."  *Dangberg Holdings*

22   *Nev., LLC v. Douglas County and its Bd. of County Comm'rs*, 115 Nev. 129, 141, 978 P.2d 311,

23

24   _____

25       [6]      The Ninth Circuit has similarly found that a "[d]etermination of the timeliness of a
     motion to intervene depends upon (1) 'the stage of the proceeding,' (2) 'the prejudice to other

26   parties,' and (3) 'the reason for and length of the delay.'"  *Day v. Apoliona*, 505 F.3d 963, 965 (9th
     Cir. 2007) (quoting *United States v. Alisal Water Corp.*, 370 F.3d 915, 923 (9th Cir. 2004)).

27       [7]      For over five of those months, the case was removed to federal court, where it

28   remained pending until it was remanded for lack of federal jurisdiction.

318 (1999) (quoting *Lawler*, 94 Nev. at 626, 584 P.2d at 669).  Then "the relevant issue is not how much prejudice would result from allowing intervention, but rather how much prejudice would result from the would-be intervenor's failure to request intervention as soon as he knew or should have known of his interest in the case."  *Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977); *see also Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) ("The requirement of timeliness is not a tool of retribution to punish the tardy would-be intervenor, but rather a guard against prejudicing the original parties by the failure to apply sooner.").

Here, the parties did not forego or lose any advantage that they otherwise would have had if the government had sought intervention earlier.  For example, any purported delay in the government's decision to intervene has not resulted in the unavailability of evidence.  To the contrary, given the commencement of discovery, the evidence in this action has been identified and preserved, and there is no reason to believe it should not remain that way.  The prejudice to the government, on the other hand, would be significant if intervention were denied.  Absent intervention, the government's ability to protect its interests and those of the public in enforcing the criminal laws in connection with the allegations in this civil action would be adversely affected.  Not only would it diminish the government's ability to pursue its criminal investigation, it would also seriously compromise the effectiveness and integrity of that process.

Moreover, and perhaps more importantly, "merely permitting the Government to intervene" cannot really be said to "delay this case or prejudice the adjudication of the rights of the original parties."  *Bureerong*, 167 F.R.D. at 86 (internal quotation marks omitted).  Whatever minimal delay or prejudice, if any, to the parties in the civil action that might result from this intervention would necessarily come from the stay, which is discussed below.  *See id.* (noting "the arguments . . . concerning delay and prejudice really go more to the stay, not to the actual intervention by the Government"); *Nicholas*, 569 F. Supp. 2d at 1068 ("Any undue delay or prejudice perceived here does not flow from the intervention, but instead from the proposed stay.").

For these reasons, the government has met the requirements under NRCP 24(a)(2) and the Court should permit intervention as of right in the civil action.

### 2.    Permissive Intervention Is Appropriate

Alternatively, the government's application readily satisfies the standard for permissive intervention under NRCP 24(b)(2).  That provision requires that the government's "claim . . . and the main action have a question of law or fact in common."  NRCP 24(b)(2).  As stated above, and detailed in the *ex parte* declaration, certain aspects of the government's criminal investigation and the civil action involve substantially similar allegations that arise out of the same nucleus of facts.  The resolution of the criminal investigation will turn on many of the same factual and legal questions at issue in the civil action.  Accordingly, NRCP 24(b)(2) provides an alternative basis to permit the government's intervention.  *See, e.g., Flash Memory Antitrust Litig.*, 2007 WL 3119612, at *1 (granting permissive intervention where "the DOJ's criminal investigation involves common questions of fact with the consolidated [antitrust] action . . . ."); *Downe*, 1993 WL 22126, at *11 (granting permissive intervention where grand jury investigation and SEC enforcement action involved common questions of law and fact).

### B.    A Stay of Civil Discovery Is Warranted

Should the Court permit the government to intervene in this civil action, the government requests a temporary and partial stay of discovery in order to prevent prejudice to the criminal investigation.  As explained, there is substantial overlap between the facts at issue in the civil action and the ongoing criminal investigation being conducted by the government.  Absent a stay, the criminal investigation could be compromised because the same issues being investigated by the government will be subject to civil discovery.  A stay is necessary to prevent the broader civil discovery rules from circumventing the more limited discovery that will be available to the prospective defendants in the criminal case.  A stay will further the public interest by ensuring the integrity and effectiveness of the criminal investigation.  It will also promote the most efficient use of judicial and litigative resources because the resolution of the criminal matter will likely streamline the issues in the civil action, while not unduly burdening the civil parties.  When all of the implicated interests are taken into account, and the paramount interest of the government and the public in law enforcement is given its appropriate weight, it becomes plain that a partial and temporary stay of discovery is appropriate under the circumstances.

1    **1.     This Court Has Authority to Stay Discovery**

2           The Court possesses the "power to stay proceedings" that "is incidental to the power

3    inherent in every court to control the disposition of the causes on its docket with economy of time

4    and effort for itself, for counsel, and for litigants." *Maheu v. District Ct.*, 89 Nev. 214, 217, 510

5    P.2d 627, 629 (1973) (quoting *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936)); *see also Stern*

6    *v. United States*, 563 F. Supp. 484, 489 (D. Nev. 1983) ("Every court has the inherent power to

7    stay causes on its docket with a view to avoiding duplicative litigation, inconsistent results, and

8    waste of time and effort by itself, the litigants and counsel.") (citations omitted).  Moreover, the

9    Supreme Court has noted with approval that "[f]ederal courts have deferred civil proceedings

10   pending the completion of parallel criminal prosecutions when the interests of justice seemed to

11   require such action." *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970).

12          The Nevada Supreme Court has explained that determining whether to grant a stay is "a

13   fact-intensive, case-by-case determination that requires a delicate balancing of the 'competing

14   interests involved in the case.'" *Aspen Fin. Servs. v. District Ct.*, 289 P.3d 201, 206, 128 Nev.

15   Adv. Op. 57 (2012) (quoting *Federal Sav. and Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 902

16   (9th Cir. 1989)).  To make that determination, the Nevada Supreme Court has looked to the

17   "comprehensive framework for analyzing whether to grant a stay" set forth by the Ninth Circuit.

18   *See Keating v. Office of Thrift Superv.*, 45 F.3d 322, 324-25 (9th Cir. 1995).  In *Keating*, the Ninth

19   Circuit reaffirmed the adoption of a multi-factor balancing test of those interests that are generally

20   implicated in the "decision whether to stay civil proceedings in the face of a parallel criminal

21   proceeding." *Id.* at 324.  Quoting *Keating*, the Nevada Supreme Court found that courts should

22   analyze the following nonexhaustive list of factors:

23          (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or
             any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the
24          burden which any particular aspect of the proceedings may impose on defendants;
             (3) the convenience of the court in the management of its cases, and the efficient
25          use of judicial resources; (4) the interests of persons not parties to the civil
             litigation; and (5) the interest of the public in the pending civil and criminal
26          litigation.

27

28

1    *Aspen*, 289 P.3d at 206 (quoting *Keating*, 45 F.3d at 325 (quoting *Molinaro*, 889 F.2d at 903)).

2    Because *Aspen*, like *Keating* and *Molinaro*, involved a request for accommodation of a civil

3    litigant's Fifth Amendment privilege, who was also the subject of a parallel criminal investigation,

4    the Nevada Supreme Court indicated that courts should additionally consider "'the extent to which

5    the defendant's fifth amendment rights are implicated.'"  *Id.* (quoting *Keating*, 45 F.3d at 325

6    (quoting *Molinaro*, 889 F.2d at 903)).[8]  Applying this multi-factor balancing test to the various

7    _____

8          [8]    In *Aspen, Keating*, and *Molinaro*, the private party (defendants) sought a stay in the
civil action brought by a governmental agency or private party (plaintiffs) for fear that the

9    discovery process would force the defendants to choose between their Fifth Amendment rights and
their civil defense.  The instant case "presents the reverse proposition of the government seeking a

10   stay to prevent information in the criminal investigation from being exposed during civil
discovery."  *Acacia Corp. Mgmt., LLC v. United States*, 2008 WL 2018438, at *2 (E.D. Cal. 2008).

11   Courts have "found the situations so different that it termed the case law of one 'not relevant' to
the other."  *Id.* (citing *De Vita v. Sills*, 422 F.2d 1172, 1181 (3d Cir. 1970)).  "Nevertheless, courts

12   within the Ninth Circuit have applied the *Molinaro[/Keating]* factors when considering a
government's request for a stay."  *Id.* (citing *Belford Strategic Inv. Fund, LLC v. United States*,

13   2005 WL 3278597, at *2 (N.D. Cal. 2005) ("The[ ] holdings in [*Keating* and *Molinaro*] have little
direct application in the present context, but the factors enumerated by the court are instructive")).

14

15         Moreover, in that setting when a civil defendant argues for a stay of discovery so as not to

16   undermine his Fifth Amendment privilege, courts have found that argument far weaker when no
indictment has been returned.  *See, e.g., Aspen*, 289 P.3d at 207 ("the need for a stay [sought by

17   defendant] is 'far weaker' when, as here, '[n]o indictment has been returned.") (quoting *SEC v.
Dresser*, 628 F.2d 1368, 1376 & n.20 (D.C. Cir. 1980) (noting that, unlike this case, the

18   government sometimes seeks to stay civil proceedings); *CFTC v. A.S. Templeton Group, Inc.*, 297
F. Supp. 2d 531, 534 (E.D.N.Y. 2003) ("Pre-indictment requests for a stay of civil proceedings [by

19   civil defendants] are generally denied.").  In such cases, whether an indictment has been returned

20   is of critical importance because the focus is on weighing the prejudice that the parallel criminal
proceeding presents to the defendant's assertion of his Fifth Amendment privilege and his ability

21   to defend against the criminal charges.  *See Trustees of Plumbers and Pipefitters Nat'l Pension
Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1140 (S.D.N.Y. 1995) ("the likelihood that a

22   defendant may make incriminating statements is greatest after an indictment has issued.").  The
same cannot be said where, as here, the basis of the government's request for a stay is not the

23   threat to the defendant's Fifth Amendment privilege or his ability to defend against the criminal
charges.  But rather, the relevant consideration is the prejudice to the government and the public,

24   and the corresponding risk of witness intimidation, subornation of perjury, and fabrication of

25   evidence, arising from the broad civil discovery that make it possible to circumvent the limited
scope of criminal discovery.  *See SEC v. One or More Unknown Purchasers of Secs. of Global*

26   *Indus., Ltd.*, 2012 WL 5505738, at *3 (S.D.N.Y. 2012) (recognizing, "The analysis, however,
differs where, as here, the government is requesting a stay that is opposed by the defendant."); *SEC*

27   *v. Offill*, 2008 WL 958072, at *2-3 (N.D. Tex. 2008) ("when the government seeks a stay of civil

28   discovery, the justification for obtaining a 'stay is often strongest *before* an indictment is handed

1    interests implicated by a temporary and partial stay of discovery in this case weigh in favor of

2    granting the government's request.[9]

3                    a.    **Plaintiff's Interests and Potential Prejudice**

4        As an initial matter, although the plaintiff has a right to prompt adjudication of its claim,

5    courts have recognized that this "right may be trumped" due to the other considerations

6    influencing the stay of discovery. *Ashworth v. Albers Med., Inc.*, 229 F.R.D. 527, 531 (S.D.W. Va.

7    2005); *see, e.g.*, *Bridgeport Harbour Place I, LLC v. Ganim*, 269 F. Supp. 2d 6, 9 (D. Conn. 2002)

8    ("While plaintiff does have a legitimate interest in 'the expeditious resolution' of [his] case, courts

9    frequently allow other factors . . . to trump plaintiff's interest."); *Kaiser v. Stewart*, 1997 WL

10   66186, at *4 (E.D. Pa. 1997) ("While a civil litigant with a private dispute has an interest in the

11   prompt disposition of his or her claims, the public has a greater interest in the enforcement of the

12   criminal law.  This interest alone may be enough to stay the entire civil proceeding, or at least to

13   narrow the range of civil discovery.").  In evaluating the plaintiff's burden resulting from a stay,

14   the plaintiff must establish more prejudice than simply a delay in its right to expeditiously pursue

15   its claim.  *See In re Adelphia Comms. Secs. Litig.*, 2003 WL 22358819, at *3 (E.D. Pa. 2003)

16   (citing *Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc.*, 87 F.R.D. 53, 56 (E.D.

17   Pa. 1980)).  "Instead, the plaintiff should demonstrate a particularly unique injury, such as the

18   dissipation of assets or an attempt to gain an unfair advantage from the stay." *Id.* (citing *State*

19   *Farm Mut. Auto. Ins. Co. v. Beckham-Easley*, 2002 WL 31111766, at *2 (E.D. Pa. 2002); *Walsh*

20   *Secs., Inc. v. Cristo Prop. Mgmt. Ltd.*, 7 F. Supp. 2d 523, 528 (D.N.J. 1998)).

21

22

---

23   down") (emphasis added); *A.S. Templeton Group*, 297 F. Supp. 2d at 535 (distinguishing
     defendants' pre-indictment stay motion from the motion granted in *Downe*, in which the
24   "*government*, not [the] defendant" sought pre-indictment stay) (emphasis in original).

25        [9]    In a similar situation, where the Nevada Supreme Court has "not previously had the
     occasion to elaborate upon the various considerations that may, in certain circumstances, be
26   relevant to striking this balance, [it has] turn[ed] to guidance from federal caselaw." *Francis v.*
     *Wynn Las Vegas, LLC*, 262 P.3d 705, 711, 127 Nev. Adv. Op. 60 (2011) (determining how to
27   proceed in response to a civil litigant's request for accommodation of his Fifth Amendment
     privilege while he was a defendant in an overlapping criminal proceeding).
28

1    Here, the government is not asking the plaintiff or counterclaimants to forgo their claims,

2    but merely to tolerate a temporary delay in the resolution of those claims.[10] Beyond such a delay,

3    it does not appear that the plaintiff or counterclaimants can demonstrate a particularly unique

4    injury.  This is not a case where the parties have attempted to gain an unfair advantage from the

5    requested stay.  Nor is this a case where there is a risk of dissipation, for example, of the disputed

6    assets from the redemption of Aruze USA's shares of Wynn Resorts stock.  In fact, the

7    government understands that the parties have litigated this issue and the Court recently ordered the

8    parties to jointly establish an interest bearing escrow account to hold the disputed assets, thereby

9    ensuring that such assets will remain available to satisfy any eventual judgment.  *See, e.g., Global*

10   *Indus.*, 2012 WL 5505738, at *4 ("[Defendant] Ergoport's prejudice therefore is not that a stay

11   deprives it of access to assets that would otherwise be liquid, but only that a stay may require

12   Ergoport to wait an additional period of time to access the assets it already agreed to subject to a

13   freeze of indefinite length."); *Walsh Secs.*, 7 F. Supp. 2d at 528 ("Walsh's financial losses are

14   undoubtedly continuing, as with any plaintiff during the pendency of a lawsuit.  However, Walsh

15   is protected from monetary harm caused by the delay by its ability to obtain interest as part of its

16   ultimate judgment.").

17   Furthermore, courts have repeatedly held that any prejudice resulting from a stay of civil

18   proceedings is minimized by the fact that the parties will have an appropriate opportunity for

19   discovery at the conclusion of the criminal investigation and any resulting prosecution.  *See SEC v.*

20   *Princeton Econ. Int'l Ltd.*, 2000 WL 193131, at *2 (citing *Chestman*, 861 F.2d at 50).  In addition,

21   issues litigated in a criminal prosecution may have preclusive effect in the civil action, thereby

22

23          [10]    In terms of time frame, while the government is requesting a partial stay of
     discovery until the completion of the criminal investigation and any resulting prosecution, the
24   government recognizes that a delay cannot, and should not, be indefinite.  As a result, the
     government has requested that the Court set a control date of six months in order to monitor the
25   progress and status of the criminal investigation to determine whether the requested stay should
     remain in force or expire.  Given the nature of the criminal investigation, as detailed more fully in
26   the *ex parte* declaration, this time frame is not unreasonable or immoderate under the
     circumstances.
27

28

1   potentially resolving or narrowing aspects of the civil litigation.  *See, e.g., Emich Motors Corp. v.*

2   *General Motors Corp.*, 340 U.S. 558, 568-69 (1951); *Allen v. City of Los Angeles*, 92 F.3d 842,

3   849 (9th Cir. 1996) ("A civil litigant may be estopped from relitigating an issue that was 'directly

4   determined in a previous criminal action.'") (quoting *Bagley v. CMC Real Estate Corp.*, 923 F.2d

5   758, 762 (9th Cir. 1991) (internal quotation omitted)); *United States v. Mellon Bank, N.A.*, 545

6   F.2d 869, 872-73 (3d Cir. 1976) (where resolution of a parallel criminal case might "moot, clarify,

7   or otherwise affect various contentions in the civil case," the court properly concluded that the

8   interests in favor of a stay outweighed the burden on defendant).  For instance, a criminal

9   conviction may eliminate the need for the plaintiff to prove civil liability and would allow the

10  parties to focus on litigating damages.  Furthermore, the criminal conviction of a defendant may

11  provide a strong incentive to reach a settlement with the civil plaintiff.  Conversely, any defendant

12  not charged in the criminal investigation may improve their chances of resolving the civil litigation

13  on favorable terms.[11]  As a result, this factor supports a temporary and partial stay of discovery.

**b.      Burden on the Defendants**

15       The imposition of a temporary and partial stay of discovery at this stage of the proceedings

16  would not impose a significant burden on the defendants, and even would have the potential to

17  confer benefits on the defendants as well.  Most significantly, it would relieve the defendants of

18  the obligation to defend against the civil action while the criminal investigation is pending, a

19  burden which frequently forms the basis of a defendant's request for a stay to avoid eroding one's

20  Fifth Amendment privilege.  *See, e.g., Aspen*, 289 P.3d at 204-11.  Courts have long recognized

21  that defending a civil action during the pendency of a criminal investigation creates real peril to a

22  defendant's right against self-incrimination as well as an effective defense at a criminal trial.

---

[11]      It is worth noting that Wynn Resorts has advised the government that it consents to the requested temporary and partial stay of discovery.  *See Global Indus.*, 2012 WL 5505738, at *3 ("a stay of discovery would not prejudice the plaintiffs in the civil case, as evidenced by the fact that the SEC does not oppose the [government's] motion." (quotation omitted)); *Offill*, 2008 WL 958072, at *3 ("The SEC has consented to the stay of discovery.  Thus this factor weighs in favor of a stay.").  The defendants/counterclaimants, on the other hand, have advised the government that they are likely to oppose the government's motion in whole or in part.

Quoting one federal court, the Nevada Supreme Court has provided the following to explain that peril:

> On the one hand, if [a defendant] invokes his constitutional privilege during civil discovery, not only does this prevent him from adequately defending his position, but it may subject him to an adverse inference from his refusal to testify.  On the other hand, if [a defendant] fails to invoke his Fifth Amendment privilege, he waives it, and any evidence adduced in the civil case can then be used against him in the criminal trial.

*Aspen*, 289 P.3d at 209 (quoting *Volmar Distribs. v. New York Post Co.*, 152 F.R.D. 36, 39-40 (S.D.N.Y. 1993) (citations omitted)).  The Court went on to detail additional burdens facing a defendant:

> [C]ontinuing with civil discovery in the face of a criminal investigation may burden a defendant because, by invoking the privilege to certain questions, a defendant may inadvertently "reveal[ ] his weak points to the criminal prosecutor." *Afro-Lecon, Inc. v. United States*, 820 F.2d 1198, 1203 (Fed. Cir. 1987).  Other burdens include the diversion of resources needed to defend a possible criminal action, *White v. Mapco Gas Prods., Inc.*, 116 F.R.D. 498, 502 (E.D. Ark. 1987), or "the likelihood that the materials unearthed during civil discovery may eventually inure to the benefit of the government prosecution," thereby effectively broadening the scope of criminal discovery. *King v. Olympic Pipeline Co.*, 104 Wash. App. 338, 16 P.3d 45, 58 (2000) [(where "[t]here is no indication that prosecutors seek to control–as opposed to benefit from–civil discovery," it is not problematic for the government to "seek to obtain the results of civil discovery")].

*Aspen*, 289 P.3d at 209-10.

Here, if civil discovery is allowed to proceed, the defendants will be presented with a sharp dilemma.[12]  They may either respond to discovery requests and so provide testimony, for instance, that the government may use against them to further its ongoing criminal investigation and potentially at a future criminal trial, or assert their right against self-incrimination and risk, at the very least, an adverse inference ruling or other detrimental civil sanctions.  *See Twenty First*

---

[12]     Even if a putative criminal defendant indicates he has no intention of invoking his Fifth Amendment privilege, courts nevertheless have seen fit to consider this factor where the evidence so requires.  *See, e.g., Southeast Recovery Group*, 278 F.R.D. at 168 ("although counsel for the corporate plaintiff asserts . . . that plaintiffs individual principal 'has no intention' to invoke the Fifth Amendment in upcoming civil discovery," the court in evaluating this factor "[could not] credit that assertion in light of the evidence.").

1   *Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1011 (E.D.N.Y. 1992) (noting "'[w]here

2   invocation of the fifth amendment imposes undue sanctions or penalties on a defendant, a court

3   may in its discretion stay civil proceedings"). The defendants also risk the other burdens that

4   accompany a civil litigant facing a criminal investigation, including expending and diverting

5   resources to defend a potential criminal prosecution, and effectively broadening the scope of

6   criminal discovery for the government. On the other hand, if the defendants were charged by the

7   government and acquitted, they may be able to use information obtained during the criminal case

8   to their advantage in the civil action. For these reasons, a temporary and partial stay will not

9   impose an heavy burden on the defendants.

10                    **c.    Convenience and Efficiency of the Court**

11          The Court's interest in convenience and efficiency also counsels in favor of a temporary

12   and partial stay of discovery in the civil action. Given the considerable overlap between the civil

13   action and the criminal investigation, should the criminal investigation result in a prosecution, it is

14   very likely that "some common factual questions may be conclusively determined in the criminal

15   action," and a stay of discovery would effectively "pare down the issues to be determined in the

16   civil case, and serve the interests of judicial economy by narrowing the focus of the action to the

17   benefit of the litigants" and the Court. *Bureerong*, 167 F.R.D. at 87. It is also likely that the

18   criminal process may very well create an evidentiary record that will limit the scope of subsequent

19   discovery in the civil action, thus conserving resources of both the parties and the Court in

20   completing the civil discovery process. *See, e.g., Ashworth*, 229 F.R.D. at 532 (asserting where

21   "the resolution of the criminal case may later streamline discovery in the civil case" the

22   considerations of judicial economy favor a stay) (quoting *Bridgeport Harbour*, 269 F. Supp. 2d at

23   9); *Rosenthal v. Giuliani*, 2001 WL 121944, at *2 (S.D.N.Y. 2001) ("a stay in the action will

24   streamline later civil discovery since transcripts from the criminal case will be available to the civil

25   parties"); *Brock v. Tolkow*, 109 F.R.D. 116, 120 (E.D.N.Y. 1985) (acknowledging "the resolution

26   of the criminal case might reduce the scope of discovery in the civil case or otherwise simplify the

27   issues"); *see also Mellon Bank*, 545 F.2d at 873 (finding a district court's decision to stay *all*

28   proceedings was consonant with the interest of judicial economy since "resolution of the criminal

1   case would moot, clarify, or otherwise affect various contentions in the civil case"). In addition,

2   future criminal convictions may increase the likelihood of settlements by parties to the action. *See*

3   *In re: Worldcom, Inc. Secs. Litig.*, 2002 WL 31729501, at *7 (S.D.N.Y. 2003) ("conviction of a

4   civil defendant as a result of a plea or following a trial can . . . promote settlement of civil litigation

5   not only by that defendant but also by co-defendants who do not face criminal charges.");

6   *Transworld Mech.*, 886 F. Supp. at 1140 ("resolution of the criminal case may increase the

7   possibility of settlement of the civil case due to the high standard of proof required in a criminal

8   prosecution.").

9        Further, potentially litigating this case in civil and criminal court would serve only to raise

10  concerns over possible inconsistent civil and criminal rulings and judgments. The Court's interest

11  in avoiding duplication of effort and conserving judicial resources by eliminating redundancy are

12  advanced by a temporary and partial stay of discovery in the civil case, particularly given the fact,

13  as noted above, that resolution of the criminal matter may have preclusive effect in the civil action.

14  *See Southeast Recovery Group*, 278 F.R.D. at 168-69. For these reasons, the Court's interest in

15  convenience and efficiency weighs in favor of the requested stay.

16        **d.     Interests of the Government and the Public**

17        The interests of the government in protecting its criminal investigation and the public

18  interest in law enforcement are the paramount concerns in considering whether to stay a civil

19  proceeding pending a related criminal investigation. *See Kaiser*, 1997 WL 66186, at *4;

20  *Bureerong*, 167 F.R.D. at 87. As courts have explained, those compelling interests are meant to

21  protect the integrity of the pending criminal investigation, and ensure that the liberal discovery

22  available in civil cases is not used to circumvent the limited discovery allowed in criminal cases.

23  *See Bureerong*, 167 F.R.D. at 86-87. Those concerns strongly support the imposition of a

24  temporary and partial stay.[13]

25

26

_____

27  [13]    As the case law reflects, the interest of the government, as a non-party to the civil

28  action, naturally closely mirrors that of the public when considering a stay of discovery in the civil action pending a related criminal investigation.

1         It is well established that the government and public interest in the prosecution of a

2    criminal case is entitled to precedence over the rights of parties in a related civil action when

3    application of civil discovery rules would effectively undermine the more restrictive rules of

4    criminal discovery. *See Osband v. Woodford*, 290 F.3d 1036, 1042-43 (9th Cir. 2002) (quoting

5    *McSurely v. McClellan*, 426 F.2d 664, 671-72 (D.C. Cir. 1970) ("[C]ivil discovery may not be

6    used to subvert limitations on discovery in criminal cases, either by the government or by private

7    parties.")); *Chestman*, 861 F.2d at 50 (government has "discernible interest" in preventing

8    discovery in a civil case from being used to circumvent more limited scope of discovery in a

9    criminal matter under investigation); *Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir. 1962) ("A

10   litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil

11   suit as a dodge to avoid restrictions on criminal discovery and thereby obtain documents he would

12   not otherwise be entitled to for use in his criminal suit."); *Rosenthal*, 2001 WL 121944, at *2

13   ("The public has an interest in ensuring the criminal discovery process is not subverted."); *Souza*,

14   1996 WL 241824, at *3 ("[defendant] should . . . be prevented from having the opportunity to use

15   the liberal rules of discovery applicable to this civil action to gain an unfair advantage in the

16   possible criminal case against him."); *Downe*, 1993 WL 22126, at *12 ("a stay of discovery is

17   often necessary where liberal discovery rules will allow a litigant to undermine, or gain an unfair

18   advantage in, a potential criminal prosecution which parallels the subject matter of the civil

19   action."). "The very fact that there is clear distinction between civil and criminal actions requires a

20   government policy determination of priority: which case should be tried first.  Administrative

21   policy gives priority to the public interest in law enforcement.  This seems so necessary and wise

22   that a trial judge should give substantial weight to it in balancing the policy against the right of a

23   civil litigant to a reasonably prompt determination of his civil claims or liabilities." *Campbell*, 307

24   F.2d at 487; *see also Halliday v. Spjute*, 2009 WL 1458465, at *1 (E.D. Cal. 2009)

25   ("administrative policies prioritize criminal prosecutions over civil actions due to courts'

26   recognition that liberal civil discovery can imperil a criminal prosecution.").[14]

27   _____

28       [14]    Courts have recognized that application of this administrative policy affording

priority to law enforcement is not limited to those parallel proceedings in which criminal charges are pending, it also applies when a criminal investigation is ongoing and the grand jury has yet to return an indictment. *See, e.g., Global Indus.*, 2012 WL 5505738, at *2 (granting government's pre-indictment stay of civil discovery for six months with leave for further extension upon a showing of good cause in light of pending related criminal investigation) (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012) ("A district court may stay civil proceedings when related criminal proceedings are imminent or pending, and it will sometimes be prudential to do so.")); *Halliday*, 2008 WL 5068588, at *5 (granting government's pre-indictment stay of civil action for six months and directing status report on criminal matters at the end of that period); *Acacia Corp. Mmgt., LLC v. United States*, 2008 WL 4911907, *2 (E.D. Cal. 2008) (extending government's first six-month pre-indictment stay of civil action for additional six months); *Acacia Corp. Mmgt.*, 2008 WL 2018438, at *5 (granting government's pre-indictment stay of civil action for six months and directing the government to file status report on criminal matters at the end of that period); *Offill*, 2008 WL 958072, at *5 (granting pre-indictment stay of all civil discovery pending outcome of criminal trial, and granting government four months to return indictments); *Grubbs v. Irey*, 2008 WL 906246, at *4 (E.D. Cal. 2008) (granting District Attorney's pre-indictment stay of civil discovery for six months with leave for further extension upon detailed showing justifying such action); *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI (N.D. Cal. Sept. 25, 2007) (unpublished) (granting pre-indictment stay of civil discovery for eight months subject to a showing of further need for a stay at the end of that time); *SEC v. Mutuals.com, Inc.*, 2004 WL 1629929, at *4 (N.D. Tex. 2004) (granting stay of civil action "pending the conclusion of the trial of the criminal case" where civil litigants not yet indicted); *Walsh Secs.*, 7 F. Supp. 2d at 528 (granting defendants' motion for a stay for approximately five months in advance of criminal charges); *Souza*, 1996 WL 241824, at *1-3 (rejecting civil plaintiff's argument that a stay was inappropriate because the government was only involved in a "provisional investigation" and not a formal "criminal proceeding," and granting stay for three months and ordering the government, at the end of that time, to submit a report *in camera* detailing the progress and status of the criminal investigation); *SEC v. Mersky*, 1994 WL 22305, at *4 (E.D. Pa. 1994) (preliminarily staying civil discovery for approximately two months and indicating, "if an indictment relating to the subject matter of the civil action is pending at that time, the Court will extend the time until the prosecution of that matter has been completed."); *Downe*, 1993 WL 22126, at *13 (granting a three month stay of discovery and explaining, "[c]ourts have granted stays of discovery in order to protect the integrity of the pending criminal investigations, even where an indictment has not yet been returned").

      Given that stay requests are fact-intensive, case-by-case determinations that require a delicate balancing of competing interests, *see Aspen*, 289 P.3d at 206, it is not surprising that a number of courts have denied requests by the government to stay civil proceedings. Such denials, however, often involve situations where a branch of the government, like the Securities and Exchange Commission, and not private parties, has initiated the civil action that the government seeks to stay. In so ruling, courts have noted with disfavor the fact that the government itself created the very harm it then seeks to remedy. *See, e.g., SEC v. Fraser*, 2009 WL 1531854, at *3 (D. Ariz. 2009) ("[a]lthough courts have been receptive to Government stay requests in civil cases brought by parties other than the Government, results in recent years have been markedly different when the Government itself brings a civil lawsuit simultaneous with a criminal proceeding." (citation omitted)).

1    As a general matter, the Nevada Rules of Civil Procedure, like its federal counterpart,

2    authorize broad civil discovery of both parties and non-parties.  *See, e.g.*, NRCP 26(b) (a party is

3    allowed to discover any relevant information that is "reasonably calculated to lead to the discovery

4    of admissible evidence."); *Palmer v. Pioneer Inn Assocs., Ltd.*, 118 Nev. 943, 952, 59 P.3d 1237,

5    1243 (2002) ("the rules of civil procedure, especially the discovery rules, are designed to afford

6    parties broad access to information"); *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351

7    (1978) (the relevancy requirement under Fed. R. Civ. P. 26(b) "has been construed broadly to

8    encompass any matter that bears on, or that reasonably could lead to other matter that could bear

9    on, any issue that is or may be in the case.").  In contrast, discovery under the Federal Rules of

10   Criminal Procedure, which would govern any resulting prosecution from the criminal

11   investigation, is circumscribed.  *See, e.g.*, Fed. R. Crim. P. 16.  Rule 16 generally limits discovery

12   to certain statements of the defendant, the defendant's prior criminal record, and other information

13   that is "material to the preparation of the defendant's defense or . . . intended for use by the

14   government as evidence in chief at the trial, or were obtained from or belong to the defendant."

15   *See* Fed. R. Crim. P. 16(a)(1)(A), (B), and (C).  Additional discovery is otherwise governed by

16   case law mandating disclosure in only certain circumstances, such as when evidence contains

17   exculpatory material.  *See, e.g.*, *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963) (requiring

18   disclosure of exculpatory material possessed by prosecution and unknown to defendant).

19   Furthermore, Rule 16 expressly precludes discovery of "reports, memoranda or other internal

20   government documents [and] statements made by government witnesses or prospective

21   government witnesses, except as provided in 18 U.S.C. § 3500."  Fed. R. Crim. P. 16(a)(2).  In

22   turn, Section 3500, known as the Jencks Act, compels disclosure of such statements only after a

23   witness has testified on direct examination.  *See* 18 U.S.C. § 3500(b).

24       As a result, unlike a civil case, criminal defendants ordinarily are not entitled to depose

25   prosecution witnesses, much less engage in the type of far-ranging inquiry permitted by civil

26   discovery rules.  *See, e.g.*, *In re United States*, 878 F.2d 153, 156 (5th Cir. 1989) (unlike

27   depositions taken in civil litigation, criminal depositions are taken not for discovery purposes, but

28   to preserve testimony for trial and only when it is in the interest of justice due to exceptional

29

1    circumstances).  Nor are criminal defendants able to obtain documents reflecting prior statements

2    of witnesses before trial.  *See Degen v. United States*, 517 U.S. 820, 825 (1996) ("no general right

3    to obtain the statements of the Government's witnesses before they have testified"); *United States*

4    *v. Coppa*, 267 F.3d 132, 145 n.10 (2d Cir. 2001) ("The Jencks Act was enacted to clarify that the

5    government need not disclose such statements to the defense until after the Government witness

6    has testified against the defendant on direct examination.").  Likewise, the criminal discovery rules

7    require production only of those documents that the government intends to offer at trial, or that are

8    material to the defense.  *See* Fed. R. Crim. P. 16(1)(C).

9            In addition, courts have made clear that criminal targets and defendants are not entitled,

10   under Rule 16, to the production of internal, corporate investigative reports, even if those reports

11   contain information or analysis relating to the basis of the criminal investigation or charges at

12   issue.  *See United States v. Reddy*, 190 F. Supp. 2d 558, 572-73 (S.D.N.Y. 2002); *United States v.*

13   *Rigas*, 258 F. Supp. 2d 299, 306-07 (S.D.N.Y. 2003).  In *Reddy*, for instance, the court denied the

14   criminal defendants' request for an order directing the government to produce witness statements

15   and investigative reports gathered and prepared by private professionals during a corporate,

16   internal investigation of the same wrongdoing that formed the basis of the government's criminal

17   charges.  *See Reddy*, 190 F. Supp. 2d at 572.  The court disagreed with the defendants' contention

18   that such documents were discoverable under Rule 16 because they "provided the basis of the

19   criminal charges against the Defendants," and held that the documents were not discoverable,

20   except to the extent that the investigative file contained *Brady* or Jencks Act material.  *See id.* at

21   573 (the defendants failed to establish how the "opinions, conclusions, and analysis of the [private]

22   investigators" meet the materiality standard of Rule 16).  Similarly, in *Rigas*, the criminal

23   defendants, former senior executives of Adelphia Communications Corp. ("Adelphia"), sought

24   discovery of memoranda, presentations, and reports prepared by lawyers and accountants hired by

25   Adelphia to investigate the conduct of the defendants and to determine whether they engaged in

26   wrongdoing in the management of the company.  *See Rigas*, 258 F. Supp. 2d at 306.  Observing

27   that Rule 16(a)(1)(E)(i) entitles the defendant to documents or other items material to preparing

28   arguments in response to the government's case-in-chief, the court held that the materials

30

1   requested by the defendants were not discoverable except to the extent that they contained *Brady*

2   or Jencks Act materials. *See id.*

3         As this authority demonstrates, the scope of federal criminal discovery is quite narrow, and

4   those narrow strictures are based on concerns that broad disclosure of the details of the

5   prosecution's case will, *inter alia*, (a) lead to perjury and manufactured evidence, (b) create

6   opportunities for intimidation of prospective government witnesses, and (c) permit criminal

7   defendants to unfairly surprise the prosecution at trial with information gained through discovery.

8   *See Raphael v. Aetna Cas. and Sur. Co.*, 744 F. Supp. 71, 75 (S.D.N.Y. 1990) (citing *Founding*

9   *Church of Scientology of Wash., D.C. v. Kelley*, 77 F.R.D. 378, 381 (D.D.C. 1977)); *see also*

10  *Campbell*, 307 F.2d at 487 n.12 ("the narrow scope of discovery in criminal litigation is justified

11  [in part by] a fear that broad disclosure of the essentials of the prosecution's case would result in

12  perjury and manufactured evidence"); *Mersky*, 1994 WL 22305, at *5 (policy underlying more

13  limited scope of discovery in criminal proceedings "is rooted in concerns about possible perjury,

14  manufacture of false evidence and intimidation of confidential informants" which "are

15  considerable where, as here, an indictment has not yet been returned."); *cf. United States v.*

16  *Percevault*, 490 F.2d 126, 131 (2d Cir. 1974) ("Fear of intimidation of witnesses and concern over

17  efforts to suborn perjury were not flights of fantasy by those who drafted Rule 16.").

18        It is important to note that with respect to the threat that civil discovery poses to the

19  government and public's interest, "the proper focus is not upon the discovering party's intent in

20  seeking discovery, but rather, upon the effect of his obtaining such discovery." *Mersky*, 1994 WL

21  22305, at *5.  In other words, the Court should not consider the government's motion to stay

22  discovery as tantamount to an accusation of bad faith on the part of any of the parties to the civil

23  action. *See Integrated Generics, Inc. v. Bowen*, 678 F. Supp. 1004, 1009 (E.D.N.Y. 1988) ("the

24  decision of whether or not to stay this lawsuit pending the outcome of the grand jury proceeding

25  does not depend solely on whether this Court finds some wrongful intent . . . to circumvent the

26  criminal discovery rules.").  Despite the absence of any wrongful intent to obtain broader

27  discovery that would compromise the integrity of the government's investigation, however, "this

28  result [– obtaining broader discovery –] may [nonetheless] occur since the issues in the civil and

31

criminal proceedings overlap extensively." *Twenty First Century Corp.*, 801 F. Supp. at 1010; *see also Application of Eisenberg*, 654 F.2d 1107, 1113-14 (5th Cir. 1981) (in balancing interests of potential litigant with that of significant government interests in grand jury secrecy and other confidences in connection with criminal investigation, court determined that – regardless of motives of potential litigant – trial judge did not abuse discretion in denying permission to take pre-complaint deposition).

Here, given the extensive overlap between the civil action and the criminal investigation, as set forth above and in the *ex parte* declaration, if civil discovery were to proceed unfettered the potential is very real that the parties would obtain far more discovery than that to which they would be entitled under the criminal discovery rules, resulting in a serious threat to the integrity of the criminal investigation. In that regard, the production of additional discovery in the civil action – in the form of discovery disclosures, document production, interrogatories, and deposition testimony – may reveal the nature, scope, and direction of the criminal investigation, as well as the identity of potential witnesses, including those who may be cooperating with the government. *See WorldCom Secs. Litig.*, 2002 WL 31729501, at *9 (observing, "The U.S. Attorney has a significant interest in preserving the usefulness of cooperating defendants as Government witnesses."). That, in turn, may subject government witnesses to pressure, threats, and intimidation, potentially causing them to become less forthcoming or even unavailable. *See Mersky*, 1994 WL 22305, at *5 (articulating considerable "concerns about possible perjury, manufacture of false evidence and intimidation of confidential informants"). Moreover, access to such information may enable putative criminal defendants to manufacture, fabricate or destroy evidence, as well as tailor testimony and/or defenses to conform with the government's proof. *See Global Indus.*, 2012 WL 5505738, at *6 (crediting the government's proffer that "absent a stay, the Criminal Case risks exposure to those specific concerns against which the restrictions on criminal discovery are intended to guard, including that '(1) the broad disclosure of the essentials of the prosecution's case may lead to perjury and manufactured evidence; [and] (2) the revelation of the identity of prospective witnesses may create the opportunity for intimidation.'" (quotation omitted)). Furthermore, as addressed in the *ex parte* declaration, these "concerns are heightened by the fact

1   that most of the witnesses and evidence are overseas, thereby limiting the [government's] ability to

2   investigate or mitigate any possible intimidation or obstruction." *Id.* (finding that the government

3   has "identified specific and serious risks of prejudice to the Criminal Case sufficient to justify a

4   stay of discovery in the Civil Case.").  Simply put, unbounded, civil discovery in this action raises

5   a significant risk that information gathered by the government, which otherwise would not be

6   available under the Federal Rules of Criminal Procedure, will be disclosed to the parties and

7   thereby impede or jeopardize the criminal investigation.  The interests of the government and the

8   public therefore support the requested stay.

9         Balancing the various interests discussed above, the multi-factor analysis strongly supports

10   the government's motion for a temporary and partial stay of discovery.

**IV.  CONCLUSION**

12         Having satisfied the requirements for intervention as of right and permissive intervention,

13   including the fact that the government's criminal investigation involves the same subject matter as

14   the civil litigation, the Court should grant the government's motion to intervene in this civil action

15   for the limited purpose of seeking a temporary and partial stay of discovery.  In light of the

16   ongoing criminal investigation into the same matters that form the basis of the civil action, the

17   government also has demonstrated a compelling interest in seeking to prevent civil discovery from

18   interfering with and potentially compromising that investigation.  Considering that interest

19   together with those of the Court, the parties, and the public, the Court should grant the

20   government's motion for a temporary and partial stay of discovery in this action.  In doing so, the

21   Court should exclude from any such stay those areas of discovery that do not focus on the

22   defendants' allegedly unlawful activities in connection with the Philippine Casino Project.

23         In accordance with the attached proposed order, and for the reasons set forth above and in

24   the government's *ex parte* declaration, the Court should stay discovery until the completion of the

25   criminal investigation and any resulting prosecution.  To ensure that the government is

26   investigating this matter in a diligent and expeditious manner, and so as to not delay civil

27   discovery indefinitely, the Court should set a control date of approximately six months, in order for

28   the government to explain to the Court, in an *ex parte* submission if necessary, whether the stay

33

1    should remain in force or expire, and the reasons why.  The government understands that, pursuant

2    to any such order, it would immediately advise the Court should the criminal investigation

3    terminate prior to the control date.

4           DATED this 5th day of April, 2013.

5                                                    Respectfully submitted,

6                                                    DANIEL G. BOGDEN
                                                     United States Attorney
7

8                                                     /s/ Russell E. Marsh
                                                     RUSSELL E. MARSH
9                                                    ROGER WENTHE
                                                     Assistant United States Attorneys
10

11                                                   JEFFREY H. KNOX
                                                     Chief, Fraud Section
12                                                   Criminal Division, U.S. Department of Justice

13                                                    /s/ Joey Lipton
                                                     JOEY LIPTON
14                                                   Trial Attorney
                                                     Fraud Section, Criminal Division
15                                                   U.S. Department of Justice

16
                                                     Attorneys for Proposed Intervenor
17                                                   United States of America

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to Rule 5(b) of the Nevada Rules of Civil Procedure, I hereby certify that I am an employee of the UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF NEVADA and that on this 8th day of April, 2013, I caused true and correct copies of the foregoing **UNITED STATES OF AMERICA'S MOTION TO INTERVENE AND FOR TEMPORARY AND PARTIAL STAY OF DISCOVERY** to be served by First Class Mail on the following:

| | |
|---|---|
| James J. Pisanelli, Esq. | Samuel S. Lionel, Esq. |
| Todd L. Bice, Esq. | Charles H. McCrea, Jr., Esq. |
| Debra L. Spinelli, Esq. | Ketan D. Bhirud, Esq. |
| PISANELLI BICE PLLC | Steven C. Anderson, Esq. |
| 3883 Howard Hughes Parkway, Suite 800 | LIONEL SAWYER & COLLINS |
| Las Vegas, NV 89169 | 1700 Bank of America Plaza |
| | 300 South Fourth Street |
| Paul K. Rowe, Esq. | Las Vegas, NV 89101 |
| Bradley R. Wilson, Esq. | |
| Grant R. Mainland, Esq. | Marc J. Sonnenfeld, Esq. |
| WACHTELL LIPTON, ROSEN & KATZ | MORGAN LEWIS & BOCKIUS LLP |
| 51 West 52nd Street | 1701 Market Street |
| New York, NY 10019 | Philadelphia, PA 19103 |
| | |
| Robert L. Shapiro, Esq. | Joseph E. Floren, Esq. |
| GLASER WEIL FINK JACOBS HOWARD | Benjamin P. Smith, Esq. |
| AVCHEN & SHAPIRO, LLP | Christopher J. Banks, Esq. |
| 10259 Constellation Blvd., 19th Floor | MORGAN LEWIS& BOCKIUS LLP |
| Los Angeles, CA 90067 | One Market, Spear Street Tower |
| | San Francisco, CA 94105-1126 |
| Donald J. Campbell, Esq. | |
| J. Colby Williams, Esq. | Ronald L. Olson, Esq. |
| CAMPBELL & WILLIAMS | Mark B. Helm, Esq. |
| 700 South Seventh Street | Jeffrey Y. Wu, Esq. |
| Las Vegas, NV 89109 | MUNGER, TOLLES & OLSON LLP |
| | 355 South Grand Avenue, 35th Floor |
| William R. Urga, Esq. | Los Angeles, CA 90071-1560 |
| Martin A. Little, Esq. | |
| JOLLY URGA WIRTH WOODBURY & STANDISH | |
| 3800 Howard Hughes Parkway, 16th Floor | ___/s/ Roger W. Wenthe___ |
| Las Vegas, NV 89169 | An employee of the UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF NEVADA |