# EXHIBIT 13



# 2013
# REPORT TO CONGRESS

*of the*

## U.S.-CHINA ECONOMIC AND SECURITY REVIEW COMMISSION

### ONE HUNDRED THIRTEENTH CONGRESS
#### FIRST SESSION

NOVEMBER 2013

Printed for the use of the
U.S.-China Economic and Security Review Commission
Available via the World Wide Web: http://www.uscc.gov

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 2013

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001



# U.S.-CHINA ECONOMIC AND SECURITY REVIEW COMMISSION

Hon. WILLIAM A. REINSCH, *Chairman*
Hon. DENNIS C. SHEA, *Vice Chairman*

## COMMISSIONERS

CAROLYN BARTHOLOMEW
PETER T.R. BROOKES
ROBIN CLEVELAND
JEFFREY L. FIEDLER
Hon. CARTE P. GOODWIN

DANIEL M. SLANE
Hon. JAMES M. TALENT
Hon. KATHERINE C. TOBIN
MICHAEL R. WESSEL
LARRY M. WORTZEL

MICHAEL R. DANIS, *Executive Director*

The Commission was created on October 30, 2000, by the Floyd D. Spence National Defense Authorization Act for 2001 § 1238, Pub. L. No. 106–398, 114 STAT. 1654A–334 (2000) (codified at 22 U.S.C. § 7002 (2001), as amended by the Treasury and General Government Appropriations Act for 2002 § 645 (regarding employment status of staff) & § 648 (regarding changing annual report due date from March to June), Pub. L. No. 107–67, 115 STAT. 514 (Nov. 12, 2001); as amended by Division P of the "Consolidated Appropriations Resolution, 2003," Pub. L. No. 108–7 (Feb. 20, 2003) (regarding Commission name change, terms of Commissioners, and responsibilities of Commission); as amended by Pub. L. No. 109–108 (H.R. 2862) (Nov. 22, 2005) (regarding responsibilities of Commission and applicability of FACA); as amended by Pub. L. No. 110–161 (Dec. 26, 2007) (regarding changes in annual report due date; submission of financial reports; printing and binding of Congressional reports; employee compensation and performance reviews; and applicability of House rules for travel by members and staff).

The Commission's full charter *http://www.uscc.gov/about/uscc-charter* and Statutory Mandate *http://www.uscc.gov/about/fact_sheet* are available via the World Wide Web.

U.S.-CHINA ECONOMIC AND SECURITY REVIEW COMMISSION

NOVEMBER 13, 2013
The Honorable Patrick Leahy,
President Pro Tempore of the U.S. Senate, Washington, DC 20510
The Honorable John Boehner,
Speaker of the U.S. House of Representatives, Washington, DC 20510

DEAR SENATOR LEAHY AND SPEAKER BOEHNER:

On behalf of the U.S.-China Economic and Security Review Commission, we are pleased to transmit the Commission's 2013 Annual Report to the Congress—the eleventh major Report presented to Congress by the Commission—pursuant to Public Law 106–398 (October 30, 2000), as amended by Public Law No. 109–108 (November 22, 2005). This report responds to the mandate for the Commission "to monitor, investigate, and report to Congress on the national security implications of the bilateral trade and economic relationship between the United States and the People's Republic of China." In this Report, the Commission reached a broad and bipartisan consensus, approving the Report by a vote of 11 ayes to 1 nay.

In accordance with our mandate, this Report, which is current as of November 13, includes detailed treatment of our investigations of the areas identified by Congress for our examination and recommendation. These areas are:

- PROLIFERATION PRACTICES—The role of the People's Republic of China in the proliferation of weapons of mass destruction and other weapons (including dual-use technologies), including actions the United States might take to encourage the People's Republic of China to cease such practices;
- ECONOMIC TRANSFERS—The qualitative and quantitative nature of the transfer of United States production activities to the People's Republic of China, including the relocation of high technology, manufacturing, and research and development facilities, the impact of such transfers on United States national security, the adequacy of United States export control laws, and the effect of such transfers on United States economic security and employment;
- ENERGY—The effect of the large and growing economy of the People's Republic of China on world energy supplies and the role the United States can play (including joint research and development efforts and technological assistance), in influencing the energy policy of the People's Republic of China;
- UNITED STATES CAPITAL MARKETS—The extent of access to and use of United States capital markets by the People's Republic of China, including whether or not existing disclosure and transparency rules are adequate to identify People's Republic of China companies engaged in harmful activities;
- REGIONAL ECONOMIC AND SECURITY IMPACTS—The triangular economic and security relationship among the United States, [Taiwan] and the People's Republic of China (including the military modernization and force deployments of the People's

Republic of China aimed at [Taiwan]), the national budget of the People's Republic of China, and the fiscal strength of the People's Republic of China in relation to internal instability in the People's Republic of China and the likelihood of the externalization of problems arising from such internal instability;

- UNITED STATES–CHINA BILATERAL PROGRAMS—Science and technology programs, the degree of noncompliance by the People's Republic of China with agreements between the United States and the People's Republic of China on prison labor imports and intellectual property rights, and United States enforcement policies with respect to such agreements;

- WORLD TRADE ORGANIZATION COMPLIANCE—The compliance of the People's Republic of China with its accession agreement to the World Trade Organization (WTO); and

- FREEDOM OF EXPRESSION—The implications of restrictions on speech and access to information in the People's Republic of China for its relations with the United States in the areas of economic and security policy.

The Commission conducted its work through a comprehensive set of seven public hearings and one public roundtable, taking testimony from 57 witnesses from the executive branch, industry, academia, policy groups, and other experts. For each of its hearings, the Commission produced a transcript (posted on its Web site—www.uscc.gov). The Commission also received a number of briefings by officials of executive branch agencies, intelligence community agencies, and the armed services, including classified briefings on Chinese investment, China's cyber operations, China's foreign policy, and China's navy. The Commission is preparing a classified report to Congress on these and other topics.

Commissioners also made an official delegation visit to Taiwan, Japan, China, and Hong Kong to hear and discuss perspectives on China and its global and regional activities. In these visits, the Commission delegations met with U.S. diplomats, host government officials, representatives of the U.S. and foreign business communities, and local experts.

The Commission also relied substantially on the work of its excellent professional staff, and supported outside research in accordance with our mandate.

The Report includes 41 recommendations for Congressional action. Our 10 most important recommendations appear on page 27 at the conclusion of the Executive Summary.

We offer this Report to the Congress in the hope that it will be useful as an updated baseline for assessing progress and challenges in U.S.-China relations.

Thank you for the opportunity to serve. We look forward to continuing to work with you in the upcoming year to address issues of concern in the U.S.-China relationship.

Yours truly,

William A. Reinsch
*Chairman*

Dennis C. Shea
*Vice Chairman*

**Commissioners Approving the 2013 Report**

_(signature)_
William A. Reinsch, Chairman

_(signature)_
Dennis C. Shea, Vice Chairman

_(signature)_
Carolyn Bartholomew, Commissioner

_(signature)_
Peter T.R. Brookes, Commissioner

_(signature)_
Jeffrey L. Fiedler, Commissioner

_(signature)_
Carte P. Goodwin, Commissioner

_(signature)_
Daniel M. Slane, Commissioner

_(signature)_
James M. Talent, Commissioner

_(signature)_
Katherine C. Tobin, Commissioner

_(signature)_
Michael R. Wessel, Commissioner

_(signature)_
Larry M. Wortzel, Commissioner

**Commissioner Dissenting from the 2013 Report**

_(signature)_
Robin Cleveland, Commissioner

# CONTENTS

| | Page |
|---|---|
| TRANSMITTAL LETTER TO THE CONGRESS | iii |
| COMMISSIONERS APPROVING THE REPORT | v |
| EXECUTIVE SUMMARY | 1 |
| KEY RECOMMENDATIONS | 27 |
| INTRODUCTION | 31 |

## 2013 REPORT TO CONGRESS OF THE
## U.S.-CHINA ECONOMIC AND SECURITY REVIEW COMMISSION

| | |
|---|---|
| **Chapter 1: The U.S.-China Trade and Economic Relationship** | 35 |
| Section 1: Trade and Economics Year in Review | 35 |
| Section 2: Trends in Chinese Investment in the United States | 91 |
| Section 3: Governance and Accountability in China's Financial System | 113 |
| Section 4: China's Agriculture Policy, Food Regulation, and the U.S.-China Agriculture Trade | 153 |
| Recommendations | 203 |
| **Chapter 2: China's Impact on U.S. Security Interests** | 207 |
| Section 1: Military and Security Year in Review | 207 |
| Section 2: China's Cyber Activities | 243 |
| Section 3: China's Maritime Disputes | 266 |
| Recommendations | 293 |
| **Chapter 3: China and the World** | 295 |
| Section 1: China and the Middle East and North Africa | 295 |
| Section 2: Taiwan | 325 |
| Section 3: Macau and Hong Kong | 354 |
| Recommendations | 395 |
| **Comprehensive List of the Commission's Recommendations** | 397 |
| **Additional Views of Commissioners** | 403 |
| **Appendices:** | |
| Appendix I: U.S.-China Economic and Security Review Commission Charter | 415 |
| Appendix II: Background of Commissioners | 425 |
| Appendix III: Public Hearings of the Commission During 2013 | 435 |
| Appendix IIIA: List of Witnesses Testifying Before the Commission During 2013 | 439 |
| Appendix IV: List of Interlocutors During Commission Fact-Finding Trips to Asia During 2013 | 443 |
| Appendix V: List of Research Material | 445 |
| Appendix VI: Acronyms and Abbreviations | 449 |
| **2013 Commission Staff and Acknowledgements** | 453 |

# SECTION 3: MACAU AND HONG KONG

## Introduction

China exercises sovereignty over two former European colonies, Macau and Hong Kong. Both former colonies operate as special administrative regions (SAR) of the People's Republic of China (PRC) under the "one country, two systems" framework.* Control of Macau was officially transferred from the Portuguese Republic to the PRC in 1999, and control of Hong Kong reverted from British control to the PRC in 1997. While geographically close, the two former colonies are quite distinct, and the governance issues that Hong Kong presents differ markedly from those of Macau. Whereas Macau has experienced an economic rebirth, with booming prosperity and dramatic reduction in street crime under Chinese rule, Hong Kong was already a well-run, thriving economic powerhouse prior to its handover, and many of its citizens have felt more acutely the drawbacks of living under the new regime. The result, as one former Hong Kong official noted in a July meeting with Commissioners, is that "Macau is the patriotic SAR, while Hong Kong is the defiant one." [1]

During the 2013 report cycle, the Commission held a hearing in Washington, DC, on June 27 on Macau and Hong Kong. The Commission heard from expert witnesses on the evolution of the gaming industry in Macau and the investments there by three U.S.-based casino companies. The Commission also examined the implications to U.S. regulators and to the U.S.-based casinos of the gaming industry in Macau. The Commission hearing in June included testimony on the efforts in Hong Kong by prodemocracy forces to achieve universal suffrage in the elections of the legislature and executive as promised under Hong Kong's Basic Law. The Commission examined the increasing police surveillance of the prodemocracy movement and the decline of press freedom in Hong Kong. The Commission also visited Hong Kong in July and met with current and former government officials and representatives of nongovernmental organizations.

---

*The "one country, two systems" framework is a policy measure adopted by the PRC following the establishment of Hong Kong and Macau as SARs. The system grants Hong Kong and Macau the right to self govern their economy and political system to a certain extent, excluding foreign affairs.

> ### A Note on this Section
>
> The Commission is not an investigative or regulatory body but functions as a policy advisor to Congress. The purpose of the Commission's work in holding its June 27 hearing and in travelling to Hong Kong and the People's Republic of China in July 2013 was to collect information that would enable it to assess the risk to U.S. national and economic security from a variety of perspectives. As in all of its work, the Commission's ultimate goal is to report to Congress on the topics within its mandate and to make recommendations to Congress for appropriate policy and legislative changes. The Commission did not seek nor did it find evidence of wrongdoing by any U.S.-based casino company, either in Macau or Las Vegas.

## Macau's Economy Depends on Gambling

The gaming sector is the most important element of the Macau SAR economy, and Macau's government is heavily dependent on a 35 percent tax on gross gaming revenue.[2] Macau's tax collections from the gaming sector in 2012 totaled $13.9 billion, which accounted for 87.5 percent of total government revenue.[3] As Macau's gambling sector has grown rapidly, Macau has accumulated the world's third-largest budget surplus as a percentage of gross domestic product (GDP).[4] Macau's per capita GDP, at $78,275, is 12 times the size of mainland China's and considerably higher than that of the United States at $49,964.[5]

Although gambling is illegal on the Mainland (with the exception of state-run lotteries), Beijing allowed Macau's gaming industry to continue operations following its reversion to PRC sovereignty.[6] Macau's gaming sector thrived and, in 2006, officially surpassed Las Vegas as the world's largest gambling market. Macau's official annual gross gaming revenue is now more than six times that of Las Vegas, surpassing $38 billion in 2012.[7] Taking off-book profits into consideration, the actual gaming market is estimated to be much higher. During the Commission's trip to Hong Kong in July 2013, Steve Vickers, former head of the Royal Hong Kong Police's Criminal Intelligence Bureau and an acknowledged authority on Macau's gaming sector and Asian organized crime issues, estimated that the real value of Macau's gaming industry is likely six times larger than the official reported size, making the actual market worth more than $200 billion, over four times Macau's 2012 official GDP.[8] (Mr. Vickers is now a private consultant and investigator in Hong Kong.)

The exponential growth of Macau's gaming revenue has been driven primarily by visitors from mainland China. According to the Macau government, 16.9 million people visited Macau from mainland China in 2012, accounting for 60 percent of total visitors. Other visitors are primarily from Hong Kong or Taiwan, accounting for 30 percent.[9]

## Money Laundering in Macau

Macau in 2001 liberalized a home-grown, monopolistic concession system and opened bidding for casino operation licenses to a limited number of foreign casino operators.[10] The introduction of new and larger casinos led to substantial increases in cash flow, which consequently presented an increased risk for money laundering within Macau's financial and gaming institutions.* Among all financial institutions, casinos generally present the greatest risk for money laundering.[11] "It is the variety, frequency and volume of transactions that makes the casino sector particularly vulnerable to money laundering. Casinos are by nature a cash intensive business and the majority of transactions are cash based ... It is this routine exchange of cash for casino chips or plaques, TITO [ticket-in, ticket-out] tickets,† and certified cheques, as well as the provision of electronic transactions to and from casino deposit accounts, casinos in other jurisdictions, and the movement of funds in and out of the financial sector which makes casinos an attractive target for those attempting to launder money,"[12] according to the Asia-Pacific Group on Money Laundering and the Financial Action Task Force, a Paris-based intergovernmental body.

In Macau there is an even larger risk of money laundering within the VIP gaming room operations, which are physically conducted within the casinos but remain outside of the casino's official oversight.[13] The risk is further enhanced because so much of the money that is wagered in Macau goes through the loosely regulated VIP rooms. In 2012, VIP baccarat rooms in Macau casinos accounted for 69.3 percent of total revenue from games of chance.[14]

The structure of VIP gaming operations—as an independent contractor of the casino—dates back to the 1930s and is legal under Macau law. But regulatory oversight of VIP rooms, junket operators, and affiliates who supply the clients and manage the money remains opaque and prone to substantial abuse.[15,16] "The movement of funds associated with gaming-related tourism is poorly understood and may pose particular money laundering risks, e.g., international movement of funds for casino junket operations."[17] The PRC's strict capital controls that limit the amount of money individuals can carry to or otherwise transfer from mainland China to Macau have created a unique opportunity for the VIP gaming rooms to participate in a grey financial market. Large sums of renminbi (RMB) are moved through the independent VIP gaming room operations with the help of junket operators and their affiliates on the Mainland. That renminbi can be converted to Hong Kong dollars by gamblers in the casino and then transferred abroad through a variety of legitimate means, such as bank or casino wire transfers.

According to I. Nelson Rose, professor of law at Whittier Law School, who testified at the Commission's June 27 hearing, Macau's weak enforcement of anti-money-laundering prohibitions comes, in part, "from lack of experience, since big-scale casino gambling is

---

*According to the most recent Macau government statistics, U.S. direct investment in Macau totaled $677.3 million at the end of 2011, although unofficial numbers put the figure between $8 billion and $10 billion. There are more than 30 U.S. firms doing business in Macau. U.S. Department of State, "U.S. Relations with Macau" (Washington, DC: August 16, 2013).

less than ten years old. And part comes from the enormous amounts of money coming in and the junket system, which make it difficult to track all the transactions and gives incentives to ignore what may be going on. And China likes the economic booms of Macau and Hong Kong, and has plans to spend hundreds of billions of dollars to create large regional centers around the two SARs."[18] Nevada regulators generally agree that the problem lies more with Macau and its loose regulations of VIP gaming room operators and junket operators in Macau and on the Mainland. While Nevada's affiliated casinos in Macau offer "robust compliance" with anti-money-laundering protocols, "that robust compliance, however, is only up to a point; that point is where the VIP room operators assume responsibility," said Nevada State Gaming Control Commission Chairman A.G. Burnett in testimony before the Commission.[19]

According to a 2013 report from the U.S. Department of State, the gaming industry in Macau "relies heavily on loosely-regulated gaming promoters and collaborators, known as junket operators,[20] for the supply of wealthy gamblers, mostly from nearby mainland China."[21] The report notes that in addition to supplying customers, the junket operators bear much of the risk that high rollers will renege on the unsecured loans that casinos and junket operators typically extend to heavy gamblers. (In the Macau system, the junket operators are allowed to extend credit to gamblers from the Mainland and buy chips directly from the Macau casinos to supply to their customers. If the customers fail to repay the loans, it is the junket operator who is not repaid. The casinos have already collected from the junket operators.) "Increasingly popular among gamblers seeking inscrutability and alternatives to China's currency movement restrictions, junket operators are also popular among casinos aiming to reduce credit default risk and unable to legally collect gambling debts in China, where gambling is illegal," the State Department report notes.[22]

One problem is the abuses of the junket operators in collecting debts from customers through threats of violence and other non-judicial means. "Other extra-legal means of debt collection may indeed come into play," according to a 2007 University of Nevada study. "The extent to which extra-legal means of debt collection (i.e., threats, intimidation, violence, induced crime such as embezzlements, etc.) occurs is an obvious concern for regulators, especially those from outside Macau that oversee companies which are concession or subconcession holders in Macau."[23]

All of these concerns have led American companies operating casinos in Macau to take additional steps to prevent illegal activity in their operations. Some of those steps were detailed in a submission by the companies to the Commission and are set forth at the end of this section. The Commission is not in a position to evaluate the adequacy of these measures to insulate these companies from the danger of association with illegal activity. However, Mr. Rose, who was one of the witnesses at the Commission hearing, has in a subsequent article warned that in evaluating the danger of illegality "it is important ... to distinguish between casinos (in Macau) that are licensed by U.S. states and those that are not." Mr. Rose noted further that, "in practice, there are two separate regulatory

systems working in Macau. There are the casinos that are subject only to Macanese regulations. And there are those that are also subject to controls by states and nations outside of the PRC—in particular, the three casino operators who are also licensed by Nevada and other states."

Macau's junket operations have a history of affiliation with Asian organized crime,[24] which presents added risks for U.S.-licensed companies operating casinos in Macau, according to Nevada's state gaming regulators. Numerous junkets may have ties to organized crime, and public media and intelligence sources "have affiliated all but one of the seven VIP Room operator groups of interest with reputed Asian organized crime figures," according to Mr. Burnett.[25] "It is common knowledge [that] the operation of VIP rooms in Macau casinos had long been dominated by Asian organized crime commonly referred to as triads [and] the same [organized crime] figures are allegedly still working the VIP operations."[26]

U.S.-based casino companies are also subject to "suitability requirements" under state gaming laws that prohibit consorting with criminal elements, even outside the United States. Furthermore, the grey market nature of Macau's loosely regulated junket operators and underground banking system raises the possibility for exploitation of casinos by international criminals seeking to launder illicit funds. Although U.S.-licensed casinos have implemented strict safeguards to prevent criminal activity from occurring within their Macau casinos,[27] loose regulation by China and Macau of third-party junket operators and their affiliates that support the success of Macau casinos presents considerable risks.

Macau has taken steps to improve the efficacy of its laws preventing the abuse of gaming and financial institutions by criminals; however, according to Assistant Secretary for Terrorist Financing at the U.S. Department of the Treasury Daniel L. Glaser, Macau's regulators have fallen far short in complying with internationally recognized standards, and numerous deficiencies remain in its regulatory framework.[28] The PRC has also recently expressed interest in closer monitoring of Macau's gaming industry as part of its nationwide initiative to crack down on corruption. However, to date, the PRC has not implemented any significant policy measures to regulate Macau's grey market VIP gaming system.

## The Role of Money Laundering and Capital Flight from the Mainland

The PRC maintains strict capital controls to limit the amount of cash taken out by individuals from mainland China to $3,260 per day and $50,000 per year.[29] Despite these restrictions, individuals from mainland China are able to bypass the PRC's capital controls and move large sums of money into Macau by making money transfers through various grey market channels. One of the most common methods is for individuals to physically smuggle cash.[30] Mainland Chinese may also bypass the PRC's capital controls via "pawn shops" and "jewelry dealers" in Macau.* Underground banks also

---

* It is common to witness individuals making purchases at "pawn shops" or "jewelry shops" using China's domestic bank card Unionpay to purchase items and immediately return them for Hong Kong dollars, which then can be moved out of the country. The "front" shops, which are

play a key role in moving illicit funds outside of mainland China, directly transferring RMB to VIP accounts at Macau casinos.[31] Individuals will then collect the RMB in the form of special gambling chips at Macau casinos and cash them out in Hong Kong dollars after using the chips for gambling.[32,33] Although the exact amount of money moved through underground banks in unknown, Yan Lixin, secretary general of the China Center for Anti-Money-Laundering Studies at Fudan University in Shanghai, estimates that 30–40 percent of all capital moving through underground banking channels is dirty money being laundered.[34]

There is a high risk to Macau for money laundering, especially considering its gaming-driven economy. Macau is noted as a "jurisdiction of primary concern" in a 2012 report by the U.S. Department of State in its *International Narcotics Control Strategy Report*.[35] A 2013 State Department report specifically identifies Macau's junket operators as contributing to the vulnerability for money laundering and notes that "Macau Government officials indicate the primary sources of laundered funds—derived from local and overseas criminal activity—are gaming-related crimes, property offenses, and fraud."[36] The U.S. Central Intelligence Agency also notes that "Macau continues to face the challenges of managing its growing casino industry, money-laundering, and the need to diversify the economy away from heavy dependence on gaming revenues."[37] Moreover, *The Economist* reported that a memo sent in December 2009 from the U.S. consulate in Hong Kong to the U.S. Secretary of State said that "[Macau's] phenomenal success is based on a formula that facilitates, if not encourages, money laundering."[38] The memo noted that "[s]ome of these mainlanders are betting with embezzled state money or proceeds from official corruption, and substantial portions of these funds are flowing on to organized crime groups in mainland China, if not Macau itself."[39]

A 2009 report by the Financial Action Task Force, a multinational organization that sets standards for the prevention of money laundering and the financing of terrorism, provided multiple case studies outlining cash smuggling and money laundering in Macau. According to one case study, "Cash Smuggling and Underground Remittance," a Mainland customer who wanted to gamble in a Macau casino entrusted a junket affiliate with a large sum of money. The junket affiliate then brought the cash to a "front" shop that he operates as an underground bank in Zhuhai, a city in the Guangdong Province near the border of Macau. The cash was then divided into small lots, which were then smuggled into Macau by many "professional commuters." A junket operator in Macau then collected the cash and deposited the money into a casino account in the form of cash, checks, bank transfers, and remittances. When the full sum was deposited, the casino agent converted the sum into a cashier's order to the VIP room of the casino. The VIP room then issued chips to the Mainland customer, who could start gambling.[40]

---

located throughout Macau and within casinos, also operate as underground banks by extending high-interest-rate loans to gamblers. *Financial Times*, "Macao Casino Boom Fuelled by Illicit Cash," January 3, 2012. *http://www.ft.com/intl/cms/s/0/833b06bc-1a63-11e1-ae4e-00144feabdc0. html*; U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, testimony of I. Nelson Rose, June 27, 2013.

An indicator of the money-laundering problem in Macau is evident in the rising number of suspicious transaction reports * filed with Macau's financial intelligence unit. In 2012, the total number of "suspicious transaction reports" filed increased to 1,840 from 1,563, up 18 percent from 2011.[41] The top three reasons triggering suspicious transaction reports in 2012 were (1) the inability of clients to provide identification or important personal information, (2) the possible match of a client with an internal watch list or other black list, or (3) a client's attempt to convert gambling chips without partaking in gambling activities.[42] Reports originating specifically from Macau's gambling institutions have increased as a share of total suspicious transaction reports from 52 percent in 2007 to 72 percent in 2012,[43] indicating a potential, growing, money-laundering problem in Macau's gaming institutions or a growing willingness to report.†

## Money Laundering in Macau's Gaming System

In Macau, one of the main channels for money laundering is in the gaming sector through underregulated junket operators or VIP room operators and their affiliates on the Mainland, which include the underground banking system that supports their operations. The junket operators "smooth a money-laundering route that processes billions of dollars every year," according to *The Times of London*.[44] U.S. regulators have also described junket operators and their affiliates as especially able to offer money-laundering services.

Junket operators attract high-stakes gamblers to VIP rooms within Macau casinos by offering clients special services, including travel arrangements, hotel rooms, loans and money transfers, and a stack of chips waiting at a reserved chair at a baccarat table. In return, the junket operators receive a commission on the amount of chips they deal and a percent of the gambling losses incurred by their VIP clients.‡ Unlike gambling industries in the United States and Singapore, casinos operating in Macau—including subsidiaries of U.S.-licensed casinos—are heavily dependent on the junket system as the primary source of income. Mr. Vickers noted the heavy reliance of U.S.-licensed casinos on the Macau junket system during a briefing with the Commission in July: "Without the junkets,

---

* The Macau SAR Financial Intelligence Office requires casino concessionaires, subconcessionaires, and junket promoters to report any "transaction relating to the practice of gaming or betting that, given its nature, unusual nature or complexity, indicates an activity of money laundering or terrorist financing." Jorge Godinho, "The Prevention of Money Laundering in Macau Casinos," *Gaming Law Review and Economics* 17:4 (2013): 272.

† Suspicious transaction reports from the casinos rose from 347 in 2007 to 1328 in 2012. Reports from all other financial sources in Macau rose from 343 to 510 during the same period. Government of Macau, *Financial Intelligence Office Newsletter for Gaming Sector* (Macau, SAR: Financial Intelligence Office, 2007–2013), *http://www.gif.gov.mo/web1/doc/Newsletter/Casino_Newsletter_Issue_8_201305.pdf*.

‡ Junkets frequently receive a commission from the casino based on total gaming play, or "rolling chip turnover." This commission is based on the number of chips dealt, guaranteeing the junket will receive a commission whether the client wins or loses. The commission is determined in the contract between the junket and the casino and usually ranges from 0.8 percent to 1.25 percent. Carlos Siu Lam, "Controlling Internal Operations Risk: VIP Rooms in Macau," *Casino Enterprise Management*, *http://www.casinoenterprisemanagement.com/articles/october-2012/controlling-internal-operational-risk-vip-rooms-macau*; Wuyi Wang and William R. Eadington, "VIP-Room Contractual System of Macau's Traditional Casino Industry" (Reno, NV: University of Nevada, Working Paper 07–001, 2007), p. 6. *http://www.business.unr.edu/econ/wp/papers/unreconwp_07001.pdf*.

none of the U.S. operators would make a red cent."[45] In 2012, baccarat, the preferred game of high rollers in VIP rooms, accounted for 69 percent of total casino-generated revenue in Macau.[46]

Although junket operators are common throughout the world—including Las Vegas, where they are referred to as "independent agents"—junket operators in Macau are significantly more involved in gambling operations and operate very differently, with far fewer restrictions. According to the written testimony submitted for the June 27 Commission hearing by Mr. Rose:

> *The Macau VIP Gaming promoters, on the other hand, are nothing like the traditional junket operators associated with American casinos, who were often paid a flat fee per head to bring in players. The Macau VIP gaming promoters can do virtually every part of the gambling transaction: recruit players, arrange transportation, provide credit, operate the gaming room in the casino, and collect the gambling debt.[47]*

Not only is the heavy reliance on the junket system and the direct involvement of junket operators in gaming transactions uncommon outside Macau, the business relationship between Macau casinos and junket promoters is also unique. Macau's junket system is not subject to the same regulatory requirements as casinos, and it is up to casinos, not the gaming regulator, to craft due diligence procedures with junket operators.[48] Also, unlike states such as Nevada, where junket operators are subject to in-depth background checks, strict internal control standards, and independent audits that are conducted in VIP rooms, in Macau, obtaining a junket license is a cursory process, and VIP rooms rely on in-house accountants to report on the financial status of their business.*[49]

According to experts who provided testimony to the Commission, Macau's junkets may have links to organized crime. During the Commission's June 2013 hearing, Mr. Burnett noted that "it is common knowledge that the operation of VIP rooms in Macau casinos had long been dominated by Asian Organized Crime (AOC), commonly referred to as 'triads.'"[50] Former Director of the Financial Crimes Enforcement Network of the U.S. Treasury Department James H. Freis, Jr., also recognized the possible link between Macau junkets and the triads in his written testimony. He wrote that "in some capacity, the involvement of organized crime groups such as China's triads is likely." Finally, during the Commission's trip to Hong Kong in July, Mr. Vickers noted the junkets' connection to organized crime: "The junket model in Macau should be the enemy, not the industry in Macau, because it is demonstrably connected to organized crime." However, despite likely affiliation with the triads, junkets continue to proliferate in Macau casinos. From 2006 to 2013, the total number of licensed junket promoters grew from 76 to 202.[51]

---

*Representatives of Wynn Resorts and MGM Resorts met with the Commission on October 21 and 23 and indicated that they maintain supervision of all the VIP gaming rooms through surveillance videos, cash room auditing, and personnel controls.

## Role and Risks of Macau's Junket System

Due to the PRC's limit on the amount of money an individual can move outside of mainland China, Macau VIP room operators hire or partner with junket affiliates, or "subjunkets," to make arrangements in mainland China to extend credit to wealthy Mainland Chinese clients to gamble in Macau's casinos—essentially bypassing the PRC's capital controls. In turn, junket affiliates are then required to collect debts incurred by clients in Macau casinos back on the Mainland in the form of RMB (see figure 1, below).

Although junket promoters are licensed in Macau, VIP room operators and their affiliates are composed of an extensive network of junket financiers, credit guarantors, and other profit participants, which are all unlicensed by Macau's gaming regulator. Such junket affiliates are often comprised of local groups that have knowledge of Mainland clients' credit histories to ensure that they will be able to collect gaming debts when the client returns to the Mainland.[52] However, the collection of gambling debts is illegal in mainland China, presenting the risk of junket operators and their affiliates resorting to extrajudicial measures to collect incurred debts, which can lead to threats and violence, according to Mr. Rose.[53] A 2008 report published by the Macau Polytechnic Institute shed light on the risks of unenforceable debt collection when it examined 99 publically reported cases of VIP gamers from mainland China.[54] The report found that seven of the "high rollers" included in the study ended up either committing suicide or were murdered.[55]

**Figure 1:  Simplified Money-laundering Technique Using Junket/Casino System**



*Source:* U.S.-China Economic and Security Review Commission (Washington, DC).

## Money Laundering in Financial Institutions

Outside of the gaming industry, Macau's banks have also been involved in money-laundering activities. One well-known example

occurred in 2005 when the U.S. Treasury Department's Financial Crimes Enforcement Network found a Macau-based bank, Banco Delta Asia, to be participating in the laundering of counterfeit U.S. dollars on behalf of the North Korean government.[56] The Financial Crimes Enforcement Network recognized Banco Delta Asia as a primary money-laundering concern, stating, "Banco Delta Asia's special relationship with the DPRK [Democratic People's Republic of Korea] has specifically facilitated the criminal activities of North Korean government agencies and front companies. One well-known DPRK front company that has been a client of [Banco Delta Asia] for over a decade has conducted numerous illegal activities, including distributing counterfeit currency."[57]

The bank was also linked to drug smuggling. "In addition to facilitating illicit activities of the DPRK, investigations reveal that [Banco Delta Asia] has serviced a multi-million dollar account on behalf of a known international drug trafficker," the Financial Crimes Enforcement Network noted.[58] Following the investigation, in 2007 the U.S. Treasury Department finalized a rule to ban the Macanese bank from access to the U.S. financial system under the USA Patriot Act.[59]

## Vulnerabilities in Macau's Regulatory System

Macau first passed legislation requiring financial and gaming institutions to report suspicious transactions* in 1998, which was replaced by a revised set of laws in 2006 that criminalized money laundering and required stricter reporting in the gaming sector.[60] The legal reforms in 2006 brought Macau more in line with global anti-money-laundering standards. Improvements included reporting requirements for suspicious transactions over a certain cash value; customer due diligence procedures intended to prevent gambling by corrupt officials using public funds; and additional record-keeping requirements.[61] However, according to Mr. Glaser, multiple deficiencies still exist in Macau's anti-money-laundering and counter-terrorist-financing framework, including Macau's refusal to seize stolen money.[62]

## Compliance with International Standards

The premier international standards for effective anti-money-laundering and combating the financing of terrorism are set by the Financial Action Task Force, a multinational body established in 1989.[63] The organization, of which the United States and Macau are both members, has created a list of 40 recommendations to prevent money laundering and the financing of terrorism. Macau is subject to a periodic review of its compliance with the recommendations as a member of the Asia-Pacific Group on Money Laundering, Asia's regional Financial Action Task Force body. The most recent evaluation of Macau's compliance with Financial Action Task Force

*The Macau SAR Gaming Inspection Coordination Bureau defines a suspicious transaction as "The operation relating to the practice of gaming or wagering which, by its nature, non-habitual manner or complexity, indicates any activity of money laundering or terrorist financing." Macau SAR Gaming Inspection Coordination Bureau, "Instruction No. 2/2006 Preventive Measures against Crimes of Money Laundering and Terrorist Financing," p. 2. http://www.gov.mo/web1/en_law.html.

recommendations was conducted in 2006 and published by the Asia-Pacific Group in 2007. Macau's next evaluation will occur in 2015 or 2016, and its compliance will be gauged against a new set of Financial Action Task Force recommendations that were revised in 2012.[64]

The 2007 evaluation recognized the risk of money laundering in Macau's gaming sector and noted multiple deficiencies in its anti-money-laundering and counter-terrorist-financing framework. According to the report, "[Macau's] close proximity [to the] border with [the] PRC and its open economy do pose a threat to ML/FT [money laundering and financing of terrorism] activities."[65] The evaluation also discovered several specific deficiencies in Macau's compliance with the Financial Action Task Force recommendations, including the refusal to respond to foreign requests to freeze assets, the inability to effectively implement UN Security Council resolutions on the financing of terrorism, and the inability of Macau's Customs Service to investigate money-laundering cases. Other shortcomings specific to the gaming sector included a lack of a risk-based assessment of gaming customers and operators, inadequate inspection and oversight of casinos and junket operators and promoters, a lack of communication among gaming regulators, and a high threshold ($62,500) for reporting large transactions at casinos.[66] In the report, Macau received a "compliant" rating in only seven of a total of 49 recommendations,* with the majority receiving a rating of only "partially compliant." Against the same recommendations, the United States was "compliant" in 15 of 49 recommendations in its 2007 evaluation, with the majority receiving a rating of "largely compliant."[67]

Since the report was published in 2007, "Macau has yet to address a number of deficiencies in its AML/CFT [anti-money-laundering and counter-terrorist-financing] framework that were identified by the APG [Asia-Pacific Group on Money Laundering]," according to Mr. Glaser.[68] He noted four major deficiencies identified in the evaluation report that have yet to be addressed: (1) Macau still has not implemented a method to freeze bank accounts in anti-money-laundering and counter-terrorist-financing cases; (2) Macau has not yet enacted a number of legal enhancements to its customer due diligence requirements; (3) Although Macau has been asked to lower its high transaction reporting threshold for casinos to $3,000 as recommended by the Financial Action Task Force,† Macau continues to allow a very high threshold of $62,500 for reporting large transactions at casinos; (4) Macau has yet to implement an effective, cross-border, cash declaration system.[69]

---

*The mutual evaluation measured compliance with the Financial Action Task Force's 40 recommendations (2003) and included an additional nine special recommendations on counter-terrorist-financing measures. Compliance with the Financial Action Task Force recommendations is rated on a scale that includes "compliant, largely compliant, partially compliant, and non-compliant." Asia-Pacific Group on Money Laundering, *APG/OGBS Mutual Evaluation Report on Macau, China* (July 24, 2007), p. 210. *http://www.apgml.org/documents/default.aspx?s=date&c=7.*

†Financial Action Task Force Recommendation 12 sets the reporting threshold at $3,000 for gaming institutions. Financial Action Task Force, "FATF Recommendation 16: Reporting of Suspicious Transactions and Compliance, Text of the Recommendation and Interpretative Note" (Paris, France). *http://www.un.org/en/sc/ctc/docs/bestpractices/fatf/40recs-moneylaundering/fatf-rec 16.pdf.*

## Shortcomings in Macau's Gaming Sector Regulation

Although casinos and junket promoters are licensed by Macau's gaming regulator, there remain significant vulnerabilities with unlicensed junket operators, junket affiliates, and satellite casinos* that play an integral role in Macau's gaming system. These entities are not subject to the same regulations and reporting requirements as licensed entities and thus are more susceptible to money laundering and influence from organized crime (see figure 2, below). During the Commission's June 27 hearing, Mr. Burnett noted this vulnerability in his written testimony, that "criminal transactions are widely alleged to take place just out of the direct purview of the casino," pointing to the susceptibility for criminal organizations to infiltrate junket groups.[70] "Such activities include back-betting, side-betting, loan sharking, violent loan collections, underground banking, and money laundering."[71]

**Figure 2:   Vulnerabilities in Macau's Licensing System**



*Source:* U.S.-China Economic and Security Review Commission (Washington, DC).

Macau's junket operators are not subject to the same transparency requirements as casinos, and strict privacy controls prevent U.S. regulators from obtaining information on individuals operating in Macau subsidiaries of U.S. parent casinos.[72] The Macau SAR Gaming Inspection and Coordination Bureau (Portuguese acronym, DICJ), Macau's gaming regulator, is also only required to publically disclose the names of licensed junket promoters in Macau and does not disclose financial information. More importantly, information about the unlicensed junket operators, their affiliates, and third-party satellite casinos is inaccessible to the public and regulatory counterparts overseas. The lack of information presents difficulties in determining the origin of money flowing through such operations, and U.S. state regulators do not have the

---

*Satellite casinos are owned and operated by third parties and are not considered concession or subconcession holders. I. Nelson Rose, "Does Macau Create Legal Risks for American Operators?" *Gaming Law Review and Economics* 14:6 (2010): 454.

authority or resources to independently conduct investigations in Macau or other foreign jurisdictions.[73] Mr. Burnett explained the legal barrier in obtaining relevant information from Macau regulators in his testimony to the Commission:

> The Macanese Privacy Act 8/2005, which took effect February 2006, has varying degrees of interpretation. It essentially forbids businesses there from transferring data on individuals to any other country. In general, therefore, it has precluded us from obtaining information from our operators to the degree we are accustomed to.

Although Macau regulators require reporting for transactions that are deemed "suspicious" in nature, there are shortcomings in the reporting requirements of gaming institutions. Macau's eyes and ears for the gaming sector, the Gaming Inspection and Coordination Bureau, require gaming institutions to automatically report all transactions above $62,500.* In the 2007 evaluation published by the Asia-Pacific Group, this threshold is considered too high to comply with Financial Action Task Force recommendations.[74] Moreover, the Gaming Inspection and Coordination Bureau does not report detailed information on the number or nature of such reports filed to the public; however, Gaming Inspection and Coordination Bureau officials have indicated that the number of reports filed annually is increasing, reaching hundreds of thousands per year.[75]

## Influence of PRC Regulations on Macau

Capital controls implemented by the PRC that are intended to prevent illicit cross-border transfers should, in theory, hinder Macau's economic growth. In reality, capital controls have caused more money to cycle through Macau due to Macau's thriving VIP gaming industry, which relies on junkets and their affiliates to facilitate cross-border money transfers for clients via underground banks. The circumvention of capital controls by junkets to get money from mainland China to Macau has been tolerated by Beijing and, according to Mr. Rose, "Beijing doesn't view this as much of a problem, unless it becomes a scandal, as when government officials embezzle [money] and lose it in Macau." [76] Recent reports, however, have signaled that Beijing is beginning to take measures to prevent illicit cross-border transfers and money laundering in Macau as part of the nationwide crackdown on corruption promoted by PRC President Xi Jinping. A December 2012 *Wall Street Journal* article reported that police in mainland China and Macau detained multiple individuals who work for Macau's biggest junket operators, a move described by a Macau casino executive as "an attempt by the Chinese government to tell people in the market that they need to behave, especially regarding underground money transfers." [77] The recent appointment of the PRC's former Hong Kong liaison Li Gang to deputy director of the Central Liaison Of-

---

*All transactions under the $62,500 threshold that are deemed suspicious in nature are required to be reported to the Macau SAR Financial Intelligence Office. Jorge Godinho, "The Prevention of Money Laundering in Macau Casinos," *Gaming Law Review and Economics* 17:4 (2013): 271, 272.

fice in Macau was also seen as an effort to gain closer oversight over Macau's gaming industry.[78] Despite these actions, analysts such as Grant Govertsen of Macau-based Union Gaming Research, remain skeptical about China engaging in a large-scale crackdown.[79] In response to comments from Beijing's liaison office, Mr. Govertsen predicted in February that "there would not be any changes in policy on Macau," based on Beijing's official pronouncements.[80]

Experts have argued that Macau's heavy reliance on junkets operating in the grey market can only be reduced if mainland China repeals its strict capital controls or permits the collection of gambling debts in mainland China.[81] The PRC's capital controls have encouraged clients to utilize junkets to facilitate money transfers, thus making it difficult to determine the origin of funds coming from mainland China. On top of the capital controls, PRC regulations forbidding the collection of gambling debts have given rise to a troubling grey market. Unlike the United States, where collection lawsuits by casinos can be filed and gamblers can be charged criminally for writing bad checks,* casinos are not allowed to collect gaming-related debts through the courts in mainland China. This prevents Macau casinos from directly seeking VIP customers, and they instead rely on unsupervised junket operators to attract clients. Casinos in Macau would prefer to attract VIP clients themselves and, according to Mr. Rose, "the casinos want to get rid of [VIP operators because the casinos themselves] want to be the VIP operators."[82]

## Implications for the United States

In Macau, undeclared cross-border cash flows, criminal influence in the opaque junket system, an ambiguous privacy law preventing disclosure of criminal activities, and substandard anti-money-laundering and counter-terrorist-financing regulations have several implications for the United States. First, Macau's junket system and its apparent link with organized crime present legal risks for the foreign affiliates of U.S.-licensed casinos operating in Macau. Those affiliates are dependent for their revenues on the same loosely regulated junket and shadow banking system. Second, Macau's gambling system has attracted the attention of Chinese nationals seeking to circumvent the PRC's strict capital controls. Some are corrupt officials hoping to invest abroad funds received through bribery and extortion—money that may be used for other illegitimate purposes in order to escape notice and taxation. Third, individuals or criminal groups involved in activities that have the potential to threaten U.S. national security may be able to exploit Macau's underregulated financial and gaming institutions to disguise illegally obtained funds, which could be used in a variety of nefarious ways against the United States. North Korea has used Macau's fi-

---

*Gambling debts in the United States can be collected through some state courts, but the process can be difficult and expensive. Some courts outside Nevada may choose not to honor debts for gambling if that activity is considered illegal in that state. Holders of unpaid gambling debts have sometimes resorted to criminal prosecutions for fraud in order to coerce payments from debtors. Casinos also make a practice of partially forgiving debts in order to collect a fraction of money owed by gamblers. I. Nelson Rose, telephone interview with Commission staff, September 14, 2013.

nancial system to launder counterfeit U.S. dollars, for example. Money laundering has proven useful in other criminal activities, such as the international smuggling trade in small arms, drugs, and cigarettes.

Macau's junket system and its susceptibility to organized crime and money laundering present direct legal risks for U.S.-licensed casinos operating in Macau. The business models of U.S. parents' Macau casinos are based on the losses of VIP clients introduced to the casinos by junket operators. As Mr. Burnett noted, "It is what the business model allows to occur outside of the casino's purview (in the VIP rooms and with the junket operators) that may pose problems."[83] U.S.-based casinos risk loss of their state-issued license if they become associated with crime figures abroad. Such rules are known as "suitability" requirements. According to the trade publication *Casino Enterprise Management*:

> *At its core, suitability involves a judgment about an individual's character based on his or her history and a prediction about his or her likely future behavior. It necessarily immerses the regulator in the murky areas of social science, psychology and even philosophy. In making a licensing decision, a gaming board or commission must determine the eligibility and suitability of each applicant and, in the case of business entity applicants, associated qualifiers. The burden is always on the applicant to establish eligibility and suitability through clear and convincing evidence as to his or her character, reputation, integrity, business probity, experience and ability, financial means and responsibility, and any other criteria that the board or commission may deem appropriate.[84]*

All U.S. casinos are licensed by at least one U.S. state.[85] Respective state regulators have the power to monitor the activity of U.S. companies in Macau and can exercise the right to revoke a casino's state license if a casino licensed in its state is determined to be associating with criminals, even if those associations are outside U.S. borders. Nevada, for example, requires that it review the overseas operations of casinos licensed in the state to determine if a licensee is complying with its Foreign Gaming Statute, which prohibits licensees from engaging in activity that "reflects or tends to reflect discredit or disrepute upon this state or gaming in this state."[86] New Jersey's Casino Control Act has similar stipulations, requiring licensees to be of "good character, honesty and integrity" on a continuing basis, obliging them to provide clear and convincing evidence in support.[87]

---

### Issues Facing U.S.-licensed Casinos in Macau

U.S.-licensed casinos began operating in Macau in 2004, when Sands opened its first gambling establishment. Currently, three U.S.-licensed casinos have operations in Macau: MGM Resorts International, Las Vegas Sands Inc., and Wynn Resorts Ltd. All three casinos have come under various forms of regulatory scrutiny regarding their Macau operations.

## Issues Facing U.S.-licensed Casinos in Macau—*Continued*

*MGM*—In 2009, MGM ran into trouble when a New Jersey gaming regulator investigated the casino's joint-venture partnership with the daughter of the Macau casino mogul Stanley Ho. In a special report by the New Jersey Division of Gaming Enforcement, Stanley Ho's daughter was deemed unsuitable under New Jersey's Casino Control Act, based on family links to organized crime in Macau and the PRC.[88] As a result of the report, in March 2010 MGM decided to enter into a settlement with the New Jersey Division of Gaming Enforcement that required MGM to divest 50 percent of its stake in a New Jersey casino. The agency also barred MGM from applying for a casino license.[89] In 2013, a petition was approved to allow MGM to apply for permission to retain its interest in its New Jersey assets, but a decision on the application will not be made by New Jersey regulators until a more thorough investigation is conducted to determine MGM's compliance with the state regulations."[90] MGM noted in a meeting with Commissioners and staff on October 23 that Nevada, Maryland, Illinois, Michigan, and Mississippi regulators had found no suitability issues relating to MGM's partnership with Ms. Ho.

*Las Vegas Sands*—Intracompany transfers* have presented a risk of junkets associated with triads transferring money from Macau into the United States. Evidence from a 2010 lawsuit filed by a former Sands executive included a ledger detailing that Sands had transferred over $28 million for more than two dozen junket operators between Macau and Las Vegas.[91] Two junket operators who were listed on the ledger, Cheung Chi Tai and Charles Heung, were identified by the U.S. Senate Permanent Subcommittee on Investigations as officers of triad groups in a 1992 report on organized crime in Asia.[92] In the report, Charles Heung was identified as an officer of the Sun Yee On triad,[93] and Cheung Chi Tai was identified as an officer of the Wo Hop To triad.[94]

As a result of increasing concerns from regulators, Sands has reportedly restructured its compliance functions, which entailed discontinuing intracompany transfers on behalf of its "high-rolling customers."[95] In addition, the casino also hired three former Federal Bureau of Investigation (FBI) agents to strengthen anti-money-laundering efforts and improve background checks of VIP customers and junket operators.[96]

*Wynn*—In 2012, Macau police detained a partner of one of Macau's major junket operators that had ties with the former Communist Party chief in Chongqing, Bo Xilai. The junket operator the individual was affiliated with was reported to operate in both Wynn and Las Vegas Sands casinos.[97]

---

*Intracompany transfers, or "cross-property deposits," are common between foreign subsidiaries of U.S. casinos and their U.S. parent casinos. They are subject to compliance with the Currency and Foreign Transactions Reporting Act of 1970 (commonly referred to as the "Bank Se-

The success of Macau's gaming sector is closely tied to the underground and shadow banking system to facilitate money transfers from mainland China.[98] Junket operators and their affiliates utilize underground and shadow banks to extend loans and facilitate cross-border transfers for Mainland customers who want to gamble in Macau, allowing them to bypass China's capital controls. Although the exact amount of credit extended to Macau gamblers and the amount of money flowing from mainland China to Macau via underground banks is unknown, the Chinese shadow banking system overall "poses serious risk to China's financial and social stability."[99]

Furthermore, the loosely regulated junket and shadow banking system that support Macau's gaming industry may allow individuals involved in criminal activities that threaten U.S. national security to exploit financial and gaming institutions in Macau to disguise illegally obtained funds. After money has effectively been "laundered," criminals may freely move those funds in the international financial system, and there is a risk of "dirty money" making its way into the United States or other countries to be used for illegitimate purposes. Criminals may exploit intracompany accounts to move money from casino subsidiaries in Macau into the United States.[100]

Macau's banking institutions have also presented a risk to the United States. As in the case of Banco Delta Asia, individuals or organizations involved in activities against the interests of the United States may exploit financial institutions in Macau to launder counterfeit U.S. dollars, disguise financial transfers, or deposit funds from illegal activities such as drug trafficking. Because Macau's law enforcement agencies lack certain capabilities to effectively freeze or seize assets as identified in the 2007 mutual evaluation, it may be difficult to prevent the financing of criminal or terrorist activities in a timely manner.[101]

---

### Submissions from U.S.-based Casino Operators

The Commission met with two U.S. casino companies, Wynn Resorts and MGM Resorts International, on October 21 and 23 at their request. The two companies disagreed with some portions of this section and offered additional information of their own with respect to actions they have taken to mitigate the risks the Commission and others have identified. Their information follows.

Wynn: "Macau's junkets operators are under continual supervision and audit by the gaming regulator, financial intelligence unit and monetary authority. Further, Macau casino companies such as Wynn are active participants in VIP rooms providing dealers, supervisors, pit managers and security. The rooms are also under surveillance by Wynn staff and the gaming regulator who has full access to Wynn's surveillance system. In addition to regulatory audits, Wynn's internal audit group audits junket compliance with AML [anti-money-laundering] rules/procedures.

---

crecy Act" or "BSA"). Nevada Gaming Control Board, telephone correspondence with Adriana

## Submissions from U.S.-based Casino Operators—
### *Continued*

"Wynn files Suspicious Transaction Reports every month. Recently, Wynn Macau employees became suspicious of an attorney gambling with funds wired to the casino from a questionable account. The report Wynn Macau made to the Hong Kong Police resulted in uncovering and prosecuting a system of embezzling from client trust funds. Wynn Macau is actively vigilant, using years of experience in law enforcement and gaming, with respect to suspicious financial activities. The company has a strong incentive to report such activities because the company is legally required to do so and the gaming licenses of the company are at risk. The company trains its employees to be zealous in reporting anything that may be even considered slightly suspicious. For example, if a customer comes to the casino, plays for cash, and wins $25,000 or more and refuses to provide proper identification when he attempts to cash out, we not only file a Suspicious Transaction Report, we also refuse to cash out the customer.

"The Macau authorities and Wynn are active participants in VIP rooms providing dealers, supervisors, pit managers and security. The rooms are also under surveillance by Wynn staff and the gaming regulator who has full access to Wynn's surveillance system. In addition to regulatory audits, Wynn's internal audit group audits junket compliance with AML rules/procedures.

"Junkets and subjunkets are licensed by the gaming regulator if they pass a background check and police clearance. Wynn Macau then engages in its own due diligence of its junkets prior to allowing them to commence operations. Wynn Macau only does business with licensed junket operators (after all background screening is completed and the junket found suitable to do business with Wynn Macau).

"With respect to know-your-customer-protocols, Macau casinos are required to screen their patron databases and Wynn Macau employs the Worldcheck Database to screen for patrons who may pose AML, crime/fidelity, terrorism, OFAC [Office of Foreign Assets Control] or PEP [politically exposed persons] risk. Macau is in the process of exploring currency importation declarations."

MGM: "Macau's internal controls are sufficient to safeguard assets and promote fair and equitable gaming within the Macau jurisdiction. In addition the Maryland Lobbying Gaming Control Commission found that MGM Macau has policies and procedures that not only minimally satisfy the rules, regulations and laws of the Macau government, but have instituted procedures that go substantially above and beyond these minimum requirements.[102]

"MGM background checks are conducted on the following entities related to gaming promoters: Individual applicants and company's shareholders and directors (and) any individual, entity or group providing a guarantee of credit in connection with the VIP room operations in MGM Macau."

## Universal Suffrage, Press Freedom, and Police Surveillance in Hong Kong

Tensions over erosions of Hong Kong's traditional civic freedoms appear in Hong Kong street demonstrations and in social media sites. Issues of particular concern include the Hong Kong government's slow progress in granting the universal suffrage stipulated in the region's Basic Law, tightening restrictions on the press, and stepped-up police surveillance of civil rights activists. Several legislators who met with Commissioners in Hong Kong in July expressed concerns that growing political polarization and heavy-handed efforts by the pro-Beijing-controlled government to stifle dissent threaten to render the city ungovernable.[103] These concerns are borne out by the numbers. In one July poll, the pro-Beijing chief executive scored a record low approval rating of just 15.8 percent, while 37 percent of respondents reported that they do not trust the Hong Kong government.[104,105]

Hong Kong never enjoyed a fully democratic government under British rule. But before Hong Kong's return to the PRC, Hong Kong's citizens enjoyed popular participation in political affairs as well as "a vibrant media," "an effective and meritocratic bureaucracy," rule of law, and the protection of key civil rights and liberties under the Letters Patent and Royal Instructions that served as Hong Kong's principal constitutional documents.[106] Hong Kong's Basic Law, a sort of "mini-constitution promulgated to implement the basic policies of the central government toward Hong Kong," provides for "the separation and preservation of the two economic, social, political and legal systems through the legal entrenchment of Hong Kong's [preexisting] systems" until 2047.*[107,108]

Sophie Richardson, China director at the Human Rights Watch's Washington office, testified at a Commission hearing on June 27 that since its return to PRC sovereignty in 1997, Hong Kong has "remained the only part of China with a robust and independent legal system, relatively strong protections on the freedom of expression, and limited but regular elections."[109] But she noted that since the handover, there have been very worrying developments, as maintaining the economic strength of the region's traditionally capitalist system has clearly been prioritized by Beijing, whereas preservation of the civil rights associated with political autonomy has not. Dr. Richardson noted that "large numbers of Hong Kong residents continue to object to what are considered intrusions on Hong Kong's autonomy and rally in remarkable numbers to remember events like the Tiananmen massacre," but government efforts to restrain their freedom have grown.[110] Freedom House's Madeline Earp told the Commission that in the initial years following the handover of Hong Kong to mainland China, the region's role as a "golden goose" for the Mainland helped to insulate it from anti-democratic pressures in Beijing.[111] Nowadays, however, the rel-

*The Basic Law of the Hong Kong Special Administrative Region (SAR) is a constitutional document that sets out the basic principles agreed to in the 1984 Sino-British Joint Declaration on the Question of Hong Kong. The Joint Declaration spelled out agreed-upon terms for the government of Hong Kong after Great Britain's return of the region to the sovereignty of the PRC. According to this declaration, the Hong Kong SAR would retain its capitalist system and life-style for 50 years. The declaration went into effect after the handover of Hong Kong on July 1, 1997. The Basic Law was drafted by a committee of Mainland and Hong Kong Chinese and was formally adopted by the National People's Congress on April 4, 1990.

ative affluence of many Mainland coastal cities and ports, such as Shanghai, has reduced Hong Kong's economic importance to the Mainland. While Hong Kong does still play a unique economic role within the PRC that Beijing is "loathe to tinker too much with," Hong Kong's prosperity is not the impenetrable shield of civic freedoms it once was.[112] Beijing also wields greater political leverage in the region, because many Hong Kong business leaders now hold Mainland investments that they did not have 20 years ago.

Recent examples of Beijing's constraints on Hong Kongers' freedom include more frequent requests to the National People's Congress Standing Committee to interpret the Basic Law, appointments of pro-Beijing partisans in key Hong Kong institutions, denials of Hong Kong visas to Chinese dissidents, and an inflammatory proposal designed by the Hong Kong Curriculum Development Council* to require Hong Kong schools to teach students the nationalistic version of history taught on the Mainland.[113,114] Backlash against this national education initiative reached a crescendo in the summer and fall of 2012. At least 30,000 people reportedly attended a July 2012 protest against the education plan, while roughly 30,000 attended a September 2012 protest.[115] Many thousands of protestors waved colonial flags. To the organizers, the flag symbolized an era of greater protection of civil rights and liberties under British colonial rule.[116,117] In the end, the colonial flag demonstrations grew so big and intense that the Hong Kong government retracted plans for the new patriotic history lessons.[118] But while popular resistance to the nationalistic education requirements demonstrated the persistence of self-determination for Hong Kong's citizens, it contrasts with many more examples of how important rights and liberties in the region are eroding.

### Universal Suffrage

The most significant problem for democratic rights activists is the Hong Kong government's lack of progress toward ensuring universal suffrage in the election of the Legislative Council and the chief executive. Although the Basic Law articulates a goal of achieving some form of universal suffrage in the elections of both the chief executive and the legislature, the dominance of the Hong Kong government by politicians allied to Beijing has stymied progress in achieving universal suffrage. Beijing-friendly current Chief Executive Leung Chun-ying (CY Leung) is described as "a populist on economic issues" with "a limited tolerance of democracy and public demonstrations."[119]

Despite assurances by Chief Executive Leung that he supports universal suffrage, neither the Mainland government nor the Hong Kong chief executive has "outlined clear plans on how universal suffrage might be instituted."[120,121] In March 2013, Chief Executive Leung said in meetings with Chinese President Xi Jinping that he was committed to the process of achieving universal suffrage in Hong Kong by 2017. He reiterated this commitment in July, promising that free and open elections for the Legislative Council would

---

*The Mainland government did not design the contested educational curriculum. Rather, it was designed by the Hong Kong Curriculum Development Council, a body whose members are appointed by the Hong Kong chief executive, whose leanings are decidedly pro-Beijing.

follow in 2020. But as Dr. Richardson noted in her testimony, these dates have been Beijing's tentative targets since statement decision made by the National People's Congress Standing Committee in 2007.[122] Many Pan-Democrats* are afraid that the Mainland is seeking to postpone universal suffrage or stop it altogether by rigging elections to limit them to candidates who are pro-Beijing. The idea would be to ensure that the Hong Kong government continues to be dominated by pro-Beijing representatives. Article 22 of the Basic Law stipulates that no offices or Mainland authorities may interfere in the affairs of the Hong Kong SAR, but pro-Beijing sympathies are not deemed interference. In elections of the chief executive and the Legislative Council, Mainland sympathizers continue to enjoy a distinct advantage due to the configuration of the electoral system.[123,124]

Article 45 of the Basic Law specifies that "the ultimate aim" for selection of the chief executive, the highest office in the Hong Kong government, is "universal suffrage upon nomination by a broadly representative nominating committee in accordance with democratic procedures." [125] At present, the chief executive is chosen from a slate of nominees by a 1,200-person election committee. Shi Zhangshan, a Washington, DC-based Hong Kong expert, notes that "it took 10 years to increase the members of the Hong Kong Election Committee from 400 to 800 and then 1,200" and that by sticking to the pace of this so-called progressive approach, it would take Hong Kong 10,000 years to gain universal suffrage for its seven million citizens.[126] The current election committee is heavily populated with business figures, who have investments in mainland China, as well as politicians and labor leaders with strong connections to Beijing, giving it a distinctly pro-Beijing slant. A former Legislative Council member told Commissioners that Beijing effectively controls roughly 950 of the 1,200 election committee votes for chief executive.[127] In the 2012 chief executive election, pro-Beijing candidate CY Leung won with 689 votes, while Henry Tang, the runner-up and also a pro-Beijing candidate, received 285.[128] By contrast, the most popular prodemocracy candidate, Albert Ho of the Democratic Party, received a mere 79 votes.

Article 68 of the Basic Law specifies that "the ultimate aim is the election of all the members of the Legislative Council by universal suffrage." [129] For the time being, 35 members of the 70-person legislature are directly chosen through geographical constituencies in which members of the general population are each afforded one vote. Another 30 members are elected by traditional functional constituencies, in which professionals in specific fields such as insurance, transportation, health care, education, accounting, commerce, industry, finance, and tourism are allowed to cast a vote in addition to their vote in their geographic constituency," giving them greater voting power than the general populace.[130] Certain business entities and professional organizations are also given votes in the functional constituencies. Five Legislative Council members are elected by district council constituencies, which are made up of regular voters not in professional sectors already represented by the

---

*Politicians and members of civil society affiliated with a variety of prodemocracy groups often band together to promote their common cause and are collectively referred to as pan-demo-crats.

375

traditional functional constituencies. The greater representation of some segments of society as a result of the functional constituencies, combined with the dominant support for pro-Beijing candidates among functional constituency voters, has ensured that the Legislative Council remains in the control of pro-Beijing representatives. Since 2004, the split has stood at roughly 60/40. Figure 3 illustrates the politics of legislators elected by the functional constituencies vs. those elected by the geographic constituencies. Figure 4 shows the pan-Democrat vs. pro-Beijing split in the Legislative Council over time.

**Figure 3:   Pan-Democrat vs. Pro-Beijing Representatives in Legislative Council, 2012–2016**



*Source:* Chung-Kai Sin, "Political Elections, Parties and Reforms since 1984," June 8, 2013.

**Figure 4:  Pan-Democrats vs. Pro-Beijing Representatives in Legislative Council, 1998–2012**

| Term | Pan-Democrat Camp | Pro-Beijing Camp | Total Seats |
|---|---|---|---|
| 1998 (1st term) | 20 (33.33%) (13 seats—DPHK) (3 seats—The Frontier) | 40 (66.67%) (9 seats—DAB) (10 seats—Liberal Party) | 60 |
| 2000 (2nd term) | 21 (35.00%) (12 seats—DPHK) (2 seats—The Frontier) | 39 (65.00%) (11 seats—DAB) (8 seats—Liberal Party) | 60 |
| 2004 (3rd term) | 25 (41.67%) (9 seats—DPHK) (4 seats—Article 45 Concern Group) | 35 (58.33%) (10 seats—DAB) (10 seats—Liberal Party) | 60 |
| 2008 (4th term) | 23 (38.33%) (8 seats—DPHK) (5 seats—Civic Party) | 37 (61.67%) (10 seats—DAB) (7 seats—Liberal Party) | 60 |
| 2012 (5th term) | 27 (38.57%) (6 seats—DPHK) (6 seats—Civic Party) | 40 (61.43%) (13 seats—DAB) (6 seats—Liberal Party) | 70 |

*DPHK—Democratic Party of Hong Kong; DAB—Democratic Alliance for the Betterment and Progress of Hong Kong; HKFTU—Hong Kong Federation of Trade Unions.

*Source:* Chung-Kai Sin, "Political Elections, Parties and Reforms Since 1984," June 8, 2013.

Since two-thirds of all Legislative Council members are required to endorse any amendment to the process of electing the chief executive, pro-Beijing dominance in the Legislative Council dims the prospects for amendments that would advance universal suffrage. The pall that this has cast on hopes of achieving universal suffrage is amplified by a December 29, 2007, statement by the National People's Congress Standing Committee that universal suffrage in the election of the Legislative Council will be implemented only after implementation of universal suffrage in the election of the chief executive.[131,132]

In discussions with Commissioners during a July fact-finding trip to Hong Kong, Legislative Councilor Chung-Kai Sin explained that Pan-Democrats' worries over prospects for universal suffrage have been stoked by recent statements from the Mainland.[133] In March, for example, Qiao Xiaoyang, chairman of the legal committee of the National People's Congress, warned that Beijing "would not accept a chief executive candidate who adopted a confrontational attitude towards the central government."[134] In July, Zhang Xiaoming, director of the central government's liaison office in Hong Kong, used a sieve to illustrate the advantages of a screening and filtration process to ensure that all candidates for chief executive are acceptable to Beijing.[135] Chief Executive Leung says he favors allowing all adults to vote but is vague about whether he would support allowing the chief executive ballot to feature candidates opposed by Beijing.[136]

In March 2013, 27 lawmakers from 12 pan-democratic groups formed the Alliance for True Democracy to demand that the government deliver universal suffrage in the 2017 election, but it is unclear if this coalition will remain united. Past efforts by the various democratic parties to promote universal suffrage have dissolved into disagreement. Mr. Shi notes that Beijing has lots of practice dividing the opposition, and these divisions are surfacing once again. Some Pan-Democrat lawmakers have backed Martin Lee Chu-ming, former chairman of the Democratic Party, in his recent suggestion for a screening committee to ensure that at least five candidates stand for election and that one of them is prodemocracy, but others have chastised him for recommending a screening mechanism at all.[137]

April 2013 saw the formation of a civil disobedience movement to support 2017 suffrage. Dubbed "Occupy Central" (Hong Kong's core downtown financial district), the movement was started by Benny Tai, a law professor at Hong Kong University. Professor Tai says the Occupy Central movement will be peaceful and will feature several days of deliberation culminating in early 2014, when occupiers will gather in small groups to discuss political reform. The movement's plan is to follow this deliberation with a Hong Kong-wide ballot allowing people to choose their vision of reform. It would then demand that the government carry out the popular will. Sit-in protests would follow in the central city should the government resist.

"The key point of the movement is about developing a democratic culture of rational discussion and consensus building by the people themselves," says Professor Tai.[138] But business groups, led by the Chinese General Chamber of Commerce, fear that the movement will hurt the city's economy, while pro-Beijing groups argue that it will hurt the city's interests more broadly. One pro-Beijing group, Voice of Loving Hong Kong, staged counterprotests at the first Occupy deliberation on June 9.[139] One former official describes the movement as having "touched a nerve" with Beijing and notes that many companies with ties to Beijing have been persuaded to take out full page advertisements against Occupy Central in various Hong Kong newspapers.[140] The Hong Kong government has also publicly warned that it sees no possibility of the Occupy Central gatherings being lawful, and former Central Policy Unit head Lau Siu-kai expressed concerns that the movement would become radical and "end in bloodshed."[141,142]

## Press Freedom

Pro-Beijing newspapers such as *Wen Wei Po* have accused "external powers" of being behind the Occupy Movement, while a leading mainstream English-language newspaper, the *South China Morning Post,* ran an editorial earlier this year saying that "Hong Kongers need genuine democracy—of that there can be no doubt," but then followed the editorial by declaring its opposition to Occupy Central's peaceful civil disobedience plans.[143] Within the Hong Kong press community and among international free press advocacy groups, such editorial kowtows to the pro-Beijing government are widely perceived as demonstrative of the Mainland's increasing sway over the Hong Kong press. Article 27 of the Basic Law grants

Hong Kong residents "freedom of speech, of the press, and of publication" and, on the surface, it would seem that a vibrant Hong Kong press remains alive and well today, given that the city of seven million people supports 46 daily newspapers and 642 periodicals as of 2010.[144] But the large number of media outlets belies what Ms. Earp and other critics say is a diminishing diversity of voices in the Hong Kong press.[145] According to Ms. Earp, in the early years after the handover, PRC media interventions in Hong Kong were generally limited to Mainland political issues, but political pressures and the influence of Mainland economic interests on Hong Kong media owners are increasingly evident.[146] Beijing's Hong Kong Liaison Office, for example, "played a uniquely aggressive role in the run-up to the chief executive election last year, effectively ordering news outlets to support the eventual winner."[147]

In 2005, Freedom House ranked Hong Kong 28th in the world among 197 countries and territories in terms of press freedom and assigned it a status of "free," but by 2012, Hong Kong's ranking had fallen to 33rd and "partly free."[148] In January, Reporters without Borders released its *World Press Freedom Index 2013*, showing Hong Kong press freedom at a five-year low of 58th out of 179 locations worldwide.[149,150] Its 2002 ranking had been 18th.[151] Reporters without Borders ranked mainland China 173 for 2013, while Taiwan garnered the top spot among Asian localities, coming in at 47.[152] But Taiwan may not be a regional gold standard for long, as Mainland pressures on the media are increasingly apparent there, too. In both places, potential media buyouts threaten to give pro-Beijing business magnates control over independent news outlets currently known for being critical of the Mainland government. For example, in late 2012, Jimmy Lai, the outspoken owner of Hong Kong-based Next Media and the pro-Democracy *Apple Daily* paper, sold his Taiwan media holdings to a group of businessmen supportive of the Beijing government.[153] In early 2013, *China Daily* reported that a Shanghai real estate tycoon was seeking a controlling stake in Hong Kong's cash-strapped and increasingly pro-Beijing broadcaster Asia Television Limited.[154]

The Hong Kong press itself reports a sense of diminishing freedom. In 2007, a major Hong Kong Journalists Association survey showed that 58.4 percent of the industry respondents felt press freedom had been eroded since the 1997 handover.[155] In early 2012, a survey asked if press freedom had deteriorated since Donald Tsang took over as chief executive seven years before. The survey showed that 87 percent of the 663 journalists polled indicated that they felt it had.[156] Growing political interference from Beijing, tighter government controls on information, and rising self-censorship by the media outlets themselves were the key reasons cited in this trend.* More than 92 percent of respondents in the Hong Kong Journalists Association's spring survey felt that government restraints on information had surpassed self-censorship as the main factor undermining press freedom.[157] This sense of diminishing

---

* According to a spring 2013 Hong Kong Journalists Association poll, of the 663 reporters, photographers, editors, and media management respondents, 92.7 percent attributed the erosion of press freedom to the Hong Kong government's tighter grip on information; 71 percent attributed it to increased self-censorship; and 67.5 percent attributed it to the growing influence of the Chinese central government.

press freedom correlates with survey data indicating that the Hong Kong public perceives newspapers as less credible, though it is worth acknowledging that U.S. media credibility has been on a downward trajectory over the past decade, too.[158]

Following the election of Mr. Leung to chief executive in 2012, press freedom advocates reported an escalation in government efforts to censor and control media access to official information. This is viewed as problematic, because it is not simply the Hong Kong government that controls the release of information to the press but specifically the governing party dominating access to official information.*[159] Decisions to grant or refuse media licensing under Hong Kong's Broadcasting Ordinance are made by the executive branch. Some prodemocracy stations, such as Citizens' Radio, have had difficulty obtaining licenses.†[160,161] Free press advocates also contend that the government has reduced the number of full press conferences it holds for Hong Kong media and more often opts to communicate information via press releases, thereby denying journalists the opportunity to ask questions.[162] The government has also reportedly begun offering information on background without specific attribution or via anonymous statements.[163,164] Hong Kong officials contend that the Hong Kong government's issuance of press releases and video clips has actually declined over the past five years (from 177 in 2008 to 127 in 2012), while the number of press conferences and briefings has steadily increased (from 1,181 in 2008 to 1,372 in 2012). The Hong Kong Journalists' Association cites its own research to contend that those numbers do not tell the full story, since full press conferences are typically held only for noncontroversial issues, whereas off-the-record background briefings are more frequently used for politically sensitive matters.[165] In 2012, press complaints rose about police blocking media access to emergency hotlines and restricting access to political protests and other politically sensitive events.[166] In August 2011, for example, the media were largely denied access during a three-day visit by Chinese Vice Premier Li Keqiang, and press that were admitted to the official ceremonies were confined to a designated press area remote from event activities.[167] Though it is not clear that police treatment of the press has improved since that time, a government report on the complaints arising from the Li Keqiang visit does note, "Public concerns over the magnitude of the security operation have unfortunately created an overcast on the reputation of the Police." The report also stresses that the episode provides a valuable opportunity to make "improvements in the planning and execution of security operations, to avoid similar complaints in the future and to reaffirm commitment [by the Hong Kong police] to discharging duties professionally and lawfully without any political consider-

---

* Mak Yinting, chairperson of the Hong Kong Journalists Association, notes in a July 2012 CNN op-ed, "Hong Kong press freedom under Chinese attack": "In one recent example, a population policy report was presented at a Rotary Club lunch by Chief Secretary Stephen Lam. A closed-door briefing was held, during which no audio or video recording was allowed. The full report was also not provided to the media, who were told to find it on the government's website."

† The Hong Kong government contends that over a several year period, Citizens' Radio repeatedly failed to submit requested additional information and clarification regarding its proposed use of frequency spectrum and that the Broadcasting Authority decided not to grant a license because of these information insufficiencies in the Citizens' Radio application. Unlicensed broadcasting is criminal in Hong Kong, and *HKSAR v Wong Yuk Man and others* (2012) notes that the unlicensed and uncoordinated use of radio frequencies may interfere with licensed users and emergency, air, and navigational services users.

ation, and safeguarding fundamental rights and freedoms of the public."[168]

Newly proposed legislation would further limit journalists. An antistalking bill that may be considered this year could hinder journalists' ability to seek out information from sources. The Hong Kong Journalists Association has said that while it agrees that "innocent people should be protected from harassment in the form of stalking," the new law, "if implemented, will have an adverse impact on legitimate journalistic activities and could be abused to block genuine investigative activities by journalists."[169] Another law would limit personal data that corporate directors must make public. While supporters argue that this law is important for enhancing protections of individual personal data, detractors are concerned that it will unduly shield directors from media scrutiny.[170] The debate over the corporate director data law comes in the wake of major U.S. media outlets embarrassing the Chinese leadership with allegations of corruption, nepotism, and profiteering that were partially substantiated by research involving Hong Kong's corporate databases. The databases helped the media to confirm that multi-billion-dollar business interests were vested in the families of then Chinese Premier Wen Jiabao and President-designate Xi Jinping. Press freedom advocates contend that reporting the business details of the families of government is a legitimate press function, but supporters of the proposed data restrictions argue that business directors should be afforded greater personal privacy.[171]

Media self-censorship is also a pervasive concern. A poll conducted in May 2013 by the Public Opinion Program of the University of Hong Kong found that 48 percent of respondents believed that the local news media practiced self-censorship. The veracity of this perception was borne out by the 2012 Hong Kong Journalists Association poll results, which showed 36 percent of media employees conceding that "they or their supervisors had practiced self-censorship in the past 12 months."[172] In that same Hong Kong Journalists Association survey, 79.2 percent of journalists said self-censorship has grown since 2005.[173,174]

Self-censorship has increased as the Chinese central government has co-opted media company owners. According to the 2013 annual report of the Hong Kong Journalists Association, roughly 50 percent of Hong Kong media owners have been appointed to the National People's Congress or the Chinese People's Political Consultative Conference. Publishers of the four leading pro-Beijing newspapers—*Ta Kung Pao, Wen Wei Po, Hong Kong Commercial Daily*, and the Hong Kong edition of *China Daily*—are "routinely appointed to one of the two national bodies."[175] These four papers, which make up 13.3 percent of news outlets in Hong Kong, have also recently implemented special vetting groups for articles pending publication.[176] Owners of an additional 36.7 percent of Hong Kong's news outlets have been appointed to the Chinese bodies. Only four news outlets (13.3 percent) are clearly free of Beijing or Hong Kong government ties. These are the two newspapers published by Jimmy Lai's Next Media Group (*Apple Daily* and *Sharp Daily*); *am730*, a free newspaper published by the fiercely independent Hong Kong businessman and philanthropist Shih Wing-

ching; and *Metropolis Daily*, the Hong Kong edition of the international *Metro* newspaper series published by Swedish-owned Metro International.[177]

According to the Belgium-based International Federation of Journalists, during the legislative and chief executive elections in 2012, the Hong Kong media received "a white-list of pro-establishment candidates whom they were expected to promote unconditionally."[178] At least some in the media establishment followed the government's suggestions. In one incident, *Sing Pao Daily News* newspaper editors admitted to having altered veteran columnist Johnny Lau's opinion column to support Mr. Leung ahead of the election. After the election, Mr. Lau's column was dropped from the paper following a piece he wrote on the death of a Mainland dissident.*[179] Such reports of internal censorship within the top ranks of the Hong Kong media have risen as media owners have established closer ties with the Mainland. Many Hong Kong media owners have business interests in mainland China to protect, and others have accepted honorary political titles in the PRC, despite the fact that accepting such titles poses a conflict of interest.[180]

While violent retaliation against the press in Hong Kong for its political reporting remains uncommon, some press advocates say it is on the rise. There were 11 attacks against journalists and media outlets in Hong Kong in 2012 and the first half of 2013, and the attackers in only two of those incidents were brought to justice. In February 2013, a *South China Morning Post* photographer was slapped, shoved, and verbally assaulted while covering a sensitive story on parallel importers.†[181] In July 2012, a New Tang Dynasty television reporter covering a Falun Gong protest was threatened by a pro-Beijing counterprotestor wielding a butcher knife.[182] In August and September 2012, *Sing Tao* News Corporation's offices were attacked by masked men who smashed equipment and windows with an axe.[183] *Apple Daily* parent company *NextMedia* and owner Jimmy Lai were the targets of a series of attacks in June 2013, including a raid in the early hours of June 30 in which masked men armed with knives intimidated workers and burned 26,000 copies of the forthcoming *Apple Daily* issue.[184] On June 26, the driver of a truck unloading copies of *Apple Daily* was chased by knife-wielding assailants who then set the truck and cargo on fire. On June 19, attackers rammed Mr. Lai's house gate with a car and left behind two axes. Mr. Lai offered a reward for information leading to the attackers, whom he believed were motivated by anti-democratic sentiments. Police believe the attacks are related, and two arrests have been made, but no charges have yet been filed.[185]

A few attacks have also occurred in the presence or at the hands of police, suggesting a degree of official coercion or complacency. On August 7, 2013, the International Federation of Journalists condemned a series of attacks on members of the press at an August

---

*Although *Sing Pao Daily News* is not one of the four leading pro-Beijing newspapers, it maintains clear ties to Beijing. As of December 2012, *Sing Pao Daily News* has been run by Tian Bingxin, a veteran journalist for Chinese government–run Xinhua News Agency. Prior to Mr. Tian's appointment, *Sing Pao* was run by mainland Chinese businessman Xie Haiyu.

†Parallel trading, buying in demand goods like foreign baby formula tax-free in Hong Kong and reselling them on the Mainland for a profit, is a growing industry in Hong Kong. It is also a growing cause of local unrest because it has increased prices and decreased the supply of certain goods in Hong Kong.

4 incident in which photographers covering a pro- and antipolice protest were blocked and pushed to the ground by unidentified assailants. One of the photographers, Yel Tang of *Ming Pao* newspaper, noted that policemen on the scene declined to intervene on the journalists' behalf.[186] (Hong Kong authorities dispute this contention, noting that five people were arrested and charged with "common assault" and "disorderly conduct in a public place.") A handful of journalists have also been detained by police while covering protests and official events. In June 2012, a journalist for *Apple Daily* was detained and questioned after shouting a question at Hu Jintao about Hong Kongers' support for the victims of the 1989 Tiananmen Square massacre.[187]

### Police Surveillance

Under British rule of Hong Kong, police had longstanding, unofficial authority to conduct surveillance, but the 2006 posthandover Interception of the Communications and Surveillance Ordinance granted police broader and more explicit authority to conduct physical and communications surveillance for the sake of public security.[188] The law does impose restrictions on law enforcement's ability to intercept communications without authorization, but it does not explicitly ban surveillance for political purposes, and breach of the ordinance is not criminal. The bill passed 32 to zero after Pan-Democratic lawmakers in the 60-member Legislative Council walked out of the chamber in protest when all of the 200 amendments they sought to introduce were defeated or ruled out of order.[189] In 2011, authorized wiretaps and covert surveillance led to the arrest of 137 people, and there is growing concern among democracy advocates that the surveillance is targeted at them.

In 2013, police began testing video cameras clipped to their uniforms, which they are not permitted to use to film the public unless they have a "justifiable reason," such as gathering evidence in confrontational scenarios or incidents where a breach of the peace has occurred or is deemed likely to occur. Like highway patrol cameras, they will record the actions of citizens and officers alike. Hong Kong democracy rights activists have expressed concerns that the cameras will be used to monitor political activists. Human Rights Watch has reported that police are using these cameras to take close-up shots of demonstrators even when there is not criminal behavior during the demonstrations "and even when protestors have explicitly told the police that they do not wish to be filmed."[190] If a person blocks the camera, he or she can be charged with obstructing a police officer in the execution of his duty.[191]

The introduction of police cameras comes at a time when protests against the Hong Kong leadership are up sharply. In addition to the Occupy Central efforts and the rallies against the national education proposal, thousands of Hong Kong residents have participated in protests calling for the resignation of Chief Executive Leung, and anywhere from 100,000 to 400,000 Hong Kongers turned out to participate in July 1 prodemocracy rallies despite heavy rain. In addition, tens of thousands of Hong Kongers also turned out for the June 4 vigil commemorating the victims of the 1989 violence in Tiananmen Square. Some prodemocracy advocates worry that police might use the cameras at such events to build up

a database on social activists for "political prosecutions."[192,193] Indeed, Pan-Democratic legislators meeting with Commissioners in Hong Kong reported that police are now monitoring and arresting prodemocracy demonstrators as much as 12 to 24 months after their participation in political events.[194] In July 2013, for example, Yau Ka-yu was reportedly arrested and charged with illegal assembly in relation to her 15-month-old participation in an April 2012 protest outside the China Liaison Office in Hong Kong.[195]

Article 27 of the Basic Law grants Hong Kong residents "freedom of association, of assembly, of procession and of demonstration," but demonstrations and protests are also governed by the Public Order Ordinance. This ordinance was amended in 1997, shortly before the handover, to stipulate that organizers of groups of more than 50 protestors or processions of more than 30 protesters "have to both notify the police seven days in advance and receive a 'notice of no objection' from the government before they can be held."[196] According to Hong Kong-based Civil Human Rights Front, there were 444 arrests of protestors in 2011, "which surpassed the total number of protestors arrested since 1997."[197] The increase in arrests may also be partially attributed to a threefold increase in protests and processions, from 2,300 in 2002 to 6,800 in 2011. According to Ms. Richardson, police insisted that the increased arrests are due to increased violence, but "protestors allege that the government is using parts of the Public Order Ordinance, which includes vague standards such as whether at a given protest 'a breach of the peace is likely to be caused,' to punish and deter protestors."[198]

A watchdog system exists for police abuses of power, but while it can report on complaints and make recommendations to the commissioner of police and the chief executive, it cannot take direct action to rectify problems. From mid-2010 to mid-2011, complaints to the Independent Police Complaints Council surged over 50 percent from the prior year. There were 2,672 allegations against police in 2008; 4,257 allegations in 2009; and 7,964 allegations in 2010.[199] The biggest spikes involved allegations of the fabrication of evidence, and assault, but Hong Kong authorities note that more than 80 percent of total complaints received have been for minor issues such as "misconduct," "improper manner," "use of offensive language," and "neglect of duty."[200] Some of these incidents involved Hong Kong authorities apprehending and handing over Chinese political dissidents to Beijing without due process and despite there being no extradition treaty between Hong Kong and the Mainland.[201]

Police requests for electronic data also appear to be on the rise. In late 2012, for example, Google reported that in the first half of the year it had received 192 requests for data to use in investigations compared to 325 in all of 2011 and 140 in all of 2010. The increase prompted calls for an investigation into privacy violations. However, Hong Kong laws no longer protect data privacy where the data are obtained for "prevention, preclusion, or remedying of unlawful or serious improper conduct."[202] Without explicit protections for the exercise of free speech and freedom of assembly, existing protections may be inadequate to protect the exercise of such civil liberties.[203]

## Implications for the United States

While the U.S. approach to bilateral relations with China and the SARs has allowed integrated discussion and consideration of a range of security and economic issues, Hong Kong's civil rights and liberties concerns have increasingly fallen through the cracks as other China-related issues have taken precedence.

Hong Kong's traditional civic values continue to be integral to its international economic power and importance. It is these civil rights and political freedoms that have ensured that transparency and the rule of law remain hallmarks of Hong Kong's trade and investment culture. This makes Hong Kong an important gateway for business relations with the Mainland. As these traditions are permitted to erode, it will be to the detriment of U.S.-China bilateral economic relations more broadly.

Furthermore, the United States has long taken the position that it expects Beijing to uphold the democratic commitments it made in the Sino-British Declaration and in the Basic Law. To the extent that these issues are marginalized in our bilateral engagement with China, the United States is not only overlooking important economic interests but also compromising fundamental American values for the sake of diplomatic expedience.

## Conclusions

- The rapid inflow of money to Macau, its casino-oriented economy, and its proximity to the PRC present a significant risk of money laundering and financing of terrorism, particularly in the under-regulated shadow banking and junket system supporting the VIP gaming business in Macau.

- A combination of the PRC's strict capital controls and restrictions on the collection of gambling debts has given rise to grey market alternatives to facilitate the movement of gambling funds into Macau. Gambling debt collection conducted by unregulated third-party affiliates in the Mainland is susceptible to organized crime and violence.

- Macau's junkets with alleged criminal affiliations present legal risks for U.S.-licensed casinos operating VIP rooms in Macau. Casinos found to be working with junkets directly or indirectly associated with Asian organized crime may be subject to revocation of their state-issued license to operate in the United States.

- Macau's loose regulation of the junket system and its strict privacy law prevent U.S. regulators from accessing information they are accustomed to, and U.S. state regulators lack the authority and resources to independently conduct investigations in foreign jurisdictions. This prevents U.S. regulators from accurately accessing the situation in Macau and effectively stops them from evaluating individuals conducting business with U.S.-licensed casinos.

- Macau's anti-money-laundering and counter-terrorist-financing framework has fallen short in complying with internationally recognized standards. Numerous vulnerabilities remain in its regulations, including deficiencies relating to Macau's inability to ef-

385

fectively freeze financial assets and its inadequate inspection and oversight of casinos and junket operators and promoters.

- Despite reports that the PRC aims to more closely monitor Macau's gaming industry as part of its nationwide initiative to crack down on corruption, there is no substantial evidence to suggest that Beijing intends a crackdown on illicit money transfers and money laundering in Macau.

- To protect their licenses to do business in the United States, American casinos have adopted a number of measures designed to prevent illegal activities in their VIP rooms. The Commission is not in a position to evaluate whether those measures are fully adequate to insulate the operations of those rooms from illegal activity.

- Despite official statements of support from Beijing and the Hong Kong chief executive, the continued lack of meaningful progress calls into question Beijing's real intentions. Prospects for universal suffrage by 2017 are dimming. Political interference, government restraints on access to information, and self-censorship continue to take a toll on press freedom in Hong Kong. Public perceptions of media credibility have declined since the handover. Violent attacks on prodemocracy news outlets and their owners are on the rise, and the totality of the evidence suggests that Beijing does not intend to allow real democracy to develop in Hong Kong.

- Prodemocracy activists express alarm over stepped-up police surveillance at protests, which they fear may be aimed at chilling public discourse or quelling public dissent.

- All of these trends run counter to the Basic Law's assurances that Hong Kong's traditional democratic and civil rights would be preserved for the first 50 years following the handover.

- The systematic disenfranchisement of those who support greater democratic freedoms and civil liberties has created a climate of political polarization that may undermine Hong Kong's fundamental governability.

## ENDNOTES FOR SECTION 3

1. Former Hong Kong Legislative Council member, interview with Commissioners and staff, July 26, 2013.

2. University of Nevada Las Vegas Center for Gaming Research, "Macau Gaming Summary." *http://gaming.unlv.edu/abstract/macau.html*.

3. Government of Macau, *Macau in Figures 2013* (Macau, SAR: Special Administrative Region Statistics and Census Service, 2013), p. 16. *http://www.dsec.gov.mo/Statistic.aspx?NodeGuid=ba1a4eab-213a-48a3-8fbb-962d15dc6f87*.

4. CIA [Central Intelligence Agency] World Factbook, "Country Comparison." *https://www.cia.gov/library/publications/the-world-factbook/rankorder/2222rank.html?countryname=Macau&countrycode=mc&regionCode=eas&rank=3#mc*.

5. The World Bank, "GDP per capita current US dollars" (Washington, DC: 2013).

6. I. Nelson Rose, "The Explosive But Sporadic Growth of Gambling in Asia," *Gambling and the Law®* (2010). *http://www.gamblingandthelaw.com/index.php/articles/252-the-explosive-but-sporadic-growth-of-gambling-in-asia*.

7. Macau SAR Gaming Inspection and Coordination Bureau, "Gaming Statistics." *http://www.dicj.gov.mo/web/en/information/contacts_casino/content.html#sjm*. Wynn Resorts estimates the total at $45 billion. Barry B. Langberg, Meeting with Commission, October 23, 2013, Washington, DC.

8. Government of Macau, *Gross Domestic Product 2012* (Macau, SAR: Statistics and Census Service), p. 28. *http://www.dsec.gov.mo/Statistic.aspx?NodeGuid=b35edb8a-ed5c-4fab-b741-c91b75add059*.

9. Macau SAR, Statistics and Census Service, "Visitor Arrivals and Same-day Visitor Arrivals by Place of Residence" (Macau, SAR). *http://www.dsec.gov.mo/TimeSeriesDatabase.aspx*.

10. Macau SAR Gaming and Inspection Coordination Bureau, "Gaming Liberalization after the Handover." *http://www.dicj.gov.mo/web/en/history/*.

11. Financial Action Task Force and the Asia-Pacific Group on Money Laundering, *Vulnerabilities of Casinos and Gaming* Sector (Paris, France: March 2009), p. 9. *http://www.fatf-gafi.org/media/fatf/documents/reports/Vulnerabilities%20of%20Casinos%20and%20Gaming%20Sector.pdf*.

12. Financial Action Task Force and the Asia-Pacific Group on Money Laundering, *Vulnerabilities of Casinos and Gaming* Sector (Paris, France: March 2009), p. 9. *http://www.fatf-gafi.org/media/fatf/documents/reports/Vulnerabilities%20of%20Casinos%20and%20Gaming%20Sector.pdf*.

13. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013.

14. Macau SAR Gaming Inspection Coordination Bureau, "Gaming Statistics." *http://www.dicj.gov.mo/web/en/information/DadosEstat/2012/content.html#n1*.

15. U.S. Department of State, *2013 International Narcotics Control Strategy Report Volume II: Money Laundering and Financial Crimes Country Database* (Washington, DC: 2013). *http://www.state.gov/j/inl/rls/nrcrpt/2013/database/211182.htm*.

16. Wuyi Wang and William R. Eadington, "VIP-Room Contractual System of Macau's Traditional Casino Industry" (Reno, NV: University of Nevada, Working Paper 07–001, 2007), p. 6. *http://www.business.unr.edu/econ/wp/papers/unreconwp07001.pdf*.

17. Financial Action Task Force, "Vulnerabilities of Casinos and Gaming Sector," (Paris, France: March, 2009). *http://www.fatf-gafi.org/media/fatf/documents/reports/Vulnerabilities%20of%20Casinos%20and%20Gaming%20Sector.pdf*.

18. I. Nelson Rose, telephone interview and e-mail exchange with Commission staff, September 17, 2013.

19. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013.

20. Junket operators in Macau casinos arrange for travel to and from the Mainland, and hotel rooms and in-casino credit to gamblers visiting Macau.

21. U.S. Department of State, *2013 International Narcotics Control Strategy Report Volume II: Money Laundering and Financial Crimes Country Database* (Washington, DC: 2013). *http://www.state.gov/j/inl/rls/nrcrpt/2013/database/211182.htm*.

22. U.S. Department of State, *2013 International Narcotics Control Strategy Report Volume II: Money Laundering and Financial Crimes Country Database* (Washington, DC: 2013). *http://www.state.gov/j/inl/rls/nrcrpt/2013/database/211182.htm*.

23. Wuyi Wang and William R. Eadington, "VIP-Room Contractual System of Macau's Traditional Casino Industry" (Reno, NV: University of Nevada, Working Paper 07–001, 2007), p. 6. *http://www.business.unr.edu/econ/wp/papers/unreconwp07001.pdf*.

24. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013.

25. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013.

26. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013.

27. Kate O' Keefe, "Sands Bolsters Safeguards Against Money-Laundering," *Wall Street Journal*, January 24, 2013. *http://online.wsj.com/article/SB1000142412788732385490457826136350181532z.html*; U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, testimony of A.G. Burnett, June 27, 2013.

28. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Daniel L. Glaser, June 27, 2013.

29. Edward Prasad and Lei (Sandy) Ye, "The Renminbi's Role In the Global Monetary System" (Washington, DC: The Brookings Institution, February 2012), pp. 57, 60. *http://www.brookings.edu/~/media/research/files/reports/2012/2/renminbi%20monetary%20system%20prasad/02_renminbi_monetary_system_prasad.pdf*.

30. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, testimony of I. Nelson Rose, June 27, 2013.

31. James Promfret and Matthew Miller, "How China-HK-Macau Underground Banking Triangle Works, Reuters, May 20, 2013. *http://www.abs-cbnnews.com/business/05/20/13/why-china-hk-macau-underground-banking-triangle-thrives*.

32. James Promfret and Matthew Miller, "How China-HK-Macau Underground Banking Triangle Works, Reuters, May 20, 2013. *http://www.abs-cbnnews.com/business/05/20/13/why-china-hk-macau-underground-banking-triangle-thrives*.

33. Casinos in Macau may sell nonnegotiable chips, also known as "dead chips," or "clay chips" to junket operators at a slight discount below their face value. Junket operators then provide the dead chips to their client gamblers, often as a loan. The so-called dead chips cannot be cashed out directly at the cashier's cages within the VIP rooms. They must first be used to gamble, often at the baccarat table. The junket operators receive a commission on the number of chips they transfer to the client. If the intent is to launder the money or convert the money from renminbi into another currency, whatever money is lost to gambling by the client is an incidental cost of the money laundering. Wuyi Wang and William R. Eadington, "VIP-Room Contractual System of Macau's Traditional Casino Industry" (Reno, NV: University of Nevada, Working Paper 07–001, 2007), pp. 11–13. *http://www.business.unr.edu/econ/wp/papers/unreconwp07001.pdf*.

34. James Promfret and Matthew Miller, "How China-HK-Macau Underground Banking Triangle Works, Reuters, May 20, 2013. *http://www.abs-cbnnews.com/business/05/20/13/why-china-hk-macau-underground-banking-triangle-thrives*.

35. U.S. Department of State, *2012 INCSR: Countries/Jurisdictions of Primary Concern.* (Washington, DC: 2012). *http://www.state.gov/j/inl/rls/nrcrpt/2012/vol2/184116.htm*.

36. U.S. Department of State, *2013 International Narcotics Control Strategy Report Volume II: Money Laundering and Financial Crimes Country Database* (Washington, DC: 2013). *http://www.state.gov/j/inl/rls/nrcrpt/2013/database/211182.htm*.

37. CIA [Central Intelligence Agency] World Factbook, 'Macau. " *https://www.cia.gov/library/publications/the-world-factbook/geos/print/country/countrypdf_mc.pdf*.

38. *Economist*, "A Window On China," December 10, 2011. *http://www.economist.com/node/21541417*.

39. *Economist*, "A Window On China," December 10, 2011. *http://www.economist.com/node/21541417*.

40. Financial Action Task Force and the Asia-Pacific Group on Money Laundering, *Vulnerabilities of Casinos and Gaming* Sector (Paris, France: March 2009), p. 50. *http://www.fatf-gafi.org/media/fatf/documents/reports/Vulnerabilities%20of%20Casinos%20and%20Gaming%20Sector.pdf*.

41. Government of Macau, *Financial Intelligence Office Newsletter for Gaming Sector* 8 (Macau, SAR: Financial Intelligence Office, May, 2013), p. 4. *http://www.gif.gov.mo/web1/doc/Newsletter/Casino_Newsletter_Issue_8_201305.pdf*.

42. Government of Macau, *2012 Annual Report* (Macau, SAR: Financial Intelligence Office, 2013), p. 98. *http://www.gif.gov.mo/web1/doc/AnnualReport/2012/GIF_Annual_Report_2012_English.pdf*.

43. Government of Macau, *Financial Intelligence Office Newsletter for Gaming Sector* 8 (Macau, SAR: Financial Intelligence Office, May, 2013), p. 4. *http://www.gif.gov.mo/web1/doc/Newsletter/Casino_Newsletter_Issue_8_201305.pdf*.

44. Leo Lewis, "Door is About to Slam Shut on High-Rolling Holidays to Macau," *Times of London*, February 5, 2013. *http://www.thetimes.co.uk/tto/business/industries/leisure/article3677844.ece*.

45. Steve Vickers, interview with Commissioners and staff, Hong Kong, July 2013.

46. Macau SAR Gaming Inspection and Coordination Bureau, "Gaming Statistics." *http://www.dicj.gov.mo/web/en/information/DadosEstat/2013/cntent.html#n5.*

47. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of I Nelson Rose, June 27, 2013.

48. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett June 27, 2013; Wuyi Wang and William R. Eadington, "VIP-Room Contractual System of Macau's Traditional Casino Industry" (Reno, NV: University of Nevada, Working Paper 07–001, 2007), pp. 6–9. *http://www.business.unr.edu/econ/wp/papers/unreconwp07001.pdf.*

49. Liz Benston, "What Happens in Macau Could Complicate Business Deals Here," *Las Vegas Sun*, April 20, 2010. *http://www.lasvegassun.com/news/2010/apr/20/what-happens-macau-could-complicate-business-deals/#axzz2WKyMBKaO*; Carlos Siu Lam, "Controlling Internal Operational Risk: VIP Rooms in Macau," *Casino Enterprise Management*, September 28, 2012. *http://www.casinoenterprisemanagement.com/articles/october-2012/controlling-internal-operational-risk-vip-rooms-macau.*

50. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett June 27, 2013.

51. Macau SAR Gaming Inspection and Coordination Bureau, "List of Licensed Junket Operators." *http://www.dicj.gov.mo/web/cn/services/junket/LicPromJogo/20070131.html.*

52. Farah Master, "Factbox: How Macau's Casino Junket System Works," Reuters, October 21, 2011. *http://www.reuters.com/article/2011/10/21/us-macau-junkets-factbox-idUSTRE79K2DS20111021.*

53. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, testimony of I. Nelson Rose, June 27, 2013.

54. Zhonglu Zeng and David Forrest, *High Rollers from Mainland China: A Profile Based on 99 Cases* (Macau SAR: Macau Polytechnic Institute, 2008). *http://digitalscholarship.unlv.edu/cgi/viewcontent.cgi?article=1116&context=grrj.*

55. Zhonglu Zeng and David Forrest, *High Rollers from Mainland China: A Profile Based on 99 Cases* (Macau, SAR: Macau Polytechnic Institute, 2008), p. 40. *http://digitalscholarship.unlv.edu/cgi/viewcontent.cgi?article=1116&context=grrj.*

56. U.S. Department of the Treasury Financial Crimes Enforcement Network, "Finding That Banco Delta Asia SARL is a Financial Institution of Primary Money Laundering Concern" (Washington, DC: September 12, 2005). *http://www.fincen.gov/statutes_regs/patriot/pdf/noticeoffinding.pdf.*

57. U.S. Department of the Treasury Financial Crimes Enforcement Network, "Finding That Banco Delta Asia SARL is a Financial Institution of Primary Money Laundering Concern" (Washington, DC: September 12, 2005), pp. 9–10. *http://www.fincen.gov/statutes_regs/patriot/pdf/noticeoffinding.pdf.*

58. United States Department of the Treasury, "Finding That Banco Delta Asia SARL is a Financial Institution of Primary Money Laundering Concern" (Washington, DC: September 12, 2005). *http://www.fincen.gov/statutes_regs/patriot/pdf/noticeoffinding.pdf.*

59. Mark S. Gaylord, "The Banco Delta Asia Affair: The USA Patriot Act and Allegations of Money Laundering in Macau" (Springer Science + Business Media, 2008); U.S. Department of the Treasury, "Treasury Finalizes Rule Against Banco Delta Asia: BDA Cut Off From U.S. Financial System" (Washington, DC: March 14, 2007). *http://www.treasury.gov/press-center/press-releases/Pages/hp315.aspx.*

60. Macau SAR Financial Intelligence Office, "About the GIF." *http://www.gif.gov.mo/web1/en_about.html*; Jorge Godinho, "The Prevention of Money Laundering in Macau Casinos," *Gaming Law Review and Economics* 17:4 (2013): 264–265.

61. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of James H. Freis, Jr., June 27, 2013.

62. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Daniel L. Glaser, June 27, 2013.

63. Financial Action Task Force, "Who We Are" (Paris, France). *http://www.fatf-gafi.org/pages/aboutus/.*

64. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, testimony of Daniel L. Glaser, June 27, 2013.

65. Asia-Pacific Group on Money Laundering, *APG/OGBS Mutual Evaluation Report on Macau, China* (July 24, 2007), p. 17. *http://www.apgml.org/documents/default.aspx?s=date&c=7.*

66. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Daniel L. Glaser, June 27, 2013; Asia-Pacific Group on Money Laundering, APG/OGBS Mutual Evaluation Report on Macau,

*China*, July 24, 2007, pp. 210–218. *http://www.apgml.org/documents/default.aspx?s= date&c=7.*

67. Financial Action Task Force, *Third Mutual Evaluation Report on Anti-Money Laundering and Combating the Financing of Terrorism, United States* (Paris, France: June 24, 2007), pp. 299–303. *http://www.fatf-gafi.org/media/fatf/documents/ reports/mer/MER%20US%20full.pdf.*

68. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Daniel L. Glaser, June 27, 2013.

69. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Daniel L. Glaser, June 27, 2013.

70. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013.

71. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013.

72. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013.

73. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013.

74. Asia-Pacific Group on Money Laundering, *APG/OGBS Mutual Evaluation Report on Macau, China* (July 24, 2007), p. 155. *http://www.apgml.org/documents/ default.aspx?s=date&c=7*; Financial Action Task Force, "FATF Recommendation 16: Reporting of Suspicious Transactions and Compliance, Text of the Recommendation and Interpretative Note" (Paris, France). *http://www.un.org/en/sc/ctc/docs/bestpractices /fatf/40recs-moneylaundering/fatf-rec16.pdf.*

75. Jorge Godinho, "The Prevention of Money Laundering in Macau Casinos," *Gaming Law Review and Economics* 17:4 (2013): 264–265.

76. I. Nelson Rose, e-mail to Commission staff, September 17, 2013.

77. Kate O'Keefe, "China Tightens Reins on Macau," *Wall Street Journal*, December 4, 2012. *http://online.wsj.com/article/SB100014241278873237170045781567431611445844.html.*

78. Reuters, "Gamblers Not So Anonymous: Beijing Keeps Closer Eye on Macau," April 29, 2013. *http://www.reuters.com/article/2013/04/29/us-casinos-macau-china-idUSBRE93S0XK20130429.*

79. Vítor Quintã, "Casino Insiders See No Hint of Crackdown," *Macau Business Daily*, July 2, 2013. *http://macaubusinessdaily.com/Gaming/Casino-insiders-see-no-hint-crackdown.*

80. Vinicy Chan, "Macau Casinos Decline After Report on Junket Crackdown," Bloomberg, February 6, 2013. *http://www.bloomberg.com/news/2013-02-06/galaxy-leads-macau-casino-drop-on-report-of-junket-curbs.html.*

81. Jorge Godinho, "The Prevention of Money Laundering in Macau Casinos," *Gaming Law Review and Economics* 17:4 (2013): 274.

82. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of I. Nelson Rose, June 27, 2013.

83. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013.

84. Patrick B. Len and Thomas C. Nelson, "Determining Suitability: It's All About Character," *Casino Enterprise Management*, July 31, 2007. *http://www.casino enterprisemanagement.com/articles/august-2007/determining-suitability-it%E2%80% 99s-all-about-character.*

85. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of I. Nelson Rose, June 27, 2013.

86. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of A.G. Burnett, June 27, 2013. Nevada's law is NRS 463.715, http://www.leg.state.nv.us/NRS/NRS-463.html#NRS463Sec715.

87. I. Nelson Rose, "Does Macau Create Legal Risks for American Operators?" *Gaming Law Review and Economics* 14:6 (2010): 495, New Jersey's Casinos Control Act is N.J.S.A. 5:12–1 et seq. *http://www.nj.gov/lps/gcc/act.html.*

88. Department of Law and Public Safety, *Special Report of the Division of Gaming Enforcement to the Casino Control Commission on its Investigation of MGM Mirage's Joint Venture with Pansy Ho in Macau, Special Administrative Region, People's Republic of China* (State of New Jersey:: May 18, 2009), p. 71.

89. State of New Jersey Casino Control Commission, *Public Meeting No. 13–02– 13*, testimony of Nicholas Casiello Jr., February 13, 2013, pp. 37–38. *http://www. state.nj.us/casinos/meetings/transcripts/2013/021313.pdf.*

90. State of New Jersey Casino Control Commission, *Public Meeting No. 13–02– 13*, testimony of George Rover, February 13, 2013, p. 45. *http://www.state.nj.us/ casinos/meetings/transcripts/2013/021313.pdf.*

91. *Wall Street Journal*, "Vegas Bet on Chinese VIPs Raises Red Flags With Feds," December 18, 2012. *http://online.wsj.com/article/SB10000872396390444017504577648160626366488.html.*

92. *Wall Street Journal*, "Vegas Bet on Chinese VIPs Raises Red Flags With Feds," December 18, 2012. *http://online.wsj.com/article/SB10000872396390444017504577648160626366488.html;* United States Senate, Committee on Governmental Affairs Permanent Subcommittee on Investigations, *The New International Criminal and Asian Organized Crime*, 102nd Congress, S. Prt. 102–129 (Washington, DC: U.S. Government Printing Office, December 1993), pp. 7–8. *https://www.ncjrs.gov/pdffiles1/Digitization/148447NCJRS.pdf.*

93. United States Senate, Committee on Governmental Affairs Permanent Subcommittee on Investigations, *The New International Criminal and Asian Organized Crime*, 102nd Congress, S. Prt. 102–129 (Washington, DC: U.S. Government Printing Office, December 1993), p. 7. *https://www.ncjrs.gov/pdffiles1/Digitization/148447NCJRS.pdf.*

94. United States Senate, Committee on Governmental Affairs Permanent Subcommittee on Investigations, *The New International Criminal and Asian Organized Crime*, 102nd Congress, S. Prt. 102–129 (Washington, DC: U.S. Government Printing Office, December 1993), p. 8. *https://www.ncjrs.gov/pdffiles1/Digitization/148447NCJRS.pdf.*

95. Kate O' Keeffe, "Sands Bolsters Safeguards Against Money-Laundering," *Wall Street Journal*, January 24, 2013. *http://online.wsj.com/article/SB10001424127887323385490457826136350181532.html.*

96. Kate O' Keeffe, "Sands Bolsters Safeguards Against Money-Laundering," *Wall Street Journal*, January 24, 2013. *http://online.wsj.com/article/SB10001424127887323385490457826136350181532.html.*

97. *Wall Street Journal*, "China Tightens Reins on Macau," December 4, 2012. *http://online.wsj.com/article/SB10001424127887323371700457815674316114584.html.*

98. Enid Tsui, "Macau Casino Boom Fuelled by Illicit Cash," *Financial Times*, January 3, 2012. *http://www.ft.com/intl/cms/s/0/833b06bc-1a63-11e1-ae4e-00144feabdc0.html#axzz2fFPeETnz.*

99. U.S.-China Economic and Security Review Commission, *Hearing on Corporate Accountability, Access to Credit, and Access to Markets in China's Financial System*, written testimony of Sheridan Prasso, June 27, 2013.

100. *Wall Street Journal*, "Vegas Bet on Chinese VIPs Raises Red Flags With Feds," December 18, 2012. *http://online.wsj.com/article/SB10000872396390444017504577648160626366488.html.*

101. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Daniel L. Glaser, June 27, 2013; Asia-Pacific Group on Money Laundering, *APG/OGBS Mutual Evaluation Report on Macau, China* (July 24, 2007), pp. 210–218. *http://www.apgml.org/documents/default.aspx?s=date&c=7.*

102. Lottery and Gaming Control Commission, MGM National Harbor LLC Operation License Applicant, Commission Presentation.

103. Former and current legislative councilors, interviews with Commission staff, July 26, 2013.

104. Ng Kang-chung, "Cy Leung's credibility gap yawns as even allies cool on him," *South China Morning Post* (Hong Kong), July 30, 2013. *http://www.scmp.com/news/hong-kong/article/1292867/cy-leungs-credibility-gap-yawns-even-allies-cool-him.*

105. *Wall Street Journal*, "Hong Kong's Crisis of Governability: Lack of Democracy Turns a Kerfuffle into an Uproar," August 14, 2013.

106. Peter T. Y. Cheung, "Intergovernmental Relations between Mainland China and the Hong Kong SAR" (Hong Kong, SAR: Taylor and Francis Group, LLC, 2011).

107. Peter T. Y. Cheung, "Intergovernmental Relations between Mainland China and the Hong Kong SAR" (Hong Kong, SAR: Taylor and Francis Group, LLC, 2011).

108. Y. Ghazi, "Autonomy with Chinese Characteristics: The Case of Hong Kong," *Pacifica Review* 10, 1: 7–22.

109. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Sophie Richardson, June 27, 2013.

110. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Sophie Richardson, June 27, 2013.

111. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, testimony of Madeline Earp, June 27, 2013.

112. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, testimony of Madeline Earp, June 27, 2013.

113. Surya Deva, "Flagging up fears over threat to Hong Kong's autonomy," *South China Morning Post* (Hong Kong), March 12, 2013.

114. John Simpson, "Hong Kong and China: Growing apart?" BBC News, November 23, 2012.

115. Fox Hu, "Thousands Rally in Hong Kong Against National Education," *Bloomberg Businessweek*, September 1, 2012.

116. John Simpson, "Hong Kong and China: Growing apart?" BBC News, November 23, 2012.

117. Fox Hu, "Thousands Rally in Hong Kong Against National Education," *Bloomberg Businessweek*, September 1, 2012.

118. John Simpson, "Hong Kong and China: Growing apart?" BBC News, November 23, 2012.

119. Keith Bradsher, "Pro-Beijing Elite Elects Chief Executive of Hong Kong," *New York Times*, March 25, 2012.

120. John Simpson, "Hong Kong and China: Growing apart?" BBC News, November 23, 2012.

121. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Sophie Richardson, June 27, 2013.

122. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Sophie Richardson, June 27, 2013.

123. Peter T. Y. Cheung, "Intergovernmental Relations between Mainland China and the Hong Kong SAR" (Hong Kong, SAR: Taylor and Francis Group, LLC, 2011).

124. The Basic Law of the Hong Kong Special Administrative Region of the People's Republic of China, Chapter II, Article 22. *http://www.basiclaw.gov.hk/text/en/basiclawtext/chapter_2.html*.

125. The Basic Law of the Hong Kong Special Administrative Region of the People's Republic of China, Chapter IV, Section 1, Article 45. *http://www.basiclaw.gov.hk/pda/en/basiclawtext/chapter_4.html*.

126. Li Zhen, "Hong Kong Says More Action Needed on Universal Suffrage," *Epoch Times* (New York), March 31, 2013.

127. Former Hong Kong Legislative Council member, interview with Commissioners and staff, July 26, 2013.

128. Keith Bradsher, "Pro-Beijing Elite Elects Chief Executive of Hong Kong," *New York Times*, March 25, 2012.

129. The Basic Law of the Hong Kong Special Administrative Region of the People's Republic of China, Chapter IV, Section 3, Article 68. *http://www.basiclaw.gov.hk/pda/en/basiclawtext/chapter_4.html*.

130. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Sophie Richardson, June 27, 2013.

131. Chung-Kai Sin, "Political Elections, Parties and Reforms since 1984," June 8, 2013.

132. *Decision of the Standing Committee of the National People's Congress on Issues Relating to the Methods for Selecting the Chief Executive of the Hong Kong Special Administrative Region and for Forming the Legislative Council of the Hong Kong Special Administrative Region in the Year 2012 and on Issues Relating to Universal Suffrage* (adopted by the Standing Committee of the Tenth National People's Congress at its Thirty-first Session on 29 December 2007). *http://www.legislation.gov.hk/blis_ind.nsf/CURALLENGDOC/50CF52DA13DFB768482575EE000ED11A?OpenDocument*.

133. Chung-Kai Sin, SBS, JP (Legislative Councillor), interview with Commission staff, July 26, 2013.

134. Didi Kirsten Tatlow, "Occupy Hong Kong, for Universal Suffrage," *International Herald Tribune*, April 4, 2013.

135. Chung-Kai Sin, "Political Elections, Parties and Reform Since 1984," June 8, 2013.

136. Keith Bradsher, "Pro-Beijing Elite Elects Chief Executive of Hong Kong," *New York Times*, March 25, 2012.

137. Emily Lau and Tam Yiu-ching, "The fight for universal suffrage in 2017," *South China Morning Post* (Hong Kong), April 24, 2013.

138. Didi Kirsten Tatlow, "Occupy Hong Kong, for Universal Suffrage," *International Herald Tribune*, April 4, 2013.

139. Joshua But and Stuart Lau, "Tackle Business Fears about Occupy Central head on, Supporters Say," *South China Morning Post* (Hong Kong), June 10, 2013.

140. Former Hong Kong government official, interview with Commission staff, July 26, 2013.

141. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Sophie Richardson, June 27, 2013.

142. Eddie Luk, "Bloody Fears Over Occupy Central," *Standard* (Hong Kong), April 11, 2013. *http://www.thestandard.com.hk/news_detail.asp?art_id=132749&con_type=1*.

143. John Simpson, "Hong Kong and China: Growing apart?" BBC News, November 23, 2012.

144. The Basic Law of the Hong Kong Special Administrative Region of the People's Republic of China, Chapter IV, Section 3, Article 27. *http://www.basiclaw.gov.hk/text/en/basiclawtext/chapter_3.html.*

145. Mak Yinting, "Opinion: Hong Kong press freedom under Chinese attack," CNN, July 5, 2012.

146. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong,* written testimony of Madeline Earp, June 27, 2013.

147. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong,* written testimony of Madeline Earp, June 27, 2013.

148. Freedom House, "Freedom of the Press Data: Scores and Status 1980–2013" (Washington, DC). *http://www.freedomhouse.org/report-types/freedom-press.*

149. Stuart Lau, "Hong Kong press freedom drops to 5-year low on global index," *South China Morning Post* (Hong Kong), January 31, 2013.

150. Law Yuk-kai, "Hong Kong: A Strange Place to Seek Freedom," *New York Times,* June 11, 2013.

151. Law Yuk-kai, "Hong Kong: A Strange Place to Seek Freedom," *New York Times,* June 11, 2013.

152. Reporters without Borders, "Press Freedom Index" (Paris, France). *http://en.rsf.org/spip.php?page=classement&id_rubrique=1054.*

153. *China Daily,* "Next Media's Taiwan Biz Sold for $600m," November 29, 2012.

154. Madeline Earp, "Taiwanese media sale could threaten press freedom" (New York, NY: Committee to Protect Journalists Asia, December 10, 2012).

155. Mak Yinting, "Opinion: Hong Kong press freedom under Chinese attack," CNN, July 5, 2012.

156. Mak Yinting, "Opinion: Hong Kong press freedom under Chinese attack," CNN, July 5, 2012.

157. Mak Yinting, "Opinion: Hong Kong press freedom under Chinese attack," CNN, July 5, 2012.

158. Pew Research Center, "Further Decline in Credibility Ratings for Most News Organizations" (Washington, DC: August 16, 2012). *http://www.people-press.org/2012/08/16/further-decline-in-credibility-ratings-for-most-news-organizations/.*

159. Mak Yinting, "Opinion: Hong Kong press freedom under Chinese attack," CNN, July 5, 2012.

160. Freedom House, "Freedom of the Press 2012: Hong Kong" (New York, NY: 2012). *http://www.freedomhouse.org/report/freedom-press/2012/hong-kong.*

161. A.L. Nanik, "Getting a Radio Licence in Hong Kong Should Be Straightforward," *South China Morning Post* (Hong Kong), August 9, 2013. *http://www.scmp.com/article/668720/getting-radio-licence-hk-should-be-straightforward.*

162. Simon Lee, "Hong Kong Journalists Seeks Information Law Amid Free Press Woes," *Bloomberg Businessweek,* July 8, 2013.

163. Mak Yinting, "Opinion: Hong Kong press freedom under Chinese attack," CNN, July 5, 2012.

164. Mak Yinting, "Opinion: Hong Kong press freedom under Chinese attack," CNN, July 5, 2012.

165. *Journalist,* "Government Briefs Out the Press Conference" (Hong Kong, SAR: Hong Kong Journalists Association, October 2012).

166. *South China Morning Post* (Hong Kong), "Heavy-handed police cast 'shadow' over freedom," April 26, 2012.

167. Mak Yinting, "Opinion: Hong Kong press freedom under Chinese attack," CNN, July 5, 2012.

168. Independent Police Complaints Council, "Final Report on Complaint Cases Arising from the Visit by the Vice Premier Mr. Li Keqiang," December 2012. *http://www.ipcc.gov.hk/report/Other/Report_f_en.pdf.*

169. Hong Kong Journalists Association, "Dark Clouds on the Horizon: Hong Kong's Freedom of Expression Faces New Threats" (Hong Kong, SAR: *2013 Annual Report,* July 2013). *http://www.hkja.org.hk/site/Host/hkja/UserFiles/file/annualreport/e_annual_report_2013.pdf.*

170. Stuart Lau, "Hong Kong press freedom drops to 5-year low on global index," *South China Morning Post* (Hong Kong), January 31, 2013.

171. Ivan Broadhead, "Hong Kong Journalists Protest Proposal to Restrict Information," Voice of America, January 28, 2013.

172. Law Yuk-kai, "Hong Kong: A Strange Place to Seek Freedom," *New York Times,* June 11, 2013.

173. Mak Yinting, "Opinion: Hong Kong press freedom under Chinese attack," CNN, July 5, 2012.

174. Hong Kong Journalists Association, "Survey: Government Manipulation Eroded Press Freedom" (Hong Kong, SAR: June 24, 2012). *http://www.hkja.org.hk/site/portal/Site.aspx?id=A1-1003&lang=en-US*.

175. Hong Kong Journalists Association, "Dark Clouds on the Horizon: Hong Kong's Freedom of Expression Faces New Threats" (Hong Kong, SAR: *2013 Annual Report*, July 2013).

176. Hong Kong Journalists Association, "Dark Clouds on the Horizon: Hong Kong's Freedom of Expression Faces New Threats" (Hong Kong, SAR: *2013 Annual Report*, July 2013).

177. Hong Kong Journalists Association, "Dark Clouds on the Horizon: Hong Kong's Freedom of Expression Faces New Threats" (Hong Kong, SAR: *2013 Annual Report*, July 2013).

178. International Federation of Journalists, "2012 Annual Report on Press Freedom in China and Hong Kong" (Brussels, Belgium: February 4, 2013).

179. Mak Yinting, "Opinion: Hong Kong press freedom under Chinese attack," CNN, July 5, 2012.

180. Law Yuk-kai, "Hong Kong: A Strange Place to Seek Freedom," *New York Times*, June 11, 2013.

181. Ada Lee, "Two Men Admit Assaulting South China Morning Post Photographer," *South China Morning Post* (Hong Kong), May 1, 2013. *http://www.scmp.com/news/hong-kong/article/1226945/two-men-admit-assaulting-south-china-morning-post-photographer*.

182. Lee Zan and To Zit-on, "Communist Front Group Pulls Knife on Falun Gong in Hong Kong," *Epoch Times* (New York), July 6, 2012.

183. Clifford Lo, "Police Arrest Suspected Triad Members for Attacks on Sing Tao News Group," *South China Morning Post* (Hong Kong), September 6, 2012. *http://www.scmp.com/news/hong-kong/article/1030231/police-arrest-suspected-triad-members-attacks-sing-tao-news-group*.

184. Patrick Brzeski, "Hong Kong Media Group Offers Reward for Information Leading to Arson Attackers," *Hollywood Reporter*, July 1, 2013.

185. Eddie Luk, "First Arrest Made Over Attacks on Newspaper," *Standard* (Hong Kong), July 5, 2013. *http://www.thestandard.com.hk/news_detail.asp?pp_cat=11&art_id=135219&sid=39913018&con_type=1&d_str=20130705*.

186. Scoop (Wellington, New Zealand), "IFJ [International Federation of Journalists] Demands Hong Kong Police Protect Media," August 7, 2013.

187. International Federation of Journalists, "IFJ Condemns Detention of Journalist by Hong Kong Police" (Brussels, Belgium: July 2, 2012).

188. Keith Bradsher, "Hong Kong Surveillance Law Passes," *New York Times*, August 6, 2006.

189. Keith Bradsher, "Hong Kong Surveillance Law Passes," *New York Times*, August 6, 2006.

190. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Sophie Richardson, June 27, 2013.

191. Thomas Chan, "Police to don surveillance cameras for duty next month," *South China Morning Post* (Hong Kong), February 23, 2013.

192. Thomas Chan, "Police to don surveillance cameras for duty next month," *South China Morning Post*, (Hong Kong), February 23, 2013.

193. Simon Lee and Jasmine Wang, "Hong Kong Protestors Demand Leung Resign on Credibility Loss," *Bloomberg Law*, January 1, 2013.

194. Current and former Hong Kong Legislative Councillors, interviews with Commissioners and staff, July 26, 2013.

195. *Real Hong Kong News*, "Woman Protested Last Year Arrested Today for Illegal Assembly," July 25, 2013.

196. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Sophie Richardson, June 27, 2013.

197. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Sophie Richardson, June 27, 2013.

198. U.S.-China Economic and Security Review Commission, *Hearing on Macau and Hong Kong*, written testimony of Sophie Richardson, June 27, 2013.

199. Hong Kong Police Force Crime Statistics, 2008–2012. *http://www.police.gov.hk/ppp_en/09_statistics/*.

200. For more information, see Joshua But, "Reports against police up 60pc," *South China Morning Post* (Hong Kong), March 5, 2010; *South China Morning Post* (Hong Kong), "Police Complaints a Cause for Concern," July 9, 2011.

201. See, for example, Edward Wong, "Lawyer Says Hong Kong Violated Chinese Dissident's Rights," *New York Times*, January 26, 2010.

202. Simpson Cheung, "Google reports Surge in Data Requests from Hong Kong Police," *South China Morning Post* (Hong Kong), November 16, 2012.

394

203. Simpson Cheung, "Google reports Surge in Data Requests from Hong Kong Police," *South China Morning Post* (Hong Kong), November 16, 2012.

# RECOMMENDATIONS

## *China and the Middle East and North Africa*

The Commission recommends:

- Congress support efforts by the Department of Defense to strengthen cooperation with China on counterpiracy in the Gulf of Aden and elsewhere.

- Congress consider the merits of including fuel oil purchases in the current sanctions regime prohibiting countries from purchasing crude oil from Iran.

- Congress work with the Departments of State, Commerce, and the Treasury to utilize the full range of incentives and disincentives to encourage China to reduce its ties with Iran, including exploring conditioning Chinese energy companies' future investments in the United States on limiting commercial ties with Iran.

- Congress urge the Department of State to elevate the U.S.-China Middle East Dialogue to include an annual meeting at the Cabinet level and to increase meetings at the undersecretary level from once to twice per year.

- Congress direct the Administration to provide a report to Congress on China's enforcement of its export controls, to include an assessment of the level of scrutiny the Chinese government applies to end users in transfers that are of proliferation concern.

## *Taiwan*

The Commission recommends:

- Congress direct the Administration to transmit an unclassified report to Congress on U.S. arms sales to Taiwan from 2001 to 2013. It should detail each of Taiwan's requests for purchase of U.S. weapons, defense items, or defense services during this period; describe Taiwan's justification for each request; report on any Administration decision to reject, delay, or alter each request; and provide an update on the status of sales that have been previously approved.

- Congress encourage the Administration to continue discussions between the United States and Taiwan concerning a bilateral investment agreement.

- Congress urge Cabinet-level officials to visit Taiwan to promote commercial, technological, and people-to-people exchanges and direct the Administration to permit official travel to Taiwan for Department of State and Department of Defense personnel above

the rank of office director or, for uniformed military personnel, above the level of O6.

## *Macau and Hong Kong*

The Commission recommends:

- Congress urge the State Department to negotiate with the Macanese government to fix the shortcomings in its regulatory framework. Potential reforms would include implementing an effective asset freezing mechanism, an increase in due diligence procedures in casinos, reduction in the high threshold for reporting suspicious transactions within casinos, establishing more transparent cross-border reporting requirements, and a requirement that junket operators and their affiliates disclose detailed financial information and implement stricter licensing requirements

- Congress reconvene a congressional caucus on Hong Kong to ensure continuous attention to the region's democracy and civil rights issues.

- Congress adopt a resolution urging China to keep its commitments to universal suffrage as articulated in the 1984 Sino-British Joint Declaration on the Question of Hong Kong and the Basic Law of the Hong Kong Special Administrative Region.

- Congress reaffirm its support for human rights and the rule of law in Hong Kong.

- Congress renew the biennial reporting requirements of the U.S.-Hong Kong Policy Act of 1992.

# EXHIBIT 14

## LAS VEGAS SUN

# Panel: Wynn Resorts suitable to open casino in Massachusetts

**By Steve LeBlanc, Associated Press**

Monday, Dec. 16, 2013 | 10:31 a.m.

BOSTON — The Massachusetts Gaming Commission's investigative bureau has found Wynn Resorts suitable to open a resort casino in Everett.



The recommendation, made in a report released Monday at a commission meeting, represents one less hurdle Wynn must clear as it seeks to win the sole eastern Massachusetts casino license allowed under the state's 2011 casino law.

The commendation comes after four commission members signed off on a revised real estate deal for the proposed casino on Friday.

It also comes after Las Vegas-based Caesars filed a lawsuit against Commission Chairman Stephen Crosby for allegedly failing to disclose a potential conflict of interest in a timely manner related to the Wynn deal. Caesars had been a partner of the Suffolk Downs horse track in a resort casino bid, but it withdrew in October over concerns raised during the background check by commission staff.

Karen Wells, director of the commission's Bureau of Investigation and Enforcement, said the recommendation to find Wynn suitable comes with a few conditions, including convincing the commission that the company's business practices in Macau meet the requirement of "responsible business practices."

Macau is a Chinese administrative region that has become the most lucrative gambling market in the world. Both Wynn and MGM Resorts International, which hopes to build a casino in Springfield, have operations in Macau.

While Wynn's Macau operations have come under scrutiny, Steve Wynn, chief executive of Wynn Resorts, said the company works hard to stay within the law.

"Do we allow illegal activity in our casinos? The answer is no, no, no," Wynn said at Monday's hearing.

Wynn officials have also defended the use in Macau of so-called junket operators, saying they are all licensed and subject to criminal background checks by the government, along with additional background investigations by the company.

Junket operators recruit well-heeled gamblers from the mainland for Baccarat in VIP rooms in Macau's casinos, often providing credit to players. They have gotten the attention of regulators because of alleged connections to organized crime.

Crosby said the commission spent about $1.5 million investigating Wynn — much of it looking at the operations in Macau — but found few red flags.

"It seems like they run as buttoned-up an operation in Macau as pretty much can possibly be done," he said.

In her bureau's report, Wells also recommends that if Wynn Resorts is awarded a casino license, it be required to promptly report any changes in ownership, members or directors — and that those new owners, members or directors be found suitable by the commission.

Monday's recommendation comes as Crosby continues to grapple with his revelation of his past business relationship with Paul Lohnes, a part owner of land in Everett on which Wynn Resorts hopes to develop its casino.

In its lawsuit, Caesars challenges the "objectivity and fairness" of its treatment by Crosby, alleging Crosby's intent was to block the impartial consideration of Suffolk Downs' casino application. Caesars was competing for the same eastern Massachusetts casino license that Wynn is seeking.

Crosby said he isn't planning to recuse himself from the Wynn vote. He said the process has been "incredibly transparent."

"I think fair and reasonable people will see that and realize that I've fulfilled my obligations of disclosure," he said.

Wynn, who at times appeared to doze off during the hearing, was being represented by former Massachusetts Gov. William Weld.

The commission's decision on Wynn's suitability isn't expected for at least another week.

Case 3:14-cv-04329-WHO   Document 14-3   Filed 10/20/14   Page 55 of 77

Most Popular
Viewed
Discussed
Trending
4 arrested in Culinary protest near Red Rock Resort
Downtown Summerlin opens: Live, work, shop, eat and party there
New games coming to PT's? Golden Gaming's COO discusses what's on the horizon
If OK'd, sports betting in New Jersey could dwarf Nevada
Review: Sexy 'X Rocks' is still rockin' at the Rio one year later
Complete Listing »

THE SUNDAY    THE NEXT BIG THING IN NEWS

Connect with Us
Facebook
Twitter
Google+
Tumblr
Email Edition
RSS

Scene in Las Vegas
SUMMERLIN: Downtown now open for business



STRIP: Miss Nevada, Life Is Beautiful, Santa Run



'X ROCKS': Celebrates first anniversary at Rio



Featured Galleries



Clark County Issues Same-Sex Marriage Licenses



Culinary Protest at Red Rock Resort



[Grand Opening of Downtown Summerlin](#)
[More photos »](#)
[AP Headlines](#)
[Hernandez defense loses bid to toss phone evidence](#)
2 minutes ago
[How the Dow Jones industrial average did Friday](#)
5 minutes ago
[Gay marriage in Kansas throws political twist](#)
6 minutes ago
[Martin Laird takes the lead at Silverado](#)
11 minutes ago
[Nursing home chain to pay $38M in US settlement](#)
12 minutes ago
[Colts seize control of AFC South as Irsay returns](#)
14 minutes ago
[Hospital: Ebola patient shows modest improvement](#)
14 minutes ago

AdChoices ▷

[Calendar](#)
[10 Fri](#)
[11 Sat](#)
[12 Sun](#)
[13 Mon](#)
[14 Tue](#)
[Rock 'n Roll Wine Amplified Festival Weekend](#)
MGM Grand Hotel and Casino



[No Exit](#)
Art Square



[Lebanese American Festival](#)
St. Sharbel Mission

All events on Friday »

Locally owned and independent since 1950; Winner of the Pulitzer Prize for Public Service, best news website in the nation & DuPont Award for broadcast journalism

**© Las Vegas Sun, 2014, All Rights Reserved**

# EXHIBIT 15

**NewsRoom**

7/11/14 Inv. Bus. Daily 0
2014 WLNR 18886360

Investor's Business Daily
Copyright © 2014 Investor's Business Daily, Inc

July 11, 2014

Section: Business

Macau Corruption Agency Opens Probe Of Wynn Resorts

JAMES DETAR; INVESTOR'S BUSINESS DAILY

Macau's anti-corruption agency launched an investigation of Wynn Resorts' ([STOCK[WYNN]]) Macau operations, centered on how a small company gained possession of land that was later granted to Wynn to build a $4 billion casino.

Wynn is set to open the Macau Palace, its second resort in the Chinese coastal city, in 2016. It sits on land in the trendy Cotai Strip.

Macau's Commission Against Corruption said it will begin reviewing materials related to the deal after being contacted by the U.S.-based International Union of Operating Engineers, which requested information about the land deal.

The union, which represents construction workers, has been pushing for an investigation of possible corruption in Macau, a former Portuguese colony that last decade passed Las Vegas and other gaming hot spots to become the world's top gambling destination.

The Wall Street Journal said Wynn disclosed its dealings with the company, Tien Chiao Entertainment, in a 2009 Securities and Exchange Commission filing.

Wynn has said in previous public statements the land deal was done in compliance with U.S. and Macau laws.

On its first-quarter earnings call on May 1, Wynn said it's on track with construction of Wynn Palace, which will include a 1,700-room hotel, casino, conference facilities, retail outlets and a small lake.

Wynn competes in Macau with Las Vegas Sands ([STOCK[LVS]]) and MGM Resorts International ([STOCK[MGM]]), as well as Hong Kong-based Melco Crown Entertainment ([STOCK[MPEL]]) and others.

Wynn shares were down 0.5% on the stock market today. Sands and MGM were both down fractionally. Melco Crown also dipped 1%.

Follow James DeTar on Twitter: @IBD_JDeTar.

---- Index References ----

Company: LAS VEGAS SANDS CORP; LAS VEGAS SANDS LLC; MELCO CROWN ENTERTAINMENT LTD; MGM RESORTS INTL; WYNN RESORTS LTD; DOW JONES AND CO INC; LAS VEGAS SANDS CORP; MGM RESORTS INTL; MELCO CROWN ENTERTAINMENT LTD; WYNN RESORTS LTD

News Subject: (Corruption, Bribery & Embezzlement (1EM51); Crime (1CR87); Emerging Market Countries (1EM65); Fraud (1FR30); Social Issues (1SO05))

Industry: (Casinos (1CA80); Entertainment (1EN08); Gaming Industry (1GA25); Resorts (1RE44); Travel & Tourism (1TR07))

Region: (Americas (1AM92); Asia (1AS61); China (1CH15); Eastern Asia (1EA61); Far East (1FA27); Macao (1MA65); Nevada (1NE81); North America (1NO39); U.S. West Region (1WE46); USA (1US73))

Language: EN

Other Indexing: (Tien Chiao Entertainment)

Company Terms: Las Vegas Sands; Melco Crown Entertainment; MGM Resorts International; Wynn Resorts'

Ticker Symbol: WYNN; LVS; MGM; MPEL; WYNN; LVS; MGM; MPEL

Word Count: 265

---

**End of Document** <span style="float:right">© 2014 Thomson Reuters. No claim to original U.S. Government Works.</span>



# EXHIBIT 16

MAY 3, 2010 | BUSINESS PRESS P23

# OPINION

# ALL THE ANSWERS

Crude oil prices are rising as summer approaches. Are you worried that high gasoline and fuel prices could stifle any budding economic rebound?



**CRAIG CAVILEER**
PRESIDENT, SILVERTON CASINO LODGE

"Anytime we raise the barriers to entry to otherwise discretionary visits to Las Vegas I am concerned. That said, the entertainment value being offered today by all of the resorts is extremely attractive to the middle-market customer from California and I believe they will remain resilient to moderate increases in fuel. At least in the short run."

**SALOMON BRAUN**

CO-OWNER, TERESA'S CLEANING SERVICE

"Absolutely. A year ago, we were paying only $2.30 a gallon for gas and now it's around $3. As a residential cleaning service, we have five or six vehicles on the road all day long and it eats into profits. As a small business, we can only do that for so long before we have to pass it on to the consumers. If it was $100, we might have to charge $110. Then they start shopping around and may go to unlicensed services that charge a lot less than we can."



**TOM HUMM**
VICE PRESIDENT AND GENERAL MANAGER, BEASLEY BROADCAST GROUP

"I don't know. Consumer confidence is up, and we're seeing more of an influx of tourists in the last couple of months. From a media standpoint, we're seeing things turn around significantly."



**BRIAN MELL**
MARKETING COORDINATOR, BANNERVIEW.COM

"Although I do think people cut back when prices surge past a certain point, the technology exists for businesses to compensate for any rising costs. Many components of communications, delivery or production can be streamlined by integrating daily operations into a secure and accessible web-based infrastructure."

**JOHN POWER**
EXECUTIVE VICE PRESIDENT, HELI USA

"Every time fuel goes up 10 cents a gallon it's about a $50,000 hit to the bottom line. Ultimately it gets passed to the customer. Once oil goes above $100 a barrel, we all start feeling it in every industry. It's an expense that overwhelms every business. Unfortunately, it doesn't discriminate."



**RICH ABAJIAN**
OWNER AND GENERAL MANAGER, FINDLAY TOYOTA

"Certainly, there's always a concern when oil prices go up. But I do believe that (prices) have fluctuated so much over the past decade that people have come to expect they will come back down. But should they continue to rise, it will hurt a rebound. Once gas gets above $4 is where it becomes painful and people go into a panic."

---

**Sounding off**
David Schwartz

## When Wynn speaks, gaming listens

Steve Wynn made headlines when he suggested he might consider moving the headquarters of Wynn Resorts Ltd. to Macau from Las Vegas. As always, Wynn's forthrightness points the way to a larger truth about the future of the casino industry.

Wynn Resorts is a Las Vegas success story. Since moving here in 1967 as a part-owner of the Frontier, Steve Wynn has been one of the city's prime movers. He began making a mark in 1973, when he became the chief executive officer of the Golden Nugget, then a small downtown casino with no real distinction.

Wynn's aspirations outside of Las Vegas have always been an important piece of the puzzle. In 1980, he opened the Golden Nugget Atlantic City, which became the market leader there. Wynn remained the trendsetter there until 1986 when he sold the casino. Two years later, he entered the Laughlin market, which was similarly growing, by buying and renovating the Nevada Club, which he transformed into the Golden Nugget Laughlin.

In 1989, with The Mirage, Wynn redefined the Strip hotel-casino, but he didn't rest. He planned downmarket (Treasure Island, 1993) and upmarket (Bellagio, 1998) versions, seeking new markets in the same geographical area. In 1999, with the opening of Biloxi's Beau Rivage, Wynn again showed willingness to move away from the familiar.

In these years, Wynn pioneered much of the expansion of casino gambling across the country. As one of the first Las Vegas operators to really understand the Atlantic City market, his success there presaged decades of growth. The Mirage helped to prove that, even with massive expansion, major investment in Las Vegas was still viable. Where Wynn led, others followed.

After selling his Mirage Resorts to Kirk Kerkorian, Wynn started over with the casino that bears his name. Though he's mulled expansions into other states, thus far he's only planted his flag in Macau. His 2002 selection as a casino concessionaire in that city came when Macau's profit potential was still unknown. Wynn jumped in with both feet, opening Wynn Macau three years later; the casino immediately made an impact, and Wynn has been expanding there ever since.

In the same way, those American companies lucky enough to get a foot in the Macau door have bet big on the city. With a casino monopoly in the world's most populous country, it's easy to see the upside. Revenue from Macau quickly competed with, then swamped, those from Las Vegas.

In 2009, Wynn Resorts got 60 percent of its revenue from Macau; by the stark numbers, it is already a predominantly Chinese company, this despite owning arguably the two casinos at the top of America's leading gaming destination.

This is a significant watershed: Companies exist to return value to their shareholders, and with more of Wynn's revenues coming from China, discussing a possible move makes sense, if nothing else out of deference to the customers who now are the company's most valuable.

With growth in Las Vegas a question mark and Macau continuing to boom, we will likely see a continuing shift toward China in the next few years. Whether Wynn is seriously considering a move, his comments highlight the growing importance of Macau to America-based companies, and we would do well to start considering the consequences this emphasis will bring.

*David G. Schwartz is director of the Center for Gaming Research at the University of Nevada, Las Vegas. His latest book is "Roll the Bones: The History of Gambling."*

Copyright of Las Vegas Business Press (10712186) is the property of Las Vegas Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# EXHIBIT 17

TIME  **Subscribe to TIME Magazine today!**

Sign In    Subscribe

CLICK THE ALARM TO START THE DAY    7:00

2013 2012 2011 2010 2009

# The 2006 TIME 100

Here's our list of the 100 men and women whose power, talent or moral example is transforming our world

Like  32        Tweet  0        2        Share

Prev  38 *of* 102  Next View All
Builders & Titans

## Steve Wynn

By Joel Stein  |  Monday, May 08, 2006



Illustration for TIME by Mark Stutzman

Your first reaction is to stifle a giggle, as you would listening to a little kid get really serious about his ideas for inventions. I'm going to build a giant dancing water fountain in the desert ... Nice, wholesome American families will fly to Vegas to gamble ... Slot players will pay to see Picassos and Gauguins ... People want to see two fey Germans play with white tigers ... And I'll have puppets pop out of the waterfall. Sure you will, Steve. Now it's time for your bath.

But Steve Wynn, 64, is not only a great salesman of insane ideas and a clever real estate player but also the gaming industry's most brilliant designer. For the Wynn Las Vegas, his $2.7 billion, 2,716-room hotel (an additional 2,054-room tower is on the way), he spent a year walking the 215-acre Strip property, jotting down ideas for the space and changing the rules he had created to make Vegas boom in the '90s. Instead of luring the suckers with beacon attractions right on the Strip—like his dancing waters at the Bellagio, pirate ship at Treasure Island and volcano at the Mirage — with Wynn Las Vegas, he hid the waterfalls, puppets and giant screens behind man-made mountains, reserving them for his diners, gamblers and guests. The draw isn't glitz; it's buzz. He dropped the theme-hotel motif and made the hallways low and intimate. He broke the most basic rule of casinos by flooding the place with natural light. And he focused on small, calm spaces.

It's Vegas not as wild insanity but rather as an escape from the wild insanity of daily life. Wynn has become the anti-Trump, hiding the bling, de-gilding the chandeliers, putting the Ferrari dealership in the back. The greatest creator of spectacle has redefined spectacle as an inner experience—or at least as much of an inner experience as you can have while playing blackjack. Which means playing it by the pool.

The newly meditating grandpa Wynn is moving a bit more slowly than he used to. But his ideas are getting only bigger. He's going to export his vision of Vegas—the übercapitalist, guilt-free overindulgence—to China, with the Wynn Macau, scheduled to open Sept. 5. If someone can teach the Chinese how to skip the ugly growing pains of capitalism and get right to the pretty parts, it's Wynn. Plus they already love tigers.

If they're smart, they'll listen. Because in the next millennium, when people study the U.S. empire, they won't be looking

Case 3:14-cv-04329-WHO   Document 14-3   Filed 10/20/14   Page 68 of 77

at buildings created by Frank Lloyd Wright or Frank Gehry. They'll be looking at our temples of pleasure, the buildings where we packed in as much America as would fit. And, somehow, Steve Wynn has done it in a way we won't be ashamed of.

NEXT   **The Skype Guys**

Email      Print      Share

**Follow @TIME**

**FROM THE WEB**                                    Sponsored Links by Taboola



Forget the iPhone 6. Next hit Apple product revealed!
*The Motley Fool*



6 Ways San Francisco's fitmob Called My BS and G…
*Fit Bottomed Girls*



You Should Do This If You Have A Credit Card Balanc…
*Next Advisor*



10 Things No One Ever Told You That Happened on the…
*Rant Movies*



Top 12 Hard To Watch Movies
*Movieseum*



There Are 7 Types of English Last Names — Whi…
*Ancestry.com*



30 Candid Met Gala Snaps You Haven't Seen (But Ne…
*Refinery29*



Kate Middleton's Bizarre Behavior at Event Gets Ev…
*Stirring Daily*

**WE RECOMMEND**

**Gene Kelly: Caught in the Act**

**Thank You, Sweetheart, for the 'Jap Skull': Portrait of a Grisly WWII Memento**

**LIFE With Postwar Teens: Photos of Fads From Around the U.S. in 1948**

**World War II Erupts: Color Photos From the Invasion of Poland, 1939**

**LIFE and Civil Rights: Segregation in 1956 South Carolina**

**ELSEWHERE ON THE WEB**

**Oprah Winfrey's Surprising DNA Test**   *(Ancestry.com)*

**10 Crazy Punishments Used in Schools**   *(Parent Society)*

**27 Dogs That Absolutely Hate Humans**   *(ViewMixed)*

**You Won't Believe Your Eyes Looking At These 16 Pictures**   *(ViewMixed)*

**10 Worst College Majors for Today's Job Market**   *(Business Cheat Sheet)*

Recommended by

**THE 2006 TIME 100**

Leaders & Revolutionaries

Builders & Titans

Artists & Entertainers

Heroes & Pioneers

Scientists & Thinkers

TIME 100 Tales

Meet the Other 100



**Features**

- Leaders & Revolutionaries
- Builders & Titans
- Artists & Entertainers
- Heroes & Pioneers
- Scientists & Thinkers
- TIME 100 Tales
- Meet the Other 100
- Photos: An Evening with the TIME 100

**RECOMMENDED FOR YOU**                                        by Taboola



**Emmys 2014: Sarah Silverman Says She Brought Weed**



**Hacker Leaks Nude Photos Of Jennifer Lawrence**



**iCloud Hack: A Closer Look At The Celebrity Photo Leak**



**VMAs 2014: Nicki Manaj's Wardrobe Malfunction**

Sponsored Links

**Used Honda Super Sale**
Honda Certified Pre-Owned Vehicles. Check out our selection online.
www.sfhonda.com

**Home Solar Lease Options**

Get Clean, More Affordable Energy Today. Act Now And Save!
www.solarcity.com

**hotel w barcelona**
Compare 190+ sites, save up to 75% trivago: The Hotel Search
www.trivago.com/hotel-search

© 2014 Time Inc. All rights reserved.

# EXHIBIT 18

Casino Developer Steve Wynn Criticizes President, Fox News, Oct. 10, 2012
(transcript of broadcast)


GRETA VAN SUSTEREN, HOST: Tonight, a prize fight, a Vegas casino mogul taking on President Obama!

(BEGIN VIDEO CLIP)

STEVE WYNN, FOUNDER AND CEO, WYNN RESORTS: I'll be damned if I want him lecturing me about small business and jobs. I'm a job creator. Guys like me are job creators, and we don't like having a bull's-eye painted on our back.

(END VIDEO CLIP)

VAN SUSTEREN: And Steve Wynn has a whole lot more to tell President Obama, and you will hear it all!

Plus, the gloves about to come off in Kentucky. It will be Vice President Joe Biden versus Congressman Paul Ryan. Now, Dick Morris looks ahead to the big VP debate.

And why wasn't there enough security at our Libya consulate on September 11? Congress grilled State Department officials while the White House continues to dodge the issue! Why the dodge, cover-up or incompetence?

(BEGIN VIDEO CLIP)

…

VAN SUSTEREN: Straight ahead, the vice presidential showdown. Congressman Ryan says Vice President Biden has an Achilles heel. So what is it? Congressman Ryan answers that question, and Dick Morris is here to talk about the big debate. That's next.

Also, casino developer Steve Wynn comes out swinging at President Obama! Wynn says he will be damned if he wants the president to lecture him. And that's only the beginning with Wynn! You should hear what else he has to say. And you will.

Coming up: Casino developer Steve Wynn is boiling mad at President Obama, and he's certainly not holding back. And it is all caught on tape. He is taking the president to the woodshed! You will hear from Steve Wynn next.

Also, President Obama -- well, he had a horrible debate, but that is not stopping him from giving Vice President Joe Biden advice for his debate tomorrow night. You will hear the president's advice to the vice president, coming up.

(COMMERCIAL BREAK)

VAN SUSTEREN: A world-class fight has just started between a world-famous businessman and President Obama. Vegas casino developer Steve Wynn taking a giant swing at the president over jobs and the economy. Just listen to this knockout punch.

(BEGIN VIDEO CLIP)

WYNN: I have created about 250,000 direct special indirect jobs according to the state of Nevada's measurement. That's exactly -- if the number's 250,000, that's exactly 250,000 more than this president, who I will be damned if I want to have him lecture me about small business and jobs. I'm a job creator. Guys like me are job creators, and we don't like a bull's- eye on our back.

The president is trying to put himself gone me and my employees.

UNIDENTIFIED MALE: How?

WYNN: By doing class warfare. By deprecating and calling a group that makes money billionaires and millionaire who is don't pay their share. I gave 120 percent of my salary and bonus away last year to charities, as I do most years. I can't stand the idea of being demagogued, that is, put down by a president who has never created any jobs and doesn't understand how the economy works.

(END VIDEO CLIP)

# EXHIBIT 19



Print Page | Close Window

# PRESS RELEASE

Steve Wynn Honored by Time Magazine's TIME 100 Issue

**Article Names Wynn One of the World's Most Influential People**

LAS VEGAS, May 8, 2006 /PRNewswire-FirstCall via COMTEX News Network/ -- "The lives and ideas of the world's most influential people" was the headline on the special May 8, 2006 issue of Time Magazine. Steve Wynn, Chairman of the Board and CEO of Wynn Resorts, Ltd. was honored in the "Builders and Titans" category of the publication. Those recognized as "Builders and Titans" were individuals who exhibit an extraordinary ability to influence the world of business. Time said these are people with "innovation, grand plans, style and substance." Some of the other notaries recognized in this category included: Sean (Diddy) Combs, Wall Street Investor Eddie Lampart, Xerox's Anne Mulcahy and MySpace.com creators Chris DeWolfe and Tom Anderson.

The article proclaimed Wynn "didn't invent Las Vegas -- he just makes it work," and praised him for being one of the world's best salesmen, real estate developers and "the gaming industry's most brilliant designer."

The opening of Wynn Las Vegas in April 2005 was highlighted for being significantly different from his previous properties (such as the Mirage, Bellagio and Treasure Island) because this time Wynn designed his resort from the "inside out." Stating Wynn's ability to cater to a multitude of different markets and cultures, the opening of Wynn Macau, scheduled for September 2006, was also mentioned.

Finally, the article said "in the next millennium, when people study the U.S. empire, they won't be looking at buildings created by Frank Lloyd Wright or Frank Gehry. They'll be looking at our temples of pleasure, the buildings where we packed in as much America as would fit. And, somehow, Steve Wynn has done it in a way we won't be ashamed of."

About Wynn Resorts:

Wynn Resorts, Limited is traded on the Nasdaq National Market under the ticker symbol WYNN and is part of the NASDAQ-100 Index. The company owns and operates Wynn Las Vegas (www.wynnlasvegas.com), a luxury hotel and destination casino resort located on the Las Vegas Strip which opened to the public on April 28, 2005. Wynn Las Vegas features 2,716 luxurious guest rooms and suites; an approximately 111,000 square foot casino; 22 food and beverage outlets; an on-site 18-hole golf course; approximately 223,000 square feet of meeting space; an on-site Ferrari and Maserati dealership; and approximately 76,000 square feet of retail space. Wynn Resorts, Limited is currently constructing Wynn Macau, a destination casino resort in the Macau Special Administrative Region of the People's Republic of China. Wynn Macau (www.wynnmacau.com) is scheduled to open September 5, 2006.

SOURCE Wynn Las Vegas

Denise Randazzo of Wynn Resorts, +1-702-770-2120, denise.randazzo@wynnresorts.com; or Justine Mroziak of Wynn Las Vegas, +1-702-770-2119, justine.mroziak@wynnlasvegas.com

# EXHIBIT 20



Print Page  |  Close Window

# PRESS RELEASE

Wynn Resorts Completes Sale of its Subconcession Right to Publishing and Broadcasting Limited

LAS VEGAS--(BUSINESS WIRE)--Sept. 11, 2006--Wynn Resorts (Macau), S.A., a subsidiary of Wynn Resorts, Limited (Nasdaq:WYNN), announced today the completion of its sale of its subconcession right to an affiliate of Publishing and Broadcasting Limited ("PBL") for US$900 million. The subconcession right permits the PBL affiliate to receive a subconcession from the Macau Special Administrative Region ("SAR") of the People's Republic of China to conduct gaming operations in the Macau SAR.

"With the government of the Special Administration Region, we believe that PBL will make a positive contribution to the future of Macau. We also recognize that the growth of healthy tourism in this city is the result of the wisdom of the Central Government's policy of 'One Country Two Systems.' Today's progress is a direct result of that policy," said Steve Wynn, Chairman and CEO of Wynn Resorts.

Wynn Resorts, Limited is traded on the Nasdaq National Market under the ticker symbol WYNN and is part of the NASDAQ-100 Index. On September 6, 2006, Wynn Macau, a destination casino resort in the Macau Special Administrative Region of the People's Republic of China, opened, featuring 600 deluxe hotel rooms and suites, approximately 220 table games and 380 slot machines in approximately 100,000 square feet of casino gaming space, seven restaurants, approximately 26,000 square feet of retail space, a spa, a salon, entertainment lounges and meeting facilities. Additionally, the Company owns and operates Wynn Las Vegas (www.wynnlasvegas.com), a luxury hotel and destination casino resort located on the Las Vegas Strip. Wynn Las Vegas features 2,716 luxurious guest rooms and suites; an approximately 111,000 square foot casino; 22 food and beverage outlets; an on-site 18-hole golf course; approximately 223,000 square feet of meeting space; an on-site Ferrari and Maserati dealership; and approximately 76,000 square feet of retail space.

CONTACT: Wynn Resorts
Samanta Stewart, 702-770-7555

SOURCE: Wynn Resorts, Limited