# EXHIBIT 21



Print Page | Close Window

# PRESS RELEASE

Encore at Wynn Macau Opens Today

MACAU, April 21, 2010 /PRNewswire via COMTEX/ --Steve Wynn unveils Encore, his new, all-suites boutique hotel this afternoon at 5 p.m.. Adjacent to sister resort Wynn Macau, Encore is a unique destination with its own repertoire of suites, dining and shopping.

To view the multimedia assets associated with this release, please click: http://multivu.prnewswire.com/mnr/wynn/43604/

"Our goal with Encore was to broaden the appeal of Macau as a tourist destination and open the most beautiful hotel in the world. I am grateful to the People's Republic of China and the Government of Macau who gave us this opportunity. As a result, the loveliest hotel in the world is not in London, Paris, Tokyo, New York or San Francisco. It is here in Macau. Encore at Wynn will bring the highest level of service and accommodations to the hospitality industry and will be enjoyed by our employees and guests forever," said Steve Wynn, Chairman of the Board & Chief Executive Officer - Wynn Resorts, Limited.

Accommodations at Encore include 414 suites and villas that offer tasteful elegance in a comfortable, residential setting. Encore introduces two new restaurants to the Wynn dining family, and Bar Cristal's jewel-box decor turns a classic lobby bar into a work of art. The serene Spa at Encore offers treatments in eight private therapy suites, each with its own steam room, sauna and aroma-hydrotherapy bath and shower. The Shopping Esplanade is home to three signature stores--Cartier, Chanel and Piaget--showcasing the finest selections, including limited-edition pieces unique to Encore.

Encore suite reservations may be made by calling (853) 8986 9966.

As the nation mourns the victims of the earthquake in Yushu county, Qinghai province, China, Wynn Macau expresses its deepest condolences. As such, the celebratory activities for the opening of Encore at Wynn Macau have been cancelled. The fireworks display planned for this evening at 8:08 p.m. has been postponed to Thursday, April 22 at 8:08 p.m.

Wynn Resorts, Limited is traded on the Nasdaq Global Select Market under the ticker symbol WYNN and is part of the S&P 500 and NASDAQ-100 Indexes. Wynn Resorts owns and operates Wynn Las Vegas (www.wynnlasvegas.com), Encore (www.encorelasvegas.com) and Wynn Macau (www.wynnmacau.com). Wynn Las Vegas, a luxury hotel and destination casino resort located on the Las Vegas Strip features 2,716 luxurious guest rooms and suites, an approximately 111,000 square foot casino, 22 food and beverage outlets, an on-site 18-hole golf course, approximately 223,000 square feet of meeting space, an on-site Ferrari and Maserati dealership, and approximately 74,000 square feet of retail space.

We opened Encore, an expansion of Wynn Las Vegas, on December 22, 2008. Encore is located immediately adjacent to Wynn Las Vegas and features a 2,034 all-suite hotel, approximately 72,000 square foot casino, 12 food and beverage outlets, a night club, a spa and salon, approximately 60,000 square feet of meeting space and approximately 27,000 square feet of upscale retail outlets.

Wynn Macau is a destination casino resort in the Macau Special Administrative Region of the People's Republic of China and currently features 600 deluxe hotel rooms and suites, an approximately 205,000 square foot casino, casual and fine dining in six restaurants, approximately 46,000 square feet of retail space, a health club, pool and spa, along with lounges and meeting facilities.

We open Encore at Wynn Macau on April 21, 2010. This resort is an expansion of Wynn Macau which adds a fully-integrated resort hotel with approximately 410 luxury suites and four villas along with restaurants, additional retail space and gaming space.

Fireworks Spectacular

Phil Grucci's creativity, vision and management style have positioned him as one of the most imaginative and technically advanced fireworks designers in the world. The fireworks performance at Encore at Wynn Macau will have a total duration of 10 minutes and will be composed of 13 different sets. Among other significant works, The Grucci Family has designed and directed fireworks displays at Times Square in New York, the Opening and Closing Ceremonies of the 2008 Beijing Olympic Games and the Wynn Macau Opening in 2006.

For official resort photography, visit http://multivu.prnewswire.com/mnr/wynn/43604/.

SOURCE Wynn Macau

# EXHIBIT 22



Print Page | Close Window

# PRESS RELEASE

Wynn Macau Receives Formal Gazette Approval for Cotai Development From Macau SAR Government

MACAU--(BUSINESS WIRE)--May. 1, 2012-- Wynn Resorts, Limited (Nasdaq: WYNN) announced today that Wynn Macau's Cotai land concession contract has been officially approved by the Macau government, paving the way for Wynn to break ground on the 51-acre site.

In Macau today Stephen A. Wynn, Chairman and CEO of Wynn Resorts made the following statement, "Our Company has enjoyed the privilege of being included in the remarkable modern history of our community.

"The official transfer of real estate in Cotai makes possible the commencement of the construction phase, of what will be the single most important project in the history of Wynn Resorts.

"We are mindful of our responsibilities to the citizens and government of Macau and we will remain consistent to the history of our organization by bringing to life a hotel resort in Cotai that will mark a new standard of elegance in the world.

"On behalf of all our employees and shareholders, we offer our thanks to the government for this opportunity."

The Macau Special Administrative Region's Official Gazette published its formal approval of the Cotai land concession for Wynn Macau today. The government's approval represents a vote of confidence in Wynn's efforts to create an imaginative and exceptional resort experience on Cotai, and its ongoing contribution to the transformation of Macau.

Source: Wynn Resorts, Limited

**Investors:**
Wynn Resorts, Limited
Samanta Stewart, 702-770-7555
investorrelations@wynnresorts.com
**Media:**
Wynn Las Vegas
Deanna Pettit, 702-770-2121 (US)
Director of Public Relations
deanna.pettit@wynnlasvegas.com
Wynn Macau
Katharine Liu, 853-8986-5521 (Macau)
Director - Communications
katharine.liu@wynnmacau.com

# EXHIBIT 23

Steve Wynn rails against US regulatory process, praises Chinese policies

Boston Herald

Thursday, October 2, 2014 PrintEmail39 Comments
By:
Jack Encarnacao

Casino mogul Steve Wynn praised the People's Republic of China's regulatory process while slamming America's yesterday in remarks experts called "impolitic" and "more than just a little bit disingenuous" as Wynn works with Bay State regulators to build an Everett casino.

"The regulatory burden in China is infinitesimal compared to the crap we get in America," Wynn told CNBC yesterday after his keynote speech at the Global Gaming Expo in Las Vegas.

Wynn also called pro-democracy protests in Hong Kong "sort of a party," and said he's "more scared about the United States than I am about China ... Everyone in China is pragmatic."

Wynn, who operates a palatial casino in Macau, last year blasted the Gaming Commission as "freshmen" and saying they treated him "in many respects, as if they are doing us a favor." But spokesman Michael Weaver said Wynn praised the Bay State commission in his address yesterday, and that he sees China's regulatory environment as more predictable than America's.

University of Nevada, Las Vegas gaming expert William Thompson said, "I would say it's impolitic, but he likes to shoot from the hip." He added Wynn likely prefers Macau because he "can go to one person and get things settled."

Boston College gaming expert Richard McGowan called Wynn's comment "more than just a little bit disingenuous" because the Chinese could shut down his operation on a whim, but he has "all kinds of legal redress" here.

# EXHIBIT 24



FOCUS - 3 of 20 DOCUMENTS

Copyright 2013 Factiva ®, from Dow Jones
All Rights Reserved

Dow Jones Factiva

(Copyright (c) 2013, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

**U.S. EDITION**

The Wall Street Journal

October 29, 2013 Tuesday

**SECTION:** Pg. B2

**LENGTH:** 937 words

**HEADLINE:** Corporate News: Casinos Get No Quarter --- Operators Rebut Regulators' Efforts to Challenge Expansion

**BYLINE:** By Kate O'Keefe

**BODY:**

The U.S. casino industry is pushing back against government entities criticizing its operations and blocking its expansion efforts, saying they are inexperienced and their claims are unsubstantiated.

The latest blow to the big casino operators came earlier this month in Massachusetts, where Caesars Entertainment Corp. withdrew from a consortium bidding for a casino license in East Boston after the Massachusetts Gaming Commission raised concerns about the gambling company's suitability.

Caesars was sharply critical of the commission, which was concerned about the company's relationship, since canceled, with the hip New York-based Gansevoort Hotel Group for a project in Las Vegas, among other issues. The state commission's report alleged that one of Gansevoort's investors, Arik Kislin, had ties to organized crime.

Mr. Kislin didn't return requests for comment.

Jan Jones Blackhurst, Caesars' head of communications and government relations, said the allegations against Mr. Kislin were unsubstantiated and the gambling company had "no relationship" with him and was only licensing the Gansevoort name for the project. "We bought a name," she said. "That is like saying we should change the name of the Flamingo because Bugsy Siegel once owned it."

Corporate News: Casinos Get No Quarter --- Operators Rebut Regulators' Efforts to Challenge Expansion The Wall Street Journal October 29, 2013 Tuesday

Other casino operators were also critical of the Massachusetts regulators. At a commission hearing, Steve Wynn, whose Wynn Resorts Ltd. is also applying for a license there, called the panel a "young regulatory agency" that is "new and inexperienced," according to a transcript from the regulator. He asked the commission to clarify what kind of regulatory standards would be applied in the state. "My nightmare scenario exists when irresponsible investigators start to apply standards that they invent that run afoul of common sense and our ability to comply abroad," he told the regulators.

Commissioner Gayle Cameron told Mr. Wynn that she was struggling with his "black-and-white arguments" about the possibility of criminal activity at casinos. "There has never been a casino anywhere in the world that has no criminal activity," she said. "You really have some disdain for investigations or law enforcement."

Wynn and another Massachusetts applicant, MGM Resorts International, are likely to have a difficult time passing muster with the state's regulators because of their Macau operations, which are being scrutinized by regulators in the U.S., casino executives said.

A representative for Wynn said: "Our company has been fully engaged with the commission in their investigation and have no reason to believe that the company will have any issue being found suitable."

An MGM representative said: "MGM has been granted licenses to operate in jurisdictions across the U.S. and around the world, and we see no legitimate reason why we would not be granted one in Massachusetts."

Massachusetts Gaming Commission Chairman Steve Crosby said the regulator is "completely satisfied" with its approval process. "The Commission set two top priorities for the licensing process: the integrity of the process and participants, and robust competition for the licenses, in that order," he said.

Caesars, in the same regulatory filing in which it pulled out of Massachusetts, also disclosed it is under investigation by the U.S. Treasury and a federal grand jury for possible violations of the Bank Secrecy Act. The company, which said it would fully cooperate with the investigations, is the third Las Vegas Strip giant currently facing federal probes. Neither the Treasury nor the Justice Department would comment.

Some industry executives have said they are concerned even more federal scrutiny is on the way. They point to a tough recent speech by the director of the Treasury's Financial Crimes Enforcement Network who spent 15 years at the Justice Department fighting money laundering and organized crime.

The director, Jennifer Shasky Calvery, last month told attendees at the industry's biggest annual conference in Las Vegas: "I fear there may be a culture within some pockets of the industry of reluctant compliance with the bare minimum, if not less. I hope that together we can make a cultural change."

In an interview, the American Gaming Association's chief executive, Geoff Freeman, said of Ms. Shasky Calvery, who took the helm a year ago: "You have a new director who has been very public in saying she wants to take a look at a multitude of nonfinancial institutions of which casinos are one."

Mr. Freeman also said that casino operators are seeking to change a draft report on gambling in the Chinese territory of Macau that was issued by the U.S.-China Economic and Security Review Commission. The commission was created by Congress to investigate national-security implications of trade between the two countries and to provide recommendations to Congress.

A draft of the commission's annual report reviewed by The Wall Street Journal discusses the risks of organized crime and money laundering in Macau in depth. It quotes Nevada's top regulator, A.G. Burnett, as saying: "It is common knowledge [that] the operation of VIP rooms in Macau casinos had long been dominated by Asian organized crime commonly referred to as triads [and] the same [organized crime] figures are allegedly still working the VIP operations."

Corporate News: Casinos Get No Quarter --- Operators Rebut Regulators' Efforts to Challenge Expansion The Wall Street Journal October 29, 2013 Tuesday

Mr. Freeman said that the commission had written the draft, dated Oct. 16, before speaking to anyone from his industry but that some casino operators had recently sought meetings with the commission to discuss its findings. "I'm optimistic that it will lead to a more informed report," he said.

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** October 30, 2013

# EXHIBIT 25

**News**Room

10/18/13 Boston Herald 4
2013 WLNR 26232585

Boston Herald (MA)
Copyright © 2013 The Boston Herald

October 18, 2013

Volume 31; Issue 291

Wynn tells board: Butt out of Macau

DAVE WEDGE

— dwedge@bostonherald.com

'Macau is a legitimate place. They're not gangsters or bums, they're businessmen.'

— STEVE WYNN gambling tycoon behind proposed Everett casino

What happens in Macau, stays in Macau.

That was gambling tycoon Steve Wynn's clear message for the Gaming Commission yesterday, as he defended the legitimacy of his Macau casino and questioned whether Massachusetts regulators might go too far by penalizing him for his overseas operations.

The flamboyant casino mogul's multibillion-dollar empire is under close scrutiny as he seeks a state license for a $1.4 billion Everett resort. He voiced fears that "irresponsible" news reports and "murky" investigations into his Macau operation could lead to sanctions in Massachusetts if he wins a license here.

"We're scared to death," Wynn, who owns the most profitable casinos in the world, told the Gaming Commission, chaired by Stephen Crosby. "We're scared to death — not that you won't pick us, but that you will, and there goes a billion-three or a billion-five."

The comments came as the board seeks to set rules on regulating Massachusetts-licensed casino companies that do business overseas and in other jurisdictions. While gaming boards in Las Vegas and Atlantic City routinely investigate casino operators who break rules overseas, Wynn fears the Massachusetts board might penalize him over his Macau dealings even if he is in compliance with Macau's laws.

Wynn, who is competing with Suffolk Downs and Foxwoods for the sole Boston-region casino license, said Macau has been misrepresented as a haven for corrupt public officials and Asian triad gangs who infiltrate casinos to launder cash.

Gaming commissioner Gayle Cameron said to Wynn: "There's never been a casino anywhere in the world that has no criminal activity. You really have some disdain for investigations and law enforcement. That's my opinion."

"Macau is a legitimate place," Wynn said. "They're not gangsters or bums, they're businessmen.

"There are people saying things, printing things that are grossly irresponsible," Wynn continued. "If we are in compliance (in Macau), are we subject to being disciplined or having our license revoked after we invest over $1 billion in Boston, in Massachusetts? If so, no sane person would ever risk such an exposure."

Wynn was referring to reports that allege corruption among third-party "junket" operators in China who bring high-rollers from the country's mainland to Macau, an exploding gaming mecca that hauls in six times the cash of Las Vegas. Wynn said security at his casinos — run by ex-FBI agents — is tight, and that public officials and organized crime figures are barred from his properties.

"They don't go in our place because we don't tolerate it," Wynn said.


**---- Index References ----**

News Subject: (Social Issues (1SO05); Racketeer Influenced & Corrupt Organizations (RICO) (1RI18); Crime (1CR87); Emerging Market Countries (1EM65))

Industry: (Entertainment (1EN08); Gaming Industry (1GA25); Travel & Tourism (1TR07); Casinos (1CA80); Resorts (1RE44))

Region: (Massachusetts (1MA15); Nevada (1NE81); Americas (1AM92); Far East (1FA27); Macao (1MA65); Asia (1AS61); U.S. New England Region (1NE37); USA (1US73); Eastern Asia (1EA61); China (1CH15); U.S. West Region (1WE46); North America (1NO39))

Language: EN

Other Indexing: (Gayle Cameron; STEVE WYNN; Stephen Crosby)

Keywords: MACAU; WYNN; CASINO; GAMING; MASSACHUSETTS; OVERSEAS; BILLION; COMMISSION; DEATH; FEARS

Word Count: 445

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.



WestlawNext® © 2014 Thomson Reuters. No claim to original U.S. Government Works.   2

# EXHIBIT 26

10-K 1 d272879d10k.htm FOM 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the fiscal year ended December 31, 2011**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the transition period            to**

**Commission File No. 000-50028**

# WYNN RESORTS, LIMITED
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **NEVADA** | **46-0484987** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**3131 Las Vegas Boulevard South - Las Vegas, Nevada 89109**
(Address of principal executive offices) (Zip Code)

**(702) 770-7555**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $.01 par value | Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act:

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the registrant's voting and non-voting common stock held by non-affiliates based on the closing price as reported on the NASDAQ Global Select Market on June 30, 2011 was approximately $11 billion.

As of February 23, 2012, 100,527,776 shares of the registrant's Common Stock, $.01 par value, were outstanding.

Portions of the registrant's Proxy Statement for its 2012 Annual Meeting of Stockholders to be filed not later than 120 days after the end of the fiscal year covered by this report are incorporated by reference into Part III of this Form 10-K.

Table of Contents

## TABLE OF CONTENTS

### PART I

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 17 |
| Item 1B | Unresolved Staff Comments | 31 |
| Item 2. | Properties | 31 |
| Item 3. | Legal Proceedings | 32 |
| Item 4. | Mine Safety Disclosures | 33 |

### PART II

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 34 |
| Item 6. | Selected Financial Data | 35 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 36 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 59 |
| Item 8. | Financial Statements and Supplementary Data | 63 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 108 |
| Item 9A. | Controls and Procedures | 108 |
| Item 9B. | Other Information | 108 |

### PART III

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 109 |
| Item 11. | Executive Compensation | 109 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 109 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 110 |
| Item 14. | Principal Accountant Fees and Services | 110 |

### PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 111 |
| Signatures | | 128 |

2

Table of Contents

## PART I

### ITEM 1.        BUSINESS

#### Overview

Wynn Resorts, Limited, a Nevada corporation, was formed in June 2002, is led by Chairman and Chief Executive Officer, Stephen A. Wynn, and is a leading developer, owner and operator of destination casino resorts. We own and operate two destination casino resorts. In Las Vegas, Nevada, we own and operate "Wynn Las Vegas," which includes "Encore at Wynn Las Vegas." In the Macau Special Administrative Region of the People's Republic of China ("Macau") we own and operate "Wynn Macau" which includes "Encore at Wynn Macau." We present our results based on the following two segments: Las Vegas Operations and Macau Operations. For more information on the financial results for our segments, see Item 8 "Financial Statements", Note 17 "Segment Information."

Unless the context otherwise requires, all references herein to "Wynn Resorts," the "Company," "we," "us" or "our," or similar terms, refer to Wynn Resorts, Limited and its consolidated subsidiaries.

Wynn Resorts files annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments of such reports with the Securities and Exchange Commission ("SEC"). Any document Wynn Resorts files may be inspected, without charge, at the SEC's public reference room at 100 F Street, N.E. Washington, D.C. 20549 or at the SEC's internet site address at http://www.sec.gov. Information related to the operation of the SEC's public reference room may be obtained by calling the SEC at 1-800-SEC-0330. In addition, through our own internet address at www.wynnresorts.com, Wynn Resorts provides a hyperlink to a third-party SEC filing website which posts these filings as soon as reasonably practicable, where they can be reviewed without charge. The information found on our website is not a part of this Annual Report on Form 10-K or any other report we file or furnish to the SEC.

#### Our Resorts

##### *Las Vegas Operations*

Wynn Las Vegas opened on April 28, 2005. On December 22, 2008, we opened Encore at Wynn Las Vegas, an expansion of Wynn Las Vegas. We refer to the fully integrated Wynn Las Vegas and Encore at Wynn Las Vegas resort as our "Las Vegas Operations." We believe that this resort offers exceptional accommodations, amenities and service. For the sixth consecutive year, The Tower Suites at Wynn Las Vegas has received both the Forbes five-star and AAA five-diamond distinctions. The Spa at Wynn Las Vegas earned five-star recognition from Forbes for the fourth year in a row. The Spa at Wynn Las Vegas and the Spa at Encore are two of only four spas in Las Vegas to be recognized with the Forbes five-star award.

Our Las Vegas Operations feature approximately 4,750 hotel rooms and suites, 220 table games, 2,430 slot machines and a poker room in approximately 186,000 square feet of casino gaming space, (including a sky casino and private gaming salons), casual and fine dining in 35 food and beverage outlets, two spas and salons, lounges, and approximately 97,000 square feet of retail space featuring boutiques from Alexander McQueen, Brioni, Cartier, Chanel, Dior, Graff, Hermes, Loro Piana, Louis Vuitton, Manolo Blahnik, Oscar de la Renta, Vertu and others. Our Las Vegas Operations also offer three nightclubs, a beach club, a Ferrari and Maserati automobile dealership, wedding chapels, an 18-hole golf course, approximately 283,000 square feet of meeting space, a specially designed theater presenting "Le Rêve-The Dream," a water-based theatrical production, and an Encore Theater presenting Garth Brooks and other headliner entertainment acts. We believe that the unique experience of our Las Vegas Operations drives the significant visitation experienced since opening.

##### *Macau Operations*

Wynn Macau opened on September 6, 2006. On April 21, 2010, we opened Encore at Wynn Macau, an expansion of Wynn Macau. We refer to the fully integrated Wynn Macau and Encore at Wynn Macau resort as

3

Table of Contents

our "Macau Operations." We believe that this resort offers exceptional accommodations, amenities and service. For the fourth consecutive year, Wynn Macau and The Spa at Wynn Macau received the Forbes five-star distinction.

Our Macau Operations feature approximately 1,008 hotel rooms and suites, 486 table games, 930 slot machines and a poker pit in approximately 265,000 square feet of casino gaming space, (including a sky casino and private gaming salons), casual and fine dining in eight restaurants, two spas and a salon, lounges, meeting facilities and approximately 54,200 square feet of retail space featuring boutiques from Bvlgari, Cartier, Chanel, Dior, Dunhill, Ferrari, Giorgio Armani, Gucci, Hermes, Hugo Boss, Louis Vuitton, Miu Miu, Piaget, Prada, Rolex, Tiffany, Tudor, Vacheron Constantin, Van Cleef & Arpels, Versace, Vertu, Zegna and others. Our Macau Operations include a show in the rotunda featuring a Chinese zodiac-inspired ceiling and interchangeable gold "prosperity tree" and "dragon of fortune" attractions.

See Item 7 of Part II, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations" for information about our net revenues.

## Construction and Development Opportunities

In January 2011, we completed a refurbishment and upgrade to the resort rooms at Wynn Las Vegas. A remodel of the suites was completed in early May 2011. These remodels were completed at a cost of $61 million.

In the ordinary course of our business, in response to market developments and customer preferences, we have made and continue to make certain enhancements and refinements to our resort complexes.

In 2011, we formally accepted the terms and conditions of a draft land concession contract from the Macau government for approximately 51 acres of land in the Cotai area of Macau. In December 2011, we paid the initial deposit of $62.5 million pursuant to this draft land concession contract. Following government approval, we anticipate constructing on this site a full-scale integrated resort containing a casino, approximately 2,000 hotel suites, convention, retail, entertainment and food and beverage offerings. We continue to finalize the project scope, timeline and budget.

## Our Strategy

We believe that Steve Wynn is the preeminent designer, developer and operator of destination casino resorts and has developed brand name status. Mr. Wynn's involvement with our casino resorts provides a distinct advantage over other gaming enterprises. We integrate luxurious surroundings, distinctive entertainment and superior amenities, including convention facilities, entertainment, fine dining and premium retail offerings, to create resorts that appeal to a variety of customers.

Our resorts are designed and built to provide a premium experience. Wynn Las Vegas and Wynn Macau are positioned as full-service luxury resorts and casinos in the leisure, convention and tour and travel industries. We market these resorts directly to gaming customers using database marketing techniques, as well as traditional incentives, including reduced room rates and complimentary meals and suites. Our rewards system offers discounted and complimentary meals, lodging and entertainment for our guests. We also create general market awareness for our resorts through various media channels, including social media, television, radio, newspapers, magazines, the internet, direct mail and billboards.

Mr. Wynn and his team bring significant experience in designing, developing and operating casino resorts. The senior executive team has an average of over 25 years of experience in the hotel and gaming industries. We also have an approximately 90-person design, development and construction subsidiary, the senior management of which has significant experience in all major construction disciplines.

We continually seek out new opportunities for additional gaming or related businesses, in the United States, and worldwide.

4

Table of Contents

**Market and Competition**

*Las Vegas*

Las Vegas is the largest gaming market in the United States. The casino/hotel industry in Las Vegas is highly competitive. Over the last several years, Las Vegas has been impacted by economic disruptions. In 2011, Las Vegas visitation and gaming statistics began to improve, but uncertainty remains regarding the future gaming, tourism and convention environment. Our Las Vegas Operations are located on the Las Vegas Strip and compete with other high-quality resorts and hotel casinos in Las Vegas. Many competing properties draw a significant number of visitors and directly compete with our operations. Resorts located on or near the Las Vegas Strip compete with other Las Vegas Strip hotels and with other hotel casinos in Las Vegas on the basis of overall atmosphere, range of amenities, level of service, price, location, entertainment, themes and size, among other factors. We seek to differentiate our Las Vegas Operations from other major Las Vegas resorts by concentrating on our fundamental elements of design, atmosphere, personal service and luxury.

Our Las Vegas Operations also compete, to some extent, with other hotel/casino facilities in Nevada and throughout the United States, casino resorts throughout Asia, and elsewhere in the world. In addition, the legalization of casino gaming in or near metropolitan areas from which we attract customers, such as the recently passed legislation in Massachusetts, could have a negative effect on our business. New or renovated casinos in Asia, including two new resorts in Singapore, resorts in the Philippines, and our resort in Macau, could draw gaming customers away from Las Vegas.

*Macau*

Macau, which was a Portuguese colony for approximately 450 years, was transferred from Portuguese to Chinese political control in December 1999. Macau is governed as a special administrative region of China and is located approximately 37 miles southwest of, and approximately one hour away via ferry from, Hong Kong. Macau, which has been a casino destination for more than 40 years, consists principally of a peninsula on mainland China, and two neighboring islands, Taipa and Coloane. We believe that Macau is located in one of the world's largest concentrations of potential gaming customers. According to Macau Statistical Information, casinos in Macau, the largest gaming market in the world, generated approximately $33.5 billion in gaming revenue in 2011, a 42% increase over the approximately $23.5 billion generated in 2010.

Macau's gaming market is primarily dependent on tourists. Tourist arrivals in 2011 were 28 million, compared to 25 million in 2010. The Macau market has also experienced tremendous growth in capacity in the last few years. As of December 31, 2011, there were 22,356 hotel rooms and 5,302 table games in Macau, compared to 12,978 hotel rooms and 2,762 table games as of December 31, 2006.

Gaming customers traveling to Macau have typically come from nearby destinations in Asia including Hong Kong, mainland China, Taiwan, South Korea and Japan. According to the Macau Statistics and Census Service Monthly Bulletin of Statistics, approximately 89% of the tourists who visited Macau in 2011 came from mainland China, Hong Kong and Taiwan. Macau completed construction of an international airport in 1995, which accommodates large commercial aircraft and provides direct air service to major cities in Asia, including Beijing, Shanghai, Jakarta, Taipei, Manila, Singapore and Bangkok. Travel to Macau by citizens of mainland China requires a visa. Chinese government officials have, on occasion, exercised their authority to adjust the visa policy and may do so in the future.

Prior to 2002, gaming in Macau was permitted as a government-sanctioned monopoly concession awarded to a single concessionaire. However, the government of Macau liberalized the gaming industry in 2002 by granting concessions to operate casinos to three concessionaires (including Wynn Macau), who in turn were permitted, subject to the approval of the government of Macau, to each grant one sub-concession to other gaming operators. There is no limit to the number of casinos each concessionaire is permitted to operate, but each facility is subject to government approval. Currently, there are 34 operating casinos in Macau.

5

Table of Contents

In 2002, the other two concessions were granted to Sociedade de Jogos de Macau ("SJM") and Galaxy Entertainment Group Limited ("Galaxy"). SJM, which is controlled by the family of Stanley Ho, operates 20 of the 34 existing casinos, including the Hotel Lisboa and The Grand Lisboa. In addition, an affiliate of SJM owns one of three water ferry services and the helicopter shuttle service that links Macau to Hong Kong. SJM is a Hong Kong Stock Exchange listed company.

Galaxy owns the Waldo Hotel/Casino located on the Macau peninsula, Galaxy Star World hotel casino located immediately adjacent to Wynn Macau, the Grand Waldo Cotai and Galaxy Cotai. Galaxy is a Hong Kong Stock Exchange listed company.

Las Vegas Sands Corp., the owner and operator of The Venetian and The Palazzo resorts in Las Vegas and a former partner of Galaxy, entered into a sub-concession agreement with Galaxy in 2002 which allows it to independently develop and operate casinos in Macau. The Las Vegas Sands Corp. or its affiliate owns and operates the Sands Macao, The Venetian Macao Resort Hotel, the largest casino resort in Macau and the Four Seasons Hotel Macau, located adjacent to the Venetian Macao. In addition, an affiliate of Las Vegas Sands Corp. is expected to open Sands Cotai Central, commencing in phases, in 2012, which will include additional hotel properties as well as gaming and retail space. In late 2009, Las Vegas Sands Corp. completed the initial public offering of Sands China, Ltd. on the Hong Kong Stock Exchange.

A joint venture consisting of Melco, a Hong Kong Stock Exchange-listed company, and Crown, Ltd., an Australian company, is currently operating the Altira and the City of Dreams, a large resort in Cotai. This joint venture operates its properties under a subconcession purchased from Wynn Macau in 2006. In December 2011, Melco Crown, a NASDAQ listed company, completed its dual listing and started trading on the Hong Kong Stock Exchange.

In December 2007, a joint venture of MGM Resorts International and Pansy Ho Chiu-king opened the MGM Grand Macau, a resort on the Macau peninsula adjacent to Wynn Macau. The MGM Grand Macau is operated pursuant to a subconcession granted to the joint venture by SJM. In June 2011, MGM Resorts International and Pansy Ho Chiu-king completed the initial public offering of MGM China Holdings Limited on the Hong Kong Stock Exchange.

Our casino concession agreement currently allows the government to grant additional concessions for the operation of casinos. If the government of Macau awards additional concessions or permits additional sub-concessionaires, Wynn Macau will face increased competition from casino operators in Macau. Resorts located on or near Macau compete with other hotels and with other hotel casinos in Macau on the basis of overall atmosphere, range of amenities, level of service, price, location, entertainment and size, among other factors.

Wynn Macau faces competition from casinos located in other areas of Asia, including the Marina Bay Sands and Resorts World Sentosa resorts operating in Singapore, Genting Highlands Resort, a major gaming and resort destination located outside of Kuala Lumpur, Malaysia, and casinos in the Philippines. Wynn Macau also encounters competition from other major gaming centers located around the world, including Australia and Las Vegas, cruise ships in Asia that offer gaming, and other casinos throughout Asia.

## Geographic Data

Geographic data are reported in Note 17 to the consolidated financial statements. Additional financial data about our geographic operations is provided in Item 7 "Management's Discussion of Analysis of Financial Condition and Results of Operations."

## Regulation and Licensing

The gaming industry is highly regulated. Gaming registrations, licenses and approvals, once obtained, can be suspended or revoked for a variety of reasons. We cannot assure you that we will obtain all required registrations, licenses and approvals on a timely basis or at all, or that, once obtained, the registrations, findings

6

Table of Contents

of suitability, licenses and approvals will not be suspended, conditioned, limited or revoked. If we are ever prohibited from operating one of our gaming facilities, we would, to the extent permitted by law, seek to recover our investment by selling the property affected, but we cannot assure you that we could recover full value.

*Nevada*

*Introduction.* The ownership and operation of casino gaming facilities in the State of Nevada are subject to the Nevada Gaming Control Act and the regulations made under the Act, as well as to various local ordinances. Our Las Vegas Operations are subject to the licensing and regulatory control of the Nevada Gaming Commission, the Nevada State Gaming Control Board and the Clark County Liquor and Gaming Licensing Board, which we refer to herein collectively as the "Nevada Gaming Authorities."

*Policy Concerns of Gaming Laws.* The laws, regulations and supervisory procedures of the Nevada Gaming Authorities are based upon declarations of public policy. Such public policy concerns include, among other things:

- preventing unsavory or unsuitable persons from being directly or indirectly involved with gaming at any time or in any capacity;

- establishing and maintaining responsible accounting practices and procedures;

- maintaining effective controls over the financial practices of licensees, including establishing minimum procedures for internal fiscal affairs and safeguarding assets and revenue, providing reliable recordkeeping and requiring the filing of periodic reports with the Nevada Gaming Authorities;

- preventing cheating and fraudulent practices; and

- providing a source of state and local revenue through taxation and licensing fees.

Changes in applicable laws, regulations and procedures could have significant negative effects on our Las Vegas gaming operations and our financial condition and results of operations.

*Owner and Operator Licensing Requirements.* Our subsidiary, Wynn Las Vegas, LLC, the owner and operator of our Las Vegas Operations, has been approved by the Nevada Gaming Authorities as a limited liability company licensee, referred to as a company licensee, which includes approval to conduct casino gaming operations, including a race book and sports pool and pari-mutuel wagering. These gaming licenses are not transferable.

*Company Registration Requirements.* Wynn Resorts was found suitable by the Nevada Gaming Commission to own the equity interests of Wynn Resorts Holdings, LLC ("Wynn Resorts Holdings"), a wholly-owned subsidiary of Wynn Resorts, and to be registered by the Nevada Gaming Commission as a publicly traded corporation, referred to as a registered company, for the purposes of the Nevada Gaming Control Act. Wynn Resorts Holdings was found suitable by the Nevada Gaming Commission to own the equity interests of Wynn Las Vegas, LLC and to be registered by the Nevada Gaming Commission as an intermediary company. In addition to being licensed, Wynn Las Vegas, LLC, as an issuer of First Mortgage Notes registered with the SEC, also qualified as a registered company. Wynn Las Vegas Capital Corp., a co-issuer of the First Mortgage Notes, was not required to be registered or licensed, but may be required to be found suitable as a lender or financing source.

Periodically, we are required to submit detailed financial and operating reports to the Nevada Gaming Commission and provide any other information that the Nevada Gaming Commission may require. Substantially all of our material loans, leases, sales of securities and similar financing transactions must be reported to, and/or approved by, the Nevada Gaming Commission.

*Individual Licensing Requirements.* No person may become a more than 5% stockholder or member of, or receive any percentage of the profits of, an intermediary company or company licensee without first obtaining

7

Table of Contents

licenses and approvals from the Nevada Gaming Authorities. The Nevada Gaming Authorities may investigate any individual who has a material relationship to or material involvement with us to determine whether the individual is suitable or should be licensed as a business associate of a gaming licensee. Certain of our officers, directors and key employees have been or may be required to file applications with the Nevada Gaming Authorities and are or may be required to be licensed or found suitable by the Nevada Gaming Authorities. All applications required as of the date of this report have been filed. However, the Nevada Gaming Authorities may require additional applications and may also deny an application for licensing for any reason which they deem appropriate. A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation. An applicant for licensing or an applicant for a finding of suitability must pay or must cause to be paid all the costs of the investigation. Changes in licensed positions must be reported to the Nevada Gaming Authorities and, in addition to their authority to deny an application for a finding of suitability or licensing, the Nevada Gaming Authorities have the jurisdiction to disapprove a change in a corporate position.

If the Nevada Gaming Authorities were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the Nevada Gaming Commission may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review in Nevada.

*Redemption of Securities Owned By an Unsuitable Person.* The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the board of directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts. The redemption price will be the amount, if any, required by the gaming authority or, if the gaming authority does not determine the price, the sum deemed by the board of directors to be the fair value of the securities to be redeemed. If Wynn Resorts determines the redemption price, the redemption price will be capped at the closing price of the shares on the principal national securities exchange on which the shares are listed on the trading day before the redemption notice is given. If the shares are not listed on a national securities exchange, the redemption price will be capped at the closing sale price of the shares as quoted on The NASDAQ Global Select Market or if the closing price is not reported, the mean between the bid and ask prices, as quoted by any other generally recognized reporting system. Wynn Resorts' right of redemption is not exclusive of any other rights that it may have or later acquire under any agreement, its bylaws or otherwise. The redemption price may be paid in cash, by promissory note, or both, as required, and pursuant to the terms established by, the applicable Gaming Authority and, if not, as the Board of Directors of Wynn Resorts elects, and as set forth in the Company's articles of incorporation.

*Consequences of Violating Gaming Laws.* If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

*Requirements for Voting or Nonvoting Securities Holders.* Regardless of the number of shares held, any beneficial owner of Wynn Resorts' voting or nonvoting securities may be required to file an application, be investigated and have that person's suitability as a beneficial owner of voting securities determined if the Nevada Gaming Commission has reason to believe that the ownership would be inconsistent with the declared policies of the State of Nevada. If the beneficial owner of the voting or nonvoting securities of Wynn Resorts who must be

8

Table of Contents

found suitable is a corporation, partnership, limited partnership, limited liability company or trust, it must submit detailed business and financial information including a list of its beneficial owners. The applicant must pay all costs of the investigation incurred by the Nevada Gaming Authorities in conducting any investigation.

The Nevada Gaming Control Act requires any person who acquires more than 5% of the voting securities of a registered company to report the acquisition to the Nevada Gaming Commission. The Nevada Gaming Control Act requires beneficial owners of more than 10% of a registered company's voting securities to apply to the Nevada Gaming Commission for a finding of suitability within 30 days after the Chairman of the Nevada State Gaming Control Board mails the written notice requiring such filing. However, an "institutional investor," as defined in the Nevada Gaming Control Act, which beneficially owns more than 10% but not more than 11% of a registered company's voting securities as a result of a stock repurchase by the registered company may not be required to file such an application. Further, an institutional investor which acquires more than 10%, but not more than 25%, of a registered company's voting securities may apply to the Nevada Gaming Commission for a waiver of a finding of suitability if the institutional investor holds the voting securities for investment purposes only. An institutional investor that has obtained a waiver may hold more than 25% but not more than 29% of a registered company's voting securities and maintain its waiver where the additional ownership results from a stock repurchase by the registered company. An institutional investor will not be deemed to hold voting securities for investment purposes unless the voting securities were acquired and are held in the ordinary course of business as an institutional investor and not for the purpose of causing, directly or indirectly, the election of a majority of the members of the board of directors of the registered company, a change in the corporate charter, bylaws, management, policies or operations of the registered company, or any of its gaming affiliates, or any other action which the Nevada Gaming Commission finds to be inconsistent with holding the registered company's voting securities for investment purposes only. Activities which are not deemed to be inconsistent with holding voting securities for investment purposes only include:

- voting on all matters voted on by stockholders or interest holders;

- making financial and other inquiries of management of the type normally made by securities analysts for informational purposes and not to cause a change in management, policies or operations; and,

- other activities that the Nevada Gaming Commission may determine to be consistent with such investment intent.

The articles of incorporation of Wynn Resorts include provisions intended to assist its implementation of the above restrictions.

Wynn Resorts is required to maintain a current stock ledger in Nevada which may be examined by the Nevada Gaming Authorities at any time. If any securities are held in trust by an agent or by a nominee, the record holder may be required to disclose the identity of the beneficial owner to the Nevada Gaming Authorities. A failure to make the disclosure may be grounds for finding the record holder unsuitable. We are required to provide maximum assistance in determining the identity of the beneficial owner of any of Wynn Resorts' voting securities. The Nevada Gaming Commission has the power to require the stock certificates of any registered company to bear a legend indicating that the securities are subject to the Nevada Gaming Control Act. The certificates representing shares of Wynn Resorts' common stock note that the shares are subject to a right of redemption and other restrictions set forth in Wynn Resorts' articles of incorporation and bylaws and that the shares are, or may become, subject to restrictions imposed by applicable gaming laws.

9

Table of Contents

***Consequences of Being Found Unsuitable.*** Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the Nevada Gaming Commission or by the Chairman of the Nevada State Gaming Control Board, or who refuses or fails to pay the investigative costs incurred by the Nevada Gaming Authorities in connection with the investigation of its application, may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any person found unsuitable and who holds, directly or indirectly, any beneficial ownership of any voting security or debt security of a registered company beyond the period of time as may be prescribed by the Nevada Gaming Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to hold an equity interest or to have any other relationship with us, we:

- pay that person any dividend or interest upon any voting securities;

- allow that person to exercise, directly or indirectly, any voting right held by that person relating to Wynn Resorts;

- pay remuneration in any form to that person for services rendered or otherwise; or,

- fail to pursue all lawful efforts to require the unsuitable person to relinquish such person's voting securities including, if necessary, the immediate purchase of the voting securities for cash at fair market value.

***Gaming Laws Relating to Debt Securities Ownership.*** The Nevada Gaming Commission may, in its discretion, require the owner of any debt or similar securities of a registered company, to file applications, be investigated and be found suitable to own the debt or other security of the registered company if the Nevada Gaming Commission has reason to believe that such ownership would otherwise be inconsistent with the declared policies of the State of Nevada. If the Nevada Gaming Commission decides that a person is unsuitable to own the security, then under the Nevada Gaming Control Act, the registered company can be sanctioned, including the loss of its approvals if, without the prior approval of the Nevada Gaming Commission, it:

- pays to the unsuitable person any dividend, interest or any distribution whatsoever;

- recognizes any voting right by the unsuitable person in connection with the securities;

- pays the unsuitable person remuneration in any form; or,

- makes any payment to the unsuitable person by way of principal, redemption, conversion, exchange, liquidation or similar transaction.

***Approval of Public Offerings.*** We may not make a public offering without the prior approval of the Nevada Gaming Commission if the proceeds from the offering are intended to be used to construct, acquire or finance gaming facilities in Nevada, or to retire or extend obligations incurred for those purposes or for similar transactions. On March 24, 2011, the Nevada Gaming Commission granted us and Wynn Las Vegas, LLC prior approval, subject to certain conditions, to make public offerings for a period of two years (the "Shelf Approval"). The Shelf Approval also applies to any affiliated company wholly owned by us which is a publicly traded corporation or would thereby become a publicly traded corporation pursuant to a public offering. The Shelf Approval may be rescinded for good cause without prior notice upon the issuance of an interlocutory stop order by the Chairman of the Nevada State Gaming Control Board. The Shelf Approval does not constitute a finding, recommendation or approval by any of the Nevada Gaming Authorities as to the accuracy or adequacy of the offering memorandum or the investment merits of the securities. Any representation to the contrary is unlawful.

***Approval of Changes in Control.*** A registered company must obtain the prior approval of the Nevada Gaming Commission with respect to a change in control through merger; consolidation; stock or asset acquisitions; management or consulting agreements; or any act or conduct by a person by which the person obtains control of the registered company.

10

Table of Contents

Entities seeking to acquire control of a registered company must satisfy the Nevada State Gaming Control Board and Nevada Gaming Commission with respect to a variety of stringent standards before assuming control of the registered company. The Nevada Gaming Commission may also require controlling stockholders, officers, directors and other persons having a material relationship or involvement with the entity proposing to acquire control to be investigated and licensed as part of the approval process relating to the transaction.

*Approval of Defensive Tactics.* The Nevada legislature has declared that some corporate acquisitions opposed by management, repurchases of voting securities and corporate defense tactics affecting Nevada corporate gaming licensees or affecting registered companies that are affiliated with the operations of Nevada gaming licensees may be harmful to stable and productive corporate gaming. The Nevada Gaming Commission has established a regulatory scheme to reduce the potential adverse effects of these business practices upon Nevada's gaming industry and to further Nevada's policy in order to:

- assure the financial stability of corporate gaming licensees and their affiliated companies;

- preserve the beneficial aspects of conducting business in the corporate form; and,

- promote a neutral environment for the orderly governance of corporate affairs.

Approvals may be required from the Nevada Gaming Commission before a registered company can make exceptional repurchases of voting securities above its current market price and before a corporate acquisition opposed by management can be consummated. The Nevada Gaming Control Act also requires prior approval of a plan of recapitalization proposed by a registered company's board of directors in response to a tender offer made directly to its stockholders for the purpose of acquiring control.

*Fees and Taxes.* License fees and taxes, computed in various ways depending on the type of gaming or activity involved, are payable to the State of Nevada and to the counties and cities in which the licensed subsidiaries' respective operations are conducted. Depending upon the particular fee or tax involved, these fees and taxes are payable monthly, quarterly or annually and are based upon:

- a percentage of the gross revenue received;

- the number of gaming devices operated; or,

- the number of table games operated.

A live entertainment tax also is imposed on admission charges and sales of food, beverages and merchandise where live entertainment is furnished.

*Foreign Gaming Investigations.* Any person who is licensed, required to be licensed, registered, required to be registered in Nevada, or is under common control with such persons (collectively, "licensees"), and who proposes to become involved in a gaming venture outside of Nevada, is required to deposit with the Nevada State Gaming Control Board, and thereafter maintain, a revolving fund in the amount of $10,000 to pay the expenses of investigation of the Nevada State Gaming Control Board of the licensee's or registrant's participation in such foreign gaming. The revolving fund is subject to increase or decrease at the discretion of the Nevada Gaming Commission. Licensees and registrants are required to comply with the foreign gaming reporting requirements imposed by the Nevada Gaming Control Act. A licensee or registrant is also subject to disciplinary action by the Nevada Gaming Commission if it:

- knowingly violates any laws of the foreign jurisdiction pertaining to the foreign gaming operation;

- fails to conduct the foreign gaming operation in accordance with the standards of honesty and integrity required of Nevada gaming operations;

- engages in any activity or enters into any association that is unsuitable because it poses an unreasonable threat to the control of gaming in Nevada, reflects or tends to reflect, discredit or disrepute upon the State of Nevada or gaming in Nevada, or is contrary to the gaming policies of Nevada;

11

Table of Contents

- engages in activities or enters into associations that are harmful to the State of Nevada or its ability to collect gaming taxes and fees; or,

- employs, contracts with or associates with a person in the foreign operation who has been denied a license or finding of suitability in Nevada on the ground of unsuitability.

*Licenses for Conduct of Gaming and Sale of Alcoholic Beverages.* The conduct of gaming activities and the service and sale of alcoholic beverages at Wynn Las Vegas is subject to licensing, control and regulation by the Clark County Liquor and Gaming Licensing Board, which has granted Wynn Las Vegas, LLC licenses for such purposes. In addition to approving Wynn Las Vegas, LLC the Clark County Liquor and Gaming Licensing Board has the authority to approve all persons owning or controlling the stock of any corporation controlling a gaming license. Clark County gaming and liquor licenses are not transferable. The County has full power to limit, condition, suspend or revoke any license. Any disciplinary action could, and revocation would, have a substantial negative impact upon our operations.

*Macau*

*General.* As a casino concessionaire, Wynn Macau, S.A., an indirect subsidiary of the Company, is subject to the regulatory control of the Government of Macau. The government has adopted Laws and Administrative Regulations governing the operation of casinos in Macau. Only concessionaires or subconcessionaires are permitted to operate casinos. Subconcessions may be awarded subject to the approval of the Macau government and each concessionaire has issued one subconcession. Each concessionaire was required to enter into a concession agreement with the Macau government which, together with the Law and Administrative Regulations, forms the framework for the regulation of the activities of the concessionaire.

Under the Law and Administrative Regulations, concessionaires are subject to suitability requirements relating to background, associations and reputation, as are stockholders of 5% or more of a concessionaire's equity securities, officers, directors and key employees. The same requirements apply to any entity engaged by a concessionaire to manage casino operations. Concessionaires are required to satisfy minimum capitalization requirements, demonstrate and maintain adequate financial capacity to operate the concession and submit to continuous monitoring of their casino operations by the Macau government. Concessionaires also are subject to periodic financial reporting requirements and reporting obligations with respect to, among other things, certain contracts, financing activities and transactions with directors, financiers and key employees. Transfers or the encumbering of interests in concessionaires must be reported to the Macau government and are ineffective without government approval.

Each concessionaire is required to engage an executive director who must be a permanent resident of Macau and the holder of at least 10% of the capital stock of the concessionaire. The appointment of the executive director and of any successor is ineffective without the approval of the Macau government. All contracts placing the management of a concessionaire's casino operations with a third party also are ineffective without the approval of the Macau government.

Concessionaires are subject to a special gaming tax of 35% of gross gaming revenue, and must also make an annual contribution of up to 4% of gross gaming revenue for the promotion of public interests, social security, infrastructure and tourism. Concessionaires are obligated to withhold, according to the rate in effect as set by the government, from any commissions paid to games promoters. Such withholding rate may be adjusted from time to time.

A games promoter, also known as a junket representative, is a person who, for the purpose of promoting casino gaming activity, arranges customer transportation and accommodations, and provides credit in their sole discretion, food and beverage services and entertainment in exchange for commissions or other compensation from a concessionaire. Macau law provides that games promoters must be licensed by the Macau government in order to do business with and receive compensation from concessionaires. For a license to be obtained, direct and indirect owners of 5% or more of a games promoter (regardless of its corporate form or sole proprietor status), its

12

Table of Contents

directors and its key employees must be found suitable. Applicants are required to pay the cost of license investigations, and are required to maintain suitability standards during the period of licensure. The term of a games promoters' license is one calendar year, and licenses can be renewed for additional periods upon the submission of renewal applications. Natural person junket representative licensees are subject to a suitability verification process every three years and business entity licensees are subject to the same requirement every six years. The DICJ implemented certain instructions in 2009, which have the force of law, relating to commissions paid to and by games promoters. Such instructions also impose certain financial reporting and audit requirements on games promoters.

Under Macau law, licensed games promoters must identify outside contractors who assist them in their promotion activities. These contractors are subject to approval of the Macau government. Changes in the management structure of business entity games promoters licensees must be reported to the Macau government and any transfer or the encumbering of interests in such licensees is ineffective without prior government approval. To conduct gaming promotion activities licensees must be registered with one or more concessionaires and must have written contracts with such concessionaires, copies of which must be submitted to the Macau government.

Macau law further provides that concessionaires are jointly responsible with their games promoters for the activities of such representatives and their directors and contractors in the concessionaires' casinos, and for their compliance with applicable laws and regulations. Concessionaires must submit annual lists of their games promoters, and must update such lists on a quarterly basis. The Macau government may designate a maximum number of games promoters and specify the number of games promoters a concessionaire is permitted to engage. Concessionaires are subject to periodic reporting requirements with respect to commissions paid to their games promoters representatives and are required to oversee their activities and report instances of unlawful activity.

The government of Macau may assume temporary custody and control over the operation of a concession in certain circumstances. During any such period, the costs of operations must be borne by the concessionaire. The government of Macau also may redeem a concession starting at an established date after the entering into effect of a concession. The government of Macau also may terminate a concession for cause, including, without limitation, failure of the concessionaire to fulfill its obligations under law or the concession contract.

*Concession Agreement.* The concession agreement between Wynn Macau S.A. and the Macau government required Wynn Macau, S.A. to construct and operate one or more casino gaming properties in Macau, including, at a minimum, one full-service casino resort by the end of December 2006, and to invest not less than a total of 4 billion patacas (approximately US$500 million) in Macau-related projects by June 2009. These obligations were satisfied upon the opening of Wynn Macau in 2006.

Wynn Macau, S.A. was also obligated to obtain, and did obtain, a 700 million pataca (approximately US$87 million) bank guarantee from Banco National Ultramarino, S.A. ("BNU") that was effective until March 31, 2007. The amount of this guarantee was reduced to 300 million patacas (approximately US$37 million) for the period from April 1, 2007 until 180 days after the end of the term of the concession agreement. This guarantee, which is for the benefit of the Macau government, assures Wynn Macau, S.A.'s performance under the casino concession agreement, including the payment of premiums, fines and indemnity for any material failure to perform the concession agreement. Wynn Macau, S.A. is obligated, upon demand by BNU, to promptly repay any claim made on the guarantee by the Macau government. BNU is currently paid an annual fee by Wynn Macau, S.A. for the guarantee not to exceed 5.2 million patacas (approximately US$0.7 million).

The government of Macau may redeem the concession beginning on June 24, 2017, and in such event Wynn Macau, S.A. will be entitled to fair compensation or indemnity. The amount of such compensation or indemnity will be determined based on the amount of revenue generated during the tax year prior to the redemption multiplied for the remaining years under the concession.

13

Table of Contents

The government of Macau may unilaterally rescind the concession if Wynn Macau, S.A. fails to fulfill its fundamental obligations under the concession agreement. The concession agreement expressly provides that the government of Macau may unilaterally rescind the concession agreement if Wynn Macau, S.A.:

- conducts unauthorized games or activities that are excluded from its corporate purpose;
- abandons or suspends gaming operations in Macau for more than seven consecutive days (or more than 14 days in a civil year) without justification;
- defaults in payment of taxes, premiums, contributions or other required amounts;
- does not comply with government inspections or supervision;
- systematically fails to observe its obligations under the concession system;
- fails to maintain bank guarantees or bonds satisfactory to the government;
- is the subject of bankruptcy proceedings or becomes insolvent;
- engages in serious fraudulent activity, damaging to the public interest; or,
- repeatedly and seriously violates applicable gaming laws.

If the government of Macau unilaterally rescinds the concession agreement for one of the reasons stated above, Wynn Macau, S.A. will be required to compensate the government in accordance with applicable law, and the areas defined as casino under Macau law and all of the gaming equipment pertaining to the gaming operations of Wynn Macau will be transferred to the government without compensation. In addition, the government of Macau may, in the public interest, unilaterally terminate the concession at any time, in which case Wynn Macau, S.A. would be entitled to reasonable compensation.

**Seasonality**

We may experience fluctuations in revenues and cash flows from month to month, however, we do not believe that our business is materially impacted by seasonality.

**Employees**

As of December 31, 2011, we had a total of approximately 16,400 full-time equivalent employees (including approximately 9,000 in Las Vegas and approximately 7,400 in Macau).

During 2006, we entered into a ten year collective bargaining agreement with the Culinary and Bartenders Union local that covers approximately 5,600 employees at our Las Vegas Operations. We also entered into a ten year collective bargaining agreement with the Transportation Workers Union in November 2010, which covers the table games dealers at our Las Vegas Operations. Certain other unions may seek to organize the workers of our Las Vegas Operations. Unionization, pressure to unionize or other forms of collective bargaining could increase our labor costs.

The success of our operations in Macau will be affected by our success in retaining our employees. Wynn Macau competes with the large number of casino resort developments in Macau for limited qualified employees. We seek employees from other countries to adequately staff our Macau resorts, and policies announced publicly by the Macau government have affected our ability to import labor in certain job classifications. We are coordinating with the Macau labor and immigration authorities to ensure that our labor demand is satisfied, but cannot be certain that we will be able to recruit and retain a sufficient number of qualified employees for our Macau operations or that we will be able to obtain required work permits for those employees.

14

Table of Contents

**Intellectual Property**

Among our most important marks are our trademarks and service marks that use the name "WYNN." Wynn Resorts has registered with the U.S. Patent and Trademark Office ("PTO") a variety of the WYNN-related trademarks and service marks in connection with a variety of goods and services. These marks include "WYNN RESORTS," "WYNN DESIGN AND DEVELOPMENT," "WYNN LAS VEGAS," "ENCORE" and "WYNN MACAU." Some of the applications are based upon ongoing use and others are based upon a bona fide intent to use the marks.

A common element of most of these marks is the use of the surname "WYNN." As a general rule, a surname (or the portion of a mark primarily constituting a surname) is not eligible for registration unless the surname has acquired "secondary meaning." To date, Wynn Resorts has been successful in demonstrating to the PTO such secondary meaning for the Wynn name based upon factors including Mr. Wynn's prominence as a resort developer.

Federal registrations are not completely dispositive of the right to such marks. Third parties who claim prior rights with respect to similar marks may nonetheless challenge our right to obtain registrations or our use of the marks and seek to overcome the presumptions afforded by such registrations.

We have also filed applications with various foreign patent and trademark registries, including in Macau, China, Singapore, Hong Kong, Taiwan, Japan, certain European countries and various other jurisdictions throughout the world, to register a variety of WYNN-related trademarks and service marks in connection with a variety of goods and services. These marks include many of the same marks filed with the United States PTO and include "WYNN MACAU," "WYNN LAS VEGAS" and "ENCORE." Some of the applications are based upon ongoing use and others are based upon a bona fide intent to use the marks.

We recognize that our intellectual property assets, including the word and logo version of "WYNN," are among our most valuable assets. As a result, and in connection with expansion of our resorts and gaming activities outside the United States, we have undertaken a program to register our trademarks and other intellectual property rights in relevant jurisdictions. We have retained counsel and intend to take all steps necessary to protect our intellectual property rights against unauthorized use throughout the world.

On August 6, 2004, we entered into agreements with Mr. Wynn that confirm and clarify our rights to use the "Wynn" name and Mr. Wynn's persona in connection with our casino resorts. Under a Surname Rights Agreement, Mr. Wynn has acknowledged our exclusive, fully paid-up, perpetual, worldwide right to use, and to own and register trademarks and service marks incorporating, the "Wynn" name for casino resorts and related businesses, together with the right to sublicense the name and marks to our affiliates. Under a Rights of Publicity License, Mr. Wynn has granted us the exclusive, royalty-free, worldwide right to use his full name, persona and related rights of publicity for casino resorts and related businesses, together with the ability to sublicense the persona and publicity rights to our affiliates, until October 24, 2017.

We have also registered various domain names including, but not limited to, www.wynnlasvegas.com, www.wynnmacau.com, www.wynnmacaulimited.com, www.encorelasvegas.com and www.wynnresorts.com, with various domain registrars around the world. Our domain registrations extend to various foreign countries such as ".com.cn" and ".com.hk." We pursue domain related infringement on a case by case basis depending on the infringing domain in question. The information found on these websites is not a part of this Annual Report on Form 10-K or any other report we file or furnish to the SEC.

**Forward-Looking Statements**

The Private Securities Litigation Reform Act of 1995 provides a "safe harbor" for forward-looking statements. Certain information included in this Annual Report on Form 10-K contains statements that are forward-looking, including, but not limited to, statements relating to our business strategy and development activities as well as other capital spending, financing sources, the effects of regulation (including gaming and tax

15

Table of Contents

regulations), expectations concerning future operations, profitability and competition. Any statements contained in this report that are not statements of historical fact may be deemed to be forward-looking statements. Without limiting the generality of the foregoing, in some cases you can identify forward-looking statements by terminology such as "may," "will," "should," "would," "could," "believe," "expect," "anticipate," "estimate," "intend," "plan," "continue" or the negative of these terms or other comparable terminology. Such forward-looking information involves important risks and uncertainties that could significantly affect anticipated results in the future and, accordingly, such results may differ from those expressed in any forward-looking statements made by us. These risks and uncertainties include, but are not limited to those set forth in Item 1A (Risk Factors) as well as the following:

- adverse tourism and trends reflecting current domestic and international economic conditions;

- volatility and weakness in world-wide credit and financial markets and from governmental intervention in the financial markets;

- general global macroeconomic conditions;

- decreases in levels of travel, leisure and consumer spending;

- continued high unemployment;

- fluctuations in occupancy rates and average daily room rates;

- conditions precedent to funding under our credit facilities;

- continued compliance with all provisions in our credit agreements;

- competition in the casino/hotel and resort industries and actions taken by our competitors;

- doing business in foreign locations such as Macau (including the risks associated with developing gaming regulatory frameworks);

- restrictions or conditions on visitation by citizens of mainland China to Macau;

- new development and construction activities of competitors;

- our dependence on Stephen A. Wynn and existing management;

- our dependence on a limited number of resorts and locations for all of our cash flow;

- leverage and debt service (including sensitivity to fluctuations in interest rates);

- changes in federal or state tax laws or the administration of such laws;

- changes in state law regarding water rights;

- changes in U.S. laws regarding healthcare;

- changes in gaming laws or regulations (including the legalization of gaming in certain jurisdictions);

- approvals under applicable jurisdictional laws and regulations (including gaming laws and regulations);

- the impact that an outbreak of an infectious disease or the impact of a natural disaster may have on the travel and leisure industry;

- the consequences of military conflicts in the Middle East and any future security alerts and/or terrorist attacks;

- regulatory or enforcement actions/probity; and

- pending or future legal proceedings.

Further information on potential factors that could affect our financial condition, results of operations and business are included in this report and our other filings with the SEC. You should not place undue reliance on any forward-looking statements, which are based only on information currently available to us. We undertake no obligation to publicly release any revisions to such forward-looking statements to reflect events or circumstances after the date of this report.

Table of Contents

ITEM 1A.        RISK FACTORS

The following risk factors, among others, could cause our financial performance to differ significantly from the goals, plans, objectives, intentions and expectations expressed in this Annual Report on Form 10-K. If any of the following risks and uncertainties or other risks and uncertainties not currently known to us or not currently considered to be material actually occurs, our business, financial condition or operating results could be harmed substantially.

**Risks Related to our Substantial Indebtedness**

*We are highly leveraged and future cash flow may not be sufficient for us to meet our obligations, and we might have difficulty obtaining more financing.*

We have a substantial amount of consolidated debt in relation to our equity. As of December 31, 2011, we had total outstanding debt of approximately $3.2 billion. In addition, our Wynn Las Vegas credit agreement permits us to incur additional indebtedness in the future and the Wynn Macau credit facilities permit us to incur additional indebtedness, in each case if certain conditions are met. Furthermore, on February 18, 2012, we issued a subordinated promissory note with a principal amount of approximately $1.9 billion in redemption of all of the shares of Wynn Resorts common stock held by Aruze USA, Inc. (the "Redemption Price Promissory Note"). For additional information on the redemption and the Redemption Price Promissory Note, see Item 8—"Notes to Consolidated Financial Statements", Note 19 "Subsequent Events." Our substantial indebtedness could have important consequences. For example:

- if we fail to meet our payment obligations or otherwise default under the agreements governing our indebtedness, the lenders under those agreements will have the right to accelerate the indebtedness and exercise other rights and remedies against us. These rights and remedies include rights to:

  - repossess and foreclose upon the assets that serve as collateral;

  - initiate judicial foreclosure against us; and

  - petition a court to appoint a receiver for us or for substantially all of our assets;

- we are required to use a substantial portion of our cash flow from the operations of Wynn Las Vegas to service and amortize our indebtedness at Wynn Las Vegas, which will reduce the amount of available cash, if any, to fund working capital, other capital expenditures and other general corporate purposes, and may give us greater exposure to the current adverse economic and industry conditions;

- we may experience decreased revenues from our operations attributable to decreases in consumer spending levels and high unemployment due to the current adverse economic and industry conditions, and could fail to generate sufficient cash to fund our liquidity needs and/or fail to satisfy the financial and other restrictive covenants to which we are subject under our existing indebtedness. We cannot provide assurance that our business will generate sufficient cash flow from operations or that future borrowings will be available to us in an amount sufficient to enable us to pay our indebtedness or to fund our other liquidity needs;

- we are dependent on certain amounts of cash flow from Wynn Macau to service Wynn Macau's indebtedness, which reduces the available cash flow to fund working capital, other capital expenditures and other general corporate purposes at Wynn Macau;

- we may have a limited ability to respond to changing business and economic conditions and to withstand competitive pressures, which may affect our financial condition;

- we may not be able to obtain additional financing, if needed, to satisfy working capital requirements or pay for other capital expenditures, debt service or other obligations;

17

Table of Contents

- while we do hedge a certain amount of our debt under our credit facilities, rates with respect to a portion of the interest we pay will fluctuate with market rates and, accordingly, our interest expense will increase if market interest rates increase; and

- if we fail to pay our debts generally as they become due, unsecured creditors that we fail to pay may initiate involuntary bankruptcy proceedings against us, and such bankruptcy proceedings will delay or impair the repayment of our secured debt.

Under the terms of the documents governing our debt facilities, we may, subject to certain limitations, be permitted to incur additional indebtedness, including secured senior and subordinated indebtedness. If we incur additional indebtedness, the risks described above will be exacerbated.

Following the Company's press release on February 19, 2012 relating to the redemption of Aruze USA, Inc.'s shares of Wynn Resorts' common stock and the issuance of the Redemption Price Promissory Note, Standard & Poor's Ratings Services and Fitch Ratings revised their ratings outlooks on Wynn Resorts to stable from positive, although they did not change their ratings of Wynn Resorts. (Moody's did not revise the ratings or outlook for Wynn Resorts as a result of the announcement.) Such ratings agency actions could make it more difficult for us to obtain additional financing on acceptable terms.

***The agreements governing our debt facilities contain certain financial covenants and other covenants that restrict our ability to engage in certain transactions and may impair our ability to respond to changing business and economic conditions.***

Our debt facilities require us to satisfy various financial covenants, which include requirements for minimum interest coverage ratios (currently required for both Wynn Macau and Wynn Las Vegas credit facilities) and leverage ratios pertaining to total debt to earnings before interest, tax, depreciation and amortization (currently required for our Wynn Macau credit facility). If our operations fail to generate adequate cash flow, we may violate those covenants causing a default in our agreements. Future indebtedness or other contracts could contain covenants more restrictive than those contained in our existing debt facilities.

Our ability to comply with the terms of our outstanding facilities may be affected by general economic conditions, industry conditions and other events, some of which may be beyond our control. As a result, we may not be able to maintain compliance with these covenants. Our failure to comply with the terms of our debt facilities, including failure as a result of events beyond our control, could result in an event of default, which would materially and adversely affect our operating results and our financial condition or result in our lenders taking action to enforce their security interests in our various assets.

The agreements governing our debt facilities also contain restrictions on our ability to engage in certain transactions and may limit our ability to respond to changing business and economic conditions. The debt facilities impose operating and financial restrictions on our restricted subsidiaries, including, among other things, limitations on the ability to:

- pay dividends or distributions or repurchase equity;

- incur additional debt;

- make investments;

- create liens on assets to secure debt;

- enter into transactions with affiliates;

- issue stock of, or member's interests in, subsidiaries;

- enter into sale-leaseback transactions;

18

Table of Contents

- engage in other businesses;
- merge or consolidate with another company;
- transfer, sell or otherwise dispose of assets;
- issue disqualified stock;
- create dividend and other payment restrictions affecting subsidiaries; and
- designate restricted and unrestricted subsidiaries.

If there were an event of default under one of our debt instruments, the holders of the defaulted debt could cause all amounts outstanding with respect to that debt to be due and payable immediately. We cannot assure you that our assets or cash flow would be sufficient to fully repay borrowings under our outstanding debt instruments if accelerated upon an event of default, or that we would be able to repay, refinance or restructure the payments on those debt securities.

If Wynn Macau were to cease to produce cash flow sufficient to service its indebtedness or otherwise become unable to make certain payments or dividends to us which we in turn could use to service our indebtedness, our ability to service the indebtedness of Wynn Macau or Wynn Las Vegas, LLC could be negatively impacted.

### *Our subsidiaries' indebtedness is secured by a substantial portion of their assets.*

Subject to applicable laws, including gaming laws, and certain agreed upon exceptions, our subsidiaries' debt is secured by liens on substantially all of the assets of our subsidiaries. In the event of a default by any of our subsidiaries under their financing documents, or if certain of our subsidiaries experience insolvency, liquidation, dissolution or reorganization, the holders of our subsidiaries' secured debt instruments would first be entitled to payment from their collateral security, and only then would holders of our subsidiaries' unsecured debt be entitled to payment from their remaining assets.

### Risks Related to our Business

### *The loss of Stephen A. Wynn could significantly harm our business.*

Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts. Mr. Wynn's employment agreement expires in October 2020. However, we cannot assure you that Mr. Wynn will remain with Wynn Resorts, Limited. If we lose the services of Mr. Wynn, or if he is unable to devote sufficient attention to our operations for any other reason, our business may be significantly impaired.

### *We are entirely dependent on a limited number of resorts for all of our cash flow, which subjects us to greater risks than a gaming company with more operating properties.*

We are entirely dependent upon our resorts in Las Vegas and Macau for all of our cash flow. As a result, we are subject to a greater degree of risk than a gaming company with more operating properties. The risks to which we have a greater degree of exposure include the following:

- local economic and competitive conditions;
- changes in local and state governmental laws and regulations, including gaming laws and regulations;
- natural and other disasters;
- a decline in the number of visitors to Las Vegas or Macau;

19

Table of Contents

- a decrease in gaming and non-gaming activities at our resorts ; and
- the outbreak of an infectious disease such as H1N1 or the avian flu.

Any of the factors outlined above could negatively affect our ability to generate sufficient cash flow to make payments or maintain our covenants with respect to our debt.

***Our casino, hotel, convention and other facilities face intense competition.***

<u>Competition for our Las Vegas Operations.</u> The casino/hotel industry is highly competitive and additional developments have recently opened in Las Vegas. Resorts located on or near the Las Vegas Strip compete with other Las Vegas Strip hotels and with other hotel casinos in Las Vegas on the basis of overall atmosphere, range of amenities, level of service, price, location, entertainment, theme and size, among other factors.

Wynn Las Vegas also competes with other hotel/casino facilities in other cities. The proliferation of gaming activities in other areas could significantly harm our business as well. In particular, the legalization or expansion of casino gaming in or near metropolitan areas from which we attract customers could have a negative effect on our business. In addition, new or renovated casinos in Macau or elsewhere in Asia could draw Asian gaming customers away from our Las Vegas Operations.

<u>Competition for Macau Operations.</u> Currently there are 34 operating casinos in Macau. We hold a concession under one of only three gaming concessions and three sub-concessions authorized by the Macau government to operate casinos in Macau. The Macau government has had the ability to grant additional gaming concessions since April 2009. If the Macau government were to allow additional competitors to operate in Macau through the grant of additional concessions or subconcessions, we would face additional competition, which could have a material adverse effect on our financial condition and results of operations. Current concessionaires and subconcessionaires can open additional facilities.

Our Macau resort complex also faces competition from casinos located in other areas of Asia, including the Marina Bay Sands and Resorts World Sentosa resorts operating in Singapore, Genting Highlands Resort, a major gaming and resort destination located outside of Kuala Lumpur, Malaysia, and casinos in the Philippines. We also encounter competition from other major gaming centers located around the world, including Australia and Las Vegas, cruise ships in Asia that offer gaming, and other casinos throughout Asia. Further, if current efforts to legalize gaming in other Asian countries are successful, our Wynn Macau resort will face additional regional competition.

***Our business relies on high-end, international customers. We often extend credit, and we may not be able to collect gaming receivables from our credit players or credit play may decrease.***

<u>General.</u> A significant portion of our table games revenue at our resorts is attributable to the play of a limited number of international customers. The loss or a reduction in the play of the most significant of these customers could have a substantial negative effect on our future operating results. A downturn in economic conditions in the countries in which these customers reside could cause a further reduction in the frequency of visits by and revenue generated from these customers.

We conduct our gaming activities on a credit as well as a cash basis. This credit is unsecured. Table games players typically are extended more credit than slot players, and high-stakes players typically are extended more credit than patrons who tend to wager lower amounts. The collectability of receivables from international customers could be negatively affected by future business or economic trends or by significant events in the countries in which these customers reside. We will extend credit to those customers whose level of play and financial resources, in the opinion of management, warrant such an extension.

20

Table of Contents

In addition, premium gaming is more volatile than other forms of gaming, and variances in win-loss results attributable to high-end gaming may have a positive or negative impact on cash flow and earnings in a particular quarter.

*Wynn Las Vegas.* While gaming debts evidenced by a credit instrument, including what is commonly referred to as a "marker," are enforceable under the current laws of Nevada, and judgments on gaming debts are enforceable in all states of the United States under the Full Faith and Credit Clause of the United States Constitution, other jurisdictions may determine that direct or indirect enforcement of gaming debts is against public policy. Although courts of some foreign nations will enforce gaming debts directly and the assets in the United States of foreign debtors may be used to satisfy a judgment, judgments on gaming debts from U.S. courts are not binding on the courts of many foreign nations. We cannot assure you that we will be able to collect the full amount of gaming debts owed to us, even in jurisdictions that enforce them. Recent dramatic changes in economic conditions may make it more difficult to assess creditworthiness and more difficult to collect the full amount of any gaming debt owed to us. Our inability to collect gaming debts could have a significant negative impact on our operating results.

*Wynn Macau.* Although the law in Macau permits casino operators to extend credit to gaming customers, Wynn Macau may not be able to collect all of its gaming receivables from its credit players. We expect that Wynn Macau will be able to enforce these obligations only in a limited number of jurisdictions, including Macau. To the extent our gaming customers are visitors from other jurisdictions, we may not have access to a forum in which it will be able to collect all of its gaming receivables because, among other reasons, courts of many jurisdictions do not enforce gaming debts and we may encounter forums that will refuse to enforce such debts. Our inability to collect gaming debts could have a significant negative impact on our operating results.

Currently, the gaming tax in Macau is calculated as a percentage of gross gaming revenue. However, unlike Nevada, the gross gaming revenue calculation in Macau does not include deductions for uncollectible gaming debts. As a result, if we extend credit to our customers in Macau and are unable to collect on the related receivables from them, we remain obligated to pay taxes on our winnings from these customers.

### *Our business is particularly sensitive to reductions in discretionary consumer and corporate spending as a result of downturns in the economy.*

Consumer demand for hotel/casino resorts, trade shows and conventions and for the type of luxury amenities that we offer is particularly sensitive to downturns in the economy which adversely impact discretionary spending on leisure activities. Changes in discretionary consumer spending or consumer preferences brought about by factors such as perceived or actual general economic conditions, high unemployment, the housing foreclosure crisis, perceived or actual changes in disposable consumer income and wealth, the economic recession and changes in consumer confidence in the economy, or fears of war and future acts of terrorism could reduce customer demand for the luxury amenities and leisure activities we offer, and may have a significant negative impact on our operating results.

### *We are subject to extensive state and local regulation, and licensing and gaming authorities have significant control over our operations, which could have a negative effect on our business.*

*General.* The operations of our resorts are contingent upon our obtaining and maintaining all necessary licenses, permits, approvals, registrations, findings of suitability, orders and authorizations. The laws, regulations and ordinances requiring these licenses, permits and other approvals generally relate to the responsibility, financial stability and character of the owners and managers of gaming operations, as well as persons financially interested or involved in gaming operations. The scope of the approvals required to open and operate a facility is extensive. We received all approvals for the opening of Wynn Las Vegas on April 28, 2005, and Encore at Wynn Las Vegas on December 22, 2008. We are subject to ongoing regulation to maintain their operations. We opened

21

Table of Contents

Wynn Macau on September 6, 2006 and Encore at Wynn Macau on April 21, 2010, and are subject to ongoing regulation to maintain their operations.

*Wynn Las Vegas.* The Nevada Gaming Commission may, in its discretion, require the holder of any debt or securities we issue to file applications, be investigated and be found suitable to own Wynn Resorts' securities if it has reason to believe that the security ownership would be inconsistent with the declared policies of the State of Nevada.

Nevada regulatory authorities have broad powers to request detailed financial and other information, to limit, condition, suspend or revoke a registration, gaming license or related approval and to approve changes in our operations. Substantial fines or forfeiture of assets for violations of gaming laws or regulations may be levied. The suspension or revocation of any license which may be granted to us or the levy of substantial fines or forfeiture of assets could significantly harm our business, financial condition and results of operations. Furthermore, compliance costs associated with gaming laws, regulations and licenses are significant. Any change in the laws, regulations or licenses applicable to our business or a violation of any current or future laws or regulations applicable to our business or gaming licenses could require us to make substantial expenditures or could otherwise negatively affect our gaming operations.

The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the board of directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts. The redemption price may be paid in cash, by promissory note, or both, as required, and pursuant to the terms established by, the applicable gaming authority and, if not, as Wynn Resorts elects.

*Wynn Macau.* Wynn Macau's operations are subject to unique risks, including risks related to Macau's regulatory framework. Failure to adhere to the regulatory and gaming environment in Macau could result in the revocation of Wynn Macau, S.A.'s concession or otherwise negatively affect its operations in Macau. Moreover, we would be subject to the risk that U.S. regulators could determine that Macau's gaming regulatory framework has not developed in a way that would permit us to conduct operations in Macau in a manner consistent with the way in which we intend, or the Nevada gaming authorities require us, to conduct our operations in the United States.

**We are subject to taxation by various governments and agencies. The rate of taxation could change.**

We are subject to tax by various governments and agencies, both in the United States (at the federal, state and local levels) and in Macau. Changes in the rates of taxation, the amount and the time when income is subject to taxation, the ability to claim U.S. foreign tax credits, failure to renew our Macau dividend agreement and Macau income tax exemption after 2015 and the imposition of foreign withholding taxes could increase our overall rate of taxation.

**Terrorism and the uncertainty of military conflicts, natural disasters and contagious diseases, as well as other factors affecting discretionary consumer spending, may harm our operating results.**

The strength and profitability of our business depends on consumer demand for hotel casino resorts in general and for the type of luxury amenities our resorts offer. Changes in consumer preferences or discretionary consumer spending could harm our business. Terrorist activities in the United States and elsewhere, military conflicts in the Middle East, outbreaks of infectious disease and pandemics, and natural disasters such as hurricanes, tsunamis and earthquakes, among other things, have had negative impacts on travel and leisure expenditures. We cannot predict the extent to which similar events and conditions may continue to affect us in the future. An extended period of reduced discretionary spending and/or disruptions or declines in airline travel and business conventions could significantly harm our operations. In particular, because our business relies

22

Table of Contents

heavily upon premium customers, particularly international customers, factors resulting in a decreased propensity to travel internationally could have a negative impact on our operations.

In addition, other factors affecting travel and discretionary consumer spending, including general economic conditions, disposable consumer income, high unemployment, and reduced consumer confidence in the economy, may negatively impact our business. Negative changes in any factors affecting discretionary spending could reduce customer demand for the products and services we offer, thus imposing practical limits on pricing and harming our operations.

### *Our insurance coverage may not be adequate to cover all possible losses that we could suffer, and our insurance costs may increase.*

We currently have insurance coverage for terrorist acts included in our commercial property insurance policy with respect to Wynn Las Vegas, not to exceed $1.75 billion. Wynn Macau has separate terrorist insurance coverage for up to $800 million per occurrence for losses that could result from these acts. However, these types of acts could expose us to losses that exceed our coverage and could have a significant negative impact on our operations.

We may not have sufficient insurance coverage in the event of a catastrophic property or casualty loss. We also may suffer disruption of our business in the event of a terrorist attack or other catastrophic property or casualty loss or be subject to claims by third parties injured or harmed. While we currently carry general liability insurance and business interruption insurance, such insurance may not be adequate to cover all losses in such event. In the event that insurance premiums increase, we may not be able to maintain the insurance coverage we currently have or otherwise be able to maintain adequate insurance protection.

### *If a third party successfully challenges our ownership of, or right to use, the Wynn-related trademarks and/or service marks, our business or results of operations could be harmed.*

We have filed applications with the PTO and with various foreign patent and trademark registries including registries in Macau, China, Hong Kong, Singapore, Taiwan, Japan, certain European countries and various other jurisdictions throughout the world, to register a variety of WYNN-related trademarks and service marks in connection with a variety of goods and services. These marks include "WYNN RESORTS," "WYNN DESIGN AND DEVELOPMENT," "WYNN LAS VEGAS," "ENCORE" and "WYNN MACAU." Some of the applications are based upon ongoing use and others are based upon a bona fide intent to use the marks in the future.

A common element of most of these marks is the use of the surname "WYNN." As a general rule, a surname (or the portion of a mark primarily constituting a surname) is not eligible for registration unless the surname has acquired "secondary meaning." To date, we have been successful in demonstrating to the PTO such secondary meaning for the Wynn name, in certain of the applications, based upon factors including Mr. Wynn's prominence as a resort developer, but we cannot assure you that we will be successful with the other pending applications.

Federal registrations are not completely dispositive of the right to such marks. Third parties who claim prior rights with respect to similar marks may nonetheless challenge our right to obtain registrations or our use of the marks and seek to overcome the presumptions afforded by such registrations.

Our intellectual property assets, especially the logo version of "Wynn," are among our most valuable assets. Efforts we take to acquire and protect our intellectual property rights against unauthorized use throughout the world, which may include retaining counsel and commencing litigation in various jurisdictions, may be costly and may not be successful in protecting and preserving the status and value of our intellectual property assets.

23

Table of Contents

***If a third party asserts other forms of intellectual property claims against us, our business or results of operations could be adversely affected.***

Historically, trademarks and service marks have been the principal form of intellectual property right of relevance to the gaming industry. However, due to the increased use of technology in computerized gaming machines and in business operations generally, other forms of intellectual property rights (such as patents and copyrights) are becoming of increased relevance. It is possible that, in the future, third parties might assert superior intellectual property rights or allege that their intellectual property rights cover some aspect of our operations. The defense of such allegations may result in substantial expenses, and, if such claims are successfully prosecuted, may have a material impact on our business.

***Our largest stockholders are able to exert significant influence over our operations and future direction.***

Mr. Wynn and Elaine P. Wynn together own approximately 19.7%, of our outstanding common stock. As a result, Mr. Wynn and Elaine P. Wynn to the extent they vote their shares in a similar manner, may be able to exert significant influence over all matters requiring our stockholders' approval, including the approval of significant corporate transactions.

In November 2006, Mr. Wynn, and Aruze USA, Inc., entered into a stockholders' agreement. On January 6, 2010, the agreement was amended and restated to, among other things, recognize Mr. Wynn's transfer of 11,076,709 shares to Elaine P. Wynn. Pursuant to the amended and restated stockholders agreement, Elaine P. Wynn became party to the agreement in connection with her ownership of 11,076,709 shares of the Company's common stock. On February 18, 2012, the Company redeemed all of the shares of the Company's common stock held by Aruze USA, Inc. For additional information on the redemption, see Item 8—"Notes to the Consolidated Financial Statements", Note 19 "Subsequent Events."

Under the amended and restated stockholders' agreement, Mr. Wynn and Elaine P. Wynn have agreed to vote their shares of our common stock for a slate of directors supported by Mr. Wynn. As a result of this voting arrangement, Mr. Wynn, as a practical matter, exercises significant influence over the slate of directors to be elected to our board of directors. In addition, with stated exceptions, the agreement requires the written consent of the other party prior to any party selling any shares of Wynn Resorts that it owns. Currently, Mr. Wynn owns 10,026,708 shares and Elaine P. Wynn owns 9,742,150 shares.

In November 2006, the Board of Wynn Resorts approved an amendment of its bylaws that exempts future acquisitions of shares of Wynn Resorts' common stock by either Mr. Wynn or Aruze USA, Inc. from Nevada's acquisition of controlling interest statutes. The Nevada acquisition of controlling interest statutes require stockholder approval in order to exercise voting rights in connection with any acquisition of a controlling interest in certain Nevada corporations unless the articles of incorporation or bylaws of the corporation in effect on the 10th day following the acquisition of a controlling interest by certain acquiring persons provide that these statutes do not apply to the corporation or to the acquisition specifically by types of existing or future stockholders. These statutes define a "controlling interest" as (i) one-fifth or more but less than one-third, (ii) one-third or more but less than a majority, or (iii) a majority or more, of the voting power in the election of directors. As a result of the bylaw amendment, either Mr. Wynn or Aruze USA, Inc. or their respective affiliates may acquire ownership of outstanding voting shares of Wynn Resorts permitting them to exercise more than one-third but less than a majority, or a majority or more, of all of the voting power of the corporation in the election of directors, without requiring a resolution of the stockholders of the corporation granting voting rights in the control shares acquired.

***Because we own real property, we are subject to extensive environmental regulation, which creates uncertainty regarding future environmental expenditures and liabilities.***

We have incurred costs to comply with environmental requirements, such as those relating to discharges into the air, water and land, the handling and disposal of solid and hazardous waste and the cleanup of properties

24

Table of Contents

affected by hazardous substances. Under these and other environmental requirements we may be required to investigate and clean up hazardous or toxic substances or chemical releases at our property. As an owner or operator, we could also be held responsible to a governmental entity or third parties for property damage, personal injury and investigation and cleanup costs incurred by them in connection with any contamination.

These laws typically impose cleanup responsibility and liability without regard to whether the owner or operator knew of or caused the presence of the contaminants. The liability under those laws has been interpreted to be joint and several unless the harm is divisible and there is a reasonable basis for allocation of the responsibility. The costs of investigation, remediation or removal of those substances may be substantial, and the presence of those substances, or the failure to remediate a property properly, may impair our ability to use our property.

***Any violation of the Foreign Corrupt Practices Act or applicable Anti-Money Laundering laws or regulations could have a negative impact on us.***

A significant portion of our revenue is derived from operations outside the United States, which exposes the Company to complex foreign and U.S. regulations inherent in doing business cross-border and in each of the countries in which it transacts business. We are subject to regulations imposed by the Foreign Corrupt Practices Act (the "FCPA") and other anti-corruption laws that generally prohibit U.S. companies and their intermediaries from offering, promising, authorizing or making improper payments to foreign government officials for the purpose of obtaining or retaining business. Violations of the FCPA and other anti-corruption laws may result in severe criminal and civil sanctions as well as other penalties and the SEC and U.S. Department of Justice have increased their enforcement activities with respect to the FCPA. Internal control policies and procedures and employee training and compliance programs that we have implemented to deter prohibited practices may not be effective in prohibiting our directors, employees, contractors or agents from violating or circumventing our policies and the law. If our directors, employees or agents fail to comply with applicable laws or Company policies governing our international operations, the Company may face investigations, prosecutions and other legal proceedings and actions which could result in civil penalties, administrative remedies and criminal sanctions. Kazuo Okada, one of our directors, has failed to comply with internal training in these matters and has failed to return to the Company an executed Acknowledgment that he agrees to comply with the Company's Code of Business Conduct and Ethics. For additional information on the Freeh Report, which detailed numerous instances of conduct constituting prima facie violations of the FCPA by Mr. Okada and certain of his affiliates, and the redemption of Aruze USA, Inc.'s shares, see Item 8—"Notes to Consolidated Financial Statements", Note 19 "Subsequent Events." Any determination that we have violated the FCPA could have a material adverse effect on our financial condition. Compliance with international and U.S. laws and regulations that apply to our international operations increases our cost of doing business in foreign jurisdictions. We also deal with significant amounts of cash in our operations and are subject to various reporting and anti-money laundering regulations. Any violation of anti-money laundering laws or regulations by any of our resorts could have a negative effect on our results of operations.

As previously disclosed, in May 2011, Wynn Macau, a majority owned subsidiary of the Company, made a commitment to the University of Macau Development Foundation in support of the new Asia-Pacific Academy of Economics and Management. This contribution consists of a $25 million payment made in May 2011 and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive. The pledge was consistent with the Company's long-standing practice of providing philanthropic support for deserving institutions in the markets in which it operates. The pledge was made following an extensive analysis which concluded that the gift was made in accordance with all applicable laws. The pledge was considered by the Boards of Directors of both the Company and Wynn Macau and approved by 15 of the 16 directors who serve on those boards. The sole dissenting vote was Mr. Kazuo Okada whose stated objection was to the length of time over which the donation would occur, not its propriety.

25

Table of Contents

Also as previously disclosed, Mr. Okada commenced litigation on January 11, 2012, in Nevada seeking to compel the Company to produce information relating to the donation to the University of Macau, among other things.

On February 8, 2012, following Mr. Okada's lawsuit, the Company received a letter from the Salt Lake Regional Office of the U.S. Securities and Exchange Commission ("SEC") requesting that, in connection with an informal inquiry by the SEC, the Company preserve information relating to the donation to the University of Macau, any donations by the Company to any other educational charitable institutions, including the University of Macau Development Foundation, and the Company's casino or concession gaming licenses or renewals in Macau. The Company has informed the Salt Lake Regional Office that it intends to fully comply with the SEC's request.

On February 19, 2012, the Company filed a complaint in Nevada state court against Mr. Okada and other entities alleging, among other things, breach of fiduciary duty in connection with alleged violations of the FCPA. For additional information on legal proceedings between the Company and Mr. Okada and his affiliates, see Item 3—"Legal Proceedings."

*Potential violations of law by Mr. Okada (formerly the largest beneficial owner of our shares) and his affiliates could have adverse consequences to the Company.*

As described in this Annual Report on Form 10-K, on February 18, 2012, the board of directors of Wynn Resorts received a report from Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing numerous instances of conduct constituting prima facie violations of the FCPA by Kazuo Okada (formerly the largest beneficial owner of our shares) and certain of his affiliates. See Item 8—"Notes to Consolidated Financial Statements", Note 19 "Subsequent Events." The Company has provided the Freeh Report to applicable regulators and intends to cooperate with any related investigation that such regulators may undertake. The conduct of Mr. Okada and his affiliates and any resulting regulatory investigations could have adverse consequences to the Company. A finding by regulatory authorities that Mr. Okada violated the FCPA on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, regulators could pursue separate investigations into the Company's compliance with applicable laws, including in response to litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau and a related informal inquiry by the SEC into this donation. While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company.

*Mr. Okada and his affiliates may challenge the redemption of Aruze USA, Inc.'s shares.*

As described in this Annual Report on Form 10-K, on February 18, 2012, after receiving the Freeh Report, the board of directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada were "unsuitable" within the meaning of Article VII of Wynn Resorts' articles of incorporation and redeemed all of Aruze USA, Inc.'s shares of Wynn Resorts' common stock. See Item 8—"Notes to Consolidated Financial Statements", Note 19 "Subsequent Events." Universal Entertainment Corporation has publicly stated that Aruze USA, Inc. intends to commence litigation, but to our knowledge no such action has been filed. Wynn Resorts has filed litigation against Mr. Okada alleging breaches of fiduciary duty and related claims. For more information on this litigation, see Item 3—"Legal Proceedings."

*Ongoing litigation and other disputes with Mr. Okada and certain of his affiliates could distract management and result in negative publicity and additional scrutiny of regulators.*

There has been widespread publicity of the findings in the Freeh Report of prima facie violations of law by Mr. Okada and his affiliates, the Board's unsuitability finding, the redemption of shares and related litigation. The actions, litigation, and publicity could reduce demand for shares of Wynn Resorts and Wynn Macau, Limited

26

Table of Contents

and thereby have a negative impact on the trading prices of their respective shares. The disputes may also lead to additional scrutiny from gaming regulators, which could lead to investigations relating to, and possibly a negative impact on, the Company's gaming licenses, and possibly have a negative impact on the Company's ability to bid successfully for new gaming market opportunities.

## Risks Associated with our Macau Operations

*Revenues from our Macau gaming operations will end if we cannot secure an extension of our concession in 2022 or if the Macau government exercises its redemption right in 2017.*

Our concession agreement expires in June 2022. Unless our concession is extended, in June 2022, all of our gaming operations and related equipment located in defined areas of our casino in Macau will be automatically transferred to the Macau government without compensation to us and we will cease to generate any revenues from these operations. Beginning in June 2017, the Macau government may redeem the concession agreement by providing us at least one year's prior notice. In the event the Macau government exercises this redemption right, we are entitled to fair compensation or indemnity. The amount of such compensation or indemnity will be determined based on the amount of revenue generated during the tax year prior to the redemption multiplied for the remaining years under the concession. We cannot assure you that we will be able to renew or extend our concession agreement on terms favorable to us or at all. We also cannot assure you that if our concession is redeemed, the compensation paid will be adequate to compensate us for the loss of future revenues.

*Visitation to Macau may decline due to economic disruptions in mainland China as well as increased restrictions on visitations to Macau from citizens of mainland China.*

A significant number of our gaming customers at Wynn Macau come from mainland China. Any economic disruption or contraction in China could disrupt the number of patrons visiting our property or the amount they may be willing to spend. In addition, any travel restrictions imposed by China on its citizens could disrupt the number of visitors from mainland China to our property. It is not known when, or if, policies similar to those implemented in 2009 restricting visitation by mainland Chinese citizens to Macau and Hong Kong, will be put in place and travel policies may be adjusted, without notice, in the future.

*We compete for limited labor resources in Macau and Macau government policies may also affect our ability to employ imported labor.*

The success of our operations in Macau will be affected by our success in retaining our employees. We compete with a large number of casino resorts in Macau for a limited number of qualified employees. We have to seek employees from other countries to adequately staff our resort and certain Macau government policies affect our ability to import labor in certain job classifications. We coordinate with the Macau labor and immigration authorities to ensure our labor needs are satisfied, but cannot be certain that we will be able to recruit and retain a sufficient number of qualified employees for our operations or that we will be able to obtain required work permits for those employees.

*We depend upon games promoters for a significant portion of our gaming revenue. If we are unable to maintain, or develop additional, successful relationships with reputable games promoters, our ability to maintain or grow our gaming revenues could be adversely affected. Increased competition may result in increased pressure on commission rates.*

A significant portion of our gaming revenue is generated by clientele of our games promoters. There is intense competition among casino operators in Macau for services provided by games promoters. We anticipate that this competition will further intensify as additional casinos open in Macau. Other operators in the market have increased commissions and advances to games promoters, in some cases dramatically, in an effort to

27

Table of Contents

increase market share. These types of actions by other casino operators have further intensified competition for the services of games promoters. While we believe that we currently maintain good relations with our existing games promoters, there can be no assurance that we will be able to continue to maintain these relationships. If we are unable to maintain, or develop additional, successful relationships with reputable games promoters, or lose a significant number of our games promoters to our competitors, our ability to maintain or grow our gaming revenues will be adversely affected and we will have to seek alternative ways of developing relationships with VIP customers. In addition, if our games promoters are unable to develop or maintain relationships with our VIP customers, our ability to maintain or grow our gaming revenues will be hampered.

Certain games promoters have significant leverage and bargaining strength in negotiating operational agreements with casino operators. This leverage could result in games promoters negotiating changes to our operational agreements, including higher commissions, or the loss of business to a competitor or the loss of certain relationships with games promoters. If we need to increase our commission rates or otherwise change our practices with respect to games promoters due to competitive forces, our results of operations could be adversely affected.

The reputations of the games promoters we deal with are important to our own reputation and to our ability to operate in compliance with our concession, Macau gaming laws and other gaming licenses. While we endeavor, through contractual protections and otherwise, to ensure that our games promoters comply with the high standards of probity and integrity under Macau gaming laws, we cannot assure you that our games promoters will always comply with these high standards. In addition, if we enter into a business relationship with a games promoter whose probity is in doubt, this may be considered by regulators or investors to reflect negatively on our own probity. If any of our games promoters violate the Macau gaming laws while on our premises, the Macau government may, in its discretion, take enforcement action against us, the games promoter, or each concurrently, and we may be sanctioned and our reputation could be harmed. If our games promoters are unable to maintain required standards of probity and integrity, we may face consequences from gaming regulators with authority over our operations.

### *The financial resources of our games promoters may be insufficient to allow them to continue doing business at our resort.*

Our games promoters may encounter decreased liquidity, for a variety of reasons, limiting their ability to grant credit to their patrons and thereby decreasing gaming volume at Wynn Macau. Furthermore, credit already extended by our games promoters to their patrons may become increasingly difficult for them to collect. This inability to grant credit and collect amounts due can negatively affect our games promoters' operations, and as a result, our results of operations could be adversely impacted.

### *Wynn Macau may be affected by adverse political and economic conditions.*

The success of Wynn Macau will depend on political and economic conditions in Macau and mainland China. In December 1999, after approximately 450 years of Portuguese control, Portugal returned Macau to Chinese administration. The People's Republic of China established Macau as a special administrative region. As a result of this change in control, Macau's legislative, regulatory, legal, economic and cultural institutions are in a period of transition. We cannot predict how these systems and cultural institutions will develop, or how developments would affect the business of Wynn Macau.

Our operations are subject to significant political, economic and social risks inherent in doing business in an emerging market. For example, fiscal decline and civil, domestic or international unrest in Macau, China or the surrounding region could significantly harm our business, not only by reducing customer demand for casino resorts, but also by increasing the risk of imposition of taxes and exchange controls or other governmental restrictions that might impede its ability to repatriate funds.

28

Table of Contents

*Macau may not have an adequate transportation infrastructure to accommodate the demand from future development.*

Because of additional casino projects which are under construction and to be developed in the future, the ferry and helicopter services which provide transportation between Macau and Hong Kong may need to be expanded to accommodate the increased visitation of Macau. If transportation facilities to and from Macau are inadequate to meet the demands of an increased volume of gaming customers visiting Macau, the desirability of Macau as a gaming destination, as well as the results of operations of Wynn Macau, could be negatively impacted.

*Extreme weather conditions may have an adverse impact on Wynn Macau.*

Macau's subtropical climate and location on the South China Sea are subject to extreme weather conditions including typhoons and heavy rainstorms. Unfavorable weather conditions could negatively affect the profitability of our resort complex and prevent or discourage guests from traveling to Macau.

*The Macau government can terminate our concession under certain circumstances without compensation to us, which would have a material adverse effect on our operations and financial condition.*

The Macau government has the right to unilaterally terminate our concession in the event of our material non-compliance with the basic obligations under the concession and applicable Macau laws. The concession agreement expressly provides that the government of Macau may unilaterally rescind the concession agreement if Wynn Macau, S.A.:

- conducts unauthorized games or activities that are excluded from its corporate purpose;

- suspends gaming operations in Macau for more than seven consecutive days (or more than 14 days in a civil year) without justification;

- defaults in payment of taxes, premiums, contributions or other required amounts;

- does not comply with government inspections or supervision;

- systematically fails to observe its obligations under the concession system;

- fails to maintain bank guarantees or bonds satisfactory to the government;

- is the subject of bankruptcy proceedings or becomes insolvent;

- engages in serious fraudulent activity, damaging to the public interest; or,

- repeatedly violates applicable gaming laws.

If the government of Macau unilaterally rescinds the concession agreement, Wynn Macau, S.A. will be required to compensate the government in accordance with applicable law, and the areas defined as casino space under Macau law and all of the gaming equipment pertaining to our gaming operations will be transferred to the government without compensation. The loss of our concession would prohibit us from conducting gaming operations in Macau, which would have a material adverse effect on our operations and financial condition.

*Conflicts of interest may arise because certain of our directors and officers are also directors of Wynn Macau, Limited.*

In October 2009, Wynn Macau, Limited, an indirect wholly-owned subsidiary of Wynn Resorts and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold through an initial public offering, 1,437,500,000 shares (27.7%) of this subsidiary's common stock. As a result of Wynn Macau, Limited having stockholders who are not affiliated with us, we and certain of our officers and directors who also serve as officers and/or directors

29

Table of Contents

of Wynn Macau, Limited may have conflicting fiduciary obligations to our stockholders and to the minority stockholders of Wynn Macau, Limited. Decisions that could have different implications for Wynn Resorts and Wynn Macau, Limited, including contractual arrangements that we have entered into or may in the future enter into with Wynn Macau, Limited, may give rise to the appearance of a potential conflict of interest.

### Certain Nevada gaming laws apply to Wynn Macau's gaming activities and associations.

Certain Nevada gaming laws also apply to gaming activities and associations in jurisdictions outside the State of Nevada. With respect to our Wynn Macau operations, we and our subsidiaries that must be licensed to conduct gaming operations in Nevada are required to comply with certain reporting requirements concerning gaming activities and associations in Macau conducted by our Macau-related subsidiaries. We and our licensed Nevada subsidiaries also will be subject to disciplinary action by the Nevada Gaming Commission if our Macau-related subsidiaries:

- knowingly violate any Macau laws relating to their Macau gaming operations;

- fail to conduct Wynn Macau's operations in accordance with the standards of honesty and integrity required of Nevada gaming operations;

- engage in any activity or enter into any association that is unsuitable for us because it poses an unreasonable threat to the control of gaming in Nevada, reflects or tends to reflect discredit or disrepute upon the State of Nevada or gaming in Nevada, or is contrary to Nevada gaming policies;

- engage in any activity or enter into any association that interferes with the ability of the State of Nevada to collect gaming taxes and fees; or,

- employ, contract with or associate with any person in the foreign gaming operation who has been denied a license or a finding of suitability in Nevada on the ground of unsuitability, or who has been found guilty of cheating at gambling.

Such disciplinary action could include suspension, conditioning, limitation or revocation of the registration, licenses or approvals held by us and our licensed Nevada subsidiaries, including Wynn Las Vegas, LLC, and the imposition of substantial fines.

In addition, if the Nevada State Gaming Control Board determines that any actual or intended activities or associations of our Macau-related subsidiaries may be prohibited pursuant to one or more of the standards described above, the Nevada State Gaming Control Board can require us and our licensed Nevada subsidiaries to file an application with the Nevada Gaming Commission for a finding of suitability of the activity or association. If the Nevada Gaming Commission finds that the activity or association in Macau is unsuitable or prohibited, our Macau-related subsidiaries will either be required to terminate the activity or association, or will be prohibited from undertaking the activity or association. Consequently, should the Nevada Gaming Commission find that our Macau-related subsidiary's gaming activities or associations in Macau are unsuitable, those subsidiaries may be prohibited from undertaking their planned gaming activities or associations in Macau, or be required to divest their investment in Macau, possibly on unfavorable terms.

### Unfavorable changes in currency exchange rates may increase Wynn Macau's obligations under the concession agreement and cause fluctuations in the value of our investment in Macau.

The currency delineated in Wynn Macau's concession agreement with the government of Macau is the Macau Pataca. The Macau Pataca, which is not a freely convertible currency, is linked to the Hong Kong dollar, and in many cases the two are used interchangeably in Macau. The Hong Kong dollar is linked to the U.S. dollar and the exchange rate between these two currencies has remained relatively stable over the past several years. However, the exchange linkages of the Hong Kong dollar and the Macau Pataca, and the Hong Kong dollar and the U.S. dollar, are subject to potential changes due to, among other things, changes in Chinese governmental policies and international economic and political developments.

30

Table of Contents

We cannot assure you that the Hong Kong dollar and the Macau Pataca will continue to be linked to the U.S. dollar, which may result in severe fluctuations in the exchange rate for these currencies. We also cannot assure you that the current rate of exchange fixed by the applicable monetary authorities for these currencies will remain at the same level.

Because many of Wynn Macau's payment and expenditure obligations are in Macau Patacas, in the event of unfavorable Macau Pataca or Hong Kong dollar rate changes, Wynn Macau's obligations, as denominated in U.S. dollars, would increase. In addition, because we expect that most of the revenues for any casino that we operate in Macau will be in Hong Kong dollars, we are subject to foreign exchange risk with respect to the exchange rate between the Hong Kong dollar and the U.S. dollar. Also, if any of our Macau-related entities incur U.S. dollar-denominated debt, fluctuations in the exchange rates of the Macau Pataca or the Hong Kong dollar, in relation to the U.S. dollar, could have adverse effects on our results of operations, financial condition and ability to service its debt.

*Currency exchange controls and currency export restrictions could negatively impact Wynn Macau.*

Currency exchange controls and restrictions on the export of currency by certain countries may negatively impact the success of Wynn Macau. For example, there are currently existing currency exchange controls and restrictions on the export of the renminbi, the currency of China. Restrictions on the export of the renminbi may impede the flow of gaming customers from China to Macau, inhibit the growth of gaming in Macau and negatively impact Wynn Macau's gaming operations.

**ITEM 1B.       UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2.       PROPERTIES**

**Las Vegas Land**

We currently own approximately 240 acres of land on or near the Las Vegas Strip consisting of approximately 75 acres at the northeast corner of the intersection of Las Vegas Boulevard and Sands Avenue on which Wynn Las Vegas is located, the approximately 142-acre golf course behind Wynn Las Vegas, approximately 5 acres adjacent to the golf course on which an office building is located, and approximately 18 acres located across from the Wynn Las Vegas site at Koval Lane and Sands Avenue, a portion of which is improved with an employee parking garage. Our Las Vegas property, with limited exceptions, is encumbered by a first priority security interest in favor of our lenders under our first mortgage notes and our Wynn Las Vegas bank credit facilities.

31

Table of Contents

**Las Vegas Water Rights**

We own approximately 834 acre-feet of permitted and certificated water rights, which we currently use to irrigate the golf course. We also own approximately 151.5 acre-feet of permitted and certificated water rights for commercial use. There are significant cost savings and conservation benefits associated with using water supplied pursuant to our water rights. We anticipate using our water rights to support future development of the golf course land.

**Macau Land Concessions**

The government of Macau owns most of the land in Macau. In most cases, private interests in real property located in Macau are obtained through long-term leases and other grants of rights to use land from the government. In July 2004, our subsidiary, Wynn Macau, S.A., entered into a land concession contract under which Wynn Macau, S.A. leases from the Macau government an approximately 16-acre parcel of land in downtown Macau's inner harbor area where Wynn Macau is located. The term of the land concession contract is 25 years from August 2004, and it may be renewed with government approval for successive periods. Wynn Macau, S.A. paid a land concession premium of approximately 319.4 million patacas (approximately US $40 million) for this land concession. In 2009, the Company and the Macau government agreed to modify this land concession as a result of the expansion of Wynn Macau with Encore at Wynn Macau and the additional square footage that was added as a result of such expansion. In November 2009, the Company made an additional one-time land premium payment of approximately 113.4 million patacas (approximately US $14.2 million). Annual rent of approximately 4.2 million patacas (approximately US $525,000) is being paid in accordance with the land concession contract.

In September 2011, Palo Real Estate Company Limited and Wynn Resorts (Macau) S.A., each an indirect subsidiary of Wynn Macau, Limited, formally accepted the terms and conditions of a draft land concession contract from the Macau government for approximately 51 acres of land in the Cotai area of Macau. In December 2011, we paid the initial deposit of $62.5 million pursuant to this draft land concession contract. Following government approval, we anticipate constructing a full scale integrated resort containing a casino, approximately 2,000 hotel suites, convention, retail, entertainment and food and beverage offerings on this land. We continue to finalize the project scope, timeline and budget.

**ITEM 3.      LEGAL PROCEEDINGS**

We are occasionally party to lawsuits. As with all litigation, no assurance can be provided as to the outcome of such matters and we note that litigation inherently involves significant costs. For information regarding the Company's legal matters see Note 16 to our Consolidated Financial Statements in this Annual Report on Form 10-K and below.

As previously disclosed, in May 2011, Wynn Macau, a majority owned subsidiary of the Company, made a commitment to the University of Macau Development Foundation in support of the new Asia-Pacific Academy of Economics and Management. This contribution consists of a $25 million payment made in May 2011 and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive. The pledge was consistent with the Company's long-standing practice of providing philanthropic support for deserving institutions in the markets in which it operates. The pledge was made following an extensive analysis which concluded that the gift was made in accordance with all applicable laws.

On January 11, 2012, Kazuo Okada, a member of the board of directors of Wynn Resorts, filed a Petition for Writ of Mandamus (the "Petition") in the District Court of Clark County, Nevada (the "Nevada Court") to compel the Company to produce certain of its books and records. The Petition seeks to inspect and copy, among other things, books and records regarding the commitment made in May 2011 by Wynn Macau to the University of Macau Development Foundation in support of the new Asia-Pacific Academy of Economics and Management

32

Table of Contents

and the manner in which $120 million invested in April 2002 by an entity affiliated with Mr. Okada was spent. The Company has stated that it will make certain documents sought in the proceeding available for inspection.

On February 8, 2012, following Mr. Okada's lawsuit, the Company received a letter from the Salt Lake Regional Office of the SEC requesting that, in connection with an informal inquiry by the SEC, the Company preserve information relating to the donation to the University of Macau, any donations by the Company to any other educational charitable institutions, including the University of Macau Development Foundation, and the Company's casino or concession gaming licenses or renewals in Macau. The Company has informed the Salt Lake Regional Office that it intends to fully comply with the SEC's request.

On February 19, 2012, the Company filed a complaint in the Nevada Court against Aruze USA, Inc., Universal Entertainment Corporation (the parent company of Aruze USA, Inc.) and Mr. Okada, alleging breaches of fiduciary duty and related claims. The complaint alleges, among other things, that Mr. Okada breached his fiduciary duties to the Company, breached the Company's code of conduct, and committed improper acts, including making payments for the benefit of foreign gaming officials who could advance his personal business interests. The complaint also alleges that Mr. Okada's conduct jeopardizes the Company's good reputation, its long-standing business relationships, and its gaming business licenses. The complaint further alleges that, in pursuing the development of gaming operations in the Philippines through companies he controls, Mr. Okada is breaching his obligations to the Company because such Philippines operations would be in competition with the Macau operations of the Company's majority-owned subsidiary, Wynn Macau, Limited. The complaint included as an exhibit a report on the results of an independent investigation by Freeh Sporkin & Sullivan, LLP to the Company's Gaming Compliance Committee (the "Freeh Report"). The Freeh Report stated, among other things, that Mr. Okada appears to have engaged in a pattern of conduct that would constitute prima facie violations of the Foreign Corrupt Practices Act. The complaint further describes the board of director's determination that Mr. Okada, Aruze USA, Inc. and Universal Entertainment Corporation are "unsuitable" under the Wynn Resorts' articles of incorporation, and the issuance of the Redemption Price Promissory Note to Aruze USA, Inc. in redemption of the shares. For additional information on the redemption and the Redemption Price Promissory Note, see Item 8— "Notes to Consolidated Financial Statements", Note 19 "Subsequent Events." The complaint asserts a claim of breach of fiduciary duty against Mr. Okada and a claim of aiding and abetting a breach of fiduciary duty against Aruze USA, Inc. and Universal Entertainment Corporation. Among other things, the complaint seeks compensatory and special damages, disgorgement of profits, punitive damages and a declaration that Wynn Resorts acted lawfully and in full compliance with its articles of incorporation and bylaws.

ITEM 4.       MINE SAFETY DISCLOSURES

Not Applicable.

33

Table of Contents

PART II

ITEM 5.      MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY
SECURITIES

**Market Information**

Our common stock trades on the NASDAQ Global Select Market under the symbol "WYNN." The following table sets forth the high and low sale prices for the indicated periods, as reported by the NASDAQ Global Select Market.

|  | High | Low |
|---|---|---|
| **Year Ended December 31, 2011** | | |
| First Quarter | $132.25 | $106.08 |
| Second Quarter | $151.73 | $128.15 |
| Third Quarter | $172.58 | $111.71 |
| Fourth Quarter | $142.20 | $101.02 |
| **Year Ended December 31, 2010** | | |
| First Quarter | $ 77.95 | $ 59.70 |
| Second Quarter | $ 93.99 | $ 71.00 |
| Third Quarter | $ 95.88 | $ 73.12 |
| Fourth Quarter | $117.50 | $ 85.80 |

**Holders**

There were approximately 188 record holders of our common stock as of February 15, 2012.

**Dividends**

Wynn Resorts is a holding company and, as a result, our ability to pay dividends is dependent on our ability to obtain funds and our subsidiaries' ability to provide funds to us. Restrictions imposed by our subsidiaries' debt instruments significantly restrict certain key subsidiaries holding a majority of our assets, including Wynn Las Vegas, LLC and Wynn Macau, S.A., from making dividends or distributions to Wynn Resorts. Specifically, Wynn Las Vegas, LLC and certain of its subsidiaries are restricted under the indentures governing the first mortgage notes from making certain "restricted payments," as defined in the indentures. These restricted payments include the payment of dividends or distributions to any direct or indirect holders of equity interests of Wynn Las Vegas, LLC. Restricted payments cannot be made unless certain financial and non-financial criteria have been satisfied. In addition, the terms of the other loan agreements of Wynn Las Vegas, LLC and Wynn Macau, S.A. contain similar restrictions. Our Company has paid the following dividends:

• In December 2011, we paid a cash dividend of $5 per share. In each of May 2011, August 2011 and November 2011, we paid a cash dividend of $0.50 per share.

• In December 2010, we paid a cash dividend of $8 per share. In each of May 2010 and August 2010, we paid a cash dividend of $0.25 per share.

Our Board of Directors will continue to periodically assess the level and appropriateness of any cash dividends.

34

Table of Contents

ITEM 6.        SELECTED FINANCIAL DATA

   The following tables reflect selected consolidated financial data of Wynn Resorts and its subsidiaries. This data should be read together with our Consolidated Financial Statements and Notes thereto, "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and the other information contained in this Annual Report on Form 10-K. Operating results for the periods presented are not indicative of the results that may be expected for future years. Significant events impacting our operational results include:

- On April 28, 2005, we opened our Wynn Las Vegas resort.

- On September 6, 2006, we opened our Wynn Macau resort.

- On December 24, 2007, we opened an expansion of our Wynn Macau resort.

- On December 22, 2008, we opened Encore at Wynn Las Vegas, an expansion of Wynn Las Vegas.

- On October 9, 2009, Wynn Macau, Limited listed its shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 27.7% of its common stock through an initial public offering.

- On April 21, 2010, we opened Encore at Wynn Macau, an expansion of Wynn Macau.

| | Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2009 | 2008 | 2007 |
| | (in thousands, except per share amounts) | | | | |
| Consolidated Statements of Income Data: | | | | | |
| Net revenues | $ 5,269,792 | $ 4,184,698 | $ 3,045,611 | $ 2,987,324 | $ 2,687,519 |
| Pre-opening costs | — | 9,496 | 1,817 | 72,375 | 7,063 |
| Operating income | 1,008,240 | 625,252 | 234,963 | 312,136 | 427,355 |
| Net income | 825,113 | 316,596 | 39,107 | 210,479 | 196,336 |
| Less: Net income attributable to noncontrolling interest[1] | (211,742) | (156,469) | (18,453) | — | — |
| Net income attributable to Wynn Resorts | 613,371 | 160,127 | 20,654 | 210,479 | 196,336 |
| Basic income per share | 4.94 | 1.30 | 0.17 | 1.94 | 1.85 |
| Diluted income per share | 4.88 | 1.29 | 0.17 | 1.92 | 1.80 |

| | As of December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2009 | 2008 | 2007 |
| | (in thousands, except per share amounts) | | | | |
| Consolidated Balance Sheets Data: | | | | | |
| Cash and cash equivalents | $ 1,262,587 | $ 1,258,499 | $ 1,991,830 | $ 1,133,904 | $ 1,275,120 |
| Construction in progress | 28,477 | 22,901 | 457,594 | 221,696 | 923,325 |
| Total assets | 6,899,496 | 6,674,497 | 7,581,769 | 6,755,788 | 6,312,820 |
| Total long-term obligations[2] | 3,096,149 | 3,405,983 | 3,695,821 | 4,430,436 | 3,774,951 |
| Stockholders' equity | 2,223,454 | 2,380,585 | 3,160,363 | 1,601,595 | 1,956,959 |
| Cash distributions declared per common share | $ 6.50 | $ 8.50 | $ 4.00 | $ — | $ 6.00 |

---

[1]    In October 2009, Wynn Macau, Limited, our indirect wholly-owned subsidiary and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of its common stock through an initial public offering. Net income attributable to noncontrolling interest represents the noncontrolling interests' share of our net income of Wynn Macau, Limited.

[2]    Includes long-term debt, the required contract premium payments under our land concession contract at Wynn Macau, future charitable contributions and deferred income taxes.

35

Table of Contents

**ITEM 7.        MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion should be read in conjunction with, and is qualified in its entirety by, the consolidated financial statements and the notes thereto included elsewhere in this Annual Report on Form 10-K.

**Overview**

We are a developer, owner and operator of destination casino resorts. We currently own and operate two casino resort complexes. In Las Vegas, Nevada, we own and operate Wynn Las Vegas, a destination casino resort which opened on April 28, 2005. In December 2008, we expanded Wynn Las Vegas with the opening of Encore at Wynn Las Vegas. We refer to the fully integrated Wynn Las Vegas and Encore at Wynn Las Vegas resort as our Las Vegas Operations. In the Macau Special Administrative Region of the People's Republic of China ("Macau"), we own and operate Wynn Macau, which opened on September 6, 2006. On April 21, 2010 we opened Encore at Wynn Macau, a further expansion of Wynn Macau. We refer to the fully integrated Wynn Macau and Encore at Wynn Macau as our Macau Operations.

**Our Resorts**

The following table sets forth information about our resorts as of February 2012:

| | Hotel Rooms & Suites | Approximate Casino Square Footage | Approximate Number of Table Games | Approximate Number of Slots |
|---|---|---|---|---|
| Las Vegas Operations | 4,750 | 186,000 | 220 | 2,430 |
| Macau Operations | 1,008 | 265,000 | 486 | 930 |

*Las Vegas Operations*

Wynn Las Vegas I Encore is located at the intersection of the Las Vegas Strip and Sands Avenue, and occupies approximately 217 acres of land fronting the Las Vegas Strip. In addition, we own approximately 18 acres across Sands Avenue, a portion of which is utilized for employee parking, and approximately 5 acres adjacent to the golf course on which an office building is located.

Our Las Vegas resort complex features:

- Approximately 186,000 square feet of casino space, offering 24-hour gaming and a full range of games, including private gaming salons, a sky casino, a poker room, and a race and sports book;

- Two luxury hotel towers with a total of 4,750 spacious hotel rooms, suites and villas;

- 35 food and beverage outlets featuring signature chefs;

- A Ferrari and Maserati automobile dealership;

- Approximately 97,000 square feet of high-end, brand-name retail shopping, including stores and boutiques by Alexander McQueen, Brioni, Cartier, Chanel, Dior, Graff, Hermes, Loro Piana, Louis Vuitton, Manolo Blahnik, Oscar de la Renta, Vertu and others;

- Recreation and leisure facilities, including an 18-hole golf course, swimming pools, private cabanas and two full service spas and salons;

- Two showrooms; and

- Three nightclubs and a beach club.

In January 2011, we completed a refurbishment and upgrade to the resort rooms at Wynn Las Vegas. A remodel of the suites was completed in early May 2011. These remodels were completed at a cost of $61 million.

36

Table of Contents

In response to our evaluation of our Las Vegas Operations and the reactions of our guests, we have and expect to continue to make enhancements and refinements to this resort complex.

### Macau Operations

We operate Wynn Macau I Encore under a 20-year casino concession agreement granted by the Macau government in June 2002.

Our Macau resort complex features:

- Approximately 265,000 square feet of casino space, offering 24-hour gaming and a full range of games, including private gaming salons, sky casinos and a poker pit;
- Two luxury hotel towers with a total of 1,008 spacious rooms and suites;
- Casual and fine dining in eight restaurants;
- Approximately 54,200 square feet of high-end, brand-name retail shopping, including stores and boutiques by Bvlgari, Cartier, Chanel, Dior, Dunhill, Ferrari, Giorgio Armani, Gucci, Hermes, Hugo Boss, Louis Vuitton, Miu Miu, Piaget, Prada, Rolex, Tiffany, Tudor, Vacheron Constantin, Van Cleef & Arpels, Versace, Vertu, Zegna and others;
- Recreation and leisure facilities, including two health clubs and spas, a salon, a pool; and
- Lounges and meeting facilities.

In response to our evaluation of our Macau Operations and the reactions of our guests, we have made and expect to continue to make enhancements and refinements to this resort complex.

### Future Development

Approximately 142 acres of land comprising our Las Vegas Operations is currently improved with a golf course. While we may develop this property in the future, we have no immediate plans to do so.

In September 2011, Palo Real Estate Company Limited and Wynn Resorts (Macau) S.A., each an indirect subsidiary of Wynn Macau Limited, formally accepted the terms and conditions of a draft land concession contract from the Macau government, and in December 2011 made a $62.5 million initial deposit for approximately 51 acres of land in the Cotai area of Macau. Following government approval, we anticipate constructing a full scale integrated resort containing a casino, approximately 2,000 hotel suites, convention, retail, entertainment and food and beverage offerings on this land. We continue to finalize the project scope, timeline and budget.

## Results of Operations

Our operating results in Macau were significantly higher in 2011 as the Macau market continued to grow, and the Las Vegas market began to improve with increased levels of gaming revenue, visitation, and hotel room demand. Our results for the years presented are not comparable as the year ended December 31, 2011 includes a full year of operations for Encore at Wynn Macau which opened on April 21, 2010.

The table below presents our net revenues (amounts in thousands):

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| Net Revenues: |  |  |  |
| Las Vegas Operations | $ 1,480,719 | $ 1,296,064 | $ 1,229,573 |
| Macau Operations | 3,789,073 | 2,888,634 | 1,816,038 |
|  | $ 5,269,792 | $ 4,184,698 | $ 3,045,611 |

37

Table of Contents

Reliance on only two resort complexes (in two geographic regions) for our operating cash flow exposes us to certain risks that competitors, whose operations are more geographically diversified, may be better able to control. In addition to the concentration of operations in two resort complexes, many of our customers are premium gaming customers who wager on credit, thus exposing us to increased credit risk. High-end gaming also increases the potential for variability in our results.

*Operating Measures*

Certain key operating statistics specific to the gaming industry are included in our discussion of our operational performance for the periods for which a Consolidated Statement of Income is presented. There are two methods used to calculate win percentage in the casino industry. In Las Vegas and in the general casino in Macau, customers usually purchase cash chips at the gaming tables. The cash and net markers used to purchase the cash chips are deposited in the gaming table's drop box. This is the base of measurement that we use in the casino at our Las Vegas Operations and in the general casino at our Macau Operations for calculating win percentage.

In our VIP casino in Macau, customers primarily purchase non-negotiable chips, commonly referred to as rolling chips, from the casino cage and there is no deposit into a gaming table drop box from chips purchased from the cage. Non-negotiable chips can only be used to make wagers. Winning wagers are paid in cash chips. The loss of the non-negotiable chips in the VIP casino is recorded as turnover and provides a base for calculating VIP casino win percentage. Because of this difference in chip purchase activity, the measurement base used in the general casino is not the same that is used in the VIP casino. It is customary in Macau to measure VIP casino play using this rolling chip method.

The measurement method in Las Vegas and in the general casino in Macau tracks the initial purchase of chips at the table while the measurement method in our VIP casino in Macau tracks the sum of all losing wagers. Accordingly, the base measurement in the VIP casino is much larger than the general casino. As a result, the expected win percentage with the same amount of gaming win is smaller in the VIP casino in Macau when compared to the general casino in Las Vegas and Macau.

Even though both use the same measurement method, we experience different win percentages in the general casino activity in Las Vegas versus Macau. This difference is primarily due to the difference in the mix of table games and customer playing habits between the two casinos. Each type of table game has its own theoretical win percentage. In the second quarter of 2011, we increased our expectations for table games win percentage in the general casino at Wynn Macau from 21% - 23% to 26% - 28% based on our experience since the opening of the Encore at Wynn Macau expansion.

Below are definitions of the statistics discussed:

- Table games win is the amount of drop or turnover that is retained and recorded as casino revenue.

- Drop is the amount of cash and net markers issued that are deposited in a gaming table's drop box.

- Turnover is the sum of all losing rolling chip wagers within our Macau VIP program.

- Rolling chips are identifiable chips that are used to track VIP wagering volume (turnover) for purposes of calculating incentives.

- Slot win is the amount of handle (representing the total amount wagered) that is retained by us and is recorded as casino revenue.

- Average Daily Rate ("ADR") is calculated by dividing total room revenue (less service charges, if any) by total rooms occupied.

- Revenue per Available Room ("REVPAR") is calculated by dividing total room revenue (less service charges, if any) by total rooms available.

38

Case 3:14-cv-04329-WHO    Document 14-4    Filed 10/20/14    Page 53 of 214

Table of Contents

*Financial results for the year ended December 31, 2011 compared to the year ended December 31, 2010.*

*Revenues*

Net revenues for the year ended December 31, 2011 are comprised of $4,190.5 million in casino revenues (79.5% of total net revenues) and $1,079.3 million of net non-casino revenues (20.5% of total net revenues). Net revenues for the year ended December 31, 2010 are comprised of $3,245.1 million in casino revenues (77.5% of total net revenues) and $939.6 million of net non-casino revenues (22.5% of total net revenues).

Casino revenues are primarily comprised of the net win from our table games and slot machine operations. Casino revenues for the year ended December 31, 2011 of $4,190.5 million represents a $945.4 million (29.1%) increase from casino revenues of $3,245.1 million for the year ended December 31, 2010.

Our Las Vegas Operations experienced a $90.9 million (17%) increase in casino revenues to $625.2 million, compared to the prior year due to a 9.9% increase in drop and an increase in our average table games win percentage. Our average table games win percentage (before discounts) for the year ended December 31, 2011 was 24.9%, which was above the expected range of 21% to 24% and compares to 22.2% for the prior year. Slot machine handle at our Las Vegas Operations increased slightly compared to the prior year; however slot machine win increased 7.0% as more play shifted to higher hold slot machines.

Our Macau Operations experienced an $854.5 million (31.5%) increase in casino revenues to $3,565.3 million for the year ended December 31, 2011, compared to the prior year. Our VIP revenue segment increased 28.9% due to a 34.9% increase in turnover, offset by a lower win percentage, all compared to the prior year. Our win as a percent of turnover was 2.93%, which is within our expected range of 2.7% to 3.0%, and compares to 3.0% in the prior year. For the year ended December 31, 2011, we benefited from an increase in the number of VIP tables and a full year of operations from Encore at Wynn Macau which opened in April 2010. In our general casino, drop increased 18.1% when compared to the prior year and the average table games win percentage was 28.4%, which is slightly above our expected range of 26% to 28%. The average table game win percentage for the year ended December 31, 2010 was 23.6%. Slot machine handle increased 28.4% compared to the prior year as a result of increased visitation to our resort and a full year of operations for Encore at Wynn Macau. Slot machine win increased 26.8% due to the increased handle partially offset by a slight decrease in hold percentage.

For the year ended December 31, 2011, room revenues were $472.1 million, an increase of $71.8 million (17.9%) compared to prior year room revenue of $400.3 million. Room revenue at our Las Vegas Operations increased $45.6 million (14.8%) compared to the prior year. In Las Vegas, we experienced an increase in room rates during the year ended December 31, 2011, compared to the prior year, with a 1.9 percentage point decrease in occupancy rate. We were able to achieve an increase in ADR as we adjusted rates to attract a higher quality customer who would take advantage of all aspects of our resort. Room revenue at our Macau Operations increased $26.2 million (28.5%) due to increases in both occupancy rate and room rates compared to the prior year, as well as the inclusion of a full year of the 414 additional suites added with the opening of Encore at Wynn Macau in April 2010.

The table below sets forth key operating measures related to room revenue.

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| Average Daily Rate | | |
| Las Vegas | $ 242 | $ 210 |
| Macau | 315 | 291 |
| Occupancy | | |
| Las Vegas | 86.1% | 88.0% |
| Macau | 91.8% | 87.8% |
| REVPAR | | |
| Las Vegas | $ 208 | $ 185 |
| Macau | 289 | 256 |

Table of Contents

Other non-casino revenues for the year ended December 31, 2011, included food and beverage revenues of $547.7 million, retail revenues of $260.8 million, entertainment revenues of $82.2 million, and other revenues from outlets such as the spa and salon, of $71.8 million. Other non-gaming revenues for the year ended December 31, 2010, included food and beverage revenues of $488.1 million, retail revenues of $214.6 million, entertainment revenues of $72 million, and other revenues from outlets, including the spa and salon, of $67.7 million. Food and beverage revenues at our Las Vegas Operations increased $37.5 million (9.0%), while our Macau Operations increased $22.1 million (31.3%), as compared to the prior year. The increase in Las Vegas is due primarily to business in our nightclubs including the full year of operations for the Encore Beach Club and Surrender Nightclub (which opened in May 2010) and increases in our catering and restaurant business. The increase in Macau is due to increased visitation to our resort and a full year of operations from Encore at Wynn Macau which opened in April 2010. Retail revenues at our Macau Operations increased $42.6 million (32.3%), while retail at our Las Vegas Operations increased by $3.6 million (4.3%). The increase at Wynn Macau is due primarily to strong same-store sales growth and the addition of three new boutiques at Encore at Wynn Macau. Entertainment revenues increased $10.2 million (14.1%) over the prior year primarily due to increased revenue from Garth Brooks, who performs in the Encore Theater, and the Sinatra "Dance with Me" show, both in Las Vegas. The Sinatra "Dance with Me" show ended its run on April 23, 2011.

*Departmental, Administrative and Other Expenses*

For the year ended December 31, 2011, departmental expenses included casino expenses of $2,686.4 million, room expenses of $125.3 million, food and beverage expenses of $283.9 million, and entertainment, retail and other expenses of $214.4 million. Also included are general and administrative expenses of approximately $389.1 million and $33.8 million charged as a provision for doubtful accounts receivable. For the year ended December 31, 2010, departmental expenses included casino expenses of $2,100.1 million, room expenses of $122.3 million, food and beverage expenses of $272.7 million, and entertainment, retail and other expenses of $204.6 million. Also included are general and administrative expenses of approximately $391.3 million and approximately $28.3 million charged as a provision for doubtful accounts receivable. Casino expenses have increased during the year ended December 31, 2011 due to an increase in casino revenues at both of our Las Vegas Operations and at our Macau Operations (where we incur a gaming tax and other levies at a rate totaling 39% in accordance with the concession agreement). Although our room revenues increased 17.9%, room expenses increased only 2.5% as the revenue increase was driven primarily by increased ADR. Food and beverage and entertainment, retail and other expenses increased commensurate with the increase in revenues. The increase in the provision for doubtful accounts relates primarily to Wynn Las Vegas and is a result of the higher casino revenue base experienced during the year ended December 31, 2011, compared to the prior year.

*Pre-opening costs*

We incurred no pre-opening costs during the year ended December 31, 2011. For the year ended December 31, 2010, we incurred $9.5 million of pre-opening costs primarily related to Encore at Wynn Macau which opened on April 21, 2010 and the Encore Beach Club and Surrender Nightclub which opened in Las Vegas on May 28, 2010.

*Depreciation and amortization*

Depreciation and amortization for the year ended December 31, 2011, was $398 million compared to $405.6 million for the year ended December 31, 2010. While there was little change between periods, depreciation expense decreased due to assets with a 5-year life being fully depreciated as of September 2011 at Wynn Macau and assets with a 5-year life being fully depreciated as of April 2010 at Wynn Las Vegas. These decreases were offset by additional depreciation for the assets of Encore at Wynn Macau which were placed into service in April 2010 and the assets of the Encore Beach Club and Surrender Nightclub in Las Vegas which were placed into service in May 2010.

40

Table of Contents

During the construction of our resorts, costs incurred in the construction of the buildings, improvements to land and the purchases of assets for use in operations were capitalized. Once these resorts opened, their assets were placed into service and we began recognizing the associated depreciation expense. Depreciation expenses will continue throughout the estimated useful lives of these assets. In addition, we continually evaluate the useful life of our property and equipment, intangibles and other assets and adjust them when warranted.

The maximum useful life of assets at our Macau Operations is the remaining life of the gaming concession or land concession, which currently expire in June 2022 and August 2029, respectively. Consequently, depreciation related to our Macau Operations is charged on an accelerated basis when compared to our Las Vegas Operations.

*Property charges and other*

Property charges and other for the year ended December 31, 2011, were $130.6 million compared to $25.2 million for the year ended December 31, 2010. Property charges and other for the year ended December 31, 2011 include a charge of $109.6 million reflecting the present value of a charitable contribution made by Wynn Macau to the University of Macau Development Foundation. This contribution consists of a $25 million payment made in May 2011, and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive, for a total of $135 million. The amount reflected in the accompanying Consolidated Statements of Income has been discounted using our then estimated borrowing rate over the time period of the remaining committed payments. Also included are the write off of certain off-site golf memberships by Wynn Las Vegas, miscellaneous renovations and abandonments at our resorts, including modifications of the Encore at Wynn Las Vegas and Wynn Macau retail esplanades, closure of the Blush nightclub and the write off of certain costs related to a show that ended its run in Las Vegas in April 2011.

Property charges and other for the year ended December 31, 2010, include a contract termination payment of $14.9 million related to a management contract for certain of the nightclubs at Wynn Las Vegas and miscellaneous renovations, abandonments and gain/loss on sale of equipment at our resorts.

*Other non-operating costs and expenses*

Interest income was $7.7 million and $2.5 million for the years ended December 31, 2011 and 2010, respectively. During 2011 and 2010, our short-term investment strategy has been to preserve capital while retaining sufficient liquidity. While the majority of our short-term investments were primarily in money market accounts, U.S. Treasury Bills and time deposits with a maturity of three months or less, beginning in May 2011 we have invested in certain corporate bond securities and commercial paper which contributed to the increase in interest income.

Interest expense was $229.9 million, net of capitalized interest of $0, for the year ended December 31, 2011, compared to $222.9 million, net of capitalized interest of $7.2 million, for the year ended December 31, 2010. Our interest expense increased compared to the prior year primarily due to a decrease in interest capitalized and an increase in interest rates on our first mortgage notes, offset by a decrease in amounts outstanding under our Wynn Las Vegas and Wynn Macau bank credit revolving facilities compared to the prior year.

Changes in the fair value of our interest rate swaps are recorded as an increase (decrease) in swap fair value in each period. We recorded a gain of $14.2 million for the year ended December 31, 2011, resulting from the increase in the fair value of our interest rate swaps from December 31, 2010 to December 31, 2011. For the year ended December 31, 2010, we recorded an expense of $0.9 million resulting from the decrease in the fair value of interest rate swaps between December 31, 2009 and December 31, 2010. For further information on our interest rate swaps, see Item 7A—"Quantitative and Qualitative Disclosures about Market Risk."

In April 2010, we completed an exchange offer for a portion of our outstanding 6 5/8% First Mortgage Notes (the "2014 Notes"). In connection with that exchange offer, the direct costs incurred with third parties of $4.4 million were expensed. In August 2010, we completed a tender offer for the then outstanding 2014 Notes

41

Table of Contents

and subsequent call of all the remaining amounts once the tender was completed. In connection with this transaction, we recorded a loss on extinguishment of debt of $63 million. This included the tender offer consideration, the call premium and the related write off of the unamortized debt issue costs and original issue discount.

*Income Taxes*

For the year ended December 31, 2011, we recorded a tax benefit of $19.5 million. Our income tax benefit is primarily related to tax benefits resulting from an increase in our deferred tax assets, a decrease in our liability for uncertain tax positions as the result of the statute of limitations lapse reduced by foreign taxes assessable on the dividends of Wynn Macau, S.A. and foreign tax provisions related to our international marketing offices. Since June 30, 2010, we have no longer considered our portion of the tax earnings and profits of Wynn Macau, Limited to be permanently invested. No additional U.S. tax provision has been made with respect to amounts not considered permanently invested as we anticipate that U.S. foreign tax credits should be sufficient to eliminate any U.S. tax provision relating to such repatriation. To the extent that book earnings exceed the tax earnings and profits of Wynn Macau, Limited, such excess is considered permanently invested. For the years ended December 31, 2011 and 2010, we recognized income tax benefits related to excess tax deductions associated with stock compensation costs of $11.2 million and $10.5 million, respectively.

Effective September 6, 2006, Wynn Macau, S.A. received a 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits. On November 30, 2010, Wynn Macau, S.A. received an additional 5-year exemption through December 31, 2015. Accordingly, we were exempted from the payment of approximately $82.7 million and $64.4 million in such taxes for the years ended December 31, 2011 and 2010, respectively. Our non-gaming profits remain subject to the Macau Complementary Tax and casino winnings remain subject to the Macau Special Gaming tax and other levies at a rate totaling 39% in accordance with our concession agreement.

During the year ended December 31, 2011, Wynn Macau, S.A. received the results of the Macau Finance Bureau's examination of its 2006 and 2007 Macau Complementary Tax returns and filed an appeal related to the examination's disallowance of certain deductions claimed in its 2006 Macau Complementary Tax Return. In August 2011, the 2006 Macau tax issues under appeal were resolved. As part of the settlement, the Company paid $1.1 million in Macau Complementary tax substantially all of which was provided for in prior years. As the result of the resolution of these Macau tax issues and expiration of the statute of limitations for 2006 Macau Complementary tax assessments on December 31, 2011, the total amount of unrecognized tax benefits decreased $10.8 million.

During 2010, we received the results of an IRS examination of our 2006 through 2008 U.S. income tax returns and filed an appeal of the examination's findings with the Appellate division of the IRS. In connection with that appeal, we agreed to extend the statute of limitations for our 2006 and 2007 U.S. income tax returns to December 31, 2012. The issues under examination in these years are temporary differences and relate to the treatment of discounts extended to Las Vegas casino customers gambling on credit, the deduction of certain costs incurred during the development and construction of Encore at Wynn Las Vegas and the appropriate tax depreciation recovery periods applicable to certain assets. Upon the settlement of these issues, unrecognized tax benefits could decrease by $0 to $54 million. The resolution of the 2006, 2007 and 2008 examination is not expected to result in any significant cash payment but rather the utilization of a portion of our foreign tax credit carryforward.

During the fourth quarter of 2010, the IRS commenced an examination of our 2009 U.S. income tax return. We believe that our liability for uncertain tax positions related to the period covered by the examination is adequate. The resolution of the 2009 IRS examination is not expected to result in any significant cash payment, but rather the utilization of a portion of our foreign tax credit carryforward.

42

Table of Contents

During October 2011, the IRS began an examination of our 2010 U.S. income tax return. Since the examination is in its initial stages we are unable to determine if it will be concluded within the next twelve months. We believe our liability for uncertain tax positions related to the period covered by this examination is adequate.

We are participating in the IRS Compliance Assurance Program ("CAP") for the 2011 tax year. Under the CAP program, the IRS and the taxpayer work together in a pre-filing environment to examine transactions and issues and thus complete the tax examination before the tax return is filed. Participation in this program should enable us to reduce time spent on tax administration and enhance tax reserve and financial statement reporting integrity. In January 2012, we received notification that we had been accepted into the IRS CAP for the 2012 tax year.

*Net income attributable to noncontrolling interests*

In October 2009, Wynn Macau, Limited, an indirect wholly-owned subsidiary, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of its common stock through an initial public offering. We recorded net income attributable to noncontrolling interests of $211.7 million for the year ended December 31, 2011, compared to $156.5 million for the year ended December 31, 2010. This represents the noncontrolling interests' share of net income from Wynn Macau, Limited for each year.

**Financial Results for the Year Ended December 31, 2010 Compared to the Year Ended December 31, 2009**

*Revenues*

Net revenues for the year ended December 31, 2010 are comprised of $3,245.1 million in casino revenues (77.5% of total net revenues) and $939.6 million of net non-casino revenues (22.5% of total net revenues). Net revenues for the year ended December 31, 2009 were comprised of $2,206.8 million in casino revenues (72.5% of total net revenues) and $838.8 million of net non-casino revenues (27.5% of total net revenues).

Casino revenues are comprised of the net win from our table games and slot machine operations. Casino revenues for the year ended December 31, 2010 of approximately $3,245.1 million represents a $1,038.3 million (or 47%) increase from casino revenues of $2,206.8 million for the year ended December 31, 2009.

Our Las Vegas Operations experienced a $28.5 million increase in casino revenues compared to the prior year due to a 3.4% increase in drop and an increase in our average table games win percentage. Our average table games win percentage (before discounts) for the year ended December 31, 2010 was 22.2% which was within the expected range of 21% to 24% and compares to 20.2% for the prior year. Slot handle at our Las Vegas Operations decreased 18.3% compared to the prior year; however slot win decreased only 6.9% as more play shifted to higher hold machines.

Casino revenues at our Macau Operations increased $1,009.8 million during the year ended December 31, 2010, compared to the prior year. We experienced a 77.8% increase in the VIP revenue segment due to a 68.0% increase in turnover. Our win as a percent of turnover was 3.0%, which is at the high end of the expected range of 2.7% to 3.0%, and compares to 2.9% in the prior year. In November 2009 we added two new private gaming salons with 29 VIP tables and on April 21, 2010 we added 37 VIP tables with the opening of Encore at Wynn Macau, which helped drive some of the growth in our VIP segment during the year ended December 31, 2010 compared to the prior year. Our VIP casino segment win as a percent of turnover includes a nominal beneficial effect attributable to non-rolling chip play. In our general casino, drop increased 17.4% when compared to the prior year and the average table games win percentage was 23.6%, which is above the expected range of 19% to 21%. The average table game win percentage for the year ended December 31, 2009 was 21.9%. Slot handle increased 23.8% compared to the prior year primarily due to the opening of Encore at Wynn Macau and slot win increased by 29.8%.

Table of Contents

For the year ended December 31, 2010, room revenues were approximately $400.3 million, an increase of $22.8 million compared to prior year room revenue of $377.5 million. Room revenue at our Las Vegas Operations decreased approximately $12.7 million compared to the prior year. In Las Vegas, we continued to experience a decrease in room rates during the year ended December 31, 2010, compared to the year ended December 31, 2009. We believe this was due to the economic conditions in the U.S. and the increased capacity in the Las Vegas market including the opening of a new large scale casino hotel in Las Vegas in December 2009. In addition, in July 2010, we commenced a project to remodel all of the rooms at Wynn Las Vegas. Accordingly, we had 3.8% fewer room nights available during the year ended December 31, 2010 which had a negative impact on our room revenues in Las Vegas. This room remodel was completed in the second quarter of 2011. Room revenue at our Macau Operations increased approximately $35.5 million due to the 414 additional suites added with Encore at Wynn Macau and an increase in the average daily room rate compared to the prior year.

The table below sets forth key operating measures related to room revenue.

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| Average Daily Rate | | |
| Las Vegas | $ 210 | $ 217 |
| Macau | 291 | 266 |
| Occupancy | | |
| Las Vegas | 88.0% | 85.2% |
| Macau | 87.8% | 87.5% |
| REVPAR | | |
| Las Vegas | $ 185 | $ 185 |
| Macau | 256 | 233 |

Other non-casino revenues for the year ended December 31, 2010, included food and beverage revenues of approximately $488.1 million, retail revenues of approximately $214.6 million, entertainment revenues of approximately $72 million, and other revenues from outlets such as the spa and salon, of approximately $67.7 million. Other non-casino revenues for the year ended December 31, 2009, included food and beverage revenues of approximately $436.4 million, retail revenues of approximately $165.1 million, entertainment revenues of approximately $57.1 million, and other revenues from outlets, including the spa and salon, of approximately $66.2 million. Food and beverage revenues at our Las Vegas Operations increased approximately $31.4 million, while our Macau Operations increased $20.3 million, as compared to the prior year. The increase in Las Vegas is due primarily to business in our nightclubs including the opening of the Encore Beach Club and Surrender nightclub in May 2010. The increase in Macau is primarily due to the opening of Encore at Wynn Macau and increased visitation to our resort. Retail revenues at our Macau Operations increased $52.2 million, offset by a decrease of $2.7 million in Las Vegas. The increase in Macau is due primarily to increased sales at several outlets, the opening of Wynn and Co. Watches and Jewelry in November 2009, which sells Cartier and Jaeger Le Coultre products, and new outlets at Encore at Wynn Macau including Chanel, Piaget and Cartier. Entertainment revenues increased over the prior year primarily due to performances by Garth Brooks in the Encore Theater in Las Vegas which commenced in December 2009, as well as increased revenue from our "Le Rêve" show.

*Departmental, Administrative and Other Expenses*

During the year ended December 31, 2010, departmental expenses included casino expenses of $2,100.1 million, room expenses of $122.3 million, food and beverage expenses of $272.7 million, and entertainment, retail and other expenses of $204.6 million. Also included are general and administrative expenses of approximately $391.3 million and approximately $28.3 million charged as a provision for doubtful accounts receivable. During the year ended December 31, 2009, departmental expenses included casino expenses of $1,460.1 million, room expenses of $111.6 million, food and beverage of $252.7 million, and

44

Table of Contents

entertainment, retail and other expenses of $166.6 million. Also included are general and administrative expenses of approximately $365.1 million and approximately $13.7 million charged as a provision for doubtful accounts receivable. Casino expenses have increased during the year ended December 31, 2010 due primarily to an increase in casino revenues especially at our Macau Operations where we incur a gaming tax and other levies at a rate totaling 39% in accordance with our concession agreement. Room expenses increased during the year ended December 31, 2010, compared to the prior year, primarily due to increased customer acquisition and marketing costs and the opening of Encore at Wynn Macau in April 2010. Food and beverage expenses increased commensurate with the increase in revenue.

Entertainment, retail and other expense increased primarily as a result of performances by Garth Brooks in the Encore Theater at Wynn Las Vegas and increased retail sales in Macau as noted above. General and administrative expenses increased primarily due to higher spending associated with corporate activities. The provision for doubtful accounts receivable increased $14.6 million due to an increase in credit issuances commensurate with the increase in business volume.

*Pre-opening costs*

During the year ended December 31, 2010, we incurred $9.5 million of pre-opening costs compared to $1.8 million during the year ended December 31, 2009. Pre-opening costs incurred during the year ended December 31, 2010, primarily related to Encore at Wynn Macau which opened on April 21, 2010, and the Encore Beach Club and Surrender Nightclub which opened in Las Vegas on May 28, 2010.

*Depreciation and amortization*

Depreciation and amortization for the year ended December 31, 2010, was $405.6 million compared to $410.5 million for the year ended December 31, 2009. This decrease is primarily due to assets with a 5-year life being fully depreciated as of April 2010 at Wynn Las Vegas, offset by depreciation of the assets of Encore at Wynn Macau which were placed in to service in April 2010 and the assets of the Encore Beach Club which were placed in to service in May 2010.

During the construction of our resorts, costs incurred in the construction of the buildings, improvements to land and the purchases of assets for use in operations were capitalized. Once these resorts opened, their assets were placed into service and we began recognizing the associated depreciation expense. Depreciation expenses will continue throughout the estimated useful lives of these assets. In addition, we continually evaluate the useful life of our property and equipment, intangibles and other assets and adjust them when warranted.

The maximum useful life of assets at our Macau Operations is the remaining life of the gaming concession or land concession, which currently expire in June 2022 and August 2029, respectively. Consequently, depreciation related to our Macau Operations is charged on an accelerated basis when compared to our Las Vegas Operations.

*Property charges and other*

Property charges and other generally include costs related to the retirement of assets for remodels and asset abandonments. Property charges and other for the year ended December 31, 2010, were $25.2 million compared to $28.5 million for the year ended December 31, 2009. Property charges and other for the year ended December 31, 2010 include a contract termination payment of $14.9 million related to a management contract for certain of the nightclubs at Wynn Las Vegas and Encore at Wynn Las Vegas and miscellaneous renovations, abandonments and gain/loss on sale of equipment at Wynn Las Vegas and Wynn Macau. Property charges and other for the year ended December 31, 2009, include a $16.7 million charge for the abandonment of the front porte-cochere at Encore at Wynn Las Vegas to make way for the Encore Beach Club, the write-off of $6.8 million of aircraft purchase deposits and $5 million related to miscellaneous renovations, abandonments and loss on sale of equipment.

45

Table of Contents

In response to our evaluation of our resorts and the reactions of our guests, we continue to remodel and make enhancements at our resorts.

*Other non-operating costs and expenses*

Interest income was $2.5 million and $1.7 million for the years ended December 31, 2010 and 2009, respectively. During 2010 and 2009, our short-term investment strategy has been to preserve capital while retaining sufficient liquidity. Accordingly, our short-term investments include primarily money market funds, U.S. Treasury Bills and time deposits with a purchase maturity of three months or less.

Interest expense was $222.9 million, net of capitalized interest of $7.2 million, for the year ended December 31, 2010, compared to $211.4 million, net of capitalized interest of $10.7 million, for the year ended December 31, 2009. Our interest expense increased approximately $11.5 million primarily due to interest expense for the Wynn Las Vegas $500 million 7 7/8% First Mortgage Notes issued in October 2009 and the increased rate on our remaining Wynn Las Vegas First Mortgage Notes as discussed below, offset partially by the payoff of the Wynn Resorts term loan in June 2009 and reduction in amounts outstanding under the Wynn Las Vegas and Wynn Macau bank revolving credit facilities compared to the prior year.

Changes in the fair value of our interest rate swaps are recorded as an increase (decrease) in swap fair value in each year. We recorded an expense of approximately $0.9 million for the year ended December 31, 2010 resulting from the decrease in the fair value of our interest rate swaps from December 31, 2009 to December 31, 2010. During the year ended December 31, 2009 we recorded an expense of $2.3 million resulting from the decrease in the fair value of interest rate swaps between December 31, 2008 and December 31, 2009. For further information on our interest rate swaps, see Item 7A—"Quantitative and Qualitative Disclosures about Market Risk."

In April 2010, we completed an exchange offer for a portion of the Wynn Las Vegas 6 5/8% First Mortgage Notes due 2014 ("the 2014 Notes"). In connection with that exchange offer, the direct costs incurred with third parties of $4.6 million were expensed. Also, in connection with our July 2010 tender offer for the then outstanding 2014 Notes and subsequent call of all the remaining amounts once the tender was completed, we recorded a loss on extinguishment of debt of $ 63.3 million. This included the tender offer consideration, the call premium and the related write off of the unamortized debt issue costs and original issue discount.

During the year ended December 31, 2009, we recorded a gain on early extinguishment of debt of $18.7 million as a result of several debt retirements. We purchased and retired outstanding loans of $375 million under the Wynn Resorts Term Loan Facility at a discounted price of 97.25%. In connection with this transaction, we recognized an $8.8 million gain on early retirement of debt, net of the write-off of unamortized debt issue cost. During this same period, we purchased $65.8 million face amount of the 2014 Notes through open market purchases at a discount. This transaction resulted in a gain on early extinguishment of debt of $13.7 million, net of the write off of unamortized debt discount and debt issue costs. We participated in the April 2010 tender offer noted above with respect to $35.8 million of these notes and accordingly, as of December 31, 2011 and 2010, Wynn Resorts holds $30 million of this debt which has not been contributed to its wholly-owned subsidiary, Wynn Las Vegas. For accounting purposes these notes were treated as having been extinguished by Wynn Resorts in 2009. In October 2009, we purchased loans through an offer to purchase loans outstanding under the Wynn Las Vegas credit agreement, with a face-value of $87.6 million for $84.4 million, reflecting a discounted price of 96.37%. In connection with this transaction, we recognized a net gain of approximately $2.1 million on early retirement of debt. Offsetting these gains was the write off of debt issue costs of approximately $5.9 million related to permanent reductions in our bank credit facility.

*Income Taxes*

During the year ended December 31, 2010, we recorded a tax expense of $20.4 million. Our provision for income taxes was primarily comprised of increases in our foreign and domestic valuation allowances relating to foreign tax loss carryforwards, other foreign deferred tax assets and U.S. foreign tax credits not considered more

46

Table of Contents

likely than not realizable in the future. The tax provision recorded for the valuation allowance increases was reduced by an income tax benefit recorded for the loss from our U.S. operations. As of June 30, 2010, we no longer consider our portion of the tax earnings and profits of Wynn Macau, Limited to be permanently reinvested. No additional U.S. tax provision has been made with respect to this amount as we anticipate that U.S. foreign tax credits should be sufficient to eliminate any U.S. tax provision relating to such repatriation. Prior to this change, our earnings attributable to periods after September 2009, were considered permanently reinvested abroad. The decrease in our current deferred tax liability was primarily attributable to the repatriation of $1.14 billion of Wynn Macau, Limited IPO proceeds not considered permanently reinvested. During the year ended December 31, 2010, we recognized income tax benefits related to excess tax deductions associated with stock-based compensation costs of $10.5 million.

Effective September 6, 2006, Wynn Macau S.A. received a 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits. Accordingly, we were exempted from the payment of $64.4 million in such taxes for the year ended December 31, 2010. Our non-gaming profits remain subject to the Macau Complementary Tax and casino winnings remain subject to the Macau Special Gaming tax and other levies at a rate totaling 39% in accordance with our concession agreement. On November 30, 2010, Wynn Macau S.A. received an additional 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits to December 31, 2015.

*Net income attributable to noncontrolling interests*

In October 2009, Wynn Macau, Limited, our indirect wholly-owned subsidiary and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of its common stock through an initial public offering. We recorded net income attributable to noncontrolling interests of $156.5 million for the year ended December 31, 2010, compared to $18.5 million for the period October 9, 2009, the date of the initial public offering, to December 31, 2009. This represents the noncontrolling interests' share of net income from Wynn Macau, Limited.

**Adjusted Property EBITDA**

We use adjusted property EBITDA to manage the operating results of our segments. Adjusted property EBITDA is earnings before interest, taxes, depreciation, amortization, pre-opening costs, property charges and other, corporate expenses, stock-based compensation, and other non-operating income and expenses, and includes equity in income from unconsolidated affiliates. Adjusted property EBITDA is presented exclusively as a supplemental disclosure because we believe that it is widely used to measure the performance, and as a basis for valuation, of gaming companies. We use adjusted property EBITDA as a measure of the operating performance of our segments and to compare the operating performance of our properties with those of our competitors. We also present adjusted property EBITDA because it is used by some investors as a way to measure a company's ability to incur and service debt, make capital expenditures and meet working capital requirements. Gaming companies have historically reported EBITDA as a supplement to financial measures in accordance with U.S. generally accepted accounting principles ("GAAP"). In order to view the operations of their casinos on a more stand-alone basis, gaming companies, including us, have historically excluded from their EBITDA calculations pre-opening expenses, property charges and corporate expenses that do not relate to the management of specific casino properties. However, adjusted property EBITDA should not be considered as an alternative to operating income as an indicator of our performance, as an alternative to cash flows from operating activities as a measure of liquidity, or as an alternative to any other measure determined in accordance with GAAP. Unlike net income, adjusted property EBITDA does not include depreciation or interest expense and therefore does not reflect current or future capital expenditures or the cost of capital. We have significant uses of cash flows, including capital expenditures, interest payments, debt principal repayments, taxes and other non-recurring charges, which are not reflected in adjusted property EBITDA. Also, our calculation of adjusted property EBITDA may be different from the calculation methods used by other companies and, therefore, comparability may be limited.

47

Table of Contents

The following table (amounts in thousands) summarizes adjusted property EBITDA for our Las Vegas and Macau Operations as reviewed by management and summarized in "Item 8—Notes to Consolidated Financial Statement—Note 17 Segment Information." That footnote also presents a reconciliation of adjusted property EBITDA to net income.

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| Las Vegas | $ 439,036 | $ 270,299 | $ 244,065 |
| Macau | 1,196,232 | 892,686 | 502,087 |
| Total Adjusted Property EBITDA | $ 1,635,268 | $ 1,162,985 | $ 746,152 |

During 2011, the economic environment in the gaming and hotel markets in Las Vegas began to improve with increased levels of gaming revenue, visitation and hotel room demand. While these gaming and hotel statistics have increased from prior year levels, uncertainty still exists in the Las Vegas market. During 2011, the average daily room rate increased 10.7%, visitation increased 4.3% to 38.9 million visitors, and Las Vegas Strip gaming revenues increased 5.1%, all as compared to the year ended December 31, 2010. During 2010, the average daily room rate increased 2%, visitation increased 2.7% to 37.3 million visitors, and Las Vegas Strip gaming revenues increased 4.5%, all as compared to the year ended December 31, 2009.

For 2011, our Las Vegas Operations benefited from increased gaming volumes, a higher than normal table games win percentage, improved ADR, and an overall increase in all other revenue streams including food and beverage, entertainment and retail. While we experienced a slight decrease in our occupancy compared to the prior year, we were able to achieve an increase in ADR as we adjusted rates to attract a higher quality customer who would take advantage of all aspects of our resort. While we benefited from higher win percentages on our table games and higher non-casino revenues for the year, the economic environment in the Las Vegas market is still uncertain.

Our Macau Operations' adjusted property EBITDA has increased as the Macau market continues to grow and as a result of our expansion of that resort as detailed in the discussions above regarding our results of operations.

**Liquidity and Capital Resources**

*Cash Flow from Operations*

Our operating cash flows primarily consist of our operating income generated by our Las Vegas and Macau operations (excluding depreciation and other non-cash charges), interest paid, and changes in working capital accounts such as receivables, inventories, prepaid expenses, and payables. Our table games play both in Macau and Las Vegas is a mix of cash play and credit play, while our slot machine play is conducted primarily on a cash basis. A portion of our table games revenue is attributable to the play of a limited number of premium international customers that gamble on credit. The ability to collect these gaming receivables may impact our operating cash flow for the period. Our rooms, food and beverage, and entertainment, retail, and other revenue is conducted primarily on a cash basis or as a trade receivable. Accordingly, operating cash flows will be impacted by changes in operating income and accounts receivables.

Net cash provided from operations for the year ended December 31, 2011 was $1.5 billion compared to $1.1 billion provided by operations for the year ended December 31, 2010. This increase is primarily due to the increase in operating income as a result of increased operating department profitability at both our Las Vegas Operations and our Macau Operations, especially in the casino, room and food and beverage departments. Offsetting this increase was the impact of ordinary working capital changes primarily driven by customer deposits and accounts receivable and an increase in cash paid for interest of $49.5 million.

48

Table of Contents

*Capital Resources*

We require a certain amount of cash on hand for operations. At December 31, 2011, we had approximately $1.3 billion of cash and cash equivalents available for operations, debt service and retirement, development activities, general corporate purposes and enhancements to our resorts. Of this amount $663.5 million was held by Wynn Macau, Limited and its subsidiaries of which we own 72.3%. If repatriated to the U.S., substantially all of our portion of such cash would be subject to U.S. tax in the year of repatriation. Cash balances held by Wynn Resorts, Limited, which is not a guarantor of the debt of its subsidiaries, was $378.5 million. We also have available-for-sale investments in foreign and domestic debt securities with maturities of 1 to 3 years totaling $213.6 million.

In addition, as of December 31, 2011, we had approximately $351.1 million of availability under our Wynn Las Vegas Revolving Credit Facility and approximately $849.6 million of availability under our Wynn Macau Senior Revolving Credit Facility. Debt maturities in 2012 are $407.9 million.

We believe that cash flow from operations, availability under our bank credit facilities and our existing cash balances will be adequate to satisfy our anticipated uses of capital during 2012. If any additional financing became necessary, we cannot provide assurance that future borrowings will be available.

Cash and cash equivalents include investments in money market funds, domestic and foreign bank time deposits and commercial paper, all with maturities of less than 90 days.

*Investing Activities*

Capital expenditures were approximately $184.1 million, $283.8 million and $540.9 million for the years ended December 31, 2011, 2010 and 2009. For 2011, our capital expenditures primarily relate to the room and suite remodel at Wynn Las Vegas, a new high limit slot salon, new Las Vegas Tower Suites lobby and lounge and other property remodels. In addition, 2011 includes a $62.5 million initial payment pursuant to the terms of a draft land concession in Macau. For 2010 and 2009, our capital expenditures relate primarily to the construction cost associated with Encore at Wynn Macau, which opened in April 2010, the Encore Beach Club and Surrender Nightclub, which opened in May 2010 and final costs associated with Encore at Wynn Las Vegas, which opened in December 2008.

During the year ended December 31, 2011, we invested $316.5 million in corporate debt securities and commercial paper.

*Financing Activities*

*Las Vegas Operations*

As of December 31, 2011, our Wynn Las Vegas credit facilities, as amended, consisted of a $108.5 million revolving credit facility, due July 2013 and a $258.4 million revolving credit facility due July 2015 (together the "Wynn Las Vegas Revolver"), and a fully drawn $40.3 million term loan facility due August 2013 and a fully drawn $330.6 million term loan facility due August 2015 (together the "Wynn Las Vegas Term Loan"). The Wynn Las Vegas Revolver and the Wynn Las Vegas Term Loan are together referred to as the "Wynn Las Vegas Credit Facilities." During the year ended December 31, 2011, we repaid $20.1 million of borrowings under the Wynn Las Vegas Revolver and $4 million under the Wynn Las Vegas Term Loan. As of December 31, 2011, the Wynn Las Vegas Term Loan was fully drawn and we had no borrowings outstanding under the Wynn Las Vegas Revolver. We had $15.8 million of outstanding letters of credit that reduce availability for borrowing under the Wynn Las Vegas Revolver. Accordingly, we had availability of $351.1 million under the Wynn Las Vegas Revolver as of December 31, 2011.

Loans under the Wynn Las Vegas Credit Facilities bear interest at fluctuating rates, based on either LIBOR or an alternative base rate, plus an applicable margin. As of December 31, 2011, the applicable margin for

49

Table of Contents

LIBOR loans under the Wynn Las Vegas Revolver and the Wynn Las Vegas Term Loan due August 17, 2015 was 3.0%, and the applicable margin for LIBOR loans under the Wynn Las Vegas Term Loan due August 15, 2013 was 1.875%. Base Rate Loans bear interest at (a) the greatest of (i) the rate most recently announced by Deutsche Bank as its "prime rate," (ii) the Federal Funds Rate plus 1/2 of 1% per annum, and (iii) in the case of a Wynn Las Vegas Revolver loan the one month Eurodollar rate; plus (b) a borrowing margin of 2.0% for Wynn Las Vegas Revolver loans and 0.875% for Wynn Las Vegas Term Loans. Interest on Base Rate Loans will be payable quarterly in arrears. Wynn Las Vegas, LLC also pays, quarterly in arrears, 1.0% per annum on the daily average of unused commitments under the Wynn Las Vegas Revolver.

In addition to scheduled amortization payments, Wynn Las Vegas, LLC is required to make mandatory prepayments of indebtedness under the Wynn Las Vegas Credit Facilities from the net proceeds of all debt offerings (other than those constituting certain permitted debt). Wynn Las Vegas, LLC is also required to make mandatory repayments of indebtedness under the Wynn Las Vegas Credit Facilities from specified percentages of excess cash flow, which percentages may decrease and/or be eliminated based on Wynn Las Vegas, LLC's leverage ratio. For 2012, Wynn Las Vegas, LLC expects to make a mandatory repayment of approximately $88 million in March pursuant to this provision of the Wynn Las Vegas Credit Facilities. Wynn Las Vegas, LLC has the option to prepay all or any portion of the indebtedness under the Wynn Las Vegas Credit Facilities at any time without premium or penalty.

The Wynn Las Vegas Credit Facilities contain customary negative covenants and financial covenants, including, but not limited to, negative covenants that restrict Wynn Las Vegas, LLC's ability to: incur additional indebtedness, including guarantees; create, incur, assume or permit to exist liens on property and assets; declare or pay dividends and make distributions or restrict the ability of Wynn Las Vegas, LLC's subsidiaries to pay dividends and make distributions; engage in mergers, investments and acquisitions; enter into transactions with affiliates; enter into sale-leaseback transactions; execute modifications to material contracts; engage in sales of assets; make capital expenditures; and make optional prepayments of certain indebtedness. The financial covenants include maintaining a Consolidated Interest Coverage Ratio, as defined, not less than 1.00 to 1 as of December 31, 2011. Management believes that Wynn Las Vegas, LLC was in compliance with all covenants at December 31, 2011. The Consolidated Interest Coverage Ratio remains at 1.00 to 1 through June 2013. As of December 31, 2011, approximately $1 billion of net assets of Wynn Las Vegas, LLC were restricted from being distributed under the terms of its long-term debt.

As of December 31, 2011, we had the following first mortgage notes outstanding:

*7 7/8% First Mortgage Notes due 2017*

In October 2009, Wynn Las Vegas, LLC and Wynn Las Vegas Capital Corp. (together, the "Issuers") issued, in a private offering, $500 million aggregate principal amount of 7 7/8% first mortgage notes due November 1, 2017 (the "2017 Notes") at a price of 97.823% of the principal amount. Interest is due on the 2017 Notes on May 1st and November 1st of each year. Commencing November 1, 2013, the 2017 Notes are redeemable at the Issuer's option at a price equal to 103.938% of the principal amount redeemed and the premium over the principal amount declines ratably on November 1st of each year thereafter to zero on or after November 1, 2015. The 2017 Notes are senior secured obligations of the Issuers, guaranteed by certain of Wynn Las Vegas, LLC's subsidiaries and secured by a first priority lien on substantially all of the existing and future assets of the Issuers and guarantors, and a first priority lien on the equity interests of Wynn Las Vegas, LLC, all of which is the same collateral that secures borrowings under Wynn Las Vegas, LLC's credit facilities. The indenture governing the 2017 Notes contains customary negative covenants and financial covenants, including, but not limited to, negative covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restriction affecting subsidiaries.

50

Table of Contents

*7 ⁷⁄₈% First Mortgage Notes due 2020*

In April 2010, the, the Issuers issued, in a private offering, $352 million aggregate principal amount of 7 ⁷⁄₈% first mortgage notes due May 1, 2020 (the "2020 Notes"). The 2020 Notes were issued pursuant to an exchange offer for previously issued notes that were to mature in December 2014. Interest is due on the 2020 Notes on May 1st and November 1st of each year. Commencing May 1, 2015, the 2020 Notes are redeemable at the Issuer's option at a price equal to 103.938% of the principal amount redeemed and the premium over the principal amount declines ratably on May 1st of each year thereafter to zero on or after May 1, 2018. The 2020 Notes rank pari passu in right of payment with borrowings under Wynn Las Vegas, LLC's credit facilities and 2017 Notes. The 2020 Notes are senior secured obligations of the Issuers, guaranteed by certain of Wynn Las Vegas, LLC's subsidiaries and secured by a first priority lien on substantially all of the existing and future assets of the Issuers and guarantors, and a first priority lien on the equity interests of Wynn Las Vegas, LLC, all of which is the same collateral that secures borrowings under Wynn Las Vegas, LLC's credit facilities and the 2017 Notes. The indenture governing the 2020 Notes contains customary negative covenants and financial covenants, including, but not limited to, negative covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restriction affecting subsidiaries.

*7 ³⁄₄% First Mortgage Notes due 2020*

In August 2010, the Issuers issued $1.32 billion aggregate principal amount of 7 3/4% first mortgage notes due August 15, 2020 (the "New 2020 Notes"). The New 2020 Notes were issued at par. The New 2020 Notes refinanced a previous note issue that was to mature in December 2014. Interest is due on the New 2020 Notes on February 15th and August 15th of each year. Commencing August 15, 2015, the New 2020 Notes are redeemable at the Issuer's option at a price equal to 103.875% of the principal amount redeemed and the premium over the principal amount declines ratably on August 15th of each year thereafter to zero on or after August 15, 2018. The New 2020 Notes rank pari passu in right of payment with borrowings under Wynn Las Vegas, LLC's credit facilities, the 2017 Notes and the 2020 Notes. The New 2020 Notes are senior secured obligations of the Issuers, guaranteed by certain of Wynn Las Vegas, LLC's subsidiaries and secured on an equal and ratable basis (with certain exceptions) by a first priority lien on substantially all of the existing and future assets of the Issuers and guarantors, and a first priority lien on the equity interests of Wynn Las Vegas, LLC, all of which is the same collateral that secures borrowings under Wynn Las Vegas, LLC's credit facilities, the 2017 Notes and the 2020 Notes. The indenture governing the New 2020 Notes contains customary negative covenants and financial covenants, including, but not limited to, negative covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restriction affecting subsidiaries.

*Macau Operations*

As of December 31, 2011, our Wynn Macau credit facilities, as amended, consisted of a $550 million equivalent fully-funded senior term loan facility (the "Wynn Macau Term Loan"), and a $1 billion equivalent senior revolving credit facility (the "Wynn Macau Revolver") in a combination of Hong Kong and U.S. dollars. The Wynn Macau Revolver and the Wynn Macau Term Loan are together referred to as the "Wynn Macau Credit Facilities." Wynn Macau, S.A. also has the ability to increase the total facilities by an additional $50 million pursuant to the terms and provisions of the Amended Common Terms Agreement. During the year ended December 31, 2011, we repaid $100.2 million of borrowings under the Wynn Macau Revolver in the first part of the year and borrowed $150.4 million in December 2011. Beginning in September 2011, quarterly payments became due under the Wynn Macau Term Loan and for 2011 the total amount repaid was $74 million. As of December 31, 2011, the Wynn Macau Term Loan was fully drawn, with total amounts outstanding of $477.3 million and we had $150.4 million in borrowings outstanding under the Wynn Macau Revolver. We had $849.6 million of availability under the Wynn Macau Revolver as of December 31, 2011.

Table of Contents

The Wynn Macau Term Loan matures in June 2014, and the Wynn Macau Revolver matures in June 2012. The principal amount of the Wynn Macau Term Loan is required to be repaid in quarterly installments that commenced in September 2011, with $145.9 million due in 2012. Borrowings under the Wynn Macau Credit Facilities bear interest at LIBOR or the Hong Kong Interbank Offer Rate ("HIBOR") plus a margin which was 1.75% through September 30, 2010. Commencing in the fourth quarter of 2010, the Wynn Macau Credit Facilities are subject to a margin of 1.25% to 2.00% depending on Wynn Macau's leverage ratio at the end of each quarter. At December 31, 2011, the margin was 1.25% to 1.75%.

The Wynn Macau Credit Facilities contain a requirement that we must make mandatory repayments of indebtedness from specified percentages of excess cash flow. If the Wynn Macau subsidiary meets a Consolidated Leverage Ratio, as defined, of greater than 4.0 to 1, such repayment is defined as 50% of Excess Cash Flow, as defined. If the Consolidated Leverage Ratio is less than 4.0 to 1, then no repayment is required. Based on current estimates we do not believe that the Wynn Macau Consolidated Leverage Ratio during the year ending December 31, 2012 will exceed 4.0 to 1. Accordingly we do not expect to make any mandatory repayments pursuant to this requirement during 2012.

The Wynn Macau Credit Facilities contain customary covenants restricting certain activities including, but not limited to: the incurrence of additional indebtedness, the incurrence or creation of liens on any of its property, sales and leaseback transactions, the ability to dispose of assets, and make loans or other investments. In addition, Wynn Macau was required by the financial covenants to maintain a Leverage Ratio, as defined, of not greater than 3.50 to 1 as of December 31, 2011, and an Interest Coverage Ratio, as defined, of not less than 2.00 to 1. Management believes that Wynn Macau was in compliance with all covenants at December 31, 2011.

*Wynn Resorts, Limited*

In October 2009, Wynn Macau, Limited, our indirect wholly-owned subsidiary, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Through an initial public offering, including the over allotment, Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of its common stock. We received proceeds, net of related costs, of approximately $1.8 billion as a result of this transaction.

During the years ended December 31, 2011, 2010 and 2009, we paid cash dividends totaling $6.50 per share, $8.50 per share and $4.00 per share, respectively.

Our Board of Directors has authorized an equity repurchase program of up to $1.7 billion. The repurchase program may include repurchases from time to time through open market purchases, in privately negotiated transactions, and under plans complying with Rules 10b5-1 and 10b-18 under the Exchange Act. No share repurchases were made during the years ended December 31, 2010 or 2009. During 2011, the Company repurchased a total of 51,136 shares (6,160 shares during the fourth quarter) in satisfaction of tax withholding obligations on vested restricted stock. As of December 31, 2011, we had repurchased a total of 12,856,090 shares of our common stock for a net cost of $1.1 billion under the program.

*Off Balance Sheet Arrangements*

We have not entered into any transactions with special purpose entities nor do we engage in any derivatives except for previously discussed interest rate swaps. We do not have any retained or contingent interest in assets transferred to an unconsolidated entity. At December 31, 2011, we had outstanding letters of credit totaling $15.8 million.

52

Table of Contents

*Contractual Obligations and Commitments*

The following table summarizes our scheduled contractual commitments at December 31, 2011 (amounts in millions):

| | Payments Due By Period | | | | |
| --- | --- | --- | --- | --- | --- |
| | Less Than 1 Year | 1 to 3 Years | 4 to 5 Years | After 5 Years | Total |
| Long-term debt obligations | $407.9 | $364.8 | $254.7 | $2,200.7 | $3,228.1 |
| Fixed interest payments | 169.4 | 338.8 | 338.8 | 496.1 | 1,343.1 |
| Estimated variable interest payments[1] | 28.9 | 38.4 | 9.7 | 0.2 | 77.2 |
| Operating leases | 5.0 | 5.1 | 3.3 | 4.6 | 18.0 |
| Construction contracts and commitments | 62.6 | 17.8 | 2.0 | — | 82.4 |
| Leasehold interest in land | 13.4 | 57.2 | 46.7 | — | 117.3 |
| Employment agreements | 45.8 | 48.3 | 17.5 | 20.1 | 131.7 |
| Other[2] | 88.1 | 74.1 | 38.7 | 112.5 | 313.4 |
| Total commitments | $821.1 | $944.5 | $711.4 | $2,834.2 | $5,311.2 |

---

[1]   Amounts for all periods represent our estimated future interest payments on our debt facilities based upon amounts outstanding and LIBOR or HIBOR rates at December 31, 2011. Such rates are at historical lows as of December 31, 2011. Actual rates will vary.

[2]   Other includes open purchase orders, commitments for an aircraft purchase, future charitable contributions, fixed gaming tax payments in Macau and other contracts. As further discussed in Item 8 "Financial Statements", Note 15 "Income Taxes", of this report, we had $85.5 million of unrecognized tax benefits as of December 31, 2011. Due to the inherent uncertainty of the underlying tax positions, it is not practicable to assign this liability to any particular year and therefore it is not included in the table above as of December 31, 2011.

*Other Liquidity Matters*

Wynn Resorts is a holding company and, as a result, our ability to pay dividends is highly dependent on our ability to obtain funds and our subsidiaries' ability to provide funds to us. Restrictions imposed by our Wynn Las Vegas and Wynn Macau debt instruments significantly restrict our ability to pay dividends. Specifically, Wynn Las Vegas, LLC and certain of its subsidiaries are restricted under the indentures governing the 2017 Notes, the 2020 Notes and the New 2020 Notes from making certain "restricted payments" as defined in the indentures. These restricted payments include the payment of dividends or distributions to any direct or indirect holders of equity interests of Wynn Las Vegas, LLC. These restricted payments may not be made unless certain financial and non-financial criteria have been satisfied. The Wynn Las Vegas, LLC Credit Facilities contain similar restrictions. While the Wynn Macau Credit Facilities contains similar restrictions, Wynn Macau is currently in compliance with all requirements, namely satisfaction of its leverage ratio, which must be met in order to pay dividends and is presently able to pay dividends in accordance with the Wynn Macau Credit Facilities.

Wynn Las Vegas, LLC intends to fund its operations and capital requirements from operating cash flow and availability under the Wynn Las Vegas Revolver. We cannot assure you; however, that our Las Vegas Operations will generate sufficient cash flow from operations or the availability of additional indebtedness will be sufficient to enable us to service and repay Wynn Las Vegas, LLC's indebtedness and to fund its other liquidity needs. Similarly, we expect that Wynn Macau will fund Wynn Macau, S.A.'s debt service obligations with existing cash, operating cash flow and availability under the Wynn Macau Revolver. However, we cannot assure you that operating cash flows will be sufficient to do so. We may refinance all or a portion of our indebtedness on or before maturity. We cannot assure you that we will be able to refinance any of the indebtedness on acceptable terms or at all.

53

Table of Contents

New business developments or other unforeseen events may occur, resulting in the need to raise additional funds. We continue to explore opportunities to develop additional gaming or related businesses in domestic and international markets. There can be no assurances regarding the business prospects with respect to any other opportunity. Any new development would require us to obtain additional financing. We may decide to conduct any such development through Wynn Resorts or through subsidiaries separate from the Las Vegas or Macau-related entities.

The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the board of directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts. The redemption price may be paid in cash, by promissory note or both, as required by the applicable gaming authority and, if not, as we elect. Any promissory note that we issue to an unsuitable person or its affiliate in exchange for its shares could increase our debt to equity ratio and would increase our leverage ratio.

On February 18, 2012, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Kazuo Okada are "unsuitable" under the provisions of Wynn Resorts' articles of incorporation and redeemed all of Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' common stock. Pursuant to Wynn Resorts' articles of incorporation, Wynn Resorts issued the Redemption Price Promissory Note to Aruze USA, Inc. in redemption of the shares. For additional information on the redemption and the Redemption Price Promissory Note, see Item 8—"Notes to Consolidated Financial Statements", Note 19 "Subsequent Events."

## Critical Accounting Policies and Estimates

Management's discussion and analysis of our results of operations and liquidity and capital resources are based on our consolidated financial statements. Our consolidated financial statements were prepared in conformity with accounting principles generally accepted in the United States of America. A summary of our significant accounting policies are presented in Note 2 to the Consolidated Financial Statements. Certain of our accounting policies require management to apply significant judgment in defining the appropriate assumptions integral to financial estimates. On an ongoing basis, management evaluates those estimates, including those relating to the estimated lives of depreciable assets, asset impairment, allowances for doubtful accounts, accruals for customer loyalty rewards, self-insurance, contingencies, litigation and other items. Judgments are based on historical experience, terms of existing contracts, industry trends and information available from outside sources, as appropriate. However, by their nature, judgments are subject to an inherent degree of uncertainty, and therefore actual results could differ from our estimates.

### Development, Construction and Property and Equipment Estimates

During the construction and development of a resort, pre-opening or start-up costs are expensed when incurred. In connection with the construction and development of our resorts, significant start-up costs are incurred and charged to pre-opening costs through their respective openings. Once our resorts open, expenses associated with the opening of the resorts are no longer charged as pre-opening costs.

During the construction and development stage, direct costs such as those incurred for the design and construction of our resorts, including applicable portions of interest, are capitalized. Accordingly, the recorded amounts of property and equipment increase significantly during construction periods. Depreciation expense related to capitalized construction costs is recognized when the related assets are placed in service. Upon the opening of our resorts, we began recognizing depreciation expense on the resort's fixed assets.

The remaining estimated useful lives of assets are periodically reviewed.

Our leasehold interest in land in Macau under the land concession contract entered into in June 2004 is being amortized over 25 years, to the initial term of the concession contract, which currently terminates in

54

**Table of Contents**

August 2029. Depreciation on a majority of the assets comprising Wynn Macau commenced in September of 2006, when Wynn Macau opened. The maximum useful life of assets at Wynn Macau is deemed to be the remaining life of the land concession which currently expires in August 2029, or the gaming concession which currently expires in June 2022. Consequently, depreciation related to Wynn Macau will generally be charged over shorter periods when compared to Wynn Las Vegas.

Costs of repairs and maintenance are charged to expense when incurred. The cost and accumulated depreciation of property and equipment retired or otherwise disposed of are eliminated from the respective accounts and any resulting gain or loss is included in operating income.

We also evaluate our property and equipment and other long-lived assets for impairment in accordance with applicable accounting standards. For assets to be disposed of, we recognize the asset at the lower of carrying value or fair market value less costs of disposal, as estimated based on comparable asset sales, solicited offers, or a discounted cash flow model. For assets to be held and used, we review for impairment whenever indicators of impairment exist. In reviewing for impairment, we compare the estimated future cash flows of the asset, on an undiscounted basis, to the carrying value of the asset. If the undiscounted cash flows exceed the carrying value, no impairment is indicated. If the undiscounted cash flows do not exceed the carrying value, an impairment is recorded based on the fair value of the asset, typically measured using a discounted cash flow model. If an asset is still under development, future cash flows include remaining construction costs. All recognized impairment losses, whether for assets to be disposed of or assets to be held and used, are recorded as operating expenses.

### Investments and Fair Value

We have made investments in domestic and foreign corporate debt securities and commercial paper. Our investment policy requires investments to be investment grade and limits the amount of exposure to any one issuer with the objective of minimizing the potential risk of principal loss. We determine the appropriate classification (held-to-maturity/available-for-sale) of our investments at the time of purchase and reevaluate such designation as of each balance sheet date. Our investments are reported at fair value, with unrealized gains and losses, net of tax, reported in other comprehensive income (loss). Adjustments are made for amortization of premiums and accretion of discounts to maturity computed under the effective interest method. Such amortization is included in interest income together with realized gains and losses and the stated interest on such securities.

We measure certain of our financial assets and liabilities, such as cash equivalents, available-for-sale securities and interest rate swaps, at fair value on a recurring basis pursuant to accounting standards for fair value measurements. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. These accounting standards establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

We obtain pricing information in determining the fair value of our available-for-sale securities from independent pricing vendors. Based on our inquiries, the pricing vendors use various pricing models consistent with what other market participants would use. The assumptions and inputs used by the pricing vendors are derived from market observable sources including: reported trades, broker/dealer quotes, issuer spreads, benchmark curves, bids, offers and other market-related data. We have not made adjustments to such prices. Each quarter, we validate the fair value pricing methodology to determine the fair value consistent with applicable accounting guidance and to confirm that the securities are classified properly in the fair value hierarchy. We also compare the pricing received from our vendors to independent sources for the same or similar securities.

55

Table of Contents

*Allowance for Estimated Doubtful Accounts Receivable*

A substantial portion of our outstanding receivables relates to casino credit play. Credit play, through the issuance of markers, represents a significant portion of the table games volume at our Las Vegas Operations. While offered, the issuance of credit at our Macau Operations is less significant when compared to Las Vegas. Our goal is to maintain strict controls over the issuance of credit and aggressively pursue collection from those customers who fail to pay their balances in a timely fashion. These collection efforts may include the mailing of statements and delinquency notices, personal contacts, the use of outside collection agencies, and litigation. Markers issued at our Las Vegas Operations are generally legally enforceable instruments in the United States, and United States assets of foreign customers may be used to satisfy judgments entered in the United States.

The enforceability of markers and other forms of credit related to gaming debt outside of the United States varies from country to country. Some foreign countries do not recognize the enforceability of gaming related debt, or make enforcement burdensome. We closely consider the likelihood and difficulty of enforceability, among other factors, when issuing credit to customers who are not residents of the United States. In addition to our internal credit and collection departments, located in both Las Vegas and Macau, we have a network of legal, accounting and collection professionals to assist us in our determinations regarding enforceability and our overall collection efforts.

As of December 31, 2011 and 2010, approximately 85% and 82%, respectively, of our casino accounts receivable were owed by customers from foreign countries, primarily in Asia. In addition to enforceability issues, the collectability of markers given by foreign customers is affected by a number of factors including changes in currency exchange rates and economic conditions in the customers' home countries.

We regularly evaluate our reserve for bad debts based on a specific review of customer accounts as well as management's prior experience with collection trends in the casino industry and current economic and business conditions. In determining our allowance for estimated doubtful accounts receivable, we apply industry standard reserve percentages to aged account balances and we specifically analyze the collectability of each account with a balance over a specified dollar amount, based upon the age, the customer's financial condition, collection history and any other known information. The standard reserve percentages applied are based on our historical experience and take into consideration current industry and economic conditions.

The following table presents key statistics related to our casino accounts receivable (amounts in thousands):

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| Casino accounts receivable | $ 301,658 | $ 256,807 |
| Allowance for doubtful casino accounts receivable | $ 128,875 | $ 113,203 |
| Allowance as a percentage of casino accounts receivable | 42.7% | 44.1% |
| Percentage of casino accounts receivable outstanding over 180 days | 30.1% | 31.2% |

Our reserve for doubtful casino accounts receivable is based on our estimates of amounts collectible and depends on management's prior experience with collection trends in the casino industry and current economic and business conditions. In determining our allowance for estimated doubtful accounts receivable, we apply industry standard reserve percentages to aged account balances and we specifically analyze the collectability of each account with a balance over a specified dollar amount, based upon the age, the customer's financial condition, collection history and any other known information. The standard reserve percentages applied are based on our historical experience and take into consideration current industry and economic conditions.

At December 31, 2011, a 100 basis-point change in the allowance for doubtful accounts as a percentage of casino accounts receivable would change the provision for doubtful accounts by approximately $1.3 million.

As our customer payment experience evolves, we will continue to refine our estimated reserve for bad debts. Accordingly, the associated provision for doubtful accounts expense may fluctuate. Because individual customer

56

Table of Contents

account balances can be significant, the reserve and the provision can change significantly between periods, as we become aware of additional information about a customer or changes occur in a region's economy or legal system.

### Derivative Financial Instruments

We seek to manage our market risk, including interest rate risk associated with variable rate borrowings, through balancing fixed-rate and variable-rate borrowings and the use of derivative financial instruments. We account for derivative financial instruments in accordance with applicable accounting standards. Derivative financial instruments are recognized as assets or liabilities, with changes in fair value affecting net income. As of December 31, 2011, changes in our interest rate swap fair values are being recorded in our Consolidated Statements of Income, as the swaps do not qualify for hedge accounting.

We measure the fair value of our interest rate swaps on a recurring basis. We categorize our interest rate swap contracts as Level 2 in the hierarchy as described above. The fair value approximates the amount we would receive (pay) if these contracts were settled at the respective valuation dates. Fair value is estimated based upon current and predictions of future, interest rate levels along a yield curve, the remaining duration of the instruments and other market conditions, and therefore is subject to significant estimation and a high degree of variability of fluctuation between periods. We adjust this amount by applying a non-performance valuation, considering our creditworthiness or the creditworthiness of our counterparties at each settlement date, as applicable.

### Stock-Based Compensation

Accounting standards for stock-based payments establish standards for the accounting for transactions in which an entity exchanges its equity instruments for goods and services or incurs a liability in exchange for goods and services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. It requires an entity to measure the costs of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award and recognize that cost over the service period. We use the Black-Scholes valuation model to value the equity instruments we issue. The Black-Scholes valuation model uses assumptions of expected volatility, risk-free interest rates, the expected term of options granted, and expected rates of dividends. Management determines these assumptions by reviewing current market rates, making industry comparisons and reviewing conditions relevant to our Company.

The expected volatility and expected term assumptions can significantly impact the fair value of stock options. We believe that the valuation techniques and the approach utilized to develop our assumptions are reasonable in calculating the fair value of the options we grant. We estimate the expected stock price volatility using a combination of implied and historical factors related to our stock price in accordance with applicable accounting standards. As our stock price fluctuates, this estimate will change. For example, a 10% change in the volatility assumption for the 25,200 options granted in 2011 would have resulted in an approximate $117,000 change in fair value. Expected term represents the estimated average time between the option's grant date and its exercise date. A 10% change in the expected term assumption for the 25,200 options granted in 2011 would have resulted in an approximate $20,000 change in fair value. These assumed changes in fair value would have been recognized over the vesting schedule of such awards.

Accounting standards also require the classification of stock compensation expense in the same financial statement line items as cash compensation, and therefore impacts our departmental expenses (and related operating margins), pre-opening costs and construction in progress for our development projects, and our general and administrative expenses (including corporate expenses).

### Self-Insurance Reserves

We are self-insured up to certain limits for costs of employee health coverage (fully insured for employee health coverage beginning January 1, 2012), workers' compensation and general liability claims. Insurance

Table of Contents

claims and reserves include accruals of estimated settlements for known claims, as well as accruals of estimates for claims incurred but not yet reported. In estimating these accruals, we consider historical loss experience and make judgments about the expected level of costs per claim. Management believes the estimates of future liability are reasonable based upon its methodology; however, changes in healthcare costs, accident frequency and severity could materially affect the estimate for these liabilities.

### Customer Loyalty Program

We offer a slot club program whereby customers may earn points based on their level of play that may be redeemed for free credit that must be replayed in the slot machine. We accrue a liability based on the points earned times the redemption value, less an estimate for breakage, and record a related reduction in casino revenue.

### Slot Machine Jackpots

We do not accrue a liability for base jackpots because we have the ability to avoid payment of such as the slot machine can legally be removed from the gaming floor without payment of the base amount. Conversely, when we are unable to avoid payment of the jackpot (i.e., the incremental amount on a progressive machine) due to legal requirements, the jackpot is accrued as the obligation becomes unavoidable. This liability is accrued over the time period in which the incremental progressive jackpot amount is generated with a related reduction in casino revenue.

### Income Taxes

We are subject to income taxes in the United States and other foreign jurisdictions where we operate. Accounting standards require the recognition of deferred tax assets, net of applicable reserves, and liabilities for the estimated future tax consequences attributable to differences between financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. The effect of a change in tax rates on the income tax provision and deferred tax assets and liabilities is recognized in the results of operations in the period that includes the enactment date. Accounting standards require recognition of a future tax benefit to the extent that realization of such benefit is more likely than not. Otherwise, a valuation allowance is applied.

As of December 31, 2011, we have a foreign tax credit carryover of $1,848 million and we have recorded a valuation allowance of $1,777 million against this asset based on our estimate of future realization. The foreign tax credits are attributable to the Macau special gaming tax which is 35% of gross gaming revenue in Macau. The U.S. taxing regime only allows a credit for 35% of "net" foreign source income. Due to our current operating history of U.S. losses, we currently do not rely on forecasted taxable income in order to support the utilization of the foreign tax credits. The estimated future foreign tax credit realization was based upon the estimated future taxable income from the reversal of "net" U.S. taxable temporary differences that we expect will reverse during the 10-year foreign tax credit carryover period. The amount of the valuation allowance is subject to change based upon the actual reversal of temporary differences and future taxable income exclusive of reversing temporary differences.

Our income tax returns are subject to examination by the Internal Revenue Service ("IRS") and other tax authorities in the locations where we operate. We assess potentially unfavorable outcomes of such examinations based on accounting standards for uncertain income taxes. The accounting standards prescribe a minimum recognition threshold a tax position is required to meet before being recognized in the financial statements.

Uncertain tax position accounting standards apply to all tax positions related to income taxes. These accounting standards utilize a two-step approach for evaluating tax positions. Recognition (Step I) occurs when

Table of Contents

the Company concludes that a tax position, based on its technical merits, is more likely than not to be sustained upon examination. Measurement (Step II) is only addressed if the position is deemed to be more likely than not to be sustained. Under Step II, the tax benefit is measured as the largest amount of benefit that is more likely than not to be realized upon settlement. Use of the term "more likely than not" is consistent with how that term is used in accounting for income taxes (i.e., likelihood of occurrence is greater than 50%).

Tax positions failing to qualify for initial recognition are recognized in the first subsequent interim period that they meet the "more likely than not" standard. If it is subsequently determined that a previously recognized tax position no longer meets the "more likely than not" standard, it is required that the tax position is derecognized. Accounting standards for uncertain tax positions specifically prohibit the use of a valuation allowance as a substitute for derecognition of tax positions. As applicable, we recognize accrued penalties and interest related to unrecognized tax benefits in the provision for income taxes. During the year ended December 31, 2011, we recognized interest and penalties of approximately $40,000. During the years ended December 31, 2010 and 2009, we recognized no amounts for interest or penalties.

Effective September 6, 2006, we received a 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits. On November 30, 2010, we received an additional 5-year exemption to December 31, 2015 related to this tax. Accordingly, during 2011 we were exempted from the payment of approximately $82.7 million in such taxes. Wynn Macau's non-gaming profits remain subject to the Macau Complementary Tax and Wynn Macau's casino winnings remain subject to the Macau Special Gaming tax and other levies in accordance with its concession agreement.

## Recently Issued Accounting Standards

In May 2011, the Financial Accounting Standards Board (the "FASB") issued an accounting standards update that is intended to align the principles for fair value measurements and the related disclosure requirements under GAAP and IFRS. From a GAAP perspective, the updates are largely clarifications and certain additional disclosures. The effective date for this update is for years, and the interim periods within those years, beginning after December 15, 2011. This update is not expected to have a material impact on our financial statements.

In June 2011, the FASB issued an accounting standards update that will require items of net income, items of other comprehensive income ("OCI") and total comprehensive income to be presented in one continuous statement or two separate but consecutive statements. This will make the presentation of items within OCI more prominent. Companies will no longer be allowed to present OCI in the statement of stockholders' equity. The effective date for this update is for years, and the interim periods within those years, beginning after December 15, 2011.

**ITEM 7A.      QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Market risk is the risk of loss arising from adverse changes in market rates and prices, such as interest rates, foreign currency exchange rates and commodity prices.

## Interest Rate Risks

One of our primary exposures to market risk is interest rate risk associated with our debt facilities that bear interest based on floating rates. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Financing Activities." We attempt to manage interest rate risk by managing the mix of long-term fixed rate borrowings and variable rate borrowings supplemented by hedging activities as believed by us to be appropriate. We cannot assure you that these risk management strategies have had the desired effect, and interest rate fluctuations could have a negative impact on our results of operations.

The following table provides estimated future cash flow information derived from our best estimates of repayments at December 31, 2011 of our expected long-term indebtedness and related weighted average interest

Table of Contents

rates by expected maturity dates. However, we cannot predict the LIBOR or HIBOR rates that will be in effect in the future. As of December 31, 2011, such rates remain at historic lows. Actual rates will vary. The one-month LIBOR and HIBOR rates at December 31, 2011 of 0.295% and 0.341%, respectively were used for all variable rate calculations in the table below.

The information is presented in U.S. dollar equivalents as applicable.

| | | | Years Ending December 31, Expected Maturity Date | | | | |
|---|---|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015**<br>(in millions) | **2016** | **Thereafter** | **Total** |
| **Long-term debt:** | | | | | | | |
| Fixed rate | $ — | $ — | $ — | $ — | $ — | $2,172.0 | $2,172.0 |
| Average interest rate | — | — | — | — | — | 7.8% | 7.8% |
| Variable rate | $407.9 | $175.5 | $189.4 | $253.2 | $ 1.4 | $ 28.7 | $1,056.1 |
| Average interest rate | 1.92% | 1.69% | 1.87% | 3.29% | 1.55% | 1.55% | 2.19% |

## Interest Rate Swap Information

We have entered into floating-for-fixed interest rate swap arrangements relating to certain of our floating-rate debt facilities. We measure the fair value of our interest rate swaps on a recurring basis. Changes in the fair values of our interest rate swaps for each reporting period recorded are, and will continue to be, recognized as an increase/ (decrease) in swap fair value in our Consolidated Statements of Income, as the swaps do not qualify for hedge accounting.

### Las Vegas Operations

As of December 31, 2011, we have one interest rate swap intended to hedge a portion of the underlying interest rate risk on borrowings under the Wynn Las Vegas Credit Facilities. Under this swap agreement, we pay a fixed interest rate of 2.485% on borrowings of $250 million incurred under the Wynn Las Vegas Credit Facilities in exchange for receipts on the same amount at a variable interest rate based on the applicable LIBOR at the time of payment. This interest rate swap fixes the interest rate on $250 million of borrowings under the Wynn Las Vegas Credit Facilities at approximately 5.485%. This interest rate swap agreement matures in November 2012.

### Macau Operations

As of December 31, 2011, we have one interest rate swap intended to hedge a portion of the underlying interest rate risk on borrowings under the Wynn Macau Credit Facilities. Under this swap agreement we pay a fixed interest rate of 2.15% on borrowings of approximately HK$2.3 billion (approximately U.S.$300 million) incurred under the Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable interest rate based on the applicable HIBOR at the time of payment. This interest rate swap fixes the interest rate on HK$2.3 billion (approximately U.S.$300 million) of borrowings under the Wynn Macau Credit Facilities at approximately 3.4%. This interest rate swap agreement matures in June 2012.

We had two interest rate swap agreements to hedge a portion of the underlying interest rate risk on borrowings under the Wynn Macau Credit Facilities, both of which expired in August 2011. Under the first swap agreement, we paid a fixed interest rate of 3.632% on U.S. dollar borrowings of $153.8 million incurred under the Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable interest rate based on the applicable LIBOR at the time of payment. Under the second swap agreement, we paid a fixed interest rate of 3.39% on Hong Kong dollar borrowings of HK $991.6 million (approximately U.S.$127 million) incurred under the Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable interest rate

60

Table of Contents

based on the applicable HIBOR at the time of payment. Until they expired in August 2011, these interest rate swaps fixed the interest rates on the U.S. dollar and the Hong Kong dollar borrowings under the Wynn Macau Credit Facilities at 4.88% - 5.38% and 4.64%, respectively.

### Summary of Historical Fair Values

The following table presents the historical liability fair values as of December 31, 2011 and 2010, of our interest rate swap arrangements (amounts in thousands):

| Liability fair value at: | Las Vegas Operations | | Macau Operations | | Total Interest Rate Swaps | |
|---|---|---|---|---|---|---|
| December 31, 2011 | $ | 4,628 | $ | 2,670 | $ | 7,298 |
| December 31, 2010 | $ | 8,457 | $ | 12,992 | $ | 21,449 |

The fair value approximates the amount we would pay if these contracts were settled at the respective valuation dates. Fair value is estimated based upon current, and predictions of future, interest rate levels along a yield curve, the remaining duration of the instruments and other market conditions, and therefore, is subject to significant estimation and a high degree of variability of fluctuation between periods. We adjust this amount by applying a non-performance valuation, considering our creditworthiness or the creditworthiness of our counterparties at each settlement date, as applicable.

### Other Interest Rate Swap Information

The following table provides information about our interest rate swaps, by contractual maturity dates, as of December 31, 2011 and using estimated future LIBOR and HIBOR rates based upon implied forward rates in the yield curve. The information is presented in U.S. dollar equivalents, which is our reporting currency:

| | Years Ending December 31, Expected Maturity Date | | | | | | |
| | 2012 | 2013 | 2014 | 2015 | 2016 | Thereafter | Total |
| | | | | (in millions) | | | |
|---|---|---|---|---|---|---|---|
| Average notional amount | $550.0 | $— | $— | $— | $— | $   — | $550.0 |
| Average pay rate | 2.35% | — | — | — | — | — | 2.35% |
| Average receive rate | 0.40% | — | — | — | — | — | 0.40% |

We do not use derivative financial instruments, other financial instruments or derivative commodity instruments for trading or speculative purposes.

### Interest Rate Sensitivity

As of December 31, 2011, approximately 84% of our long-term debt was based on fixed rates, including the notional amounts related to interest rate swaps. Based on our borrowings as of December 31, 2011, an assumed 1% change in variable rates would cause our annual interest cost to change by $5.1 million.

### Foreign Currency Risks

The currency delineated in Wynn Macau's concession agreement with the government of Macau is the Macau pataca. The Macau pataca, which is not a freely convertible currency, is linked to the Hong Kong dollar, and in many cases the two are used interchangeably in Macau. The Hong Kong dollar is linked to the U.S. dollar and the exchange rate between these two currencies has remained relatively stable over the past several years. However, the exchange linkages of the Hong Kong dollar and the Macau pataca, and the Hong Kong dollar and

61

**Table of Contents**

the U.S. dollar, are subject to potential changes due to, among other things, changes in Chinese governmental policies and international economic and political developments.

If the Hong Kong dollar and the Macau pataca are not linked to the U.S. dollar in the future, severe fluctuations in the exchange rate for these currencies may result. We also cannot assure you that the current rate of exchange fixed by the applicable monetary authorities for these currencies will remain at the same level.

Because many of Wynn Macau's payment and expenditure obligations are in Macau patacas, in the event of unfavorable Macau pataca or Hong Kong dollar rate changes, Wynn Macau's obligations, as denominated in U.S. dollars, would increase. In addition, because we expect that most of the revenues for any casino that Wynn Macau operates in Macau will be in Hong Kong dollars, we are subject to foreign exchange risk with respect to the exchange rate between the Hong Kong dollar and the U.S. dollar. Also, if any of our Macau-related entities incur U.S. dollar-denominated debt, fluctuations in the exchange rates of the Macau pataca or the Hong Kong dollar, in relation to the U.S. dollar, could have adverse effects on Wynn Macau's results of operations, financial condition, and ability to service its debt. To date, we have not engaged in hedging activities intended to protect against foreign currency risk.

As of December 31, 2011, in addition to Hong Kong dollars, Wynn Macau also holds other foreign currencies, primarily CNH (offshore renminbi).

62

Table of Contents

ITEM 8.        FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

### INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting | 64 |
| Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements | 65 |
| Consolidated Balance Sheets | 66 |
| Consolidated Statements of Income | 67 |
| Consolidated Statements of Stockholders' Equity | 68 |
| Consolidated Statements of Cash Flows | 69 |
| Notes to Consolidated Financial Statements | 70 |

63

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of Wynn Resorts, Limited and subsidiaries:

We have audited Wynn Resorts, Limited and subsidiaries' (the "Company") internal control over financial reporting as of December 31, 2011, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management Report on Internal Control Over Financial Reporting, included in Item 9A. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the 2011 consolidated financial statements of Wynn Resorts, Limited and subsidiaries and our report dated February 29, 2012 expressed an unqualified opinion thereon.

/s/   Ernst & Young LLP
Las Vegas, Nevada
February 29, 2012

64

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of Wynn Resorts, Limited and subsidiaries:

We have audited the accompanying consolidated balance sheets of Wynn Resorts, Limited and subsidiaries (the "Company") as of December 31, 2011 and 2010, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2011. Our audits also included the financial statement schedules listed in the index at item 15(a)2. These financial statements and schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Wynn Resorts, Limited and subsidiaries at December 31, 2011 and 2010, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2011, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedules referred to above, when considered in relation to the basic financial statements taken as a whole, present fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2011, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 29, 2012 expressed an unqualified opinion thereon.

/s/   Ernst & Young LLP
Las Vegas, Nevada
February 29, 2012

65

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(amounts in thousands, except share data)**

| | December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,262,587 | $ 1,258,499 |
| Investment securities | 122,066 | — |
| Receivables, net | 238,490 | 187,464 |
| Inventories | 72,061 | 86,847 |
| Prepaid expenses and other | 31,248 | 28,326 |
| Total current assets | 1,726,452 | 1,561,136 |
| Property and equipment, net | 4,865,332 | 4,921,259 |
| Investment securities | 91,501 | — |
| Intangibles, net | 35,751 | 40,205 |
| Deferred financing costs | 50,372 | 61,863 |
| Deposits and other assets | 125,712 | 85,802 |
| Investment in unconsolidated affiliates | 4,376 | 4,232 |
| Total assets | $ 6,899,496 | $ 6,674,497 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts and construction payable | $    171,608 | $    168,135 |
| Current portion of long-term debt | 407,934 | 2,675 |
| Current portion of land concession obligation | 13,425 | — |
| Customer deposits | 576,011 | 368,621 |
| Gaming taxes payable | 177,504 | 173,888 |
| Accrued compensation and benefits | 78,717 | 70,834 |
| Accrued interest | 49,989 | 53,999 |
| Other accrued liabilities | 94,642 | 32,476 |
| Construction retention | 4,471 | 12,266 |
| Deferred income taxes, net | 3,575 | 2,974 |
| Income taxes payable | 2,017 | 2,061 |
| Total current liabilities | 1,579,893 | 887,929 |
| Long-term debt | 2,809,785 | 3,264,854 |
| Land concession obligation | 103,854 | — |
| Other long-term liabilities | 128,216 | 64,248 |
| Deferred income taxes, net | 54,294 | 76,881 |
| Total liabilities | 4,676,042 | 4,293,912 |
| Commitments and contingencies (Note 16) | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.01; 40,000,000 shares authorized; zero shares issued and outstanding | — | — |
| Common stock, par value $0.01; 400,000,000 shares authorized; 137,937,088 and 137,404,462 shares issued; 125,080,998 and 124,599,508 shares outstanding | 1,379 | 1,374 |
| Treasury stock, at cost; 12,856,090 and 12,804,954 shares | (1,127,036) | (1,119,407) |
| Additional paid-in capital | 3,177,471 | 3,346,050 |
| Accumulated other comprehensive income | 840 | 889 |
| Retained earnings | 36,368 | 9,042 |
| Total Wynn Resorts, Limited stockholders' equity | 2,089,022 | 2,237,948 |
| Noncontrolling interest | 134,432 | 142,637 |
| Total equity | 2,223,454 | 2,380,585 |
| Total liabilities and stockholders' equity | $ 6,899,496 | $ 6,674,497 |

The accompanying notes are an integral part of these consolidated financial statements.

66

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**(amounts in thousands, except share data)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| Operating revenues: | | | |
| Casino | $ 4,190,507 | $ 3,245,104 | $ 2,206,829 |
| Rooms | 472,074 | 400,291 | 377,520 |
| Food and beverage | 547,735 | 488,108 | 436,361 |
| Entertainment, retail and other | 414,786 | 354,332 | 288,432 |
| Gross revenues | 5,625,102 | 4,487,835 | 3,309,142 |
| Less: promotional allowances | (355,310) | (303,137) | (263,531) |
| Net revenues | 5,269,792 | 4,184,698 | 3,045,611 |
| Operating costs and expenses: | | | |
| Casino | 2,686,372 | 2,100,050 | 1,460,130 |
| Rooms | 125,286 | 122,260 | 111,596 |
| Food and beverage | 283,940 | 272,747 | 252,687 |
| Entertainment, retail and other | 214,435 | 204,558 | 166,636 |
| General and administrative | 389,053 | 391,254 | 365,070 |
| Provision for doubtful accounts | 33,778 | 28,304 | 13,707 |
| Pre-opening costs | — | 9,496 | 1,817 |
| Depreciation and amortization | 398,039 | 405,558 | 410,547 |
| Property charges and other | 130,649 | 25,219 | 28,458 |
| Total operating costs and expenses | 4,261,552 | 3,559,446 | 2,810,648 |
| Operating income | 1,008,240 | 625,252 | 234,963 |
| Other income (expense): | | | |
| Interest income | 7,654 | 2,498 | 1,740 |
| Interest expense, net of amounts capitalized | (229,918) | (222,863) | (211,385) |
| Increase (decrease) in swap fair value | 14,151 | (880) | (2,258) |
| Gain (loss) on extinguishment of debt/exchange offer | — | (67,990) | 18,734 |
| Equity in income from unconsolidated affiliates | 1,472 | 801 | 121 |
| Other | 3,968 | 225 | 191 |
| Other income (expense), net | (202,673) | (288,209) | (192,857) |
| Income before income taxes | 805,567 | 337,043 | 42,106 |
| Benefit (provision) for income taxes | 19,546 | (20,447) | (2,999) |
| Net income | 825,113 | 316,596 | 39,107 |
| Less: Net income attributable to noncontrolling interests | (211,742) | (156,469) | (18,453) |
| Net income attributable to Wynn Resorts, Limited | $ 613,371 | $ 160,127 | $ 20,654 |
| Basic and diluted income per common share: | | | |
| Net income attributable to Wynn Resorts, Limited: | | | |
| Basic | $ 4.94 | $ 1.30 | $ 0.17 |
| Diluted | $ 4.88 | $ 1.29 | $ 0.17 |
| Weighted average common shares outstanding: | | | |
| Basic | 124,039 | 122,787 | 119,840 |
| Diluted | 125,667 | 123,939 | 120,185 |
| Dividends declared per common share | $ 6.50 | $ 8.50 | $ 4.00 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(amounts in thousands, except share data)**

| | Common stock | | Treasury stock | Additional paid-in capital | Accumulated other comprehensive income | Retained earnings (deficit) | Total Wynn Resorts, Ltd stockholders' equity | Noncontrolling interest | Total stockholders' equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares outstanding | Par value | | | | | | | |
| **Balances, January 1, 2009** | 112,013,040 | $1,248 | $(1,119,407) | $2,734,276 | $ 2,614 | $ (17,136) | $ 1,601,595 | $ — | $ 1,601,595 |
| Net income | — | — | — | — | — | 20,654 | 20,654 | 18,453 | 39,107 |
| Currency translation adjustment | — | — | — | — | 876 | — | 876 | (106) | 770 |
| Comprehensive income | | | | | | | 21,530 | 18,347 | 39,877 |
| Exercise of stock options | 244,916 | 3 | — | 6,344 | — | — | 6,347 | — | 6,347 |
| Cancellation of restricted stock | (4,500) | — | — | — | — | — | — | — | — |
| Forfeited cash dividends upon cancellation of nonvested stock | — | — | — | — | — | 55 | 55 | — | 55 |
| Issuance of common stock, net | 11,040,000 | 110 | — | 202,035 | — | — | 202,145 | — | 202,145 |
| Sale of Wynn Macau, Ltd common stock, net | — | — | — | 1,623,228 | (1,044) | — | 1,622,184 | 107,358 | 1,729,542 |
| Cash dividends | — | — | — | (400,000) | — | (93,132) | (493,132) | — | (493,132) |
| Excess tax benefits from stock-based compensation | — | — | — | 49,013 | — | — | 49,013 | — | 49,013 |
| Stock-based compensation | — | — | — | 24,601 | — | — | 24,601 | 320 | 24,921 |
| **Balances, December 31, 2009** | 123,293,456 | 1,361 | (1,119,407) | 4,239,497 | 2,446 | (89,559) | 3,034,338 | 126,025 | 3,160,363 |
| Net income | — | — | — | — | — | 160,127 | 160,127 | 156,469 | 316,596 |
| Currency translation adjustment | — | — | — | — | (1,557) | — | (1,557) | (597) | (2,154) |
| Comprehensive income | | | | | | | 158,570 | 155,872 | 314,442 |
| Exercise of stock options | 1,308,052 | 13 | — | 66,173 | — | — | 66,186 | — | 66,186 |
| Issuance of restricted stock | 50,000 | 1 | — | — | — | — | 1 | — | 1 |
| Cancellation of restricted stock | (52,000) | (1) | — | — | — | — | (1) | — | (1) |
| Forfeited cash dividends upon cancellation of nonvested stock | — | — | — | — | — | 252 | 252 | — | 252 |
| Cash dividends | — | — | — | (996,473) | — | (61,778) | (1,058,251) | (140,672) | (1,198,923) |
| Excess tax benefits from stock-based compensation | — | — | — | 10,480 | — | — | 10,480 | — | 10,480 |
| Stock-based compensation | — | — | — | 26,373 | — | — | 26,373 | 1,412 | 27,785 |
| **Balances, December 31, 2010** | 124,599,508 | 1,374 | (1,119,407) | 3,346,050 | 889 | 9,042 | 2,237,948 | 142,637 | 2,380,585 |
| Net income | — | — | — | — | — | 613,371 | 613,371 | 211,742 | 825,113 |
| Currency translation adjustment | — | — | — | — | 1,520 | — | 1,520 | 582 | 2,102 |
| Net unrealized loss on investments | — | — | — | — | (1,569) | — | (1,569) | (501) | (2,070) |
| Comprehensive income | | | | | | | 613,322 | 211,823 | 825,145 |
| Exercise of stock options | 431,126 | 4 | — | 23,836 | — | — | 23,840 | 19 | 23,859 |
| Purchase of Treasury stock | (51,136) | — | (7,629) | — | — | — | (7,629) | — | (7,629) |
| Issuance of restricted stock | 101,500 | 1 | — | (1) | — | — | — | — | — |
| Cash dividends | — | — | — | (226,755) | — | (586,045) | (812,800) | (221,649) | (1,034,449) |
| Excess tax benefits from stock-based compensation | — | — | — | 11,176 | — | — | 11,176 | — | 11,176 |
| Stock-based compensation | — | — | — | 23,165 | — | — | 23,165 | 1,602 | 24,767 |
| **Balances, December 31, 2011** | 125,080,998 | $1,379 | $(1,127,036) | $3,177,471 | $ 840 | $ 36,368 | $ 2,089,922 | $ 134,432 | $ 2,223,454 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(amounts in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| Cash flows from operating activities: | | | |
| Net income | $ 825,113 | $ 316,596 | $ 39,107 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 398,039 | 405,558 | 410,547 |
| Deferred income taxes | (10,822) | 18,875 | (656) |
| Stock-based compensation | 23,881 | 27,168 | 24,336 |
| Excess tax benefits from stock-based compensation | (11,052) | (9,833) | (44,909) |
| Amortization and write-offs of deferred financing costs and other | 19,683 | 24,342 | 26,160 |
| Loss (gain) on extinguishment of debt/exchange offer | — | 62,608 | (18,734) |
| Provision for doubtful accounts | 33,778 | 28,304 | 13,707 |
| Property charges and other | 104,223 | 10,270 | 28,458 |
| Equity in income of unconsolidated affiliates, net of distributions | (144) | (130) | 594 |
| (Increase) decrease in swap fair value | (14,151) | 880 | 2,258 |
| Increase (decrease) in cash from changes in: | | | |
| Receivables, net | (84,653) | (63,073) | (41,416) |
| Inventories and prepaid expenses and other | 11,168 | 22,169 | 3,265 |
| Accounts payable and accrued liabilities | 220,772 | 213,578 | 151,239 |
| Net cash provided by operating activities | 1,515,835 | 1,057,312 | 593,956 |
| Cash flows used in investing activities: | | | |
| Capital expenditures, net of construction payables and retention | (184,146) | (283,828) | (540,929) |
| Purchase of investment securities | (316,533) | — | — |
| Proceeds from sales or maturities of investment securities | 101,017 | — | — |
| Deposits and purchase of other assets | (60,135) | (13,034) | (11,258) |
| Proceeds from sale of equipment | 697 | 739 | 1,107 |
| Net cash used in investing activities | (459,100) | (296,123) | (551,080) |
| Cash flows from financing activities: | | | |
| Proceeds from exercise of stock options | 23,859 | 66,186 | 6,347 |
| Excess tax benefits from stock-based compensation | 11,052 | 9,833 | 44,909 |
| Proceeds from issuance of common stock | — | — | 202,145 |
| Proceeds from Wynn Macau, Ltd IPO | — | — | 1,869,653 |
| Dividends paid | (1,033,447) | (1,192,138) | (489,876) |
| Proceeds from issuance of long-term debt | 150,483 | 2,246,361 | 1,151,781 |
| Principal payments on long-term debt | (201,901) | (2,551,561) | (1,799,040) |
| Repurchase of Wynn Las Vegas First Mortgage Notes | — | — | (50,048) |
| Purchase of treasury stock | (7,629) | — | — |
| Interest rate swap transactions | — | — | (9,561) |
| Payments on long-term land concession obligation | — | — | (6,065) |
| Payment of financing costs | (58) | (71,317) | (104,730) |
| Net cash provided by (used in) financing activities | (1,057,641) | (1,492,636) | 815,515 |
| Effect of exchange rate on cash | 4,994 | (1,884) | (465) |
| Cash and cash equivalents: | | | |
| Increase (decrease) in cash and cash equivalents | 4,088 | (733,331) | 857,926 |
| Balance, beginning of year | 1,258,499 | 1,991,830 | 1,133,904 |
| Balance, end of year | $ 1,262,587 | $ 1,258,499 | $ 1,991,830 |
| Supplemental cash flow disclosures: | | | |
| Cash paid for interest, net of amounts capitalized | $ 221,123 | $ 171,663 | $ 209,093 |
| Change in property and equipment included in accounts and construction payables | 13,794 | (27,670) | (181,366) |
| Cash paid for income taxes | 2,088 | 1,019 | 2,894 |
| Increase in liability for cash distributions declared on nonvested stock | 1,003 | 6,703 | 3,556 |

The accompanying notes are an integral part of these consolidated financial statements.

69

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Organization**

Wynn Resorts, Limited, a Nevada corporation (together with its subsidiaries, "Wynn Resorts" or the "Company"), was formed in June 2002 and completed an initial public offering of its common stock on October 25, 2002.

In June 2002, the Company's indirect subsidiary, Wynn Resorts (Macau), S.A. ("Wynn Macau, S.A."), entered into an agreement with the government of the Macau Special Administrative Region of the People's Republic of China ("Macau"), granting Wynn Macau, S.A. the right to construct and operate one or more casino gaming properties in Macau. Wynn Macau, S.A.'s first casino resort in Macau is hereinafter referred to as "Wynn Macau".

The Company currently owns and operates casino hotel resort properties in Las Vegas, Nevada and Macau. In Las Vegas, Nevada, the Company owns Wynn Las Vegas, which opened on April 28, 2005 and was expanded with the opening of Encore at Wynn Las Vegas on December 22, 2008 (together, "Wynn Las Vegas" or the "Las Vegas Operations"). In Macau, the Company owns Wynn Macau, which opened on September 6, 2006 and was expanded with the opening of Encore at Wynn Macau on April 21, 2010 (together, "Wynn Macau" or the "Macau Operations").

In October 2009, Wynn Macau, Limited, an indirect wholly-owned subsidiary of the Company, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Through an initial public offering, including the over allotment, Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of this subsidiary's common stock.

**2. Summary of Significant Accounting Policies**

*Principles of Consolidation*

The accompanying consolidated financial statements include the accounts of the Company and its majority-owned subsidiaries. Investments in the 50%-owned joint ventures operating the Ferrari and Maserati automobile dealership and the Brioni mens' retail clothing store inside Wynn Las Vegas are accounted for under the equity method. All significant intercompany accounts and transactions have been eliminated. Certain amounts in the consolidated financial statements for the previous years have been reclassified to be consistent with the current year presentation. These reclassifications had no effect on the previously reported net income.

*Use of Estimates*

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Cash and Cash Equivalents*

Cash and cash equivalents are comprised of highly liquid investments with original maturities of three months or less and include both U.S. dollar-denominated and foreign currency-denominated securities. Cash equivalents are carried at cost, which approximates fair value. Cash equivalents of $545 million and $663.9 million at December 31, 2011 and 2010, respectively, were invested in bank time deposits, money market funds, U.S. treasuries and commercial paper.

70

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Investment Securities*

Investment securities consist of short-term and long-term investments in domestic and foreign corporate debt securities and commercial paper. The Company's investment policy requires investments to be investment grade and limits the amount of exposure to any one issuer with the objective of minimizing the potential risk of principal loss. Management determines the appropriate classification (held-to-maturity/available-for-sale) of its securities at the time of purchase and reevaluates such designation as of each balance sheet date. The Company's investments are reported at fair value, with unrealized gains and losses, net of tax, reported in other comprehensive income. Adjustments are made for amortization of premiums and accretion of discounts to maturity computed under the effective interest method. Such amortization is included in interest income together with realized gains and losses and the stated interest on such securities.

*Accounts Receivable and Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of casino accounts receivable. The Company issues credit in the form of "markers" to approved casino customers following investigations of creditworthiness. At December 31, 2011 and 2010, approximately 85% and 82%, respectively, of the Company's markers were due from customers residing outside the United States, primarily in Asia. Business or economic conditions or other significant events in these countries could affect the collectability of such receivables.

Accounts receivable, including casino and hotel receivables, are typically non-interest bearing and are initially recorded at cost. Accounts are written off when management deems them to be uncollectible. Recoveries of accounts previously written off are recorded when received. An estimated allowance for doubtful accounts is maintained to reduce the Company's receivables to their carrying amount, which approximates fair value. The allowance is estimated based on specific review of customer accounts as well as management's experience with collection trends in the casino industry and current economic and business conditions.

*Inventories*

Inventories consist of retail merchandise, food and beverage items which are stated at the lower of cost or market value and certain operating supplies. Cost is determined by the first-in, first-out, average and specific identification methods.

*Property and Equipment*

Purchases of property and equipment are stated at cost. Depreciation is provided over the estimated useful lives of the assets using the straight-line method as follows:

| | |
|---|---|
| Buildings and improvements | 10 to 45 years |
| Land improvements | 10 to 45 years |
| Leasehold interest in land | 25 years |
| Airplanes | 7 to 20 years |
| Furniture, fixtures and equipment | 3 to 20 years |

Costs related to improvements are capitalized, while costs of repairs and maintenance are charged to expense as incurred. The cost and accumulated depreciation of property and equipment retired or otherwise disposed of are eliminated from the respective accounts and any resulting gain or loss is included in operations.

71

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Capitalized Interest*

The interest cost associated with major development and construction projects is capitalized and included in the cost of the project. Interest capitalization ceases once a project is substantially complete or no longer undergoing construction activities to prepare it for its intended use. When no debt is specifically identified as being incurred in connection with a construction project, the Company capitalizes interest on amounts expended on the project at the Company's weighted average cost of borrowed money. Interest of $0, $7.2 million and $10.7 million was capitalized for the years ended December 31, 2011, 2010 and 2009, respectively.

*Intangibles*

The Company's indefinite-lived intangible assets consist primarily of water rights acquired as part of the original purchase price of the property on which Wynn Las Vegas is located, and trademarks. Indefinite-lived intangible assets are not amortized, but are reviewed for impairment annually. The Company's finite-lived intangible assets consist of a Macau gaming concession and show production rights. Finite-lived intangible assets are amortized over the shorter of their contractual terms or estimated useful lives.

*Long-Lived Assets*

Long-lived assets, which are to be held and used, including intangibles and property and equipment, are periodically reviewed by management for impairment whenever events or changes in circumstances indicate that the carrying value of the asset may not be recoverable. If an indicator of impairment exists, the Company compares the estimated future cash flows of the asset, on an undiscounted basis, to the carrying value of the asset. If the undiscounted cash flows exceed the carrying value, no impairment is indicated. If the undiscounted cash flows do not exceed the carrying value, then impairment is measured as the difference between fair value and carrying value, with fair value typically based on a discounted cash flow model. If an asset is still under development, future cash flows include remaining construction costs.

*Deferred Financing Costs*

Direct and incremental costs incurred in obtaining loans or in connection with the issuance of long-term debt are capitalized and amortized to interest expense over the terms of the related debt agreements. Approximately $11.6 million, $13.2 million and $15.4 million were amortized to interest expense during the years ended December 31, 2011, 2010 and 2009, respectively. Debt discounts incurred in connection with the issuance of debt have been capitalized and are being amortized to interest expense using the effective interest method.

*Derivative Financial Instruments*

The Company seeks to manage its market risk, including interest rate risk associated with variable rate borrowings, through balancing fixed-rate and variable-rate borrowings with the use of derivative financial instruments. The fair value of derivative financial instruments are recognized as assets or liabilities at each balance sheet date, with changes in fair value affecting net income as the Company's current interest rate swaps do not qualify for hedge accounting. Accordingly, changes in the fair value of the interest rate swaps are presented as an increase (decrease) in swap fair value in the accompanying Consolidated Statements of Income. The differentials paid or received on interest rate swap agreements are recognized as adjustments to interest expense.

72

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Revenue Recognition and Promotional Allowances*

The Company recognizes revenues at the time persuasive evidence of an arrangement exists, the service is provided or the retail goods are sold, prices are fixed or determinable and collection is reasonably assured.

Casino revenues are measured by the aggregate net difference between gaming wins and losses, with liabilities recognized for funds deposited by customers before gaming play occurs and for chips in the customers' possession. Cash discounts, other cash incentives related to casino play and commissions rebated through junkets to customers are recorded as a reduction to casino revenue. Hotel, food and beverage, entertainment and other operating revenues are recognized when services are performed. Entertainment, retail and other revenue includes rental income which is recognized on a time proportion basis over the lease term. Contingent rental income is recognized when the right to receive such rental income is established according to the lease agreements. Advance deposits on rooms and advance ticket sales are recorded as customer deposits until services are provided to the customer.

Revenues are recognized net of certain sales incentives which are required to be recorded as a reduction of revenue; consequently, the Company's casino revenues are reduced by discounts, commissions and points earned in the player's club loyalty program.

The retail value of accommodations, food and beverage, and other services furnished to guests without charge is included in gross revenues. Such amounts are then deducted as promotional allowances. The estimated cost of providing such promotional allowances is primarily included in casino expenses as follows (amounts in thousands):

|  | Years Ended December 31, | | |
|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| Rooms | $ 52,019 | $ 52,017 | $ 53,325 |
| Food and beverage | 104,413 | 94,220 | 86,798 |
| Entertainment, retail and other | 17,017 | 21,091 | 12,787 |
|  | $ 173,449 | $ 167,328 | $ 152,910 |

*Self-Insurance Reserves*

The Company is self-insured up to certain limits for costs of employee health coverage (fully insured for employee health coverage beginning January 1, 2012), workers' compensation and general liability claims. Insurance claims and reserves include accruals of estimated settlements for known claims, as well as accruals of estimates for claims incurred but not yet reported. In estimating these accruals, the Company considers historical loss experience and makes judgments about the expected level of costs per claim. Management believes the estimates of future liability are reasonable based upon its methodology; however, changes in health care costs, accident frequency and severity could materially affect the estimate for these liabilities.

*Customer Loyalty Program*

The Company offers a slot club program whereby customers may earn points based on their level of play that may be redeemed for free credit that must be replayed in the slot machine. The Company accrues a liability based on the points earned times the redemption value, less an estimate for breakage, and records a related reduction in casino revenue.

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Slot Machine Jackpots*

The Company does not accrue a liability for base jackpots because it has the ability to avoid such payment as slot machines can legally be removed from the gaming floor without payment of the base amount. When the Company is unable to avoid payment of the jackpot (i.e., the incremental amount on a progressive slot machine) due to legal requirements, the jackpot is accrued as the obligation becomes unavoidable. This liability is accrued over the time period in which the incremental progressive jackpot amount is generated with a related reduction in casino revenue.

*Gaming taxes*

The Company is subject to taxes based on gross gaming revenue in the jurisdictions in which it operates, subject to applicable jurisdictional adjustments. These gaming taxes are an assessment on the Company's gaming revenue and are recorded as an expense within the "Casino" line item in the accompanying Consolidated Statements of Income. These taxes totaled $1.9 billion, $1.4 billion and $892.2 million for the years ended December 31, 2011, 2010 and 2009, respectively.

*Advertising Costs*

The Company expenses advertising costs the first time the advertising takes place. Advertising costs incurred in development periods are included in pre-opening costs. Once a project is completed, advertising costs are included in general and administrative expenses. Total advertising costs were $19.5 million, $19 million and $20.4 million for the years ended December 31, 2011, 2010 and 2009, respectively.

*Pre-Opening Costs*

Pre-opening costs consists primarily of direct salaries and wages, legal and consulting fees, insurance, utilities and advertising, and are expensed as incurred. During the year ended December 31, 2010, the Company incurred pre-opening costs in connection with the Encore Beach Club and Surrender Nightclub which opened in May 2010, and Encore at Wynn Macau prior to its opening in April 2010.

*Income Taxes*

The Company is subject to income taxes in the United States and other foreign jurisdictions where it operates. Accounting standards require the recognition of deferred tax assets, net of applicable reserves, and liabilities for the estimated future tax consequences attributable to differences between financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. The effect of a change in tax rates on the income tax provision and deferred tax assets and liabilities is recognized in the results of operations in the period that includes the enactment date. Accounting standards also require recognition of a future tax benefit to the extent that realization of such benefit is more likely than not. Otherwise, a valuation allowance is applied.

The Company's income tax returns are subject to examination by the Internal Revenue Service ("IRS") and other tax authorities in the locations where it operates. The Company assesses potentially unfavorable outcomes of such examinations based on accounting standards for uncertain income taxes. The accounting standards prescribe a minimum recognition threshold a tax position is required to meet before being recognized in the financial statements.

74

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Uncertain tax position accounting standards apply to all tax positions related to income taxes. These accounting standards utilize a two-step approach for evaluating tax positions. Recognition (Step I) occurs when the Company concludes that a tax position, based on its technical merits, is more likely than not to be sustained upon examination. Measurement (Step II) is only addressed if the position is deemed to be more likely than not to be sustained. Under Step II, the tax benefit is measured as the largest amount of benefit that is more likely than not to be realized upon settlement. Use of the term "more likely than not" is consistent with how that term is used in accounting for income taxes (i.e., likelihood of occurrence is greater than 50%).

Tax positions failing to qualify for initial recognition are recognized in the first subsequent interim period that they meet the "more likely than not" standard. If it is subsequently determined that a previously recognized tax position no longer meets the "more likely than not" standard, it is required that the tax position is derecognized. Accounting standards for uncertain tax positions specifically prohibit the use of a valuation allowance as a substitute for derecognition of tax positions. As applicable, the Company will recognize accrued penalties and interest related to unrecognized tax benefits in the provision for income taxes.

*Currency Translation*

Gains or losses from foreign currency remeasurements are included in other income/expense in the accompanying Consolidated Statements of Income. The results of operations and the balance sheet of Wynn Macau, Limited and its subsidiaries are translated from Macau Patacas to U.S. dollars. Balance sheet accounts are translated at the exchange rate in effect at each year-end. Income statement accounts are translated at the average rate of exchange prevailing during the year. Translation adjustments resulting from this process are charged or credited to other comprehensive income.

*Comprehensive Income*

Comprehensive income includes net income and all other non-stockholder changes in equity, or other comprehensive income. Components of the Company's comprehensive income are reported in the accompanying Consolidated Statements of Stockholders' Equity. The cumulative balance of other comprehensive income consists solely of currency translation adjustments and unrealized gain (loss) on available-for-sale securities.

*Fair Value Measurements*

The Company measures certain of its financial assets and liabilities, such as cash equivalents, available-for-sale securities and interest rate swaps, at fair value on a recurring basis pursuant to accounting standards for fair value measurements. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. These accounting standards establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

75

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table presents assets and liabilities carried at fair value (amounts in thousands):

| | Total Carrying Value | Fair Value Measurements Using: | | |
|---|---|---|---|---|
| | | Quoted Market Prices in Active Markets (Level 1) | Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
| **As of December 31, 2011** | | | | |
| Cash equivalents | $545,045 | $363,104 | $181,941 | — |
| Interest rate swaps | $ 7,298 | — | $ 7,298 | — |
| Available-for-sale securities | $213,567 | — | $213,567 | — |
| **As of December 31, 2010** | | | | |
| Cash equivalents | $663,948 | $480,918 | $183,030 | — |
| Interest rate swaps | $ 21,449 | — | $ 21,449 | — |

*Earnings Per Share*

Basic earnings per share ("EPS") is computed by dividing net income attributable to Wynn Resorts by the weighted average number of shares outstanding during the year. Diluted EPS reflects the addition of potentially dilutive securities which for the Company include: stock options and nonvested stock.

The weighted average number of common and common equivalent shares used in the calculation of basic and diluted EPS for the years ended December 31, 2011, 2010 and 2009, consisted of the following (amounts in thousands):

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| Weighted average common shares outstanding (used in calculation of basic earnings per share) | 124,039 | 122,787 | 119,840 |
| Potential dilution from the assumed exercise of stock options and nonvested stock | 1,628 | 1,152 | 345 |
| Weighted average common and common equivalent shares outstanding (used in calculation of diluted earnings per share) | 125,667 | 123,939 | 120,185 |
| Anti-dilutive stock options excluded from the calculation of diluted earnings per share | 610 | 1,078 | 4,900 |

*Stock-Based Compensation*

Accounting standards require the Company to measure the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award and recognize that cost over the service period. The Company uses the Black-Scholes valuation model to determine the estimated fair value for each option grant issued. The Black-Scholes determined fair value net of estimated forfeitures is amortized as compensation cost on a straight line basis over the service period.

Further information on the Company's stock-based compensation arrangements is included in Note 14 Benefit Plans—Stock-Based Compensation.

76

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Recently Issued Accounting Standards*

In May 2011, the Financial Accounting Standards Board (the "FASB") issued an accounting standards update that is intended to align the principles for fair value measurements and the related disclosure requirements under GAAP and IFRS. From a GAAP perspective, the updates are largely clarifications and certain additional disclosures. The effective date for this update is for years, and the interim periods within those years, beginning after December 15, 2011. This update is not expected to have a material impact on the Company's financial statements.

In June 2011, the FASB issued an accounting standards update that will require items of net income, items of other comprehensive income ("OCI") and total comprehensive income to be presented in one continuous statement or two separate but consecutive statements. This will make the presentation of items within OCI more prominent. Companies will no longer be allowed to present OCI in the statement of stockholders' equity. The effective date for this update is for years, and the interim periods within those years, beginning after December 15, 2011.

**3. Investment Securities**

Investment securities consisted of the following (amounts in thousands):

| | | Available-for-sale securities | | |
|---|---|---|---|---|
| | Amortized cost | Gross unrealized gains | Gross unrealized losses | Fair value (net carrying amount) |
| **December 31, 2011** | | | | |
| Domestic and foreign | | | | |
| corporate bonds | $ 196,986 | $ 20 | $ (2,070) | $194,936 |
| Commercial paper | 18,651 | 1 | (21) | 18,631 |
| | $ 215,637 | $ 21 | $ (2,091) | $213,567 |

For investments with unrealized losses as of December 31, 2011, the Company has determined that (i) it does not have the intent to sell any of these investments, and (ii) it is not likely that the Company will be required to sell these investments prior to the recovery of the amortized cost. Accordingly, the Company has determined that no other-than-temporary impairments exist at the reporting date. All of the investments in a continuous loss position have been so for less than 12 months.

The Company obtains pricing information in determining the fair value of its available-for-sale securities from independent pricing vendors. Based on management's inquiries, the pricing vendors use various pricing models consistent with what other market participants would use. The assumptions and inputs used by the pricing vendors are derived from market observable sources including: reported trades, broker/dealer quotes, issuer spreads, benchmark curves, bids, offers and other market-related data. The Company has not made adjustments to such prices. Each quarter, the Company validates the fair value pricing methodology to determine the fair value consistent with applicable accounting guidance and to confirm that the securities are classified properly in the fair value hierarchy. The Company compares the pricing received from its vendors to independent sources for the same or similar securities.

77

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The amortized cost and estimated fair value of these investment securities at December 31, 2011, by contractual maturity are shown below (amounts in thousands):

| | Amortized Cost | Fair value |
|---|---|---|
| **Available-for-sale securities** | | |
| Due in one year or less | $ 122,451 | $ 122,066 |
| Due after one year through three years | 93,186 | 91,501 |
| | $ 215,637 | $ 213,567 |

**4. Receivables, net**

Receivables, net consisted of the following (amounts in thousands):

| | As of December 31, | |
|---|---|---|
| | 2011 | 2010 |
| Casino | $ 301,658 | $ 256,807 |
| Hotel | 20,790 | 15,900 |
| Retail leases and other | 45,520 | 28,848 |
| | 367,968 | 301,555 |
| Less: allowance for doubtful accounts | (129,478) | (114,091) |
| | $ 238,490 | $ 187,464 |

**5. Property and Equipment, net**

Property and equipment, net consisted of the following (amounts in thousands):

| | As of December 31, | |
|---|---|---|
| | 2011 | 2010 |
| Land and improvements | $ 730,335 | $ 731,810 |
| Buildings and improvements | 3,777,612 | 3,735,633 |
| Airplanes | 77,436 | 77,421 |
| Furniture, fixtures and equipment | 1,655,655 | 1,647,424 |
| Leasehold interest in land | 316,437 | 85,545 |
| Construction in progress | 28,477 | 22,901 |
| | 6,585,952 | 6,300,734 |
| Less: accumulated depreciation | (1,720,620) | (1,379,475) |
| | $ 4,865,332 | $ 4,921,259 |

Depreciation expense for the years ended December 31, 2011, 2010 and 2009, was $389.8 million, $394.9 million and $395.2 million, respectively.

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**6. Intangibles, net**

Intangibles, net consisted of the following (amounts in thousands):

| | Macau Gaming Concession | Show Production Rights | Water Rights | Trademarks | Total Intangibles, Net |
|---|---|---|---|---|---|
| **January 1, 2010** | $ 29,784 | $ 7,076 | $6,400 | $ 1,399 | $ 44,659 |
| Amortization | (2,383) | (2,071) | — | — | (4,454) |
| **December 31, 2010** | 27,401 | 5,005 | 6,400 | 1,399 | 40,205 |
| Amortization | (2,383) | (2,071) | — | — | (4,454) |
| **December 31, 2011** | $ 25,018 | $ 2,934 | $6,400 | $ 1,399 | $ 35,751 |

The Macau gaming concession intangible is being amortized over the 20-year life of the concession. The Company expects that amortization of the Macau gaming concession will be $2.4 million each year from 2012 through 2021, and $1 million in 2022.

Show production rights represent amounts paid to purchase the rights to the "Le Rêve" production show, which is performed at Wynn Las Vegas. The Company expects that amortization of show production rights will be $2.1 million for 2012 and $0.8 million for 2013.

Water rights reflect the fair value allocation determined in the purchase of the property on which Wynn Las Vegas is located in April 2000. The value of the trademarks primarily represents the costs to acquire the "Le Rêve" name. The water rights and trademarks are indefinite-lived assets and, accordingly, not amortized.

**7. Deposits and Other Assets**

Deposits and other assets consisted of the following (amounts in thousands):

| | As of December 31, | |
|---|---|---|
| | **2011** | **2010** |
| Deposits and other | $ 100,399 | $ 52,664 |
| Base stock | 23,117 | 26,289 |
| Entertainment production costs | 2,196 | 6,849 |
| | $ 125,712 | $ 85,802 |

*Aircraft Deposits*

As of December 31, 2011, the Company has made deposits of $48 million toward the purchase of an aircraft, with additional payments to be made totaling $9.3 million. The delivery date for this aircraft is scheduled for June 2012.

79

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**8. Long-Term Debt**

Long-term debt consisted of the following (amounts in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| 7 7/8% Wynn Las Vegas First Mortgage Notes, due November 1, 2017, net of original issue discount of $8,578 at December 31, 2011 and $9,679 at December 31, 2010 | $   491,422 | $   490,321 |
| 7 7/8% Wynn Las Vegas First Mortgage Notes, due May 1, 2020, net of original issue discount of $ 1,789 at December 31, 2011 and $1,933 at December 31, 2010 | 350,221 | 350,077 |
| 7 3/4% Wynn Las Vegas First Mortgage Notes, due August 15, 2020 | 1,320,000 | 1,320,000 |
| Wynn Las Vegas Revolving Credit Facility, due July 15, 2013; interest at LIBOR plus 3% | — | 3,868 |
| Wynn Las Vegas Revolving Credit Facility, due July 15, 2015; interest at LIBOR plus 3% | — | 16,187 |
| Wynn Las Vegas Term Loan Facility, due August 15, 2013; interest at LIBOR plus 1.875% | 40,262 | 44,281 |
| Wynn Las Vegas Term Loan Facility, due August 17, 2015; interest at LIBOR plus 3% | 330,605 | 330,605 |
| Wynn Macau Senior Term Loan Facilities (as amended June 2007), due June 27, 2014; interest at LIBOR or HIBOR plus 1.25%—1.75% at December 31, 2011 and 1.25%—1.75% at December 31, 2010 | 477,251 | 550,900 |
| Wynn Macau Senior Revolving Credit Facility, due June 27, 2012; interest at LIBOR or HIBOR plus 1.25% at December 31, 2011 and 1.25% at December 31, 2010 | 150,400 | 100,165 |
| $42 million Note Payable, due April 1, 2017; interest at LIBOR plus 1.25% | 35,350 | 36,750 |
| $32.5 million Note Payable, due August 10, 2012; interest at LIBOR plus 1.15% | 22,208 | 24,375 |
| | 3,217,719 | 3,267,529 |
| Current portion of long-term debt | (407,934) | (2,675) |
| | $ 2,809,785 | $ 3,264,854 |

*7 7/8% Wynn Las Vegas First Mortgage Notes due 2017*

In October 2009, Wynn Las Vegas, LLC and Wynn Las Vegas Capital Corp. (together, the "Issuers") issued, in a private offering, $500 million aggregate principal amount of 7 7/8% first mortgage notes due November 1, 2017 (the "2017 Notes") at a price of 97.823% of the principal amount. Interest is due on the 2017 Notes on May 1st and November 1st of each year. Commencing November 1, 2013, the 2017 Notes are redeemable at the Issuer's option at a price equal to 103.938% of the principal amount redeemed and the premium over the principal amount declines ratably on November 1st of each year thereafter to zero on or after November 1, 2015. The 2017 Notes are senior secured obligations of the Issuers, guaranteed by certain of Wynn Las Vegas, LLC's subsidiaries and secured by a first priority lien on substantially all of the existing and future assets of the Issuers and guarantors, and a first priority lien on the equity interests of Wynn Las Vegas, LLC, all of which is the same collateral that secures borrowings under Wynn Las Vegas, LLC's credit facilities. The indenture governing the 2017 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restriction affecting subsidiaries.

80

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*7 7/8% Wynn Las Vegas First Mortgage Notes due 2020*

In April 2010, the, the Issuers issued, in a private offering, $352 million aggregate principal amount of 7 7/8% first mortgage notes due May 1, 2020 (the "2020 Notes"). The 2020 Notes were issued pursuant to an exchange offer for previously issued notes that were to mature in December 2014. Interest is due on the 2020 Notes on May 1st and November 1st of each year. Commencing May 1, 2015, the 2020 Notes are redeemable at the Issuer's option at a price equal to 103.938% of the principal amount redeemed and the premium over the principal amount declines ratably on May 1st of each year thereafter to zero on or after May 1, 2018. The 2020 Notes rank pari passu in right of payment with borrowings under Wynn Las Vegas, LLC's credit facilities and 2017 Notes. The 2020 Notes are senior secured obligations of the Issuers, guaranteed by certain of Wynn Las Vegas, LLC's subsidiaries and secured by a first priority lien on substantially all of the existing and future assets of the Issuers and guarantors, and a first priority lien on the equity interests of Wynn Las Vegas, LLC, all of which is the same collateral that secures borrowings under Wynn Las Vegas, LLC's credit facilities and the 2017 Notes. The indenture governing the 2020 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restriction affecting subsidiaries.

*7 3/4% Wynn Las Vegas First Mortgage Notes*

In August 2010, the Issuers issued $1.32 billion aggregate principal amount of 7 3/4% first mortgage notes due August 15, 2020 (the "New 2020 Notes"). The New 2020 Notes were issued at par. The New 2020 Notes refinanced a previous note issue that was to mature in December 2014. Interest is due on the New 2020 Notes on February 15th and August 15th of each year. Commencing August 15, 2015, the New 2020 Notes are redeemable at the Issuer's option at a price equal to 103.875% of the principal amount redeemed and the premium over the principal amount declines ratably on August 15th of each year thereafter to zero on or after August 15, 2018. The New 2020 Notes rank pari passu in right of payment with borrowings under Wynn Las Vegas, LLC's credit facilities, the 2017 Notes and the 2020 Notes. The New 2020 Notes are senior secured obligations of the Issuers, guaranteed by certain of Wynn Las Vegas, LLC's subsidiaries and secured on an equal and ratable basis (with certain exceptions) by a first priority lien on substantially all of the existing and future assets of the Issuers and guarantors, and a first priority lien on the equity interests of Wynn Las Vegas, LLC, all of which is the same collateral that secures borrowings under Wynn Las Vegas, LLC's credit facilities, the 2017 Notes and the 2020 Notes. The indenture governing the New 2020 Notes contains customary negative covenants and financial covenants, including, but not limited to, covenants that restrict Wynn Las Vegas, LLC's ability to: pay dividends or distributions or repurchase equity; incur additional debt; make investments; create liens on assets to secure debt; enter into transactions with affiliates; enter into sale-leaseback transactions; merge or consolidate with another company; transfer and sell assets or create dividend and other payment restriction affecting subsidiaries.

*Wynn Las Vegas Credit Facilities*

As of December 31, 2011, the Wynn Las Vegas Amended and Restated Credit Agreement (the "Credit Agreement") consisted of a $108.5 million revolving credit facility due July 2013, a $258.4 million revolving credit facility due July 2015 (together the "Wynn Las Vegas Revolver"), a fully drawn $40.3 million term loan facility due August 2013 and a fully drawn $330.6 million term loan facility due August 2015 (together the "Wynn Las Vegas Term Loan"). The Wynn Las Vegas Revolver and the Wynn Las Vegas Term Loan are together referred to as the "Wynn Las Vegas Credit Facilities." During the year ended December 31, 2011, Wynn Las Vegas repaid $20.1 million of borrowings under the Wynn Las Vegas Revolver and $4 million under the Wynn Las Vegas Term Loan. As of December 31, 2011, the Wynn Las Vegas Term Loan was fully drawn and no borrowings were outstanding

81

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

under the Wynn Las Vegas Revolver. Wynn Las Vegas, LLC had $15.8 million of outstanding letters of credit that reduce availability for borrowing under the Wynn Las Vegas Revolver. Wynn Las Vegas, LLC had availability of $351.1 million under the Wynn Las Vegas Revolver as of December 31, 2011.

Loans under the Wynn Las Vegas Credit Facilities bear interest at fluctuating rates, based on either LIBOR or an alternative base rate, plus an applicable margin. As of December 31, 2011, the applicable margin for LIBOR loans under the Wynn Las Vegas Revolver and the Wynn Las Vegas Term Loan due August 17, 2015 was 3.0%, and the applicable margin for LIBOR loans under the Wynn Las Vegas Term Loan due August 15, 2013 was 1.875%. Base Rate Loans bear interest at (a) the greatest of (i) the rate most recently announced by Deutsche Bank as its "prime rate," (ii) the Federal Funds Rate plus 1/2 of 1% per annum, and (iii) in the case of a Wynn Las Vegas Revolver loan the one month Eurodollar rate; plus (b) a borrowing margin of 2.0% for Wynn Las Vegas Revolver loans and 0.875% for Wynn Las Vegas Term Loans. Interest on Base Rate Loans will be payable quarterly in arrears. Wynn Las Vegas, LLC also pays, quarterly in arrears, 1.0% per annum on the daily average of unused commitments under the Wynn Las Vegas Revolver.

The Wynn Las Vegas Credit Facilities are obligations of Wynn Las Vegas, LLC, guaranteed by each of the subsidiaries of Wynn Las Vegas, LLC, other than Wynn Completion Guarantor, LLC. Subject to an intercreditor agreement, and certain exceptions, the obligations of Wynn Las Vegas, LLC and each of the guarantors under the Wynn Las Vegas Credit Facilities are secured by: (1) a first priority pledge of all member's interests owned by Wynn Las Vegas, LLC in its subsidiaries (other than Wynn Completion Guarantor, LLC) and Wynn Resorts Holdings, LLC's 100% member's interest in Wynn Las Vegas, LLC; (2) first mortgages on all real property constituting Wynn Las Vegas, its golf course and Encore at Wynn Las Vegas; and (3) a first priority security interest in substantially all other existing and future assets of Wynn Las Vegas, LLC and the guarantors, excluding an aircraft beneficially owned by World Travel, LLC.

The obligations of Wynn Las Vegas, LLC and the guarantors under the Wynn Las Vegas Credit Facilities rank equal in right of payment with their existing and future senior indebtedness, including indebtedness with respect to the 2017 Notes the 2020 Notes and the New 2020 Notes and ranks senior in right of payment to all of their existing and future subordinated indebtedness.

In addition to scheduled amortization payments, Wynn Las Vegas, LLC is required to make mandatory prepayments of indebtedness under the Wynn Las Vegas Credit Facilities from the net proceeds of all debt offerings (other than those constituting certain permitted debt). Wynn Las Vegas, LLC is also required to make mandatory repayments of indebtedness under the Wynn Las Vegas Credit Facilities from specified percentages of excess cash flow, which percentages may decrease and/or be eliminated based on Wynn Las Vegas, LLC's leverage ratio. For 2012, Wynn Las Vegas, LLC expects to make a mandatory repayment of approximately $88 million in March pursuant to this provision of the Wynn Las Vegas Credit Facilities. Wynn Las Vegas, LLC has the option to prepay all or any portion of the indebtedness under the Wynn Las Vegas Credit Facilities at any time without premium or penalty.

The Credit Facilities contains customary negative covenants and financial covenants, including, but not limited to, negative covenants that restrict Wynn Las Vegas, LLC's ability to: incur additional indebtedness, including guarantees; create, incur, assume or permit to exist liens on property and assets; declare or pay dividends and make distributions or restrict the ability of Wynn Las Vegas, LLC's subsidiaries to pay dividends and make distributions; engage in mergers, investments and acquisitions; enter into transactions with affiliates; enter into sale-leaseback transactions; execute modifications to material contracts; engage in sales of assets; make capital expenditures; and make optional prepayments of certain indebtedness. The financial covenants include maintaining a Consolidated Interest Coverage Ratio, as defined, not less than 1.00 to 1 as of December 31, 2011. Management believes that

82

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Wynn Las Vegas, LLC was in compliance with all covenants at December 31, 2011. The Consolidated Interest Coverage Ratio remains at 1.00 to 1 through June 2013. As of December 31, 2011, approximately $1 billion of net assets of Wynn Las Vegas, LLC were restricted from being distributed under the terms of its long-term debt.

*Wynn Macau Credit Facilities*

As of December 31, 2011 and 2010, the Company's Wynn Macau credit facilities, as amended, consisted of a $550 million equivalent fully-funded senior term loan facility (the "Wynn Macau Term Loan"), and a $1 billion senior revolving credit facility (the "Wynn Macau Revolver") in a combination of Hong Kong and U.S. dollars (together the "Wynn Macau Credit Facilities"). Wynn Macau, S.A. also has the ability to increase the total facilities by an additional $50 million pursuant to the terms and provisions of the Amended Common Terms Agreement. As of December 31, 2011, the Wynn Macau Term Loan was fully drawn and $150.4 million was outstanding under the Wynn Macau Revolver. Consequently, there was availability of approximately $849.6 million under the Wynn Macau Revolver as of December 31, 2011.

The Wynn Macau Term Loan matures in June 2014, and the Wynn Macau Revolver matures in June 2012. The principal amount of the Wynn Macau Term Loan is required to be repaid in quarterly installments that commenced in September 2011, with $145.9 million due in 2012. Borrowings under the Wynn Macau Credit Facilities bear interest at LIBOR or the Hong Kong Interbank Offer Rate ("HIBOR") plus a margin which was 1.75% through September 30, 2010. Commencing in the fourth quarter of 2010, the Wynn Macau Credit Facilities are subject to a margin of 1.25% to 2.00% depending on Wynn Macau's leverage ratio at the end of each quarter. At December 31, 2011, the margin was 1.25% to 1.75%.

Collateral for the Wynn Macau Credit Facilities consists of substantially all of the assets of Wynn Macau, S.A. Certain affiliates of the Company that own interests in Wynn Macau, S.A., either directly or indirectly through other subsidiaries, have executed guarantees of the loans and pledged their interests in Wynn Macau, S.A. as additional security for repayment of the loans. In addition, the Wynn Macau Credit Facilities' governing documents contain capital spending limits and other affirmative and negative covenants.

The Wynn Macau Credit Facilities contain a requirement that the Company must make mandatory repayments of indebtedness from specified percentages of excess cash flow. If the Wynn Macau subsidiary meets a Consolidated Leverage Ratio, as defined, of greater than 4.0 to 1, such repayment is defined as 50% of Excess Cash Flow, as defined. If the Consolidated Leverage Ratio is less than 4.0 to 1, then no repayment is required. Based on current estimates the Company does not believe that the Wynn Macau Consolidated Leverage Ratio during the year ending December 31, 2012 will exceed 4.0 to 1. Accordingly, the Company does not expect to make any mandatory repayments pursuant to this requirement during 2012.

The Wynn Macau Credit Facilities contain customary covenants restricting certain activities including, but not limited to: the incurrence of additional indebtedness, the incurrence or creation of liens on any of its property, sales and leaseback transactions, the ability to dispose of assets, and make loans or other investments. In addition, Wynn Macau was required by the financial covenants to maintain a Leverage Ratio, as defined, of not greater than 3.50 to 1 as of December 31, 2011, and an Interest Coverage Ratio, as defined, of not less than 2.00 to 1. Management believes that Wynn Macau was in compliance with all covenants at December 31, 2011.

In connection with the initial financing of the Wynn Macau, Wynn Macau, S.A. entered into a Bank Guarantee Reimbursement Agreement with Banco Nacional Ultramarino, S.A. ("BNU") for the benefit of the Macau government. This guarantee assures Wynn Macau, S.A.'s performance under the casino concession agreement, including the payment of premiums, fines and indemnity for any material failure to perform under the

83

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

terms of the concession agreement. As of December 31, 2011, the guarantee was in the amount of $300 million Macau Patacas (approximately US$37 million) and will remain at such amount until 180 days after the end of the term of the concession agreement (2022). BNU, as issuer of the guarantee, is currently secured by a second priority security interest in the senior lender collateral package. From and after repayment of all indebtedness under the Wynn Macau Credit Facilities, Wynn Macau, S.A. is obligated to promptly, upon demand by BNU, repay any claim made on the guarantee by the Macau government. BNU is paid an annual fee for the guarantee not to exceed approximately $5.2 million Macau Patacas (approximately US$0.7 million).

### $42 Million Note Payable for Aircraft

On March 30, 2007, World Travel, LLC, a subsidiary of Wynn Las Vegas, entered into a loan agreement with a principal balance of $42 million. The loan is guaranteed by Wynn Las Vegas, LLC and secured by a first priority security interest in one of the Company's aircraft. Principal payments of $350,000 plus interest are made quarterly with a balloon payment of $28 million due at maturity, April 1, 2017. Interest is calculated at 90-day LIBOR plus 125 basis points.

### $32.5 Million Note Payable for Aircraft

On May 10, 2007, World Travel G-IV, LLC, a subsidiary of Wynn Resorts, entered into a $32.5 million term loan credit facility to finance the purchase of an aircraft. Principal payments of $542,000 plus interest are made quarterly with a balloon payment of $21.1 million due at maturity, August 10, 2012. Interest is calculated at LIBOR plus 115 basis points.

### Fair Value of Long-Term Debt

The net book value of the Company's outstanding first mortgage notes was $2.2 billion at both December 31, 2011 and 2010. The estimated fair value of the Company's outstanding first mortgage notes, based on quoted market prices, was approximately $2.4 billion and $2.3 billion as of December 31, 2011 and 2010, respectively. The net book value of the Company's other debt instruments was $1.1 billion and $1.1 billion as of December 31, 2011 and 2010, respectively. The estimated fair value of the Company's other debt instruments was approximately $1 billion and $1.1 billion as of December 31, 2011 and 2010.

### Scheduled Maturities of Long-Term Debt

Scheduled maturities of long-term debt, including the accretion of debt discounts of $10.4 million, are as follows (amounts in thousands):

| Years Ending December 31, | |
|---|---:|
| 2012 | $ 407,934 |
| 2013 | 175,469 |
| 2014 | 189,350 |
| 2015 | 253,223 |
| 2016 | 1,400 |
| Thereafter | 2,200,710 |
| | $ 3,228,086 |

84

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**9. Interest Rate Swaps**

The Company has entered into floating-for-fixed interest rate swap arrangements in order to manage interest rate risk relating to certain of its debt facilities. These interest rate swap agreements modify the Company's exposure to interest rate risk by converting a portion of the Company's floating-rate debt to a fixed rate. These interest rate swaps essentially fix the interest rate at the percentages noted below; however, changes in the fair value of the interest rate swaps for each reporting period have been recorded in the increase/decrease in swap fair value in the accompanying Consolidated Statements of Income, as the interest rate swaps do not qualify for hedge accounting.

The following table presents the historical fair value of the interest rate swaps recorded in the accompanying Consolidated Balance Sheets as of December 31, 2011 and 2010. The Company utilized Level 2 inputs as described in Note 2 to determine fair value. The fair value approximates the amount the Company would pay if these contracts were settled at the respective valuation dates. Fair value is estimated based upon current, and predictions of future, interest rate levels along a yield curve, the remaining duration of the instruments and other market conditions, and therefore, is subject to significant estimation and a high degree of variability and fluctuation between periods. The fair value is adjusted, to reflect the impact of credit ratings of the counterparties or the Company, as applicable. These adjustments resulted in a reduction in the fair values as compared to their settlement values. As of December 31, 2011, the interest rate swap liabilities are included in other current accrued liabilities. As of December 31, 2010, $5.9 million of the interest rate swap liabilities are included in other current accrued liabilities and $15.6 million are included in other long-term liabilities.

| Liability fair value:<br>(amounts in thousands) | Wynn Las Vegas | | Wynn Macau | | Total Interest<br>Rate Swaps | |
|---|---|---|---|---|---|---|
| December 31, 2011 | $ | 4,628 | $ | 2,670 | $ | 7,298 |
| December 31, 2010 | $ | 8,457 | $ | 12,992 | $ | 21,449 |

*Wynn Las Vegas Swap*

As of December 31, 2011, the Company has one interest rate swap agreement to hedge a portion of the underlying interest rate risk on borrowings under the Wynn Las Vegas Credit Facilities. Under this swap agreement, beginning November 27, 2009, the Company pays a fixed interest rate of 2.485% on borrowings of $250 million incurred under the Wynn Las Vegas Credit Facilities in exchange for receipts on the same amount at a variable interest rate based on the applicable LIBOR at the time of payment. As of December 31, 2011, this interest rate swap fixes the interest rate on such borrowings at 5.485%. This interest rate swap agreement matures in November 2012.

*Wynn Macau Swaps*

As of December 31, 2011, the Company has one interest rate swap agreement to hedge a portion of the underlying interest rate risk on borrowings under the Wynn Macau Credit Facilities. Under this swap agreement, the Company pays a fixed interest rate of 2.15% on borrowings of HK $2.3 billion (approximately U.S.$300 million) incurred under the Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable interest rate based on the applicable HIBOR at the time of payment. As of December 31, 2011, this interest rate swap fixes the interest rate on such borrowings at 3.4%. This interest rate swap agreement matures in June 2012.

In August 2011, two of the Company's interest rate swap agreements expired. Under the first swap agreement, the Company paid a fixed interest rate of 3.632% on U.S. dollar borrowings of $153.8 million incurred under the Wynn Macau Credit Facilities in exchange for receipts on the same amount at a variable interest rate based on the

85

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

applicable LIBOR at the time of payment. Under the second swap agreement, the Company paid a fixed interest rate of 3.39% on Hong Kong dollar borrowings of HK $991.6 million (approximately U.S.$127.9 million) incurred under the Wynn Macau Credit Facilities in exchange for receipt on the same amount at a variable interest rate based on the applicable HIBOR at the time of payment. Until they expired in August 2011, these interest rate swaps fixed the interest rates on the U.S. dollar and the Hong Kong dollar borrowings under the Wynn Macau Credit Facilities at 4.88%—5.38% and 4.64%, respectively.

**10. Related Party Transactions**

*Amounts Due to Officers*

The Company periodically provides services to Stephen A. Wynn, Chairman of the Board of Directors and Chief Executive Officer ("Mr. Wynn"), and certain other officers and directors of the Company, including the personal use of employees, construction work and other personal services. Mr. Wynn and other officers and directors have deposits with the Company to prepay any such items, which are replenished on an ongoing basis as needed. As of December 31, 2011 and 2010, Mr. Wynn and the other officers and directors had a net deposit balance with the Company of $0.4 million and $0.3 million, respectively.

*Villa Suite Lease*

On March 18, 2010, Mr. Wynn and Wynn Las Vegas entered into an Amended and Restated Agreement of Lease (the "SW Lease") for a villa suite to serve as Mr. Wynn's personal residence. The SW Lease amends and restates a prior lease. The SW Lease was approved by the Audit Committee of the Board of Directors of the Company. The term of the SW Lease commenced as of March 1, 2010 and runs concurrent with Mr. Wynn's employment agreement with the Company; provided that either party may terminate on 90 days notice. Pursuant to the SW Lease, the rental value of the villa suite will be treated as imputed income to Mr. Wynn, and will be equal to the fair market value of the accommodations provided. Effective March 1, 2010, and for the first two years of the term of the SW Lease, the rental value will be $503,831 per year. Effective March 1, 2012, the rental value will be $440,000 per year based on the current fair market value as established by the Audit Committee of the Company with the assistance of an independent third-party appraisal. The rental value for the villa suite will be re-determined every two years during the term of the lease by the Audit Committee, with the assistance of an independent third-party appraisal. Certain services for, and maintenance of, the villa suite are included in the rental.

On March 17, 2010, Elaine P. Wynn, a director of Wynn Resorts, and Wynn Las Vegas entered into an Agreement of Lease (the "EW Lease") for the lease of a villa suite as Elaine P. Wynn's personal residence. The EW Lease was approved by the Audit Committee of the Board of Directors of the Company. Pursuant to the terms of the EW Lease, Elaine P. Wynn paid annual rent equal to $350,000, which amount was determined by the Audit Committee with the assistance of a third-party appraisal. Certain services for, and maintenance of, the villa suite were included in the rental. The EW Lease superseded the terms of a prior agreement. The term of the EW lease commenced as of March 1, 2010 and was scheduled to terminate on December 31, 2010. The lease was extended on a month-to-month basis after December 31, 2010 until terminated effective March 31, 2011.

*Home Purchase*

In May 2010, the Company entered into an employment agreement with Linda Chen, who is also a director of Wynn Resorts. The term of the employment agreement is through February 24, 2020. Under the terms of the employment agreement, the Company purchased a home in Macau for use by Ms. Chen for $5.4 million, and as of December 31, 2011, has expended $2.1 million to renovate the home. The new employment agreement also provides Ms. Chen the use of an automobile in Macau. Upon the occurrence of certain events set forth below, Ms. Chen has the option to purchase the home at the then fair market value of the home (as determined by an independent appraiser) less a discount equal to ten percentage points multiplied by each anniversary of the term

86

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

of the agreement that has occurred (the "Discount Percentage"). The option is exercisable for (a) no consideration at the end of the term, (b) $1.00 in the event of termination of Ms. Chen's employment without "cause" or termination of Ms. Chen's employment for "good reason" following a "change of control" and (c) at a price based on the applicable Discount Percentage in the event Ms. Chen terminates the agreement due to material breach by the Company. Upon Ms. Chen's termination for "cause," Ms. Chen will be deemed to have elected to purchase the Macau home based on the applicable Discount Percentage unless the Company determines to not require Ms. Chen to purchase the home. If Ms. Chen's employment terminates for any other reason before the expiration of the term (e.g., because of her death or disability or due to revocation of gaming license), the option will terminate.

*The "Wynn" Surname Rights Agreement*

On August 6, 2004, the Company entered into agreements with Mr. Wynn that confirm and clarify the Company's rights to use the "Wynn" name and Mr. Wynn's persona in connection with its casino resorts. Under the parties' Surname Rights Agreement, Mr. Wynn granted the Company an exclusive, fully paid-up, perpetual, worldwide license to use, and to own and register trademarks and service marks incorporating the "Wynn" name for casino resorts and related businesses, together with the right to sublicense the name and marks to its affiliates. Under the parties' Rights of Publicity License, Mr. Wynn granted the Company the exclusive, royalty-free, worldwide right to use his full name, persona and related rights of publicity for casino resorts and related businesses, together with the ability to sublicense the persona and publicity rights to its affiliates, until October 24, 2017.

**11. Property Charges and Other**

Property charges and other consisted of the following (amounts in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2011** | **2010** | **2009** |
| Net loss on assets abandoned/retired for remodel or sold | $ 19,708 | $10,270 | $21,696 |
| Donation to University of Macau Foundation | 109,563 | — | — |
| Loss on contract termination | — | 14,949 | 6,762 |
| Loss on show cancellation | 1,378 | — | — |
|  | $130,649 | $25,219 | $28,458 |

Property charges and other generally include costs related to the retirement of assets for remodels and asset abandonments. Property charges and other for the year ended December 31, 2011 include the present value of a charitable contribution made by Wynn Macau to the University of Macau Development Foundation. This contribution consists of a $25 million payment made in May 2011, and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive, for a total of $135 million. The amount reflected in the accompanying Consolidated Statements of Income has been discounted using the Company's estimated borrowing rate over the time period of the remaining committed payments. In accordance with accounting standards for contributions, subsequent accretion of the discount is being recorded as additional donation expense and included in Property charges and other. Also included are the write off of certain off-site golf memberships by Wynn Las Vegas, miscellaneous renovations and abandonments at the Company's resorts, including modifications of the Encore at Wynn Las Vegas retail esplanade, closure of the Blush nightclub and the write off of certain costs related to a show that ended its run in Las Vegas in April 2011.

87

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Property charges and other for the year ended December 31, 2010 include a contract termination payment of $14.9 million related to a management contract for certain of the nightclubs at Wynn Las Vegas as well as miscellaneous renovations, abandonments and gain/loss on sale of equipment at Wynn Las Vegas and Wynn Macau.

Property charges and other for the year ended December 31, 2009 include a $16.7 million charge for the abandonment of the front porte-cochere at Encore at Wynn Las Vegas to make way for an addition at that property, a $6.8 million charge for the write-off of two aircraft deposits, and a $5 million charge related to miscellaneous remodels, abandonments and loss on sale of equipment.

**12. Stockholders' Equity**

*Common Stock*

The Company is authorized to issue up to 400,000,000 shares of its common stock, $0.01 par value per share (the "Common Stock"). As of December 31, 2011 and 2010, 125,080,998 shares and 124,599,508 shares, respectively, of the Company's Common Stock were outstanding. Except as otherwise provided by the Company's articles of incorporation or Nevada law, each holder of the Common Stock is entitled to one vote for each share held of record on each matter submitted to a vote of stockholders. Holders of the Common Stock have no cumulative voting, conversion, redemption or preemptive rights or other rights to subscribe for additional shares. Subject to any preferences that may be granted to the holders of the Company's preferred stock, each holder of Common Stock is entitled to receive ratably such dividends as may be declared by the Board of Directors out of funds legally available therefore, as well as any distributions to the stockholders and, in the event of liquidation, dissolution or winding up of the Company, is entitled to share ratably in all assets of the Company remaining after payment of liabilities.

The Board of Directors of Wynn Resorts has authorized an equity repurchase program of up to $1.7 billion. The repurchase program may include repurchases from time to time through open market purchases or negotiated transactions, depending upon market conditions. During 2011, the Company repurchased a total of 51,136 shares in satisfaction of tax withholding obligations on vested restricted stock. No repurchases were made during the years ended December 31, 2010 or 2009. As of December 31, 2011, the Company had repurchased a cumulative total of 12,856,090 shares of the Company's Common Stock for a net cost of $1.1 billion under the program.

*Preferred Stock*

The Company is authorized to issue up to 40,000,000 shares of undesignated preferred stock, $0.01 par value per share (the "Preferred Stock"). As of December 31, 2011, the Company had not issued any Preferred Stock. The Board of Directors, without further action by the holders of Common Stock, may designate and issue shares of Preferred Stock in one or more series and may fix or alter the rights, preferences, privileges and restrictions, including the voting rights, redemption provisions (including sinking fund provisions), dividend rights, dividend rates, liquidation rates, liquidation preferences, conversion rights and the description and number of shares constituting any wholly unissued series of Preferred Stock. The issuance of such shares of Preferred Stock could adversely affect the rights of the holders of Common Stock. The issuance of shares of Preferred Stock under certain circumstances could also have the effect of delaying or preventing a change of control of the Company or other corporate action.

*Redemption of Securities*

The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the board of directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the

88

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts. The redemption price will be the amount, if any, required by the gaming authority or, if the gaming authority does not determine the price, the sum deemed by the board of directors to be the fair value of the securities to be redeemed. If the Company determines the redemption price, the redemption price will be capped at the closing price of the shares on the principal national securities exchange on which the shares are listed on the trading day before the redemption notice is given. If the shares are not listed on a national securities exchange, the redemption price will be capped at the closing sale price of the shares as quoted on The NASDAQ Global Select Market or if the closing price is not reported, the mean between the bid and ask prices, as quoted by any other generally recognized reporting system. The Company's right of redemption is not exclusive of any other rights that it may have or later acquire under any agreement, its bylaws or otherwise. The redemption price may be paid in cash, by promissory note, or both, as required, and pursuant to the terms established by, the applicable gaming authority and, if not, as the Board of Directors of the Company elects.

**13. Noncontrolling Interest**

In October 2009, Wynn Macau, Limited, an indirect wholly-owned subsidiary of the Company and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Through an initial public offering, including the over allotment, Wynn Macau, Limited sold 1,437,500,000 shares (27.7%) of this subsidiary's common stock (the "Wynn Macau Limited IPO"). Proceeds to the Company as a result of this transaction were approximately $1.8 billion, net of transaction costs of approximately $84 million. The shares of Wynn Macau, Limited were not and will not be registered under the Securities Act and may not be offered or sold in the United States absent a registration under the Securities Act, or an applicable exception from such registration requirements. In connection with this transaction, in October 2009, the Company recorded $107.4 million of noncontrolling interest as a separate component of equity in the accompanying Consolidated Balance Sheets and has followed accounting standards for noncontrolling interest in the consolidated financial statements beginning in October 2009. Net income attributable to noncontrolling interest was $211.7 million, $156.5 million and $18.5 million for the years ended December 31, 2011, 2010 and 2009, respectively.

On November 16, 2011, the Wynn Macau, Limited Board of Directors approved a HK$1.20 per share dividend. The total dividend amount was approximately $800 million and the Company's share of this dividend was $578.3 million. A reduction of $221.6 million was made to noncontrolling interest in the accompanying Consolidated Balance Sheets to reflect the payment of this dividend.

On November 2, 2010, the Wynn Macau, Limited Board of Directors approved a HK$0.76 per share dividend. The total dividend amount was approximately $508 million and the Company's share of this dividend was $367 million. A reduction of $140.7 million was made to noncontrolling interest in the accompanying Consolidated Balance Sheets to reflect the payment of this dividend.

**14. Benefit Plans**

*Employee Savings Plan*

The Company established a retirement savings plan under Section 401(k) of the Internal Revenue Code covering its U.S. non-union employees in July 2000. The plan allows employees to defer, within prescribed limits, a percentage of their income on a pre-tax basis through contributions to this plan. Prior to March 16, 2009, the Company matched the contributions, within prescribed limits, with an amount equal to 100% of the participant's initial 2% tax deferred contribution and 50% of the tax deferred contribution between 2% and 4% of the participant's compensation. Effective March 16, 2009, the Company suspended matching contributions to

89

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

this plan. The Company recorded an expense for matching contributions of $0, $0, and $1.4 million for the years ended December 31, 2011, 2010 and 2009, respectively.

Wynn Macau also operates a defined contribution retirement benefits plan (the "Wynn Macau Plan"). Eligible employees are allowed to contribute 5% of their salary to the Wynn Macau Plan and the Company matches any contributions. The assets of the Wynn Macau Plan are held separately from those of the Company in an independently administered fund. The Company's matching contributions vest to the employee at 10% per year with full vesting in ten years. Forfeitures of unvested contributions are used to reduce the Company's liability for its contributions payable. For the period from March 1, 2009 through April 30, 2010, the Company suspended its matching contributions. The contributions were reinstated effective May 1, 2010. During the years ended December 31, 2011, 2010 and 2009, the Company recorded an expense for matching contributions of $6.6 million, $3.3 million and $0.5 million, respectively.

*Multi-employer pension plan*

Wynn Las Vegas contributes to a multi-employer defined benefit pension plan for certain of its union employees under the terms of the Southern Nevada Culinary and Bartenders Union collective-bargaining agreement. The collective-bargaining agreement that covers these union-represented employees expires in 2016. The legal name of the multi-employer pension plan is the Southern Nevada Culinary and Bartenders Pension Plan (the "Plan") (EIN: 88-6016617 Plan Number: 001). The Company recorded an expense of $7.6 million, $6.8 million and $6.2 million for contributions to the Plan for the years ended December 31, 2011, 2010 and 2009, respectively. For the 2010 plan year, the most recent for which plan data is available, the Company's contributions were identified by the Plan to exceed 5% of total contributions for that year. Based on information the Company received from the Plan, it was certified to be in neither endangered nor critical status for the 2010 plan year. Risks of participating in a multi-employer plan differs from single-employer plans for the following reasons: (1) assets contributed to a multi-employer plan by one employer may be used to provide benefits to employees of other participating employers; (2) if a participating employer stops contributing to the plan, the unfunded obligations of the plan may be borne by the remaining participating employers; and (3) if a participating employer stops participating, it may be required to pay those plans an amount based on the underfunded status of the plan, referred to as a withdrawal liability.

*Stock-Based Compensation*

The Company established the 2002 Stock Incentive Plan (the "WRL Stock Plan") to provide for the grant of (i) incentive stock options, (ii) compensatory (i.e., nonqualified) stock options, and (iii) nonvested shares of Common Stock of Wynn Resorts, Limited. Employees, directors (whether employee or nonemployee) and independent contractors or consultants of the Company are eligible to participate in the WRL Stock Plan. However, only employees of the Company are eligible to receive incentive stock options.

A maximum of 12,750,000 shares of Common Stock are reserved for issuance under the WRL Stock Plan. As of December 31, 2011, 4,098,336 shares remain available for the grant of stock options or nonvested shares of Common Stock.

Options are granted at the current market price at the date of grant. The WRL Stock Plan provides for a variety of vesting schedules all determined at the time of grant. All options expire ten years from the date of grant.

90

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

A summary of option activity under the WRL Stock Plan as of December 31, 2011, and the changes during the year then ended is presented below:

| | Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2011 | 3,252,708 | $ 61.97 | | |
| Granted | 25,200 | 140.54 | | |
| Exercised | (431,126) | 55.18 | | |
| Canceled/Expired | (117,658) | 68.52 | | |
| Outstanding at December 31, 2011 | 2,729,124 | 63.49 | 6.8 | $129,304,063 |
| Fully vested and expected to vest at December 31, 2011 | 2,485,576 | 63.02 | 6.7 | $120,165,961 |
| Exercisable at December 31, 2011 | 376,924 | 51.75 | 4.0 | $ 22,419,903 |

The following information is provided for stock options of the WRL Stock Plan (amounts in thousands, except weighted average grant date fair value):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| Weighted average grant date fair value | $ 48.31 | $ 40.32 | $ 28.25 |
| Intrinsic value of stock options exercised | $36,776 | $63,095 | $ 8,249 |
| Net cash proceeds from the exercise of stock options | $23,789 | $66,186 | $ 6,347 |
| Tax benefits realized from the exercise of stock options and vesting of restricted stock | $11,176 | $10,480 | $49,013 |

As of December 31, 2011, there was a total of $55.7 million of unamortized compensation related to stock options, which is expected to be recognized over the vesting period of the related grants through May 2019.

A summary of the status of the WRL Stock Plan's nonvested shares as of December 31, 2011 and changes during the year then ended is presented below:

| | Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Nonvested at January 1, 2011 | 861,000 | $ 88.75 |
| Granted | 101,500 | 129.55 |
| Vested | (168,000) | 69.28 |
| Nonvested at December 31, 2011 | 794,500 | $ 98.08 |

91

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following information is provided for nonvested stock of the WRL Stock Plan (amounts in thousands, except weighted average grant date fair value):

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2011** | **2010** | **2009** |
| Weighted average grant date fair value | $129.55 | $107.03 | $ — |
| Fair value of shares vested | $24,865 | $ 2,833 | $1,685 |

Approximately $38.6 million of unamortized compensation cost relating to nonvested shares of Common Stock at December 31, 2011 will be recognized as compensation over the vesting period of the related grants through October 2021.

### Wynn Macau, Limited Stock Incentive Plan

The Company's majority-owned subsidiary Wynn Macau, Limited adopted a stock incentive plan effective September 16, 2009 (the "WML Stock Plan"). The purpose of the WML Stock Plan is to reward participants, which may include directors and employees of Wynn Macau, Limited who have contributed towards enhancing the value of Wynn Macau and its shares. A maximum of 518.75 million shares have been reserved for issuance under the WML Stock Plan. As of December 31, 2011, 1.4 million options have been granted.

A summary of option activity under the WML Stock Plan as of December 31, 2011, and the changes during the year then ended is presented below:

|  | Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
| --- | --- | --- | --- | --- |
| Outstanding at January 1, 2011 | 1,000,000 | $   1.41 |  |  |
| Granted | 400,000 | 3.34 |  |  |
| Exercised | (50,000) | 1.41 |  |  |
| Outstanding at December 31, 2011 | 1,350,000 | 1.98 | 8.6 | $1,046,374 |
| Fully vested and expected to vest at December 31, 2011 | 1,350,000 | 1.98 | 8.6 | $1,046,374 |
| Exercisable at December 31, 2011 | 150,000 | 1.41 | 8.3 | $  165,217 |

The following information is provided for stock options of the WML Stock Plan (amounts in thousands, except weighted average grant date fair value):

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | **2011** | **2010** |
| Weighted average grant date fair value | $   0.75 | $   0.60 |
| Intrinsic value of stock options exercised | $  99.2 | $    — |
| Net cash proceeds from the exercise of stock options | $  70.2 | $    — |

As of December 31, 2011, there was a total of $0.7 million of unamortized compensation related to stock options, which is expected to be recognized over the vesting period of the related grants through May 2016.

92

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Compensation Cost*

The Company uses the Black-Scholes valuation model to determine the estimated fair value for each option grant issued, with highly subjective assumptions, changes in which could materially affect the estimated fair value. Expected volatility is based on implied and historical factors related to the Company's Common Stock. Expected term represents the weighted average time between the option's grant date and its exercise date. The risk-free interest rate used for each period presented is based on the U.S. Treasury yield curve for WRL Stock Plan options or the Hong Kong Exchange Fund rates for the WML Stock Plan options at the time of grant for the period equal to the expected term.

The fair value of stock options granted under the WRL Stock Plan was estimated on the date of grant using the following weighted-average assumptions:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2011** | **2010** | **2009** |
| Expected dividend yield | 4.0% | 1.23% | 0.12% |
| Expected stock price volatility | 49.7% | 60.9% | 54.6% |
| Risk-free interest rate | 2.4% | 3.1% | 2.7% |
| Expected average life of options (years) | 6.5 | 6.9 | 7.6 |

The fair value of stock options granted under the WML Stock Plan was estimated on the date of grant using the following assumptions:

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | **2011** | **2010** |
| Expected dividend yield | 4.0% | — |
| Expected stock price volatility | 37.8% | 40.8% |
| Risk-free interest rate | 2.1% | 2.4% |
| Expected average life of options (years) | 6.5 | 6.5 |

The total compensation cost for both the WRL Stock Plan and the WML Stock Plan is allocated as follows (amounts in thousands):

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2011** | **2010** | **2009** |
| Casino | $ 8,997 | $10,497 | $ 8,740 |
| Rooms | 383 | 455 | 460 |
| Food and beverage | 429 | 301 | 305 |
| Entertainment, retail and other | 24 | 87 | 19 |
| General and administrative | 14,048 | 15,828 | 14,812 |
| Total stock-based compensation expense | 23,881 | 27,168 | 24,336 |
| Total stock-based compensation capitalized | 886 | 617 | 585 |
| Total stock-based compensation costs | $24,767 | $27,785 | $24,921 |

93

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**15. Income Taxes**

Consolidated income (loss) before taxes for domestic and foreign operations consisted of the following (amounts in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| Domestic | $ 49,521 | $ (239,125) | $ (229,861) |
| Foreign | 756,046 | 576,168 | 271,967 |
| Total | $ 805,567 | $ 337,043 | $ 42,106 |

The Company's benefit (provision) for income taxes consisted of the following (amounts in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| Current |  |  |  |
| Federal | $ — | $ — | $ — |
| Foreign | 3,386 | (1,560) | (3,679) |
|  | 3,386 | (1,560) | (3,679) |
| Deferred |  |  |  |
| Federal | 10,809 | (9,640) | (2,090) |
| Foreign | 5,351 | (9,247) | 2,770 |
|  | 16,160 | (18,887) | 680 |
| Total | $19,546 | $(20,447) | $(2,999) |

94

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The tax effects of significant temporary differences representing net deferred tax assets and liabilities consisted of the following (amounts in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| Deferred tax assets—U.S.: | | |
| Current: | | |
| Receivables, inventories,accrued liabilities and other | $  36,753 | $  34,384 |
| Less: valuation allowance | (33,525) | (30,430) |
| | 3,228 | 3,954 |
| Long-term: | | |
| Foreign tax credit carryforwards | 1,848,185 | 1,306,965 |
| Intangibles and related other | 31,215 | 29,069 |
| Stock based compensation | 17,001 | 16,275 |
| Pre-opening costs | 16,671 | 18,758 |
| Syndication costs | 3,780 | 3,780 |
| Other credit carryforwards | 3,458 | 3,930 |
| Interest rate swap valuation adjustment | 1,620 | 2,960 |
| Other | 615 | 494 |
| | 1,922,545 | 1,382,231 |
| Less: valuation allowance | (1,753,667) | (1,223,288) |
| | 168,878 | 158,943 |
| Deferred tax liabilities—U.S.: | | |
| Current: | | |
| Prepaid insurance, maintenance and taxes | (6,803) | (6,928) |
| | (6,803) | (6,928) |
| Long-term: | | |
| Property and equipment | (223,172) | (235,824) |
| | (223,172) | (235,824) |
| Deferred tax assets—Foreign: | | |
| Long-term: | | |
| Net operating loss carryforwards | 17,593 | 24,791 |
| Property equipment and other | 5,345 | 5,819 |
| Accrued charitable contribution | 2,222 | — |
| Pre-opening costs and other | 130 | 1,588 |
| Less: valuation allowance | (25,290) | (32,198) |
| | — | — |
| Net deferred tax liability | $  (57,869) | $  (79,855) |

95

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The income tax (benefit) provision differs from that computed at the federal statutory corporate tax rate as follows:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| Federal statutory rate | 35.0% | 35.0% | 35.0% |
| Foreign tax rate differential | (21.3%) | (38.8%) | (133.3%) |
| Other items, net: | | | |
| Foreign tax credits, net of valuation allowance | (80.8%) | (104.9%) | 77.0% |
| Repatriation of foreign earnings | 76.3% | 134.9% | 113.8% |
| Excess executive compensation | 0.4% | 0.7% | 5.4% |
| Non-taxable foreign income | (13.0%) | (24.8%) | (108.6%) |
| Non-deductible foreign property charges | — | — | 2.4% |
| General business credits | (0.1%) | (0.4%) | (2.8%) |
| Other, net | 0.1% | 1.4% | 2.6% |
| Valuation allowance, other | 1.0% | 3.0% | 15.6% |
| Effective tax rate | (2.4%) | 6.1% | 7.1% |

The Company has no U.S. tax loss carryforwards. The Company incurred foreign tax losses of $73.7 million, $89.4 million, and $74.2 million during the tax years ended December 31, 2011, 2010 and 2009, respectively. These foreign tax loss carryforwards expire in 2014, 2013, and 2012, respectively. The Company has recorded a valuation allowance against these tax loss carryforwards. The Company incurred a capital loss of $3.6 million during the year ended December 31, 2011. The capital loss carryforward will expire in 2016. The Company recorded tax benefits resulting from the exercise of nonqualified stock options and the value of vested restricted stock and accrued dividends of $11.2 million, $10.5 million, and $49 million as of December 31, 2011, 2010, and 2009, respectively, in excess of the amounts reported for such items as compensation costs under accounting standards related to stock-based compensation. The Company uses a with-and-without approach to determine if the excess tax deductions associated with compensation costs have reduced income taxes payable.

Accounting standards require recognition of a future tax benefit to the extent that realization of such benefit is more likely than not. Otherwise, a valuation allowance is applied. During 2011 and 2010, the aggregate valuation allowance for deferred tax assets increased by $526.6 million and $574.2 million, respectively. The 2011 and 2010 increases are primarily related to foreign tax credit carryforwards that are not considered more likely than not realizable. As discussed in the succeeding paragraph, the Company does not consider forecasted future operating results when scheduling the realization of deferred tax assets and the required valuation allowance but instead relies solely on the reversal of net taxable temporary differences. The ultimate realization of the Company's recorded foreign tax credit deferred tax asset is dependent upon the incurrence of sufficient US income tax liabilities attributable to foreign source income during the 10-year foreign tax credit carryover period.

The Macau special gaming tax is 35% of gross gaming revenue. The IRS only allows a credit for 35% of "net" foreign source income. In February 2010, the Company and the IRS entered into a Pre-Filing Agreement ("PFA") providing that the Macau Special Gaming Tax qualifies as a tax paid in lieu of an income tax and could be claimed as a U.S. foreign tax credit. The valuation allowance for foreign tax credits was determined in accordance with accounting standards by scheduling the existing U.S. "net" taxable temporary differences that are expected to reverse during the 10-year foreign tax credit carryover period. The U.S. income tax rules applicable to foreign tax credit utilization are applied to the scheduling results in order to determine the amount of foreign tax credit expected to be utilized in the future.

96

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

During the years ended December 31, 2011, 2010 and 2009, the Company recognized tax benefits of $647.6 million, $955.2 million and $125.3 million, respectively (net of valuation allowance and uncertain tax positions) for foreign tax credits applicable to the earnings of Wynn Macau S.A. A significant portion of these credits result from the treatment of the Macau Special Gaming Tax as a U.S. foreign tax credit. Of the $647.6 million, $955.2 million and $125.3 million, $640.8 million, $949.5 million and $121.5 million were used to offset 2011, 2010 and 2009 U.S. income tax expense incurred as a result of the repatriation of Wynn Macau S.A. earnings and in 2009 the Wynn Macau Limited IPO proceeds. The remaining $6.8 million, $5.8 million and $3.8 million (net of valuation allowance and uncertain tax positions) were recorded as a deferred tax asset. Of the Company's $1,848 million of foreign tax credit carryforwards (net of uncertain tax positions) as of December 31, 2011, $665.7 million will expire in 2018, $110.9 million will expire in 2019, $530.4 million in 2020, and $541.3 million in 2021.

Of the December 31, 2011, 2010 and 2009 U.S. valuation allowances of $1,787 million, $1,254 million and $694.5 million, respectively, $1,777 million, $1,246 million and $689.4 million, respectively, relate to U.S. foreign tax credits expected to expire unutilized, $1.3 million, $1.3 million and $0 represent stock-based compensation for foreign-based services that may be nondeductible, $3.4 million, $2.7 million and $1.3 million represent stock-based compensation that may be nondeductible under IRC §162 (m), and $3.8 million is attributable to syndication costs. During the year ended December 31, 2011, the Company recorded a valuation allowance of $1.3 million attributable to a capital loss carryforward. Subsequent recognition of income tax benefits associated with syndication costs will be allocated to additional paid-in capital.

Except for $51 million of accumulated earnings which the Company plans on repatriating, the Company has not provided deferred U.S. income taxes or foreign withholdings taxes on temporary differences of $300.6 million and $325.1 million as of December 31, 2011 and 2010, respectively, which are indefinitely reinvested and will be used to fund future operations or expansion. The amount of the unrecognized deferred tax liability without regard to potential foreign tax credits associated with these temporary differences is approximately $105.2 million and $113.8 million for the years ended December 31, 2011 and 2010. Deferred income taxes are provided for foreign earnings planned for repatriation. In connection with the Wynn Macau Limited IPO in 2009 (Note 13), the Company recorded a deferred tax liability net of expected foreign tax credits of $56.1 million to the extent that the book basis of the investment exceeded the tax basis and where that difference was expected to reverse in the foreseeable future. The deferred tax liability was recorded as a reduction in additional paid-in capital. In 2009, the Company repatriated $400 million from the Wynn Macau Limited IPO proceeds leaving a deferred tax liability net of expected foreign tax credits of $41.5 million as of December 31, 2009. During 2010, the Company repatriated an additional $1,143 million of Wynn Macau, Limited IPO proceeds resulting in the reversal of the $41.5 million deferred tax liability. In 2011, the Company repatriated $578.2 million from Wynn Macau, Limited. The amounts repatriated during 2011, 2010 and 2009 were used to fund domestic operations, to provide additional U.S. liquidity, and to fund dividends to the Company's shareholders.

Effective September 6, 2006, Wynn Macau, S.A. received a 5-year exemption from Macau's 12% Complementary Tax on casino gaming profits. On November 30, 2010, an additional 5-year Complementary Tax exemption was approved, thereby exempting the casino gaming profits of Wynn Macau S.A. through December 31, 2015. Accordingly, the Company was exempted from the payment of $82.7 million, $64.4 million, and $31.7 million in such taxes for the years ended December 31, 2011 and 2010 and 2009, respectively. The Company's non-gaming profits remain subject to the Macau Complementary Tax and its casino winnings remain subject to the Macau Special Gaming tax and other levies in accordance with its concession agreement.

In June 2009, Wynn Macau, S.A. entered into an agreement with the Macau Special Administrative Region that provides for an annual payment of MOP $7.2 million (approximately $900,000 US dollars) to the Macau Special Administrative Region as complementary tax otherwise due by shareholders of Wynn Macau S.A. on dividend distributions. This agreement was retroactive to 2006. Therefore, included in the tax provision for the

97

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

year ended December 31, 2009, are the amounts related to the years 2006 through 2009 totaling $3.6 million. This agreement on dividends is effective through 2010. On July 19, 2011, Wynn Macau, S.A. received notification that a 5-year extension of this agreement had been ratified and that an annual payment of MOP $15.5 million (approximately $1.9 million U.S. dollars) would be due to the Macau Special Administrative Region for each of the years 2011 through 2015. As a result of the shareholder dividend tax agreements, income taxes payable includes $1.9 and $0.9 million accrued for the years ended December 31, 2011 and 2010.

Effective January 1, 2007, the Company adopted the accounting standards related to accounting for uncertain tax positions. This standard requires that tax positions be assessed using a two-step process. A tax position is recognized if it meets a "more likely than not" threshold, and is measured at the largest amount of benefit that is greater than 50 percent likely of being realized. Uncertain tax positions must be reviewed at each balance sheet date. Liabilities recorded as a result of this analysis must generally be recorded separately from any current or deferred income tax accounts.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (amounts in thousands):

|  | As of December 31, | |
|---|---|---|
|  | **2011** | **2010** |
| Balance—beginning of year | $ 83,834 | $148,365 |
| Additions based on tax positions of the current year | 12,427 | 13,164 |
| Additions based on tax positions of prior years | — | 694 |
| Reductions for tax positions of prior years | — | — |
| Settlements | — | (78,389) |
| Lapses in statutes of limitations | (10,763) | — |
| Balance—end of year | $ 85,498 | $ 83,834 |

As of December 31, 2011 and 2010, the Company has recorded a liability related to uncertain tax positions of $25.1 million and $35.9 million, respectively. These amounts are included in Other Long-Term Liabilities in the accompanying Consolidated Balance Sheets. As of December 31, 2011 and 2010, $60.4 million and $48 million, respectively, of liabilities related to U.S. and foreign uncertain tax positions that increase the NOL and foreign tax credit carryforward deferred tax assets are classified as reductions of the NOL and foreign tax credit carryforward deferred tax assets in the net deferred tax asset and liability table above. Other uncertain tax positions not increasing the NOL and foreign tax credit carryforward deferred tax assets have been recorded as increases in the liability for uncertain tax positions.

As of December 31, 2011 and 2010, $24.2 million and $17.9 million, respectively, of unrecognized tax benefit would, if recognized, impact the effective tax rate. The Company recognizes penalties and interest related to unrecognized tax benefits in the provision for income taxes. During the year ended December 31, 2011, the Company recognized interest and penalties of $0.04 million. The Company recognized no interest or penalties during the years ended December 31, 2010 and 2009.

The Company anticipates that the 2007 statute of limitations will expire in the next 12 months for certain foreign tax jurisdictions. Also, the Company's unrecognized tax benefits include certain income tax accounting methods. These accounting methods govern the timing and deductibility of income tax deductions. As a result, the Company's unrecognized tax benefits could decrease by a range of $0 to $0.5 million over the next 12 months.

98

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company files income tax returns in the U.S. federal jurisdiction, various states and foreign jurisdictions. The Company's income tax returns are subject to examination by the IRS and other tax authorities in the locations where it operates. As of December 31, 2011, the Company has filed domestic income tax returns for the years 2002 to 2010 and foreign income tax returns for 2002 to 2010. The Company's 2002 to 2005 domestic income tax returns remain subject to examination by the IRS to the extent of tax attributes carryforwards to future years. The Company's 2006 to 2010 domestic income tax returns also remain subject to examination by the IRS. The Company's 2007 to 2010 Macau income tax returns remain subject to examination by the Macau Finance Bureau.

During 2010, the Company reached an agreement with the Appellate division of the IRS regarding issues raised during the examination of its 2004 and 2005 income tax returns. The issues for consideration by the Appellate division were temporary differences and related to the deduction of certain costs incurred during the development and construction of Wynn Las Vegas and the appropriate tax depreciation recovery periods applicable to certain assets. As a result of this settlement with the Appellate division, the Company reduced its unrecognized tax benefits by $78.4 million. This reduction in unrecognized tax benefits resulted in a decrease in the Company's liability for uncertain tax positions of $55 million. The settlement of the 2004 and 2005 examination issues did not result in a cash tax payment but rather utilized $88.5 million and $2.5 million in foreign tax credit and general business credit carryforwards.

During 2010, the Company received the results of an IRS examination of its 2006 through 2008 U.S. income tax returns and filed its appeal of the examination's findings with the Appellate division of the IRS. In connection with that appeal, the Company agreed to extend the statute of limitations for its 2006 and 2007 tax returns to December 31, 2012. The Company believes that it will likely reach an agreement with the IRS with respect to the examination of its 2006, 2007 and 2008 U.S. income tax returns within the next 12 months. The issues under examination in these years are temporary differences and relate to the treatment of discounts extended to Las Vegas casino customers gambling on credit, the deduction of certain costs incurred during the development and construction of Encore at Wynn Las Vegas and the appropriate tax depreciation recovery periods applicable to certain assets. Upon the settlement of these issues, unrecognized tax benefits could decrease by $0 to $62.1 million. The resolution of the 2006, 2007 and 2008 examination is not expected to result in any significant cash payment but rather the utilization of a portion of the foreign tax credit carryforward.

The Company received the results of an IRS examination of its 2009 U.S. income tax return and filed an appeal of the examination's findings with the Appellate division of the IRS during 2011. The Company believes it will likely reach an agreement with the IRS with respect to the examination of the 2009 U.S. income tax return within the next 12 months. The issues under examination in 2009 relate to the impact of prior year IRS audit adjustments on the computation of 2009 taxable income. Upon settlement of these issues, unrecognized tax benefits could decrease by $0 to $0.2 million. The resolution of the 2009 IRS examination is not expected to result in any significant cash payment, but rather the utilization of a portion of the foreign tax credit carryforward.

During 2011, the IRS commenced an examination of the Company's 2010 U.S. income tax return. Since the examination is in its initial stages the Company is unable to determine if it will be concluded within the next twelve months. The Company believes that its liability for uncertain tax positions related to the period covered by this examination is adequate.

The Company is participating in the IRS Compliance Assurance Program ("CAP") for the 2011 tax year. Under the CAP program the IRS and the taxpayer work together in a pre-filing environment to examine transactions and issues and thus complete the tax examination before the tax return is filed. Participation in this program should enable the Company to reduce time spent on tax administration and enhance tax reserve and financial statement reporting integrity. In January 2012, the Company received notification that it had been accepted into the IRS CAP for the 2012 tax year.

99

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

During 2011, Wynn Macau, S.A. received the results of the Macau Finance Bureau's examination of its 2006 and 2007 Macau Complementary Tax returns and filed an appeal related to the examination's disallowance of certain deductions claimed in its 2006 Macau Complementary Tax Return. In August 2011, the 2006 Macau tax issues under appeal were resolved. As part of the settlement, the Company paid $1.1 million in Macau Complementary tax substantially all of which was provided for in prior years. As the result of the resolution of these Macau tax issues and the expiration of the statute of limitations for 2006 Macau Complementary tax assessments on December 31, 2011, the total amount of unrecognized tax benefits decreased by $10.8 million.

**16. Commitments and Contingencies**

*Wynn Macau*

<u>Land Concession Contract.</u> Wynn Macau, S.A. has entered into a land concession contract for the land on which Wynn Macau is located. Under the land concession contract, Wynn Macau, S.A. leases a parcel of approximately 16 acres from the government for an initial term of 25 years, with a right to renew for additional periods with government approval. Wynn Macau, S.A. has made payments to the Macau government under the land concession contract totaling $42.7 million. Wynn Macau, S.A. also paid approximately $18.4 million to an unrelated third party for its relinquishment of rights to a portion of the land. In 2009, the Company and the Macau government agreed to modify this land concession as a result of the construction of Encore at Wynn Macau and the additional square footage that was added as a result of such construction. In November 2009, the Company made an additional one-time land premium payment of $14.2 million. During the term of the land concession contract, Wynn Macau, S.A. is required to make annual lease payments of up to $525,000.

<u>Cotai Development and Land Concession Contract.</u> In September 2011, Palo Real Estate Company Limited and Wynn Resorts (Macau) S.A., each an indirect subsidiary of Wynn Macau Limited, formally accepted the terms and conditions of a draft land concession contract from the Macau government for approximately 51 acres of land in the Cotai area of Macau. Following government approval, the Company anticipates constructing a full scale integrated resort containing a casino, approximately 2,000 hotel suites, convention, retail, entertainment and food and beverage offerings on this land. The Company continues to finalize the project scope, timeline and budget.

The initial term of the land concession contract is 25 years, and it may be renewed with government approval for successive periods. The total land premium payable, as described in the draft land concession contract, is $193.4 million. An initial payment of $62.5 million was paid in December 2011, with eight additional semi-annual payments of approximately $16.4 million each (which includes interest at 5%) due once the Macau government publishes the Company's rights to the Cotai land in the government's official gazette. As of December 31, 2011, the Company has recorded this obligation and related asset with $13.4 million included as a current liability and $103.9 million included as a long-term liability. Wynn Macau will also be required to make annual lease payments of $0.8 million during the resort construction period and annual payments of approximately $1.1 million once the development is completed.

<u>Cotai Land Agreement.</u> On August 1, 2008, subsidiaries of Wynn Resorts, Limited entered into an agreement with an unrelated third party to make a one-time payment in the amount of $50 million in consideration of the unrelated third party's relinquishment of certain rights in and to any future development on the Cotai land noted above. The payment will be made within 15 days after the Macau government publishes the Company's rights to the Cotai land in the government's official gazette. With the Company's acceptance of the draft land concession contract noted above, the Company has accrued this $50 million obligation as a current liability included in other accrued liabilities as of December 31, 2011.

100

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Leases and other arrangements*

The Company is the lessor under several retail leases and has entered into license and distribution agreements for several additional retail outlets. The Company also is a party to joint venture agreements for the operation of one retail outlet and the Ferrari and Maserati automobile dealership at Wynn Las Vegas. The lease agreements include minimum base rents with contingent rental clauses.

The following table presents the future minimum rentals to be received under the operating leases (amounts in thousands):

| Years Ending December 31, | |
|---|---|
| 2012 | $20,939 |
| 2013 | 13,907 |
| 2014 | 13,130 |
| 2015 | 12,027 |
| 2016 | 8,947 |
| Thereafter | 3,693 |
| | $72,643 |

The total future minimum rentals do not include contingent rental. Contingent rentals were $73.2 million for the year ended December 31, 2011.

In addition, the Company is the lessee under leases for office space in Las Vegas, Macau and certain other locations, warehouse facilities, the land underlying the Company's aircraft hangar and certain office equipment.

At December 31, 2011, the Company was obligated under non-cancelable operating leases to make future minimum lease payments as follows (amounts in thousands):

| Years Ending December 31, | |
|---|---|
| 2012 | $ 5,017 |
| 2013 | 2,775 |
| 2014 | 2,329 |
| 2015 | 1,672 |
| 2016 | 1,602 |
| Thereafter | 4,616 |
| | $18,011 |

Rent expense for the years ended December 31, 2011, 2010 and 2009, was $20.2 million, $21.6 million and $17.2 million, respectively.

*Self-insurance*

The Company's domestic subsidiaries are covered under a self-insured medical plan up to a maximum of $300,000 per year for each insured person. Amounts in excess of these thresholds are covered by the Company's insurance programs, subject to customary policy limits. The Company's foreign subsidiaries are fully insured. Beginning January 2012, the medical plan covering employees of the Company's domestic subsidiaries is fully insured.

101

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Employment Agreements*

The Company has entered into employment agreements with several executive officers, other members of management and certain key employees. These agreements generally have three- to five-year terms and typically indicate a base salary and often contain provisions for discretionary bonuses. Certain of the executives are also entitled to a separation payment if terminated without "cause" or upon voluntary termination of employment for "good reason" following a "change of control" (as these terms are defined in the employment contracts).

*Litigation*

On May 3, 2010, Atlantic-Pacific Capital, Inc. ("APC") filed an arbitration demand with Judicial Arbitration and Mediation Services regarding an agreement with the Company. The action concerns a claim for compensation of approximately $32 million pursuant to an agreement entered into between APC and the Company on or about March 30, 2008 whereby APC was engaged to raise equity capital for an investment vehicle sponsored by the Company. APC is seeking compensation unrelated to the investment vehicle. The Company has denied APC's claims for compensation. The Company filed a Complaint for Damages and Declaratory Relief against APC in the District Court, Clark County, Nevada, on May 10, 2010. APC removed the action to the United States District Court, District of Nevada. In March 2011, the court denied APC's motion to compel arbitration. APC has appealed. Management believes that APC's claim against the Company is without merit and intends to defend this matter vigorously.

*Sales and Use Tax on Complimentary Meals*

In March 2008, the Nevada Supreme Court ruled, in the matter captioned *Sparks Nugget, Inc. vs. The State of Nevada Ex Rel. Department of Taxation*, that food and non-alcoholic beverages purchased for use in providing complimentary meals to customers and to employees was exempt from sales and use tax. In July 2008, the Court denied the State's motion for rehearing. Through April 2008, Wynn Las Vegas paid use tax on these items and has filed for refunds for the periods from April 2005 to April 2008. The amount subject to these refunds is $5.4 million.

In January 2012, the Nevada Tax Commission upheld the decision of an Administrative Law Judge ("ALJ") who ruled that complimentary meals provided to patrons and employees of a Nevada casino operator were retail sales subject to sales tax. The ruling of the ALJ further held that the use tax already paid on such items and sought as refunds should be credited against the sales tax due. Furthermore, the ALJ held that the Nevada Department of Taxation could not assess additional taxes, penalties or interest because its regulations and policies at the time only required the payment of use tax on such complimentary meals. The Company expects that the Nevada Tax Commission ruling will be appealed through the Nevada courts. As of December 31, 2011, the Company has neither recorded a receivable associated with its $5.4 million refund claim nor any sales tax liability for complimentary meals provided to customers and employees.

102

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**17. Segment Information**

The Company monitors its operations and evaluates earnings by reviewing the assets and operations of its Las Vegas Operations and its Macau Operations. The Company's total assets and capital expenditures by segment consisted of the following (amounts in thousands):

|  | As of December 31, | |
|---|---|---|
|  | 2011 | 2010 |
| **Assets** | | |
| Las Vegas Operations | $ 4,035,398 | $ 4,108,516 |
| Macau Operations | 2,202,683 | 1,777,119 |
| Corporate and other | 661,415 | 788,862 |
|  | $ 6,899,496 | $ 6,674,497 |

|  | Years ended December 31, | |
|---|---|---|
|  | 2011 | 2010 |
| **Capital expenditures** | | |
| Las Vegas Operations | $ 65,207 | $ 157,080 |
| Macau Operations | 115,702 | 120,580 |
| Corporate and other | 3,237 | 6,168 |
|  | $ 184,146 | $ 283,828 |

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company's results of operations by segment for the years ended December 31, 2011, 2010 and 2009 consisted of the following (amounts in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| **Net revenues** | | | |
| Las Vegas Operations | $ 1,480,719 | $ 1,296,064 | $ 1,229,573 |
| Macau Operations | 3,789,073 | 2,888,634 | 1,816,038 |
| Total | $ 5,269,792 | $ 4,184,698 | $ 3,045,611 |
| **Adjusted Property EBITDA(1)** | | | |
| Las Vegas Operations | $ 439,036 | $ 270,299 | $ 244,065 |
| Macau Operations | 1,196,232 | 892,686 | 502,087 |
| Total | 1,635,268 | 1,162,985 | 746,152 |
| **Other operating costs and expenses** | | | |
| Pre-opening costs | — | 9,496 | 1,817 |
| Depreciation and amortization | 398,039 | 405,558 | 410,547 |
| Property charges and other | 130,649 | 25,219 | 28,458 |
| Corporate expenses and other | 96,868 | 96,659 | 70,246 |
| Equity in income from unconsolidated affiliates | 1,472 | 801 | 121 |
| Total other operating costs and expenses | 627,028 | 537,733 | 511,189 |
| Operating income | 1,008,240 | 625,252 | 234,963 |
| **Other non-operating costs and expenses** | | | |
| Interest income | 7,654 | 2,498 | 1,740 |
| Interest expense, net of amounts capitalized | (229,918) | (222,863) | (211,385) |
| Increase (decrease) in swap fair value | 14,151 | (880) | (2,258) |
| Gain (loss) from extinguishment of debt/exchange offer | — | (67,990) | 18,734 |
| Equity in income from unconsolidated affiliates | 1,472 | 801 | 121 |
| Other | 3,968 | 225 | 191 |
| Total other non-operating costs and expenses | (202,673) | (288,209) | (192,857) |
| Income before income taxes | 805,567 | 337,043 | 42,106 |
| Benefit (provision) for income taxes | 19,546 | (20,447) | (2,999) |
| Net income | $ 825,113 | $ 316,596 | $ 39,107 |

---

(1) "Adjusted Property EBITDA" is earnings before interest, taxes, depreciation, amortization, pre-opening costs, property charges and other, corporate expenses, stock-based compensation, and other non-operating income and expenses and includes equity in income from unconsolidated affiliates. Adjusted Property EBITDA is presented exclusively as a supplemental disclosure because management believes that it is widely used to measure the performance, and as a basis for valuation, of gaming companies. Management uses Adjusted Property EBITDA as a measure of the operating performance of its segments and to compare the operating performance of its properties with those of its competitors. The Company also presents Adjusted Property EBITDA because it is used by some investors as a way to measure a company's ability to incur and service debt, make capital expenditures and meet working capital requirements. Gaming companies have historically reported EBITDA as a supplement to financial measures in accordance with U.S. generally accepted accounting principles ("GAAP"). In order to view the operations of their casinos on a more stand-alone basis, gaming companies, including Wynn Resorts, Limited, have historically excluded

104

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

from their EBITDA calculations pre-opening expenses, property charges and corporate expenses, which do not relate to the management of specific casino properties. However, Adjusted Property EBITDA should not be considered as an alternative to operating income as an indicator of the Company's performance, as an alternative to cash flows from operating activities as a measure of liquidity, or as an alternative to any other measure determined in accordance with GAAP. Unlike net income, Adjusted Property EBITDA does not include depreciation or interest expense and therefore does not reflect current or future capital expenditures or the cost of capital. The Company has significant uses of cash flows, including capital expenditures, interest payments, debt principal repayments, taxes and other non-recurring charges, which are not reflected in Adjusted Property EBITDA. Also, Wynn Resorts' calculation of Adjusted Property EBITDA may be different from the calculation methods used by other companies and, therefore, comparability may be limited.

**18. Quarterly Financial Information (Unaudited)**

The following tables (amounts in thousands, except per share data) present selected quarterly financial information for 2011 and 2010, as previously reported. Because income (loss) per share amounts are calculated using the weighted average number of common and dilutive common equivalent shares outstanding during each quarter, the sum of the per share amounts for the four quarters may not equal the total income per share amounts for the year.

| | First | | Second | | Third | | Fourth | | Year | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Year Ended December 31, 2011** | | | | | | | | | | |
| Net revenues | $ | 1,260,272 | $ | 1,367,353 | $ | 1,298,304 | $ | 1,343,863 | $ | 5,269,792 |
| Operating income | | 280,556 | | 213,033 | | 239,845 | | 274,806 | | 1,008,240 |
| Net income | | 226,335 | | 155,331 | | 185,185 | | 258,262 | | 825,113 |
| Net income attributable to Wynn Resorts | | 173,804 | | 122,031 | | 127,063 | | 190,473 | | 613,371 |
| Basic income per share | $ | 1.40 | $ | 0.98 | $ | 1.02 | $ | 1.53 | $ | 4.94 |
| Diluted income per share | $ | 1.39 | $ | 0.97 | $ | 1.01 | $ | 1.52 | $ | 4.88 |

| | First | | Second | | Third | | Fourth | | Year | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Year Ended December 31, 2010** | | | | | | | | | | |
| Net revenues | $ | 908,918 | $ | 1,032,643 | $ | 1,005,949 | $ | 1,237,188 | $ | 4,184,698 |
| Operating income | | 114,848 | | 148,146 | | 131,949 | | 230,309 | | 625,252 |
| Net income (loss) | | 57,859 | | 88,917 | | (2,054) | | 171,874 | | 316,596 |
| Net income (loss) attributable to Wynn Resorts | | 26,988 | | 52,405 | | (33,508) | | 114,242 | | 160,127 |
| Basic income (loss) per share | $ | 0.22 | $ | 0.43 | $ | (0.27) | $ | 0.93 | $ | 1.30 |
| Diluted income (loss) per share | $ | 0.22 | $ | 0.42 | $ | (0.27) | $ | 0.91 | $ | 1.29 |

**19. Subsequent Events (Unaudited)**

*Determination of Unsuitability and Redemption of Aruze USA, Inc. and Affiliates and Related Matters*

On February 18, 2012, Wynn Resorts' Gaming Compliance Committee concluded a year-long investigation after receiving an independent report by Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing numerous prima facie violations of the FCPA by Aruze USA, Inc., at the time a stockholder of Wynn Resorts, Universal Entertainment Corporation, Aruze USA, Inc.'s parent company, and Kazuo Okada, the majority shareholder of Universal Entertainment Corporation, who is also a member of Wynn Resorts' Board of Directors and was at the time a director of Wynn Macau, Limited.

105

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Based on the Freeh Report, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada are "unsuitable" under Article VII of the Wynn Resorts articles of incorporation. The Board was unanimous (other than Mr. Okada) in its determination. The Board of Directors also requested that Mr. Okada resign as a director of Wynn Resorts and recommended that Mr. Okada be removed as a member of the board of directors of Wynn Macau, Limited. On February 18, 2012, Mr. Okada was removed from the board of directors of Wynn Las Vegas Capital Corp., a wholly owned subsidiary of Wynn Resorts.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' Common Stock. Following a finding of "unsuitability," Wynn Resorts' articles authorize redemption at "fair value" of the shares held by unsuitable persons. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the current trading price was appropriate because of, among other things, restrictions on most of the shares which are subject to the terms of an existing stockholder agreement. Pursuant to the articles of incorporation, Wynn Resorts issued the Redemption Price Promissory Note to Aruze USA, Inc. in redemption of the shares. The Redemption Price Promissory Note has a principal amount of approximately $1.9 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of a Redemption Price Promissory Note. Wynn Resorts may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Price Promissory Note. In no instance shall any payment obligation under the Redemption Price Promissory Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Price Promissory Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Price Promissory Note, to the prior payment in full of all existing and future obligations of Wynn Resorts or any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

On February 19, 2012, Wynn Resorts filed a complaint in the District Court of Clark County, Nevada against Mr. Okada, alleging breaches of fiduciary duty and related claims.

On February 24, 2012, the board of directors of Wynn Macau, Limited removed Mr. Kazuo Okada from the board.

The Company has provided the Freeh Report to applicable regulators and intends to cooperate with any related investigation that such regulators may undertake. The conduct of Mr. Okada and his affiliates and any resulting regulatory investigations could have adverse consequences to the Company. A finding by regulatory authorities that Mr. Okada violated the FCPA on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, regulators could pursue separate investigations into the Company's compliance with applicable laws, including in response to litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau and a related informal inquiry by the SEC into this donation. While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company.

*Litigation Commenced by Mr. Okada and Related Matters*

In May 2011, Wynn Macau, a majority owned subsidiary of the Company, made a commitment to the University of Macau Development Foundation in support of the new Asia-Pacific Academy of Economics and Management. This contribution consists of a $25 million payment made in May 2011 and a commitment for

Table of Contents

**WYNN RESORTS, LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive. The pledge was consistent with the Company's long-standing practice of providing philanthropic support for deserving institutions in the markets in which it operates. The pledge was made following an extensive analysis which concluded that the gift was made in accordance with all applicable laws. The pledge was considered by the Boards of Directors of both the Company and Wynn Macau and approved by 15 of the 16 directors who serve on those boards. The sole dissenting vote was Mr. Kazuo Okada whose stated objection was to the length of time over which the donation would occur, not its propriety.

Mr. Okada commenced litigation on January 11, 2012, in Nevada seeking to compel the Company to produce information relating to the donation to the University of Macau, among other things.

On February 8, 2012, following Mr. Okada's lawsuit, the Company received a letter from the Salt Lake Regional Office of the U.S. Securities and Exchange Commission ("SEC") requesting that, in connection with an informal inquiry by the SEC, the Company preserve information relating to, but not limited to, the donation to the University of Macau, any donations by the Company to any other educational charitable institutions, including the University of Macau Development Foundation, and the Company's casino or concession gaming licenses or renewals in Macau. The Company has informed the Salt Lake Regional Office that it intends to fully comply with the SEC's request.

107

Table of Contents

**ITEM 9.        CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

    None.

**ITEM 9A.        CONTROLS AND PROCEDURES**

    (a) *Disclosure Controls and Procedures*. The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can only provide reasonable assurance of achieving the desired control objectives and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2011, the Company's disclosure controls and procedures are effective, at the reasonable assurance level, in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act and in ensuring that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely discussions regarding required disclosure.

    (b) *Management Report on Internal Control Over Financial Reporting*. Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act.

    Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

    Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2011. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control-Integrated Framework*.

    Based on our assessment, management believes that, as of December 31, 2011, the Company's internal control over financial reporting was effective.

    The Company's independent registered public accounting firm has issued an audit report on our internal control over financial reporting. This report appears under "Report of Independent Registered Public Accounting Firm on Internal Controls Over Financial Reporting" on page 64.

    (c) *Changes in Internal Control Over Financial Reporting*. There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our fourth fiscal quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**ITEM 9B.        OTHER INFORMATION**

    None.

Table of Contents

**PART III**

**ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by this item will be contained in the Registrant's definitive Proxy Statement for its 2012 Annual Stockholder Meeting, to be filed with the Securities and Exchange Commission within 120 days after December 31, 2011 (the "2012 Proxy Statement") under the captions "Directors and Executive Officers, "Further Information Concerning the Board of Directors-Corporate Governance," and "Section 16(a) Beneficial Ownership Reporting Compliance," and is incorporated herein by reference.

As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. The most recent update dated November 1, 2011, included clarifications and revisions in presentation and is available on our website. In the event we determine to amend or waive certain provisions of this code of ethics, we will disclose such amendments or waivers on our website at *http://www.wynnresorts.com* under the heading "Corporate Governance" or as otherwise required by the NASDAQ listing standards.

**ITEM 11.    EXECUTIVE COMPENSATION**

The information required by this item will be contained in the 2012 Proxy Statement under the caption "Directors and Executive Officer Compensation and Other Matters," and is incorporated herein by reference.

**ITEM 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table summarizes compensation plans under which our equity securities are authorized for issuance, aggregated as to: (i) all compensation plans previously approved by stockholders, and (ii) all compensation plans not previously approved by stockholders. These plans are described in "Item 8. Financial Statements and Supplementary Data" of Part II (see Notes to Consolidated Financial Statements).

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 2,729,124 | $ 63.49 | 4,098,336 |
| Equity compensation plans not approved by security holders | — | — | — |
| **Total** | 2,729,124 | $ 63.49 | 4,098,336 |

Certain information required by this item will be contained in the 2012 Proxy Statement under the caption "Security Ownership of Certain Beneficial Owners and Management," and is incorporated herein by reference.

Table of Contents

ITEM 13.        CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this item will be contained in the 2012 Proxy Statement under the caption "Certain Relationships and Related Transactions, and "Further Information Concerning the Board of Directors-Corporate Governance," and is incorporated herein by reference.

ITEM 14.        PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by this item will be contained in the 2012 Proxy Statement under the caption "Ratification of Appointment of Independent Public Accountants," and is incorporated herein by reference.

110

Table of Contents

**PART IV**

**ITEM 15.        EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a)1. The following consolidated financial statements of the Company are filed as part of this report under "Item. 8—Financial Statements and Supplementary Data."

- Reports of Independent Registered Public Accounting Firm
- Consolidated Balance Sheets as of December 31, 2011 and 2010
- Consolidated Statements of Income for the years ended December 31, 2011, 2010 and 2009
- Consolidated Statements of Stockholders' Equity for the years ended December 31, 2011, 2010 and 2009
- Consolidated Statements of Cash Flows for the years ended December 31, 2011, 2010 and 2009
- Notes to Consolidated Financial Statements

(a)2. Financial Statement Schedules filed in Part IV of this report are listed below:

- Schedule I—Condensed financial information of the registrant
- Schedule II—Valuation and Qualifying Accounts

We have omitted all other financial statement schedules because they are not required or are not applicable, or the required information is shown in the financial statements or notes to the financial statements.

111

Table of Contents

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**

**CONDENSED BALANCE SHEETS**
**(amounts in thousands, except share data)**

| | December 31, | |
|---|---|---|
| | 2011 | 2010 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 378,486 | $ 662,561 |
| Investment Securities | 108,676 | — |
| Receivables | 2,151 | 541 |
| Prepaid expenses | 1,003 | 995 |
| Total current assets | 490,316 | 664,097 |
| Property and equipment, net | 12,161 | 12,746 |
| Investment Securities | 39,419 | — |
| Due from subsidiaries | 173,583 | 95,681 |
| Investment in subsidiaries | 1,611,198 | 1,729,393 |
| Total assets | $ 2,326,677 | $ 2,501,917 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,274 | $ 88 |
| Accrued compensation and benefits | 5,811 | 5,256 |
| Other accrued liabilities | 1,768 | 1,279 |
| Deferred income taxes, net | 3,575 | 2,974 |
| Total current liabilities | 12,428 | 9,597 |
| Other long term liabilities | 11,388 | 9,742 |
| Uncertain tax position liability | 25,112 | 25,112 |
| Deferred income taxes, net | 54,295 | 76,881 |
| Total liabilities | 103,223 | 121,332 |
| Commitments and contingencies (Note 2) | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.01; 40,000,000 shares authorized; zero shares issued and outstanding | — | — |
| Common stock, par value $0.01; 400,000,000 shares authorized; 137,937,088 and 137,404,462 shares issued; and, 125,080,998 and 124,599,508 shares outstanding | 1,379 | 1,374 |
| Treasury stock, at cost; 12,856,090 and 12,804,954 shares | (1,127,036) | (1,119,407) |
| Additional paid-in capital | 3,177,471 | 3,346,050 |
| Accumulated other comprehensive income | 840 | 889 |
| Retained earnings | 36,368 | 9,042 |
| Total Wynn Resorts, Limited stockholders' equity | 2,089,022 | 2,237,948 |
| Noncontrolling interest | 134,432 | 142,637 |
| Total equity | 2,223,454 | 2,380,585 |
| Total liabilities and stockholders' equity | $ 2,326,677 | $ 2,501,917 |

The accompanying notes are an integral part of these condensed financial statements.

112

Table of Contents

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**
**CONDENSED STATEMENTS OF INCOME**
**(amounts in thousands, except per share data)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| Operating revenues: | | | |
| Wynn Las Vegas management fees | $ 22,229 | $ 19,459 | $ 18,434 |
| Wynn Macau royalty fees | 152,463 | 114,904 | 71,537 |
| Net revenues | 174,692 | 134,363 | 89,971 |
| Operating costs and expenses: | | | |
| General and administrative | 30,421 | 31,468 | 21,099 |
| Provision for doubtful accounts | — | (68) | (234) |
| Depreciation and amortization | 421 | 483 | 558 |
| Property charges and other | — | 163 | — |
| Total operating costs and expenses | 30,842 | 32,046 | 21,423 |
| Operating income | 143,850 | 102,317 | 68,548 |
| Other income (expense): | | | |
| Interest and other income | 865 | 1,750 | 623 |
| Interest expense | — | — | (12,746) |
| Increase in swap fair value | — | — | 5,773 |
| Gain on early extinguishment of debt | — | — | 22,512 |
| Equity in income (loss) of subsidiaries | 669,589 | 263,684 | (28,951) |
| Other income (expense), net | 670,454 | 265,434 | (12,789) |
| Income before income taxes | 814,304 | 367,751 | 55,759 |
| Benefit (provision) for income taxes | 10,809 | (51,155) | (16,652) |
| Net income | 825,113 | 316,596 | 39,107 |
| Less: Net income attributable to noncontrolling interests. | (211,742) | (156,469) | (18,453) |
| Net income attributable to Wynn Resorts, Limited | $ 613,371 | $ 160,127 | $ 20,654 |
| Basic and diluted earnings per common share: | | | |
| Net income: | | | |
| Basic | $ 4.94 | $ 1.30 | $ 0.17 |
| Diluted | $ 4.88 | $ 1.29 | $ 0.17 |
| Weighted average common shares outstanding: | | | |
| Basic | 124,039 | 122,787 | 119,840 |
| Diluted | 125,667 | 123,939 | 120,185 |

The accompanying notes are an integral part of these condensed financial statements.

113

Table of Contents

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**
**CONDENSED STATEMENTS OF CASH FLOWS**
**(amounts in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| Cash flows from operating activities: | | | |
| Net income | $ 825,113 | $ 316,596 | $ 39,107 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 421 | 483 | 558 |
| Deferred income taxes | (10,809) | 51,155 | 16,652 |
| Stock-based compensation | 10,663 | 10,792 | 10,937 |
| Gain on early extinguishment of debt | — | — | (22,512) |
| Provision for doubtful accounts | — | — | 234 |
| Amortization of deferred financing costs and other | — | — | 718 |
| Increase in swap fair value | — | — | (5,773) |
| Property charges and other | — | 163 | — |
| Dividends received from subsidiary | 578,240 | 1,509,584 | 529,846 |
| Equity in (income) loss of subsidiaries | (669,589) | (263,684) | 28,951 |
| Increase (decrease) in cash from changes in: | | | |
| Receivables | (1,610) | (178) | (597) |
| Prepaid expenses and other | (9) | 4 | 1,161 |
| Accounts payable and accrued expenses | 5,168 | (8,305) | (938) |
| Due to (from) affiliates | (22,065) | (9,040) | (18,434) |
| Net cash provided by operating activities | 715,523 | 1,607,570 | 579,910 |
| Cash flows from investing activities: | | | |
| Redemption of Wynn Las Vegas First Mortgage Notes | — | 30,000 | — |
| Purchase of investment securities | (249,374) | — | — |
| Proceeds from sales or maturities of investment securities | 101,017 | — | — |
| Due to (from) subsidiaries | (55,673) | (25,300) | (37,918) |
| Net cash (used in) provided by investing activities | (204,030) | 4,700 | (37,918) |
| Cash flows from financing activities: | | | |
| Principal payments on long term debt | — | — | (364,688) |
| Repurchase of Wynn Las Vegas First Mortgage Notes | — | — | (50,048) |
| Capital contribution to Wynn Las Vegas LLC | — | (50,000) | (412,951) |
| Proceeds from issuance of common stock | — | — | 209,760 |
| Cash distributions | (811,798) | (1,051,543) | (489,876) |
| Exercise of stock options | 23,859 | 66,186 | 6,347 |
| Purchase of treasury stock | (7,629) | — | — |
| Interest rate swap transactions | — | — | (9,561) |
| Payments for deferred financing costs and other | — | — | (7,612) |
| Net cash used in financing activities | (795,568) | (1,035,357) | (1,118,629) |
| Cash and cash equivalents: | | | |
| Increase (decrease) in cash and cash equivalents | (284,075) | 576,913 | (576,637) |
| Balance, beginning of year | 662,561 | 85,648 | 662,285 |
| Balance, end of year | $ 378,486 | $ 662,561 | $ 85,648 |

The accompanying notes are an integral part of these condensed financial statements.

114

Table of Contents

**WYNN RESORTS, LIMITED**
**(Parent Company Only)**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

**1. Basis of Presentation**

The accompanying condensed financial statements include only the accounts of Wynn Resorts, Limited (the "Company"). Investments in the Company's subsidiaries are accounted for under the equity method.

In October 2009, Wynn Macau, Limited, an indirect wholly-owned subsidiary of the Company and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Wynn Macau, Limited sold through an initial public offering, including the over allotment, 1,437,500,000 (27.7%) shares of this subsidiary's common stock.

Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted since this information is included in the Company's consolidated financial statements included elsewhere in this Form 10-K.

**2. Commitments and Contingencies**

The Company is a holding company and, as a result, its ability to pay dividends is dependent on its subsidiaries' ability to provide funds to it. Restrictions imposed by Wynn Las Vegas, LLC's (a wholly-owned indirect subsidiary of the Company) debt instruments significantly restrict certain of the Company's key subsidiaries holding a majority of the consolidated group's total assets, including Wynn Las Vegas, LLC, from making dividends or distributions to the Company, subject to certain exceptions for affiliated overhead expenses as defined in the agreements governing Wynn Las Vegas, LLC's debt instruments, unless certain financial and non-financial criteria have been satisfied. In addition, the terms of the loan agreement of Wynn Resorts (Macau), S.A. noted below contains similar restrictions. The Company received cash dividends of $578.3 million, $1.51 billion and $530 million from a subsidiary during the years ended December 31, 2011, 2010 and 2009, respectively.

**3. Equity Repurchase Program**

The Board of Directors of Wynn Resorts authorized an equity repurchase program of up to $1.7 billion. The repurchase program may include repurchases from time to time through open market purchases or negotiated transactions, depending upon market conditions. During 2011, the Company repurchased a total of 51,136 shares in satisfaction of tax withholding obligations on vested restricted stock. No repurchases were made during the years ended December 31, 2010 or 2009. As of December 31, 2011, the Company had repurchased 12,856,090 shares of the Company's common stock for a net cost of $ 1.1 billion.

**4. Common Stock Secondary Offerings**

On March 20, 2009, the Company completed a secondary common stock offering of 11,040,000 shares with net proceeds of $202.3 million.

**5. Noncontrolling Interest**

In October 2009, Wynn Macau, Limited, an indirect wholly owned subsidiary of the Company and the developer, owner and operator of Wynn Macau, listed its ordinary shares of common stock on The Stock Exchange of Hong Kong Limited. Through an initial public offering, including the over allotment, Wynn Macau, Limited sold 1,437,500,000 (27.7%) shares of this subsidiary's common stock. Net proceeds to the Company as a

115

Table of Contents

result of this transaction were approximately $1.8 billion. The shares of Wynn Macau, Limited were not and will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be offered or sold in the United States absent a registration under the Securities Act, or an applicable exception from such registration requirements. In connection with this transaction, the Company recorded $107.4 million of noncontrolling interest as a separate component of equity in the accompanying Condensed Balance Sheets as of December 31, 2009. Net income attributable to noncontrolling interest was $211.7 million, $156.5 million and $18.5 million for the years ended December 31, 2011, 2010 and 2009, respectively.

On November 16, 2011, the Wynn Macau, Limited Board of Directors approved a HK$1.20 per share dividend. The total dividend amount was $800 million and the Company's share of this dividend was $578.3 million. A reduction of $221.6 million was made to noncontrolling interest in the accompanying Condensed Balance Sheets to reflect this dividend. On November 2, 2010, the Wynn Macau, Limited Board of Directors approved a HK$0.76 per share dividend. The total dividend amount was $508 million and the Company's share of this dividend was $367 million. A reduction of $140.7 million was made to noncontrolling interest in the accompanying Condensed Balance Sheets to reflect this dividend.

**Note 6. Subsequent Events (Unaudited)**

*Determination of Unsuitability and Redemption of Aruze USA, Inc. and Affiliates and Related Matters*

On February 18, 2012, Wynn Resorts' Gaming Compliance Committee concluded a year-long investigation after receiving an independent report by Freeh, Sporkin & Sullivan, LLP (the "Freeh Report") detailing numerous prima facie violations of the FCPA by Aruze USA, Inc., at the time a stockholder of Wynn Resorts, Universal Entertainment Corporation, Aruze USA, Inc.'s parent company, and Kazuo Okada, the majority shareholder of Universal Entertainment Corporation, who is also a member of Wynn Resorts' Board of Directors and was at the time a director of Wynn Macau, Limited.

Based on the Freeh Report, the Board of Directors of Wynn Resorts determined that Aruze USA, Inc., Universal Entertainment Corporation and Mr. Okada are "unsuitable" under Article VII of the Wynn Resorts articles of incorporation. The Board was unanimous (other than Mr. Okada) in its determination. The Board of Directors also requested that Mr. Okada resign as a director of Wynn Resorts and recommended that Mr. Okada be removed as a member of the board of directors of Wynn Macau, Limited. On February 18, 2012, Mr. Okada was removed from the board of directors of Wynn Las Vegas Capital Corp., a wholly owned subsidiary of Wynn Resorts.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed Aruze USA, Inc.'s 24,549,222 shares of Wynn Resorts' Common Stock. Following a finding of "unsuitability," Wynn Resorts' articles authorize redemption at "fair value" of the shares held by unsuitable persons. The Company engaged an independent financial advisor to assist in the fair value calculation and concluded that a discount to the current trading price was appropriate because of, among other things, restrictions on most of the shares which are subject to the terms of an existing stockholder agreement. Pursuant to the articles of incorporation, Wynn Resorts issued a Redemption Price Promissory Note to Aruze USA, Inc. in redemption of the shares. The Redemption Price Promissory Note has a principal amount of approximately $1.9 billion, matures on February 18, 2022 and bears interest at the rate of 2% per annum, payable annually in arrears on each anniversary of the date of the Redemption Price Promissory Note. Wynn Resorts may, in its sole and absolute discretion, at any time and from time to time, and without penalty or premium, prepay the whole or any portion of the principal or interest due under the Redemption Price Promissory Note. In no instance shall any payment obligation under the Redemption Price Promissory Note be accelerated except in the sole and absolute discretion of Wynn Resorts or as specifically mandated by law. The indebtedness evidenced by the Redemption Price Promissory Note is and shall be subordinated in right of payment, to the extent and in the manner provided in the Redemption Price Promissory Note, to the prior payment in full of all existing and future obligations of Wynn Resorts or any of its affiliates in respect of indebtedness for borrowed money of any kind or nature.

116

Table of Contents

On February 19, 2012, Wynn Resorts filed a complaint in the District Court of Clark County, Nevada against Mr. Okada, alleging breaches of fiduciary duty and related claims.

On February 24, 2012, the board of directors of Wynn Macau, Limited removed Mr. Kazuo Okada from the board.

The Company has provided the Freeh Report to applicable regulators and intends to cooperate with any related investigation that such regulators may undertake. The conduct of Mr. Okada and his affiliates and any resulting regulatory investigations could have adverse consequences to the Company. A finding by regulatory authorities that Mr. Okada violated the FCPA on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, regulators could pursue separate investigations into the Company's compliance with applicable laws, including in response to litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau and a related informal inquiry by the SEC into this donation. While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company.

### Litigation Commenced by Mr. Okada and Related Matters

In May 2011, Wynn Macau, a majority owned subsidiary of the Company, made a commitment to the University of Macau Development Foundation in support of the new Asia-Pacific Academy of Economics and Management. This contribution consists of a $25 million payment made in May 2011 and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022 inclusive. The pledge was consistent with the Company's long-standing practice of providing philanthropic support for deserving institutions in the markets in which it operates. The pledge was made following an extensive analysis which concluded that the gift was made in accordance with all applicable laws. The pledge was considered by the Boards of Directors of both the Company and Wynn Macau and approved by 15 of the 16 directors who serve on those boards. The sole dissenting vote was Mr. Kazuo Okada whose stated objection was to the length of time over which the donation would occur, not its propriety.

Mr. Okada commenced litigation on January 11, 2012, in Nevada seeking to compel the Company to produce information relating to the donation to the University of Macau, among other things.

On February 8, 2012, following Mr. Okada's lawsuit, the Company received a letter from the Salt Lake Regional Office of the U.S. Securities and Exchange Commission ("SEC") requesting that, in connection with an informal inquiry by the SEC, the Company preserve information relating to, but not limited to, the donation to the University of Macau, any donations by the Company to any other educational charitable institutions, including the University of Macau Development Foundation, and the Company's casino or concession gaming licenses or renewals in Macau. The Company has informed the Salt Lake Regional Office that it intends to fully comply with the SEC's request.

117

Table of Contents

## SCHEDULE II-VALUATION AND QUALIFYING ACCOUNTS
### (In Thousands)

| Description | Balance at Beginning of Year | Provisions for Doubtful Accounts | Write-offs, Net of Recoveries | Balance at End of Year |
|---|---|---|---|---|
| Allowance for doubtful accounts: | | | | |
| 2011 | $ 114,091 | 33,778 | (18,391) | $ 129,478 |
| 2010 | $ 102,081 | 28,304 | (16,294) | $ 114,091 |
| 2009 | $ 102,819 | 13,707 | (14,445) | $ 102,081 |

| Description | Balance at Beginning of Year | Additions | Deductions | Balance at End of Year |
|---|---|---|---|---|
| Deferred income tax asset valuation allowance: | | | | |
| 2011 | $ 1,285,916 | 533,474 | (6,908) | $ 1,812,482 |
| 2010 | $ 711,719 | 574,197 | — | $ 1,285,916 |
| 2009 | $ 642,630 | 69,089 | — | $ 711,719 |

118

Table of Contents

(a)3.   Exhibits

Exhibits that are not filed herewith have been previously filed with the SEC and are incorporated herein by reference.

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Second Amended and Restated Articles of Incorporation of the Registrant. (1) |
| 3.2 | Fourth Amended and Restated Bylaws of the Registrant, as amended. (12) |
| 4.1 | Specimen certificate for shares of Common Stock, $0.01 par value per share of the Registrant. (1) |
| 4.2 | Indenture, dated as of October 19, 2009, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors set forth therein and U.S. Bank National Association, as trustee. (29) |
| 4.3 | Indenture, dated as of April 28, 2010, by and among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors set forth therein and U.S. Bank National Association, as trustee. (33) |
| 4.4 | Indenture, dated as of August 4, 2010, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors named therein and U.S. Bank National Association, as trustee. (35) |
| 4.5 | Third Supplemental Indenture, dated August 4, 2010, among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., the Guarantors name therein and U.S. Bank National Association, as trustee. (35) |
| *10.1 | Employment Agreement, dated as of October 4, 2002, by and between Wynn Resorts, Limited and Stephen A. Wynn. (1) |
| *10.2 | First Amendment to Employment Agreement, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts, Limited. (4) |
| *10.3 | Second Amendment to employment agreement between Wynn Resorts, Limited and Stephen A. Wynn dated January 31, 2007. (16) |
| *10.4 | Third Amendment to Employment Agreement, dated as of September 11, 2008, between Wynn Resorts, Limited and Stephen A. Wynn. (18) |
| *10.5 | Fourth Amendment to Employment Agreement dated as of December 31, 2008, between Wynn Resorts, Limited and Stephen A. Wynn. (22) |
| *10.6 | Amendment to Employment Agreement, dated as of February 16, 2009, by and between Wynn Resorts, Limited and Stephen A. Wynn. (24) |
| *10.7 | Sixth Amendment to Employment Agreement dated as of February 24, 2011, between Wynn Resorts, Limited and Stephen A. Wynn. (39) |
| *10.8 | Employment Agreement, dated as of March 4, 2008, by and between Wynn Resorts, Limited and Marc D. Schorr. (10) |
| *10.9 | First Amendment to Employment Agreement dated as of December 31, 2008, between Wynn Resorts, Limited and Marc D. Schorr. (22) |
| *10.10 | Amendment to Employment Agreement, dated as of February 12, 2009, by and between Wynn Resorts, Limited and Marc D. Schorr. (24) |
| *10.11 | Employment Agreement, dated as of October 1, 2005, by and between Wynn Las Vegas, LLC and Matt Maddox. (22) |
| *10.12 | First Amendment to Employment Agreement, dated as of May 5, 2008, by and between Wynn Resorts, Limited and Matt Maddox. (21) |
| *10.13 | Second Amendment to Employment Agreement dated as of December 31, 2008, between Wynn Resorts, Limited and Matt Maddox. (22) |

Table of Contents

| Exhibit No. | Description |
|---|---|
| *10.14 | Amendment to Employment Agreement, dated as of February 13, 2009, by and between Wynn Resorts, Limited and Matt Maddox. (24) |
| *10.15 | Fourth Amendment to Employment Agreement, dated as of March 5, 2009, by and between Wynn Resorts, Limited and Matt Maddox. (25) |
| *10.16 | Fifth Amendment to Employment Agreement, dated as of February 2, 2010, by and between Wynn Resorts, Limited and Matt Maddox. (31) |
| *10.17 | Employment Agreement, dated as of August 31, 2005, between Wynn Resorts, Limited and John Strzemp. (9) |
| *10.18 | First Amendment to Employee Agreement, dated as of March 26, 2008, between Wynn Resorts, Limited and John Strzemp (20) |
| *10.19 | Second Amendment to Employment Agreement dated as of December 31, 2008, between Wynn Resorts, Limited and John Strzemp. (22) |
| *10.20 | Amendment to Employment Agreement, dated as of February 12, 2009, by and between Wynn Resorts, Limited and John Strzemp. (24) |
| *10.21 | Fourth Amendment to Employment Agreement, dated as of March 23, 2009, by and between Wynn Resorts, Limited and John Strzemp. (26) |
| *10.22 | Employment agreement, dated May 12, 2010, by and between Worldwide Wynn, LLC and Linda C. Chen. (34) |
| *10.23 | Retention agreement, dated July 27, 2011, by and between Worldwide Wynn, LLC and Linda Chen. (40) |
| *10.24 | Employment Agreement, dated as of April 24, 2007, by and between Wynn Resorts, Limited and Kim Sinatra. (38) |
| *10.25 | First Amendment to Employment Agreement, dated as of December 31, 2008 by and between Wynn Resorts, Limited and Kim Sinatra. (38) |
| *10.26 | Amendment to Employment Agreement, dated as of February 12, 2009, by and between Wynn Resorts, Limited and Kim Sinatra. (38) |
| *10.27 | Second Amendment to Employment Agreement, dated as of November 30, 2009, by and between Wynn Resorts, Limited and Kim Sinatra. (38) |
| 10.28 | Tax Indemnification Agreement, effective as of September 24, 2002, by and among Stephen A. Wynn, Aruze USA, Inc., Baron Asset Fun on behalf of the Baron Asset Fund Series, Baron Asset Fund on behalf of the Baron Growth Fund Series, Kenneth R. Wynn Family Trust dated February 20, 1985, Valvino Lamore, LLC and Wynn Resorts, Limited. (1) |
| *10.29 | 2002 Stock Incentive Plan as Amended and Restated effective May 12, 2010. (41) |
| *10.30 | 2002 Stock Incentive Plan as Amended and Restated effective May 17, 2011. (44) |
| *10.31 | Form of Stock Option Agreement pursuant to 2002 Stock Incentive Plan. (44) |
| *10.32 | Form of Stock Option Grant Notice. (44) |
| *10.33 | Form of Restricted Stock Agreement pursuant to 2002 Stock Incentive Plan. (44) |
| *10.34 | Form of Indemnity Agreement. (5) |
| 10.35 | Amended and Restated Stockholder Agreement, dated January 6, 2010, by and among Stephen A. Wynn, Elaine P. Wynn and Aruze USA, Inc. (30) |
| 10.36 | Waiver and Consent, dated November 24, 2010, by and among Aruze USA, Inc., Stephen A. Wynn and Elaine P. Wynn. (36) |

Table of Contents

| Exhibit No. | Description |
|---|---|
| 10.37 | Waiver and Consent, dated December 15, 2010, by and among Aruze USA, Inc., Stephen A. Wynn and Elaine P. Wynn. (37) |
| 10.38 | Amended and Restated Shareholders Agreement, dated as of September 16, 2004 by and among Wynn Resorts (Macau), Ltd., Wong Chi Seng and Wynn Resorts (Macau), S.A. (4) |
| 10.39 | Concession Contract for the Operation of Games of Chance or Other Games in Casinos in the Macau Special Administrative Region, dated June 24, 2002, between the Macau Special Administrative Region and Wynn Resorts (Macau), S.A. (English translation of Portuguese version of Concession Agreement). (2) |
| 10.40 | Concession Contract for Operating Casino Gaming or Other Forms of Gaming in the Macao Special Administrative Region, dated June 24, 2002, between the Macao Special Administrative Region and Wynn Resorts (Macau) S.A. (English translation of Chinese version of Concession Agreement). (5) |
| 10.41 | Unofficial English translation of Land Concession Contract between the Macau Special Administrative Region and Wynn Resorts (Macau) S.A. (3) |
| 10.42 | Material terms of draft land concession contract. (43) |
| 10.43 | Agreement, dated as of June 13, 2002, by and between Stephen A. Wynn and Wynn Resorts, Limited. (2) |
| 10.44 | Surname Rights Agreement, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts Holdings, LLC. (4) |
| 10.45 | Rights of Publicity License, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts Holdings, LLC. (4) |
| 10.46 | Termination Agreement, dated as of August 6, 2004, by and between Stephen A. Wynn and Valvino Lamore, LLC. (4) |
| 10.47 | Trademark Assignment, dated as of August 6, 2004, by and between Stephen A. Wynn and Wynn Resorts Holdings, LLC. (4) |
| 10.48 | Acknowledgement and Agreement, dated as of September 1, 2004, among Wynn Las Vegas, LLC, Wells Fargo Bank, National Association and the lenders named therein. (6) |
| 10.49 | Common Terms Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., certain financial institutions as Hotel Facility Lenders, Project Facility Lenders and Revolving Credit Facility Lenders, Deutsche Bank AG, Hong Kong Branch and Societe Generale Asia Limited as Global Coordinating Lead Arrangers and Societe Generale Asia Limited as Hotel Facility Agent, Project Facility Agent, Intercreditor Agent and Security Agent. (4) |
| 10.50 | Common Terms Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as the Company, Certain Financial Institutions as Hotel Facility Lenders, Project Facility Lenders, Revolving Credit Facility Lenders and Hedging Counterparties, Bank of America Securities Asia Limited, Deutsche Bank AG, Hong Kong Branch and Societe Generale Asia Limited as Global Coordinating Lead Arrangers, Societe Generale Asia Limited as Hotel Facility Agent and Project Facility Agent, Societe Generale Asia Limited as Intercreditor Agent, and Societe Generale, Hong Kong Branch as Security Agent. (8) |
| 10.51 | Second Amendment Agreement to the Common Terms Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A., certain financial institutions as Hotel Facility Lenders, Project Facility Lenders, and Revolving Credit Facility Lenders, Banc of America Securities Asia Limited, Deutsche Bank A.G. Hong Kong Branch, and Societe Generale Asia Limited as Global Lead Arrangers and Societe Generale Asia Limited as Hotel Facility Agent and Project Facility Agent and Societe Generale Hong Kong Branch as Intercreditor Agent. (12) |

121

Table of Contents

| Exhibit No. | Description |
|---|---|
| 10.52 | Common Terms Agreement Third Amendment Agreement dated September 8, 2009 between, among others, Wynn Resorts (Macau) S.A. as the company and Société Générale, Hong King Branch as security agent. (38) |
| 10.53 | Hotel Facility Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Hotel Facility Agent and the several Hotel Facility Lenders named therein. (4) |
| 10.54 | Hotel Facility Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company, Societe Generale Asia Limited, as Hotel Facility Agent and Certain Financial Institutions as Hotel Facility Lenders. (8) |
| 10.55 | Second Amendment Agreement to the Hotel Facility Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Hotel Facility Agent, and certain financial institutions as Hotel Facility Lenders. (12) |
| 10.56 | Project Facility Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Project Facility Agent and the several Project Facility Lenders named therein. (4) |
| 10.57 | Project Facility Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company, Societe Generale Asia Limited, as Project Facility Agent and Certain Financial Institutions as Project Facility Lenders. (8) |
| 10.58 | Second Amendment Agreement to the Project Facility Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A., Societe Generale Asia Limited as Project Facility Agent, and certain financial institutions as Project Facility Lenders. (12) |
| 10.59 | Revolving Credit Facility Agreement, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A. and the several Revolving Credit Facility Lenders named therein. (4) |
| 10.60 | Revolving Credit Facility Agreement Amendment Agreement, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company and Certain Financial Institutions as Revolving Credit Facility Lenders. (8) |
| 10.61 | Revolving Credit Facility Second Amendment Agreement dated June 27, 2007 among Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as Revolving Credit Facility Agent and certain financial institutions as revolving credit facility lenders. (12) |
| 10.62 | Deed of Appointment and Priority, dated as of September 14, 2004, among Wynn Resorts (Macau), S.A., certain financial institutions as Original First Ranking Lenders, Banco Nacional Ultramarino, S.A. as Second Ranking Finance Party, Wynn Group Asia, Inc. as Third Ranking Finance Party, Societe Generale -Hong Kong Branch as Security Agent, Societe Generale Asia Limited as Intercreditor Agent and Hotel Facility Agent and Project Facility Agent and others. (4) |
| 10.63 | Floating Charge (unofficial English Translation), dated September 14, 2004 between Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as the Security Agent. (4) |
| 10.64 | Debenture, dated September 14, 2004 between Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as the Security Agent. (4) |
| 10.65 | Wynn Resorts Support Agreement, dated September 14, 2004 between Wynn Resorts, Limited, Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as the Security Agent. (4) |
| 10.66 | Wynn Pledgors' Guarantee, dated September 14, 2004 between Wynn Group Asia, Inc., Wynn Resorts International, Ltd., Wynn Resorts (Macau) Holdings, Ltd. and Wynn Resorts (Macau), Ltd. as Guarantors; and Societe Generale, Hong Kong Branch as the Security Agent. (4) |

Table of Contents

| Exhibit No. | Description |
|---|---|
| 10.67 | Sponsors' Subordination Deed, dated September 14, 2004 between Wynn Resorts (Macau), S.A., Wynn Group Asia, Inc., Wynn Resorts International, Ltd., Wynn Resorts (Macau) Holdings, Ltd. and Wynn Resorts (Macau), Ltd. as the Wynn Companies and Societe Generale, Hong Kong Branch as the Security Agent. (4) |
| 10.68 | Bank Guarantee Reimbursement Agreement, dated September 14, 2004, between Wynn Resorts (Macau), S.A. and Banco Nacional Ultramarino. (4) |
| 10.69 | Wynn Resorts Support Agreement Deed of Amendment, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. and Societe Generale, Hong Kong Branch as Security Agent. (8) |
| 10.70 | Deed of Appointment and Priority Deed of Amendment, dated as of September 14, 2005, between Wynn Resorts (Macau), S.A. as Company, Certain Financial Institutions as Original First Ranking Lenders, Certain Financial Institutions as Original Hedging Counterparties, Banco Nacional Ultramarino, S.A. as Second Ranking Finance Party, Wynn Group Asia, Inc. as Third Ranking Finance Party, Societe Generale Asia Limited as Security Agent, Societe Generale Asia Limited as Intercreditor Agent , Societe Generale Asia Limited as Hotel Facility Agent and Project Facility Agent, and Others. (8) |
| 10.71 | Amended and Restated Master Disbursement Agreement, dated as of October 25, 2007, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the initial Bank Agent, and Deutsche Bank Trust Company America, as the initial Disbursement Agent. (15) |
| 10.72 | First Amendment to Amended and Restated Master Disbursement Agreement, dated as of October 31, 2007, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the initial Bank Agent, and Deutsche Bank Trust Company America, as the initial Disbursement Agent. (13) |
| 10.73 | Second Amendment to Amended and Restated Master Disbursement Agreement, dated as of November 6, 2007, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent. (14) |
| 10.74 | Third Amendment to Amended and Restated Master Disbursement Agreement, dated October 19, 2009, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent. (29) |
| 10.75 | Fourth Amendment to Amended and Restated Master Disbursement Agreement, dated April 28, 2010, by and among Wynn Las Vegas, LLC, Deutsche Bank Trust Company Americas, as the Bank Agent, and Deutsche Bank Trust Company Americas, as the Disbursement Agent. (33) |
| 10.76 | Management Fees Subordination Agreement, dated as of December 14, 2004, by Wynn Resorts, Limited, Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., and those subsidiaries of Wynn Las Vegas, LLC listed on Exhibit A hereto in favor of Deutsche Bank Trust Company Americas, as administrative agent, and U.S. Bank National Association, as trustee. (7) |
| 10.77 | Management Agreement, made as of December 14, 2004, by and among Wynn Las Vegas, LLC, Wynn Show Performers, LLC, Wynn Las Vegas Capital Corp., Wynn Golf, LLC, World Travel, LLC, Las Vegas Jet, LLC, Wynn Sunrise, LLC, and Wynn Resorts, Limited. (7) |
| 10.78 | Intellectual Property License Agreement dated as of December 14, 2004, by and among Wynn Resorts Holdings, Wynn Resorts, Limited and Wynn Las Vegas, LLC. (7) |
| 10.79 | Agreement of Lease, dated as of March 17, 2010, by and between Wynn Las Vegas, LLC and Elaine P. Wynn. (32) |
| 10.80 | Amended and Restated Agreement of Lease made as of March 18, 2010, by and between Wynn Las Vegas an Stephen A. Wynn. (32) |

123

Table of Contents

| Exhibit No. | Description |
|---|---|
| 10.81 | Fifth Amended and Restated Art Rental and Licensing Agreement, dated as of July 1, 2007, between Stephen A. Wynn, as lessor, Wynn Gallery, LLC, as lessee. (42) |
| 10.82 | Aircraft Time Sharing Agreement dated as of November 25, 2002, by and between Las Vegas Jet, LLC and Stephen A. Wynn. (38) |
| 10.83 | Amendment No. 1 to Aircraft Time Sharing Agreement, entered into as of January 1, 2004, by and between Las Vegas Jet, LLC and Stephen A. Wynn. (38) |
| 10.84 | Amendment No. 2 to Aircraft Time Sharing Agreement, entered into as of October 31, 2009, by and between Las Vegas Jet, LLC and Stephen A. Wynn. (38) |
| 10.85 | Aircraft Time Sharing Agreement dated as of November 26, 2002, by and between Las Vegas Jet, LLC and Marc Schorr. (38) |
| 10.86 | Amendment No. 1 to Aircraft Time Sharing Agreement, entered into as of January 1, 2004, by and between Las Vegas Jet, LLC and Marc Schorr. (38) |
| 10.87 | Amendment No. 2 to Aircraft Time Sharing Agreement, entered into as of October 31, 2009, by and between Las Vegas Jet, LLC and Marc Schorr. (38) |
| 10.88 | Amended and Restated Credit Agreement, dated as of August 15, 2006 among Wynn Las Vegas, LLC, as the Borrower, several lenders and agents, and Deutsche Bank Trust Company Americas, as Administrative Agent. (11) |
| 10.89 | First Amendment to Amended and Restated Credit Agreement dated April 9, 2007 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006. (12) |
| 10.90 | Second Amendment to Amended and Restated Credit Agreement dated October 31, 2007 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantors, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006. (13) |
| 10.91 | Third Amendment to Amended and Restated Credit Agreement dated as of September 17, 2008 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantor, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas, LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006. (19) |
| 10.92 | Fourth Amendment to Amended and Restated Credit Agreement, dated as of April 17, 2009, among Wynn Las Vegas, LLC and Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantors, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006. (27) |

124

**Table of Contents**

| Exhibit No. | Description |
|---|---|
| 10.93 | Fifth Amendment to Amended and Restated Credit Agreement, dated as of September 10, 2009, among Wynn Las Vegas, LLC and Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantors, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006. (28) |
| 10.94 | Sixth Amendment to Amended and Restated Credit Agreement dated as of April 28, 2010 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantor, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent. (33) |
| 10.95 | Seventh Amendment to Amended and Restated Credit Agreement dated as of August 4, 2010 among Wynn Las Vegas, LLC, Wynn Las Vegas Capital Corp., Wynn Show Performers, LLC, Wynn Golf, LLC, Wynn Sunrise, LLC, World Travel, LLC, Kevyn, LLC, Las Vegas Jet, LLC, Wynn Resorts Holdings, LLC, Wynn Completion Guarantor, LLC and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to Wynn Las Vegas, LLC's Amended and Restated Credit Agreement, dated as of August 15, 2006. (35) |
| 10.96 | Credit Agreement dated June 21, 2007 among Wynn Resorts, Limited and Deutsche Bank Securities, Inc and Bank of America Securities LLC. (12) |
| 10.97 | First Amendment to Credit Agreement, dated as of August 1, 2008, among Wynn Resorts, Limited and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to the Credit Agreement. (17) |
| 10.98 | Second Amendment to Credit Agreement, dated as of November 13, 2008, among Wynn Resorts, Limited and Deutsche Bank Trust Company Americas, as Administrative Agent on behalf of the several banks and other financial institutions or entities from time to time party to the Credit Agreement. (23) |
| 21.1 | Subsidiaries of the Registrant. (44) |
| 23.1 | Consent of Ernst & Young LLP. (44) |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. (44) |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. (44) |
| 32.1 | Certification of CEO and CFO Pursuant to 18 U.S.C. Section 1350. (44) |
| **101 | The following financial information from the Company's Annual Report on Form 10-K for the year ended December 31, 2011, filed with the SEC on February 29, 2012 formatted in Extensible Business Reporting Language (XBRL): (i) the Consolidated Statements of Income for the years ended December 31, 2011, 2010 and 2009, (ii) the Consolidated Balance Sheets at December 31, 2011 and December 31 2010, (iii) the Consolidated Statements of Cash Flows for the years ended December 31, 2011, 2010 and 2009, (iv) the Consolidated Statements of Stockholders' Equity at December 31, 2011, 2010 and 2000, and (v) Notes to Consolidated Financial Statements.** |

---

\*    Denotes management contract or compensatory plan or arrangement.

**    Pursuant to Rule 406T of Regulation S-T, the XBRL related information in Exhibit 101 to this Annual Report on Form 10-K shall be deemed to be not filed for purposes of Section 18 of the Exchange Act, or

Table of Contents

otherwise subject to the liability of that section, and shall not be deemed part of a registration statement, prospectus or other document filed under the Securities Act or the Exchange Act, except as shall be expressly set forth by specific reference in such filings.

(1)   Incorporated by reference from Amendment No. 4 to the Form S-1 filed by the Registrant on October 7, 2002 (File No. 333-90600).
(2)   Incorporated by reference from Amendment No. 1 to the Form S-1 filed by the Registrant on August 20, 2002 (File No. 333-90600).
(3)   Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on August 3, 2004.
(4)   Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on November 4, 2004.
(5)   Incorporated by reference from Amendment No. 3 to the Form S-1 filed by the Registrant on September 18, 2002 (File No. 333-90600).
(6)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 8, 2004.
(7)   Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 15, 2005.
(8)   Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on November 8, 2005.
(9)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 1, 2005.
(10)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 4, 2008.
(11)  Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on November 9, 2006.
(12)  Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on August 9, 2007.
(13)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 1, 2007.
(14)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 13, 2007.
(15)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on October 31, 2007.
(16)  Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 1, 2007.
(17)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on August 5, 2008.
(18)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 15, 2008.
(19)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 19, 2008.
(20)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 28, 2008.
(21)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on May 7, 2008.
(22)  Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 2, 2009.
(23)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 13, 2008.
(24)  Incorporated by reference from the Quarterly Report on Form 10-Q filed by the Registrant on May 11, 2009.
(25)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 9, 2009.
(26)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 23, 2009.
(27)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on April 21, 2009.
(28)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 14, 2009.
(29)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on October 20, 2009.
(30)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on January 6, 2010.
(31)  Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on February 5, 2010.

**Table of Contents**

(32)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on March 19, 2010.
(33)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on April 28, 2010.
(34)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on May 18, 2010.
(35)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on August 5, 2010.
(36)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on November 26, 2010.
(37)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on December 15, 2010.
(38)   Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 1, 2010.
(39)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on February 28, 2011.
(40)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on August 18, 2011.
(41)   Incorporated by reference from the Form S-8 Registration Statement filed by the Registrant on July 27, 2010.
(42)   Incorporated by reference from the Annual Report on Form 10-K filed by the Registrant on March 1, 2011.
(43)   Incorporated by reference from the Current Report on Form 8-K filed by the Registrant on September 12, 2011.
(44)   Filed herein.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**WYNN RESORTS, LIMITED**

Dated: February 29, 2012

By _____  /s/  STEPHEN A. WYNN
                                 **Stephen A. Wynn**
                     **Chairman of the Board and Chief Executive Officer**
                              **(Principal Executive Officer)**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/  STEPHEN A. WYNN<br>**Stephen A. Wynn** | Chairman of the Board and<br>Chief Executive Officer (Principal Executive Officer) | February 29, 2012 |
| /s/  LINDA CHEN<br>**Linda Chen** | President, Wynn International Marketing and Director | February 29, 2012 |
| /s/  RUSSELL GOLDSMITH<br>**Russell Goldsmith** | Director | February 29, 2012 |
| /s/  RAY R. IRANI<br>**Dr. Ray R. Irani** | Director | February 29, 2012 |
| /s/  ROBERT J. MILLER<br>**Robert J. Miller** | Director | February 29, 2012 |
| /s/  JOHN A. MORAN<br>**John A. Moran** | Director | February 29, 2012 |
| **Kazuo Okada** | Director | |
| /s/  MARC SCHORR<br>**Marc Schorr** | Chief Operating Officer and Director | February 29, 2012 |
| /s/  ALVIN SHOEMAKER<br>**Alvin V. Shoemaker** | Director | February 29, 2012 |
| /s/  D. BOONE WAYSON<br>**D. Boone Wayson** | Director | February 29, 2012 |
| /s/  ELAINE P. WYNN<br>**Elaine P. Wynn** | Director | February 29, 2012 |
| /s/  ALLAN ZEMAN<br>**Allan Zeman** | Director | February 29, 2012 |
| /s/  MATT MADDOX<br>**Matt Maddox** | Chief Financial Officer and Treasurer (Principal Financial and Accounting Officer) | February 29, 2012 |

128

# EXHIBIT 27

8-K 1 d304177d8k.htm FORM 8-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

**FORM 8-K**

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): February 19, 2012

**WYNN RESORTS, LIMITED**
(Exact name of registrant as specified in its charter)

| **Nevada** | **000-50028** | **46-0484987** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **3131 Las Vegas Boulevard South** | **89109** |
|---|---|
| **Las Vegas, Nevada** | |
| (Address of principal executive offices of the registrant) | (Zip Code) |

**(702) 770-7555**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01.        Other Events.**

On February 19, 2012, Wynn Resorts, Limited (the "Company") filed a complaint in the District Court of Clark County, Nevada against Mr. Kazuo Okada, a member of the Board of Directors of the Company, and certain of his affiliates, alleging breaches of fiduciary duty and related claims (the "Complaint"). The Complaint included as an exhibit a report on the results of an independent investigation by Freeh Sporkin & Sullivan, LLP to the Company's Gaming Compliance Committee (the "Freeh Report"). The Complaint and the Freeh Report are attached as Exhibits 99.1 and 99.2, respectively, to this Current Report on Form 8-K and incorporated herein by reference.

**Item 9.01.        Financial Statements and Exhibits.**

(d)                Exhibits:

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Complaint, Wynn Resorts, Ltd. v. Kazuo Okada, et al., No. A-12-656710-B (Nev. Dist. Ct., Clark Cnty., Feb. 19, 2012). |
| 99.2 | Report by Freeh, Sporkin & Sullivan, LLP to the Gaming Compliance Committee of Wynn Resorts, Limited. |

Case 3:14-cv-04329-WHO   Document 14-4   Filed 10/20/14   Page 146 of 214

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: February 22, 2012

WYNN RESORTS, LIMITED

By:     /s/ Matt Maddox
        Matt Maddox
        Chief Financial Officer and Treasurer

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.         Page 1 of 21

Case 3:14-cv-04329-WHO   Document 14-4   Filed 10/20/14   Page 147 of 214

EX-99.1 2 d304177dex991.htm COMPLAINT, WYNN RESORTS, LTD. V. KAZUO OKADA ET AL.      **Exhibit 99.1**



Electronically Filed
02/19/2012 02:14:35 AM

CLERK OF THE COURT

1   **COMP**
James J. Pisanelli, Esq., Bar No. 4027
2   JJP@pisanellibice.com
Todd L. Bice, Esq., Bar No. 4534
3   TLB@pisanellibice.com
Debra L. Spinelli, Esq., Bar No. 9695
4   DLS@pisanellibice.com
Jarrod L. Rickard, Esq., Bar No. 10203
5   JLR@pisanellibice.com
PISANELLI BICE PLLC
6   3883 Howard Hughes Parkway, Suite 800
Las Vegas, Nevada 89169
7   Telephone: 702.214.2100
Facsimile: 702.214.2100
8
Paul K. Rowe, Esq. *(pro hac vice forthcoming)*
9   pkrowe@wlrk.com
Stephen R. DiPrima, Esq. *(pro hac vice forthcoming)*
10   srdiprima@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ, LLP
11   51 West 52nd Street
New York, NY 10019
12   Telephone: 212.403.1000
Facsimile: 212.403.2000
13
Robert L. Shapiro, Esq. *(pro hac vice forthcoming)*
14   RS@glaserweil.com
GLASER WEIL FINK JACOBS HOWARD
15   AVCHEN & SHAPIRO, LLP
10259 Constellation Boulevard, 19th Floor
16   Los Angeles, CA 90067
Telephone: 310.553.3000
17   Facsimile: 310.556.2920
18   Attorneys for Wynn Resorts, Limited

19              **DISTRICT COURT**

20          **CLARK COUNTY, NEVADA**

21   WYNN RESORTS, LIMITED, , a Nevada    Case No.: A-12-656710-B
Corporation,
22                         Dept. No.: X I
23            Plaintiff,
vs.                 **COMPLAINT**
24   KAZUO OKADA, an individual, ARUZE
USA, INC., a Nevada corporation,    **(Request for Business Court Assignment**
25   UNIVERSAL ENTERTAINMENT CORP.,   **Pursuant to EDCR 1.61(a))**
a Japanese corporation,
26                     **(Exempt from Arbitration – Declaratory**
           Defendants.    **Relief Requested)**
27
28

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

1

1   Plaintiff WYNN RESORTS, LIMITED ("Wynn Resorts"), by and through its undersigned

2   counsel, hereby files the above-captioned Complaint:

3                                  **NATURE OF THE ACTION**

4        This is an action for breach of fiduciary duty and related offenses committed against

5   Wynn Resorts at the hands of one of its directors, Kazuo Okada ("Okada") and his affiliates.

6   Wynn Resorts' Compliance Committee commissioned former Director of the Federal Bureau of

7   Investigation, Louis J. Freeh, to examine Okada's domestic and foreign activities impacting

8   Wynn Resorts. Based upon a multi-month investigation – which culminated with a personal

9   interview that Okada long evaded – Freeh uncovered substantial evidence of gross improprieties

10  by Okada and his agents, as explained in Freeh's report, attached as Exhibit 1. In particular, Freeh

11  presented Wynn Resorts' Board with evidence that Okada had made unlawful payments to foreign

12  gaming regulators who could advance Okada's business interests. Okada surreptitiously undertook

13  these acts despite admonishments that all Directors closely adhere to Company policy, scrupulous

14  business practices/ethics, and the law, both foreign and domestic. The public's confidence in

15  gaming's integrity depends upon strict observance of these principles. Okada's conduct poses a

16  direct assault upon, and a present threat to, Wynn Resorts' reputation for probity, which is central

17  to maintaining its stature in the gaming industry as well as its current and future licensing.

18                          **PARTIES AND RELATED PERSONS/ENTITIES**

19       1.   Plaintiff WYNN RESORTS is and was at all times relevant hereto a corporation

20  organized and existing under the laws of the State of Nevada, with its principal place of business

21  in the State of Nevada. Wynn Resorts is publicly traded on NASDAQ.

22       2.   Wynn Resorts is a world class developer of destination resort casinos.

23  Wynn Resorts owns resort casinos through its wholly owned subsidiary,

24  WYNN LAS VEGAS, LLC ("Wynn Las Vegas") and through WYNN MACAU, LIMITED

25  ("Wynn Macau").

26       3.   Wynn Las Vegas operates the Wynn Las Vegas and Encore resort casinos in

27  Las Vegas, Nevada.

28

PISANELLI BICE PLLC
3883 Howard Hughes Parkway, Suite 800
Las Vegas, Nevada 89169

2

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

1   4.    Wynn Macau is a Cayman Islands company, publicly traded on the Hong Kong

2   Stock Exchange (of which Wynn Resorts owns a majority interest). Through its wholly owned

3   subsidiary, WYNN RESORTS (MACAU), S.A., a company organized and existing under the

4   laws of Macau Special Administrative Region of the Peoples Republic of China, Wynn Macau

5   operates the Wynn Macau and Encore at Wynn Macau resort-casinos in Macau.

6   5.    Defendant OKADA is and was at all times relevant hereto a citizen of Japan, and a

7   director of Wynn Resorts. Okada serves multiple roles with Wynn Resorts and its affiliated

8   companies (the "Wynn Companies"). He is a member of the Board of Directors for both

9   Wynn Resorts and Wynn Macau and, until February 18, 2012, through UNIVERSAL

10   ENTERTAINMENT CORPORATION ("Universal") and ARUZE USA, controlled a shareholder

11   that had owned approximately 19.66% of Wynn Resorts. From October 2002 up to and until

12   October 2011, Okada also served as Vice Chairman of Wynn Resorts. In these capacities, Okada

13   owed, and continues to owe, fiduciary duties of care, loyalty, and good faith to the

14   Wynn Companies.

15   6.    Defendant ARUZE USA, INC. ("ARUZE USA") is and was at all times relevant

16   hereto a corporation organized and existing under the laws of the State of Nevada, and a wholly

17   owned subsidiary of Universal ("Universal"). Until February 18, 2012, ARUZE USA was a

18   19.66% shareholder in Wynn Resorts. Okada serves as director, President, Secretary, and

19   Treasurer of ARUZE USA.

20   7.    Defendant UNIVERSAL is a public corporation organized under the laws of

21   Japan, and formerly known as ARUZE Corporation until a November 2009 name change.

22   Universal manufactures and sells pachislot and pachinko machines, and other similar gaming

23   equipment. Universal does business in the State of Nevada, has been issued a manufacturer's

24   license by the Nevada Gaming Commission, and was deemed suitable by the Nevada Gaming

25   Commission as a 100% shareholder in ARUZE USA. Okada is Director, Chairman of the Board

26   and, together with his family members, a 67.9% shareholder in Universal.

27   8.    The Wynn Resorts' Board of Directors consists of 12 members, comprised of

28   Stephen A. Wynn ("Mr. Wynn") as Chairman, Okada, Russell Goldsmith, Linda Chen,

3

1    Dr. Ray R. Irani, former Nevada Governor Robert J. Miller, John A. Moran, Alvin V. Shoemaker,

2    D. Boone Wayson, Elaine P. Wynn, Allan Zeman, and Marc D. Schorr (collectively "Wynn

3    Directors" and/or "Wynn Board").

4         9.     Wynn Resorts' Gaming Compliance Committee ("Compliance Committee") is an

5    internal committee chaired by Director Miller and comprised of two additional members, Schorr

6    (director and COO) and John Strzemp (Wynn Resorts' Executive Vice President and Chief

7    Administrative Officer). The Compliance Committee is charged with assuring Wynn Resorts'

8    compliance with all laws and regulations, particularly on gaming laws, regulations, and policies.

9         10.     The Honorable Louis J. Freeh, Esq., is a former director of the Federal Bureau of

10   Investigation ("FBI"), having led that agency with distinction from 1993 to 2001. Prior to serving

11   as FBI Director, Freeh was a United States District Court Judge. Today, Freeh is a partner in

12   Freeh Sporkin & Sullivan, LLP – a law firm he founded with two other former federal judges –

13   which specializes in domestic and foreign corporate investigations and compliance.

14        **JURISDICTION**

15        11.     Defendants Universal, ARUZE USA, and Okada have each individually and in

16   concert with one another, caused the acts and events alleged herein within the State of Nevada

17   and all are subject to the jurisdiction of this Court. Venue is also proper in this Court.

18        12.     This matter is properly designated as a business court matter and assigned to the

19   Business Docket under EDCR 1.61(a) as the claims alleged herein arise from business torts.

20        **GENERAL ALLEGATIONS**

21        13.     A Nevada gaming license is a privilege. Nevada law imposes comprehensive

22   regulatory requirements upon gaming licensees, including obligations that those associated with

23   the licensee possess the necessary character, qualifications, and integrity to be suitable to hold

24   that privilege so as to not pose a threat to the public interest or the integrity of the regulation and

25   control of gaming. As a Director of Wynn Resorts, Okada is subject to these demanding

26   standards.

27        14.     Additionally, all of Wynn Resorts' Directors agreed to be, were, and are subject to

28   Wynn Resorts' Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

4

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.   Page 5 of 21

Case 3:14-cv-04329-WHO   Document 14-4   Filed 10/20/14   Page 151 of 214

1  Conduct reinforces and enhances Wynn Resorts' commitment to doing business in an ethical
2  manner. The Code of Conduct reflects Wynn Resorts' values, demonstrates ethical leadership,
3  and promotes an environment that upholds its longstanding reputation for integrity, ethical
4  conduct, and trust.

5     15.     Forsaking his obligations to maintain the integrity required of a gaming licensee,
6  the Company's Code of Conduct and his other fiduciary duties, Okada committed improper acts
7  that included making payments for the benefit of foreign gaming officials who could advance his
8  personal business interests. He has furthermore elected to compete against Wynn Resorts,
9  undertaking a campaign to convert Wynn Resorts' assets for his own benefit, and that of his
10 affiliates. Wynn Resorts has been compelled to defend against Okada's acts of aggression by,
11 among other things, the initiation of remedial and defensive Board actions and the prosecution of
12 this action.

13                    *Okada Enters the Philippine Market*

14     16.     By all measures, Okada's abandonment of his duty of loyalty to Wynn Resorts
15 commenced with his plan to develop gaming operations in the Philippines.

16     17.     Upon learning of opportunities in the Philippines, Okada approached Mr. Wynn
17 with an idea of creating a casino resort in Manila Bay. Neither Mr. Wynn nor the Board of
18 Directors was willing to pursue such opportunities in the Philippines.

19     18.     Undeterred, Okada pressed on with his personal agenda without full disclosure to
20 Mr. Wynn or the Board. In furtherance of his personal scheme, Okada asked that a city ledger
21 account at Wynn Resorts be opened in the name of his company, Universal ("Universal City
22 Ledger"). Upon information and belief, and unbeknownst to Wynn Resorts, Okada sought the
23 city ledger account, in part, to facilitate his pursuit of his personal business interests in the
24 Philippines and to promote the false appearance of an affiliation with Wynn Resorts to his
25 Philippine business contacts.

26     19.     Upon information and belief, many doors opened for Okada in the Philippines due
27 to his well-publicized relationship with Mr. Wynn and Wynn Resorts. Wynn Resorts is informed
28 and believes that Okada touted his relationship and affiliation with Wynn Resorts so as to

PISANELLI BICE PLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

5

1   convince others that Wynn Resorts was and/or is somehow affiliated with Universal's desired

2   presence in Manila.  All such representations were and are false.

3       20.    In 2008, the Philippine Amusement and Gaming Corporation ("PAGCOR"), a

4   100% government-owned and controlled corporation that operates under the direct supervision of

5   the Office of the President of the Philippines and is charged with "[r]egulat[ing], authoriz[ing] and

6   licens[ing] games of chance, games of cards and games of numbers, particularly casino gaming,

7   in the Philippines," awarded four provisional gaming licenses without public bidding.  PAGCOR

8   issued one such license to a newly-formed entity that is owned 99% by ARUZE USA, known as

9   Tiger Resort, Leisure and Entertainment Inc.  Okada's pursuit and development of that license

10   expressly contradicts Wynn Resorts' requests to Okada not to pursue business in the Philippines.

11   Moreover, Okada's actions to obtain and exploit that license involved violations of his duties to

12   Wynn Resorts.

13                    *Initial Examination of Okada's Activities*

14       21.    In or around the fall of 2010, Wynn Resorts heard that Okada was continuing to

15   represent to multiple people that he (and/or Universal) and Wynn Resorts were involved in a joint

16   venture together in the Philippines and were pursuing, also as joint venturers, potential

17   opportunities in Japan. Such representations were again false.

18       22.    Questioning Okada's actions, in or around January 2011, Wynn Resorts, through

19   its Compliance Committee, commissioned an independent investigation and risk assessment of

20   investing in the gaming industry in the Philippines, which found:

21           a.    Official corruption in the Philippine gaming industry is "deeply ingrained";

22           b.    Doubts that newly-elected President Aquino's stated plans for reform would

23               eliminate corruption from the gaming industry;

24           c.    The country's legal/regulatory frameworks were not closely aligned with

25               American compliance and transparency standards; and

26           d.    Despite a general refusal by witnesses to discuss Okada's role in the

27               Philippines (many refused to comment), other information created

28

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWY, SUITE 800
LAS VEGAS, NEVADA 89169

6

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

1    reasonable suspicion that persons acting on Okada's behalf had engaged in

2    improprieties.

3    23.    Notwithstanding the issues identified by the investigation/assessment, Okada was

4    unrelenting in his appeal to Wynn Resorts. In February 2011, he repeated his oft-uttered request

5    that Mr. Wynn travel to the Philippines to explore investing in Universal's Manila Bay project.

6    24.    During the February 24, 2011 meeting of the Board of Directors, following

7    discussion of the Foreign Corrupt Practices Act ("FCPA"), the findings from the independent

8    investigation were relayed to the Board. Mr. Wynn advised the Board that he had been invited by

9    Okada to meet Philippine President Aquino. Okada was present for the Board's discussions. The

10   independent directors (Goldsmith, Irani, Miller, Moran, Shoemaker, Wayson, and Zeman)

11   unanimously advised Wynn Resorts management that involvement in the Philippines was

12   inadvisable and that the meeting should be cancelled. In plain terms, the Board informed Okada

13   that Wynn Resorts would not invest in Universal's Manila Bay project.

14   25.    Okada, who had scheduled on his own initiative a meeting between Mr. Wynn and

15   Philippine President Aquino, was embarrassed and angry in having to cancel the arrangements.

16   Again, however, Okada remained undeterred.

17   26.    Finally recognizing that Wynn Resorts was not going to provide Okada and

18   Universal with funds or know-how for his Philippine project, Okada nonetheless moved forward

19   with his secret plans to compete against Wynn Resorts by false claims of affiliation and

20   endorsement, among other things.

21   27.    Despite knowing the Board's opposition to his plans in the Philippines, Okada

22   proceeded to announce that he and Universal planned to lure high-limit, VIP gamblers from China

23   to its Manila Bay resort-casino, the same customer base as Wynn Macau. In short, Okada was

24   creating a new casino in direct competition with Wynn Macau.

25   28.    Universal purportedly intends to construct two casinos and three hotels in Manila

26   by December 2013, intends to open those facilities in early 2014, intends to spend $2.3 billion on

27   the project, and hopes to turn $2 billion in sales in its first year of operation. Okada has publicly

28

7

1    stated his intent to open more casinos in Asia in 2015.  On or about January 26, 2012, Universal

2    broke ground on construction of the Manila Bay casino resort.

3        29.    To promote his own interests, Okada launched a campaign to misappropriate

4    Wynn Resorts' assets and secrets for his and his affiliates' use.  Among other things, Okada

5    arranged to have several people serve as interns at the Wynn Macau property so that Wynn Macau

6    "know how" could be learned and siphoned from Wynn Resorts.

7                        *Wynn Resorts Expects Compliance*

8        30.    During a July 28, 2011 executive session, the independent directors again

9    discussed Okada's ongoing involvement in the Philippines and expressed concern about probity

10   issues attendant to Okada's involvement and the effect that Okada's actions in the Philippines

11   could have on Wynn Resorts.  Of notable concern were Okada's comments at prior Board

12   meetings.  Specifically, Okada had relayed his familiarity with local business practices that

13   involved having third parties make payments to government officials rather than someone doing

14   so directly (acts prohibited not only under the Foreign Corrupt Practices Act, but also by Wynn

15   Resorts' Code of Conduct and other policies).

16       31.    Following Okada's comments, Wynn Resorts took several steps to reiterate and to

17   ensure awareness of the boundaries of corporate policies and legal restrictions on payments to

18   government officials (among other things). These include the following:

19           a.    To ensure that all directors, especially Okada, were kept informed about the

20               Foreign Corrupt Practices Act, on August 4, 2011, a notice to the Board

21               was issued for a training on the Foreign Corrupt Practices Act to be held on

22               October 31, 2011, followed by a Board meeting on November 1, 2011.

23           b.    To further protect Wynn Resorts, on August 5, 2011, all members of the

24               Board of Directors were asked to review:  (1) the Code of Business Ethics;

25               and (2) the Policy Regarding Payments to Government Officials, and

26               execute an acknowledgement that they read, understood, and

27               acknowledged the policies.  All members of the Board have signed the

28

8

1    acknowledgement but for one.  Despite multiple attempts to follow-up,

2    Okada has still failed to sign.

3    c.    Attached to the Directors' & Officers' Questionnaire sent to all members of

4    the Board on January 12, 2012 was an acknowledgement form that required

5    the Directors to sign in two places:  (1) Page 26 of the questionnaire; and

6    (2) Page 50 on the separate Code of Business Conduct and Ethics

7    Acknowledgement Form that was part of the questionnaire packet.  Okada

8    signed and returned the former on the January 27, 2012 deadline but failed

9    to return a signed Code of Business Conduct and Ethics Acknowledgement

10   Form.  Okada has still not returned the acknowledgement despite a

11   follow-up request to do so.

12   32.    On September 15, 2011, Okada, through his assistant, sent an RSVP that he would

13   attend both the Foreign Corrupt Practices Act training on October 31 and the Board meeting

14   noticed for November 1, 2011.  But Okada never attended the training.

15   33.    To follow up on issues raised during the July 28, 2011 Board meeting, in early

16   August, Wynn Resorts' Board of Directors also commissioned a second independent investigation

17   into the regulatory and compliance climate in the Philippines.  This investigation identified

18   anomalies and improprieties related to Universal's/Okada's dealings in the Philippines.

19   34.    On September 27, 2011, the Compliance Committee held a special meeting to

20   discuss the findings of the second independent investigation.  Those findings identified a number

21   of concerns regarding Okada's activities, including that he may be:  (a) engaging in acts that

22   would render him unsuitable under Nevada gaming regulations, and (b) breaching the fiduciary

23   duties he owed to Wynn Resorts.

24   35.    At the direction of the Compliance Committee, Wynn Resorts approached Okada's

25   counsel to discuss the Committee's concerns relative to Okada's conduct and business in the

26   Philippines, and its effect on Wynn Resorts and Okada's duties and responsibilities as a member

27   of Wynn Resorts' Board of Directors.  Wynn Resorts' concerns were ill-received.

28

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

9

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.        Page 10 of 21

Case 3:14-cv-04329-WHO   Document 14-4   Filed 10/20/14   Page 156 of 214

PISANELLI BICE PLLC
3883 Howard Hughes Parkway, Suite 800
Las Vegas, Nevada 89169

36.    Over the next month, counsel for Wynn Resorts and Okada engaged in discussions about Wynn Resorts' concerns that Okada's involvement in the Philippines was placing Wynn Resorts and its shareholders at substantial risk.

37.    Okada designed and executed a strategy to divert attention away from his own misconduct. Okada claimed to need access to certain books and records (*e.g.*, records related to an amendment to a shareholder's agreement between Mr. Wynn, Elaine Wynn, and Okada). Okada's diversionary tactics underscored his need to change the topic from the real issue – his misconduct in the Philippines.

38.    Okada's game playing continued. On October 25, 2011, days before the long-scheduled Foreign Corrupt Practices Act training, he requested that the training materials be translated into Japanese (despite his previous, long-term practice of translating all materials on his own) and that the date of the training be moved (despite that it had been planned around his previous confirmation). His refusal to attend the training, an event attended by all other Board members, demonstrated a cavalier disregard for his obligations as director of a company in a highly regulated gaming industry. In the end, Okada was the sole Board member who failed to attend the training, with all other directors appearing in person or telephonically.

*Former FBI Director Freeh Investigates*

39.    On or about October 29, 2011, Wynn Resorts, on behalf of its Compliance Committee, retained Freeh to conduct an independent investigation into Okada and his activities, with a focus on three main areas: (1) whether Okada breached the fiduciary duties owed to Wynn Resorts; (2) whether Okada engaged in conduct that could jeopardize Wynn Resorts' gaming licenses; and (3) whether Okada engaged in any conduct that could violate Wynn Resorts' compliance policy.

40.    As part of that investigation, Freeh conducted dozens of interviews (including of all independent members of Wynn Resorts' Board of Directors), and reviewed thousands of pages of documents and emails. As of January 1, 2012, there remained only one outstanding item on Freeh's to-do list: interview Okada. Yet, Okada refused to schedule the interview despite Freeh's

10

1   stated willingness to travel on short notice to conduct the interview anywhere in the world to

2   accommodate Okada's schedule.

3          41.    With only Okada's interview outstanding, on February 6, 2012, Freeh briefed

4   Wynn Resorts' Compliance Committee.

5          42.    Okada finally sat for his interview with Freeh in Tokyo, Japan, on February 15,

6   2012, where Okada was accompanied by United States counsel.

7          43.    Freeh announced that he would report his findings to the Board of Directors on

8   February 18, 2012.

9          44.    At the February 18, 2012 Board meeting, Freeh made a detailed presentation and

10  provided the Board with copies of his final report, outlining the following improprieties, among

11  others:

12         a.     The Universal City Ledger account established by Okada revealed

13                36 separate instances, from May 2008 to through June 2011 where Okada

14                or his associates/affiliates made payments exceeding US $110,000 that

15                directly benefitted senior PAGCOR officials.   This included payment for

16                luxury lodging, extravagant dinners, shopping, and cash to spend for,

17                among others, former PAGCOR Chairman Genuino and his family and

18                friends and current PAGCOR Chairman, Cristino Naguiat ("Naguiat").

19         b.     The Freeh report noted that Okada's conduct constituted *prima facie*

20                evidence of violations of the Foreign Corrupt Practices Act.   On one

21                particular occasion, Okada arranged for PAGCOR Chairman Naguiat, his

22                wife, his three children, their nanny, other senior PAGCOR officials, one of

23                whom also brought his family to stay at Wynn Macau.   Okada and his

24                associates refused to provide Wynn Macau management with the name of

25                Chairman Naguiat and tried to conceal his identity.   At Okada's associates'

26                request and Okada's direction, Chairman Naguiat and his entourage were

27                provided with the most expensive accommodation, food, and star

28                treatment.   In addition, Okada's associates asked that each guest be

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

11

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.                    Page 12 of 21

Case 3:14-cv-04329-WHO    Document 14-4    Filed 10/20/14    Page 158 of 214

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

1    provided a $5,000 cash advance during their stay. Following the stay,

2    Okada's associates requested Wynn Macau reduce the excessive charges

3    because they feared an investigation and did not want Universal to get in

4    trouble. Wynn Macau refused.

5        c.    There is substantial evidence that Okada, his associates and companies may

6              have arranged and manipulated ownership and management of legal

7              entities in the Philippines under his control, in a manner that may have

8              enabled the evasion of Philippine constitutional and statutory requirements.

9        d.    Moreover, close associates and consultants of the former PAGCOR

10             administration attained positions as corporate officers, directors and/or

11             nominal shareholders of entities controlled by Okada and, in some cases,

12             served as links between Okada and the former PAGCOR chair.

13       e.    There is substantial evidence that the ownership structure of

14             Okada-affiliated, ARUZE USA-owned entities may subject Okada to civil

15             and criminal penalties under Philippine law.

16       f.    Despite being repeatedly advised of the strict anti-bribery laws and

17             Wynn Resorts' policies, Okada insists and strongly believes that, when

18             doing business in Asia, he is permitted to provide gifts and things of value

19             to government officials, whether directly or indirectly.

20       g.    His conduct is not accidental or based upon a misunderstanding of the law

21             or the policies. Rather, Okada stated his personal rejection of anti-bribery

22             laws and Wynn Resorts' related policies to fellow Wynn Resorts Board

23             members.

24    45.    Following Freeh's presentation, the Board deliberated at length and unanimously

25    adopted resolutions finding the Defendants to be Unsuitable Persons under Wynn Resorts' Second

26    Amended and Restated Articles of Incorporation ("Articles of Incorporation" and/or "Articles"),

27    and redeemed ARUZE USA's shares in Wynn Resorts in accordance with the provisions of the

28    Articles

12

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.    Page 13 of 21

Case 3:14-cv-04329-WHO   Document 14-4   Filed 10/20/14   Page 159 of 214

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

46.    Okada's deplorable actions demonstrate that he had abandoned and forsaken all duties owed to Wynn Resorts. Worse, Okada undertook a pattern of conduct that jeopardizes Wynn Resorts' good reputation, its long-standing business relationships, and its gaming and business licenses. Accordingly, the Board of Directors has unanimously (except for Okada) authorized the pursuit of this action.

### FIRST CAUSE OF ACTION

**(Breach of Fiduciary Duty)**

**(Wynn Resorts against Okada)**

47.    Wynn Resorts repeats and realleges the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

48.    Wynn Resorts' Code of Conduct, which applies to all employees, officers, and directors, provides guidelines for ethical behavior consistent with the reputation and integrity of Wynn Resorts. The Code of Conduct supplements the duties, fiduciary and otherwise, imposed upon Okada under Wynn Resorts' governing documents and the law.

49.    The Code of Conduct addresses conflicts of interest. Specifically, the Code of Conduct provides that "directors are expected to dedicate their best efforts to advancing [Wynn Resorts'] interests and to make decisions that affect [Wynn Resorts] based on [Wynn Resorts'] best interest, independent of outside influences."

50.    The Code of Conduct defines a "conflict of interest" as "when your own interests (including the interests of a family member or an organization with which you have a significant relationship) interfere, or even appear to interfere with the interests of [Wynn Resorts]. A conflict situation can arise when you take actions, have interests or are offered benefits that make it difficult for you to perform your [Wynn Resorts] work objectively and effectively."

51.    The Code of Conduct provides a non-exclusive list of potential conflict scenarios. Included in this list is an express prohibition on financial interests in other businesses: "You may not own a significant interest in any company that competes with [Wynn Resorts]." The Code of Conduct provides that "it is not typically" a conflict if the competing entity "is a publicly traded company *and* you and your family members' only relationship with any such entity is to have an

13

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.        Page 14 of 21

Case 3:14-cv-04329-WHO   Document 14-4   Filed 10/20/14   Page 160 of 214

1  interest of *less than 2%* of the outstanding shares of the [competing] company." (Emphasis

2  added).

3       52.   Further, the Code of Conduct precludes outside employment or activities with a

4  competitor. Specifically, "[s]imultaneous employment with or serving as a director of a

5  competitor of [Wynn Resorts] is prohibited, as is any activity that is intended to or that you

6  should reasonably expect to advance a competitor's interests.  You may not market products or

7  services in competition with [Wynn Resorts'] current or potential business activities. . . . ."

8       53.   In addition, the Code of Conduct expressly states that *"[y]ou may not use*

9  *corporate property or information or your position at [Wynn Resorts] for improper personal*

10  *gain, and you may not compete with [Wynn Resorts]."* (Emphasis added.)

11      54.   The Code of Conduct also provides as follows:

12        a.   With respect to offering gifts and entertainment,

13          i.   "Special rules apply in the context of dealing with government

14             officials and employees.  See 'Interacting with Government –

15             Prohibition on Gifts to Government Officials and Employees'

16             below."

17          ii.   "Giving or receiving any payment or gift in the nature of a bribe or

18             a kickback is absolutely prohibited."

19          iii.   "You are prohibited from providing gifts, meals or anything of

20             value to government officials or employees or members of their

21             families in connection with Company business without prior written

22             approval from the Compliance Officer."

23          iv.   "The Company's Policy Regarding Payments to Foreign Officials,

24             the U.S. Foreign Corrupt Practices Act (the "FCPA"), and the laws

25             of many other countries prohibit the Company and its officers,

26             employees and agents or other third parties from giving or offering

27             to give money or anything of value, directly or through an

28             intermediary, to a foreign officials, employees of a state-owned

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

14

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.                                    Page 15 of 21

Case 3:14-cv-04329-WHO   Document 14-4   Filed 10/20/14   Page 161 of 214

company, a foreign political party, a party official or a candidate for
political office in order to attempt to influence officials acts or
decisions of that person or entity, to obtain or retain business, or to
secure any improper advantage."

    b.    With respect to company information and intellectual property:

        i.    "Company assets, including Company time, equipment, materials,
resources and proprietary information, must be used for business
purposes only."

        ii.    "The Intellectual Property must not be used or reproduced without
the consent of the Company and for authorized use in connection
with the Company's business. Every effort must be undertaken to
protect the Intellectual Property from illegal copying or misuse."

55.    As a Wynn Resorts director, Okada was bound by the Code of Conduct.

56.    Further, as a Director, Okada stands as a fiduciary to Wynn Resorts and, therefore, owes a high duty to the Company, including the duty of care, the duty of loyalty, and that he at all times discharged those duties in good faith and with a view to the interests of Wynn Resorts.

57.    The fiduciary duty of loyalty that Okada owed as a Director required him to maintain, in good faith, the corporation's and its shareholders' best interests over the interests of anyone else, including his own.

58.    Okada breached his fiduciary duties by engaging in unlawful activities, many of which occurred on Wynn Resorts' properties, and all of which undermine Wynn Resorts' reputation as well as its business and gaming licenses.

59.    Okada further breached his fiduciary duty of loyalty by, among other things, self-dealing, placing his own interests above those of Wynn Resorts, and using Wynn Resorts' confidential information, trade secrets, and related trademarks for his own benefit and to Wynn Resorts' detriment. Specifically, and among other things, the website of Universal (of which Okada holds a significant interest and serves as Chairman of the Board) states that Universal obtained its purported experience and "know how" in operating top quality facilities

15

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

and providing services to the high end market through Okada's experience with Wynn Resorts. Universal's website also states that it intends to use its know-how acquired by Okada from his relationship with Wynn Resorts in Universal's Manila Bay casino-resort operation. Universal and Okada expressly admit (and those in the industry indisputably recognize) that a Manila Bay casino-resort will compete with Wynn Macau (in which Wynn Resorts has a significant ownership interest) for gaming customers and resort clientele.

60.    Okada's acts and/or failures to act constituted breaches of his fiduciary duties. Okada's breaches of duty involved intentional misconduct and knowing violations of the law.

61.    As a direct and proximate result of Okada's acts and omissions, Wynn Resorts has suffered and will continue to suffer direct, incidental and consequential damages in an amount to be proven at trial, but in any event, in excess of $10,000, plus prejudgment interest.

62.    In committing the acts herein above alleged, Okada is guilty of oppression, fraud, and malice toward Wynn Resorts. As such, Wynn Resorts is entitled to recover punitive damages from Okada for the purpose of deterring him and others similarly situated from engaging in like conduct.

63.    As a result of the acts and omissions of Okada, Wynn Resorts has been compelled to hire the services of an attorney for the protection of its interests.

### SECOND CAUSE OF ACTION

### (Aiding & Abetting Breach of Fiduciary Duty)

### (Wynn Resorts against ARUZE USA & Universal)

64.    Wynn Resorts repeats and realleges the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

65.    As a director, Okada owed Wynn Resorts a fiduciary duty of loyalty which, as alleged herein, he breached.

66.    ARUZE USA and Universal knowingly participated in Okada's breach by facilitating the self-dealing and misappropriation of Wynn Resorts' confidential information, trade secrets, and trademarks, and committing unlawful acts that undermine Wynn Resorts' good reputation as well as its business and gaming licenses.

16

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.                    Page 17 of 21

Case 3:14-cv-04329-WHO    Document 14-4    Filed 10/20/14    Page 163 of 214

67.    As a direct and proximate result of ARUZE USA's and Universal's acts and omissions in aiding and abetting Okada's breach of duty, Wynn Resorts has suffered and will continue to suffer direct, incidental and consequential damages in an amount to be proven at trial, but in any event, in excess of $10,000, plus prejudgment interest.

68.    In committing the acts herein above alleged, ARUZE USA and Universal are guilty of oppression, fraud, and malice toward Wynn Resorts.  As such, Wynn Resorts is entitled to recover punitive damages from ARUZE USA and Universal for the purpose of deterring them and others similarly situated from engaging in like conduct.

69.    As a result of the acts and omissions of ARUZE USA and Universal, Wynn Resorts been compelled to hire the services of an attorney for the protection of its interests.

### THIRD CAUSE OF ACTION

**(Declaratory Relief – NRS Chapter 30)**

**(Wynn Resorts against Okada, ARUZE USA & Universal)**

70.    Wynn Resorts repeats and realleges the allegations set forth in Paragraphs 1 through 69 above as though fully set forth herein.

71.    To be deemed "suitable" under Nevada gaming law, the applicant must be:  (a) a person of good character, honesty and integrity; (b) a person whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest of the State of Nevada or to the effective regulation and control of gaming, and (c) must have adequate business probity, competence and experience, in gaming or generally.

72.    Section 3.090 of the Nevada Gaming Regulations provides that a license, registration, and suitability finding requires, among other things, a person of "good character, honesty, and integrity" and one "whose background, reputation and associations will not result in adverse publicity for the State of Nevada and its gaming industry . . . ."

73.    Even after a suitability finding, Regulation 3.080 provides that "[t]he commission may deny, revoke, suspend, limit condition or restrict any registration or finding of suitability or application therefor upon the same grounds as it may take such action with respect to licenses, licensees and licensing; without exclusion of any other grounds."

17

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.                    Page 18 of 21

Case 3:14-cv-04329-WHO    Document 14-4    Filed 10/20/14    Page 164 of 214

1    74.    In recognition of the central importance of its gaming license, Wynn Resorts'

2    Articles of Incorporation afford the Board of Directors the "sole discretion" to take certain action

3    to protect the gaming licenses and approvals of Wynn Resorts and its affiliates.    Under the

4    Articles of Incorporation, an "'Unsuitable Person' shall mean a Person who . . . in the sole

5    discretion of the board of directors of the Corporation, is deemed likely to jeopardize the

6    Corporation's or any Affiliated Company's application for, receipt of approval for, right to the use

7    of, or entitlement to, any Gaming License."  In addition, the Amended and Restated Gaming and

8    Compliance Program defines an "Unsuitable Person" as, among other things, one "that the

9    Company determines is unqualified as a business associate of the Company or its Affiliates based

10   on, without limitation, that person's antecedents, financial practices, financial condition or

11   business probity."

12   75.    Following a determination of unsuitability, the Articles of Incorporation provide

13   that "[t]he Securities Owned or Controlled by an Unsuitable Person or an Affiliate of an

14   Unsuitable Person shall be subject to redemption by the Corporation, out of funds legally

15   available therefor, by action of the board of directors, to the extent . . . deemed necessary or

16   advisable by the board of directors.  If . . . the board of directors deems it necessary or advisable,

17   to redeem any such Securities, the Corporation shall give a redemption Notice to the Unsuitable

18   Person or its Affiliate and shall purchase on the Redemption Date the number of shares of the

19   Securities specified in the Redemption Notice for the price set forth in the Redemption

20   Notice . . . ."

21   76.    On February 18, 2012, following Freeh's presentation, the Board of Directors

22   deliberated at length and thereafter adopted resolutions that:  (1) determined that ARUZE USA,

23   and Universal were likely to jeopardize Wynn Resorts' and its affiliated companies' gaming

24   licenses; (2) deemed Okada, ARUZE USA, and Universal to be unsuitable persons under

25   Wynn Resorts' Articles of Incorporation; and (3) redeemed ARUZE USA's shares in

26   Wynn Resorts for approximately US $1.936 billion via a promissory note, in accordance with

27   Article VII of the Articles of Incorporation.

28

PISANELLI BICE PLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

18

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.                                    Page 19 of 21

Case 3:14-cv-04329-WHO    Document 14-4    Filed 10/20/14    Page 165 of 214

77.    Aware of the magnitude of his improprieties and what any reasonable Board of Directors of a Nevada gaming company would have to do, Okada attempted, in advance of the February 18, 2012 Board meeting, to set up a defense by disputing the Board's authority to act upon Freeh's report.

78.    Accordingly, a justiciable controversy has arisen between the parties whose interests are adverse, and the dispute is ripe for adjudication. Wynn Resorts acted lawfully and in full compliance with its Articles of Incorporation, Bylaws, and other governing documents and is entitled to a declaration from this Court to that effect.

79.    As a result of the acts and omissions of Defendants, Wynn Resorts has been compelled to hire the services of an attorney for the protection of its interests.

WHEREFORE, Wynn Resorts prays for judgment as follows:

1.    For compensatory and special damages, including attorneys' fees, against Defendants in an amount to be determined at trial;

2.    For a declaration that Wynn Resorts acted lawfully and in full compliance with its Articles of Incorporation, Bylaws, and other governing documents as set forth herein;

3.    Disgorgement of profits;

4.    Punitive damages;

5.    For an award of reasonable costs and attorneys' fees;

6.    For prejudgment and post-judgment interest on the foregoing sums at the highest rate permitted by law; and

19



1   7.   Any additional relief this Court deems just and proper on the evidence presented at
2   trial.
3       DATED this 18th day of February, 2012.
4                                   PISANELLI BICE PLLC
5
6       By: _____
            James J. Pisanelli, Esq., Bar No. 4027
7           Todd L. Bice, Esq., Bar No. 4534
            Debra L. Spinelli, Esq., Bar No. 9695
8           Jarrod L. Rickard, Esq., Bar No. 10203
            3883 Howard Hughes Parkway, Suite 800
9           Las Vegas, Nevada  89169
10
            and
11
            Paul K. Rowe, Esq. *(pro hac vice forthcoming)*
12          Stephen R. DiPrima, Esq. *(pro hac vice forthcoming)*
            WACHTELL, LIPTON, ROSEN & KATZ, LLP
13          51 West 52nd Street
            New York, NY 10019
14
            and
15
            Robert L. Shapiro, Esq. *(pro hac vice forthcoming)*
16          GLASER WEIL FINK JACOBS HOWARD
            AVCHEN & SHAPIRO, LLP
17          10259 Constellation Boulevard, 19th Floor
            Los Angeles, CA 90067
18
19          Attorneys for Wynn Resorts, Limited
20
21
22
23
24
25
26
27
28

20

PISANELLI BICE PLLC
3883 HOWARD HUGHES PARKWAY, SUITE 800
LAS VEGAS, NEVADA 89169

Complaint, Wynn Resorts, Ltd. v. Kazuo Okada et al.                                    Page 21 of 21

Case 3:14-cv-04329-WHO   Document 14-4   Filed 10/20/14   Page 167 of 214

**EXHIBIT 1**

See Exhibit 99.2, which is incorporated herein by reference.

EX-99.2 3 d304177dex992.htm REPORT BY FREEH, SPORKIN & SULLIVAN, LLP TO THE GAMING COMPLIANCE COMMITTEE

**Exhibit 99.2**

REPORT
Attorney – Client / Work Product / Privileged and Confidential

## I.    Introduction

Wynn Resorts, Limited ("Wynn Resorts"), a publicly traded company incorporated in the State of Nevada, on behalf of its Compliance Committee, retained Freeh Sporkin & Sullivan, LLP ("FSS") on November 2, 2011 to conduct an independent investigation. That independent investigation has been conducted under the sole direction of the Compliance Committee. The purpose of the investigation was to determine whether there is evidence that Mr. Kazuo Okada, a member of the Wynn Resorts Board of Directors, may have: (i) breached his fiduciary duties to Wynn Resorts; (ii) engaged in conduct that potentially could jeopardize the gaming licenses of Wynn Resorts; and/or, (iii) violated the Wynn Resorts compliance policy. Specifically, FSS has been asked to examine Mr. Okada's efforts in connection with the creation of a gaming establishment in the Republic of the Philippines.

This is the Report to the Compliance Committee Chairman on the results of FSS' investigation. As set forth with greater detail in the attached appendix, FSS has performed its investigation by interviewing dozens of individuals and by reviewing thousands of documents, electronic emails, corporate and public records.

## II.    Summary

The investigation has produced substantial evidence that:

1.  Despite being advised by the Wynn Resorts Board of Directors and Wynn Resorts attorneys on the strict US anti-bribery laws which govern Wynn Resorts and its board, Mr. Okada strongly believes and asserts that when doing business in Asia, he should be able to provide gifts and things of value to foreign government officials, whether directly or by the use of third party intermediaries or consultants.

2.  Mr. Okada, his associates and companies have arranged and designed his corporate gaming business and operations in the Philippines in a manner which appears to contravene Philippine Constitutional provisions and statutes that require 60% ownership by Philippine nationals, as well as a Philippine criminal statute.

3.  Mr. Okada, his associates and companies appear to have engaged in a longstanding practice of making payments and gifts to his two (2) chief gaming regulators at the Philippines Amusement and Gaming Corporation ("PAGCOR"), who directly oversee and regulate Mr. Okada's Provisional Licensing Agreement to operate in that country. Since 2008, Mr. Okada and his associates have made multiple payments to and on behalf of these chief regulators, former PAGCOR Chairman Efraim Genuino and Chairman Cristino Naguiat (his current chief regulator), their families and PAGCOR associates, in an amount exceeding US 110,000. At times, Mr. Okada, his

1

REPORT
Attorney – Client / Work Product / Privileged and Confidential

associates and companies have consciously taken active measures to conceal both the nature and amount of these payments, which appear to be prima facie violations of the United States Foreign Corrupt Practices Act ("FCPA"). In one such instance in September 2010, Mr. Okada, his associates and companies, paid the expenses for a luxury stay at Wynn Macau by Chairman Naguiat, Chairman Naguiat's wife, their three children and nanny, along with other senior PAGCOR officials, one of whom also brought his family. Mr. Okada and his staff intentionally attempted to disguise this particular visit by Chairman Naguiat by keeping his identity "Incognito" and attempting to get Wynn Resorts to pay for the excessive costs of the chief regulator's stay, fearing an investigation. Wynn Resorts rejected the request by Mr. Okada and his associates to disguise and to conceal the actual expenditures made on behalf of Chairman Naguiat.

4.   Additionally, Mr. Okada, his associates and companies appear to have engaged in a pattern of such prima facie violations of the FCPA. For example, in 2010 it also is possible that Mr. Okada, his associates and companies made similar payments to a Korean government official who oversees Mr. Okada's initial gaming investment in that country. Additional investigation is needed to develop and confirm these possible FCPA violations.

5.   The prima facie FCPA violations by Mr. Okada, his associates and companies constitute a substantial, ongoing risk to Wynn Resorts and to its Board of Directors, creating regulatory risk, conflicts of interest and potential violations of his fiduciary duty to Wynn Resorts. Finally, Mr. Okada's documented refusal to receive Wynn Resorts requisite FCPA training provided to other Directors, as well as his failure to sign an acknowledgment of understanding of Wynn Resorts Code of Conduct, increase this risk going forward.

6.   Mr. Okada insisted in his interview that all of his gaming efforts in the Philippines prior to the change of the presidential administration in the summer of 2010 were undertaken on behalf of and for the benefit of Steve Wynn and Wynn Resorts. This assertion is contradicted by press releases dating back to 2007 on his website, which announce an independent effort by Universal; his real estate investments; and the ownership of his corporations in the Philippines.

7.   (7) Mr. Okada has stated that Universal paid expenses related to then-PAGCOR Chairman Genuino's trip to Beijing during the 2008 Olympics.

2

REPORT
Attorney – Client / Work Product / Privileged and Confidential

### III.  Kazuo Okada's Relevant Corporate Affiliations

#### A.  Wynn Resorts

After an initial public offering which closed in October 2002, Aruze USA, Inc., controlled by Mr. Okada, became a 24.5% shareholder of Wynn Resorts. Mr. Okada's current ownership of Wynn Resorts through his control of Aruze USA, Inc. is 19.66%.

Mr. Okada became a member of the Wynn Resorts Board of Directors on October 21, 2002, and remains on the Board of Directors as of the date of this Report. In the past, Mr. Okada has used the title of Vice Chairman of Wynn Resorts. In October 2011, the Wynn Resorts Board of Directors eliminated the position of Vice Chairman.

As a Director of Wynn Resorts, Mr. Okada is entitled to receive the courtesy of what is called a "City Ledger Account." Such accounts were originally instituted as a result of Sarbanes Oxley's prohibition of extensions of credit, in the form of a personal loan from an issuer to an officer or director. The accounts were funded by deposits from the director or his company. Such an account exists for billing conveniences related to charges incurred at various Wynn Resorts locales. Mr. Okada has availed himself of this courtesy and established such a City Ledger Account.[1] Within Wynn Resorts, this Okada City Ledger Account is referred to either as the "Universal City Ledger Account" or as the "Aruze City Ledger Account." Accordingly, the phrases Universal City Ledger Account and Aruze City Ledger Account will be referred to interchangeably within this report despite the fact that Aruze Corp.'s name was changed to Universal Entertainment Corporation in November of 2009.

Mr. Okada has been found to be suitable by the Nevada Gaming Commission.[2]

#### B.  Universal Entertainment Corporation of Japan

Mr. Okada currently serves as Director and Chairman of the Board of Universal Entertainment Corporation ("Universal Entertainment"), registered in Tokyo, Japan. Universal Entertainment Corporation is the current trade name of a company which was incorporated in 1969 as Universal Lease Co. Ltd. and which became Aruze Corp. in 1998. Aruze changed its

---

[1] The initial wire to establish the Aruze Corp. City Ledger Account was dated February 15, 2008.

[2] Mr. Okada was originally found to be suitable as a shareholder of Aruze Corp. as part of *An Order of Registration* issued jointly by the State Gaming Control Board and the Nevada Gaming Commission on June 4, 2004. On June 5, 2005, in a similar order, the Nevada Commission and the State Gaming Control Board found Aruze Corp. to be (1) suitable as a controlling shareholder of Wynn Resorts, Limited, (2) suitable as the sole shareholder of Aruze USA, Inc., (3) that Aruze USA, Inc. is registered as an intermediary company and is found suitable as a shareholder of Wynn Resorts, Limited, and (4) that Mr. Okada is suitable as a shareholder and controlling shareholder of Aruze Corp. [See Appendix]

REPORT

Attorney – Client / Work Product / Privileged and Confidential

name to Universal Entertainment Corporation in November 2009. Universal is listed on the JASDAQ stock exchange and is engaged in the manufacture and sale of pachinko and gaming machines and related business activities. As of September 2011, Okada Holdings Godokaisha was Universal Entertainment's major shareholder, with 67.90% of the issued shares.

The Nevada Gaming Commission has approved Universal Entertainment's suitability as the 100% shareholder for a subsidiary, Aruze USA, Inc.

### C.  **Aruze USA, Inc.**

Aruze USA, Inc. ("Aruze USA") is a wholly owned subsidiary of Universal Entertainment. Aruze USA is a US company and was incorporated in the State of Nevada on June 9, 1999. Mr. Okada is a Director of Aruze USA and serves as its President, Secretary, and Treasurer.

Aruze USA has been found suitable by the Nevada Gaming Commission as a major shareholder of Wynn Resorts.

### D.  **Aruze Gaming America, Inc.**

Aruze Gaming America, Inc. is a private company that is 100% personally owned by Mr. Okada. He currently serves as a Director, Secretary, and Treasurer of the company. Aruze Gaming America, Inc. is a US company and was incorporated on February 7, 1983. The company changed its name from Universal Distributing of Nevada, Inc. to Aruze Gaming America, Inc. on January 6, 2006. Aruze Gaming America, Inc. shares a common business address with Aruze USA, Inc. in Las Vegas, Nevada.

### E.  **Business Interests in the Republic of the Philippines**

Since 2008, Mr. Okada has been involved with a variety of corporate entities and with various business associates in the creation of a gaming establishment in an area of the Philippines known as Entertainment City Manila.[3] In furtherance of this endeavor, Mr. Okada and his associates have procured land and a provisional gaming license in the Philippines. A more detailed review of Mr. Okada's corporate entities and business associates in the Philippines is set forth in Section V(2)(A) below.

### F.  **Business Interests in the Republic of Korea**

Mr. Okada has recently pursued development of a casino resort complex in the Incheon Free Economic Zone in the Republic of Korea. A more detailed review of Mr. Okada's activities in Korea is set forth in Section V(4) below.

---

[3] On the Universal Entertainment website (viewed January 30, 2012) this project is referenced as "Manila Bay Resorts." [See Appendix]

4

REPORT
Attorney – Client / Work Product / Privileged and Confidential

## IV.    Relevant Legal and Policy Standards

### A.    FCPA

The United States Foreign Corrupt Practices Act ("FCPA") contains two primary categories of violations: (i) a books and records provision, and (ii) a bribery provision. Based upon available information, it seems clear that Aruze USA fits the definition of domestic concern[4] and United States person[5] provided in the FCPA, and that the FCPA applies both to Aruze USA and to Mr. Okada personally, in his capacity as an officer and director of Aruze USA.

Under the definitions of domestic concern and United States person, the statute applies to a corporation, partnership, unincorporated organization and other enumerated entities that have their principal place of business in the United States or which are organized under the laws of a State of the United States. It also applies to officers and directors of such concerns.[6]

In 1998, the FCPA was amended and added an alternative basis to interstate commerce for jurisdiction. As the United States District Court for the Southern District of New York wrote: "…. The amendments expanded FCPA coverage to 'any person' — not just 'issuers' or 'domestic concerns'…. [A]ny United States person or entity violating the Act outside of the United States is subject to prosecution, regardless of whether any means of interstate commerce were used. Citing 15 USC 78dd-1, 78dd-2…. (Emphasis added.)[7]

Under this definition, Aruze USA is a covered party under the FCPA.

The FCPA provides that "[i]t shall be unlawful for any domestic concern, other than an issuer which is subject to section 78dd–1 of this title, or for any officer, director, employee, or agent of such domestic concern or any stockholder thereof acting on behalf of such domestic concern, to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to—

(1)    any foreign official for purposes of—

(A)

---

[4] 15 U.S.C. 78 dd – 2(a),(h).
[5] 15 U.S.C. 78 dd – 2(i).
[6] 15 U.S.C. 78 dd – 2(g).
[7] *In re Grand Jury Subpoena*, 218 F. Supp. 2d 544, 550 (S.D.N.Y 2002).

5

REPORT
Attorney – Client / Work Product / Privileged and Confidential

(i) influencing any act or decision of such foreign official in his official capacity,

(ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or

(iii) securing any improper advantage; or

(B) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person;…"[8]

The head of PAGCOR fits within the definition of foreign official as used in the FCPA.

According to PAGCOR's website, it "is a 100 percent government-owned and controlled corporation that runs under the direct supervision of the Office of the President of the Republic of the Philippines."[9] In addition to prescribing mandates to generate revenue for certain government programs and promote tourism in the Philippines, PAGCOR's charter states that the entity will "…[r]egulate, authorize and license games of chance, games of cards and games of numbers, *particularly casino gaming,* in the Philippines…."[10] (Emphasis added.)

As set forth above, there is still the interstate commerce basis for jurisdiction, but there is also an alternative. The alternative would require the same elements for an offense, but a showing of interstate commerce would not be required. If the interstate commerce basis for jurisdiction were used, the analysis set forth below would be of significance.

With regard to means or instrumentality of interstate commerce, some of the facts referred to in this report pertain to Mr. Okada utilizing the Universal City Ledger Account to confer financial benefits upon Philippine gambling regulators who could affect the business interests of Aruze USA, Inc. in the Philippines. Some of those benefits were conferred at Wynn Macau. The following facts concerning the Universal City Ledger Account, which bear upon use of means or instrumentalities of interstate commerce, were established during the investigation:

■ The account is maintained at the corporate offices of Wynn Resorts, Limited in Las Vegas, Nevada where periodic deposits are made from Universal into the Wynn Resorts, Limited operating account at Bank of America in Las Vegas, Nevada to ensure that the amount on deposit remains at or about US 100,000. Bank documents reflect that the deposits are received from a Universal Entertainment account located in Japan.[11]

---

[8] 15 U.S.C. Section 78dd – 2(a).
[9] http://www.pagcor.ph/pagcor-faqs-profile.php, viewed January 18, 2012. [See Appendix]
[10] Ibid., viewed January 18, 2012. [See Appendix]
[11] See, e.g. wire transfer documents from Sumitomo Mitsumi Bank to Bank of America. [See Appendix]

6

REPORT

Attorney – Client / Work Product / Privileged and Confidential

■    When charges are incurred at Wynn Macau, Wynn Macau tracks all charges for the Universal City Ledger Account on its books, and then the accounting department transfers the charges to accounting at Wynn Resorts, Limited in Las Vegas via a journal entry. Wynn Macau sends a pdf file to a staff accountant at Wynn Resorts, Limited in Las Vegas with all the backup documentation. Invoices issued by Wynn Resorts, Limited are periodically sent to a Universal Entertainment email address.[12]

    B.   __Nevada Gaming Regulations and Wynn Resorts Policies__

      The question of whether or not a gaming licensee or licensee applicant is deemed "suitable" in Nevada is answered by reviewing the Nevada Revised Statutes ("NRS") in conjunction with the regulations promulgated by the Nevada Gaming Commission ("NGC"), which is empowered by the NRS.[13]

      1.   Legislative Authority

      The standard for determining suitability is found in Section 463.170 of the NRS. Paragraph (2) of the NRS 463.170, entitled *Qualifications for license, finding of suitability or approval; regulations,* provides that the person seeking a license or a suitability determination is subject to the following considerations: "[a]n application to receive a license or be found suitable must not be granted unless the Commission is satisfied that the applicant is: (a) A person of good character, honesty and integrity; (b) A person whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest of this State or to the effective regulation and control of gaming…." In addition, paragraph (3) provides in pertinent part "[a] license to operate a gaming establishment or an inter-casino linked system must not be granted unless the applicant has satisfied the Commission that: (a) [t]he applicant has adequate business probity, competence and experience, in gaming or generally…."

      The Nevada Gaming Commission Regulations ("Nevada Gaming Regulations") are also relevant to the conditions placed upon suitability. According to Section 3.080 of the Nevada Gaming Regulations, entitled *Unsuitable affiliates,* "[t]he commission may deny, revoke, suspend, limit, condition or restrict any registration or finding of suitability or application therefor upon the same grounds as it may take such action with respect to licenses, licensees and licensing; without exclusion of any other grounds." Paragraph (1) of Section 3.090, entitled

---

[12] In a Wynn Resorts Memorandum to File from the Corporate Accounting department, dated January 10, 2012, the "invoice[s] and all support documentation are emailed to kimiko.okamura@hq.universal-777.com, takashi.usami@hq.universal-777.com and iwayama.hidetsugu@hq.universal-777.com on the 5th of each month for the prior month [sic] activity." [See Appendix]

[13] For further advice regarding suitability, please consult directly with David Arrajj, Esq. and/or see Memo dated December 9, 2011 from Kate Lowenhar-Fisher, Esq. and Jamie L. Thalgott, Esq. to David Arrajj, Esq. re Associations and the Suitability Analysis. [See Appendix]

7

REPORT
Attorney – Client / Work Product / Privileged and Confidential

*Standards for commission action,* provides in pertinent part that "[n]o license, registration, finding of suitability, or approval shall be granted unless and until the applicant has satisfied the commission that the applicant: (a) Is a person of good character, honesty, and integrity; (b) Is a person whose background, reputation and associations will not result in adverse publicity for the State of Nevada and its gaming industry; and (c) Has adequate business competence and experience for the role or position for which application is made."

2.   <u>Underlying Corporate Documents of Wynn Resorts</u>

The Second Amended and Restated Articles of Incorporation of Wynn Resorts, Limited (filed September 16, 2002) also provide for standards that seek to define an "Unsuitable Person." As set forth on page 8 of the Articles of Incorporation, the phrase Unsuitable Person "shall mean a Person who . . . in the <u>sole discretion of the board of directors of the Corporation, is deemed likely to jeopardize</u> the Corporation's or any Affiliated Company's application for, receipt of approval for, right to the use of, or entitlement to, any Gaming License." (Emphasis added.)

Finally, the Amended and Restated Gaming and Compliance Program of Wynn Resorts, Limited (adopted as of July 29, 2010) defines an *Unsuitable person* as a "[p]erson (i) who has been denied licensing or other related approvals by a Gaming Authority on the grounds of unsuitability or who has been determined to be unsuitable to be associated with a gaming enterprise by a Gaming Authority; or (ii) that the Company determines is unqualified as a business associate of the Company or its Affiliates based on, without limitation, that Person's antecedents, associations, financial practices, financial condition or business probity."

In the event of a finding of unsuitability, there are provisions within the aforementioned corporate documents that provide for a resolution post determination. Specifically, on page 6 of the Second Amended and Restated Articles of Incorporation of Wynn Resorts, Limited, the Articles state in pertinent part, "[t]he Securities Owned or Controlled by an Unsuitable Person or an Affiliate of an Unsuitable Person shall be subject to redemption by the Corporation, out of funds legally available therefor, by action of the board of directors, to the extent required by the Gaming Authority making the determination of unsuitability or to the extent deemed necessary or advisable by the board of directors. If a Gaming Authority requires the Corporation, or the board of directors deems it necessary or advisable, to redeem any such Securities, the Corporation shall give a Redemption Notice to the Unsuitable Person or its Affiliate and shall purchase on the Redemption Date the number of shares of the Securities specified in the Redemption Notice for the Price set forth in the Redemption Notice…." The Articles provide further guidance as to the terms of the redemption.

In addition, according to Section 3.6 of the Fourth Amended and Restated Bylaws, effective as of November 13, 2006, the removal of a director is premised upon ". . . the

8

REPORT

Attorney – Client / Work Product / Privileged and Confidential

affirmative vote of the holders of not less than two-thirds (2/3) of the voting power of the issued and outstanding stock of the Corporation entitled to vote generally in the election of directors (voting as a single class)….” Resignation is also listed as an option “upon giving written notice, unless the notice specifies a later time for effectiveness of such resignation, to the chairman of the board, if any, the president or secretary, or in the absence of all of them, any other officer.”

## C.   **Wynn Resorts Code of Business Ethics**

Wynn Resorts first adopted a Code of Business Conduct and Ethics on May 4, 2004. The document defines itself as “a statement of policies for the individual and business conduct of the Company’s employees and Directors….”[14] There are two sections of the Code that are relevant to this investigation: (i) conflict of interest and (ii) interaction with government officials. The sections are included below for reference purposes.

### 1.   Conflict of Interest:

“A Conflict of interest occurs when your private interests interfere, or even appear to interfere, with the interests of the Company. A conflict situation can arise when you take actions or have interests that make it difficult for you to perform your Company work objectively and effectively. Your obligation to conduct the Company’s business in an honest and ethical manner includes the ethical handling of actual, apparent and potential conflicts of interest between personal and business relationships. This includes full disclosure of any actual, apparent or potential conflicts of interest as set forth below.

Special rules apply to executive officers and Directors who engage in conduct that creates an actual, apparent or potential conflict of interest. Before engaging in any such conduct, executive officers and Directors must make full disclosure of all facts and circumstances to the Corporate Secretary, who shall inform and seek the prior approval of the Audit Committee of the Board of Directors.”

### 2.   Interacting with Government:

#### Prohibition on Gifts to Government Officials and Employees

“Different governments have different laws restricting gifts, including meals, entertainment, transportation and lodging, that may be provided to government officials and government employees. You are prohibited from providing gifts, meals or anything of value to government officials or employees or members of their families in connection with Company business without prior written approval from the Compliance Officer.”

---

[14] Wynn Resorts Code of Business Conduct and Ethics dated May 4, 2004, page 7. [See Appendix]

9

REPORT
Attorney – Client / Work Product / Privileged and Confidential

<u>Bribery of Government Officials</u>

"The Company's Policy Regarding Payments to Foreign Officials, the U.S. Foreign Corrupt Practices Act (the "FCPA"), and the laws of many other countries prohibit the Company and its officers, employees and agents from giving or offering to give money or anything of value to a foreign official, a foreign political party, a party official or a candidate for political office in order to influence official acts or decisions of that person or entity, to obtain or retain business, or to secure any improper advantage. Please refer to the Company's Policy Regarding Payments to Foreign Officials for more details regarding prohibited payments to foreign government officials."

<u>Discipline for Violations:</u>

"The Company intends to use every reasonable effort to prevent the occurrence of conduct not in compliance with its Code and to halt any such conduct that may occur as soon as reasonably possible after its discovery. Subject to applicable laws and agreements, <u>Company personnel who violate this Code</u> and other Company policies and procedures <u>may be subject to disciplinary action</u>, <u>up to and including discharge</u>." (Emphasis added.)

The Code has since been revised twice, once in 2009 and then again on November 1, 2011. Although the above sections have been expanded in these later editions, for the purpose of this investigation and the dates in question the substance has remained basically the same and the FCPA has continued to be a point of emphasis.

## V.    <u>Report of Investigation</u>

### 1.   <u>Mr. Okada's Attitude Toward Wynn Resorts Compliance Requirements</u>

Mr. Okada's prima facie violations of FCPA, involving both his government regulators in the Philippines and possibly in Korea, do not appear to be accidental or based upon a misunderstanding of anti-bribery laws. Conversely, despite being advised by fellow Wynn Resorts Board members and Wynn Resorts counsel that payments and gifts to foreign government officials are strictly prohibited, Mr. Okada has insisted that there is nothing wrong with this practice in Asian countries. Mr. Okada has stated his personal rejection of Wynn Resorts anti-bribery rules and regulations, as well as legal prohibitions against making such payments to government officials, to fellow Wynn Resorts Board members.

In a February 24, 2011 Wynn Resorts Board of Directors ("Board") meeting at which Mr. Okada was present, after a lengthy discussion by the Board of the FCPA,[15] including specifically the Universal project in the Philippines and potential Wynn Resorts' involvement, "[t]he

---

[15] In an email from Kim Sinatra to Michiaki Tanaka, dated *F*ebruary 26, 2011, Ms. Sinatra referenced a meeting with Mr. Okada in which she furnished FCPA policy and training materials and reiterated the importance of strict compliance with the FCPA. [See Appendix]

10

REPORT
Attorney – Client / Work Product / Privileged and Confidential

independent members of the board unanimously advised management that any involvement [by Wynn Resorts] in the Philippines under the current circumstances was inadvisable."[16] During this discussion, Mr. Okada challenged the other board members over statements regarding the impermissibility under the FCPA of giving gifts abroad in return for favorable treatment, and made statements about hiring "third party consultants" to give gifts to officials.[17]

One board member recalled Mr. Okada stating that, in Asia, one must follow the local culture, and that is why one should hire "consultants" to give the gifts.[18] This board member understood Mr. Okada to mean that such use of consultants would help avoid prosecution under the FCPA. Another board member who was present recalled Mr. Okada stating that conducting business in the Philippines was all a matter of "hiring the right people" to pay other people.[19] Yet another board member recalled Mr. Okada being "adamant" during the FCPA discussion that it is not corrupt to give "gifts."[20] A board member who participated in the meeting by phone recalled Mr. Okada claiming that, in the Philippines, "business is done in a different manner, and sometimes you have an 'intermediary' that will do whatever he has to do," or words to that effect.[21] A different board member recalled being "shocked" by the contradiction between two of Mr. Okada's statements during this discussion.[22] Early in the discussion, Mr. Okada explained that there were no longer corruption issues in the Philippines with the new administration. However, Mr. Okada subsequently stated, in effect, that while he himself would not pay bribes, he would "hire someone else" to bribe the necessary person.

Pursuant to a chain of emails reviewed by FSS, commencing with an email on August 4, 2011 from Roxane Peper, Director of Intellectual Property and Corporate Records, to each of the board members (or their representatives), and ending with an email from Ms. Peper to Kevin Tourek, Senior Vice President and Corporate Counsel, on October 26, 2011, the following is clear:[23]

- ■    All board members were notified of upcoming FCPA training/board meeting set for October 31 – November 1, 2011 and asked to confirm attendance by August 31, 2011.

- ■    Mr. Okada, through two of his representatives, was emailed at least three (3) separate times before Shinobu Noda, his assistant, sent an email on September 15, 2011 confirming that Mr. Okada would attend.

---

[16] Minutes of Wynn Resorts Board of Directors meeting, February 24, 2011, p.3. [See Appendix]
[17] Interview of Steve Wynn, November 7, 2011.
[18] Interview of Robert J. Miller, December 16, 2011.
[19] Interview of Alvin V. Shoemaker, December 20, 2011.
[20] Interview of Marc D. Schorr, December 20, 2011.
[21] Interview of Allan Zeman, December 21, 2011.
[22] Interview of D. Boone Wayson, December 20, 2011.
[23] See emails from Roxane Peper to Kevin Tourek on October 26, 2011. [See Appendix]

11

REPORT
Attorney – Client / Work Product / Privileged and Confidential

Subsequent to the confirmation, Ms. Peper received an email from Ms. Noda on October 25, 2011. Ms. Noda stated that the email contained a message to Kim Sinatra, Senior Vice President and General Counsel of Wynn Resorts, from Mr. Okada.[24] This part of the message was entirely in Japanese and had to be translated. Mr. Okada asked for the FCPA training materials to be provided in Japanese. He also stated that he would be arriving on "Monday [October 31]", which was the day the FCPA training was to commence. He asked if the training could be held after the board meeting or rescheduled. Kim Sinatra sent a response to Ms. Noda via email on October 25, 2011 thanking Mr. Okada for the note and stating further that the FCPA training materials had been translated and would be provided to him via email and that Wynn Resorts had made further arrangements to have the FCPA live training translated to Japanese via simultaneous translation.[25] She also stated that the date of the training could not be rescheduled because it had been planned around his previous confirmation and that outside counsel was coming to Las Vegas to provide the training.

Mr. Okada failed to attend the training on October 31, 2011. He was the only member of the board not in attendance (all others attended in person or via telephone dial-in as evidenced via a sign-in sheet).[26]

## 2.    Gaming Establishment in the Philippines

Evidence obtained in the course of the investigation establishes that Mr. Okada, his associates and companies, may have arranged and manipulated the ownership and management of legal entities in the Philippines under his control, in a manner that may have enabled the evasion of Philippine constitutional and statutory requirements. It is also noted that Mr. Okada's two principal Philippine corporations, Eagle I Landholdings, Inc. and Eagle II Holdco, Inc., which may have been purposefully created to circumvent Philippine constitutional restrictions on foreign ownership of land, appear to be closely intertwined with Rodolfo Soriano, Paolo Bombase and Manuel M. Camacho, who have numerous common ties to former PAGCOR Chairman Efraim Genuino. For example, with regard to Eagle II Holdco, Inc., as late as 2010, Platinum Gaming and Entertainment ("Platinum") had acquired 60% of its shares. According to a dated filing by Platinum on file with the Philippine SEC, Rodolfo Soriano controlled 20% of Platinum at the time of its incorporation. Mr. Soriano, referred to by attorney Camacho as a "bag man" for then-Chairman Genuino, is a former PAGCOR consultant and respondent in PAGCOR corruption referrals (see page 15 infra). Similarly, Paolo Bombase, an officer, director and nominal shareholder of Eagle I Landholding, Inc. and Eagle II Holdco., Inc. has a 1.25% share of Ophiuchus Real Properties Corp. This Ophiuchus entity is 15% owned by a Philippine company named SEAA Corp. In turn, SEAA is the family-controlled company of former PAGCOR Chairman Efraim Genuino. At this time, the significance of this interlocking shareholder link

---

[24] See email from Shinobu Noda to Roxane Peper dated October 25, 2011. [See Appendix]
[25] See email from Kim Sinatra to Shinobu Noda dated October 25, 2011. [See Appendix]
[26] See FCPA Training Sign-In sheet dated October 31, 2011. [See Appendix]

12

REPORT

Attorney – Client / Work Product / Privileged and Confidential

between Mr. Okada, his former Philippine gaming regulator, and the regulator's associates is not known.

## A. <u>Corporate Links between Mr. Okada's Business Interests and Those of Philippine Government Officials</u>

Close associates and consultants of the former Genuino PAGCOR administration eventually attained positions as corporate officers, directors and/or nominal shareholders in legal entities controlled by Mr. Okada, and, in some cases, served as links between the business interests of Mr. Okada and those of former PAGCOR chairman Efraim Genuino and members of Genuino's immediate family.

In order to better understand the interrelationships among corporate entities in the Philippines controlled by Mr. Okada and those controlled by PAGCOR officials and their associates, FSS requested the Philippines law firm of M. M. Lazaro & Associates ("Lazaro") to produce a study of this issue.[27] Drawing upon official records obtained from the Philippines Securities and Exchange Commission, Lazaro produced an analysis of the relationships created by the ownership and control structures of these entities.[28] The chart below, extracted from that analysis, illustrates these relationships in schematic form.

---

[27] Manuel Lazaro was formerly a government corporate counsel with the rank and privileges of a Philippine presiding justice, court of appeals, who FSS retained to assist in the investigation and to advise on certain aspects of Philippine law. [See Appendix]

[28] The complete Lazaro PPT is attached to this report. [See Appendix]

13

REPORT
Attorney – Client / Work Product / Privileged and Confidential



Tiger Resorts, Leisure and Entertainment, Inc. ("Tiger") was incorporated in the Philippines on June 13, 2008.[29] Its primary purpose was stated as:

> To acquire, own, maintain, operate and/or manage hotels (city and resort), inns, apartments, private clubs, pension houses, convention halls, lodging houses, restaurants, cocktail bars, and any and all services and facilities related or incident thereto.[30]

Tiger is predominantly owned by Aruze USA, Inc.[31] In August 2008, PAGCOR granted Tiger a Provisional Licensing Agreement to operate a gaming establishment in the Entertainment City Manila Zone. An official of the current PAGCOR administration told FSS in December 2011 that PAGCOR was currently reexamining this license.[32]

---

[29] Articles of Incorporation of Tiger. [See Appendix]

[30] Ibid. [See Appendix]

[31] GIS of Tiger, 2010. [See Appendix]

[32] Combined interview of Jay Daniel R. Santiago and Thadeo Francis P. Hernando, on December 12, 2011. It should be noted that after the interview with Santiago and Hernando, FSS along with its Philippine counsel, for purposes of this investigation, formally requested a copy of the Provisional Licensing Agreement from PAGCOR, as well as other related documents. On the same date that the formal request was made, PAGCOR refused to supply a

14

REPORT

Attorney – Client / Work Product / Privileged and Confidential

Eagle I Landholdings, Inc. ("Eagle I") was incorporated in the Philippines on May 16, 2008 with 5 partners of the Philippines law firm Sycip Salazar Gatmaitan ("Sycip") as the shareholders, directors and officers.[33] By certification on September 5, 2008, the original shareholders were all replaced by, among others, Eagle II Holdco, Inc. ("Eagle II"), with approximately 60% ownership. Eagle II maintained this percentage of ownership of Eagle I through the filing of the latest available General Information Statement ("GIS") for the year 2010.[34] Eagle I's 2009 GIS, filed September 17, 2009, indicates that Paolo Bombase, Manuel N. Camacho and Rodolfo V. Soriano (whose associations with PAGCOR and Mr. Genuino are explained below) all had become officers/directors and nominal stockholders of Eagle I; they retained this status through the filing of the latest GIS for Eagle I.[35] Aruze USA, Inc. first appears as the owner of approximately 40% of Eagle I as of the 2010 GIS, owning the share previously owned by Molly Investments Cooperative UA ("Molly").[36]

Eagle II's filings with the Philippines Securities and Exchange Commission indicate a history similar to that of Eagle I. Incorporated on May 19, 2008 by the same 5 Sycip partners,[37] Eagle II reflected the acquisition of approximately 60% of its shares by Platinum Gaming & Entertainment Corp. ("Platinum") on its GIS filed September 17, 2009, with Platinum owning the same percentage as of the 2010 GIS.[38] The same filings reflect the appearance--in 2009 and continuing through the 2010 filing--of Messrs. Camacho, Soriano and Bombase as officers/directors and nominal shareholders. In 2010 Aruze USA, Inc. appears with the 40% shareholding that was attributed to Molly in 2009.[39]

Platinum was incorporated in the Philippines on November 21, 2001, with a Certificate of Filing of Amended Articles of Incorporation ("AOI") issued by the Philippines Securities and Exchange Commission on June 10, 2002.[40] Platinum has no GIS on file with the Philippines Securities and Exchange Commission, and the only corporate document filed besides the Articles of Incorporation is the 2004 Financial Statement. The latest information on file lists Mr.

---

copy of Tiger's Provisional Licensing Agreement, saying that they were bound by a non-disclosure clause. That refusal was signed by Francis P. Hernando, who is identified below as a PAGCOR employee, who stayed in Wynn Macau in June 2011 and had US 709.72 of expenses paid for by the Aruze City Ledger account. See Letter of Request and Letter of Refusal. [See Appendix]

[33] Articles of Incorporation of Eagle I. [See Appendix]

[34] GIS of Eagle I for years 2009 and 2010. [See Appendix] A GIS is required to be filed on an annual basis according to Section 141 of the Corporation Code of the Philippines. [See Appendix]

[35] Ibid. [See Appendix]

[36] Ibid. [See Appendix]; FSS has determined Molly to be a wholly owned subsidiary of Aruze Corp. See http://www.universal-777.com/en/ir/ir_lib/material/annual_20081119.pdf, page 32.

[37] Articles of Incorporation of Eagle II. [See Appendix]

[38] GIS of Eagle II, years 2009-2010. [See Appendix]

[39] GIS of Eagle II, 2010. [See Appendix]

[40] Articles of Incorporation of Platinum, as amended June 10, 2002. [See Appendix]

15

REPORT
Attorney – Client / Work Product / Privileged and Confidential

Soriano, a former PAGCOR consultant, as a director/officer and a 20% shareholder in Platinum.[41]

Messrs. Camacho, Bombase and Soriano are all directly associated with former PAGCOR Chairman Genuino in significant ways. Mr. Camacho is an attorney and a principal of the Manila law firm Camacho & Associates. He was for a time in a law partnership with Mr. Genuino's son, Erwin Genuino.[42] Mr. Camacho traveled to Japan with Mr. Soriano at then PAGCOR Chairman Genuino's behest, to meet with Mr. Okada and other representatives of Aruze. This meeting resulted in Mr. Camacho's firm replacing Sycip in representing Aruze with respect to the development of the project in Entertainment City Manila.[43]

Sometime subsequent to this meeting, Aruze wired retainer funds to the bank account of Mr. Camacho's firm, an account controlled jointly by Mr. Camacho and Erwin Genuino. Later, Mr. Camacho discovered that all or most of these funds had been withdrawn by Erwin Genuino. When he questioned this withdrawal, he was eventually told by Mr. Soriano and/or then PAGCOR Chairman Genuino that the funds had been withdrawn to be used as a "cash payoff" to the mayor of the municipality in which the Entertainment City Manila project is located, in order to facilitate approval of the use of some plots of land to build roads needed for Mr. Okada's casino project. Mr. Camacho claims to have had a falling out with Erwin Genuino and Mr. Soriano, and to be involved currently in a lawsuit against Erwin Genuino over the dissolution of their law partnership.[44] Erwin Genuino is named as a respondent, along with former PAGCOR Chairman Genuino, in two sworn corruption referrals ("PAGCOR Referrals") filed with the Republic of the Philippines Department of Justice ("DOJ") in the summer of 2011 by the current PAGCOR Administration.[45]

Mr. Bombase, also an attorney, is an officer/director and shareholder of Ophiuchus Real Properties Corporation ("Ophiuchus"), incorporated in April 2011.[46] According to its 2011 GIS, Ophiuchus was 15% owned by SEAA Corporation ("SEAA").[47] SEAA, which was registered with the Philippine SEC on December 3, 1997, is, according to its 2011 GIS, 100% owned by members of former PAGCOR Chairman Genuino's immediate family.[48] The Articles of

---

[41] M. M. Lazaro & Associates, "Aruze Corporations in the Philippines and 'Related' Corporations", p. 18. [See Appendix]
[42] Interview of M. Camacho, December 13, 2011.
[43] In his discussion with FSS, Mr. Camacho referred to the firm only as "Aruze," not further defined.
[44] Although Mr. Camacho, who is in his seventies, failed to recall some details of his dealings with Mr. Genuino and Mr. Soriano, FSS credits the general account given by him during the December 13, 2011 interview.
[45] See PAGCOR Referrals. [See Appendix]
[46] Articles of Incorporation of Ophiuchus. [See Appendix]
[47] GIS of Ophiuchus, 2011. [See Appendix]
[48] GIS of SEAA, 2011. [See Appendix]

16

REPORT

Attorney – Client / Work Product / Privileged and Confidential

Incorporation of Ophiuchus also list Emilio Marcelo as an officer/director and shareholder.[49] Mr. Marcelo is named as a respondent in the PAGCOR Referrals.[50]

Mr. Soriano is a former PAGCOR consultant, named by Mr. Camacho as a close business associate and "bag man" for Mr. Genuino.[51] Mr. Soriano is also named as a respondent in the PAGCOR Referrals.[52] As of the latest information filed with the Philippines Securities and Exchange Commission in 2002, Mr. Soriano was a 20% shareholder and an officer/director of Platinum,[53] identified above as a 60% shareholder in Eagle II. If Mr. Soriano still held the same stake in Platinum when it acquired its share of Eagle II in 2009, then he became an effective owner of 12% of Eagle II and approximately 7% in Eagle I.

## B. Apparent Evasion of Republic of Philippines Legal Requirements

As described in the preceding section, Mr. Okada caused various legal entities to be incorporated in the Philippines, in order to develop his casino resort project there, over time replacing the original incorporating Filipino shareholders with combinations of foreign shareholders affiliated with or controlled by him and associates of then-PAGCOR Chairman Genuino. As discussed below, there are constitutional and statutory requirements in the Republic of the Philippines requiring that purchasers of land be Philippines citizens or Filipino-owned legal entities, and that legal entities conducting business in the Philippines, with certain exceptions, be at least 60% Filipino owned.

In 2008, Eagle I purchased various tracts of land near Manila Bay totaling approximately 30 hectares at a total price of PHP 13,527,637,941.00 (approximately US 314,953,000.00) for the development of the project in Entertainment City Manila.[54]

At FSS' request, Lazaro prepared an analysis and opinion on the validity of Eagle I's ownership of these properties, in light of the aforementioned provisions of the Philippines Constitution and applicable statutes.[55] The analysis included a detailed review of the ownership and capitalization of Eagle I and associated entities described in the preceding section. The following is a summary of pertinent findings of the Lazaro analysis.

---

[49] Articles of Incorporation of Ophiuchus. [See Appendix]
[50] See PAGCOR Referrals. [See Appendix]
[51] Interview of M. Camacho, Dec 13, 2011.
[52] See PAGCOR Referrals. [See Appendix]
[53] Articles of Incorporation of Platinum, as amended June 10, 2002. The 2001 Articles of Incorporation list four (4) additional 20% shareholders, identified as Filipino nationals. Because Platinum has not filed a GIS since 2002, the current ownership and control of Platinum is unknown. [See Appendix]
[54] Numbered Transfer Certificates of Title ("TCT") for Eagle I purchase of land tracts in Parañaque City, Philippines, dated August 19, 2008. [See Appendix]
[55] M. M. Lazaro & Associates. Memo re "Validity of Eagle I's Ownership of Real Estate Properties" ("Ownership Memo"), Jan 2012. [See Appendix]

17

REPORT
Attorney – Client / Work Product / Privileged and Confidential

A review of the 2009 Financial Statement of Eagle I disclosed that the funds used to purchase the land tracts appear to have been advanced by Molly.[56]

Platinum, the 59.99% owner of Eagle II, has filed no records with the Philippines Securities and Exchange Commission indicating that its paid-in capital ever increased beyond the original PHP 62,500, despite its amended Articles of Incorporation indicating that its authorized capital stock was increased from the initial PHP 1,000,000.00 to PHP 24,000,000.00.[57] Nor is it known today what person(s) or entities have controlled Platinum since incorporation in 2001.

The 1987 Constitution of the Philippines requires that only Philippines citizens or corporations with at least 60% of their capital stock owned by Filipinos are qualified to acquire land in the Philippines.[58] The Philippines Foreign Investment Act further requires that for a corporation to be considered a Philippines national, at least 60% of its capital stock outstanding and entitled to vote must be owned and held by citizens of the Philippines.[59]

Whenever facts or circumstances create doubt as to whether the ownership of 60% of a corporation is truly Filipino, Philippines Securities and Exchange Commission case law has held that a stringent examination of the true ownership of the voting stock of the subject corporation and of the true ownership of the voting stock of all successive layers of corporate ownership should be conducted. The application of this stringent standard is known as the "Grandfather Rule."[60]

Serious doubts are therefore raised about the actual Filipino equity of Eagle I, because of the appearance that Eagle I and Eagle II were created purposely to "...circumvent the constitutional restriction on foreign ownership of land."[61] Lazaro bases this assertion on its conclusion that "...Platinum appears to be merely a shell corporation used to satisfy the Filipino equity requirement."[62] Application of the Grandfather Rule would therefore be appropriate.

Applying the Grandfather Rule, Lazaro calculates the true percentage of Filipino versus foreign equity in Eagle I as illustrated in the following table:[63]

---

[56] Ibid, p. 2. [See Appendix]
[57] Ibid, pp. 5-6. [See Appendix]
[58] Ibid, p. 8. [See Appendix]
[59] Ibid, pp. 9-10. [See Appendix]
[60] Ibid, pp. 11-14. [See Appendix]
[61] Ibid, p. 14. [See Appendix]
[62] Ibid, pp. 14-15. [See Appendix]
[63] Ibid, p. 15. [See Appendix]

18

REPORT
Attorney – Client / Work Product / Privileged and Confidential

| Shareholder | Direct | Indirect | Total Filipino investment in Eagle I | Total Foreign investment in Eagle I |
|---|---|---|---|---|
| Aruze USA | 40% of Eagle I | 24%<br><br>(40% of 60% total holdings of Eagle II in Eagle I) | | 64% |
| Platinum* | | 36%<br><br>(60% of 60% total holdings of Eagle II in Eagle I) | 36% | |

*As noted above, Platinum has failed to file its annually required GIS with the Philippine SEC since its inception in 2001. The calculations in the above table prepared by Lazaro assume the "best case" scenario (for Platinum), i.e., that it is a truly 100% Filipino-owned corporation. If Platinum's actual Filipino ownership is less than 100%, then the percentage of Filipino investment in Eagle I would be correspondingly even less than calculated in the table.

Lazaro concludes that "...the foregoing shareholder structure appears to have been formulated by the parties as a legal scheme to justify the qualification of Eagle I to own real estate properties. The scheme employed...gives Aruze USA, Inc....a convenient vehicle to justify its ownership...in circumvention of the constitutional restriction on the foreign ownership of land."[64] Lazaro goes on to conclude that the apparent shareholder structuring scheme outlined above may also constitute a violation of Commonwealth Act No. 108, commonly known in the Philippines as the "Anti-Dummy Law."[65] If convicted of a violation of this law, stockholders of Platinum and of Aruze USA, Inc. who profited from the scheme would face a sentence of imprisonment of not less than five years nor more than fifteen years.[66]

From the foregoing discussion, there is substantial evidence and credible legal opinion indicating that the ownership structure of Eagle I and Eagle II may subject Mr. Okada, along with his associates and companies, to civil as well as criminal sanctions under Philippine law.

---

[64] Ibid, p. 16. [See Appendix]
[65] Ibid, pp. 16-17. [See Appendix]
[66] Ibid, p. 17. [See Appendix]

19

REPORT
Attorney – Client / Work Product / Privileged and Confidential

### 3.      Apparent FCPA Violations Regarding Philippine PAGCOR Officials at Wynn Resort Properties

FSS has reviewed records of the Aruze City Ledger Account, through which Mr. Okada and Universal charge expenses for lodging, entertainment and other incidentals incurred at Wynn Resorts facilities against funds deposited into the account by Universal, and available underlying documentation furnished by Wynn Resorts management. The table below highlights thirty-six (36) separate instances, from May, 2008, through June 2011 (more than a three (3) year period), when Mr. Okada, his associates and companies made payments exceeding US 110,000, which directly benefitted senior PAGCOR officials, including two chairmen and their family members.

| Name | Relationship to PAGCOR/Phil. Gov't. | Location(s) and Date(s) of Stay(s) | Total Charged to Aruze City Ledger Account (in US) |
|---|---|---|---|
| Efraim C. Genuino | Former PAGCOR Chairman (February 2001 to June 30, 2010) | WM June 6-9 2010 | 1,870.64 |
| Cristino L. Naguiat Jr. | PAGCOR Chairman (July 2, 2010 to Present) | WM Sep 22-26 2010 | See Suzzanne Bangsil[67] |
| | | WLV Nov 15-20 2010 | 5,380.86 |
| | | WM June 6-10 2011 | 3,909.80 |
| Dinner (Naguiat Party) | Chairman (PAGCOR) | WM Sep 24 2010 (Hosted by and charged to Kazuo Okada) | 1,673.07 |
| Maria Teresa Socorro Naguiat | Wife of PAGCOR Chairman Cristino L. Naguiat Jr. | WM June 6-10 2011 | 1,039.31 |
| Suzzanne Bangsil[68] | Wife of Rogelio Bangsil, PAGCOR | WM Sep 22-26 2010 | 50,523.22 |
| Jose Miguel | Husband of former | WLV Nov 12-17 | 4,642.40 |

---

[67] Chairman Naguiat did not identify himself and Mr. Okada's representatives insisted that his stay there be "Incognito." Accordingly, the bulk of the charges for the trip are reflected on the City Ledger Account as attributable to "Suzzanne Bangsil," the wife of Rogelio Bangsil, a senior PAGCOR official and Chairman Naguiat's employee. However, interviews, photo identifications and documentary evidence clearly establish that Chairman Naguiat was the "Incognito" guest and the direct beneficiary of these payments.

[68] Investigation has in fact determined that Chairman Naguiat was registered as an "Incognito" VIP guest under Suzzanne Bangsil's reservation. Therefore, this US 50,523.22 was paid for Chairman Naguiat's benefit.

20

REPORT
Attorney – Client / Work Product / Privileged and Confidential

| | | | |
|---|---|---|---|
| "Mike" Arroyo | Philippines President Gloria M. Arroyo (Jan 20 2001 – June 20 2010) | 2009 | |
| Imelda Dimaporo | PAGCOR Board Member | WM June 8-10 2010 | 891.44 |
| Philip Lo | PAGCOR Board Member | WLV April 29 2009 – May 3 2009 | 1,755.25 |
| Manuel Roxas | PAGCOR Board Member | WLV April 2009[69] | 253.75 |
| | | WLV April 29 2009 – May 3 2009 | 1,686.95 |
| Susan Vargas | PAGCOR Board Member | WM June 8-10 2010 | 480.17 |
| Jose Tanjuatco | PAGCOR Board Member (July 19 2010 to Present) | WLV Nov 15-18 2010 | 2,148.57 |
| Rogelio J. B. Bangsil | Officer in Charge of PAGCOR Gaming Department | WM Sep 24-26 2010 | 1,149.04 |
| | | WM June 6-12 2011 | 2,955.23 |
| Rodolfo Soriano | PAGCOR Consultant | WM June 3-7 2008 | 1,186.08 |
| | | WLV Nov 12-17 2009 | 4,228.00 |
| | | WM June 7-10 2010 | 1,104.06 |
| | | WM Aug 18 2010 | 368.06 |
| Olivia Soriano | Relative of Rodolfo Soriano | WLV May 2008 | 975.55 |
| Anthony F. "Ton" Genuino[70] | Son of Efraim C. Genuino; Mayor of Los Baños (2010 to Present) | WLV Sep. 2008 | 2,386.26 |
| | | WLV Oct 2008 | 2,326.49 |
| Rafael Francisco | PAGCOR COO and President | WLV Nov 12-17 2009 | 4,360.16 |
| | | WM June 7-11 2010 | 935.21 |

---

[69] When the "Dates of Stay" in this table were not readily available, the month and year that the charges were entered in the City Ledger Account are used.
[70] See PAGCOR Referrals (Anthony Genuino is named as a respondent). [See Appendix]

21

REPORT
Attorney – Client / Work Product / Privileged and Confidential

| Emelio Marcello | PAGCOR Consultant | WLV Nov 12-17 2009 | 1,181.60 |
|---|---|---|---|
| | | WM June 7-9 2010 | 471.51 |
| Carlos Bautista | PAGCOR VP Legal | WM June 6-10 2010 | 1,049.69 |
| Mario Cornista | PAGCOR Consultant | WM June 7-9 2010 | 600.02 |
| Rene Figueroa | PAGCOR Executive VP | WM June 7-10 2010 | 646.76 |
| Ernesto Francisco | PAGCOR Executive Committee and Casino General Manager | WM June 7-10 2010 | 797.17 |
| Edward King | PAGCOR VP Corporate Communications | WM June 7-10 2010 | 767.71 |
| Transportation | PAGCOR Delegation | WM Aug 2010 | 462.42 |
| Jeffrey Opinion | Member of Naguiat Party | WM Sep 24-26 2010 | 906.61 |
| Ed de Guzman | PAGCOR Executive Committee, AVP Slots | WM Jun 6-12 2011 | 3,421.79 |
| Gabriel Guzman | Probable relative of Ed de Guzman (had adjoining room) | WM Jun 6-12 2011 | 1,391.71 |
| (Thadeo) Francis P. Hernando[71] | PAGCOR VP, Licensed Casino Development Dept. | WM Jun 8-10 2011 | 709.72 |
| **TOTAL** | | | 110,636.36 |

　　　　The total in the above table represents charges from the Aruze City Ledger Account that are readily identifiable as incurred directly by officials and consultants of PAGCOR,[72] their family members and close associates, including Jose Miguel Arroyo, the then-First Gentleman of the Republic of the Philippines, husband of Philippine President Gloria Arroyo. Through a review of the Aruze City Ledger Account for statement periods March 2008 through November 2011, FSS has calculated that total charges to the account for that period, attributable to

---

[71] This is the same PAGCOR official who denied the FSS request for documents in December 2011, including a copy of the Provisional License Agreement. See footnote 31.
[72] In order to establish the PAGCOR affiliation of some of the individuals listed in this chart, various sources were consulted, including the PAGCOR website, internet news articles and the PAGCOR Referrals.

22

REPORT

Attorney – Client / Work Product / Privileged and Confidential

PAGCOR officials, employees, consultants, their associates and family members, exceed USD 110,000.[73]

      FSS investigators interviewed members of the Wynn Macau management team, who furnished the following relevant information regarding a visit to that property in September 2010 by then and current PAGCOR Chairman and CEO Cristino L. Naguiat, Jr., his wife, three children, nanny and other PAGCOR officials, whose four-day stay at Wynn Macau was paid for via the Aruze City Ledger Account:

-     September 20, 2010:   Yoshiyuki Shoji of Universal, in an e-mail to Angela Lai of Wynn Macau, requests reservations for "Rogelio Bangsil (Guest Representative) & Others." Mr. Shoji requests Encore Suite or "more gorgeous room, such as Villa," and "the best butler" for unnamed person in group, who is "VIP for Universal." Mr. Shoji states that guests other than Bangsil should not be registered, that all charges should be posted to Universal's City Ledger,[74] and that "Mr. Okada would like them to experience the best accommodations and services at Wynn Macau."[75] The communication makes no reference to PAGCOR or the government affiliation of the guests.

-     September 20, 2010:   In an e-mail to Wynn Macau President Ian Coughlan and others, Ms. Lai informs Mr. Coughlan of the reservation and that checks of websites indicate that Mr. Bangsil is in charge of PAGCOR's gaming department.[76]

-     September 20, 2010:   In an e-mail to Mr. Shoji, Ms. Lai advises that Wynn Macau is checking on availability of the requested upgrade and that Macau law requires that all room occupants be registered, and requests that all guest names be furnished in advance of or at the time of registration.[77]

-     September 22, 2010:   In an e-mail to Wynn Macau President Ian Coughlan, Wynn Macau Senior Vice-President – Legal Jay M. Schall advises Mr. Coughlan of

---

[73] See City Ledger Account. [See Appendix]

[74] When Mr. Shoji set up the City Ledger Account for Mr. Okada in 2008, he asked whether the customer name and amount paid would be made public. He was advised that such information would not become public. Email response from Kim Sinatra to Shoji, dated February 8, 2008. [See Appendix]

[75] E-mail from Y. Shoji to A. Lai, September 20, 2010 [See Appendix]; interview of A. Lai, January 4, 2012.

[76] E-mail from A. Lai to I. Coughlan, September 20, 2011 [See Appendix]; interview of A. Lai, January 4, 2012; interview of I. Coughlan, December 29, 2011. It should be noted that according to an article in Manilatimes.net, published February 2, 2012, Rogelio Bangsil has recently been transferred to the PAGCOR international marketing department after a probe that found the government losing PHP 160 million in government run casinos to a Mr. Liu. [See Appendix]

[77] E-mail from A. Lai to Y. Shoji, September 20, 2010 [See Appendix]; interview of A. Lai, January 4, 2012.

23

REPORT

Attorney – Client / Work Product / Privileged and Confidential

PAGCOR's 100% government ownership and of Mr. Bangsil's position there. He writes "Bangsil, the guest of Mr. Okada, is a top five (if not 3) officer."[78]

■   September 22, 2010 (14:00):   Wynn Macau sends 1 Rolls Royce and 1 Elgrand to the airport, along with Masato Araki, Special Assistant to Mr. Okada; and Kenichiro Watanabe, another Universal associate, to meet arriving party, who arrived on Philippine Airline Flight 352 from Manila. They return with Chairman Cristino L. Naguiat, Rogelio Bangsil and Jeffrey Opinion at 14:45.[79] Only Mr. Bangsil furnishes his name upon registration. Ms. Lai and Wynn Macau VIP Services Manager Beatrice Yeung thereafter checks PAGCOR website and identifies Chairman Naguiat's name from his picture there.[80] Ms. Yeung's log and ongoing entries refer to "[I]ncognito (Mr. Naguiat, Cristino L.)."[81]

■   Chairman Naguiat occupies Villa 81, the most expensive accommodation at Wynn Resorts Macau (about 7,000 square feet in size, which then cost about US 6,000 per day and is mostly reserved for "high rollers").

■   September 22, 2010:   the Wynn Encore log book reflects "Incognito (Mr. Naguiat) stayed in Villa 81 Master Bedroom l."[82]

■   September 23, 2010 (10:00):   Mr. Araki advises Ms. Yeung that Chairman Naguiat plans to have lunch with Miss Pansy Ho at MGM.[83]

■   September 23, 2010 (14:04):   Jay Schall sends an email to Wynn Macau corporate security to check Worldcheck, as a rush job, for Cristino L. Naguiat Jr., Chairman and Chief Executive Officer of PAGCOR.[84]

---

[78] E-mail from J. Schall to I. Coughlan, September 22, 2010 [See Appendix]; interview of J. Schall, January 3, 2012; interview of I. Coughlan, December 29, 2011.
[79] Wynn Macau Manager – Encore Logbook, September 22, 2010. [See Appendix]
[80] Interviews of Beatrice Yeung, January 4, 2012 and February 1, 2012; interviews of Angela Lai January 4, 2012 and February 2, 2012.
[81] Wynn Macau Manager – Encore Logbook, September 22, 2010. [See Appendix]
[82] Ibid. [See Appendix] During subsequent visits, Chairman Naguiat was identified as "Naguiat," though he was identified during his initial visit as "incognito." The negative inference to be drawn is an attempt to hide the payment of extremely costly expenses by a corporation connected with a regulated entity. The fact that he had only recently become chairman may have been a factor in his desire to keep his identity secret.
[83] Miss Ho is the daughter of Hong-Kong and Macau-based businessman Stanley Ho. Though Nevada gaming regulators found Miss Ho to be a suitable business partner for MGM Mirage, see http://www.lvri.com/business/45462797.html, New Jersey regulators recommended that she be found unsuitable as MGM Mirage's joint venture partner in Macau. See http://www.newjerseynewsroom.com/state/mgm-mirage-chooses-pansy-ho-over-atlantic-city. [See Appendix]
[84] Email from Jay Schall to Peter Barnes of Wynn Macau Corporate Security, dated September 23, 2010. [See Appendix]

REPORT
Attorney – Client / Work Product / Privileged and Confidential

- September 23, 2010: In an e-mail to Ms. Lai, with a copy to Mr. Okada, Mr. Shoji requests that a credit of US 5,000 be extended to each person now staying at the Villa for shopping and gaming, up to a total of US 50,000. According to Mr. Shoji's email, the funds are to be advanced by Wynn Macau and charged to the Universal City Ledger account.[85]

- September 24, 2010 (13:45): MOP 80,000[86] (approximately US 10,000) is advanced from the Wynn Macau main cage to a Wynn Macau VIP Services employee (no longer employed at Wynn Macau), who in turn hands the money to Masato Araki, special assistant to president of Aruze USA, based upon instructions in the above referenced e-mail to Ms. Lai. The handover of funds is witnessed by Wynn Encore manager Alex Kong. The funds are charged to the Universal City Ledger Account. [87] MOP 15,000 of this sum is used to pay for a Chanel bag that Chairman Naguiat requested be purchased for his wife.[88]

- September 24, 2010 (Approximately 14:00): Mrs. Naguiat, her three children, Mrs. Bangsil and her daughter arrive at Wynn Macau.

- September 24, 2010 (15:45): Wynn Macau employees meet Mr. Okada and his assistant, Jun Yoshie, at the airport, transport them to Wynn Macau and escort Mr. Okada to room 5688.[89]

- September 24, 2010 (late afternoon): Mr. Coughlan receives a phone message from Mr. Yoshie that Mr. Okada would like to speak to him. Mr. Coughlan proceeds to an area near the Wynn Encore reception desk, where he meets Mr. Yoshie and Mr. Okada. They step into the Cristal Bar to talk, whereupon Mr. Okada, with Mr. Yoshie interpreting into English, tells Mr. Coughlan that the guests [referring to

---

[85] E-mail from Y. Shoji to A. Lai, September *23*, 2010 [See Appendix]; e-mail from B. Yeung to I. Coughlan, September 27, 2010 [See Appendix]; interview of B. Yeung, January 4, 2012; Wynn Macau Manager – Encore Logbook, September 24, 2010.

[86] MOP 80,000 was worth approximately US 9,816 at that time.

[87] Wynn Macau Manager – Encore Logbook, September 24, 2010 [See Appendix]; Wynn Macau "Miscellaneous Disbursement" record #013014, dated September 24, 2010 [See Appendix]; e-mail from B. Yeung to I. Coughlan, September 27, 2010 [See Appendix]; interview of B. Yeung, January 4, 2012; interview of Alex Kong, February 1, 2012.

[88] Wynn Macau Manager – Encore Logbook, September 24, 2010. [See Appendix]. The Chanel bag was purchased by a Wynn Macau employee as per instructions by Mr. Araki, who works for Mr. Okada. The Wynn Macau employee gave the bag, store receipt and change to Mr. Araki to deliver to Mrs. Naguiat. Later, Mr. Araki stated that Mrs. Naguiat did not like the bag so he would give it to his own wife.

[89] Wynn Macau Manager – Encore Logbook, September 24, 2010 [See Appendix]; interview of B. Yeung, January 4, 2012.

25

REPORT

Attorney – Client / Work Product / Privileged and Confidential

Chairman Naguiat's party] are very important to Universal, and that Mr. Okada wants Mr. Couglan to insure that they are well cared for during their stay.[90]

- September 24, 2010 (17:00): Mr. Okada meets Chairman Naguiat (and approximately thirteen (13)) others in his party) for dinner at Okada Restaurant.[91] Mr. Okada hosts the dinner and the bill for $1,673.07 is charged to his room.

- September 25, 2010 (05:45): Wynn Macau employees meet Mr. Okada outside his room and escort him to a limousine, which transports him to the Macau Ferry Terminal for 07:00 scheduled ferry departure to Hong Kong International Airport.[92]

- September 25, 2010: Beatrice Yeung describes in her log book "Movements – Incognito (Mr. Naguiat, Cristino L) / Mr. Bangsil, Rogelio / Mr. Opinion, Jeffrey (Mr. Okada's guests, Villa 81)."[93]

- September 25, 2010: Mr. Araki requests a second advance of MOP 80,000 for guests in Villa 81. Ms. Yeung accompanies Mr. Araki to the Main Cage and obtains the advance for him.[94] [This makes a total of MOP 160,000 advanced for the use of Chairman Naguiat and his party and charged to the Universal City Ledger Account per Mr. Okada's orders, as relayed in Mr. Shoji's e-mail.]

- September 26, 2010 (11:10): Mr. Araki departs the Wynn Macau Encore main entrance. He hands Ms. Yeung MOP 4100, returning what he says is the remainder of the two cash advances for Chairman Naguiat's party.[95]

- September 26, 2010 (13:15): Chairman Naguiat's party departs via Wynn Macau limousine to pick up Mrs. Naguiat from shopping and proceeds to the airport.[96]

---

[90] Interviews of Ian Coughlan, January 5, 2012 and February 2, 2012.

[91] Interview of B. Yeung, January 4, 2012; Wynn Macau Manager – Encore Logbook, September 24, 2010. [See Appendix]

[92] Interview of B. Yeung, January 4, 2012; Wynn Macau Manager – Encore Logbook, September 25, 2010. [See Appendix]

[93] Wynn Macau Manager – Encore Logbook, September 25, 2010. [See Appendix]

[94] Interview of B. Yeung, January 4, 2012; Wynn Macau Manager – Encore Logbook, September 25, 2010 [See Appendix]; Wynn Macau "Miscellaneous Disbursement" record #013066, dated September 25, 2010. [See Appendix]

[95] E-mail from B. Yeung to I. Coughlan, September 27, 2010 [See Appendix]; Wynn Macau Manager – Encore Logbook, September 26, 2010 [See Appendix]; handwritten and signed note dated "9/26/10" with notation "MOP 4.100". [See Appendix]. The returned funds were equal to approximately US 503.07 returned out of a total of approximately US 19,632 provided.

[96] Interview of B. Yeung, January 4, 2012; Wynn Macau Manager – Encore Logbook, September 26, 2010. [See Appendix]

26

REPORT
Attorney – Client / Work Product / Privileged and Confidential

- ■    November 10, 2010: Mr. Shoji advises Mr. Coughlan in an e-mail of receipt of Wynn Macau's invoice for the late September 2010 visit, in which the Villa [for Chairman Naguiat] was charged at the amount of MOP 48,000. Mr. Shoji states that "<u>I understand that Mr. Okada explained to you in Macau that they were our business guests and we made reservations for them and all charges are billed to our company</u>. While some of charges [sic] will be reimbursed by them, room charges were planned to be borne by us as ordinary business expenses. Since the amount charged is too much and beyond the ordinary room charge, <u>our company will be put in a very difficult position to give us reasonable explanations if we are inquired by someone</u>. I would appreciate if you would reconsider this matter and charge us the original rate (free upgrade to Villa) since the party directly dealing with [sic] on this matter is our company rather than the each [sic] individual guest."(Emphasis added.)[97]

- ■    On or about December 10, 2010: After e-mails and phone messages following Mr. Shoji's September 20, 2010 e-mail, Mr. Coughlan has a phone conversation with Mr. Shoji, in which he advises Mr. Shoji that, after internal Wynn Macau discussions, the final decision was that Wynn Macau would not provide the requested free upgrade for the Villa occupied during the September 2010 visit.[98]

The foregoing recitation of facts surrounding the September 2010 visit of Chairman Naguiat and his party to Wynn Macau demonstrates several significant elements of that visit:

- ■    Mr. Okada considered these guests to be very important to his company.

- ■    An effort was made from the outset to conceal Chairman Naguiat's identity and official status, to the point of not even wanting to advise Wynn Macau management and staff.

- ■    With Mr. Okada's knowledge, Chairman Naguiat and his family were provided with approximately US 20,000 cash to use for gaming and also shopping

- ■    Mr. Okada's representative sought to have Wynn Resorts fund a portion of the expenses incurred by Chairman Naguiat and his party, i.e., the free upgrade to a Villa.

---

[97] E-mail from Y. Shoji to I. Coughlan, November 10, 2010 [See Appendix]; interviews of I. Coughlan, December 29, 2011 and January 5, 2012.
[98] Interviews of I. Coughlan, December 29, 2011 and January 5, 2012; e-mail string between I. Coughlan and Y. Shoji and others, September 20 to December 9, 2010, subject: "Invoice and Statement for September Stay." [See Appendix]

27

REPORT
Attorney – Client / Work Product / Privileged and Confidential

■     Mr. Okada's representative expressed apprehension about Universal being able to justify the level of expenditures in the event of future inquiries.

There is evidence that Mr. Okada personally directed the payments and gifts provided to Chairman Naguiat and his family during their luxury stay at Wynn Macau's most expensive accommodation in September 2010. On October 5, 2010, Mr. Araki sent an email to Wynn Macau in order to arrange for a "second group of PAGCOR" checking into Wynn Macau on October 8, 2010. Clearly referring back to Chairman Naguiat's stay less than two weeks earlier, Mr. Araki writes: "Our Chairman Okada once again instructed us to take care of the group, but not like last time meaning that we will not take care of their room charges and others." (Emphasis added). Mr. Araki, who worked for Mr. Okada and personally supervised Chairman Naguiat's luxury stay at Wynn Macau, appears to confirm Mr. Okada's personal knowledge and control of the payments for Chairman Naguiat.[99]

It is significant to note that the leadership of PAGCOR, which is appointed by the President of the Republic of the Philippines, changed effective June 30, 2010, when Benigno S. Aquino III assumed office as President of the Republic of the Philippines, succeeding Gloria M. Arroyo. Former PAGCOR Chairman Efraim C. Genuino, an Arroyo appointee, left office effective June 30, 2010, and Cristino L. Naguiat, Jr., President Aquino's appointee, assumed the position of Chairman and CEO of PAGCOR on July 2, 2010.

A review of the Aruze City Ledger Account records reveals that, after June 30, 2010, there are no charges attributed to Mr. Genuino or any of his family members who collectively had three (3) separate stays at Wynn resorts (Macau or Las Vegas) while Mr. Genuino was PAGCOR Chairman.[100] Conversely, the Aruze City Ledger Account reflects charges for Chairman Naguiat, his family, and key PAGCOR staff from Chairman Naguiat's "new" administration only after Naguiat became PAGCOR Chairman. This sequence is evidence that the hosting of these persons at Wynn Resorts, and payments made for them through the Aruze City Ledger Account, are solely related to PAGCOR, the Philippines government agency in charge of licensing and regulating Mr. Okada's business interests.

It is also clear that, having already received approval from PAGCOR in 2008 for a Provisional Licensing Agreement to develop a gaming business in the Philippines, Mr. Okada had a strong and continuing motive effective through 2010 and beyond to maintain favorable relations with the Chairmen and senior officials of PAGCOR. As previously noted, PAGCOR's primary governmental mission is regulating gaming businesses in the Philippines. Mr. Okada's project in Entertainment City Manila was prominently featured in PAGCOR's annual reports for

_____

[99] Email from Matt Araki to Beatrice Yeung dated October 5, 2010. [See Appendix]
[100] The sole exception identified, Rodolfo Soriano, Jr., is listed on the Aruze City Ledger Account as having a single room charge on August 18, 2010. [See Appendix]

28

REPORT

Attorney – Client / Work Product / Privileged and Confidential

2008,[101] 2009[102] and 2010.[103] The 2010 Annual report features photos and messages from Chairman Naguiat, and several other members of the new PAGCOR leadership. The 2010 Annual report makes it clear that two of the proponents, Bloomsbury and the SM Consortium, are constructing their resorts and are expected to complete their first phase within 2014. The other two proponents (one of which is Tiger, the provisional licensee for Mr. Okada's casino project) are in the initial design stages and are expected to break ground in 2012.

The continuing coverage of Mr. Okada's Manila Bay Resorts project in PAGCOR's annual reports indicates that PAGCOR's interest in and oversight of this project did not stop with the granting of the Provisional Licensing Agreement in 2008. Indeed, the very nature of the Provisional Licensing Agreement requires continued oversight by PAGCOR officials. As Lazaro advised, the Provisional Licensing Agreement was issued in relation to the "Bagong Nayong Philipino Manila Bay Tourism City" project, which is also referred to as "PAGCOR City." PAGCOR City is envisioned to be a Las Vegas-style gaming and entertainment complex. The project was designed to attract proponents with established experience in the hotel and gaming business. PAGCOR released the "Terms of Reference," which detailed a list of requirements to which project proponents must conform in order to qualify for a PAGCOR license to operate within PAGCOR City.

The "Terms of Reference" section provides, in pertinent part, a mandatory Minimum Investment of US 1 Billion, consisting of both equity and debt, and the submission of an associated Project Implementation Plan within 120 days from signing of the Provisional License and approval by PAGCOR (Paragraph 4, Section II, Terms of Reference). Furthermore, within 30 days of signing of the Provisional License, proponents are required to submit a Performance Assurance Bond in the amount of PHP 100 Million to guarantee the completion of the project (Paragraph 8, Section II, Terms of Reference). Within 15 days of signing of the Provisional License, proponents are also required to open an Escrow Account (with an initial deposit of at least US 100 Million) through which funds for the project will pass. This Escrow Account must maintain a balance of at least US 50 Million. (Paragraph 9, Section II, Terms of Reference).

Specifically, paragraph 13 of the Terms of Reference states the following in relation to achieving a regular, non-provisional, Casino Gaming license:

---

[101] PAGCOR 2008 Annual Report, pp. 12-18, viewed January 25, 2012 at http://www.pagcor.ph/annual- reports/annual-2008/pagcor-annual-report-2008.html. [See Appendix]
[102] PAGCOR 2009 Annual Report, pp. 16-19, viewed January 25, 2012 at http://www.pagcor.ph/annual- reports/annual-2009/pagcor-annual-report-2009.html. [See Appendix]
[103] PAGCOR 2010 Annual Report, pp. 24-26, viewed January 25, 2012 at http://www.pagcor.ph/annual- reports/annual-2010/pagcor-annual-report-2010.html. [See Appendix]

29

REPORT

Attorney – Client / Work Product / Privileged and Confidential

"13. Issuance of License

A Provisional License will be issued to the winning proponent effective for the duration of the project development period and shall not exceed the approved completion date of the whole project.

*The Regular Casino Gaming License will be issued upon completion of the Project and upon approval by PAGCOR of the report detailing the actual total cost of the Project* to ensure the proponent's compliance with the approved project cost based on the Project Implementation Plan. The term of the License shall not exceed the term of PAGCOR as specified in RA 9487.

No sub-license will be issued nor allowed." (Emphasis added.)

Thus, a Regular Casino Gaming License will be issued by PAGCOR upon (1) completion of the Project and (2) compliance with the approved project cost as approved by PAGCOR, based on the previously submitted Project Implementation Plan, including all other conditions as may be stipulated in the Provisional License Agreement.[104] Clearly, PAGCOR maintains an active regulatory role over gaming businesses after the issuance of a provisional gaming license. An operator who has already been granted a provisional license, therefore, would have a powerful business incentive to maintain favorable relations with PAGCOR's Chairman and senior leadership.[105]

Finally, the PAGCOR officials with whom FSS spoke in December 2011 indicated that, upon "taking over" from the Genuino Administration in 2010, they conducted a review of previously granted gaming licenses to ensure that all issuance decisions had been done properly, indicating that the Naguiat Administration was exercising close review in monitoring of all licensees, including Mr. Okada.

---

[104] See research of Michelle Lazaro as expressed in her email dated January 30, 2012 to Mike McCall; See also "Terms of Reference" that were attached to the email. [See Appendix]

[105] A recent example of the extent of PAGCOR's continuing oversight of gaming operators can be found in the August 2011 issue of *Inside Asian Gaming* magazine. An article therein reported on claims by gaming operator Thunderbird Resorts, Inc. ("Thunderbird") that PAGCOR had unlawfully attempted to force Thunderbird, through various allegedly selective enforcement actions, to renegotiate the revenue sharing agreement it had signed with the previous PAGCOR leadership under Mr. Genuino. See "Ball of Confusion," dated August 10, 2011, *Inside Asian Gaming,* online edition, viewed January 26, 2011 at http://www.asgam.com/features/item/1238-ball-of-confusion.html. In the September 2011 issue, PAGCOR responded by making reference to various regulatory or enforcement functions it had been carrying out with regard to Thunderbird's casinos, up through the time that the dispute became heated. Among the functions mentioned were "resident monitoring teams" in Thunderbird casinos to "...guarantee the fair conduct of games..." as well as PAGCOR's serving of a notice of closure to Thunderbird in response to the disputed issues. See "Philippines Gaming Regulation—The Untold Story", dated 23 September 2011, *Inside Asian Gaming,* online edition, viewed January 26, 2011. [See Appendix]. These statements by PAGCOR clearly indicate that PAGCOR maintains active regulatory monitoring of licensed gaming businesses in the Philippines and claims the authority to close down licensed operators.

30

REPORT
Attorney – Client / Work Product / Privileged and Confidential

Mr. Okada's hosting and payments on behalf of PAGCOR Chairman Naguiat and his family at Wynn Macau, was most likely related to Mr. Okada's business interests in the Philippines, and would therefore constitute a prima facie violation of the FCPA both by Mr. Okada as well as by Aruze USA, Inc.

## 4.    Possible Pattern of FCPA Violations Regarding Korean Government Officials

As stated previously, in recent years, Mr. Okada has been pursuing development of a resort complex in the Incheon Free Economic Zone in the Republic of Korea. Jong Cheol Lee, the Commissioner of the Incheon Free Economic Zone Authority, and apparently an Incheon government official, announced the signing of a Memorandum of Understanding on approximately October 27, 2011, between the Incheon Free Economic Zone ("IFEZ") and Okada Holdings Korea to develop a casino resort near the Incheon International Airport.[106]

A review of the Aruze City Ledger Account disclosed charges paid for Jong Cheol Lee and other guests of his party at Wynn Las Vegas and Wynn Macau for the period November 2010 to June 2011. Registration documents provided by Wynn Resorts disclosed annotations for Mr. Lee and three other guests, indicating: "Share with Incheon Free Economic Zone." According to the Aruze City Ledger Account, the following amounts were paid for government Lee and his party:

| Name | Relationship to Incheon Free Economic Zone | Location and Date of Stay | Total Charged to Aruze City Ledger Account |
|---|---|---|---|
| Jong Cheol Lee | Commissioner | WLV Nov 16-18 2010 | 1,597.16 |
| | | WM June 2011 | 1,134.55 |
| Woo Hyeung Lee | Unknown | WLV Nov 16-18 2010 | 843.89 |
| | | WM June 2011 | 1,083.22 |
| Min Yong Choi | Unknown | WLV Nov 16-18 2010 | 507.50 |
| Ki Dong Hur | Unknown | WLV Nov 16-18 2010 | 779.20 |
| **TOTAL PAID** | | | 5,945.52 |

These payments made for and on behalf of possible Korean government officials may be part of a continuing pattern by Mr. Okada and his associates to commit prima facie violations of the

---

[106] http://english.visitkorea.or.kr/enu/bs/tour_investment_support/pds/content/cms_view_1516066.jsp?gotoPage=&item=&keyword=, viewed January 14, 2012 [See Appendix].
http://blog.daum.net/ikoreatimes/60, viewed January 14, 2012. [See Appendix]

31

REPORT
Attorney – Client / Work Product / Privileged and Confidential

FCPA. However, further investigation is required in order to determine (i) the nature of Mr. Okada's relationship with these guests; (ii) whether these guests actually had a government affiliation at the time of their 2010 visits to Wynn Las Vegas and Wynn Macau; and, (iii) the status of Mr. Okada's gaming initiative in Korea.

5.    **Mr. Okada's Continuing Refusal to Receive Wynn Resorts mandated FCPA Orientation Training and to Acknowledge Wynn Resorts Code of Conduct**

Mr. Okada's apparent practice and pattern of committing prima facie violations of the FCPA must also be reviewed in the context of his ongoing and likely future conduct as a majority shareholder and director of Wynn Resorts. Since August, 2011, Mr. Okada has failed to make himself available for requisite Wynn Resorts Board of Directors training regarding the FCPA and compliance. Not only has every other board member accepted and received such training, but attempts to accommodate Mr. Okada (including Japanese translation of the FCPA training materials and telephonic availability for the training) have failed.

Moreover, since August 2011, Mr. Okada has also failed even to acknowledge in writing Wynn Resorts Code of Business Ethics and Wynn Resorts Policy regarding Payments to Government Officials. Mr. Okada's continuing failure to perform this requisite review and agreement to comply with Wynn Resorts Ethics and anti-bribery rules and regulations create risk to Wynn Resorts and its board. Such non-compliance by Mr. Okada also suggests that he intends to continue his apparent practice and pattern of making FCPA prohibited payments on a going-forward basis. Any such future conduct would substantially enhance the risks to Wynn Resorts and compromise Mr. Okada's fiduciary duties to Wynn Resorts.

On August 5, 2011, Cheryl Palmer, the executive assistant to Kevin Tourek, sent out an email memorandum on Mr. Tourek's behalf to all board members stating that per compliance policy requirements, all members must acknowledge in writing on an annual basis having reviewed (and agreeing to comply with) two separate documents: (1) the Company's Code of Business Ethics and (2) Policy Regarding Payments to Government Officials.[107] A copy of the form was attached to the email, as was a copy of both the Code and the Policy. The email asked for the executed form to be returned prior to August 26, 2011. All of the members of the board, except for Mr. Okada, returned a signed copy of the acknowledgement. Mr. Okada was reminded, via emails to his representatives on a number of occasions,[108] as well as via a letter from Kevin Tourek, dated November 2, 2011, to provide an executed copy of the

---

[107] See email from Cheryl Palmer dated August 5, 2011. [See Appendix]
[108] See emails contained in email from Kevin Tourek to Robert Shapiro, Esq., dated October 24, 2011. [See Appendix]

32

REPORT

Attorney – Client / Work Product / Privileged and Confidential

acknowledgement form no later than November 15, 2011.[109] Mr. Okada failed to meet this deadline and, as of the date of this report, has yet to provide a signed copy of the form.[110]

        In addition to his failure to return the fully executed Code of Business Conduct and Ethics and the Policy Regarding Payments to Government Officials Acknowledgement Form, which, as previously indicated, was sent out in August of 2011, Mr. Okada has yet to return a secondary acknowledgement form that was attached to the annual Directors' & Officers' Questionnaire ("D&O Questionnaire"). This form was sent out to each member of the board of directors on January 9, 2012, as part of the overall D&O Questionnaire packet.[111] The packet contained instructions to "sign where indicated by the *sign here tabs"* and asked that the 2012 D&O Questionnaire be returned in its entirety on or before January 27, 2012. The two places that required Mr. Okada's signature were (1) on page 26 of the D/O Questionnaire itself, and (2) on page 50 on the separate Code of Business Conduct and Ethics Acknowledgement Form that was part of the overall D&O Questionnaire packet. Though Mr. Okada returned the signature page (page 26) of the D&O Questionnaire itself on January 27, 2012,[112] (which was confirmed to FSS on February 7, 2012), the fact that he has yet to return the separate Code of Business Conduct and Ethics Acknowledgement Form (which he has unequivocally pledged to do by virtue of signing on the signature page of the D&O Questionnaire) is telling and is consistent with his refusal to provide an executed copy of the Code of Business Conduct and Ethics and the Policy Regarding Payments to Government Officials Acknowledgement Form that was sent to him in August of 2011. Though Wynn Resorts did not send to Mr. Okada the Code of Business Conduct and Ethics and the Policy Regarding Payments to Government Officials attached to the D & O Questionnaire in Japanese language versions, which they did previously with respect to the code and policy sent out in August of 2011 after a request by Mr. Okada's attorney, Mr. Okada has never previously requested that the D & O Questionnaire itself be translated into Japanese. Mr. Okada was again reminded of his obligation to return the separate Code of Business Conduct and Ethics Acknowledgement Form (page 50 of the D&O Questionnaire packet) in an email from Roxane Peper to Mr. Okada's assistant, Takashi Matsui, on January 31, 2012.[113] A copy of the form was attached to the email for Mr. Okada's convenience. This form remains outstanding.

---

[109] See letter from Kevin Tourek to Mr. Okada, dated November 2, 2011. [See Appendix]

[110] In a letter dated December 1, 2011 to Robert Shapiro, Esq., outside counsel for Wynn Resorts, Gidon Caine, Esq., counsel for Mr. Okada, explained that the reason Mr. Okada did not sign the acknowledgement form was due to the fact that the materials had not been translated into Japanese. As of the date of submission of this Report, Mr. Okada has not yet submitted a signed copy of the acknowledgement form despite being provided with the requested translations, which were attached to a letter sent via email dated December 27, 2011 from Jeffrey Soza to Gidon Caine. [See Appendix]

[111] See Memorandum from Kim Sinatra to Board of Directors and Officers of Wynn Resorts, Limited, dated January 9, 2012, and 2012 Director's & Officers Questionnaire attached thereto. [See Appendix]

[112] See email from Takashi Matsui to Roxane Peper, dated January 27, 2012. [See Appendix]

[113] See email from Roxane Peper to Takashi Matsui, dated January 31, 2012. [See Appendix]

33

REPORT

Attorney – Client / Work Product / Privileged and Confidential

On February 1, 2012, Barry Brooks, one of Mr. Okada's attorneys, contacted Kevin Tourek, senior vice president and general counsel with Wynn Resorts, via email regarding "address[ing] the request, forwarded to Mr. Okada under cover of a memorandum from Mr. Wynn, that Mr. Okada execute and return to Wynn Resorts, Ltd. ("Wynn Resorts") a form of acknowledgment ("Acknowledgment") in regard to the Wynn Resorts Code of Business Conduct and Ethics (the "Code"). Most importantly, I wanted to emphasize that Mr. Okada agrees, with a deep sense of commitment, with the principles set out in the Code and agrees that it is in the best interest of Wynn Resorts and its shareholders that he, as a director, be a leader in observing and advocating for those principles. Also, and in any case, Mr. Okada believes that the requirements of the Code, and the spirit of those requirements, are keys to the future success of Wynn Resorts."[114] In a follow-up phone call to that email, Mr. Brooks and Mr. Tourek discussed the ramifications of Mr. Okada not signing the policy, the possibility of interpretation issues, and concerns over whether Mr. Okada may have any conflict of interest issues. Mr. Brooks also asked for a copy of the D & O Questionnaire.[115]

## 6.   Mr. Okada, his associates and companies, Universal have pursued independently a casino gambling development in the Philippines since 2008.

FSS interviewed Mr. Okada on February 15, 2012 and the results of that interview are set forth more fully in Section VI.[116] In this interview, Mr. Okada asserted that all his efforts in the Philippines prior to the change of presidential administration in the summer of 2010 were undertaken on behalf of and for the benefit of Steve Wynn and Wynn Resorts, and that he only undertook to develop a gaming business in the Philippines independently subsequent to the change of presidential administrations.

On December 20, 2007, Aruze Corp. issued a press release entitled "Business Realignment and Future Business Development." The press release stated the following:

"The Company looks to acquire the licenses necessary to operate a casino resort in the Asian region, including Macau, and to commence operation of a casino resort on its own over the next business year. . . . For this know-how, which is vital from a management perspective, the Company intends to enlist the full cooperation of Wynn Resorts, Limited's Steve Wynn in its future pursuits regarding this project. For the purpose of successfully operating a casino resort in the Asian Region on an independent basis, the Company has received agreement from Steve Wynn that he will supply all necessary support, including active personal exchange with Wynn Resorts, Limited.…"[117] (Emphasis added.)

---

[114] See email from Barry Brooks to Kevin Tourek, dated February 1, 2012. [See Appendix]
[115] See email from Kevin Tourek to Kim Sinatra, dated February 2, 2012. [See Appendix]
[116] Statements attributed to Okada during the February 15, 2012 interview are based on FSS' contemporaneous notes.
[117] See JASDAQ press release for Aruze Corp., dated December 20, 2007, entitled "Business Realignment and Future Business," available at: http://www.universal-777.com/en/ir/releases/2007/20071220 e.pdf. [See Appendix]

34

REPORT
Attorney – Client / Work Product / Privileged and Confidential

On April 25, 2008, Aruze Corp. issued another press release entitled "Casino Project in the Philippines." This press release stated the following:

"As announced in its 'Business Realignment and Future Business Development' press release issued December 20, 2007, ARUZE GROUP seeks to commence the operation of a casino resort in the Asian region, which shall be conducted independently by ARUZE CORP. . . . Out of the above mentioned elements, where essential management-based know-how is concerned, the Company intends to proceed with the project under the full guidance of Wynn Resorts, Limited's Steve Wynn."[118] (Emphasis added.)

The press release identifies the location of the planned casino as a plot of land adjacent to "Bagong Nayong Pilipino Manila Bay Tourism City."

The language in the press releases suggest that Universal's intentions from the inception of the project were to develop a gaming business independently, and not for the benefit of Steve Wynn or Wynn Resorts.

> 7.   **Mr. Okada has stated that Universal paid expenses related to then-PAGCOR Chairman Genuino's trip to Beijing during the 2008 Olympics.**[119]

Mr. Okada was asked during his interview whether he met then-PAGCOR Chairman Genuino in Beijing during the 2008 Olympics. Mr. Okada stated that Universal's President Tokuda made the arrangements for Chairman Genuino to travel to the Olympics. Mr. Okada explained that Mr. Tokuda was involved with the setting of the travel itinerary. When Mr. Okada was asked if the travel arrangements were "paid by Universal," Mr. Okada responded "not 100% perhaps there were people certainly not all but I'm not familiar with the details." Mr. Okada was then asked "To your knowledge, did Universal pay any of the associated costs of any of the travel of Mr. Genuino?" Mr. Okada answered "I don't know whether or not the travel expense was paid by them. My understanding is that there was a certain amount of personal monies being spent from the attendees and participants including Chairman Genuino but I do not know details regarding this." Mr. Okada was then asked "But is it your knowledge that some of those expenses were paid by Universal?" Mr. Okada answered: "Regarding the individual payment of personal monies, whether before or after, it was Universal that put together all of the expenses."

Mr. Okada then explained that since Mr. Okada was previously invited to "one of the islands in the Philippines so in return well we decided that we would decide to do this in turn so I too would invite them as well. There was a time from where we had that understanding now that I recall. So I may have asked Mr. Tokuda to include this person [Genuino] as well." The

---

[118] See JASDAQ press release for Aruze Corp., dated April 25, 2008, entitled "Casino Project in the Philippines," available at: http://www.universal-777.com/en/ir/releases/2008/20080425 e pr2.pdf. [See Appendix]
[119] Attributions from Mr. Okada's interview are based on FSS contemporaneous notes.

35

REPORT
Attorney – Client / Work Product / Privileged and Confidential

following question was then asked: "If there was a time that Genuino has invited you to the Philippines and in return for that you may have invited him or had some knowledge that Universal paid some of his expenses when he came to Beijing?" Mr. Okada responded: "I don't like to be invited more than what is necessary because that would mean that I am vulnerable and I don't like that. I was told that it was paid for and he insisted so I remember <u>he had to be paid for in this way</u>. So I remember that Mr. Tokuda said he should be included as well. I remember thinking that I had to return this in some way so I may have made that decision based on that memory." (Emphasis Added).

Later in the interview, Mr. Okada stated that Chairman Genuino appeared to have a "few people" with him at the Olympics and, "I asked my staff why wasn't he around and then my people said Mr. Genuino had a few people accompany him and he met with them to go shopping and once I heard that I do not recall now but again I don't have a clear recollection of his whereabouts."

## VI.    Summary of Mr. Okada's February 15, 2012 Interview[120]

Mr. Okada had four lawyers present over the course of the interview, including a Japanese interpreter/associate. Mr. Okada was given a full opportunity to answer all questions. He attended the interview voluntarily and at the end he was asked whether he wanted to explain anything else.

### A.    Apparent FCPA Violations regarding Philippine PAGCOR officials.

1. Mr. Okada admitted going to Macau on or about September 24 2010 to meet with PAGCOR chairman Naguiat at Wynn Macau. Mr. Araki called Mr. Okada on either September 24 or 23 to advise that Chairman Naguiat was at Wynn Macau.

2. Mr. Okada stated he flew to Macau from Japan for the sole reason of meeting Chairman Naguiat.

3. Mr. Okada stated the purpose of Chairman Naguiat's visit to Wynn Macau was for business – as a new PAGCOR Chairman, Naguiat wanted to better understand the casino business. Mr. Okada stated that a number of his Universal employees, including Araki, were at Wynn Macau in order to assist Chairman Naguiat in this regard.

4. Mr. Okada stated that when he got to Wynn Macau he asked to see Ian Coughlan, Wynn Macau CEO.

5. Mr. Okada asked to see and met with Ian Coughlan at Wynn Macau but denied telling Coughlan that the guests were Universal VIPs and that they should be treated well.

---

[120] Certain sections of the report below are presented in an abbreviated form. See the attached notes of Mr. Okada's interview for a more expansive description. [See Appendix]

36

REPORT

Attorney – Client / Work Product / Privileged and Confidential

6.   Mr. Okada emphatically denied saying this and related that there is no way he would have said something to that extent regarding special care: "I would have said this is a person with a position with PAGCOR, I would have said be normal and don't do anything out of the ordinary."

7.   Mr. Okada stated he attended a dinner for approximately ten (10) people at Wynn Macau and that Chairman Naguiat also attended.

8.   Mr. Okada stated that either Araki, Shoji or Universal paid for the dinner

9.   Mr. Okada said that he did not know whether any other PAGCOR officials attended the dinner.

10.   Mr. Okada stated that he and Naguiat did not discuss any business at the dinner which would have been rude.

11.   Mr. Okada stated that he believed Naguiat's wife was present at the dinner but that he was not introduced to her.

12.   Mr. Okada stated he left early the next morning.

**B.   Mr. Okada's Knowledge of and Response to Chairman Naguiat's September 2010 stay**

1.   Mr. Okada stated that sometime after September 2010 he learned from Universal President Tokuda that the cost of Chairman Naguiat's stay at Wynn Macau exceeded reasonable entertainment expenses.

2.   Mr. Okada learned about the excessive September 2010 expenses from Takuda about three or four months after the events when the bills would come up.

3.   Mr. Okada stated that he was never told the cost of Chairman Naguiat's Wynn Macau stay nor did he ask anybody that question.

4.   Mr. Okada stated that he understood that Chairman Naguiat had stayed in the most expensive accommodation at Wynn Macau. But he said "I heard later on that he was in one of the more expensive rooms. I heard this in the context of it would be a problem regarding our corporate policy…."

5.   Mr. Okada stated that Chairman Naguiat's wife was present at Wynn Macau. Mr. Okada did not know if his children were present.

6.   Mr. Okada stated that he did not know that any cash had been provided to Chairman Naguiat.

7.   Mr. Okada stated that he did not know that Universal employees had tried to hide the identity of Chairman Naguiat as a guest.

8.   Mr. Okada stated that he did not know how long Chairman Naguiat had stayed at Wynn Macau.

9.   Mr. Okada denied seeing two (2) emails from Shoji to Angela Lai at Wynn Macau, dated September 20th and 23rd 2010 respectively, which requested

37

REPORT

Attorney – Client / Work Product / Privileged and Confidential

reservations for a Universal VIP guest, "who would not be registered," and arrangements to provide up to 5,000 US credit for each person staying at Naguiat's Villa. Mr. Okada explained that although he saw his name in the email cc's, he would not have seen either email because for the most part he does not use his PC.

10.   Mr. Okada stated that internal Universal rules do not permit the payment of cash to government officials. Mr. Okada stated that no stay in the Villa in Wynn Macau could cost US 50,000

11.   Mr. Okada stated that internal Universal rules permitted the payment of reasonable entertainment expense for government officials but did not know what amount was permitted.

12.   Mr. Okada stated that the cost of Chairman Naguiat's stay at Wynn Macau caused a "problem" for Universal and that as a result Araki was fired, and Shoji resigned after having been scolded by Mr. Okada.

13.   Mr. Okada stated that he did not make any changes at his company or give anyone new instructions as a result of finding out about Naguiat's stay in September 2010.

14.   Mr. Okada said that it was possible that Chairman Naguiat would be billed for the cost of the stay.

15.   Mr. Okada said, when he was asked about a reference in a Shoji email to posting all expenses to the Universal City Ledger Account, that he lacked any knowledge of such an account and said "I wonder if the City Ledger is in reference to our internal policy, as long as it is under that ceiling.…"

C.   **Mr. Okada stated that he was aware of only one other guest stay at Wynn Macau that he believed was improperly paid by Universal.**

1.   Mr. Okada stated only a few weeks ago he learned from President Tokuda that Anthony Genuino, son of former PAGCOR Chairman Genuino, had stayed at Wynn Las Vegas in September of 2008 and that Universal had paid US 2300 for his stay.

2.   Mr. Okada stated that Genuino would be sent the bill for this cost

3.   Mr. Okada denied any knowledge of other PAGCOR officials staying at Wynn Resorts from 2008 through June 2011 with Universal paying for their expenses.

4.   Mr. Okada stated that he had just instructed President Tokuda of Universal to conduct an investigation into Universal's payment of entertainment expenses.

5.   Mr. Okada blamed Shoji as the responsible party for these payments.

6.   Mr. Okada stated that he yelled at Shoji for not reporting these matters to him and would have fired Shoji except that Shoji resigned. Mr. Okada stated that Tokuda

38

REPORT
Attorney – Client / Work Product / Privileged and Confidential

did report these matters and Mr. Okada believed that Shoji was also in a position to know all about what had happened but had failed to report it to him.

7. Mr. Okada stated that Shoji was a trusted employee who had worked closely with him since 2002 and should have reported these matters to him.

8. Mr. Okada stated that they were just starting this investigation and that bills may be sent to certain of these guests for the expenses which Universal paid.

9. Mr. Okada especially blamed Mr. Shoji since he was the head of the company's compliance committee from 2002-2010.

10. Mr. Okada stated that he last met with Chairman Naguiat in the Philippines during January 2012 in order to seek land leasing approval from PAGCOR.

11. Mr. Okada stated that Universal had an expense policy but he didn't know what the amounts were. Mr. Okada stated that he was unfamiliar with the specific details of his compliance policy because he was too high within the company. He left it to others to handle the details of the policies.

12. Mr. Okada was asked a series of questions regarding about a dozen other PAGCOR officials who stayed at Wynn Macau or Wynn Las Vegas during 2010 and 2011 for whom Universal paid their expenses.

13. Mr. Okada denied having authorized any of these payments and said that he would not have authorized such payments if the guests were PAGCOR officials.

14. Mr. Okada stated that on one occasion he met Jose Miguel Arroyo, husband of Former Philippine President Gloria Arroyo, but did not know that Jose Arroyo had stayed at Wynn Las Vegas in November 2009, with Universal paying for his expenses totaling US 4,642.

15. Mr. Okada stated that he met Chairman Naguiat approximately 4 or 5 times since Naguiat's Chairmanship in June 2010 and that these meetings always involved official matters.

16. Mr. Okada stated that he told Tokuda in December of 2011 to investigate these matters.

17. Mr. Okada stated that December was the first time he asked Mr. Tokuda investigate these charges for Universal.

18. Mr. Okada stated further that Shoji was a trusted employee whom he had met with "very frequently." During the time period in September 2010 when Shoji was setting up the Naguiat visit, Shoji told Mr. Okada nothing about Naguiat.

**D.    Okada statements to the Board of Directors Regarding doing business in Asia**

1. Mr. Okada stated that he could not specifically remember attending a Wynn Resorts Board of Directors meeting in February 2011.

39

REPORT
Attorney – Client / Work Product / Privileged and Confidential

2. Mr. Okada stated that he did not remember attending a Wynn Resorts Board of Directors meeting where bribery was discussed.

3. Mr. Okada denied ever stating to Wynn Resort Directors words to the effect that "it was a matter of hiring the right people and that you must pay other people." He responded "absolutely not, that's a lie."

4. Mr. Okada denied telling fellow board members words to the effect that "you have to follow local customs and that's why you have consultants."

5. Mr. Okada also denied ever stating to fellow board members words to the effect "I wouldn't bribe someone but would have someone else bribe that person."

6. As to bribing someone in the Philippines, Mr. Okada stated that "there is no need to do that in the Philippines even because we are in the position to invest."

7. Mr. Okada also denied ever stating words to the effect that "in Asia, it is okay to give gifts to government officials." His response was "absolutely not."

8. Mr. Okada stated that he had been a member of the Wynn Resorts Board of Directors since 2005 or 2006. When asked about his duties or responsibilities as a director of Wynn Resorts, Okada stated that he had to "ensure socially just company, there should be no illegal activities, and that I have to help them be successful and grow as a company."

9. Mr. Okada was asked if he had ever read the Wynn Resorts Code of Conduct to which he responded, "No because it is in English, no I cannot."

10. Mr. Okada was asked if he had accepted Wynn Resorts Board of Director FCPA training in 2011, to which he replied that he had received some documents but sent them to his lawyers.

**E.** **Doing Business in the Philippines**

1. Mr. Okada stated that prior to the new Philippine administration taking over in 2010, his efforts to conduct a gambling business in the Philippines were being done for Wynn Resorts and that he was reporting to Steve Wynn about these activities.

2. Mr. Okada said before the new Philippine administration in 2010 "All of the conversation between myself and Genuino was for the sake of explaining to Mr. Wynn."

3. Mr. Okada stated that a press release from Aruze Corp. dated April 25, 2008, that announced Aruze would independently operate a casino project in the Philippines, had not been presented to him for approval.

4. Mr. Okada stated that neither Steve Wynn nor Wynn Resorts had invested any money in the Philippine business initiative which he had been conducting since 2008.

40

REPORT

Attorney – Client / Work Product / Privileged and Confidential

5.     Okada stated that Universal had invested between US 300-400 million in 2008 to acquire the land for the Manila Bay project.

6.     When asked whether Mr. Wynn or Wynn Resorts invested any money in the US 300-400 million purchase, Mr. Okada stated that "Wynn Resorts had no involvement whatsoever."

7.     Mr. Okada stated that it was only after the new Aquino presidency in June of 2010 that he decided to pursue a Philippine gaming project independently.

8.     Mr. Okada stated that this land had been acquired by a company called Eagle I Land Holdings in which Aruze USA had an ownership interest.

9.     Mr. Okada stated that at the time of the land acquisition in 2008, Eagle I Land Holdings was 60% owned by Filipino nationals. However, when asked to identify the 60% ownership today, he responded "I know of them I know who they are but I don't remember their names."

10.    Mr. Okada stated that he was aware of the Philippine legal requirement that land be 60% owned by Filipinos.

11.    Mr. Okada stated that neither Tiger or Aruze had a provisional gaming license for the Philippines.

12.    Mr. Okada does not know whether a deposit was made by Universal in order to pursue the Filipino gaming initiative.

13.    It was his understanding that to get a gaming license in the Philippines you needed to do certain things beforehand and that he asked questions on Wynn's behalf as to what had to be done.

14.    Mr. Okada stated that Platinum Gaming and Entertainment was a Philippine company run by Soriano.

15.    Mr. Okada stated that he did not know Paolo Bombase or Manuel Camacho as shareholders of Eagle I and Eagle II.

16.    Mr. Okada stated that Masato Araki may have lent his name as a stockholder to Eagle I and Eagle II but that Mr. Okada did not know the details. Mr. Okada stated that he did not know whether Manabu Kawasaki, who was another Universal employee, was a stockholder of Eagle I or Eagle II.

**F.**    **Possible Payments by Universal to Korean Government Officials**.

    Mr. Okada stated that he is interested in the IFEZ for possible investment. Mr. Okada stated that he personally set up arrangements in 2009 or 2010 for a Korean delegation from the IFEZ to visit Las Vegas. According to Mr. Okada, this delegation was led by a Mr. Lee, who was "seconded" to IFEZ by the Korean government. Mr. Okada invited this delegation to see the Venetian.

41

REPORT
Attorney – Client / Work Product / Privileged and Confidential

Mr. Okada stated that "at the very beginning" he discussed the "issue of expense" and the Korean side said they had to pay for their own expenses as government officials. Mr. Okada stated that the Korean delegation stayed at Wynn Las Vegas and paid for their rooms. When told that Universal in fact paid for the Koreans' rooms, Mr. Okada stated "It's possible we paid in advance the first time but then they paid later. I am personally in charge of the Koreans." When Mr. Okada was then asked if he knew that was done he responded "I am certain it was done."

Mr. Okada later repeated that the Koreans paid for their own travel. When advised that Universal paid for Commissioner Lee and others to stay at Wynn Macau in 2011, and Wynn Las Vegas in 2010, Mr. Okada stated that "It may have been that we made a temporary payment to be reimbursed later but in any case for Korea all trips must be applied for with the City Hall and they need to get prior approval."

Mr. Okada later repeated that he did not authorize Universal to pay approximately US 6,000 worth of room charges for Commissioner Lee and other IFEZ officials for stays at Wynn Resorts. When asked if it would be against "Universal's policy" to pay such travel expenses, Mr. Okada repeated that the Koreans would pay for their own expenses. He added that "Maybe it was the case where Universal made a temporary payment to be reimbursed later and all this would be paid by 'admin official.'"

### G.   Mr. Okada Instructs Mr. Tokuda to Conduct an Investigation

Mr. Okada stated that since about 2008-2009, Universal has had both "ordinary" and "extraordinary" rules about paying entertainment expenses regarding government officials. However, he stated that he did not know the "specific details." Mr. Okada stated that "cash" could not be given but that he did not know the dollar amount limit for providing government officials with meals.

Mr. Okada stated that after learning from Mr. Tokuda about the excessive expenses paid by Universal for Chairman Naguiat's September 2010 stay at Wynn Macau, Mr. Okada did not take any steps or give instructions to prevent a recurrence. Indeed, Mr. Okada stated his belief that Universal's corporate policy as it exists today is "plenty on its own."

Mr. Okada stated that "within the last week or so" he learned from Mr. Tokuda that the son of then-PAGCOR Chairman Genuino stayed at Wynn Las Vegas in 2008 and that Universal had paid US 2,800 for his expenses. Mr. Okada said this was "inexcusable" and that he had given instructions to have him [Genuino] billed directly. Mr. Okada further stated that Mr. Tokuda had found "several more" of these instances but that Mr. Okada did not "know the details." Mr. Okada stated that in regard to Chairman Naguiat's stay at Wynn Macau, perhaps an invoice should also be sent to him as the customer.

Mr. Okada stated that "it was just yesterday" that he heard from Tokuda about "these issues being raised." After being asked what he knew about a list of PAGCOR officials whose

42

REPORT
Attorney – Client / Work Product / Privileged and Confidential

stays at Wynn Macau and Wynn Las Vegas were paid by Universal from 2008 – 2011, Mr. Okada denied any knowledge of these events. However, Mr. Okada stated that "everything I believe [FSS] mentioned matches with what Mr. Tokuda is investigating right now. And I will have him write a paper that lists all the countermeasures and a progress report and what has been wrapped up and so forth."

Mr. Okada stated that in approximately December 2011, he "clearly instructed" Mr. Tokuda to conduct an investigation about these matters. At the end of the interview, Mr. Okada stated that "I will look into all the expense that you have asked about and if it is someone who has an existing relationship I will for sure bill that person."

## VII.   Conclusions

The investigation has produced substantial evidence that directly relates to Mr. Okada's suitability under Nevada law as both a major shareholder and director of Wynn Resorts.

Nevada Gaming Commission Regulations regarding individual suitability issues encompass, among other things, a person's "good character, honesty and integrity," and whether a person's "background, reputation and associations will not result in adverse publicity for the State of Nevada and its gaming industry" (Section 3.090 of the NRS). The NRS also require that a covered person satisfy the Commission that such person has "adequate business probity" (Section 463.170, paragraph 3).

Both Aruze USA , a Nevada corporation, and Mr. Okada personally, as a Director, President, Secretary and Treasurer of Aruze Inc., are covered parties under the jurisdiction of the FCPA.

As set forth above, the investigation has produced substantial evidence that Mr. Okada, his associates and companies have apparently been engaging in a longstanding practice and pattern of committing prima facie violations of anti-bribery laws, particularly the FCPA.

The testimonial and documentary evidence appear to prove that, since at least 2008, Mr. Okada, his associates and companies have made over US 110,000 in payments to his chief gaming regulators (2) in the Philippines (PAGCOR), their families and associates. Mr. Okada is building a multi-billion dollar gaming business and operation in the Philippines.

The practice and means of making these payments varied slightly but were regularly and repeatedly arranged in the same manner. For example, between June 2008 and August 2010, former PAGCOR Chairman Efraim Genuino (February 2001 – June 30, 2010), his son and other PAGCOR government officials, were hosted by Mr. Okada, his associates and companies at either Wynn Resorts Las Vegas or Wynn Resorts Macau. Mr. Okada, his associates and companies would arrange and pay thousands of dollars to cover the expenses of Chairman

REPORT
Attorney – Client / Work Product / Privileged and Confidential

Genuino, his son and other then-current PAGCOR officials in his party. These payments were made by Mr. Okada, his associates and companies, using the City Ledger Account, which contained an average balance of US 100,000 funded and replenished by Universal. International money transfers and the facilities of interstate commerce were used to make these payments.

There is substantial evidence to show that Chairman Genuino's June 2010 stay at Wynn Macau was due to the fact that he was then Mr. Okada's principal Philippine gaming regulator. This is also demonstrated by the fact that after Chairman Genuino left his PAGCOR office in June 2010, he and his family were no longer the beneficiaries of such payments at Wynn Resorts facilities.

However, as set forth above in greater detail, Mr. Okada's current chief Philippine gaming regulator, Chairman Cristino Naguiat (July 2, 2010 – present) and his family quickly succeeded Chairman Genuino as the beneficiaries of payments by Universal for stays at Wynn Resorts Las Vegas and Wynn Resorts Macau (September 2010 in Macau; November 2010 in Las Vegas; and June 2011 in Macau, just over seven (7) months ago).

These payments were made using Mr. Okada's City Ledger Account, as was done regarding payments on behalf of the former PAGCOR Chairman. The evidence further suggests that Chairman Naguiat's luxury stays at Wynn Resorts facilities were fully known to Mr. Okada, who actively involved himself in some of the arrangements. For example, Chairman Naguiat's September 22-26, 2010 stay at Wynn Resorts Macau luxury Villa 81, the most expensive accommodation at Wynn Resorts Macau (about 7,000 square feet in size, which then cost about US 6,000 per day), was intended by Mr. Okada and his associates to be kept secret and concealed within Wynn Resorts Macau records. Initially, Mr. Okada's associates arranging for Chairman Naguiat's September 2010 stay at Wynn Resorts Macau purposefully withheld Naguiat's name and had him registered as an "Incognito" VIP guest of Universal, utilizing the named reservation of "Rogelio Bangsil" (another then-senior PAGCOR official). Chairman Naguiat then stayed at the Wynn Resorts Macau for four days, together with his wife, three children and a nanny, without ever once introducing himself to the constantly attending Wynn Resorts Macau VIP service managers.

Mr. Okada's associate, who made this reservation for Chairman Naguiat, requested a "more gorgeous room, such as "Villa" and "the best butler," for this unnamed "VIP for Universal," who turned out to be the chief gaming regulator for the Philippines. The evidence also shows that on September 24, 2010, Mr. Okada personally made clear (via an interpreter) to Ian Coughlan, the Wynn Resorts Macau Executive Director and President, that Chairman Naguiat and his party were important guests and that Mr. Coughlan should make sure that his staff took good care of them. The evidence further shows that on the evening of September 24, 2010, Mr. Okada hosted a dinner at Wynn Macau for Chairman Naguiat (and approximately 13 others). The US 1,673.07 cost of this dinner was charged to Mr. Okada's room.

44

REPORT
Attorney – Client / Work Product / Privileged and Confidential

    The testimonial and documentary evidence also shows that despite deliberate attempts to conceal Chairman Naguiat's identity while a guest at Wynn Resorts Macau in September 2010, hotel staff, acting on their own, soon identified Chairman Naguiat by means of a photo from the PAGCOR website. Their interest in doing so was sparked by the fact that the senior PAGCOR guest known to them, Mr. Bangsil, exercised great deference to Chairman Naguiat, who the staff determined must be the 'boss'. Nevertheless, the VIP service providers continued to refer to Chairman Naguiat only as "sir," thereby following the wishes and directions of Chairman Naguiat and Mr. Okada's associates. The evidence also shows that several weeks after Chairman Naguiat's intended "Incognito" stay at Villa 81, Mr. Okada's associates became concerned about the high cost of Chairman Naguiat's luxury stay at Wynn Resorts Macau. Specifically, Mr. Okada's associate advised Wynn Resorts Macau that the amount being charged for Chairman Naguiat's stay was too much over an ordinary business expense. Mr. Okada's associate then asked if Wynn Resorts Macau "could reconsider the matter [Chairman Naguiat's stay] and charge us [Mr. Okada's company] the original rate [and free upgrade to a Villa] since the party directly dealing with on this matter is our company [Mr. Okada's company] rather than each individual guest [Chairman Naguiat]." Mr. Okada's associate further stated that "since the amount charged [for Chairman Naguiat] is too much beyond the ordinary room charge, <u>our company</u> [Mr. Okada's company] <u>will be put in a very difficult position to give reasonable explanations if we are inquired by someone</u>." (Emphasis added).

    Despite Mr. Okada's associate's efforts to have Wynn Resorts Macau reduce these payments and assist in covering up the beneficial amounts received by Chairman Naguiat, Wynn Resorts Macau denied this request.

    Mr. Araki's later email ("Our Chairman Okada once again instructed us to take care of the group [PAGCOR], but not like the last time….") to Wynn Macau, dated October 5, 2010, also tends to confirm Mr. Okada's personal knowledge and direction of the payments made on behalf of Chairman Naguiat and his family for their luxury stay at Wynn Macau for September 22-26, 2010.

    The evidence also shows that on September 24-25, 2010, Mr. Okada's associates obtained a total of US 20,000 cash from Wynn Resorts Macau's main cage as "cash advances" for Chairman Naguiat, his family and party. This same associate of Mr. Okada returned approximately US 503 of this advance on September 26, 2010 as the remainder from Chairman Naguiat's party. Mr. Okada's City Ledger Account was again used to pay for this advance.

    The evidence also shows that the PAGCOR-related payments made by Mr. Okada and his associates are not the result of any misunderstanding of the applicable anti-bribery laws, including the FCPA. Conversely, by his own statements and declarations to fellow Wynn Resorts Board members, Mr. Okada apparently believes that there is nothing wrong with making payments and gifts to government officials when doing business in Asia. When advised by fellow directors and Wynn Resorts lawyers that such payments are bribes strictly prohibited by

45

REPORT
Attorney – Client / Work Product / Privileged and Confidential

the FCPA and other laws, Mr. Okada responded that third party intermediaries or "consultants" can be used to make the payments.

The best evidence of Mr. Okada's belief that it is permissible to make payments to government officials is his admission that Universal paid expenses for then-PAGCOR Chairman Genuino's trip to the 2008 Beijing Olympics. Mr. Okada explained that since Mr. Genuino had previously invited Mr. Okada to "one of the islands in the Philippines," Mr. Okada and Universal's President Tokuda in turn had Universal pay for expenses related to Genuino's trip to Beijing, which Mr. Okada stated was arranged by President Tokuda. This admission by Mr. Okada is consistent with his February 24, 2011 statements to board members that there is nothing wrong with making payments and gifts to government officials.

The evidence about the corporate structures utilized by Mr. Okada and his associates to initiate his multibillion dollar gaming business in the Philippines also appears to demonstrate Mr. Okada's intent to do business as he desires, regardless of the applicable laws and regulations. FSS's examination of the corporate documents relating to Mr. Okada's gaming initiative in the Philippines appears to show that he has used a complex web of corporate structures and companies to evade laws which require Philippine nationals to own 60% interest in all real estate. A separate legal analysis by a Philippine attorney confirms this finding and suggests that Mr. Okada's Philippine gaming initiative has been set up in violation of applicable law.

Additionally, the preliminary evidence also shows that in connection with Mr. Okada's efforts to develop a gaming business in IFEZ, Mr. Okada and his associates may be engaging in the same pattern of proscribed payments to government officials. The preliminary evidence shows that in October 2011, Mr. Okada's company signed a Memorandum of Understanding with IFEZ to develop a casino resort near the Incheon International Airport. Preliminary information indicates that IFEZ is overseen by the Incheon Free Economic Zone Authority, apparently part of the City of Incheon government. Mr. Okada's City Ledger account reflects that from November 2010 through June 2011, four (4) individuals, including IFEZ Commissioner Jong Cheol Lee, had two stays at Wynn Resorts Las Vegas and Wynn Resorts Macau, where payments totaling US 5,945.52 were made on their behalf through Mr. Okada's City Ledger account. Preliminary internet research identifies Jong Cheol Lee as the current IFEZ Commissioner, a position he has held since July 2010. It is not clear at this preliminary stage i) whether Mr. Okada's announced gaming investment and operation within IFEZ has received any gaming licensing, and ii) whether the three (3) guests who accompanied Commissioner Lee were then Korean government officials.

The investigation has established that despite requests by Wynn Resorts since August 2011 that Mr. Okada acknowledge in writing that he has reviewed (and agreed to comply with) Wynn Resort's "Code of Business Ethics" and "Policy Regarding Payments to Government Officials," Mr. Okada has failed to do so.

46

REPORT
Attorney – Client / Work Product / Privileged and Confidential

Finally, Mr. Okada was interviewed by FSS on February 15, 2012 by FSS and was given the opportunity to present his version of the facts. Mr. Okada denied knowledge of Chairman Naguiat staying "incognito" at Wynn Macau in September 2010. He also denied knowledge that Mr. Shoji was actively involved in arranging for Chairman Naguiat's stay. Although Mr. Shoji's emails asking that Chairman Naguiat's identity be kept secret, and that Chairman Naguiat be provided with cash in connection with his visit, were copied directly to Mr. Okada, the latter stated that because he rarely uses his personal computer, he would not have seen such emails. Mr. Okada acknowledged flying to Macau on September 24, 2010 in order to visit Chairman Naguiat but denied telling Ian Coughlan that Chairman Naguiat was an important Universal guest who should be treated well. Conversely, Mr. Okada stated that there is "no way" he would have said something like that, but would have said "be normal and don't do anything out of the ordinary." The substantial evidence relating to Chairman Naguiat's September 2010 stay at Wynn Macau, including emails, Coughlan's statements, and the facts and reasonable inferences regarding this evidence, cast substantial doubt on Mr. Okada's credibility.

Mr. Okada also vehemently denied making statements to fellow board members to the effect that doing business in Asia requires and permits bribes to be made to government officials. Mr. Okada's denials are directly contradicted by many of his fellow board members.

Similarly, Mr. Okada insists that all of his efforts to establish a gambling business in the Philippines prior to 2010 were undertaken solely on behalf of Wynn Resorts. His insistence is largely contradicted by the actions which he undertook. First, Mr. Okada and Universal invested US 300-400 million to buy property in the Manila Bay Entertainment Zone, which was to be used for his gaming operation. Mr. Okada admitted that Wynn Resorts had "no money involved in this investment." Secondly, Mr. Okada and Universal set up an elaborate corporate structure in order to initiate, and operate in the future, a multimillion dollar casino operation. Wynn Resorts had no participation in any of these corporate initiatives or structures, all of which were controlled by Universal and Mr. Okada. Third, the provisional gaming license, which is required in order to establish a gaming business in the Philippines, was procured by Mr. Okada and his companies, without any relation to Wynn Resorts. Finally, when shown an April 25, 2008 Aruze Corp. press release, which states that the Aruze casino operation will be independently developed by Aruze with the mere intent that Wynn Resorts help guide its project, Mr. Okada denied any knowledge of this press release.

In sum, the substantial evidence developed by this investigation and set forth above, based on witness interviews, public information, documentary and electronic data, provide the Compliance Committee and Board of Directors a factual basis to review Mr. Okada's continued suitability to be a major shareholder and director of Wynn Resorts.