Pages 1 - 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

STEPHEN WYNN and WYNN RESORTS )    Case No. 14-cv-04329-WHO
LIMITED,                      )
                              )
        Plaintiffs,           )
                              )
    v.                        )
                              )
JAMES CHANOS,                 )
                              )
        Defendant.            )
_____)

San Francisco, California

Wednesday
February 25, 2015

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL
ELECTRONIC SOUND RECORDING - FTR 2:21-2:46

<u>APPEARANCES</u>:


For Plaintiff Stephen Wynn and Wynn Resorts Limited:

                BROWNSTEIN HYATT FARBER SCHRECK LLP
                1020 State Street
                Santa Barbara, CA 93101

        BY:     **BARRY BENSON LANGBERG, ESQ.**

                HANSON BRIDGETT LLP
                425 Market Street, 26th Floor
                San Francisco, CA 94105

        BY:     **LAWRENCE M. CIRELLI, ESQ.**

                *Transcribed by Kelly Polvi, Contract Transcriber*

(Appearances Continued on Following Page.)

1       APPEARANCES (Continued):

2

3       For Defendant James Chanos:

4                       ARNOLD & PORTER LLP
                        Three Embarcadero Center, 7th Floor
5                       San Francisco, CA 94111-4024

6            BY:        **KENNETH G. HAUSMAN, ESQ.**
                        **JULIAN WALDO, ESQ.**
7
                        BOSTWICK & JASSY LLP
8                       12400 Wilshire Boulevard
                        Suite 400
9                       Los Angeles, CA 90025

10           BY:        **GARY L. BOSTWICK, ESQ.**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Wednesday, February 25, 2015**                    **2:21 P.M.** |
| 2 | P R O C E E D I N G S |
| 3 | ---000--- |
| 4 | **THE CLERK:**  Calling civil matter 14-4329, Wynn, et al. |
| 5 | vs. Chanos. |
| 6 | Counsel, please come forward and state your appearance. |
| 7 | **MR. LANGBERG:**  Good afternoon, Your Honor, Mitchell |
| 8 | Langberg for Plaintiffs. |
| 9 | **THE COURT:**  Mr. Cirelli. |
| 10 | **MR. HAUSMAN:**  Good afternoon, Your Honor, Kenneth G. |
| 11 | Hausman on behalf of Defendant, James Chanos. |
| 12 | **THE COURT:**  Mr. Hausman. |
| 13 | And who else is here? |
| 14 | **MR. HAUSMAN:**  Gary Bostwick, my co-counsel from LA, and |
| 15 | an associate from our office, Julian Waldo, who worked on the |
| 16 | briefs. |
| 17 | **THE COURT:**  Welcome.  All right. |
| 18 | So Mr. Langberg, besides bringing Mr. Cirelli this |
| 19 | time -- |
| 20 | **MR. LANGBERG:**  Yes, Your Honor. |
| 21 | **THE COURT:**  -- what is there about the First Amended |
| 22 | Complaint that should change my analysis from before? |
| 23 | I understand that you didn't like my analysis before, and |
| 24 | I know that you provided a lot of context, I guess, in the |
| 25 | First Amended Complaint, but what -- I could be wrong -- I |

1    don't doubt that I make mistakes, so I could be wrong -- but is

2    there something new that I should really be focusing on with

3    respect to the motion to dismiss?

4        **MR. LANGBERG:**  Your Honor, yes.  And I'm going to start

5    by saying with respect -- I'm going to say usually I mean

6    something else, but for fear that in arguing -- I'm going to

7    have some intellectual debate with the Court, if that's okay.

8    Because I do think Your Honor was mistaken.

9        But if it was something we didn't think we could amend,

10   then we would have dealt with that with an initial appeal, and

11   we don't just amend complaints for, you know, a particular

12   reason.  We thought you gave us leave to amend that we could

13   make it better; we think we made it better.

14       We amended the complaint in three significant ways, Your

15   Honor.  One is that we provided context.  And I think that's

16   important.  While the moving papers suggest that that context

17   was argued in the prior briefing, and much of it was, the

18   context was presented in a factual manner in the complaint in a

19   manner that at least the facts of the context, that is, what

20   the nature of the audience was, what they understood about

21   Mr. Chanos or didn't understand about Mr. Chanos, those are

22   facts that should be accepted as true for purposes of the

23   complaint because they're plausible facts, given the context.

24       So we added more context.  That's important for reasons

25   that I'll express.

 1            Second, the initial complaint was admittedly threadbare,

 2     and it made an assertion that a statement was made.

 3            This complaint not only alleges that that's the

 4     reasonable understanding of readers, it also alleges that it

 5     implies a certain meaning.  And it also alleges that even if it

 6     were to be considered a statement of opinion, it was a

 7     statement of an opinion that was made on facts that were not

 8     disclosed.

 9            And then we talk about what those suggested facts are.

10            So those are three significant ways that the complaint

11     was amended.  And I think that they're ways that really matter,

12     notwithstanding that I think that the Court was mistaken the

13     first time around.  That is, that we certainly do repeat the

14     arguments that we made before because it's still in the

15     complaint, it's a new motion, but I think that the arguments --

16     the facts about the context are important, and they're

17     particularly important because the defendant, in his papers,

18     admit -- that is, when they're stating their facts about who

19     Mr. Chanos is and what he's famous for, they admit those same

20     facts, citing to our complaint, and they're critical to the

21     analysis, Your Honor.

22            What they say at paragraph -- well, page 2 of their 12(b)

23     motion and page 3 of their anti-SLAPP motion is that Mr. Chanos

24     is a famous short-seller, that, quote, short-selling is only

25     profitable if it is based on accurate information.

1    I'll pause for a moment.  Accurate information suggests

2    that the short-selling is successful only if it's based on

3    information that is true, which by definition means it's

4    something that's provably true or false.

5        And they go on to say that Mr. Chanos and his firm only

6    takes positions, quote, after conducting analysis and

7    investigations.

8        We agree.  These facts about these facts need to be read

9    into every statement that he makes in the subject area that he

10   is an expert.  When he is in front of an audience that is aware

11   of who he is -- and, by the way, in this context the transcript

12   reflects that people were reminded or informed about who he was

13   if they didn't know -- that this -- these facts that he's

14   famous for, that he's a short-seller, that it's important that

15   he trade on accurate information and that he only makes these

16   trades after doing a thorough investigation, need to be read

17   into anything that he says in this area of his expertise.

18       Well, that matters because then we come to what he said.

19   There's our view of how it would be interpreted and there is

20   their view and the Court's view of how it would be interpreted.

21   But either way, I think the result's the same on a 12(b) motion

22   or the defamatory-meaning part of the anti-SLAPP motion

23   analysis.

24       And, Your Honor, if it's okay, I'm just going to talk in

25   the world of 12(b) now, and if somehow something persuades you,

1    then I'll --

2         THE COURT:  I'll raise my hand and stop you.

3         MR. LANGBERG:  -- I'll leave the rest -- I'll turn to the

4    rest of the SLAPP portion.

5         THE COURT:  Okay.

6         MR. LANGBERG:  But I feel like what we're dealing here

7    right now is defamatory meaning.

8         THE COURT:  That's right.

9         MR. LANGBERG:  So again, having provided this context,

10   who does a reasonable listener understand Mr. Chanos is, what

11   do they know about him as they admit what he's famous for, and

12   then, what did he say?

13        To be clear, our perspective is he said, "Look, given

14   that there are --

15        I'm paraphrasing it to our meaning; right?

16        The words were that after he dug deep, became, quote,

17   concerned about the risk he was taking with his clients' money

18   under the FCPA.

19        We believe -- and our linguistics expert before did an

20   analysis, and to me, Your Honor, again, it suggests that if a

21   renowned linguistics expert has an interpretation that he

22   ascribes reasonable readers that apply, that that at least

23   creates a factual question.  It's at least a reasonable

24   interpretation that it's capable of that interpretation

25   reasonably.

1       So we think that that means that -- paraphrasing --
2   "Given the FCPA violations, I'm concerned about the risk I'm
3   talking with my clients' money."
4       But of course, Your Honor, if a company has violated the
5   FCPA, that doesn't mean your clients are going to lose money.
6   If you know that a company has violated the FCPA and you're an
7   investment adviser, there's a risk to your clients' money but
8   that FCPA violation that you -- Mr. Chanos -- have so carefully
9   analyzed and found out better than anybody, there's a risk that
10  it will be uncovered by others, perhaps investigators, and
11  therefore your clients would lose money.
12      Or just the mere fact that they might be uncovered and
13  there be an investigation might make your clients lose money.
14      But in our interpretation, Your Honor, which we believe a
15  reasonable one, the statement "I'm concerned about the risk I
16  was taking with my clients' money under the FCPA" is a
17  statement that my clients' money was at risk because the FCPA
18  has been violated.
19      But equally, if we're just talking about their
20  interpretation, the Court's interpretation -- which is really
21  there's a risk of an FCPA violation by which my clients might
22  lose money -- and view that as an opinion, in this context it
23  suggests that there are facts upon which that opinion is based
24  because he only trades based on finding information he believes
25  to be accurate and he only does it after an investigation.

1      So there's facts upon which that opinion is based that

2  were not disclosed.  It's not enough to say, "Oh, there was a

3  video there," it's not enough to say, "Oh, by the way, there's

4  junkets there" because that's not an FCPA violation.  They

5  haven't argued it is.

6      He said a lot of bad stuff about Wynn.  We knowledge it.

7  But when he has an opinion that his clients' money might be at

8  risk under the FCPA, he must disclose the basis for that.

9      **THE COURT:**  So when he has an opinion speaking at a

10  conference with a couple of other people, it's your position

11  that he needs to disclose everything on which that opinion is

12  based, otherwise a linguistics expert could tell me that your

13  client was being defamed?

14      Does that sort of sum it up?

15      **MR. LANGBERG:**  No, Your Honor.  I think -- I must have

16  said something that caused the Court to think I was merging two

17  parts.

18      So the linguistics expert is relevant to our straight

19  interpretation of it as a statement of false fact.  Okay?  That

20  is, he said there was a risk of his clients' money because the

21  FCPA has been violated.  It's false that the FCPA has been

22  violated.

23      I, not so gracefully, I think, transitioned to the

24  opinion argument, the interpretation of the words that the

25  Court and opposing counsel applies.

1    And what I'm saying, Your Honor, is that when somebody

2    states an opinion in a context, particularly when they have a

3    special expertise -- and we cited the case law and I'm going to

4    do my best not to regurgitate information, Your Honor; I can

5    tell you read the papers thoroughly.  So I'm really trying to

6    argue the applications to the law that you're familiar with.

7    And if there's a case that I need to bring up, I will.

8    But when somebody states an opinion, particularly when

9    they have special expertise in cases cited in our papers, that

10   suggests to the reader that there are underlying facts that

11   support that opinion that are not disclosed.

12   If those underlying facts, those assumed facts, are

13   defamatory, false, then there's a cause for defamation.

14   Case after case talks about this.  You don't look

15   literally at the words that are said; you look at what the

16   words mean and how they're understood.

17   By way of example -- and this is why I brought

18   Mr. Cirelli with me today, Your Honor, because -- and this is

19   by way of hypothetical -- I don't think Mr. Cirelli has ever

20   done anything wrong in his life.  As far as I know -- we worked

21   together at Brownstein -- I trust him implicitly.

22   But presume for the moment, Your Honor --

23   **THE COURT:**  I've had a case or two with Mr. Cirelli; I

24   know he's done wrong things before, so.

25   (Indiscernible background comment.)

1    MR. LANGBERG:  I was going to say maybe that's just the
2    only other time you were mistaken.
3        THE COURT:  Okay.  All right.
4        MR. LANGBERG:  So suppose for the moment that I have
5    expertise in attorney ethics and investigation and I'm talking
6    to a group of people.
7        And by the way, Your Honor, not just a few people --
8    which I'll come back to in a moment -- but I'm talking to a
9    group of people about lawyers making referrals to other
10   lawyers.
11       And these people know that I'm known for my expertise in
12   ethics and investigations.  Maybe I worked for the state bar at
13   some point.
14       And I say, "Look, I dug deep into San Francisco attorneys
15   like Mr. Cirelli and I'm concerned about the risks for my
16   clients under ethics rules for misappropriating funds."
17       I've said something there.  I have not just said, "In my
18   opinion, Mr. Cirelli's not a great attorney."  That's okay.
19   That's a straight opinion.  I have even -- I think I said
20   straight.  But I have facts that Mr. Cirelli has
21   misappropriated funds.  And it's a straight defamatory
22   statement.
23       But taking counsel's view that there's some sort of
24   opinion in the risk I'm taking with my clients' cases under
25   ethics rules for misappropriating funds, what I suggested,

1   given my expertise, is there's something I know that I haven't

2   told you that supports my opinion.

3       And there's a really good reason for this rule, Your

4   Honor.  Because people are free to speak their opinions.  It's

5   an absolute First Amendment right, yes, when they do it in a

6   way that is either a pure opinion or when it's based on facts

7   that give the facts to the listener so the listener themselves

8   can look at the information and decide whether they share that

9   opinion.  Particularly, again, when somebody has unique

10  expertise.

11      That's not what happened here.  And it wasn't just a few

12  people, Your Honor.  Of course we haven't had the opportunity

13  to do discovery, but we know a partial list that we provided to

14  the Court, and as you know from our papers, this was something

15  that was videotaped, there's a transcript from it being on the

16  Internet.  This is not just a few people.  This was something

17  that was available and highly -- even -- even in this limited

18  forum, it was highly publicized because this *Frontline*

19  presentation, or documentary that was going to come out, an

20  investigative report, it was there that this introduction was

21  posted on the Internet.  You've seen it, Your Honor.

22      I don't think we should minimize the situation that it's

23  just a few people.  We have to take the context so people

24  understand who Mr. Chanos is by his own admission.  Somebody

25  who bases his opinions on deep investigations and facts.

1       And then we can go further down the line as to actual

2   malice and falsity and those issues because, Your Honor, all of

3   these SEC filings -- for example, there's no evidence,

4   certainly not Mr. Chanos' deposition on the anti-SLAPP, no

5   evidence that could be presented on the 12(b) motion that he

6   ever looked at these things, that he based his opinion on these

7   things, let alone disclosed it to the audience, despite our

8   difference of opinion on what those things mean in relation to

9   what the defamatory statements are.

10      There's lots I can say about those things, Your Honor,

11  but no need until we get past the defamatory meaning piece or,

12  you know, if the Court's going to consider it then I could

13  argue the balance.

14      At the end of the day, whether the Court accepts our

15  interpretation with the linguistics expert giving at least his

16  expert opinion on how reasonable readers would understand it or

17  whether the Court considers the opinion argument and whether or

18  not the facts were disclosed, either way there's a defamatory

19  statement in there either express or implied.  And it is not

20  enough that Mr. Chanos was just speaking about his concern

21  about risk for his clients.

22      **THE COURT**:  And Mr. Hausman, deal just with the

23  defamatory statements.

24      **MR. HAUSMAN**:  With the defamatory.

25      Your Honor, to begin with, nothing has changed with what

1    Mr. Chanos said from the last time we were here.  The

2    transcript is the same.  And while the complaint adds a bunch

3    of legal conclusions, most of them on information, belief, pure

4    speculation with no facts on where the information or belief

5    comes from, it's all legal conclusions and it doesn't change

6    what Mr. Chanos said.

7         Counsel has said that there was discussion of FCPA

8    violations.  You can scour the transcript.  It's not there.

9    What he said, "I was" -- he was speaking in the past, asked why

10   did he get out of his investments in Macau casinos, and he

11   said, "I got concerned over the risk I was taking with clients'

12   money under the FCPA and the way business is done there."

13        That doesn't say there were FCPA violations.  It's the

14   risk of the FCPA.  That you're going to be investigated.

15   You're going to spend millions of dollars on an investigation.

16   You might be found in violation.

17        He never said it.  And the Court 's decision in December

18   found that.  He didn't imply it either, and the Court's

19   analysis in the last order said he didn't imply it.

20        So changing the allegation from he stated it to implied

21   was a difference without a distinction, or a distinction

22   without a difference.

23        As to whether Mr. Chanos read the SEC statement, they've

24   alleged it.

25        Look at paragraph 62, 70, and 71.  They said he's an

1    investor and he reads all these things and we have these SEC.

2    It's in their complaint that that says that he read them.  And,

3    in fact, it's information that was out in the public.

4         And remember, when they say "dug deeper," Mr. Chanos is

5    an investment adviser.  He looks at public documents, he looks

6    at the SEC's filings, he analyzes public documents.

7         If he had been the FBI and the DOJ, yeah, he might have

8    got in and taken people under oath and examined them and gone

9    through all their employees and produced all their documents.

10        Well, they know he didn't do that.  Because he would have

11   about on their premises and they would have told him to get out

12   of here.

13        I mean, it's illogical, it's not plausible to think that

14   he did more than look at publicly-available materials.

15        And in fact, if he's following the law, that's what he

16   did.  He didn't have inside information or have some

17   investigation, like they're trying to conflate that maybe he

18   went in there and really investigated and took each employee

19   and took depositions from him.  He didn't do that.  And that's

20   not plausible.

21        In terms of a falsity, though, this -- their statement

22   that he implied something or that it's an opinion based on

23   facts -- they call it a "mixed opinion," those are all

24   conclusions of law and don't change anything from what was here

25   in December.

1      And remember, as to falsity, they're not asking for

2  discovery.  The only place they ask for discovery in their

3  motion is on malice and on the common-interest privilege under

4  47(c).

5      They didn't ask for it on falsity or on opinion.  So the

6  Court could decide this case even without considering the

7  motion for discovery.  But the motion for discovery -- if you

8  want, I can address that later, why that's in firm.

9      So Your Honor, I would say there is no -- he never

10  accused anybody, he never stated that anybody violated the

11  FCPA, and he never implied that.  That should be the end of the

12  case here.

13      And in fact, if they're looking at context, he said -- he

14  actually came a little bit on their side.  He said, "Hey, they

15  might be adhering to all aspects of legal requirements.  They

16  might not be across the legal line, but I had concerns and I

17  couldn't get comfortable with it so we got out of our Macau

18  casino investments."

19      And remember, he's talking, in April of 2014, about a

20  sale he made in 2012, in May 2012, two years earlier, and he's

21  saying, "This is the reason I did it."  He's talking about his

22  opinion at that time about what was going to happen later.

23      It's clearly a forward look, it's clearly an opinion, and

24  he's just restating what it was.

25      **THE COURT:**  Okay.

1        Mr. Langberg, last try.

2        **MR. LANGBERG:**  Sure.

3        First, we don't call it "mixed opinion."  The United

4    States Supreme Court calls it "mixed opinion."

5        He looks at public documents.  The problem is, Your

6    Honor, is that's the very point.  That is the precise point.

7    His reputation is for looking at whatever he looks at -- I'm

8    not suggesting he has insider information --  and figuring out

9    things that others don't.  That's what Enron was about.  He was

10   the guy that figured it all out.

11       The problem is, is that when you state your opinion on

12   something that you're supposedly an expert on, that you have

13   dug deeper on, that you have researched and investigated, it

14   suggests to people that you have evidence to support that

15   opinion, particularly in the context where it's admitted.

16       So by not stating the basis, even if it was these SEC

17   filings, he deprives the listeners of the opportunity to look

18   at the facts and form their own opinion.

19       Perhaps if it was only based on these SEC filings that

20   he's never declared that he saw, perhaps then people would go

21   through and then they would say, "Oh, these are just standard

22   disclosures.  Everybody discloses everything.  It doesn't

23   really say anybody did anything.  It's talking about what some

24   director did in his own business enterprise and not here and I

25   don't reach the same conclusion."

1    But he didn't do that.  And that's exactly why the rule

2    is there.  Because when I say -- falsely -- that Mr. Cirelli,

3    there's a risk -- Mr. Cirelli dug deeper and I'm concerned

4    about my clients because of ethics rules for taking clients'

5    money, if I disclose the basis of my opinion because I heard it

6    from three -- you know, I heard it from my friend's gardener's

7    lawyer, then people go, "No."

8    If I state "Because I've been going through the books and

9    records, I've spoken to three of his former clients and they've

10   shown me where the transfers happen," then that has a different

11   effect on the listener.

12   By failing to give that information in that context, I

13   would be defaming Mr. Cirelli, just as Mr. Chanos defamed Wynn

14   here.

15   **THE COURT:**  All right.

16   Well, I appreciate your argument.  I've read the

17   statements, first with your motion for discovery back a while

18   ago, and then, again, before the motion last time, and again

19   before this one, and I will go back and I will read it one more

20   time with the -- with your example of Mr. Cirelli in mind and

21   the context arguments, and I'll get an order out as soon as I

22   can.

23   **MR. LANGBERG:**  Your Honor, may I address something that I

24   actually think is important in making the ruling?  And that is

25   we do have pending a motion to stay determination of this or

1    deny it pending an application for discovery.  And that is

2    relevant, as counsel said in our motion, to issues of actual

3    malice and also the privilege issue.

4        The last time Your Honor -- again, the Court not only

5    opined on the defamatory meaning issue but went on to opine on

6    the actual malice issue and falsity issue and the privilege

7    issue.

8        But I think under *Metabolite* Your Honor -- that's the

9    only case I'm going to cite right now.  I think that under

10   *Metabolite* that's not appropriate.  That is, I don't think

11   those factual issues, especially actual malice, which is

12   unique, the information is uniquely in the possession of the

13   defendant, I think *Metabolite* makes clear that the Court has to

14   consider even a SLAPP motion as a 12(b) unless it grants some

15   discovery, and therefore -- I mean, unless we're going to argue

16   the discovery issue, which doesn't sound like we should do now,

17   I think it would be inappropriate to rule on the factual issues

18   at this time.

19       THE COURT:  Okay.  I appreciate that.  I will take a look

20   at *Metabolite* in light of that.

21       MR. LANGBERG:  Thank you, Your Honor.

22       MR. HAUSMAN:  Your Honor.  I just ask one thing.  We have

23   spoken that our reply -- our opposition is due -- to their

24   motion for discovery -- they filed it four days after they

25   filed their opposition to this -- is due on Friday.  And we

1    talked about our getting an extension and the possibility of

2    how the Court might rule, that we might be wasting money by

3    filing a opposition on Friday.

4         Could we have, you know, a week or two weeks, or can we

5    get an open extension of time or something so we can wait and

6    see Your Honor's ruling before we oppose that?

7         THE COURT:  Mr. Langberg, you're fine with that?

8         MR. LANGBERG:  In light -- based on my -- assuming that

9    the Court is not going to rule on what I think are factual

10   issues, then I think there's no reason to oppose until after

11   the Court rules on the motion -- on this.

12        THE COURT:  So should we make it a week after the

13   motion -- after my order comes out?

14        MR. LANGBERG:  Yes.

15        MR. HAUSMAN:  That would be fine.  That would be fine.

16   And then I assume we'd get some guidance if, you know, or

17   granted we would know we would not and --

18        THE COURT:  Yes.

19        MR. HAUSMAN:  -- if it would warrant them, we would --

20   then we would know that we need to.

21        THE COURT:  Yes, I will do that.

22        MR. HAUSMAN:  Thank you, Your Honor.

23        THE COURT:  Okay.  Thank you very much.

24        (Proceedings adjourned at 2:46 P.M.)

25

## <u>CERTIFICATE OF CONTRACT TRANSCRIBER</u>

I, Kelly Polvi, CSR, RMR, FCRR, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further, that I am not financially nor otherwise interested in the outcome of the action.

Dated May 7, 2015.

_____
Kelly Polvi, CSR #6389, RMR, FCRR
Contract Transcriber

*Kelly Polvi, CSR, RMR, FCRR*
*P.O. Box 1427*
*Alameda, CA 94501*
*(503) 779-7406; kpolvi@comcast.net*